# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA,
## ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS,
OXFORD UNIVERSITY PRESS, INC.,
and SAGE PUBLICATIONS, INC.,

                Plaintiffs,

    - *v.* -

MARK P. BECKER, in his official
capacity as Georgia State University
President, et al.,

                Defendants.

Civil Action No. 1:08-CV-1425-ODE

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER

## PRELIMINARY STATEMENT

Defendants have moved the Court for a protective order, the effect of which would be to prevent Plaintiffs from obtaining evidence going to the heart of this lawsuit:  the facts underlying years of widespread, systematic, and ongoing acts of copyright infringement via Georgia State University's ("GSU") electronic reserves and other similar computer systems.  The impetus for the motion is Defendants' recent promulgation of a new copyright policy which is intended to replace a predecessor that was in place while the massive infringing conduct precipitating this lawsuit occurred.  Mistaking administrative form for copyright law substance, Defendants appear to contend that by the simple expedient of this switch in *policies*, GSU's infringing copyright *practices* have somehow been eliminated, or at least rendered nonjusticiable, thus barring further inquiry into them by Plaintiffs. The fundamental shortcoming of Defendants' position, however, is that the new policy has changed absolutely nothing.

What this lawsuit challenges is not the content of a given GSU (or statewide) copyright policy; it is, instead, years of disregard for Plaintiffs' and countless other publishers' copyright rights as evidenced by the unlawful display, copying, and distribution of their works thousands of times each month via electronic reserves and other computer-facilitated systems operated by GSU.  To the extent these

practices infringe Plaintiffs' copyrights, whether or not they took place in conformance with one or more GSU copyright policies is irrelevant.

Notwithstanding the massive nature of these ongoing infringements, it is now clear that the Board of Regents committee that developed the new policy giving rise to this motion gave no consideration to the extent, if any, to which that new policy will address and end the practices complained of in this lawsuit. And even though these unlawful takings of Plaintiffs' and other publishers' works continue unabated on the GSU campus, GSU has no present plans to remove even a single such work from its system, including several identified in Plaintiffs' Complaint that still reside on the system.

In these circumstances, Defendants' attempt through this motion to cut off discovery into "past practice"—insofar as that past practice is meant to encompass the activities that have given rise to this litigation—lacks merit. Not only does the new policy fail to address the acts of copyright infringement described in the Complaint; as we later describe, given the new policy's biased and inaccurate representations of copyright law, as well as its wholesale delegation to thousands of individual GSU faculty members of the legal determination as to which copyrighted materials require permission to be used in the classrooms, the new

policy is likely, if anything, to spawn even more infringements than have occurred to date.

Defendants' appeal to the Eleventh Amendment is similarly unavailing: the fact that the remedy in this case may be limited to prospective injunctive relief does not alter the relevance of prior activity at GSU or mean that discovery into such activity is similarly limited—particularly when Defendants have failed to provide any credible assurance that the ongoing pattern of infringement will change. In short, Plaintiffs remain entitled to the discovery needed to develop a full record relating to the Defendants' prior and ongoing acts of copyright infringement. Defendants' motion should be denied.

## STATEMENT OF FACTS

The Core Conduct at Issue

This copyright infringement action seeks declaratory and injunctive relief arising out of GSU's creation, hosting, maintenance, and control of a variety of online systems, including GSU's electronic course reserves system ("ERes"), electronic course management systems (Blackboard, uLearn, and WebCT/Vista) and various course and faculty web pages that have spawned over many years the unauthorized copying and distribution of Plaintiffs'—and numerous other publishers'—copyrighted works to students enrolled at GSU. *See* First Amended

Complaint for Declaratory Judgment and Injunctive Relief ("Am. Compl.") ¶¶ 1–5. These acts and practices have, in turn, enabled GSU students to view, download, print, copy, and distribute without limitation countless copyrighted works, also without the requisite authorization and appropriate compensation to the authors and publishers of those works and in violation of federal copyright law. *See* Copyright Act of 1976, 17 U.S.C. §§ 106(1) (reproduction right); 106(3) (distribution right); 106(5) (display right).

