# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA,
## ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS,
OXFORD UNIVERSITY PRESS, INC.,
and SAGE PUBLICATIONS, INC.,

                Plaintiffs,

       - *v.* -

MARK P. BECKER, in his official
capacity as Georgia State University
President, et al.,

                Defendants.

Civil Action No. 1:08-CV-1425-ODE

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR PROTECTIVE ORDER

552086.1

Dockets.Justia.com

## PRELIMINARY STATEMENT

In this copyright infringement action, Plaintiffs seek declaratory and injunctive relief arising out of GSU's use of various online systems—including its electronic course reserves system ("ERes") and online course management system ("uLearn")—to unlawfully copy and distribute Plaintiffs' copyrighted works without permission. Throughout this litigation, Plaintiffs have sought discovery into a limited number of topics that are and continue to be vital to the adjudication of their claims and to their entitlement to prospective relief. [1]

As previously explained,[2] seven months into the discovery process (which began in July 2008), Defendants informed Plaintiffs that the University System of Georgia Board of Regents had secretly and unilaterally revised its copyright policies. *See* Pls.' Opp'n Br. at 8–10. Defendants coupled this disclosure with

---

[1] Plaintiffs' discovery requests have largely been directed to: (1) the extent and nature of the unauthorized copying and distribution of Plaintiffs' works at GSU, which—by Defendants' own admission—is ongoing as of the date of this filing; (2) the nature of the ERes and uLearn systems and their use by GSU faculty, staff, and students; (3) the administrative and technical oversight of ERes and uLearn, including the persons responsible for such oversight; and (4) the University System of Georgia's new copyright policy itself, including its creation and planned implementation and what, if any, effect it has had on GSU's practices relating to the digital distribution of course materials.

[2] Plaintiffs incorporate by reference herein all of the arguments and evidentiary proffers made in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Protective Order, April 3, 2009, Docket No. 61 ("Pls.' Opp'n Br.").

their initial attempt to foreclose discovery into longstanding practice under the pre-existing policy, which this Court denied without prejudice. *See Cambridge Univ. Press, et al, v. Becker, et al,* Civ. Action No. 1:08-CV-1425-ODE (Docket No. 83, Order dated April 27, 2009) ("Order").

Defendants have now filed a Renewed Motion for a Protective Order,[3] once again burdening the Court by requesting relief to which Defendants simply are not entitled. For one, the mandate of the Federal Rules is that Plaintiffs be afforded discovery into topics that are reasonably calculated to lead to admissible evidence. The new policy provides no reason to assume that the longstanding pattern of copyright infringement at GSU will change or diminish such that it can simply be declared irrelevant under that broad standard. Indeed, the deposition testimony given by GSU faculty and staff in the past several weeks only underscores that GSU's unauthorized and infringing uses of Plaintiffs' works continue unabated under the auspices of the new policy.

For another, Defendants have failed to provide the Court with "specific details supporting the allegation that inquiry into Georgia State's past practices" has been, or will be, "burdensome." Order at 3. To the contrary, the discovery that

---

[3] Defendants Renewed Motion for Protective Order and Memorandum of Law in Support Thereof, May 4, 2009, Docket No. 87 ("Defs.' Renewed Mot.").

has been conducted to date has been focused on relevant subject matter, and has not been burdensome to the limited extent it has explored what the Defendants misportray as their "past practices."

What is more, as a result of communications which Plaintiffs invited long before Defendants rushed to the courthouse, the parties have now entered into a series of agreements concerning the scope of remaining discovery that obviates the need for the Court to expend judicial resources on Defendants' motion, the sole conceivable impact of which would be to modestly limit the scope of questions in a handful of remaining depositions. Thus, even putting to one side the dubious import of the new policy on pre-existing practice, Defendants' stated concerns over ostensible burdens associated with remaining discovery now amount to a theoretical argument that has little practical impact on remaining discovery in the case.

Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motion and allow the parties to complete the limited amount of discovery remaining in accordance with the longstanding policies of the Federal Rules.

