# EXHIBIT B

The expert report of Debra Mariniello is Confidential pursuant to the protective order entered in this case. It will be served on Defendants' Counsel via email on October 15, 2009, and filed under seal with the clerk's office on October 16, 2009. A redacted copy of her report is attached to these Supplemental Initial Disclosures.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA,**
**ATLANTA DIVISION**

CAMBRIDGE UNIVERSITY PRESS,
OXFORD UNIVERSITY PRESS, INC., and
SAGE PUBLICATIONS, INC.,

> Plaintiffs,

> *- v. -*

MARK P. BECKER, in his official capacity as
Georgia State University President, et al.,

> Defendants.

Civil Action No. 1:08-CV-1425-ODE

**EXPERT REPORT OF DEBRA J. MARINIELLO**
**IN RESPONSE TO THE REPORT OF KENNETH D. CREWS**

I.     **INTRODUCTION AND OPINIONS**

I am the Director of Rightsholder Relations and Inventory Strategy for Copyright Clearance Center, Inc. (CCC) and I offer this report to respond to certain aspects of the Report of Kenneth D. Crews filed in this litigation – namely, his contention that despite the fact that CCC has made the permissions process "much easier" and is "an important part of the copyright equation,"[1] it is still not realistic for Georgia State University (GSU) professors to obtain permissions for the digital copies of works they provide to students because they are generally either too expensive or not readily available for licensing.   I believe that these contentions are unsupported and incorrect, as is Dr. Crews's implicit assumption that, absent a fair-use determination, professors are limited to the choice to either purchase the entire work or not use it

---

[1]  Report of Dr. Kenneth D. Crews, June 1, 2009, p. 47 (hereafter the "Crews Report").

at all. This report provides a more robust description of CCC, its history, its copyright licensing and permissions services, and the established market for academic "permissions" more generally. In doing so, I offer several specific responses to Dr. Crews.

First, CCC, on behalf of tens of thousands of publishers and authors, offers academic users a variety of easy-to-use services to enable them quickly and efficiently to obtain permissions for distributing copyrighted course materials to students in hard-copy or digital formats. CCC's various licensing services (both transactional or pay-per-use, and repertory-wide) are used successfully by faculty and librarians at thousands of institutions. CCC's innovative Internet website, www.copyright.com, has automated much of the permissions process and made obtaining permissions even faster and more simple – indeed often instant.

Second, the repertory of works that can be "permissioned" for distribution to students, either via CCC or directly from publishers, is much broader than Dr. Crews or his collection of "studies" suggest – and is growing every day. This report focuses on the wide array of licensing options available via CCC (my particular area of expertise), but it is important to keep in mind that publishers also offer a variety of licensing mechanisms that allow users to obtain permissions directly from the publishers, as well.

Third, the permissions fees charged to provide digital copies of excerpts to students, contrary to Dr. Crews's assertions, are reasonable, especially when properly considered on a *per-student basis.* Dr. Crews mistakenly assumes that the permission fees would need to be borne by the library or instructor – contrary

to longstanding practice with respect to coursepacks – and thus presents misleadingly large fees at odds with his own acknowledgement that per-copy fees are "modest."

<u>Fourth</u>, although Dr. Crews pays scant attention to this fact, the market for academic permissions is longstanding, substantial, and expanding to meet the needs of users.   Permissions fees for excerpts of works generate significant revenue streams for publishers across the country, including Plaintiffs.   CCC distributed over ▮▮▮▮▮▮▮ last year to its rightsholder participants through its pay-per-use academic permissions services – and nearly ▮▮▮▮▮▮▮ since 1999. It would seem clear that if GSU activities continue unabated, or become widespread, there is a real risk of significant harm to these important revenue streams.

## II.   <u>BACKGROUND AND RELEVANT EXPERIENCE AT CCC</u>

I graduated from Montclair State University in 1992 with a B.A. in psychology. I began working at CCC in 1996 and was promoted regularly to positions with increasing responsibility for customer relations, repertory acquisition, product/service development, and general operations.   I assumed my current position as Director of Rightsholder Relations and Inventory Strategy in February of 2009.

In my current position, I am responsible for identifying and securing the rights and titles that our content users need in our licensing services, and also responsible for a sales group that interacts with our rightsholders to expand their participation in our licensing service programs.   In my previous positions at CCC, including as Director of Transactional Products

and Services, I was responsible for the evolution of all of our pay-per-use services. I have worked closely with CCC customers to understand their needs and develop strategies for improving our services based on their feedback. I also spearheaded the creation of the Academic Annual Copyright License (described in detail below) for academic users.

My experience has thus provided me with valuable insight into two aspects of CCC's operations that are implicated by Dr. Crews's assertions: the breadth of coverage of CCC's repertory (and its ongoing growth), and the desirability and affordability of CCC's licenses for users. I have extensive experience developing and improving the academic licensing services most relevant to this case and routinely speak with our sales personnel and customers about our services and whether they are meeting the needs of the marketplace.

I offer this testimony in my role as an employee of CCC; I am not being paid separately or additionally to my regular salary for this testimony.

