# Rebuttal Expert Report of
# Kenneth D. Crews, J.D., Ph.D.

*Cambridge University Press v. Patton, et al.*
Civil Action No. 1:08-CV-1425-ODE

In the United States Federal District Court
Northern District of Georgia


November 2, 2009

**Table of Contents**

**Part I:**
**Introduction**

**Part II:**
**Is Licensing of Copyrighted Works a Substitute for the Implementation of a Fair Use Standard and Policy?**

**Part III:**
**Does the Exercise of Fair Use Poses Risks to the Survival of Scholarly Publishing?**

**Part IV:**
**Conclusion**

**Part I:**
**Introduction**

This report is the Rebuttal Expert Report of Kenneth D. Crews, dated June 1, 2009, submitted in connection with the case originally titled *Cambridge University Press v. Patton, et al.*, filed in the Federal District Court for the Northern District of Georgia, Civil Action No. 1:08-CV-1425-ODE (hereinafter the "Current Case").

Since that date, I have had the opportunity to review the following documents in connection with this case, all of which were as provided by the law firm of King & Spalding, counsel for the defendants.

- Expert Report of Robert B.K. Dewar (hereinafter the "Dewar Report").

- Expert Report of Debra J. Mariniello (hereinafter the "Mariniello Report").

- Expert Report of Steven K. Sheffrin (hereinafter the "Sheffrin Report").

- Deposition of Debra Mariniello, Copyright Clearance Center, dated June 30, 2009.

- Deposition of Sara Van Valkenburg, Sage Publications, Inc., dated June 29, 2009.

- Deposition of Niko Pfund, Oxford University Press, dated June 15, 2009.

- Deposition of John Challice, Oxford University Press, dated June 12, 2009.

- Deposition of Frank Smith, Cambridge University Press, dated July 1, 2009.

I also have reviewed the materials cited in this report and I previously reviewed the sources indicated in my first report.

The following terms as used in this report are as defined in my first report:

"E-Reserves" is the library service of providing electronic reserves services.
"GSU" is Georgia State University.
"Georgia University Policy" comprises the documents on the website of the University System of Georgia (http://www.usg.edu/copyright/) as itemized in my first report.

The plaintiff's reports raise important questions related to E-Reserves, and the nature of an appropriate policy for GSU. The leading issues raised in the reports listed above may be summarized and articulated as follows:

1. Is Licensing of Copyrighted Works a Substitute for the Implementation of a Fair Use Standard and Policy?

2. Does the Exercise of Fair Use Poses Risks to the Survival of Scholarly Publishing?

This report will address the foregoing questions.

**Part II:**
**Is Licensing of Copyrighted Works a Substitute for the Implementation of a Fair Use Standard and Policy?**

    A.  The Benefits and Limits of Licensing

As noted in my first report, permissions and licensing are an important part of the overall application of copyright. Limitations or exceptions in the law, such as fair use, are also vital for the proper functioning and application of copyright law in general and in higher education. The Mariniello Report emphasizes solely the availability and price of licensed copies of works through the Copyright Clearance Center (CCC). I continue to believe that licensing through the CCC is "an important part of the copyright equation." Colleges and universities throughout the country are certain to continue to use the services of the CCC for many purposes.

However, the role of licensing should not be overstated. Licensing has the appearance of offering an efficient and affordable means for access to the needed educational resources. Sometimes that is the case. But the system of licensing is often inefficient, costly, and prone to error. It is important, but it is not a simple solution to copyright needs. It must be questioned critically, and it must be utilized as just one means, along with fair use and other alternatives, for lawful uses of copyrighted works. Consider these limits and deficiencies of licensing:

    1.  The CCC may be an efficient means for securing permission, but the CCC does not offer permission for all needed works.

Some of the examples recounted in my first report provide repeated evidence that the CCC does not offer licenses for all works that are needed for E-Reserves. As a result, relying on permissions necessarily introduces uncertainty, delays, staff time, and expense to the process of clearing materials for use. Mr. Challice of OUP stated in his deposition: "Well, I think we have established licensing and permission is always available. It is always available. You almost don't need to put it on the list, or just go ahead and print a check mark in the box because it's always available." When pressed, he later limited his answer to Oxford University Press works.

The Mariniello Report further concedes that CCC licensing does not encompass a significant portion of the works actually used at GSU. She cites a review, apparently undertaken by CCC, of materials placed on E-Reserves at GSU during Fall semester 2009. She finds that 85% of the materials could be licensed through the CCC. That statistic masks a variety of questions about the limits of CCC services: (1) The remaining 15% constitutes a significant burden of individual licensing and uncertain fees, if the materials are not within fair use. (2) The 85% that are licensable are, according to the Mariniello Report, licensable from a combination of two CCC services, suggesting that

GSU would have to purchase an annual license and secure additional individual permissions.  (3) The annual license from the CCC would most certainly overlap with the ability to use many works under fair use, other license agreements, or other opportunities for lawful uses of copyrighted works.  (4) Perhaps the materials in this specific situation are licensable for electronic uses, but the Mariniello Report acknowledges that "millions" of works available from the CCC are not available for electronic uses, undercutting the ability of the CCC to serve the needs of E-Reserves services.

My first report offered examples of a library seeking permission for placing materials on E-Reserves.  In one example, the library sought permission for 29 items.  Only seven items were licensable through the CCC.  Of the 29 items, the library was ultimately able to secure permission for only ten.  Permission was denied for twelve items, and the publishers did not respond at all for the remaining seven items.  Of the ten items for which permission was granted, the copyright fees averaged $58.40 per item.  The price was a high enough cost to compel the instructor to drop most of the materials altogether.[1]

Because the CCC does not offer licenses for all works, cannot license electronic uses of many works, and because its fixed prices often exceed budgets, the CCC cannot be viewed as the solution for all copyright needs of E-Reserves.  It remains an important resource, but it must be used in connection with the other resources available to educators and libraries for the proper application of the law.

> 2.  The cost of permissions from the CCC or any rightsholder may be reasonable under some circumstances, but in the context of E-Reserves, they can become prohibitive, and they can lead to limited educational opportunity.

The Mariniello Report provides examples demonstrating the total cost to use a particular work is, of course, a lesser amount when divided by the number of students enrolled in the course.  She prefers to use a cost "per student" because the lesser amount therefore appears to be more "modest."  However, that method of calculating costs does not reflect the realistic economic model of E-Reserves.  The actual cost to most universities of E-Reserves will not be measured "per student."  As outlined in greater detail later in this report, the economic model for E-Reserves at most universities does not allow for shifting the expense of copyright fees to the students, as may be true with regard to coursepacks.  Consequently, the cost of the copyright royalty will be borne by the institution, which will ultimately pay the cumulative of the "per student" cost, multiplied by the number of students enrolled in the course.  The institution will pay the full amount, not the "per student" amount.

Specifically, the Mariniello Report lists fifteen examples of alleged copying from books, as set forth in the original complaint.  The cost per student for each instance of copying ranged from $3.36 to $18.48.  The Mariniello Report calls these fees "modest."  Even if that label were appropriate, the fees are no longer modest when multiplied by the overall

---

[1] See page 26 of my first report.

enrollment in the course.[2]  For example, if the cost per student for a CCC license is $5.00, and 30 students are enrolled in the course, the fee jumps to $150.00.  If 300 students, then $1,500.00.  At a major state university, an introductory course in psychology or freshman writing could have combined enrollments reaching or exceeding 1,000 students each semester.  That $5.00 cost could leap to $5,000.00, and the university could face that fee semester after semester.  Indeed, as I was able to document in my first report, many universities instead abandoned the use of certain works when faced with such fees, even fees that were considerably lower.  The real cost in that situation is not monetary.  The real cost is lost educational opportunity.

3.  Relying on licensing can lead to payments for, or limited use of, materials that are lawfully available for education and research.

If permissions are accepted as the principal or primary means lawful uses of educational materials, users will often turn to permissions and their appurtenant fees on occasions when permission is already granted.  I have given workshops and programs at universities throughout the country, and the following situation is one of the most common topics of discussion:

Section 110(1) of the U.S. Copyright Act explicitly permits the showing of motion pictures in classrooms at nonprofit educational institutions.  Often the educator or librarian or other buyer of a motion picture on DVD is unaware of this statutory provision.  As a result, some educational institutions often purchase the DVD of a motion picture with a "performance license."  An additional price is paid for a license to allow classroom performances of the work, but those performances are already clearly permitted by law.

