# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS,
OXFORD UNIVERSITY PRESS, INC.,
and SAGE PUBLICATIONS, INC.,

               Plaintiffs,

      - v. -

MARK P. BECKER, in his official
capacity as Georgia State University
President, et al.,

               Defendants.

Civil Action No. 1:08-CV-1425-ODE

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ............................................................................7

A. PLAINTIFFS AND THEIR BUSINESS.................................................7

    1. Plaintiffs' Publishing Activities ....................................................7

    2. Permissions to Reproduce Plaintiffs' Works .....................................11

B. DEFENDANTS ...............................................................................12

C. GSU'S INFRINGING CONDUCT ....................................................14

    1. GSU's Migration to Electronic Course Content ..................................14

    2. The ERes System.........................................................................16

    3. uLearn.......................................................................................19

    4. Prevalence of Unlicensed Electronic Course Readings as a Substitute for Licensed Coursepacks ..................................................20

D. GSU COPYRIGHT POLICY ...........................................................21

    1. Former Regents' Policy.................................................................21

    2. Current, Revised Policy.................................................................22

        a. Faculty confusion regarding fair use .........................................26

        b. Lack of oversight ..................................................................29

        c. Lack of budget ....................................................................31

        d. Rampant continuing infringement .............................................32

E. HARM TO PLAINTIFFS..................................................................33

ARGUMENT ..........................................................................................35

I. THE SUMMARY JUDGMENT STANDARD ........................................35

II.    DEFENDANTS ARE RESPONSIBLE FOR THE INFRINGEMENT OF
       PLAINTIFFS' COPYRIGHTS......................................................................36

III.   DEFENDANTS' ONLINE COURSE MATERIAL PRACTICES
       ARE NOT FAIR USE ...............................................................................38

       A.    The Purpose and Character of the Use ..................................................40

             1.    Digitized course materials are not transformative ...................40

             2.    GSU profits from the infringement............................................44

             3.    GSU's practices are inconsistent with classroom and
                   library guidelines......................................................................47

       B.    The Nature of the Copyrighted Work ...................................................49

       C.    The Amount and Substantiality of the Use ...........................................52

       D.    The Effect of the Use on the Potential Market for or Value of the
             Copyrighted Works .............................................................................54

IV.    INJUNCTIVE RELIEF IS APPROPRIATE..................................................58

CONCLUSION ..........................................................................................................60

# TABLE OF AUTHORITIES

**Page**

## CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ......................46

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 917, 923
   (2d Cir. 1994)........................................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................... 35-36

*Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522
   (S.D.N.Y. 1991) ........................................................................................ *passim*

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).............................. *passim*

*DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24 (2d Cir. 1982)........................55

*Elektra Entm't Group v. Freeman*, No. Civ. A. No. 2:06cv914-ID, 2007 WL
   1837130 (M.D. Ala. June 26, 2007) ....................................................................59

*Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177 (D. Mass. 2007) ...................56

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841)....................................... 40-42

*Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244 (11th Cir. 2008)...................4

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ....... *passim*

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ...........................43

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*,
   533 F.3d 1287 (11th Cir. 2008) ................................................................. *passim*

*Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988) .................................................37

*Milk Money Music v. Oakland Park Entm't Corp.*, No. 09-CV-61416,
   2009 WL 4800272 (S.D. Fla. Dec. 11, 2009).....................................................59

*Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490 (11th Cir. 1994).................43, 50, 58

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ....................59

741706.1

*Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381
(6th Cir. 1996) ................................................................... *passim*

*Sony Music Entm't, Inc. v. Global Arts Prods.*, 45 F. Sup. 2d 1347
(S.D. Fla. 1999) ................................................................... 59

*Stewart v. Abend*, 495 U.S. 207 (1990) ................................................. 49

*SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257
(11th Cir. 2001) ................................................................ *passim*

*UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) .... 43

*Wall Data, Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769 (9th Cir. 2006) ........ 46

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) ......................... 41, 44, 45, 51

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000) ................................................... 45, 46

## STATUTES, RULES, AND OTHER AUTHORITIES

U.S. Const. art. 1, § 8 ......................................................................... 39

17 U.S.C. § 101 ............................................................................. 44-45

17 U.S.C. § 107 .............................................................................. 22, 38

17 U.S.C. § 108(a)(1) ......................................................................... 48

17 U.S.C. § 108(g) .......................................................................... 48-49

17 U.S.C. § 502(a) ............................................................................ 58

H.R. Rep. No. 94-1476 (1976) ............................................................... 47

H.R. Conf. Rep. No. 94-1733 (1976) ........................................................ 47

H.R. Rep. No. 89-2237 (1966) ........................................................... 10-11

Fed.R.Civ.P. 56 ................................................................................. 1

741706.1

iv

Fed.R.Civ.P. 56(c) ...................................................................................35

Fed.R.Civ.P. 56(e)(2) .............................................................................36

4 William F. Patry, *Patry on Copyright* § 10:138 (March 2008) ...........................50

Plaintiffs Cambridge University Press ("Cambridge"), Oxford University Press, Inc. ("Oxford"), and SAGE Publications, Inc. ("SAGE") (collectively, "Plaintiffs") submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Local Rule 56.1.

## PRELIMINARY STATEMENT

Plaintiffs, leading academic publishers, seek to enjoin the systematic, widespread, and unauthorized copying and distribution by Georgia State University (GSU)[1] of copyrighted academic works owned or controlled by Plaintiffs through a variety of university-controlled online systems. This unlawful conduct has continued largely unabated despite GSU's adoption of a new copyright policy in response to the initiation of this lawsuit.

Our nation's copyright law seeks to "promote[] the public access to new ideas and concepts." *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1262 (11th Cir. 2001). It does so by "supply[ing] the economic incentive to create and disseminate ideas," *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S.

---

[1] Defendants (sometimes referred to collectively herein as "GSU") are sued on the basis of their own conduct and that of the GSU librarians and faculty who are agents of GSU and whose infringing conduct falls under the supervisory authority of each of the Defendants.

539, 558 (1985), including in the form of scholarly works. Copyright law "rewards the individual author in order to benefit the public," *id.* at 546 (citation omitted), because "[w]ithout this limited monopoly, authors would have little economic incentive to create and publish their work," which would undermine the goal of copyright. *SunTrust Bank*, 268 F.3d at 1262.

To be sure, built into the fabric of copyright law is a judicially crafted fair use privilege that "permits courts to avoid rigid application of the copyright statute when, *on occasion*, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (citation omitted) (emphasis added). The fair use privilege is a *limited exception* to the norm of exclusivity conferred upon copyright owners; it is not a doctrine that contemplates wholesale, system-wide copying of significant portions of countless thousands of copyrighted works, year after year, without any compensation to copyright owners. Yet that is precisely what has occurred at GSU.

The record demonstrates that Defendants have, for more than six years, provided GSU students with access to thousands of course reading materials in digital formats for hundreds of courses each semester without permission from or compensation to the copyright owners. Such materials have included substantial portions of the Plaintiffs' works listed in Exhibit 1 to the First Amended Complaint

(the "Complaint"), Docket No. 39.  Plaintiffs' works, combined with thousands of other similarly unlicensed works of other publishers, comprise the principal, and at times exclusive, sources of reading material for myriad GSU courses.  GSU has encouraged its students to view, download, and print this extraordinary range of copyrighted materials on the premise that these practices constitute fair use.  That premise is wrong.

GSU's status as an institution of higher education does not give it license to engage in widespread copyright infringement.  While the nature of the user and of its use of the copyrighted material are relevant to fair use analysis, the proposition that takings of this magnitude are afforded a legal safe harbor simply because they have occurred on a university campus finds no support in the law.  Educational uses are not presumptively fair.

In fact, colleges and universities have for generations lived with, and satisfactorily resolved, the inherent tension between maximizing the availability of teaching materials to students and abiding by copyright law.  The purchase of textbooks and other course reading materials has long been an accepted part of the cost of a college education.  Indeed, even where faculty at GSU and elsewhere have compiled excerpts from various books and periodicals into so-called "coursepacks" and made copies of the coursepacks available to students enrolled in

their courses in lieu of requiring the purchase of full texts, they have – consistent with settled copyright law – obtained permissions (and their students have paid modest permissions fees) for the use of these teaching materials. This has occurred at GSU and elsewhere without disrupting the educational mission.

The latest-generation means of distributing course reading material at GSU entails the dissemination of the very same kinds of coursepacks, only accessed by students in digital form via computer. Although copyright law is "media neutral," *Greenberg v. Nat'l Geographic Soc'y,* 533 F.3d 1244, 1257 (11th Cir. 2008), and despite the fact that the record shows that efficient permissions mechanisms are as available to obtain permissions for electronic uses as they are for paper coursepacks, GSU's administrators seized on this new technological means of providing course readings to students without making customary payments to copyright holders for the use of these core teaching materials. As a result, over the past six years, at GSU's encouragement, there has been a steady migration in the distribution of course readings away from paper coursepacks to electronic access/downloading/printing – *without a single dollar in permissions fees having been paid to copyright owners in connection with this electronic distribution system*. This blanket presumption of "fair use" has to date encompassed thousands of separate takings of copyrighted works for hundreds of courses.

The commencement of this action brought this massive infringement to light. In response – and in obvious acknowledgement that its conduct fell well outside the norms of acceptable copyright practice – GSU and the Board of Regents of the University System of Georgia (USG) hastily convened a committee to revise the policies that had encouraged the challenged practices. However well intended this process, what emerged in February 2009 was a new policy that is deeply flawed in conception, in execution, and – most important – in impact on ongoing infringing conduct.

