EXHIBIT

24

Dockets.Justia.com

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                  ATLANTA DIVISION

4  CAMBRIDGE UNIVERSITY

5  PRESS, et al.,

6              Plaintiffs,     Case Number:

7      vs.                     1:08-CV-1425-ODE

8  MARK BECKER, et al.,

9              Defendants.

10  ~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12     Videotape deposition of JASON REIFLER, Ph.D.,

13  taken on behalf of the defendants, pursuant to the

14  stipulations contained herein, before Regina W. Hollis,

15  RPR, CCR-B-2306, at Georgia State University, Atlanta,

16  Georgia, on Wednesday, June 3rd, 2009, commencing at

17  the hour of 1:30 p.m.

18

19

20              Shugart & Bishop

              Certified Court Reporters

21              Suite 140

              13 Corporate Square

22          Atlanta, Georgia 30329

              770-955-5252

23          770-955-5211 (facsimile)

24

25

EXHIBIT 24 - 1

INDEX TO EXHIBITS

| Plaintiffs' Exhibit | Description | Page |
|---|---|---|
| 11 | University of Georgia Copyright Policy, Policy on the Use of Copyrighted Works in Education and Research | 13 |
| 12 | University of Georgia Copyright Policy, Additional Guidelines for Electronic Reserves | 13 |
| 13 | University of Georgia Copyright Policy, The Fair Use Exception | 13 |
| 14 | University of Georgia Copyright Policy, Introduction to the Fair Use Checklist | 13 |
| 242 | Curriculum Vitae of Jason Reifler, Ph.D. | 15 |
| 243 | Dialogue Page for Studies in American Politics, Spring Semester 2009, Pols-8190 | 36 |
| 244 | Pols 1101 Fall 2008 uLearn Roster.csv | 37 |
| 245 | Pols 1101, Fall Semester Syllabus | 46 |
| 246 | Pols 8101 Political Psychology Spring 2009 Syllabus | 46 |
| 247 | Fair Use Checklist, The Psychology of Emotion and Politics | 54 |
| 248 | The Psychology of Emotion and Politics by George E. Marcus | 54 |
| 249 | Table of Contents, Oxford Handbook of Political Science | 66 |
| 250 | Fair Use Checklist, Psychologies Underlying Political Psychology | 78 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT 24 - 2

| | 251 | Oxford Handbook of Political Psychology, Sears, Huddy and Jervis Chapter | 78 |
| | 252 | Fair Use Checklist, Models of Decision | 85 |
| | 253 | Fair Use Checklist, Social Cognition | 87 |
| | 254 | Chapter 2, Dual Modes in Social Cognition | 87 |
| | 255 | Chapter 3, Attention and Encoding | 87 |
| | 256 | Chapter 4, Representation in Memory | 87 |
| | 257 | Fair Use Checklist, Reconsidering the Rational Public | 99 |
| | 258 | Reconsidering the Rational Public Chapter, Elements of Reason | 99 |
| | 259 | Fair Use Checklist, Affect as Information, Elements of Reason, Wendy Rahn | 100 |
| | 260 | Affect as Information, Elements of Reason, Wendy Rahn | 100 |
| | 261 | Elements of Reason, Table of Contents | 102 |
| | 262 | Fair Use Checklist, Public Opinion and Democratic Politics: The Problem of Nonattitudes and the Social Construction of Political Judgment | 108 |
| | 263 | Chapter 9, Public Opinion and Democratic Politics: The Problem of Nonattitudes and the Social Construction of Political Judgment | 108 |
| | 264 | Fair Use Checklist, Nature and Origins of Mass Opinion | 112 |
| | 265 | The Nature and Origins of Mass Opinion | 112 |

EXHIBIT 24 - 3

1    266      The Nature and Origins of Mass        112
              Opinion Table of Contents
2

     267      Fair Use Checklist, The Poly-Psy       119
3             Relationship
4    268      Pols 4190, Political Psychology        122
              Syllabus
5

     269      Studies in American Politics 1,        122
6             Spring Semester, 4190 Dialogue Box
7

8

     (Original Exhibits 242 through 269 and previously
9  marked copies of 11 through 14 have been attached to
   the original transcript.)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 24 - 4

```
 1              APPEARANCES OF COUNSEL
 2  On behalf of the Plaintiff:
 3  TODD D. LARSON, Esq.
    Weil, Gotshal & Manges, LLP
 4       767 Fifth Avenue
         New York, New York  10153-0119
 5       212-310-8238
         212-310-8007 (Facsimile)
 6       todd.larson@weil.com
 7  On behalf of the Defendants: Mark P. Becker, et al.:
 8  SUZANNE JOHNSON, Esq.
    LAURA GARY, Esq.
 9  King & Spalding, LLP
         1180 Peachtree Street, N.E.
10       Atlanta, Georgia  30309
         404-572-2759
11       404-572-5100 (Facsimile)
         suzanne.johnson@kslaw.com
12
13  On behalf of the Witness:
14  BHARATH PARTHASARATHY, Esq.
    Assistant Legal Advisor
15       Georgia State University
         10 Park Place Building, Suite 510
16       Atlanta, Georgia  30303
         404-413-0500
17       404-413-0518 (Facsimile)
         bparthasarathy@gsu.edu
18
19  Videographer:
20       Derrick Jones
21
22
                         -  -  -
23
24
25
```

EXHIBIT 24 - 5

1      VIDEOTAPE DEPOSITION OF JASON REIFLER, Ph.D.

2                    June 3rd, 2009

3

4         (Reporter disclosure made pursuant to Article

5   8.B. of the Rules and Regulations of the Board of Court

6   Reporting of the Judicial Council of Georgia.)

7         THE VIDEOGRAPHER:  This will be the videotape

8   deposition of Jason Reifler taken by the Plaintiff in

9   the matter of Cambridge University Press et al. versus

10  Mark P. Becker, et al.  The date is June 3rd, 2009.  We

11  are on the record at 1:25 p.m.

12     JASON REIFLER, Ph.D., having been first duly

13  sworn, was examined and testified as follows:

14     EXAMINATION BY MR. LARSON:

15     Q.   Good afternoon, Professor Reifler.  Just for

16  the record, could you state your full name, please.

17     A.   First, middle and last?

18     Q.   Sure.

19     A.   First is Jason, J-a-s-o-n, middle is Aaron,

20  A-a-r-o-n, and last is Reifler, R-e-i-f-l-e-r.

21     Q.   Thank you.  My name is Todd Larson.  I'm from

22  Weil, Gotshal & Manges.  It's a law firm in New York.

23  As you probably know, we're representing the Plaintiffs

24  in this action, Cambridge University Press, Oxford

25  University Press, and Sage Publications.  Have you been

EXHIBIT 24 - 6

1 deposed before?

2    A.   I have not.

3    Q.   Okay.  Did your counsel give you some sense of

4 how this was going to work today?

5    A.   We had a preparatory session last week.

6    Q.   I will just remind you of a few sort of ground

7 rules, then, based on that.  The first is please just

8 answer verbally.  You know, nods show up on the video

9 and don't show up on the transcript, so verbal answers

10 are best.  Most important, if you don't understand a

11 question that I ask, please ask me for clarification so

12 make sure we're on the same page.  If you need a break

13 at any point, too, just let me know.  I'm happy to take

14 a pause.  I would only ask that you not do that while

15 there's a question pending.  And that should be it.

16    You mentioned that you met with counsel in

17 preparation?

18    A.   I did.

19    Q.   When was that?

20    A.   That was last week.

21    Q.   Last week.  How long was the meeting?

22    A.   Few hours.  I don't recall specifically.

23    Q.   And it was counsel that's here defending you

24 today?

25    A.   Yes.

EXHIBIT 24 - 7

1    Q.   Did you review any documents or records in

2 preparation for the deposition today?

3    A.   I went back over Fair Use Checklist that I had

4 prepared.

5    Q.   Any others?

6    A.   And syllabi for one -- a syllabus for one

7 course.

8    Q.   Which course was that?

9    A.   8190.

10   Q.   Did you speak to anyone at Georgia State -- I

11 may use the term GSU today -- about the deposition?

12   A.   Can you be more specific, please?

13   Q.   Yeah.  Did you discuss the fact that you were

14 going to be deposed with anyone, any employee of GSU, a

15 fellow professor or anyone else?

16   A.   Yes.

17   Q.   Who was that?

18   A.   Probably most assistant professors in my

19 department.  The only two that I know for sure are

20 Robert Howard and Jeffrey Lazarus.

21   Q.   What was the nature of those conversations?

22   A.   Just I'm being deposed in a copyright lawsuit.

23   Q.   Did you speak with Professors Kaufmann or

24 Belcher about the deposition?

25   A.   No.  I do not know who they are.

EXHIBIT 24 - 8

1    Q.   So I take it you didn't read the transcripts

2  of their depositions?

3    A.   I have not.

4    Q.   Did you read the transcripts of any previous

5  depositions in the matter?

6    A.   I have not.

7    Q.   When were you informed you were being deposed?

8    A.   When I received the deposition notice, which I

9  don't remember the exact date, but that was less than a

10 week before the original deposition was scheduled.

11   Q.   And who told you about the fact that you're

12 being deposed?

13   A.   The deposition notice was attached to the

14 e-mail.  I don't recall who sent the e-mail.

15   Q.   Were you aware of this lawsuit prior to

16 getting that deposition notice?

17   A.   Yes.

18   Q.   How did you know about the suit?

19   A.   In the original complaint that was filed, two

20 members of my department were mentioned in it.

21   Q.   Who are they?

22   A.   Jeffrey Lazarus and Kim Reimann.

23   Q.   And how did it come to your attention that

24 they were named or that there had been a complaint

25 filed?

EXHIBIT 24 - 9

1    A.    I don't recall exactly.  I think just

2 conversation in the hallways.

3    Q.    And did you have occasion to read the

4 complaint?

5    A.    I've not read the complaint.

6    Q.    Have you attended a training session for the

7 new copyright policy that's been passed at Georgia

8 State?

9    A.    I have not.

10    Q.    And you said that you did fill out some

11 checklists for the --

12    A.    I filled out checklists after I received the

13 deposition notice.

14    Q.    Did someone tell you that you should fill them

15 out?

16    A.    No.

17    Q.    How was it that you decided to fill them out

18 after getting the notice?

19    A.    I was surprised to receive a deposition

20 notice, and I believe that everything that I've not

21 violated copyright law.  And sought out the checklists

22 to make sure, and I'm as convinced as ever that I've

23 done absolutely nothing to violate copyright law.

24    Q.    When you got the deposition notice, how did

25 you know that there were checklists out there that

EXHIBIT 24 - 10

1 existed that you could fill out?

2     A.   I did not know that there were checklists.  I

3 started searching the Internet, particularly GSU's Web

4 site, saw information on copyright policy and copyright

5 law more generally.

6     Q.   And as a result of that search, you discovered

7 the checklists on the Web site?

8     A.   Yes.

9     Q.   And then what did you do?

10     A.   Excuse me?

11     Q.   What did you do after you found them on the

12 site?

13     A.   I printed them out and completed them.

14     Q.   And what did you do with them after you

15 completed them?

16     A.   I put them on my shelf, on my bookcases.

17     Q.   Did you read any other materials on the Web

18 site accompanying the checklists?

19     A.   I'm sure that I did, but I don't have any

20 specific memory of content.

21     Q.   Let me ask it another way.  When you filled

22 out the checklists, did you do that essentially cold,

23 or had you read some background material to assist you

24 in filling them out?

25     A.   I think I just filled them out.

EXHIBIT 24 - 11

1    Q.   Did you consult anyone in the legal affairs

2 office or anyone at GSU to assist you in filling them

3 out?

4    A.   No.

5    Q.   So you held onto them in your files until they

6 were requested from you by counsel for this deposition?

7    A.   Yes.

8    Q.   Since that time, have you consulted any other

9 sources of information about fair use or copyright law?

10   A.   Since the day that I first printed out the

11 checklists, no.

12   Q.   When you say that you're convinced that you've

13 done nothing wrong, is that based on filling out the

14 checklists, or some other knowledge you have of fair

15 use or copyright law?

16   A.   From the checklists, from guidelines as I

17 understood them from when I was a graduate student at

18 Duke.

19   Q.   What kinds of things were those?

20   A.   The guidelines I understood was 20 percent of

21 a work.

22   Q.   You can use 20 percent and if -- or sorry.

23 Strike that.  If you used 20 percent or less it's

24 considered fair use?

25   A.   Yes.

EXHIBIT 24 - 12

1    Q.   That was the policy at Duke?

2    A.   That's what I understood the policy to be.

3    Q.   Have you received any training, either at Duke

4 or at Loyola or at GSU, related to copyright or fair

5 use?

6    A.   I haven't.

7    Q.   And again --

8    A.   Let me follow up.

9    Q.   Uh-huh.

10   A.   What do you mean by training?

11   Q.   Courses, reading materials, really anything

12 that --

13   A.   No.

14   Q.   Is there something that you have read or are

15 familiar with that you were getting at?

16   A.   I assume at some point in time somebody has

17 given me instructions or given me advice but --

18   Q.   Do you recall any specifically?

19   A.   I don't.

20   Q.   And you said before, just correct me if I'm

21 wrong, you don't recall any particular instructional

22 information you read on the GSU Web site?

23   A.   I do not recall any.

24        (Plaintiff's Exhibit-11, 12, 13 and 14 was

25 previously marked for identification.)

EXHIBIT 24 - 13

1    Q.   Just mark something just to be sure.  I'm

2 going to hand you what's previously been marked as

3 Plaintiff's Exhibits 11 through 14.  Professor Reifler,

4 do you recall seeing any of these pages I just put in

5 front of you?  Just for the record, note that

6 Exhibit 11, Plaintiff's 11, is entitled "Policy on use

7 of Copyright At Works in Education and Research."

8 Plaintiff's Exhibit 12 is headlined "Additional

9 Guidelines for Electronic Reserves."  Plaintiff's

10 Exhibit 13 is entitled "The Fair Use Exception."

11 Plaintiff's Exhibit 14 is "Introduction to the Fair Use

12 Checklist."  And these are from the University System

13 of Georgia Web site.  Do you recall ever seeing these,

14 Professor?

15    A.   They look familiar.  I probably read them, but

16 again, I can't definitively say one way or another.

17    Q.   You don't recall whether you read them or not?

18    A.   I recall seeing them.  I don't recall the

19 extent to which or how carefully I read them.

20    Q.   And was it when you went to the Web site in

21 this process of filling out the checklists that you saw

22 them?

23    A.   I assume so.

24    Q.   Hand you what's been marked Plaintiff's

25 Exhibit 242.  Do you recognize this?

EXHIBIT 24 - 14

1      (Plaintiff's Exhibit 242 was marked for

2 identification.)

3      A.   It is my CV.

4      Q.   Can you briefly summarize your educational

5 background for me?

6      A.   I received my Bachelor's Degree from Colby

7 College in 1995.  I received my Ph.D. from Duke

8 University in 2006.

9      Q.   And you've been at Georgia State since the

10 Fall of 2007?

11     A.   That's correct.

12     Q.   And prior to that you were at Loyola?

13     A.   That is correct.

14     Q.   And prior to that was graduate school?

15     A.   Yes.

16     Q.   Currently you're an assistant professor?

17     A.   Yes.

18     Q.   Is that a tenure track position?

19     A.   It is.

20     Q.   Are you tenured?

21     A.   I am not tenured currently.

22     Q.   Have you taken any law classes in the course

23 of your educational training?

24     A.   I briefly sat in one or two sessions of maybe

25 it was an administrative law class at Duke.  I didn't

EXHIBIT 24 - 15

1 stay in the class.  It was not more than one or two

2 sessions.  I actually don't recall what the course was.

3    Q.   What's your Doctorate in?

4    A.   Political Science.

5    Q.   And can you tell me just at a basic level what

6 your specialty is, your area of focus?

7    A.   Public opinion, political psychology, and

8 political behavior.

9    Q.   Focussing on any particular topics?

10   A.   The primary topic is public opinion towards

11 the use of military force and how the public responds

12 to casualties experienced during wartime.

13   Q.   You're in the Political Science Department?

14   A.   That is correct.

15   Q.   Tell me, who do you report to in the Political

16 Science Department?

17   A.   To the -- report to anybody, it would be the

18 department chair.

19   Q.   And do you report to the Provost in any

20 fashion, or does Provost have any supervisory authority

21 over you?

22   A.   I have never met the Provost personally.

23   Q.   How big is the department?

24   A.   I think that we're 26 faculty members.

25   Q.   And tell me about the courses you teach.

EXHIBIT 24 - 16

1    A.   So far at GSU I've taught Introduction to

2  American Politics, course number POLS 1101, and I've

3  taught an upper level undergraduate course in Political

4  Psychology.

5    Q.   Is that 4190?

6    A.   That's 4190, which is a special topics course

7  designation.  It's being added to the curriculum under

8  its own course number, and I'm not sure when that takes

9  effect.  And a graduate course in Political Psychology.

10  Again, 8190 is a special topics designation, and it's

11  my understanding it's being added as its own course

12  designation in the future.

13    Q.   Let me ask you this:  Are you aware of any

14  stated departmental rules or policies that guide your

15  teaching or any of your employments?

