EXHIBIT

26

Dockets.Justia.com



**Office of Legal Affairs**

*"Creating A More Educated Georgia"*

# Regents Guide to Understanding Copyright & Educational Fair Use

For distance education questions, see <u>The Regents Guide to the Teach Act</u>.

*Created November 13, 1997*

The Guide to Copyright and Fair Use is the result of the work completed by the University System Committee on Copyright. The guide provides illustrative examples of Fair Use and the legal background of copyright law.

The purpose of this guide is to provide faculty, employees, and students of the University System of Georgia with a basic understanding of copyright and fair use. Permission to copy these guidelines for non-commercial educational use is freely granted.

Based upon our initial review of the <u>Digital Millennium Copyright Act ("DMCA")</u> (PDF - 330KB), we do not believe that the act affects the guide's fair use analysis.

If you have any comments or questions regarding the guide, please feel free to <u>leave a comment</u>.

**Contents:**

<u>Foreword</u>

**<u>Part I. Principles of Fair Use</u>**

**<u>Part II. Examples Illustrating the Application of Fair Use</u>**

   A. **<u>Research and Writing</u>**

PLAINTIFFS EXHIBIT

3-4-89

GSU002523

EXHIBIT 26 - 1

    1. Comment and Criticism
    2. Unpublished Letters
    3. Journal Article for Personal Use
    4. Out-of-Print Book
  B. Printed Material
    1. Journal Article for Classroom Use
    2. Posting Copyrighted Article to Web Page
    3. Coursepacks
    4. Textbooks
    5. Textbooks for Library Reserves
    6. Public Domain Materials
  C. Video and Sound Recordings
    1. Showing a Videotape for Classroom Instruction
    2. Copying a Videotape for Classroom Instruction
    3. Renting a Videotape That Is in the Public Domain for Nonclassroom Use
    4. Renting a Videotape That Is Copyright-Protected for Nonclassroom Use
  D. Multimedia Projects
    1. Classroom Presentation
    2. Electronic Transmission or Broadcast of Classroom Presentation
    3. Broadcast of Classroom Presentation to Home or Office
    4. Videotaping of Classroom Presentation
    5. Broadcast of Videotaped Classroom Presentation
    6. Incorporation of Photographs in an Electronic Presentation (Excluding the Internet)
    7. Making Changes to Photographs
    8. Use of Copyrighted Music
    9. Use of Music Over Two-Way Interactive Video (GSAMS)
    10. Use of Music in Videotaped Classroom Presentation
    11. Use of Music in Broadcast of Videotaped Classroom Presentation
    12. Use of Music in an Electronic Presentation (Excluding the Internet)
    13. Use of Music as Content in a Classroom Presentation
    14. Use of Music in Classroom Presentations on the Internet
  E. Distance Education
    1. Videotape of Telecourse

GSU002524

EXHIBIT 26 - 2

2. Videotape of Telecourse Shown at Other Institutions

3. Telecourse via the Internet

4. Telecourse via Cable Television

5. Remote Access of Searchable Database via the Internet

6. Student Project for Distribution on the Internet

7. Student Project on the Internet with Restricted Access

8. Use of Commercial Videotape

9. Taping On-Air Programming

10. Retention of Tape of On-Air Programming

11. Retention of Videotape of Copyrighted Material

12. Use of a Videotape of a GSAMS Class Containing Copyrighted Material

13. Rebroadcast of a Videotape of a Two-Way Interactive Video (GSAMS) Class Containing Copyrighted Material

F. Electronic Course Reserves

1. Placing a Book Chapter on the Library's Electronic Reserves

2. Retention of Book Chapters on Electronic Reserve

Part III. The Legal Background: Understanding Copyright and Fair Use

A. Understanding Copyright Law

1. The Copyright Clause

2. The Copyright Statute

3. Supreme Court Decisions

B. Understanding Fair Use

C. Fair Use and New Communications Technology

D. Fair Use Applied to Copyright as a Marketing Monopoly

1. The Crucial Distinction between the Work and the Copyright and the Use of Each

2. The Three Types of Copyrightable Works: Creative Works, Compilations, and Derivative Works

3. The Three Kinds of Fair Use: Creative, Personal, and Educational

a. Creative Fair Use: Authors Using Other Copyrighted Works to Create a New Work

b. Personal Fair Use: Use of Copyrighted Works for One's Own Learning or Enjoyment

c. Educational Fair Use: Use of Copyrighted Works for Teaching or for Scholarship or Research

4. The Fair Use Factors in Relation to the Type of Work and the Kind of Use

5. Fair Use and the Rights of the Copyright Holder

GSU002525

EXHIBIT 26 - 3

E.  Nonstatutory Fair Use Guidelines

F.  Overbroad Copyright Notices G. Conclusion

Part IV. Legal Authorities

A.  The Copyright Clause of the U.S. Constitution

B.  Selected Provisions of the Copyright Statute

    1.  Sec. 101. Definitions

    2.  Sec. 102. Subject Matter of Copyright: In General

    3.  Sec. 103. Subject Matter of Copyright: Compilations and Derivative Works

    4.  Sec. 105. Subject Matter of Copyright: United States Government Works

    5.  Sec. 106. Exclusive Rights in Copyrighted Works

    6.  Sec. 107. Limitations on Exclusive Rights: Fair Use

    7.  Sec. 201. Ownership of Copyright

    8.  Sec. 202. Ownership of Copyright as Distinct from Ownership of Material Object

C.  Copyright Decisions of the U.S. Supreme Court

    1.  Copyright Is a Statutory Grant, Not Common Law Property

    2.  Ownership of Copyright Is Separate from Ownership of a Copy of the Work

    3.  The Copyright Holder Does Not Own the Copyrighted Work

    4.  Copyright Is a Series of Rights to Which a Work Is Subject

    5.  Copyright Does Not Negate Property Right of Purchaser of Copy of the Work

    6.  Personal Use of Copyrighted Work Is a Fair Use

    7.  Copyright Law Protects the Public Domain

    8.  Primary Function of Copyright Is to Provide Public Access

    9.  Fair Use Is to Be Determined Individually for Each Work

    10. Copyright Is to Serve the Public Interest in Preference to Private Interests

Members of the Copyright Committee

Endnotes

[Contents]

GSU002526

EXHIBIT 26 - 4

## Foreword

The Congress shall have Power . . . To promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings . . .

-- **U.S. Constitution, art. I, sec. 8, cl. 8**

The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This result is neither unfair nor unfortunate. It is the means by which copyright advances the progress of science and art.

-- Justice Sandra Day O'Connor, *Feist Publications, Inc. v. Rural Telephone Service Co.*, **499 U.S. 340, 349** (1991)

The most famous newspaper headline in American history may well be the *Chicago Tribune*'s famous gaffe about the outcome of the 1948 presidential election: "Dewey defeats Truman." Some fifty years later, a staff member of the Truman Presidential Library in Missouri, while preparing a video on President Truman for library visitors, asked the newspaper for permission to use the headline in the video. The newspaper refused, presumably on the grounds that the law of copyright gave it the power to say who could use the headline and who could not. The *Chicago Tribune* was wrong. Copyright requires an original work of authorship and a three-word headline does not qualify.

The incident reveals the two most common errors committed in the name of copyright: a request for permission to use material when no request is needed and a denial of such requests. These errors suggest that there is a vast amount of confusion about copyright and the right to use copyrighted material. Since copyright is the grant of a limited monopoly in recorded knowledge, this confusion has large consequences for society. Indeed, there is currently an important public policy debate about copyright and fair use.

That debate, however, is about what copyright law should be, not what it currently is. The Regents Copyright Committee has concerned itself with what the law is, not what it should be. The guide will thus contribute to the policy debate only insofar as it increases an understanding of copyright law and fair use.

The purpose of this guide is to provide faculty, employees, and students of the University System of Georgia with a basic understanding of copyright and fair use. Individuals and institutions acquire copyrighted materials--books, journals, videotapes, sound recordings, etc.--and expect to use them to support educational and research activities. This is especially important today when advanced information technology offers so many ways to enhance instruction. New technology complicates the issue. A teacher may have been

GSU002527

EXHIBIT 26 - 5

quite comfortable providing photocopies of a magazine article to students in one classroom, but may begin to be concerned if the students are spread across many classrooms in diverse geographic locations connected by distance learning technology.

It would be impossible to prepare a guide that exhaustively lists all possible uses of copyrighted materials and gives guidance for each situation. Instead, this guide attempts to provide a basic framework for applying copyright law and fair use. Each situation must be evaluated on a case-by-case basis. This guide should enable members of the University System community to make these evaluations.

The Constitution of the United States and the existing copyright law recognize that a balance is needed between the rights of the copyright holder and society's need to use copyrighted works to advance learning. It is valuable to our society for authors and publishers to have a market for their work, but the open exchange of ideas is also crucial to education and to an informed citizenry.

The basic thrust of the present document is that the rights assigned to copyright holders under existing law are essentially marketing rights. That is, the copyright owners have the right to sell their works, and users should not interfere with that right by diminishing the available market for a work or by selling pirated copies. However, the existing copyright law expressly provides for the "fair use" of copyrighted materials, especially for education and research. The basic rule of thumb, elaborated in the document, is that a copyrighted work can be used or copied for educational purposes so long as the use is not solely a substitute for purchasing a copy of the work.

Most users of this guide will and should focus on the first two sections--the principles for applying fair use and the illustrative examples that follow. Reading these two sections should enable readers to analyze most situations and determine if their use of a publication is fair or if it infringes on the rights of the copyright owner. The last two sections explain the positions taken in this guide and provide the supporting legal authorities for these positions.

While the present federal copyright law was passed in 1976 before the advent of so much of the technology that now pervades higher education, present copyright law can be applied in virtually all situations. The underlying doctrine that allows use of copyrighted materials for educational purposes still pertains whether a publication is print or electronic or multimedia.

This document is a good faith effort to explain copyright and fair use to our community.

How should members of the University System of Georgia community determine the fair use of copyrighted materials for teaching, scholarship, and research? The answer is found in three different bodies of law: (1) the copyright clause of the U.S. Constitution; (2) the current copyright statute; and (3) copyright decisions of the U.S. Supreme Court.

Because copyright is the statutory grant of monopoly rights in recorded knowledge to serve a public purpose--the promotion of learning--

GSU002528

EXHIBIT 26 - 6

copyright law consists of an interrelated set of complex rules. On one hand, copyright gives proprietary rights to copyright holders; on the other, it grants learning rights to users in the form of the fair use doctrine. Since the law provides rights for both holders of copyright and for users of copyrighted works, and since everyone has a duty to respect the law, it follows that users have a duty to respect the rights of holders and holders have a duty to respect the rights of users. The problem is to know the limits of the respective rights, and that is the problem to which this document is directed.

Special care has been taken to ensure that the contents of this Guide accurately reflect the law. To this end, the Committee has relied upon the copyright clause of the U.S. Constitution, the copyright statute, and decisions of the U.S. Supreme Court. A complex body of law, of course, provides room for reasonable persons to disagree as to meaning and interpretation, and there will probably be those who disagree with some of the positions this document reflects. Nevertheless, the Committee is convinced that the positions taken in the guide are both sound and supported by legal authority and that members of the University System Community may safely rely on them.

A caveat to members of the University Community is appropriate. This Guide is limited to copyright and fair use and does not deal with other intellectual property issues, for example, patents. For guidance on those issues, reference should be made to the Regents Intellectual Property Policy.

