Cambridge University Press et al v. Patton et al

Doc. 147 Att. 1

E
X
H
I
B
I
T

27

Dockets.Justia.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COPY

- - - - - - - - - - - - - - - - X
CAMBRIDGE UNIVERSITY PRESS, )
OXFORD UNIVERSITY PRESS, INC., )
and SAGE PUBLICATIONS, INC., )
)
Plaintiffs, )
)
-against- )
) Index No.
) 1:08-CV-1425-ODE
MARK P. BECKER, in his )
official capacity as Georgia )
State University President, et )
al., )
)
Defendant. )
- - - - - - - - - - - - - - - - X

DEPOSITION OF KENNETH D. CREWS
New York, New York
December 10, 2009

Reported by:
Judi Johnson, RPR, CRR, CLR
Job No.: 26678

767 Fifth Avenue
New York, New York

December 10, 2009
9:30 A.M.

Deposition of KENNETH D. CREWS, held at the offices of WEIL, GOTSHAL & MANGES, LLP, 767 Fifth Avenue, New York, New York, pursuant to Notice, before Judi Johnson, a Registered Professional Reporter, a Certified Realtime Reporter, a Certified LiveNote Reporter and Notary Public of the State of New York.

APPEARANCES:

WEIL, GOTSHAL & MANGES, LLP
Attorney for the Plaintiff
767 Fifth Avenue
New York, New York 10153-0119

BY: R. BRUCE RICH, ESQ.
HARRIS COHEN, ESQ.

KING & SPALDING, LLP
Attorney for the Defendant
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521

BY: STEPHEN M. SCHAETZEL, ESQ.
KRISTEN A. SWIFT, ESQ.

KENNETH D. CREWS

IT IS HEREBY STIPULATED AND AGREED by
and between the attorneys for the respective
parties herein, that filing and sealing and
the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.

IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be sworn to
and signed before any officer authorized to
administer an oath, with the same force and
effect as if signed and sworn to before the
Court.

- oOo -

KENNETH D. CREWS

KENNETH D. CREWS,

Called as a witness herein, having first been duly sworn, was examined and testified as follows:

BY THE REPORTER:

Q Please state your name and address for the record.

A Kenneth D. Crews, J.D., Ph.D., 535 West 114th Street, New York, New York 10027.

EXAMINATION

BY MR. RICH:

Q Good morning. Is it Mr., Doctor, Professor? What do you like to be called?

A Everybody calls me different things. But, I mean, formally, you could call me Professor Crews. But you can call me Kenneth or Kenny. I just don't go by Ken.

Q All right. We'll go with Professor Crews.

A All right.

Q Good morning, Professor Crews.

My name is Bruce Rich. As you know, I'm representing the plaintiffs in this lawsuit. And you are appearing today, I take it,

represented by the gentlemen to your right and by the law firm King & Spalding?

A Am I represented by them?

Q Yes.

A Well, they've invited me to be an expert in the case, yes, if that's what that means.

Q And you are appearing today as an expert witness in the proceeding; is that correct?

A That's correct.

Q All right. And what was the nature of the assignment you were given in relation to your expert testimony in this case?

A In relation to my expert testimony, if I understand correctly -- I mean, I'm a novice to this, so I may not appreciate all the fine details.

Q And if any of my questions are ever less than clear, please ask me to sharpen them.

A Well, thank you very much.

In April of 2009, I was asked to begin preparing a report, the report that you have in front of you that was filed in June, and then

later was asked to prepare a rebuttal report in response to the plaintiff's expert witnesses.

Q And what was the scope of your expert engagement starting with the preparation of the first expert report to which you refer?

A To respond to the issues related to electronic reserves and put them in context as I was familiar with them.

Q Was that the extent of your assignment as an expert?

A I was asked to prepare a report related to the case, knowing that the case was about copyright fair use electronic reserves, and that was the extent of the issues.

MR. RICH: Why don't we mark as Plaintiff's Exhibit 290 the June 1, 2009 expert report of Kenneth D. Crews.

(Whereupon, June 1, 2009 expert report of Kenneth D. Crews was marked as Plaintiff's Exhibit 290 for identification, as of this date.)

BY MR. RICH:

Q Can you identify the document that we've placed in front of you as Plaintiff's

KENNETH D. CREWS

Exhibit 290?

A Yes, I can.

Q What is it?

A It's labeled "Expert Report of Kenneth D. Crews, JD, Ph.D," and then the name of the case, title of the case and the court, dated June 1, 2009.

Q Have you ever seen that document before?

A Yes, I have.

Q What is it?

A It -- all indications are it appears to be the report that I wrote.

Q Why don't you take a minute and confirm that it is.

A (Witness complies.)

Q Barring typographic -- pardon me, Xerographic error, I assume that looks to be the report?

A It sure does look to be the report.

Q Now, if you turn to Page 2 of that document, please.

A Uh-huh.

Q In the last paragraph, you state in

KENNETH D. CREWS

the first sentence, "This report will examine the circumstances of E-Reserves at GSU and the current state of the law of copyright as applied to E-Reserves."

Do you see that?

A I do.

Q Is that an accurate summation, at at least a high level, of the purpose of this report?

A Yes. I think I would like to have inserted a word. The report will examine the circumstances of the E-Reserves policy at a GSU and the circumstances of the law of copyright.

Q When you say the circumstances of the E-Reserves policy, what do you have in mind by that statement?

A Sure. Later in the report, I do examine the policy itself, line by line essentially, and there is some indication from the depositions, in particular, that I was able to review that tells me something about how the policy may have been developed, why it was developed and tells me something about its implementation and the effect that it may have

had.

Q And what expert addition do you give to the testimony that you advert to? In other words, beyond the actual facts and circumstances as known by and will be attested to by those who participated, what is the expert gloss that you, through this report, are putting on the, quote, circumstances of E-Reserves at GSU?

A Did you say expert gloss, with a G?

Q Yeah.

MR. SCHAETZEL: Objection as to form.

BY MR. RICH:

Q You can answer.

A Okay. What is the expert gloss that I'm putting on this? I wouldn't use the word "gloss." But what expertise might I be bringing to this evaluation, to this report? I have a background of many years of working with questions of fair use in the higher education context, specifically considerable experience working with the questions associated with electronic reserves and having followed the history and development of the relevant law and having paid attention to a great extent to

different policies that have been adopted at different universities.

Q And so my question stands, which is: What additional insights do you believe you are bringing to the court by summarizing or doing an overview of what you understood to be the circumstances of E-Reserves at GSU?

A Okay, good. I think I understand. What I was able to bring to this report, among other things, I'm sure, but what I was able to bring to this report is an understanding of the lineage of policy making, the lineage of thinking about electronic reserves in relationship to fair use over a period of years, a period of learning, a period of experimentation at different universities and then from that, the emergence of the policy at Georgia State University or the University System of Georgia. If I mix up the label there, I mean one, I mean the other. And the emergence of the policy at the Georgia University and how it fits relative to other policies and how it fits relative to broader national thinking about fair use and about fair use policies.

KENNETH D. CREWS

Q So let me take that in pieces.

A Sure.

Q So do I understand you to be saying that a portion of what you were presenting here was to place the actual process that the University of Georgia state system went through, that you are -- strike that.

Do I understand you to be stating in part that the backdrop and the history, as you've cited, are known by you factually to have been a component of the deliberations undertaken by the University of Georgia system in developing the new policy? Do you know that factually?

A No, I do not.

Q So you are surmising to that degree to what extent that context or history or background may have informed the judgments and decision making which culminated in the current policy; is that correct?

A To a great extent, yes. But there were times when I was -- I am aware of the fact that some of the discussion included some reflection on what may have been in existence in

other documents and other policies. So partially, I'm going to say I am aware, and for the most part I am going to say I am not aware.

Q And to the extent you are aware, what is the basis of the awareness of the various sums that you had in that last sentence?

A Okay. I participated very slightly in witnessing something of the decision making that was going on in the development of the policy. And that slight bit of witnessing would've been one telephone conversation that I had with the attorneys representing the University, where the policy was effectively finished or nearly finished, and we just bounced a couple of ideas around about possibilities. That gave an opportunity for -- I don't remember whether they put it in context of other policies, but it certainly gave me a chance to reflect upon and add to the conversation that, well, I've seen it done like this and I've seen it done like that and introduce some of that into the conversation, but that's a small amount.

Q Now, you said that occurred when the policy was largely done. Can you put that in a

date time frame for me?

A To the best of my recollection, it would've been February of 2009.

Q Let's cycle back, if we can, then.

A Sure.

Q To my understanding, the first contact you had with any representatives of GSU, whether related specifically to what we have in front of you as Plaintiff's Exhibit 290 or otherwise --

A Right.

Q -- when was that?

A Yeah, the very first -- I'm going to have trouble putting a good date on it. But the very first contact would have been a telephone call from Mary Jo Volkert, who is, as I understand, an attorney. In fact, I have her listed in my report as Assistant Attorney General for the State of Georgia. A phone call. If I recall, she initiated a phone call to me. It sounded a little bit like she was calling to different people who worked on these issues.

Q To, T-W-O? Or calling to, T-O, different people?

A Good point. Good point. If I

remember my statement correctly, it sounded like she was calling me and some other people.

Q Okay.

A The number, I can't put a number on it.

Q Fine.

A And that she was simply contacting people who were familiar with the issues of fair use, electronic reserves. She found me and wanted to talk generally about the issues. At that point, I knew of the fact that the case had been filed. I maybe had seen a complaint, but that was the extent of my knowledge and my contact.

Q And was it your understanding that the reason that Ms. Volkert reached out and contacted you was in relation in some fashion to the filing of the complaint in this case?

A Oh, yes.

Q And what did she say you to in terms of what she was curious to learn from you or how otherwise to engage you?

A Well, I hear two different questions.

Q That's fair enough. Let me break it

up.

What was the substance of your, I take it, one conversation with Ms. Volkert at that time?

A And that first conversation. There may have been on one or two other brief conversations afterwards. But in that first conversation, it was extremely general, very high level, and she simply wanted to talk about the general nature of fair use. I believe it was a new subject for her to explore. The general nature of electronic reserves and what universities and libraries may be doing. As I recall, it was in that regard a very, very general conversation. These were new subjects to her.

Q How long did that phone call take?

A Oh, if I had to guess, it was probably not more than 30 minutes.

Q And did you do most of the talking on that phone call?

A Yes.

Q And what sorts of information do you recall providing Ms. Volkert with during that

conversation?

A And at that point, I probably would've talked with her about the fact that E-Reserves exist. They exist in hundreds, if not thousands of colleges and universities all over the country. That there's been open questions about what fair use means. There have been different ways that different colleges and universities have addressed those questions through their policy statements. It probably would've gone something like that.

Q Did she ask you if you had had a chance to review the complaint?

A I don't recall her asking that.

Q Whether or not she asked you, do you recall in that conversation conveying any reactions, preliminary or otherwise, to the allegations of the complaint?

A No.

Q Have you had occasion at any time thereafter to convey your reactions to the allegations of the complaint to any GSU representative?

A To any GSU representative? And, you

know, no. At no point.

Q Let me phrase the question a little more generally. Have you ever expressed an opinion as a copyright expert as to the merits or lack of merits of the allegations that are as you understand them in this case?

A No.

I'll tell you something that probably is as close as it gets to that. I remember a professional colleague, who also works on these issues, saying that she -- she informed me early on that Georgia State had, in fact, filed a defense; and I remember saying something like, that's great, and that's it.

Q Whether or not you communicated it, did you ever have a chance to review the complaint in this case?

A Have I ever reviewed the complaint?

Q Yes.

A Oh, yes, I have.

Q And have you formed an opinion as to the merits of the position set forth in that complaint?

A I have not specifically systematically

made that determination.

Q Have you generally made that determination?

A No. I think it's dangerous to do that just from a complaint. The complaint is only a view of the whole picture.

Q I take it, though, you have had some familiarity with the preexisting 1997 University of Georgia copyright policy; is that correct?

A That's correct.

Q And am I correct that one of its principal authors was a professor in the field known to you personally?

A That's correct.

Q And who is that?

A Professor Ray Patterson.

Q And you had a lot of admiration for him; is that correct?

A Oh, yes.

Q And you're aware that at the time this suit was brought, that was the prevailing policy both at GSU and throughout the University system in Georgia, correct?

A I'm aware of that now, yes.

KENNETH D. CREWS

Q And you had been asked at or around the time of its promulgation by Professor Patterson to comment on the draft of that policy; is that correct?

A That's correct.

