KENNETH D. CREWS

1  years, many decades. And they come in a couple

2  of different varieties. One of the most

3  standard would be it's a service that's -- where

4  there's a physical location inside the library

5  or other facility, but it's typically the

6  library. The faculty members assigning reading

7  to students may bring selected -- their own

8  selection, whatever they select, of readings to

9  the reserve operation. The staff of the reserve

10  operation would either place the originals -- it

11  could be and often is the book itself, for

12  example, and place that original work at the

13  reserve desk. Or in some cases, it's a

14  photocopy of an item, very commonly a journal

15  article or a book chapter. And then kept in a

16  folder. The students come to the reserve desk

17  or anybody typically is allowed to -- who is

18  allowed to enter the building may come to the

19  reserve desk, look at whatever list of materials

20  are available, request that item. The staff

21  member will hand that item, whether it's the

22  physical book or a folder with some photocopied

23  pages in it, and the student would very often

24  sit down at a desk and start reading it and


Dockets.Justia.com

1      KENNETH D. CREWS

2   doing homework, taking notes, whatever the

3   student may do.  Or if the student feels so

4   compelled, may walk over to a photocopy machine

5   and put some money in and make some copies.  Or

6   what a student might do today, it wouldn't

7   surprise me in the slightest, student pulls out

8   a digital camera or a cell phone, takes pictures

9   and hands the document back at the shelf.  None

10  of that would surprise me, and indeed, the

11  reading it on location or selectively making

12  copies is very common in a reserve operation.

13  So it's a limited number of works, because they

14  can't -- for whatever reason, they can't have

15  everything at the desk.  And making those items

16  available for the students, and the students can

17  read it on the spot and get their homework done.

18      Q      Now, you say a limited number of

19  works.  Is the conception of physical reserves

20  and the quantity of offerings limited only by

21  space constraints or by concept and pedagogical

22  and other needs?

23      A      I've heard at some universities it's

24  just simply space and management.  There's only

25  so much they'll take on.  There's only so many

KENNETH D. CREWS

1

2  types of things that they will take on because

3  they just can't manage it. But usually it's

4  limited by what happens to be brought to it.

5      Q     And in your experience, if you have a

6  course involving -- well, I don't want to do it

7  quantitatively. What I'm trying to understand

8  is what does your experience tell you the

9  parameters of the percentage of total required

10 and/or supplemental course readings that will or

11 have in the past found their way into physical

12 reserves stacks? What I'm trying to get at is

13 how significant a portion of the entirety of

14 course readings traditionally were available to

15 students through a physical reserve system.

16 What's your general experience?

17     A     Yeah, I don't think I've ever seen any

18 really good, you know, statistics to give us the

19 answer we might want. But it's usually some

20 fraction of the total reading. It wouldn't

21 surprise me if it's anywhere from 10 percent to

22 30 percent.

23     Q     And so at least in conception,

24 physical reserves have never been conceived as a

25 means of generating wholesale access to course

KENNETH D. CREWS

2 readings in any given course, right?

3     A    You know, it can vary from course to
4 course.  I mean, there are instructors who have,
5 over the years, relied dominantly, if not
6 exclusively, on materials that are placed on
7 reserve.  But I think they are the minority.
8 Then I know there are plenty of teachers who
9 rely heavily on reserve.  But I suspect for most
10 it's -- whatever label we would put on it, it's
11 a minority of the total readings.

12     Q    If you look at Page 8 of your report,
13 at the end of the first paragraph, you indicate
14 that "reserves are not a means of generating
15 wholesale access.  Instead, they focus on
16 providing access to selected materials
17 individually identified by instructors to meet
18 the educational needs of a particular course."

19     A    And actually, what I mean by that,
20 that sentence -- I remember writing that
21 sentence.  And what I'm making the distinction
22 between in that sentence is reserves are a
23 system for providing access to that work because
24 the instructor said I want my students to read
25 that work as opposed to some -- a library

KENNETH D. CREWS

1

2   saying, well, we have frequent requests for this

3   journal or articles on this subject. Let's just

4   create a databank of those materials and just

5   have them available so that when a professor

6   wants it, it's already there and already

7   accessible. That's not the purpose. The only

8   point I'm making with that sentence is reserves

9   are really used for purposes of providing access

10  to materials chosen by the instructor for that

11  particular course. That's really the whole

12  point.

13      Q    Now, if it were the normal practice

14  that the entire curriculum of a course and the

15  readings were offered on a physical reserve

16  basis, where no materials were purchased at the

17  campus bookstore, no materials were acquired via

18  course packs, no materials were otherwise

19  licensed via some other permissions process and

20  instead originals or library first-generation

21  copies of originals were put out allowing every

22  student in the class every week to access every

23  piece of reading material, would that be

24  consistent with what you regard the norm of a

25  physical reserve offering to be?

KENNETH D. CREWS

1

2    A    I think I'm with you on the question,

3  and your question goes to just the critical --

4  there I go, using that word "critical." It goes

5  to the point of a professor happens to put

6  100 percent of his or her readings on reserve.

7  Now, we haven't said anything about the law or

8  the lawfulness of those readings. Just the

9  fact of -- I would say that would be unusual.

10  But could it happen? Absolutely.

11    Q    If that practice, rather than being

12  sporadic or episodic or representing a distinct

13  minority of practice became the prevalent

14  practice, would you -- putting the law to one

15  side, would you have concerns about the

16  potential impact on the creation of materials

17  for academic markets if the norm were one copy

18  is then the foundation for access by -- or one

19  copy per 25 students, or whatever the ratio

20  might be, was the norm?

21    A    And assuming it's perfectly lawful.

22  putting the law aside.

23    Q    For this per purpose.

24    Would give you pause in terms of

25  thinking of the economics of the academic

1                KENNETH D. CREWS

2       publishing industry as you understand it?

3            A    No.

4            Q    And why not?

5            A    No.  Because I think that what we

6       would find if we keep looking and explore the

7       issue more fully, we would find that that

8       material wouldn't have even made it into the

9       library, into the hands of the instructor, into

10      the reserve system without our having purchased

11      it in the first place.  Odds are overwhelmingly,

12      we wouldn't have to look very far to realize

13      that really all that we're doing at that point

14      is taking some -- and again, perfectly lawfully,

15      because that's the premise of the question,

16      taking materials that we had to get from

17      someplace, and chances are it was the library

18      that bought that material.  Could have been the

19      instructor.  But chances are it was the library

20      that bought that material and made it available

21      through the reserve system.

22           Q    So if I'm a textbook publisher and I

23      hire Professor Crews to write this seminal piece

24      on emerging fair use concepts across the world,

25      and I'm projecting sales, because I saying,

1          KENNETH D. CREWS

2    well, there are X universities with X numbers of

3    students and Y number of courses who are likely

4    to buy this, wouldn't that publisher be

5    concerned if that model was significantly

6    altered such that its only expected sale might

7    be as few as one sale into a given academic

8    institution?

9          A    You know, I think the answer is no.

10   And I'll tell you why.  Because if you had asked

11   that question 20 years ago, before we had

12   high-powered photocopy machines, before we had

13   scanners, before we had any of that, they were

14   only going to sell one then anyway.  If I'm

15   still selling that one, my calculation about

16   publishing that scholarly book, for example,

17   it's the same today as it was 20 years ago.  And

18   if the legal system -- because remember, your

19   entire question is based on the premise that

20   everything that's happening here is lawful.  So

21   I want to keep reminding myself that that's what

22   we're talking about.  And if the environment

23   within which we work signals that you're going

24   to make a sale to these libraries and you're

25   going to sell this scholarly book that has a

1    KENNETH D. CREWS

2    very modest demand, certainly -- it's not a best

3    seller.  It's only going to be sold into the

4    scholarly community.  Getting one sale here and

5    one sale there, honestly, it's just about all I

6    ever expected to get anyway.

7         Q     Let's take Samuelson on Economics, a

8    staple of economics 101 courses.  Surely, the --

9    that work is or had been primarily sold, at

10   least in my era, you'd go to the bookstore if

11   you were in the course, and that became the

12   basic textbook and every student in the class, I

13   assume, would be expected to buy it, correct?

14        A     Correct.

15        Q     Under my hypothetical, I'm saying that

16   book is now placed on physical reserve instead

17   and students access that.  Are you saying there

18   would be no impact on the publisher of that

19   change in model, namely instead of in a survey

20   course of 100 students, 100 students buying it,

21   there's one sale of it?

22        A     It's a very different set of facts,

23   and you actually asked a very different

24   question.  Because if you were talking about --

25   you used a critical element in your question of

KENNETH D. CREWS

change.  Yeah, if what you're saying is the
state of affairs is like this, but then it
changed into this, such that there is a
reduction in number of sales, would I be
concerned about that change?  Well, sure.  Sure,
I'd be concerned.  Naturally.  That's normal, to
be concerned about that change.

Your first set of questions didn't
involve any change.  If we just had an
environment where there is -- where I'm allowed
under the law to include this item over here in
this kind of use, such as reserve use, and I'm
the publisher, I'm just going to take that into
consideration and make my business decisions
accordingly.

Q    Well, let's be clear.  I don't agree
with you that my questions didn't incorporate
it.  But you didn't understand it that way.
That's fine.

Let's assume a changed environment,
where the prevailing practice has been physical
sales of hard copies of textbooks to each
student in a particular course.

A    I'm with you.

KENNETH D. CREWS

1

2      Q      And that that practice evolves with

3   the institution saying, you know what, these

4   textbooks are too darn expensive.  We're going

5   to save Johnny and Joanie the expense of going

6   to the bookstore and not only getting a

7   herniated disk from carrying all those heavy

8   books home but also paying those exorbitant

9   prices those publishers charge.  We're just

10  going to now systematically -- we're going to

11  build out some new book shelves, we're going to

12  open up a new annex to the physical reserve

13  wing, and we're just going to have, you know,

14  one copy per 25 students.  We'll expand the

15  opening hours of the reserve room till

16  2:00 a.m., 4:00 a.m., whatever.  And people now

17  can consume and learn their lessons by that.

18  And, you know, we'll buy one institutional

19  subscription or one per 25 students.  In that

20  situation, would you not agree with me that

21  there could be a significant impact on the

22  economics of textbook publishing?

23      A      And again, we're talking -- I'm going

24  to give you an answer.  And again, we're talking

25  about perfectly lawful.  For example, it could

KENNETH D. CREWS

1
2  even be what's lawful today, what's clearly
3  lawful today, of the library buys five copies of
4  that Samuelson textbook and puts them on the
5  shelf for the students to check out.
6      Q    I'm saying without regard to legal
7  issues.  We're talking for the moment at an
8  economic impact level.
9      A    Yeah, I can imagine there could be
10 economic impact on that.
11     Q    You can only imagine or can you
12 envision it?
13     A    Sure.  Can I envision it?  Yes, I can
14 envision it.
15     Q    Now, you've described physical
16 reserves to me.  Describe your understanding of
17 what course packs, as you would use that term
18 understand and that term, to connote?
19     A    Course packs?
20     Q    Yes.
21     A    Course packs are usually produced or
22 managed by some other office, typically not the
23 library.  In fact, I can't even think of an
24 example where libraries actually do this.  And
25 so some other office, usually the campus

KENNETH D. CREWS

2    bookstore or an off-campus bookstore or a

3    photocopy shop or an off-campus photocopy shop,

4    somebody like that, receives, again in a typical

5    situation, from the instructor a stack of

6    materials and brings them in and says these are

7    materials that I would like to have available

8    for my students. I would like them to acquire

9    their own on copies of these materials. And

10    whatever shop that is says we have the service

11    of making those copies and selling them --

12    typical course packs are sold. Selling them to

13    students who would walk in and purchase that

14    course pack. And kind of like the question of

15    reserves, it isn't necessarily just the students

16    in the class, although, granted, that's going to

17    be the primary readership, but it could have

18    been anybody else. Because it's usually an

19    open-door business. The course packs are in

20    fact sometimes out on the open shelf where

21    anybody could pick one up and walk over to the

22    cash register and buy a copy and take it home.

23       Q    What's the fundamental difference

24    between course packs, as you described them, and

25    physical reserve practices?

KENNETH D. CREWS

1

2      A      The convenience of the service of

3  making the copy for the students is certainly

4  one of those differences.  Enabling the students

5  in one stop to be able to come in and pick up

6  that course pack, pay whatever the purchase

7  price is and take it home, as opposed to in a

8  reserved system, the items -- in a typical

9  situation, the items that are on reserve, they

10  themselves never leave the premises, and many

11  students will just sit right there at a desk and

12  read it and hand it back to the person running

13  the desk.

14      Q      Now, as a matter of copyright, there

15  is also a difference, as you describe it, in

16  that, putting aside for a moment the students

17  that might push a button on a photocopy machine,

18  in the physical reserve setting, many, as you

19  point out, will borrow it, read it, make notes

20  and return it.  So the original remains the

21  original.  There has been no multiplying of

22  copies in that situation, correct?

23      A      In that situation, that's right.

24      Q      So there is no copyrightable event

25  occurring there that would cause anyone any

KENNETH D. CREWS

1

2   concern?  You don't even have to get a fair use

3   analysis, right?

4        A     Right.  Especially if it's the book on

5   the shelf, right?

6        Q     For sale.

7        A     For sale.  We're fine.

8        Q     Whereas in the course pack setting, by

9   definition, we are creating multiple copies of

10  those works, which at least raises at the

11  threshold a fair use analysis, because you've

12  got to decide whether those copies fall within

13  or outside of fair use parameters; is that

14  correct?

15       A     That's correct.

16       Q     Now let's talk about E-Reserves.  How

17  do you conceive the concept of E-Reserves?

18       A     And then E-Reserves is a little

19  different formula in that E-Reserves involves,

20  once again, like both of those situations, an

21  instructor makes selections of materials that --

22  for the students to read, communicates that

23  selection in a common situation by actually

24  bringing the materials to whatever office is

25  operating the E-Reserves.  And that is in a

KENNETH D. CREWS

1
2  typical situation, inside of a library.  And
3  bringing the material or bringing a list --
4  sometimes the instructor will only bring in a
5  reading list with citations.  But nevertheless,
6  the items are selected by the instructor to
7  read.  And instead of being made available at a
8  the desk to anybody who walks in and requests
9  that item at the desk, they're made available
10  through the electronic reserve system, which
11  is -- which would be a computer interface
12  system, where in a typical situation, a student
13  enrolled in a class would be informed by the
14  instructor that there are readings available for
15  you over in this place that you can access
16  online, and the students would then go to that
17  place.  Unlike either of the situations that we
18  just described, there's a much stronger level of
19  control and control of access, because in
20  electronic reserves, the access is routinely
21  restricted only to the students who are enrolled
22  in that class.
23      Q    When you look at the concept of one
24  copy versus multiple copies, you would agree
25  with me that an E-Reserves system certainly

1        KENNETH D. CREWS

2    facilitates, indeed contemplates the generation

3    of multiple copies of what, for lack of a better

4    term, we could consider the original, and for

5    this purpose the original is treated as a

6    scanned material, correct?

7        A     You know, a couple of years ago I

8    might have said a quick yes to that.  But you

9    know what, I'm seeing things change.  I'm seeing

10   a few institutions, listening to conversations,

11   finding out what other people are doing, where

12   actually they're able to use the software so

13   that students can see on the screen this item,

14   but the print key is disabled and the download

15   key is disabled.  And this is a feature of some

16   of the programs, such as Adobe Acrobat, as I

17   understand.  I'm not holding myself out as an

18   expert on the technology of it.  But I've had a

19   few people at some of the workshops that I run

20   happen to mention to me that they actually

21   disable the download and disable the printing of

22   this material.  So it becomes just a view-only

23   on the screen as part of E-Reserves.

24        Q     How prevalent is that practice?

25        A     I suspect that's a minority of

KENNETH D. CREWS

1

2  situations but you know, its got to start

3  somewhere.

4      Q      And what's your understanding about

5  whether that disabling function is in place at

6  Georgia State University?

7      A      I have no understanding of whether it

8  is or isn't.