In numerous instances, GSU professors are using these distribution channels to provide students with copies of many, if not all, of the readings for numerous courses. This practice differs only in form from the hard-copy collections of course-related readings, commonly referred to as "coursepacks," that professors have assembled for years and enabled students to purchase through the university bookstore or local copyshop. Whereas, however, sales of hard-copy coursepacks are subject to licensing (or "permissions") fees from copyright owners or their agents, GSU and its professors are using ERes, uLearn, and the like to provide students with digital copies of the very same materials—de facto "electronic coursepacks"—without seeking or securing such permissions fees. Indeed, faculty at GSU have been advised to use ERes to allow students to freely copy selections from copyrighted works "instead of buying them printed at the bookstore"

4

precisely in order to avoid the cost of licensing.[1]  It is thus apparent that GSU's

ongoing unauthorized digital copying and distribution of Plaintiffs' and other

publishers' copyrighted materials is designed to and is enabling GSU students to

obtain reading materials for a given course without setting foot in a bookstore or

expending a single cent on the copyrighted materials that lie at the heart of the

educational experience.

Plaintiffs' Efforts to Avoid the Necessity of this Lawsuit

Before filing this lawsuit, Plaintiffs attempted to work cooperatively with

GSU to reform copyright practices on the GSU campus.  On April 18, 2007,

Plaintiffs' counsel, also acting on behalf of the Association of American

Publishers, Inc. ("AAP"), contacted GSU's then-president Carl V. Patton to alert

him to the pervasive and ongoing copyright infringement arising out of GSU's

unlicensed electronic distribution of copyrighted reading materials to students.  *See*

Letter from R. Bruce Rich to Carl V. Patton (April 18, 2007), (Krugman Decl. Ex.

C).  To underscore the seriousness of the matter, Plaintiffs appended a draft

Complaint to their letter, which identified with specificity the practices complained

---

[1] *See* email from Jim Palmour to Nancy Kropf (Oct. 31, 2006), Declaration of
Edward Krugman ("Krugman Decl.") Ex. A.  Notably, the use of print reserves at
GSU declined 30% the year that advice was given, while electronic reserve usage
increased 18%.  *See* "Action Plan 2007 Development," (Krugman Decl. Ex. B).

of, as well as a sampling of the extensive excerpts of Plaintiffs' copyrighted works that were being wrongfully copied and distributed to GSU students. The letter urgently requested that GSU contact Plaintiffs' counsel to discuss appropriate means of bringing these infringements to an end.

GSU effectively ignored this as well as several follow-up letters from the Plaintiffs. The sole substantive response received by Plaintiffs was a late July 2007 letter from GSU counsel reflecting the position that GSU's existing copyright practices were fully compliant with the law and failing to offer to discuss the matter further. *See* Letter from Kerry Heyward to R. Bruce Rich (July 20, 2007) (Krugman Decl. Ex. D); Plaintiffs' Response To Interrogatory No. 8 (summarizing pre-suit correspondence) (Krugman Decl. Ex. E).

Commencement of Litigation

The pervasive unauthorized digital distribution of copyrighted course readings at GSU continued unabated. During the spring 2008 semester, GSU students accessed over 4,300 works via the ERes system —a level of usage that has been consistent for the last several semesters. *See infra* pp. 13–14. Accordingly, Plaintiffs initiated this action on April 15, 2008. The Complaint cited numerous specific instances of copyright infringement that Plaintiffs believed to be indicative of an ongoing pattern and practice of infringement at GSU, including ongoing uses

of many of the same Plaintiffs' works as had been identified in the April 2007 draft Complaint earlier provided to the Defendants. Am. Compl. ¶¶ 19-27. The Complaint expressly sought an end to the widespread infringement of Plaintiffs' copyrighted works which was and still is taking place on the GSU campus through the electronic course material systems.

Defendants' Answer predictably contended that the challenged activities somehow qualify as "fair uses" under the copyright law. *See* Defs.' Answer ¶¶ 2, *et seq.* The Answer at the same time effectively acknowledged that Defendants facilitated the copying, display, and distribution of Plaintiffs' works without permission, *id.* ¶ 22, including those works specifically alleged by Plaintiffs to have been infringed, *id.* ¶¶ 22–27.

Plaintiffs fundamentally disagree with the notion that the fair use doctrine of copyright law—while concededly having proper application to certain discrete uses of limited excerpts of copyrighted works in the academic setting—properly can be utilized to provide a safe harbor from infringement claims for the kinds of massive and systematic takings of copyrighted works, and the creation of electronic coursepacks, that have occurred here. But that ultimate legal question is not now before the Court. Rather, the sole issue before the Court at this time is the effect, if any, of Defendants' new copyright policy on ongoing discovery in this case.