## ARGUMENT

### I.  PLAINTIFFS ARE ENTITLED TO DISCOVERY INTO GSU'S PAST AND PRESENT COPYRIGHT POLICIES AND PRACTICES

Defendants have given the Court no reason to treat Defendants' pre-policy conduct as different from its post-policy conduct. Both are highly relevant and probative in this case, and both are discoverable as part and parcel of an ongoing and continuous pattern of copyright infringement at GSU. Even had the new policy brought about a departure from past copyright practice, Defendants' proposed discovery limitation would be unwarranted in light of the scope of discovery authorized by the Federal Rules. But given what the record now reveals—that the new policy has not materially changed GSU's copyright practices at all—a protective order shielding examination into GSU's past practice is all the more inappropriate.

### A.  GSU's Past Practices are Relevant to Plaintiffs' Claims for Prospective Equitable Relief

This case is about widespread and consistent disregard in *practice* of the copyrights of Plaintiffs and countless other publishers. Discovery has revealed that the terms of the prior policy were routinely violated and evidence that GSU failed to enforce its relatively lax policy in the past is relevant to the question of the extent to which the newly enacted policy, which lacks even the most basic

compliance safeguards, will be enforced, if at all. Moreover, deposition testimony demonstrates that some of the very works cited in the complaint are still being distributed even under the new policy.

Whether or not the Regents' new copyright policy is likely to impact the reality of electronic course material distribution at GSU, there is no question that the University's historic practices are relevant to Plaintiffs' claims for prospective equitable relief. That Plaintiffs do not seek monetary damages for that conduct is immaterial – *i.e.,* the fact that their *remedy* is limited to prospective injunctive relief does not mean that the body of relevant evidence bearing on the necessity for such relief is likewise limited to prospective activities. "Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction." *Lynch v. Baxley,* 744 F.2d 1452, 1456 (11th Cir. 1984) (suit for injunctive relief against Alabama state officials).

Indeed, as discussed in Plaintiffs' response to Defendants' first motion, substantive copyright law requires that Plaintiffs prove "a past infringement and a substantial likelihood of future infringement" in order to obtain an injunction. *New World Music Co. v. Tampa Bay Downs, Inc.,* No. 8:07-cv-389-T-33TBM, 2009 WL 35184, at *9 (M.D. Fla. Jan. 6, 2009) (quoting *Pacific & S. Co. v. Duncan,*

744 F.2d 1490, 1499 (11th Cir. 1984)).  *See also Peter Letterese & Assocs. v. World Inst. of Scientology Enters., Int'l,* 533 F.3d 1287, 1323 (11th Cir. 2008). Plaintiffs are thus entitled to take discovery pertinent to establishing GSU's acts of past infringement as a basic facet of their case and part of their eventual entitlement to prospective injunctive relief.  *See generally* Fed. R. Civ. P. 26(b)(1) (Plaintiffs entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense").

> **B.** **Litigation-Inspired Reformation of Practice Does Not Relieve the Defendant of its Discovery Obligations Relating to Prior Practice, Nor Does It Moot Plaintiffs' Claims for Injunctive Relief**

Were litigants' purported self-imposed changes in practice sufficient to avoid discovery and/or the ultimate resolution of civil disputes, defendants would routinely circumvent the court system and evade judicial review of their wrongful conduct simply by claiming to have reformed their practices.  Regardless of whether GSU's new policies are likely to bring about a cessation of infringing activity (as we discuss below, they are not), absent an injunction in this case defining the circumstances in which GSU hereafter may use, and authorize faculty and students to use, Plaintiffs' copyrighted materials without their permission, GSU would be free upon termination of this litigation to either repeal those policies or simply decline to enforce them, rendering the purported reformed

practice a sham. Courts will not countenance such an outcome, as it would otherwise be "entirely too easy for an adjudicated infringer to claim a reformation once the specter of a permanent injunction looms near." *New World Music Co.,* 2009 WL 35184, at *10 (quotations omitted).

This principle is no less relevant to an action for injunctive relief against government officials in their official capacities. Contrary to Defendants' implications, claims alleging that government policies are contrary to federal law are not rendered moot simply because officials propose to change those policies during litigation. *Region 8 Forest Secv. Timber Purchasers Council v. Alcock,* 736 F. Supp. 267, 274 (N.D. Ga. 1990) (Evans, J.). As this Court found in *Alcock,* official capacity defendants "fulfill their heavy burden of establishing that the alleged violation is reasonably likely not to recur [when] the events that are alleged to have made the action moot have 'completely and irrevocably eradicated the effects of the alleged violation.'" *Id.* (citation omitted). Defendants here have not fulfilled that heavy burden; no action taken by the Defendants to date amounts to an effective discontinuance of the unlawful conduct at issue here.