## III. DESCRIPTION OF CCC AND ITS SERVICES

### A. CCC History

CCC, headquartered in Danvers, Massachusetts, is a not-for-profit corporation that was established in 1977 by publishers, authors, and corporate and academic users of copyrighted text materials in response to the expressed desire of the United States Congress that a service be created to facilitate implementation of the copyright law that took effect on January 1, 1978, in connection with the making and distribution of photocopies. *See* S. Rep. No. 983, 93rd Cong. 2d Sess., at 122 (1974); H.R. Rep. No. 83, 90th Cong., 1st Sess., at 33 (1968); S. Rep. No. 94-473, 94th Cong., 1st Sess., at 70-71 (1975). Our Board of Directors includes authors, publishers, and employees of academic and other user communities.

Among other things, CCC acts as a centralized clearinghouse for the granting of reproduction rights for books, journals, newspapers and other text, non-text and multimedia works.   Tens of thousands of authors and publishers have granted CCC the nonexclusive right to include millions of their works in the CCC repertory and to issue licenses on their behalf. Hundreds of thousands of users – businesses, universities, and individuals – turn to CCC as a convenient, one-stop solution for obtaining permission to reproduce works from the CCC repertory without having to track down the owner of every work they may wish to reproduce. As detailed below, CCC has processed over ███████ permission requests just for academic uses in the past five years.

CCC is a member of the International Federation of Reproduction Rights Organizations (IFRRO), an organization of licensing organizations like CCC from around the world.   CCC has entered into bilateral agreements with more than twenty foreign Reproduction Rights Organizations, which enables CCC to grant to U.S. users rights not only to the works of its participating U.S. rightsholders, but to millions of works published in foreign countries such as England, France, Germany, Spain, Australia and many others.

CCC's costs are covered by the modest service fees the company charges to rightsholders on the licenses it processes and, in its academic services, by the $3.00 flat fee charged to users on a per-transaction basis (not per-student or per-page).   After those charges, CCC is able to distribute to rightsholders about ████ of the revenues it collects in its pay-per-use services.

### B.    CCC Services Described

CCC originally offered license services primarily for business/corporate users. The first service, now part of CCC's pay-per-use permissions service, provides corporate users a way to quickly secure rights on a work-by-work or transactional basis to make photocopies of

individual works. Beginning in 1984, CCC also offered corporate users the option of an Annual Authorizations Service license, now part of the Annual Copyright License for businesses, which today provides a repertory-wide license that allows users to pay a single annual price to make unlimited print and digital reproductions for internal purposes of all works in the license repertory without needing to secure a separate permission for (or even keep records of) every single work copied.

In 1985, not long after CCC began rolling out the Annual Copyright License for business, a landmark law suit was filed in federal district court in New York, *American Geophysical Union, et al. v. Texaco Inc.* In that case, the United States Court of Appeals for the Second Circuit ultimately held that the licenses offered by CCC were directly relevant to ascertaining the "market impact" of the defendants' activities under the fourth factor of the fair use analysis. The Court understood from the evidence that a recognized, functioning permissions market that could be harmed by the defendants' activities was relevant to assessing potential market impact – indeed as relevant as the potential harm to the market for sales of the book or journal involved.

The Second Circuit's affirmation in the *Texaco* case that the copyright doctrine of fair use does not shield regular and systematic photocopying of copyrighted textual materials in circumstances in which there exist feasible permissioning processes that would allow such activities to continue without undue disruption led to continued growth and adoption of CCC's Annual Copyright License, which continues today to be widely adopted by corporate users.

Even as the *Texaco* case proceeded to address photocopying in the corporate environment, the growth of photocopied coursepacks on college and university campuses raised similar concerns for rightsholders in the academic environment. A group of publishers sued

Kinko's, then one of the largest copy shop chains in the United States, in a case referred to as *Basic Books v. Kinko's*. As in *Texaco*, the federal district court in New York denied defendant's claim of fair use, and judgment after trial (with an award of money damages) was entered in March of 1991 in favor of the publishers.

Within weeks of the *Basic Books* decision, CCC launched a new licensing program for academic users, which has grown ever since. Today, CCC offers two types of pay-per-use services to users in the academic community: the Academic Permissions Service (APS) and the Electronic Course Content Service (ECCS). (Academic users can also use CCC's other pay-per-use services as well, but generally do so only for other types of specialized needs.) Using APS and ECCS, faculty, librarians, administrators, students and other college and university users can quickly and easily obtain single permissions to copy (scan) and distribute works from CCC's vast repertory. More recently, CCC has developed an annual repertory-wide license for university users called the Academic Annual Copyright License (AACL), analogous to the corporate Annual Copyright License.

### C. The Academic Permissions Service (APS)

CCC has offered the Academic Permissions Service (APS) since 1991. Under APS, users can quickly and easily obtain permission, on a transactional (i.e., work-by-work) basis, to photocopy and distribute paper copies of text-based copyrighted works, including books and journal articles commonly used as academic course readings. APS covers photocopying for coursepacks and classroom handouts.

The APS service has been a tremendous success. Since 2005, CCC has processed over ███████ APS permission requests. In 2009 alone,[2] CCC processed over

---

[2] The dates in this report reflect CCC's fiscal year, which runs July 1 – June 30. By way of example, a reference to 2009 covers the period July 1, 2008 – June 30, 2009.