Other examples of needless payments are legion.  Every "fair use" that is made the subject of a license is a payment for activity that is already permitted under law.  In my first report, I noted the example of one university faced with payment of $23.10 for the use of a single page from a 333-page book.  Even the depositions of plaintiffs' witnesses indicate that such activity is likely within fair use.[3]

Further, the CCC is now offering an annual license to colleges and universities, permitting uses of many materials for educational purposes.  The educational institution pays an annual "blanket" fee.  According to the Mariniello Report, the annual license

---

[2] In my first report, I noted the example of a three-page excerpt from a 593-page book.  The CCC license fee was $84.78 for copies of those three pages for a class of 154 students.  The Mariniello Report responds to the example by calculating that the fee per student is therefore the comparatively modest amount of $0.55.  However, even that lower price may be judged as excessive or simply unwarranted when fair use is introduced into the overall application of copyright law at the university.  By standards of fair use articulated in the Challice deposition, such examples of a few pages from a book would likely meet his criteria for fair use: "If somebody had handed out in the course of a 15-week semester 5 documents, 3 pages each, I would have no trouble believing all of that was fair use, without diving into what the actual documents were."
[3] See the preceding footnote.

encompasses only a portion of the materials otherwise available through the CCC. Because the license requires a fixed payment for use of all materials, the college or university is in effect paying for uses that are permitted under fair use or other copyright exception and for uses that may already be authorized through purchase of access to journals and other materials through online databases. Once again, reliance on licensing leads to multiple payments for the same uses of the same materials.

4. Relying on licensing can lead to payments for, or limited use of, materials that are in the public domain.

Confusion about copyright, and simple erroneous assertions of rights, often lead to the payment of royalties or imposition of restrictions with regard to works that are in fact in the public domain. Works in the public domain have no copyright restrictions. They may be used without permission or payment of fees or even consideration of fair use and other copyright exceptions. The purpose of the public domain is to allow public use of materials and to foster learning and the growth of knowledge. Nevertheless, institutional reliance on licensing has created opportunities for parties to assert a copyright claim where no copyright may legally exist—and to collect payment of fees where none may be due.

Example: *Emma*, by Jane Austen, was originally published in 1815. It is clearly in the public domain. A new version or translation or other derivative of the original novel could have copyright protection, but the author's original words from nearly two centuries ago are in the public domain. Several publishers have made a version of the book available at a low price, exactly as the public domain should allow. Among those publishers is Oxford University Press (OUP) (ISBN 0-19-282756-1). The list price for the OUP book was $4.50.[4] A purchase price for a public-domain book is often justifiable; the buyer is obtaining a physical copy of the book that may be convenient for the reader and expensive to produce and deliver. However, if a user would like to make photocopies of pages from the book, a license for the OUP edition of *Emma* is available online from the CCC at the price of $0.12 per page.[5] That payment is not for a physical copy, but is purely for permission to make copies; the buyer incurs yet additional costs of producing the copies. The buyer has true alternatives and may find versions of *Emma* that are explicitly in the public domain and available without copyright fees.[6] However, unless the instructor, the coursepack office, the library, or another party takes the time to track the copyright status and the alternative sources, a user that relies primarily on licensing will needlessly pay the fees, adding substantial costs to the process of meeting educational needs.

---

[4] OUP apparently no longer has this particular book listed for sale.
[5] The rightsholder may well have a copyright interest in preface or other original contributions to the book, but the text of the book reflects the original, thereby evidently placing it in the public domain. The CCC licensing fee, however, is applicable to any pages from the book.
[6] For example, the full text is available for free from Project Gutenberg, an online service facilitating access to public domain works. See: http://www.gutenberg.org/etext/158.

Example: One of the clearest rules of American copyright law is that works published in the United States before 1923 are today in the public domain. Oxford University Press is currently preparing to publish a book that is planned to include reprints of materials from the *Journal of the American Medical Association* (JAMA). Those materials were published between the years 1919 and 1922. Based on that information, the articles are unquestionably in the public domain. Nevertheless, the editors of JAMA have refused to acknowledged that fact and have insisted that the author of the book secure a license that may result in restrictions on reprinting, payment of fees, or both. The individual author of the OUP book does not have the means to pursue a legal confrontation, and under a standard publishing agreement, the author is responsible for clearing rights and paying fees. To the best of my awareness as of this writing, the book author agreed to limit his use of the 1922 article to print uses only, and he agreed to pay $150.00 in permission fees for each of two figures (for a total of $300.00) that were originally published in JAMA in the years 1919 and 1921. According to the book author, OUP seemed to be urging him to accept that result. The author has not yet paid the fees and believes that OUP may assist with the costs in this extraordinary situation.

Heavy reliance on licensing leaves openings for gross misinterpretations of the law, unnecessary expenditures, and constraints on the use of information resources. Another important lesson from this example is the realization that the neither of the parties with the greatest influence—JAMA and OUP—was willing to press for an accurate application of the law, and in a customary situation, neither of them pays the price for the flawed application. The book author ordinarily pays the fees, and the readers face the risk of limited or denied access to information. In this case, I have been informed that OUP may be willing to bear some or all of the $300 fees for the use of the figures. That decision would be important for the author, but it is still detrimental to OUP and the public. The fees will probably be reflected in the retail price of the book, and because JAMA was not willing to permit electronic distribution of the reproduced article, consumers will not be able to have the option of an electronic book version.

These are the results of what might be described as a "culture of licensing." An institutional environment that favors licensing over copyright law runs the risk of foreclosing opportunities and incurring needless costs. Publishers should not require licensed clearance for works in the public domain, and users should not pay fees for materials that lack copyright protection. Institutional practices that are built around the primacy of licensing can lead to distortions of the law, burdensome transaction costs, and unjustified expenses. In the end, the public loses.

5. Relying on licensing can lead to payments for use of materials that are not properly authorized by the copyright owner or other rightsholder.

Nothing in copyright law protects GSU, or other user, if it secures what appears to be a proper permission, but in fact the permission was obtained from an unauthorized source. The user may have acted in good faith, and may have paid considerable fees for the permission, but the user is still facing a potential infringement claim. Indeed, because

representations, warranties, and sureties from a licensor are seldom available, the risks associated with permissions remain with the user.[7]

Greatly complicating the possibility of wrongful permissions is that the user will almost never have the information necessary to confirm the rightful owner of the copyright. Ownership may depend on the terms of the author's employment, the contract with a publisher, the existence of later transfers, and many other variables. Without the ability to review such evidence and private documents, no one can be certain that permission from a licensor is valid.

However, I do have access to my own private files, and I have found the following examples of my own publications that are licensable through CCC:

- "Licensing for Information Resources: Creative Contracts and the Library Mission." In *Virtually Yours: Models for Managing Electronic Resources and Services*, pp. 98-110. Edited by Peggy Johnson and Bonnie MacEwan. Chicago: American Library Association, 1999.

  By letter of August 4, 1997, contributors to this book were asked to give the publisher a right of first refusal. I signed such an agreement on October 2, 1997. Other rights remain with the authors.

- "Copyright Protection and Technological Reform of Library Services: Digital Change, Practical Applications, and Congressional Action." In *Libraries, Museums, and Archives: Legal Issues and Challenges in the New Information Era*, pp. 257-273. Edited by Tomas A. Lipinski. Lanham, MD: Scarecrow Press, 2002 [co-authored with Dwayne K. Buttler].

  By agreement of 2001, Mr. Buttler and I entered into an agreement granting to the publisher "the nonexclusive right to publish and sell . . . the Article as part of the Work [the book]."

In each of these instances, I gave the publisher only a limited license, which did not include broader rights, such as the right to license individual items outside the context of the collective work.[8] Nevertheless, permission to make copies of each of these works for

---

[7] In a review of the website of the Copyright Clearance Center (www.copyright.com), I could find no indication that the CCC provides indemnification or other protection for libraries, universities, teachers, or anyone else purchasing a license from the CCC. By contrast, the "Copyright.com Terms and Conditions" specifies that *users* of the website must indemnify the CCC against losses and explicitly disclaims any warranties of non-infringement (www.copyright.com/ccc/viewPage.do?pageCode=i23). Also, an author or publisher of a work submitted to the CCC for licensing must represent that it has the rights, and indemnify CCC against loses (http://www.copyright.com/media/pdfs/RH_Authorization_Agreement_Authors.pdf). The company Xanedu.com offers the service of clearing permissions for coursepacks, and it offers a guaranty and indemnification (www.xanedu.com/copyright/guarantee.shtml).

[8] The U.S. Supreme Court in *New York Times Co., Inc. v. Tasini*, 533 U.S. 483 (2001) affirmed that a license to contribute an article to a collective work includes only the right to include the article in the collective work, in a revision of it, or in a collective work that is part of the series.

E-Reserves may be purchased from the CCC.[9]  As a result, users may pay significant amounts to the CCC, but in return not receive a properly authorized license and thus face the risks of copyright liabilities, including actual damages or statutory damages, injunctions, attorney fees, and court costs.[10]

> 6. Licensing has the appearance of efficiency and economy in the context of coursepacks, but the different business and financial model for E-Reserves makes a dominant role for licensing inappropriate.