The new policy delegates the responsibility for ensuring copyright compliance entirely to faculty unschooled in copyright law, requiring them to complete an inherently biased fair use "checklist" for each of the course readings they propose to make available to students electronically. The combination of this built-in bias and profound faculty confusion over – and ignorance of – basic precepts of fair use has resulted in overwhelmingly one-sided checklist "determinations" in favor of fair use. These virtually foreordained fair use conclusions have, if anything, been reinforced by the faculty's awareness that GSU has not budgeted any funds for permissions payments with respect to these electronic course offerings or developed a system to charge students permissions fees in the same way they have been charged for coursepacks.

The failure of the new policy to come anywhere close to adequately reforming GSU's copyright practices is evident from the fact that during the Fall 2009 semester, the following materials published by Plaintiffs were typical of the many readings made available to students via electronic distribution without license authority:

- eight chapters totaling 187 pages from *The Sage Handbook of Qualitative Research* (SAGE) for Qualitative/Interpretive Research in Education I (EORS8500 and EPRS8500);

- chapters 12 and 13 from *The Power Elite* (Oxford) for Social Theory I (SOCI8030);

- chapter 4 from *Criterion-referenced Language Testing* (Cambridge) for Second Language Evaluation and Assessment (AL8550);

- chapter 7 from *The Slave Community* (Oxford) for African-American Family (AAS3000);

- chapter 14 from *Crabgrass Frontier: The Suburbanization of the United States* (Oxford) for Comparative Culture (PERS2001).

Such plainly excessive unauthorized takings have been combined with 10 to 15 (and occasionally 20, 40, or even 100 or more) additional takings from other publishers' works into electronic anthologies comprising significant portions of required and suggested course readings.

This lawsuit seeks no money damages, only a reform of future practice. The patent failure of the new policy to remediate the rampant infringement that

prompted this lawsuit necessitates continued pursuit of appropriate injunctive relief.  By failing to observe long-established norms of copyright law, by treating the fair use doctrine as if it were a blanket exemption from copyright compliance, and by failing to pay the "customary price" for use of the Plaintiffs' works, Defendants undermine the creation-inducing, knowledge-disseminating purpose of copyright law.  Unless GSU's infringing practices are enjoined, Plaintiffs, authors, and the publishing community at large will continue to face a certain, substantial, and continuing threat of the loss of revenues that are the lifeblood of the publishing businesses on which the academic enterprise fundamentally depends.

## STATEMENT OF FACTS

**A.    PLAINTIFFS AND THEIR BUSINESS**

Plaintiffs are the publishers and owners of the rights to exploit the copyrights in thousands of works, many of which are marketed primarily for academic use.  *See* EX 1 (Challice Dep.) 230:8-14; EX 2 (Smith Dep.) 13:2-5, 124:25-125:8; EX 3 (Van Valkenburg Decl.) ¶ 4.

### 1.    Plaintiffs' Publishing Activities

Plaintiff Cambridge is one of the world's largest and most prestigious academic publishers, having published high-quality scholarly works for the past 425 years.  Cambridge publishes over 265 journals as well as academic books,

textbooks, monographs, reference works, professional books, and electronic products. Cambridge has 53 offices throughout the world, including in New York, which is the headquarters for the Americas branch. EX 4 (Smith Decl.) ¶¶ 3-7.

The Oxford family of publishers publishes more than 4,500 books a year worldwide in a wide array of academic disciplines, ranging from the arts to the sciences to economics and finance, which further Oxford University's objective of excellence in research, scholarship, and education. Plaintiff Oxford is a not-for-profit corporation headquartered in New York. In addition to book publishing, Oxford publishes over 200 academic and research journals in the fields of science, medicine, humanities, the arts, and the social sciences, among others. EX 5 (Pfund Decl.) ¶¶ 3-6.

Plaintiff SAGE has a long history of developing high-quality scholarly books and textbooks for the higher education market. SAGE's Books Division currently publishes nearly 500 titles each year and has over 5,800 titles in print. SAGE also publishes textbooks in over 20 subject areas, including business, the humanities, science, technology, and medicine. SAGE also publishes more than 560 journals at the forefront of knowledge in business, humanities, social sciences, science, technology, and medicine. EX 3 (Van Valkenburg Decl.) ¶¶ 3-4.

The works Plaintiffs publish lie at the heart of the educational enterprise. They reflect leading scholarship by university faculty (including at GSU) as well as by renowned experts in a myriad of subjects of critical importance to society. The thousands of textbooks, monographs, journal articles, and handbooks Plaintiffs publish each year form the backbone of college and university teaching in the full range of fields of study offered by GSU. *See* EX 5 (Pfund Decl.) ¶¶ 3-4; EX 4 (Smith Decl.) ¶¶ 3-5; EX 3 (Van Valkenburg Decl.) ¶¶ 3-4; EX 6 (Kaufmann Dep.) 22:16-20.

The academic publisher plays an integral role in bringing high-quality scholarly works to life. Plaintiffs are intimately involved in all aspects of the publishing process, from selecting and editing content to designing, producing, marketing, and selling the works. *See* EX 5 (Pfund Decl.) ¶¶ 11-15; EX 3 (Van Valkenburg Decl.) ¶ 5. Publishing cutting-edge scholarship involves choosing, from among thousands of submissions each year, those manuscripts worthy of publication, with the vetting assistance of outside scholars. *See, e.g.*, EX 7 (Pfund Dep.) 173:20-174:4; EX 1 (Challice Dep.) 30:5-9, 94:12-19. This peer-reviewed scholarship not only advances intellectual discourse but also is essential to the advancement of academic careers. *See* EX 6 (Kaufmann Dep.) 19:19-20:23 (explaining that being published enhances reputation and promotes the chances of

obtaining tenure); EX 1 (Challice Dep.) 30:5-9; EX 2 (Smith Dep.) 8:3-12; EX 7 (Pfund Dep.) 217:21-218:3; EX 8 (Belcher Dep.) 38:8-9; EX 9 (Sheffrin Decl.) 4-8. Plaintiffs incur costs running to tens of millions of dollars a year to perform these functions. EX 5 (Pfund Decl.) ¶ 16; EX 4 (Smith Decl.) ¶ 41; EX 3 (Van Valkenburg Decl.) ¶ 7.

Absent an incentive for publishers to publish scholarly works for a small, specialized audience, the higher education "ecosystem," with its interdependent relationships among scholars, publishers, schools, and students, would collapse. *See* EX 5 (Pfund Decl.) ¶ 44. Along with sales of the works themselves (their primary source of revenue), Plaintiffs depend on ancillary revenues such as permissions fees to maintain sufficient profitability to remain in business. *See* EX 1 (Challice Dep.) 254:2-16. Practices such as those uncovered at GSU that reflect a systematic disregard for copyright are particularly threatening. In the words of one Plaintiff executive, "[I]f we didn't do something about this [unauthorized copying], our entire business model would erode . . . . It would be . . . devastating to the entire academic environment in the United States." *Id.* 85:11-22. As Congress has recognized, "[E]ducation is the textbook publishers' only market, and . . . many authors receive their main income from licensing reprints in anthologies and textbooks; if an unlimited number of teachers could prepare and

reproduce their own anthologies, the cumulative effect would be disastrous." H.R. Rep. No. 89-2237 at 62 (1966).

### 2. Permissions to Reproduce Plaintiffs' Works

Each of the Plaintiffs allows users to request permission to use excerpts of their works through Copyright Clearance Center (CCC), a not-for-profit licensing organization that is widely used and has demonstrated its capacity to offer effective and efficient licensing solutions to meet the needs of academic and other markets, including as they adapt to new technology. Since 1991, CCC has offered the Academic Permissions Service (APS), under which users can quickly and easily obtain permission on a work-by-work basis to photocopy and distribute paper copies of portions of text-based copyrighted works, including books and journal articles commonly used as academic course readings. APS covers photocopying for coursepacks and classroom handouts. Since 2005, CCC has processed millions of APS permission requests. EX 10 (Mariniello Rpt.) 7. In 1997, CCC created the Electronic Course Content Service (ECCS), which is in all material respects the digital equivalent of APS. Professors and universities use APS to secure permissions for works included in print coursepacks and use ECCS to secure permissions to distribute works to students in electronic (*e.g.*, pdf) format. In fact, many universities obtain electronic permissions using the very same software GSU

currently uses to distribute copyrighted works to students.  EX 11 (Mariniello Dep. I) 114:2-23.

Plaintiffs partner with CCC to administer comprehensive permissions coverage so third parties can use portions of Plaintiffs' works in hard-copy or digital format, including as a part of coursepacks and digital course reading anthologies.  Users can link to the CCC website via Plaintiffs' websites or access it directly at http://www.copyright.com.  CCC typically provides users with instantaneous responses to permissions requests.  If CCC cannot process a permissions request, it typically will contact the publisher directly, at no additional cost, to attempt to secure permission on behalf of the customer.  CCC and Plaintiffs rarely deny permissions requests.  EX 5 (Pfund Decl.) ¶ 20; EX 3 (Van Valkenburg Decl.) ¶ 13.

The majority of Plaintiffs' works are available for licensing through CCC's transactional or "pay per use" services (APS and ECCS).  EX 4 (Smith Decl.) ¶ 9; EX 5 (Pfund Decl.) ¶ 19; EX 3 (Van Valkenburg Decl.) ¶ 15.

## B.    DEFENDANTS

Georgia State University, located in Atlanta, Georgia, is a public university and a unit of the Regents of the University System of Georgia.  Answer ¶ 13.  It has approximately 1,000 full-time faculty members and more than 27,000 full-time

students.  GSU President Mark P. Becker is the head of GSU and is its chief administrative officer, with supervisory authority over the administrators of the GSU library and the GSU Information Systems and Technology Department. Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Admission (May 13, 2009) (hereinafter "RFA"), Nos. 1, 2.  The GSU Provost (currently Risa Palm)[2] is responsible for monitoring the functions and officials of the University's academic administration, including correcting noncompliance with federal copyright law.  *Id.* Nos. 18, 19.  GSU Associate Provost for Information Systems and Technology J. L. Albert is responsible for the technical operation and maintenance of the ERes system at GSU and has supervisory authority for the GSU staff who support use of the uLearn course management system at GSU.  *Id.* Nos. 42, 43.  Defendant Nancy Seamans is the Dean of Libraries at GSU.  Defendants' Amended and Supplemental Responses to Plaintiffs' First Set of Interrogatories to Defendants ("GSU Interrog. Resp."), No. 4.  The Board of Regents of USG, the members of which are named (in their official capacities) as Defendants, has general supervisory authority over the operations of GSU and is responsible for providing and maintaining the computer

---

[2] GSU's RFA responses were submitted when Dr. Palm's predecessor, Ron Henry, was in office.

hardware and software that operates the uLearn course management system at GSU. RFA Nos. 55, 58.