16    A.   Quality teaching and good research.

17    Q.   Are there stated policies or written policies

18  that you are required to follow or that have ever been

19  provided to you?

20    A.   I'm not sure.  Can you be more specific in

21  terms of what policies you might mean or what those

22  policies might apply to?

23    Q.   Well, human resource policies, copyright

24  policies, code of conduct, any --

25    A.   Human resources I'm not -- occasionally we get

EXHIBIT 24 - 17

1 information about, you know, insurance period

2 switchovers, and for code of conduct, they are very

3 forceful in communicating no inappropriate relations

4 with students.  And as far as copyright, prior to the

5 Spring 2009 semester, I don't recall anything.

6     Q.   We will talk about the new copyright policy.

7 What about, are there policies regarding academic

8 integrity, plagiarism, those sorts of things that are

9 disseminated?

10    A.   I'm sure that policies exist.  I don't know

11 that I've ever seen them.

12    Q.   Is it fair to say that the copyright policy

13 that was recently disseminated is the lone instance of

14 someone sending you sort of an official policy at the

15 University that you're required to follow?

16    A.   I'm willing to say it's the only policy that I

17 can specifically have note of receiving are from

18 inappropriate conduct with students.

19    Q.   How did you receive that copyright policy?

20    A.   I believe via e-mail.

21    Q.   Do you know who the e-mail was from?

22    A.   I think it was a mass University e-mail.  I

23 don't recall.

24    Q.   Was the policy itself appended to the e-mail?

25    A.   I don't know.  I tend not to read mass

EXHIBIT 24 - 18

1 e-mails.

2    Q.   But you do recall receiving it?

3    A.   I recall receiving it in terms of going back

4 through some old e-mail, but I don't recall really

5 receiving it at the time.

6    Q.   Tell me about going back through old e-mail.

7 Was that in response to this deposition?

8    A.   Yes.

9    Q.   What did you do?

10    A.   Printed out copies of e-mail.

11    Q.   Did you go back and search for particular

12 topics or --

13    A.   Whatever the term phrases were.

14    Q.   Oh, I'm sorry.  This was in response to

15 counsel asking you to gather documents?

16    A.   Yes.

17    Q.   I see.  And in the course of that, you found

18 the e-mail from University with the policy attached?

19    A.   Or at least announcing there was a new policy.

20    Q.   Take a look at Exhibit 242, your CV, if you

21 could.

22    A.   Uh-huh.

23    Q.   I see here you are -- have a book about to

24 come out; is that right?

25    A.   It came out in February.

EXHIBIT 24 - 19

1    Q.   That's with Princeton University Press?

2    A.   Yes.

3    Q.   Did you sign a contract with the Princeton

4 University Press for that book?

5    A.   Yes.

6    Q.   How long ago did you sign the contract?

7    A.   Maybe a year, 18 months ago.  We signed one

8 contract, as I recall, and the page numbers or number

9 of tables and figures changed.  And so then I think we

10 signed a new one.

11    Q.   Was it a single contract that all three of you

12 signed?

13    A.   Yes.

14    Q.   By all three, I should just confirm you have

15 two coauthors; is that right?

16    A.   I do.

17    Q.   Do you know in the contract whether you own

18 the copyright or whether you assigned that to a

19 publisher?

20    A.   I believe we transferred the copyright over,

21 but I don't recall specifically.

22    Q.   Did you receive an advanced payment under the

23 contract?

24    A.   We did not receive any advance payment.

25    Q.   How are you paid under the contract?

EXHIBIT 24 - 20

1   A.   We get a percentage of sales.

2   Q.   And split three ways?

3   A.   Yes.

4   Q.   What's the percentage?  Do you know?

5   A.   The percentage that we receive from Princeton

6 or the percentage how we split?

7   Q.   The percentage that -- what's the percent --

8 what percent do you end up receiving personally?

9   A.   I'm not sure.  We'll split it between the

10 three of us equally as we equally did the work.

11   Q.   Do you know, is there a number specified in

12 the contract?

13   A.   There is, but it's actually like four numbers

14 because it's percentage of paperback before a certain

15 number of percentage of paperbark, after a certain

16 number sold; a percentage of hard cover before a

17 certain number sold, percentage of hardback after a

18 certain number sold.  I believe it's about -- it

19 averages out to about ten percent, and I don't recall

20 if that's of list price or of wholesale price.

21   Q.   How many sales have you had so far?

22   A.   I checked with the publisher about a month,

23 six weeks ago, and at that point we had sold 322

24 paperback copies and 88 hardback copies.

25   Q.   Have you received any royalty payments?

EXHIBIT 24 - 21

1    A.   No.

2    Q.   Does the contract cover license and

3 information fees?

4    A.   I don't know.

5    Q.   Are you aware of any other sorts of payments

6 that you stand to receive for use of the book other

7 than sales of the book in hardback or paperback?

8    A.   I'm not aware of any.

9    Q.   So I take it you don't know if a professor at

10 a university included a chapter from the book in a

11 CoursePack and paid permission fees for that, you don't

12 know whether you would receive any cut from that?

13    A.   I have absolutely no idea.

14    Q.   If a professor did want to do that, would it

15 be your expectation that they would pay a permission's

16 fee to do so?

17    A.   How much of the book?

18    Q.   A chapter.

19    A.   No.

20    Q.   Two chapters?

21    A.   Probably not.

22    Q.   Three chapters?

23    A.   At three, depending on which chapters and

24 length, maybe at that point they would think about

25 assigning, asking students to buy it.

EXHIBIT 24 - 22

1    Q.   Tell me what changed between two and three

2 that caused you to change your answer.

3    A.   At three it's starting to become a large

4 portion of the book, though it wouldn't necessarily

5 demand that they assign it at that point.

6      Ironically enough, in GSU's policies, it's my

7 understanding that I'm not allowed to benefit

8 financially from anything I assign in my classes.  So

9 if I want to assign it in my classes, I either have to

10 give it to them for free in the form of PDFs or find

11 some way for the sales portion to be returned to the

12 students.  The portion that would be --

13   Q.   You understand that policy to include

14 royalties that you might receive from the use or sales

15 that you would -- royalties you would receive?

16   A.   Yes.  Yes.

17   Q.   Not just profiting in the way that, you know,

18 if you were to charge a mark-up or something for a

19 CoursePack?

20   A.   Yes.

21   Q.   So three, you said that starts to become a

22 large portion.  You also said --

23   A.   It would depend on which three chapters.

24   Q.   That was my next question.  Tell me what you

25 meant by that.

EXHIBIT 24 - 23

1    A.   The first chapter is an introduction that

2 covers a lot of literature review and outlines the core

3 of our argument.  That content is available in other

4 ways, either in terms of some of our journal articles

5 or in terms of literature review.  Other people work in

6 the same literature and have similar literature review.

7 I don't know that I would necessarily count the

8 introductory chapter or the conclusion chapter among

9 those as content.  The ones that have new empirical

10 analyses that aren't available elsewhere.  So there are

11 two chapters in the book that have similar content in

12 published journal articles, and if they wanted to

13 assign the book version, scan it to PDF or photocopy,

14 that wouldn't -- I wouldn't -- that wouldn't bother me.

15    So once you take away the introduction and

16 conclusion chapter and the two chapters that have

17 similar content published elsewhere, that only leaves

18 three chapters.

19    Q.   So if it were those three chapters, you would

20 expect that professor to --

21    A.   I would hope.  I wouldn't necessarily go so

22 far as to say expect.  I would hope that they would.

23    Q.   Would have the students purchase the book for

24 use in the class?

25    A.   Yes.

EXHIBIT 24 - 24

1    Q.   What about, are you aware of the existence of

2 permissioning mechanisms whereby they could, rather

3 than having the book purchased, just get a license

4 essentially to use those three chapters?

5    A.   I am told that those things exist.

6    Q.   Were you aware of it prior to this deposition

7 process?

8    A.   Not really.  I know that CoursePacks exist,

9 and I know that they go through permission process but

10 I don't know exactly what it is.

11    Q.   So in this example we have been talking about,

12 if a professor wanted to use those three chapters,

13 would it be, you know, okay with you if they used those

14 three chapters in a CoursePack as opposed to having the

15 students buy the book?

16    A.   I don't see why not.  To be completely honest,

17 if they used it just as scanned documents, it wouldn't

18 really bother me that much.  I just would hope that

19 they would -- I won't actually benefit all that much

20 financially from this book.  So for me, if the choice

21 were selling more copies, if the only way they could

22 put it on their syllabus was to assign books and they

23 felt that they didn't want to do it for whatever

24 reason, I benefit more as a scholar for my reputation

25 and getting tenure having the book on the syllabus.  So

EXHIBIT 24 - 25

1 it would be my preference that they would distribute

2 the work, even without payment to me, because the real

3 payment for me is reputation, publishing success,

4 people reading my work, citing my work.

5    Q.  So let me ask you, if Princeton University

6 Press or publishers weren't -- if it weren't

7 financially viable for them to publish your books,

8 would that reputational benefit you receive from being

9 published by them disappear?

10    A.  It would change where I send manuscripts and

11 how manuscripts are organized.

12    Q.  How would it change it?

13    A.  Rather than going to university presses, if

14 all university presses folded, then I would go through

15 journals.

16    Q.  And what if there weren't journals, if it

17 weren't financially viable for the journals to publish

18 your materials?

19    A.  Then I assume that the academic market would

20 find another way.

21    Q.  Any idea what that other way would be?

22    A.  Internet-based journals that have a much lower

23 overhead and still have a peer review process.

24    Q.  For your book that you've just published, are

25 you aware were there sales projections done as part of

EXHIBIT 24 - 26

1 the process of producing a book?

2    A.   I assume that there were, but I'm not aware

3 that there were.

4    Q.   Do you have any idea of the margin that

5 Princeton University Press earns on the sales of your

6 book?

7    A.   I have absolutely no idea.

8    Q.   Any idea of how many copies they need to sell

9 to be able to turn profit on the book?

10    A.   The rule of thumb that I've been told in

11 academic publishing is 500 copies.  Whether that's

12 accurate or not, how that varies across presses, I have

13 no ability don't know.

14    Q.   Where is that rule coming from?  Where have

15 you heard that?

16    A.   I believe it was from Michael Munger, the

17 current Chair of Political Science at Duke and was my

18 advisor on my dissertation.

19    Q.   Do you have any knowledge of the finances the

20 publishing, academic publishing industry generally?

21    A.   No, I do not.

22    Q.   Let me just ask on your CV, there is a book

23 chapter there.

24    A.   Uh-huh.

25    Q.   Just tell me what -- was that a chapter that

EXHIBIT 24 - 27

1 contributed to a compilation of some kind or what is

2 that?

3    A.   Yes.  The name of book as listed on the CV is

4 Life After Reform: When The Bipartisan Campaign Reform

5 Act Meets Politics, Michael Malbin edited, Published by

6 Rowman & Littelfield.

7    Q.   This was a hard copy --

8    A.   Soft copy, but it was --

9    Q.   Different authors contributed different

10 chapters?

11    A.   Yes.

12    Q.   Your section called "Articles Under Review"?

13    A.   Yes.

14    Q.   What does that mean, "Articles Under Review"?

15    A.   Those are completed manuscripts that I have

16 submitted to journals for the peer review process.

17    Q.   What are the leading journals in your

18 particular field?

19    A.   The top three general journals would be

20 considered the American Political Science Review, the

21 American Journal of Political Science and the Journal

22 of Politics.

23    Q.   Do you know who the publishers of those

24 journals are?

25    A.   I do not.  Cambridge might be of PSR.  I'm not

EXHIBIT 24 - 28

1 sure.

2   Q.   One more question.  You received a grant and

3 award for something called the Technology Fee Grant,

4 "Software for a Political Psychology Lab."  What is

5 that?

6   A.   It's software to be able to conduct surveys.

7   Q.   You're teaching in the -- or you just taught

8 in the Maymester; is that right?

9   A.   Yes.

10  Q.   What course did you teach?

11  A.   Another section of POLS 1101, Introduction to

12 American Politics.

13  Q.   Are you teaching in the main Summer session?

14  A.   Another section of 1101.

15  Q.   And what about this Fall, do you know yet?

16  A.   I'm teaching, I believe, another section of

17 1101 and upper level undergraduate class on War and

18 Public Opinion.

19  Q.   Is that a new class?

20  A.   It is a new class to Georgia State.  It's the

21 second time I will have taught it.

22  Q.   Where did you teach it before?

23  A.   At Loyola.

24  Q.   Will you be teaching the 4190 or 8190 courses

25 again?

EXHIBIT 24 - 29

1    A.   It's my understanding that War and Public

2  Opinion has a 4190 designation, and is itself in the

3  process of being given its own designation course

4  number for the future.  And I assume that I will be

5  teaching the graduate Political Psychology seminar

6  every year or every other year, and my hope is that the

7  graduate seminar War and Public Opinion every year or

8  every other year.

9    Q.   Now, I'm correct that you used the uLearn

10 system for distributing materials to your class; is

11 that right?

12   A.   That is correct.

13   Q.   Did you start doing that as soon as you

14 started teaching at GSU?

15   A.   Yes.

16   Q.   And you use that to provide, among other

17 things, readings for the course?

18   A.   Yes.

19   Q.   Why was it, if you can recall, that you

20 decided to use the uLearn system for those purposes?

21   A.   Loyola didn't have an E-Reserve system, so I

22 was just in the habit of --

23   Q.   Just so I understand, that was what you were

24 used to using from your time at Loyola?

25   A.   Yes.

EXHIBIT 24 - 30

1    Q.   So when you started here, you stuck with it?

2    A.   Yes.

3    Q.   Did you consider using the E-Reserves system

4 at GSU?

5    A.   I may have thought about it briefly, but I

6 don't think so.

7    Q.   Did you consider using CoursePacks to

8 distribute your readings to your students?

9    A.   I did not.

10    Q.   Why not?

11    A.   In my experience as a student, CoursePacks are

12 never ready on time.

13    Q.   And is that a problem with using uLearn

14 instead?

15    A.   No.  I post them to uLearn.  If it's late,

16 it's my fault.

17    Q.   Did the University or anyone in your

18 department suggest any particular method over another

19 for distributing readings?

20    A.   Not that I recall.

21    Q.   So just tell me about the uLearn process, if

22 you can, when you start a class.  I take it there is

23 some sort of course page or course area?

24    A.   There's a course page that's automatically

25 created by Georgia State.

EXHIBIT 24 - 31

1    Q.   Do you know who creates that?

2    A.   I assume the IT Department, or more accurately

3 I assume that it's an automated process based on course

4 number.

5    Q.   Is that communicated to you somehow that this

6 area or page exists?

7    A.   I assume I must have been told it at some

8 point because I found it and used it, but I don't

9 recall that specific conversation.

10   Q.   I mean, did you get an e-mail or something

11 saying your page is up and ready to go?

12   A.   No.   There's never any communication like

13 that.   It's just -- at some point it shows up.

14   Q.   Is there a particular, you know, password or

15 login that you are given to be able to get in?

16   A.   It's the same as my campus user ID and

17 password.

18   Q.   So what are the various functions on uLearn

19 that you are able to utilize, if you could tell me what

20 the options are?

21   A.   The two primary functions that I use it for

22 are as a grade book so I can post grades and keep a

23 record of that and students can check their grades.

24 And if I need to post something for students to have

25 access to, a reading, a study guide.   I rarely make my

EXHIBIT 24 - 32

1 PowerPoint slides available, but on occasion for some

2 reason or another I do.

3     Q.    And is there a bulletin board or discussion

4 function available?

5     A.    There is one, and in my 8190 course I asked

6 students to post response papers that they were

7 assigned to, to it, and I'm not sure how they went

8 about it.

9     Q.    So when you post reading materials or study

10 guides, is there a particular page or area of the site

11 that --

12     A.    When you log onto the uLearn site, generally

13 you have a home page for you, and then there are links

14 to various classes.  So the classes that I have taught

15 or am currently teaching or depending on the point in

16 the semester and going to teach in the next term, and

17 then students have access to their classes.  And you

18 click on a link for each particular course so you -- I

19 only have access to courses I teach.  I assume my

20 students only have access to the courses that they

21 take.  And you click on the link to the class, and then

22 that brings you up to a main page.  And it has -- if

23 something is posted, there is a little section that

24 people can -- little icons for each document, not

25 unlike a folder or directory in the operating system.

EXHIBIT 24 - 33

1    Q.   Take a look at a printout of that in a second.

2 You said courses you've taught in the past are

3 available to you when you login?

4    A.   I think so.  At Loyola and Duke they used a

5 product called Blackboard.  uLearn is based on the

6 WebCT, which is a competitor of Blackboard, which I

7 think Blackboard has now purchased.  And I know that I

8 can look at old classes in Blackboard, and I think that

9 I can in uLearn.  But I don't 100 percent remember, and

10 I don't remember the adjustments, whether how to take

11 them off the front page or -- I assume that they must

12 be there, that they must be stored somehow, but I

13 honestly don't recall.

14    Q.   So when you post, you know, reading materials

15 or study guides, who copies and scans the materials

16 that are --

17    A.   Sometimes I do; sometimes the secretaries in

18 the department.

19    Q.   And how do you actually post it to the system

20 and put it up for students to read?