[Contents]

## PART I. PRINCIPLES OF FAIR USE

The 1976 Copyright Act grants the "fair use" of copyrighted materials for a variety of purposes, for the creation of new works, for educational use, and for personal use. The following principles provide a framework for the application of educational fair use. The goal is to enable teachers and scholars to use copyrighted materials for teaching, scholarship, and research with respect for the rights of copyright holders as well as their own rights.

The principles are based on three propositions: (1) the copyright statute regulates the copyright monopoly it grants in order to maintain an appropriate balance between the rights of copyright holders and the rights of users; (2) the copyright monopoly is essentially for marketing a work and does not extend to the copy of a work that the copyright owner has sold; and (3) the ultimate test for educational fair use is whether the copying is done for sound pedagogical reasons and not simply to avoid purchasing a work.

These ideas, and the fair use principles stated below, are grounded in the discussion that follows in Part III and in the legal authorities

GSU002529

EXHIBIT 26 - 7

discussed in Part IV. The principles of fair use are derived from the <u>Fair Use Statute, 17 U.S.C. § 107</u>, which is printed in full in Part IV.

1. Fair use is derivative of copyright and is complex in part because there are three kinds of copyright, each of which varies in the scope of copyright protection:

   a. Creative copyright, for original works such as a novel, drama, painting, sonata, or poem (plenary copyright protection)
   b. Compilation copyright, for a directory or anthology (limited copyright protection)
   c. Derivative copyright, for works based on another work, such as a motion picture based on a novel (limited copyright protection)

2. Fair use applies to all copyrighted works regardless of the media in which they are fixed: print, electronic, or multimedia.

3. There are four kinds of use:

   a. Personal use is the use of a copyrighted work for the purpose for which it was intended, e.g., reading a book.
   b. Infringing use is a use that violates one of the rights granted to copyright holders in section 106 of the copyright statute.
   c. Fair use is a use permitted by the copyright statute that might otherwise be infringing.
   d. Constitutional use is the use of uncopyrightable, i.e., public domain, material and is protected by the U.S. Constitution.

4. Fair use is a right granted to users by section 107 of the copyright statute.

5. Fair use modifies the marketing monopoly of the copyright holder so that copyright can fulfill its constitutional purpose of promoting learning.

6. Everyone has a constitutional right to use public domain material without limitation, even if it is included in a copyrighted work.

7. One infringes a copyright, not a work, and fair use applies only to the use of the copyright. Therefore, determining if a use is fair requires making the following distinctions between a use of the work itself and a use of the copyright of the work:

   a. One who copies a work to put it on the market uses the copyright, because the copyright holder has the right to market the work. Without permission, such a use is an infringing use.
   b. One who copies from a work for study or research uses the work, not the copyright, because the use is a use for which the work was intended. Such a use is a fair use, not an infringement.

8. One may always use a *work* without permission; one may use a *copyright* only with permission or as a matter of fair use.

9. The threshold issue in determining fair use is whether the copying involves a use of the work or a use of the copyright because:

   a. The use of the work is by definition a protected use.
   b. The use of the copyright must be with permission or must fulfill fair use criteria.

10. Fair use normally entails copying and is of three kinds:

    a. Creative fair use by authors who copy from other works to create their own work.
    b. Personal fair use by individuals who copy from works for their own learning or entertainment.
    c. Educational fair use by teachers, scholars, and students who copy for teaching, scholarship, or learning.

GSU002530

EXHIBIT 26 - 8

11. There are four nonexclusive statutory factors--all directed to the marketing of works-- to use in determining whether a use is fair. They are:

   a. The purpose of the use, including whether such use is for commercial or for non- profit educational purposes. (Commercial purpose implies a use of the copyright; educational purpose, a use of the work.)

   b. The nature of the work. (This requires a determination of whether the work is a creative work, a compilation, or a derivative work.)

   c. The amount used in relation to the work as a whole. (The amount of the work used is a major factor in determining whether the use is merely a use of the work or a use of the copyright; the greater the amount used, the more likely the use will be a use of the copyright.)

   d. The effect of the use on the market or potential market for the work. (The greater the market effect, the less the likelihood that the use will be fair.)

12. The four factors are not exclusive. Other factors that may be relevant are the availability of the work, the ability to determine whether the work is still under copyright, and the ability to locate the copyright holder.

13. The four factors are necessary because fair use is to be determined on a case-by-case basis in order to protect the constitutional rights of users.

14. Attempts to limit the fair use right with quantitative guidelines are without statutory authority.

15. The legal effect of quantitative guidelines is to provide a safe-harbor, i.e., copying within the guideline limits automatically qualifies as fair use. Such guidelines do not, and cannot legally, mean that copying in excess of the guidelines is infringement and not fair use.

16. The limitations on the copyright monopoly in sections 108-120 grant rights to non-copyright holders as to particular type uses; these rights, however, do not negate the general right of fair use, which permits uses in excess of the limitations if the additional uses are fair.

17. The location of the line between fair use and infringing use is determined by the market factor, that is, the extent to which the copy becomes a substitute for the purchase of the work.

18. The 1976 Copyright Act protects educational fair use with four different provisions:

   a. The use of works for "teaching (including multiple copies for classroom use), scholarship and research" as exemplars of fair use (Sec. 107)

   b. The distinction between commercial and nonprofit educational use (Sec. 107(1)), a superfluous distinction unless it means special protection for educational use

   c. The provision that fair use overrides the limitations on library photocopying (Sec. 108(f)(4))

   d. The good faith defense for employees of nonprofit educational institutions, libraries, and archives (Sec. 504(c)(2).)

19. The copyright statute does not empower copyright holders to override the fair use right by overbroad copyright notices or other unilaterally imposed provisions

GSU002531

EXHIBIT 26 - 9

# PART II. EXAMPLES ILLUSTRATING THE APPLICATION OF FAIR USE

The following examples are intended to aid members of the University System Community to evaluate fair use at three levels: creative, educational, and personal. They deal with situations involving print, multimedia, distance learning, and electronic reserves. The examples are illustrative, not exhaustive. These examples apply to non-profit educational uses only.

[Contents]

## A. Research and Writing

### 1. Comment and Criticism

**SCENARIO A:** A professor of English is writing a book comparing the work of three women poets, all of whose poems are copyrighted.

QUESTION: May the professor quote the poems in her book?

ANSWER: Yes. This is one of the traditional types of fair use, that is, creative fair use. Two other examples of fair use are use for comment and criticism.

## 2. Unpublished Letters

**SCENARIO B:** A professor of psychology desires to edit and publish a collection of unpublished letters in the library archives.

QUESTION: Is this a fair use?

ANSWER: The answer to this scenario requires further information. Has the copyright protection expired? Are the letters subject to any agreement the library made with the donor? Can the author or authors of the letters be located? Is the library agreeable to publication? This is the type of problem that requires a detailed legal and factual analysis. One should consult the institution's office

[Contents]

GSU002532

EXHIBIT 26 - 10

of legal affairs for advice.

## 3. Journal Article for Personal Use

**SCENARIO C:** A professor wishes to make a copy of an article from a copyrighted periodical for her files to use later.

QUESTION: Is this a fair use?

ANSWER: Yes. This is a classic example of personal fair use so long as the professor uses the article for her personal files and reference. See SCENARIO E.

## 4. Out-of-Print-Book

**SCENARIO D:** A library has a book that is out of print and unavailable. The book is an important one in the professor's field that she needs for her research.

QUESTION a: May the professor copy the book for her files?

ANSWER: Yes. This is another example of personal use. If one engages in the fair use analysis, one finds that: (1) the purpose of the use is educational versus commercial; (2) the professor is using the book, a creative work, for research purposes; (3) copying the entire book would normally exceed the bounds of fair use, however, since the book is out of print and no longer available from any other source, the copying is acceptable; (4) finally, the copying will have no impact on the market for the book because the book is no longer available from any other source.

QUESTION b: Using the same facts as explained in SCENARIO D, could the professor copy the book and place the book on reserve in the library? Could the professor scan the book into her computer and place the book onto the World Wide Web?

ANSWER: If the professor placed the book on reserve in the library, the use would be considered a fair use. However, if the professor placed the book on the Web, then the use is not a fair use. Placement on the Web allows unlimited access to the book. This would affect the copyright holder's public distribution of the book. See SCENARIO R, SCENARIO T, and SCENARIO U.

**[Contents]**

GSU002533

EXHIBIT 26 - 11

## B. Printed Material

### 1. Journal Article for Classroom Use

**SCENARIO E:** A professor copies one article from a periodical for distribution to the class.

QUESTION: Is this fair use?

ANSWER: Yes. Distribution of multiple copies for classroom use is a fair use.

### 2. Posting Copyrighted Article to Web Page

**SCENARIO F:** A professor has posted his class notes on a Web page available to the public. He wants to scan an article from a copyrighted journal and add it to his Web page.

QUESTION: Is this a fair use?

ANSWER: It depends. If access to his Web page is restricted, then this is a fair use. If access is not limited, then this use is probably not a fair use. No exclusively educational purpose can be guaranteed by putting the article on the Web, and such conduct would arguably violate the copyright holder's right of public distribution.

### 3. Coursepacks

**SCENARIO G:** A professor copies excerpts of documents, including copyrighted text books and journals, from various sources. The professor plans to distribute the materials to his class as a coursepack.

QUESTION a: Is the preparation of a coursepack for students in the class a fair use?

ANSWER: One must do the fair use analysis. If the use of each excerpt complies with the fair use criteria, then use of the coursepack is a fair use. The inclusion of the excerpts in a coursepack will not change a fair use to an infringing use.

QUESTION b: Same facts as SCENARIO G, except the professor prepares a digital or electronic coursepack. Is the preparation of an

GSU002534

EXHIBIT 26 - 12

electronic coursepack for students in the class a fair use?

ANSWER: If the professor anticipates distributing the coursepack via the World Wide Web, e-mail or compact disk, then a fair use analysis is required.

## 4. Textbooks

**SCENARIO H:** A professor wishes to use a textbook he considers to be too expensive. He makes copies of the book for the class.

QUESTION: Is this a fair use?

ANSWER: No. Although the use is educational, the professor is using the entire work, and by providing copies of the entire book to his students, he has affected the market. This conduct clearly interferes with the marketing monopoly of the copyright owner. The professor should place a copy on reserve or require the students to purchase the book. See following examples.

## 5. Textbooks for Library Reserves

QUESTION: If in SCENARIO H the professor decides to make three copies of the book and place them on reserve in the library for the class, is this a fair use?

ANSWER: No. This conduct still interferes with the marketing monopoly of the copyright owner. The professor may place a copy of the textbook, not the copies, on reserve.

## 6. Public Domain Materials

**SCENARIO I:** A teacher copies a Shakespearean play from a copyrighted anthology.

QUESTION: Is this a fair use?

ANSWER: The play is in the public domain and not subject to copyright protection and, therefore, one need not do a fair use analysis. Other public domain materials include U.S. government documents, works whose copyright has expired and unsealed court records. There are other public domain materials; for a determination consult legal affairs.

GSU002535

EXHIBIT 26 - 13

[Contents]

## C. Video and Sound Recordings

### 1. Showing a Videotape for Classroom Instruction

**SCENARIO J:** A teacher wishes to show a copyrighted motion picture to her class for instructional purposes.

QUESTION: Is this a fair use?