Q And you declined to do so; is that correct?

A That is not correct.

Q What is the correct answer to that?

A The correct answer is it was in 1997, he had sent me a copy of the policy asking generally what do you think of this, and I remember writing a fairly detailed letter back to him, a one-and-a-half, two-page letter back to him.

Q And the essence of that letter was to endorse the policy or something different?

A Oh, something different.

Q And what was the something different, substantively?

A Substantively? Well, I don't have it in front of me, so I'm working from memory. And so if I had it in front of me, you know, I might have the ability to give you a different answer.

But I remember raising some serious concerns about the 1997 policy.

Q And what is your recollection about what the most salient of those concerns were?

A They generally fit into, I guess, a couple of groupings. One is as a matter of policy making by a University, it's structurally not right. In other words, it's a highly detailed policy that purports to walk the reader through a series of detailed scenarios. Professor wants to do X, Y, Z, A, B, C, detailed scenarios with an answer. And as a matter of policy making, I find that just simply ineffective and in many ways, over time, can be counterproductive. A policy should be very general, leaving room for experience and growth and circumstances that change for that maturation of experience to occur and keep the policy relatively general, aiming the users of the policy in a general direction, giving them some parameters, but not necessarily hammering nails on the head. Because if you do that, the policy is going to immediately not be meaningful to anybody who has a question that's not in the

policy. It's over time going to not be useful for new needs and new circumstances, new technologies that arise that in 1997 they weren't thinking of. So structurally, I found it -- I found it flawed.

Q What about in terms of substance of it?

A Well, it's been a lot of years since I've combed through the substance of that policy, and I did find that -- what I remember, and I won't -- you might want to show me something, but I'm not going to pretend that I remember exact individual questions and exactly how he responded. But what I think I remember -- well, what I -- yeah, what think I remember, I suppose it's the best way to put it, is that litany of question/answer, question/answer, question/answer, question/answer. And then a whole lot of the questions were yes, explanation. Can I do this, this, this; answer, yes, explanation. Now, that may be distorted in my memory. There may be more no answers than I'm remembering. But, you know, a policy that just says yes to everything

KENNETH D. CREWS

is not very helpful. A policy also has to give you a heads-up about what you can't do.

Q And do I interpret correctly the use of yes in this context as a shorthand for yes, it is within the bounds of fair use and therefore you can do it without further permission or consent?

A If I'm recalling the policy correctly, that's what he meant.

Q That's the context of your answer?

A Yes.

MR. RICH: Why don't we mark the correspondence to which you refer so we have it in the record, please. And we'll mark that as Plaintiff's 291.

(Whereupon, Bates GASTATE 63527-28 was marked as Plaintiff's Exhibit 291 for identification, as of this date.)

BY MR. RICH:

Q Please take your time looking at what we've marked. I will ask you to identify it after you have done that.

A Sure.

Q Is this the correspondence to which

you referred a few minutes ago?

A Yes, it is.

Q Do you recall any other written exchanges with Professor Patterson on this subject?

A No, I do not.

Q Now, coming back to the complaint in this action for a moment. Assuming for the sake of my question that the policy that was thereafter promulgated was essentially the one you had reviewed and commented on to Professor Patterson and that that was the policy in place at the time this complaint was filed, is it still your view that you formed no impression or view or perspective on the merits of that complaint?

A It is. It is still my position.

Q And that's because you just didn't do it or because you would have needed more facts?

A Probably both of those. I just didn't do it; and I would need more information, I'm sure, if I were to do it.

MR. RICH: Let's mark as Plaintiff's 292 a May 13 E-mail from Kenneth

Crews to Mary Jo Volkert.

(Whereupon, Bates GSUX 2170 was marked as Plaintiff's Exhibit 292 for identification, as of this date.)

BY MR. RICH:

Q Do you recognize this as an E-mail which you transmitted to Ms. Volkert on or about May 13th, 2008?

A It sure purports to be.

Q And do you have any reason to doubt that it is what it purports to be?

A Just give me one second to finish reading.

No. It purports to be from me, and I believe it is.

Q Now, the first sentence says, "I greatly appreciated the chance to talk with you today." Is your recollection that the conversation you described a few minutes ago is the conversation that you're referencing in this E-mail?

A I'm confident it is.

Q And what was the culmination of that call in the sense that did Ms. Volkert and you

agree to talk again or did she inquire as to whether you might be retained in some consulting capacity or anything of that nature?

A No. No. I think she was looking just for helpful background information about the issues.

Q And you provided that for a fee or gratis?

A Gratis.

Q And why was it that you attached a copy of your resume, as promised? Did she ask you for that?

A She must have.

Q And in the second paragraph, you indicate that you had located two documents, the document we've just marked as Plaintiff's Exhibit 291, as well as the 1997 AAP legal analysis of the region's policy.

Do you see that?

A I do.

Q Was that a topic of discussion during your 30-minute or so phone call?

A I suspect I mentioned to her that I knew that that document existed and I had seen

it, yes.

Q And why did you believe it was pertinent to what she would be interested in?

A Oh, because it's about their policy. If I were in her position, I'd want to know all about my policy too.

Q "Their policy" meaning?

A The Georgia University policy.

Q And had you --

MR. RICH: Let's mark now as Plaintiff's 293 a December 23, 1997 document on AAP letterhead to members of the University System of Georgia, Regents Copyright Committee.

(Whereupon, Bates GASTATE 63529-534 was marked as Plaintiff's Exhibit 293 for identification, as of this date.)

BY MR. RICH:

Q And once you've had a chance to look at this document, is this the document to which the May 13th E-mail refers; that is, the AAP legal analysis?

A Yes, it is.

Q And I take it you forwarded both of

these items on to Ms. Volkert?

A Are there two items here?

Q By both, I meant your July 1997 correspondence with Professor Patterson as well as this document.

A I believe that's right. I sent both of them to her.

Q Do you recall at that time providing Ms. Volkert with any other material of any kind?

A No.

Q And what is your recollection of what happened next in terms of any interaction with any representatives of either Georgia State University or the University System of Georgia?

A I had one, maybe two more phone calls -- I'd be surprised if it were more than that -- with Ms. Volkert, and we talked about later, sometime later, maybe it was June, maybe it was July, about what I might be able to do to help the University, and we talked about some possibilities. And then that's as far as it went.

Q And had you made certain suggestions as to what value you might bring to the process

the University was then engaging in, whatever that process might have been?

A Oh, I'm sure I did, yes.

Q And what, to your recollection, were the suggestions you made as to how you might assist the process?

A Sure. If they were wanting to make -- either make a new policy, I have at some universities helped or given advice or given guidance about policy making. Or probably what I would've said much more enthusiastically is if you are interested in having seminars or workshops at the University to help the community better understand these issues and how to work with those issues, I like doing that. I do that as often as I can fit it into my schedule, and I have been an invited guest at dozens and dozens of colleges and universities around the country to do exactly that. And I find that it is received very nicely. So I suspect I would have emphasized my ability to provide educational services for the community.

Q Now, in these several discussions that you had in this period of time with Ms. Volkert,

did you provide her with your thoughts as to the directions of change in policy that you thought might be appropriate in response to the pending litigation?

A Well, let me add just one word of caution. You use the word "several," several conversations. I mean, really, to my recollection, we're talking two or three.

Q All right. I didn't mean anything different by several.

A It's an issue I have with my wife all the time. To me, several means seven, and to her means three.

Q That's okay. We want to be precise. In the two or three conversations.

A Whatever it was, right. So I think I lost your question.

Q My question was: In those two or three conversations, did you provide Ms. Volkert with thinking directionally as to the modifications and policy that might be appropriate in light of the pendency of the litigation?

A No.

KENNETH D. CREWS

Q She didn't ask, and you didn't volunteer?

A No. And I don't want to be cagey. I mean, back to this other E-mail of May 13th, I do raise to her the California State University example, and I led the drafting of much of the discussion of fair use is a statement that I put in my E-mail. We may very well have talked about have I worked on other policies at other universities. That could easily have been a topic of discussion.

If there's any hesitation in my answer, it's only because in light of the complaint that you filed -- if the question is something about creating new policy that exactly responds to what's in the complaint, no, we did not have that conversation. If the question is maybe work on issues, workshops, suggestions about policy making because the complaint has put this issue in front of us and we maybe have to or should do something, well, then the answer is probably yes.

Q Did you identify for Ms. Volkert or for anyone else in the process of your various

interactions with Georgia State University and with the Board of Regents, areas of what you thought were legal vulnerability in relation to the then existing copyright policies of the University system?

A No.

Q In this --

MR. RICH: Let's mark next a June 20, 2008 E-mail -- this will be 294, I believe -- from Mary Jo Volkert to Kenneth Crews.

(Whereupon, Bates GSUX 2135 was marked as Plaintiff's Exhibit 294 for identification, as of this date.)

BY MR. RICH:

Q I ask you to take a look at that document, please. (Handing.)

A Okay.

Q Starting, I guess, at the bottom, which is an earlier E-mail.

A Right.

Q Do you recall sending Ms. Hurt the E-mail which appears -- the June 3rd E-mail which appears at the bottom of this document?

A Yes, I do.

Q And when you wrote "Ms. Volkert thought that you and I could explore ideas about policy alternatives and would be happy to share some perspectives from my years in the copyright trenches," what did you have in mind and what were you trying to convey?

A Sure. I have conversations like that with University officials frequently, and so because of my years of experience, if she were -- "she" meaning Ms. Hurt, were in the position or desiring to have a fresh look at their policy, I may be able to lend a hand and give some pointers.

Q And do you recall why it was that Ms. Volkert suggested you reach out to Ms. Hurt?

A Because I think -- well, she didn't say, if that's what your question is.

Q Ms. Hurt was then the chief librarian at GSU; is that correct?

A To my understanding, yes.

Q Were you aware that she was nearing retirement at the same point?

A No, I was not.

Q Now, as of June 20th, Ms. Volkert writes to you, "I hope you're well," and so forth. "I'm wondering if you ever heard back from Charlene Hurt." And did you ever hear back from Charlene Hurt?

A No, I don't recall ever hearing back from her.

Q So as of the period, say, through June 2008, did any of the conversations with Ms. Volkert culminate in any more formal consulting or other arrangement with GSU?

A No.

Q Okay. What was the next point of contact as you recall it?

A I think the next point of contact would have come from somebody at the offices of King & Spalding.

Q And what is your recollection about the nature of that contact?

A And we talked about very much what I do for other universities. Could you come in, have a meeting with officials, as I do with visits to other universities, to just talk about copyright, talk about role of policy, talk about

options, talk about the issues of fair use, talk about the options for policy making for E-Reserves.

Q And what was the context in which you recall that request was made or that exploratory outreach was made?

A Well, at this point -- I believe by that point, not only complaint, but there was answer filed, I believe. I'd have to go back and map the dates. And so I think at that point, probably all conversation about this issue was done through counsel. So in that regard, even the simplest questions probably would have come through counsel. So as I understood it, I was simply being invited to come and meet with University officials to talk about the issues in broad general terms, the way I do at other institutions.

Q And that contact came from inside counsel at the University or outside counsel?

A I believe it was outside counsel, King & Spalding.

Q Who specifically, do you recall?

A No. Maybe it was the gentleman

KENNETH D. CREWS

sitting next to me, Steve Schaetzel.

Q Okay. And roughly when in time was that contact made?

A Well, we had those conversations with Ms. Volkert, the non-conversations with Ms. Hurt in June. And so maybe all of that would be in August.

Q So did that culminate in one or more meetings?

A One meeting.

Q And when did that meeting take place?

A I don't remember the exact date, but it was in September, I hope I'm remembering the month, of 2008.

Q And where did that meeting take place?

A It took place initially at the law firm of King & Spalding in Atlanta, Georgia, and then we had part of the day with the -- at the offices of counsel at Georgia State University.

Q And what was the agenda for that meeting, as you recall, or those meetings, plural?

A Sure. And by "agenda," what was the topic?

Q Yeah, what were the topics?

A The topic was really, again, very, very general. It was what are our alternatives for policy making. What are other universities doing? How do I see the issues? What's been my experience working with the issues? Generally, what do I suggest to libraries and to universities about how to handle fair use and fair use decision making. What exactly to put in a policy. What's the structure of a policy. It was questions like that.

Q And what answers did you provide, as you recall, to those issues?

A Oh, I probably talked all day.

Q We have all a day as well.

A We do. Do you want me to recreate it?

Q In summary form would be good.