9      Q      Let's assume you have an institution

10  where it's not in place.  You would agree with

11  me that it would be common and certainly easily

12  available for students to do those acts, not

13  disable, namely to download and to print,

14  correct?

15      A      And I would say, yeah, probably is

16  common and particularly is what I'm noticing

17  with students, more just the downloading.

18  They'll just put it into their computer and just

19  let it be there for their future study.

20      Q      But you would agree with me that the

21  ability to make a convenience copy, to bring it

22  to the classroom is there, correct?

23      A      Oh, yeah.

24      Q      And indeed the ability to E-mail

25  that -- let's assume a password-restricted

KENNETH D. CREWS

1   environment for E-Reserves, so that I am a

2   student, and I can then download.  What is your

3   understanding at Georgia State with respect to

4   my ability, having lawfully gained access that

5   way or at least having gained access that way,

6   the restriction on my emailing that to my buddy

7   who goes to school across town?

8       A     I don't have any specific awareness of

9   the technological conditions at Georgia State

10  University.  So I don't want to answer to that

11  question.  Should I answer more generally?

12      Q     No.  My question was what is your

13  knowledge as to Georgia State is.

14      A     None.

15      Q     And since your report features the

16  importance of password protection as a feature,

17  wouldn't that have been something relevant for

18  you to consider in evaluating E-Reserves and its

19  fair use, namely whether, in fact, that feature,

20  without more, would have the practical effect of

21  limiting the numbers of copies that could be

22  made of the materials uploaded and indeed the

23  population to which they could be sent?

24      A     You use the word "important."  Can we

KENNETH D. CREWS

1  make the case that there is relevance to adding

2  that as another fact?  Yes.  Is it important in

3  the sense that does it tip the balance, does it

4  change the equation?  Is it important in the

5  sense that of does it weigh my thinking and sway

6  my thinking a certain direction?  The answer is

7  no.

8      Q     You again asked yourself questions.

9  My only question was whether it would have been

10  relevant to the analysis to ascertain the answer

11  about the ability of those with password access

12  to further make copies and allow non-university,

13  non-enrolled students to have access.

14      A     Could you make that relevant?  Yes,

15  you could.

16      Q     I didn't say "could you."  Would you

17  not find the answer to that relevant?

18      A     Relevant, sure, yes.

19      Q     But you did not make that

20  investigation, did you?

21      A     I did not make that investigation.

22      Q     And you don't know the answer sitting

23  here, correct?

24      A     That's correct.

KENNETH D. CREWS

1

2    Q    Okay.  Now, what analysis have you

3  made of the migration of course materials at

4  Georgia State University from the course pack

5  process over to E-Reserves?  And by that I mean,

6  what knowledge have you gained as part of your

7  expert retention about a practice of steering

8  faculty away from course pack for their course

9  readings in favor of posting the very same

10  materials on the E-Reserves system?  What is

11  your knowledge of that?

12    A    I don't recall seeing any indication

13  of that at all.

14    Q    Would you have any interest in what

15  information?

16    A    Oh, yes.

17    Q    Why?

18    A    Just as a matter of interest about the

19  dynamic of what's going on inside universities.

20  I study universities.  I study these issues.

21  Sure, I'd be interested in knowing how many

22  instructors are doing this or doing that.

23    Q    Would it be of any relevance to you as

24  you conceive of these issues that if the effect

25  of that practice was to see a diminution in --

1          KENNETH D. CREWS

2    permissions payments with respect to a given set

3    of copyrighted materials which had been made via

4    the course pack process, as those materials

5    instead were offered through E-Reserves, would

6    that be of any relevance to you in the way you

7    think about the fair use issues?

8          A     No.

9          Q     Because?

10         A     It would be an interesting dynamic in

11   the business of education, but it would leave me

12   asking a series of questions before I could even

13   begin to wonder if this is -- I think, please

14   help me, your question was would I find it

15   relevant?  Is that your question?

16         Q     Yes.

17         A     There's a lot more that needs to be

18   done to make that relevant.  I mean, after all,

19   your question did include the notion of fair

20   use.  So we're not talking about the

21   hypothetical, where everything is -- you know,

22   we've eliminated the legal barriers.  In the

23   issue of fair use, you know, I'm going to want

24   to know what was copied, how was it copied and

25   was that permission and payment that was done

KENNETH D. CREWS

1

2 over in the course pack area, was it A,

3 appropriate or B, was it done under

4 circumstances where it would be appropriate over

5 there but not necessarily appropriate in this

6 other area, where the materials are made

7 available.  So I've got a lot of questions I'd

8 want to ask before I'd make it even relevant.

9     Q     Let's assume your investigation led

10 you to conclude that it was appropriate for

11 permissions to be paid for a given course pack

12 quote, "over there."  What different

13 circumstance, if that same course pack were

14 offered in the same course by the same professor

15 to the same students, could lead you to reach a

16 different conclusion as to its fair use in the

17 E-Reserves setting?

18     A     And your question said course packs

19 over here, and then you said course packs here

20 in the E-Reserves setting.

21     Q     No, no.  Let me do it again.  Let me

22 do it again, okay?

23     A     Yeah.

24     Q     I'm asking you to assume that you've

25 investigated whether a given course pack

1          KENNETH D. CREWS

2    offering traditionally made through the

3    university bookstore, you say, well, that was

4    properly the subject of permissions payments.

5    I'm asking you to assume that for purposes of

6    this hypothetical, okay?

7         A     Got it.

8         Q     The only thing that changes now is

9    that that same body of material is offered by

10   the same professor for the same course to the

11   same students, but it is scanned and made

12   available through the E-Reserves system.  What

13   facts or factors would or might lead you to

14   conclude that that activity, while in the course

15   pack setting warranting permission payments

16   would not warrant permission payments and would

17   be fair use in the E-Reserves setting?  Do you

18   understand the question?

19        A     I do understand the question.  I

20   believe I understand the question, and please

21   stop me if I get off track.

22             The very first thing that could make a

23   difference and could make a very important

24   difference would be the question of whether that

25   course pack service was being provided by a

1          KENNETH D. CREWS

2    commercial for-profit shop.  And then in

3    contrast, if we move over to the E-Reserves,

4    then I would ask and look for confirmation of

5    whether it's being run by the library as part of

6    the nonprofit educational mission of the

7    university.  And that alone is a change of facts

8    that's going to lead me to rethink the first

9    factor, the purpose of the use.  Starting with

10   the fair use statute, the law is very clear

11   about laying out a dichotomy between commercial

12   purpose and education or nonprofit purpose.  And

13   so if you take those same facts and move them

14   into the university and make it part of the

15   nonprofit educational enterprise, then we may

16   have a difference on the first factor.

17        Q     From the standpoint of the impact of

18   the publishers of the materials that comprised

19   the course pack, is there any difference in

20   market effect of how those materials are

21   disseminated to students as between, on the one

22   hand, through let us say a for-profit copy

23   facility and on the other hand, through

24   E-Reserves?  If on the other hand, there are

25   permissions payments flowing and on the other

KENNETH D. CREWS

1

2  there aren't, does the distinction driven by the

3  for-profit factor that you cite, from the

4  standpoint of the publisher, is that at all

5  meaningful in terms of the impact on its

6  business?

7       A    And so I don't -- I mean, I don't see

8  the publisher -- I mean, the publisher may not

9  like it.  Some publishers don't mind.  But the

10  publisher may not like the fact that a nonprofit

11  educational institution has a greater scope of

12  fair use.  But that's part of the very essence

13  of the law.  But your question -- and make sure

14  I'm getting to your question properly.  I'm

15  trying to.  Your question was about, all right,

16  given that, isn't there still an impact on the

17  market or the revenues for the author -- for the

18  publisher, I mean.

19       Q    Yes.  Factor four, as it were.

20       A    Factor four.  We're moving out of

21  factor four of the fair use equation.  And, you

22  know, there is a difference.  Because when that

23  off-campus commercial copy shop sells that set

24  of course materials called the course pack, you

25  know, it's in itself kind of a stand-alone

KENNETH D. CREWS

finished product. The student pays a price, the
student walks away with it. The student turns
to Page 133 of this set of photocopied material
and reads the next 10 pages for class tomorrow
morning. The student doesn't necessarily have
much of a realization of exactly where that
material came from. There may be a citation,
but it's removed from context and so on. What
I'm seeing in the electronic reserve environment
is that the students see this not as necessarily
as a separate part, a separate place to go and
where in total isolation you're going to see
those same 10 pages, but the system that I see
in many policies requires a citation to the
original. So we're going to see a reference
back to the original work. I have seen some
universities, even if it's a scan and not a
link, provide a link to more information for
that work. I certainly have seen students in
the online environment, where they're not
working with a stack of paper, but they're at
their computer looking at something online and
saying, that's interesting, these ten pages of
reading, let me see what else is out there. Oh,

KENNETH D. CREWS

1
2      it's by author Smith.  Let me go over here to
3      Amazon, let me see what it is.  Let me take a
4      look at that book.  And actually, in many ways
5      the facilitating access in that online
6      environment creates a much more active
7      relationship with the material and I would dare
8      to say maybe generates some market interest for
9      that same material.
10         Q     What data have you ever seen about the
11     degree of generation of market interest through
12     that process?
13         A     I've seen data not specifically in
14     E-Reserves, but I have seen data involving
15     public access to materials actually leading to
16     greater sales.
17         Q     Let's talk about E-Reserves.  That's
18     the environment in which this lawsuits pends.
19            What data, if any, have you seen,
20     putting your reasoning process to one side,
21     supporting the view that any number or
22     percentage of students enrolled in a course for
23     their exposure to E-Reserves materials will be
24     prompted to make purchases of that author or
25     publisher's work?

KENNETH D. CREWS

1

2     A     And have I seen specifically data

3  studies percentages and so on?  No, I have not

4  seen that.

5          (Whereupon, a discussion was held off

6          the record.)

7  BY MR. RICH:

8     Q     Just a couple more questions on this

9  area, and then we'll move on.

10          Modify the examples we've been talking

11  about by assuming that the course pack operation

12  operated by the University is a not-for-profit

13  arm of the University.  Everything else is the

14  same.  The course packs are still the same.

15  They're generated for the same purposes, for the

16  same courses by the same professors.  Everything

17  is the same except that the University bookstore

18  is a not-for-profit arm where there is some copy

19  facility.  How, in your estimation, does that

20  share the fair use analysis with respect to

21  course packs?

22          MR. SCHAETZEL:  Objection as to form.

23          Go ahead.

24     A     That's a very important change of

25  fact.  And of course, I always keep telling my

1                 KENNETH D. CREWS

2 students is when you change the facts, you've

3 got to go back to rethinking the four factors.

4 And that's a change of fact that is clearly

5 important to the first factor, the purpose of

6 the use. And the general favoring, for lack of

7 a better word, of nonprofit education under the

8 fair use equation, at least favoring relative to

9 the commercial user, and that does mean that

10 it's very likely that what may not be fair use

11 in the hands of the commercial shop may very

12 well be fair use in the hands of the on-campus

13 educational nonprofit shop.

14     Q     That answer gives dispositive weight

15 to the commercial/non-commercial distinction.

16 But as you know so well, it is but one of four

17 factors and a series of elements within those,

18 correct?

19     A     That is absolutely right.

20     Q     But you nevertheless feel it is a

21 pivotal distinction or may be?

22     A     No. I think you're overreading my

23 statement. What I said -- you can read it back

24 to me, if you want. But I said that something

25 that may not be fair use in the hands of the

KENNETH D. CREWS

1
2  commercial shop may very well be fair use in the
3  hands of the nonprofit educational shop. I
4  didn't reach the conclusion that said it is. I
5  certainly didn't say it all would be. I didn't
6  say that at all. I said it could be.

7      Q     If it were determined that in the
8  not-for-profit setting, the course pack activity
9  were determined on a balance of fair use factors
10 not to be fair use --

11     A     I think I just missed something.

12     Q     You're taking the assumption that it's
13 in a non-commercial setting?

14     A     The nonprofit campus shop we're
15 talking about.

16     Q     So take a Kinko's and an MDS case in a
17 not-for-profit setting. I'm just asking you to
18 assume that a court would say or the courts
19 would say still doesn't tilt the balance
20 sufficiently in favor of fair use. In that
21 hypothetical, would you then see a legal analogy
22 from the standpoint of fair use and application
23 to the use of the same materials in the E-Res
24 setting?

25     A     I'm just making sure I've got all --

KENNETH D. CREWS

2  that I'm understanding everything, and I think I

3  do.  That if the facts of the Kinko's or MDS

4  case instead of involving off-campus commercial

5  shop and the only factual change involved a

6  nonprofit education and the court came back and

7  said no, sorry, but that's still not fair use,

8  well, that would be something we would have to

9  learn from, absolutely.  And, you know, people

10 like me would spend a lot of time studying that,

11 gleaning whatever lessons we need to glean from

12 it.  I'm a realist, and I would study that and

13 try to figure out what the court really meant by

14 what it said in that opinion and then, also as a

15 realist, look to see is somehow what's happening

16 over here in electronic reserves somehow

17 different from what's going on in the course

18 pack, and there may very well be differences.

19     Q    Sitting here today --

20     A    I'm sorry --

21     Q    Sitting here today, are you able to

22 identify any of those differences, or would you

23 think about it?

24     A    Things that could make a difference?

25     Q    Other than the profit/not for profit

KENNETH D. CREWS

2  distinction or commercial/non-commercial.

3      A      Sure.  I mean some of the things that

4  I would look for are the fact that in Kinko's

5  and MDS, the parties in those cases were selling

6  the course packs and charging money to the

7  students.  So there's a fact that was present in

8  both of those.  And that's not a fact that's

9  present in the E-Reserves systems that I'm

10  familiar with.  I would look to that and wonder

11  whether that might not make a difference.  I

12  would look to the fact that in the MDS and

13  Kinko's situation anybody -- I believe, anybody

14  could have walked in off the street, requested

15  that item, purchased it and walked away with it.

16  And in a typical E-Reserves setting, that is not

17  the case.  It's closed access.  It's restricted

18  access.  So I would see that as a difference,

19  and I would wonder, weigh in the balance, is

20  that a difference that makes a difference.

21  We're not at the conclusion here.  But I would

22  wonder that.  And I would look for factual

23  elements such as that.

24      Q      Is it your conception of the -- is

25  part of your conception of an E-Reserves system

KENNETH D. CREWS

2    that no materials offered on any reserve system

3    should ever carry with them a permission

4    obligation?

5         A    Oh, is that my position?

6         Q    Yes.

7         A    No, it is not.

8         Q    If you were to be exposed to an

9    institution's range of practice over multiple

10   years involving E-Reserves offerings, thousands

11   and thousands of offerings over hundreds and

12   hundreds of courses, and if you were to discern

13   that not a single penny of permissions income

14   ever flowed with respect to the use of any

15   single use of material over a multi-year period,

16   would you be concerned as a matter of copyright

17   law?

18        A    No.

19        Q    So it is consistent with your view

20   that an E-Reserves system logically won't

21   generate permissions income?

22        A    No.  I don't think you can reach the

23   conclusion that you just reached from your own

24   questions or from my answers.  What I heard from

25   one your questions was if I saw that no

1        KENNETH D. CREWS

2    permission fees were being paid over a long

3    period of practice, would I be concerned, and I

4    think you said as a matter of copyright law, and

5    the answer is no.  Concerned is not at all is

6    what I would be.

7            And then I think your next point was,

8    so therefore, there's some inconsistency, and

9    I'm not sure exactly how it was worded.  And no,

10   because I can think of reasons and circumstances

11   why maybe people are choosing certain materials,

12   using them in certain ways, screening them in

13   certain ways, evaluating them in certain ways,

14   and maybe all those years of practice in fact

15   are very carefully within fair use.  That's

16   possible.

17       Q    Do you have any knowledge today

18   whether the practice under the existing GSU

19   policy is uniformly within the bounds of fair

20   use?