<u>The New State Copyright Policy</u>

Shortly after Plaintiffs filed suit, Defendants' counsel proposed a stay of litigation to enable GSU to consider revisions to its existing copyright policies in light of the concerns raised by the lawsuit. Plaintiffs expressed a willingness to consider such a stay but, particularly given GSU's pre-litigation posture, indicated that any such stay needed to be accompanied by certain basic understandings designed to promote meaningful changes in practice at the end of that process. *See* Letter from R. Bruce Rich to George S. Zier (May 30, 2008) (Krugman Decl. Ex. F). Ultimately, the parties could not agree on the terms under which such a moratorium could be implemented, and the litigation therefore proceeded.

Only in February 2009 did Plaintiffs learn that the State Board of Regents had proceeded on its own with a unilateral set of changes to its pre-existing copyright policies. Late in 2008, the Regents assembled a "Select Committee on Copyright," the avowed purpose of which was to "revisit" the existing "Regents Guide to Understanding Copyright and Educational Fair Use" ("Regents Guide"), which had been issued in 1997. At its lawyers' urging, and with the understanding that the resulting policy "will be used in [this lawsuit] and is extremely sensitive," the Committee rushed to complete its work by January 31, 2009, a sixty-day period from its inception. *See* email from William Potter to Beth Brigdon (Nov. 7, 2008)

(Krugman Decl. Ex. H); email from Beth Brigdon to Ray Lee (Jan. 8, 2009)

(Krugman Decl. Ex. I); Potter Dep. 114:13–21, March 9, 2009 (Krugman Decl. Ex.

J). The end result of this effort is a "Policy on the Use of Copyrighted Works in

Education and Research." *See* Krugman Decl. Ex. K. Notwithstanding that in

October 2008 the Regents had advised Committee members that the previous

Regents Guide "currently reflect[s] established principles of copyright law," and

therefore would not need to be "rewritten," *see* email from Burns Newsome to

Committee (Krugman Decl. Ex. G), just three months later the Regents scuttled the

prior policy completely in favor of its successor. *See* Potter Dep. 69:18–22 ("[The

University System of Georgia has] a new policy that supersedes . . . this guide.").

Defendants neither informed Plaintiffs about the ongoing work of the Select

Committee, nor invited Plaintiffs' input into its deliberations. Instead, on February

20, 2009, three days before the first deposition was scheduled to be taken by

Plaintiffs, Defendants' counsel informed Plaintiffs' counsel that the Defendants

had drafted and adopted a new copyright policy. *See* Letter from Kristen A. Swift

to Edward B. Krugman (Feb. 20, 2009) (Defs.' Mem. Ex. C). That letter also laid

the foundation for the instant motion, intimating that this development somehow

warranted a cessation of further discovery into GSU's "practices and procedures" prior to adoption of the new policy. *Id.*[2]

After reviewing the new policy, Plaintiffs advised Defendants that the policy on its face provided no basis for limiting discovery in the manner proposed. *See* Letter from R. Bruce Rich to Kristen A. Swift (Feb. 27, 2009) (Defs.' Mem. Ex. A). Plaintiffs did, however, accede to Defendants' request to postpone the scheduled depositions in order to learn more about the new policy—including, critically, what impact it might be expected to have on existing practices. To that end, Plaintiffs deposed two members of the Select Committee on Copyright – committee chairman William Gray Potter (University Librarian of the University of Georgia) and GSU Dean of Libraries Nancy H. Seamans. Those depositions served only to confirm that the new policy provides no meaningful relief from the practices that gave rise to this case, and accordingly warrants no change in the scope of discovery available to Plaintiffs in pursuing their legal claims.

The linchpin of the new statewide policy is a so-called Fair Use Checklist. *See* Krugman Decl. Ex. L. This checklist is to be filled out by faculty members

---

[2] That letter belatedly invited Plaintiffs to comment upon what was by then a *fait accompli*, a suggestion that, given the timing of the offer and the deeply flawed nature of the policy itself, Plaintiffs' counsel saw little point in pursuing. *See* Letter from R. Bruce Rich to Kristen A. Swift (Feb. 27, 2009) (Defs.' Mem. Ex. A).