To the contrary, the very vagueness, lack of substance, and absence of oversight inherent in the new policy, *see* Pls.' Opp'n Br. at 10-15, makes it highly likely that the new policy will by and large simply perpetuate old practice. In these

circumstances—where the new policies relied upon by official capacity defendants are alleged to "suffer many of the same . . . defects" as the old policies—claims for injunctive relief related to those defects are not moot. *Alcock,* 736 F. Supp. at 274. It logically follows, then, that discovery relating to such claims is appropriate.

None of the precedent cited by Defendants contravenes this conclusion.[4] As discussed at length in Plaintiffs' prior response papers, even under the standards set forth in the cases Defendants themselves cite, Defendants have not met the burden of showing that Plaintiffs' claims are moot simply by virtue of having enacted a new copyright policy. *See* Pls.' Opp'n Br. at 20–23. Defendants' continued reliance on out-of-context language from *Summit Medical Assocs., P.C. v. Pryor,* 180 F.3d 1326, 1337 (11th Cir. 1999), is especially misplaced. In that case, the

---

[4] The cases cited by Defendants involve defendant officials who committed to cease *specific activity*. The claims in those cases related to the enforcement of a discrete rule or a similar "one-off" action, which was held unlikely to recur in light of the policy changes cited by the officials. *See Students for a Conservative Am. v. Greenwood,* 378 F.3d 1129, 1131 (9th Cir. 2004) (defendants entered into an agreement not to reenact policies that were the express bases for plaintiffs' claims); *Comm. for First Amendment v. Campbell,* 962 F.2d 1517, 1524 (10th Cir. 1992) (defendants "effective[ly] discontinu[ed]" the challenged practices concurrently with issuance of new policy, and continuing activities cited by plaintiffs were "somewhat dissimilar" to those initially complained of). Here, Plaintiffs allege an ongoing and continuous pattern of copyright infringement, which is not based on any one policy or guideline. Violations of an *identical* nature to those cited by Plaintiffs in their complaint occurred after February 2009, and are likely to continue.

Eleventh Circuit found that plaintiffs *had* sufficiently alleged an ongoing and continuous violation of federal law by showing that there was "a threat of future enforcement [of the statute at issue] that may be remedied by prospective relief." *Id.* at 1338. In evaluating the existence of a future threat, the *Summit* court relied in part on evidence of *past* statements made by the state Attorney General. *Id.* at 1339, n.10. Plainly, nothing in *Summit* bars the Court from considering evidence of past conduct in evaluating the likelihood such conduct will continue into the future.

### C. The Ongoing and Continuous Nature of the Practices Underlying Plaintiffs' Claims Further Mandate Denial of the Motion

Plaintiffs' entitlement to the remaining discovery they seek is made all the more manifest by the evidence demonstrating that the new policy will do little to abate, let alone bring to an end, the massive infringing conduct that underlies this action.

As discussed at length in Plaintiffs' prior response, the only change in practice at GSU that can be reasonably expected going forward is that University and Regents officials will engage in even *less stringent* enforcement of copyright standards than they did before February 2009. *See* Pls.' Opp'n Br. at 12–13. Deposition testimony given since the filing of that response further supports this view. For instance, where they were formerly *required* to screen faculty

submissions for compliance with the "20% rule" as a matter of course, staff are now merely *encouraged*, on a voluntary and sporadic basis, to "raise a red flag" if a given posting appears improper. *See* Deposition of Marjorie Denise Dimsdale, May 13, 2009 ("Dimsdale Dep.") at 56:6–7, (Accompanying Declaration of Edward B. Krugman ("Krugman Decl.") Ex. A). Moreover, the relevant library staff members have been given no guidance as to what constitutes a "red flag," and have developed no concrete standards as to which excerpts can or should be referred to University legal counsel. *See id.* at 58:20–24, 61:5–62:10. Three months after the new policy was implemented, Ms. Dimsdale could not recall the substance of any copyright training and did not recall ever seeing the written training material supposedly used. *See, e.g., id.* at 13:14–15, 100:5–9, 116:23–24. Predictably, then, in considering the works posted for the currently ongoing "Maymester" and the Summer 2009 semester, Ms. Dimsdale was not aware that a *single* "red flag" had been raised. *Id.* at 64:3–11. Additionally, Ms. Dimsdale indicated that as of mid-May the library staff had not yet deleted all of the links to excerpts from course pages for the Spring 2009 semester, and that even once that operation was completed the works themselves would remain on the ERes server. *Id.* at 40:1–3, 42:8–11. It is thus likely that many of the *exact same* infringing

excerpts specifically identified in the Complaint are still being distributed via ERes *right now* and can be easily re-posted in the future. *See* Pls.' Opp'n Br. at 13–14.[5]