███ APS permission requests. These transactions are not only convenient for users in the academy, but also provide a critically important source of revenue for rightsholders. CCC has distributed over ████████ in APS photocopy royalties to rightsholders in the past ten years – income that may be seen to compensate rightsholders for what otherwise in many instances would represent lost revenues from book and journal sales.

GSU itself has used our APS print pay-per-use service for its coursepack permission requests for a number of years. According to Mr. Palmour, the GSU employee who has processed coursepack orders since 1995, it has been standard protocol at GSU to seek permissions when including copies of copyrighted works in hard-copy coursepacks.[3]

### D. The Electronic Course Content Service (ECCS)

Recognizing that users wished to make and distribute digital as well as print copies of course materials, CCC created the Electronic Course Content Service (ECCS) in 1997. ECCS is basically the digital equivalent of APS. For example, while professors use APS to secure permissions for works included in print coursepacks, they use ECCS to secure permissions to distribute works to students in electronic (e.g., pdf) format through an e-reserves system or a course management system like GSU's uLearn.

Although of more recent vintage, and even in the face of what CCC perceives as a similar reluctance to acknowledge copyright norms in the digital environment to that which preceded the *Texaco* and *Basic Books* precedents in relation to those copying environments, our digital pay-per-use service (ECCS) has achieved significant market acceptance. Since 2005, CCC has processed over ████ digital permission requests. ECCS growth has been steady: since 2005, digital permission requests have increased from over ████ to over ████ annually.

---

[3] Deposition of James Palmour at pp. 24-25, 31-35 (Apr. 23, 2009).

In turn, distributions to rightsholders for digital reuse of their content have increased from nearly ▮▮▮ in 1999 to over ▮▮▮ in 2009.   CCC has distributed nearly ▮▮▮ in digital (ECCS) reuse royalties to rightsholders in the past ten years.

In contrast to their use of CCC's print pay-per-use service (APS) to clear permissions for hard-copy course packs, GSU personnel have not used our digital pay-per-use service (ECCS) to secure permissions for the distribution of digital copies through their e-reserves or uLearn systems and have not paid for these digital reuse rights.

**E.     CCC's Distributions to Rightsholders, Including the Plaintiffs**

The success and growth of CCC's academic services belies Dr. Crews's claim that permissions are not practical or feasible.   To the contrary, as the statistics show, these services are widely used, popular, and growing, creating a thriving licensing market.   CCC has processed over ▮▮▮ print and digital permission requests since 2005, and distributed over ▮▮▮ in license royalties to rightsholders for these products.   CCC has distributed hundreds of millions of dollars in license royalties for corporate uses during that time period as well.

- Since 2007, CCC has paid Cambridge University Press a total of more than ▮▮▮ in print (APS) and digital (ECCS) reuse royalties alone.   In 2009 alone, Cambridge University Press has been paid over ▮▮▮ for all uses (*i.e.*, corporate, academic, and foreign) of Cambridge works.

- Since 2007, CCC has paid Oxford University Press over ▮▮▮ in print (APS) and digital (ECCS) reuse royalties.

- Since 2007, CCC has paid SAGE Publications over ▮▮▮▮▮ in print (APS) and digital (ECCS) reuse royalties. In 2009 alone, CCC paid SAGE over ▮▮▮▮▮ for all uses of its various books and journals.

**F.      The Academic Annual Copyright License (AACL)**

In 2006, CCC developed and launched an annual, repertory-wide license for academic users called the Academic Annual Copyright License. Instead of seeking permission and paying a discrete fee on a work-by-work basis, institutions that take an Academic Annual Copyright License pay a single "blanket" fee annually for university-wide rights to copy and internally distribute works in the AACL repertory in both hard-copy and digital formats, including coursepacks, e-reserves and course management systems, class handouts, and the like. (A description of the Academic Annual Copyright License providing some additional information is attached as Exhibit B.)    Although new, the AACL has attracted significant interest. Currently, more than ▮ institutions have signed up for the AACL, ranging from private colleges such as Middlebury and Marquette Law School to large public state universities such as the University of Texas.

**G.      Ease of Use:    The CCC Web Interface at Copyright.com**

Obtaining print and digital pay-per-use permissions, or determining whether a work is covered by one's Academic Annual Copyright License, has been made even easier by copyright.com, CCC's Internet website, which went live in 1995 and was one of the first websites to conduct e-commerce transactions via the Internet. With a few keystrokes, a user can search for a work (by title or International Standard Book/Serial Number [ISBN/ISSN]) and, if it is included among the millions of works in the CCC repertory, obtain instant permission to use an excerpt of the work. Exhibit C shows exactly how easy it is to use the CCC website to obtain

permission.   I have used as my example *Feminist Media Studies*, a SAGE work identified in Plaintiffs' Complaint as one that has been routinely copied by GSU professors without permission.

- C-1 shows CCC's home page at www.copyright.com.   The search entry box is located in the upper righthand corner of the screen.   In this example, the user has entered *Feminist Media Studies* in the search box.

- C-2 shows the search results page that is displayed when the user hits the "Go" (i.e., search) button on the home page.   This page reveals the works in the CCC database that match the title entered in the search box.