Especially following the 1991 ruling in *Basic Books, Inc. v. Kinko's Graphics Corporation*,[11] many bookstores, photocopy shops, and other providers of coursepacks for colleges and universities have relied principally on licensing as a means for lawfully reproducing copyrighted works.  Publishers and other supporters of the licensing model have successfully advanced the cause of licensing in large part because the coursepack providers had little motivation to resist it.  The *Kinko's* ruling drew considerable attention to the issues of copyright and coursepacks, and the litigation created fear of liability among many operators and owners of coursepack shops.  Most important, however, the labor and expense of licensing can be absorbed by the business and financial model of the coursepack service.  By contrast, the library and the E-Reserves service is typically not able to absorb these burdens in a similar manner.

In the common situation at a university, the faculty member brings to the bookstore or other office the collection of materials for the coursepack.  The bookstore may make the copies or send them to a third party for the copying.  A bookstore or copyshop is seldom willing to invest staff time to evaluate the materials and determine whether they are within fair use.  As a result, many coursepack services turn immediately to licensing.  Coursepack offices could make a determination about fair use, but their business model often gives them little motivation to do so.  When the permission to reproduce works is subject to fees, whether through the CCC or directly to the rightsholder, those fees are added to the cost of the coursepack.[12]  The student pays the bill.  In the usual arrangement, copyright royalties are paid only for the number of copies sold; any excess copies can be disposed of without payment of copyright fees.

Under this model, the bookstore or copyshop has several reasons to give relatively little attention to fair use:

---

[9] I have not received any compensation from the CCC licensing of these works (I will concede that maybe no one has been willing to pay for them).  I am also not raising this point with the expectation of receiving any payment, and I will gladly waive any amounts that may be due to me from the publishers as a result of any CCC licensing, and waive any claims against users who purchased a license from the CCC.

[10] It is possible that the CCC reviews and rejects a request to license such works, but I found nothing on the CCC website to indicate that possibility.

[11] 758 F.Supp. 1522 (S.D.N.Y. 1991).

[12] Under this common model, the "per student" cost for licensing, as emphasized in the Mariniello Report, has some relevance, because the cost is able to be divided among the number of coursepacks created and sold.

- The shop is often a for-profit bookstore or other organization, and as a result it may have less ability to apply fair use. The *Kinko's* court ruling, for example, held that the first factor of fair use, the "purpose of the use," can weigh against a finding of fair use in the case of a for-profit copyshop. With the law probably permitting less fair use for a commercial shop than it permits for a nonprofit educational institution, the shop has less motivation to identify a benefit from fair use.

- The shop is often independent of the college or university, and as a result does not necessarily share the primary mission of optimizing access to information in furtherance of education. The mission of the university centers on teaching, research, and service. The mission of an independent shop is usually to provide business service and to maximize profits. Many shops serving the educational community are part of large national chains and are responsive to shareholders; they may have little incentive to indulge in the subtleties and uncertainties of fair use. The shops may ignore fair use, while fair use remains crucial to the university. Universities and libraries are not avoiding fees. They are instead making instructional materials available to students under a different model, and one that bring fair use into the equation and that best serves the educational mission.

- The process of reviewing the materials and evaluating fair use requires a dedication of staff time and possibly specialized training. For a copyshop, staff time can be recouped only through higher prices on services and products. In a competitive environment, the shops are instead striving to keep costs down. For the educational institution, staff time is at least as costly, but the university is often ready to absorb that burden, motivated by the importance of fair use for the needs of higher education.

- The direct costs of copyright fees incurred for coursepacks are ordinarily not borne by the copyshop; they are added to the cost of the coursepack and are borne by the students. Whether the copyright fees are small or large is often immaterial, unless the price is so unusually high that it might stir concerns among customers. Otherwise, the costs are added to the purchase price, and the students pay the bill. Fair use and even waived or reduced fees may not be important to the copyshop, so long as the fees can be passed to the students. Fees only affect the cost of the coursepack to the student, and not affect the ability or willingness of the copyshop to provide the service. By contrast, because E-Reserves services typically are not able to charge fees back to students.[13] Thus a low fee or a fair use can make the difference between meeting educational needs or not. When faced with a fee, the only alternatives for most libraries are to pay the fee or drop the material.

---

[13] The libraries that operate E-Reserves encounter various challenges to setting fees for services. Libraries offer many services that incur individualized costs, but seldom do libraries charge those fees back to the user. Fees conflict with the library's role as an open information resource for the academic community. Libraries are also not administratively structured to charge and collect service fees for various reasons, including the possible need to account for state sales tax.

- Some campus bookstores receive orders for printed coursepacks, but outsource them to independent companies. Those companies clear copyright issues and prepare the physical copies for sale. In a common formula, many university bookstores add a fixed percentage to the price of a book or coursepack to determine the retail price. If the price to the store includes high copyright fees, the final price to the student, and the profit margin to the store, may therefore escalate even further. Fair use might have the effect of creating a lower cost for coursepacks that could be perversely undesirable to some sellers of coursepacks.

- In the coursepack environment, copyright fees are ordinarily based on actual sales of copies. If a course has 30 students enrolled, but only 20 students purchase the coursepack, then fees are due on only the 20 actual sales. Fees for E-Reserves may not be so easily contained. An equivalent determination for E-Reserves could involve a review of technological access of files and a potential breach of the privacy interests of students about the use of their online accounts. It would also entail distinguishing access by students from access by librarians and administrators who are managing the E-Reserves system. By contrast, the sales of coursepacks can be made anonymously, and the quantity of sales can be measured with more reliable precision. The problem for E-Reserves is exacerbated if licensing is required in advance of the use, whether through individual transaction fees or through acquisition of a blanket annual license. The university is left to pay the costs for all students, whether the materials are used or not.

Educational institutions and libraries are offering services under a model that is necessarily different from the model that has emerged for coursepacks. The systems are different in policy, mission, economics, management, and law. Most important for the Current Case, universities are simply positioned to bring fair use into the equation, while many bookstores and copyshops are not. For universities, fair use is important; for many copyshops, fair use is immaterial. Universities will surely continue to secure permissions and pay licensing fees, but they do so in a robust environment where all aspects of copyright are considered. In the coursepacks setting, the shops often have no motivation to consider fair use, and thus choose not to pursue its benefits. Educators and librarians are not compelled to make that same sacrifice.

## 7. Overview

For the foregoing reasons, any suggestion that licensing should be the leading or primary means for copyright compliance in connection with E-Reserves is misplaced. Licensing is one means toward clearance, but it should be utilized in careful coordination with fair use, the public domain, and other important opportunities in order to apply the full potential of copyright law and to prevent errors of overprotection, wasted staff time, and unjustified copyright fees.

This examination of the role of licensing also reveals many of the critical differences between E-Reserves and coursepacks. The Dewar Report asserts that E-Reserves is akin to print coursepacks. In fact, the two services are dramatically different, specifically with respect to the role and importance of licensing and fair use. The differences are evident in the operating procedures that copyshops and libraries usually implement around their respective services. Many bookstores and copyshops never consider fair use for the reproduction and sale of coursepacks. By contrast, fair use is often an important and prominent part of the process for E-Reserves. At GSU, faculty members are expected to evaluate whether their materials are within fair use before delivering them to the library. Library staff members have testified in depositions that they make additional reviews of the same materials and return to the instructor those materials that raise concerns about fair use.

Licensing continues to be an important part of the copyright equation, but failure to include fair use in that equation will lead to defects of overprotection, flawed application of the law, excessive fees, and lost educational opportunity. The most accurate means of working within the law for purposes of E-Reserves is by addressing licensing, together with other opportunities allowed under the law. Only by taking the initiative to understand and apply fair use, before seeking permission from the copyright owner, will fair use be allowed its proper role to serve the advancement of knowledge and to advance education.

Only by properly questioning the role of permissions and licensing will the full benefits of copyright be realized through the protection and use of the public domain as well as assuring that fees are paid to rightful owners when warranted under law.[14] Building a culture of licensing has resulted in payment of fees for materials that are in the public domain, and payment for materials that are already available under law or other license agreement. The service model that has evolved around E-Reserves affords the opportunity to advance the fuller purpose of copyright law as well as the mission of education.

The Georgia University Policy, together with the procedures for implementation, allows for a proper role of both rights and responsibilities under copyright law. Indeed, such policies are usually labeled "fair use" policies, but they have additional and broader functions. From a legal perspective, the label "fair use" policy may be shortsighted. These policies are not merely about the "use" of copyrighted works. To the extent that they set a limit on fair use, these policies are as much about assuring that the libraries will link to the online databases, purchase works needed for classroom instruction, and seek permissions and pay fees when appropriate.

---

[14] Mr. Pfund stated in his deposition that he sees the CCC as offering a single standard: "I think the CCC is obviously intended to be a one size fits all clearing house to address some of these [fair use questions]." GSU is, by contrast, seeking to bring a more nuanced perspective to the matter of licensing and the application of copyright law. That nuanced perspective is simply an application of a range of opportunities allowed under the law.