All of the named Defendants are aware of the existence of GSU's so-called electronic reserves ("ERes") system, as well as the online course management system known as "uLearn." Defendants are also aware that GSU faculty place course reading materials on these electronic course distribution systems for students to access and read. RFA Nos. 4, 5, 23, 24, 40, 41. Each of the defendant officials of GSU and/or USG is responsible in part for the copyright infringement that is the subject of this lawsuit. Each has participated in, facilitated, encouraged, and/or overseen the process by which Plaintiffs' works have been digitally copied and distributed on the GSU campus, and each has the authority to effect a change in the relevant practices.[3]

## C. GSU'S INFRINGING CONDUCT

### 1. GSU's Migration to Electronic Course Content

As with all universities, the faculty and students at GSU rely on high-quality scholarly works published by Plaintiffs and others. Historically, students purchased textbooks principally through the university bookstore and

---

[3] *See* Rule 56.1 Statement ¶¶ 25-36; Defendants' Objections & Responses to Plaintiffs' First Requests for Admission (May 13, 2009).

supplemented these course readings with access to "reserve" materials, originals of works that could be borrowed for short periods from the university library for purposes of study and note-taking and then returned. *See* EX 12 (Dewar Dep.) 27:12-17.

The advent of the photocopy machine initiated a second-generation method of accessing course content. Schools such as GSU supplemented – or, increasingly, supplanted – textbooks with coursepacks (photocopied collections of excerpts of copyrighted works compiled by a professor into a custom anthology of course readings). EX 13 (Palmour Dep.) 25:1-6. At GSU, the practice has been to print and bind these reading materials together and sell them as a unit through the GSU Bookstore. *Id.* Since seminal court decisions in the 1990s (discussed *infra*), sales of coursepacks – including at GSU – typically have been conditioned upon securing copyright permissions for making such reproductions either directly from the publishers or through CCC acting as their agent. *Id.* 129:18-21, 135:1-4. The rationale for requiring such permissions is obvious: students purchase coursepacks instead of textbooks. The proliferation of unlicensed coursepack use would dramatically reduce the revenue streams necessary to produce the textbooks in the first place.

Since at least 2004, GSU administrators have encouraged instructors to distribute course materials in digital form via Internet-based tools rather than in the form of paper coursepacks. *See* EX 14 (Seamans Dep.) 144:2-8; EX 15, (Dimsdale Dep.) 104:6-20; EX 13 (Palmour Dep.) 128:25-129:12, 144 :17-24; EX 16; EX 17. Foremost among these tools at GSU are ERes and uLearn. It is the legality of this third-generation method of disseminating course readings that is at issue in this case.

## 2. The ERes System

The ERes system is used by GSU professors to assemble course readings just as they would student coursepacks, but instead of bringing the master set to the university copy center for duplication of physical copies, the same master set is sent to the GSU library. EX 14 (Seamans Dep.) 110:2-20; EX 15 (Dimsdale Dep.) 18:17-19:7. The GSU library electronically scans these copyrighted materials, thereby creating a permanent digital copy on a computer server owned by GSU and operated by GSU information technology staff. EX 15 (Dimsdale Dep.) 41:6-10, 58:2-19.[4] Library personnel upload the electronic copies to that server. Students in a given course access the posted digital copies via a web page within the ERes

---

[4] GSU licenses the "ERes" software that operates the GSU electronic reserves system from a third-party vendor and maintains servers on which the software is installed. EX 13 (Palmour Dep.) 52:13-53:16.

web interface that is dedicated to the specific course (a "course page"). EX 15 (Dimsdale Dep.) 34:20-35:12, 52:15-16. Students then can display the copies on their computer screens, download them to their own computers, and/or make physical copies, which they frequently bring to class. EX 6 (Kaufmann Dep.) 47:25-48:4; Defendants' Initial Disclosures, Docket No. 19 at 3; Rule 56.1 Statement ¶ 45-46.[5] Initial access to ERes materials is limited to students enrolled in a given course, but once those students have gained such access, there is nothing to prevent further unrestricted dissemination of the copies. EX 18 (Burtle Dep.) 130:6-10; EX 15 (Dimsdale Dep.) 72:5-23.

Unlike the practice with respect to coursepacks, no one at GSU ever seeks publisher permission or pays any license fees for use of ERes materials. EX 19. Since May 2003, *not a single dollar* has been spent by GSU to secure permissions for uses of Plaintiffs' or any other publishers' works on the ERes system.[6] Instead,

---

[5] ERes results in the creation of multiple copies. A first copy is made and distributed to each student when the student views the work on his screen, which requires that a copy of the file be sent to the student's computer. EX 13 (Palmour Dep.) 60:4-9; EX 12 (Dewar Dep.) 67:9-14. If the student saves the material to his or her hard drive, a second copy is made. EX 12 (Dewar Dep.) 81:18-21. When the student prints out the material, a third copy is made. *Id.* 82:6-9.

[6] The only instance revealed by the record in which permission was sought for ERes was in May 2003, when Cambridge authorized the copying of 242 pages from a Cambridge work for a class of seven students for a fee of $33.88. EX 20.

as further discussed below, GSU administrators have encouraged faculty to use the ERes system in lieu of other course reading distribution options, such as paper coursepacks, specifically to circumvent payment of copyright permissions fees. EX 13 (Palmour Dep.) 142:12-145:5; EX 16; EX 17.

Professors post both required and supplemental readings to the ERes system. *See, e.g.*, EX 8 (Belcher Dep.) 63:20-65:5; EX 6 (Kaufman Dep.) 48:5-17; EX 13 (Palmour Dep.) 38:15-39:3. On average, each course page on ERes contains fifteen to twenty readings, *see* EX 21; *see also* EX 13 *(*Palmour Dep.) 117:21-118:4, but a significant number of courses offer twenty or even forty excerpts. EX 21. Professor Shapiro's ERes offerings for his course Adapted Physical Education (KHE7650) surpassed 100 excerpts, and he is not the only instructor to have done so. *Id.*; EX 13 (Palmour Dep.) 118:5-7. The creation of these electronic anthologies continued into the Fall 2009 semester. EX 22.

The infringing excerpts are lengthy – often at least a full chapter of the original work – as well as numerous. For example, during the Spring 2009 Semester, Professor Belcher offered students two chapters of Cambridge's *Focus on the Language Classroom* (a work identified in Plaintiffs' Amended Complaint) totaling 37 pages. During the 2009 "Maymester" (after the institution of GSU's new policy) Professor Kaufmann provided students with eight digital excerpts

comprising 200 pages of the *SAGE Handbook of Quantitative Qualitative Research.* During the Fall 2009 semester, Professor Kaufmann provided students with over 150 pages from the *SAGE Handbook.* During the same semester (the most recent for which ERes system reports have been provided to Plaintiffs) GSU professors provided students with hundreds of excerpts of other works, some totaling more than one hundred pages. *See* 56.1 Statement ¶¶ 126-139 (discussing Fall 2009 ERes usage).

### 3. uLearn

The uLearn system, a third-party software platform that resides on a server owned and maintained by the Georgia Board of Regents, EX 13 (Palmour Dep.) 20:7-21:17; EX 23 (Christopher Dep.) 19:3-10; Rule 56.1 Statement ¶¶ 81-82, allows GSU faculty to create web pages specific to each course and to distribute syllabi, reading materials, and other course-related information via those pages. GSU Interrog. Resp. No. 1. Instructors are specifically encouraged to use uLearn to distribute reading materials (including required readings), and, indeed, such distribution is among the most-used features of the uLearn system. EX 23 (Christopher Dep.) 24:14-22, 58:24-59:7; EX 24 (Reifler Dep.) 40:15-22. Students can print materials from uLearn on university printers, but they pay the university a fee to do so. EX 23 (Christopher Dep.) 119:20-25; EX 13 (Palmour Dep.) 131:2-4.

The use of copyrighted material on uLearn is even less regulated than it is on ERes. Rule 56.1 Statement ¶¶ 91-93. It is possible for professors to upload copyrighted materials to uLearn without ever looking at a copyright policy, EX 23 (Christopher Dep.) 79:20-23; 109:2-22, and there are no procedures to ensure that professors comply with any copyright policies before uploading material to uLearn. *Id.*[7]

## 4. Prevalence of Unlicensed Electronic Course Readings as a Substitute for Licensed Coursepacks

Licensed coursepack activity at GSU has been displaced by a dramatic increase in electronic course reading distribution. *See* EX 16; EX 13 (Palmour Dep.) 140:15-25; EX 18 (Burtle Dep.) 23:17-20.[8] GSU faculty and staff recognize that ERes and uLearn serve the same function as the licensed coursepacks that preceded them. As Professor Belcher candidly testified: "I haven't thought about

---

[7] Even when GSU staff has become aware that professors were using uLearn in derogation of their copyright responsibilities, GSU has taken no action in response. EX 23 (Christopher Dep.) 112:19-113:1.

[8] During the Spring 2009 semester, for instance, coursepacks were down to "about 15 titles," while materials for more than 300 courses were available on ERes. EX 13 (Palmour Dep.) 128:16-24; EX 21.

coursepacks since I came to Georgia State because of EReserves." EX 8 (Belcher Dep.) 53:4-9.[9]  *See also* EX 24 (Reifler Dep.) 129:8-13.