21    A.   It gets scanned into a PDF, and there's a

22 series of dialogue boxes to upload from your computer

23 to the course page.

24    Q.   How long does it take you to do that?

25    A.   A few minutes.

EXHIBIT 24 - 34

1    Q.    So at the risk of oversimplifying, if you're

2 at your computer and you have a file sitting on the

3 hard drive on your own computer, you can basically load

4 it up to the uLearn server and that will be available

5 to students?

6    A.    Yes, that's correct.

7    Q.    Have you had any interface with the IT

8 Department or anyone at the library to help you with

9 this process?

10    A.    I have not.

11    Q.    Do they offer training sessions or materials,

12 instructional materials, as to how to use the system?

13    A.    I believe they do.

14    Q.    Have you taken advantage of any of those?

15    A.    I have not.

16    Q.    How did you know how to operate it?

17    A.    I have reasonably good aptitude with

18 computers.

19    Q.    Do you get reports of any kind from the uLearn

20 system as to activity on your course pages?

21    A.    It is on the uLearn system, it's my

22 understanding that that information is not available.

23 When I used Blackboard at Loyola, I could keep track of

24 students accessing or downloading readings that I had

25 posted.

EXHIBIT 24 - 35

1    Q.   And uLearn doesn't provide that to you, that

2  capability to you?

3    A.   I don't think it does.

4    Q.   Have you tried?

5    A.   I have not tried.

6    Q.   Have you asked anyone about that

7  functionality?

8    A.   I have not.

9    Q.   On what basis, then, do you say that you don't

10 think that functionality is available?

11   A.   In Blackboard it's very easy to get to those

12 -- not super easy, but not especially difficult.  That

13 there are -- there is a tab on usage statistics, and I

14 just don't see anything similar in uLearn .

15       (Plaintiff's Exhibit 243 was marked for

16 identification.)

17   Q.   Mark this Plaintiff's Exhibit 243.  This is a

18 document Bates stamped Georgia State 0033632.  Do you

19 recognize this, Professor?

20   A.   It appears to be the dialogue page that I

21 described before for, I think, my 8190 course.

22   Q.   So how would you get to this particular page?

23 Is there a preliminary link from the course page that

24 gets you to an area where you would see this?

25   A.   I don't think so.  I think once you clicked

EXHIBIT 24 - 36

1 into the course, I think you see this.

2    Q.   Okay.

3    A.   The reason I'm not a hundred percent sure is

4 that uLearn has different dialogues for teachers and

5 students, and I can look at the student view but I

6 rarely do.  So this doesn't look exactly like what I

7 see, but looks roughly the same.

8    Q.   Set that aside for one second, although keep

9 it handy because we may be referring back to it.

10         (Plaintiff's Exhibit 244 was marked for

11 identification.)

12    Q.   Hand you what I'm marking Plaintiff's

13 Exhibit 244.  Now, this is a document that was produced

14 in discovery tests, I believe, from your files.  It's

15 marked Georgia State 0049883.  And I will represent to

16 you that it's been altered in one way, and that is we

17 have redacted out the information in the Last Name,

18 First Name columns because of concerns over the FERPA

19 law in the state.

20    A.   Okay.

21    Q.   But do you recognize -- acknowledging that we

22 redacted that information, do you recognize this

23 document?

24    A.   It appears to be the roster from my Fall 2008

25 1101 course.

EXHIBIT 24 - 37

1    Q.   And was this a document that you received or

2  generated in some way using the system?

3    A.   I suppose it must be.

4    Q.   Do you recall seeing it before?

5    A.   I do not.

6    Q.   You can put that aside.

7    A.   What I imagine that it is was a list of the

8  students to prepare a grade book.

9    Q.   How does this relate to preparing a grade

10 book?

11   A.   In my 1101 courses I have a weekly current

12 events quiz, which I have my RA grade, and my RA

13 doesn't have access to my course page.  So I imagine I

14 gave my RA the list of students to create a grade book

15 for him.

16   Q.   I believe you said before that prior to the

17 new copyright policy at GSU being implemented, you

18 weren't aware of any prior policy; is that right?

19   A.   I'm sorry.  Could you repeat that?

20   Q.   I will ask it in a more straight-forward

21 fashion.  During the 2007-2008 course year, for

22 example, were you aware that there was any copyright

23 policy in place at Georgia State?

24   A.   I don't recall ever being specifically told

25 what the copyright policy is or is not.

EXHIBIT 24 - 38

1    Q.    Were you aware whether there was one?

2    A.    I never gave it any thought.  If you were to

3 have asked me then is there a policy, I probably would

4 have said I assume there is.

5    Q.    So when you were in the 2007-2008 timeframe

6 putting materials on uLearn pages for your students,

7 did you do that -- were you following any guidelines or

8 policies as to what was fair use or not?

9    A.    In 2007-2008 I only taught sections of 1101,

10 and I don't recall being able to post anything that

11 would come under the purview in any way of fair use.

12 There are only a handful of things I can remember

13 posting at all.

14    Q.    And what were those?

15    A.    An occasional study guide that I produced, a

16 study guide that was given to me by the textbook

17 company for distribution, occasional slides, PowerPoint

18 slides.

19    Q.    You used the textbook in that course?

20    A.    I did.

21    Q.    So was Spring 2009 the first time that you

22 taught 4190 and 8190?

23    A.    It is.

24    Q.    And you posted materials for that class prior

25 to the new policy at GSU being promulgated, correct?

EXHIBIT 24 - 39

1    A.    That is correct.

2    Q.    So when you posted reading materials for 4190

3 and 8190 initially back in December or January, did you

4 follow any guidelines or policy as to what you could or

5 couldn't post?

6    A.    The guideline I tried to follow was the

7 20 percent rule from Duke.

8    Q.    Anything else?

9    A.    I think that's really what I followed.

10    Q.    Do you recall not posting because of that

11 20 percent rule that you would have liked to?

12    A.    There certainly were a number of additional

13 chapters, book chapters, here and there that I probably

14 would have posted, especially for the 8190.

15    Q.    The materials that you post on uLearn, do they

16 include readings for the class that are required

17 readings?

18    A.    Can you be more specific what you mean by

19 "Required"?

20    Q.    Readings that are part of the syllabus that

21 you expect the students to read.

22    A.    Yes.

23    Q.    I mean it as required versus optional.

24    A.    There's only -- for the Spring semester

25 there's only one reading or set of readings that I can

EXHIBIT 24 - 40

1 think of that I would have considered optional.

2    Q.   Was that -- well, we will look at the syllabus

3 and you can point those out to me.  I take it you've

4 never, at least during your time at Georgia State,

5 sought any sort of permission to use excerpts of works

6 that you put on your uLearn, correct?

7    A.   That would not be correct.

8    Q.   What have you received permission to use?

9    A.   There is a work in progress by John Bullock,

10 who is an assistant professor at Yale, and the work was

11 not published yet.  I asked for his permission.  He

12 said as long as it was in a gated environment that only

13 students of the class would have access to that he was

14 fine with it.

15    Q.   Any others that you sought permission to use?

16    A.   Not that I recall.

17    Q.   And I assume for his, that permission was

18 granted without any requirement of paying a fee?

19    A.   That's correct.

20    Q.   You mentioned before that you are -- well,

21 correct me if I'm wrong.  I don't want to put words in

22 your mouth, but you're aware that there are ways that

23 you can pay a permission fee or seek a permission and

24 pay a fee to use excerpts of works?

25    A.   I'm not sure I know exactly how to answer

EXHIBIT 24 - 41

1 that.

2    Q.   Okay.  Are you aware that you could, if you

3 wanted -- pick a publisher, pick Oxford University

4 Press.  That if you wanted to use two chapters of an

5 Oxford book, post it to uLearn for your students, are

6 you aware that you could go to Oxford University Press

7 and there's a mechanism in place for getting permission

8 to post those chapters and pay a royalty fee to do so?

9    A.   I was not aware of that.

10    Q.   Are you aware of it for any publisher?

11    A.   Some textbook publishers occasionally say if

12 you like different chapters from different textbooks we

13 can put together a custom textbook for you.  So

14 assuming they are drawing from different textbooks that

15 they have, but apart from that, no.

16    Q.   So it's your understanding, then, if you want

17 to use a couple of chapters from a given work and put

18 them on uLearn for your students, that your choices are

19 either put them up without any sort of payment, don't

20 use them, or make the students buy the whole book?

21    A.   Yes.

22    Q.   Are you aware of an entity called Copyright

23 Clearance Center?

24    A.   I'm not.

25         MR. LARSON:  Probably a good time to break.

EXHIBIT 24 - 42

1 Why don't we switch the tapes.

2          THE VIDEOGRAPHER:  We are off the record at

3 2:19 p.m.

4          (Recess from 2:19 p.m. to 2:30 p.m.)

5          THE VIDEOGRAPHER:  This is videotape number

6 two.  The time is 2:31 p.m., and we are back on the

7 record.

8     Q.   (By Mr. Larson)  Professor Reifler, just a

9 couple more questions about the new policy, the new

10 copyright policy at GSU.  Is it your understanding that

11 it applies to material posted to uLearn?

12    A.   I think it does.

13    Q.   And what do you base that assumption on?

14    A.   It's hard for me to believe that copyright law

15 doesn't apply in some form.

16    Q.   So you would expect it to apply to whatever

17 format you used to distribute your readings to

18 students?

19    A.   Yes.

20    Q.   Are you aware of a requirement under the new

21 policy that professors complete checklists prior to

22 posting materials to the E-Res system or to the uLearn

23 system?

24    A.   I am not aware of a policy that requires

25 filling that checklist.

EXHIBIT 24 - 43

1    Q.   You did it, as you said before, as a result of

2 this deposition being noticed, right?

3    A.   Yes.

4    Q.   Are you --

5    A.   Although as you pointed out, those checklists

6 didn't exist when the course started.

7    Q.   Right.  In the -- well, in the Maymester,

8 you're teaching the 1100 class?

9    A.   1101.

10    Q.   1101.  Forgive me.  Are there readings you

11 have posted to uLearn for that class?

12    A.   No.

13    Q.   If you were teaching, say, the 8190 class in

14 the Summer semester, am I right, then, that you as a

15 matter of normal course wouldn't have filled out

16 checklists for those readings?

17    A.   Because of receiving the deposition, I

18 probably would have.

19    Q.   You would now.  Had you not received the

20 deposition notice?

21    A.   I don't know.

22    Q.   Are you aware under the new policy if there is

23 any limits to the total number of works you're allowed

24 to post?

25    A.   No.

EXHIBIT 24 - 44

1    Q.   Aware if there is any percentage limit as, you

2 know, for instance, the 20 percent, you know, rule that

3 you mentioned before?

4    A.   I am -- I'm sorry.  Can you clarify that

5 question?

6    Q.   Are you aware the new policy, the new GSU

7 copyright policy, contains any percentage limit on the

8 amount of work that you can post and provide to

9 students?

10    A.   I believe that it does not have a specific

11 percentage guideline.

12    Q.   Any limit on the number of chapters that

13 you're aware of?

14    A.   I believe there is not a specific chapter

15 guideline.

16    Q.   For the 1100, 1101 class you are teaching, I

17 guess taught in the Maymester, was there a syllabus for

18 that class?

19    A.   Yes.

20    Q.   Did you use the similar syllabus to previous

21 incarnations of the class?

22    A.   The syllabus would have been, except for

23 changing of dates and schedule, identical to the Fall

24 2008 syllabus.

25    Q.   Just for the record, let's mark this as

EXHIBIT 24 - 45

1  Plaintiff's Exhibit 245.

2         (Plaintiff's Exhibit 245 was marked for

3  identification.)

4     Q.   I'm putting before you a syllabus identified

5  as the Fall 2008 syllabus for 1101.  Can you confirm

6  for me that's the syllabus you were just discussing?

7     A.   Yes.

8     Q.   The syllabus you used in the Maymester was

9  essentially identical to this with dates changed?

10    A.   Yes.

11    Q.   And so I'm clear, the book that you used, you

12 used a book called We the People?

13    A.   Uh-huh.

14    Q.   And that was an assigned text for purchase?

15    A.   It was.

16    Q.   And there weren't readings in addition to that

17 placed on uLearn for students?

18    A.   No.

19    Q.   Place that aside.  Let me mark as Plaintiff's

20 Exhibit 246 a document that starts with Bates number

21 Georgia State 0024578.

22         (Plaintiff's Exhibit 246 was marked for

23 identification.)

24    Q.   And do you recognize this document?

25    A.   It appears to be my syllabus from my graduate

EXHIBIT 24 - 46

1 Political Psychology course in Spring 2009.

2    Q.   Now, it says 8101 rather than 8190.  Do you

3 know why?

4    A.   I assume that's a typo.

5    Q.   How many students were in the course?

6    A.   Eight.

7    Q.   And just to confirm, if you look back at

8 Exhibit 243, which was the uLearn, this is the syllabus

9 corresponding with the uLearn page we were looking at,

10 at 243?

11    A.   It is.

12    Q.   If you'll turn to page two of the syllabus,

13 please.

14    A.   Should I keep 243 out as well?

15    Q.   Yeah, just keep it handy.  It says, "Course

16 Texts" in the second bold paragraph.  There are two

17 assigned books for this course.

18    A.   Yeah, that's a typo.  I did my undergraduate

19 syllabus first.

20    Q.   It's actually one book?

21    A.   It's actually just one, Yeah.

22    Q.   And that's the Daniel --

23    A.   The Dan Ariely.

24    Q.   The Dan Ariely.  That was a book that was

25 required that you asked the students to purchase?

EXHIBIT 24 - 47

1    A.    It is.

2    Q.    And did you arrange --

3    A.    Well, I asked them to read it.

4    Q.    And you left it to them to figure out where to

5 get it?

6    A.    Yes.

7    Q.    Did you arrange with the bookstore or anyone

8 to have it ordered so that they could buy it?

9    A.    Yes, I asked the bookstore to order copies.

10    Q.    And then it says in the next sentence,

11 "Additional readings will be accessible via the GSU

12 library E-journals porta."

13    A.    It's supposed to be portal.

14    Q.    And what is that?

15    A.    GSU subscribes to a number of academic

16 journals, actually a large number, and if you go to the

17 library Web page, there's a link that you can click on

18 that says, "E-journals".  And you can search for

19 journals that the library has electronic access to.

20    Q.    That sentence continues, "Or will be made

21 available on uLearn/WebCT."  I take it that means that

22 made available by you in PDF form?

23    A.    Yes.

24    Q.    Turn for me to the page that's headlined

25 "Course Schedule" two or three pages along.  And just

EXHIBIT 24 - 48

1 looking as an example the first two or three postings,

2 which I take it refer to journal articles,

3 International Security, Public Opinion Quarterly, and

4 another Public Opinion Quarterly?

5    A.   Yes.

6    Q.   Those are on that journal portal that you just

7 described?

8    A.   They are.

9    Q.   And then the next one is a book by -- or I'm

10 sorry, a work by Rose McDermott?

11   A.   An article in the journal Annual Review of

12 Political Science.

13   Q.   And that says available on uLearn?

14   A.   Georgia State does not subscribe to the Annual

15 Review of Political Science.

16   Q.   And so you photocopied the article and put it

17 up on the uLearn site?

18   A.   I did not photocopy the article.  I found a

19 copy elsewhere online.  I downloaded it, and then

20 posted it to the site.

21   Q.   So it wasn't one that you photocopied from the

22 journal, but one that you found somewhere else on the

23 Web?

24   A.   Yes.

25   Q.   And then you did post it to the uLearn site?

EXHIBIT 24 - 49

1    A.   I did.

2    Q.   If you turn to the next page for me, please.

3 And if you would just look at under the Tuesday,

4 January 27th entry, actually the second and third

5 entries there.

6    A.   Uh-huh.

7    Q.   The first one is identified as being by David

8 Sears and two other authors, and the second one by

9 Richard Lau?

10    A.   Uh-huh.

11    Q.   Am I correct those are chapters from the

12 Oxford Handbook of Political Psychology?

13    A.   Yes.

14    Q.   And those were posted to the uLearn site?

15    A.   They were.

16    Q.   Now, how come that one doesn't say available

17 on uLearn like the other entries, some of the other

18 entries do?

19    A.   Sometimes I remember to put it; sometimes I

20 don't.

21    Q.   Look for me at page -- two pages later under

22 March 17th.  First entry is an entry identified as

23 George Marcus.  You see where I am, under March 17th?

24    A.   Yes.

25    Q.   Is that another chapter from that same book?

EXHIBIT 24 - 50

1    A.   It is.

2    Q.   And was that also made available on uLearn?

3    A.   It was.

4    Q.   And finally one page later, under March 24th,

5 you see there's an entry by Stanley Feldman, 2003.

6 There is two entries by Feldman, but the second of the

7 two under that date March 24th is for -- looks to be a

8 chapter called, "Values, Ideology, and the Structure of

9 Political Attitudes."

10   A.   Yeah.  I eliminated that from the -- when we

11 got to the week, we did not do that chapter.

12   Q.   So this one was never posted?

13   A.   That is correct.

14   Q.   The other three were?

15   A.   The other three were not posted.  The students

16 had access to them via the E-journal pages.