ANSWER: Yes. It is fair use since it is for classroom instruction and no admission fee is charged. Tuition and course fees do not constitute admission fees.

### 2. Copying a Videotape for Classroom Instruction

**SCENARIO K:** A teacher makes a copy of the videotape described in SCENARIO J for a colleague to show in her class at the same time.

QUESTION: May she do so?

ANSWER: No. This is not a fair use. The teacher may lend her personal copy of the videotape to a colleague for this purpose.

### 3. Renting a Videotape That Is in the Public Domain for Nonclassroom Use

**SCENARIO L:** A professor wishes to raise funds for a scholarship. She rents a videocassette of a motion picture on which the copyright *has expired* and charges admission fees.

QUESTION: May she do so?

ANSWER: Yes. The copyright of the motion picture has expired, which places the motion picture in the public domain.

### 4. Renting a Videotape That Is Copyright-Protected for Nonclassroom Use

GSU002536

EXHIBIT 26 - 14

**SCENARIO M:** The facts are the same as those in SCENARIO L except that the movie is protected by copyright.

QUESTION: Is this a fair use?

ANSWER: No. This is not a fair use because it infringes the copyright owner's right to market the work.

[Contents]

## D. Multimedia Projects

### 1. Classroom Presentation

**SCENARIO N:** A teacher or student prepares and gives a presentation that displays photographs. Permission was not obtained to use the photographs.

QUESTION: Can the photographs be included in the initial presentation, if it is in a traditional classroom?

ANSWER: Yes. The copyright fair use provision explicitly provides for classroom use of copyrighted material. Instructors and students may perform and display their own educational projects or presentations for instruction.

### 2. Electronic Transmission or Broadcast of Classroom Presentation

QUESTION: What if the presentation incorporating the photographs discussed in SCENARIO N is broadcast to a distant classroom?

ANSWER: Yes. This use would be considered fair use, as long as the presentation is broadcast for remote instruction.

### 3. Broadcast of Classroom Presentation to Home or Office

QUESTION: What if the presentation discussed in SCENARIO N is broadcast to students at their homes or offices? Would such use be a fair use?

ANSWER: Yes. This use would be considered fair use if the individuals are enrolled in a course and viewing the presentation for

GSU002537

EXHIBIT 26 - 15

purposes of criticism, comment, teaching or instruction, scholarship, or research.

## 4. Videotaping of Classroom Presentation

QUESTION: What if the teacher's or student's presentation explained in SCENARIO N is videotaped? Would such use be a fair use?

ANSWER: Yes. This use would be considered fair use, if the videotape is used for educational purposes such as student review or if the videotape is for instruction.

## 5. Broadcast of Videotaped Classroom Presentation

QUESTION: What if the SCENARIO N presentation incorporating the photographs is videotaped and rebroadcast? Is this a fair use?

ANSWER: Yes. The use of the photographs is fair use as long as the presentation is videotaped and rebroadcast only for instruction.

## 6. Incorporation of Photographs in an Electronic Presentation (Excluding the Internet)

QUESTION: What if the SCENARIO N presentation is included in an electronic presentation such as Microsoft's Power Point?

ANSWER: Yes. This should be considered fair use as long as the electronic presentation is for educational or instructional use.

## 7. Making Changes to Photographs

QUESTION: What if the student or teacher were to change the attributes of the pictures discussed in SCENARIO N?

ANSWER: Yes. This would be considered fair use for education, comment, criticism, or parody. One must inform the audience that changes were made to the photographer's copyrighted work.

## 8. Use of Copyrighted Music

**SCENARIO O:** A teacher or student creates a presentation and incorporates copyrighted music into the background. Assume that permission was not obtained to use the music for the presentation.

GSU002538

EXHIBIT 26 - 16

QUESTION: Can the music be included in the teacher's or student's initial presentation?

ANSWER: Yes. This is fair use if instruction is occurring.

## 9. Use of Music Over Two-Way Interactive Video (GSAMS)

SCENARIO P: Same facts as SCENARIO O. The presentation is broadcast to a distant classroom using two-way interactive video (GSAMS).

QUESTION: Is this a fair use?

ANSWER: Yes. The use of interactive video for educational instruction is considered a fair use.

## 10. Use of Music in Videotaped Classroom Presentation

QUESTION: What if the teacher's or student's presentation described in SCENARIO O is videotaped? Is this a fair use?

ANSWER: Yes. This is fair use if instruction is occurring.

## 11. Use of Music in Broadcast of Videotaped Classroom Presentation

QUESTION: What if the SCENARIO O presentation is videotaped and rebroadcast? Would this be a fair use?

ANSWER: The answer is not clear. If instruction is occurring and there are no admission charges to the rebroadcast, the presumption is that it may be fair use. Tuition and course fees do not constitute admission fees.

## 12. Use of Music in an Electronic Presentation (Excluding the Internet)

QUESTION: What if the SCENARIO O presentation is included in an electronic presentation (excluding the Internet)? Would this use be an appropriate fair use?

ANSWER: Yes. This is fair use if instruction is occurring.

GSU002539

EXHIBIT 26 - 17

## 13. Use of Music as Content in a Classroom Presentation

**SCENARIO Q:** A professor teaches an opera course, and the professor creates a presentation. The presentation contains the works of ten contemporary artists and is presented to a new class every semester.

QUESTION: Is this a fair use?

ANSWER: Yes, as long as the use of the presentation continues to be for instruction.

## 14. Use of Music in Classroom Presentations on the Internet

QUESTION: The opera classroom presentation (SCENARIO Q) or the presentation containing background music (SCENARIO O) is placed on the Internet? Is this a fair use?

ANSWER: This would be fair use so long as access is restricted, e.g., by use of a password or PIN or other means.

[Contents]

## E. Distance Education

### 1. Videotape of Telecourse

**SCENARIO R:** Institution A creates a telecourse. The course contains copyrighted text, video, audio, and photographs relevant to the class.

QUESTION: If Institution A did not obtain permission to use the copyrighted materials, can Institution A show the videotape of the telecourse to students who have signed up for a telecourse at Institution A?

ANSWER: Yes. Most experts believe that showing the videotape to students enrolled in the telecourse is a fair use.

### 2. Videotape of Telecourse Shown at Other Institutions

QUESTION: Assume same facts as in SCENARIO R. If Institution A did not obtain permission to use the copyrighted materials, can

GSU002540

EXHIBIT 26 - 18

students at Institution B enroll and receive credit for the course at Institution B?

ANSWER: Yes. Most experts believe that showing the videotape to students enrolled in the telecourse is a fair use.

### 3. Telecourse via the Internet

QUESTION: Assume same facts as in SCENARIO R. What if the telecourse is transmitted via the Internet?

ANSWER: If the telecourse is broadcast and there is open access, the audience is no longer clearly defined. A rebroadcast over the Internet to a global audience is probably not a fair use. A restricted broadcast of the telecourse is a fair use.

### 4. Telecourse via Cable Television

QUESTION: Assume same facts as in SCENARIO R. What if the delivery mode is cable television?

ANSWER: The audience is no longer clearly defined, but if the institution is broadcasting the material over an institutionally controlled cable channel, then the use is fair.

### 5. Remote Access of Searchable Database via the Internet

**SCENARIO S:** A faculty member at Institution C creates a searchable database of copyrighted materials. The database is used as a part of a distance learning course and is available on the institution's webserver. Students enrolled in the course access the course materials from home, work, and other areas that are not traditional classrooms. Access to the database is controlled and available only to students enrolled in the class. The faculty member did not obtain permission to use the copyrighted materials.

QUESTION a: Will this use of copyrighted materials from home, work, or other areas constitute fair use?

ANSWER: Yes. So long as the materials are being accessed for educational instruction and access remains controlled.

QUESTION b: What if the copyrighted materials in SCENARIO S are musical works or dramatic works? Is the use a fair use?

ANSWER: Yes. This is a fair use, as long as the materials are being accessed for educational instruction and access remains

GSU002541

EXHIBIT 26 - 19

controlled.

## 6. Student Project for Distribution on the Internet

**SCENARIO T:** A student is taking a distance learning class in which the instructor has required that a particular assignment be created for unlimited distribution on the Web.

QUESTION: If a student includes an audio segment of copyrighted music (video, news broadcast, non-dramatic literary work), is this a fair use?

ANSWER: No. Since the teacher specifically stated that the project is being created for distribution over the Web, this is not a fair use of any of the listed copyrighted materials and permission should be obtained. See SCENARIO U.

## 7. Student Project on the Internet with Restricted Access

**SCENARIO U:** Same facts as SCENARIO T, however, access to each student's Web page will be restricted to other students in the class.

QUESTION: Is this a fair use?

ANSWER: Yes. This should be considered fair use.

## 8. Use of Commercial Videotape

**SCENARIO U:** An instructor is teaching a class delivered on cable television or via two-way interactive video (GSAMS), and she uses a commercial videotape (either in its entirely or a portion), which is sold for instructional purposes, during a class to illustrate a concept covered in the discussion.

QUESTION a: In this a fair use?

ANSWER: Yes. She is using a commercial video for its intended purpose. Moreover, it is being used to illustrate a concept connected with the class discussion.

GSU002542

EXHIBIT 26 - 20

QUESTION b: Same facts as SCENARIO V, but the class is distributed over the Internet. Is this a fair use?

ANSWER: This is a fair use only if access over the Internet is restricted.

QUESTION c: Same facts as SCENARIO V, but the videotape is not "educational" in orientation. Is this fair use?

ANSWER: Distribution over two-way interactive video or cable television controlled by the institution would be fair use, as would restricted distribution over the Internet. Unrestricted distribution over the Internet is not a fair use.

## 9. Taping On-Air Programming

**SCENARIO W:** A faculty member records a segment from a television program. The segment will be shown in a GSAMS class the following day. The remote sites will record the class in the event of technical difficulties.

QUESTION: Is the showing of the recording considered fair use?

ANSWER: Yes.

## 10. Retention of Tape of On-Air Programming

QUESTION: Assume there are technical difficulties in SCENARIO W and the remote sites replay the tape containing the program segment. Is that a fair use?

ANSWER: Yes. The use is for instructional purposes.

## 11. Retention of Videotape of Copyrighted Material

**SCENARIO X:** Institution E records a two-way interactive video (GSAMS) class that contains copyrighted works. The tapes are kept for the entire quarter to serve as review for students who may have missed a class or as backup in the event of technical difficulties. At the end of the term, the tapes are erased.

QUESTION: Is this fair use?

GSU002543

EXHIBIT 26 - 21

ANSWER: Yes.

## 12. Use of a Videotape of a GSAMS Class Containing Copyrighted Material

QUESTION: What if the professor who conducted the class in SCENARIO X decides to show the tape to her continuing education class (or to a community group)? Is this a fair use?

ANSWER: Yes, showing the tapes to her continuing education class is fair use if she is using the material for educational purposes and no admission fee is charged. Showing the tape to a community group may or may not be a fair use. The fact that the user of the tapes is a professor does not make the showing of the tape to a community group an educational use. One would need to conduct a fair use analysis.

## 13. Rebroadcast of a Videotape of a Two-Way Interactive Video (GSAMS) Class Containing Copyrighted Material

SCENARIO Y: Institution E records a two-way interactive video class that contains copyrighted text, video, audio, and photographs that are relevant to the class. Institution E rebroadcasts the videotape to a class at Institution F.