A In summary form, sure. I've had many such meetings. I have many conversations like this, that are very general, at different universities with different University officials. I usually begin by talking about what is copyright. The conversation usually begins there. On the other hand, I'm dealing

with lawyers at that meeting who are experienced with copyright, so I could move through that fairly quickly. But I could get straight to the question of the different exceptions, limitations in the copyright act. How, for purposes of fair use, Section 107 on -- I'm sorry, for purposes of electronic reserves, Section 107 of fair use is really the provision of principal importance, and then what it means in general. Probably had some conversation about other fair use court decisions of all different types and all different subject matter. And then some discussion -- probably would have had some discussion about the background and development of electronic reserve policy making on a national level, on a local level. Probably had some discussion about the classroom guidelines from 1976, developments since then, implementation in policy or policies that have taken a different approach to understanding and applying fair use. And probably, it was really a very, very general conversation. In many respects, I felt like I was being, again, the teacher, helping them

understand what was going on.

Q Did any of the participants in the meetings you described that day indicate to you what aspects of the then existing University of Georgia system policy they believed it would be appropriate to modify in whatever fashion?

A No.

Q And did you indicate your views in connection with your overview of points, where the approach you would adopt or the approaches you would adopt would diverge from existing practices?

A I do recall mentioning the 1997 letter that you've introduced and that I had concerns in 1997, and my experience since then has reaffirmed that a more general approach in policy making is more appropriate.

Q And you had mentioned two types of critiques you had offered Professor Patterson.

A Uh-huh.

Q One was general versus specific, and the other was too many yes's. I'm slightly paraphrasing. But on the too many yes's side, did you discuss that at the meetings in

September of 2008?

A I don't recall bringing up that point.

Q Now, if you'd look at your report for a moment, please --

A Sure.

Q -- which is in your pile there and turn to Page 7.

A Okay.

Q There's a reference to October 3 meetings. Was that, in fact -- does that refresh you that that was the date of the meetings we've just been discussing?

A You are exactly right.

Q And the listed participants were the participants in one or the combination of those meetings, correct?

A That's correct.

Q And were you paid to participate in that meeting?

A Yes, I was.

Q And what was the arrangement you worked out?

A I gave them my standard arrangement for a one-day visit to a University, and that

standard arrangement is $4,000 plus out-of-pocket expenses.

Q And I take it you were paid?

A I have been.

Q Glad to hear that.

A Thank you.

Q And did that form the beginning -- how would you characterize that relationship as of then, a consultancy?

A A one-day consultancy, yes.

Q Which was going to lead to my question, which was: Did that lead to an ongoing consultancy with respect to the process that then evolved, as we're all familiar with now, where the University of Georgia System convened a copyright committee, engaged counsel, promulgated a policy, which was, I think, announced in February, if I recall, of 2009? My broad question for the moment is, what level of involvement, if any, following October 3rd, did you have in that process?

A I can tell you one thing I was not was I was not a consultant to the policy making task force or committee. I was not. In fact,

whatever communication that happened after October 3rd, it wasn't very much that I'm recalling until we get to the one communication that I've already mentioned that I believe was in February of 2009 in which we had a telephone conversation about a policy document that was either finished or nearly finished, that the task force was wrapping up its work.

Q And so were you aware, even, from October until the time of that phone call that there was a process ongoing?

A I was.

Q How did you know that?

A Somebody at King & Spalding would have told me.

Q But not with any more substantive participation on your part?

A Absolutely not.

MR. RICH: Let's now mark as Plaintiff's 295 a January 13, 2009 E-mail from Kenneth Crews to Steve Schaetzel.

(Whereupon, Bates GSUX 2092-93 was marked as Plaintiff's Exhibit 295 for identification, as of this date.)

KENNETH D. CREWS

BY MR. RICH:

Q I ask you if you recall this E-mail. (Handing.)

A Boy, really vaguely, but I think I remember this E-mail.

Q What was the predicate for your writing "Steve, this is great. I actually wrote this material?" Was there a phone call with Mr. Schaetzel?

A You know what it was? I can feel the "this is great" response. There was some confusion in a phone call about exactly what he was referring to. He asked me something about may we have permission to use some documents that he found on the Columbia website. And my mind went to something and he was talking about something else, and then we had this exchange that clarified what we were talking about. And I remember the feeling, oh, yes, that material. Oh, yes, no problem. Go a right ahead. And so I think that's what the emotion here is about.

Q And during the call leading to this E-mail with Mr. Schaetzel, did he update you on the state of activity with respect development

of a new copyright policy?

A Not in substance, but in process I remember his saying there is a committee. The committee has representation of different participants at the University. The committee is meeting. The committee has a desired deadline for finishing their work. And that's all you remember, that it was a lot of process and not substance.

Q And in that phone conversation, did you and Mr. Schaetzel discuss any further role for you in that process?

A No.

MR. RICH: Let's mark next a January 19, 2009 note from Steve Schaetzel to Kenneth Crews. That's now Plaintiff's 296.

(Whereupon, Bates GSUX 2030 was marked as Plaintiff's Exhibit 296 for identification, as of this date.)

BY MR. RICH:

Q Do you recall receiving what we've marked as Plaintiff's Exhibit 296? (Handing.)

A Only in general terms, yes. I don't

remember exactly this E-mail.

Q Did this come out of the blue? Or, again, what predicate was there for Mr. Schaetzel writing you "Kenny, per our conversation, I'm pleased to confirm that you are being retained by the Board of Regents of the University System of Georgia. Pursuant thereto, we ask that you review this proposed document."

A Okay. And as I say, I didn't recall this exact E-mail, but I suspect it was just the lead-in to that phone conversation that I'm remembering being in February, where we had some then reflection about the policy that was coming out of the policy making task force.

Q But in other words, between the earlier conversation, perhaps a week or so earlier, where Mr. Schaetzel asked for permission to use some materials from, I guess, the Columbia University website and this, this just developed in the interim week, that they were asking you to perform this role?

A I'm not recalling anything different.

Q Okay. And what did you understand

your retention by the Board of Regents of the University System of Georgia to be?

A It was -- there's an attached document, review the proposed document. I assume it was attached or was delivered some other way. And what I remember is that it was being retained to review the document and give some feedback.

Q And what was your understanding -- what is your recollection of what the attached document was?

A Well, I do see a reference on this E-mail itself down at the bottom. It says "USG copyright policy website clean.doc." If this printout is structured the way I'm used to seeing them, that probably means that there was a document attached to it. So that's probably the proposed document. And it would have been -- clean refers to maybe edited, fixed. You know, the typing errors and so on were cleaned out of it. And that it would have been then a version of what the policy task force was proposing as the content of the website.

Q Do you recall it to -- the attached

material to constitute a single document, namely a draft fair use checklist or a series of documents?

A Well, I don't recall exactly. The checklist was certainly there, if I'm remembering correctly. But it was probably more than just a checklist.

Q Sitting here today, do you remember performing edits to anything more than a proposed checklist?

MR. SCHAETZEL: Objection as to form.

A Honestly, I didn't see myself as an editor. So I don't think of anything I did as being an edit.

Q Well, you don't have to over react to your counsel's instruction or coaching.

A I'm not.

Q All I was trying to get at, do you recall making comments on any document other than a proposed fair use checklist?

A Yes, I do.

Q What other documents do you recall, just by nature?

A Sure. There probably was -- in fact,

what I'm recalling is having -- during this time period, whether it was late January or into February, giving comments, for example, about some additional statement about electronic reserves, and one thing that stood out in my mind -- it was important then; it stands out in my recollection -- was, for example, a statement in the document that the library would, where possible, link to the item in a database as opposed to scanning. And I remember making a comment that that's really extremely important. It may not actually be an aspect of fair use law, but it's a very important part of the overall component of such a policy statement, guiding the users, guiding the librarians with respect to fair use and the implementation of fair use.

Q Why was that your view? What was the basis for that view that it was a very important component?

A Sure. As important as fair use is, it's also important to realize that we should save fair use for different types of circumstances where fair use really has that

importance at the University. And this means that if we have a ready availability of the content through these databases, that it's wise, it's effective, both as a management matter, I think as well as a pedagogical matter for the readers, for the faculty member, for the students to link to that content in those databases. We're paying a tremendous amount of money for those databases, and it's good to use them. It's good to direct students and others to use them so that they know that those resources are there and available. And it a also means that because we know that fair use involves an important element of decision making about what is, what is not fair use, that we're then able to just save that decision for when we need it in other circumstances.

MR. RICH: Let's mark as Plaintiff's 297 a January 30, 2009 E-mail from Kenneth Crews to Laura Gary, to which is an attachment bearing Bates Numbers 63160 through 63162.

(Whereupon, Bates GASTATE 63159-63162 was marked as Plaintiff's Exhibit 297 for

identification, as of this date.)

BY MR. RICH:

Q Can you identify what we've marked as Plaintiff's Exhibit 297, please? (Handing.)

A Yes. It appears to be an E-mail from me addressed to Laura Gary, copies to others at King & Spalding; and I assume this document, fair use checklist, was the document that accompanied it. Where I say "please see attached," that was probably what was attached.

Q Do you recognize those as comments that you made on the draft which had been press engined to you?

A I do.

Q Focusing on -- first, if you turn to the draft, please, and focusing on the first paragraph labeled "Instructions."

A Yes.

Q You will see that there's an underline -- there is underlined language following a semicolon, which do I understand the editing protocol to mean that this was an insertion which you were proposing, the underlined words beginning with "reach a

conclusion"?

A It sure does appear to be what Word or another document would underline as an insertion. Now, there's nothing here that indicates that I made that insertion or whether it came to me with that insertion already, but there it is.

Q Focusing on that underlined language which reads "reach a conclusion only after considering all relevant facts and all four factors."

A Right.

Q Do you recall that being a suggestion on your part?

A Do I recall that as a suggestion?

Q Yes.

A No.

Q Is it consistent -- whether or not you recall it, is it consistent with your perspective that that would have been or would be a useful modification and amplification?

A Yes.

Q And why is that?

A Because it's an accurate statement of

the law. One of the problems is reaching a conclusion too hastily, and I'm trying to push people back to all four factors.

Q And have you, from experience, seen instances where application of the fair use doctrine has been in some fashion distorted by a failure to evaluate all four factors?

A Yes.

Q Now, in connection with -- so tell me next what happened then. So on the 30th of January, according to Plaintiff's Exhibit 297, you forwarded to King & Spalding a checklist with suggestions, correct?

A It appears that way, that's correct.

Q Now, I don't see attached to this document any suggestions on any other document or documents that might have been compromising the draft policy.

A I do not see those either.

Q Do you recall, independently of this document, having made such suggestions and forwarding them on in writing to King & Spalding?

A I do not recall.

Q Now, what happened next in terms of your involvement with the process in which you now were commenting?

A Well, I hope you'll just show me the E-mail, if there's something that I said, and I'll happily acknowledge whatever.

Q This isn't a memory test.

A And that's okay. Because what I do remember is -- and now we really are at the end of January. So sometime in February having that telephone conversation that I mentioned.

Q And who -- I do not have a document that would refresh you or me as to that. To the best of your recollection, who was that conversation with?

A To the best of my recollection, lawyers at King & Spalding and nobody other than lawyers at King & Spalding. And those specific lawyers would have been Steve Schaetzel, as I recall, Kristen Swift. Maybe Laura Gary was on the phone. And I believe an attorney that I never met, Tony Askew, was on the phone.

Q What was the subject matter of that discussion?

A Discussing the draft of the website policy, whatever was coming out of that task force.

Q Now, was the subject matter of that discussion broader than the document and your comments on the document that were attached to Plaintiff's Exhibit 297?

A I do remember talking about that one issue, and let's see if it might be in here. The issue about linking to the databases, where possible.

Q Why don't you take your time. Is it in here, in fact?

A I don't recall its being in here.

Well, in a way it is here, because it certainly raises not in quite so explicit form, in some of the factors relevant to the fourth factor, an issue about licensing available. And licensing comes in all different forms. And in the library community, frequently when somebody raises the word "license," what they usually are thinking of is the license to purchase the big database of thousands or millions of journal articles on which we spend 10, $12 million a

year to acquire. In the library community, whenever we raise the word "license," that's usually where most people's mind will go. And certainly, we talked about that concept and is it relevant here, is it an appropriate part of the policy.

Q You may have answered this, and if so, I just want to be clear.

A Sure.

Q Is it your best recollection that in that conversation with King & Spalding following -- sometime following January 30th, that you were -- you either physically had access to or were, in any event, commenting on a broader scope of documents that were proposed to be part of the copyright policy, the new one, than simply the checklist?