21       A    The policy itself?

22       Q    No.  Practice, I said.

23       A    What they're really doing behind the

24   scenes, real individuals screening, reviewing,

25   making their determination?

1           KENNETH D. CREWS

2       Q    Yes.

3       A    Based upon what I have seen -- and

4   again, I've only seen the information as I've

5   detailed in my report.  Based upon what I've

6   seen, it looks to me like they're taking the

7   proper steps to determine that this material is

8   within fair use and this material is not.  And

9   so I think -- I think that gets to your

10  question.

11      Q    So your answer is yes, even given the

12  extraordinarily limited diligence you've done on

13  that issue?

14      A    Well, now wait a minute.

15           Can you read the question back to me,

16  please?

17           MR. RICH:  Read my original question.

18           (Whereupon, the requested portion was

19  read back by the court reporter:  Do you

20  have any knowledge today whether the

21  practice under the existing GSU policy is

22  uniformly within the boundaries of fair

23  use?)

24      A    And I think I misunderstood the word

25  "uniformly."  By "uniformly," do I have

KENNETH D. CREWS

1

2  knowledge that everything that they're doing is

3  within fair use?

4      Q     Yes.

5      A     If that's the question, then the

6  answer is no, I don't have the information to

7  give you an answer to that question.

8      Q     Is it your view that trying to get

9  there in good faith discharges an institution's

10  copyright responsibilities?

11      A     That's a very interesting question.

12  Congress -- Congress included -- they didn't use

13  the word -- Congress included in Section 504 a

14  very interesting and, frankly, I would say an

15  extraordinarily important provision that allows

16  some protection from some damages for copyright

17  infringement for nonprofit educational

18  institutions, libraries and archives if they --

19  and I'm paraphrasing; I don't have the statute

20  in front of me -- if they believed that what

21  they were doing was within fair use and if they

22  had reasonable grounds for that belief.  There's

23  a subjective component to that provision that

24  one must be -- must believe, as to have a

25  certain state of mind, and then an objective

1       KENNETH D. CREWS

2  component, have reasonable grounds for that

3  belief.  That provision does not exonerate the

4  user from liability for infringement.

5       Q    Or injunctive relief?

6       A    Or injunctive relief.  What it does is

7  it reduces the damages.  And in fact, the

8  language says "must remit damages."  And I read

9  that -- because we don't have a court telling us

10  exactly what that means.  But I read that, I

11  believe it means that reduces the statutory

12  damages down to zero, down to zero.  So it does

13  leave injunctive relief and it does leave other

14  possibilities based upon the plain reading of

15  the statute.  So if that's what the statute

16  means.  It doesn't -- the good-faith behavior,

17  meaning I believed I was within fair use and I

18  had reasonable grounds for that belief, does not

19  mean you are therefore not an infringer.  But it

20  does mean that you get some credit for having

21  done your homework.  You get some credit for

22  having learned a little bit about fair use,

23  having applied it in a reasonable, I say,

24  good-faith manner.  And therefore, there's

25  considerable protection from the dollar

KENNETH D. CREWS

1

2     liabilities.  And, you know, that's a pretty

3     cool thing.

4          Q     What is your understanding of the

5     relief that the plaintiffs seek in this case?

6          A     I believe it's limited to injunctive

7     relief.

8          Q     So your dissertation on good faith

9     really doesn't have much bearing on the relief

10    sought in this case, correct?

11         A     It depends how the injunction is

12    crafted.  But it may not have bearing on it in

13    terms of a 504(c)(2), which is the statutory

14    provision, sense.  But I think good faith is

15    something -- I'm not an expert on injunctions,

16    but I think that a court could take the

17    good-faith practices of the parties into

18    consideration in determining whether an

19    injunction was appropriate.

20         Q     If we get to that stage, it will be an

21    interesting discussion.

22               If you look at Page 8 of your report,

23    the last full paragraph, "These simple reserve

24    operations."

25               Do you see that?

KENNETH D. CREWS

2    A    Yes.

3    Q    Beginning with the second sentence,
4 you make some assertions.  They did not serve
5 educational needs well.  The risk was a lost
6 opportunity for learning.  Students were
7 continuously frustrated by the need to wait in
8 line at the library for another student.  Heavy
9 use of materials.  I don't see any citations to
10 any references for that.  What is the source of
11 all of this, these assertions?

12    A    Well, there are a few things that, you
13 know -- when I'm here as an expert, there are a
14 few things I know from just my own experience
15 and my own experience working at my own
16 university but, probably more than that, my own
17 experience in working and meeting with people at
18 other universities and learning from them.  So I
19 can certainly tell you that when I do my
20 workshops around the country and talk with
21 people about reserves, these are some of the
22 frustrations that arise frequently.

23    Q    Why would the limitations of physical
24 reserves create a lost opportunity for learning,
25 in your words?

KENNETH D. CREWS

A    If, in fact, the access to the
materials is confined to the physical material
being available only in the one physical
location, that's inherently limited; and if
that's the way that the content has been made
available, then that means that there will be
times when a student either can't get to it, I'm
sick, I have whatever other situation or it's
I'm there at the library, waiting for the item,
but it hasn't been returned and other students
have it checked out and so on and so on and so
on.  So it's a limited system, inherently.

Q    It would not have precluded purchase
of the original, would it, by the student?

A    No.

Q    And it wouldn't have precluded seeking
a publisher's permission to use the material,
would it?

A    No.

MR. RICH:  Let's mark as Exhibit 304,
the expert report of Robert B.K. Dewar.

(Whereupon, the expert report of
Robert B.K. Dewar was marked as Plaintiff's
Exhibit 304 for identification, as of this

1                    KENNETH D. CREWS

2        date.)

3   BY MR. RICH:

4        Q     Sorry.  Just before I ask you to turn

5   to this exhibit, if you would turn back to

6   Page 9 of your report.  There's one other

7   question I want to ask you.

8        A     Uh-huh.

9        Q     There's a footnote, Footnote 3

10  appearing there.

11       A     Uh-huh.

12       Q     In which you say, "Studies long have

13  suggested that the higher price the

14  institutional subscription paid for journals in

15  print and now electronic form is an additional

16  fee that covers at least in part the effects of

17  copying for purposes such as education and

18  research."

19             Do you see that?

20       A     I do.

21       Q     I take it that statement is not

22  intended to convey that as a matter of legal

23  conveyance or legal license, that such

24  subscriptions entitle forms of copying not

25  otherwise authorized either by fair use or by

KENNETH D. CREWS

2  license, correct?

3      A      It's only intended to convey that

4  studies have suggested it, and that's all.

5      Q      But what's the "it"?

6      A      That studies have suggested that that

7  higher institutional fee does at least cover --

8  and I really was being very careful about

9  this -- the effects of copying for certain

10  purposes.

11      Q      Meaning?

12      A      Meaning it's there to say whatever the

13  law may be, that's a separate question, that we

14  know that when we sell this material at a higher

15  price to -- well, let me even backup from that.

16  We know that when we sell this material to a

17  library, there are certain to be multiple users

18  as opposed to selling it to an individual, where

19  there's typically only one user.  And in the

20  hands of multiple users, there may also be some

21  copying.  And the suggestion from studies -- in

22  other words, I'm not making the statement -- is

23  that the higher fee is simply a way of

24  compensating for the fact that this copying

25  activity is taking place.

KENNETH D. CREWS

1

2     Q     It's an economic observation, not a

3 legal observation?

4     A     Yeah, I think that's right.  It's a

5 marketing observation.

6     Q     And that's an observation of

7 Ms. Gordon, a former colleague of mine at this

8 law firm, not by you, per se, right?

9     A     That's right.

10     Q     You have not made a study of that

11 topic?

12     A     I have not made a study of that.

13     Q     Okay.  So you're not adopting --

14 you're neither rejecting or adopting that

15 premise, right?

16     A     That's correct.

17     Q     Now let's turn to Mr. Dewar.  I take

18 it you've had a chance to read Mr. Dewar's

19 report?

20     A     I have.  I have.

21     Q     Turn to the third page, please.

22     A     Okay.

23     Q     I would ask you to read to yourself

24 the full paragraph under Roman III, first full

25 paragraph, beginning with the "Georgia State

1                KENNETH D. CREWS

2   University provides for students."

3      A      Uh-huh.

4      Q      And advise me what statements of fact,

5   if any, in that paragraph you disagree with.

6      A      I have no reason to refute any of it,

7   although it doesn't necessarily mean I have

8   reason to support all of it.

9      Q      I, frankly, don't know what that

10   means.

11      A      Sure. I'll give you a good example.

12   The system allows instructors or personnel at

13   the library to scan in course reading materials.

14   That's presented here as a simple statement of

15   fact. But I don't know whether instructors are

16   also able to do the scanning to add the

17   material. I can't refute that. I can't confirm

18   it, I can't refute it.

19      Q      You have no knowledge to the contrary,

20   do you?

21      A      That's correct.

22      Q      Turn to the next page, Page 4, and I

23   will read you the following from the top of the

24   page. "In addition to the electronic reserve

25   system, professors can access uLearn, a general

KENNETH D. CREWS

1

2  software system (commonly known as a 'course

3  management system') for supporting a professor

4  in a course and allowing a wide range of

5  communication of information of all kinds to

6  students.  Of particular relevance here is

7  uLearn's capability to allow users to upload

8  materials to a class page, including music,

9  movies and documents such as PDF files of

10  scanned copyrighted reading materials."

11         Is there anything in what I've just

12  read you with which you disagree or have

13  knowledge as to its inaccuracy?

14     A     I do not.

15     Q     Let's continue down a sentence.

16  "There are no uploading restrictions of which I

17  am aware, other than a file size limit.  This

18  would not in practice pose any limitation for

19  PDF files, which could in any case be split into

20  separate chapters.  I understand that large

21  amounts of materials" -- strike that.  Let's

22  just go with the sentence I read you.

23         Do you have any reason to disagree

24  with the accuracy of that statement?

25     A     I have no knowledge that would let me

KENNETH D. CREWS

1
2    do that.

3         Q    Okay.  Turn to Page 5, please, and

4    read to yourself the second and third paragraphs

5    on the page.  And my question to you is the

6    same.  Is there any statement in there with

7    which you disagree?  That is the paragraph

8    beginning "The other common way" and the

9    paragraph beginning "However created."

10        A    Okay.

11        Q    I had a question pending, which is:

12   Is there any statement of fact in those two

13   paragraphs with which you disagree?

14        A    I have no reason, no grounds for

15   refuting it.

16        Q    Finally, if you turn, sir, to Page 6,

17   beginning with the third paragraph, "When a PDF

18   file is transferred," and if you would read

19   through the balance of that section through the

20   top of Page 7 up to conclusions.  So that's

21   three paragraphs in all.

22        A    Uh-huh.

23        Q    If you would tell me if there's

24   anything in those three paragraphs with which

25   you disagree.

KENNETH D. CREWS

A    Uh-huh.

Q    The question pending was:  Any disagreements?

A    I said earlier in the day that I don't hold myself out as a technology expert.  So certainly there's some of this that I can't confirm or refute because it's a description of the technology.  Otherwise, in terms of -- unlike the other paragraphs that we've commented on just in the last several minutes, I would want to investigate certain things, like the use of the word "copy."  There's the casual sense of copy, and then there's a highly technical sense of the word "copy" in the U.S. Copyright Act.  I don't have that in front of me, but I think that's a question I would want to explore.  I know that there have been some cases involving the issue of RAM copies and just what exactly constitutes work that's, I believe the expression is, sufficiently stable to constitute a copy.  I'm saying that looking at this through my legal copyright prism, where I usually see much of the world, it does leave me with wanting to investigate questions like that.

KENNETH D. CREWS

1

2    But in terms of the basic mechanics of

3 how a student might receive that item off of the

4 server, receive it on his or her computer, and

5 certain things, except for those maybe

6 restrictions on printing and downloading we had

7 talked about earlier, this is a basic

8 description of the system as I know it.

9    Q    Thank you.

10    Turn to Page 15 of your report,

11 please.

12    A    (Witness complies.)

13    Q    You make some statements about the

14 Basic Books/Kinko's case.

15    A    Yes.

16    Q    Do you believe that case was wrongly

17 decided?

18    A    No.

19    Q    At the bottom of 15, over to 16, you

20 say in the last sentence, "Moreover, the court

21 rejected the urgings of the publishers to adopt

22 one particular provision of the guidelines" --

23 which is a reference, I take it, to the

24 classroom guidelines of 1976?

25    A    Yes.

1        KENNETH D. CREWS

2        Q      -- "that would bar all 'anthologies'

3   of copied all materials.  The court instead held

4   'It is not clear that Congress intended strict

5   application of this prohibition without fair use

6   balancing.'  The court in Kinko's in fact did

7   not apply that element of the classroom

8   guidelines to the facts of the case.  The court

9   instead determined that the fair use of each

10  item must be evaluated individually.  The fact

11  that they are assembled into the course pack is

12  not determinative of fair use."

13         Is that a correct reading of that?

14      A      That is.

15      Q      And that is a fair statement of your

16  testimony, right?

17      A      Yes, it is.

18      Q      Now, is it your understanding from

19  that decision, nonetheless, that the Kinko's

20  court did weigh the practice of what it viewed

21  as anthologizing as a relevant factor in the

22  fair use balance?

23      A      I honestly don't remember the court

24  doing that.  So if you would like to look at the

25  case here, we can.  But no, I'm not recalling

KENNETH D. CREWS

that from the case at all.

Q    Are you aware whether the injunctive
relief awarded in that case expressly forbade
Kinko's from engaging in anthologizing?

A    The injunctive relief, as I've read
it, was not in the case but was in a separate
document that I'm recalling having read many
years ago, and I don't believe it explicitly
prohibited anthologizing.  In fact, again, we're
talking -- I haven't read this in years.  But
what I recall was that in fact the parties
agreed that some small amount of a work would
will in fact be within fair use, that Kinko's
could go ahead and make anthologies or course
packs or whatever they're called and that there
was still a survival of fair use.  But what I'm
remembering -- and again, correct me.  It's been
years since I read that instrument.  That it
provided for a tiny amount, in fact, what comes
to mind is a measure of something like two pages
of a book, as within fair use.  So that the
anthology itself was not prohibited, but the
fair use measure was just so small that, as a
practical matter, Kinko's moved on from it.

1          KENNETH D. CREWS

2     Q     Well, let's take a look at both of

3 those.

4     A     Yes.

5          MR. RICH:  Let's mark as Plaintiff's

6 Exhibit 305 the opinion Judge Mottler, if I

7 recall, in Basic Books v. Kinko's.

8          (Whereupon, the opinion Judge Mottler,

9 if I recall, in Basic Books V Kinko's was

10 marked as Plaintiff's Exhibit 305 for

11 identification, as of this date.)

12          MR. RICH:  And while we're at it,

13 let's mark as Plaintiff's Exhibit 306 the

14 judgment entered in that case.

15          (Whereupon, the judgment entered in

16 that case was marked as Plaintiff's Exhibit

17 306 for identification, as of this date.)

18 BY MR. RICH:

19     Q     By all means, take the time you need.

20 I will direct you to what I found to be

21 pertinent to my questions, but you should

22 certainly review as you will.

23          If you were to turn to Page 18 of the

24 text of this printout of the decision, in the

25 court's discussion of other factors in

1       KENNETH D. CREWS

2   connection with its fair use analysis, in the

3   second paragraph it states, "Additionally the

4   classroom guidelines express a specific

5   prohibition of anthologies.  The fact that these

6   excerpts were compiled and sold in anthologies

7   weighs against defendant."

8           Then if you go on to Page 21, in the

9   right-hand column in the first full paragraph

10  midway down, the court writes, "We are convinced

11  that this is the more prudent path than a

12  bright-line pronouncement and refuse to hold

13  that all unconsented anthologies are prohibited

14  without a fair use analysis."  And I'm assuming

15  that's what you pulled out of the opinion.

16          It goes on.  "However, the fact that

17  these excerpts were placed in anthologies weighs

18  significantly against defendant."  Footnote.