with respect to each copyrighted work proposed to be made available to students via the ERes system. Disregarding entirely the nuanced balancing of considerations that underlies copyright fair use determinations, *see Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577–78 (1994), the checklist calls for faculty members to check off, within each of the four factors listed, those criteria believed to favor fair use and those believed not to support fair use. All criteria are to be given equal weight.[3] The straight numerical outcome of this process, factor-by-factor, and evaluating the factors overall, dictates whether copyright permission needs to be sought as to a given work or whether, instead, the professor believes herself free to distribute the work to her students without seeking such authorization. Potter Dep. 163:19–164:2; Seamans Dep. 150:21–151:3, March 10,

---

[3] By way of illustrating how this approach distorts the requisite fair use analysis, it is well recognized that a critical element in such analysis is whether the copying is "transformative," *e.g.*, constitutes criticism or parody, rather than simply serving to supersede the original. *Campbell,* 510 U.S. at 579. Defendants concede that no transformative purpose is served by ERes-type copying. Potter Dep. 155:16–156:16, 172:5–8; Seamans Dep. 154:3–14, 180:20–21. Yet, the transformativeness element is just one of *seven* listed under Factor 1 of the Fair Use Checklist as favoring fair use, each of which are to be given equal weight. Indeed, Defendants have also conceded that the mere use of Plaintiffs' works in the classroom setting will virtually assure that the Factor 1 checklist will result in a "favoring" fair use outcome even in the absence of any transformativeness. *See* Seamans Dep. 180:17–181: 18, 192:25–193:21. *See also id.* 196:11–23, 197:10–15. (similar outcome as to Factor 2 for published works of nonfiction).

2009 (Krugman Decl. Ex. M).[4]

In delegating sole responsibility for fair use analysis to individual faculty members, the Committee *never considered how those instructors would apply the policy in practice*. Potter Dep. 148:24–149:2 ("Q: So sitting here today, you really have no idea how individual faculty will apply [the "Fair Use Checklist"] in any individual situation? A: No."). Yet, neither the new policy itself, nor GSU's planned implementation of it, provides for any meaningful review mechanisms to determine the reasonableness of individual faculty determinations or assure some modicum of uniformity in application of fair use principles to thousands of copyrighted works. The Committee did not devise any process for university administrators or legal counsel to perform any review of instructors' assessments. *See* Potter Dep. 146:7–21, 168:12–20; Seamans Dep. 34:23–35:10, 115:8–16 (testifying that no "checks and balances" were put in place by Committee, and even opinion of legal department may not always trump faculty determination).

---

[4] Further anomalous results are invited by this formalistic math. It is widely recognized that Factor 4 of the fair-use analysis—calling for an assessment of the potential impact of the taking on the market for the publisher's work—is a critically important element in the overall appraisal as to fair use. *Harper & Row, Publishers., Inc. v. Nation Enters.,* 471 U.S. 539, 565 (1985). Yet, under the process envisioned by the new policy, a faculty member *is not even required to undertake an analysis of Factor 4* if his appraisal of the first three factors is that they—and hence a majority of the four factors—favor fair use. *See* Potter Dep. 169:14–22.

Accordingly, the GSU library staff, under Dr. Seamans' direction, has no plans to review faculty decisions or otherwise enforce the new policy.[5]  According to Dr. Seamans, "[T]here's not an enforcement mechanism. . . . [T]here are no copyright police out there . . . ."  Seamans Dep. 167:23, 168: 2.

Nothing contained in the new policy or associated with its proposed implementation suggests that the massive infringements of Plaintiffs' and other publishers' works giving rise to this lawsuit will diminish, let alone end. Discovery to date reveals that such activity is ongoing—and even increasing—at GSU.  Reports from the GSU library ERes system produced in discovery reveal that some 4,000 to 5,000 copyrighted works are posted to the system each fall and spring semester—numbers that have been fairly steady since 2005.  *See* ERes "Document Hit Report," (Krugman Decl. ¶ 16, Ex. N).  These same reports reveal that the works on the system are tremendously popular and have been collectively "hit" (i.e., accessed and viewed by students) as many as 127,000 times per semester.  Krugman Decl. ¶ 16, Ex. N.  (Only a month into 2009, some 2,400

---

[5] The one exception is the potential for a reserve desk attendant, who may be no more than a high school graduate, randomly to spot a proposed ERes posting that is "pretty egregious" such that it would "raise[] a red flag."  Seamans Dep. 35:15–36:6, 112:2–8, 113:19–114:3.  The only example Ms. Seamans could think of that might meet this "red flag" test would entail the proposed copying of an entire work.  *Id*. 36:9–18.

copyrighted works were already posted on GSU's ERes system for the Spring 2009

Term—and been "hit" a total of 28,625 times. Krugman Decl. ¶ 16, Ex. O.)