The recently-conducted deposition testimony of Professors Jodi Kaufmann and Diane Belcher further supports the conclusion that the Checklist will—by leaving instructors to their own devices—in fact do very little to change the widespread infringing use of ERes at GSU. For instance, in evaluating her proposed syllabus for the *currently ongoing* Maymester, Professor Kaufmann used the Checklist to analyze each course reading she had offered without permission via ERes during the Summer 2007 semester. *See* Deposition of Jodi Kaufmann, May 6, 2009 ("Kaufmann Dep.") at 48:23–49:3 (Krugman Decl. Ex. B). Her Summer 2007 ERes offerings had included multiple complete chapters from the *SAGE Handbook of Qualitative Research* amounting to some 187 pages, as well as a number of other copyrighted works. *See* "Qualitative / Interpretive Research in Education I" Summer 2007 Syllabus, Doc. No. GaState0003766–75 (Krugman Decl. Ex. C). Many of these same excerpts had also been posted at Professor Kaufmann's request for other semesters, and were cited in Plaintiffs' Complaint. *See* Am. Compl. at Ex. 1. Using the Checklist, Professor Kaufmann concluded

---

[5] Defendants admitted as much in their motion papers when they acknowledged that Plaintiffs' Requests for Admission related to "[materials] posted on ERes (from 2005 *to the present*)." Defs.' Renewed Mot. at 4 (emphasis added).

that *every single one* of these excerpts could lawfully be distributed without permission via ERes. Kaufman Dep. at 56:10–15. None of them so much as presented a close call. *Id.* Professor Kaufmann's view of fair use remained unchanged until she received input from GSU's legal counsel Cynthia Hall, who advised Professor Kaufmann that to be "safe," her ERes postings should, in the aggregate, represent no more than 10% of any one complete original work. *Id.* at 37:2–4. Such a guideline, in addition to being legally unfounded,[6] is nowhere to be found in the Regents' new policy. Nor does it appear to be part of the formal training provided to GSU professors (other than those whose depositions have been noticed). *See* Cynthia Hall, PowerPoint Presentation dated Feb. 23, 2009, Doc. No. GaState0021120-48 (Krugman Decl. Ex. D).

Similarly, Professor Belcher concluded that the two full chapters from Cambridge University Press' *Focus on the Language Classroom* (amounting to some 35 pages) which she offered via ERes as recently as the Spring 2009 semester could, under the new policy, continue to be offered via ERes without

---

[6] *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 564 (1985) (finding taking that is "[i]n absolute terms . . . an insubstantial portion" of the whole to nonetheless infringe the copyright in the original); *Princeton Univ. Press v. Mich. Document Servs., Inc.,* 99 F.3d 1381, 1389 (6th Cir. 1996) (finding takings of as little as 5% of a work to be "not insubstantial"); *Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F. Supp. 1522, 1527 (S.D.N.Y. 1991) (finding takings of as little as 5% to "weigh[] against defendant").

payment of license fees. "Practicum in ESL/EFL Teaching" Spring 2009 Syllabus,

Doc. No. GaState0046249–59 (Krugman Decl. Ex. F); Deposition of Diane

Belcher, May 7, 2009 ("Belcher Dep.") at 110:21–25 (Krugman Decl. Ex. G).

Professor Belcher determined that every single one of the fair use factors, as

represented on the Checklist, weighed in favor of her unlicensed taking. Belcher

Dep. at 92:6–110:25. Professor Belcher's determination that her ERes usage did

not impermissibly harm the market for Plaintiffs' works was apparently unaffected

by her realization that the directly analogous use of the same material in a hard

copy coursepack would require the payment of permissions fees, and that ERes had

almost entirely replaced licensed coursepacks at GSU. *Id.* at 53:4–9, 54:5–7.