- C-3 shows the various types of permissions available for this title, including both pay-per-use options and coverage under CCC's annual repertory-wide licenses.   A user can obtain permission to, among other activities, photocopy the work in academic coursepacks and post the work to e-reserves or course management systems.   The bottom section of the page reveals that the work is also covered by CCC's Annual Copyright License – Academic.   If the user's institution is an AACL subscriber, she is free to copy the work for internal purposes and need not do anything more.

- When the user hits the third "Price & Order" button – the button covering "posting e-reserves" – she sees a page that looks like C-4.   As revealed in the upper righthand corner, the charge for use of this work is only 14 cents per page. The data entered into the on-screen form reflects the pages of *Feminist Media Studies* being used during the Spring 2009 semester by Professor Meyers in JOUR 4780 (as evidenced by the e-reserves system report produced by GSU in this litigation).   The number of students

in the course (25) is taken from the GSU website, which provides online registration information for each GSU course. The "total number of pages" (32) is automatically calculated by the website based on the page ranges entered.

- When the user hits the "Get Price" button, the page labeled C-5 is displayed, revealing the permissions price for use of the work. Although the price listed is the price for copies for the entire class, the per-student price for using 32 pages – about 20% of the book – is only $4.60 per student.

- Pages C-6 and C-7 show the steps that lead to completion of the transaction, which utilizes a "shopping cart" similar to other standard e-commerce applications. The entire process takes only a couple of minutes, and users have the option of either paying with a credit card at the time of the transaction or having an invoice sent later.

For the vast majority of permission requests – approximately ▮ of digital permissions (ECCS) requests and ▮ of print permissions (APS) requests – the user is given an answer on the spot. In most cases where permission is not automatically granted (resulting in what is known at CCC as a "special order"), CCC will contact the rightsholder at no additional cost to the customer in an effort to attempt to secure permission on behalf of the customer. In other cases (where CCC has been so instructed by the Rightsholder), CCC will provide contact information to allow the user to contact the rightsholder directly.

The CCC website also offers an array of educational materials to help users better understand copyright law, the rights involved, and the types of licenses offered, as well as resources to help academic users create policies to guide the use of copyrighted materials on their own campuses. The goal of providing this educational material is not to offer legal advice

or an official CCC "policy" on fair use or any other copyright issue; rather, it is intended to provide users (including university librarians) with a centralized set of resources – some written by CCC itself, some gathered from other sources – to draw from as they create their own policies to guide practice at their institutions. These resources, as well as CCC's website generally, are updated on a regular basis.

### H. CCC Technology and Licensing within the Customer's Workflow

In recent years, CCC has developed technology that provides access to CCC's licensing services directly from websites and software programs other than copyright.com. One example of such a CCC service is Rightslink®. There, CCC works with individual publishers to design an e-commerce capability that integrates CCC's licensing services into the publisher's own website, thus enabling that publisher to offer permissions for its works "on the spot" to website visitors. A user browsing the website of Cambridge University Press journals, for example, can seek permission to copy an article without having to visit copyright.com or ever leave the Cambridge site. A simple pop-up window allows the user to request permission and enter the appropriate information to process the transaction. The experience is seamless from the user's perspective and CCC handles the "back end" details – processing the payment data, distributing the royalties – for the publisher.

Since launching in 2000, Rightslink® has been into integrated the websites of over ██ publishers, including those of The New York Times and The Wall Street Journal, and provides licensing access to almost 20 million articles. Although developed with newspapers, Rightslink® is now also used by major science, medical, trade and textbook publishers.

Yet another example of the ways that CCC is partnering with other technology providers to make the permission process quicker and easier is through the development of software plug-ins or "gateways" – more technically known as APIs, or Application Programming

Interfaces – that can be used to incorporate CCC's licensing functionality into users' own software programs.   With the help of the gateway, the user software communicates directly with CCC's licensing system and allows users to process licensing transactions directly from within their own software application, without ever having to leave the application or separately visit copyright.com.   Notably, CCC has designed just such a gateway or API for Docutek ERes, the system used at GSU (and hundreds of other institutions) for providing course reading materials. As a result, a GSU professor or librarian posting class material to the ERes system could easily obtain permission to post the material for students on the spot, directly from within the ERes application.

## I.   The Reasonable Cost of Permissions Through CCC

Dr. Crews argues that it is often not realistic for professors to seek permissions because they are too expensive.   His discussion (suggesting royalty levels in the range of $50 to $110) is misleading and unsupported in several ways.   First, he apparently did no original research on the royalties charged by CCC or publishers; instead, he recounts a number of articles from a trade publication discussing attempts by certain librarians to obtain permissions in particular circumstances.   As those articles do not identify the works requested, the length of the excerpts, the publishers, or the number of students, I am not in a position to respond directly to the claims made.   In any event, the anecdotal examples in the articles certainly do not present a comprehensive study or overview of permissions coverage or pricing.   For example, one of the examples, described in a 2003 article – published six years ago – involved a single out-of-print book,[4] a one-page table, and a three-page excerpt, and that article discusses prices as far back as 1992 to 1994, over 15 years ago, at the very beginning of CCC's academic licensing services.