Finally, educators and librarians are the only parties realistically able to bring fair use into the E-Reserves environment.  In her deposition, Ms. Mariniello emphasized that the CCC does not evaluate fair use as applied to licensed materials.  Requests come to the CCC, the licenses are issued.  She acknowledged that fair use may apply, but the CCC does not assume that duty.[15]  If fair use is to have its rightful role, then educators and librarians are the only participants in the system of E-Reserves who are able to assure that fair use receives proper consideration and that E-Reserves are conducted in a manner fully consistent with copyright law.


### B.  The Georgia University Policy and the Fair Use Checklist

In my first report, I detailed the characteristics of the Georgia University Policy and the fair use checklist that forms a part of it.  The plaintiff's expert reports do not offer any direct counter to the validity of the Georgia University Policy itself, other than suggesting that the Georgia University Policy may pose risks to licensing or to the well being of publishers.  By turning all attention in the reports to the possible harm to licensing or to the conventions of scholarly publishers, the plaintiff's reports are not recognizing the appropriateness of the Georgia University Policy.  Indeed, they are not acknowledging a role for any policy that would encompass issues of fair use and support the needs of education.

By contrast, such policies have been developed and implemented at many colleges and universities.  Further, aspects of the Georgia University Policy, as well as the fair use checklist, have been widely accepted at many educational institutions, and the Georgia University Policy is consistent with many principles of fair use articulated in the depositions of the plaintiff's witnesses.


### 1.  Fair Use Varies with Circumstances of the Use

The Pfund deposition revealed that OUP has different standards of fair use for authors writing textbooks and for authors writing scholarly books.  He also noted that the standard of fair use for a quotation as an epigraph would be different from a quotation within the text of a book.  The Georgia University Policy is little different, in that it allows individuals at the university to assess the particulars of the use and apply fair use accordingly.

---

[15] As she stated: ""By a balanced approach, as I think I've said a couple of times over the course of this conversation, one of the things that we are very cognizant of is we don't provide guidance in terms of fair use."

2. Fair Use Concepts of the "Heart of the Work" are Variable

Mr. Pfund explained in considerable detail how different readers of a book could reach different conclusions about what constituted the "heart" of the book. He further added that the determination of the "heart" may depend on the "purpose" for which the work is being used. Mr. Challice similarly affirmed that the "heart" of a work can vary depending on who is selecting the excerpt and for what purpose. The Georgia University Policy similarly allows an assessment of the work and the context of the use.

3. Fair Use Varies with the Length and Character of the Original Work

In his deposition, Mr. Challice indicated that he did not know where the line might be for fair use, but he gave the example of copying two pages from a three-page article. He said that would not be fair use. On the other hand, Mr. Challice also said that it would be fair use for a teacher to copy an article from the front page of today's *New York Times* for use in a political science course.

In another example, when asked whether copying two chapters, or about 30 pages, from a book would be fair use, he clearly indicated that fair use would depend on exactly what is in the materials copied:

> Again, without the work in front of me, I just can't answer. I would want to see what chapters 1 and 2 are. I would like to know how long the book is, I would like to see what else is in chapters 1 and 2, in terms of the material.
> If it's an executive summary of the entire work, I might say actually that's too much.
> If it's a prologue and it's a narrative, I might not be worried about it. It really would depend.

Later he added when asked about a hypothetical use of five pages from each of various different works:

> Conceivably Oxford would [have a problem with the copying], if they were all Oxford works, and I were to learn the facts of this in this way, I would want to know what the works were, how long they were, what the 5 pages were in each case, and—can I imagine one scenario where I would do that and it would be a legitimate fair use? Yes, I could probably come up with one scenario. But it's so farfetched as to be unlikely to occur.

Mr. Challice continued his answer by outlining a type of use that he would call fair use, and it depended on the length and character of the work used, the circumstances of the use, and other factors. One need not agree with his evaluation to agree with his more general point: fair use depends on the particulars of the given situation. One rule does not answer all fair use questions.

4. Fair Use Varies with the Context of the Use

The Pfund deposition revealed that OUP sets different standards for fair use when an item is being quoted in the text of a book, or is set forth as an "epigraph." The deposition further revealed that OUP sets different standards when a work is being reproduced in a textbook as opposed to placing it in a departmental newsletter at a university. When asked to explain how these uses are different, he offered: "Because I think in one case there is a very clear desire to broadly, in a broad market sense, commodify or derive commercial benefit from the use of our copyright. In other cases, it is a smaller and much less deliberately commercial usage that doesn't actually have an effect on—or is unlikely to have an effect on our ability to generate future revenues."

The deposition of Mr. Pfund referred to possible different standards of fair use depending on whether the coursepack of materials was supplementary or are used "quite centrally in courses."

The deposition of Ms. Van Valkenburg of Sage reaffirmed that a "black line" rule may not be appropriate, but that fair use may depend on the context of the use: "It is difficult to have a black line quantity, floor or ceiling, without looking at how the content is being used. So we purposely stay away from black line lines and simply say what is the amount of content being used with respect to the way it's being used."

The Georgia University Policy allows the university to make some of the same evaluation of fair use that the publishers also implement under the law.


5. Fair Use is Best Evaluated by Faculty

In their depositions, some of the plaintiffs' witnesses expressed concerns about allowing faculty members to make decisions involving fair use. In practical reality, an individual instructor is often the ideal party to make decisions about fair use for many reasons. First, the instructor has the facts. Fair use is a fact-based inquiry, and the instructor has the details about the copyrighted work, the character of the use, and more. Second, under the Georgia University Policy, and at many other universities, the instructor's decision about E-Reserves is subject to review by librarians who manage the service, and the university counsel is available for consultation. Third, the simple volume of activity at any university involving copyrighted works and fair use decisions would likely overwhelm a centralized office attempting to review and approve activity.

The most important reason is to bring faculty members into the copyright process. Through greater awareness of copyright, they will have the opportunity to learn more about the important connection between copyright law and their academic work. Faculty members are not merely users of copyrighted works; they are also creators and owners of

many new works.  Involvement by instructors in any aspect of the copyright equation will better prepare them to make informed decisions on many other occasions.

Giving faculty members a place in the decision-making process at the university is analogous to the copyright decisions that publishers expect of them when the same faculty member is the author of a new book.  A standard publication agreement usually places responsibility on the author to clear permissions for the use of materials in the book, and to make an initial determination of fair use.  These agreements also usually call for the author to warrant that all copyrights are clear and to indemnify the publisher against losses.  The faculty author attends to the decisions of fair use and permissions, much as that same faculty member would be responsible for evaluating fair use for E-Reserves.  The book publisher usually reviews the decisions and may raise questions, much as the librarian may review the materials submitted for E-Reserves.

As the depositions confirm, many of the publishing companies rely on staff members to review questions about fair use.  Those staff members are seldom trained lawyers, but they have studied copyright law and have ongoing experience with the issues.  Similarly, many university librarians have learned much about copyright and have gained tremendous experience with fair use and related issues.  In the end, placing initial responsibility for copyright compliance with faculty members is not only responsible, but beneficial to the educational process and to the balanced implementation of copyright at the university.


### C.  The Checklist for Fair Use

The checklist for fair use is an attempt to articulate and guide users through many of the variables that are part of fair use.  The checklist is also an important element of the Georgia University Policy.  To the extent that the plaintiffs' expert reports are critical of the Georgia University Policy and standards for fair use, the reports are therefore critical of the checklist.


#### 1.  Criticism of the Checklist

The depositions of Mr. Pfund and Mr. Challice devoted considerable attention to the "fair use checklist" as a part of the Georgia University Policy.

Mr. Pfund, criticized the basic concept of the checklist: "there is sort of pseudoscientific construct that you can tally up the numbers and compare these issues, which I think are radically disproportionate in terms of the emphasis they're given, seems to me first and foremost that is one thing I think is deeply unhelpful."  Mr. Pfund further stated that the checklist appears to be an "algorithmic calculation" and does not include a "human element" in the decision about fair use.  Mr. Pfund criticized the notion of "tallying" of

factors in order to reach a conclusion, but that is exactly what courts do when they apply the factors to determine whether a use is fair.

Mr. Challice used the checklist to evaluate the hypothetical example of a faculty member wanting to copy all of a 1,500-page textbook for distribution to students enrolled in a course. In that one example, he asserted that an instructor using the checklist would conclude that the copies are within fair use. He later added: "There's almost no circumstance under which one could take anything at Georgia State and conclude that it's not fair use." One can quibble with many of his conclusions about the meaning of the variables on the list, and about his evaluation of them, but most important is that he overlooks the simple fact that no policy will be effective unless understood and applied with a clear vision and practical good sense. Any policy may be subject to distortion and honest disagreement, but anyone applying the checklist in good faith would be strained to conclude that it permitted a full copy of a lengthy textbook for each student, especially if the book is available from the publisher or other rightsholder.