Even where the appropriate license fees were paid for copyrighted material when it was used in a coursepack, when the same material is placed on ERes, no license fee is paid.  EX 13 (Palmour Dep). 128:25-129:25; *see also* EX 8 (Belcher Dep.) 54:5-7.  GSU employees have touted the cost savings represented by ERes and encouraged faculty to avoid paying the "copyright royalties" involved in paper coursepacks.  EX 16; EX 13 (Palmour Dep.) 141:7-16; 135:1-14; EX 25.  Not surprisingly, GSU students like ERes because it is free; for its part, GSU is happy to oblige, insofar as students are its "customers."  EX 13 (Palmour Dep.) 139:6-9; 144:25-145:5.

## D.    GSU COPYRIGHT POLICY

### 1.    Former Regents' Policy

Until February 2009, USG's official position on copyright law as applied to its member institutions was embodied in a 1997 "Regents' Guide to Understanding Copyright & Educational Fair Use."  EX 26.  The bulk of this document consisted of a series of hypothetical situations depicting unlicensed uses of copyrighted

---

[9] For example, rather than have her students buy a Cambridge book, as in the past, Professor Belcher instead "put a couple of the chapters on EReserves" so they could read (and copy) it for free.  EX 8 (Belcher Dep.) 44:24-45:10.

material, most of which were accompanied by a rationale for treating such use as "fair" within the meaning of 17 U.S.C. § 107. *See id.* This policy led to massive takings of copyrighted materials for use as course reading materials without making the customary permissions payments. Defendants' putative expert witness Dr. Kenneth Crews, a critic of that policy, aptly characterized it as one "that just says yes to everything." EX 27 (Crews Dep.) 22:24-23:2; *see also id*. 21:2-3 (Crews raised "serious concerns" about the 1997 policy).

During the time the Regents' Guide was in effect, GSU assigned to its library employees responsibility for reviewing each ERes request from GSU instructors for compliance with GSU's fair use parameters. EX 13 (Palmour Dep.) 40:2-19; EX 18 (Burtle Dep.) 146:10-16. The extent of those parameters consisted of ascertaining that (1) the library or instructor owned a copy of the requested work, and (2) the requested excerpt was shorter than the greater of one chapter or twenty percent of the entire work. EX 13 (Palmour Dep.) 79:3-9; EX 18 (Burtle Dep.) 54:11-13, 142:8-10.

## 2.    Current, Revised Policy

In December 2008, eight months after this lawsuit was filed, Defendants convened a "Select Committee on Copyright," composed of employees of various State of Georgia educational institutions, which was tasked to "revisit" the

Regents' existing copyright guide in light of "digital technologies." EX 28; EX 29 (Potter Dep.) 110:9-11; EX 30. The record reveals that this lawsuit was a motivating factor behind the creation of the Committee. EX 29 (Potter Dep.) 107:8-23; EX 31. The Committee was urged to complete its work in short order, by January 31, 2009, with an eye to its potential use in this litigation. *Id.* and EX 101 Plaintiffs were first advised about the new policy in February 2009, following its public announcement. *See* EX 32.

The current policy delegates virtually entirely to faculty the responsibility for determining whether copyrighted course materials may be copied and distributed without permission. EXs 33, 34; EX 14 (Seamans Dep.) 20:10-18. This delegation is a "fundamental element" of the policy, based on the assumption that faculty will "do the right thing given the right tools and the right information." EX 29 (Potter Dep.) 145:14-146:9. Unfortunately, they are given neither the right tools nor the right information.

The tool with which professors have been furnished to carry out this legal analysis is a "Fair Use Checklist." EX 34. The checklist is a form document, divided into two columns (entitled "weigh[s] in favor of fair use" and "weigh[s] against fair use") that presents users with a series of leading prompts under four separate headings that correspond to each of the four statutory fair use factors.

Instructors are asked to review the checklist factors with respect to each work they propose to distribute digitally to students and to decide, for example, whether the "[a]mount taken is narrowly tailored to educational purpose" or is "more than necessary." EX 34.

After filling out the checklist, the user is instructed to add up the checks in each column for each of the four factors. If there are more checks in the "weigh[s] in favor of fair use" column than in the "weigh[s] against fair use" column, the factor cuts in favor of fair use. *See, e.g.*, EX 34. Following this rote numeric computation, "[w]here the factors favoring fair use outnumber those against it," instructors are authorized to use the work in question without permission. *Id.*

Each statutory factor and each of the criteria within each factor are given equal weight. *See* EX 34; EX 8 (Belcher Dep.) 117:25-118:1; EX 6 (Kaufmann Dep.) 34:21-35:5, 68:21-24, 88:15-24; EX 14 (Seamans Dep.) 150:21-151:3. Thus, for example, the critical concession by GSU witnesses that none of the copying involved is transformative (*see, e.g.,* EX 29 (Potter Dep.) 155:21-22; EX 24 (Reifler Dep.) 59:12-13; EX 8 (Belcher Dep.) 89:4-5; EX 6 (Kaufmann Dep.) 67:7-8) is "balanced out" (and in practice *cancelled* out) by a determination under Factor 1 as to any of six other equally weighted considerations, such as that the use is "[n]onprofit [e]ducational," "[t]eaching," and/or "necessary to achieve your

intended educational purpose." *See* EX 34. Each of these three overlapping/duplicate considerations will be checked almost by definition for faculty-selected GSU course materials. *See* EX 6 (Kaufmann Dep.) 68:6-19 ("Transforming it to one electronic or one mode of text to another does not transform the piece," but "[t]here was enough on the other side to outweigh it."); *id.* 77:9-78:5; EX 8 (Belcher Dep.) 84:8-24.

Similarly, the fact that a large percentage of a work will be used or that the excerpt constitutes the "heart of the work" is offset under Factor 3 by a subjective determination that the amount taken "is narrowly tailored to educational purpose…." – yet another "check" that will occur almost by definition for GSU course readings. What is more, since the checklist prescribes that the outcome of this mechanistic process as to a majority of the four factors governs the fair use determination, a professor need not even undertake the crucial Factor 4 – market harm – evaluation where he or she has already determined that the other three factors weigh in favor of fair use. EX 29 (Potter Dep.) 169:14-22; EX 6 (Kaufmann Dep.) 88:10-20; EX 24 (Reifler Dep.) 77:25-78:7.

The checklist is so skewed in favor of a "fair use" outcome that even the chair of the committee that devised it was forced to concede that the mere offer of copyrighted works by a GSU professor in a classroom setting virtually guarantees

a "favors fair use" outcome on at least two of the fair use factors.  EX 29 (Potter

Dep.) 170:15-174:4.  GSU's own copyright law expert admitted he was "troubled"

by the completely un-nuanced procedure called for by the new policy and

conceded that he had no idea how the new policy was in fact being implemented.

EX 27 (Crews Dep.) 180:17-182:7, 224:16-225:13, 227:14-228:2; 228:9-14.

### a.    Faculty confusion regarding fair use

Under the new policy, the fair use analysis is, by design, performed by

faculty members, many without any training in copyright law.  Ex 18 (Burtle Dep.)

59:23–60:4; 94:16-19; 163:16-21.  Not surprisingly, instructors attempting to use

the checklist have revealed a number of fundamental misunderstandings of

copyright law.[10]  For instance, neither Professor Belcher nor Professor Reifler

thought unlicensed distribution of copyrighted works to their classes constituted

"public distribution" (a factor against fair use on the checklist).  EX 8 (Belcher

---

[10] GSU cannot sidestep the force or representativeness of the testimony given by
the three professors whose depositions were taken in this case.  It opposed
Plaintiffs' stated interest in taking up to seven such depositions to assure the
representativeness of the testimony, observing in its opposition to Plaintiffs'
motion seeking such leave that that number was "well beyond what is necessary
for this case. . . . The professors noticed by Plaintiffs use GSU's ERes and uLearn
systems in similar fashions and thus are likely to provide similar testimony
regarding their use of GSU's online systems . . . ."  Defendants' Response in
Opposition to Plaintiffs' Motion To Take Additional Depositions (May 5, 2009),
Docket No. 88, at 12.

Dep.) 89:17-23; EX 24 (Reifler Dep.) 60:2-4. When asked whether a particular excerpt constituted the heart of a work (a consideration under Factor 3), Professor Belcher conceded that although she "[hadn't] really looked at the whole book," she nevertheless assumed that "these two chapters are not the heart of the book" and registered a check in favor of fair use. EX 8 (Belcher Dep.) 100:24-101:1.

Professor Kaufmann admitted she "had problems differentiating" between certain factors, EX 6 (Kaufmann Dep.) 79:8, and that there were several factors that simply "[d]idn't compute" while she was filling out checklists. *Id.* 86:24. She was able to conclude that placing pages 1-32 of the *Sage Handbook of Qualitative Analysis* on ERes would not have a significant effect on the market under Factor 4 because students might later purchase the work. *Id.* 83:4-84:24. She gave no thought to the cost of creating the material or to the publisher's need to cover its costs. *Id.* 94:25-95:7. In the end, she determined that all the materials she assigned, despite stretching to hundreds of pages, easily qualified as fair use. *Id.* 56:10-15.

Professor Belcher conceded that she "need[s] more direction" with respect to certain of the factors and "need[s] some guidance on what you need to get permission for and then find out how I would go about doing that." EX. 8 (Belcher Dep.) 98:14-15; 103:18-20. She thought "commercial activity" under Factor 1

required payment to *her* for providing the copies. *Id.* 86:11-21. She also admitted that market harm "seems important in terms of copyright and ownership," but she doesn't "have a specific enough understanding of copyright" to know how to determine such harm. *Id.* 108:10-13. She thought Factor 4 only required consideration of the effect of *her own* use on the market for the work. *Id.* 101:23-102:4. Accordingly, she posited that distributing *six chapters* of a SAGE work "probably would not" have a significant effect on the market or potential market for the book. *Id.* 122:21-22. She concluded in frustration that "I think that maybe there needs to be some more specificity in the guidelines in how to use the checklist." *Id.* 116:3-5.