17   Q.   I'm sorry.  So let me make sure -- I misspoke.

18 I meant the other three chapters from this Oxford

19 Handbook of Political Psychology, not the other

20 chapters for that different week.

21   A.   I believe I did, yes.

22   Q.   And just to confirm that.  Can you look back

23 at 243?

24   A.   Uh-huh.

25   Q.   And just can you confirm that the entries,

EXHIBIT 24 - 51

1 there is one in the top row called, "Lau Oxford

2 Handbook.pdf"?

3     A.    Yes.

4     Q.    That's the Lau chapter?

5     A.    The Lau chapter.

6     Q.    And then right next to it there's one called

7 "Sears Huddy Jervis.pdf"?

8     A.    Yes.

9     Q.    And then down in the last row there's one

10 called "Marcus (Handbook).pdf"?

11     A.    Yes.

12     Q.    And those are the PDFs of those chapters from

13 the Oxford Handbook we were just looking at?

14     A.    Yes.

15     Q.    If you look for me in the week for March 10th.

16     A.    Uh-huh.

17     Q.    There is a reading by Susan Fiske and Shelley

18 Taylor?

19     A.    Uh-huh.

20     Q.    And that's two chapters from a book called

21 Social Cognition:  From Brains to Culture?

22     A.    Yeah, three chapters.

23     Q.    And that was required reading?

24     A.    It was not.

25     Q.    It was not required reading?

EXHIBIT 24 - 52

1    A.   Yeah.

2    Q.   How was that communicated to the students?

3    A.   I told them.  It's not on the syllabus as

4 such, but I told them.

5    Q.   And so it was optional?

6    A.   Yeah.

7    Q.   What about those three chapters from the

8 Oxford Handbook that we were just talking about, were

9 those required reading?

10    A.   Yes.  Under the definition of required that we

11 established earlier, I would consider those required.

12    Q.   And just so we are clear on that, that's --

13 what do you mean when you say that it's required?  What

14 was the expectation with these particular readings by

15 the students?

16    A.   That they would have read them and know the

17 content.

18    Q.   And would it have harmed, potentially harmed

19 their performance in the class if they hadn't read

20 these and weren't prepared to discuss them?

21    A.   In hindsight, I would probably not use the

22 Sears, Huddy, and Jervis or the Marcus articles.  The

23 Sears, Huddy, Jervis I think doesn't have enough

24 specific content, and the Marcus is too jargony for

25 somebody who doesn't already know that literature.

EXHIBIT 24 - 53

1    Q.   At the time, however, the expectation of

2  students should read this when they came to class?

3    A.   Yes.  Yes.

4         (Plaintiff's Exhibit 247 was marked for

5  identification.)

6    Q.   Let me give you what I'm labelling as

7  Plaintiff's Exhibit 247.

8    A.   Should I continue to keep out 243 and 246?

9    Q.   That's okay.  246 keep nearby.  We will be

10 returning to that.  Also going to mark Exhibit 248.

11        (Plaintiff's Exhibit 248 was marked for

12 identification.)

13   Q.   Could you look at 248 first?

14   A.   Uh-huh.

15   Q.   Can you just confirm for me that this is the

16 -- I'll represent to you this was produced to us in

17 discovery in this case.  You see it has a Bates stamp

18 Georgia State 0033651.  Is this the Marcus chapter that

19 you assigned to students in the 8190 course in the week

20 of March 17th?

21   A.   It is.  Yeah, I'm assuming you're correct

22 about March 17th.

23   Q.   Yeah, it's in the syllabus if you want to

24 look.  And this comprises pages 183 to 221?

25   A.   Yes.  182 to 221.

EXHIBIT 24 - 54

1    Q.   Can you tell me what -- the checklist is 247;

2 is that right?

3         MS. JOHNSON:  Yes.

4    A.   That is correct.

5    Q.   So can you just identify what Exhibit 247 is?

6    A.   It is the Fair Use Checklist that I completed

7 after receiving the deposition notice.

8    Q.   Okay.  So the date -- you didn't fill in the

9 date, I see, but that was after the deposition notice?

10   A.   Correct.

11   Q.   And the course and term you didn't fill in,

12 but this was for the 8190 class; is that right?

13   A.   Yes.

14   Q.   Now, under "Portion to Be Used," you say

15 chapter 6, pages 182 to 221.

16   A.   Yes.

17   Q.   And then there is some parens there saying

18 pages 206 to 221 are notes and bib?

19   A.   Yeah.

20   Q.   208 to 221 is bib?

21   A.   Yes.

22   Q.   What was the -- what was the point of writing

23 that in there or did that impact your analysis in some

24 way?

25   A.   It did not.

EXHIBIT 24 - 55

1    Q.   Let's take a look down at Factor 1.

2    A.   Okay.

3    Q.   I apologize for the noise outside.  So tell me

4  under the column "Weighs in Favor of Fair Use," it

5  looks like you've checked three boxes.  Just take me

6  through why you checked those three boxes.

7    A.   That's for educational purpose, reading

8  assigned for a course.  GSU is a nonprofit institution.

9  I already said teaching, so that's the first two.  And

10  the third is "Use is necessary to a achieve your

11  intended educational purpose."  In hindsight I would

12  choose a different reading, but at the time I thought

13  this would be a good summary literature review of how

14  affective subsystems in the brain affect information

15  processing.

16    Q.   Just tell me what -- do you view those three

17  factors that you just checked as getting at different

18  aspects of the use, or how are they different in your

19  mind as you check the three?

20    A.   Seems to me that one who is engaged in

21  nonprofit educational mission may or may not include

22  teaching, and the use of something may or may not

23  achieve intended educational purpose.  Teaching doesn't

24  necessarily have to be nonprofit.

25    Q.   But in your position, would it ever be the

EXHIBIT 24 - 56

1  case that you would check teaching but not nonprofit

2  educational as a professor at GSU?

3      A.   Me personally as a professor at GSU, most

4  likely not, unless our department started sponsoring

5  for-profit executive education programs.

6      Q.   Apart from something like that, in the normal

7  course of your teaching duties, if you checked

8  teaching, you would also then check nonprofit

9  educational?

10     A.   In the normal course of my teaching duties,

11 yes.

12     Q.   Is there ever a case where you wouldn't check

13 the last box?  I mean, isn't that automatic if you

14 choose to use it in a class that you would check that

15 it's necessary for educational purpose?

16     A.   I -- personally, I don't know, but I can't

17 really --

18     Q.   Would you pick something that wasn't necessary

19 to achieve your intended educational purpose?

20     A.   Probably not but --

21     Q.   Look at the second column.  You didn't check

22 anything in the second column, the "Weighs Against Fair

23 Use" column?

24     A.   Yes.

25     Q.   What did you -- how did you interpret

EXHIBIT 24 - 57

1 commercial activity?

2    A.   As something that I would be selling and

3 financially gaining from.

4    Q.   And correct me if I'm wrong, but I think what

5 you said before is if this were your book at issue

6 here, you might actually check commercial activity?

7    A.   No, I would not.

8    Q.   Even if you were receiving royalties by virtue

9 of its use?

10   A.   Well, as you may recall, at GSU, if I assign

11 my book here, I can't receive royalties.

12   Q.   Tell me about non-transformative, what did you

13 -- how do you understand the requirement or the choice

14 here of whether something is transformative or not?

15   A.   It's one in hindsight I probably should have

16 checked.  I imagine there's probably some inconsistency

17 from form to form.  I'm not sure what order I did them

18 in.  The transformative would be something that would

19 usually be unlikely to apply to social science.  That's

20 something seemed to me to be more limited to visual or

21 auditory arts, taking an imagine, changing it somehow.

22 It's hard for me to believe that I would ever be able

23 to check something as transformative in the type of

24 Poly Psy.

25   Q.   And do you understand that transformative to

EXHIBIT 24 - 58

1 apply to the work itself or to your use of the work in

2 the course?

3    A.    Since I don't think that how I would assign

4 work would ever be transformative, I'm not sure I

5 understand the question.

6    Q.    I guess the question is, if the work was --

7 say the work was a very creative work of art or

8 something as you were just talking about, might you

9 check transformative, or is the issue whether you're

10 giving that work to students in the course to read

11 would be transformative?

12    A.    I don't think that me assigning something

13 would be transformative.

14    Q.    So were you to do this list again, you would

15 check "Non-transformative" for your assigning of this

16 Marcus chapter?

17    A.    Yes, I would.  Yeah.  And I assume that we

18 will be going through more of these.

19    Q.    Yeah.

20    A.    On any of them that I have not checked

21 "Non-transformative" I would.

22    Q.    Tell me about "For public distribution."  You

23 didn't check that.  Why not?

24    A.    Because it was not distributed to the public

25 as a whole.  It was on a gated Web page that only

EXHIBIT 24 - 59

1 members of my class had access to.

2    Q.   So you don't consider distribution to the

3 students to be the public?

4    A.   I do not.

5    Q.   At the bottom there you haven't checked at the

6 very bottom of each column "Factor Weighs in Favor of

7 Fair Use" or "Factor Weighs Against Fair Use."  Is

8 there a reason you didn't check either of those?

9    A.   The main reason is when I first did these, it

10 was in response to receiving -- being very surprised to

11 receive a deposition notice, because I believe I did

12 everything consistent with fair use.  And the main

13 reason I did these was just to reassure myself, and so

14 that's why there are some inconsistencies as to what I

15 checked and didn't check.  And so looking back through,

16 three on one side and zero whereas there should be one,

17 I would check "Factor Weighs in Favor of Fair Use."

18    Q.   Let's look at Factor 2.  Let me ask you a

19 preparatory question before we do that.

20    A.   Okay.

21    Q.   When you filled out this list, this particular

22 sheet for the Marcus chapter --

23    A.   Uh-huh.

24    Q.   -- and then we'll look, I believe you filled

25 out sheets as well for the Lau chapter and for the

EXHIBIT 24 - 60

1 Sears, Huddy, Jervis chapter?

2    A.   Yes.

3    Q.   Why was it that you decided to fill out three

4 separate sheets for those chapters from Oxford Handbook

5 as opposed to just one list for all three chapters

6 combined?

7    A.   I don't know.  I think the main reason

8 probably is just that the topics says, "Title of

9 Copyrighted Work" and "Author and Publisher" that there

10 just was limited space and --

11    Q.   No reason other than that?

12    A.   Probably so.  I'm not exactly sure how these

13 documents were turned over to you.  As I prepared them,

14 all three chapters were paper-clipped together with a

15 total percentage, with a little post-it attached with

16 the total percentage of Oxford Handbook of Political

17 Psychology.  So in terms of judging whether I was

18 within fair use guidelines as I understood them, the

19 20 percent guideline, I added all three together as

20 whether that was within the 20 percent and not

21 individually whether each one was 20 percent or less.

22 But I understood them as the whole.

23    Q.   So you did -- you looked at the three

24 collectively.

25         MR. LARSON:  I don't believe we got that

EXHIBIT 24 - 61

1 sticky, and I would ask just for the record if we get a

2 copy of that, that would be --

3      MS. JOHNSON:  Yes, we will make sure that

4 those get to you.

5   A.   Yeah.  For the -- I don't remember the

6 percentages exactly, but for the Oxford Handbook it was

7 7 or 11 percent of the total.

8   Q.   (By Mr. Larson) After I've given you all

9 three, maybe we will return to that question, and you

10 can show me how you added them up.

11    Just explain to me how the 20 percent figure came

12 into this.  I think you said before you didn't

13 understand 20 percent to be a part of the policy at

14 this point.

15   A.   As you may recall from our discussion before,

16 I filled these out in response to receiving the

17 deposition notice, and wanted to fill these out to

18 reassure myself that I'd done nothing wrong, which I'm

19 glad I did because I feel that more than ever.  And so

20 I wanted to compare how well these stacked up against

21 the main decision rule that I was following.

22   Q.   So that was to some degree a separate sort of

23 measure than what was in these checklists, that seeing

24 if what you used was under 20 percent from this book?

25   A.   Yeah, whether I would have -- you know,

EXHIBIT 24 - 62

1 roughly is how I arrived at my decisions, did I arrive

2 at correct decisions.  I believe that I did.

3    Q.   Got you.  Let's look at Factor 2.

4    A.   Okay.

5    Q.   You have all three here checked under the

6 "Weighs in Favor of Fair Use" column?

7    A.   Yes.

8    Q.   And none under "Weighs Against Fair Use"; is

9 that right?

10    A.   That is correct.

11    Q.   Just look at the third box, "Important to

12 educational objectives."  Can you tell me whether you

13 see a difference, and if so, what that difference is

14 with the last box under Factor 1, which is, "Use is

15 necessary to achieve your educational purpose."

16    A.   I think one way to think about it is imagine

17 you are on a shore, there is a row boat in front of

18 you.  You want to get to the other side.  The question

19 of whether or not you need oars, which is what I take

20 Factor 1 to be, the last item in Factor 1, compared to

21 whether it is a good idea to go across the body of

22 water to the other side is what I take the third item

23 of Factor 2 to mean, or something along those lines.

24    Q.   Wouldn't given that analogy any work that you

25 choose to use in your class automatically lead you to

EXHIBIT 24 - 63

1 checking that third box under Factor 2?

2     A.    Assuming I'm choosing readings wisely.

3     Q.    And, in fact, wouldn't given your teaching

4 Political Science, the types of readings that we see

5 you assigning here, wouldn't you basically

6 automatically check all three of these Factor 2 boxes

7 in pretty much every situation, apart from maybe

8 assigning a novel or a play or something?

9     A.    I imagine that item number two -- I don't

10 think I would always be assigning published work.  As I

11 mentioned before, in this class I did seek permission

12 from a colleague at Yale whether I can present his

13 work, and it's not uncommon to assign, particularly in

14 graduate courses, stuff that's not yet officially

15 published.  So I don't think that I would automatically

16 do published work.  I think that the preponderance of

17 what I would assign would count as published work.

18     Yes, I imagine factual or nonfiction work would --

19 I would usually check, although as you mentioned, I

20 don't think that would be -- it's possible to imagine

21 situations in which I may choose to do something

22 fiction.

23     Q.    Hasn't happened yet at GSU, though, right?

24     A.    It has not happened at GSU.

25     Q.    For your courses?

EXHIBIT 24 - 64

1    A.    For my courses.  And I like to think that I

2 choose my readings well and so that they would be

3 important to the educational objectives.  At the same

4 time, I could imagine from time to time assigning

5 something that would be of more secondary importance

6 and less essential.  I can't imagine I would ever

7 assign anything that would be genuinely unimportant.

8    Q.    So when all is said and done, Factor 2 then

9 generally would be either 3-0 or 2-to-1 for the

10 preponderance of the readings you assign?

11    A.    I assume so.

12    Q.    Look at Factor 3.  Well, Factor 2, you didn't

13 actually check the box at the bottom of each column

14 adding them up, but I assume you would have checked

15 "Factor Weighs in Favor of Fair Use"?

16    A.    Yes.

17    Q.    Factor 3, you've checked here under the Weighs

18 in Favor of Fair Use, "Small portion of work used."

19    A.    Uh-huh.

20    Q.    Tell me about how you arrived at that version.

21    A.    Using the 20 percent guideline.

22    Q.    And so under 20 percent, as you understand it,

23 would be small portion?

24    A.    Yeah, more as, you know, a rough guideline.  I

25 don't -- I think I also looked at how many of the --

EXHIBIT 24 - 65

1 versus the total number of chapters and the number of

2 topics that were covered in the Oxford Handbook.

3     Q.   Tell me about that, what was your thought

4 process there?

5     A.   I think that there were 15 or 16 different

6 chapters and covered a wide variety of topics relevant

7 to Political Psychology.

8     Q.   Would it be helpful to look at the Table of

9 Contents?

10     A.   Probably.

11     Q.   I mark this as Exhibit 249.

12     (Plaintiff's Exhibit 249 was marked for

13 identification.)

14     Q.   I will represent that this is copy of the

15 Table of Contents that I had printed out from the

16 Amazon site for the book.  Take a look and tell me if

17 you recognize this from your experience with this book

18 as being -- -

19     A.   Yes, it appears to be accurate.

20     Q.   And so tell me now what you were referencing

21 in terms of --

22     A.   Yeah.  There are 21 chapters, of which I used

23 a total of three.  It covers one, two, three, four,

24 five extremely broad topics within Political Science,

25 and I assigned readings from just one of those five

EXHIBIT 24 - 66

1 broad topics.  And so to me that strikes me as a small

2 portion.

3    Q.   And just the chapters you assigned were

4 chapters one, chapters two and --

5    A.   Six.

6    Q.   And six.  So the introduction it looks like

7 and then two chapters from the Theoretical Approaches

8 section?

9    A.   Yes.

10    Q.   Now, the 20 percent, let's just -- tell me how

11 you arrived at that or what your thought process there

12 was in terms of the percentage that you used.

13    A.   Again, that's a guideline I learned as a

14 graduate student at Duke.

15    Q.   So just looking at the back page, if you can

16 confirm your process here to me, it looks like there

17 were around 795 pages in the book.  The Index starts at

18 795; is that right?

19    A.   Yeah.  I think the front page sometimes, the

20 front page says.  I imagine for page numbers, I

21 probably looked at -- like you did, looked at the

22 Amazon page and said how many pages are there.

23    Q.   And then took the total length of the three

24 chapters combined?