QUESTION: Is this a fair use?

ANSWER: Yes. It is fair use since instruction is occurring.

[Contents]

## F. Electronic Course Reserves

### 1. Placing a Book Chapter on the Library's Electronic Reserves

SCENARIO Z: A professor wants to add a book chapter to the library's electronic reserve system.

QUESTION: Is this a fair use?

ANSWER: Yes. The chapter may be added if access to the system is limited to students enrolled in the class.

GSU002544

EXHIBIT 26 - 22

## 2. Retention of Book Chapters on Electronic Reserve

**SCENARIO AA :** The professor in SCENARIO Z will be teaching the same course for three successive terms.

QUESTION: Is leaving a book chapter on the electronic reserve system for this period of time a fair use?

ANSWER: Yes. The use is fair if access is limited to students and the work is out of print and not readily available. However, if the book is currently in print, then a fair use analysis using the four fair use factors is required.

[Contents]

## PART III. THE LEGAL BACKGROUND:

## UNDERSTANDING COPYRIGHT AND FAIR USE

The following discussion, based on the copyright clause of the U.S. Constitution, the copyright statute, and decisions of the U.S. Supreme Court, provides the legal background necessary for understanding copyright and fair use. The discussion should be read in light of the fact that copyright is a highly regulated statutory grant, a limited monopoly to serve the public interest in preference to private interests.

### A. Understanding Copyright Law

#### 1. The Copyright Clause

A proper understanding of copyright law begins with the copyright clause of the U.S. constitution, the source of Congress' authority to enact copyright statutes. Contained in the intellectual property clause (which also contains the patent clause), it reads: "The Congress shall have Power . . . To promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings." As a careful reading of this language shows, the clause limits the power it grants to the purpose for which the power is granted. That purpose is to promote science, which means knowledge or learning in the eighteenth-century usage of the word. Thus, it authorizes Congress to grant copyright only to authors, only for their writings, and only for limited times. The national legislature could not, for example, constitutionally enact a statute providing for a perpetual copyright.

GSU002545

EXHIBIT 26 - 23

The key to understanding the limits on Congress' power to enact copyright legislation is the meaning of the "exclusive Right" that Congress can grant. In 1789, the meaning of this phrase was clear: it was the right to publish the work. Today there are ways other than publishing to market a work. Thus, the "exclusive Right" today can be properly read as meaning the exclusive right of authors to market their works, which retains the original function of the phrase. The purpose of copyright--to promote learning--remains the same.

Originality--in the words of the copyright statute, "an original work of authorship"--is a constitutional condition for copyright. This condition is important because it means that copyright law divides all writings into two categories: those that are copyrightable and those that are not.

Material that is not copyrightable is called public domain material. Examples are: (1) facts and ideas (Sec. 102(b)); (2) works of the U.S. Government (Sec. 105); (3) all material that is not original with the author claiming copyright (Sec. 103); and (4) works upon which the copyright has expired. Copyright law thus has a major role in preserving the public domain.

While the purpose of copyright is to promote learning, there are two obvious points sometimes overlooked: (1) the amount of public domain material exceeds the amount of copyrighted material by far; and (2) the public domain is as necessary to the promotion of learning as copyright. Consequently, copyright's role in preserving the public domain is as important as protecting the new writings of authors.

Preserving the public domain is specified by the copyright clause of the Constitution, which requires a *new writing* and a *limited* term for copyright, and by the copyright statute, which conforms to these limitations. Since copyright requires a new work, it cannot be used to capture old works from the public domain; since copyright is limited to a definite term, all copyrighted works eventually go into the public domain. Thus two of the constitutional roles of copyright law are to preserve and to enhance the public domain.

[Contents]

## 2. The Copyright Statute

Unlike the copyright clause, the current copyright statute is long and complex, but the pattern of Chapter 1 of the statute, the most important, is simple. After defining key terms in **section 101**, that chapter: (1) states the conditions for copyright; (2) excludes copyright for certain types of material and works; (3) defines the types of copyrightable works; (4) grants rights to the copyright holder in **section 106**; and (5) limits those rights in sections **107-120**.

The statutory condition for copyright, consistent with the Constitution, is the creation of an original work of authorship fixed in a tangible

GSU002546

EXHIBIT 26 - 24

medium of expression (**Sec. 102**(a)). The statute, however, puts ideas (Sec. 102(b)) and works of the U.S. Government (**Sec. 105**) in the public domain by excluding them from copyright protection. The pattern--conditions, defined rights, and limitations on those rights--is that of a highly regulated statutory grant.

One of the most subtle aspects of the copyright statute is that it provides copyright for works that contain public domain material and are original only in part. To make this copyright constitutional, Congress excluded public domain material (and other material unoriginal to the author) from copyright protection even though it is contained within a copyrighted work. This explains why there are three kinds of copyrights with varying degrees of protection: (1) creative works (which consist entirely of original material like novels, dramas, and poems) are entitled to plenary protection (Sec. 102(a)); (2) compilations (collections of independently copyrightable works or data, for example, an anthology of short stories or entries in a library catalog) (**Sec. 103**), entitled to only limited protection; and (3) derivative works (works based on other works, such as a motion picture based on a novel) (Sec. 103), also entitled to only limited protection.

The scope of the copyright monopoly is thus commensurate with the amount of originality necessary to create each type of protected work. This follows from the fact that the originality of a creative work is in composing it, the originality of a compilation is in arranging pre-existing material, and of a derivative work in transforming another work. In short, Congress was careful to limit the scope of copyright protection to the original material of the author claiming copyright. It should be noted that a gathering of independently copyrightable works is a compilation that is called a collective work, and that the individual works themselves may be entitled to plenary copyright protection independently of the partial protection provided by the compilation copyright.

In **section 106**, Congress grants the copyright holder six rights: (1) to reproduce the work in copies; (2) to prepare derivative works; (3) to distribute copies of the work to the public; (4) to perform the work publicly; (5) to display the work publicly; and (6) to perform audio digital recordings publicly (added by amendment some twenty years after the statute was enacted).

These rights are said to be exclusive, but--consistent with the regulatory scheme of the statute--they are subject to limitations contained in the fourteen sections following section 106. These limitations explain the Supreme Court's statement that "the copyright holder's dominion is subject to precisely defined limits."[1] The copyright holder, for example, has the exclusive right to market a work by distributing copies *publicly* (Sec. 106(3)). And the copyright holder has the exclusive right to market the public performance of a work, but not its private use. One can sing the copyrighted song in the shower, but not on the radio (Sec.106(4)). Similarly, owners control the market for public display of a copyrighted painting but not its private display in one's home (Sec. 106(5)).

[Contents]

GSU002547

EXHIBIT 26 - 25

## 3. Supreme Court Decisions

The copyright statute is to be interpreted in light not only of the copyright clause, but also of the copyright decisions of the U.S. Supreme Court. Indeed, it is primarily in reference to these decisions that a very important, but subtle, point becomes clear. The subject of the copyright statute is proprietary rights in the copyright, not in the work itself.(2) Thus, the copyright statute provides that the copyright holder has certain rights to which the work is subject, and it is only these rights that can be transferred or infringed.

The U.S. Supreme Court dealt with this issue in a case near the beginning of the twentieth century, when a copyright holder had sued a retailer claiming that the retailer had to charge the price that the publisher set for the book. The Court rejected the copyright holder's claim of a right to control proprietary rights in a book (technically a copy of the copyrighted work) that it had sold. The result was what in legal terms is called the "first sale" doctrine.(3) That is, the Court held that the copyright holder's marketing monopoly as to a particular book ends with the first sale of that book. The monopoly, of course, ends only for that particular copy and does not otherwise affect the copyright.

The first sale doctrine means that the purchaser of a book can subsequently do with it as he or she pleases, give it away, resell it, or burn it. This right is based on the distinction between the physical object in which the work is contained and the copyright of the work. The purchaser of the book owns the book, the copyright holder owns the copyright. It follows, then, that there is a distinction between the use of the work and the use of the copyright of the work. Thus, the purchaser of a copy of a work can use that copy as he or she wishes, but may not use the copyright except as a matter of fair use or with permission.

The copyright statute codifies the distinction between the work and the copyright in section 202. Thus, the transfer of a book containing the work is not a transfer of the copyright (or any of the rights of copyright) of the work; and the transfer of the copyright is not a transfer of any rights in a book in which the work is contained (Sec. 202).

To summarize, copyright law means that: (1) copyright is a monopoly that provides authors the right to sell copies of their work; (2) the monopoly is regulated in the public interest; (3) the monopoly of a particular copy ends when that copy is sold; and (4) a user is free thereafter to make use of the work contained in that copy but not to make use of the copyright of that work.

**[Contents]**

## B. Understanding Fair Use

The most important of the statutory limitations on copyright is fair use, which applies to all copyrighted works and all uses granted in

GSU002548

EXHIBIT 26 - 26

section 106.

The fair use statute is __section 107__ of the copyright statute, which is printed in full in Part IV. It provides that "the fair use of a copyrighted work, including such use by reproduction in copies," is not an infringement of copyright. As exemplars of fair use, it lists "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research" and provides four non-exclusive factors to be used in determining whether a use is fair. They are: (1) the purpose of the use, including whether the use is a commercial use or for non-profit educational purposes; (2) the nature of the work; (3) the amount used; and (4) the effect on the marketing of the work. These factors are discussed below.

The purpose of fair use is twofold: to protect the copyright holder's market monopoly while preventing the market monopoly from being used to inhibit (rather than promote) learning. But these goals are often confused when the use of a work involves copying. Thus, it is helpful to compare fair use conduct with infringing conduct to avoid the confusion.

The copyright statute defines infringement as the violation of "any of the exclusive rights of the copyright owner," __(4)__ which includes the right to reproduce the work in copies. One who copies the work without permission, therefore, would appear to have infringed the copyright. But the fair use statute says, "The fair use of a work, _including such use by reproduction in copies . . . is not an infringement of copyright_" (emphasis added). This means that the same type of conduct--reproduction of a work in copies--may be a fair use in one case or an infringement in another and this is the major reason for confusion as to the scope of the fair use right.

The primary source of the confusion is the language in section 106(1), which grants the copyright owner the "exclusive" right to reproduce the work in copies subject to limitations. A right subject to limitations is not totally exclusive, it is merely a right subject to limitations. Although these limitations include the right of fair use, which, in the language of the statute, includes use by copying, copyright holders prefer to read the statute otherwise. See, for example, copyright notices in many books that purport to deny anyone the right to copy any portion of the book without the consent of the copyright holder. The plain meaning of the statute, however, precludes this interpretation, and it is clear that the copyright holder's right to copy is not absolute.

Since a truly absolute right to reproduce in copies would create an absolute monopoly to market a work, there are four persuasive items of evidence (apart from the language in section 107) indicating that the copyright holder's right to copy is not absolute. The first is that the limitations on the copyright holder's right to copy are limitations on the marketing right. But the marketing right is not absolute because of the first sale doctrine, which says that the copyright owner's marketing monopoly is exhausted with the first sale and others can then sell the copy. To say that the reproduction of the work in copies is an absolute right is inconsistent with the fact that the right to distribute the copies is limited to the right to distribute them to the public.

GSU002549

EXHIBIT 26 - 27

The second item of evidence is based on the many rulings of the U.S. Supreme Court that copyright is intended primarily to benefit the public's rather than the copyright holders' interest, which cannot be so if the right to copy is absolute.