A I wouldn't say broader scope of documents, but certainly a few issues came up that were maybe within the parameters, depending upon how you interpret the parameters of the checklist, and maybe not.

Q Between the time you provided these comments and the promulgation of the policy,

were you shown any other drafts of any aspect of the policy?

A I don't recall seeing anything else after that.

Q And were you compensated for, you know, this activity? And by "this activity" I mean for your time commenting on the checklist and/or having that conversation with counsel.

A I was probably keeping track of hours at that point and added them up, yes.

Q And do you recall whether you submitted an invoice for that?

A I believe I did. I've submitted invoices for my time, and I believe that that included some few hours from January, February, when we were reviewing these documents or this document.

Q What is your practice when you submit such an invoice? Is it on a personal letterhead? What does your letterhead say?

A It's just personal. I actually just type my name and address at the top.

Q And do you have a heading, like consulting services or anything of that nature?

A No.

Q Services rendered? What do you say?

A Well, at the top just name, address, maybe E-mail, maybe phone number. Invoice for services, words like that.

Q And do you typically describe the dates the services were performed and the time involved --

A No.

Q -- in any detail at all?

A No, no.

Q Just a sum, a number?

A Sometimes a summary of types of services rendered and then span of dates or as of a certain date. Total hours, fee for hours, any out-of-pocket expenses added up.

Q Now, you testified at the very outset of this deposition that you were retained with respect to preparation of your report and now reports, plural --

A Uh-huh.

Q -- in or around April of this year; is that correct?

A Yes. I believe I state in the report

an exact date.

Q April 22nd, I believe it is. Is that your recollection?

A That sounds correct.

Q What is your recollection of how that retention came about?

A I received another phone call from attorneys at King & Spalding, and I reflect that in the exact date, saying that they would now like me to become -- and again, my apologies if I'm stumbling over the terminology. I'm a newcomer to being an expert witness, so I may not get the terms and labels exactly right. But to be an expert witness involved in the case, and you might phrase that differently. And therefore, they would like me to write a report.

Q And that was a phone conversation?

A That was a phone conversation.

Q And in that conversation, what more specifically were you asked to cover in that report?

A I was given remarkably little guidance. In fact, again, being a newcomer to doing this, that was a little bit frustrating

and perplexing for me. I was actually looking for more advice than I was receiving. But they were allowing me a free hand to do what I thought was appropriate. And so therefore, when I think about these issues, and I resolved that my goal was not to be the judge, I'm not going to render verdict on the issues that are raised in this case. My goal, as I saw myself, was to be as helpful as possible with helping anybody who reads this report to understand the context of the issues, the context of electronic reserves, the evolution or history of policymaking surrounding electronic reserves and, therefore, to see whatever these issues may be that lawyers or judges are struggling with today in this case, to be able to see those issues in the context of what's been happening nationally.

Q Whose decision was it to do a survey of fair use law?

A Mine.

Q And your report indicates for this phase of your work, you are being compensated at the rate of $250 an hour plus expenses; is that

correct?

A That's correct.

Q Have you kept a record of approximately how many hours you have invested in this process?

A I have.

Q And what is it, approximately?

A Well, I have submitted invoices that come through the end of the first report, and if I remember correctly, it's approximately 140, 150 hours, something like that. That brings us through the end of the first report. And then I have not submitted an invoice since then, but my little cryptic notes show a total of somewhere around 120 hours on activities since the first report, including preparation of the second report.

Q The hours you cite, are those your own time or are those inclusive of any assistant's time?

A Strictly my own time.

Q And how many assistants did you employ?

A The only assistants that I have

retained in preparing either of these reports was Neil Wehenman, W-E-H-E-N-M-A-N. He is -- was a student at Indiana University who had done work with me on other projects. I needed some quick help; he was available. And I paid him an hourly rate to do some background research for me.

In preparing the gathering of policies themselves that are reflected in the -- in report number one, my wife helped me out. And she wanted to be helpful. She saw me busy working nights and weekends to prepare this report and said, what can I do? And I said, well, I need an assortment of policies, not scientific, that just shows a range of different approaches that different universities and different libraries have taken on electronic reserves. And I turned her loose with that task, and she came back with a long list of policies and printouts, and that became the overview. I transformed that raw data into the overview that you see in report number one.

Q And your wife's name is?

A Elizabeth Crews.

Q And what is her professional background and training?

A Elizabeth has a degree in English and French from the University of Southern California. She has a master's degree in special education from the University of Southern California. She worked for 10 years as a special education teacher in the Torrance Unified School District in California. When our second child was born, she became what she calls mom at home. In the last couple of years that we were in Indiana, so that would've been roughly 2006 and 2007, she went back to school and earned a master's in library science, graduating in December of 2007. And then we moved here, and she is sending resumes, looking for a new career.

Q And was she compensated for her work on this project?

A Only with love and attention.

Q And so her hours were not logged in any way and billed for?

A Not in any way.

Q However, your assistant, I take it,

received some compensation, your research assistant?

A Neil Wehenman?

Q Yes.

A Yes.

Q And approximately how much time did he put into this project?

A Approximately 20 to 25 hours total.

Q And did he work on the rebuttal report as well?

A No.

Q Only on the first report?

A Only on the first one.

Q And did you advise King & Spalding during the process that your wife Elizabeth was assisting you on part of this project?

A I think I may have told them.

Q How many drafts of your first report do you recall preparing?

A Well, now that's a tough question to answer. I mean, does every time I stop turn into a draft, every time I need to take a break and go back to my other work?

Q Fair enough. Let me rephrase that.

A Yeah.

Q How many drafts did you communicate to counsel for GSU?

A I think two.

Q And what is your recollection of the nature of feedback you received on those drafts from counsel for GSU?

A Sure. Let's deal with the easy one first. One of those two drafts I think I submitted the day before the June 1. And it was knowing that we were all in a hurry, knowing that it had to be filed the next day, I said to Kristin Swift, I believe, take a look at this, see if you catch anything. We have about 10 minutes to fix anything if there's an obvious error. I typed my name wrong on the cover or something like that. And I think she may have come back with something the equivalent of a typographical error, and that was it. So that was the easy one. That was the one of the drafts.

And then there was one a week or 10 days before that, where I submitted it to them and I was -- as I said earlier, I was kind of

feeling adrift. I wasn't quite sure what an expert report is supposed to look like and especially in an extraordinary case like this. And so I was eager for some feedback, so they agreed to give me some feedback. And so I submitted that to them.

And the feedback -- you did ask what sort of comments did I get back. They really fall into two categories. One was a category of what did you mean by this? Just clarify what it was that I was trying to say. And that was perfectly understandable, writing on a tight deadline, something doesn't communicate well. And the other one, that I had to agree 100 percent, was the draft I submitted was painfully missing something that I wish was in there. And so, yeah, I heard it from them, so I hurried up and did it. And that was the survey of the fair use checklist and just some comments about the legal -- I'm not quite sure how to word it, but point of law that may be relevant to each element on that fair use checklist. I had, by that time, already done the breakout of the rest of the Georgia State or the Georgia University

policy, but I didn't have a similar break out of the checklist. So I had to quickly go to work. We were down to a matter of days. I was on a tight schedule. I had will other deadlines too, but just quickly go to work. And that's where I think I also contacted Neil Wehenman and said you gotta help me, you gotta help me.

Q Did the entirety of this work on the initial report take place between April 22nd and the date it was submitted?

A 100 percent.

Q And what reason were you provided with why it was on such a tight deadline?

A Well, I guess, I mean, really -- why not start earlier, in other words? I wasn't asked to. I mean, what I understood -- all I know is what I was told. And at the outside, we had whatever deadline it ended up being, June 1st, as the deadline to file this, and April 22nd when I got the call to prepare this document.

Again, I'm sitting way up here; the lawyers are way down there. I'm not privy to their conversations. Why didn't they call me on

the 21st? Why didn't they call me some other date? I don't know. I don't know. There it is.

MR. RICH: Let's mark as Plaintiff's 298 a May 14th E-mail from Kenneth Crews to Kristen Swift, together with an attachment dated May 14th, 2009, bearing Bates Number 63228 through 63291.

(Whereupon, Bates GASTATE 63212 and 63228-63291 was marked as Plaintiff's Exhibit 298 for identification, as of this date.)

BY MR. RICH:

Q While you're free to look it all over, I'm going to have very, very few questions on the draft itself. And my first question is whether you can identify this exhibit as a transmittal of your first -- transmittal of the first draft which you sent to counsel.

A It has every appearance that it is.

Q On or about May 14th sounds right to you?

A That does sound right.

MR. RICH: Now let's mark as

Plaintiff's 299 a May 31 transmittal from you to Ms. Swift to which is attached a document bearing the date May 31, 2009, bearing Bates Number 63009 through 63080.

(Whereupon, Bates GASTATE 63008 through 63080 was marked as Plaintiff's Exhibit 299 for identification, as of this date.)

BY MR. RICH:

Q And for the moment, my question, sir, to you is whether you recognize this to be the second and, if not ultimate, close to final draft that was transmitted on or about May 31?

A Everything suggests that it is.

Q Now, if you would turn back to the May 14 draft and flip to Page 52.

A All right.

Q You will see under the section labeled "Fair Use Exception," there is a quote from what I take it to be the policy that you are commenting on, followed by the following statement: "A critically important statement that immediately reminds all readers that they need to consider all four factors and resist

reaching a conclusion based on a single factor."

Do you see that?

A I do.

Q I take it that's consistent with the discussion we had a little while ago reflecting your strong viewpoint, correct?

A It is.

Q Now, if you turn to Page 52 of the May 31 draft.

A Uh-huh.

Q You will see that the prior quoted language has been replaced by, "This statement reminds readers that they need to consider all four factors and resist reaching a conclusion based on a single factor."

Do you see that?

A I do.

Q What is your recollection as to why that language was modified in the fashion it was between the May 14th and the May 31st draft?

A I don't recall any particular reason, because I don't think it changes it in substance, other than I will tell you this. I remember in my final editing, I over use a few

words, and one of those words is "important." And one of those words is "critical." And I think I went through the document in my own editing and took out certain words like that that just became tiresome as you read it. But otherwise, I don't see any particular reason to have changed it, because substantively it's the same.

Q And I take it this didn't reflect any editing suggestion from counsel for Georgia State University?

A Not that I can recall. And frankly, not that I can imagine.

Q Is it your view, however it's worded, that the notion that all four factors should be evaluated in a given case is a critically important component of the fair use analysis?

A It does sound like something I would say.

MR. RICH: Let's take a five-minute break.

(Whereupon, a break was taken.)

MR. RICH: Back on the record.

KENNETH D. CREWS

BY MR. RICH:

Q When you had occasion, Professor Crews, to look at the new -- the University System of Georgia policy in its final form, did you see some Ken Crews imprints on it?

A Oh, yeah.

Q Can you describe those, at least at a general level?

A Sure. I mean, it really goes back to the lawyers asked may I have permission to use some of these documents from the Columbia website that I host, and I said absolutely. I give permission to lots of people, or they just use it or whatever. So I'm on happy to see them out and being used. And so certainly I recognized elements of things that came from me or were like me or whatever.

Q And that were facilitated by the prior discussions, presumably, that you had over time with the folks at GSU?

A I don't know what facilitated means, but did it maybe -- I'm not sure what it means.

Q Let me ask the question more narrowly.

You mentioned a meeting back in

October of 2008, for example. When you later saw the culmination of the process and the new policy, did you say, ah, I recognize some of my thoughts? Again, not by express, oh, here it is, but by inference, did you recognize, perhaps, some of the influence of your thinking in the final product, in your own opinion?

A Yeah. In my own opinion, I'm going to say yes to something just slightly different.

Q Please.

A And that is not so much that there were things said and done in October that therefore were reflected in it, but explicitly the final website-based document from Georgia even mentions kind courtesy or whatever of Columbia University, et cetera. And so it didn't take me long to look at that, know they were acknowledging my work as a source, and I could look at it and say there it is. In substance and even some words, there are some pieces of my work. And I was happy to see that. I'm always happy to see my work being used. But can I relate it specifically back to an October meeting, no, I can't. They could have just as

easily found somebody else's work and preferred that over mine, and that could easily have been the case.

Q You're proud of the contributions you've made that when people borrow, as it were, from checklists and the like that you've helped to shape over time. That's a source of pride to you, I take it?

A Yes, it is.

MR. RICH: We found a couple of invoices, and I want to mark them for the record here. So let's go to Plaintiff's Exhibit 300, which is an October 6th, 2008 -- appears to be an October 6th, 2008 invoice from Mr. Crews directed to Mr. Schaetzel.