19  The 1966 House report noted, "Education is the

20  textbook publisher's only market and many

21  authors receive their main income from licensing

22  reprints in anthologies and textbooks.  If an

23  unlimited number of teachers could prepare and

24  reproduce their own anthologies, the cumulative

25  effect would be disastrous."

KENNETH D. CREWS

2           Do you see that?

3      A    Unfortunately, I don't. I'm listening

4 to you. I picked it up. I'm just wondering if

5 we've actually got matching pages.

6      Q    Sorry. So it would be on the top

7 right-hand column, is what I read, under

8 Headnote 1535.

9      A    I see it now, right.

10     Q    Then what I read next appears on your

11 Page 19. And I had begun reading down in that

12 first full paragraph on the left. Midway down

13 it starts with "We are convinced that," and then

14 the footnote accompanying it.

15     A    I'm almost there. There it is.

16     Q    So my earlier question had been,

17 subject to your being refreshed, whether

18 notwithstanding that the court didn't find the

19 practice of anthologizing dispositive of the

20 fair use analysis, it nonetheless held it very

21 probative?

22     A    And I would emphasize as part of that,

23 too, the first of the language that you say

24 "compiled and sold in anthologies," and

25 especially that word "sold" I think is an

1      KENNETH D. CREWS

2  important part of the equation.

3      Q     But that really wasn't the focus of my

4  questioning nor of the section of your report

5  that I was examining on, which was assertions

6  about the purported relevance of anthologizing

7  to that decision.

8      A     Uh-huh.

9      Q     And you acknowledged the context in

10 which that decision was reached.

11          Now, if you look at the injunctive

12 relief provision.

13     A     And that is the separate document?

14     Q     That's Plaintiff's Exhibit 306.

15     A     Now, remember, this is one I haven't

16 read in several years.

17     Q     This is fine.  I'm simply showing it

18 to you because you wanted to be refreshed.

19          Paragraph 1, "Ordered and adjudged

20 that defendant Kinko's Graphics Corporation and

21 its directors," et cetera, "are enjoined from

22 creating, copying, distributing or selling or

23 assisting or participating in creating, copying,

24 distributing or selling any anthology

25 compilation, collective work, course packet or

1                        KENNETH D. CREWS

2    similar collection to or for students, hereafter

3    anthology or course pack, containing, without

4    permission in writing or other fixed medium of

5    expression, a copy of more than one page from

6    any work in which plaintiffs or any of them now

7    own or hereafter acquire a copyright or where

8    exclusive right under copyright in the material

9    copied where," and it goes on, as you can read

10   to yourself, one, two, three and four.

11        A     Okay.

12        Q     And I assume that refreshes your

13   recollection about a document you haven't looked

14   at in a long time.

15        A     That's right.  And it actually, the

16   one thing -- it's consistent with what I was

17   remembering, except I was remembering it as two

18   pages.  It's actually one, and that was it.

19        Q     Well, if you say consistent means you

20   remembered it as specifically enjoining creation

21   of anthologies subject only to a one-page

22   limitation, then there is no dispute between us.

23         Now, back to your report, sir.  At

24   Page 16, you briefly reference Texaco and

25   Princeton University Press cases, correct?

1                    KENNETH D. CREWS

2        A      That's correct.

3        Q      Do you believe Texaco was correctly

4   decided?

5        A      I've had a lot of problems with the

6   Texaco decision.  There are some aspects of it

7   that I think were problematic.  There was, in

8   fact, a dissent in that case when it was decided

9   by the full panel -- no, I'm sorry.  There was a

10  dissent in that case.  I'm mixing it up with the

11  Michigan case.

12              Let me stop.  Let me stop and catch my

13  breath, because I'm mixing up the two cases.

14       Q      This was Judge Newman's majority

15  opinion.

16       A      Right.  Right.  There was a dissent in

17  that case.

18       Q      Judge Jacobs.

19       A      And the difficulty that I had with

20  that case is the heavy use of the concept of

21  availability of permissions and the weight that

22  it played in the calculation of fair use.

23       Q      So-called circularity argument?

24       A      So-called circularity.

25       Q      Did you disagree with the MDS

1                    KENNETH D. CREWS

2    decision?

3         A    MDS decision.

4         Q    The decision on rehearing en banc.

5         A    That's right.  That's right.  Holding

6    that it was not fair use.  In principle and

7    probably in the overall decision of the court, I

8    had no particular reason to argue with the

9    overall decision.  I had problems with the

10   internal reasoning of the decision, as I recall.

11   But the general conclusion, not too surprising

12   and not much to argue with.

13        Q    In the first bullet on Page 16 of your

14   report, you state in the last sentence, "The

15   implication of the cases" -- and I believe

16   you're referencing back to Texaco and MDS --

17   "and the clear language of the fair use statute

18   indicate that the outcome may be considerably

19   different if photocopying were made by the

20   educational institution."

21             Do you see that?

22        A    I do.

23        Q    Is that your recollection of the

24   viewpoint of the en banc court in MDS?

25        A    No, I'm not presenting it as a

KENNETH D. CREWS

1

2     statement of what that court said.  The lead-in

3     says, "These cases allow the following

4     observations about fair use."  I'm not

5     presenting these bullet points as a summary of

6     what the courts may have actually said.

7          Q     So when you state the implication of

8     the cases indicate, you're not referring to what

9     the cases -- you're not drawing on the text of

10    the cases for that purpose?

11         A     Yes.  If your question is is this my

12    statement that I'm drawing this implication from

13    the cases, the answer is yes.  If your question

14    was is that a statement from the court, which is

15    what I thought I heard --

16         Q     I guess to say it differently, I

17    assume you found some textural support --

18         A     Oh, I did.

19         Q     -- in MDS for the proposition that the

20    outcome may be considerably different if

21    photocopying were made by the educational

22    institution?

23         A     And for the statement that the

24    implication is that it may be considerably

25    different.

1          KENNETH D. CREWS

2     Q    I'm just going to show you the MDS

3    decision.

4     A    Please do.

5     Q    And I want you to show me where you

6    draw that from.

7          MR. RICH:  Let's mark this as

8          Plaintiff's Exhibit 307.

9          (Whereupon, MDS decision was marked as

10         Plaintiff's Exhibit 307 for identification,

11         as of this date.)

12   BY MR. RICH:

13    Q    If it will expedite -- again, you can

14   look where you want, but if you will turn to

15   Page 9 of your text of the opinion, down the

16   left column, there is a paragraph beginning "As

17   to the proposition," which I'll read into the

18   record.

19         "As to the proposition that it would

20   be fair use for the students or professors to

21   make their own copies, the issue is by no means

22   free from doubt.  We need not decide this

23   question, however, for the fact is that the

24   copying complained of here was performed on a

25   profit-making basis by a commercial enterprise."

KENNETH D. CREWS

And I'll represent to you that's the
only discussion I saw bearing on this.

A    Uh-huh.  I don't recall much more, if
any more than that.

Q    So you interpret the court saying it's
not free from doubt as expressing a -- the
implication that the outcome may be considerably
different?

A    That's correct.

Q    At the bottom of 16 over to 17 and I
believe at other points in your report, although
I don't have it flagged here, you make a number
of observations about what you term the
straightforward economics of decisions of copy
shops not to invoke fair use.  Do you see that
at the bottom of Page 16 of your report?

A    Yes.  Yes, I'm with you now.

Q    What's the source for those sets of
opinions on your part or statements?  I don't
see any citations.

A    Yeah, there too, I'm certainly
bringing to this task the expertise of my many
years of experience of working with people who
are in this field.  And I have honestly worked

1        KENNETH D. CREWS

2    with, met with and had conversations with many

3    individuals who are managers of or otherwise in

4    the business of running course packs and book

5    stores and photocopy shops, and many of these

6    observations I have not seen documented

7    anywhere.  So there aren't articles to cite, for

8    example.  But they certainly come up frequently

9    and have been expressed to me in my

10   conversations with people who are in this

11   business.

12       Q    And how many such conversations would

13   you estimate you've had on this topic?

14       A    Sure.  Over the last, say, 18 years,

15   since the Kinko's decision?

16       Q    Yeah.

17       A    Oh, I've probably had close detailed

18   conversations, I would have to say with 20 or

19   more people who are in a position of authority.

20   Plus having met in different kinds of sessions,

21   the workshops that I do, question/answer

22   sessions.  Met with large and small groups of

23   yet additional people who are in this kind of

24   business to talk about what they do and how they

25   do it, what some of their decision making is,

KENNETH D. CREWS

2   what influences they feel coming to bear on how

3   they run their business.

4       Q    And do you believe that they

5   reasonably, following Kinko's and MDS, would be

6   able to sustain a position that course packs

7   delivered to them of a type that were the

8   subject matter of those cases could reasonably

9   be justified under a fair use analysis?

10      A    I can reasonably say that certainly

11  some materials may be within fair use.  I can

12  certainly say, as we've already said earlier

13  today, that the fair use equation may be

14  different if you change the facts.  And if one

15  of those facts is change it from the off-campus

16  commercial to the on campus educational, then

17  you may also have a different fair use equation.

18      Q    You're moving away from my question,

19  sir.

20      A    I'm sorry.

21      Q    I'm focusing on this paragraph of your

22  testimony and asking you the facts, which is:

23  Is it your understanding from these many

24  discussions over 18 years, that the 20 or so

25  folks with whom you spoke in words or substance

KENNETH D. CREWS

1
2  reported you to that while they believed they
3  would have had viable fair use positions had
4  they investigated further, even in the aftermath
5  of MDS and Kinko's, that simply as a matter of
6  economics, they would rather pay the fees?
7  That's the burden of your testimony?

8      A     I have heard that said by many people
9  who are in the course pack business, that is
10  correct.

11     Q     Can you identify anyone by name?

12     A     No.

13     Q     Do you have any notes, records of
14  those discussions?

15     A     No.  I can -- just in general, the
16  fact that I went to this conference on the
17  National Association of College Book Stores,
18  that kind of thing.

19     Q     Do you view it as legally inadvisable
20  for someone who may in some situations have a
21  fair use position and in others not to decide to
22  remove any cloud of uncertainty by entering into
23  a license arrangement that obviates the need for
24  line drawing?

25     A     I don't -- there are times when that's

KENNETH D. CREWS

1
2  perfectly appropriate.  I think that's your
3  question.
4      Q     Would the course pack setting be such
5  a time?
6      A     For the kind of situation where you're
7  talking about the Kinko's like situation?
8      Q     Yeah.
9      A     Commercial shop?  I would rather see
10  them stop and pay a little bit more attention to
11  the details.  But I certainly understand the
12  pressure of the business that they're needing to
13  run and that while there may be opportunities to
14  use materials, they may not have the staff or
15  other reason to invest in investigating each of
16  those works.  If they turn to me and say yes, we
17  know that we probably could do it without
18  permission and without fees, but it's going to
19  take this kind of practical business investment,
20  therefore, I'm not going to do it, I'm going to
21  rely on licensing and if they said that to me as
22  a matter of business decision, I would honestly
23  look at them and say more power to you, that you
24  needed to make a business decision, it's not for
25  me to question your business, and if that's the

KENNETH D. CREWS

1
2  way you chose to do it, that's your choice.

3      Q    What knowledge do you have about the

4  extent to which certain materials which appear

5  in course packs are, in fact, not the subject of

6  copyright permissions requests and

7  authorizations.

8      A    In terms of have I seen real examples?

9      Q    I'm just asking you what your

10 awareness of that is --

11     A    Yeah.

12     Q    -- as a practice.

13     A    Yeah.  I actually see quite a bit of

14 it.  I've had situations brought to me for

15 question or just curiosity involving --

16 sometimes it's material produced by the faculty

17 member himself or herself.  Sometimes it's

18 material that they got from a colleague down the

19 hall and maybe produced by the colleague, and

20 it's just kind of a casual permission, a

21 handshake and that's it.  But it raises

22 questions.  I've seen things that are just

23 dubious.  I mean, I list an example in my report

24 about something that was on electronic reserves,

25 a kidnap ransom note.  And this is the kind of

KENNETH D. CREWS

thing that I've also seen in course packs.  So

there are a variety of ways that something -- a

variety of examples where something appears or

is proposed to be in a course pack, but the

course pack office maybe doesn't have the

facility or the inclination to investigate and

determine how to proceed.

Q    Are you aware in relation to one of

CCC's offerings, which is clearing permissions

requests for use in the academic setting on a

transactional basis, whether there is any

compulsion on the part of the user of that

service to produce any material other than

material it believes is not subject to fair use?

A    So that the person presenting that

material could say, well, I just withheld this

for whatever reason?

Q    Yes.  What's your knowledge of that

practice?

A    I have asked about book stores that do

the photocopy course packs and I've asked them,

do you do that?  Do you go through this?  And,

you know, routinely the answer is no, we don't

go through the material at all.  We just go

1          KENNETH D. CREWS

2    through it, we see what's there, we fire off any

3    requests that we can find where we can find

4    somebody to request the permission from.  We

5    don't have the staffing to make the judgment

6    that this is not copyrighted at all or that this

7    doesn't need permission or that this is even

8    pre-cleared, like with creative commons or it's

9    fair use.  We just don't have the staff to do

10   that.

11       Q     Reading the MDS and Kinko's

12   injunctions, is it any wonder why people

13   wouldn't spend any enormous amount of time

14   seeing if individual pages of an otherwise

15   anthological course pack might meet fair use?

16       A     You know, the answer is no, it is no

17   wonder.

18       Q     If you would turn to Page 18, please,

19   of your report.

20       A     Uh-huh.

21       Q     Under purpose of the use.

22       A     Yes.

23       Q     You say in the context of E-Reserves,

24   "In some respects the use of some materials may

25   be transformative.  For example, an article in a

1        KENNETH D. CREWS

2    scholarly journal was originally written and

3    published for purposes of advancing scholarship.

4    If the article is about medicine, the purpose is

5    for advancing medical treatment and improving

6    health conditions.  If the same article is part

7    of the assigned reading in a course, its use is

8    transformed into a teaching tool.  The article

9    may be assigned for purposes of advancing

10   medicine, but it might also be assigned as an

11   example of research methods or even to study

12   trends in research funding or scholarly

13   publishing.  In an electronic environment, the

14   instructor may add questions and references for

15   further study and students may add commentary

16   and observations.  In the hands of the teacher

17   and student, the article takes on a new

18   purpose."

19            Is that a correct statement of your

20   testimony?

21        A     Yes, it is.

22        Q     So is it your position that the simple

23   use of copyrighted material in the classroom

24   setting qualifies that material as

25   transformative, assuming it fulfills one or more

KENNETH D. CREWS

of the functions you described?

A     If it fits some of the patterns that I described, I think there's a transformative aspect to that use.

Q     So you really believe, consistent with your scholarship and copyright law, that simply assigning an article in a classroom qualifies -- for whatever purpose the teacher assigns to it, is a transformative use of that photocopy?

A     Your second question goes many steps beyond your first question.

Q     Let's take my second question.

A     No.  I will not say yes to your second question?

Q     Second question.

A     Yeah.  I will not say yes to your second question.

Q     When, then, is the material transformative within the meaning of copyright law?

A     Sure.  The easiest one may be the last that I give here, and that's where I take the work, whatever it might be, and I add to it some features.  For example, we'll see instructors

KENNETH D. CREWS

1

2  take a newspaper article and instead of saying

3  just read the newspaper article, it's let's take

4  the newspaper article and I'm going to add

5  margin comments about what to look at, arrows to

6  upon point to certain ways that something is

7  communicated and so on. So somebody has

8  actually added commentary, observations and

9  other elements to the work to really transform

10  it from its original purpose of being a news

11  item to its new purpose of being specifically

12  adapted to serving the educational needs of

13  what's going on.

14      Q     What if I lecture about it? What if

15  my lecture is devoted to the topic of the

16  assigned reading and the students take

17  annotations along the side of the article,

18  absorbing all the wisdom of their professor,

19  does that make the photocopies of the article

20  transformative within the meaning of the

21  copyright act?

22      A     All by itself, I'm having trouble

23  worrying about when we're really going to care

24  about that issue coming up.