More than half of the excerpts specifically identified in the Complaint

remain available to students in current Spring 2009 courses, among some 2,400

other excerpts. *See id.* By way of example, two full chapters from Plaintiff SAGE

Publications' *Sage Handbook of Qualitative Research* are offered in conjunction

with the course "EPRS8500: Qualitative / Interpretive Research in Education I."

*Id.* The same two chapters were offered in the Fall 2007 semester for the same

course*,* and were cited in the Complaint. *See* Am. Compl. Ex. 1.[6] Additionally,

instructors at GSU continue to use ERes to create, copy, and distribute *de facto*

anthologies or "coursepacks" without paying the license fees required for such

activity. As of January 2009, the ERes offerings for some 30 courses each

contained twenty or more excerpts of Plaintiffs' works. Krugman Decl. ¶ 16, Ex.

O (January 2009 report labeled GSU007945.006). Of those, nearly ten courses

each offered collections of 40 or more excerpts. *Id.*

---

[6] Such examples reflect that even the objective components of the policies in effect prior to February 2009, despite being overly permissive, were ignored in practice. Those policies purported to ban the unlicensed offering of multiple chapters from one work for a given course and the use of the same excerpts from semester to semester. *Cf.* "Course Reserves—ERes Guidelines," (Krugman Decl. Ex. P); Email from Denise Dimsdale to Kim Reimann (Aug. 14, 2007) (Krugman Decl. Ex. Q) (stating archival of ERes material at end of semester is automatic).

The new policy does not expressly or even implicitly address these current practices, which lie at the heart of this litigation. Indeed, the Select Committee never gave consideration to the impact of the new policy on the practices giving rise to this lawsuit. Potter Dep. 148:16–19. Nor does GSU plan to review the material currently available on GSU's ERes system for compliance with the new policy. Seamans Dep. 100:1–5. It instead plans to allow for continued copying and distribution during the Spring 2009 semester—then let come what may as unchecked, instructor-generated fair use determinations are made on a going-forward basis. *Id.* 100:20–101:16.

## **ARGUMENT**

As described above, Defendants have purported to render inoperative their pre-existing copyright policies via an effectively standardless new policy and now seek to hide all practices under the former policy behind the veil of a protective order. Defendants' efforts to place relevant information beyond the reach of Plaintiffs should fail, as Defendants have failed to carry their burden of showing either how the new policy has remedied ongoing infringements (it has not) or why its terms are likely to do so (they are not). In other words, in practice, nothing has changed that bears on Plaintiffs' grievances or the relief they seek to abate their injury, so there can be no rationale for withholding relevant information on the

theory that changed circumstances have rendered "past" practice irrelevant.

Defendants' improper attempts to use the Eleventh Amendment tactically in order

to shut off discovery into relevant and highly probative topics bearing directly on

Plaintiffs' legitimate claims for prospective injunctive relief are of no avail.

Defendants' motion should be denied in all respects.

## I. PLAINTIFFS ARE ENTITLED TO FULL DISCOVERY RELATING TO ONGOING COPYRIGHT INFRINGEMENT AT GSU

### A. Defendants' Motion Should Be Denied For Failure to Comply With Rule 26(c)

As a threshold matter, Defendants have failed to comply with Federal Rule

26(c), which requires (1) a good faith conferral and (2) certification that such

efforts have been made before a party may seek a protective order under the Rule.

*See* Fed. R. Civ. P. 26(c); *Williams v. Art Inst. of Atlanta*, No. 06-CV-0285-

CC/AJB, 2006 WL 3694649, at *13 (N.D. Ga. Sept. 1, 2006).  No attempt was

made to confer on this subject, and no certification accompanied the motion.

Accordingly, Defendants' Motion should be denied on this ground alone.

### B. Defendants Improperly Seek to Withhold Information that is Relevant and Discoverable Under Rule 26(b)

Plaintiffs have been victimized by practices established, supervised,

facilitated, and encouraged by GSU and the Board of Regents over many years.