Professor Belcher testified to the ingrained "culture" at GSU favoring unlicensed

distribution of electronic course materials, *see id.* at 53:8–9.[7]

---

[7] That sentiment is reflected in the communications of other GSU staff who assisted instructors in using ERes specifically to avoid the payment of license fees. *See* Email from Jim Palmour to Nancy Kropf, Oct. 31, 2006, Doc. No. GaState0004844-45 (Krugman Decl. Ex. H); Email from Marian Meyers to libreserves@langare.gsu.edu, Jan. 2, 2007, Doc. No. GaState0003395 (Krugman Decl. Ex. I).

## II. PLAINTIFFS' DEPOSITIONS AND DOCUMENT REQUESTS HAVE SOUGHT RELEVANT INFORMATION AND HAVE NOT BEEN BURDENSOME

Contrary to Defendants' assertions, the discovery Plaintiffs have conducted to date has focused on facts that are entirely relevant to Plaintiffs' claims of copyright infringement, including what, if any, changes in practice can be expected at GSU under the new policy. Plaintiffs have deposed seven witnesses—four members of the GSU staff who have direct involvement in the operation and oversight of ERes (including GSU's head librarian Nancy Seamans), the chair of the committee responsible for drafting the Board of Regents' new copyright policy, and two GSU professors who have extensively used (and will continue to use) ERes to distribute course reading material. None of the depositions has consumed the seven-hour limit and the professor depositions lasted less than half a day each.

Shortly after receiving notice from Defendants' counsel that the Board of Regents had introduced a new copyright policy, Plaintiffs deposed the chairman of the committee that drafted that policy, Dr. William Potter. *See generally* Deposition of William Potter, March 9, 2009 ("Potter Dep.") (Krugman Decl. Ex. J). Dr. Potter's testimony dealt extensively with the process that led to the promulgation of the new policy, including what prior documents might have informed the committee members' understanding of copyright law, and how the

new policy differed from prior guidelines. *See, e.g., id*. at 68:24–72:13, 76:13–88:25, 91:5–99:23.[8] At that, Defendants cite to at most nineteen pages of testimony on so-called "past practices" of the roughly 200 total pages comprising Dr. Potter's deposition—less than 10% of the full examination. *See* Defs.' Renewed Mot. at 5–6.

Plaintiffs next deposed Dr. Nancy H. Seamans, the head librarian at GSU and a defendant in this case. As with Dr. Potter, Plaintiffs asked Dr. Seamans for her insight into the development of the Regents' new policy, and her plans to implement the policy at GSU. *See, e.g.,* Deposition of Nancy H. Seamans, March 10, 2009 ("Seamans Dep.") at 21:2–38:20, 60:17–65:8 (Krugman Decl. Ex. K). Plaintiffs also spent a substantial portion of the deposition exploring Dr. Seamans' perspective on the Fair Use Checklist, which is the central feature of the new policy.[9] *See, e.g., id.* at 150:10–167:7.

---

[8] Dr. Potter was asked a limited number of questions regarding a University of Georgia copyright policy that dated back to 1992, in order to assess the extent to which the document may have informed his thinking in drafting the new policy. *See* Potter Dep. at 43:11–54:6. It bears noting that—even though the 1992 document had been superseded by other official publications—Dr. Potter considered it to reflect the current University of Georgia copyright policies "in general." *Id.* at 46:3-5.

[9] *See* Pls.' Opp'n Br. at 10–13.

Insofar as Dr. Seamans testified that she was largely unfamiliar with the day-to-day management of the ERes system, (*id.* at 13:3–17, 92:3–8), in order to obtain this information, Plaintiffs deposed two GSU library staff members:  Associate University Librarian for Learning and Technology Initiatives Laura Burtle, and Library Associate Marjorie Denise Dimsdale.  Additionally, Plaintiffs deposed Information System Specialist Lead James Palmour, who has spent years maintaining the computer software and hardware underlying the ERes system, assisting faculty with ERes postings, and—until January 2009—making digital copies of works posted on ERes.  Deposition of James Palmour, April 23, 2009 ("Palmour Dep.") at 19:11–13 (Krugman Decl. Ex. L).  Each witness testified as to his or her current role in providing electronic course material systems at GSU, as well as how that role has evolved over time.  *See, e.g.,* Palmour Dep. at 18:11–54:7; Deposition of Laura Burtle, April 24, 2009 ("Burtle Dep.") 105:3–115:6 (Krugman Decl. Ex. E), Dimsdale Dep. 16:13–27:1.