---

[4]  Crews Report, pgs 25-26

The reality is that publishers, through CCC, actually charge a reasonable royalty intended to compensate them for reuse of the work (and thus, to help pay for the original development and creation of the work) per each page copied – generally in the range of 10-25 cents per page for academic uses.   As was demonstrated above, the 32-page excerpt of SAGE book *Feminist Media Studies* used by GSU Professor Meyers in the Spring 2009 semester would cost only $4.60 per student.   The 55-page excerpt identified in the Complaint from an earlier semester would cost $7.70 per student.   Indeed, the per-student costs for each work in the Plaintiffs' Complaint would be similarly modest:

- The 33 pages of Ethan Scheiner's *Democracy and Competition in Japan,* at $0.15 per page, would cost each student $4.95.

- The 32 pages of *The Cambridge Companion to the Organ,* at $0.15 per page, would cost each student $4.80.

- The 109 pages of Theda Skocpol's *States and Social Revolutions* would be flagged by CCC's system because the page range exceeds 20% of the work (the standard limit in CCC's academic pay-per-use services).   Were Cambridge to grant the permission (under the "special order" procedure described above), the cost to each student, even for using this very large excerpt – over a third of the text of the book – would be $16.35.

- The 61 pages of Cambridge's *Materials Development in Language Teaching,* at $0.15 per page, would cost each student $9.15.

- The 37 pages of Cambridge's *Focus on the Language Classroom,* at $0.15 per page, would cost each student $5.55.

- The 86 pages of Cox and McCubbin's *Legislative Leviathan* would be flagged by CCC's system because the page range exceeds 20% of the work.   Were Cambridge to grant the permission, the cost to each student for using this very large excerpt would be $17.90.

- The 28 pages of Christopher Simpson's *Science of Coercion,* at $0.12 per page (Oxford charges a different price than Cambridge), would cost each student $3.36.

- The 51 pages of George Frederickson's *White Supremacy,* at $0.12 per page, would cost each student $6.12.

- The 39 pages of Laura Berke's *Awakening Children's Minds,* at $0.12 per page, would cost each student $4.68.

- The 43 pages of John Blassingame's *White Supremacy* used by GSU Professor Dixon in the Fall 2007 semester, at $0.12 per page, would cost each student $5.16.

- The 78 pages of the book used by Professor Dixon in the Spring 2008 semester would be flagged by CCC's system because the page range exceeds 20% of the work. Were Oxford to grant the permission, the cost each student for the larger excerpts would be $9.36.

- The various chapters of the *Sage Handbook of Qualitative Research* used by several GSU professors, at $0.14 per page, would range from $4.20 (for the 30-page chapter used in EPRS 8500 in the Fall 2006 semester) to $18.48 (for the 132 pages used in EPS 8500 in the Fall 2007 semester).

- The 28 pages of Milan Dluhy's *Changing the System,* at $0.14 per page, would cost each student $3.92.[5]

Viewed (as these permissions royalties should be) on a work-by-work, per-student basis, the fees are neither unreasonable nor cost-prohibitive. Dr. Crews himself acknowledges on page 47 of his Report the "modest fee for a single copy" charged by CCC; and for the example on page 26 of his Report ($84.78 for 154 students), the permissions royalty indeed would be only 55 cents per student. It is only by multiplying these modest per-page/per-student fees by the number of students in the class that, in Dr. Crews's words, they become "large" – a not very meaningful description that simply reflects the potentially large number of pages and copies of a given work that are chosen by faculty members to meet student enrollment in a given course, presumably in order to avoid requiring the students to purchase the actual books or journals themselves.

Implicit in Dr. Crews's Report is the assumption that the fees paid for permissions must be covered by the library or, perhaps, the academic department – a position suggesting that

---

[5] A very reasonable CCC service charge of $3.00 per transaction (across all students, not per student) is added to orders. The actual pro rata cost of this charge to a student would depend upon the number of students in the course.

e-reserves are fundamentally a form of borrowing or viewing a library reserve holding (which students traditionally do not pay for) instead of a form of purchasing readings for the course (which students routinely pay for, whether as a book or as a coursepack purchased at the campus bookstore). But there is no reason to assume a university must pay the licensing royalties for the distribution of electronic copies to each student when it does not do the same for the distribution of paper copies of the same readings in coursepacks (the licensing fees for which, as Mr. Palmour explained at GSU, are simply included in the cost of the coursepack along with the charge for printing, binding, etc.).

### J.     The Broad Coverage of CCC's Repertory

Dr. Crews also wrongly assumes that permissions are not a realistic alternative to simply infringing because most materials are not readily available for licensing – i.e., through the repertory of either CCC or the publisher. Here again, the handful of "studies" he cites to support this proposition are unscientific anecdotes drawn from brief articles in library journals completely lacking in detail, again making it impossible to verify the results. Moreover, many of those anecdotes and articles date back several years – presenting at best a historic snapshot with little relevance to present practice.