The Georgia University Policy provides safeguards against exactly this type of unreasonable construction of fair use. First, the university has begun a series of workshops for faculty members and other members of the university community. As I described in my first report, those workshops already have had a positive effect on the understanding and application of fair use at GSU. Second, while faculty members have primary responsibility for applying fair use to their selections of materials for E-Reserves, the librarians who receive materials from instructors are in a position to review submissions. Again, as I noted in my first report, the depositions of librarians reveals that they do in fact review submissions and have been able to question review and question interpretations of fair use. Third, the Georgia University Policy commits the university to allowing any faculty member or librarian to consult with university counsel for assistance with fair use applications. These safeguards are extraordinary steps toward assuring an appropriate interpretation of fair use and respect for the interests of the copyright owners.

The depositions of faculty members and librarians at GSU revealed that the implementation of the new policy in fact has caused them to reevaluate their use of the copyrighted materials. A professor may plan to use a particular excerpt from a book, but after applying the checklist, may significantly reduced the amount of the book that she would copy, in order to more clearly stay within fair use. This dynamic of adjusting one's activities in light of the limits of the law is exactly what the doctrine of fair use should foster. Indeed, in the deposition of Mr. Pfund from OUP, he recounted that he might sometimes face questions about fair use or permission fees, and in response "we say we can actually paraphrase and truncate and get it down to this level and oftentimes it's acceptable." The depositions in this case have revealed that some faculty members are engaged in exactly that process, and that is exactly one of the hallmarks of a reasonable fair use policy. The user is in fact critically reevaluating plans and making the copies only after reconsideration in light of the law.

By contrast, for Ms. Van Valkenburg from Sage, one of her criticisms of the checklist is that is may be too rigid.  When asked about any flaws in the checklist, she replied: "I think the instructions paragraph, the first sentence which talks about, I think it tries to black line rule what is actually a pretty context specific analysis.  And when the instructions refer to a pure count of 'factors for' versus 'factors against,' it lacks a qualitative analysis of possibility that some factors are more important and in certain cases than other factors."

Evidently, one witness believes that the checklist is potentially too flexible and open ended; another witness believes that it lacks the flexibility to encompass additional nuance in the law of fair use.  These different views of the checklist most likely are a reflection of the versatility of fair use that the checklist attempts encompass.  In the final analysis, fair use will depend on the circumstances of the specific situation, and a checklist ultimately takes on real meaning when applied in the context of an actual situation.

2. Alternative Methods for Policy Implementation

In his deposition, Mr. Challice had the opportunity to describe his vision of a process for handling fair use at the university:

> What GSU should do is have a person in place who understands fair use, and have a process in place to be able to handle requests from faculty members, where that person—and a policy in place, a reasonable policy in place, that probably ought to be negotiated with the AAP on behalf of all publishers, that would protect GSU and make the publishers happy.

Mr. Challice further described what he expected of any given university:

> I would expect to find a librarian or a body of librarians who understand fair use, who screen the stuff the faculty is doing, collect all the things they want, actually handle the digitization to make sure it's done in a professional way, look after the postings, and advise people this is way too much material, you need to get clearance, here is where you go to do that.  Probably manage the budget for that.  And sort of—that's what I would expect.

Similarly, Mr. Smith of Cambridge University Press testified generally about his expectations for universities:

> We would have expected Georgia State to act as many other universities do in policing faculty and instructor use to ensure that fair use is sought for any copying, scanning of copyright materials and that permission is sought for all such uses.
> …

> We mean [by "policing"] that the university should take responsibility to ensure that no infringement takes place by university personnel using university resources.

Calling for the university to have a reasonable policy and a staff member available for copyright guidance is appropriate. However, this vision of comprehensive copyright policing at the university is impracticable. First, universities are facing severe budget cutbacks; the staff requirements to review all faculty requests would be prohibitively expensive. The simple volume of activity would overwhelm any system of review, and it would steadily delay the educational process. Second, efforts have been made in recent decades to develop or negotiate interpretations of fair use applicable to teaching. Those efforts have failed to achieve the goal of providing a workable standard. The most recent efforts, initiated by the federal government in the 1990s, produced a set of guidelines that never gained wide acceptance.

As with many activities undertaken by members of any large organization, training and guidance can be important. The University System of Georgia is offering workshops and providing access to legal counsel. Ultimately, individuals will be allowed to make responsible and informed decisions. That is exactly what is happening in Georgia, and the depositions reveal that faculty members and librarians have adjusted their activities in the wake of the new policy.


### D. The Fair Use Checklist at American Colleges and Universities

To suggest that the Georgia University Policy and the fair use checklist are an improper standard for a university is to suggest that many colleges, universities, community colleges, primary and secondary schools, and even private companies have adopted an improper standard for working with fair use. The wide acceptance of the checklist, in particular, demonstrates that it has been reviewed by many academic professionals and attorneys, and it has been selected as an appropriate element of responsible decision making about fair use.


### 1. Checklists that are Variations on the Original Checklist

The checklist that is part of the Georgia University Policy is rooted in a checklist that originated at Indiana University, now posted at a Columbia University website. Many educational institutions have posted to their websites fair use checklists that have that same source. Some institutions have adopted the checklist with little or no change. Other universities have made significant alterations. Nevertheless, the following universities have posted on their websites a form of a checklist that is explicitly or evidently rooted in the Indiana University or Columbia University model.

University of Minnesota
University Libraries
http://www.lib.umn.edu/copyright/checklist.phtml

North Carolina State University
Office of the Provost
http://www.provost.ncsu.edu/copyright/resources/tutorials/FairUseChecklist.php

University of Chicago
Copyright Information Center
http://www.lib.uchicago.edu/copyrightinfo/fairuse.html
"This web site is a collaboration of The Library, NSIT, and the Provost's Office and the
Office of Legal Counsel.  While copyright law is discussed and guidance is given, this
site should not be relied on as definitive legal advice.  If legal advice is required, faculty
and staff of the University of Chicago should contact the Office of Legal Counsel."

Medical University of South Carolina
Department of Library Science and Informatics
http://www.library.musc.edu/page.php?id=1414

Boise State University
Office of General Counsel
http://www.boisestate.edu/generalcounsel/copyright/fairuse/fairusechecklist.shtml

Ball State University (Indiana)
Library
http://www.bsu.edu/library/media/pdf/IUPUP-FairUse-Checklist.pdf

University of Denver
Sturm College of Law
http://www.law.du.edu/index.php/copyright/fair-use-checklist

California State University
Office of General Counsel
http://www.calstate.edu/gc/OGC_Manuals_on_Legal_Issues.shtml
At this web address, select "Fundamentals of Copyright and Fair Use" for a manual that
explains the law and includes a version of the checklist.

Virginia Tech
Digital Library & Archives
http://scholar.lib.vt.edu/copyright/FairUseChecklistVT.pdf

Kankakee Community College (Illinois)
http://www.kcc.edu/FacultyStaff/resources/copyright/Documents/copyrightchecklist.pdf

Schoolcraft College (Michigan)
Vice President Policy
http://www.schoolcraft.edu/pdfs/policies/3112.1_checklist.pdf

Baylor College (Texas)
http://www.baylor.edu/content/services/document.php/68621.pdf
This policy adds several variables to the checklist. It also includes an opportunity for the user to evaluate each factor on a scale from "strongly favors" to "strongly weighs against."

University of Rochester
River Campus Libraries
http://www.lib.rochester.edu/copyright/wksheet.htm
Makes a significant variation on the elements for the checklist, and it organizes them into categories that reflect their influence on the evaluation of fair use.

University of Arizona
University Libraries
http://www.library.arizona.edu/services/faculty/scholcom/fairuse/
This version adds several variables, including references directly to the Classroom Guidelines of 1976 and some of the elements of those guidelines.

Hamline University (Minnesota)
Information Technology Services
http://www.hamline.edu/hamline_info/offices_services/technology/knowledgebase/copyright/fair_use_checklist.html

Cornell University
Office of University Counsel
http://www.copyright.cornell.edu/policies/docs/Fair_Use_Checklist.pdf

University of North Carolina
School of Information and Library Science
School of Journalism and Mass Communication
http://www.ibiblio.org/pub/electronic-publications/stay-free/ml/readings/fairuse_checklist.pdf

University of Central Missouri
James C. Kirkpatrick Library
http://library.ucmo.edu/copyright/checklist.htm

Portland Community College
http://www.pcc.edu/about/policy/copyright/documents/fair-use.pdf

Yakima Valley Community College
Library
http://www.yakima.cc.wa.us/library/COPYRIGHT/checklist.htm

University of Cincinnati
Libraries
http://www.libraries.uc.edu/services/reserves/FairUseChecklist.html

University of Cincinnati
Engineering Libraries
http://www.engrlib.uc.edu/eres/copyright/copyrtchecklist.html

Western University of Health Sciences (California)
Libraries
http://www.westernu.edu/bin/library/fair-use-checklist.pdf

Wright State University (Ohio)
University Libraries
http://www.libraries.wright.edu/services/copyright/fac_staff/fair_use_checklist_fac_staff.html

Luther College (Iowa)
Library and Information Services
http://lis.luther.edu/files/images/fair_use_checklist.pdf

Central Michigan University
Copyright Assistance Office
http://www.cmich.edu/documents/copyright/checklist.pdf

Albany College of Pharmacy and Health Sciences
Library
http://library.acphs.edu/services-faculty-copyright.aspx
Restructures the checklist and includes general description of each factor.