Professor Reifler was not even aware of a policy that required filling out the checklist, EX 24 (Reifler Dep.) 43:24-25, and he never attended a training session on the new policy. *Id.* 10:6-9. In fact, he first learned about the checklist in preparing for his deposition, and he acknowledged that in filling it out for his various course readings "there's probably some inconsistency from form to form." *Id.* 58:16-17. He, like Professor Belcher, understood a commercial use to be one that he personally "would be selling and financially gaining from." *Id.* 56:25-58:3. Reflecting his frustration with the checklist, Professor Reifler said, "In thinking about it now, Factor 3 perhaps should take precedence over the others. I don't

know.  You ask me on a different day, I might give a different answer." *Id.* 85:9-12.  By limiting the analysis of market harm to *his own use* and assuming that assigning multiple chapters might stimulate students to buy the entire book, *id.* 72:14-73:2, he felt justified in posting to his uLearn page three chapters totaling more than seventy-five pages of a book, two chapters constituting fifty pages of a 330-page book, and four chapters totaling seventy-five pages from yet another book, along with myriad other works, for a single course.  *Id.* 10:21-23; 99:2-7; 105:4-7; 113:8-13; EXs 35-46.  He finally acknowledged what the totality of professor experience makes obvious: "This is outside of my area of expertise." EX 24 (Reifler Dep.) 96:20-21.

### b.    Lack of oversight

The policy's delegation of fair use determinations to generally copyright-unknowledgeable faculty is exacerbated by the nearly complete lack of oversight over GSU faculty fair use decisions by trained library staff, legal counsel, or anyone else – despite such review being a *sine qua non* of an effective policy in the estimation of Dr. Crews.  EX 27 (Crews Dep.) 123:7-125:16, 222:9-224:15.  The library staff receiving and posting copyrighted materials has no responsibility for reviewing the checklists filled out by the instructors (or even for ascertaining if a checklist has been filled out) or in any other way for ascertaining the rationale

supporting a fair use determination. EX 14 (Seamans Dep.) 34:23–35:10, 115:8-16; EX 29 (Potter Dep.) 146:7-21, 168:12-20; EX 18 (Burtle Dep.) 93:23-94:19. Even the library review for postings exceeding 20 percent of an entire work called for by the pre-2009 policy has been eliminated.

At most, library staff are asked to raise a "red flag" and to consult a superior when a professor attempts to post something that appears to be obviously infringing. EX 18 (Burtle Dep.) 196:3-8; EX 14 (Seamans Dep.) 35:15-36:6, 112:2-8, 113:19-114:3; EX 15 (Dimsdale Dep.) 56:6-17, 114:8-10. Yet the library staff involved in this process – who may be as inexperienced as part-time high school clerks, EX 14 (Seamans Dep.) 113:19-114:3 – have been given no training or guidelines as to what constitutes a "red flag." EX 15 (Dimsdale Dep.) 59:23-60:6. Library head Dr. Seamans acknowledged that it "would be something that would have to be pretty egregious to make [library clerks] question [an instructor's fair use determination]," EX 14 (Seamans Dep.) 36:3-5, such as the unlicensed taking of an entire book. *Id.* 36:9-18. *No* red flags were raised as to excerpts of books or journals posted for the Maymester 2009 or Summer 2009 terms. EX 15 (Dimsdale Dep.) 64:6-65:3. What is more, GSU's witnesses were aware of no plans to enforce the new policy or to sanction violators. EX 14 (Seamans Dep.) 167:22-168:8. This *laissez-faire* approach to enforcing the new policy stands in

contrast to enforcement norms for other university violations, EX 14 (Seamans Dep.) 168:22-170:4, and it further underscores that the new policy elevates the appearance of reform over meaningful change in practice.

### c.    Lack of budget

GSU has not budgeted for or established any procedures for obtaining licenses to post electronic course materials.  EX 14 (Seamans Dep.) 48:19-25, 49:16-51:4; EX 13 (Palmour Dep) 156:21-25, 159:5-10; EX 29 (Potter Dep.) 143:9-13.  Indeed, prior to this lawsuit GSU instructors were not even aware that such permission could be obtained, EX 8 (Belcher Dep). 55:14-17, 63:8-11; EX 6 (Kaufmann Dep). 60:16-22, 72:19-73:7; EX 24 (Reifler Dep.) 42:2-9, even though "licenses are available 99.9999 percent of the time."  EX 1 (Challice Dep.) 200:5-6.  Nor has GSU looked into passing on to students the cost of permissions fees, as it does with coursepacks, even though one GSU employee familiar with GSU's practices with respect to both paper coursepacks and ERes/uLearn admitted that such a system is likely feasible.  EX 13 (Palmour Dep.) 157:1-11.

At other institutions, including a number identified by Dr. Crews, budgets exist for this very purpose.  EX 27 (Crews Dep.) 114:16-116:2, 267:19-23; EX 47 (Mariniello Dep. II) 203:21-205:19.  GSU itself imposes a number of student charges, including to maintain its varsity athletics programs, and it has, as noted,

managed to pass on the costs of permissions associated with paper coursepacks without repercussion.  *See* EX 13 (Palmour Dep.) 132:2-134:2.

If a GSU instructor determines that permission is necessary for a posting of copyrighted material to ERes or uLearn, the instructor himself would be responsible for arranging payment, given the lack of institutional resources committed to that purpose.  EX 18 (Burtle Dep.) 62:14-63:12; EX 23 (Christopher Dep.) 131:5-15; EX 29 (Potter Dep.) 143:9-144:1.  As Dr. Crews conceded, this system presents faculty with "a tough decision.  You're going to either have to decide you really need it and you're going to pay the bill . . . or you have to drop the material from the lesson."  EX 27 (Crews Dep.) 251:22-252:3.  Another option, of course, is to take an extraordinarily broad view of fair use.

### d. Rampant continuing infringement

Unlicensed and infringing ERes and uLearn practice remains rampant after implementation of the new policy.  Nearly 200 unlicensed excerpts, which were accessed a total of more than 2,700 times, were posted to ERes during the brief three-week 2009 Maymester.  EX 48.  More than 230 unlicensed excerpts, which were accessed a total of more than 4,500 times, were posted to ERes for the Summer 2009 semester.  EX 49.  Most recently, more than 1,000 unlicensed excerpts were posted for the Fall 2009 semester and, only three weeks into the

semester, had been accessed more than 15,000 times. EX 22. Paula Christopher, the Project Manager in charge of uLearn, testified that she had not noticed any change in how faculty used the uLearn system as a result of the new copyright policy. EX 23 (Christopher Dep.) 124:23-125:1. The representative examples listed on page 6 above and the testimony of the GSU professors discussed at pages 26-29 above demonstrates that the new policy has failed to end the rampant and systematic copyright infringement at GSU.

## E.    HARM TO PLAINTIFFS

The harm to Plaintiffs from the infringing conduct detailed above is self-evident: the unauthorized copying and distribution of significant portions of copyrighted books owned or controlled by Plaintiffs displaces sales of those works and reduces permissions payments to Plaintiffs (either directly or through CCC). As Frank Smith, Director of Digital Publishing for the Americas Branch of Cambridge testified, "Insofar as our copyrights are violated, that is used without permission or fees, we view that as striking a dagger into the heart of our operation." EX 2 (Smith Dep.) 96:6-9. *See also id.* 97:8-10. Sara Van Valkenburg, SAGE's contract manager, explained that GSU's unauthorized posting of electronic course materials is "directly substituting [for] an existing market of the rights holder which is to license that content and potentially to sell

the work that the content comes from." EX 50 (Van Valkenburg Dep.) 165:16-22; *see also id.* 142:13-18. John Challice, head of Oxford's Higher Education division, testified: "[I]f anybody who teaches a student thinks they can grab whatever they want for free and not pay for it because they are a not-for-profit school, the entire $6 billion higher education publishing industry is going to disappear and who is going to make this material anymore[?]" EX 1 (Challice Dep.) 85:13-19.

Lost book sales (as a result of GSU making excerpts available for free instead of requiring students to buy the books) comprise the most significant category of financial harm from GSU's conduct. *See, e.g.*, EX 2 *(*Smith Dep.) 132:8-13 (majority of Cambridge's annual revenue derived from book sales); EX 50 (Van Valkenburg Dep.) 159:13-18 (books sales primary segment of SAGE revenue). But Oxford's Mr. Challice specifically highlighted the importance of the permissions income of which Plaintiffs are deprived by GSU, pointing to the fact that this income can make the difference between an unprofitable book and one that at least breaks even. EX 1 (Challice Dep.) 254:2-11. "There are some books," he stated, for which the absence of permissions income would mean "we won't be able to publish them [anymore]." *Id.* 254:13-16. *See also* EX 4 (Smith Decl.) ¶ 39

(permission fees for one year are equivalent to the cost of publishing 20 new monographs).

The impact of GSU's infringing conduct on Plaintiffs – particularly if it were to become the norm across the country – is particularly acute given that academia is Plaintiffs' primary market. EX 1 (Challice Dep.) 229:19-230:14 (majority of Oxford's business consists of sales and licenses to undergraduate institutions); EX 2 (Smith Dep.) 124:21-125:14 (primary market for Cambridge books is college and university libraries, followed by college and university students); *see also* EX 50 (Van Valkenburg Dep). 159:21-160:14 (majority of SAGE revenue from CCC is from academic uses). For these publishers, the loss of sales and permissions revenue from campuses across the country would be devastating. EX 1 (Challice Dep.) 85:17-18.