25    A.   Uh-huh.

EXHIBIT 24 - 67

1    Q.   And put it over 795?

2    A.   Or some number.  If not 795, close to 795.

3    Q.   And what do you recall the percentage you got

4 for that?

5    A.   It was either 7 or 11.  I can't remember

6 which.

7    Q.   In either event, would you consider that to be

8 a small portion?

9    A.   Yes.  Yes.

10   Q.   Looking under Factor 3 in the third box,

11 "Amount taken is narrowly tailored to educational

12 purpose."  Just tell me again how do you distinguish

13 that from the last box under Factor 1 and the last box

14 under Factor 2?

15   A.   To extend my row boat metaphor, I would take

16 it to mean that would oars, you know, sort of the

17 minimal thing necessary to get you across versus

18 getting an outboard motor and trying to use more than

19 is necessary.

20   Q.   And that's factor -- that's how you understand

21 Factor 1?

22   A.   Yes.

23   Q.   The "Use is necessary to achieve your intended

24 educational purpose"?

25   A.   Factor 3.  So again with the rowboat metaphor,

EXHIBIT 24 - 68

1 oars would be necessary.  That would be Factor 1.  In

2 Factor 3, it would be a consideration of, say, oars

3 versus outboard motor.

4    Q.   I see.  And in what case would a reading that

5 you would assign be the outboard motor?  I mean, would

6 you assign, you know, essentially something not

7 narrowly tailored to the educational purpose?

8    A.   I don't think that I would, but, again, as I

9 mentioned before, I felt as I assigned readings,

10 everything I did was consistent with fair use under

11 copyright law.  So since I believe that I behaved

12 consistently with that, I can't -- yes, I would not

13 imagine veering from narrowly tailored.

14    Q.   Under the "Weighs Against Fair Use" column,

15 you didn't check anything.  Is it right that if the

16 large portion -- you would have checked "Large portion

17 or entire work used" if used over 20 percent?

18    A.   Probably, yes.

19    Q.   Tell me about the "heart of the work" box.

20 You didn't check that.  What do you understand that to

21 mean?

22    A.   I take it to mean the core central argument,

23 that the reason any -- the original content left after

24 you use that, original or novel or interesting or

25 important.  That there's still -- if you've read -- if

EXHIBIT 24 - 69

1 I have assigned one chapter that makes reading the rest

2 of it futile or pointless, but as long as there is

3 reason to continue reading the rest, I would consider

4 that not carving out the "heart of the work."

5    Q.   So is that -- just help me.  Is it the case

6 that you can imagine where a single chapter or two

7 chapters of a work with ten or twelve chapters would

8 ever meet that criteria as being the heart?  In other

9 words, two chapters would render the rest superfluous?

10    A.   I don't have any specific examples off the top

11 of my head, but I believe that could be the case.

12    Q.   What about in this Oxford example we are

13 looking at here where it is a compilation of articles

14 by different authors, would it ever be the case that,

15 you know, one or two or even three or four chapters

16 from a 15-chapter compilation would pass the test of

17 being the heart as you just defined it?

18    A.   From the 21 chapters of this book that is

19 designed to be a broad overview of the subdiscipline of

20 clinical psychology, I do not think that selecting any

21 three or four articles would likely be in violation of

22 fair use.

23    Q.   Well --

24    A.   Or taking out the heart of the work.

25    Q.   I mean, could you imagine if we used 20 out of

EXHIBIT 24 - 70

1 21, that wouldn't the 21st chapter still be something

2 different or unique, as you defined it, to the

3 compilation?

4      A.   I think taking out 20 of 21 would be cutting

5 out the heart of the work.

6      Q.   Where would you draw the line?

7      A.   I don't know.  I would have to do it case by

8 case.

9      Q.   So this factor, again, you didn't necessarily

10 add them up in the bottom of each column, but I take it

11 this one would be 3-to-0 and you would check "Factor

12 Weighs in Favor of Fair Use"?

13      A.   Yes.

14      Q.   And I think you said this, but just so I'm

15 clear.  When you determine a small portion, that was

16 adding the three chapters together, even though this

17 particular form just identifies one chapter at a time,

18 correct?

19      A.   That is how I -- at the end of the process of

20 doing this, I reflected on what small portion should

21 be.  Whether at the time I was doing this -- I'm not

22 exactly sure what order I did these in, for which

23 reading, so I can't say for absolute certain that when

24 I checked small portion here that I was thinking about

25 all three chapters combined and not just the one.  The

EXHIBIT 24 - 71

1 only thing that I know for sure is that after doing all

2 of them and putting them together, I did calculate the

3 proportion of all three as a total amount, and judged

4 those to be consistent with a small portion.

5     Q.    Sitting here now, putting aside what you were

6 thinking at the time, if you were to fill this out for

7 these same three chapters and you were confronted with

8 the small portion question, would you look at all three

9 chapters combined in filling that out?

10     A.    Yes.

11     Q.    Under Factor 4, in fact, I mark it for

12 original.

13     A.    Uh-huh.

14     Q.    You checked the first box, "No significant

15 effect on market or potential market for copyrighted

16 work."  What did you understand that factor to mean?

17     A.    I wasn't entirely sure how to do one and two,

18 and so I thought of it in terms of does my making these

19 three chapters available to the eight students in my

20 Political Psychology course significantly hinder sales

21 of the book as a whole.  Then I said No.  Then I also

22 said for "Use stimulates market for original work" I

23 clicked yes, because since it was a small portion of

24 the work as a whole, students who have chosen to take

25 Political Psychology course, that they may decide that

EXHIBIT 24 - 72

1 they would like to purchase the handbook themselves and

2 have access to the remaining chapters.

3     Q.  Has it been your experience with any of the

4 books you've used that students have, in fact,

5 purchased the entire book based on your giving them

6 some smaller excerpt in your course via uLearn?

7     A.  I think so.  I don't remember students ever

8 coming up to me and saying I bought this because you

9 assigned a smaller portion.

10     Q.  Are you aware of any students in this

11 particular class who bought the book?

12     A.  This particular book, I don't.

13     Q.  Did you consider the impact more broadly if,

14 you know, basically if every professor who used --

15 wanted to use the Oxford Handbook were to provide it to

16 students without charge as opposed to making them buy

17 it when you considered the impact on the market?

18     A.  I do not think that I did.

19     Q.  The third box says, "No similar product

20 marketed by the copyright holder."  What did you

21 understand that box to mean?

22     A.  I'm not aware of any other broad overview of

23 the subdiscipline of Political Psychology to be

24 published by Oxford.

25     Q.  Did you limit this to -- you did limit this to

EXHIBIT 24 - 73

1 Oxford when you made that consideration?

2    A.   I'm actually not aware of anything similar at

3 all, but I think that when I did it, I made it specific

4 to Oxford.

5    Q.   And tell me about "Licensing or permission

6 unavailable." You didn't check that or on the other

7 side, in the Weighs Against Fair Use column, "Licensing

8 or permission reasonably available." Did you consider

9 checking either of those boxes?

10    A.   I don't remember. I may have thought about

11 clicking -- clicking, checking unavailable just because

12 I don't particularly know if it is or not, but then

13 decided that isn't exactly what's being asked.

14    Q.   What do you understand it to be being asked

15 there?

16    A.   Whether I personally know the availability of

17 licensing or permission programs.

18    Q.   Let me just make sure I'm clear. You just

19 said that you actually don't know whether there are

20 licensing or permission programs, then why didn't you

21 check it?

22    A.   I'm sorry. I may have misspoke. That it's --

23    Q.   If I could, let me start over with a new

24 question. Be a little more clear. Did you consider

25 this objective or subjective?

EXHIBIT 24 - 74

1  A.   I would only be able to check either the left

2 column or the right column if I knew affirmatively one

3 way or the other.  As I don't know either way

4 affirmatively, I checked nothing.

5  Q.   I see.  And so just to be clear, then, but it

6 was based on your knowledge one way or the other, not

7 objectively, whether these licensing or commission

8 mechanisms may exist out there independent of your

9 knowledge of them?

10  A.   Yes, I believe that's how I felt on that.

11  Q.   The next line "Supplemental classroom

12 reading," and I will ask you to tell me how you

13 understood that as compared to the check box in the

14 second column which is "Required classroom reading,"

15 which you checked?

16  A.   It's something that I expected students to

17 read and that we would be talking about the reading in

18 class, so if I cold-called on them.

19  Q.   They could answer the question?

20  A.   Yeah.

21  Q.   You checked the last two boxes.  I take it the

22 second to last is because -- well, because you own a

23 copy or because the library?

24  A.   It's because I personally own a copy.

25  Q.   Did you understand that to mean you particular

EXHIBIT 24 - 75

1 owned the copy?

2    A.    I understood it to mean either me or the

3 institution.  Although I may have learned that later,

4 because of all of the ones that we're going to go

5 through, there's only one that I didn't personally own

6 a copy.  And I actually can't remember if I checked it

7 in that or not when I first filled it out.  I may have

8 checked it later.

9    Q.    Just looking back at the first, significant

10 effect on market, at what point would you say with this

11 Oxford work that we're looking at here, 21 chapters, at

12 what point would you say that there would be -- you

13 know, looking over to the fair use,

14 Weighs Against Fair Use column, a significant

15 impairment of the market?  Where would you draw that

16 line?

17    A.    I'm not sure.

18    Q.    If you used ten chapters, would you consider

19 that to significantly impair the market?

20    A.    I don't understand "impairs the market" to be

21 a part of amount.

22    Q.    Explain.

23    A.    You're saying the quantity that I assigned of

24 a particular work would affect market, and I don't -- I

25 did not understand Factor 4 to be asking about the

EXHIBIT 24 - 76

1 quantity of any particular work that would be assigned.

2    Q.   I see.  What do you understand it to be

3 asking?

4    A.   The number of copies.

5    Q.   And where would you draw the line there?  How

6 many students would be enough for you to consider to be

7 impairing the market?

8    A.   I know this is a wide range.  Somewhere

9 between 8 and 48.  Eight being the standard graduate

10 course, and 48 being standard in an undergraduate,

11 upper level undergraduate course.

12    Q.   And so --

13    A.   But that's off the top of my head right now.

14    Q.   Let me make sure I understand.  So if it was a

15 course of 30 students that you provided these works to,

16 you would check "Significantly impairs market"?

17    A.   Thirty I'm not sure.  The threshold is

18 somewhere between 8 and 48.

19    Q.   Well, let's say it's 50 students.  For 50

20 students then for sure you would check "Significantly

21 impairs market"?

22    A.   I think that I probably would.

23    Q.   And what if it was only a couple of pages

24 rather than four chapters?

25    A.   Well, it's my understanding that Factor 4 is

EXHIBIT 24 - 77

1 separate from Factor 3, and you take all four factors

2 as a whole and that any one particular factor doesn't

3 rule in or rule out whether something is allowed under

4 fair use.  So that one could check "Significantly

5 impairs market" and through the other three factors

6 still, especially if it's a small quantity under Factor

7 3, fairly post that under fair use.

8    Q.   I see.

9         (Plaintiff's Exhibit 250 was marked for

10 identification.)

11    Q.   Let me show you what I will mark as

12 Plaintiff's Exhibit 250.

13    A.   Are there any things that you want me to

14 currently keep out?

15    Q.   Maybe the Table of Contents, but other than

16 that, I don't think so.  Also give you what I will mark

17 as 251.

18         (Plaintiff's Exhibit 251 was marked for

19 identification.)

20    Q.   Now, 250 is a document marked GSU 008675, and

21 251 is a document Bates stamped Georgia State 0033642.

22 Actually, let's look at the second one first, at 251.

23 Can you just confirm for me that is the Sears, Huddy,

24 and Jervis chapter that you provided the students?

25    A.   It is.

EXHIBIT 24 - 78

1    Q.   Put that one aside.  And then looking back at

2  250.  If you would start on this one for me by looking

3  at the last page, which appears to be a printout from

4  Amazon.com.

5    A.   Yes.

6    Q.   What was -- what is that or why is that there?

7    A.   Oh, just to show that it shows the date that I

8  purchased this item just to show that I personally

9  owned a copy.

10    Q.   And where did you get this page from?

11    A.   From Amazon.com.

12    Q.   So when you filled out the checklist, you went

13  into Amazon and found this old record and printed it

14  up?

15    A.   Yes.

16    Q.   Let's go back to page one.  Again, date and

17  course and term aren't completed, but I take it the

18  date is the same as we discussed before?

19    A.   Yeah.

20    Q.   And your course was 8190 course?

21    A.   Yeah.

22    Q.   Now, here under Factor 1, you've got the same

23  box that's checked in the first column, "Weighs in

24  Favor of Fair Use"?

25    A.   Uh-huh.

EXHIBIT 24 - 79

1    Q.   And then in the second column, you have in the

2  "Weighs Against Fair Use" column you have

3  "Non-transformative" checked?

4    A.   Yes.

5    Q.   And for the reasons we discussed with

6  reference to the previous checklist --

7    A.   Yes.

8    Q.   -- you hadn't checked it there, but would have

9  if you were to do it again?

10    A.   I'm sorry.  Say that again.

11    Q.   Strike that question.  That's -- and the first

12  factor, again, for this one is 3-to-1 in favor of fair

13  use; is that it?

14    A.   Yes.

15    Q.   And why is it that you checked here that

16  "Factor Weighs in Favor of Fair Use" at the bottom,

17  whereas you didn't before?

18    A.   I don't remember for sure.  My guess is that

19  the previous one we did was one that I either did

20  earlier or late in the process or I was just

21  inconsistent.

22    Q.   That's okay.  Factor 2, again, this looks,

23  just so I'm clear, it was 3-0 in favor of weighs in

24  favor of fair use; is that right?

25    A.   Yes.

EXHIBIT 24 - 80

1     Q.   And, again, Factor 3 also 3-0?

2     A.   It is.

3     Q.   And just here again, when you were looking at

4 small portion, were you considering all three chapters

5 from this handbook combined, or were you looking at

6 just the particular chapter on this checklist?

7     A.   The same answer as before.  In terms of

8 filling out this particular checklist, as I was doing

9 -- I did them in succession, and I honestly don't

10 recall as I was going through and filling it out

11 whether I judged small portion of work as this

12 particular chapter or the totality of everything I

13 selected from the -- from the book.  But I did make

14 sure that at the end of the process that I added

15 everything from any particular work together and wanted

16 to make sure I felt comfortable I was using a small

17 portion in relation of everything I assigned from a

18 work in relation to the total of a work.

19     Q.   And as you sit here now, were you to do it

20 again, you would consider all three chapters when

21 looking at this small portion versus large portion

22 choice under Factor 3?

23     A.   Yes.  Yes.

24     Q.   Would you do the same for the second choice,

25 whether portion used is central or not to the entire

EXHIBIT 24 - 81

1 work?

2    A.   Yes.  Yes.  Yeah, absolutely.  As I mentioned

3 before, this is a reading that I actually would be

4 unlikely to use again in the future.

5    Q.   My question gets more to the process of

6 filling out than these particular -- the particular

7 reading edition here.

8    A.   But I'm answering these questions in relation

9 to specific readings.

10    Q.   I understand.  For choice three, same

11 question, as you sit here now, you understand or would

12 you approach your answering the third box by looking at

13 the three chapters total and considering whether that

14 amount taken is narrowly tailored, or would you check

15 that based just on the single chapter identified on

16 this checklist?

17    A.   I think all three.

18    Q.   All three.  You would base on looking at the

19 chapters you wanted to use collectively?

20    A.   Again, if I do these checklists in the future,

21 which I assume that I will, I imagine that the process

22 I would go through would be similar to what I'm

23 describing, which is I would go through individual

24 readings and then I would group.  If there was more

25 than one reading from one particular source, then I

EXHIBIT 24 - 82

1 would group those together and make an overall judgment

2 as to whether it's small or central or narrowly

3 tailored.  But in terms of the process of filling it

4 out, I think that I may do one reading at a time and

5 then make an overall judgment of all of them together

6 at the end.

7     So it's possible that I can imagine checking small

8 portion of work used individually for multiple chapters

9 and then arriving at a decision that that whole -- that

10 the whole set would be too large an amount, at which

11 point I would either have to change the amount or

12 consider asking students to purchase the book.

13         MR. LARSON:  I think we're at the end of our

14 tape, so why don't we take a quick break.

15         THE VIDEOGRAPHER:  We're off the record at

16 3:31 p.m.

17         (Recess from 3:30 p.m. to 3:33 p.m.)

18         THE VIDEOGRAPHER:  This is the beginning of

19 tape number three.  The time is 3:35 p.m., and we are

20 back on the record.

21     Q.  (By Mr. Larson)  Let's turn to Factor 4 on

22 the chart, the checklist we were just looking at,

23 Plaintiff's Exhibit 250.  Here you haven't checked the

24 first box, "No significant effect on market or

25 potential market for copyrighted work."  Was that just

EXHIBIT 24 - 83

1 an oversight or --

2    A.   I think it was an oversight.  I don't recall

3 why I did or did not.

4    Q.   Sitting here now would you check that box?

5    A.   I think that I would, yes.

6    Q.   Well, giving the class had eight students,

7 would you check that box?