The third item of evidence is the specific ruling of the Supreme Court--made in response to claims that the making of one copy of a copyrighted motion picture off-the-air (under the current copyright statute) was infringement--*that copyright has never granted to the copyright holder absolute rights*, which clearly qualifies all "exclusive" rights of the copyright holder. **(5)**

The fourth item of evidence is the Supreme Court's ruling that there is a *constitutional* right for a user to copy uncopyrightable material from a copyrighted work, a right that could not be exercised if the copyright owner's right to copy were absolute. **(6)**

**[Contents]**

## C. Fair Use and New Communications Technology

The application of new communications technology created by computers developed after Congress enacted the 1976 Copyright Act. Consequently, application of fair use to the transmission of material by computer, e.g. on the Internet, merits special mention.

Originally, fair use was a judicial doctrine that one author could make fair use of another author's work in creating his or her own new work. If the amount used was fair, the method or scope of distribution made no difference. If, for example, Author X made a fair use of the work of Author Y, the fact that Author X's book sold a million copies did not divest the material of its fair use status.

Today, fair use is a statutory right that applies to all copyrighted works and all rights of the copyright holder, and whether a use is fair is to be determined by applying the four factors listed in the statute. Since the method of distribution is not one of the statutory factors, it follows that the distribution of material by electronic rather than print media is not the decisive issue. The important point is that if the amount used does not unlawfully interfere with the copyright holder's marketing monopoly, it is a fair use.

**[Contents]**

## D. Fair Use Applied to Copyright as a Marketing Monopoly

In view of the regulatory nature of copyright as manifested in the marketing monopoly limitation, to apply the fair use statute it is useful

GSU002550

EXHIBIT 26 - 28

to begin with three basic propositions: (1) there is a distinction between the work and the copyright and thus between the use of the work and the use of the copyright; (2) there are different kinds of copyrighted works and of fair use; and (3) the application of fair use depends upon the kind of work being used and the kind of use one is making of the work. The end result is that fair use must be determined on a case-by-case (or work-by-work) basis.[7]

### 1. The Crucial Distinction between the Work and the Copyright--and the Use of Each

The ultimate issue in copyright law is the location of the appropriate line of demarcation between the marketing rights of copyright holders and the fair use rights of users of copyrighted material. The ability to locate this line depends, in part at least, upon understanding that the work itself is separate and distinct from the copyright of the work, a point proved by the fact that works continue to exist even after their copyrights have expired and the works have passed into the public domain. The U.S. Supreme Court made this distinction clear as long ago as 1852. "[T]he property in the copy-right is regarded as a different and distinct right, wholly detached from the manuscript, or any other physical existence, and will not pass with the manuscript unless included by express words in the transfer."[8] The continued relevance of this holding is demonstrated by the fact that Congress codified it in section 202 of the current copyright statute, which reads in part: "Ownership of a copyright . . . is distinct from ownership of any material object in which the work is embodied."

There are three components of a copyrighted work: the work itself; the original fixation of the work; and copies of the original copy (the fixation) made for the market. Since copyright is a series of rights to which a given work is subject, copyright does not give the copyright holder (even the author) ownership of the work, only the ownership of rights. One who exercises a right of the copyright holder uses the copyright; one who does not uses only the work (or the copy of the work). This distinction is what makes so important the definition of the copyright owner's right to copy as only the right to copy for the purpose of marketing the copies made.

One who copies--or makes another use of--a work for a non-market purpose (such as teaching, scholarship, or research) uses the work; one who copies--or makes another use of--a work for the market uses the copyright. The point is that a purchaser pays for the use of the work when he or she buys a copy of it. The distinction between the work and the copyright thus enables one to distinguish the use of the work, which does not interfere with the owner's marketing right, and the use of the copyright, which does. Recognizing that a use of the work never involves a use of the copyright, but a use of the copyright always involves a use of the work helps avoid confusion.

### 2. The Three Types of Copyrightable Works: Creative Works, Compilations, and Derivative Works

The three kinds of copyrighted works are: (1) a creative work (Sec. 102(a)); (2) a compilation (Sec. 103); and (3) a derivative work

GSU002551

EXHIBIT 26 - 29

(Sec. 103). Only original portions of these works are protected by copyright, and since fair use is necessary only when using copyrighted material, it follows that the application of fair use criteria will differ for different type works. A novel will contain more original material than a compilation.

## 3. The Three Kinds of Fair Use: Creative, Personal, and Educational

There are also three kinds of fair use: (1) creative fair use; (2) personal fair use; and (3) educational fair use. Creative fair use involves the use of another work in creating one's own work; personal use involves the use of a copyrighted work for learning or entertainment; and educational fair use involves the use of copyrighted works for teaching, scholarship, or research. As a general proposition, creative fair use involves a use of the copyright; personal and educational fair use involve only a use of the work, as discussed below.

### a) Creative Fair Use: Authors Using Other Copyrighted Works to Create a New Work

Creative fair use is use by one author of another author's work in creating his or her own original work. It is the earliest--and during the nineteenth century was the only--form of fair use. Thus, in his nineteenth-century classic on copyright, Easton S. Drone said:

It is a recognized principle that every author, compiler or publisher may make use of a rival or other publication. The recognition of this doctrine is essential to the growth of knowledge; as it would obviously be a hindrance to learning if every work were a sealed book to all subsequent authors. The law, therefore, wisely allows a 'fair use' to be made of every copyrighted production. . . . (9)

The use of another's work to create one's own often means also the use of the copyright of that work, since it may interfere with the marketing right of the copyright holder. An author who abridges another author's work, for instance, makes use of the work that is so extensive it is also a use of the copyright. It is when the use of a work extends to the use of the copyright in creating a new work that creative fair use comes into play. The essential question is always how much of an intrusion on the copyright of the original work will be fair.

The three factors to aid in this determination were named in the 1841 case, *Folsom v. Marsh*, that created the right of fair use, when the court said that one must "look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." (10) Thus the factors were: (1) the nature of the work, (2) the amount used, and (3) the effect on the market--the same factors, except for purpose of the use, now in section 107. (The purpose of the use, the first factor listed in section 107, was not listed in the *Folsom* case because that factor implies other kinds of fair use--personal and educational fair use--that were neither necessary nor recognized until the 1976

GSU002552

EXHIBIT 26 - 30

Copyright Act.)

**b) Personal Fair Use: Use of Copyrighted Works for One's Own Learning or Enjoyment**

Personal fair use is a use of the work by an individual for his or her learning or entertainment. For example, copying for scholarship and research uses are personal uses permitted by section 107, as is taping a copyrighted motion picture off-the-air for later viewing--a personal fair use permitted by ruling of the U.S. Supreme Court.(11) This is consistent with the traditional view of one's right to use a copy of a work, e.g. a book, as stated by Justice Brewer of the U.S. Supreme Court when he said:

[T]he effect of a copyright is not to prevent any reasonable use of the book which is sold. I go to a book-store and I buy a book which has been copyrighted. I may use the book for reference, study, reading, lending, copying passages from it at my will. I may not duplicate that book and thus put it on the market, for in doing so I would infringe the copyright. But merely taking extracts from it, merely using it, in no manner infringes the copyright.(12)

Most authorities now treat personal use as being under the fair use umbrella. But since personal fair use is a use of the work--not the copyright--it is always a protected use.

**c) Educational Fair Use: Use of Copyrighted Works for Teaching or for Scholarship or Research**

Educational fair use, as the statute makes clear, is a use of the work for teaching, scholarship, or research. There is some overlap between creative use, educational use, and personal use since copying is necessary for all three. This may be one reason that Congress in the 1976 Copyright Act took special pains to protect educational fair use, as shown by four provisions of the statute: (1) the use of works for "teaching (including multiple copies for classroom use)" as an exemplar of fair use (Sec. 107); (2) the distinction between commercial and nonprofit educational use (Sec. 107(1)), a superfluous distinction unless it means special protection for educational use; (3) the provision that fair use overrides the limitations on library photocopying (Sec. 108(f)(4)); and (4) the good-faith defense for employees of nonprofit educational institutions, libraries, and archives (Sec. 504(c)(2)).

It should be noted that two cases have dealt indirectly with educational fair use, *Basic Books, Inc. v. Kinko's Graphic Corp.*(13) and *Princeton University Press v. Michigan Document Services.*(14) Both of these cases were infringement actions against a commercial copyshop that copied coursepack materials for classroom use at the request of professors. Both courts held that the commercial copyshops were not entitled to the right of fair use, but it is worthy of note that the *Princeton University Press* court did not decide whether "it would be fair use for the students or professors to make their own copies," because "the copying complained of here was

GSU002553

EXHIBIT 26 - 31

performed on a profit-making basis by a commercial enterprise." **(15)** It is also worthy of note that there were three very strong dissents in that case, one of which noted that "[t]here is no legal precedent and no legal history that supports our Court's reading of this phrase ["multiple copies for classroom use"] in a way that outlaws the widespread practice of copying for classroom use by teachers and students," and that the Supreme Court, the only court whose rulings apply nationwide, has not ruled on the issue. **(16)**

*Kinko's* was an order of the U.S. District Court of the Southern District of New York and such orders are binding only in that district. Moreover, the Attorney General of the State of Georgia has issued an unofficial opinion contrary to *Kinko's* (and *Princeton University Press*) (Attorney General's Opinion No. U96-4 [Feb. 15, 1996]). The Opinion takes the position that the plain language of the statute ("multiple copies for classroom use" is an exemplar of fair use) means what it says.

A third case to be noted is *American Geophysical Union v. Texaco,* **(17)** which dealt with photocopying by a for-profit corporation for research purposes (the copies were made by a scientist in the research lab). The court held that the for-profit corporation was not entitled to the right of fair use, but said "our opinion does not decide the case that would arise if Chickering [the copier] were a professor or an independent scientist engaged in copying and creating files for independent research." **(18)**

## 4. The Fair Use Factors in Relation to the Type of Work and the Kind of Use

The fair use statute lists four non-exclusive factors--purpose of the use, nature of the work, amount used, and market effect--in determining whether a use is fair (that is, whether the use improperly intrudes upon the market monopoly of the copyright holder).

The statute, however, does not provide any guidance for using the factors, except for distinguishing commercial and non-profit educational use in factor one. Presumably, this is because fair use is a fact-intensive determination and all the factors are to be applied to each work alleged to have been infringed on a work-by-work basis. Thus, the Supreme Court has ruled that, contrary to lower court rulings, the fourth factor is no more important than the other three, and that all the factors are to be considered together.

The important point is that the purpose of the factors is to protect the marketing monopoly of the copyright owner against unfair intrusion and both the type of work and the kind of use involved must be related to that purpose. Further, the factors are not exclusive, and the relevance of the additional factors will vary according to the type of work and the kind of use intended.

## 5. Fair Use and the Rights of the Copyright Holder

Although fair use is applied most often when the copyrighted work is copied, the fair use statute does not limit fair use to the

GSU002554

EXHIBIT 26 - 32

reproduction right or to any one right of the copyright holder. Since fair use applies to all the copyright holder's rights, the preparation of a derivative work (for example, a parody) and the public distribution, public performance, or public display of a work (as well as copying) can be a fair use.