(Whereupon, Bates GSUX 0000001 was marked as Plaintiff's Exhibit 300 for identification, as of this date.)

BY MR. RICH:

Q I'll ask you if you can identify this document for the record.

A Yes, I can.

Q Please.

KENNETH D. CREWS

A It's an invoice dated October 6th, 2008, signed by me, to Mr. Schaetzel at King & Spalding.

Q And this is consistent with your earlier testimony that you charged a daily consulting fee, as I recall, your standard daily consulting fee in association with that October visit; is that correct?

A That's correct.

Q And that's when you gave that consulting advice about how they might be thinking about developing a new policy?

A That's correct.

MR. RICH: Let's mark next as Plaintiff's Exhibit 301 an invoice dated March 2, 2009, also from Mr. Crews directed to Mr. Schaetzel.

(Whereupon, Bates GSUX 000007 was marked as Plaintiff's Exhibit 301 for identification, as of this date.)

BY MR. RICH:

Q I'll also ask you, sir, to tell us what this document is.

A Uh-huh. It's an invoice dated

March 2, 2009 from me. This particular copy doesn't have the signature on it, but it's got my name at the bottom, and it's addressed to Mr. Schaetzel at King & Spalding.

Q And I take it from the entries and from our prior colloquy that this reflects activity involved, as indicated, in reviewing policy drafts and conversations concerning same, correct?

A It sure appears to be that way.

Q And this was preceding your retention as an expert for purposes of preparing the report we're going to spend the balance of the day discussing, yes?

A That's correct.

Q If you would turn to Page 6 of your report, please.

A (Witness complies.) Are we now looking at the June 1st dated report?

Q We are looking at the June 1st report.

A Okay.

Q You list the documents that as of the time this report was prepared, you had reviewed.

How was it determined which documents you would review?

A Some documents were supplied by King & Spalding. That would have been my only manner of receiving the transcripts of any of the depositions. So those came directly from King & Spalding. The other documents would have been either in my possession. We've talked about the consultations or whatever appropriate word that occurred in January and February 2009. And then I was able to find the University System of Georgia policy on the website, publicly accessible. So I don't remember whether somebody said go look here, but I was interested enough. I knew to go look there. And then I had earlier, even before talking with anybody connected with the case, had seen the complaint, as I already mentioned, and then at some point saw the answer. These are also publicly available.

Q Now, you indicate at a general level the legal research that you conducted.

Do you see that?

A I do.

Q Was that personally done by you or you in combination with your research assistant?

A Almost of all of it would have been personally done by me. When I asked the research assistant, Neil Wehenman, to help with that, especially the last stage of points about the elements of the fair use checklist, he did some original research and cited some of those cases that are there.

Q Was all the writing in the report yours?

A All of it's mine.

Q And the library science research, was that -- who conducted that?

A I did.

Q And the review of sample copyright policies, I believe you indicated that that was a task which your wife graciously agreed to take on at least in part?

A She took on the task of handing me a stack of policies, and then I did the task of the review, organizing, pulling out information and so on.

Q So all she did was cull, as it were,

sources for you to then review?

A Located policies on websites, that's correct.

Q And did you ultimately use a subset of the totality of website information she provided you?

A I did not use 100 percent of what she gave me, that's correct.

Q What was the basis for filtering out some of it?

A Mostly I was seeing repetition. I think by the time, of course, I was working on a tight deadline, couldn't do everything. Plus it got to the point where you begin to see patterns in the policies. My principal goal in putting the policies in here at all or at least, I should say, my principal goal in the selection of which policies ended up in the report was to demonstrate something about the variety of positions that colleges and universities were taking. And when I was getting through the stack of policies, when I was pretty much seeing the same language again and again and again, I just realized maybe I've had enough. It's time

to move to the next task.

Q Why did you believe it was relevant to your assignment to provide an overview of what you term the diversity or variety, pardon me, of positions taken by universities?

A I can think of a few reasons. Among them would be the fact that, at least as professionals have worked with fair use, have worked in the context of electronic reserves, they've seen the issue or, if you will, the answer about what is fair use and how to work with fair use. They've seen that issue in different ways. So just simply the fact that there is a diversity of views and understanding and ways of implementing fair use. I'm simply underscoring that fact, underscoring the fact that there is a -- that there is variation in how a University might, in fact, implement its fair use or implement its electronic reserve system and, therefore, how that might impinge on what's important in the fair use equation. And so on. I really wanted to show the variety of approaches that were out there.

Q Turn to page 69 of this report.

A I'm there.

Q In your conclusion section, the last bullet states, "The policy is consistent with and similar to many policies that have been in place at colleges and universities throughout the country."

Do you see that?

A I do.

Q And you cite that as a factor, among others, that leads you to the conclusion at the start of your conclusion that the Georgia University policy as examined in this report is consistent with the copyright law of the United States.

Do you see that?

A I do.

Q If, in fact, your main purpose was to show diversity and that somewhere in that diversity, almost by definition, a policy falls, why is that supportive of a conclusion that it's consistent with fair use?

A Well, because fair use itself is flexible. Fair use itself is open to diverse interpretation. Fair use itself applies

differently under different circumstances. And so fair use itself doesn't lock in and give one answer, especially to something as multifaceted as a system of electronic reserves. And so it doesn't give one answer. As we see from these policies, that to the -- if we accept that the policies are consistent with the law, that there is a diversity of ways that an institution can look at the law, determine what it is that really is more important at that institution in the way it structures electronic reserves and also then choose, make some important policy choices about how in turn to structure its policy. So diversity doesn't mean that some are lawful and some aren't. It means that there is a range of choices where a policy maker may land in its effort to comply with the law of fair use.

Q So in sponsoring part 7, I guess it is, of this report, which is your non-scientific survey of posted information about fair use policies at different colleges and universities --

A Uh-huh.

Q -- was a premise that each of the cited institutions, based solely on what you know from what's publicly posted, is operating in conformance with copyright law?

A Am I making the statement that each of these policies --

Q Are you making that assumption?

A Am I making that assumption that they are in fact in compliance with copyright law? No, I am not making that assumption, no.

Q Are you making the assumptions that the policies, at least so much of them as you became familiar with through this search process, on their face are in conformance with copyright law?

A No, I'm not making that assumption either.

Q But then you nonetheless conclude that since Georgia State's policy falls within this diverse range, it is support for the lawfulness of the Georgia State policy. How do you do that? How do you make that leap?

A I will tell you what I am assuming. I am assuming that the makers of these policies

have addressed, have considered issues of fair use, have considered the fair use law as it applies to their institution, that they have -- somebody, in developing these policies, has learned about fair use and has -- has written a policy that they believe is in conformity with the law of fair use. I'm assuming that, therefore, there is a very, very good chance that they are in conformity with fair use, as opposed to my having made a specific evaluation of each of these policies. I haven't done that.

And I also know that the one thing that we can see, and we have some documented evidence of that, is that a lot of the policy making process of different universities is a process of learning from one another. We also have documented evidence that I've cited in here that a lot of the policies have gone to University counsel for formal legal review, which I think heightens the likelihood that they are, in fact, in conformity with the law. I know that a lot of the elements of the policies are, in fact, directly relatable to things that I could, given more time, cite in the law as

being part of the law.

And therefore, while I'm not here to endorse any particular one or to pass legal judgment that X university is in compliance with the law, I am making what I think is a supportable assumption, that as a general trend, we are seeing universities that have legal support, have legal advice, have years of experience, have experimented with different policies. And in fact, I think we can make an assumption that they are likely, highly likely operating within the law.

Q How many of the 39 institutions that you culled from your wife's surveying of the Internet have you personally spent time with and discussed and learned the details as to their fair use policies and practices?

A Me personally?

Q Yes. I assume Indiana is one of them.

A Actually, not. One of them I list in here is Indiana Northwest, I think it is. And it's my experience from having been at Indiana University that the different campuses actually make different -- have the flexibility to make

different policies on these issues. And so I have not worked on that particular policy. So how many have I actually spent time discussing to any extent with any of these universities, not very many.

Q How many?

A You know, in fact, I've had some conversation with -- I met -- chatted with somebody many years ago at Brown University. Many years ago with somebody at Bucknell. I've had conversations with people at Pennsylvania State University.

Q How recently?

A About E-Reserves in particular?

Q Yes. How recently?

A On E-Reserves, it's probably been five years, maybe more.

Q When you say you chatted with them, in what capacity? Were you hired as a consultant?

A Not hired as a consultant, other than you might -- one of the visits that I've made to different campuses and made a visit to Pennsylvania State University, not as a policy-making consultant, but somebody to come

and visit and be available to discuss these issues. Then they take whatever we talk about and make their own decisions.

Q How much time did you spend with them?

A I was there for a full day's visit.

Q One day?

A One day.

Q You wouldn't say you're an expert in their current practices as they relate to E-Reserves, would you?

A No.

Q Keep going.

A I've had occasion over the years to talk with people at Yale University, maybe most recently within the last year or two.

Q What were the nature of those conversations?

A I visited Yale as a guest but to talk about other issues, and I know that we had just some just side conversations about some of the issues that they're dealing with and still making decisions. But if Penn State was a one-day visit, this would've been a 15-minute visit.

Q Okay.

A University of Wisconsin. Their policy at the University of Wisconsin, if I recall correctly, it's been in place there for eight or 10 years, and I don't believe it's been changed in the meantime. And I remember back at that time having some extensive conversations with people at the University of Wisconsin, some give and take about their position.

Q In any formal capacity or just conversation?

A Just conversation, just one professional to another, sharing ideas.

Cornell University, I chatted with somebody at just a lunch meeting as recently as within the month to talk about what they've done, how their policy may be working and how they use it.

Q Was that a meeting set up for that purpose?

A No. No. Somebody from Cornell happened to be in town, somebody I work with, and we share ideas on different copyright issues.

KENNETH D. CREWS

Q Who was that?

A Peter Hirtle, H-I-R-T-L-E.

Q And did you have occasion to discuss with Mr. Hirtle the impact of the understanding that Cornell reached with the Association of American Publishers on ongoing E-Reserves practices at Cornell?

A We did talk a little bit about that, because that does form the crux of their policy.

Q What did he have to say about that?

A He said that actually it's given -- because they rely, it's integrated into their standard. They use the fair use checklist, their own version of it. I believe he said they made some minor changes to it. That it actually -- the result has given them a good amount of flexibility for how they proceed with what materials they can put on electronic reserves.

Q So he reports that the resolution of the dialogue with the publishers had a positive impact on the application of fair use at Cornell?

A I believe he was saying in some

respects, it does.

Q Anyone else?

A Keep turning the page here.

I did make a visit to the University of North Carolina at Greensboro, but it was one of the general visits, big crowd, answering questions. I don't believe we talked anything about electronic reserves. And I can say the same thing about the University of Washington. And that brings us to the end of the year.

Q Turn to Page 41. Let's just take Princeton University.

A Sure.

Q Tell me all the details you know about Princeton University's E-Reserves practice?

A I did put an appendix.

Q Yes, we have that. We'll mark that now.

MR. RICH: We'll mark as Plaintiff's 302 -- well, it's really Appendix E to the June 1 report of the witness.

(Whereupon, Appendix E to the June 1 report of the witness was marked as

Plaintiff's Exhibit 302 for identification, as of this date.)

BY MR. RICH:

Q I think you're going to find it towards the back of this compilation. Page 92 out of 120, if you look at the pagination at the top right.

A 92?

Q Out of 120.

A I am there.

MR. RICH: You can read back my question.

(Whereupon, the requested portion was read back by the court reporter: Tell me all the details you know about Princeton University's E-Reserves practice?)

A The details I know is limited to what's publicly available. It's limited to what I'm reading here and what I have included in the appendix. I believe that I did click these links that are inside this report to copyright basics and the University's copyright policy; but I did not include them here, and I don't recall exactly what they said.

KENNETH D. CREWS

Q What do you know about the actual day-to-day implementation of E-Reserves practices at Princeton University?

A Nothing.

Q If I were to ask you that question about the additional 38 colleges and universities, how would your answer differ; that is, what you know beyond what appears in Appendix E?

A Other than an occasional insight, such as the one I mentioned about Cornell or -- you know, I better rephrase it a different way.

We know -- I know -- because your question is what do I know. I know pieces of information about some of these institutions, and typical examples of that would be the one spot of information that I mentioned about Cornell or the pieces of information that I was able to find in some of the published articles that individuals at those universities have written, to say here is our experience at, for example, the University of Colorado and here is experience we've incurred. Here is how we developed our policy and so on. So actually, I

am able to say I know some pieces of information about practices at some of these universities.