25      Q     We care if we're going through a fair

KENNETH D. CREWS

use analysis, don't we?

A     In other words, it would come up if
somebody were to say, hey, student, you have
taken that article and have turned it into a
derivative work by virtue of your annotations.
So is that one copy?  Because it's not the
student that's doing multiple copying or sharing
or any of these things that we've talked about.
I'm just really thinking of the instructor, and
that's really what I'm imagining here.  That the
instructor takes that newspaper article, and
maybe the newspaper article is about whatever
diplomatic development in the world, but what
the teacher is really teaching is something
about, say, journalism.  And now I'm going to
use that article as a tool for teaching about
journalism.  Let's look at how the article is
constructive.  And my margin comments are going
to be focused on that aspect of the article.  I
think that's a transformative use of that work.

Q     And then is it transformative for
every student who would download, print, bring
to class, a copy of that article and benefit
from all of that, quote, transformative work

1          KENNETH D. CREWS

2    from the professor?  This is written in the

3    context of E-Reserves, not in the context of a

4    theoretical by a professor being sitting in a

5    study, if I'm not mistaking you.

6         A     That's right.  But I'm having trouble

7    understanding that.  In other words, are you

8    suggesting reframing the place where the fair

9    use question arises so that it isn't arising in

10   the context of getting a copy of the work,

11   making it available on the E-Reserves system

12   that students access, but will it be a second

13   fair use analysis with each download by those

14   students?

15        Q     No.  This isn't that complicated.  The

16   checklist which you endorse and believe to be,

17   you know, spectacularly in conformance with the

18   copyright act, has as part of an element whether

19   the use of the work is transformative.  And I

20   take it --

21        A     Yes.

22        Q     -- the faculty member needs to check

23   the box, yes, it is; no, it isn't, and that

24   along with the other factors, it will weigh in

25   the determination whether that work will be

1    KENNETH D. CREWS

2    uploaded and then, subject to everything that

3    Professor Dewar's report, which you've generally

4    endorsed, indicates can be done with respect to

5    further dissemination of that work.  So it

6    puzzles that you would sit here saying I can't

7    imagine why that's relevant, especially when

8    you've written about it.

9        A     No.  No.  I'm not here testifying at

10   all to any subsequent downstream uses of that

11   work by the student, if the situation is the

12   student downloading and then look what the

13   student can do, uploading and passing it along.

14   When we looked at Dewar report, that was just a

15   question of the matter of fact, can that, in

16   fact, happen; and I believe my answer was yes,

17   that can in fact, happen.  But we didn't get to

18   the question of can a student legally do that.

19   You didn't ask that question at all.

20        And so let's back up from that

21   question.  I'm only saying here that if the

22   instructor takes that newspaper article, let's

23   stick with that example, and annotates it,

24   circles different items, transforms it from a

25   news item into how to deconstruct a news article

1        KENNETH D. CREWS

2    for purposes of learning journalism, I think

3    we've got a transformative use of that work.

4    And therefore, that is a piece of the many

5    different pieces that are possible in the

6    evaluation of whether or not it's within fair

7    use.

8        Q    Would it surprise you that not a

9    single professor who gave testimony in the GSU

10   case, nor any librarian, remotely believed that

11   any of the uses involved in E-Res are

12   transformative in nature?

13       A    No, that wouldn't surprise me at all.

14       Q    Are they just ignorant of copyright

15   law?

16       A    No.  I believe that the professors and

17   so on were not -- I think they were professor of

18   something else.  They were not law professors.

19       Q    That's true.  So they're ignorant of

20   copyright law?

21       A    Well, I wouldn't say ignorant.  I

22   wouldn't say ignorant.

23       Q    They don't know how to apply fair use

24   correctly?

25       A    No, no.  Hang on a second.  You're

1  KENNETH D. CREWS

2  going back to your original question.  They said

3  that they didn't believe that that use, and

4  you'll have to look at some specific uses, but

5  whatever question they were asked, was not

6  transformative.  I think that was your

7  statement.  And that the professor was saying I

8  believe that that use is not transformative.

9  Maybe they're right.

10  Q   But you criticize them, at least

11  obliquely, for not being schooled in copyright?

12  MR. SCHAETZEL:  Objection to form.

13  A   No.

14  Q   You said, well, that's not their

15  discipline, didn't you, in so many words?

16  A   That's not their discipline.  But on

17  the other hand --

18  Q   Was that just a gratuitous statement

19  or was there a reason to say that?

20  A   Maybe there are two reasons for the

21  response.  Maybe they didn't know

22  transformative/non-transformative or maybe

23  they're right.  Maybe that particular use that

24  they were making was not transformative.  I

25  don't know which of those is true.

1            KENNETH D. CREWS

2       Q     If, in fact, they're wrong, what's the

3   logic of remitting a system of fair use

4   determinations to a bunch of people ignorant

5   about copyright law, namely the professors?  Is

6   that a logical system?

7       A     I'm bothered by the conclusions that

8   you're jumping to.

9       Q     I didn't make the conclusion.  You

10  said one of the possibilities that would explain

11  why they have a mistaken conception as to

12  transformativeness is that they're not

13  knowledgeable about copyright.  It is a

14  foundation stone, is it not, of the GSU policy

15  that fair use decisions first and foremost are

16  made by the very people you admit it is feasible

17  have no clue about copyright law?

18          MR. SCHAETZEL:  Objection as to form.

19      A     And I didn't say no clue.

20      Q     Unknowledgeable.

21      A     I didn't say unknowledgeable.

22      Q     What words would you like to use?

23      A     I don't know.  Would you like to read

24  it back?  It may be too far back in our

25  conversation.

1          KENNETH D. CREWS

2     Q     Why don't you restate it.

3     A     Would you like me to restate it?

4     Q     Please.

5     A     They're not experts.

6          MR. SCHAETZEL:  Objection to form.

7          Go ahead.

8     A     They're not experts.  They're not

9    experts.  In what we're -- certainly, what I

10   like to encourage of my faculty colleagues is

11   you don't need to be an expert in the sense that

12   you are, that I might be, that somebody else in

13   this room is.  You don't have to be an expert on

14   copyright.  You need to know something about

15   copyright.  You need to learn some of the

16   fundamentals, particularly as they apply to your

17   kinds of situations, and you need to apply them

18   in a reasoned, good-faith manner.  And I will

19   tell you even further that I feel very

20   comfortable with that, especially knowing that

21   there are the safeguards in the system, notably

22   at Georgia State University, which we've already

23   talked about.

24   Q     What are those?

25   A     That, for example, especially in the

1      KENNETH D. CREWS

2   E-Reserves system, that the content is brought

3   to the library.  That we talked about multiple

4   reviews at the library, an intake review.  We

5   talked about by whatever standard -- we don't

6   need to return to that.  But by whatever

7   standard, certain materials may be flagged, and

8   they're reviewed by somebody higher.  And I

9   believe we've said today -- if we didn't, we can

10  say it right now -- that if that person needs

11  further -- believes that the situation needs

12  further review, there are others within the

13  library, and University counsel has made itself

14  available under this policy for reviewing any of

15  these materials.

16      Q     And you, sitting here today, don't

17  have the remotest knowledge, do you, of how many

18  times those review processes have been invoked

19  under the current policy; isn't that true?

20      A     At Georgia State University?

21      Q     At Georgia State University.

22      A     The only number that I would know are

23  the examples given in the depositions.

24      Q     And you made no investigation to

25  support your conclusions as to the

1      KENNETH D. CREWS

2      reasonableness of this policy as applied and in

3      practice at Georgia State rather than assume

4      that the review process with the librarian and

5      an appeal to another librarian and legal counsel

6      is in fact working.  You just assumed it,

7      correct?

8          A      I've assumed that they're dedicated to

9      making that work, that's right.

10         Q      But you have no factual basis for that

11     assumption, do you?

12         A      Other than what the participants have

13     said in the depositions.

14         Q      And the participants in the

15     depositions identified how many instances as of

16     the date of those depositions, when the

17     librarians reviewed one or more matters for

18     copyright compliance?

19         A      I don't recall any numbers.

20         Q      What about the uLearn system, what

21     librarian is involved in that process?

22         A      The uLearn system is a course

23     management service.  I don't know.  I don't

24     recall from mention of the -- whether it was --

25     I know it was described in the -- in the

KENNETH D. CREWS

1

2  depositions, but I'm also not recalling

3  systematically about the library's involvement,

4  although I believe that they are available,

5  certainly, for questions about that.

6      Q    My question is:  What's the basis for

7  that assumption?

8      A    I believe it was mentioned in the

9  depositions.

10      Q    You can't recall that?

11      A    I'm not recalling it specifically.

12      Q    You could be wrong about that,

13  correct?

14      A    I could be wrong about that.

15      Q    In application, would it trouble

16  you -- this is focusing on GSU now.

17      A    Uh-huh.

18      Q    An application of the fair use

19  guidelines.  Would it trouble you if factor one

20  was almost always deemed by faculty to favor

21  unlicensed classroom use of copyright materials?

22      A    Yeah, yeah.  Specifically in the

23  context of electronic reserves for purposes of

24  supporting the reading in connection with the

25  courses at Georgia State University, no, that

KENNETH D. CREWS

2  wouldn't trouble me.

3  Q    Would it trouble you if the analysis
4  was weighted such that a user would consider
5  factor one to weigh in favor of fair use even
6  where its evaluation of the use was that it was
7  concededly non-transformative?

8  A    No.  That wouldn't bother me either.

9  Q    Would it concern you if instructors
10 using the checklist considered distribution of a
11 copyrighted work to all students enrolled in a
12 course not to be a "public distribution"?

13 A    No, that wouldn't bother me either.

14 Q    Would it concern you under factor two
15 the checklist almost always resulted in an
16 analysis favoring unlicensed use of published
17 nonfiction works in the classroom context?

18 A    I would question that.

19 Q    Would it concern you if instructors
20 determined that the "nature of the copyrighted
21 work" favored fair use because the instructor
22 deemed his or her use of the work to be
23 "important" to his or her "educational
24 objectives"?

25 A    And they evaluated only that reason?

1                KENNETH D. CREWS

2 That would bother me.

3     Q    Would it trouble you under factor

4 three if an instructor could use the checklist

5 to reach a fair use outcome even where she

6 concedes the portion used is a "large" one?

7     A    Not necessarily all by itself. I'd

8 look at the other factors.

9     Q    Would it trouble you if instructors

10 almost always considered their use of course

11 material to qualify as "narrowly tailored" to

12 their educational purpose?

13     A    I'd like to talk to those professors

14 and help them rethink what they're doing.

15     Q    What if they don't avail themselves of

16 mechanisms and just go and make those checklist

17 determinations and feel comfortable about it?

18 Is the system working well then?

19     A    It's not bad if you have protection

20 from the other -- looking at the other factors.

21 I mean, again, we don't know what "narrowly

22 tailored" means outside of the context of really

23 what it is you're trying to teach. And so

24 really that instructor is the one who has those

25 facts and is best able to help with that

KENNETH D. CREWS

1  decision.

2         But then again, one can't get away

3  with anything.  We'd go back to one of your

4  earlier examples of the day and say what are the

5  safeguards if somebody just shows up with what

6  clearly is a questionable amount of material

7  that would get reviewed and bounced back to the

8  instructor.

9    Q    You're saying if it flunked the

10 quantitative test?

11   A    And then if it flunked that

12 quantitative test, somebody is likely to red

13 flag it and send it back.

14   Q    But if it was 19 percent of a work and

15 had lots of other reasons objectively to cause

16 concern, there's no reason the librarian will

17 know that, correct?

18   A    In some cases, that's right.

19   Q    Well, in the record evidence, they say

20 they don't care about any other factors.  Does

21 that disturb you?

22       MR. SCHAETZEL:  Objection as to form.

23   A    The librarians say they don't care

24 about any of the other factors?

1        KENNETH D. CREWS

2        Q    They are not in a position to nor do

3    they view it as their responsibility to evaluate

4    any other fair use factor than an arbitrary,

5    quantitative test.  That's their words, not

6    mine.

7             MR. SCHAETZEL:  Objection as to form.

8        A    Yeah.

9        Q    Does that trouble you?

10       A    I would look -- it troubles me if I

11   don't find something else.  What I would look

12   for is I would go back to counsel and say, you

13   know those workshops you're doing, are we

14   covering these issues?  Are we helping people

15   understand these other issues?  Because the

16   workshops and your involvement may be on that

17   point the more important safeguard.

18       Q    You're saying if you were provost,

19   you'd do that?

20       A    Yeah.

21       Q    But you're not.

22       A    But I'm not.

23       Q    And so if the system chugs along

24   currently with high school educated often

25   library clerks simply determining if they see a

KENNETH D. CREWS

2   red flag of X percent or more and otherwise

3   saying it looks good to me, you're copesetic

4   with the practice?

5       A    And if we have a system in place that

6   says faculty members need to consider these

7   other variables, and also at Georgia State

8   University I believe they have -- and in fact,

9   it's stated in their policy that we're going to

10  investigate alternatives, particularly linking

11  to data bases so that we don't have to make

12  those copies and don't have to deal with these

13  questions if they can be -- if we already posses

14  the material in electronic form.  I think I'm

15  going to be okay with that.

16      Q    But will publishers be okay with it

17  when it's their materials that are being used

18  here?

19      A    Publishers need to speak for

20  themselves.

21      Q    They have.

22      A    They have.  But I'll tell you, I know

23  other publishers that don't mind at all.

24      Q    Who's that?

25      A    Many scholarly publishers in

1          KENNETH D. CREWS

2     particular are moving more toward an open-access

3     system and allowing easier access, including

4     download ability, including reuse.  More and

5     more materials are being available with creative

6     commons license so that they can be accessed

7     freely.  And then the permission is preassigned

8     for purposes of downloading and reuse,

9     particularly, commonly, for non-commercial kinds

10    of uses.

11        Q     But you're not suggesting that

12    publishers need to relinquish their copyright

13    rights, including the right to a reasonable

14    royalty if a use exceeds fair use, correct?

15        A     No.

16        Q     Would it trouble you if checklist

17    users relied upon varying numerical rules to

18    determine how much of an original work may be

19    taken without permission, such as less than

20    10 percent or 20 percent of the original?

21        A     If that were the sole standard, that

22    would trouble me.  I think it's important to

23    look at all four factors.

24        Q     Would it concern you if in the factor

25    three analysis, instructors considered multiple

KENNETH D. CREWS

1

2 articles taken from an edited compilation as

3 portions of one original rather than as the

4 entirety of each individual article?

5     A    And that compilation, it's a book, I

6 assume, typically.

7     Q    Yes.

8     A    Please ask the question one more time.

9     Q    Would it concern you in the factor

10 three analysis if instructors considered

11 multiple articles taken from an edited

12 compilation as portions of one original rather

13 than the entirety of each individual offering?

14     A    No. I think if they are presented as

15 effectively chapters in a book, they should be

16 evaluated as individual -- as a whatever -- if

17 you're looking at a portion limit, as a portion

18 of the book rather than a portion of each

19 chapter.

20     Q    They should be cumulative?

21     A    Correct.

22     Q    Would it concern you if instructors

23 considered factor three to potentially "take

24 precedence" over the other factors?

25     A    Oh, yeah. That would concern me.

1    KENNETH D. CREWS

2    Q    Would it concern you if instructors

3 considered it impossible or unlikely that any

4 chapter in an edited compilation of independent

5 articles could represent "the heart of the work"

6 even where multiple articles were used in their

7 entirety?

8    A    I think I'm hearing two different

9 questions. If it's just --

10    Q    Strike the last part of that.

11    A    Thank you. That's what was throwing

12 me off.

13    Would you read it again and just leave

14 that off?

15    Q    Would it concern you if instructors

16 considered it impossible or unlikely that any

17 chapter in an edited compilation of independent

18 articles could represent "the heart of the

19 work"?

20    A    You know what, my brain is turning to

21 mush. It is absolutely true. This is a good

22 time to take a break.