Those practices have enabled widespread unauthorized copying and distribution of

scores of Plaintiffs' copyrighted works.  Information concerning what has been

posted to EREs, course management systems, and faculty web pages, and how it

got there is clearly relevant under Rule 26 to this copyright infringement action.[7]

In an effort to evade that discovery, Defendants seek a protective order, the

asserted rationale for which is that Defendants have reformed practice on a state-

University-system-wide basis such that all that remains relevant—and the only

grievance to which Plaintiffs may be entitled to relief—relates to the impact that

the new policy may have on future takings of Plaintiffs' works.  But, as

established, Plaintiffs' claims are not predicated on the language of one or more

State of Georgia copyright policies—whether old or new.  They are instead based

on systematic infringements of Plaintiffs' exclusive rights under the copyright law

to authorize the distribution, copying, and display of their works.  *See* 17 U.S.C. §§

106(1), (2), (5).  Similarly, the relief sought by Plaintiffs is not solely a reform of

GSU's (or the State of Georgia's) copyright policies without regard to their actual

impact on infringing practice; rather, what Plaintiffs seek is an end to the kinds of

---

[7] Parties are entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  This "relevance" standard "encompasses the uncovering of information that will assist in defining or clarifying the issues in the case or that will illuminate issues upon which a trial court must pass . . . ."  6 James W. Moore, *et al.,* MOORE'S FEDERAL PRACTICE § 26.41 (2007).

unauthorized takings of Plaintiffs' works that are exemplified in the Complaint—by whatever means necessary to accomplish that end.[8]

As also established, while the Board of Regents may have promulgated a new policy, nothing on its face or in its apparent intent indicates that it will bring an end to the "past" practices that give rise to this litigation. Neither the chairman of the Select Committee nor GSU's head librarian could predict even a single outcome for a potential ERes posting of a given copyrighted work under the new Fair Use Checklist—let alone predict the aggregate impact of the policy on the unauthorized practices giving rise to this lawsuit. *See* Potter Dep. 175:24–176:16; Seamans Dep. 187:16–19, 198:14–16. That is not surprising as the new policy places all fair use determinations in the hands of over a thousand individual GSU faculty members. Objectively, there is even less reason for believing that meaningful change in infringing practice is at hand. The Fair Use Checklist is designed to tilt fair use determinations in favor of fair use outcomes (*see* supra, nn. 3–4). Moreover, no funding has been made available to faculty wishing to seek

---

[8] As the Complaint makes clear, it is not Plaintiffs' intent to foreclose either hard-copy or electronic use of their copyrighted works. GSU faculty and students can easily obtain the same copyrighted materials for use in their courses by the University's utilization of existing permissions and licensing systems designed to fairly and efficiently compensate copyright owners for licensed excerpts of their works. *See* Complaint ¶¶ 4, 39–46.

permission and pay license fees for material which they determine exceeds fair use boundaries. *See* Potter Dep. 143:9–144:1; Seamans Dep. 48:19–25. The practical consequence is that even the conscientious faculty member will be faced with the Hobson's choice of either paying the requisite permissions fees personally or not using the materials at all—scarcely an incentive to an impartial fair-use appraisal.

Is sum, the longstanding activities of which Plaintiffs complain are not "past" at all, but rather ongoing and likely to continue into the foreseeable future, and thus remain unquestionably relevant.

### C.  Governing Precedent Forecloses Defendants' Motion

Even if one accepted Defendants' flawed distinction between a past period governed by the old policy and current and future periods governed by the new policy (as opposed to the single pattern of consistent, ongoing and continuous infringement confirmed by the discovery process to date), information concerning such "past" practices would still be properly subject to discovery. As a matter of substantive copyright law, "an injunction is appropriate when there is 'a past infringement and a substantial likelihood of future infringement.'" *New World Music Co. v. Tampa Bay Downs, Inc.,* No. 8:07-cv-389-T-33TBM, 2009 WL 35184, at *9 (M.D. Fla. Jan. 6, 2009) (quoting *Pacific & S. Co. v. Duncan,* 744 F.2d 1490, 1499 (11th Cir. 1984)). Indeed, Plaintiffs must demonstrate that their

works have been infringed in the past before they are entitled to an injunction to "prevent or restrain" future infringement.  17 U.S.C. § 502(a).  *See also Peter Letterese & Assocs. v. World Inst. of Scientology Enters., Int'l,* 533 F.3d 1287, 1323 (11th Cir. 2008) (plaintiff must show it has suffered an irreparable injury to obtain injunction).