Mr. Palmour's testimony was particularly relevant for a number of reasons, including his insight into the information technology and reporting capabilities of ERes, his continued oversight of GSU's coursepack licensing (pursuant to which GSU does pay permission fees for uses of copyrighted works, in contrast to their ERes practices), and his authentication and verification of the usage data collected

by the ERes system.  *See generally* Palmour Dep.  Less than 20% of Mr. Palmour's

deposition was devoted to topics that the Defendants (improperly) regard as

irrelevant.  *See* Defs.' Renewed Mot. at 10-12.

Defendants also characterize Mr. Palmour's deposition as "unnecessary" in

light of his testimony that "he was no longer involved with ERes."  Defs.'

Renewed Mot. at 10.  As noted, Mr. Palmour still had much of relevance to offer.

But his change of responsibilities was unknown to Plaintiffs, and something

Defendants failed to apprise Plaintiffs concerning after earlier identifying Palmour

as possessing relevant information.  *See* Defendants' Responses to Plaintiffs' First

set of Interrogatories to Defendants, Aug. 27, 2008 at Response to Interrogatory

No. 3, (Krugman Decl. Ex. M).  Plaintiffs learned of Mr. Palmour's duties only

during the course of his testimony.  Only now have Defendants supplemented their

interrogatory responses to reflect this change.  *See* Defendants' Amended and

Supplemental Responses to Plaintiffs' First Set of Interrogatories to Defendants,

May 19, 2009 at Response to Interrogatory No. 3 (Krugman Decl. Ex. N).

Finally, Plaintiffs deposed GSU professors Jodi Kaufmann and Diane

Belcher, questioning them almost entirely about the new policy.  For example,

Plaintiffs asked both professors to explain their decisionmaking processes—those

that led them to post the infringing works at the heart of this lawsuit in the first

instance, and those that will govern their analyses going forward using the Checklist. *See, e.g.,* Kaufmann Dep. at 37:10–66:22; Belcher Dep. at 40:17–127:9. Notably, the deposition testimony indicated very little difference between the two.

The limited number of recent document requests served by Plaintiffs focus directly on ascertaining the scope of unlicensed electronic course material distribution at GSU, including specifically the unauthorized distribution of Plaintiffs' own works that continues to this day. *See* Plaintiffs' Second Requests for the Production of Documents, Jan. 30, 2009 (Krugman Decl. Ex. O) (seeking basic information regarding the enrollment information for courses in which infringement has occurred, as well as data regarding electronic course material distribution); Plaintiffs' Third Requests for the Production of Documents, April 21, 2009 (Defs.' Renewed Mot. at Ex. G) (seeking the copies of pdf excerpts of Plaintiffs' works that are currently stored on the ERes server).   Mr. Palmour's and Ms. Dimsdale's depositions made clear that the excerpts of Plaintiffs' works distributed to students all currently reside on the ERes server and can easily be located and distributed.  Palmour Dep. at 63:3–8; Dimsdale Dep. at 40:1–8, 42:8–11.

## III. DEFENDANTS' MOTION IS MOOT BECAUSE NEGOTIATIONS INVITED BY PLAINTIFFS HAVE RESULTED IN CONSENSUS ON OPEN DISCOVERY ISSUES

Defendants' motion should be denied for the separate and independent reason that it is largely moot. The period for discovery in this matter is scheduled to end on May 25, 2009. Though depositions may continue until June 30, 2009, the parties have already reached agreement as to the number of depositions which remain to be taken, and are negotiating on stipulated facts which will obviate the need for Defendants to respond to Plaintiffs' Second Set of Requests for Admission. Thus, there is very little discovery remaining in this case from which Defendants allegedly require protection, and no need for the Court to consider the substance of Defendants' arguments.