The reality is that through APS, ECCS and AACL, as well as directly from publishers, users such as GSU have access to a vast and ever-growing repertory of works for which permissions are available. Indeed, every work in the Complaint is available through CCC for licensing through both print (APS) and digital (ECCS) pay-per-use services at the modest fees described above. In addition, both SAGE and Oxford University Press make their works available for annual licensing through the AACL. The continued and significant growth in the repertory coverage for these services belies Dr. Crews's anecdotal claims:

- The number of works in the print pay-per-use (APS) repertory is just under . That number has grown from just over ▮▮▮▮ in 1991 to over ▮▮▮▮ by 1997 to over ▮▮▮▮ by 2005, reflecting the increasing rate of market acceptance. Notably, in the last five years (i.e., the period since many of the "studies" cited by Dr. Crews), the number of works in the APS repertory has more than doubled, from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ works.

- As of 2009, the digital pay-per-use (ECCS) repertory contained approximately ▮▮▮▮▮ works – a number that has also more than doubled in the past five years.

- Even the Academic Annual Copyright License, although just recently launched, has a sizeable and growing repertory that has grown from ▮▮▮▮▮▮▮▮ works in 2006 to a current level of ▮▮▮▮▮▮ works.

- In addition to the above numbers of works, CCC is also authorized to license rights to millions more works published outside the United States. Rights for these works, some of which are in English (whether published in Canada, the United Kingdom or elsewhere) but most of which are in other languages, are conveyed to CCC by our counterpart Reproduction Rights Organizations in other countries. In most cases, these rights are for photocopying, but a growing proportion are for digital uses (intranet, email, and the like) as well.

The Fall 2009 ERes report produced by GSU in this litigation illustrates that many of the works, reproductions of which have been provided to students at GSU without permission, are in fact available for licensing from CCC or directly from the publishers. We checked over 500 items on this report and found that 85% could be licensed through CCC through either the AACL or the digital pay-per-use service (ECCS), and an additional 7% might be made available for licensing directly from the publishers with the appropriate contact information supplied by CCC. The remaining 8% are either excerpts from anthologies (requiring original source information in order to secure permission) or cannot be found in CCC's database, possibly due to incomplete bibliographic data.

## IV.   THE HARM FROM UNLICENSED DIGITAL COPYING

The statistics above clearly demonstrate that there is a thriving market for the licensing of Plaintiffs' – and other publishers' – works. (And, to reiterate, these figures do not

reflect sums earned by publishers for licenses and permissions granted directly rather than through CCC.)   Unfortunately, CCC's interpretation of certain nationwide aggregate data suggests a disturbing pattern.   The advent and increasing use of digital copies to fulfill course reading requirements at institutions such as GSU appears to be having the effect of reducing permissions payments under programs such as the APS (accounting for hard-copy, course pack-type photocopying) without, however, a commensurate increase in payments under programs such as the ECCS, which provide payment mechanisms for such digital uses.   The following chart depicts the trends:



As can be seen by the data above, print permission requests (APS) and the number of licensed excerpts covered by those requests have declined steadily since 2005.   While some of this decline can be attributed to users switching to licensed digital uses (as reflected in the rising ECCS numbers), the increases in digital permission requests (ECCS) do not make up for the decreases in print permission requests (APS).

From CCC's experience and knowledge of the marketplace and ongoing practice, I believe that at least some portion of the "leakage" is caused by professors opting for unlicensed digital distribution as opposed to licensed coursepacks.   Indeed, this is in evidence at GSU, where Mr. Palmour has encouraged faculty to switch to e-reserves rather than coursepacks for their course readings precisely because e-reserves, in GSU's view, do not require the same permissions fees.[6]

Debra J. Mariniello

October 15, 2009

---

[6]  Palmour Deposition at pp. 128-142; 155-156.

# MARINIELLO EXHIBIT A

## Exhibit A

## List of Materials Reviewed

- Amended Complaint, *Cambridge University Press, et al. v. Patton, et al.*, Civil Action No. 1:08-CV-1425-ODE

- Expert Report of Kenneth D. Crews (June 1, 2009)

- The following articles cited in the Expert Report of Kenneth D. Crews:

    o Brice Austin & Karen Taylor, "Four Scenarios Concerning Fair Use and Copyright Costs: Electronic Reserves at the University of Colorado, Boulder," *Journal of Interlibrary Loan, Document Delivery & Electronic Reserve*, 13 (3) 2003;

    o Rachel Bridgewater, "Shifting Responsibility for Electronic Reserves Copyright Permissions from the Academic Departments to the Library: From Confusion to Cooperation," *Journal of Interlibrary Loan, Document Delivery & Electronic Reserve*, 18 (2) 2008;

    o Charlotte Cubbage, "The Changing Cost Environment of Managing Copyright for Electronic Reserves," *Journal of Interlibrary Loan, Document Delivery & Electronic Reserve*, 18 (1) 2007.

- Deposition of James Palmour (April 23, 2009) (excerpts)

- GSU Fall 2009 Report on ERes Usage

- CCC Payments to Rightsholder for the Academic pay-per-use services from FY1999 through FY2009

- Number of orders and revenue generated for each of the CCC academic pay-per-use services from FY1998 through FY2009

- Number of permission orders processed through CCC, including special order statistics, from FY2005 to present

- Select pages of www.copyright.com

## Other Rule 26(a) Disclosures

- I have not previously testified as an expert witness.

- I have not authored any publications in the last 10 years.