2. Links to the Checklist at Columbia University

The following educational institutions include links to the checklist as posted on the website of the Copyright Advisory Office of Columbia University.

Salisbury University (Maryland)
Blackwell Library
http://www.salisbury.edu/Library/copyright/fairuse.html

Muhlenberg College (Pennsylvania)
Trexler Library
http://www.muhlenberg.edu/library/reshelp/copyrightprimer.html

Rutgers University
University Libraries
www.libraries.rutgers.edu/rul/libs/fordham/copyright.pdf

Sam Houston State University
Gresham Library
http://library.shsu.edu/research/copyright.php

Kent State University
University Libraries
http://www.library.kent.edu/resource.php?id=3195
http://www.library.kent.edu/page/13578

Lycoming College (Pennsylvania)
Snowden Library
www.lycoming.edu/library/about/snowdencopyright.html

University of Tennessee
University Libraries
www.lib.utk.edu/copyright/fairuse.html

California State University, Chico
Technology & Learning Program
http://www.csuchico.edu/lcmt/copyright/#fairuse

Stanford University
University Libraries
http://fairuse.stanford.edu/charts_tools/

University of California, Los Angeles
University Library
www.library.ucla.edu/service/12796.cfm?prt=1

Wabash College (Indiana)
www.wabash.edu/copyright/docs/Fair%20Use%20Guidelines8.pdf

Oakton Community College (Illinois)
Library
http://researchguides.oaktonlibrary.wikispaces.net/Copyright

Drake University (Iowa)
Cowles Library
http://www.lib.drake.edu/page.php?id=10
"Print this out and pin it to your bulletin board; review it every time you think about making multiple copies or posting something to your Blackboard page or the Internet."

Georgian Court University (New Jersey)
Library
http://www.georgian.edu/library/additionallinks.htm

University of Medicine and Dentistry of New Jersey
Libraries
http://www.umdnj.edu/stlibweb/copyright/cgeninfo.htm

University of Washington
University Libraries
http://www.lib.washington.edu/types/course/copyrightsteps.html

University of California
Systemwide Policies
http://www.universityofcalifornia.edu/copyright/fairuseresources.html

Taylor University (Indiana)
Library
http://www.taylor.edu/academics/library/research-guides/copyright.shtml


3.  Links to the Checklist at Indiana University

The following educational institutions include links to the checklist as it was posted on the website of the Copyright Management Center at Indiana University (IUPUI).[16] Presumably these universities will update their links.

Bellevue University (Nebraska)
Library
http://library.bellevue.edu/copyright/index/fair%20use.htm

Syracuse University
Library
http://libwww.syr.edu/copyright/materials.html#fair_use

---

[16] In addition, this academic organization links to the same site: Consortium of College and University Media Centers (http://www.ccumc.org/copyright-matters/fair-use-guideline).

University of Alaska
Computer Services
http://hosting.uaa.alaska.edu/designteam/teach_act/fair_use.html
"There is a great deal of information available on what qualifies as Fair Use and what does not.  In order to determine if your particular use is likely to be covered under Fair Use, the following checklist, prepared by the Copyright Management Center at Indiana University and reproduced here with their permission, may be helpful."

The Master's College (California)
http://www.masters.edu/DeptPageNew.asp?PageID=1757

Capital University (Ohio)
http://www.capital.edu/20089.pdf

University of California, Los Angeles
Office of Instructional Development
http://www.oid.ucla.edu/about/units/imcs/copyright/copyrightlinks/uichecklist

St. Joseph's University (Pennsylvania)
Francis A. Drexel Library
http://librarytoolkits.sju.edu/copyright

Southern Connecticut State University
http://copyright.southernct.edu/Analysis/analysis3.htm

Claremont Graduate University (California)
Office of Information Technology
http://www.cgu.edu/pages/6266.asp

Berkeley City College (California)
Library
http://berkeley.peralta.edu/apps/pub.asp?Q=198&T=Internet%20Resources&B=3

Connecticut College
Libraries and Technology
http://www.conncoll.edu/is/info-resources/copyright/ccs/fairuse.html

Bucks County Community College (Pennsylvania)
Library
http://www.bucks.edu/library/copyright/fairuse.php
The site credits the original checklist, but the link takes readers to the version from the Copyright Clearance Center.

University of Wisconsin-Extension
Cooperative Extension
http://www.uwex.edu/ces/copyright/fairuse_checklist.pdf

University of Wisconsin
Library Reserves
http://www.library.wisc.edu/reserves/fair-use-checklist.pdf
Adds a brief explanation of the general meaning of each factor as applied in the context
of reserve copies for teaching.

University of Montana
Mansfield Lilbrary
http://libguides.lib.umt.edu/content.php?pid=3857&sid=51122

William Patterson University (New Jersey)
Cheng Library
http://www.wpunj.edu/library/copyright_info.shtml

Pennsylvania State University
Teaching and Learning with Technology
http://tlt.its.psu.edu/dmd/teachact/teachactFAQ.html

College of San Mateo (California)
Library
http://www.smccd.net/accounts/csmlibrary/copyright.htm

Harvard University
Office of the General Counsel
http://ogc.harvard.edu/copyright_docs/

Sacramento State University
Library
http://library.csus.edu/content2.asp?pageID=342

Claremont Colleges (California)
Deans Council
http://copyright.claremont.edu/FairUse.html

Soka University of America (California)
Ikeda Library
http://ikedalibrary.soka.edu/policies_5.2.html

Montclair State University (New Jersey)
Library
http://library.montclair.edu/services/copyrightguidelines.html

Governors State University (Illinois)
Library
http://www.govst.edu/library/t_gsu_library.aspx?id=1225

Alfred University (New York)
President's Cabinet
http://my.alfred.edu/index.cfm/fuseaction/student_policies.copyright_0708.cfm

Yeshiva University (New York)
Albert Einstein College of Medicine
http://library.aecom.yu.edu/resources/copyright.htm

Johns Hopkins University (Maryland)
Sheridan Libraries
http://www.library.jhu.edu/researchhelp/general/copyright/


4.  Other Users of the Fair Use Checklist

I have received numerous requests to make various uses of the fair use checklist.
Sometimes the requests are for a specific event, such as for distribution at a workshop or
meeting.  At other times, the request is for long-term use and perhaps even modification
and uploading onto a website.  In addition to some of the institutions already named
above, inquiries to use the checklist have come to me from:

Copyright Clearance Center[17]
Truman State University
Ivy Tech Community College
Arizona Western College
New York Institute of Technology
Lee College
University of Iowa, General Counsel
Rutgers University, General Counsel
School District of Palm Beach County
Rush University Medical Center
Pima Community College
California Polytechnic University, Pomona
Allatoona High School (Marietta, GA)
Oklahoma City Community College
Indiana University School of Nursing
University of Kansas
Associated Mennonite Biblical Seminary
Ursinus College
Campbellsville University
Vatterott College

---

[17] The checklist is available on the website of the Copyright Clearance Center with this explanation: "This
tool provides an important means for recording your fair use analysis, which is critical to establishing
'reasonable and good-faith' attempts to apply fair use."  See:
http://www.copyright.com/Services/copyrightoncampus/basics/fairuse_list.html

Portland Community College
West Kentucky Community & Technical College
Trocaire College
Indiana State Library, Legal Counsel
St. Pius X Catholic High School (Atlanta, GA)
Auburn University
University of Puerto Rico
Butler University
Norfolk Public Schools (Nebraska)
El Camino College
Southern Illinois University, General Counsel
Riverton High School (Utah)
The Art Institute of California
Spokane Community College
Kent State University
California State University, Fresno
University of Alaska
Central Michigan University
Madison Area Technical College
Pennsylvania State University
Swedish Medical Center
Southwest Wisconsin Technical College
University of North Carolina at Wilmington
University of California, Irvine
University of Southern Indiana
University of Washington
Mississippi State University
Tarleton State University
University of North Texas, General Counsel
Bowie Independent School District (Texas)
New Ulm Area Catholic Schools (Minnesota)
Brigham Young University
North Carolina State University, General Counsel
North Harris College


In addition to the preceding lists of colleges, universities, and primary and secondary schools, I have received requests for permission to use the checklist from the following organizations:

State of Connecticut Judicial Branch
(The courts of the State of Connecticut; request was for use by the "Education Committee" for internal education within the court system.)

Ohio Educational Library Media Association

Museum of Western Colorado

Symantec Corporation
(Developer of Norton Utilities and other leading software programs.)

Gallagher Duby, PLC
(Law firm based in Saint Johns, Michigan)

Renaissance Printing
(A private printing and photocopy service company based in Gainesville, Florida.)