## ARGUMENT

### I.     THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if the evidence, viewed in the light most favorable to the nonmoving party, shows that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). To defeat a properly made and supported motion for summary judgment, the opposing party must come forward with "specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(e)(2). That factual evidence must be "of such a character that it would warrant the jury in finding a verdict in favor of" the nonmoving party. *Anderson*, 477 U.S. at 251 (citation omitted).

## II. DEFENDANTS ARE RESPONSIBLE FOR THE INFRINGEMENT OF PLAINTIFFS' COPYRIGHTS

To establish copyright infringement, the plaintiff must demonstrate that (i) it owns a valid copyright in the allegedly infringed work(s) and (ii) the defendant copied protected elements of the work(s). *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008). Each of the works Plaintiffs sue upon is an original work of authorship, the exclusive copyright rights to which are owned by, or exclusively licensed to, one of the Plaintiffs. Each work is registered with the U.S. Copyright Office or is protected under U.S. copyright law as a work first published in a country that is a signatory to the Berne Convention. EX 5 (Pfund Decl.) ¶¶ 21-31; EX 4 (Smith Decl.) ¶¶ 10-29; EX 3 (Van Valkenburg Decl.) ¶¶ 21-32.

GSU has admitted that "students enrolled in a particular course were able to download, view, and print materials listed in the library electronic course reserves system for that particular course" and that GSU is relying on fair use to avoid

liability for this unauthorized reproduction and distribution. Answer ¶ 3. The ERes postings cited above from the Fall 2009 semester, *see* 56.1 Statement ¶¶ 121-140; EX 22, exemplify the ongoing unlicensed use of Plaintiffs' works.

Injunctive relief is appropriate as to each of the Defendants. In an action against state officers in their official capacities, "[p]ersonal action by defendants individually is not a necessary condition of injunctive relief"; rather, "[a]ll that is required is that the official be responsible for the challenged action." *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988). It is sufficient that the state officer sued "'by virtue of his office, ha[ve] some connection' with the . . . conduct complained of." *Id.* at 1015-16 (citation omitted).

The record here demonstrates ongoing infringing conduct by GSU employees – faculty and library staff responsible for the selection, copying, and distribution of electronic course materials – acting within the scope of their employment and subject to the authority of the "official capacity" defendants, who knew about, authorized, facilitated, and/or encouraged the copying of Plaintiffs' works without permission of the copyright owner. *See supra* pp. 14-20; 56.1 Statement ¶¶ 25-36, 41-80, 98-140. Thus, Defendants' liability is clear unless the challenged practices qualify as fair use. As shown below, they plainly do not.

## III. DEFENDANTS' ONLINE COURSE MATERIAL PRACTICES ARE NOT FAIR USE

The fair use doctrine is codified in section 107 of the Copyright Act, 17 U.S.C. § 107. Section 107 provides that the "fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." However, none of the illustrative fair uses is *per se* fair in a given case. The Supreme Court has expressly rejected reliance on "categories of presumptively fair use." *Peter Letterese*, 533 F.3d at 1309 (quoting *Campbell*, 510 U.S. at 584). The statute instead provides that whether a particular use is "fair" depends on consideration of four non-exclusive factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The fair use analysis does not entail simply adding up the statutory factors "won" by each side to determine who prevails.[11]  Rather, it is an "equitable rule of reason," *Peter Letterese*, 533 F.3d at 1308, under which the statutory factors as applied to the facts of the case are to be examined and weighed "in light of the purposes of copyright." *Id.* (quoting *Campbell*, 510 U.S. at 578).  *See also SunTrust Bank*, 268 F.3d at 1268.  The ultimate purpose of copyright law is to "promote the Progress of Science and useful Arts by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings."  U.S. Const. art. 1, § 8.  As noted, copyright protection accomplishes this by supplying "the economic incentive to create and disseminate ideas." *Harper & Row*, 471 U.S. at 558.  Fair use must not interfere with the advancement of these socially beneficial, constitutionally grounded objectives.  As discussed below, fair use precedents compel the conclusion that GSU's widespread copying of Plaintiffs' academic books to create digital anthologies of course readings is not fair use because it is inconsistent with the creation- and dissemination-incentivizing purpose of copyright protection.

---

[11] The Eleventh Circuit has rejected reliance on a "four factor tally," noting that such "'rigid application of the copyright statute' might 'stifle the very creativity which that law is designed to foster.'" *Peter Letterese*, 533 F.3d at 1308 n.22 (quoting *Campbell*, 510 U.S. at 577).

### A.     The Purpose and Character of the Use

#### 1.     Digitized course materials are not transformative

The "central purpose" of the first-factor inquiry is to determine "whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579 (citations omitted).  Transformative works "lie at the heart of the fair use doctrine[]." *Id.  See also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1994).  The centrality of transformative value to fair use stems from its relationship to the constitutional objective of promoting the progress of science and the useful arts, which is "generally furthered by the creation of transformative works." *Campbell*, 510 U.S. at 579.

Whereas a transformative work furthers the purposes of copyright, "an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use." *Am. Geophysical Union*, 60 F.3d at 923.  As Justice Story wrote in *Folsom v. Marsh*, 9 F. Cas. 342, 344-45 (C.C.D. Mass. 1841), a use that "supersede[s] the use of the original work . . . will be deemed in law a piracy." *See also Peter Letterese*, 533

F.3d at 1310 ("[A] work that is not transformative . . . is less likely to be entitled to the defense of fair use because of the greater likelihood that it will 'supplant' the market for the copyrighted work. . . .") (citation omitted); *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) ("where, as here, appellee's use [of appellant's academic article] is for the same intrinsic purpose as [appellant's] . . . such use seriously weakens a claimed fair use"); *cf. Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1388 (6th Cir. 1996) ("[I]n the context of nontransformative uses . . . the other statutory factors seem considerably less important.").

Photocopying or other exact duplication is a paradigmatic nontransformative use. In *Princeton University Press*, *id.*, the leading fair use decision involving university course readings, the court stated:

> [T]he degree to which the challenged use has transformed the original copyrighted works . . . is virtually indiscernible. If you make verbatim copies of 95 pages of a 316-page book, you have not transformed the 95 pages very much – even if you juxtaposed them to excerpts from other works and package everything conveniently. This kind of mechanical "transformation" bears little resemblance to the creative metamorphosis accomplished by the parodists in the *Campbell* case.

*Id.* at 1389. In *American Geophysical Union*, *supra*, which involved the photocopying and archiving by Texaco scientists of copies of scientific journal

articles, the court observed that the photocopying "merely transforms *the material object* embodying the intangible article that is the copyrighted original work. . . . Texaco's making of copies cannot properly be regarded as a transformative use of the copyrighted material." 60 F.3d at 923 (emphasis in original).

Nor does transformative value inhere in the selection of materials for a compilation of reproductions, each of which serves the same purpose as the original. In *Princeton University Press*, the court found that even though coursepack anthologies allowed professors to create readings perfectly tailored to their courses, the anthologies nevertheless were not transformative. *See* 99 F.3d at 1384. Similarly, in *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991), the court held that the defendant's production of coursepacks was not transformative: "The excerpts in suit were merely copied, bound into a new form, and sold," the court noted. "The copying in suit had productive value only to the extent that it put an entire semester's resources in one bound volume for students." *Id.* at 1531.[12]

---

[12] These decisions are consistent with Justice Story's observation that fair use involves "real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work." *Folsom,* 9 F. Cas. at 345 (quoted in *Campbell*, 510 U.S. at 578-79).

Simply translating a work into a new medium or making it more accessible in the same medium is not transformative. *See Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) (holding that TV news clipping service was "neither productive nor creative in any way"); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (holding that an unaltered retransmission of radio broadcasts was not transformative); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (noting that the reproduction of audio CDs in MP3 format "simply repackages those recordings to facilitate their transmission through another medium").

All of GSU's witnesses (including faculty) conceded that the use of electronic course materials is not transformative. *See* EX 29 *(*Potter Dep.) 155:16-22; EX 14 (Seamans Dep.) 154:3-14; EX 6 (Kaufmann Dep.) 68:6-9; EX 8 (Belcher Dep.) 84:5-7; EX 24 (Reifler Dep.) 58:22-24. Nevertheless, under GSU's current policy, this pivotal consideration is cancelled out if the instructor finds a use to be both "nonprofit educational" and "teaching." *See* EX 6 (Kaufmann Dep). 68:6-20, 77:22-78:5; EX 24 (Reifler Dep.) 56:3-60-4; EX 8 (Belcher Dep.) 91:6-14, 118:2-9; EX 14 (Seamans Dep.) 116:4-8, 192:25-193:21; EX 29 (Potter Dep.) 63:12-64:8; EX 34.

## 2. GSU profits from the infringement

The virtually dispositive weight the GSU checklist accords to the instructor's educational purpose is inconsistent with the Supreme Court's observation that "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement." *Campbell*, 510 U.S. at 584. The nonprofit educational purpose of a work is "only one element of the first factor enquiry." *Id. See also Princeton Univ. Press*, 99 F.3d at 1385 (noting that statute "does not provide blanket immunity for 'multiple copies for classroom use'").

In any event, GSU's attempt to define its "nonprofit educational purpose" as the opposite of a "commercial activity," *see* EX 14 *(*Seamans Dep.) 193:4-21; EX 29 (Potter Dep.) 158:20-159:3, is wrong. As the Supreme Court has made clear, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from . . . the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. The commercial use inquiry looks at "the value obtained by the secondary user from the use of the copyrighted material." *Am. Geophysical Union*, 60 F.3d at 922. The user need not profit financially for the use to be deemed commercial; the "absence of a dollars and cents profit does not inevitably lead to a finding of fair use." *Weissmann*, 868 F.2d at 1324. The Copyright Act's definition of "financial

gain" as the "receipt, or expectation of receipt, of anything of value," 17 U.S.C.

§ 101, plainly encompasses use without payment by a not-for-profit educational

institution.