8    A.   Yeah.

9    Q.   And this factor, although you didn't check the

10 box at the bottom, I take it this factor you would

11 check "Factor Weighs in Favor of Fair Use"?

12    A.   Yes, I would.

13    Q.   So in total, each factor, I think, on this

14 chart would weigh in favor of fair use, right?

15    A.   Yes.

16    Q.   Do you understand this checklist to work

17 additively?  By that I mean that if you have three in

18 favor of fair use and one weighing against fair use,

19 that the conclusion is that it's a fair use?

20    A.   It's my understanding that that's a guideline,

21 but that it is not guaranteed or set in stone.  That if

22 it's 3 to 1, that it probably is consistent with fair

23 use, but there may be instances in which the one would

24 outweigh the other three.  I can't think of specific

25 examples.  That's just my general understanding of what

EXHIBIT 24 - 84

1 the factors mean.

2   Q.   Do you have any sense of whether there's a

3 priority among the factors?

4   A.   I do not.

5   Q.   So it's possible that it could be that Factor

6 2 was so egregiously in favor or against fair use that

7 it wouldn't matter that one, three, and four were in

8 favor of fair use?

9   A.   In thinking about it now, Factor 3 perhaps

10 should take precedence over the others.  I don't know.

11 You ask me on a different day, I might give a different

12 answer.

13   Q.   Put that one aside.

14      (Plaintiff's Exhibit 252 was marked for

15 identification.)

16   Q.   Let me give you what I'm marking Plaintiff's

17 Exhibit 252.

18   A.   Do I need to keep out 249 still?

19   Q.   No.  This is a document that's Bates stamped

20 GSU 008671.  Can you identify Plaintiff's Exhibit 252

21 for me?

22   A.   It appears to be the checklist I filled out

23 for the third chapter that I assigned from the Oxford

24 Handbook of Political Psychology.

25   Q.   And Factor 1 is three in favor of fair use; is

EXHIBIT 24 - 85

1 that correct?

2     A.    It is.

3     Q.    And you would, based on your prior testimony,

4 if you were to fill this form out now, you would check

5 "Non-transformative"; is that right?

6     A.    Yes, I would.

7     Q.    Factor 2 is 3-0 in favor of fair use?

8     A.    Yes.

9     Q.    For the same reasons as the last chapter we

10 discussed?

11     A.    Yes.

12     Q.    And same in Factor 3, 3-0 in favor of fair

13 use?

14     A.    Yes.

15     Q.    Any change in analysis from the last chapter

16 we discussed?

17     A.    No.

18     Q.    And Factor 4, any difference in your analysis

19 here from the last chapter we discussed from this

20 handbook?

21     A.    No.

22     Q.    And that one, if I'm correct here, is five

23 factors to one in favor of fair use?

24     A.    Yes.

25     Q.    So the bottom line on this, if I'm not

EXHIBIT 24 - 86

1 mistaken, is that for using three chapters from a book,

2 that amounts to somewhere in the range of 11 percent --

3     A.    Seven to eleven.

4     Q.    -- of the book?  Essentially for all three

5 factors, every factor comes out in favor of fair use.

6 And most of them are -- looking at the entire chart,

7 there were only one to two checks total weighing

8 against fair use; is that right?

9     A.    Yes.

10     Q.    Put that one aside.

11     MR. LARSON:  Go off the record for just a

12 minute.  Mark several records just to save some time.

13     THE VIDEOGRAPHER:  We're off the record at

14 3:41 p.m.

15     (Recess from 3:40 p.m. to 3:41 p.m.)

16     THE VIDEOGRAPHER:  We're back on the record at

17 3:42 p.m.

18     (Plaintiff's Exhibit-253, 254, 255 and 256 was

19 marked for identification.)

20     Q.    (By Mr. Larson)  I put four exhibits in front

21 of you.  Can you identify for me what I've marked as

22 Plaintiff's Exhibit 253, Bates number GSU 008678?

23     A.    Fair Use Checklist that I filled out for three

24 chapters from the book Social Cognition by Fiske and

25 Taylor.

EXHIBIT 24 - 87

1    Q.   And can you just verify for me that what I've

2  marked as Plaintiff's Exhibits 254, 255, and 256, which

3  were produced to us in discovery from the uLearn

4  system, are those three chapters?

5    A.   Yes.

6    Q.   And those three chapters comprise pages 25 to

7  102 of the book?

8    A.   Yes.

9    Q.   And do you know how many pages the book has?

10   A.   Off the top of my head, I do not.  Although I

11 think this was about 15 percent of the total, and since

12 it's about 80 pages, that would make it, I guess,

13 approximately 480.

14   Q.   And you recall from doing this that you

15 calculated to be in the range of 15 percent?

16   A.   I believe so.  I don't have the post-its in

17 front of me, but I believe it was 15.  It may have been

18 a little bit less, 11 to 15 but --

19   Q.   Now, let's look at Plaintiff's 253, which is

20 the checklist.

21   A.   Uh-huh.

22   Q.   Just tell me here why is it that this one you

23 completed a single checklist for three chapters rather

24 than doing an individual checklist for each of the

25 three chapters as you did with the Oxford Handbook that

EXHIBIT 24 - 88

1 we looked at?

2     A.   Because it's same authors for all three.   The

3 reason I divided them up was file size.

4     Q.   File size?

5     A.   Yeah, as a scanned PDF so that the file would

6 not be too large.

7     Q.   The reason you divided them up when you gave

8 them to students, you mean?

9     A.   Yeah, into the chapters two, three and four

10 from the Fiske and Taylor.   So I think of it as one

11 general background reading.   It's part of an

12 undergraduate psychology textbook, and I don't assume

13 that my graduate students or really any of my students

14 in Political Psychology necessarily have a psych

15 background.   So I gave this to them in case they wanted

16 to read it.

17     Q.   See, my question's slightly different, though.

18 You just filled out one Fair Use Checklist for all

19 three of the chapters here, and I'm trying to

20 understand why you didn't -- why the different approach

21 on the checklist.

22     A.   I'm sorry.   I thought I had answered this.

23     Q.   You may have.   I may be missing.

24     A.   Because I think of chapters two, three and

25 four as one reading.   And the only reason that they are

EXHIBIT 24 - 89

1 in separate files on the uLearn system was so that the

2 file size of the scanned images -- scanned images tend

3 to be large -- was not too big for the -- I don't know

4 if there is a limit that uLearn will handle, but so

5 that it was easier for students to deal with in terms

6 of downloading in case they had slow Internet

7 connection.

8     Q.   Given all that, why then the previous three

9 chapters we looked at from the Oxford Handbook wouldn't

10 the same reasoning apply, and why did you do three

11 checklists there rather than just one like you did

12 here?

13     A.   Again, because those are distinct readings

14 from different authors, and as I also explained, that

15 when making the final judgments, I considered all three

16 in total.

17     Q.   Now, let's take a look at Factor 1.

18     A.   Yes.

19     Q.   Here you did not check the last box under

20 Weighs in Favor of Fair Use, "Use is necessary to

21 achieve your educational purpose." Why is that not

22 checked here whereas it was before?

23     A.   It was a background supplemental reading.

24 Didn't plan to talk about it in class. We didn't talk

25 about it in class. It was for their -- in case they

EXHIBIT 24 - 90

1 wanted access to it.

2     Q.    And that --

3     A.    I have no idea if they read it or not.

4     Q.    That's not indicated on the syllabus, right?

5     A.    That is correct, which we -- yeah, we

6 discussed before.

7     Q.    You communicated that to them verbally?

8     A.    Yes, I did.

9     Q.    Despite that, Factor 1 still weighs in favor

10 of fair use, though, right?

11     A.    Yes.

12     Q.    And it's 2-to-0?

13     A.    Yes.

14     Q.    Now, let me ask, you didn't -- given what you

15 just told me about the use being supplemental and not

16 required, you didn't check in the "Weighs Against Fair

17 Use" column, "Use exceeds that which is necessary to

18 achieve your educational purpose."  Why is that?

19     A.    I don't know.  I don't recall.  I didn't --

20 it's hard for me to say.  Although I think that there's

21 probably -- there's middle ground between necessary and

22 exceeds.

23     Q.    So sitting here now, would you still keep that

24 box unchecked?

25     A.    I think that I would, yeah.  It's not

EXHIBIT 24 - 91

1 necessary, but at the same time I don't think that it

2 is in excess of what would be necessary.  That it's

3 helpful, but not essential.

4     Q.   Got you.  So even sitting here now, even if

5 you were to check the "Non-transformative" box in

6 "Weighs Against Fair Use," this factor overall would be

7 2-to-1 in favor of fair use?

8     A.   I'm not sure that I would assign it again.

9     Q.   The factor --

10    A.   But make it available.

11    Q.   Factor 2 is 3-0 in favor of fair use, right?

12    A.   Yes.

13    Q.   Tell me about Factor 3.  Here you haven't

14 checked anything with respect to the size of the

15 portion.  Why was that left blank?

16    A.   I assume because I hadn't done the percentage

17 calculation yet, or it was less than 20 but closer to

18 20 than some of the other readings.  I think that it is

19 a small portion.  If I were to do it again, I think I

20 would check small portion, but at the same time I don't

21 -- I think that I would be unlikely to ever make

22 supplemental readings available to students again.

23    Q.   Why is that?

24    A.   This has been an unpleasant process.

25    Q.   I don't follow.

EXHIBIT 24 - 92

1    A.   Being deposed in the lawsuit.

2    Q.   What does that have to do with whether a

3 reading is supplemental or not?

4    A.   That since I feel that I have done nothing

5 wrong, I don't fully understand why I'm being deposed,

6 and so I'm going to go out of my way to go well beyond

7 what I think would be reasonable under fair use.

8    Q.   I just want to make sure I'm clear because

9 we're talking about small portion versus large portion.

10 And I'm not -- I don't understand how supplemental fits

11 into this particular factor that we're talking about.

12   A.   We can postpone that until we get to Factor 4.

13   Q.   But sitting here now you would check small

14 portion?

15   A.   I believe that I would, or here's how I can

16 bring it back in fully.  Why I went off and jumped to

17 Factor 4 is if I'm thinking about what would I do

18 again, I'm saying that I don't think I would be

19 confronted with the same situation again because I

20 would be unlikely to --

21   Q.   To use this particular --

22   A.   To use this particular reading, and one of the

23 main reasons I would be unlikely to use, or make it

24 available.  I may put it on a syllabus but not make it

25 available, is because of the supplemental nature.

EXHIBIT 24 - 93

1    Q.   I see.  You also didn't check under Factor 3

2 either that it -- that the portion is central to the

3 work or not central to the work.  Tell me about your

4 decision process there.

5    A.   I'm not sure that I gave this one as much sort

6 of careful thought.  I think the extent to which I

7 clicked that -- I'm sorry, checked that.  Used to

8 online stuff -- is when I took a graduate political

9 psych course, these three chapters were given as

10 supplemental readings for that, and I sort of copied

11 what I had already done.  And to be honest, I'm not

12 sure that I've read the rest of the book.

13    Q.   And so you didn't check that sort of the

14 summary boxes for this factor, but I take it that they

15 add up that the factor weighs in favor of fair use; is

16 that right?

17    A.   Yes, I think so.

18    Q.   Zero checks on the "Weighs Against Fair Use"

19 side?

20    A.   Yes.

21    Q.   And under Factor 4, looks to me to be five

22 checks in favor of fair use and none weighing against

23 fair use?

24    A.   Yes.

25    Q.   With respect to the licensing or permission

EXHIBIT 24 - 94

1 reasonably available or licensing or permission not

2 available, you didn't check either there.  Why was

3 that?

4    A.   Because I don't know if it's unavailable or

5 reasonably available.

6    Q.   And "Numerous copies made or distributed," you

7 didn't check that in "Weighs Against Fair Use."  Why

8 not?

9    A.   Because I put one scanned copy on a gated Web

10 site for eight students.

11    Q.   Why didn't you check one or few copies made or

12 distributed on the other side in "Weighs in Favor of

13 Fair Use"?

14    A.   I'm not sure.  My guess is I got to five and

15 once at 5-0, that the scholasticism of arguing what is

16 or is not a few copies.

17    Q.   This one is you have "Supplemental classroom

18 reading" checked?

19    A.   Yes.

20    Q.   I take it for the reasons we've been

21 discussing?

22    A.   Yes.

23    Q.   With respect to the numerous copies or one or

24 few copies, is it the same test that you told me

25 before, somewhere between 8 and 48?

EXHIBIT 24 - 95

1    A.    Yeah, I suppose so.

2    Q.    So if it were 50, say, you would check

3 "Numerous copies made or distributed"?

4    A.    In the abstract now, I will agree that I think

5 that I would.

6    Q.    And also significantly impairs market or

7 potential market?

8    A.    I think probably.  Again, as a supplemental

9 reading, it's a little bit harder for me to say because

10 I think the calculus that I would make would be if I

11 think that I'm significantly impairing the market for a

12 supplemental reading, then I would be unlikely to.

13    Q.    Let's assume just for this question that it's

14 required reading.  If it were required, under your

15 test, the first box under "Weighs Against Fair Use,"

16 and the third box are essentially the same thing,

17 right?  Your test is the same?  Has to do with the

18 number of students in the class that you're providing

19 copies to?

20    A.    I'm not exactly sure.  I'm not sure.  This is

21 outside of my area of expertise.  So if I make one

22 scanned copy and put that on a gated Web site, I don't

23 know if that -- and multiple people can download it,

24 I'm not sure if that is one copy or if that is however

25 many copies are downloaded or if they are not

EXHIBIT 24 - 96

1 downloaded and people just access and read that one

2 particular copy.  My guess is that's probably why I

3 chose not to check those, but I'm not sure that I --

4    Q.   Well, let me just ask, the first box,

5 "Significantly impairs market," when you talked about

6 the number of students somewhere 8 and 48, would it

7 matter if they were downloading it and keeping a copy

8 or just reading it and viewing it on screen and not

9 keeping a copy or --

10    A.   I think for the first one probably not.  When

11 I think of the "One or few copies made or distributed,"

12 I'm thinking pre-Internet.  How I did reserve readings,

13 I imagine probably similar how you did reserve readings

14 in college, which was go to the library.  There was one

15 photocopy there or maybe three photocopies, and you

16 could check it out for two hours.  If you wanted to go

17 make a copy, you could, or if you just wanted to read

18 it, you could.  So I was thinking that those sort of

19 questions are more along the lines of number of

20 physical copies.  Did you make a bunch of copies and

21 hand it out, rather than making it available online.

22 To the extent that's the same or different than market

23 affect, I'm not sure.  They do seem -- there may be

24 similarities, but they do seem to me to be slightly

25 different questions.

EXHIBIT 24 - 97

1    Q.   And what do you understand the next one to

2  mean, "Repeated or long-term that demonstrably affects

3  the market for the work"?

4    A.   If I were to do the same set of readings

5  semester after semester after semester, that that

6  potentially could be a problem of fair use.

7    Q.   And, again, where would you draw the line?

8  How many semesters is too many, or how many semesters

9  would lead you to check this box?

10    A.   I'm not sure.  I haven't been confronted with

11 that situation yet.

12    Q.   If you teach 4190 or 8190 this Fall, say,

13 would you check this box, and use the same readings, I

14 should say?

15    A.   It's a hypothetical.  It's difficult for me to

16 answer because I'm not sure -- there are a lot of

17 changes I would make from the syllabus from the first

18 time to the next time.

19    Q.   Let me ask you to assume that you would use

20 the same work again in the Fall semester for this same

21 class.  Would that second -- would that use the second

22 semester be enough to check this box?

23    A.   If it were the second time teaching the course

24 overall I would probably still not check it.

25    Q.   Third time?

EXHIBIT 24 - 98

1    A.   Possibly.

2    Q.   So, again, just to summarize, then, looking at

3 this chart over all, this is a work of three chapters

4 totaling over 75 pages, pages 25 to 102, and all four

5 factors as you filled this out were in favor of fair

6 use, correct?

7    A.   Yes.

8    Q.   And there are no checks in the "Weighs Against

9 Fair Use" side; is that right?

10    A.   It appears that way in terms of how I filled

11 it out.  Again, I did this as, you know, for me.  So if

12 I were to fill this out and had to hand it to somebody

13 for review, as we discussed before in Factor 1, I would

14 check "Non-transformative".

15    Q.   That was the only one on that side of all of

16 them, correct?

17    A.   Most likely.

18    Q.   Put that one aside.

19         (Plaintiff's Exhibit 257 was marked for

20 identification.)

21    Q.   Let me mark as Plaintiff's 257 the document

22 that has the Bates number GSU 008668.

23         (Plaintiff's Exhibit 258 was marked for

24 identification.)

25    Q.   Mark as Plaintiff's 258 document starting with

EXHIBIT 24 - 99

1 Georgia State 0033721.

2     Mr. Reifler, can you just identify for me

3 Plaintiff's Exhibit 257?

4     A.   It appears to be the Fair Use Checklist that I

5 filled out for the Kuklinski and Quirk chapter of the

6 Lupia, McCubbins and Popkin book.

7     Q.   And Plaintiff's Exhibit 258 is the PDF of that

8 chapter; is that correct?

9     A.   Yes.   The printout of it, yes.

10     Q.   And that comprises pages 153 to 182?

11     A.   It does.

12     Q.   And you actually provided two chapters from

13 this, from this book, right?