Generally, however, the key element in determining whether a use is fair or not is the amount of the work used. If the amount copied is so much that it violates the copyright holder's right to reproduce the work in copies, it is infringing (and the same infringer can also be guilty of infringing by distributng, performing, or displaying the work publicly). But if the amount copied conforms to fair use criteria, the fact that the portion copied is distributed, performed, or displayed publicly does not deprive the copied material of its fair use status. For example, to quote a verse from a long copyrighted poem that is heard by millions of people viewing a television broadcast does not change the fair use into an infringing use.

The above reasoning applies equally to creative fair use and educational fair use, but not to personal use. As a fair use, personal use is unique in that it involves only a use of the work, not the copyright, and is always a protected use. For example, to copy a copyrighted motion picture off-the-air for later viewing is a personal use of the work.

[Contents]

## E. Nonstatutory Fair Use Guidelines

The promulgation of "fair use guidelines" by various groups has become a common practice since the "Classroom Guidelines" were included in the House Report on the 1976 Act. These guidelines are quantitative in nature, providing the precise amount of a work to be used. For example, the "Classroom Guidelines" permit a teacher to make a single copy "for his or her individual scholarly research or use in teaching or preparation to teach a class" of a chapter from a book or an article from a periodical or newspaper; however, multiple copies for classroom use must meet the tests of brevity and spontaneity. Brevity is defined as "a complete article, story or essay of less then 2,500 words, or (b) an excerpt from any prose work of not more than 1,000 words or 10% of the work, whichever is less, but in any event a minimum of 500 words." **(19)**

However, since any set of quantitative rules has the effect of overriding the fair use statute, it is important to understand that such guidelines (including the "Classroom Guidelines") are not law and thus cannot be legally binding. Quantifying fair use is contrary to the statutory right of fair use, which authorizes the user to exercise his or her judgment in accordance with the provisions of section 107. Private agreements do not eviscerate constitutionally based rights granted by congressional statutes--at least for those who are not parties to the agreement.

GSU002555

EXHIBIT 26 - 33

[Contents]

## F. Overbroad Copyright Notices

Copyright notices are often inflated to read as if the copyright holder's right to copy is absolute, saying, for example, that no one may copy any portion of the book in any manner without the written permission of the publisher.(20) Literal compliance with such inflated notices would do away with the right of fair use, a clear signal that such notices are incorrect. This conclusion is supported by the 1991 holding of the U.S. Supreme Court that there is a *constitutional right* to copy public domain material from a copyrighted work, which could not be exercised if the copyright holder's right to copy were absolute.(21) As recently as 1994, the Court said: "We have often recognized the monopoly privileges that Congress has authorized . . . are limited in nature and must ultimately serve the public good."(22) In other cases, the Court has said copyright "protection has never accorded the copyright owner complete control over all possible uses of his work;"(23) the ultimate aim of copyright is "to stimulate artistic creativity for the general public good,"(24) and "the primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts'."25 These rulings, of course, would mean nothing if the copyright holder's right to copy were absolute.

Copyright notices that assert rights of the copyright holder beyond those granted by the copyright statute are extra-legal and inefficacious. The statute provides that a copyright notice shall consist of the word "Copyright" or the letter "C" in a circle, the name of the copyright owner, and the date. One may disregard extraneous matter in copyright notices and rely on the copyright statute for determining what may be copied as a matter of fair use.

[Contents]

## G. Conclusion

The application of the fair use statute, section 107, requires respect for the rights of copyright holders without compromising one's own rights. This is not a matter of selfishness, for to the extent users compromise their own rights in the fair use of copyrighted material, they compromise the rights of all users and ultimately defeat one of the purposes of the fair use: to keep the expanded copyright monopoly within its constitutional boundaries. The effort requires the exercise of sound judgment and common sense that depends in large part upon understanding that copyright law is not an end in itself, but a means to an end--the promotion of learning--which is essential to a free society.

The 1976 Copyright Act states the rights of copyright holders in great detail, an indication of the importance of regulating copyright and

GSU002556

EXHIBIT 26 - 34

maintaining an appropriate balance between the rights of holders and the rights of users. Despite their complexity, however, the rules as to the rights of copyright holders--apart from the adaptation right--can be reduced to one: The exclusive right to sell copies of the work to the public, to perform the work publicly, or to display the work publicly, depending upon the type of work. That is, the copyright holder's right is essentially a monopoly for marketing the work.

The fair use statute provides in plain language that "multiple copies for classroom use" and copying for scholarship and research are exemplars of fair use. The rule of thumb for copying for these purposes, then, can be stated as follows: Does the copying interfere with the selling of the work in the marketplace? To put the point another way: Is the copying a substitute for purchasing a work that is readily available? If the answer is no, the presumption is that educational use is a use of the work, which is always a fair use consistent with the constitutional purpose of copyright, the promotion of knowledge and learning.

[Contents]

## PART IV. LEGAL AUTHORITIES

The following legal authorities are constitutional, statutory, and decisional law, although the decisions are limited to those of the U.S. Supreme Court. They are provided for purposes of reference. Comments are provided for additional background.

### A. The Copyright Clause of the U.S. Constitution (Article I, section 1, clause 8)

*The Congress shall have Power . . . To Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries. . . .*

**Comment:** The copyright clause is in the intellectual property clause, which also contains the patent clause. The italicized portions above are the copyright clause. The source of this language is the title of the first English copyright statute, called the State of Anne, 8 Anne, c. 19, enacted in 1710, which also served as the model for the first U.S. Copyright Act in 1790. The title of the English statute reads:

An act for the encouragement of learning, by vesting the copies of printed books in the authors or purchasers of such copies, during the time therein mentioned.

Apparently the copyright clause is the only provision of the Constitution for which we can identify its precise source. The English

GSU002557

EXHIBIT 26 - 35

copyright statute is thus an annotation of the copyright clause, and since the English act applied only to printed books, "the exclusive Right" in the copyright clause was probably intended to be the right to publish the writings, that is a monopoly for publishing books. In view of the various media by which a work can be marketed, the right today can best be interpreted as "the exclusive Right" to market work.

[Contents]

B. Selected Provisions of the Copyright Statute (17 U.S.C. §101 et seq.)

1. Sec. 101. Definitions

a) A "**collective work**" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

b) A "**compilation**" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

c) "**Copies**" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

d) A work is "**created**" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

e) A "**derivative work**" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

f) To "**display**" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or

GSU002558

EXHIBIT 26 - 36

process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

g) **"Publication"** is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

**Comment:** There are three points to be noted. First, not all the statutory definitions are listed. Second, the statute does not define a creative work (the traditional paradigm for copyright as an author's right), but it describes compilations and derivative works in some detail. Thus, it distinguishes between the kinds of compilations, that is a compilation of data and collective works. This is because rights as to compilations and derivative works are limited by the requirement of originality, as section 103 makes clear. Third, the definitions of "copies" and "created" make clear that a work is distinct from a copy of the work. Because a work cannot be protected unless it is fixed in a copy, it follows that it is the copy that is protected, not the work. The fact that the copy is congruent with the work does not change this, because the work cannot be protected unless and until it is fixed.

[Contents]

## 2. Sec. 102. Subject Matter of Copyright: In General

a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

a. literary works;
b. musical works, including any accompanying words;
c. dramatic works, including any accompanying music;
d. pantomimes and choreographic works;
e. pictorial, graphic, and sculptural works;
f. motion pictures and other audiovisual works;
g. sound recordings; and
h. architectural works.

b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of

GSU002559

EXHIBIT 26 - 37

operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

**Comment:** Section 102(a) states the constitutional condition for copyright, the writing of an author, in the words "an original work of authorship fixed in a tangible medium of expression." This condition must be fulfilled before the other provisions of the statute comes into play.

The most important change from prior statutes in section 102(a) is that copyright exists from the moment of fixation. Under prior statutes, copyright did not exist until the work was published (a means of insuring public access). The list of the categories of copyrightable works is primarily for the convenience of the Copyright Office, which registers copyrights, and has no substantive effect. A literary work, for example, cannot be protected by copyright if it is not original.

Section 102(b) excludes ideas from copyright protection and is the codification of a nineteenth century U.S. Supreme court decision, *Baker v. Selden,(25)* which held that copyright would not protect a system of bookkeeping.

**[Contents]**

### 3. Sec. 103. Subject Matter of Copyright: Compilations and Derivative Works

a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

**Comment:** Section 103 limits the copyright protection for compilations and derivative works to the original components of those works and should be read in light of the definitions of "compilations" and "derivative works" in section 101.

**[Contents]**

GSU002560

EXHIBIT 26 - 38

## 4. Sec. 105. Subject Matter of Copyright: United States Government Works

Copyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest; or otherwise.

**Comment:** This section emphasizes that works of the U.S. Government cannot be protected by copyright. The section does not apply to works of state governments.

[Contents]

## 5. Section 106. Exclusive Rights in Copyrighted Works

Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

a. to reproduce the copyrighted work in copies or phonorecords;
b. to prepare derivative works based upon the copyrighted work;
c. to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
d. In the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
e.
   in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the Individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
f. in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**Comment:** Section 106 states the rights of the copyright holder. Three points are important: (1) the copyright holder must comply with section 102(a) before these rights are available; (2) even if a work is copyrighted, the copyright does not protect public domain material within the work; and (3) even though the rights are said to be exclusive, they are subject to the limitations in sections following section 106, the most important of which is the fair use statute, section 107.

The basic issue about section 106 is whether section 106(1) is an absolute right to copy. Since the rights of section 106 are subject to

GSU002561

EXHIBIT 26 - 39

sections 107 through 120, the copyright holder's right to reproduce copies cannot be absolute. In view of the limitations on Congress' power, there is serious doubt that Congress could grant the copyright owner the absolute right to reproduce copies.

[Contents]

## 6. Sec. 107. Limitations on Exclusive Rights: Fair Use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include:

a. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
b. the nature of the copyrighted work;
c. the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
d. the effect of the use upon the potential market for or value of the copyrighted work. The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

**Comment:** Section 107 is a statute within a statute. The important point about the section is that it grants rights to users and is to be interpreted accordingly. Arguably, without section 107, the 1976 Copyright Act would be unconstitutional in light of the limitations in the copyright clause on Congress' power to enact copyright legislation. Thus, without section 107, section 106(1) would give the copyright owner the absolute right to copy, which would mean that copyright could be used to inhibit rather to promote learning.

[Contents]

## 7. Sec. 201. Ownership of Copyright

a) *Initial Ownership.* Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are co-owners of copyright in the work.

b) *Works Made for Hire.* In the case of a work made by hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and unless the parties have expressly agreed otherwise in a written instrument signed by them,

GSU002562

EXHIBIT 26 - 40

owns all of the rights comprised in the copyright.

**Comment:** Section 201(a) makes clear that ownership of a copyright vests initially in the author. Thus publishers hold copyrights as assignees of authors. Section 201(b) is what is called a legal fiction, that is a proposition that has legal effect but is not true as a matter of fact. The fiction in this case is that the employer of an author for whom the work is prepared is the author of the work. It is necessary to use a fiction to place the copyright in the employer because the copyright clause enables Congress to grant copyright only to authors.

An important point about section 201(a) is that it deals only with ownership of the copyright, not the work. From this, it follows that the copyright statute itself deals only with the ownership of the right, not of the work. Indeed, the copyright clause does not enable Congress to grant ownership of writings, only an "exclusive Right" to which writings are subject.