Q How many the 39 do you know some information about beyond the public?

A Oh, beyond what's public?

Q Beyond what you have described and otherwise put into Appendix E.

A Oh, then we kind of go back to reading through the list. Do you really want me to do that?

Q I do.

A Okay. And so, for example, University of Colorado, but I think this is not exactly what you've asked for. I have cited some experiences that were published that were public from the University of Colorado.

Q That had to do, if I recall, with permissioning issues, correct?

A That's correct. That's correct. But that's part of the process.

Q All right. So that's the extent of what you know in addition about the University of Colorado?

A That's right.

KENNETH D. CREWS

Q What else?

A No, I'm not going to claim to be a witness to the internal operations of these institutions and how they do their E-Reserves on a day-to-day basis. If that's what you're wondering, the answer is going to be very simply, no, I'm not that.

Q And without that knowledge, you're still comfortable that it's very, very likely, in your earlier words, that every one of these institutions is in compliance with copyright in their E-Reserves practices?

A I believe I said highly likely.

Q Highly likely.

A Highly likely. And I didn't say practices. I was referring specifically to the policy documents themselves and that the policy document that they've offered up has a high likelihood of being consistent with fair use law.

Q And irrespective of the degree to which that policy document has been implemented in practice at a given institution?

A Well, if we don't know that

information, what we don't know could actually go both directions. What we don't -- we don't know, for example, if they ignore their policy or we don't know if they're actually tougher behind the scenes, that the policy allows something but in practical reality, they don't do it.

Q But you allow for the possibility that they could ignore their policy, correct? You don't know one way or the other?

A That's possible.

Q And if they did ignore their policy, is that a matter of indifference to you in terms of a conclusion as to copyright compliance?

A You've changed the question.

Q I'm allowed to do that.

A You are allowed to do that. I just want to make sure I respond -- make sure that I'm not mixing up questions.

It's not -- if the question is copyright compliance, then I would say, in general, I'm going to look for more than just a document that's in a file. On the other hand, if you're asking is the document itself and the

substantive statements in the document, is it consistent with what fair use law is or provides for, I may say yes to that. While at the same time, at the same institution, we would look for additional facts, additional information to answer a separate question about compliance.

Q You claim to be an expert in copyright law. And accepting that for the sake of my question, is it your view that all the court needs to do in this case is to look at a facial policy enacted by Georgia State University to determine whether Georgia State is in compliance with copyright law as it comes to E-Reserves practices?

A I'm going to answer your question. I'm just going to want to make sure I'm answering the right question. If the question before the court is as you've set it up -- and make sure I get this right, because I really want to answer your question. If the question before the court is, is this University, whatever University, in fact in compliance with copyright law with respect to whatever content -- I know you didn't say that, but tell

me if this is okay -- with whatever content is in electronic reserves --

Q That is my question.

A That is your question.

-- then we need to know more than just the facial policy that's in the policy manual or on a website.

Q What else do we need to know?

A Sure. Then we would want to look at the process of implementation, absolutely. But, you know, I'm wondering if your question isn't even something simpler than that. Could you -- if you're suggesting that the best policy in the world -- or the United States, because we're only talking about U.S. law. The best policy --

Q You actually cite Canadian law at one point.

A That's different.

If the best policy imaginable, whatever that may mean, and the best implementation possible, whatever that might be, I mean, is it conceivable that still something goes awry under those circumstances and therefore one could point to it and say, ah-ha,

you know, I found something that's outside the limits? Could that happen? Sure.

Q You're asking your own questions and answering them. I'd rather you answer mine. My question, which you did answer was: Can you make a judgment about the lawfulness of copyright practice at Georgia State University strictly by looking at the facial policy promulgated by the University?

MR. SCHAETZEL: Objection as to form.

BY MR. RICH:

Q You can answer. I believe you answered it no.

A I believe I've answered it no.

MR. SCHAETZEL: Same objection.

BY MR. RICH:

Q Okay. That was my question.

And therefore, if that is the question -- I'm asking you to assume that's the question that the court in this case will be required to answer -- would you agree with me that looking at the facial policies, without more, of 39 other unscientifically selected institutions really doesn't answer the question

as to the actual legality of practice at Georgia State University?

MR. SCHAETZEL: Same objection.

You can answer.

A It does not answer that question.

Q Thank you.

Let's stay with Appendix E for a few minutes. You said that your wife handed you a stack, right, whatever they were. How many different institutions were in that stack, to your recollection?

A You gave me a number earlier.

Q There are 39 in here.

A 39 here. I mean, if I had to just guess, roughly, what the number was, I think it was like 10, maybe fewer, that I did not include.

Q Because you found them to be repetitive of what you saw elsewhere, right?

A It wasn't giving me anything new.

Q And then what was the process by which you extracted the information that appears in the various bullets under each listing here?

A Yeah, I did that, and I went through

each policy, one at a time, and extracted the elements of the policy that I thought evidenced something helpful and insightful about how they are defining their position on fair use.

Q Let's just take a few example so I can understand this a little better. We'll go in order much the tabs on the exhibit. I think we will, anyway. Let's try.

The first one is if you turn to Page 30 of your report, please.

A (Witness complies.)

Q And at the top we have University of Colorado, right?

A That's correct.

Q And then if you flip to, hopefully, the first yellow sticky. If it looks like this, we're on the same place.

A We're there.

Q And if you look down to the bottom of that page, there's a bullet that says, under Copyright Guidelines, "Up to 25 percent of most other works may be placed on E-Reserves based upon our interpretation of fair use."

Do you see that?

A Actually not right now.

Q Page 9 of 120.

A Yes.

Q Do you see at the very bottom, where it says "Up to 25 percent" and so forth?

A Yes.

Q Then look back at your synopsis, eight bullets down it says, "Copying limited to 25 percent of most works."

A Uh-huh.

Q Do you think that's a fair and accurate synopsis of what appears at the bottom line there?

A Based on what I'm saying right now, I think that's right.

Q That a straight 25 percent copying rule is consistent with saying up to 25 percent based on interpretation of fair use, meaning conceivably less than that?

A I think I'm hearing two different things.

Q I'm sorry. You find that copying limited to 25 percent of most works accurately captures the last bullet on that page?

A Yes, because what I meant and what I think that I still read when I see "limited to," that means up to. It could be less than. And the document itself says up to 25 percent. I certainly meant the same thing as that.

Q Okay. Let's turn next -- oh, by the way, as I read your type one groupings, which you describe at Page 28, policies with quantified limits based on percentage of work.

A Okay.

Q The high end of that, to me, was at Page 31, Indiana University Northwest, books limited to 50 percent, articles limited to 50 percent, is that accurate from your research?

A Is it accurate that that is the high end of what I saw?

Q Of what you saw.

A Yes. I don't recall seeing anything higher than that.

Q And is it a coincidence that it is Indiana University, meaning coincidence in the sense that you had no input on that determination?

A I think there's no connection there

whatsoever. I had no input whatsoever on the determination at Northwest, and they made no contact with me about it.

Q Had they contacted you and said would you be comfortable with a bright-lined 50 percent of a book or journal entry as a fair use litmus test, what would you have counseled them?

A I would have said 50 percent of a journal is unusually low. 50 percent of a book is very unusually high. I would begin the conversation there.

Q Stated differently, you would be uncomfortable with a policy that blanketly allowed up to 50 percent of a book to be copied under a fair use rubric?

A I would be.

Q Next I believe is Ashland University, so that's over at Page 35 of your report, sir.

A Okay.

Q I just want you to follow along. And then hopefully it's the next tab as well. So it would be Page 52 of 120.

A I am there.

Q If you would look down, please, in the

section called "Restrictions," the second paragraph from the bottom there's a statement that says, "Electronic reserves are not intended to replace a course pack or traditional textbook."

Do you see that?

A Do you mean right here?

MR. SCHAETZEL: Objection to form. I think you mean under the heading "Length of Works" --

MR. RICH: I beg your pardon. I past that. You're right.

BY MR. RICH:

Q So under Lengths of Works. Are we on the same page? Yes. It's the second paragraph from the bottom of that paragraph. "Electronic reserves are not intended to."

Do you see that?

A I see that.

Q I don't see that. Although you have a very lengthy recitation of propositions, I don't see that on your list. And my question is: Why did you decide not to enumerate as that as a potentially significant feature of Ashland's

KENNETH D. CREWS

fair use E-Reserves practices?

A I'm not so sure I have an answer for you, other than just trying to get the job done.

Q You would agree that that's a relevant and indeed significant limitation on access to E-Reserves, correct?

A On access to E-Reserves?

Q Access without permission -- let me rephrase. That was poorly worded.

You would agree this is an important element of the criteria used by Ashland to determine whether works require permission or not?

MR. SCHAETZEL: Objection as to form.

A No, actually, I wouldn't.

Q So whether or not somebody is proffering what is a substitute for a textbook as an E-Reserves offering is of no moment to the fair use analysis?

A That's a very different question. That's a very different question. Your question is use of material -- well, you know, I'm going to butcher your question, but I really want to answer. I really want to answer both questions.

Q Let me re-pose a couple of narrower questions.

Did you deliberately read this sentence and determine that it was not a significant aspect -- significant cannot enough aspect of Ashland University of Ohio's policy to put into your otherwise 20 bullets here?

MR. SCHAETZEL: Objection as to form.

A I don't honestly remember exactly what I was or was not thinking when I read that and created my list of bullet points. So if I'm reconstructing my thinking at the time, I don't have a good answer for you.

Q Looking at it now, would you agree that it's at least as salient a consideration as, for example, audio, video and graphic images will not be placed on E-Reserves without permission?

MR. SCHAETZEL: Objection as to form.

A No, I think it's just altogether different.

Q Different and unimportant?

MR. SCHAETZEL: Objection as to form.

A No, just different.

Q You earlier suggested you didn't think it was particularly important, if I understood you.

MR. SCHAETZEL: Objection as to form.

A I'd really like to clarify what I'm thinking.

Q Please.

MR. SCHAETZEL: Same objection.

Go ahead.

A You've asked many, many questions now, and if it's a question about -- one question you asked is about materials being available as a textbook, is that relevant in the equation on fair use.

Q Let me pose a clean question to you so you know what question you're answering.

A Thank you.

Q I take it that your objective in going through this exercise with respect to any given university was to fairly capture elements of their E-Res policy that you think have some implication or bearing on the issues involved in this case, true?

MR. SCHAETZEL: Objection as to form.

KENNETH D. CREWS

A True.

Q My question is: Looking at this statement that I have read into the record that I don't see appearing in the bullets, do you agree with me that that statement, now that you have a chance to study it, properly warranted being included in your list here? If not, why not?

MR. SCHAETZEL: Objection as to form.

A It does not necessarily need to be or properly be warranted to be listed over in my report. And your follow-up was why not. And the answer to why not is because it's not necessarily something that has to do with the fair use equation. So now that I'm looking at it, it's very often a reserve service at a library will not put textbook material on reserve or will not put existing course pack material on reserve. And why? Because either sometimes it's, A, it's outside the scope of the content materials that the library is going to be responsible for owning, handling, managing and making available. It may have absolutely nothing to do with the question of fair use.

Sometimes the answer is B, that a library will not put traditional textbook course pack materials on reserve, again, simply for the management reason that they have a cooperative working relationship with the nearby bookstore, and the bookstore says we need to handle this type of material and the library says, okay, we'll let you handle that, we'll do other things. And so the reason why this kind of limit often occurs in reserve practices around the country has nothing whatsoever to do with copyright. It's a management decision.

Q And what is your knowledge as to the rationale that Ashland University put that limitation in its policy?

MR. SCHAETZEL: Objection as to form.

A I have no specific knowledge of the decision at Ashland.

Q And you would agree with me, would you not, that it would be just as reasonable to infer that one or more universities would place such a limitation on unpermissioned use of E-Reserves materials because of a concern that it could entail copyright infringement, correct?

KENNETH D. CREWS

MR. SCHAETZEL: Objection as to form.

A I'm not sure I'd make that same inference.

Q Okay. Let's go on. We're going on to Page 36 of the report dealing with University of Vermont, and I ask you to look at Page 55 in Exhibit E to your report and specifically the third paragraph down, beginning with "Instructor should not."

Are you with me there?

A I am.

Q The second sentence reads, "The total amount of material on reserve for a class should be a small proportion of the total assigned reading for that class when invoking fair use."