23    (Whereupon, a recess was taken.)

24    (Whereupon, the referred to portion

25 was read back by the court reporter: Would

KENNETH D. CREWS

1
2   it concern you if instructors considered it

3   impossible or unlikely that any chapter in

4   an edited compilation of independent

5   articles could represent "the heart of the

6   work"?)

7       A    The work being the whole book, that

8   chapter.  Impossible?  It's not impossible.

9   Something might be the heart of the work.  But

10  would it concern me if a professor reached a

11  conclusion and said this chapter is not the

12  heart of this book?

13      Q    No.  A slightly different question was

14  intended, which is:  If as a matter of logic, a

15  professor were to say it can't possibly be the

16  heart of the work, it's only one contribution to

17  a 20 work compilation --

18      A    And therefore I'm going to say --

19      Q    -- and, therefore, automatically it

20  can't constitute the heart of the work within

21  the meaning of the checklist.

22      A    Phrased that way, the answer would be,

23  yes, that would concern me.

24      Q    On factor four, would it concern you

25  if instructors failed to consider the impact on

KENNETH D. CREWS

1
2 the market for the original if the proposed

3 taking were to be repeated to a -- by a larger

4 group of instructors?  So that's now replicating

5 the same taking across different instructors,

6 different courses.

7    MR. SCHAETZEL:  Objection as to form.

8   A That would not concern me, and the

9 reason -- it would not concern me.

10   Q Would it concern you if instructors

11 failed to consider or didn't know about the

12 availability of licensed versions of the same

13 content?

14   A And do you mean licensed versions that

15 the, say, Georgia State already has, like the

16 databases?

17   Q No.  That's fair.  Let me rephrase.

18    Let me narrow the question to the

19 availability of a licensed alternative to secure

20 the content.  And the question is:  Would it

21 concern you -- let me break it down -- if an

22 instructor said I have no idea, therefore I'm

23 just going to check the box "no license

24 available"?

25   A That would concern me, because stated

KENNETH D. CREWS

what way, it would look like they just glossed

over the issue and didn't investigate it.

Q    Would it concern you if instructors

analyzed market harm strictly in terms of the

number of copies made for their class?

A    Strictly in terms of the number of

copies.  Not necessarily.  I think -- not

necessarily.

Q    You're familiar with the concept under

factor four, Professor, of potential harm and

the possibility that a practice could replicate

itself elsewhere.  How is it intended, if at

all, that the GSU checklist on board that

consideration, as you understand it?

A    Okay.  I see what you mean.  Yeah, it

does -- it would bother me if a professor just

very narrowly looked at just only my immediate

one example today and looked no further.  In

some cases, that would be problematic.

Q    Do you think it's appropriate for

instructors to consider the posting of a

copyrighted work on either E-Res or uLearn to

constitute a single copy rather than the

distribution of multiple copies, again, looking

1  KENNETH D. CREWS

2  at checklist item that deals with that?

3  A    Yeah.  I'm going to try real hard not

4  to be too legalistic, because, of course, all

5  those words, like "copy" and "distribution" have

6  technical legal terms.  But if what you mean is

7  a much more -- a much less formal sense of the

8  words, then yeah, I think a professor needs to

9  think of it in terms of I'm making this work

10  available for the 25 students in my class.

11  Needs to think in those terms.  I think that's

12  what you're looking for.

13  Q    Would you be concerned if instructors

14  considered factor four to be irrelevant to the

15  ultimate fair use determination in cases where

16  the previous three factors were evaluated by the

17  professor to weigh in favor of fair use?

18  A    I would still tell them you've got to

19  do some thinking about that fourth factor.  It's

20  not irrelevant.

21  Q    Do you understand the current preamble

22  to the fair use checklist?  And we can put it in

23  front of you if you need it.  To invite or, if

24  not to invite, to permit that kind of reasoning,

25  namely majority rules; if I get the first three

1          KENNETH D. CREWS

2   factors, I don't need to get to the fourth?

3       A    I see what you mean.  One, I've always

4   struggled with how one could infer that, not

5   only from the checklist but from everything in

6   fair use.  I see people jumping to conclusions

7   on single variables, whatever it might be.  And,

8   you know, we try, we try, we try, and we just

9   have to keep trying.  But, you know, even the

10  courts themselves have trouble getting people to

11  keep looking at all four factors.

12      Q    Quickly turn to Page 19.  And we're

13  not going to literally go page by page of this,

14  you'll be happy to know.  There are big chunks.

15  We're going to move along here.

16          On the first bullet on 19, which is

17  "Amount of the work," here's the question you've

18  been waiting for me to ask you.  At the end of

19  that, how do you determine the relevance of

20  quantitative takings?  In other words, how

21  should a professor think about the concept of

22  the percentage of a work or as part of its --

23  his or her calculus?

24      A    I don't know if I have been waiting

25  for you to ask that, but I figured we'd get to

1        KENNETH D. CREWS

2    it sooner or later.

3        The law itself is where I would start

4    with my answer.  And the law itself calls for

5    both a qualitative analysis, and that is the

6    amorphous part of it.  That is the heart of the

7    work sort of concept.  But then the one that

8    really is much more realistically discussed,

9    much more realistically pertinent, I think, in

10   much of the discussion surrounding electronic

11   reserves is the quantitative measure and being

12   the amount that's used.

13       You know, here's how I've struggled

14   with it over the years.  That I will certainly

15   say that, as a matter of law, the court has

16   drawn -- the courts have drawn no lines.  The

17   statute draws no lines.  One of the things I say

18   to one -- to groups at workshops is I'll say

19   something like, would you like me to show you a

20   case where the court said quoting 300 words was

21   too much?

22       Q    Harper and Rowe.

23       A    Harper and Rowe.

24       Would you like me to show you a case

25   where the court said quoting 7,000 words from a

1    KENNETH D. CREWS

2    shorter work was okay?  I can show you that case

3    too, Maxtone-Graham.  And, you know, these are

4    extreme examples, but they're examples that

5    really demonstrate the point.

6         And so what does it really mean?  It

7    means that it does come down, really does in my

8    reading of the law, that the courts are being

9    very careful not to say -- not to say as a

10   matter of law, 10 pages or 10 percent or

11   25 percent or 50 percent, as we saw earlier.  It

12   just doesn't exist in the law.  Word counts, as

13   we've seen in some of those guidelines, they

14   just do not exist in the law.  And so this is

15   one area where it's clearly coming back to us.

16   I mean, the notion of how much has surfaced in

17   our discussion here today in several different

18   contexts.  So much of the discussion keeps

19   coming back to it.  My own report takes the

20   group of the 40 or so policies and breaks them

21   out.  I could've broken them out in a dozen

22   different ways.  But what did I do?  I broke

23   them out by how much.  And one of the reasons

24   being that it's very compelling to look at that

25   as a salient piece of the discussion about fair

KENNETH D. CREWS

use.  And it's also -- it's also very compelling

because we can see real differences.  It's also

very compelling because that how much not only

is important in the question of what is the law,

what is fair use, but it's also a prominent

element -- I'm trying to get away from my over

use of the word "important."  Probably half the

times I've said "important" today I mean it in

some other sense.

But it's used -- it's a prominent

element of the discussion because it's so

instrumental to ultimately making the electronic

reserve environment, or I could've also said

print reserve or I could've also said course

packs, making that environment useful to

accomplishing the goals of education.

So that, in other words, let's clock

it way back.  That if you take those 1976

guidelines with word counts and incorporated

those, you know, if that ends up being the law,

then it's a law that's also not very useful.

And so it becomes -- it becomes a salient point

for a discussion because it's part of the fair

use equation that happens to correspond in a

KENNETH D. CREWS

significant way with accomplishing just the very

reason why a University would have an electronic

service, electronic reserve service.

Now, somewhere in there I bet I didn't

answer your question. Would you repeat the

question?

Q    Well, no. That's okay. In the

interest of time, I want to just continue the

dialogue on this.

I will represent to you that a lot of

the testimony that we have taken of efforts to

implement the new policy have resulted in fairly

easy decisions -- I don't think I'm

mischaracterizing it -- by the people filling in

the new checklist as to where factors one and

two end up. They crash in their estimation on

the side of fair use because they believe that,

as presented, the items line up with an

educational purpose, not for profit and narrowly

tailored for purposes and it's factual work, and

they just say no-brainer on those two. Third, I

don't think they have a conception on numbers.

A number came with the following baggage from

either prior GSU experience or from prior

KENNETH D. CREWS

institutional experience. 20 percent rule.

That's what they were trained in. Several of

them testified that the only understanding they

had up until the new policy at GSU, the only

rule they were told, and indeed the rule that

was enforced by the library, was 20 percent.

That's was it, hard and fast.

Now let's assume under this -- sorry

for the long exhortation -- they say it better

be under 20, it's 18 percent. Factor four, what

we come away with from the examination is how do

we know effect on market, licensing. That's

complicated stuff. But the first three favor

me, all right? Because 18 percent, I think, is

less than 20, so I'm in good shape. Or maybe

I'll do 12 percent.

And so then it goes to this library

review, such as it is, and the library says,

well, we're just going to check 20 percent. So

in my hypothetical, if it's 18 percent, they

don't know how the professor cycled through

factor one, don't know how the professor cycled

through factor two, don't know how the professor

cycled through factor four. But in my example,

KENNETH D. CREWS

1

2 let's assume the professor was sensitive enough

3 to this old 20 percent ceiling that, in fact,

4 the offerings were all less, then they would

5 meet the screen at the library. And so you

6 would have this relatively unformed process of

7 review with a quantitative review screen that is

8 below what at least most, if not all of the

9 librarians would flag, and that is what, so far,

10 has come through to us as counsel for plaintiffs

11 as the new system. And we say it leaves

12 something, if not a lot of things, to be

13 desired.

14 Do you have any reaction to that? I'm

15 not asking you to adopt these as fact but as

16 hypotheticals.

17 MR. SCHAETZEL: Objection to form.

18 A I do. I do. And, you know, let me

19 start out by saying I understand. You know,

20 everything you just said I understand. And if I

21 were sitting in your seat, I might perceive it

22 in the same way.

23 I would like to bring to the table a

24 different -- an additional perspective to put on

25 top of that. That the law of fair use is what

KENNETH D. CREWS

1

2  it is.  And we can always argue.  And for this

3  purposes, I'm not trying to say I see it this

4  way, you see it that way, no.  That's not my

5  point right now.  My point is that the law of

6  fair use is what it is.  It is, for reasons that

7  Congress identified as important, a flexible,

8  fluid doctrine, adaptable to changing needs,

9  adaptable to changing technology, adaptable to

10  changing circumstances of unpredictable types.

11  And that's what we are working with.

12        And what I'm seeing -- actually from

13  many of the same facts that you are emphasizing,

14  what I'm seeing instead is a group of

15  extraordinarily dedicated professionals.  And I

16  say this because I'm out there on the road

17  meeting their peers.  And the things that I'm

18  seeing, however much there is room to question

19  or criticize whatever they're doing, I can tell

20  you, by comparison, they are extraordinarily

21  dedicated professionals who are working with

22  these issues to really do their best to

23  absolutely understand and respect the interests

24  of copyright owners.  They know that.

25        In fact, you know, it's the

KENNETH D. CREWS

1 
2 librarians -- as you can see, I tried to explain

3 it, just a brief part of my report.  All over

4 the country, the librarians are the ones who are

5 often handed this issue.  And there are a couple

6 of reasons why.  But, you know, one of the

7 reasons why is they care.  They just care.  They

8 care about the copyright that the publishers

9 have.  They care about the system of copyright.

10 They care about fair use.  They're paying

11 attention.

12 And what I'm also seeing, compounding

13 it, is that right now Georgia State University,

14 whatever it's doing or whatever it's not doing,

15 it's actually doing a whole lot, in large

16 measure, because, you know, like the old story,

17 how do you get the donkey to follow the orders,

18 you gotta hit it over the head with a 2-by-4

19 first.  Well, you've hit them over the head with

20 the 2-by-4.  You filed a lawsuit against them.

21 I get questions all the time and have for years,

22 what are the chances that I'm going to get sued,

23 says a librarian, says a professor, says the

24 computer guy, and the answer's always been,

25 well, you know, it's a little bit like

KENNETH D. CREWS

2 lightening. The chances of your getting hit by

3 lightening are just about zero. However, if you

4 get hit by lightening, it just hurts like hell.

5 Q You tell them that Zeus is throwing

6 some more bolts, correct?

7 A Yeah. And, you know, over the years

8 we've been able to say people kind of like us

9 have been sued. Kinko's, so we learned from

10 that. It's not exactly us, but it's the closest

11 we got, so we learned from it. MDS, it's not

12 exactly us, but it's the closest we got, so we

13 learned from it. But now it's Georgia State.

14 The game has changed at this point.

15 And so what we're also seeing and I

16 see when I look at Georgia State is you've

17 got -- you have gotten their attention. You

18 have gotten Georgia State to say we're going to

19 put together a policy. Granted, it's not

20 exactly what you would have written. But on the

21 other hand, it's got a lot of pieces that the

22 publishers were content with when they worked

23 with Cornell and a few other universities, the

24 fair use checklist, for example. So it's got a

25 lot of component of that. And we got your

KENNETH D. CREWS

1
2  attention --

3      Q    Don't take silence on that as my

4  assent, but go ahead.

5      A    We got you to revise policies.  We got

6  you to commit to University counsel to being

7  available to everybody in the system with their

8  questions that they have available.  We got you

9  to commit library staff to review and layers of

10  review.  And maybe there's room for improvement.

11  There always is, of course.  But we got them in

12  place, and you've gotten their attention.

13          And you know, I'm going to tell you

14  right now that from what I know from

15  universities, working with many, many

16  universities all over the country, what's going

17  on at Georgia State University -- however much

18  we might wish or could suggest changes, what's

19  going on at Georgia State University is beyond,

20  is right now beyond the capability and

21  willingness of most colleges and universities

22  around the country.  And if what's going on

23  there right now became the mandate for everybody

24  across the country, there are lots of colleges

25  that would say, consult with counsel?  We don't

1          KENNETH D. CREWS

2    even have counsel.  What do you mean, consult

3    with counsel?  If that's part of our fair use

4    equation, in other words, Georgia State may not

5    have done everything that you would wish, that

6    anybody else would wish, but Georgia State has

7    done a tremendous amount.  I'm confident that

8    they're going to do more.  I'm confident that

9    they've committed themselves to doing more.  And

10   I think that there's important progress here.

11        Q    I appreciate those comments.  And in

12   the spirit of them, we're getting a little bit

13   afield with our mutual speechifying.  But let me

14   ask this question more narrowly.

15        What do you perceive the impact on a

16   given faculty member's fair use determination

17   and application of that checklist, what do you

18   perceive the impact is of that instructor's

19   knowledge that if that instructor makes a

20   non-fair use determination, there is no

21   permissions money available institutionally and

22   that he or she will have to reach into his or

23   her own pocket, how do you see that affecting

24   the calculus that that individual will go

25   through?

KENNETH D. CREWS

    A    I'm expecting that individual to make
that decision, to make that honest decision.
And I think this really is your question.  What
will that -- how will that professor respond
when she discovers that what I want to do is not
within fair use and there's no budget at the
university to pay for this, I gotta reach into
my own pocket?  What do I think will happen at
that point, realistically?  I try to stay
optimistic.  I try to say if that professor were
talking to me right now, I would be as
optimistic as I could and I would say let's have
a look at what you're doing, how you're doing
it, how you're accessing those materials, what
those materials are, and let's think about your
alternatives.  And I've got a litany of
different things we'd talk about.  But if the
professor comes back and says, no, this is what
I need and there's no budget for it, I'm going
to turn back to the professor and say then
you've got a tough decision.  You're going to
either have to decide you really need it and
you're going to pay the bill, because assuming
in our facts there's no of university budget to

1      KENNETH D. CREWS

2   pay for it, or you have to drop the material

3   from the lesson.

4      Q     I understand that if that individual

5   came to you, that would be the response.  But

6   isn't it also at least likely that in some

7   cases, facing that reality, the individual is

8   going to slant the fair use analysis at least

9   just a bit in favor of fair use?