Given the fact that Plaintiffs here must show prior infringement by Defendants in order to "prove up" their claim for injunctive relief, discovery related to such infringement (particularly when it is ongoing) is unquestionably relevant—and routinely considered by courts considering whether an injunction is merited against official-capacity defendants.  *See Lynch v. Baxley,* 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction.")

Similarly, Defendants' assertion that Plaintiffs' claims may actually be moot because Defendants have adopted a new copyright policy, *see* Defs.' Mem. 16–17, is just as lacking in merit.  "Only when the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated are federal courts precluded from deciding the case on mootness grounds." *Bourgeois v. Peters,* 387 F.3d 1303, 1309 (11th Cir. 2004) (quoting *Christian Coalition v. Cole,* 355 F.3d

1288, 1291 (11th Cir. 2004)).  Indeed, even where a defendant has ceased its

infringement, courts will still look to its pattern of prior infringement to determine

whether an injunction is necessary, as it is "entirely too easy for an adjudicated

infringer to claim a reformation once the specter of a permanent injunction looms

near." *New World Music Co.,* 2009 WL 35184, at *10 (quotations omitted).[9]

As described in detail above, Defendants have failed to demonstrate that

there is no reasonable expectation that GSU's infringing practices will not be

repeated.  The mere publication of a new copyright policy—without any concrete

plans as to its implementation or evidence as to its likely effect on actual practice

among faculty—does not constitute the requisite proof that these wrongs will not

be repeated.  *See Bourgeois,* 387 F.3d at 1310, n.7.  Nothing has changed insofar as

the present availability of thousands of infringing excerpts and collections is

concerned.  *See* Seamans Dep. 100:1–5.  The new policy will not be implemented

at GSU until some time in the future, *see id.* 100:8–16; even when implemented,

there is no basis for believing that the practices complained of in this lawsuit will

end.  Under such circumstances, it can hardly be said that there is "no reasonable

---

[9] *See also Walt Disney Co. v. Powell,* 897 F.2d 565, 568 (D.C. Cir. 1990)
(upholding view of cessation of infringement "in a . . . Machiavellian light");
*Mattel, Inc. v. Robarb's, Inc.,* No.00 Civ. 4866, 2001 WL 913894, at *3, *6
(S.D.N.Y. Aug. 14, 2001) (in light of a pattern of infringement, courts are "entitled
to consider [cessation] skeptically").

expectation" of repeated injury to Plaintiffs from the infringing conduct that took place under the Board of Regents Guide, is taking place now, and likely will continue to take place when the new policy is eventually implemented.

The cases on which Defendants rely are inapposite because they involve situations in which the plaintiffs specifically sought to enjoin the enforcement of particular state policies. When the challenged policies were altered in a fashion that addressed the concerns, without any suggestion they would be re-instituted, the claims—which were squarely premised on those policies—were deemed moot. *See* Defs.' Mem. at 16-17 (citing *Students for a Conservative Am. v. Greenwood,* 378 F.3d 1129, 1130 (9th Cir. 2004) (provisions of university election code); *Comm. for the First Amendment v. Campbell,* 962 F.2d 1517, 1519 (10th Cir. 1992) (suspension of showing of controversial film and prior restraint policies); *Marcavage v. West Chester Univ.,* No. 06-CV-910, 2007 WL 789430, at *1 (E.D. Pa. Mar. 15, 2007) (policy on dissemination of literature on campus)). The instant case is distinguishable because the conduct complained of is not the contents of a copyright *policy*, but rather ongoing infringing *practices*, whether occurring in conformance with one or more state policies or not.

In short, evidence of infringing practices at GSU over the past several years—often in excess of stated policy—bears directly on the likelihood that

infringement will happen again, regardless of what policy is in place, and shows that Plaintiffs face an "immediate threat of repeated injury." *Lynch*, 744 F.2d at 1456. Such evidence is quite simply at the core of the discovery to which Plaintiffs are entitled under the Federal Rules, regardless of how the conduct in issue is categorized.