### A. Requests for Admission

Upon serving their First Set of Requests for Admission, dated April 13, 2009, ("First RFAs"), Plaintiffs explained to Defendants that the Requests were specifically intended as an alternative to depositions of the named Defendants, and that Plaintiffs would be amenable to dispense with even these formal Requests if Defendants would stipulate to certain facts Plaintiffs believed to be non-controversial. Letter from Edward B. Krugman to Anthony B. Askew, April 13, 2009 (Krugman Decl. Ex. P). The First RFAs focused on each named defendant's

relationship to the conduct that underlies Plaintiffs' claims—namely, the use of ERes and uLearn to distribute copyrighted works—and sought to establish the job duties and organizational authority of each defendant official as they relate to those systems. Defendants answered the First RFAs on May 13, 2009.

Plaintiffs made a similar offer in connection with their second set of Requests for Admission, dated April 22, 2009 ("Second RFAs") (Defs.' Renewed Mot. at Ex. A), explaining that Plaintiffs hoped Defendants' responses to the Requests (or a set of factual stipulations) would obviate the need for further depositions. *See* Letter from John H. Rains to Kristen A. Swift, April 22, 2009 (Krugman Decl. Ex. Q) ("While there are a large number of requests, we believe that answering these requests—or agreeing to a set of stipulated facts—is ultimately more efficient than forcing Plaintiffs to notice and depose large numbers of faculty members.") The Second RFAs specifically sought to establish the authenticity and accuracy of data collected from the ERes and uLearn systems by Plaintiffs' representatives. *See* Second RFAs, Request Nos. 67-70, 93–111.[10] The

---

[10] The Second RFAs consist of the same 6-8 requests directed to each instance in which Plaintiffs' works have been distributed at GSU (asking, for example, that Defendants admit that their systems have accurately reported the use of the given excerpt, the course in which it was used, the number of student downloads, etc.). In other words, the overall length is the result of the massive infringement of Plaintiffs' works at GSU.

parties have agreed to toll Defendants' time to respond to these requests while the parties negotiate stipulations relating to the subject matter of the Second RFAs. *See* Letter from Laura Gary to Randi Singer, May 15, 2009 (Krugman Decl. Ex. R). A draft of such stipulations has been sent to Defendants' representatives for their review. Accordingly, Plaintiffs likely will no longer require responses to the Second RFAs.

### B. Depositions

After Defendants rebuffed Plaintiffs' numerous attempts to reach consensus on fact issues going directly to the merits of their claims, Plaintiffs had no other apparent method for obtaining certain vital evidence and thus moved the Court for permission to take a limited number of additional depositions beyond the ten permitted by the Federal Rules. *See generally* Motion to Take Additional Depositions and Supporting Memorandum, Docket No. 78, April 21, 2009. However, in light of the agreement between the parties regarding the factual stipulations discussed above, as well as Plaintiffs' agreement not to contest a set of untimely document requests and interrogatories served by Defendants, the parties have agreed that Plaintiffs will have leave to take a total of fourteen depositions. *See* Letter from Laura Gary to Randi Singer, May 15, 2009 (Krugman Decl. Ex.

R).  There is thus no longer any dispute regarding the number of depositions to be taken.

In these circumstances, the sole conceivable impact of granting the Defendants the relief they seek would be to modestly limit the scope of questions in a handful of remaining depositions.   This is warranted neither by Defendants' fallacious relevance arguments nor by any demonstrable burden such incremental discovery will impose upon them.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion.

Respectfully submitted this 21st day of May, 2009.

/s/ Edward B. Krugman
Edward B. Krugman
Georgia Bar No. 429927
John H. Rains IV
Georgia Bar No. 556052

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
krugman@bmelaw.com
rains@bmelaw.com

552086.1

R. Bruce Rich (*pro hac vice*)
Randi Singer (*pro hac vice*)
Todd D. Larson (*pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
r.bruce.rich@weil.com
randi.singer@weil.com
todd.larson@weil.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document was prepared in Times New Roman 14 point font.

/s/ Edward B. Krugman
Edward B. Krugman

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served via hand delivery **PLAINTIFFS'**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**

**RENEWED MOTION FOR PROTECTIVE ORDER** on the following

attorneys of record:

    Anthony B. Askew, Esq.
    Stephen M. Schaetzel, Esq.
    Kristen A. Swift, Esq.
    King & Spalding
    1180 Peachtree Street
    Atlanta, Georgia 30309

    Mary Jo Volkert, Esq.
    Assistant S. Attorney General
    40 Capitol Square
    Atlanta, Georgia 30334

    This 21st day of May, 2009.


                        /s/ Edward B. Krugman
                        Edward B. Krugman