- It is my understanding that CCC is paying a portion of the costs of this litigation.

# MARINIELLO EXHIBIT B

# Annual Copyright License for Academic Institutions

## Service Description

### Copyright Clearance Center

Copyright Clearance Center, Inc. is the world's largest licensing agent for text reproduction rights. The company plays a critical role as an intermediary between copyright holders – including publishers, authors and other creators – and academic institutions and businesses seeking permission to reproduce and distribute portions of copyrighted material in print and digital formats. A not-for-profit company founded in 1978, Copyright Clearance Center has become the global leader in secondary text rights licensing and the largest text-based copyright licensing resource. Through established licensing partnerships with thousands of publishers and hundreds of thousands of authors and other creators (directly or through their agents), Copyright Clearance Center represents millions of works, providing access to millions of rights for the world's most sought after content. More information on Copyright Clearance Center and our academic licensing services can be found at www.copyright.com/academic.

Today, Copyright Clearance Center works with more than 1,000 colleges and universities across the U.S. in all Carnegie classes. Our online pay-per-use services provide permissions to use text-based copyrighted materials – in both print and electronic format – for coursepacks, classroom handouts, library reserves, electronic postings, and interlibrary loan.

### Introduction

In June of 2007, Copyright Clearance Center introduced a new product for the academic market – the Annual Copyright License for Academic Institutions. Designed with input from hundreds of academic professionals from more than 50 colleges and universities, and co-developed with Middlebury College – a leading liberal arts college and member of the Oberlin Group – the Annual Copyright License is a single, comprehensive license that allows faculty, librarians, researchers and staff to reuse text-based copyrighted content for educational purposes, while respecting the intellectual property of others.

### License Overview

Copyright Clearance Center developed this licensing model to address the diverse needs of academic institutions and the continuing shift to electronic distribution of content on campus. The

EXHIBIT B - 24

Continued ➡

Annual Copyright License is a comprehensive licensing service offered as an annual subscription to academic institutions of higher education.

## The Annual Copyright License:

- Covers the reproduction and distribution of text-based copyrighted content in print and digital formats for educational and research purposes, by all faculty, librarians, research and administrative staff within public, private not-for-profit, and private for-profit institutions of higher education

- Is available to single campus institutions, multi-campus institutions, and university systems within the U.S., as well as an institution's international campuses

- Covers the creation of course materials for licensed institutions by off-campus copy shops and local, regional, and national coursepack providers who have an agreement with the institution and are identified to Copyright Clearance Center

Individuals covered at an institution include:

- Full-time, part-time, and adjunct faculty

- Full-time, part-time, and contract staff

- Permanent and visiting researchers

- Full-time and part-time graduate and under-graduate students

- Administrators

### Key Features

Key features of the Annual Copyright License include:

- Authorized conversion of paper copies to digital format when an electronic copy is unavailable from the rightsholder or their authorized agent

- Waiver of any and all unasserted prior claims of copyright infringement for uses and works falling within the scope of the license by rightsholders registered with Copyright Clearance Center (This waiver is effective upon the institution's first renewal of the Annual Copyright License)

- Persistent access: Rights to works included in the license inventory will remain available to the institution for the full term of the license regardless of whether a title and/or rightsholder is removed from the program

- An efficient, online mechanism to verify titles covered under the license

### Key Benefits

The Annual Copyright License affords users an efficient and economical approach to share content and collaborate freely while respecting the intellectual property of others. Key benefits of the license include:

- Institution-wide coverage

- A comprehensive, uniform set of reuse rights

- Ease and convenience of a single, multi-use license

- An efficient process which translates into administrative cost savings for the institution

- A predictable budgeting process for copyright permissions

- Respect for intellectual property across the institution

EXHIBIT B - 25

Continued



## Licensed Uses

The Annual Copyright License supports both print and digital reproduction and transmission of copyrighted material. Some of the more popular uses covered by the license include:

**Print coverage:**

- Coursepacks

- Class handouts

- Library reserves

- Administrative photocopying and internal communications

**Digital coverage:**

- Electronic coursepacks

- Course management system and intranet postings

- E-Reserves

- Internal email

In addition, faculty, students, researchers and staff can share and store -- for academic purposes of the institution -- electronic content covered under the Annual Copyright License on new and emerging mobile devices such as the Amazon Kindle DX, Sony Reader, Apple iPhone and iPod Touch, and BlackBerry Smartphones, as well as the traditional desktops, laptops and servers.

## License Limitations

The Annual Copyright License does not cover the following uses:

- External promotional and advertising use

- Interlibrary Loan (ILL)/document delivery – ILL borrowing and distribution, as well as document delivery by the institution's library/

libraries, are not covered under the license. However, once received by the institution, licensed content acquired through any authorized means may be used within the scope of the license in coursepacks, class handouts, electronic postings, etc.

- The reproduction of the entire work is prohibited unless specifically noted by the rightsholder

- The license does not include any right to create a library, collection or repository to substantially replace the institution's need for a particular work or subscription

The Annual Copyright License cannot be used to substitute for an institution's need for original works or subscriptions genuinely needed to serve the institution's constituents. Please refer to the Annual Copyright License Agreement for a complete list of limitations.