**Part III:**
**Does the Exercise of Fair Use Poses Risks to the Survival of Scholarly Publishing?**


    A.  Scholarly Publishing is at Risk, but Copyright is not the Cause

The Sheffrin Report makes the general assertion that E-Reserves and other technological developments that interfere with the work of publishers will cause more harm than good for the university: "To the extent professors—whether at GSU or elsewhere—give away for free that which was previously purchased or licensed, and to the extent that activity jeopardizes the ability of publishers to continue to publish scholarly work, universities stand to lose more than they gain."  Dr. Sheffrin's statement purports to make a connection between "giving away" purchased materials and the survival of publishers. He offers no evidence of the causal connection, and he does not acknowledge the difference between "giving away" and following the law.  Nevertheless, his proposition fails to adequately characterize the evolving relationship between academic goals and the transformation of scholarly publishing.

Dr. Sheffrin describes the general and common process by which faculty members are reviewed for hiring, tenure, and promotion.  I have been through the process myself, and I have seen it repeated many times.  Dr. Sheffrin notes the importance of books and journal articles, from highly reputable publishers, in the evaluation of faculty colleagues:

> Publishers are thus directly involved in the processes by which professors gain access to vital pedagogical tools (in the form of quality academic texts) and receive employment and tenure.  If the livelihood of such organizations were put at risk, or their output significantly diminished, in addition to the loss of educational content, colleges' and universities' ability to make important personnel decisions would be severely constrained, and professors as well as students would lose out.

Dr. Sheffrin is exactly right in many respects.  Many reviews of faculty members have been and continue to be based on their publication record.  He is also right to raise concerns about the survival of scholarly publishing.  However, the conventions of scholarly publishing and faculty review are in transition.  Some publication outlets are indeed at risk.  But the forces bearing on them have little if anything to do with fair use.

Recent reports and studies have underscored these transitions.  The critical point for this report, however, is that change in scholarship is occurring for many reasons.  Copyright does have a role in these changes, but mostly because of new ways that copyright owners are choosing to manage their rights and make works available.  Meanwhile, the unfortunate difficulty for publishers of scholarly books is not copyright.  According to a recent study from the Andrew Mellon Foundation:

In recent years, the contemporary challenges confronting university presses have been the focus of considerable study and debate. The issue that has received perhaps the most attention is the steady decline in average sales of scholarly titles. Publishing highly specialized academic monographs has always been a challenging business, but in the 1970s and early 1980s, presses could regularly anticipate sales of more than one thousand copies of such books. Now, in many humanistic fields, they typically budget for sales of no more than several hundred. A major cause of the decline has been the dwindling number of sales to academic libraries. Library acquisitions budgets have been severely squeezed by the rapid growth in the number and cost of serials, especially in the sciences, which are increasingly licensed in the form of electronic databases. As a result, fewer and fewer college and research libraries can afford to purchase, as many once did, all or nearly all of the scholarly monographs that university presses publish.[18]

The same report also reaffirmed the "the link between rising serials prices and the declining purchases of monographs by libraries. . . ." In other words, sales of scholarly works may be dropping, but copyright is not the cause. The cause is shrinking library budgets and greater pressure on those budgets from the rapid rise of the cost of journals.

As the Mellon Foundation unfortunately needed to conclude: "Clearly, scholarly publishing is fraught with complex problems that require a delicate balancing act as university presses and other publishers must keep pace with rapid developments in the field of publishing and yet also meet their obligations to the academy, in which the processes of creating, organizing, and disseminating knowledge are also rapidly evolving. In this changing and highly competitive environment, it is not certain that all university presses will survive in their current configuration."

The academic community has a strong interest in the survival of scholarly publishers. At the most recent meeting of the Association of Research Libraries (ARL),[19] held in Washington, D.C., in October 2009, the members advanced a study of "at-risk peer-reviewed journals."[20] The ARL study will assess 4,000 such journals and pursue options for the libraries to support the publishers and to help assure their survival. Libraries are not seeking to harm scholarly publishers. They are instead taking the lead to bolster them and to work with publishers through the ongoing transformation of scholarly publication and communication.

---

[18] *Scholarly Publishing Initiatives, 2007 Annual Report*, The Andrew W. Mellon Foundation (footnote omitted), available at: http://www.mellon.org/news_publications/annual-reports-essays/presidents-essays/scholarly-publishing-initiatives.
[19] The Association of Research Libraries has a membership of 124 major research libraries in the United States and Canada. Most member libraries are academic libraries based at research universities. Members also include the Library of Congress and several other independent or public libraries. See: http://www.arl.org/.
[20] *The Chronicle of Higher Education*, October 18, 2009.

B. Scholarly Publishing is in a Period of Rapid Change, but Copyright is not the Cause

Scholarly publishing is changing rapidly, and the means of creating, publishing, and finding scholarly articles, monographs, and other works are in a period of steady transformation. As the world of scholarly publishing changes, existing publishers will experience a time of challenge and perhaps even threat. But copyright is not the central concern in this transformation, and fair use is certainly not the threat or the remedy. Larger developments are posing the challenge to publisher.

This report summarizes several major developments in scholarly publishing, demonstrating that the industry is changing for reasons that go far beyond copyright and fair use. It is not the purpose of this report to support or promote any of these developments, and I have no intention of advancing any cause that would undermine publishers. My purpose is to describe the evolving environment of scholarly publishing and its changing relationship to the university, and to reveal that the forces of change are far greater than concerns about fair use.

1. The Growth of Open Access Publishing

For decades and centuries publishing has been necessarily a tightly controlled environment. The cost and complexity of the means of publishing limited the ability to enter the industry, and it allowed established publishers to determine what would be published and who may have access to publications. Technology has opened new possibilities and removed many of the previous barriers. At the same time, technology can allow for greater control. For some publications, access through electronic databases actually reduces the availability of scholarly publications. As libraries turn to electronic access, they often remove print versions from the shelves. The electronic version, however, is accessible only by "authorized users" under the terms of a license agreement. The greater public was losing its access, and any technological problem would shut down access for everyone.

The new technologies at the same time dropped many of the barriers to entry into the publishing industry. With relative ease and low cost, almost anyone could create a website and effectively become a publisher. Through careful planning and attention to quality, many important scholarly works began to be offered through this new form of publication. These published works could be made available to anyone in the world at no charge. This "open access" publishing model had many virtues, but principally this leading quality: Anyone with an Internet connection could have access to the literature. Access was not limited to "authorized users" and users in all parts of the world would be able to benefit from research in medicine, science, law, social sciences, humanities, and more. I have traveled to many parts of the world, and Internet connections are increasingly common. But budgets to acquire materials are sometimes zero. Open

access has been an immediate benefit from developing countries to small U.S. colleges that cannot buy the expensive databases.

Open access publishing is not ideal for all publications, but it is perfect for others. Open access is therefore growing rapidly. New journals are regularly established as open access, and existing journals are migrating to open access.[21] Earlier this year a group of ten directors of university presses endorsed open access for their journals,[22] and we are likely to see open access models applied more widely to scholarly monographs.[23] Open access is perfectly compatible with peer review and other important standards of quality scholarship. The transformation of scholarly publishing, whether because of technological change or copyright or other cause, is occurring rapidly. One of the ground-breaking statements on open access, the Berlin Declaration, also acknowledges the need for universities to adjust their promotion and tenure decisions in light of these changes, addressing directly one of the concerns in the Sheffrin Report.[24]

    2.   The expansion of alternative outlets for scholarly publishing.

A recent study by the Ithaka Foundation, a study which was led by a former president of Oxford University Press USA, noted the rapid proliferation of publishing opportunities: "scholars increasingly turn to preprint servers, blogs, listservs, and institutional repositories, to share their work, ideas, data, opinions, and critiques."[25] With regard to university presses, the report notes:

> Universities have traditionally participated in the formal publication of their intellectual output through a network of presses, but most publishing of this output has long taken place outside the university sector, especially in the sciences. For a variety of reasons university presses have become less integrated with the core activities and missions of their home campuses over the years—a drift that threatens to widen as information technology transforms the landscape of scholarly publishing.

The report acknowledges and accepts the inevitable variety of publication possibilities, but one of its central points is to encourage university administrators, librarians, and presses to work together to influence "the assessment and dissemination of knowledge and scholarship." The study focuses especially on the availability of books, noting the

---

[21] For an extensive list of journals that have converted to open access, see: http://oad.simmons.edu/oadwiki/Journals_that_converted_from_TA_to_OA.
[22] For the announcement of this endorsement, see these postings: (1) https://mx2.arl.org/Lists/SPARC-OAForum/Message/4978.html and (2) http://www.earlham.edu/~peters/fos/2009/06/10-university-presses-endorse-oa.html.
[23] For an example of an initiative among university presses, see: http://www.oapen.org/.
[24] See: http://oa.mpg.de/openaccess-berlin/berlindeclaration.html.
[25] Laura Brown, Rebecca Griffiths, Matthew Rascoff, *University Publishing in a Digital Age* (Ithaka, 2007), available at: http://www.ithaka.org/ithaka-s-r/strategy/Ithaka%20University%20Publishing%20Report.pdf.

declining sales of books. Often that decline is attributable to rising prices of journals and other scholarly works, combined with shrinking library budgets.[26]

The report is an insightful review of the many challenges that university presses and other scholarly publishers are facing: financial concerns, changing research habits, shrinking library budgets, transformation to electronic delivery, and the difficulty of long-term investing by nonprofit publishers. Copyright receives only passing mention in the report, and not as the cause of the challenge to publishers.