In *Weissmann*, the Second Circuit rejected as clearly erroneous the trial

court's holding that the unauthorized inclusion of the plaintiff's article in the

readings for a course the defendant was teaching was fair use because it was

"entirely for non-profit purposes." 868 F.2d at 1324. The court of appeals found

that that the first factor weighed against fair use based, in part, on the private

professional benefits the defendant professor sought by using the article.

*Weissmann*, 868 F.2d at 1324.

It follows that benefits obtained by nonprofit institutions from unauthorized

copying cut against fair use. In *Worldwide Church of God v. Philadelphia Church

of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000), for example, the court held that

the Philadelphia Church of God's unauthorized distribution to its followers of

verbatim copies of copyrighted book *Mystery of Ages* "unquestionably profits PCG

by providing it at no cost with the core text essential to its members' religious

observance, by attracting . . . new members who tithe ten percent of their income to

PCG, and by enabling the ministry's growth"). *See* EX 7 (Pfund Dep.) 184:13-16

("[S]imply because you[']re] non-profit educational doesn't mean that you are not potentially depriving someone else of revenue").

Consistent with this, courts have found the requisite benefit to be shown where unauthorized copies were made to save the expense of purchasing authorized ones. *See Wall Data, Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006) ("the purpose and character of the Sheriff Department's use was commercial, because the copies were made to save the expense of purchasing authorized copies, or at least the expense of purchasing a more flexible license."); *see also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001).

Despite the foregoing, GSU's faculty have been misled into believing that "commercial activity" for purposes of the first factor is limited to direct, personal financial gain from the use. *See* EX 24 (Reifler Dep.) 57:25-58:11; EX 8 (Belcher Dep.) 86:11-87:3; EX 14 (Seamans Dep.) 177:22-181:2. Yet GSU, like the church in *Worldwide Church of God*, 227 F.3d 1110, clearly has obtained an economic benefit by failing to pay the customary price for using Plaintiffs' copyrighted materials. By migrating from licensed coursepacks to unlicensed ERes and uLearn systems, GSU has avoided the cost of permission fees and book purchases and thereby acquired a commercial advantage over schools that incur those costs and

either must absorb them or pass them on to their students (*i.e.*, their "customers").

EX 13 (Palmour Dep) 144:25-145:5.

### 3. GSU's practices are inconsistent with classroom and library guidelines

Any attempt by GSU to justify its unauthorized copying as fair use by relying on its educational purpose is further undermined by the "Agreement on Guidelines for Classroom Copying in Not-for-Profit Educational Institutions With Respect to Books and Periodicals" (the "Guidelines"), H.R. Rep. No. 94-1476, at 68-71 (1976), which conferees from both Houses of Congress accepted as "part of their understanding of fair use." H.R. Conf. Rep. No. 94-1733, at 70 (1976). The Guidelines set forth several criteria for permissible unauthorized copying for classroom use, including: (i) brevity (1,000 words); (ii) spontaneity (decision to use the material is too close to time of use to reasonably expect to obtain timely permission); (iii) limited copying (no more than nine instances of multiple copying during a term, only a limited number of copies from works by one author or from any one collective work); and (iv) non-substitution (copying does not substitute for purchase of books, publishers' reprints, or periodicals). The Guidelines further state that the unauthorized creation of "anthologies, compilations or collective works" is not allowed. H.R. Rep. No. 1476 at 69.

In *Princeton University Press*, the court found that "[i]n its systematic and premeditated character, its magnitude, its anthological content, and its commercial motivation, the copying done by [the copyshop defendant] goes well beyond anything envisioned by the Congress." 99 F.3d at 1390. The court concluded that the fact that the defendant's copying was "light years away from the safe harbor of the guidelines weighs against a finding of fair use." *Id.* at 1391. *See also Basic Books*, 758 F. Supp. at 1536 (finding that coursepack copying "clearly deviates from the letter and spirit of the Guidelines").

That regular, systematic, and extensive unauthorized copying of course materials – even by a nonprofit institution – is contrary to Congress's understanding of fair use is confirmed by the strict limits placed on unauthorized copying by libraries under section 108 of the Copyright Act. Except to preserve unpublished works or to replace damaged, lost, stolen, or deteriorating copies (in which case three copies may be made), section 108 permits libraries to make or distribute "no more than one copy" of a work so long as it is done "without any purpose of direct or indirect commercial advantage" and the library is open to the public or to persons not affiliated with the library of institution of which it is a part. 17 U.S.C. § 108(a)(1). Section 108 expressly prohibits "systematic reproduction or

distribution" of single or multiple copies or "related or concerted reproduction or distribution of multiple copies . . . of the same material."  17 U.S.C. § 108(g).

The same principle – that mechanical copying by a nonprofit public institution for private educational use must be limited to avoid interfering with the market for the work – precludes a finding of fair use with respect to the practices challenged here.

* * *

For all these reasons, the  first factor clearly favors Plaintiffs.

## B.    The Nature of the Copyrighted Work

The second factor considers the nature of the copyrighted work.  Although the scope of fair use is greater with respect to works of fact than works of fiction, *Stewart v. Abend*, 495 U.S. 207, 237 (1990), these are not rigid categories.  There are, instead, "gradations as to the relative proportion of fact and fancy," and "[t]he extent to which one must permit expressive language to be copied, in order to assure dissemination of the underlying facts, will . . . vary from case to case." *Harper & Row*, 471 U.S. at 563 (citation omitted).

The Eleventh Circuit has referred to a "hierarchy of copyright protection" in which "original, creative works are afforded greater protection than derivative works or factual compilations."  *SunTrust*, 268 F.3d at 1271.  Nonfiction works

that are not simply selections or arrangements of factual material (such as statistical compilations or encyclopedias) are entitled to weight under the second-factor analysis. *See Princeton Univ. Press*, 99 F.3d at 1389 (noting with respect to coursepacks that it "was certainly not telephone book listings that the defendants were reproducing"). In *Pacific & Southern Co.*, the Eleventh Circuit expressly disapproved of allowing too wide a berth for fair use with respect to factual works, noting that courts should "take care not to discourage authors from addressing important topics for fear of losing their copyright protections." 744 F.2d at 1497.[13] And in *Letterese*, where the book *Big League Sales Closing Techniques* was at issue, the court noted that "[n]otwithstanding its informational nature [it] contains a significant 'proportion of fact and fancy,' and not merely in the subjective selection and arrangement of sales techniques; [the author] utilizes original expression that surpasses the bare facts necessary to communicate the underlying technique." 533 F.3d at 1312.

Courts regularly accord scholarly works weight under the second factor. The *Princeton University Press* court noted that the excerpts copied from non-fiction scholarly books for the coursepacks at issue "contained creative material, or

---

[13] Leading copyright expert William Patry has argued that "a broad rule permitting more generous fair use of all factual works than of all fictional works should be avoided." 4 William F. Patry, *Patry on Copyright* § 10:138 (March 2008).

'expression" and concluded that the second factor cut against fair use. *See* 99 F.3d at 1389. In *Weissmann*, 868 F.2d at 1325, the Second Circuit noted "the danger that allowing wholesale appropriation of scientific works presents." Observing that copyright protection provided the plaintiff with "an incentive to continue research," the court stated:

> [W]hile recognizing that fair use finds greater application in a factual scientific context, that recognition should not blind a court to the need to uphold those incentives necessary to the creation of works such as [the article in dispute].

*Id.*

Given the analytical, academic nature of the works sued upon, *see* EX 5 (Pfund Decl.) ¶¶ 21-32; EX 4 (Smith Decl.) ¶¶ 10-29; EX 3 (Van Valkenburg Decl.) ¶¶ 19-32, the second factor favors Plaintiffs. The contrary understanding of GSU's witnesses, *i.e.*, that Factor 2 will almost always favor use of published non-fiction works for teaching purposes, *see* EX 14 *(*Seamans Dep.) 196:11-25, 197:10-15; EX 24 (Reifler Dep.) 63:24-65:11; EX 8 (Belcher Dep.) 118-119, where the instructor deems the use to be "important" to his or her "educational objectives," EX 8 (Belcher Dep.) 93:12-94:4; EX 6 (Kaufmann Dep). 78:25-79:3, is wrong as a matter of law.

## C.    The Amount and Substantiality of the Use

The third factor looks at the amount and substantiality of the portion used in relation to the copyrighted work as a whole.  In applying the third factor, courts "evaluate the qualitative aspects as well as the quantity of material copied."  *Basic Books*, 758 F. Supp. at 1533.  Verbatim copying (such as photocopying) "is evidence of the qualitative value of the copied material."  *Harper & Row*, 471 U.S. at 565.

In *Basic Books*, the court found that the portions of the plaintiffs' works copied for the five coursepacks at issue – twelve excerpts ranging from 14 to 110 pages in length (corresponding to at least one chapter of a plaintiff's book in almost every case) – "were critical parts of the books copied, since that is likely the reason the college professors used them in their classes."  758 F. Supp. at 1533.  Based on the extent of the copying, the court concluded that the excerpts were meant to be "a complete representation of the concept explored in the chapter," *id.* at 1534 – "not material supplemental to the assigned course material but *the* assignment."  *Id.* (emphasis in original).

Similarly, in *Princeton University Press*, the Sixth Circuit compared the extent of the copying – 8,000 words in the case of the shortest excerpt – to the 1,000-word "safe harbor" in the Classroom Guidelines (equivalent to 2-3 pages of

the books sued upon here) and found that the takings far exceeded the Guidelines and were "not insubstantial." 99 F.3d at 1389. As for the qualitative aspect of the copying, the court observed:

> [T]he fact that the professors thought the excerpts sufficiently important to make them required reading strikes us as fairly convincing 'evidence of the qualitative value of the copied material.' . . . We have no reason to suppose that in choosing the excerpts to be copied, the professors passed over material that was more representative of the major ideas of the work as a whole in preference to material that was less representative.