14     A.   I did.   I also provided a chapter by Wendy

15 Rahn.

16     Q.   Mark Plaintiff's Exhibit 259, document with

17 Bates number 008666.

18     (Plaintiff's Exhibit 259 was marked for

19 identification.)

20     Q.   Can you identify this document for me?

21     A.   Fair Use Checklist for the Rahn chapter,

22 Lupia, McCubbins and Popkin.

23     Q.   Okay.   And mark Plaintiff's Exhibit 260.

24     (Plaintiff's Exhibit 260 was marked for

25 identification.)

EXHIBIT 24 - 100

1    Q.    Which is document starting with Bates number

2 Georgia State 0033710.  Can you just confirm for me

3 that's the PDF of the Rahn chapter that's described in

4 the checklist in Exhibit 259?

5    A.    Yes, the printout of the PDF.

6    Q.    Let's go back to the checklist, Kuklinski and

7 Quirk checklist if we could.

8    A.    Okay.

9    Q.    Just for the record, this was also completed

10 at the same time that you completed the others that

11 we've been discussing?

12    A.    Yes.

13    Q.    And this was from the course --

14    A.    8190 course.

15    Q.    8190 course.  And looking back, if you would,

16 at Exhibit 243, which is the -- doing a good job

17 keeping track.  These two, the Kuklinski and Quirk PDF

18 is what we see at the end of the second row in

19 Exhibit 243; is that right?

20    A.    Uh-huh.

21    Q.    And the Rahn chapter is the one we see at the

22 end of the bottom row?

23    A.    Yes.

24    Q.    Okay.  Now, again, here you did two

25 checklists, although two chapters are from the same

EXHIBIT 24 - 101

1 book, correct?

2    A.   Yes.

3    Q.   And why was that?

4    A.   I looked at them each individually, and then,

5 again, as I mentioned before, I put them together and

6 looked at the total amounts from the two of them.

7    Q.   Now, the --

8    A.   I want to say seven percent.

9    Q.   Well --

10   A.   The total.

11   Q.   The Kuklinski and Quirk chapter is 30 pages;

12 is that right?

13   A.   Yes.

14   Q.   And the Rahn chapter is 20 pages; is that

15 right?

16   A.   Yes.

17   Q.   So we've got 50 total?

18   A.   Yes.

19   Q.   And the book, do you recall the length of the

20 book?

21   A.   I do not.  We may be able to look it up.

22   Q.   Yeah, I think we can.  Mark as Plaintiff's

23 261.

24        (Plaintiff's Exhibit 261 was marked for

25 identification.)

EXHIBIT 24 - 102

1  Q.  A document which I represent is a printout we

2  made from the Amazon listing for this book.  Do you

3  recognize the cover page there of this book and Table

4  of Contents?

5  A.  I do.

6  Q.  If you look at the last page of Exhibit 261,

7  how many pages do you see that the book has?

8  A.  The subject index starts on page 329, so has a

9  handful of pages more than 329.

10  Q.  So in total you used 50 out of roughly 330?

11  A.  Yeah, so that would make it approximately

12  14 percent.

13  Q.  Okay.  I'll take your word on that.  And did

14  you -- when you completed the checklist, again, did you

15  consider -- take the two works together using that

16  14 percent figure or --

17  A.  In going through individually I did not, but

18  then put them together.  Again, I'm not exactly sure

19  how the documents were sent to you, but they were --

20  and how I handed them over to GSU they were clipped

21  together and had the little post-it treating it as a

22  total work.

23  Q.  Let's look at the checklist for the Kuklinski

24  and Quirk, 257.

25  A.  Okay.

EXHIBIT 24 - 103

1    Q.   So here we have three checks in favor of fair

2  use under Factor 1 and none under "Weighs Against Fair

3  Use"; is that right?

4    A.   Yes.  And as before, I would click

5  "Non-transformative".  Check "Non-transformative".

6    Q.   3-1 rather than 3-0?

7    A.   Yes.

8    Q.   And under Factor 2, it's, again, 3-0?

9    A.   It is.

10   Q.   And under Factor 3, 3-0?

11   A.   It is.

12   Q.   Would that change adding the two works

13  together, I'm sure somewhere in the range of 13,

14  14 percent?

15   A.   No, I still think it would be small.

16   Q.   And Factor 4 is looks like 4-to-1?

17   A.   Yes.

18   Q.   In favor of fair use?

19   A.   Yes.

20   Q.   And, again, here I assume you didn't check the

21  licensing or permission boxes because you just weren't

22  aware of whether or not there was licensing or

23  permission available?

24   A.   Correct.

25   Q.   Any other differences here between what we've

EXHIBIT 24 - 104

1 been discussing before in terms of how you did or would

2 check the boxes for Factor 4?

3    A.   I can't think of any.

4    Q.   So just to summarize, for 50 pages of an

5 approximately 330-page book, we've got all four factors

6 weighing in favor of fair use?

7    A.   Yes.

8    Q.   And by my count, two checks on the "Weighs

9 Against Fair Use" side in the whole page, namely

10 "Non-transformative" and "Required classroom reading"?

11    A.   Yes.

12    Q.   Let me ask you a question.  Given there are

13 eight people in the class, even if you use the whole

14 book, such that Factor 3 perhaps weighed against fair

15 use, wouldn't you still come out with the same result

16 on Factor 1, 2 and 4, and hence a finding of fair use?

17    A.   It would come out, I think, to 3 to 1, but as

18 we discussed previously that it's not a simple being a

19 counting exercise of three versus one.  It's the

20 totality of all of the parts of the checklist and using

21 the entirety of the work.  If I were to assign an

22 entire book, I don't think that I would even go through

23 the checklist because I would just assign the whole

24 book.

25    Q.   So --

EXHIBIT 24 - 105

1    A.   More abstract, I don't know.

2    Q.   But let's walk through these if we could just

3 quickly.  Factor 1, would any of your checked boxes

4 change if you used the whole book?

5    A.   Yes, I think that necessary would go to

6 excessive or technically exceeds.

7    Q.   And why would that be the case if you felt the

8 whole book was necessary?

9    A.   Assigning a whole book would be in terms of if

10 the factor's title purpose and character of use, sort

11 of the character of the use of the entire book would

12 strike me as excessive.

13    Q.   I'm not clear I understand that.  If you felt

14 that you wanted the students to read every chapter of

15 the work, why is it that you wouldn't check that the

16 "Use is necessary to achieve your intended educational

17 purpose"?

18    A.   I don't know.

19    Q.   Just wouldn't?

20    A.   Idiosyncratic to me.

21    Q.   Would anything under Factor 2 change if you

22 used the whole?

23    A.   Factor 2, no, I don't think so.

24    Q.   And what about Factor 4, and, again, in a

25 class with eight students?

EXHIBIT 24 - 106

1   A.   Factor 4 I don't think so, but in Factor 3, at

2   least two of the three, large portion and central,

3   would change from in favor to disfavor.  And given the

4   abstract questions of educational and intent, I

5   probably would check more than necessary, but I'm not

6   sure that we're interpreting those to mean the same

7   thing.

8   Q.   Okay.  Let's look at the Rahn checklist.

9   A.   May I put this away?

10  Q.   Yes.  Help me out with the exhibit number on

11  that one for the record.

12       MS. JOHNSON:   259.

13  Q.   So looking at this checklist, again, just for

14  the record, this was filled out at the same time as the

15  previous one?

16  A.   Yes.  Yeah.  Again, I don't know exactly what

17  order.  I may have been to lunch or class in between,

18  but approximately the same time.

19  Q.   Any difference in Factor 1, your reasons for

20  filling out the boxes you did on Factor 1 from the

21  previous list?

22  A.   No.

23  Q.   And that's again 3-to-0 is listed here, but

24  potentially 3-to-1 if you checked "Non-transformative"?

25  A.   Yes.

EXHIBIT 24 - 107

1    Q.   Any difference in Factor 2 from the last list?

2    A.   No.

3    Q.   Any difference in your answers or

4 understanding of Factor 3 as compared to the last list?

5    A.   No.

6    Q.   And same question for Factor 4?

7    A.   No difference from the Kuklinski and Quirk.

8    Q.   Okay.

9         (Plaintiff's Exhibit 262 and 263 was marked

10 for identification.)

11   Q.   262 is Bates labeled GSU 008681.  263 is

12 labeled Georgia State 0033737.

13   A.   Thank you.

14   Q.   Can you identify Exhibit 262 for me?

15   A.   This is the Fair Use Checklist for the

16 Sniderman, Tetlock and Elms chapter in the Kuklinski

17 Edited volume.

18   Q.   This was required reading for the course?

19   A.   It was.

20   Q.   And 263 is the PDF of that reading?

21   A.   It is the -- yeah, the printout of the PDF,

22 yes.

23   Q.   And that's comprised of pages 254 to 288?

24   A.   I assume that it does.

25   Q.   That's what you identify here on the

EXHIBIT 24 - 108

1 checklist?

2    A.   Yes.

3    Q.   So that's 35 pages?

4    A.   Yeah.

5    Q.   Do you recall the percentage of this book that

6 you calculated?

7    A.   I think six or seven.

8    Q.   Now, Factor 1, as we've seen before, there are

9 three checks for "Weighs in Favor of Fair Use" and no

10 checks weighing against fair use; is that right?

11    A.   Yeah, although I would change to

12 "Non-transformative".

13    Q.   Factor 2 again is 3-0 in favor of fair use?

14    A.   It is.  I'm sorry.  You said Factor 2,

15 correct?

16    Q.   Yeah.  Factor 3 is also 3-0?

17    A.   It is.

18    Q.   Did you also assign another chapter from this

19 book by someone named Birksted?

20    A.   I'm sorry.

21    Q.   I want to turn back to the syllabus for the

22 8190 course.

23    A.   Can you tell me what exhibit that is?

24         MR. PARTHASARATHY:  246.

25    A.   Sure it's not 245?

EXHIBIT 24 - 109

1      MR. PARTHASARATHY:  245 is 1101.

2    Q.   If you look at the April 7th week, there's a

3  listing for an article by Jennifer Hochschild?

4    A.   It was originally assigned.  We decided not --

5  I didn't make it available so that we wouldn't go over

6  it.

7    Q.   So I'm sorry.  So that you wouldn't what?

8    A.   So that we wouldn't -- it was already I

9  decided that the other four readings were plenty for

10  one week.

11    Q.   Got it.  You didn't go over in terms of number

12  of pages for that particular --

13    A.   Yeah, I just meant -- I didn't make it

14  available and I didn't -- so that we wouldn't cover

15  that material in class.

16    Q.   So returning to the checklist for the

17  Sniderman, Tetlock, and Elms chapter.

18    A.   Yes.

19    Q.   I take it when you -- Factor 3 was just based

20  on that chapter alone?

21    A.   It was, yes.

22    Q.   And Factor 4, if I'm correct here, there were

23  four checks in favor of fair use and one check against?

24    A.   Yes.

25    Q.   And your conclusion here then was this was

EXHIBIT 24 - 110

1 fair use?

2    A.    Yes.

3    Q.    All four factors counted, added up or came out

4 in favor of fair use, correct?

5    A.    Yes.

6    Q.    And, again, just two checks total on the

7 right-hand side for "Non-Transformative" and "Required

8 classroom reading"?

9    A.    Yes.

10    Q.    Tell me, look at the third page there on that

11 exhibit.

12    A.    Uh-huh.

13    Q.    Again, is this an Amazon page showing this is

14 a book that you purchased?

15    A.    Yes.

16    Q.    Did you have an understanding prior to going

17 through this checklist that your ownership of the work

18 mattered or not to the fair use analysis?

19    A.    I think I had a vague sense that it maybe made

20 a small difference, but to be honest, I don't really

21 recall.  The main criteria that I used was the

22 20 percent guideline I learned from Duke.

23    Q.    Give you what I'll mark as Plaintiff's

24 Exhibits 264 and 265.

25

EXHIBIT 24 - 111

1    (Plaintiff's Exhibit 264 and 265 was marked

2 for identification.)

3    Q.   264 is Bates number GSU 008641.  265 is Bates

4 stamped Georgia State 0033671.  Can you identify 264

5 for me?

6    A.   264 is the checklist for the reading I

7 assigned from John Zaller, "The Nature and Origin of

8 Mass Opinion."  And 265 is the printout of the PDF.

9    Q.   Pages 1 to 75, is that a single chapter or

10 multiple chapters?

11    A.   It's four or five chapters, I believe.  I

12 don't recall which.

13    Q.   Take a look, flip through 265 if you would and

14 see if you can confirm how many chapters it is.

15    (Plaintiff's Exhibit 266 was marked for

16 identification.)

17    Q.   Let me just mark as 266 what I will represent

18 to you is a printout from Amazon of the cover page and

19 Table of Contents for Mr. Zaller's book.  Do you

20 recognize 266 as being that?

21    A.   Yes.  Would be the first four chapters.

22    Q.   And what's the total number of pages from

23 Exhibit 266?

24    A.   75.

25    Q.   I'm sorry.  The total number of pages from the

EXHIBIT 24 - 112

1 book.

2    A.   Oh, it would be about 375.  I don't know

3 exactly.  Oh, by looking at it, the index starts on

4 page 359, so little bit longer than 359.

5    Q.   You would count the index in terms of

6 calculating the 20 percent?

7    A.   I think so.

8    Q.   So we are looking at 75 pages out of 375?

9    A.   Yeah.

10    Q.   If my math is right, that's right on the

11 20 percent figure?

12    A.   I believe when I calculated it, it was

13 slightly over.  It was like 21 point something percent.

14    Q.   Let's look at the checklist.

15    A.   Okay.

16    Q.   264.  Now, here you've got two check boxes,

17 the first two boxes under Factor 1, and then one check

18 box "Non-transformative" under Factor 1 on the "Weighs

19 Against Fair Use"?

20    A.   Yes.

21    Q.   Tell me about you don't have the last box

22 under Factor 1 checked, "Use is necessary to achieve

23 your intended educational purpose."  Is that

24 intentional or oversight?

25    A.   It is because there's a -- we can talk about

EXHIBIT 24 - 113

1 it now or when we get to Factor 3, but there's an

2 uncertainty I have in terms of this reading that I

3 assigned in particular and how it relates to copyright

4 law.

5     Q.   Tell me.  If you want to refer to Factor 3 in

6 answering, that's fine.

7     A.   Yeah.  What makes it difficult is the portion

8 of this book that I assigned is substantially similar

9 to an article published in the American Journal of

10 Political Science, John Zaller and Stanley Feldman are

11 authors.  I believe that was turned over to you.  I

12 turned it over to GSU as a part of all this.  And the

13 content of that journal article is essentially

14 identical to the 75 pages of this book that I assigned.

15 So while I think that the content is essential -- what

16 was the exact wording -- is necessary, that it became

17 difficult for me to answer that specific question of

18 this particular reading of pages 1 through 75 versus

19 the journal article.

20     Q.   Okay.  Now, is the journal article, you said

21 it's from the AJPS?

22     A.   It is.

23     Q.   Is that a journal that Georgia State ascribes

24 to?

25     A.   It is.

EXHIBIT 24 - 114

1    Q.   Why isn't it, then, that you just -- why did

2 you not do the journal article rather than giving them

3 this page 1 to 75 of this book?

4    A.   Because this actually relates to, I think,

5 Factor 4 and the question of stimulating the market.

6 The first section --

7    Q.   Before you answer that, my question isn't

8 about what you filled out on the list.

9    A.   But that's part of the --

10    Q.   Okay.  Sorry.  Go ahead, sir.

11    A.   So the first section of this book and that

12 journal article is a theory of how people answer survey

13 questions.  Now, what this book is most known for is

14 not that first section of the book pages 1 through 75.

15 It's more known for the section that follows, 76

16 through the end, which has to do with information flows

17 and communication and persuasion.  And I ultimately

18 decided to use this rather than the journal article so

19 that students would -- so that I could tell them how

20 important this book is overall in political science,

21 and let them know that there are, in fact, two separate

22 sections to the book.  That the second section is

23 something that they would have to know the material in

24 order to pass their comprehensive exams, if they were

25 to test in American Politics or Political Behavior.  So

EXHIBIT 24 - 115

1 I wanted them to think about this in terms of this

2 particular book and sort of stress the importance of

3 that second section of the book.

4     Now, the other thing, my course this time didn't

5 really cover that second portion of the book, which is

6 really what I think that book is most known for.  In

7 part because a fair number of scholars see part one as

8 to some degree contradictory to part two.

9     Q.   So given that, I take it the journal, using

10 the journal article wouldn't have fulfilled that

11 purpose you just described?

12     A.   Yes.

13     Q.   So given that, then why -- wouldn't that lead

14 you to check under Factor 1 that the "Use is necessary

15 to achieve your intended educational purpose"?

16     A.   I suppose so.

17     Q.   Under Factor 3, you -- the same issue came up.

18 You have a note here saying it's difficult to say, and

19 I take it that's a reference to the issue of whether or

20 not this is the heart of the work?

21     A.   That mainly has to do with -- the arrow is

22 mainly to enforce clicking the large, and then the

23 question mark is on the whether it's central to the

24 work or not.