**[Contents]**

## 8. <u>Sec. 202. Ownership of Copyright as Distinct From Ownership of Material Object</u>

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

**Comment:** Section 202 is consistent with the view that the subject of the copyright statute is ownership of the copyright, not the work. Thus, it makes clear that ownership of the copyright is separate from the physical object in which the work is embodied, that is the copy, as defined in section 101. This view is consistent with the U.S. Supreme Court rulings.

The statute is much longer and more complex than these excerpts indicate. A copy of the complete statute is available from the Copyright Office, Library of Congress, Washington, D. C., and, of course, the statute may be examined in any law library. It is Title 17 of the United States Code.

**[Contents]**

## C. Copyright Decisions of the U.S. Supreme Court

Decisions of the U.S. Supreme Court are the law of the land the same as a statute enacted by Congress. Once rendered, only the Court

GSU002563

EXHIBIT 26 - 41

can change the law that a decision contains, unless Congress enacts a statute to overturn it. If the decision is based on the U.S. Constitution, however, not even Congress can overturn it. Only an amendment to the Constitution can change constitutional law.

The Supreme Court has rendered relatively few copyright decisions in its two-hundred year history, but those that it has rendered establish the constitutional parameters of copyright and thus are critical to an interpretation of the copyright statute. The following cases are the most important for this purpose. Each is discussed under a heading stating the point for which the case is discussed.

## 1. Copyright Is a Statutory Grant, Not Common Law Property

*Wheaton v. Peters*, 34 U.S. 591 (1834). This case was the Supreme Court's first copyright case. A former reporter of the Supreme Court, Wheaton, who published the Court's decisions, sued his successor, Richard Peters, who reprinted Wheaton's reports along with the reports of later decisions thatThe published. Wheaton depended upon royalties from the sale of his reports as compensation for his work as reporter and sued Peters for copyright infringement.

Wheaton claimed that in addition to the statutory copyright, an author was entitled to a copyright under the common law by reason of the natural law. An author creates a work, his lawyers argued, and it is only right and just thaThe or she have the copyright of that work (in perpetuity).

The Court rejected Wheaton's argument, and said:

That an author, at common law, has a property in his manuscript, and may obtain a redress against any one who deprives him of it, or by improperly obtaining a copy, endeavors to realize a profit by its publication, cannot be doubted; but this is a very different right from that which asserts a perpetual and exclusive property in the future publication of the work, after the author shall have published it to the world. The argument that a literary man is as much entitled to the product of his labor as any other member of society, cannot be controverted. And the answer is, thaThe realizes this product by the transfer of his manuscripts, or in the sale of his works, when first published. A book is valuable on account of the matter it contains, the ideas it communicates, the instruction or entertainment it affords. Does the author hold a perpetual property in these? Is there an implied contract by every purchaser of his book that he may realize whatever instruction or entertainment which the reading of it shall give, but shall not write out or print its contents. (33 U.S. at 657)

Congress . . . by this [copyright] act, instead of sanctioning an existing right, as contended for, created it. (33 U.S. at 661)

**Comment:** The *Wheaton* case established the theoretical base for American copyright law under the Constitution and that base still

GSU002564

EXHIBIT 26 - 42

exists today. Copyright is a limited monopoly granted by a statute enacted by Congress. Had the Court ruled for Wheaton, the result would have been that copyright is an unlimited monopoly granted by judicial decisions rendered by judges.

[Contents]

## 2. Ownership of Copyright Is Separate From Ownership of a Copy of the Work

*Stephens v. Cady*, 55 U.S. 528 (1852). In this case, the defendant bought the copperplate of a map at a sheriff's sale, and the question was whether the purchase of the plate carried with it the right to print and publish the map engraved upon it. The Court said it did not.

[T]he property acquired by the sale in the engraved plate, and the copy-right of the map secured to the author under the act of Congress, are altogether different and independent of each other, and have no necessary connection. The copy-right is an exclusive right to the multiplication of the copies, for the benefit of the author or his assigns, disconnected from the plate, or any other physical existence. (55 U.S. at 529)

The Court analogized the property in the plate to the property in a manuscript.

[T]he property in the copy-right is regarded as a different and distinct right, wholly detached from the manuscript, or any other physical existence, and will not pass with the manuscript unless included by express words in the transfer. (55 U.S. at 530)

**Comment:** Apparently this is the first Supreme Court case that makes clear the distinction between the ownership of the copyright and the ownership of a physical manifestation of the work.

There are three versions of a work for copyright purposes: the work, its fixation, and copies of the work as fixed. A work, of course, can exist independently of fixation, which is the original copy made by the author, e.g. a manuscript, which in turn is used to make copies. The term fixation is used to distinguish the original copy from the copies that are made from it to be sold, e.g., a book.

In this case, the copper plate was the original fixation owned by the artist who created it and which, the Court held, could not be used to make copies, because the artist continued to own the copyright; if the owner of the copper plate made copies, he would be using the copyright.

*American Tobacco Co. v. Werckmeister*, 207 U.S. 284 (1907). This case was an infringement action against the American Tobacco

GSU002565

EXHIBIT 26 - 43

Co. for copying and using a painting for advertising without the permission of the copyright owner, to whom the artist had sold the copyright. The defense was that the painting had been publicly exhibited without a copyright notice, which the statute required. The Court held that the notice did not have to be affixed to the original painting, only copies of the painting. Therefore, the copyright had not been lost by publicly displaying the painting without the copyright notice.

[T]he purpose of the copyright law is not so much the protection of the possession and control of the visible thing, as to secure a monopoly having a limited time, of the right to publish the production which is the result of the inventor's thought. (207 U.S. at 292)

It is not the physical thing created, but the right of printing, publishing, copying, etc., which is within the statutory protection. (207 U.S. at 297)

While it is true that the property in copyright in this country is the creation of statute, the nature and character of the property grows out of the recognition of the separate ownership of the right of copying from that which inheres in the mere physical control of the thing itself, and the statute must be read in the light of the intention of Congress to protect the intangible right as a reward of the inventive genius that has produced the work. (207 U.S. at 297-98)

**Comment:** This case provides the most extensive discussion of the nature of copyright as separate from the work. The copyright of the painting was distinct from, and did not pass with, the sale of the painting. As the case makes clear, there is a difference between the use of the copyright and the use of the work, and the former is what the Copyright Act protects. The Court noted that the painting (the work) was hanging in a dining room in England, a traditional use of such a work.

**[Contents]**

## 3. The Copyright Holder Does Not Own the Copyrighted Work

*Baker v. Selden*, 101 U.S 99 (1880). The plaintiff in this case held the copyright on a book about bookkeeping and sued for infringement because the defendant published a book using the same ideas but expressing them in a different way. The Court said that if plaintiff had the exclusive right to use the system explained in the book, the defendant infringed; but if the system was not protected by copyright, the defendant did not infringe. The Court held for the defendant.

[T]here is a clear distinction between the book, as such, and the art which it is intended to illustrate. The mere statement of the proposition is so evident, that it requires hardly any argument to support it. (101 U.S. at 102)

GSU002566

EXHIBIT 26 - 44

**Comment:** *Baker v. Selden* is one of the two or three most important copyright cases of the Supreme Court. It is usually cited for the proposition that copyright cannot be used to protect ideas, which is codified in section 102(b) of the Copyright Statute. The traditional statement is that copyright protects the expression of the ideas, but not the ideas themselves. The fact that copyright cannot protect ideas means, of course, that the author cannot own the ideas, which is the basis of the fundamental proposition for which the case stands: The author of a work does not own the work, only the copyright of the work.

The decision was made long ago that the statute would provide only rights to which the work is subject. Thus the copyright clause does not empower Congress to grant ownership of the work to an author, only ownership of the copyright.

**[Contents]**

## 4. Copyright Is a Series of Rights to Which a Work Is Subject

*Dowling v. United States*, 473 U.S. 207 (1985). This case was a criminal prosecution for the transportation of stolen goods under a federal statute. The goods that the defendant shipped were "bootleg" phonorecords of Elvis Presley sound recordings, which the defendant had acquired lawfully. The Court had to determine "whether phonorecords that include the performance of copyrighted musical compositions for the use of which no authorization has been sought nor royalties paid are consequently 'stolen, converted or taken by fraud' for purposes" of the statute under which defendant was prosecuted. 473 U.S. at 216.

The Court held that they were not and reversed the conviction, but in order to make its decision, it had to determine the nature of copyright, and that is the importance of the case for understanding copyright. The following quotes from the case, with citations omitted, define copyright.

[T]he Government's theory here would make theft, conversion, or fraud equivalent to wrongful appropriation of statutorily protected rights in copyright. The copyright owner, however, holds no ordinary chattel. A copyright, like other intellectual property, comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections. 'Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright.' . . . However, '[t]his protection has never accorded the copyright owner complete control over all possible uses of his work.' . . . For example, §107 of the Copyright Act 'codified the traditional privilege of other authors to make 'fair use' of an earlier writer's work.' . . . Thus, the property rights of a copyright holder have a character distinct from the possessory interest of the owner of simple 'goods, wares, [or] merchandise,' for the copyright holder's dominion is subjected to precisely defined limits. . . .

The infringer invades a statutorily defined province guaranteed to the copyright holder alone. But he does not assume physical

GSU002567

EXHIBIT 26 - 45

control over the copyright; nor does he wholly deprive its owner of it is use. (473 U.S. at 216-217)

**Comment:** The Court's careful definition of copyright made clear the nature of copyright as a series of limited rights to which a work is subject; but perhaps it is most useful in making clear the distinction between the copyright and the work. Although it was clear that the defendant was wrong in infringing the copyright, that did not give the U.S. Government, acting under a criminal statute, the right to disregard the possessory property right the defendant had in the physical manifestation of the recordings.

**[Contents]**

## 5. Copyright Does Not Negate Property Right of Purchaser of Copy of the Work

*Bobbs-Merrill Co. v. Straus,* 210 U.S. 339 (1908). In this case, the copyright holder sought to use the copyright notice to control the purchase price of books sold at retail by R. H. Macy Co., which had purchased the books from a wholesaler. Macy Co. sold the book for 89 cents, despite the following legend inserted with the notice:

The price of this book at retail is $1 net. No dealer is licensed to sell it at a less price, and a sale at a less price will be treated as an infringement of the copyright. The Bobbs-Merrill Company.

The copyright holder contended "the statute vested the whole field of the right of exclusive sale in the copyright owner; thaThe can part with it to another to the extent thaThe sees fit, and may withhold to himself, by proper reservations, so much of the right as he pleases." 210 U.S. at 349.

The Court said the precise question is:

Does the sole right to vend . . . secure to the owner of the copyright the right, after a sale of the book to a purchaser, to restrict future sales of the book at retail, to the right to sell it at a certain price per copy, because a notice in the book that a sale at a different price will be treated as an infringement. . . . (210 U.S. at 350)

In our view the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose, by notice, . . . a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract. . . . What the complainant contends for embraces not only the right to sell the copies, *but to qualify the title of a future purchaser* by the reservation of the right to have the remedies of the statute against an infringer because of the printed

GSU002568

EXHIBIT 26 - 46

notice of its purpose so to do unless the purchaser sells at a price fixed in the notice. To add to the right of exclusive sale the authority to control all future retail sales . . . would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment. (emphasis added). (210 U.S. 350-51)

**Comment:** A person who buys a book has a property right in that book as a physical object. This case says that copyright cannot be used to negate that property right by the use of a copyright notice attempting to restrict that right. The same reasoning applies to copyright notices that purport to restrict the right of a the owner of a book to copy any passages from the book.