Do you see that?

A I do.

Q Why did you exclude that?

A I don't know if I have a good answer for you. Just, again, the process of covering a lot of material and getting the job done on a tight schedule. I'm not sure I have a good answer for you.

Q And if you turn to the next page of

this same policy statement, there is a heading entitled "Course Packs."

A Uh-huh.

Q And two sentences from the bottom it says, "Course packs will not be scanned for electronic reserve."

Do you see that?

A I do see that.

Q What was your reason for excluding that from your bullets?

A I don't recall any reason at all.

Q If you turn to the next page of your report, 37, Yale.

A Uh-huh.

Q And if you would turn, please, to the next tabbed sheet, which is Page 60 out of 120 from your compilation. In your report, you indicate digitizing books allowed limited to one chapter, digitizing articles allowed limited to one article from a journal and so forth. If you'd look under Section D on the Yale policy, do you see that it says, at most, one article from a single journal issue; at most, one chapter from a single book?

Do you see that?

A I do.

Q That's a little different from what you wrote, isn't it?

A Well, it is.

Q Not important?

A No, I think I mean the same thing.

Q Down in the very next paragraph, "Items for which we do not already own an electronic copy, we will digitize, make available And submit to the copyright clearance center."

Do you see that?

A I do.

Q And did you deliberately leave out any reference to the copyright clearance center in your bullet?

A No. I've got mentions of the copyright clearance center at various places through here.

Q All criticisms, yes?

A No, no, no, no. I think I've got them mentioned in some of these other summaries, if I recall correctly. I have no reason to leave

them out.

Q If you turn to the next page of your report, University of Chicago.

A (Witness complies.)

Q Under effective use, the fourth factor. This is page 66 of the exhibit.

A I'm there.

Q Do you see under effective use, factor 4?

A Right.

Q The last item reads, "Instructor should consider whether materials are reasonably available and affordable for students to purchase, whether as a book, course pack or other format."

Do you see that?

A I do.

Q Why did you decide not to note that in your bullets?

A No particular reason that I'm recalling.

Q Next entry on Page 38 of your report is University of Oklahoma, and it's the very next, I think, page of this compendium, if I'm

right, Page 68, actually of 120. In the middle of that page under a paragraph beginning "Many college University and school libraries."

A I see it.

Q In the middle of that it is stated, "When materials are included as a matter of fair use, electronic reserve systems should constitute an ad hoc or supplemental source of information for students beyond a textbook or other materials."

Do you see that?

A I do.

Q Why did you not flag that element in your otherwise lengthy recitation as to the University of Oklahoma?

MR. SCHAETZEL: Objection as to form.

A And I had no reason that I recall, other than, again, just the process of moving through a stack policies in short order. I could probably, you know, also really realize that as we break out these type one, type two, type three policies, giving a lot of attention to a variety of different issues. The measure of quantity and other elements that were across

the policies. But otherwise, no particular reason.

Q If we turn now to Page 39 of your report, Emory University, and look at Page 75 of the Appendix E. Your second bullet under Emory says, "Library will assist with determination of fair use."

Do you see that?

A I do.

Q If you look at the permissions section, it states, "In support of classroom instruction, Provost Lewis has generously created a special fund for the libraries to pay for permissions. This fund is separate from the budget for new library materials. If a reserve assignment seems to exceed the threshold of fair use, the libraries will seek and pay applicable permissions fees on those materials as a service for the faculty." Please contact so and so.

Do you see that?

A I do.

Q Would it not be relevant for you to indicate here that the library at Emery not only would assist in determinations but would also

substantially fund any permissions fees?

MR. SCHAETZEL: Objection as to form.

A Not -- not as to the question of calculating whether something is or is not within fair use, and that's really where most of my attention was in pulling out these bullet points.

Q You spend a fair amount of time elsewhere in your reports, don't you, doing an essay of sorts on why libraries are not well equipped to handle and fund permissions requests, correct?

A That's correct.

Q So would it not have been an aid to the court in doing these extracts to identify fairly for the court those instances from those universities you surveyed where in fact the University has funding and has indicated a willingness to support that?

A I think --

MR. SCHAETZEL: Objection as to form.

A I think I've done that. Maybe I didn't do it on this particular sentence. You could probably look around and maybe find more

sentences.

Q That's different from saying before you didn't find it relevant to the fair use analysis. That was your prior answer to me.

A It is. But then I thought you were asking about whether or not it would have been helpful to mention that universities have funds available to pay permission fees, and I've certainly done that in many instances through this report.

Q Next, and I think last, is Cornell University. Cornell appears at 41 of your report. And I would ask you to turn, please, to Page 96 of Exhibit E.

Now, looking at your own bullets here, about midway down you say, "Under Cornell's policy, course packs may not be available digitally."

Do you see that?

A I do.

Q And so when you earlier suggested to me when I pointed out with respect to another institution the same policy and indicated you didn't find it especially relevant to your

undertaking, you nevertheless determined it to be so with respect to Cornell?

A Evidently. If you could give me just a few minutes just to make sure it isn't somehow different, but -- you know, maybe my answer is I'm not perfect.

Q With respect to Cornell -- actually, let's look at Page 98.

A And may I also say that I think there may actually be a real difference between the Cornell statement and whichever university the earlier statement came out of. Because here we're talking about -- if I remember the other statement correctly. In Cornell we're talking about taking those course packet materials and making the course pack itself digitally available. Maybe that's a key difference, but I don't know. Maybe it's just I'm not perfect. Maybe that's all it is.

Q If you would turn to Page 98 of Exhibit E, please, which is styled "Cornell Electronic Course Content Copyright Guidelines."

A Yes.

Q If you look down at the second bullet,

I'd just like to read that into the record. It states "The copyright principles that apply to instructional use of copyrighted works in electronic environments are the same as those that apply to such use in paper environments. Any use of copyrighted electronic course content that would require permission from the copyright owner if the materials were part of a printed course pack, likewise requires the copyright owner's permission when made available in electronic format."

Do you see that?

A I do.

Q Did you consciously decide that that guideline, as it were, from Cornell didn't warrant inclusion in your bulleted summaries?

A I don't recall making a decision about including it or not including it.

Q Sitting here today, do you feel that's a relatively important or unimportant facet of how an institution might think about its E-Reserves practices?

A Well, it's important that it may not be -- I want to make clear, important doesn't

mean good. It means it's important.

Q And by good, you mean what?

A Well, I think it's problematic in terms of really coming to grips with fair use.

Q That's a legal conclusion you would draw?

A Is it?

Q I'm asking you.

A I don't know. I mean, it's hard -- I'm not sure. We'd have to define what a legal conclusion is. But it's certainly -- a statement of the fair use permission standard in one arena therefore needs to be the same as it is in the other arena is, as a matter of fair use, overlooking what may be real differences between the two.

Q What do you mean by arenas?

A Well, by arena, in this case it would be the arena of course packs and permissions -- course packs is really the arena. And electronic reserves being the other arena where this activity is taking place.

Q I understand that.

A That's what I mean.

KENNETH D. CREWS

Q Coming back now to your work on this report and the sources you consulted which we were looking at when we moved in this section a while ago. That was at Page 6 and 7 of your report.

A Uh-huh.

Q Who else, other than the individuals that you identify at Page 7 of your report, did you interview or otherwise consult with in connection with preparing your first or rebuttal reports?

A I believe the answer is nobody.

Q Did you sit with any library staff at GSU?

A No.

Q Did you -- and by "sit with" I mean figuratively or by telephonic communication. Did you sit with any members of the faculty?

A No.

Q Did you sit with any students?

A No.

Q Did you meet with any administrators, again, apart from anybody who might here be listed?

A No.

Q Did you sit with any legal advisers for the University other than the group listed here?

A No.

Q Can you identify for me who the legal advisor or legal advisors are to whom faculty members are to turn for any advice in implementing the new policy?

A I believe that the answer -- that I learned from the depositions that the counsel's office was available and if there were named people, I believe that Cynthia Hall, assistant legal advisor at Georgia State, has been conducting workshops, making herself available. Probably Ms. Heyward, mentioned here, would be available.

Q But do you know that as a fact about Ms. Heyward?

A That I don't know as a fact.

Q Other than Ms. Hall, do you know anyone as a matter of fact?

A As a matter of fact, no.

Q Do you know Ms. Hall's current

employment status with GSU?

A No, I don't.

Q Have you spoken with anyone who is or was on the Board of Regents about your expert report?

A No.

Q Did you speak with anyone who was on the committee chaired by Mr. Potter that was responsible for developing the new policy?

A No.

Q Did you speak with any IT people in the University about the system which facilitates the availability of E-Res materials?

A No.

Q Did you speak with anyone responsible for the so-called uLearn course management system?

A No.

Q Did you examine any course syllabi created by any professors which have been populated with works on the E-Res system?

A No.

Q Have you examined any summary data with respect to the volume of works, say, for

the fall 2009 semester that have been posted to the E-Res system?

A I believe there was some mention of those numbers in the depositions, but I don't recall them and didn't make any use of them.

Q Have you investigated the number of instances in which a member of the library staff has reviewed in any fashion any proposed scanning and a posting of E-Res materials in the creation of E-Res course pages?

A The depositions suggested that that might be happening in 100 percent of the cases.

Q Is that your understanding?

A That is my understanding.

Q If it was happening hypothetically in less than 1 percent of the cases, would that be of any concern to you?

A And if by review, you mean that a member of the library staff sees what comes in, and as I understand, that happens, because the E-Reserves at Georgia State come through the library, they're delivered by the faculty member to the library. And if it's a claim of fair use, the faculty member must have completed the

checklist. And I think that if review means seeing what's happening and seeing these simple steps, then I would expect it to be a very, very high percentage. And if that were under 1 percent, I would say we better revise our procedures.

Q Just so I'm clear, you're saying that the library review criterion which you speak about with some degree of importance attached to it, I think it's fair to say in your report, is satisfied provided solely that there is a physical handling of the material literally as part of the mechanics of scanning, independently of whether in the normal English conception of the term "review," any review of that material is actually made for fair use purposes? As long as it's physically touched by a librarian, that suffices?

A No.

MR. SCHAETZEL: Objection to form.

BY MR. RICH:

Q Then I misunderstood you?

A Yeah, yeah. What I understand is that somebody in the library is receiving, and it may

be -- I understand that most of it at this point is paper, but it could be coming in electronically. But nevertheless, somebody, a person employed inside the library system is seeing that content delivered to the E-Reserves operation and that that person has the level of knowledge sufficient to see the material and to at least then recognize whether the faculty member appears to have done his or her job and recognize some particularly problematic materials, either it's too much or there's something else unusual about it, and raise those questions then with somebody higher up in the library to give it yet an additional review. That's what I understand.

Q What level of training would you regard as appropriate for those persons performing that library function?

A At the very first level you mean?

Q The first level.

A It doesn't take much. I think that especially with some time of practice and some semesters of experience with the system and seeing different types of works come in, they'll

KENNETH D. CREWS

quickly gravitate toward being able to see here's our general pattern of what is permitted under our fair use standard. Here's a general pattern of things that generally raise questions. And I think that the person who's in that first level doesn't need especially high-level technical, certainly not technical legal training. I would like to see that person have some good awareness training. Here's what copyright is. Here's what we mean by rights of owners. Here are the kinds of materials that, in fact, are copyrighted. Here are the kinds of things that we allow and don't allow. Here's what to watch for. And if you have any questions, if you see something that raises questions or concerns, follow your instinct, set it aside and let us know. And somebody at a higher level, who maybe has more expertise, would then give it another look.

Q What minimal level of education would you recommend such library staff to possess?

A Again, at that entry level, the very first level?

Q Yes.

KENNETH D. CREWS

A        I would typically expect and probably
end up actually recommending, unless somebody
demonstrated that it's not working, these could
easily be good students at the University hired
on a part-time basis to help us manage that
intake.  They could do it.

Q        Now, if hypothetically the only review
that were to be undertaken of materials
proffered for the E-Res postings --

A        Right.

Q        -- was a quantitative litmus test,
X percent of a given work, below which end of
review.  If that were -- hypothetically, if that
were the sole screen, is it your view that that
would be a meaningful check and balance of
potential misapplication of the fair use policy
that's been put in place?

A        Well, really interesting question.
And I think this really is your question.
Because you didn't ask -- can I say what you
didn't ask?

Q        Be careful, I may ask it.

A        You might.  You didn't ask policy
having a simple quantitative analysis.

KENNETH D. CREWS

Q We'll get there later.

A Yeah, I figured.