10     A     No.  Honestly, in my experience, I

11  don't have reason to believe that that would

12  happen.

13     Q     Okay.  Now, given what you know about

14  the prior University of Georgia policy and the

15  fact that the only enforcement of it, I'll

16  represent to you, was the so-called 20 percent

17  test under the old policy versus the current

18  one.

19     A     Okay.

20     Q     If experience demonstrated that

21  comparatively the nature and volume and extent

22  of unpermissioned postings on the E-Reserves

23  system service between the prior system and the

24  current system remains fundamentally unchanged,

25  would that give you concern?

1            KENNETH D. CREWS

2        A     Yeah, I'd want to take a look at the

3   details and just see what's going on here.

4            MR. SCHAETZEL:  Objection to form.

5   BY MR. RICH:

6        Q     Down on 19, in the middle of the page,

7   effect on the market.

8        A     Yes.

9        Q     In the middle, you say, "E-Reserves

10  have, at most, limited effects on the market."

11  What's the empirical foundation for that and/or

12  your basis for a comprehensive statement of that

13  sort?

14       A     Sure.  Sure.  If E-Reserves -- if an

15  item, A, let's stick with the most common, a

16  journal article is available on E-Reserves,

17  E-Reserves is behind -- as we typically have set

18  it up, as we did at the beginning of the day,

19  it's behind password control, limited access for

20  only students enrolled in the course.  It

21  therefore, whatever effect on the market it

22  might have, it will be limited only under those

23  circumstances, that if you could say, for

24  example, a student access has some measure of

25  harm to the market, and if there are 20 students

KENNETH D. CREWS

1
2      in the class, it's 20 times that, but that's it.
3      That's the limit on the harm, as opposed to
4      somebody who takes the same item and posts it
5      publicly for all to see.
6          Q      So that's a fairly limited statement
7      intended here as opposed to the broader
8      E-Reserves practiced nationally can't have
9      untoward effects on publishers.  That's not what
10     you're intending, then, by this statement?
11         A      No, I'm not saying that.
12         Q      You're doing it in the narrower
13     context of comparatively to other means of
14     accessing material?
15         A      That's right.
16         Q      I see.
17             If you would turn, please, to Page 25.
18     Beginning at the bottom of 25, you give, I
19     think, three examples, Northwestern, Washington
20     State University of Vancouver and University of
21     Colorado, yes?
22         A      That's correct.  I see it, flowing
23     over to Page 26.
24         Q      And let me ask you, is the source of
25     the information set forth strictly that you

KENNETH D. CREWS

1

2   derive from the sources which you footnote?

3       A     That is correct.

4       Q     Did you do any independent

5   investigation of the facts, data, circumstances

6   reported in those sources?

7       A     I did not.

8       Q     Did you ask to see any of the files or

9   any of the data or anything of that sort?

10      A     I did not.

11      Q     So did you literally simply read and

12  report on these?

13      A     That's correct.

14      Q     And so I might have done the same

15  thing or Mr. Schaetzel could arguably have done

16  the same thing, correct?

17      A     That's possible.

18      Q     In that respect, you have no

19  particular expertise, sitting here today

20  reporting on these activities, correct?

21      A     Expertise about exactly what happened

22  at Northwestern?

23      Q     Yes.

24      A     Not beyond citing the source.

25      Q     Right.  And the same with Washington

1          KENNETH D. CREWS

2   State University Vancouver?

3       A     That's correct.

4       Q     And the same with University of

5   Colorado?

6       A     That's correct.

7       Q     And how representative of the universe

8   of experience with respect to, for example,

9   pricing of permissions by the CCC do you

10  represent these three examples to be?

11      A     Well, I don't have access to the full

12  roster of data of the copyright clearance

13  center, and so I can't put it into the context

14  of what their overall averages might be, for

15  example.  So I don't -- I can't tell you if

16  these are outliers statistically.

17      Q     And you've made no independent

18  investigation to ascertain that, correct?

19      A     That's right.

20      Q     And you didn't contact CCC as part of

21  your expert report, for example, saying give me

22  your take on this, right?

23      A     Yeah.  Not in the five weeks that I

24  had to prepare it.

25      Q     I understand that.

1      KENNETH D. CREWS

2          And so is it correct that, using these

3  examples, you're only intending to give some

4  anecdotal examples from which it would be

5  inappropriate to derive broader conclusions?

6      A    Well, they are what in the scientific

7  literature one would call an anecdotal example.

8      Q    Right.

9      A    However, combined with what I do hear

10 among other anecdotes in my discussion with

11 people, they're not too surprising.

12     Q    But those are all undisclosed?

13     A    Those are undisclosed.

14     Q    So you're not really asking a court to

15 rely on --

16     A    No, I'm not doing that.

17     Q    So you're not really asking the court

18 in this case to combine these three anecdotal

19 experiences with otherwise undisclosed anecdotal

20 evidence possessed by you to draw any broad

21 conclusions, correct?

22     A    I would not ask the court to do that.

23     Q    Okay.  Just to close out this little

24 discussion, if you would turn to your rebuttal

25 report at Page 6, please.

1        KENNETH D. CREWS

2        MR. RICH:  Have we marked that?

3        MR. SCHAETZEL:  I don't think so.

4        MR. RICH:  Okay, let's mark it.

5        We're marking Professor Crews'

6    rebuttal report from November 2, 2009 as

7    Plaintiff's 308.

8        (Whereupon, Professor Crews rebuttal

9    report from November 2, 2009 was marked as

10   Plaintiff's Exhibit 308 for identification,

11   as of this date.)

12   BY MR. RICH:

13   Q    I ask you to identify that as your

14   rebuttal report in this proceeding.  (Handing.)

15   A    All indications are that it is.

16   Q    Thank you.

17        And if you could turn, please, to

18   Page 6 of that report, the top carry-over

19   paragraph.

20   A    The top of Page 6?

21   Q    Yes.  The carry-over paragraph.  A

22   little over halfway down, the sentence says,

23   "Indeed, as I was able to document in my first

24   report, many universities instead abandoned the

25   use of certain works when faced with such fees,

1                       KENNETH D. CREWS

2    even fees that were considerably lower."  And if

3    you need the context, you should read higher.

4              And my question is:  Is the reference

5    to "many universities" in fact the three

6    universities --

7         A    Yeah.

8         Q    -- that we just described from

9    pages -- you know, Northwestern and the other

10   two?

11        A    And if I recall correctly, maybe there

12   were one or two cites referenced earlier.  I

13   don't remember for sure.  But yes, I think maybe

14   we're quibbling over, just as we did this

15   morning, what is several.  The question right

16   now is what is many.  And if you're pegging it

17   back to the original report, as I did, then many

18   is documented as being the ones that are

19   referenced in that report.

20        Q    Barring your showing me anything else,

21   the only ones that are referenced in the report

22   on that subject?

23        A    And I do tie it back to the report.

24        Q    Over on Page 48 of the main report,

25   please.  In the second paragraph on that page,

KENNETH D. CREWS

1
2  the paragraph speaks about the erratic nature of
3  copyright permissions as evident in other
4  studies.
5          Do you see that?
6      A    I do.
7      Q    And it refers again to the University
8  of Colorado experiment, what's called an
9  experiment.
10     A    Okay.
11     Q    Now, I'm just trying to see if my math
12 is right.
13     A    Uh-huh.
14     Q    The paragraph references permission
15 being sought for a total of 75 journal articles
16 and book chapters; is that correct?
17     A    That's what it says.
18     Q    And then it says for two items,
19 permission was denied, right?
20     A    Correct.
21     Q    For one item, the fee was in excess of
22 a $1,000 and the work was not included.  So
23 permission was offered but it was beyond that
24 which the purchaser was willing to spend,
25 correct?

KENNETH D. CREWS

A     Correct.

Q     It says CCC was unable to process permission for 20 items, right?

A     Okay.

Q     And that the library succeeded in securing permission for 10 of the items from publishers, yes?

A     Right.

Q     On the other 10, the library received no response?

A     Right.

Q     So am I correct that, in all, of the 75 works, permission was denied in two cases that -- pardon me.  That in only 10 of the 75 cases was there a failure of contact and response from the publisher, correct?

A     That's how it's written here, and I'm assuming I got it right.

Q     Right.  And so in two of those cases, but only two out of the 75, was permission actually denied.  One the fee was too high.  And balance of the other 10, those were all permissioned, right?  But in 65 of 75 cases, there was at least the process was engaged in

1           KENNETH D. CREWS

2     and culminated in a decision either to license

3     or not, correct?

4          A     It sounds like it, that's right.

5          Q     My math is right?

6          A     Or at least a license was offered,

7     whatever, or denied.

8          Q     Okay.  Does that strike you as a

9     malfunctioning system?

10         A     Well, what it tells me is that it's an

11    imperfect system.

12         Q     Isn't everything?

13         A     Well, isn't that a good point?  That,

14    yeah, I'm not perfect.  I think I've already

15    said that at least once today.  That it's -- but

16    that it's an imperfect system, and there's a

17    certain cautionary tale in that, too, about

18    needing to rely on permissions, which is itself

19    an imperfect system.

20         Q     What's the implication for a fair use

21    analysis that a permission system, for the sake

22    of discussion, is imperfect as you measure that?

23         A     Sure.  Sure.  The most important

24    response that I can give -- there's that word

25    "important" again.  In my mind, really the

KENNETH D. CREWS

primary response that I would have to that

question is that it's, therefore, essential to

keep all of these options on the table.

Q    "These options" meaning?

A    Meaning when you're looking to include

materials in E-Reserves and make them available

for students, you have to keep all of your

options open for doing it in a proper, lawful

manner.  And among those options is permissions.

Among those options is licensing.  Among those

options is linking to the license databases.

Among those options is fair use.  Among those

options may be something else.  But it's keeping

it all on the table.

Q    But I take it, however unreasonable a

user might find the asking price from a content

owner for permission, that fact by itself does

not license that user, under fair use or any

other principle of copyright, to go and arrogate

use of that material to him- or herself,

correct?

A    That fact by itself does not make

something fair use.  I think that's your

question.

KENNETH D. CREWS

Q    And you're advocating that, are you?

A    I'm not, and I've never advocated
that.

Q    Let's now turn and conclude with a bit
of examination on your rebuttal report, please.

A    Okay.

Q    And if you turn to Page 5 of that
document.

Am I correct in remembering that you
said this document was completely prepared by
yourself, no assistance from third parties,
spousal or otherwise?

A    Spousal or otherwise?  I believe I
said that.  And I'm going to take a quick look
to make sure I wasn't overlooking anything.

I'll tell you one thing that was not
exactly part of preparing the report, but just
in the interest of full disclosure.  There is a
part of the report that is the listing of other
universities that use the checklist and so on.

Q    Yeah.

A    That was prepared by one of my
research assistants during the summer for an
unrelated project.  And then came the rebuttal

1                     KENNETH D. CREWS

2   report in whatever date leading up to

3   November 2nd.  And I thought, well, it would be

4   nice to show what other universities have done,

5   and I had that document already.  And I think we

6   disclosed that to you.

7       Q    Yeah.  Okay.  Thank you.

8           And this morning, way back this

9   morning, you indicated that -- I'm paraphrasing,

10   but I think accurately -- there was relatively

11   little substantive input from the outside law

12   firm on the first report.

13       A    That's correct.

14       Q    Same question with respect to the

15   degree of input with respect from outside

16   counsel or anyone else at GSU or in the

17   university system with respect to the rebuttal

18   report.  How much input was there?

19       A    And nobody from GSU or the university

20   system at Georgia.  And one or two conversations

21   with the lawyers at King & Spalding, just to

22   make sure I was on a useful track.  And then I

23   think at some point we relayed drafts.  If we

24   did, we disclosed those.  And that would be it.

25       Q    And were there mark-ups of the draft

KENNETH D. CREWS

1
2   offered --

3       A    Oh, no.

4       Q    -- or language changes offered?
5   Nothing of that kind?

6       A    No, no.  It was, again, mostly on the
7   order of, you know, what did you mean by this
8   kind of clarifications and so on.

9       Q    Okay.  So turn to Page 5 of the
10  rebuttal report, please.  And under Paragraph
11  Number 2 there, you indicate that, "As outlined
12  in greater detail later in this report, the
13  economic model for E-Reserves at most
14  universities does not allow for shifting the
15  expense of copyright fees to the students, as
16  may be true with respect to course packs.
17  Consequently" -- this is the first paragraph
18  under Number 2.  "Consequently, the cost of the
19  copyright royalty will be borne by the
20  institution."

21          Do you see that?

22      A    I do.

23      Q    What is the basis for your conclusion
24  that the economic model for E-Reserves at most
25  universities does not allow for shifting the

1          KENNETH D. CREWS

2    expense of fees to students?

3          A    The basis for it would be the reading

4    that I've done and, again, the years of

5    experience of working with dozens, if not 100 or

6    far more universities, comparing experiences,

7    learning from them, how do they handle the

8    E-Reserves, how do they handle the economics of

9    it, and looking at how those issues of licensing

10   and permission are budgeted and managed.

11          MR. RICH:  Excuse me one second.

12          (Whereupon, a discussion was held off

13       the record.)

14   BY MR. RICH:

15          Q    And what did you learn from that

16   experience and those exposures as to the

17   economics of E-Reserves that leads you to this

18   conclusion?

19          A    I've seen repeatedly that where there

20   are costs associated with the permission for

21   putting something on electronic reserves, that

22   the cost is borne by the budget of the library.

23   And I've seen that repeatedly.  What I have

24   never seen is the example of where an

25   institution is distributing that cost out to the

KENNETH D. CREWS

1

2     students or charging a fee at the gate, if you

3     will, for the use of the electronic reserve

4     system.

5         Q     What is it about the nature of that

6     system that makes it less feasible for students

7     to bear part or all of the cost of permission

8     fees than is the practice with respect to course

9     packs?

10        A     Sure.  Part of it may be the law

11    itself, but a different part of the law.  We'd

12    run into different issues of unrelated business

13    tax.  We may run into different issues of sales

14    tax.  The course pack office charges sales tax

15    in many jurisdictions.  We may run into that

16    issue.  "We" meaning the sort of royal we of

17    libraries and universities.

18        Q     You're not testifying specifically as

19    to considerations as to the University of

20    Georgia system?

21        A     That's correct.

22        Q     Okay.

23        A     I have a bad habit.  It's just a

24    lifelong habit of saying "we."  I'm just an

25    inclusive kind of person.  So when I say that,

1 KENNETH D. CREWS

2 it generally means that more royal we.

3 And so there is some issues that are

4 far outside the scope of anything we've talked

5 about that arise there.

6 It also raises a number of different

7 issues about exactly how it would be budgeted,

8 how it would be charged back to the students.

9 Would it simply be imposed, like their

10 recreation fee for using different facilities at

11 the university? That would raise questions

12 about, again, inclusiveness. Because many of

13 those charges are for common facilities, where

14 the rights to use are shared and everybody can

15 choose to participate or not participate. You

16 know, E-Reserves is not like that. In fact,

17 it's deliberately not inclusive. It's a

18 password-restricted system.

19 And moreover, logistically,

20 pragmatically, managerially, I think we would be

21 inviting a monstrous set of other issues by

22 looking at how we would take whatever funds are

23 charged to the students and allocate them and

24 budget them for different types of courses.

25 This professor is using the system more than

KENNETH D. CREWS

2    that professor.  This professor threw something

3    in and it's got that high price tag and that

4    skews the payment over to another organization.

5    It skews the payment and takes funds away that

6    could be used for yet a different professor in

7    his or her course.

8              So I think it would be inviting a wide

9    set of other pragmatic problems.

10     Q    Have you discussed the thesis in this

11   paragraph about the infeasibility in relation to

12   E-Reserves of shifting the expense of copyright

13   fees to students with anyone at Georgia State

14   University?

15     A    Not to my recollection, no.

16     Q    So it's a purely hypothetical set of

17   concerns as applied to GSU, correct?