## II. THE ELEVENTH AMENDMENT DOES NOT BAR THE DISCOVERY PLAINTIFFS SEEK

Defendants fare no better in their arguments for a protective order by reference to the Eleventh Amendment.[10] Plaintiffs do not dispute that state sovereign immunity may bar a suit for damages against a state, or that in a suit against state officials, a plaintiff must allege an ongoing injury that can be remedied by an injunction rather than merely seeking damages for past behavior. *See Summit Med. Assocs., P.C. v. Pryor,* 180 F.3d 1326, 1337 (11th Cir. 1999) (considering whether plaintiffs had sufficiently alleged an ongoing and continuous violation of federal law, such that the court had jurisdiction to enjoin future

---

[10] Defendants' lengthy discussion of state sovereign immunity is largely academic here, where Plaintiffs have in fact sued individual state officers for prospective injunctive relief, precisely the type of action permitted pursuant to 100 years of case law stemming from *Ex parte Young*. *See* Defs.' Mem. at 13–14.

enforcement of certain Alabama abortion statutes). [11]  But the Eleventh

Amendment does not afford state officials the tactical advantage Defendants now

seek to gain by sharply curtailing the scope of discovery.

Plaintiffs have amply satisfied the legal requirement to allege an "ongoing

and continuous violation[] of federal law"  by pointing to specific instances of

infringement perpetrated by Defendants and their agents.  Am. Compl. ¶¶ 22–27.

And even at this early stage of the case, Plaintiffs have offered evidence that the

complained-of conduct is ongoing, notwithstanding the publication of a new

policy.  *See supra* pp. 13–14.  More to the point, the discovery Plaintiffs seek—and

which Defendants desire to block—is precisely the discovery necessary to reveal

that the infringing behavior of which Plaintiffs complain is indeed "ongoing and

continuous."  The relevance of such discovery is self-evident.  Moreover, as

discussed above, in determining whether such an injunction should issue, courts

routinely consider evidence of such practices as probative of the likelihood of

future violations, regardless of the Eleventh Amendment.  Defendants' argument

---

[11] Defendants repeatedly quoted the *dictum* from *Summit* that "a plaintiff may not use the doctrine [of *Ex parte Young*] to adjudicate the legality of past conduct." Defs.' Mem. at 14, 15, 17.  But the quoted language was offered by the *Summit* court simply as a rephrasing of the "ongoing and continuous" requirement for injunctive relief on the merits.  *Summit,* 180 F.3d at 1337.  The *Summit* case in no way asserts that prior infringements are irrelevant or non-discoverable.

that Plaintiffs "may not . . . adjudicate the legality of past conduct . . . confuses liability with remedy. Although Plaintiffs' allegations are rooted in events that occurred in the past, the injunctive and declaratory relief that they seek would prevent future and ongoing illegality. The Eleventh Amendment poses no bar to Plaintiffs' claims . . . ." *Porter v. Jones,* 319 F.3d 483, 491 (9th Cir. 2003).

In the end, Defendants' sovereign immunity arguments are premised on a misapplication of Eleventh Amendment: while the *remedy* available against state officials is limited to a prospective injunction, that does not mean that *discovery* is similarly limited to prospective activities at GSU. Applying such a standard to discovery would make it impossible for plaintiffs to gather the evidence required to prove the necessity of injunctive relief. As Defendants have failed to prove that the new policy will change a thing, Defendants' "past" practices— properly understood as part of an ongoing and continuous stream of infringement—remain highly relevant to, and probative of, the likelihood that such activity will continue and require the requested injunctive relief consistent with *Ex parte Young.*

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion.

Respectfully submitted this 3rd day of April, 2009.

/s/ Edward B. Krugman
Edward B. Krugman
Georgia Bar No. 429927
John H. Rains IV
Georgia Bar No. 556052

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
krugman@bmelaw.com
rains@bmelaw.com

R. Bruce Rich (*pro hac vice*)
Randi Singer (*pro hac vice*)
Todd D. Larson (*pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
r.bruce.rich@weil.com
randi.singer@weil.com
todd.larson@weil.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document was prepared in Times New Roman 14 point font.

/s/ Edward B. Krugman
Edward B. Krugman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served via hand delivery **PLAINTIFFS'**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**

**MOTION FOR PROTECTIVE ORDER** on the following attorneys of record:

Anthony B. Askew, Esq.
Stephen M. Schaetzel, Esq.
Kristen A. Swift, Esq.
King & Spalding
1180 Peachtree Street
Atlanta, Georgia 30309

Mary Jo Volkert, Esq.
Assistant S. Attorney General
40 Capitol Square
Atlanta, Georgia 30334


This 3rd day of April, 2009.


<u>/s/ Edward B. Krugman</u>
Edward B. Krugman