## Usage Surveys

Institutions that purchase the Annual Copyright License are required to provide usage data of copyrighted content used in course materials. Copyright Clearance Center will work closely with licensed institutions to obtain a statistically valid sampling of coursepacks issued or a listing of the copyrighted content included in coursepacks produced by on- and off-campus coursepack producers. The sample will be pulled from the total coursepacks produced during a major academic term (e.g. semester, trimester, or two quarters) and must be representative of the major academic disciplines taught at the institution. Copyright Clearance Center will work well in advance with the institution to determine the reporting period and methodology and will be available to answer questions and provide assistance as necessary. The coursepacks (or listing

Continued ➔

EXHIBIT B - 26

of copyrighted content) are to include the following information:

- Publication title

- Chapter/Article title

- Number of pages reproduced

- Course name and enrollment

- Academic discipline

Copyright Clearance Center will use data provided by licensed institutions to allocate and distribute royalty fees among participating rightsholders. All usage data provided by licensed institutions will be kept strictly confidential by Copyright Clearance Center and will be aggregated with data collected from other academic institutions.

Licensed institutions that do not issue coursepacks may provide a download of documents posted on the institution's e-reserve and/or course management system, a listing of the copyrighted content posted within those systems, or other representative information of copyrighted content used in course materials. Please contact Copyright Clearance Center for more information about this option.

## License Implementation

As part of the Annual Copyright License, Copyright Clearance Center provides a comprehensive program of training and support to assist licensed institutions in implementing the license on their campus. Shortly after an institution purchases the license, a representative from Copyright Clearance Center will work with the appropriate people on campus, as well as any specified off-campus vendors, to help implement the license and ensure it meets the institution's

content reuse needs. This program consists of the following:

- Copyright Education – includes a complimentary 90-minute "Copyright Foundations" online session that provides an introduction to copyright law, overviews of fair use and works in the public domain, and instructions on how to use the Annual Copyright License search interface. In addition, half-day follow-on courses and workshops are offered to licensed institutions at a 50% discount.

- Vendor Integration – since the Annual Copyright License extends "beyond the fours walls of the institution" we will help you implement the license with off-campus local and national coursepack providers.

- License Roll Out and Implementation–Copyright Clearance Center can provide support materials and assistance to raise awareness of the Annual Copyright License and ensure a successful implementation across the campus.

- Usage Survey and Data Collection – tools and assistance to determine the best way for the institution to gather and submit the necessary information required under the license.

## License Pricing

Pricing of the Annual Copyright License is on a per-student basis based on the institution's Carnegie Classification Enrollment Profile and its full-time equivalent (FTE) graduate and undergraduate student enrollment (For more information on the Carnegie Classification of Institutions of Higher Education, please visit www.carnegie-foundation.org/classifications. To look up your institutions' Carnegie Classification, hover over the "Lookup & Listings" tab and click on "Institution Lookup". Enter your institution name and

Continued ➦

then click on it in the search results. A table will be displayed that includes your FTE enrollment and Enrollment Profile Classification.). The licensed institution is required to provide Copyright Clearance Center with updated FTE student enrollment data on an annual basis at time of renewal. In addition to the per-student fee, there is a first year administrative fee equivalent to 20% of the total per-student fee.

Copyright Clearance Center offers a discount for university systems (that purchase the license under a single agreement) based on the number of campuses under the system that participate in the license.

## Participating Publishers

Our Rightsholder Relations team continues to add new publishers and titles on a weekly basis, and the license repertory is growing at a terrific rate. Currently, there over 600 participating publishers including top publishers used by academia such as Elsevier, John Wiley & Sons, American Psychological Association, Perseus Books and Princeton University Press. For a complete listing of the participating publishers, please contact Copyright Clearance Center.

## Copyright Clearance Center Contact Information

If you have any questions or would like more information regarding the Annual Copyright License, please contact the Copyright Clearance Center Licensing Consultant for your area.

| For institutions located in: AR, CT, DE, GA, IN, KS, LA, ME, MA, MS, NC, OH, RI, TX, UT, VT, WV, and Washington, DC please contact: | For institutions located in: AK, CA, HI, ID, MI, MT, NE, NV, NM, ND, OR, PA, SC, WI, and WY please contact: | For institutions located in: AL, AZ, CO, FL, IA, IL, KY, MD, MN, MO, NH, NJ, NY, OK, SD, TN, VA, and WA please contact: |
|---|---|---|
| Annie Ortega<br>Licensing Consultant<br>222 Rosewood Drive<br>Danvers, MA 01923<br>978-646-2577<br>aortega@copyright.com | Dan Short<br>Licensing Consultant<br>222 Rosewood Drive<br>Danvers, MA 01923<br>978-646-2576<br>dshort@copyright.com | Karen Melanson<br>Licensing Consultant<br>222 Rosewood Drive<br>Danvers, MA 01923<br>978-646-2846<br>kmelanson@copyright.com |

 **Copyright Clearance Center**

222 Rosewood Drive | Danvers, MA 01923 | www.copyright.com
phone: 978-750-8400 | fax: 978-646-8600
© 2009 Copyright Clearance Center, Inc.

EXHIBIT B - 28

ALSD JG0809

# MARINIELLO EXHIBIT C