  3.  The Public Library of Science (PLoS)

PLoS is an innovative alternative for publishing scholarly research articles. It is open access, and it has been widely accepted in many disciplines as a leading, high-quality source for publication of research results. According to its website: "The Public Library of Science (PLoS) is a nonprofit organization of scientists and physicians committed to making the world's scientific and medical literature a public resource."[27] According to one of the editors of PLoS, it is now one of the world's largest publishers of scholarly articles.[28] Its staff and board include leading scholars, researchers, and at least one Nobel Prize winner. PLoS is funded in part by grants from major foundations.


  4.  Harvard University Open Access Policy

In early 2008, the faculty of the Harvard University College of Arts & Sciences unanimously adopted a resolution requiring faculty members to retain rights in their scholarly articles for purpose of depositing copies of the articles with the open access repository at Harvard.[29] Under this policy, a Harvard faculty member is required to receive from the publisher of each new journal article a license to deposit a copy with the repository for full, free, unrestricted online access, open to anyone with an Internet connection. If the faculty member is not able to secure such a license, he is she must request a waiver from the Harvard Office for Scholarly Communication.

Since its adoption, other schools at Harvard have followed the example, as have several universities in the United States. By one listing, more than 140 educational institutions, programs, funding agencies, and other organizations throughout the world have adopted comparable resolutions requiring open access of research produced by the organization.[30] Similar policies have been adopted at universities in other countries. The Harvard resolution is symbolic of many changes in scholarly publishing, including the wide support for open access and the opening of alternatives for finding scholarly works and

---

[26] For example, see: http://www.historians.org/Perspectives/Issues/2003/0310/0310vie3.htm.
[27] http://www.plos.org/about/index.html.
[28] http://poeticeconomics.blogspot.com/2009/07/dramatic-growth-of-plos-one-soon-to-be.html.
[29] For the text of the resolution as adopted at several of the schools of Harvard University, see: http://osc.hul.harvard.edu/OpenAccess/policytexts.php.
[30] For a list, see: http://www.eprints.org/openaccess/policysignup/.

conducting research. It also signals that the academic community will take the lead to manage their scholarship differently in the face of growing restrictions on access and rising prices of subscriptions.

### 5. SCOAP3

"SCOAP" is the acronym for "Sponsoring Consortium for Open Access Publishing in Particle Physics." It is an initiative for the scientific field of high-energy physics (HEP) to expand access to scholarly works. According to its website: "In this model, HEP funding agencies and libraries, which today purchase journal subscriptions to implicitly support the peer-review service, federate to explicitly cover its cost, while publishers make the electronic versions of their journals free to read."[31] SCOAP is an endorsement of public access to scholarship, and it calls for an informed management of copyrights to assure wider access and use of journal articles.

While many open access publications now exist, SCOAP's distinction is its attempt to address directly the need to restructure the economic model of publishing. For many journals and their publishers, survival will depend on securing funds from alternative sources to compensate for possible lost sales or subscriptions. SCOAP takes the lead by proposing that libraries—which currently provide most funding for many publishers—shift that funding from purchases to subsidies. SCOAP is still in early stages, but it nevertheless represents an important effort to restructure the business model to keep quality publishing alive and well.

### 6. Public Access Policy of the National Institutes of Health

Under federal law that went into effect in 2008, versions of all peer-reviewed journal articles that are based on research funded by the National Institutes for Health (NIH) must be deposited with PubMed Central (PMC).[32] PMC is a database of research articles established and maintained by the NIH and the National Library of Medicine, and its contents are fully publicly accessible.[33] This federal law reflects a growing national policy of making research more widely available, especially if the research was supported by federal funding. Federal grants support research in a broad array of disciplines.

Recently introduced in Congress was the "Federal Research Public Access Act of 2009," a bill that would have required nearly all federally funded research to be made publicly accessible. That proposal was endorsed prominently by the presidents of 57 liberal arts colleges from throughout the United States.[34] As they stated in their letter of support:

---

[31] http://scoap3.org/about.html.

[32] http://publicaccess.nih.gov/.

[33] http://www.ncbi.nlm.nih.gov/pmc/about/intro.html.

[34] http://www.insidehighered.com/news/2009/09/23/access.

Our faculty actively pursue research, much of it with government funding, and often working in partnership with talented undergraduates. Unfortunately, access to research information paid for with tax dollars is severely limited at our institutions—and indeed at most universities. Academic libraries simply cannot afford ready access to most of the research literature that their faculty and students need.[35]

The forces for change in scholarly publishing are coming from many sources. Even the NIH Public Access Policy has stirred allegations that it threatens the wherewithal of scholarly presses. If that is the case, it is also a reminder that the forces on publishers are numerous, and fair use is realistically not to blame for the difficulties that publishers now confront.

## 7. Overview

The Sheffrin Report describes the long experience of Dr. Sheffrin with respect to the hiring, promotion, and tenure decisions in his department at the University of California, Davis. I do not question his experience, and surely his concern about the changing relationship between academic promotion and the well being of scholarly presses is serious. However, as the foregoing examples demonstrate, change is coming quickly to the field of scholarly publishing. Changes are more pronounced with respect to scholarly journals, but the transformation of scholarly books is not far behind. These changes will require adjustments to conventions about faculty hiring and related matters, but copyright and fair use are not the cause.

Dr. Sheffrin's own institution, the University of California, conducted a recent study of faculty views about innovation and change in scholarly publishing.[36] Among the findings:

Faculty consistently do express concern about the existing promotion and tenure processes at UC. They believe that such processes are not keeping up with the evolution of scholarly communication, although few faculty members at this time express interest in actively changing their own behavior or in fomenting change within the responsible institutions. Indeed, they identify the obstacle to change as the existing reward systems of tenure/promotion (and even grant-making), which favor traditional publishing forms and venues.[37]

Indeed, the study indicates that the relationship between faculty and publishing may be the reverse of Dr. Sheffrin's suggestion. He urges that faculty promotion and tenure are

---

[35] http://www.oberlingroup.org/files/FRPAAPresidentsletter2009FNL_1.pdf.
[36] *Faculty Attitudes and Behaviors Regarding Scholarly Communication: Survey Findings from the University of California*, Prepared by the University of California Office of Scholarly Communication and the California Digital Library eScholarship Program, August 2007. Available at: http://osc.universityofcalifornia.edu/responses/materials/OSC-survey-summaries-20070828.pdf.
[37] See ibid., page 3.

jeopardized by the transformation of scholarly publishing. The study of faculty attitudes at the University of California leads to a contrary conclusion. Despite changes in publishing, about 75% of the faculty members indicated that they were unlikely to change their current practices related to scholarly publications. Why? Because systems of promotion and tenure—and the need to reconsider copyright implications for their own work—deter innovation: "The majority's lack of motivation to alter behavior appears to be connected on the one hand to the tradition-bound tenure and review process, and on the other hand to the need for explicit forms of assistance, such as in the management of copyright."[38] Dr. Sheffrin states that harm to publishers will harm universities. The U.C. study finds instead that entrenched systems of faculty rewards—and copyright attitudes—are preventing more meaningful change in scholarly publishing.

Despite all of these challenges—and the complex relationship between faculty authors and the transformation of scholarly publishing—the University of California has actually been a leader in promoting open access to scholarly monographs. Through its "eScholarship Editions" initiative, more than 2,000 books from the University of California Press are openly accessible to the U.C. community, and about 500 of them are openly accessible to anyone.[39] Many of the monographs are in the field of economics.


## Part IV: Conclusion

The reports from the expert witnesses for the plaintiffs raise issues that relate to broad themes of licensing and the survival of scholarly publishing. This report demonstrates that licensing is a part of the copyright equation, but its deficiencies and limitations prevent licensing from becoming a substitute for a meaningful application of copyright law. Further, this report presents evidence that in fact scholarly publishing is in transition, and some publishers may be at risk. But the forces for change in scholarly publishing are far greater than the pressures of fair use. Therefore, a proper application of fair use at the university is not only consistent with the law, but it is not likely to cause harm to the existence of scholarly publishers or to the implementation of licensing as part of the overall plan for copyright and fair use in higher education.


  /S/ *Kenneth D. Crews*

Dated: November 2, 2009

---

[38] See ibid., page 4.
[39] For more information, see: http://www.escholarship.org/editions/.