99 F.3d at 1389 (quoting *Harper & Row*, 471 U.S. at 565).

The same analysis governs here. The verbatim copying by GSU is substantial in both the quantitative and qualitative senses. The ERes report from the Fall 2009 semester, from which the examples on page 6, *supra*, were drawn, reveals that the copying of one or more book chapters and and/or numerous cumulatively lengthy selections from particular books remains routine. *See* 56.1 Statement ¶¶ 121-140; EX 22. The testimony of the GSU faculty discussed *supra* at pages 26-29 confirms that GSU instructors interpret the checklist to authorize the taking of multiple book chapters without permission if they conclude the material is "narrowly tailored" to his or her "educational purpose" – without regard to the length of the taking. But there is no authority for defining the scope of permissible taking in the context of a nontransformative use by the extent of the

user's purported "need" for the material.  The "narrow tailoring" on which GSU relies correlates to appropriation of the "critical parts of the books copied." *Basic Books*, 758 F. Supp. at 1533.

The third factor thus also weighs heavily in Plaintiffs' favor.

### D.     The Effect of the Use on the Potential Market for or Value of the Copyrighted Works

The fourth and final statutory fair use factor requires the court to consider "not only the extent of market harm caused by the particular actions of the alleged infringer," but also "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (quoting *Harper & Row*, 471 U.S. at 569).

The first and the fourth factors harmonize in that "a work that merely supplants or supersedes another is likely to cause a substantially adverse impact on the potential market of the original," whereas "a transformative work is less likely to do so." *SunTrust*, 268 F.3d at 1274 n.28 (citation omitted).  The mere duplication of an original serves as a market replacement for it, "making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591.  *See also Peter Letterese*, 533 F.3d at 1315 ("the adverse effect with which

fair use is primarily concerned is that of market substitution").  In *Basic Books* the

court found that although it was possible that reading coursepacks would "whet[]

the appetite of students" to read more by the authors, it was "more likely that

purchase of the packets obviates purchase of the full texts."  758 F. Supp. at 1534.

GSU's ERes and uLearn practices, by systemically substituting unlicensed

electronic coursepacks for purchases of the original texts, plainly pose a substantial

threat to the market for sales of Plaintiffs' works, particularly if such practices

were to be replicated at other educational institutions.  EX 5 (Pfund Decl.) ¶ 43;

EX 4 (Smith Decl.) ¶ 41; EX 3 (Van Valkenburg Decl.) ¶¶ 42-43.

Lost permissions fees also are an aspect of market harm, especially where

the copyright holder is successfully exploiting the licensing market.  *Princeton

Univ. Press*, 99 F.3d at 1387.  *See also Am. Geophysical Union*, 60 F.3d at 930

("since there currently exists a viable market for licensing these rights for

individual journal articles, it is appropriate that potential licensing revenues for

photocopying be considered in a fair use analysis"); *Harper & Row*, 471 U.S. at

569 (considering harm to marketability of first serialization rights); *DC Comics,

Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir. 1982) ("one of the benefits of

ownership of copyrighted material is the right to license its use for a fee").

In *Princeton University Press*, the court discussed the potential ramifications

for permissions fees if the defendant's photocopying were deemed to be fair use:

> [M]ost of the copyshops that compete with MDS in the sale of
> coursepacks pay permission fees for the privilege of duplicating
> and selling excerpts from copyrighted works. . . . If copyshops
> across the nation were to start doing what the defendants have
> been doing here, this revenue stream would shrivel and the
> potential value of the copyrighted works of scholarship
> published by the plaintiffs would be diminished accordingly.

99 F.3d at 1387. *See also Basic Books*, 758 F. Supp. at 1534 (concluding that the

defendant copyshop's nationwide business of "usurping plaintiffs' copyrights and

profits" could not be sustained because it would frustrate the intent of copyright

law to encourage creative expression); *Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp.

2d 177, 189 (D. Mass. 2007) (finding that if unauthorized use of plaintiff's

photograph in television program were fair use, all similar uses would be fair use,

destroying the only potential market for the photographs).

The Second Circuit has discussed the relevance of an established licensing

market, explaining that "the right to seek payment for a particular use tends to

become legally cognizable under the fourth fair use factor when the means for

paying for such a use is made easier," *Am. Geophysical Union*, 60 F.3d at 930-31,

and that unauthorized use "should be considered 'less fair' when there is a ready

market or means to pay for the use." *Id.* at 931.

There is uncontroverted record evidence here of a well established, widely used system for licensing excerpts from academic books for the very type of educational use engaged in by GSU – the customized assembly by faculty of numerous excerpts from copyrighted works into comprehensive electronic course readings. *See supra* pp. 11-12. The record also establishes Plaintiffs' loss of potentially critical licensing fees as a result of GSU's infringement. *See* 56.1 Statement ¶¶ 150-162; *supra* pp. 20-21, 32-33. It is obvious, moreover, that if GSU's practices were endorsed by the Court, the multimillion-dollar market for licensing reproduction rights for academic use would disappear, thus seriously weakening if not destroying Plaintiffs' incentive to continue to publish academic works. *See supra* pp. 32-34. As the *Princeton University Press* court concluded, "[T]he destruction of this [permissions] revenue stream can only have a deleterious effect upon the incentive to publish academic writings." 99 F.3d at 1391.

GSU's failure even to comprehend properly the appropriate inquiry under Factor 4 is reflected in testimony that GSU faculty (i) do not consider the aggregate impact on the market for the original if the proposed taking were to be repeated by a larger group of instructors at GSU and at other schools, EX 24 (Reifler Dep.) 72:14-73:18; EX 6 (Kaufmann Dep.) 59:7-12; EX 8 (Belcher Dep.) 101:23-102:4; (ii) do not consider the availability of licensed versions of the same

content, EX 24 (Reifler Dep.) 74:5-75:4; EX 6 (Kaufmann Dep.) 65:23-66:8, 74:15-22, 85:17-22, 86:3-7; (iii) treat the posting of a copyrighted work on ERes or uLearn as the making of a single copy rather than of multiple copies, EX 8 (Belcher Dep.). 105:9-22; EX 24 (Reifler Dep.) 95:6-10; EX 14 (Seamans Dep.) 184:10-185:10, 199:2-5; and (iv) rely on the possibility that assigning portions of a work might stimulate students to later purchase the work as negating market harm, EX 6 (Kaufmann Dep.) 83:8-84:24; EX 24 (Reifler Dep.) 72:14-73:2 – a theory expressly rejected in *Basic Books*. *See* 758 F. Supp. 2d at 1534.

The fourth factor, like the others, clearly weighs against fair use, and consideration of all the factors mandates entry of judgment for Plaintiffs.

## IV.   INJUNCTIVE RELIEF IS APPROPRIATE

The Court is authorized to grant an injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The statute authorizes an injunction that awards relief not just as to the specific works sued upon but also as to future infringements of those and other works owned or controlled by Plaintiffs. In *Pacific & Southern Co.*, for example, the Eleventh Circuit found a "substantial likelihood of future infringements" and noted that the statute does not bar injunctive relief as to works that have not yet been created. *See* 744 F.2d at 1499 and n.17.

Similarly, in *Basic Books*, the court enjoined the defendant "from future anthologizing and copying of plaintiffs' works without permission" and extended the prohibition to "works not currently existing or which may in the future be owned by plaintiffs and as to which plaintiffs have not consented." 758 F. Supp. At 1542. *See also Princeton Univ. Press*, 99 F.3d at 1392 ("[t]he weight of authority supports the extension of injunctive relief to future works"); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1154 n.1 (9th Cir. 2007); *Milk Money Music v. Oakland Park Entm't Corp.*, No. 09-CV-61416, 2009 WL 4800272, at *3 (S.D. Fla. Dec. 11, 2009) (enjoining performance of all ASCAP music in suit alleging infringement of four specific songs); *Elektra Entm't Group v. Freeman*, No. Civ. Act. No. 2:06cv914-ID, 2007 WL 1837130, at *4 (M.D. Ala. June 26, 2007); *Sony Music Entm't, Inc. v. Global Arts Prods.,* 45 F. Supp. 2d 1347 (S.D. Fla. 1999).

As shown above, Defendants' current policies and practices present a "threat of continuing violation," *Basic Books*, 758 F. Supp. at 1542, and warrant an injunction that covers existing and future works owned or controlled by Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant

their motion for summary judgment.

Respectfully submitted,

/s/ Edward B. Krugman
Edward B. Krugman

Georgia Bar No. 429927
John H. Rains IV
Georgia Bar No. 556052

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street NW, Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
krugman@bmelaw.com
rains@bmelaw.com

R. Bruce Rich (*pro hac vice*)
Randi Singer (*pro hac vice*)
Todd D. Larson (*pro hac vice*)
Jonathan Bloom (*pro hac vice pending*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
r.bruce.rich@weil.com
randi.singer@weil.com
todd.larson@weil.com
jonathan.bloom@weil.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that this document complies with the font and point selections set forth in Local Rule 5.1.  This document was prepared in Times New Roman 14 point font.

<u>/s/ Edward B. Krugman</u>
Edward B. Krugman

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing **PLAINTIFFS'**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY**

**JUDGMENT** with the Clerk of Court using the CM/ECF filing system which will

automatically send e-mail notification of such filing to the following attorneys of

record:

> Anthony B. Askew, Esq.
> Stephen M. Schaetzel, Esq.
> Katrina M. Quicker, Esq.
> John P. Sheesley, Esq.
> Kristen A. Swift, Esq.
> C. Suzanne Johnson, Esq.
> Laura E. Gary, Esq.
> King & Spalding
> 1180 Peachtree Street
> Atlanta, Georgia 30309
>
> Mary Jo Volkert, Esq.
> Assistant S. Attorney General
> 40 Capitol Square
> Atlanta, Georgia 30334

This 26th day of February, 2010.

> /s/Edward B. Krugman
> Edward B. Krugman