25     Q.   Let's take the "portion" question first.

EXHIBIT 24 - 116

1    A.   Okay.

2    Q.   On this one you've checked large portion

3 rather than small portion?

4    A.   Yes.

5    Q.   What led you to check large portion?

6    A.   That it's slightly above the 20 percent

7 guideline.

8    Q.   And the question mark next to -- well, you

9 have checked that it's not central or significant to

10 the entire work as a whole.  Why is that checked?

11    A.   Because the same content is available via the

12 journal article.

13    Q.   So because it's -- because that content is

14 available in some other form, then its use in this

15 particular book means that it's not central to this

16 book?

17    A.   That and the fact that I think the second

18 portion of the book, the communication flow arguments,

19 which is not available in journals, to really be the

20 core.  That's what I think the book is more known for.

21 If one wants that content, they have to buy the book.

22 If people want the theory of survey response, they can

23 read the AJPS article.  There's, in fact, an additional

24 article that's also substantially similar that's

25 published in, I want to say, Political Analysis, which

EXHIBIT 24 - 117

1 is another journal.

2    Q.   So given all this that we've just talked

3 about, the upshot is that under Factor 1 you still came

4 out in favor of fair use after that factor, despite not

5 checking the last box; is that right?

6    A.   Yes.

7    Q.   And Factor 3, it still came out 2-1 in favor

8 of fair use despite having checked the large portion

9 box, right?

10    A.   Yeah, I -- yeah, I think so.

11    Q.   That's what it says here, right?

12    A.   Yeah.

13    Q.   You have "Factor Weighs in Favor of Fair Use"

14 checked, right?

15    A.   Yes, I do.

16    Q.   Okay.  And then in Factor 4, we've got five

17 boxes checked in favor of fair use, the first three and

18 the last two?

19    A.   Yes.

20    Q.   And one checked in the "Weighs Against Fair

21 Use," which is "Required classroom reading."

22    A.   Yes.

23    Q.   So that one is 5-to-1 in favor?

24    A.   It is.

25    Q.   So all four factors came out in favor of fair

EXHIBIT 24 - 118

1 use, right?

2    A.   Yes, although as the question mark that's

3 attached to the second item in the right column of

4 Factor 3, it's conceivable that other people would

5 disagree with my assessment of whether this is central

6 or not.  I think that it's not.  Although even if it

7 were, I think the sort of stimulative effect of making

8 sure the students understood two different sections

9 that may be in conflict with one other would have still

10 outweighed Factor 3.  So even if I had changed my mind

11 on that second item of Factor 3 and checked against

12 fair use, I still think that overall it would have been

13 in favor of fair use.

14    Q.   Got it.  And just to be clear, that's despite

15 the fact that we're over 20 percent and you've checked

16 large portion of entire work used?

17    A.   Yeah.

18       MR. LARSON:  Break here.

19       THE VIDEOGRAPHER:  Off the record at 4:34 p.m.

20       (Recess from 4:33 p.m. to 4:41 p.m.)

21       THE VIDEOGRAPHER:  This is the beginning of

22 tape number four.  The time is 4:41 p.m., and we are

23 back on the record.

24       (Plaintiff's Exhibit-267 was marked for

25 identification.)

EXHIBIT 24 - 119

1    Q.   (By Mr. Larson) Mr. Reifler, I'm handing you

2 what I've marked as Plaintiff's Exhibit 267.  Could you

3 identify that for me?

4    A.   It appears to be the checklist that I filled

5 out for the William McGuire chapter and the Shanto

6 Lyengar, Edited Volume.

7    Q.   You provided a PDF of this to the students in

8 the 8190 course?

9    A.   I believe I did, yes.

10   Q.   Why don't we look at Exhibit 243, which is the

11 screen print.  You see in the upper right-hand corner

12 McGuire.pdf?

13   A.   Yes.

14   Q.   Is that what's referenced in this checklist

15 here?

16   A.   It is.

17   Q.   And this is Chapter 2 comprising pages 9 to

18 35?

19   A.   Uh-huh.

20   Q.   And, again, this list was filled out at the

21 time of these others we've been discussing?

22   A.   Yeah.

23   Q.   And Factor 1 is, again, three checks for in

24 favor of fair use and no checks against?

25   A.   Yeah, with --

EXHIBIT 24 - 120

1    Q.   All right.

2    A.   -- our standard caveat that I would check

3 "Non-transformative."

4    Q.   Exactly.  And Factor 2 is 3-0 in favor of fair

5 use; is that right?

6    A.   Yes.

7    Q.   Factor 3 is 3-0 in favor of fair use?

8    A.   It is.

9    Q.   Factor 4 is 4-to-1 in favor of fair use?

10    A.   Yes.

11    Q.   Looking at the entire list for what is a

12 27-page chapter?

13    A.   Yes.

14    Q.   27-page chapter, total of two checks against

15 fair use?

16    A.   Uh-huh.

17    Q.   And none of the factors are against fair use,

18 correct?

19    A.   Correct.

20    Q.   And this was required reading for the

21 students?

22    A.   It was.

23    Q.   Okay.  You can put that one aside.  Show you

24 what I'm marking Plaintiff's 268.

25

EXHIBIT 24 - 121

1          (Plaintiff's Exhibit 268 was marked for

2  identification.)

3      Q.   Which is Bates stamped Georgia State 0024570.

4  Do you recognize this document?

5      A.   It is the syllabus for my undergraduate

6  Political Psychology course.

7      Q.   How many students were in this class?

8      A.   48, I believe.  That's I think were originally

9  enrolled.  How many stayed in after enrollment, I --

10          (Plaintiff's Exhibit-269 was marked for

11  identification.)

12     Q.   Let me mark as Plaintiff's Exhibit 269,

13  document that is a screen print we were provided from

14  University System.  Do you recognize this?

15     A.   It is, yes, I do.  It's the readings made

16  available for my undergraduate course.

17     Q.   For the course that's on the syllabus we are

18  looking at for Exhibit 268?

19     A.   Yes.  Yes.

20     Q.   And if you could turn to the second page of

21  the syllabus, please.

22     A.   Yes.

23     Q.   Again, the case you had students purchase or

24  assigned to them this book Predictable Irrationality?

25     A.   I did.

EXHIBIT 24 - 122

1    Q.   And also a book by Kuklinski, Citizens and

2 Politics?

3    A.   Yes, edited volume.

4    Q.   And that's the same book that we -- that you

5 assigned portions of in the 8190 class?

6    A.   One chapter.  The second was on the syllabus

7 but --

8    Q.   The one you didn't end up having them read?

9    A.   Yeah.

10    Q.   And then this here, "Additional readings

11 will be made available on uLearn/WebCT"?

12    A.   Yes.

13    Q.   Those are the readings we see in Exhibit 269,

14 correct?

15    A.   Yes.

16    Q.   Turn to page -- well, the Bates stamp is

17 33383, says, "Course Schedule" at the top, and if you

18 look at the January 13th week, you see a chapter

19 identified as by David Sears from the Oxford Handbook

20 of Political Psychology.  You see that?

21    A.   I do.

22    Q.   Is that the same chapter that you assigned in

23 the 8190 class?

24    A.   It is.

25    Q.   If you turn to three pages later, April 7th,

EXHIBIT 24 - 123

1 there is a reference to a chapter by George Marcus from

2 the Oxford Handbook?

3     A.    Yes.

4     Q.    Is that the same chapter that you assigned in

5 the 8190 class?

6     A.    In the syllabus it is the same.  In terms of

7 -- I decided that was too hard because we had done that

8 chapter previously in the graduate course, that I

9 changed it to a chapter by Marcus in the Kuklinski

10 Citizens and Politics.

11     Q.    Which was one of the required texts?

12     A.    Yes.

13     Q.    So in the end you just used the Sears chapter

14 from the Oxford Handbook of Political Psychology?

15     A.    Yes.

16     Q.    When you were going through the checklist

17 exercise, did you complete a separate checklist for use

18 of that excerpt in this course?

19     A.    I did not.

20     Q.    Would there be any difference in how you would

21 fill that out for this course as opposed to the first

22 course?

23     A.    I don't think so.

24     Q.    If you look at February 12th on the syllabus,

25 on the page Georgia State 33384.

EXHIBIT 24 - 124

1    A.   Yes.

2    Q.   There's a reference to some readings from John

3 Zaller.  Is that the same excerpts that were provided

4 in the 8190 class that we discussed before?

5    A.   Yes.

6    Q.   And, again, did you do a separate checklist

7 for use of those chapters in this course?

8    A.   I did not.

9         MS. JOHNSON:  Sorry.  Which -- what is the

10 Bates number on the bottom that you're looking at?

11        MR. LARSON:  33384, that's the specific page.

12 The document starts with 33380.

13    A.   Not what we have.

14        MS. JOHNSON:  That's not what we have.

15        MR. LARSON:  Maybe we should go off the record

16 for one second.

17        THE VIDEOGRAPHER:  Off the record at 5:48 p.m.

18        (Discussion off the record from 4:48 p.m.to

19 4:49 p.m.)

20        THE VIDEOGRAPHER:  We are back on the record

21 at 4:49 p.m.

22        MR. LARSON:  So just so we are clear on the

23 record, the exhibit marked as 268 bears Bates numbers

24 Georgia State 0024570 to 0024577.

25    Q.   If you could, the Zaller excerpt from

EXHIBIT 24 - 125

1 February 12th that we were looking at, you see that?

2    A.    Yes.

3    Q.    Just to be clear, that's on page Georgia State

4 0024574?

5    A.    Yes.

6    Q.    Not the page I indicated earlier.  You said

7 you did not fill out a separate checklist for that

8 excerpt?

9    A.    That's correct.

10    Q.    Would there be any difference filling out for

11 this course as there was for filling out for 8190?

12    A.    I don't think so.  Possibly because of the

13 larger enrollment.

14    Q.    And what would the -- what impact would that

15 have?

16    A.    I might change the market, the impact on

17 market.

18    Q.    Why don't you take a look at, pull back out

19 Exhibit 264.  264 is the checklist you filled out for

20 Zaller for the 8190 class; is that right?

21    A.    Yes.

22    Q.    Just tell me what you view as possibly

23 changing if you would have filled this out for the use

24 in the 4190 class rather than 8190 class.

25    A.    Because there are 48 that I might change to or

EXHIBIT 24 - 126

1 at least -- I wouldn't say significantly impairs the

2 market, but I might uncheck "No significant effect."

3 I'm not sure.

4      Q.   Were you to do that, however, you would still

5 have four checks in favor of fair use and only one

6 against fair use; is that right?

7      A.   Or possibly two.

8      Q.   And so that factor would still weigh in favor

9 of fair use?

10     A.   Yes, I believe that it would.

11     Q.   And would that change that you just mentioned

12 cause you not to offer the work to students in 4190?

13     A.   I'm not sure what I would do in the future.

14     Q.   Well, let me ask it a different way.  Would

15 your conclusion that the use of the work is a fair use

16 overall change based on that, not clicking that box or

17 checking that box in Factor 4?

18     A.   I do not think so.

19     Q.   The Zaller work on February 12th in the 4190

20 syllabus was a required reading; is that right?

21     A.   It was.

22     Q.   If you could flip back to the page that has

23 January 22nd on it.

24     A.   Yes.

25     Q.   Just tell me the Berinsky and Druckman work

EXHIBIT 24 - 127

1 that's listed first there, what is that reading?

2    A.    It's a journal article from Public Opinion

3 Quarterly.

4    Q.    Is Public Opinion Quarterly something that

5 Georgia State subscribes to?

6    A.    It is.

7    Q.    And you gave students in the course a printout

8 of that in uLearn; is that right?

9    A.    I posted the PDF, yes.

10   Q.    Why did you do that if that's something that

11 students can get through GSU subscription?

12   A.    Undergraduates are less skillful in getting

13 the right journal articles, so I made it easy for them.

14   Q.    And do you know who publishes Public Opinion

15 Quarterly?

16   A.    I do not.

17   Q.    Give me one moment, if you would.  Is it your

18 experience that -- let's talk about the 8190 class.

19 That's a small seminar, correct?

20   A.    Yes.

21   Q.    Is it your experience that when students come

22 into class, they've generally printed the works that

23 you have put on uLearn and bring them to class with

24 them for discussion?

25   A.    In the graduate class?

EXHIBIT 24 - 128

1    Q.   Uh-huh.

2    A.   Usually.

3    Q.   What about in the undergraduate class?

4    A.   No.

5    Q.   You say you are familiar with CoursePacks or

6 you used them when you were a student; is that right?

7    A.   Uh-huh.

8    Q.   So just tell me in your opinion, what's the

9 difference between your providing students readings in

10 this fashion through uLearn and giving them a

11 CoursePack, other than the fact that the CoursePack is

12 obviously a hard copy rather than an electronic copy?

13    A.   Not much.

14       MR. LARSON:  That's all I've got.

15       MS. JOHNSON:  Okay.  I have no questions.  We

16 just want to reserve our right to review and correct

17 the transcript.

18       THE VIDEOGRAPHER:  We're off the record at

19 4:55 p.m.

20       (Whereupon, the deposition was concluded at

21 4:55 p.m.)

22       (Pursuant to Rule 30(e) of the Federal Rules

23 of Civil Procedure and/or O.C.G.A. 9-11-30(e),

24 signature of the witness has been reserved.)

25

EXHIBIT 24 - 129

1

2                    C E R T I F I C A T E

3

4 STATE OF GEORGIA:

5 COUNTY OF DEKALB:

6

7         I hereby certify that the foregoing transcript

8 was taken down, as stated in the caption, and the

9 questions and answers thereto were reduced to

10 typewriting under my direction; that the foregoing

11 pages 1 through 129 represent a true, complete, and

12 correct transcript of the evidence given upon said

13 hearing, and I further certify that I am not of kin or

14 counsel to the parties in the case; am not in the

15 regular employ of counsel for any of said parties; nor

16 am I in anywise interested in the result of said case.

17         This, the 9th day of June, 2009.

18

19

20                     REGINA W. HOLLIS, CCR-B-2306

21

22

23

24

25

EXHIBIT 24 - 130

1

DISCLOSURE

2

STATE OF GEORGIA:

3

COUNTY OF DEKALB:

4

5      Pursuant to Article 10.B of the Rules and
Regulations of the Board of Court Reporting of the
6 Judicial Council of Georgia, I make the following
disclosure:

7

       I am a Georgia Certified Court Reporter.  I am
8 here as a representative of Shugart & Bishop.
9      I am not disqualified for a relationship of
interest under the provisions of O.C.G.A. 9-11-28.

10

       Shugart & Bishop was contacted by the offices of
11 Holland & Knight, LLP to provide court reporting
services for this deposition.

12

       Shugart & Bishop will not be taking this
13 deposition under any contract that is prohibited by
O.C.G.A. 15-14-37 (ab) and (b).

14

        Shugart & Bishop has no exclusive contract to
15 provide reporting services with any party to the case,
any counsel in the case, or any reporter or reporting
16 agency from whom a referral might have been made to
cover this deposition.

17

       Shugart & Bishop will charge its usual and
18 customary rates to all parties in the case, and a
financial discount will not be given to any party to
19 this litigation.

20

21

22                       REGINA W. HOLLIS, CCR-B-2306

23

24

25

EXHIBIT 24 - 131

1     DEPOSITION OF JASON REIFLER, Ph.D. /RH

2     I do hereby certify that I have read all questions
propounded to me and all answers given by me on the 3rd

3 day of June, 2009, taken before Regina W. Hollis, and
that:

4

_____1) There are no changes noted.

5 _____2)  The following changes are noted:

6     Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia

7 Annotated 9-11-30(e), both of which read in part:  Any
changes in form or substance which you desire to make

8 shall be entered upon the deposition...with a statement
of the reasons given...for making them.  Accordingly,

9 to assist you in effecting corrections, please use the
form below:

10

11 Page No._____Line No._____should read:_____
_____

12
   Page No._____Line No._____should read:_____
13 _____

14 Page No._____Line No._____should read:_____
_____

15
   Page No._____Line No._____should read:_____
16 _____

17 Page No._____Line No._____should read:_____
_____

18
   Page No._____Line No._____should read:_____
19 _____

20 Page No._____Line No._____should read:_____
_____

21
   Page No._____Line No._____should read:_____
22 _____

23 Page No._____Line No._____should read:_____
_____

24
   Page No._____Line No._____should read:_____
25 _____

EXHIBIT 24 - 132

1      DEPOSITION OF JASON REIFLER, Ph.D. /RH

2 Page No._____Line No._____should read:_____

_____

3

  Page No._____Line No._____should read:_____

4 _____

5 Page No._____Line No._____should read:_____

_____

6

  Page No._____Line No._____should read:_____

7 _____

8 Page No._____Line No._____should read:_____

_____

9

  Page No._____Line No._____should read:_____

10 _____

11 Page No._____Line No._____should read:_____

_____

12

  Page No._____Line No._____should read:_____

13 _____

14

  If supplemental or additional pages are necessary,

15 please furnish same in typewriting annexed to this

  deposition.

16

17      _____

        JASON REIFLER, Ph.D.

18

  Sworn to and subscribed before me,

19 This the _____day of _____, 20_____.

20 _____

  Notary Public

21 My commission expires: _____

22

23

24

25

EXHIBIT 24 - 133