**[Contents]**

## 6. Personal Use of Copyrighted Work Is a Fair Use

_Sony Corp. v. Universal City Studios_, 464 U.S. 417 (1984) . This was a case brought by motion picture studios against the manufacturer of videocassette recorders that could be used to copy copyrighted motion pictures off-the-air when broadcast on television. The theory was that the manufacturer of a device capable of infringing copyrighted works should be held liable for the use of that device to infringe.

The purpose of the litigation was to get a ruling that copying copyrighted motion pictures off-the-air was an infringement in order to lay the predicate for a compulsory license, which could work in several ways. One way would be to require the manufacturer to pay fees to a fund for every VCR manufactured or sold; the other would be to impose a fee on blank tapes. Either way, of course, the consumer would pay the fee. The license fees would be distributed to the copyright holders, that is, the motion picture companies, according to a formula.

The Supreme Court sustained the fair use defense and thus defeated the plan for compulsory license fees, and in doing so discussed the philosophy underlying copyright.

The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. (464 U.S. at 429)

[The task is to define] the scope of the limited monopoly that should be granted to authors . . . to give the public appropriate access to their work product. . . . [T]his task involves a difficult balance between the interests of authors . . . in the control and exploitation of their writings . . . on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the

GSU002569

EXHIBIT 26 - 47

other hand. . . . (464 U.S. at 429)

[Copyright] protection has never accorded the copyright owner complete control over all possible uses of his work. . . . All reproductions of the work . . . are not within the exclusive domain of the copyright owner; some are in the public domain. Any individual may reproduce a copyrighted work for a 'fair use'; the copyright owner does not possess the exclusive right to such a use. . . . anyone . . . who makes a fair use of the work is not an infringer of the copyright with respect to such use. (464 U.S. at 432–33)

**Comment:** The Court held that an individual who copies a copyrighted motion picture off-the-air to view it at a later time is making a fair use of the copyright. Although the Court did not use the term, this use is appropriately characterized as a personal use.

It is interesting to note that immediately after the Court handed down the *Sony* decision, members of the motion picture industry sought to have Congress overturn it by statute, claiming that otherwise the industry would be ruined. Congress refused. That was in 1984, and the industry seems to be prospering very well with the sale and rental of videocassettes, although people are still free to copy the motion pictures off-the-air as a matter of personal use.

**[Contents]**

### 7. Copyright Law Protects the Public Domain

*Feist Publications, Inc. v. Rural Telephone Co.,* 499 U.S. 390 (1991). In this case, the Court overruled some seventy years of precedent and held that the white pages of telephone directories do not have sufficient originality to be protected by copyright; originality is a constitutional condition for copyright protection. Said the Court:

Originality is a constitutional requirement. (449 U.S. at 346)

As one pair of commentators succinctly puts it: 'The originality requirement is constitutionally mandated for all works.' Patterson & Joyce, Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations, 36 UCLA L.Rev. 719, 763, n. 155 (1989). (449 U.S. at 347)

The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the sine qua non of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author. (Patterson & Joyce 800–802)

GSU002570

EXHIBIT 26 - 48

It may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation. As Justice Brennan has correctly observed, however, this is not 'some unforeseen byproduct of a statutory scheme.' . . . It is, rather, 'the essence of copyright,' . . . *and a constitutional requirement.* (emphasis added). (449 U.S. at 349)

Without a doubt, the 'sweat of the brow' doctrine flouted basic copyright principles. . . . But 'sweat of the brow' courts took a contrary view; they handed out proprietary interests in facts . . . 'But to accord copyright protection on this basis alone distorts basic copyright principles in that it creates a monopoly in public domain. . . .' (499 U.S. at 354)

**Comment:** The *Feist* case is one of the most important copyright cases the Supreme Court has decided. The Court's emphasis on originality as a constitutional condition for copyright shows the extent to which copyright law protects material in the public domain from the monopoly of

copyright. Thus, the Court said that there is a constitutional right to use public domain material that is contained in a copyrighted work.

[Contents]

## 8. Primary Function of Copyright is to Provide Public Access

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). In this case, defendant won an infringement action and applied for attorney's fees under section 505 of the copyright statute. Although the lower court granted successful plaintiffs attorneys' fees as a matter of right, it treated successful defendants differently and required them to show that the defeated plaintiff's action was frivolous or brought in bad faith. The Supreme Court rejected this dual standard and said:

Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement. . . . [A] successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright. (510 U.S. 527)

**Comment:** The Court's ruling is important for defendants in infringement actions, but it is more important for the law of copyright because it emphasizes the purpose of copyright as "enriching the general public through access." Public access is ultimately the only

GSU002571

EXHIBIT 26 - 49

justification for the grant of the copyright monopoly.

**[Contents]**

## 9. Fair Use Is to Be Determined Individually for Each Work

*Campbell v. Acuff-Rose*, 510 U.S. 569 (1994). Plaintiff music publisher sued defendant rap group for parodying and recording its copyrighted song, "Oh, Pretty Woman." Defendant claimed the parody was a fair use. The Court of Appeals held for plaintiff, saying that commercial use requires a presumption of unfair use, because the effect on the potential market is the most important element of fair use.

The Supreme Court reversed, holding that a parody may be a fair use, and explained that the fair use doctrine "calls for case-by-case analysis. . . . Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." 510 U.S. at 577.

**Comment:** The Court in this case corrects two common errors of many lower courts. One error was to treat the fourth statutory factor (market effect) as being the most important factor; the other error was to give copyrighted works class treatment by holding, for example, that since the copying of material from one book is infringement, copying from all books is infringement. The lower courts used this proposition as a predicate for granting a permanent injunction enjoining defendant from copying from any book.

The Court took note of this practice and suggested that "the goals of copyright law . . . are not always best served by automatically granting injunctive relief when parodists are found to have gone beyond the bounds of fair use." The Court pointed out that infringements that are simple piracy are to be distinguished from those raising reasonable contentions of fair use, and explained that the copyright holder's interest can be adequately protected by an award of damages for infringement. 510 U.S. at 578 n. 10.

**[Contents]**

## 10. Copyright Is to Serve the Public Interest in Preference to Private Interests

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). This case is used for this proposition because it is the most recent. The passage from the case quoted below indicates the extent to which the Court has used and relied on the proposition that copyright is to serve the public interest in preference to private interests.

GSU002572

EXHIBIT 26 - 50

We have often recognized the monopoly privileges [of copyright] that Congress has authorized, while 'intended to motivate the creative activity of authors and inventors by the provision of a special reward,' are limited in nature and must ultimately serve the public good. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). For example, in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), we discussed the polices under the 1909 Copyright Act as follows:

'The limited scope of the copyright holder's statutory monopoly . . . reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good.' (Footnotes omitted.)

We reiterated this theme in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991), where we said:

'The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' To this end, copyright assures authors the right to their original expression, encourages others to build freely upon the ideas and information conveyed by a work.' (citations omitted.)

**Comment:** Few copyright scholars would dispute the point that lower courts have not always ruled in accordance with these rulings of the Supreme Court. There seem to be two reasons. One is that courts generally have failed to recognize the distinction between the copyright and the work. Without this understanding, there is no basis for distinguishing between the use of the copyright, which requires resort to fair use criteria, and the use of the work, which does not.

The second reason is that copyright has not been assigned a specific task in regard to the public interest other than the promotion of knowledge and learning. The general goal tends to succumb to the specific goal of protecting the copyright holder's private interest. One remedy for this unbalanced view is to recognize that copyright law protects the public interest in two specific ways: (1) It protects the public domain; and (2) it insures access to recorded knowledge and learning. Once these goals are recognized, it will be easier for courts to maintain a proper balance between the public interest in protecting the proprietary interest of copyright holders and the public interest in protecting the right of access for users.

[**Contents**]

GSU002573

EXHIBIT 26 - 51

## Members of the Regents Copyright Committee

Kris Biesinger
Assistant Vice Chancellor for Instructional Technology

Reid Christenberry
Associate Provost for Information Systems and Technology
Georgia State University

Corlis P. Cummings
Assistant Vice Chancellor for Legal Affairs

Miriam Drake
Dean and Director of Libraries
Georgia Institute of Technology

E. Gail Gunnells
Deputy Chief Legal Advisor
Georgia Institute of Technology

L. Ray Patterson
Pope Brock Professor of Law
University of Georgia

Bea Yorker
Associate Provost for Faculty Relations
Georgia State University

William Gray Potter, Chair
University Librarian
University of Georgia

GSU002574

EXHIBIT 26 - 52

[Contents]

## ENDNOTES

1. *Dowling v. United States*, 473 U.S. 207, 216-17 (1985).
2. See Part IV-C, Copyright Decisions of the U.S. Supreme Court, for cases so holding.
3. *Bobbs-Merrill v. Straus*, 210 U.S. 339 (1908).
4. 17 U.S.C. Sec. 501(a).
5. "While the law has never recognized an author's right to absolute control of his work, the natural tendency of legal rights to express themselves in absolute terms to the exclusion of all else is particularly pronounced in the history of the constitutionally sanctioned monopolies of the copyright and the patent." *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 432n. 13. (1984).
6. *Feist Publications Inc. v. Rural Telephone Service Co*, 499 U.S. 340, 349 (1991).
7. *Campbell v. Acuff-Rose*, 510 U.S. 569, 577 (1994) (the fair use doctrine "calls for case-by-case analysis").
8. *Stephens v. Cady*, 55 U.S. 528, 530 (1852).
9. Eaton S. Drone, *The Law of Property in Intellectual Productions (Drone on Copyright)* 386 (1879).
10. *Folsom v. Marsh*, 9 Fed. Cases 342, 348 (No. 4,901) (C.C.D. Mass. 1841).
11. *Sony Corp. v. Universal City Studios*, 464 U.S. 417 (1984).
12. *Stover v. Lathrop*, 33 F. 348, 349 (C.C.D. Col. 1888) (emphasis added).
13. 785 F. Supp. 1522 (S.D.N.Y. 1991).
14. 99 F. 3d 1381 (6th Cir. 1996).
15. 99 F. 3d at 1388.
16. 99 F. 3d at 1393.
17. 60 F. 3d 913 (2d Cir. 1995).
18. 60 F. 3d at 916.
19. H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. 68-69 (1976).
20. The copyright notice of the *Association of American Publishers 1994 Industry Statistics* reads in full as follows:

    c 1995 By Association of American Publishers,Inc. All rights reserved. No part of this report may be used or reproduced in any manner whatsoever without express permission from the Association of American Publishers,Inc.,

    Fifth Avenue, New York, NY 10003-3004.
21. *Feist Publications, Inc. v. Rural Telephone Service Co*, 499 U.S. 340, 349 (1991).
22. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994).
23. *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 432 (1984).

GSU002575

EXHIBIT 26 - 53

25. *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).
26. *Feist Publications, Inc. v. Rural Telephone Service Co*, 499 U.S. 340, 349 (1991).
27. 101 U.S. 99 (1880).

[**Contents**]

©2008 Board of Regents of the University System of Georgia
Contact USG | Disclaimer | Privacy

270 Washington Street, S.W., Atlanta, GA 30334
U.S.A

Last modified: April 10, 2007

Content Source: Office of Legal Affairs

GSU002576

EXHIBIT 26 - 54