So, yeah, if the senior person in the library were to say to the front guard people, look, here is a short list of a couple of things that might easily be outside of fair use or merits a further review, and if maybe one of those things is, you know, this quantitative measure, send that over to me for further review, that would be all right. That would be all right.

Q What would your short list comprise?

A I haven't thought about this. So this is a brand-new question, so I'm not sure -- I'm going to give you a real meaningful answer. But I suppose it could easily be things like, you know, a certain percentage of a book. You know, again, I'm not saying this is the policy. I'm saying this is just our internal double check. It could be that. It could be a type of work. If anybody ever comes in and says put this clip from a feature motion picture up on electronic reserves, maybe that deserves a second look. So it could be measured by -- the extra screening

could be triggered by the type of work that's involved. Something like that.

Q But as to text works, can you think of nothing other than the very quantitative measure which you have elsewhere said and others have said is not a meaningful screen alone for fair use?

A Oh, okay. You mean just sticking with textural works.

Q That's what this case is about.

A Yeah, I'm with you. Yeah. You know what I have seen some universities do, and I think it's a real good thing, is at that beginning level of screening, let's do a quick check and see if we don't already have this work in electronic form. Let's take a quick look. Let's see if we don't have it, if it's a journal article in one of those expensive databases that we're buying. Or increasingly, universities are buying electronic books. You know, "we" meaning the sort of royal we. Universities, libraries all over the country are buying electronic books. So let's, for example, take a look and see if it isn't already there. And if we

already have it in our collection, fully accessible for the students in that class, then let's not scan it. So I would ask the initial review to see if it's something we don't already own. I would include that.

Q So putting that -- let's assume the body of material presented otherwise is not available through the library collection online, accessible. So it's a group of either scanned materials or hard physical copy materials sought to be scanned. And let's assume again that the only screen that the librarian is trained to do is a straight quantitative screen. If the work doesn't cry out for a red flag because it's not more than X percent but otherwise saying I can't be bothered with the rest of these fancy standards, would that in your view pass muster as a good check and balance?

A And you said check and balance. Not to be confused with the policy, but just as an initial screen so somebody else might take a closer look?

Q Yes.

A And we had some sort percentage or

quantitative measure, this deserves an extra look? Yeah, that's all right. And again, we're not talking the policy. We're not talking the definition of fair use. We're talking just give it an extra look.

Q And what if there were no librarian in the process? What if it was up to the unfettered discretion of the faculty member to apply the standards and the checklists as they would and have no library review or mechanism for review in the process, would that concern you?

A I would look for a few other things. Again, what exactly is this policy? Does the policy provide help for that individual to really make some decisions. Does it provide some guideposts about what are the things to think about before you make that scan or make that download and make that material available? I would look for that. I would look for whether or not the University has made clear to the faculty member that, by the way, copyright exists, fair use exists. Here are some materials to help you make decisions about what

fair use may mean and make them relevant to your particular situation. I would look for the University to hold some workshops and sessions and educate the faculty. I would look for elements like that to be able to support the faculty as they make responsible decisions.

Q And would that make a review mechanism such as you speak of in your report by the library staff unnecessary?

A No. I think it could all be -- just go hand in hand. You know, the neat thing about all of this is there isn't just one method. There isn't just one dynamic. There isn't just one answer. We need to just keep experimenting with all of these possibilities and keep them all in mind simultaneously. Because part of the simple fact, too, is that we can figure it all out today, but tomorrow and next year we're going to be facing some different challenges as needs, technology, education change. So it's important to keep an open mind and keep flexible and keep reviewing what we're doing.

MR. RICH: Why don't we break for lunch.

KENNETH D. CREWS

MR. SCHAETZEL: Very well.

(Whereupon, a break was taken.)

BY MR. RICH:

Q Good afternoon.

You are -- you hold the position of director of the copyright advisory office at Columbia University; is that correct?

A That's correct.

Q And you've held that position since December 2007?

A That's correct.

Q And I take it you also have an adjunct appointment as a lecturer in law?

A That's correct.

Q And that appointment was as of August of '08?

A That was when I began teaching a class for the first time at Columbia, that's right.

Q And is yours a tenured position?

A It is not.

Q Am I correct that the course you teach or have taught is an international copyright course at Columbia?

A At Columbia, yes, that's correct.

Q I take it that the reports you have submitted reflect strictly your own views and perspectives on the issues presented and not that of any other faculty at Columbia Law School, correct?

A That is correct.

Q Including any tenured copyright faculty, such as Professor Ginsberg, right?

A That is correct. To my knowledge, he doesn't even know I'm working on this case.

Q As a general proposition, you indicate at Page 3 of your testimony in the first paragraph that much of your work has been centered on the copyright issues that are important to the work of colleges and universities; is that correct?

A That is correct.

Q And among those topics is fair use, correct?

A Correct.

Q And in your vitae accompanying your report you list, I believe, a number of -- I'm looking at Page 12 of Exhibit A to your report.

MR. RICH: We can mark this as the

next exhibit, which is Kenneth Crews' curriculum vitae as attached to his report.

(Whereupon, Curriculum Vitae of Kenneth D. Crews was marked as Plaintiff's Exhibit 303 for identification, as of this date.)

BY MR. RICH:

Q If you could just direct your attention to Page 12 of your vitae. You list a series of national associations who have hosted programs you have conducted?

A Yes.

Q Is there a commonality of any kind among those? How would you describe those in terms of their orientation to issues that are within your expertise?

A Sure. There are more. These are actually just a set of examples of organizations that have invited me. But the commonality among most of the organizations that have invited me to give a program or other presentation has been some sort of a connection to higher education or research or libraries.

Q And in that relation, when you were

focusing -- I realize you focus on a series of issues not limited to fair use, but staying with the fair use aspect of your consulting work. Is it accurate for the most part the groups of people with whom you consult are, for the most part, consumers of copyrighted material and therefore their needs most dominantly are those as users as opposed to copyright owners or creators, viewing the fair use issue?

A Right. Right. The last point got me mixed up.

Q I'm sorry. I didn't mean to be complicated.

A That's okay. I don't mean for it to be complicated.

Most of the groups that I talk to have a strong interest in both questions of ownership as well as questions of fair use. So please ask me again. I'm not trying to dodge anything.

Q Let me ask the question a different way.

You're obviously very familiar with the broad literature on fair use, on academic viewpoints, on core viewpoints. If there were a

spectrum on which you would place yourself from most restrictive views of the fair use doctrine to the most liberal views, where would you place yourself with a one being most restrictive and 10 being most liberal view?

A Based upon what I read of other people and I say that person means --

Q Purely subjective.

A Yeah, that person looks really restrictive, this person looks really liberal. I'm pretty much in the middle, a five -- four, five or six, something like that.

Q Were you surprised in any way to be awarded the ALA's Patterson copyright award?

A And surprise means like surprise party, happy birthday, I'm delighted, because that's a good thing; and if that's what it means, the answer is yes, absolutely.

Q What are the attributes of the recipients of that award, as you understand it? What do they look for?

A It is -- I was the first to receive the award. And so, you know, in year one I could say the attributes would be somebody just

like me. But the pattern of people who have received it really indicates that the award is going to individuals who have really worked closely with the different national organizations to help them better understand fair use and related doctrines and to work with those organizations to implement, to understand and to engage in fair use to one extent or another.

Q Now, the award is styled as an award in support of users' rights.

A Uh-huh.

Q What is the intended significance of that?

A Honestly, I think the intended significance is to borrow from Professor Patterson, subtitle of Professor Patterson's book, where it's really the award, no matter what it says about the individuals who receive it, it's a permanent recognition of Professor Patterson and what the bestowers of the award wanted to reflect about him and also capturing one of his statements, the title, subtitle to one of his books about a law of user rights,

which I think really is the subtitle of his last book. And I think it's really more reflecting him than reflecting the recipients.

Q Do you believe as a rule, that communities of users underutilized the available scope and breadth of the fair use doctrine?

A I believe that many of them have, as evidenced -- this is, you know, again, the situation that we were talking about this morning. That as evidenced by some of their outward positions, such as their policy statements. Do I know -- you may follow up by saying do I know everything that they have actually done. No. But I have anecdotes, and I can certainly see some examples of underutilizing. I can certainly see some policy statements that I think don't adequately reflect what the institution, the organization may be able to do. So in those ways, I suppose the answer is yes.

Q You used the phrase in your report somewhere, one of your reports, the culture of licensing. Does that ring a bell with you?

A It does. I don't remember actually

putting it in the report, but if I did, that doesn't surprise me.

Q What do you have in mind by that?

A It's a concept of coming to a task, I need to do this, whatever the task may be. And where is our mind going to go? Where is our thinking going to go? How are we going to frame or begin or pursue the objective of accomplishing our goals? And very often in this area of academic uses of copyrighted materials there seems to be this kind of tension between the turning to the law and understanding how copyright applies, understanding how fair use applies versus turning to getting permissions. And you see different players in the system turning first to one or first to the other. And one of the hazards that I'm trying to point out is by really building a system that relies principally on licensing as a mechanism toward accomplishing a goal is in effect building a culture of licensing. It's building a set of expectations, a set of norms that are -- that surround and are premised upon the concept of licensing. And in contrast to turning to fair

use and determining if fair use applies, it may be then turning to licensing as part of the overall strategy rather than just picking one or the other.

Q Do you view it as a binary proposition that one can either look to licensing or look to, as you term it, law?

A No, not at all. Not at all. I think it's a bundle. We should keep it all on the table, and we should be considering all of it.

Q So you would agree that oftentimes, turning to licensing is turning to law?

A That's a different point, but I'll go ahead and answer it. And if what you mean is that licensing is consistent with the law, licensing is allowed under the law, of course, the answer is yes.

Q What if it's required under the law?

A Well, then if it's required, it's required.

Q So that if a copy shop, meaning the Kinko's and MDS decisions, were to put in place protocols to assure that course packs brought to it were the subject of appropriate permissions

KENNETH D. CREWS

because its interpretation of those decisions

was that those materials required licensing,

they would be looking to the law as they saw it,

wouldn't they?

A    And you've added something very

important to your question, that because you

added it, it's going to steer me to giving you a

straight answer.

Q    We like that.

A    That the critical piece was that the

photocopy shop made its evaluation of the law,

and its independent evaluation of the law said

that I, as a business practice, need permission

for this use, and therefore I won't make the

copy without getting permission.  I'm going to

say yes, that's appropriate.  And if you call

that law or consistent with the law or in

keeping with the law, that's okay.  You know, I

think my answer is yes.

Q    It's more than okay, it's appropriate,

isn't it?

A    Well, yeah, it's appropriate, sure.

Sure.

Q    Is this your first appearance as an

expert witness?

A It is.

Q Your background reports an apparently unrelated deposition. I don't want to know the details, but what was the subject matter?

A It was a bar discipline matter involving an individual, and I was just called in as a witness.

Q Okay. Now, do you have formal training as an economist?

A No, I do not.

Q Do you have formal training in statistics?

A No, I do not.

Q In statistical analysis?

A No, I do not.

Q In computer science?

A No, I do not. I should hesitate to say I have had courses in, I think, all of these areas. But no, I'm not going to hold myself as a statistician, for example.

Q Do you view yourself as expert in the publishing industry and how its business operates?

A Some aspects of it, but not the entire industry.

Q What aspects?

A Well, particularly some aspects of copyright, and particularly I've had a lot of experience working with publication agreements and then some experience working with the other end of the transaction, working with libraries on the licensing. I used the word "licensing" this morning. In the library perspective of the acquisition of content from the publishers and on what terms do we do that. I've had some experience on that, but not as much as I've had in some of these other areas.

Q In terms of what -- in terms of the current economics of, say, scholarly publishing today, the drivers of it, the markets for sales of its work, how much study have you made of that?

A Some. I mean, it's hard to quantify.

Q Sure.

A I haven't done research studies the way I have done with fair use. But on the other hand, I've spent a considerable amount of time

working with the issue, exploring alternatives from the perspective of working with authors, dealing with publishers and with publishers selling their works to us at the library, at the University.

Q In your report you spend several pages in talking about physical reserves. I think it begins at Page 8. And then what you term the evolution, I think, into eventually E-Reserves. You're familiar with that section of your report I take it?

A Yes, I am.

Q What do you regard to be the essential attributes of a physical reserve system as offered by a university?

A And you're not limiting your question to fair use issues?

Q No.

A Just in general?

Q What are the components?

A How would I describe it?

Q Yeah.

A These kinds of physical reserve services have been in universities for many