18     A    It's a generalized set of concerns.

19     Q    It's a set of concerns uninformed by

20   technology, history, practice, experience or

21   predisposition at GSU, correct?

22     A    At GSU, that's correct.

23     Q    Okay.  Do you know, for example,

24   whether GSU already has a practice of making one

25   or more charges directly to students in relation

1                    KENNETH D. CREWS

2    to electronic reserves usage?

3        A       I'm not aware of that.

4        Q       Would that be information you might

5    find useful and relevant to your broad

6    conclusion here?

7        A       I'd like to see it.

8        Q       But nobody has shared that with you?

9        A       That's correct.

10       Q       And in reviewing your report and your

11   conclusions, nobody offered that feedback to

12   you, correct?

13       A       That's correct.

14       Q       And technologically, I take it you're

15   aware that the Docutek system is already, quote,

16   wired, in my way of speaking, to facilitate

17   permissions payments, including to an

18   organization like CCC; is that correct?

19       A       I'm generally aware that that's true.

20       Q       So you wouldn't cite that as a

21   barrier, let alone an insuperable barrier, if

22   other conditions favored it, to a licensing

23   process whereby students paid, correct?

24       A       In other words, mechanically, could it

25   be done by some means?

1                    KENNETH D. CREWS

2       Q    Yes.

3       A    Yes, I think so.

4       Q    And surely more complicated issues

5  have been dealt with by universities such as

6  Georgia State in terms of allocation of fees.

7  For example, a per -- wouldn't E-Reserves allow

8  the tracking on a per-page used basis by student

9  easily through the software of their accessing

10  E-Reserves materials?  That wouldn't be so

11  difficult, I assume, right?

12      A    I can imagine that that could be done.

13  Difficult or not difficult, I don't know.

14      Q    But you've not investigated that?

15      A    I have not investigated that.

16      Q    So might it not be an overly strong

17  conclusion to emphatically, categorically and

18  without reservation state, as you do at Page 5

19  of your rebuttal, that the cost of the copyright

20  royalty in the E-Reserves setting will be borne

21  by the institution?  Isn't that uninformed by

22  any knowledge as to what is or may be feasible

23  at GSU?

24      A    I think they're two different

25  statements.  In other words, I'm definitely

KENNETH D. CREWS

1

2    saying that from experience, from where I have

3    seen and what I have read and what I have

4    learned, that that's not the case. But if you

5    have additional information that could help me

6    rethink that, let's have a look at that.

7        Q    Well, I don't know that that's my job

8    here. But what I am testing is the

9    conclusiveness of the statement as it purports

10   to apply to this circumstance. Might it not

11   have been more accurate for you to state that

12   while I have not investigated any of these

13   issues of efficacy at Georgia State, my

14   experience elsewhere indicates dot dot dot?

15       A    I would be okay if I had said that.

16       Q    So you really don't have any opinion

17   you can offer the court that's informed as to

18   the feasibility of shifting the cost to students

19   at Georgia State University, correct?

20       A    In that sense, yes.

21       Q    Now, in the paragraph on Page 5 over

22   to Page 6, discussing an aspect of the Marinello

23   report -- she being a representative of the

24   Copyright Clearance Center, you'll recall, yes?

25       A    Yes.

KENNETH D. CREWS

1

2     Q     You indicate following your analysis

3  of various potential cost implications of a CCC

4  license -- and we already covered the many

5  University points.  You conclude that the real

6  cost in that situation, meaning a situation

7  where faced with unacceptably high fees, the

8  user will decline the permission, you say, "The

9  real cost in that situation is not monetary.

10  The real cost is lost educational opportunity;"

11  is that correct?

12     A     That's correct.

13     Q     But isn't it the fact that in that

14  situation, for example, the works involved could

15  be put on physical reserve desk loan?

16     A     The answer is yes.  But I think in

17  that context when we were talking about the

18  print reserves or the physical reserves, we also

19  looked at the common situation that accessing

20  those materials could be cumbersome, restricted.

21  It's limited, there are lines, the materials are

22  checked out.  And therefore, also we incur lost

23  opportunity if students are unable to obtain the

24  material, even though it's from another cause

25  rather than in this example, a price tag.

KENNETH D. CREWS

Q    Again, you wouldn't generalize to say that all physical reserve offerings are like standing on the unemployment line in terms of inconvenience and, therefore, non-use by students?  Isn't that a broad generalization which is hard to bring to bear in any particular setting?

A    That's a broad generalization.  A lot of it works just fine, and a lot of it doesn't.

Q    And you don't know how it works or would work at GSU, right?

A    Not specifically at GSU.

Q    Which is the institution on whose behalf you filed this expert report, correct?

A    Correct.

Q    And conceivably, another option would be the purchase of the content, correct?

A    That's correct.

Q    So that would not result in a lost educational opportunity, would it?

A    That's correct.

Q    And conceivably substituting for other comparable materials, assuming they were available, would be yet another option, right?

KENNETH D. CREWS

A    That's another option.

Q    So whether is in fact a lost educational opportunity is at least open to those other potential options.

Now at Pages 7 and 8 -- pardon me, Page 8, you discuss a reported example involving Oxford University Press at the top of the page.

A    I do.

Q    What were your sources for that?

A    The author of the book itself, where he's seeking to reprint the material.  And I'm going to perhaps stumble over his name, but I believe it's Joel Valensky.

Q    And in writing this paragraph, what other investigation did you make of his stated understanding of the facts?

A    He sent me invoices that had some of the details about the materials.

Q    Invoices from?

A    From JAMA, the Journal of the American Medical Association.

Q    Did you contact JAMA?

A    No, I did not.

Q    Did you contact Oxford University

1       KENNETH D. CREWS

2  Press?

3       A     No, I did not.

4       Q     Might you have been interested in, for

5  example, Oxford University Press's take on the

6  situation?

7       A     I was very interested in their take on

8  it.

9       Q     Why didn't you call them?

10      A     I thought that that would be

11 inappropriate under the circumstances of the

12 litigation.

13      Q     What about JAMA, why didn't you call

14 them?

15      A     I saw the information that came to me

16 from them, and it was fairly -- it was really

17 quite detailed; and I felt that as an example of

18 documented evidence of what their standard is

19 and what they were adhering to, I had the

20 information I needed to be able to present this.

21      Q     And so you find it probative and the

22 subject of expert testimony to make statements

23 such as the penultimate sentence in the first

24 paragraph, "According to the book author, OUP

25 seemed to be urging him to accept that result."

KENNETH D. CREWS

1

2      So double hearsay in that paragraph,

3   you feel really comfortable putting that forward

4   as part of an expert submission here, yes?

5      A    Yes, I do.

6      Q    In the absence of any investigation

7   beyond talking, getting one party's perspective

8   to a dispute?

9      A    Actually, I do.

10      Q    At Page 9, you discuss the phenomenon

11   of what you term wrongful permissions or the

12   possibility of wrongful permissions.

13      A    Right.

14      Q    And you give as an example your own --

15   a couple of examples from your own private

16   files?

17      A    Right.

18      Q    Did you ever complain to anyone about

19   what you report here?

20      A    No, I didn't.

21      Q    Did you ever contact CCC to discuss

22   it?

23      A    No, I have not.

24      Q    Your publishers?

25      A    No, I have not.

KENNETH D. CREWS

1

2      Q      So you're surfacing this for the very

3   first time in connection with this expert

4   report?

5      A      Actually, yes, I am.

6      Q      Was this a matter of great consequence

7   to you before you filed this report?

8      A      These particular examples?

9      Q      Yes.

10     A      No.  I had never bothered to take a

11  look and say let's take a look at what the CCC

12  may be doing with my material.

13     Q      And what other research have you done

14  to expand from your own personal experience to

15  the -- how broad a phenomenon of wrongful

16  permissions exist out there?

17     A      Specifically from the CCC?

18     Q      From anywhere.

19     A      From anywhere?  Have I done systematic

20  study?  And the answer is no.  But I do, again,

21  see numerous examples and anecdotes come up over

22  the years.

23     Q      And where are they reported in here?

24     A      They are not reported in here.

25     Q      At Page 11, sir.  In the last bullet

KENNETH D. CREWS

1
2  at the bottom, you repeat the statement that
3  E-Reserves services typically are not able to
4  charge fees back to students, I think a concept
5  we've discussed.  And off of that you hang a
6  footnote, 13, which states, "The libraries that
7  operate E-Reserves encounter various challenges
8  to setting fees for services.  Libraries offer
9  many services that incur individualized costs,
10 but seldom do libraries charge those fees back
11 to the user.  Fees conflict with the library's
12 role as an open information resource for the
13 academic community.  Libraries are also not
14 administratively structured to charge and
15 collect service fees for various reasons,
16 including the possible need to account for state
17 sales tax."
18          Do you see that?
19     A    I do.
20     Q    Again, isn't that a very broad
21 generalization that may well misstate or
22 misrepresent both the ability and willingness of
23 libraries to take on the obligation to collect
24 permissions fees in appropriate situations?
25     A    And to collect permission fees?  You

KENNETH D. CREWS

mean in connection -- are you speaking in
connection with E-Reserves?

Q    Yes.  As they might be appropriate.

What were you attempting to convey in
the second half of this notebook, fees conflict
with the library's role, et cetera?

A    Right.  Right.  There's a definite
philosophical resistence in the library
community to charging fees for the use of the
library and of the basic services of the
library.  Fees have a tendency, of course, to
differentiate those who can pay from those who
can't.  That's a fact of life in so many other
areas.  But it's a condition that most public
and academic libraries tend to work hard to
resist.

Q    And what about GSU, what's its
library's philosophy about charging fees to
students?

A    I have not investigated exactly GSU's
position.

Q    Have you bothered to go on their
website to look and see if perhaps there already
exist one or more library fees for students?

KENNETH D. CREWS

1

2     A     No, I have not.

3     Q     Would it surprise you to know that

4  there do exist such fees?

5     A     I would like to know what they are.

6     Q     And did you not in your survey, your

7  wife's survey of 39 institutions, turn up a

8  large number, a large percent of those, where

9  among your bulleted summaries it indicated that

10 the library is prepared to assist and even cover

11 permissions fees for E-Reserves?

12    A     Yes, but that's a very different

13 topic.  That's the payment by the library.  I

14 thought what we were talking about is the

15 payment by the student to the library.

16    Q     Well, I'm simply asking you to explain

17 Footnote 13, which appeared to me to be the

18 library's allergy, as a general practice, to

19 collecting fees and administering them.  That's

20 what I understood the second half of Footnote 13

21 to mean.

22    A     And although what you just said aren't

23 my words --

24    Q     No, it's my characterization.

25    A     -- I think that's right, that is

KENNETH D. CREWS

1
2     what -- that's the context of my footnote.
3     Whereas the bullet point items over in the
4     summaries of the E-Reserves policies, where fees
5     come up over there in those bullet points,
6     that's about the payment out of fees.  I'm not
7     recalling.  If you want to draw my attention to
8     one that's different, that's great.  But I'm not
9     recalling any of those.  What I'm recalling is
10    that all of those mention of fees over there are
11    about whether or not the library will pay fees
12    to outside third parties rather than collect
13    fees in from students in exchange for services.
14    Footnote 13 is about the fees coming in.
15         Q     In all events, you have not discussed
16    with anyone at Georgia State University in
17    relation to preparing your reports whether they
18    would view that or any other distinction as
19    meaningful to them in terms of obligations to
20    undertake payments for E-Reserves if the law
21    required it, right?
22         A     That's right.  My statement here is a
23    statement about the nature of library and
24    library policy in general, not specifically
25    about GSU.

1                     KENNETH D. CREWS

2      Q      And in the course pack experience and

3   in your survey of that activity over 18 years,

4   is it -- do you have any data to demonstrate

5   that the richness of the academic offerings at

6   institutions which now require students to pay

7   permissions fees for course packs has been

8   diminished as a result of that obligation?

9      A      No.

10          MR. SCHAETZEL:  Objection as to form.

11     A      No, no.  I've never seen any data like

12  that.

13     Q      And have you any reason to believe

14  that the quality of the academic experience at

15  institutions where permissions fees are now

16  being paid is a lesser standard than it was

17  theretofore?

18     A      Only in the extent of the examples of

19  materials being dropped from the curriculum

20  because of encountering fees where the fees

21  exceed the budget, if there's any budget at all.

22     Q      And that would happen in any number of

23  situations, not limited to the academy, right?

24     A      Right.

25     Q      I might want a car that I'm not going

1          KENNETH D. CREWS

2     to pay for too, correct?

3          A     That's right.

4          Q     But I also don't steal it in that

5     situation, correct?

6          A     Yeah.  But I'm not going to accept

7     that analogy.

8          Q     I'm not asking you to.

9          MR. RICH:  I'd like to go off the

10    record.

11         (Whereupon, a discussion was held off

12    the record.)

13         MR. RICH:  I have concluded my

14    examination, and I want to thank you for

15    your patience through a long day today.

16         THE WITNESS:  I'd like to thank you.

17         (Continued on the next page to include

18    jurat.)

19

20

21

22

23

24

25

1          KENNETH D. CREWS

2          MR. SCHAETZEL:  We have no questions,

3     but we will reserve signature, read and

4     sign.

5          MR. RICH:  Thank you very much.

6          (Time noted 5:28 p.m.)

7     _____

8          KENNETH D. CREWS

9

      Subscribed and sworn to before me

10    this          day of          , 2009

11    _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

C E R T I F I C A T E

I, JUDI JOHNSON, RPR, CRR, CLR, a Notary Public in
and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefore
set forth, was duly sworn by me; and

THAT the within transcript is a true record
of the testimony given by said witness. I further
certify that I am not related, either by blood or
marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of
this matter.

IN WITNESS WHEREOF, I have hereunto set
my hand this 16th day of December, 2009.

_____
JUDI JOHNSON, RPR, CRR, CLR

1                    PROCEEDINGS

2                       INDEX

3   ATTORNEY                              PAGE

4           By Mr. Rich                     5

5

6

7

8

9

10       INDEX OF PLAINTIFF'S EXHIBITS

11  I.D.              DESCRIPTION          PAGE

12  Exhibit 290  June 1, 2009 expert report of    7

13               Kenneth D. Crews

14  Exhibit 291  Bates GASTATE 63527-28     23

15  Exhibit 292  Bates GSUX 2170           25

16  Exhibit 293  Bates GASTATE 63529-534    27

17  Exhibit 294  Bates GSUX 2135           32

18  Exhibit 295  Bates GSUX 2092-93        42

19  Exhibit 296  Bates GSUX 2030           44

20  Exhibit 297  Bates GASTATE 63159-63162  49

21  Exhibit 298  Bates GASTATE 63212 and    67

22               63228-63291

23  Exhibit 299  Bates GASTATE 63008 through 63080  8

24  Exhibit 300  Bates GSUX 0000001        73

25  Exhibit 301  Bates GSUX 000007         74

1          PROCEEDINGS

2     INDEX OF PLAINTIFF'S EXHIBITS CONTINUED

3     I.D.              DESCRIPTION                PAGE

4     Exhibit 302  Appendix E to the June 1 report   89

5                  of the witness

6     Exhibit 303  Curriculum Vitae of               135

7                  Kenneth D. Crews

8     Exhibit 304  The expert report of              186

9                  Robert B.K. Dewar

10    Exhibit 305  The opinion Judge Mottler,        197

11                 in Basic Books V Kinko's

12    Exhibit 306  The judgment entered in that case  7

13    Exhibit 307  MDS decision                      205

14    Exhibit 308  Professor Crews rebuttal report   258

15                 from November 2, 2009

16

17

18

19

20

21

22

23

24

25

ERRATA SHEET

NAME OF CASE:  CAMEBRIDGE V. BECKER

DATE OF DEPOSITION: DECEMBER 10, 2009

NAME OF WITNESS:  KENNETH D. CREWS


Reason codes:

    1.  To clarify the record.

    2.  To conform to the facts

    3.  To correct the transcription

       errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____



_____

KENNETH D. CREWS