E
X
H
I
B
I
T

29

Dockets.Justia.com

1            UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF GEORGIA

2               ATLANTA DIVISION

3

4 CAMBRIDGE UNIVERSITY PRESS, et al.,

5        Plaintiffs,

6                  CIVIL ACTION FILE

    vs.

7                  NO. 1:08-CV-1425-ODE

8 MARK P. BECKER, in his official capacity as Georgia

  State University President, et al.,

9

       Defendants.

10 _____

11

12

13     Videotaped deposition of WILLIAM GRAY POTTER,

  taken on behalf of the Plaintiffs pursuant to

14 Rules 26 and 30 of the Federal Rules of Civil

  Procedure, before Michelle M. Boudreaux, Georgia

15 Certified Court Reporter, at King & Spalding,

  1180 Peachtree Street, Atlanta, Georgia, on the

16 9th day of March 2009, commencing at the hour of

  10:04 a.m.

17

18 _____

19

20

21

22

23             SHUGART & BISHOP

       Certified Court Reporters

24         13 Corporate Square

            Suite 140

25       Atlanta, Georgia 30329

        (770) 955-5252

EXHIBIT 29 - 1

1                                    INDEX
2
                                  EXAMINATION
3
  Witness Name                                              Page
4
  WILLIAM GRAY POTTER
5
      Examination By Mr. Rich ..................... 5
6
      Examination By Mr. Askew ................... 195
7
      Further Examination By Mr. Rich ............. 197
8
9                                  EXHIBITS
10 Exhibit     Description                                   Page
11 Exhibit 1   The University of Georgia Libraries   43
               Copyright Policy
12
   Exhibit 2   Regents Guide to Understanding        54
13             Copyright & Educational Fair Use
14 Exhibit 3   1/19/09 E-mail to Ray Lee and Beth    78
               Brigdon from William Potter
15
   Exhibit 4   Untitled Document Bearing Bates Nos.  78
16             GaState0021038 through GaState0021099
17 Exhibit 5   1/8/09 E-mail to William Potter and   111
               Ray Lee from Beth Brigdon
18
   Exhibit 6   E-mail Chain, 11/7/08                 115
19
   Exhibit 7   10/31/08 Letter to William Potter     116
20             from Erroll Davis, Jr.
21 Exhibit 8   Letters Dated 10/31/08 to Various     126
               Addressees from Erroll Davis, Jr.
22
   Exhibit 9   E-mail Chain, November 4th and 5th    134
23             of 2008
24 Exhibit 10  "University System of Georgia         140
               Copyright Policy, Copyright
25             Generally"

EXHIBIT 29 - 2

1                     INDEX (Cont'd)

2

                        EXHIBITS

3

  Exhibit      Description                         Page

4

  Exhibit 11  "University System of Georgia        140
5              Copyright Policy, Policy on the Use
               of Copyrighted Works in Education and
6              Research"
7 Exhibit 12  "University System of Georgia        144
               Copyright Policy, Additional
8              Guidelines for Electronic Reserves"
9 Exhibit 13  "University System of Georgia        152
               Copyright Policy, The Fair Use
10             Exception"
11 Exhibit 14  "University System of Georgia        162
               Copyright Policy, Introduction to the
12             Fair Use Checklist"
13 Exhibit 15  Fair Use Checklist                  164
14 Exhibit 16  1/9/09 E-mail to Beth Brigdon from   193
               Ray Lee

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 29 - 3

1                    APPEARANCES OF COUNSEL

2

3  On behalf of the Plaintiffs:

4        R. BRUCE RICH, Esq.
          HARRIS COHEN, Esq.

5        Weil, Gotshal & Manges LLP
          767 Fifth Avenue

6        New York, New York 10153-0119
          (212) 310-8000

7

          EDWARD B. KRUGMAN, Esq.

8        Bondurant, Mixson & Elmore, LLP
          1201 West Peachtree Street, N.W.

9        Suite 3900 One Atlantic Center
          Atlanta, Georgia 30309-3417

10       (404) 881-4106

11

    On behalf of the Defendants:

12

          ANTHONY B. ASKEW, Esq.

13       KRISTEN A. SWIFT, Esq.
          King & Spalding LLP

14       1180 Peachtree Street, N.E.
          Atlanta, Georgia 30309-3521

15       (404) 572-4600

16

    Also Present:  Mary Jo Volkert

17                  Cynthia Hall

18  Videographer:  Kennith Drake

19

20                          -  -  -

21       (Whereupon, disclosure as required by the
          Georgia Board of Court Reporting was made by the

22       court reporter, a written copy of which is
          attached hereto.)

23

24

25

EXHIBIT 29 - 4

1     The VIDEOGRAPHER:  This will be the

2     videotaped deposition of William Potter

3     taken by the plaintiffs in the matter of

4     Cambridge University Press, et al., versus

5     Mark P. Becker in his official capacity as

6     Georgia State University president, et al.

7         The date is March the 9th, 2009.  We

8     are on the record at 10:04:48.

9         MR. RICH:  Swear the witness, please.

10             WILLIAM GRAY POTTER,

11 being first duly sworn, was examined and testified as

12 follows:

13                 EXAMINATION

14 BY MR. RICH:

15    Q    Good morning, Mr. Potter.

16    A    Good morning.

17    Q    My name is Bruce Rich.  I'm a partner at

18 the law firm of Weil, Gotshal & Manges, and I'm going

19 to be conducting the examination today, asking you

20 some questions and asking you to answer to the best

21 of your ability.

22        Would you state your name and address for

23 the record, please?

24    A    William Potter, 285 Blue Heron Drive,

25 Athens, Georgia.

EXHIBIT 29 - 5

1    MR. ASKEW:  Before we get started,

2  Mr. Rich, if I could --

3    MR. RICH:  Please.

4    MR. ASKEW:  -- we have several copies

5  of a letter that Mr. Potter received.  It

6  was mailed on Thursday.  I believe he

7  received it on Friday, and I want to give

8  you copies of that today.  It's a letter

9  from the chancellor to him.  I have five

10  copies of it for you.  It's dated March 5,

11  2009.  It's from the chancellor, Harold

12  Davis, to Dr. William Potter.  I want to

13  give those to you on the record at this

14  point.

15    MR. RICH:  Further production?

16    MR. ASKEW:  Yes, it's further --

17    MR. RICH:  Thank you very much.

18    MR. ASKEW:  -- production.

19    And, in addition, I wanted to make it

20  clear on the record, Mr. Rich, that it is

21  our intention in this deposition to

22  preserve the privilege with respect to any

23  advice that Mr. Potter has been receiving,

24  any documents that he has received in this

25  matter.  It is not our intention to waive

EXHIBIT 29 - 6

1    that privilege with respect to any of the

2    testimony that's being provided today.  I

3    want that to be clear on the record at the

4    outset.

5        MR. RICH:  Thank you.  And we will not

6    knowingly seek to intrude on that

7    privilege, but --

8        MR. ASKEW:  Thank you.

9        MR. RICH:  -- we may or may not have

10   disagreements at the margins at times about

11   what's suitable for testimony.  But let's

12   deal with that when we get there.

13       MR. ASKEW:  I'd be glad to do that.

14   Thank you.

15   Q    (By Mr. Rich)  Have you been deposed

16 before, sir?

17   A    No.

18   Q    Do you have a basic understanding from your

19 counsel of the process today?

20   A    Yes.

21   Q    Okay.  If there's anything at all that's

22 ever unclear to you, don't hesitate to raise a

23 question.  If my own questions are not clear to you,

24 I hope you'll feel free to advise me and we'll try to

25 work through that.

EXHIBIT 29 - 7

1    A    Okay.

2    Q    By whom are you employed?

3    A    University of Georgia.

4    Q    And in what capacity?

5    A    I'm the university librarian and associate

6 provost.

7    Q    And do those two titles connote the same

8 set of overall responsibilities or somewhat separable

9 responsibilities?

10    A    The same.

11    Q    Same.  And what is the significance of the

12 associate provost title in addition to librarian in

13 terms of scope of responsibility?

14    A    I think it designates that I report to the

15 provost.

16    Q    And could you identify the provost by name?

17    A    The provost is Arnett Mace.

18    Q    Can you spell that, please?

19    A    Arnett is A-r-n-e-t-t.  Mace is M-a-c-e.

20    Q    And is that a male or a female?

21    A    Male.

22    Q    And for how long have you reported to

23 Mr. Mace?

24    A    Since 2002, when he became the provost.

25    Q    I take it you've had your current position

EXHIBIT 29 - 8

1 since in or about 1989; is that correct?

2     A    That's correct.

3     Q    Have your duties over that period of time

4 remained essentially the same?

5     A    Yes.

6     Q    And at a fairly general level for now,

7 could you describe what your duties encompass?

8     A    I'm responsible for the libraries -- all

9 the libraries at the University of Georgia with

10 exception of the law library, which reports to the

11 dean of the law school.  That includes the main

12 library, the science library, the student -- sorry,

13 the Miller Learning Center, it was just renamed

14 recently, and a reading room in the music -- college

15 of music, a reading room in the school of

16 veterinarian medicine, and then there's a few

17 separate facilities on the campus that report to me,

18 all part of the university libraries.

19     Q    And what are the -- what is the nature of

20 the collections or the other functions of the Miller

21 Learning Center?

22     A    The Miller Learning Center is a combined

23 library and classroom facility that's remarkable for

24 the fact that it doesn't have any books in it.  It's

25 primarily what we librarians now call an information

EXHIBIT 29 - 9

1 commons, where you have lots of computers, lots of

2 places to study, lots of places for students to study

3 in groups, but there are not any books and they --

4 students rely instead on access to computer

5 resources.

6     Q    And what would those computer resources

7 comprise?

8     A    Well, they're the same resources available

9 throughout campus, electronic journals, electronic

10 databases, and a fairly small number of electronic

11 books.

12     Q    And how are those materials made available

13 to students?

14     A    They're made available through the --

15 through a Web site that the library maintains.

16     Q    And how is that Web site populated?

17     A    I'm not sure I understand what you mean.

18     Q    What individual or individuals have

19 responsibility or ability to populate that Web site

20 with, say, copyrighted materials?

21     A    The -- there is a Web editor in the

22 reference department who is responsible for the

23 overall look and feel of the Web site, and she

24 determines how things are organized.  I'm not sure I

25 follow what you mean by "populated," though.

EXHIBIT 29 - 10

1   Q   Who has the ability or the responsibility

2 to make specific determinations as to the specific

3 works that are made accessible by this Web site?  Who

4 makes the substantive determinations as to which

5 works will be placed on the Web site?

6   A   Well, it's --

7       MR. ASKEW:  I'm going to -- you want

8     him to answer the second question you

9     asked?

10     MR. RICH:  That's fine.

11     THE WITNESS:  That is determined --

12    have to back up a bit.  That's determined

13    by a group of librarians who select

14    materials, determine how things are spent,

15    how the library's acquisitions budget is

16    spent, we acquire licenses to various

17    materials, various electronic resources,

18    then the Web editor is aware of what those

19    resources are and organizes them on the Web

20    page.

21   Q  (By Mr. Rich)  Do students earn academic

22 credit for their participation in this Learning

23 Center?

24   A   Again, I don't understand.

25   Q   Are these course offerings that are -- that

EXHIBIT 29 - 11

1 occur through the Learning Center?  Are these

2 extracurricular activities?

3     A     No, these are -- the Learning Center, as I

4 said, is a combination library and classroom

5 building.  There are classrooms in the building and

6 students are enrolled in classes taught by our

7 faculty.  And then they would use the study areas of

8 the building to consult electronic resources.  So,

9 yes, they receive academic credit for the --

10     Q     It's a resource to supplement their

11 academics work or to facilitate the learning process?

12     A     Yes.

13     Q     Okay.  Now, would it be accurate that,

14 taken as a whole, the collections in the -- what

15 comprise the University of Georgia library system,

16 the main library, the science library, and

17 supplemented by the Learning Center and the other

18 operations you mentioned, span the gamut of subject

19 matters, liberal arts, sciences, social sciences,

20 humanities, the like?

21     A     Yes.

22     Q     Do you have a general notion of the

23 cumulative numbers of works or however you might

24 measure the collection volume of the libraries in

25 toto?

EXHIBIT 29 - 12

1    A    Yes.

2    Q    What is that?

3    A    In terms of printed materials, it's about

4  4.5 million volumes, manuscript collections, about

5  65,000 linear feet, about 100,000 audio and visual

6  tapes, about 650,000 maps.  And then in terms of

7  electronic resources, we probably have access to

8  about 9 -- we pay for about 9,000 journals,

9  subscriptions, and probably half of those are

10 available in electronic format.

11   Q    When you say "available in electronic

12 format," do you mean by some form of license or

13 permissions arrangement with the publisher?

14   A    By a subscription license, yes.

15   Q    What involvement, by way of oversight or

16 otherwise, do you have in relation to the

17 subscription licensing process with respect to such

18 journals?

19   A    It depends on the publisher.  With the

20 large publishers like Elsevier, Wiley-Blackwell,

21 Springer, I've taken a very direct role because

22 there's so much money involved in our payment to

23 them.  With the other journal publishers, not so

24 much.  I'm aware of license terms, but I've not been

25 involved in those negotiations directly.

EXHIBIT 29 - 13

1    Q    Is there an annual budget to accommodate

2 such licenses?

3    A    Yes.

4    Q    What is that in the most recent years, say?

5 And tell me what that most recent year would be in

6 terms of date.

7    A    Our overall library acquisition budget for

8 everything -- books, journals, everything -- is right

9 around 10 million and shrinking.  What we spend on

10 the -- on journals is around -- this year, around

11 6 million.  For the electronic journals would be

12 about half that, about 3 million.  I can tell you

13 with Elsevier, we spent about 1.8 million; with

14 Wiley-Blackwell last year, we spent about 900,000;

15 with Springer, right around 750,000.

16    Q    Just so the record is clear, the numbers

17 you just indicated with respect to the particular

18 publishers were to acquire subscriptions inclusive of

19 licensing privileges --

20    A    Yes.

21    Q    -- for digital uses?

22    A    Yes.

23    Q    Okay.  And do you separate -- do those

24 license arrangements provide for one inclusive fee

25 covering the subscriptions and any digital uses, or

EXHIBIT 29 - 14

1 is -- in one or more cases, is there a separate fee

2 identified with respect to the right to make digital

3 copies?

4     A    For the ones we just mentioned, the license

5 is inclusive, it covers all use, allows all faculty

6 students and staff at the University of Georgia to

7 use those resources in an unlimited fashion.  I

8 should say unlimited in terms of quantity of their

9 use.  They certainly cannot make -- you know, that's

10 so they -- all students, faculty, and staff can

11 access those journals and review and use those

12 articles.

13     Q    And do I understand you to have said that

14 for approximately half of the 9,000 journal

15 subscriptions, there are such license arrangements in

16 place?

17     A    Yes.

18     Q    And if you could generalize -- and if

19 you're not able to, don't, but if you could

20 generalize the scope of license privilege that is

21 acquired by the Georgia of University libraries from

22 such license arrangements, what is it?  Who does it

23 authorize to do what?

24     A    It allows all students, faculty, and staff

25 of the University of Georgia to review an article

EXHIBIT 29 - 15

1 online, read an article online, or print it, and use

2 for -- for educational, personal purposes.  It also

3 allows us to use those articles for library loan.

4     Q    What rights are conferred, if any, with

5 respect to the use of journal articles as posted on

6 university -- the university E-Reserve system?

7     A    In the case of those articles, which is a

8 license, it's simply a matter -- all students,

9 faculty, and staff have access to those articles.  We

10 just post a link in the E-Reserve system to those

11 articles.

12     Q    Do one or more of those license agreements

13 contain any limitations on their use, in connection

14 with course offerings, as part of a creation by the

15 faculty member of a collective work or anthology or

16 something of that sort?

17     A    Not that I'm aware of.

18     Q    As part of your responsibilities,

19 Mr. Potter, do you have oversight over any aspect of

20 the licensing of paper coursepacks --

21     A    No.

22     Q    -- within the University of Georgia?

23          Whose domain, if anyone, does that fall

24 under?

25     A    I don't know.

EXHIBIT 29 - 16

1    Q   And is it part of your supervisory

2 responsibilities, the creation and maintenance and

3 operation of E-Reserve's -- the E-Reserve system

4 within the University of Georgia library system?

5    A   Yes.

6    Q   And has that been the case over the course

7 of your entire tenure?

8    A   Yes.

9    Q   Could you briefly tell me your educational

10 background?

11    A   I have a bachelor's in English from

12 Southern Illinois University at Edwardsville, a

13 master's in English from University of Illinois, a

14 master's in library and information science from the

15 University of Illinois, and Ph.D. in library and

16 information science from the University of Illinois.

17    Q   I take it you have occasionally written

18 articles for publication?

19    A   Yes.

20    Q   Approximately how many?

21    A   I guess I -- probably about 20, 20 or 25.

22    Q   And have you written any full-length books

23 or textbooks or anything of that sort?

24    A   No.

25    Q   And have any of the arrangements by which

EXHIBIT 29 - 17

1 you have authored any works called for the payment of

2 royalties to you?

3    A    I believe there might have been one case

4 where there -- there was an arrangement for

5 royalties, and I think I got like a dollar and

6 eighty-three cents one time.  But I think there was

7 one instance of that, yes.

8    Q    The other cases, there was no --

9    A    No.

10    Q    -- understanding or expectation of

11 royalties?

12    A    No.

13    Q    What is the Technology Oversight Group

14 within the University of Georgia library system?

15    A    I'm not -- I don't understand your

16 question.

17    Q    Is there -- are you familiar with an entity

18 called the Technology Oversight --

19    A    Oh, TOG, yeah.  Yes, I am.

20    Q    Could you describe what the function of

21 that is?

22    A    That's a -- an internal group within the

23 library consisting of me, the associate university

24 librarian for systems, and other librarians and

25 programmers involved in technology, in information

EXHIBIT 29 - 18

1 technology, within the libraries who meet probably

2 every other week, just to discuss issues arising and

3 regarding our use of technology.

4    Q    And is part of the scope -- is part of the

5 topics under discussion from time to time compliance

6 with intellectual property laws?

7    A    I don't recall that that group ever -- has

8 ever discussed that.  I don't recall that.

9    Q    And specifically in relation to the most

10 recent policies, which we'll be discussing today,

11 relating to copyright, did that group have any role

12 at all in that process?

13    A    What process?

14    Q    The process by which the new copyright

15 policies that were promulgated in early -- in

16 mid-February of this year was created.

17    A    I don't recall that group ever discussed

18 it, no.

19    Q    If they had, would you be aware of it?

20    A    I would -- I would think so, but I just

21 don't recall it.

22    Q    You have no legal training; is that

23 correct?

24    A    That's correct.

25    Q    In any of your undergraduate or graduate or

EXHIBIT 29 - 19

1 postgraduate work, did you ever take any formal

2 courses in copyright law?

3     A    No.

4     Q    Notwithstanding, how would you describe the

5 level of your knowledge of copyright law as a

6 layperson?

7     A    I would characterize it as being familiar

8 with it and being able to work with it in a -- within

9 the library on a day-to-day basis.

10    Q    And can you give me several example of how,

11 in practice, you would be working with copyright law

12 on a day-to-day basis?

13    A    If I think an issue might arise as to

14 whether we can borrow articles from another

15 library that we don't -- for which we don't -- for --

16 from a journal to which we do not subscribe, that

17 could come up.  It -- it has come up in terms of how

18 we inform people of how they can use photocopy

19 machines in the library.  We have to have that little

20 sign on the -- on the photocopy machines.  And it

21 would come up in the context of reserve systems.

22    Q    And how would an issue find its way to your

23 desk?  Does it?

24    A    It would find my way to -- find its way to

25 my desk if people actually dealing with the faculty

EXHIBIT 29 - 20

1 and students could not resolve an issue, they might

2 refer it to me.  And it could find its way to my desk

3 if there's a question of policy that -- that policy

4 and procedures might need to be defined.

5     Q    Can you give me one concrete example from

6 recent memory, if it exists, where a question about

7 application of copyright to E-Reserve's practice came

8 to your attention, separate and apart from the work

9 of this committee, which we'll come to later?

10     A    With E-Reserve -- E-Reserves in my library,

11 I cannot recall an issue that's come to my office.

12 No, I cannot recall one.

13     Q    Ever?

14     A    I'm trying to think of one.  No, I can't

15 recall a specific instance, no.

16     Q    Have you ever -- do you recall any

17 instances of any issues with respect to materials

18 posted on physical reserve at the physical reserve

19 desk coming to your attention?

20     A    No.

21     Q    Is there any understanding, formal or

22 informal, as to the nature of any disputes over

23 application of guidelines or policies to E-Reserve's

24 practice as to when such issues are to be brought to

25 your attention?

EXHIBIT 29 - 21

1   A    No.  It would be -- as with any procedural

2 or policy question, if it cannot be resolved by the

3 person on the desk or his or her supervisor or the

4 supervisor of that, then they would bring it to me.

5   Q    Briefly describe those layers of review, if

6 you will.  Let's start with -- let's hypothesize that

7 a professor proposes to post a given work or set of

8 works on E-Reserve.  At the University of Georgia

9 system now, what review process goes forward before

10 that -- those works are actually posted on the

11 system?

12        MR. ASKEW:  I'll object.  Do you have

13     a time frame in mind for that, Mr. Rich?

14        MR. RICH:  Let's talk currently.

15        THE WITNESS:  The person working at

16     the desk would have the interaction with

17     the faculty member, and that interaction

18     might be face-to-face or it could be

19     through e-mail.  The faculty member

20     requests that something be placed on

21     reserve.

22        If there were a question as to whether

23     this item should be placed on reserve or

24     not, that person would talk -- the person

25     could be a student or a staff member.  That

EXHIBIT 29 - 22

1     student or staff member would talk to the

2     associate head of access services, which is

3     our -- what we used to call circulation,

4     now it's called access services.  If she

5     could not resolve it, it would refer to the

6     head of access services.  If he could not

7     resolve it, he would come talk to me.

8     Q   (By Mr. Rich)  Now, what training is the

9 desk staff, whether student or librarian, given to

10 interface on these kinds of determinations as to

11 reserves postings?

12     A   Well, to clarify, it would not be a

13 librarian.  It would be a paraprofessional or

14 staff --

15     Q   Thank you.

16     A   -- clerks.

17     Q   What training do they receive?

18     A   They would be trained by the assistant head

19 of the department in the policies that we have.

20     Q   And what is the background of the assistant

21 head?

22     A   She's a librarian.

23     Q   And what specific training does that

24 librarian -- does she have a name -- of course she

25 does.  What's her name?

EXHIBIT 29 - 23

1   A   Viki Timian.

2   Q   And what training does Ms. Timian have in
3 copyright law?

4   A   No legal training.  She would be aware of
5 the library's policies and procedures and would
6 instruct the staff on these.

7   Q   To your knowledge, would Ms. Timian have
8 had any interaction with counsel for the university
9 trained in intellectual property matters?

10   A   Not to my knowledge, no.

11   Q   And you indicated that if the issue can't
12 be resolved at that level, it would be bucked to the
13 head of access services; is that correct?

14   A   Yes.

15   Q   Who is that?

16   A   His name is Tom Frieling.

17   Q   And do you know -- Freeland?

18   A   Frieling.

19   Q   Freelink?

20   A   Frieling.

21   Q   Frieling.

22   A   Yeah.

23   Q   Do you know if Mr. Frieling has had any
24 training in copyright law?

25   A   Not to my knowledge.

EXHIBIT 29 - 24

1     Q    Do you have any notion of the frequency

2 with which either the associate head or the head of

3 access services deal with issues involving proposed

4 reserves listings?

5     A    No.

6     Q    Have you ever, since 1989 to the present,

7 requested a report of any kind regarding the nature

8 of and extensiveness of E-Reserve usage in relation

9 to course offerings at the University of Georgia?

10    A    Since 1989, I'm sure I have, but I don't

11 recall specifically.

12    Q    Do you remember any specific event or

13 thought process that triggered a request for such a

14 report?

15    A    No.

16    Q    In your tenure, have you become aware of

17 any complaints, formal or informal, by any copyright

18 owners about claimed infringements of their works by

19 the University of Georgia?

20    A    As part of the E-Reserve system?

21    Q    No, generally for now.

22    A    Generally?  I'm sorry, repeat that one,

23 please.

24    Q    Have you become aware of any complaints --

25 I don't mean necessarily legal filings, but letters

EXHIBIT 29 - 25

1 of complaint or any other form of complaint received

2 concerning claimed infringements of copyrighted

3 materials by the University of Georgia?

4     A    By the University of Georgia, no.

5     Q    And that would include any claims with

6 respect to E-Reserve's uses prior -- putting aside

7 the instant lawsuit, which is not involving --

8 withdraw that.

9     A    I don't recall any, no.

10     Q    Okay.  And you said you don't remember the

11 specifics of reports you would have requested.

12          Do you recall reports having been prepared

13 for you or at your request from time to time relating

14 to any aspect of the uses -- of the usage of the

15 E-Reserve system at the University of Georgia?

16     A    Yes.

17     Q    And what form did such report or reports

18 take?

19     A    There is an annual report provided me on

20 circulation, which would include E-Reserve activity.

21     Q    And do you have occasion to review that

22 report?

23     A    Yes.

24     Q    And does that report provide you with --

25 what degree of specificity does that report provide

EXHIBIT 29 - 26

1 you with as to the nature of the individual

2 offerings, copyrighted offerings, that appear on the

3 system?

4     A     That report really is just a number, just

5 says what the number of the transactions was.

6     Q     Have you ever requested a more granular

7 report that -- that would indicate how the system is

8 used in terms of volume of copyrighted works or how

9 much of a particular type of copyrighted work is

10 offered by the E-Reserve system?

11     A     No.

12     Q     Has that been of no interest to you in your

13 role as university librarian and associate provost?

14     A     It has not been an issue, no.

15     Q     My question was slightly different.  Has it

16 been of any interest to you to learn that

17 information?

18     A     No.

19     Q     What knowledge do you have of publishing

20 industry economics?

21     A     Do you want some sense of my level of

22 understanding or --

23     Q     Yes, general question.

24     A     I just have a general understanding of it.

25 I've -- I've served on advisory boards to Wiley and

EXHIBIT 29 - 27

1 to Elsevier.  These are library advisory boards where

2 they ask librarians to come and meet with them.  And

3 I think I've learned some basic facts about the

4 industry from that --

5    Q    How --

6    A    -- primarily science, technology, and

7 medical publishing.

8    Q    How recently have you served on one or more

9 of those library advisory boards?

10    A    I just completed a -- I completed a term on

11 the Wiley board about a year ago and the Elsevier

12 board about two years ago.

13    Q    Do you recall any of the agenda topics that

14 were encompassed in these advisory board meetings?

15    A    Yes.

16    Q    Please tell me what you recall.

17    A    Usually they want to tell us about new

18 product offerings and get our sense of -- our

19 reactions to those.  They want to talk about pricing

20 models for those new product offerings.  They want to

21 hear especially about our economic situation because

22 they want to understand what the funding -- current

23 funding status for academic libraries is.  So that

24 usually takes up quite a bit of time.

25         And then they would sort of give us an

EXHIBIT 29 - 28

1 overview of what their status was, of what their

2 economic status was.  And I should say that was

3 usually -- we usually sign a confidentiality

4 agreement for these things.  You're going to ask me

5 specifics.

6     Q    I won't bore you.

7     A    That's basically it.

8     Q    Are you familiar with an organization known

9 as the Copyright Clearance Center, sometimes

10 shorthand known as CCC?

11     A    I'm aware of it.  I know it exists.  I have

12 a -- I think a general understanding of what it does.

13     Q    And what's that general understanding?

14     A    That if you determine that you, as a

15 library or faculty member or an individual, determine

16 that you need to seek permission to use a copyrighted

17 item, that you would go to them to seek clearance and

18 that they would facilitate that clearance process.

19     Q    Do you have any knowledge the degree to

20 which members of the University of Georgia community,

21 broadly speaking, have availed themselves of the

22 services of CCC?

23     A    No.

24     Q    I take it you personally have not?

25     A    No.

EXHIBIT 29 - 29

1     Q    When did you first become aware of the

2 lawsuit concerning which you're giving a deposition

3 today?

4     A    I believe it was last March, around this

5 time.

6     Q    And how did you learn about it?

7     A    From the Athens -- I'm sorry, the Atlanta

8 Journal-Constitution.

9     Q    And did you at some point procure a copy of

10 the complaint or eventually the amended complaint?

11     A    I believe when I -- I believe the story in

12 the Atlanta Journal-Constitution actually had a

13 reproduction of the complaint.  And yes, I did read

14 through it at that point.

15     Q    At that point.  And was it ever supplied to

16 you through any other channel?

17     A    I don't recall it was, no.

18     Q    Did anyone within the University System of

19 Georgia supply you with a copy other than perhaps in

20 connection with this recent committee work?

21     A    Again, I don't recall that they did, no.

22     Q    And what is your basic understanding of the

23 grievance that the named publishers in this lawsuit

24 have against Georgia State University officials and

25 the Board of Regent members?

EXHIBIT 29 - 30

1    MR. ASKEW:  At this point, I'll

2    caution him not to reveal any discussions

3    that you've had with counsel concerning the

4    lawsuit.

5       MR. RICH:  Fair enough.

6       THE WITNESS:  My basic understanding

7    is that there were -- that the -- there was

8    a problem with the password authentication

9    that, for whatever reason, Georgia State

10   was not validating students as they were

11   coming to the E-Reserve system to view the

12   reserve readings for this particular class

13   and -- and that the passwording was not

14   functioning.  That was one area of concern.

15      The other area, as I understand it, is

16   that there's a contention that Georgia

17   State is copying large portions of

18   materials.

19   Q    (By Mr. Rich)  And did --

20   A    That's basically it.

21   Q    Did you have occasion to examine -- do you

22 recall reading the portions of the complaint which

23 identified examples of what the publishers believe to

24 be excessive copying?

25      MR. ASKEW:  What was that -- what kind

EXHIBIT 29 - 31

1    of copying?

2         MR. RICH:  Excessive.

3         MR. ASKEW:  Excessive.

4         THE WITNESS:  If I did, I don't

5    recall.

6    Q    (By Mr. Rich)  Do you recall if you looked

7    at so-called Exhibit 1 to the complaint, which had a

8    listing of works that were claimed --

9    A    No.

10   Q    -- to be infringements?

11   A    I do not recall that.

12   Q    Do you recall forming a reaction, without

13   benefit of counsel, to the allegations of the

14   complaint?

15   A    My recollection is that I thought somebody

16   messed up with the passwording system, that it should

17   have been passworded and that that was a problem that

18   was -- you know, it was a -- it was something that

19   should not have happened, but also something that was

20   easily corrected.

21        As far as the amount of material being

22   copied, my recollection of that was that that

23   would -- that is something that is open to

24   interpretation and question, and I don't recall that

25   I formed an opinion on that.  But on the passwording,

EXHIBIT 29 - 32

1 I thought it was, again, something that should have

2 been fixed.

3     Q    In reading the complaint and thinking about

4 it, did you form a judgment whether, to your

5 knowledge, similar acts of copying had been occurring

6 within the University of Georgia E-Reserve system?

7     A    Define "similar acts of copying."

8     Q    Fair enough.  Let me ask a slightly

9 different question.

10         I'll represent to you -- and I have a copy

11 of the pleading if you want to be refreshed -- that

12 in a number of instances, there are reports of as

13 many as seven chapters from a particular work that

14 were offered for one or more semesters by a professor

15 in a given course.

16         As you read examples of that type in the

17 complaint, were you aware whether, within the

18 University of Georgia E-Reserve system, similarly

19 extensive uses of copyrighted materials without

20 permissions have been taking place?

21     A    It's hard to say because, as I said, I do

22 not recall reading that.  Do you want me to answer as

23 if I know what -- hearing it now?

24     Q    Well, let me ask you the question directly,

25 then.  Are you aware of whether, within the

EXHIBIT 29 - 33

1 University of Georgia E-Reserves system during the

2 time of your tenure as university librarian, it has

3 been the practice of professors to afford students

4 access to multiple chapters of a given book during

5 one course offering?

6     A    It's my understanding of our practice that

7 we do not copy more than one chapter.

8     Q    What's the basis for that understanding?

9     A    The guidelines -- these are the University

10 of Georgia reserve -- E-Reserve guidelines that are

11 posted on our Web site.

12     Q    And what knowledge do you have, however,

13 that those guidelines posted on your Web site have

14 been observed in practice?

15     A    My trust and faith in my staff would say

16 that they do it.  Now, do I -- can I absolutely

17 guarantee that they haven't done more than one

18 chapter at some point?  No, I cannot.  And I would

19 also say that it's conceivable that it could be

20 justified they could do more than one chapter for a

21 number of -- if they apply the fair use test.  But in

22 general, we would not post multiple chapters.

23     Q    Did you have occasion to discuss the

24 current lawsuit with anyone other than legal counsel

25 of the university?

EXHIBIT 29 - 34

1     A    Legal counsel of the university?

2     Q    For the university, inside or outside

3 counsel, excluding them.

4     A    Yes.

5     Q    Who did you have discussions with?

6     A    Ms. Volkert called me last March.

7         MR. ASKEW:  Ms. Volkert is a lawyer.

8         THE WITNESS:  But she's not within the

9     University System.

10         MR. ASKEW:  Did you mean to limit it

11    that way or --

12         MR. RICH:  That's fair, and I will not

13    explore the nature of your discussions with

14    Ms. Volkert.

15         Hello, by the way.

16         MS. VOLKERT:  Hi.

17         THE WITNESS:  Sorry.

18     Q    (By Mr. Rich)  Anyone else?  Any

19 nonlawyers?

20     A    Any nonlawyers?  I do recall that I had a

21 brief conversation with Charlene Hurt, the librarian

22 at Georgia State, at a professional meeting.  So yes,

23 she and I did discuss it.

24     Q    And what was the substance of that

25 discussion?

EXHIBIT 29 - 35

1    A    Basically, it was Charlene saying, "I'm

2 being sued," and my saying, "What a shame," and her

3 saying, "But I can't talk about it."  And that's

4 really the extent of it.

5    Q    You had no discussion of substance about

6 the lawsuit?

7    A    No.

8    Q    And have you had any discussions of

9 substance about the lawsuit with Ms. Hurts'

10 successor, Nan Seamans?

11        MR. ASKEW:  Other than, you're talking

12    about, in the presence of counsel?

13        MR. RICH:  Let's exclude work in

14    connection -- yes, in connection with the

15    committee and with counsel right now.

16        THE WITNESS:  No.

17    Q    (By Mr. Rich)  Okay.  Anybody else in the

18 Georgia library system that you had discussions with

19 about the lawsuit?

20    A    I'm trying to rack my brain and make sure.

21 I don't recall that I did, no.

22    Q    Did the filing of the lawsuit cause you in

23 any way to undertake or to request any reexamination

24 of the practice within the University of Georgia

25 library system as it relates to E-Reserve?

EXHIBIT 29 - 36

1    A   You know, I might have asked in general

2 terms of the head of access services to make sure

3 that our passwords -- passwording function was

4 working properly.  I do not recall a specific

5 conversation, but I think I might have asked him

6 that, and I just have a vague recollection that I

7 did.  That's all.

8    Q   Did you ask anyone to examine the

9 extensiveness of the copying of excerpts of

10 copying -- of copyrighted materials within the

11 University of Georgia library E-Reserve system as a

12 result of the filing of this lawsuit?

13    A   No.

14    Q   What relief do you understand the

15 plaintiffs are seeking?

16       MR. ASKEW:  Other than, again, any

17      conversations you've had with lawyers.

18       MR. RICH:  And you're looking at this,

19      and I'm happy to share and even mark as

20      Plaintiff's 1 the amended complaint --

21       THE WITNESS:  Well, I --

22       MR. RICH:  -- if it will help you.

23       THE WITNESS:  All I remember is -- I

24      remember the word "injunctive," and sort of

25      the imperfect knowledge I have of that, I

EXHIBIT 29 - 37

1    believe means that you're asking Georgia

2    State to stop it.  But that's really all.

3    Q    (By Mr. Rich)  And what's the understanding

4 of the "it"?

5    A    Whatever they're doing, they need to stop

6 doing it.

7    Q    Mr. Potter, has the University of Georgia

8 System -- am I stating it correctly?  Is it the

9 University System of Georgia?  How do you --

10    A    It's the University System of Georgia.

11    Q    I will try to use that phraseology, and

12 correct me if I misstep, please.

13    A    Okay.

14    Q    Has the University System of Georgia during

15 your tenure had a uniform set of copyright guidelines

16 intended to be applicable across all State higher

17 educational institutions?

18    A    No.

19    Q    At least until the work of the committee

20 you recently chaired, which we'll talk about at great

21 length later, how was each institution, then, to be

22 guided in its compliance with copyright law?

23        MR. ASKEW:  Do we have a time frame

24    for that, Mr. Rich?

25        MR. RICH:  Let's say right up until

EXHIBIT 29 - 38

1   the promulgation of the work of the most

2   recent committee, so really up until

3   February of this year.

4       THE WITNESS:  There was a guide to

5   copyright and fair use that was issued in

6   1997 that was not intended to be a policy,

7   and I would even say -- I wouldn't even

8   call them guidelines.  It was intended to

9   be a guide, more of an educational tool

10  for -- from which members of the University

11  System of Georgia community could learn

12  sort of the fundamentals of copyright and

13  fair use.  And I believe it was expected,

14  then, that each of the 35 institutions

15  would formulate appropriate policies and

16  procedures.

17      Q    (By Mr. Rich)  Now, as you parse the words

18  "guide, guidelines, and policies," could you again

19  tell me what -- how you see the bases for distinction

20  among those terms?

21      A    Well, I would say a guide is that, it's

22  intended to present the issue and guide you through

23  it to allow you to reach an understanding that would

24  then inform your activities.

25          Guidelines was not used, but I would say

EXHIBIT 29 - 39

1 guidelines would be slightly more prescriptive.  But

2 then a policy would be an actual policy saying this

3 is the policy of the University System of Georgia and

4 this is what you should do.

5     Q    You were involved in the formulation of the

6 1997 guide, correct?

7     A    Yes.

8     Q    In fact, you chaired that effort, yes?

9     A    Yes.

10    Q    Is it accurate that a considerable amount

11 of effort went into the creation of that guide?

12    A    Yes.

13    Q    And was that process also informed by

14 access to legal counsel?

15    A    Yes, in that the vice chancellor for legal

16 affairs was a member of the committee.

17    Q    Who was that?

18    A    Her name was Corlis Cummings.  She's no

19 longer at the University System office.  I think

20 she's at Kennesaw.

21    Q    Did an individual named L. Ray Patterson

22 have anything to do with the formulation of the 1997

23 guidelines?

24    A    He was a member of the committee.

25    Q    And a lawyer?

EXHIBIT 29 - 40

1    A    Yes.

2    Q    Professor of law?

3    A    Professor of law, yes.

4    Q    Is it accurate that he was influential in

5 the creation of those guidelines?

6    A    It's accurate that he was a member of the

7 committee and has as much say as any member of the

8 committee, yes.

9    Q    And was it your understanding, as chair of

10 that effort culminating in 1997, that individual

11 institutions within the State system were free to

12 establish policy that, if they chose, disregarded, in

13 part or in whole, the guide?

14    A    Insofar as they were free to do that

15 before, yes.  The guide was not intended to set

16 policy.  The guide was intended to educate.

17    Q    Did you become aware over time of the

18 degree to which -- let me ask this question first.

19 Strike that.

20        To your knowledge, how many of the

21 individual institutions within the State of Georgia

22 system adopted after 1997 what you would term

23 "copyright policies"?

24    A    I have no knowledge that any of them did.

25    Q    Do you know whether there was any other

EXHIBIT 29 - 41

1 basis in Georgia law or in a supervisory role of the

2 Board of Regents that required individual

3 institutions to establish copyright policies?

4     A    No.

5     Q    Why, to your knowledge, did the University

6 of Georgia itself establish copyright policies?

7     A    What University of Georgia copyright policy

8 are you referring to?

9         MR. RICH:  Let me mark as -- we did

10     not mark the complaint, so let's mark this

11     document as -- Tony, we'll go with

12     plaintiff's numbering sequentially instead

13     of witness name, if you don't mind.

14         MR. ASKEW:  That will be fine.  So you

15     want to use one system throughout?

16         MR. RICH:  I think we'll try.

17         MR. ASKEW:  Okay, that's fine.

18         MR. RICH:  It requires a little more

19     record-keeping, but let's try that, if you

20     don't mind.

21         MR. ASKEW:  Fine with me.

22         MR. RICH:  So let's mark as

23     Plaintiff's 1 a document titled "The

24     University of Georgia Libraries Copyright

25     Policy."  I will note that while I've

EXHIBIT 29 - 42

1    looked for a date on it, I haven't been

2    able to find one.  And again, given the

3    nature of production, as I think Tony is

4    aware, this, among other documents, don't

5    yet bear Bates stamps.

6         THE WITNESS:  This is pre-1997.

7         MR. RICH:  Hold on.  I haven't --

8    there's no question pending.

9         THE WITNESS:  Sorry.

10        (Exhibit 1 marked for identification.)

11   Q    (By Mr. Rich)  Can you identify the

12   document that's been placed in front of you?

13   A    Yes.

14   Q    And what is it?

15   A    It's a copyright policy developed by the

16   University of Georgia libraries as part of our staff

17   policy and procedures manual.

18   Q    Do you know when this was created?

19   A    Since there's not a date on it, I can't

20   say, but judging from the people involved in it, I

21   would say early 1990s.

22   Q    And what is it from the people you see here

23   that gives you that sense?

24   A    Joe Davidson has been retired for many

25   years.  Bob Henneberger has been retired for many

EXHIBIT 29 - 43

1 years.  Kevin Risner and Deb Sommer are long gone.

2    Q    Was this in -- so this, then, was

3 promulgated sometime after you assumed your position

4 as university librarian, but before the 1997 effort?

5    A    I believe it is, but -- in fact, all these

6 people were employed by the University of Georgia

7 library before 1989, were actually working prior to

8 1989.  It's possible they wrote it before then.  I

9 would have to read through it in more detail.

10   Q    Well, if you look at the last page, which

11 has some bibliographic information --

12   A    Okay.

13   Q    -- I will note that two of the references

14 date into the '90s.

15   A    Okay, then you're --

16   Q    Which suggests at least 1992?

17   A    Yes, I would agree with that.

18   Q    And who is Susan Morris?

19   A    Susan Morris is a librarian who is in

20 charge of our interlibrary loan office.

21   Q    Do you have any recollection of giving any

22 input on the creation of this document?

23   A    I do not.

24   Q    Was it your -- was it part of your

25 responsibilities, as a formal matter, to approve its

EXHIBIT 29 - 44

1 final content?

2     A    No.  That would be delegated to the people

3 maintaining the staff manual.

4     Q    I'm sorry, maintaining the?

5     A    The staff -- the staff's policies and

6 procedures manual.

7     Q    To the extent, however, it incorporates --

8     A    And it's delegated for me.

9     Q    Delegated for you.

10     A    Yeah.

11     Q    So copyright -- is it accurate that matters

12 of copyright policy, as they affect the University of

13 Georgia libraries, is routinely delegated by you?

14     A    Yes.

15     MR. RICH:  Why don't we -- I

16     understand we're near a break, so why don't

17     we take a couple-minute break.

18     THE WITNESS:  Okay.

19     THE VIDEOGRAPHER:  Off the record at

20     11:01:15.

21     (Recess taken.)

22     THE VIDEOGRAPHER:  This is Tape 2.  We

23     are back on the record at 11:11:15.

24     Q   (By Mr. Rich)  Staying with Plaintiff's 1

25 for a few minutes, does this document still represent

EXHIBIT 29 - 45

1 the copyright policy of the University of Georgia

2 library?

3     A    I would say in general, yes, but I think

4 it's been superseded by some specific practices and

5 procedures.

6     Q    And what is it that you have in mind in

7 terms of --

8     A    I have in mind the -- the Web site for our

9 electronic reserve system that is more specific about

10 what faculty should do when they submit material for

11 electronic reserve.

12     Q    Okay.  And we'll mark that and go through

13 that a little bit later.

14     A    Okay.

15     Q    Turn to page 3 of this document.  I'd ask

16 you to -- well, let me read just in the record, it's

17 brief enough, what's reported as copyright and new

18 technology.  "Copyright functioned best in an era

19 when the means of reproduction lay in the hands of a

20 limited number of agents with the requisite skills

21 and equipment.  In recent years, however,

22 technological developments have made it possible for

23 almost anyone to make reproductions in a variety of

24 formats.  Furthermore, the copyright law is proving

25 to be increasingly inadequate to address the needs of

EXHIBIT 29 - 46

1 emerging technologies.  For example, it is no longer

2 possible in some media to draw a distinction between

3 an idea and its expression.  And in an electronic

4 environment, it is often impossible simply to read an

5 idea without first copying it.  What is needed are

6 not amendments to the copyright law, but a

7 fundamental reconsideration of the concept of

8 intellectual property.  Until new standards are

9 established, the libraries will take full advantage

10 of new technologies to further the educational

11 mission of the University of Georgia."  Do you see

12 that?

13      A    Yes.

14      Q    And does that remain the undergirding view

15 of the University of Georgia libraries as to the

16 interrelationship of copyright and new

17 technologies -- and new technology?

18      A    Yes.

19      Q    Now, in the succeeding section under the

20 heading "Policies," then "Copy Services," there is

21 set forth a set of procedures by which photocopy

22 requests are reviewed prior to submission of material

23 to what's termed "copy services."  Do you see that?

24      A    Yes.

25      Q    Is there still a unit of the library system

EXHIBIT 29 - 47

1  called "copy services"?

2    A    No.

3    Q    What -- has it been succeeded by something

4  else?

5    A    No.

6    Q    Where have its functions gone?

7    A    Its functions were done away with.

8    Q    And what were its functions?

9    A    Its functions were to provide a copy

10 service where faculty or students or staff could

11 bring material to a central desk and have copies

12 made.

13   Q    And --

14   A    By staff -- staff would actually make the

15 copies for them as opposed to self-service.

16   Q    And was this limited at the time for

17 personal use by the -- what's termed "patron" here,

18 or was it -- did it include potential uses in the

19 classroom setting?

20   A    It included potential uses in the classroom

21 setting.

22   Q    And where do those functions occur today in

23 lieu of or in place of copy services doing the

24 copying?

25   A    To make physical copies?

EXHIBIT 29 - 48

1  Q  Yes.

2  A  Those copies would be made -- I don't know

3 where it's done.  I would assume that the individual

4 faculty member would make his or her own copies or

5 could take it to a commercial service.

6  Q  And are -- to your knowledge, are any

7 records kept of those -- either of those types of

8 activities?

9  A  No.  Not -- I'm sorry, not by us.

10  Q  Not by you?

11  A  No.

12  Q  And with respect to E-Reserve, you

13 mentioned the superseding policy with respect to how

14 that's handled, which we'll talk about later.

15  A  Okay.

16  Q  Okay.  Now, when was the copy services

17 function discontinued?

18  A  I'm not sure of the exact year.  I would --

19 I believe 2002, 2003.

20  Q  And do you recall the circumstances under

21 which the determination was made to eliminate copy

22 services?

23  A  Yes.

24  Q  And what were they?

25  A  We had had a budget cut and were looking at

EXHIBIT 29 - 49

1 operations we could eliminate and decided that of all

2 of the things we do, that was one thing we could do

3 without.

4     Q    Did concerns over intellectual property or

5 copyright compliance have any relationship to that

6 decision?

7     A    No.

8     Q    Looking at item numbered 3 on this page,

9 which reads, among the criteria to be met, "The

10 request is for a single copy of one original, as

11 opposed to multiple copies of the same original."  Do

12 you see that?

13     A    Yes.

14     Q    Do you have any understanding as to whether

15 that request permitted the copying of the -- an

16 entire copyrighted work, a single copy of an entire

17 copyrighted work?

18     A    I don't know how it was applied in

19 practice.

20     Q    Do you know how it was intended to be

21 applied?

22     A    No.

23     Q    If you look at the bottom of the page,

24 carrying over to page 4, it states, "Photocopy

25 requests from commercial, for-profit entities or

EXHIBIT 29 - 50

1 those of a nonacademic nature will be filled

2 according to the 20 percent rule or one article per

3 journal, one chapter per book, etc."

4      A      Uh-huh.

5      Q      Do you see that?

6      A      Yes.

7      Q      What is the reference, to your knowledge,

8 to the 20 percent rule?

9      A      I don't know.

10      Q      Do you know the basis for the additional

11 limits set forth, one article per journal, one

12 chapter per book, as it appears in this document?

13      A      I do not know the basis, no.

14      Q      What is your understanding of the nature of

15 the for-profit commercial entities who were able to

16 avail themselves of the copy services function while

17 it was in operation?

18      A      I have no knowledge of that.

19      Q      If you look under "Document Delivery" under

20 No. 1, it states that members of the University of

21 Georgia scholarly research community would be

22 afforded certain privileges.

23           Do you have an understanding as to what was

24 encompassed by the University of Georgia scholarly

25 research community?

EXHIBIT 29 - 51

1      A      Yes.

2      Q      What is that?

3      A      Our faculty and our researchers who may not

4 be faculty, but primarily the faculty.

5      Q      And at the -- at the end of that paragraph,

6 it indicates that "the unit will provide an

7 individual researcher with one copy of any article(s)

8 or chapter(s) needed from a publication."  Do you see

9 that?

10      A      Yes.

11      Q      Do you know how that was implemented in

12 practice?

13      A      Yes.

14      Q      And what's your understanding?

15      A      My understanding is that if a faculty

16 member requested that we make a photocopy of an

17 article or chapter for him or her, to save him the

18 trip to the library to do it themselves, we would do

19 it for them and send it to them through campus mail.

20      Q      What chapter or article limits, if any,

21 were placed on such copying activity?

22      A      I'm not aware of the limits, but since it

23 was for personal use, I would expect there were no

24 limits.

25      Q      So is it your understanding that if a

EXHIBIT 29 - 52

1 faculty member, for purposes of his research, wanted

2 an entire work reproduced, that is, an entire

3 textbook reproduced or a cover-to-cover copy of a

4 journal issue, that so long as it was for that

5 individual's personal research, that request was

6 accommodated?

7     A    No, I'm sorry, I've -- no, I would say no.

8     Q    What were the limits?

9     A    Somewhere between the two -- those two

10 things.

11     Q    And in whose discretion was that line

12 drawn?

13     A    The discretion of the supervisor of the

14 copy services unit.

15     Q    And what background -- pardon me.

16     A    I'm sorry.  Or whoever was handling

17 document delivery, which would have been -- document

18 delivery was handled by a unit back when -- at that

19 point when this was written, was handled by a

20 librarian, who would have made that determination.

21     Q    Do you have someone in mind specifically or

22 several someones in mind who had that role?

23     A    Yes.  One was Steven Brown, who's listed

24 here.  He was in charge of document delivery at that

25 point.

EXHIBIT 29 - 53

1      Q    And to your knowledge, what was Mr. Brown's

2 background and experience with copyright law?

3      A    He was a librarian.  He had a librarian's

4 knowledge of copyright law.

5      Q    No legal training, to your knowledge?

6      A    No legal training, no.

7           MR. RICH:  Let's mark as Plaintiff's 2

8           a document titled "Regents Guide to

9           Understanding Copyright & Educational Fair

10          Use."  I believe the copy being distributed

11          bears Bates No. GSU002523 all the way

12          through 2576.

13          (Discussion off the record.)

14          (Exhibit 2 marked for identification.)

15     Q    (By Mr. Rich)  I'll ask you if you

16 recognize this document.

17     A    Yes.

18     Q    Can you identify it?

19     A    It is the product of the 1997 committee

20 that produced the Regents Guide to Understanding

21 Copyright & Educational Fair Use for the University

22 System of Georgia.

23     Q    And if you look to the rear of this

24 document, at pages 42 and 43 --

25     A    Uh-huh.

EXHIBIT 29 - 54

1     Q     -- there is a list of what is represented

2  to be the members of the regents copyright committee.

3  Is that, to your recollection, an accurate list?

4     A     I'm not seeing those pages.

5     Q     Pardon me, I understand you may have

6  slightly different numbers than I'm working with.

7  It's the last two pages of the document, I believe.

8     A     Okay.

9     Q     It's back to -- it's on your 52.  Does that

10 list look right?

11    A     Yes.

12    Q     And you chaired that effort?

13    A     Yes.

14    Q     How did you come to be chair?

15    A     I was asked to be chair by the vice

16 chancellor for academic affairs.

17    Q     And did the vice chancellor for academic

18 affairs indicate to you why -- was it a male or a

19 female?

20    A     Male.

21    Q     Did he indicate to you why he thought you

22 would be the most suitable person to act as chair?

23    A     No.

24    Q     Did you have any understanding as to that?

25    A     No.

EXHIBIT 29 - 55

1    Q    How were the remaining committee members

2 selected?  Did you have a role in their selection?

3    A    No.

4    Q    And over what period of time,

5 approximately, say in months, did the committee work

6 before this product was created?

7    A    Understand this is 12 years ago.

8    Q    If you recall.

9    A    I believe it was around seven or eight

10 months.

11    Q    Now, if you look at the first page of this

12 document, it indicates that, "The purpose of this

13 guide is to provide faculty, employees, and students

14 of the University System of Georgia with a basic

15 understanding of copyright and fair use."  Do you see

16 that?

17    A    Yes.

18    Q    Is that a fair statement in terms of

19 characterizing the purpose of these -- of this

20 Regents Guide?

21    A    Yes.

22    Q    And if you turn to page 5, at the bottom,

23 after essentially repeating the same statement, the

24 paragraph goes on to say, "Individuals and

25 institutions acquire copyrighted materials -- books

EXHIBIT 29 - 56

1 journals videotapes, sound recordings, etc. -- and

2 expect to use them to support educational and

3 research activities.  This is especially important

4 today when advanced information technology offers so

5 many ways to enhance instruction.  New technology

6 complicates the issue."  And it goes from there.  Do

7 you see that?

8      A    Yes.

9      Q    So is it fair to say that an aspect of the

10 work of this committee was to come to grips with and

11 formulate some guidance with respect to advanced

12 information technology?

13      A    Yes.

14      Q    And that advanced information technology

15 included, did it not, electronic distribution of

16 copyrighted materials, correct?

17      A    Yes.

18      Q    And it included electronic course reserves,

19 correct?

20      A    I'm trying to thrust my mind back 12 years

21 to see if we had contemplated -- there are so many

22 things that have happened since then that we didn't

23 really contemplate at that point.

24      Q    Perhaps --

25      A    I can't remember if E-Reserves was a factor

EXHIBIT 29 - 57

1 or not.

2     Q    If it might assist you in refreshing your

3 recollection, I would invite your attention to -- I'm

4 using different pages here, so there's a little bit

5 of a pause here, to page 22.

6     A    Yeah.

7     Q    There's a reference toward the bottom to

8 electronic course reserves.  Do you see that?

9     A    Yes.  Then we were -- yes, we did consider

10 that, yes.

11     Q    Yes.  Now, if you turn to page 6 of this

12 document, the third full paragraph, it states in its

13 last sentence, "The basic rule of thumb, elaborated

14 in the document, is that a copyrighted work can be

15 used or copied for educational purposes so long as

16 the use is not solely a substitute for purchasing a

17 copy of the work."  Do you see that?

18     A    Yes.

19     Q    What is your understanding of what was

20 being conveyed by that statement?

21     A    My understanding is that we were attempting

22 to come up with sort of a  -- as stated here, a basic

23 rule of thumb that would help people understand this,

24 that the main thing they needed to be considering was

25 whether their -- the use they were making was a use

EXHIBIT 29 - 58

1  made in place of purchasing a copy, that if -- that

2  if the only reason they were -- as it says here, to

3  be clear, if the only reason they're making the copy

4  is so they don't have to buy it, then that's -- is

5  not a good enough reason in and of itself.  But I

6  think in -- that was an attempt to kind of boil it

7  down to alert them to that one fact before going into

8  some other factors they need to consider.

9      Q    So as you understood this and what it was

10  attempting to convey, if a member of the faculty in

11  good faith said, "Well, I have a completely

12  legitimate pedagogical purpose to take certain

13  excerpts from copyrighted works.  I would rather

14  create my own array of customized course materials.

15  I don't find any single textbook adequate for that

16  purpose, so I'm going to mix and match a bit from a

17  variety of sources," as this statement in this guide

18  was conceived, was that consistent with the view

19  that, therefore, that faculty member didn't have the

20  purpose solely of substituting for purchases of

21  works?

22          MR. ASKEW:  Mr. Rich, I'm going to

23      permit the witness to answer, but we've

24      been spending now a pretty good bit of time

25      on this Regents Guide, and I do want to

EXHIBIT 29 - 59

1   state for the record, at least now, that we

2   question the relevance of this sort of

3   inquiry in view of the adoption of the new

4   policy and guidelines as of the middle of

5   February.  But I do want you to understand

6   we do object to the relevance of this line

7   of inquiry in view of the adoption of the

8   new guidelines as of the middle of

9   February.

10      MR. RICH:  Thank you.  You're

11  certainly welcome to state that for the

12  record.

13      THE WITNESS:  I'm trying to

14  reconstruct your question.

15      MR. RICH:  Yes.

16      THE WITNESS:  In the hypothetical

17  situation you're talking about, what we

18  would -- I think what the committee at that

19  point, again, going back more than 12

20  years, would have wanted the faculty member

21  to do is stop and think, "Well, is it

22  really the educational purposes that

23  overrides this, or am I just trying to

24  avoid purchasing something?"

25      But again, there have to be other

EXHIBIT 29 - 60

1    factors that come into play, and we would

2    hope that they would do that.  But again,

3    we were not trying to establish a policy.

4    We were trying to get people to think about

5    these things, and the rule of thumb was one

6    attempt to get them thinking about it.

7    Q    (By Mr. Rich)  If you would flip to page 7

8 of this document, please.  I take it notwithstanding

9 your statements about this is only a guide, that it

10 was -- this was not simply designed as a -- pardon

11 the pun, as a matter strictly of academic interest by

12 the committee, you did have purposes in mind in

13 promulgating this document, correct?

14    A    Yes.

15    Q    And one of those purposes was, in fact, to

16 allow people to shape their copyright use -- their

17 use of -- their judgments as to uses of copyrighted

18 materials based on information provided by the guide,

19 correct?

20    A    I don't think I would characterize it as

21 "shape."

22    Q    How would you characterize it?

23    A    I think what we were trying to do was to

24 instruct them on the current situation and to some

25 extent let them draw conclusions and think about

EXHIBIT 29 - 61

1 their own situation.  I would not say we had any

2 intention of shaping someone's thought or shaping

3 certain opinions on it.

4     Q    Did you not intend -- did the committee not

5 intend -- the committee of which you were chair not

6 intend that the members of the university community

7 would rely on this document in making copyright

8 judgments?

9     A    We were hoping they would use this guide to

10 educate themselves about the situation regarding

11 copyright and fair use.

12     Q    My question was slightly different,

13 whether -- isn't it a fact that that committee

14 intended members of the university committee (sic) to

15 rely on the contents of this guide and the positions

16 adopted in it in shaping their copyright compliance

17 activity?

18     A    Well, no.

19     Q    Take a look at the first full paragraph on

20 page 7 of this document, "Special care has been taken

21 to ensure that the contents of this guide accurately

22 reflect the law.  To this end, the committee has

23 relied upon the copyright clause of the U.S.

24 Constitution, the copyright statute, and decisions of

25 the U.S. Supreme Court.  A complex body of law, of

EXHIBIT 29 - 62

1 course, provides room for reasonable persons to

2 disagree as to meaning and interpretation, and there

3 will probably be those who disagree with some of the

4 positions this document reflects.  Nevertheless, the

5 committee is convinced that the positions taken in

6 the guide are both sound and supported by legal

7 authority and that members of the University System

8 community may safely rely on them."  Do you see that?

9     A    Yes.

10     Q    Was that accurate?

11     A    Yes.

12     Q    Over to page 8 of this document, sir, if

13 you would look at Item No. 7, little B.  It states in

14 a section titled "Principles of Fair Use," "One who

15 copies from a work for study or research uses the

16 work, not the copyright, because the use is a use for

17 which the work was intended.  Such a use is a fair

18 use, not an infringement."  Do you see that?

19     A    Yes.

20     Q    What is your understanding of the statement

21 reflected there, namely that copying of a work for

22 study is -- does not entail the copyright right in

23 the work?  Is that a statement with which you then

24 agreed?

25     A    Yes.

EXHIBIT 29 - 63

1    Q    Is that a statement with which you agree

2 today?

3    A    Yes.

4    Q    Is that a statement which you believe is

5 implemented within the University of Georgia library

6 system?

7    A    For one who copies a work for study or

8 research, yes.

9    Q    Can one properly read this as saying there

10 is no copyright right implicated whatsoever in that

11 circumstance since only the work is being used, not

12 any copyright in the work?

13    A    You're getting into deep waters for a

14 nonlawyer, but --

15    Q    I don't want you to testify beyond your

16 competency.  I'm only asking for your understanding.

17    A    Yes.

18    Q    Is there anything, to your knowledge, in

19 the work of the -- in the just completed work of the

20 more recent committee which would reflect a different

21 viewpoint as to such activity, namely copying of a

22 work for study or research?

23    A    Not to my knowledge.

24    Q    If you look at No. 8, following on 7, it

25 says, "One may always use a work without permission;

EXHIBIT 29 - 64

1 one may use a copyright only with permission or as a

2 matter of fair use."  Do you see that?

3      A    Yes.

4      Q    So if I'm reading 7b and 8 together

5 correctly, it seems to suggest that so long as one

6 copies a work for the purpose of study or research,

7 one doesn't need permission to do that.  Is that how

8 you interpret those?

9      A    Yes.

10      Q    If you turn to the next page, there's an

11 item listed at No. 14.  It states, "Attempts to limit

12 the fair use right with quantitative guidelines are

13 without statutory authority."  Do you know what that

14 was attempting to convey?

15      A    Yes.

16      Q    Please explain.

17      A    My recollection from way back then is that

18 there was a belief by a majority of the committee

19 that the statute itself did not mention quantitative

20 guidelines and that, therefore, we could not set

21 absolute quantitative guidelines one way or the

22 other.  We couldn't limit you too little or too much.

23 And there was some resistance from members of the

24 committee to set quantitative guidelines, although it

25 was tempting to have something that simple.  The

EXHIBIT 29 - 65

1 belief was not only that it's difficult to do such a

2 thing, it's also not based on the statute.

3    Q    Thank you.

4         And then if you look at the immediately

5 next item on 15, it says, "The legal effect of

6 quantitative guidelines is to provide a safe harbor,

7 i.e., copying within the guideline limits

8 automatically qualifies as fair use."

9         How is that statement, then, consistent

10 with what you just articulated?

11    A    Well, it's very consistent.  As I said, we

12 did not want to set quantitative guidelines because

13 from either side of the argument, it could be argued

14 where you're allowing too much, you're allowing too

15 little.

16         In this case, what we're saying is that if

17 we set a -- if we did set a quantitative guideline,

18 it would create a false sense of security in people

19 that they would think, well, if I just don't -- if I

20 just go up to that level, I'm fine, when, in fact,

21 they could be copying the heart of the work and they

22 would be in violation.

23    Q    So it's not correct, then, as I hear you,

24 to read 15 as sanctioning the concept of a safe

25 harbor?  When it says, "The legal effect of

EXHIBIT 29 - 66

1 quantitative guidelines is to provide a safe harbor,"

2 that's not intended as a normative statement?

3    A    No.  It might be -- it perhaps could have

4 been written better.  If anything, it's an argument

5 for why we should not provide a safe harbor.

6    Q    I see.  Thank you for that.

7         So that if an institution within the

8 University System of Georgia arbitrarily set a limit

9 saying anything -- so long as you copy not more than

10 20 percent of the work or 10 percent of the work, you

11 are legally safe, as I read this Regents Guide, as

12 you've construed it, that is exactly what the guide

13 is saying is dangerous to engage in?

14    A    Yes.

15    Q    Okay.  Thank you.

16         Now, in part 2 of this document, which

17 begins at page 10, certain examples said to

18 illustrate the application of fair use are set forth.

19 And even with due regard for your counsel's

20 suggestion about the continuing relevance here, I am

21 going to walk you through a number of these for

22 several reasons.

23         One is that -- well, let me ask you this

24 question as a preface:  Until the new policies were

25 issued just this past month, the work of the new

EXHIBIT 29 - 67

1 committee, is it your understanding that the Regents

2 Guide was available as providing guidance to the

3 University System of Georgia?

4     A    Yes.

5     Q    To your knowledge, is it still up on the

6 Web site?

7     A    No.

8     Q    When did it come down?

9     A    I believe when the new one was put up.

10     Q    You're sure of that?

11     A    It's my understanding -- my understanding

12 is it was.  Am I sure of it?  I mean, it's possible

13 they put it somewhere else, but I'm not aware of it.

14     Q    Let me ask what the intent was.  Was the

15 intent to no longer provide access to this document

16 as a resource to the university community?

17     A    The intent was to offer the new policy as

18 what people should use now.  We -- I don't think we

19 ever determined absolutely what should happen to the

20 old one.

21     Q    Wasn't that an important issue?

22     A    Uh-huh, but now we're getting into how much

23 I can talk about it, what the committee discussed.

24     Q    Well, again, I don't want to intrude on any

25 legal advice or actions that solely reflect advice of

EXHIBIT 29 - 68

1 counsel.  But you chaired a committee which created a

2 product which for more than 11 years, I take it, was

3 the principal source of a University System of

4 Georgia guidance with respect to copyright and

5 educational fair use, correct?

6     A    Yes.

7     Q    Did you have a view, you yourself,

8 uninformed by legal judgment, whether this document

9 still retains vitality and usefulness as a guide such

10 that it should or should have stayed up on the Web

11 site in conjunction with the new committee product?

12    A    Well, I -- no, my opinion is no, it should

13 not have stayed up.  However, I do believe, as a

14 librarian, it should be archived, it should be

15 available as a historical document, yes.

16    Q    And the reason you had for it -- for

17 believing it shouldn't stay up was what?

18    A    That we have a new policy that supersedes

19 these guides, this guide, and that people should rely

20 on the new policy --

21    Q    And --

22    A    -- as opposed to this.

23    Q    And in what particulars, in your

24 estimation, does the new policy differ from these

25 guides such that, to use your word, it is -- the

EXHIBIT 29 - 69

1 guide is superseded by them?

2      MR. ASKEW:  And I would caution the

3      witness to be careful not to reveal any of

4      the advice from counsel that you have

5      received from the various lawyers that have

6      been involved in the conduct or work of the

7      committee.

8      THE WITNESS:  Okay.  I would say I'm

9      not aware of any particulars.  I think it's

10     just a question of procedure, that we

11     wanted to make the new situation as simple

12     as possible, and that is that this is the

13     policy you follow now.  If we had this one

14     up as well, it would -- it could lead to

15     confusion.

16     Q    (By Mr. Rich)  Confusion in application of

17 copyright --

18     A    No, just --

19     Q    -- principles to practice?

20     A    No, I wouldn't -- I don't know that it

21 would cause any confusion.  It's just that the

22 purpose of this was to educate broadly.  It's a

23 document that's 12 years old.  And my feeling as

24 chair is that it should not be offered up as a guide

25 because the policy does the educational portion and

EXHIBIT 29 - 70

1 also sets up -- does more than that.  It actually

2 sets a policy.

3     Q    Would you be concerned if one of the

4 resources available to members of the University

5 System of Georgia community, whether by archive or

6 otherwise, were the examples set forth in Part 2 of

7 the guide?

8     A    No, assuming there would be some sort of

9 explanation, wherever this ends up, saying that this

10 was a guide that was -- that was created in 1997 and

11 has now been superseded by the policy.

12     Q    What do you believe has changed in terms of

13 university practice since 1997 that would warrant

14 that kind of caution?

15     A    I'm not -- well, I'm not sure I would

16 characterize it as caution.  I think it would just be

17 describing the information.  But I'm not aware of

18 anything that's changed.

19     Q    I believe your -- part of your prior answer

20 was so long as people were advised that these date

21 all the way back to 1997.  What's the relevance of

22 that comment?

23     A    Just that there -- that it is an old

24 document.

25     Q    The Sherman Act is 1890, it runs our

EXHIBIT 29 - 71

1 antitrust act, so I'm just not quite sure of what age

2 alone has to do with --

3    A    There's a difference between --

4    Q    -- relevance.

5    A    Well, I'm sorry.  I think it's common with

6 policies and procedures and guides that they need to

7 be updated and changed.  And when something has been

8 updated and changed or replaced, then, again, I think

9 for archival purposes, it would be good to have this

10 around, but I don't see a need to have it prominent.

11 I don't think it -- we don't need it to serve the

12 same function that we felt was -- it served in 1997.

13 The new policy serves that function.

14    Q    And just to complete the thought, that

15 function being?

16    A    Well, to educate the University System

17 community about copyright and fair use.  But as I

18 said before, the new policy goes further than that,

19 it is a policy.

20    Q    As of 1997, if you recall, what was the

21 nature of electronic course reserves practices within

22 the University System of Georgia?

23    A    My recollection at that point was it was

24 sort of something that was on the -- in the planning

25 stages, that we did not have electronic reserves at

EXHIBIT 29 - 72

1 that point.  When we actually implemented electronic

2 reserves -- I don't want to give you a hard date,

3 but I don't -- I do not believe that they were in

4 place in 1997.

5    Q    Do you recall generally -- and I realize it

6 was 12 years ago, but do you recall generally what

7 the conception of what electronic course reserves

8 would look like was?

9    A    Yes.  The thought then was that we would

10 tie it to our online catalog much as paper reserves

11 were tied to our online catalog, and that in terms of

12 a paper reserve system, you could go and look and

13 there would be a list of the readings that were

14 placed on reserve by the faculty member, and then you

15 would take the information to the circulation desk

16 and get the material.

17           What we hoped to do with electronic

18 reserves was substitute and provide a link to a

19 scanned copy.  The technological issues in doing that

20 were to have adequate storage and a way to display

21 the information and to have the right kind of

22 terminals we could display it on, but perhaps most

23 important is a way to password it so that it would be

24 limited only to the classroom, the class that the

25 faculty member is teaching.

EXHIBIT 29 - 73

1        And then we also needed a way to age it so

2 that we could take it down after a semester.  And it

3 was really those -- those issues that probably held

4 us up longer than the technology itself.

5     Q    If you would turn to page 10 of what's

6 listed as "A, Research and Writing," there is a

7 scenario there, Scenario A, which describes a

8 professor of English is writing a book comparing the

9 work of three women poets, all of whose poems are

10 copyrighted.  The question posed is, "May the

11 professor quote the poems in her book?"  Answer,

12 "Yes.  This is one of the traditional types of fair

13 use, that is, creative fair use.  Two other examples

14 of fair use are use for comment and criticism."

15 Do you see that?

16     A    Yes.

17     Q    Was it the intent of this example, by way

18 of guidance to members of the University System of

19 Georgia community, to indicate that entire -- the

20 entirety of the poems that are thought of here were

21 authorized to be copied as a matter of fair use?

22     A    That was not our intention, no.

23     Q    Where in here is there any limiting

24 language as to the amount of the poems that could be

25 taken?

EXHIBIT 29 - 74

1    A    I would say it's implied in the word

2 "quote," may the professor quote the poems, implies

3 to me that the professor would be quoting portions,

4 not the entire poem.

5    Q    Impliedly quote from the poems?

6    A    Yes, yes.

7    Q    The language doesn't quite get there, you

8 would agree, as worded, yes?

9    A    I could see you could take that --

10   Q    Yes.  Do you know how, in fact, individual

11 readers of this interpreted that example?

12   A    No.

13   Q    And where, if at all, in the guide, to your

14 recollection -- let me -- strike that.  Let me

15 rephrase.

16        Did the guide, to your recollection,

17 provide any quantitative or qualitative limits to the

18 amount of excerpting which would be appropriate in

19 this kind of setting?  I know we did talk about

20 quantitative limits a few minutes ago.

21   A    Right.  I don't believe it does, no.

22   Q    In whose judgment or discretion was it

23 intended that the judgment of how much of the poem

24 could be taken, where was that to rest in the view of

25 your committee back then?

EXHIBIT 29 - 75

1    A    In the view of the committee back then,

2 with the -- in this case, with the faculty member.

3    Q    And what tools was the faculty member given

4 to make a judgment whether a taking was enough, just

5 enough, or might be too much from the standpoint of

6 copyright?

7    A    Again, I just -- I have not really looked

8 at these thoroughly in a -- for quite a long time.

9 My recollection is that we brought up the four

10 factors of fair use and encouraged the -- well, in

11 this case, encouraged the faculty members to consider

12 those four factors.

13    Q    Now, you say you haven't looked at these in

14 quite a while.  It is a fact, isn't it, Mr. Potter,

15 that as part of the recent committee effort and

16 exercise, a number of these examples were revisited?

17    A    By some members of the committee, yes.

18    Q    At whose instance did that occur?

19    A    My recollection is that there were several

20 members of the committee who thought we should look

21 at the examples and consider whether we should use

22 them or not.

23    Q    And did you express a viewpoint on that?

24    A    I don't recall that I did, no.

25    Q    Are you aware of whether that exercise went

EXHIBIT 29 - 76

1 forward?

2     A    My recollection is that we did consider
3 including the examples and that we decided not to
4 because we wanted to make the guide -- I'm sorry, the
5 new policy Web site as simple and as short as
6 possible and that we didn't think the -- in the end,
7 did not think the examples were needed.

8     Q    Can you identify the individuals who took a
9 hand at examining some of these examples that appear
10 in the guide and proposed whatever language for the
11 committee's consideration was drafted?

12     A    No, I don't recall.

13     Q    To what degree was this exercise -- did
14 this exercise involve counsel inside the university
15 or outside?

16     A    I don't recall.

17     Q    Why is it, to your recollection, that in a
18 number of the examples that were examined, the answer
19 section was changed from the answers that appear in
20 this guide?

21     A    First, I'm not aware that they were, and
22 second, I don't know.

23         MR. ASKEW:  Mr. Rich, it's about
24     noontime.  Are you about ready to break for
25     lunch?

EXHIBIT 29 - 77

1    MR. RICH:  Sure -- well, okay, if you

2    want to do it early, I guess that's fine.

3    Let's go off the record.

4    THE VIDEOGRAPHER:  Off the record at

5    12 o'clock.

6    (Lunch recess taken.)

7    THE VIDEOGRAPHER:  This is Tape 3.  We

8    are back on the record at 1:05:58.

9    Q    (By Mr. Rich)  Good afternoon.

10   A    Good afternoon.

11   Q    Before the lunch break, we were talking a

12   bit about the scenarios that were depicted in the

13   Regents Guide.  I want to mark two documents now;

14   first, as Potter 3, a January 19, 2009 e-mail from

15   William Potter to Ray Lee and Beth Brigdon.  It

16   doesn't yet bear a production number -- it does here,

17   21037.  And then we'll mark as Exhibit 4 a document

18   bearing production No. 21038 on through 21099, which

19   is a draft which we'll ask the -- draft materials

20   which I'll ask the witness to further identify.

21   (Exhibits 3 and 4 marked for

22   identification.)

23   Q    (By Mr. Rich)  Mr. Potter, do you recognize

24   the document we've marked as Plaintiff's 3?

25   A    Yes.

EXHIBIT 29 - 78

1    Q    And is that an e-mail which you transmitted

2 to the addressees on or about January 19th of this

3 year?

4    A    Yes.

5    Q    It makes reference to a revised version of

6 the text of the Web site in the first sentence.

7 What -- can you describe what that Web site was and

8 what it was intended to do?

9    A    The Web site is the draft of the new policy

10 that we were working on.  We wanted to put -- develop

11 a new policy on copyright and fair use and put it up

12 on this Web site.  And the reference is a reference

13 to that Web site.

14    Q    I take it there were at least several

15 iterations of drafts that the process went through;

16 is that correct?

17    A    Yes.

18    Q    And am I correct that on or about the 19th

19 of January, you are advising Mr. Lee that a revised

20 version of the Web site had been prepared; is that

21 correct?

22    A    Yes.

23    Q    Okay.  And who is Mr. Lee?

24    A    Mr. Lee works in the office of

25 instructional and information technology at the

EXHIBIT 29 - 79

1 University System of Georgia, and he was serving as

2 the Web designer for the Web site.

3    Q    So he was a resource to the copyright

4 committee, correct?

5    A    That's right.

6    Q    And am I correct that Ms. Brigdon was a

7 member of the committee?

8    A    Yes.

9    Q    Okay.  And what's the particular reason

10 that she was copied on this?  Was she also liaising

11 to that technical function?

12    A    Yes.

13    Q    Okay.  And where is she affiliated?

14    A    She is the chief information officer at the

15 Medical College of Georgia.

16    Q    Now, the first sentence of this e-mail, you

17 mentioned that you were appending the 1997

18 guidelines.  Do you see that --

19    A    I see that the --

20    Q    -- the end of the first sentence?

21    A    -- the revised version of the text appends

22 the '97 guidelines.

23    Q    Yes.

24    A    Yes.

25    Q    And why were they appended?

EXHIBIT 29 - 80

1    A    At that point in our deliberations, we were

2 considering including the '97 guidelines as an

3 appendix --

4    Q    I see.

5    A    -- to the new policy.

6    Q    I see.  Now, here you use guidelines rather

7 than guide.  Did you mean to use those

8 interchangeably?

9    A    Yes.

10    Q    Now, if you'd look at Plaintiff's 4, the

11 next document we've marked, do you recognize this to

12 be the next iteration of Web site text that

13 accompanied or was at least referenced in Plaintiff's

14 3?  Take your time looking through it.

15    A    Yeah, I'm trying to find something that

16 would tell me that.

17    Q    What I can report to you is that it's

18 sequentially numbered in the production made by

19 counsel in this case.

20        MR. ASKEW:  I don't know that just

21     because it was sequentially numbered by us,

22     that it has any --

23        MR. RICH:  I'm asking --

24        MR. ASKEW:  -- that it has any

25     significance, so...

EXHIBIT 29 - 81

 1          THE WITNESS:  I can say it was

 2      certainly a -- an -- one draft in the

 3      iteration, but I can't tell you exactly

 4      where it stood in that --

 5          MR. RICH:  Okay.

 6          THE WITNESS:  -- in that process.

 7      Q    (By Mr. Rich)  That's fine.  And as a

 8  general matter, who physically prepared the various

 9  drafts that the committee considered?

10      A    I believe it started -- I'm trying to

11  remember now how we did this.  It was done by

12  counsel.

13      Q    And how many members of the committee were

14  active in offering amendments to language or, you

15  know, de novo drafting of language?

16      A    Well, I would say they were all active,

17  some of them more active than others.

18      Q    Including in the drafting?

19      A    Yes.

20      Q    And were you personally involved in any of

21  the drafting?

22      A    I'm trying to remember if I did much,

23  not -- no.  I -- not really.

24      Q    Now, were the materials that are reflected

25  in Plaintiff's Exhibit 4 made available to the entire

EXHIBIT 29 - 82

1 committee at some point?

2    A    Yes.

3    Q    And how were committee members able to

4 comment on it?  What was the process?

5    A    Well, there were several stages and steps

6 in this.  They commented either by making remarks to

7 the listserv, but most of the comments were done in

8 face-to-face -- in the face-to-face meetings we held.

9    Q    Okay, we'll come back to that a little bit

10 later.  I want to turn your attention, please, to

11 Bates page No. 21051.

12    A    21051?

13    Q    Yes.

14    A    Okay.

15    Q    And that page is headed "Copyright

16 Scenarios."  Do you see that?

17    A    Yes.

18    Q    Does this refresh your recollection, back

19 to before lunch, that there came a time during the

20 process when at least portions of the section of the

21 1997 guidelines that we were looking at before lunch,

22 Part 2, there were sections that were revisited at

23 this stage of the committee process?

24    A    My recollection is that there was some

25 thought by some of the committee members that we

EXHIBIT 29 - 83

1 should have examples in the new policy, and that a

2 good starting place for those examples would be the

3 '97 guide, and that those examples were picked up and

4 sort of reformatted for our consideration. That's my

5 recollection of it.

6     Q    And when you say "reformatted," you mean

7 simply as a matter of technical presentation?

8     A    That was -- my understanding was technical

9 presentation and maybe changing a few words, but I

10 don't think there was substantive change made at that

11 point.

12     Q    Do you remember who did the physical

13 editing and reformatting from the examples listed in

14 the '97 guidelines to what appears in the document

15 that's Plaintiff's 4?

16     A    It was done by counsel.

17     Q    By counsel?

18     A    Is that the right way to say --

19     Q    Absolutely.

20     Were there one or more committee conference

21 calls and/or meetings at which this section of this

22 draft was discussed?

23     A    There was one at least where it was

24 discussed.

25     Q    Was that a meeting or a conference call?

EXHIBIT 29 - 84

1    A    That was a meeting.

2    Q    And was a result of that meeting a decision

3 to not use in the final policy these scenarios?

4    A    Yes.

5    Q    And to the extent it won't intrude on

6 attorney-client privileged communications, could you

7 explain the rationale for that decision?

8    A    Yes.  The sense of the committee, as I

9 recall it, was that we wanted to make the policy as

10 succinct as we could and that the examples didn't

11 lend -- didn't help in that regard, but also, that we

12 didn't think they served -- didn't think they served

13 a purpose at that point.  We just didn't think they

14 were needed.

15    Q    I take it that prior to the final approval

16 by the chancellor of the committee's work product,

17 you determined to circulate the final draft to a

18 group whose acronym is RACL; is that correct?

19    A    Yes.

20    Q    And what is RACL?

21    A    Stands for the Regents Academic Committee

22 on Libraries, and it consists of the 35 library

23 directors of the 35 institutions of the University

24 System of Georgia.

25    Q    And I take it that at least one response

EXHIBIT 29 - 85

1 you received indicated that that individual had found

2 the examples that exist in the 1997 guides to be

3 useful, correct?

4     A     That's right.

5     Q     Did you receive other such feedback?

6     A     No, I don't think so.

7     Q     Was the view of the committee unanimous

8 that the new policy document was better and more

9 effective without examples than with examples?

10    A     I can't say it was unanimous.  It certainly

11 was the consensus of the group.

12    Q     Was that your personal view as well?

13    A     Yes.

14    Q     And so to the extent the 1997 guidelines

15 were to remain available in some form as a resource

16 to the University System of Georgia, would you

17 recommend that their section with the examples be

18 elided from those?

19          MR. ASKEW:  I'm going to object to the

20     form of that question.  I think it might

21     assume facts that I don't think are in

22     evidence, which is that it's to be

23     available to the research -- university

24     community as a resource.  I don't think

25     there's been any evidence of that.

EXHIBIT 29 - 86

1      MR. RICH:  That it will be made

2   available?

3      MR. ASKEW:  No, that --

4      MR. RICH:  Pardon me.

5      MR. ASKEW:  I think your question

6   assumed that the '97 guidelines were going

7   to be available to the university community

8   as a resource --

9      MR. RICH:  I was --

10      MR. ASKEW:  -- assumed that.

11      MR. RICH:  Thank you.  I was picking

12   up on what I understood the witness's view,

13   which is he said earlier, "I think it might

14   be useful to archive it," or something to

15   that effect.  And I assumed, therefore,

16   there might be some accessibility to it.

17      THE WITNESS:  Yes, we would -- my

18   view, again, as a librarian, and I think

19   other librarians would agree, we need to

20   archive it as a -- for nothing else, as a

21   historical document.

22   Q   (By Mr. Rich)  And would it be an archive

23 which, in your view, would -- should be accessible to

24 the members of the university community?

25   A   Accessible, yes.

EXHIBIT 29 - 87

1    Q    Yes.

2    A    As I said before, with a note that explains
3 what it is.

4    Q    Yes.  I don't see, in any of the newly
5 enacted policy documents, any explicit reference
6 whatsoever to the new 1997 guidelines.  Am I correct
7 about that?

8    A    I expect you are.  I'm not -- I'd have to
9 go back and look again.

10    Q    It's almost as if they never existed.  Was
11 that a deliberate decision not to make any reference
12 to a document that governed or at least provided the
13 only existing university-wide copyright guidance for
14 12 years, not to even reference them?

15    A    Was it deliberate, was that your question?

16    Q    Yes.

17    A    Yes.

18    Q    And the reason not even to mention them
19 was?

20    A    I think it's -- my understanding of
21 practice when you create a new policy is you -- you
22 supercede what was there before.  Even if what was
23 there before was not a policy, you want to keep this
24 as simple as possible and have the new policy stand
25 by itself.

EXHIBIT 29 - 88

1    Q    If you would, pull out, if you have it

2 handy, the Regents Guide.  I think that was our

3 second exhibit.

4    A    It was 2?

5    Q    Two.

6    A    Yeah.

7    Q    At the beginning of part 2, please.

8    A    What page is that?

9    Q    I've got to find the right version.  It may

10 be page 9 or so.  Page 10.

11    A    Okay.

12    Q    And if you would read to yourself the

13 answer to Scenario A, the one we discussed about the

14 poems, that's provided at page 10 and then compare

15 the answer to that which is provided at page 14 of

16 Plaintiff's 4.  I'd like to ask you a few questions

17 about that.

18    A    Just the answer?

19    Q    Yes.  Well, you can read the whole thing,

20 if you want the content.

21    A    And your question again was?

22    Q    I didn't have a question.  Have you read

23 them both?

24    A    Yes, I have.

25    Q    Do you agree the wording is different?

EXHIBIT 29 - 89

1    A    Yes.

2    Q    And what is your recollection -- again,

3 subject to attorney-client privileged communications,

4 what is your recollection about why the answer

5 provided in the draft materials, which were examined

6 by the more recent committee, differs from the answer

7 in the '97 guide?

8         MR. ASKEW:  I think that question will

9         involve, necessarily, a reference to

10        attorney-client communications in this

11        regard.  And in that respect, I'll instruct

12        the witness not to answer the question.

13   Q    (By Mr. Rich)  Is that consistent with your

14 understanding, sir, that to answer that question

15 would involve revealing attorney-client privileged

16 communications?

17   A    Yes.

18   Q    And if I were to ask you the same -- to

19 undertake the same comparison with respect to what

20 appears as Scenario C on page 15 of Plaintiff's 4,

21 Scenario B -- Scenario D on the same page --

22   A    Scenario?

23   Q    D.

24   A    I've lost track.

25   Q    Sorry.

EXHIBIT 29 - 90

1          MR. ASKEW:  Which exhibit --

2          MR. RICH:  What I'm trying to do in

3     shorthand, Tony, not to belabor this, is

4     we --

5     Q    (By Mr. Rich)  I've done a comparison, and

6 what I'm about to read you are those areas where

7 there is at least some degree of difference in the

8 proposed response from the identical scenario in the

9 guides.  And I was going to ask you -- if I were to

10 ask you what accounts for those, if your answer would

11 be the same in each case, namely based on privileged

12 communications with counsel.  I just want to

13 short-circuit it, or if there are any as to which you

14 have independent knowledge or information.

15          MR. ASKEW:  I believe his answer in

16     each case is going to be based on advice

17     he's received from counsel and would be

18     privileged.

19          MR. RICH:  Let's go through and make

20     sure that he agrees as I identify them,

21     okay?  Again, we won't belabor --

22          MR. ASKEW:  Which page are you

23     referring to now?

24          MR. RICH:  So the next scenario is

25     Scenario B on page 14.

EXHIBIT 29 - 91

```
 1          MR. ASKEW:  In Exhibit --

 2          MR. RICH:  I'm sorry.

 3          MR. ASKEW:  Exhibit 4 or Exhibit 2?

 4          MR. RICH:  We're looking at Exhibit 4.

 5     We covered A.  Don't focus on B.  Go to

 6     Scenario C on page 15.

 7          THE WITNESS:  Of Exhibit 4?

 8          MR. RICH:  Of Exhibit 4.

 9          THE WITNESS:  Okay.

10          MR. RICH:  The out-of-print book

11     scenario.

12          THE WITNESS:  Okay.

13     Q    (By Mr. Rich)  And again, keep in mind that

14 my question to you would be -- comparing the answers

15 here to the prior guide, I'll represent to you that

16 there are some references in the proposed response.

17 And If I were to ask you what your understanding is

18 as to the basis of those, what I'm trying to

19 understand is whether you would give me the same

20 answer as you gave me to Scenario A, namely to answer

21 my question would involve disclosing privileged

22 advice.

23     A    I'm looking for the same scenario in the

24 other --

25     Q    Okay.
```

EXHIBIT 29 - 92

1    A    -- in Exhibit 2.

2    Q    Let me help you with that.  It would be

3 page 12 at the top.  Do you see that?  No, I'm sorry,

4 I'm mistaken.  Hold on.  It's page 11, No. 4, in the

5 1997 guide, out-of-print book.

6    A    Is your question are they different?

7    Q    No.  My --

8    A    You just want me to read it?

9    Q    I will -- again, I'm happy to have you read

10 it and give me your view whether there is a different

11 answer, if you'd like.

12    A    No, I'm fine.

13    Q    It appears to me there is a different

14 answer, and I can save you the trouble, if you want.

15    A    Okay, that's fine.

16    Q    My question to you is whether you're able

17 to testify as to the reason that a different answer

18 was proposed for the out-of-print book, Scenario C,

19 without breaching attorney-client privileged

20 communications?

21    A    No.

22    Q    And same exercise, now moving down page 15,

23 "Printed Material, Journal Article for Classroom

24 Use," the analog appears at page 12 of the 1997

25 guide.

EXHIBIT 29 - 93

1      A     Same answer.

2      Q     And if you would move to, now, page 16 of

3 Exhibit 4, labeled "Coursepacks," and compare that to

4 No. 3 on page 12 of the Regent Guide, same question.

5      A     Same answer.

6      Q     If you look at page 12, with respect to

7 coursepacks, the hypothetical presented was that,

8 "A professor copies excerpts of documents, including

9 copyrighted textbooks and journals, from various

10 sources.  The professor plans to distribute the

11 materials to his class as a coursepack."

12            The answer given there was, "One must do

13 the fair use analysis.  If the use of each excerpt

14 complies with the fair use criteria, then use of the

15 coursepack is a fair use.  The inclusion of the

16 excerpts in a coursepack will not change a fair use

17 to an infringing use."  Do you see that?

18      A     Yes.

19      Q     Is that a topic which the newly constituted

20 copyright committee considered as part of its

21 deliberations, namely the impact, if any, on a fair

22 use analysis of whether a coursepack is being created

23 as part of the use of copyrighted materials?

24            MR. ASKEW:  He's just asking you yes

25      or no, was it considered.  You can answer

EXHIBIT 29 - 94

1     that yes or no.

2          THE WITNESS:  No.

3     Q    (By Mr. Rich)  Is it your understanding

4 that any different viewpoint is articulated in any

5 aspect of the final version of the policy documents

6 that have been created by the copyright committee?

7          MR. ASKEW:  If he's received advice in

8          that regard, I would submit that as

9          privileged and I instruct him not to answer

10         the question.

11    Q    (By Mr. Rich)  Do you have a view as to how

12 a faculty member proposing to generate a coursepack

13 in electronic form or the electronic equivalent --

14 strike that.

15         Do you have a view as to how a member of

16 the faculty intending to create an electronic analog

17 to a coursepack by taking multiple excerpts from

18 copyrighted works and creating course reading

19 materials, do you believe that the newly revised

20 policy statement gives copyright guidance to that

21 professor as to what to do?

22         MR. ASKEW:  I believe that's going to

23         involve advice of counsel, Mr. Rich, and so

24         therefore I'll instruct the witness not to

25         answer that question.

EXHIBIT 29 - 95

1          MR. RICH:  That I don't quite

2     understand, respectfully.  I'm asking him

3     if the face of the document, if anybody --

4     if a faculty member can infer from any of

5     the contents that provides any guidance to

6     the faculty member with respect to

7     coursepack practices.

8          MR. ASKEW:  Well, your question

9     involved a lot more than that, that is this

10    concept of some sort of an electronic

11    analog of a coursepack.

12         MR. RICH:  Okay.  Well, I --

13         MR. ASKEW:  You had included in that

14    question a lot of assumptions that I don't

15    think --

16         MR. RICH:  All right.

17         MR. ASKEW:  -- this witness is

18    prepared to make.

19         MR. RICH:  All right.  Let me break it

20    down, then.

21     Q   (By Mr. Rich)  What is your conception of a

22 coursepack?

23     A   I have to say that I don't know enough

24 about coursepacks to answer that adequately.  I don't

25 use coursepacks, I don't produce coursepacks, I've

EXHIBIT 29 - 96

1 never taught a course, I've never been a student that

2 uses coursepacks, I've never advised faculty on a

3 coursepack.  I really don't know.

4     Q    Do you have a concept of what an anthology

5 entails?

6     A    Yes.

7     Q    What is that?

8     A    Anthology is a published work consisting of

9 selected essay, short stories, other works that have

10 been assembled and published with permissions.

11    Q    Okay.  Are you familiar with the practice

12 on a number of university campuses where a professor

13 assembles excerpts of copyrighted materials and

14 assembles them physically into a bound collection of

15 material, brings them to a copy center on or off

16 campus, and makes those works available to his or her

17 students?

18    A    I'm aware that it is done.  I'm not

19 familiar with how it's done or what the details are.

20    Q    Within the University of Georgia copyright

21 policies, would that practice, in your -- to your

22 knowledge and in your experience, warrant securing

23 permissions fees from the publishers of the various

24 copyrighted works involved?

25         MR. ASKEW:  I'm going to object to the

EXHIBIT 29 - 97

1      question.  You want to put a time limit on

2      that?  You're talking about currently

3      today, you're talking about --

4          MR. RICH:  Let's start with today.

5          THE WITNESS:  I don't know.

6      Q   (By Mr. Rich)  Is that something you've not

7  given thought to?

8      A   No, I've not given thought to it.

9      Q   And is it something that you have any idea

10 as to what the practice, in fact, has been at the

11 University of Georgia?

12         MR. ASKEW:  By "has been," you're

13     meaning when?

14         MR. RICH:  At any point in time during

15     your tenure as university librarian.

16         MR. ASKEW:  Including today?

17         MR. RICH:  Yes.

18         THE WITNESS:  No.

19     Q   (By Mr. Rich)  To your understanding, do

20 the new policy guides, which have just been

21 promulgated, give any guidance to a professor with

22 respect to the copyright implications, if any, of

23 assembling multiple excerpts of multiple copyrighted

24 works as part of a course offering to his or her

25 students?

EXHIBIT 29 - 98

1    A   Yes.

2    Q   All right.  When we get to -- and what is

3 that guidance, or do you need physically a copy of

4 the document in front of you to answer that?

5    A   No, I think I can answer it.  It's the --

6 the four-factor checklist is what I would expect the

7 faculty member would use in that situation.

8    Q   And am I -- tell me if I'm interpreting

9 your answer correctly or not.  I understand -- we'll

10 go back through this later.  I understand that that

11 checklist is to be applied with respect to each

12 discrete copyrighted excerpt proposed to be used.  Is

13 that correct?

14    A   Yes.

15    Q   Okay.  Are you saying that in addition, a

16 further and separate fair use analysis must be

17 conducted to determine whether the collection of the

18 individual excerpts as a grouping also meet the fair

19 use test?

20    A   I've never thought about that.

21    Q   I take it, then, that wasn't a subject of

22 discussion of the committee?

23    A   Not to my recollection.

24    Q   To the extent that the proposed answers to

25 certain of the scenarios that appear in Plaintiff's

EXHIBIT 29 - 99

1 Exhibit 4 differ from the answers provided in the

2 Regent Guide, why wouldn't it make more sense, if

3 that Regent Guide is to be made available in some

4 fashion as an ongoing resource to the community, to

5 update the answers to be consistent with the proposed

6 revised answers that appeared in this document?

7     A     Because we don't intend to put it up as an

8 ongoing resource; we would put it up as an artifact,

9 as an archival artifact.

10     Q     Would you then put a warning notice on it

11 saying words to the effect, "Warning, the advice

12 contained in this document is not to be relied upon"?

13     A     I doubt that we would go that far.  It

14 would just say that it's -- these are the 1997

15 guide -- this is the 1997 guide, and it is now

16 superseded by the 2009 policy.

17     Q     If you would turn to --

18           (Discussion off the record.)

19     Q     (By Mr. Rich)  Yeah, if you would look at

20 your page 12, please.

21     A     In which?

22     Q     I'm sorry, in the Regent Guide.

23     A     Exhibit 2, okay.

24     Q     Uh-huh.

25     A     Page 12?

EXHIBIT 29 - 100

1  Q    Yes.  One of the scenarios labeled

2 Scenario E deals with the circumstance in which a

3 professor copies one article from a periodical for

4 distribution to the class and the question is, "Is

5 this fair use?"  The answer is, "Yes.  Distribution

6 of multiple copies for classroom use is a fair use."

7        With reference to what is contemplated by

8 the new policy, would your understanding be that it

9 would be a proper application of fair use principles

10 to allow that professor to make such a copy for

11 distribution to the class?

12  A    Under the new policy, what we would ask the

13 professor to do is to complete the fair use checklist

14 for that.

15  Q    Can you contemplate circumstances in which

16 undertaking that analysis, a professor would

17 reasonably conclude that it was excessive, that it

18 was not fair use to provide one copy -- a copy of one

19 article from a periodical to his class?

20  A    I cannot think of a concrete example, but I

21 would not rule out the possibility that that might

22 happen.

23  Q    And as to the subject of how many different

24 articles from a periodical a professor could provide

25 to her class without paying a permissions fee, what

EXHIBIT 29 - 101

1 is your understanding of how that process should go

2 forward?

3          So I'm the professor now and I've got 10

4 different works I'm intending to utilize in this

5 fashion.  Under the current new process, what do I

6 need to do?

7     A    Ten different works?

8     Q    Yes.

9     A    You would need to complete the checklist

10 for every work, for every article or chapter or

11 whatever you're talking about.

12    Q    And once again, you at least have not given

13 any thought to -- and the policy document makes no

14 reference to whether the fact that this cumulates to

15 10 works or 15 works or 20 works or perhaps more

16 works is not itself an element of the fair use

17 analysis, at least as you've thought about it?

18    A    No.  I mean, I can think about it now, if

19 you want, but no.

20    Q    Well, you're welcome to, but I don't know

21 your counsel would find that productive for you to

22 spontaneously think about it, although I welcome any

23 thoughts you may have.

24    A    No.

25    Q    Looking down on that same page of Exhibit 2

EXHIBIT 29 - 102

1  under "Coursepacks," do I understand you to be saying

2  that although this phraseology was contained in the

3  1997 guide, which was the product of a committee

4  which you chaired, you did not then have and still

5  don't have any understanding of a coursepack?

6       A    Yes.

7       Q    And in the answer under Scenario G, the

8  second (sic) sentence says, "The inclusion of the

9  excerpts in a coursepack will not change a fair use

10  to an infringing use."

11          Do you -- do you agree with that

12  conclusion, or do you have no opinion as to that

13  conclusion currently?

14      A    I don't have a -- do not have an opinion.

15      Q    Sitting here today, do you feel that's a

16  subject which your committee might properly want to

17  give further consideration to?

18      A    No.

19      Q    You feel it's irrelevant to the fair use

20  analysis?

21      A    Yes.

22      Q    If you would turn, please, to page 22 of

23  the -- of Exhibit 2, labeled "Electronic Course

24  Reserves."

25      A    Okay.

EXHIBIT 29 - 103

1    Q    There the question was posed as of 1997, "A

2 professor wants to add a book chapter to the

3 library's electronic reserve system."  Question, "Is

4 this a fair use?"  Answer, "Yes.  The chapter may be

5 added if access to the system is limited to students

6 enrolled in the class."  Do you see that?

7    A    Yes.

8    Q    What would the answer be under the current

9 policy?

10    A    Under the current policy, the answer would

11 be to apply the four-factor test and make a

12 case-by-case determination.

13    Q    And if the professor under the new policy

14 proposed to use two chapters from a given book, same

15 answer?

16    A    Yes.

17    Q    Three chapters?

18    A    Yes.

19    Q    All but the last chapter of the book?

20    A    Yes.

21    Q    The entire book?

22    A    Yes.

23    Q    So there are circumstances in which it

24 would still conceivably be a fair use to use the

25 entire book as part of an E-Reserve course offering?

EXHIBIT 29 - 104

1  A  Again, I cannot imagine a concrete example

2 that would be the case unless it was something out of

3 copyright or -- but the point of applying the fair

4 use test is to determine just that, determine whether

5 it's -- apply the four factors and discover if it is

6 an infringing use or a fair use.

7  Q  Well, the point of my question -- maybe

8 wasn't clear enough -- was slightly different.  It

9 wasn't simply to elicit the answer, which is to get

10 to the answer, you apply the factor; but, rather,

11 whether there are any normative expectations built

12 into the new policy statements that there are certain

13 activities which presumptively, if not conclusively,

14 exceed fair use, for the -- for example, use of an

15 entire copyrighted work as part of E-Reserves.

16  A  That would certainly be my interpretation

17 and my expectation, that using an entire work would

18 be -- would not be permissible.  And I think that's

19 the thrust of the -- certainly I think that's what

20 the policy would lead you to conclude.

21    But again, I guess I -- what I'm

22 uncomfortable doing is ruling out completely the

23 possibility that it might be fair use.  There might

24 be something I'm not imagining where if you applied

25 the four-factor test, you would find, well, yeah, you

EXHIBIT 29 - 105

1 could do it.  I can't -- again, I can't imagine it.

2          (Discussion off the record.)

3     Q    (By Mr. Rich)  Why was it determined to

4 convene a new committee to examine copyright

5 compliance issues on a system-wide basis?

6     A    I don't know.  Because I was not party to

7 the conversations, I don't know exactly what was -- I

8 was -- I --

9          THE WITNESS:  Can I talk about the

10     e-mail from -- can I talk about the

11     communication I had with Burns?

12         MR. ASKEW:  Well, not with -- Burns

13     Newsome is counsel to the --

14         THE WITNESS:  So, I mean --

15         MR. ASKEW:  -- Board of Regents.  I

16     would instruct you not to discuss

17     conversations you had with counsel for

18     Board of Regents.  That would be

19     privileged.

20         THE WITNESS:  So I think all I can

21     discuss is what the chancellor said in his

22     letter charging me and the committee.

23     Q    (By Mr. Rich)  So I understand it, your

24 knowledge of the purpose of this new committee came

25 from one or more discussions with Mr. Newsome?

EXHIBIT 29 - 106

1   A   Not a discussion, no, from an e-mail.

2   Q   Simply an e-mail --

3   A   Yeah.

4   Q   -- from Mr. Newsome?  And for the record,

5 can you identify who Mr. Newsome is?

6   A   Mr. Newsome is the vice chancellor of legal

7 affairs.

8   Q   And what relationship did you come to

9 understand the process of invoking the new committee

10 had to the pending litigation?

11   A   My understanding is that there was a

12 recognition that the guideline -- the guide was 12

13 years old, and that given that it was 12 years old

14 and given that there had been the suit filed, maybe

15 it was time to take a look at the guide and consider

16 revising it.

17        My take on it, though, was not that it was

18 in response to the suit, it was more a recognition of

19 the fact that the suit made some people realize that,

20 hey, we'd better take a look at these guides, that

21 it's possible after 12 years, they need to be

22 revised, replaced, or whatever.  But I never got the

23 sense that we were formed in response to the suit.

24   Q   Is it accurate that one of the motivating

25 factors was concern that without updated policies

EXHIBIT 29 - 107

1 uniformly applied, the potential for copyright

2 infringement on one or more campuses was unacceptably

3 high?

4      MR. ASKEW:  I would caution you in

5    that regard to not reveal any conversations

6    that you might have had with counsel about

7    that subject.  You can answer otherwise,

8    that's fine, but if your answer would be

9    based on advice you received from counsel,

10    then I would instruct you not to answer

11    it.

12    THE WITNESS:  I have to think about

13    that.  Just to be perfectly clear, could

14    you just repeat it again?

15    MR. RICH:  Could you read it back,

16    please?

17    (Record read.)

18    THE WITNESS:  No, that's not my

19    understanding.

20    Q  (By Mr. Rich)  Did you come into this

21 process, namely assuming chair of this effort, with

22 any understanding whether, as a matter of ongoing

23 practice, one or more campuses was infringing

24 copyrights of book publishers, among others?

25    MR. ASKEW:  I would instruct the

EXHIBIT 29 - 108

1   witness not to answer that question if it

2   is, in fact -- any answer you might provide

3   would be based on advice you would have

4   received from counsel.

5        MR. RICH:  It could have been -- if I

6   may, it could have been informed by reading

7   press, reading other people's points of

8   views, library communication blog, library

9   industry blogs.

10       MR. ASKEW:  I have cautioned him that

11  if his answer is based on the advice he

12  received from counsel, I would instruct him

13  not to answer based on that advice.

14       THE WITNESS:  And I think I can answer

15  it.  No.

16       MR. RICH:  Pardon me?

17       THE WITNESS:  No.

18       MR. RICH:  You can't answer it?

19       THE WITNESS:  No, the answer is no.

20       MR. RICH:  The answer is no.

21    Q    (By Mr. Rich)  Now, you indicated that, to

22  the best of your recollection, the process that led

23  to the Regents Guide took seven or eight or maybe

24  nine months, I forget exactly, something in that

25  range, this morning, correct?

EXHIBIT 29 - 109

1    A    Correct.

2    Q    This process was concluded roughly

3 between the time of the first committee meeting on

4 December 3rd, within about a 60-day frame, by

5 February 3rd, I believe it was approved.  Is that

6 about right?

7    A    I thought it was more like 90 days from the

8 point of the -- point the committee was formed.

9    Q    Do you recall when the first committee

10 meeting was held?

11    A    It was held in the first week of December.

12    Q    Yes.  And do you remember when the

13 committee voted to approve the final version?

14    A    It was probably the 2nd or 3rd of February.

15    Q    Yeah.  And what occurred between the --

16 substantively occurred between the formulation of the

17 committee and its first meeting in terms of any

18 substantive work on revisions?

19    A    There was a listserv established, and

20 documents were distributed so people could start

21 thinking about it, planning, and then there were a

22 lot of logistics.

23    Q    Is it accurate to say that substantive

24 discussions with and between committee members

25 and counsel occurred roughly in the period from

EXHIBIT 29 - 110

1 December 3rd to February 3rd?

2      A    Yes.

3      Q    Two months?

4      A    Yes.

5      Q    Is it also accurate that you were

6 personally under and the committee was under intense

7 pressure to get the product finalized in -- by the

8 end of January?

9      A    No.

10     Q    Doesn't ring a bell with you?

11     A    Intense pressure, no.

12     Q    Did you have any guideline or deadline by

13 which the work product of the committee was to be

14 finalized?

15     A    No.

16     Q    Let's pull out some documents.

17          (Discussion off the record.)

18          MR. RICH:  We'll mark as Plaintiff's 5

19          a January 8, 2009 e-mail from Beth Brigdon

20          to William Potter and Ray Lee bearing Bates

21          Nos. 20797 through 20798.

22          (Discussion off the record.)

23          (Exhibit 5 marked for identification.)

24     Q    (By Mr. Rich)  Do you recall seeing this

25 e-mail previously?

EXHIBIT 29 - 111

1    A    Yes.

2    Q    And we've identified Ms. Brigdon as one of

3 the committee members, correct?

4    A    Yes.

5    Q    And Mr. Lee as one of the people involved

6 in building or populating the Web site that would

7 hold the final content, correct?

8    A    Yes.

9    Q    And Ms. Brigdon was centrally involved in

10 the committee efforts?

11    A    Yes.

12    Q    Okay.  She was knowledgeable about the

13 charge of the committee and so forth?

14    A    Yes.

15    Q    Okay.  Now, if you look at the third

16 paragraph, it says, "Your team's help will be

17 critical in meeting the deadline we've been given

18 (the end of Jan to have the site ready including

19 content)."  Do you see that?

20    A    Yes.

21    Q    To what was she referring?

22    A    She was referring to the committee's

23 expectation that we would have this wrapped up by the

24 end of January.

25    Q    And that was -- and was it simply the

EXHIBIT 29 - 112

1 committee's own judgment the timetable on which this

2 project should be finished?

3    A    I would say it's the timetable that I

4 established for the committee.

5    Q    And --

6    A    Can I confer with him at all?

7    Q    Surely.

8         MR. ASKEW:  Let's step outside for a

9    second.

10        THE VIDEOGRAPHER:  Off the record at

11   1:56:27.

12        (Recess taken.)

13        THE VIDEOGRAPHER:  This is Tape 4.  We

14   are back on the record at 2:07:29.

15        MR. RICH:  Madam Reporter, could you

16   read back the last question and answer,

17   please?

18        (Record read.)

19    Q    (By Mr. Rich)  Having had a chance to

20 confer with counsel, did you wish to supplement this

21 or any of the other recent answers?

22    A    No.

23    Q    Now, if you'd look at Plaintiff's 5, which

24 should be still in front of you, toward the bottom,

25 at the end of the penultimate paragraph, Ms. Brigdon

EXHIBIT 29 - 113

1 writes, "This will be used in legal proceedings and

2 is extremely sensitive."  Do you see that?

3     A    Yes.

4     Q    What do you understand she meant by that?

5     A    You would have to ask her what she meant by

6 it.  I can speculate.

7     Q    No, I don't want you -- I want to know if

8 you have any understanding, based on your work with

9 her, the committee's work, any discussions that

10 occurred over 60 or 90 days, if you have any

11 understanding of what she meant there.  Does that

12 statement come as a surprise to you?

13    A    No.  I think within the committee's

14 discussion, there certainly was an awareness that

15 this lawsuit was pending or in process or whatever

16 you want to call it, and that what we did as a

17 committee would likely be brought up in the

18 proceedings or -- again, I don't know what the exact

19 terms for things are, would be brought up at some

20 point, so that we -- we knew it was a sensitive

21 matter.

22         MR. RICH:  Now, let's mark as

23         Plaintiff's 6 an e-mail dated November 7,

24         2008.  It bears production numbers 020869

25         through 70.  It's from William Potter to

EXHIBIT 29 - 114

1    Beth Brigdon.

2         (Exhibit 6 marked for identification.)

3         MR. ASKEW:  Thank you.

4    Q    (By Mr. Rich)  Do you recognize this

5 exchange of e-mails?

6    A    Yes.

7    Q    Looking at the topmost of the chain, you

8 write to Beth, "As this is evolving, it appears that

9 the best day for us to meet is the 21st," which I

10 gather would be the 21st of November as of that time.

11 Is that correct?

12   A    Yes.

13   Q    "While you cannot make it, any other day

14 would mean that two or more people could not attend.

15 The lawyers are pushing for us to meet before

16 Thanksgiving, so we need to get this moving."  Do you

17 see that?

18   A    Yes.

19   Q    Why were the lawyers pushing for you to

20 meet before Thanksgiving?

21        MR. ASKEW:  Again, I would advise you,

22   Dr. Potter, that in answering this

23   question, you should not reveal any

24   communications or advice that you had with

25   your counsel.  If you can answer it

EXHIBIT 29 - 115

1     otherwise, please do so.

2          THE WITNESS:  I don't believe I can

3     answer that otherwise.

4     Q    (By Mr. Rich)  But you stand by your prior

5  answer that the timing of this entire effort was a

6  function of your own and the committee's own

7  independent judgment independent of the lawyers or

8  the litigation?

9     A    Yes.

10         (Discussion off the record.)

11         MR. RICH:  Let's mark next an

12    October 31, 2008 letter from Erroll B.

13    Davis, Jr. to Dr. William G. Potter, bears

14    production 020828, 020829.

15         (Exhibit 7 marked for identification.)

16    Q    (By Mr. Rich)  Do you recognize this

17 correspondence?

18    A    Yes.

19    Q    Can you identify what it represents,

20 please?

21    A    It represents a letter from the chancellor

22 of University System of Georgia to me asking me to

23 chair this committee.

24    Q    Either before or after receiving this

25 correspondence, did you have any other communications

EXHIBIT 29 - 116

1 with Mr. Davis on this subject?

2    A    No.

3    Q    How was it that Mr. Davis was informed of

4 your willingness to chair the committee; do you know?

5    A    As I mentioned earlier, Mr. Newsome had

6 asked me to chair the committee, had asked me on

7 behalf of the chancellor to chair the committee and I

8 said I would.

9    Q    Now, there are cc's at the bottom of

10 this -- on the second -- the second paragraph says,

11 "I have asked Vice Chancellor Burns Newsome to

12 provide any assistance which the committee may need."

13 Do you see that?

14    A    Yes.

15    Q    Can you describe -- without providing the

16 substance of any advice, can you describe the role

17 that Mr. Newsome played in connection with the

18 committee process?

19    A    He -- he attended the meetings, he

20 served -- I -- I don't want to assume anything.  I'm

21 sorry.  He attended the meetings and to -- and

22 offered his advice as we worked.

23    Q    And by "his advice," you mean legal advice

24 or mixed legal and other advice?

25    A    I would say mixed legal and other.

EXHIBIT 29 - 117

1    Q    And what other perspectives did he bring to

2  the table than legal?

3    A    Oh, I think he knew about the operation of

4  the central office of the University System and could

5  help us there.  He knew how we would -- who we would

6  talk to to get the Web site up and running, things

7  like just the inner workings of the system office.

8    Q    And the letter goes on to indicate that

9  Messrs. Askew and Schaetzel of King & Spalding have

10 been retained to provide legal advice to the

11 committee.  Did that, in fact, occur?

12   A    Yes.

13   Q    And was there a written legal attention

14 between the committee or you, as chair, and King &

15 Spalding?

16   A    No.

17   Q    And did they bill and/or were they

18 compensated for their legal services in connection

19 with this?

20   A    I don't know.

21   Q    Who would know?

22   A    I don't know.  Again, I can assume, but I

23 won't assume.  I don't know.

24   Q    And did one or both of Mr. Askew and

25 Mr. Schaetzel attend every committee meeting?

EXHIBIT 29 - 118

1    A    I believe they were both present at all

2 meetings.

3    Q    How many meetings were there of the

4 committee?

5    A    It was either three or four.

6    Q    We've identified one on December 3rd,

7 correct?

8    A    Uh-huh.

9    Q    Am I correct there was one on or about

10 January 22nd?

11    A    Yes, I believe so.

12    Q    Am I correct there was a conference call on

13 or about January 15th?

14    A    I believe so.

15    Q    Are you aware of other face-to-face

16 meetings?

17    A    I thought there was an earlier -- one

18 earlier in January, but I can't --

19    Q    In addition to the committee members

20 themselves, counsel, Mr. Newsome, and Mr. Lee, who,

21 if anyone else, attended any of the committee

22 meetings?

23        MR. ASKEW:  I'll object to that.  I

24     think you've assumed something that's not

25     in evidence, that is that Mr. Lee attended

EXHIBIT 29 - 119

1    these meetings.

2          MR. RICH:  I believe he said he did.

3          THE WITNESS:  No, no, I didn't --

4          MR. RICH:  Then I misheard you.

5          THE WITNESS:  No, Mr. Lee did not

6    attend.  I have never met Mr. Lee.

7          MR. RICH:  Beg your pardon.

8          THE WITNESS:  My -- I should have --

9          MR. RICH:  I stand corrected.

10    Q   (By Mr. Rich)  And taking Mr. Lee from that

11 list, did anyone else attend any of the committee

12 meetings other than that list of counsel,

13 Mr. Newsome, and committee members?

14    A   Ms. Volkert.

15          MS. VOLKERT:  I'm an attorney.

16          MR. RICH:  That would be included in

17    counsel, yes.

18          THE WITNESS:  I'm sorry.

19    Q   (By Mr. Rich)  Were any other outside

20 advisors, legal, technical, spiritual, or any other,

21 invited to participate at any meetings?

22    A   No.

23    Q   Was there any interaction of any kind with

24 Kenneth Cruz?

25    A   On the part of the committee?

EXHIBIT 29 - 120

1    Q    Yes.

2    A    No.

3    Q    Do you know who Mr. Cruz is?

4    A    Yes.

5    Q    Can you identify him?

6    A    Mr. Cruz is -- I know he worked -- used to

7  work at Indiana University, Purdue University at

8  Indianapolis, and now works at Columbia University.

9  He writes on copyright law and fair use and authored

10 and created sort of what's considered to be sort of

11 the prototypical Web site on fair use at IUPU,

12 IUPU (phonetic), and sort of -- and also at Columbia.

13 I can't speak to his -- specifically to his

14 background.  I just know his name.

15   Q    Did you or did anyone involved in the

16 committee's work, to your knowledge, have any direct

17 communications with representatives of any other

18 institutions of higher education outside of the

19 Georgia University System?

20   A    Yes.

21   Q    Can you identify those communications and

22 who had them?

23   A    It was done by counsel.

24   Q    Who, to your knowledge, did they

25 communicate with?

EXHIBIT 29 - 121

1        THE WITNESS:  Can I answer that?

2        MR. ASKEW:  He's talking about

3    other -- you're talking about other

4    institutions, like other schools?

5        MR. RICH:  Outside of the system.

6        MR. ASKEW:  Are you talking about did

7    we contact Columbia --

8        MR. RICH:  Columbia.

9        MR. ASKEW:  -- Columbia, for instance,

10    to get a copy of their --

11        MR. RICH:  To do whatever, have any

12    contact.

13        MR. ASKEW:  He's talking about just

14    the institutions that you might have

15    contacted as opposed to individuals within

16    the institution.

17        THE WITNESS:  Yes, yes.

18    Q   (By Mr. Rich)  What is your knowledge of

19 who the outreach was to who and by whom?

20        MR. ASKEW:  He would be, again, asking

21    to which institutions.

22        MR. RICH:  For now.

23        THE WITNESS:  It was to Columbia.

24    Q   (By Mr. Rich)  And who had those contacts,

25 to your knowledge?

EXHIBIT 29 - 122

1    A    To my knowledge, it was Mr. Schaetzel.

2    Q    And what was the purpose of those contacts?

3    A    To acquire the latest information that

4 those institutions were using on their Web site and

5 then later to seek permission to use the Columbia

6 site as the basis for our policy site.

7    Q    And was that permission secured?

8    A    My understanding is it was, yes.

9    Q    And did you see one or more exchanges of

10 correspondence or e-mails between Mr. Schaetzel and

11 one or more individuals at Columbia?

12    A    I don't recall ever seeing e-mail exchanges

13 between them, no.

14    Q    How were you informed of the process and

15 the resolution that you just testified to?

16    A    Mr. Schaetzel informed me and informed the

17 committee.

18    Q    And so you've never seen any writings

19 involving communications or embodying communications

20 with Columbia?

21    A    No, not that I'm -- not that I recall, no.

22    Q    Were minutes kept of the committee

23 meetings?

24    A    I kept some notes of committee -- of the

25 meetings.

EXHIBIT 29 - 123

1    Q    Contemporaneous notes taken during the

2 meetings?

3    A    Yes.

4    Q    And do you know if those notes were

5 reviewed as part of the request for document

6 production in this litigation?

7    A    Yes.

8    Q    And is it also the case that in one or more

9 circumstances, you created summaries or recaps of the

10 meetings and sent them to committee members who had

11 not attended?

12    A    I would say those are the same things.

13    Q    Same things?

14    A    Same things.

15    Q    So those were notes --

16    A    That I shared with the entire committee,

17 yes.

18    Q    On how many occasions did you do that, each

19 meeting?

20    A    I don't think I did it each meeting, at

21 least twice.

22    Q    And what level of detail are those notes in

23 terms of who offered what points of view at the

24 meeting?

25    A    Oh, it was very sketchy.  I don't think --

EXHIBIT 29 - 124

1 we never identified -- I never identified

2 individuals.  I only talked about what action we took

3 or what the general topic was.

4     Q    I'm having a little trouble hearing you.

5     A    I'm sorry.  I only talked about what

6 actions or what general topics were discussed, and I

7 think I probably listed who was present and who was

8 not.

9     Q    Did you prepare agendas or did anyone --

10    A    No.

11    Q    -- of the meetings?

12    A    No.

13    Q    Were the meetings transcribed in any way?

14    A    No.

15    Q    Were any formal PowerPoint-type

16 presentations made at any of the meetings?

17    A    I believe -- well, no, we did have a

18 projection of the Web site at one meeting.  When we

19 had the draft Web site, we projected it on a screen

20 so we could all look at it and discuss it.

21    Q    Who selected the members of the more

22 current committee?

23    A    I don't know.

24    Q    Do you know why any of them or all of them

25 were selected in terms of their particular

EXHIBIT 29 - 125

1 backgrounds or --

2    A    No.

3    Q    -- expertise?

4    A    No.

5         MR. RICH:  Let's mark next this one.

6         (Discussion off the record.)

7         MR. RICH:  Let's mark for

8    identification a group of documents, all

9    dated October 31, 2008, reflecting

10   identically worded letters, except for the

11   addressee, from Erroll B. Davis, Jr. to

12   various individuals, Bates Nos. 20830

13   through 20838.

14        (Exhibit 8 marked for identification.)

15   Q    (By Mr. Rich)  Am I correct that these

16 appear to be formal letters of invitation to serve on

17 the University System of Georgia Select Committee on

18 Copyright extended by Mr. Davis?

19   A    Yes.

20   Q    To your knowledge, did everybody accept the

21 assignment?

22   A    To my knowledge, yes.

23   Q    Listed as the first cc on this

24 correspondence, as well as on the prior document, is

25 Senior Vice Chancellor and Chief Academic Officer

EXHIBIT 29 - 126

1 Susan Herbst.

2     A    Yes.

3     Q    Do you know why she was copied on these

4 communications?

5     A    No.

6     Q    Did she have any involvement in this

7 process?

8     A    Not to my knowledge.

9     Q    What is her role as senior vice chancellor

10 and chief academic officer; do you know?

11     A    My understanding is that she advises the

12 chancellor on matters involving academic affairs,

13 academic issues, faculty and faculty issues, library

14 issues and so forth.  She in effect functions as a

15 provost for the University System of Georgia.

16         I also believe that all but the presidents

17 of the four research universities report to her

18 rather than to the chancellor.  That's about the

19 extent of my knowledge.

20     Q    Do you have any knowledge what the stamped

21 "ABA Copy" is a reference to on the front of this

22 first --

23     A    No.

24     Q    Do you know what the "XC: ABA, CMC"

25 handwritten notations are at the bottom left-hand

EXHIBIT 29 - 127

1 corner of this first document?

2     A    No.

3     Q    I do notice that Mr. Askew's middle initial

4 is a B, thanks to my learned colleague to my right

5 here.

6          MR. ASKEW:  Yes.

7          MR. RICH:  Okay.  That mystery may be

8     solved.  And the other, which looks like

9     Cs, may be SMS, I guess.

10         MR. ASKEW:  I think that's S --

11         MR. RICH:  The whole mystery is

12    solved.

13         MR. ASKEW:  That's SMS.

14         MR. RICH:  Very good.  Thank you very

15    much.  Good sleuthing.  Key to the case.

16         THE WITNESS:  What does "ABA" mean?

17    Q    (By Mr. Rich)  Very quickly --

18         THE WITNESS:  Oh, that's him -- that's

19    still you.  Okay, that's your copy, right.

20    Q    (By Mr. Rich)  Very quickly, with respect

21 to each committee member in terms of their

22 credentials, Mr. -- how do you pronounce that,

23 McElwee?

24    A    McElwee.

25    Q    McElwee.  I notice he's designated as

EXHIBIT 29 - 128

1 "General Counsel, The University of Georgia Research

2 Foundation."

3      A      Right.

4      Q      Can you briefly tell me what the University

5 of Georgia Research Foundation is and what it does?

6      A      My knowledge isn't perfect, so don't hold

7 me to it.

8      Q      Yes, of course.

9      A      My understanding is that it is an

10 affiliated foundation of the University of Georgia

11 that handles research monies that come to the

12 university.  So if a faculty member writes a grant,

13 for example, some portion of the grant would go to

14 the Research Foundation.  They also have a corpus of

15 funds that they use to support research on the

16 campus.

17           And they also -- I think probably what's

18 most important for Mr. McElwee is that they hold

19 patents and trademarks and other intellectual

20 property for the university.  So that, for example,

21 if there -- I think some veterinarian at the

22 university came up with some kind of eye drop that

23 prevents dry eyes in animals.  The patent for that is

24 held by the University Georgia of Research

25 Foundation.

EXHIBIT 29 - 129

1    Q    Does Mr. McElwee also have expertise, to

2 your knowledge, in copyright law?

3    A    Broadly speaking, I think he's -- has

4 knowledge of intellectual property issues, and as

5 copyright might pertain to that, yes.

6    Q    Was he an active participating member of

7 the committee?

8    A    He was active, but he missed at least one

9 of the meetings.

10    Q    Dr. Sally Atherton, chair, Department of

11 Cellular Biology and Anatomy at the Medical College

12 of Georgia, is she someone you knew prior to this?

13    A    No.

14    Q    And did she bring a particular perspective

15 or set of perspectives to the committee's work?

16    A    She brought the perspective of a faculty

17 member and that was -- but I can't remember much

18 beyond that.

19    Q    Cynthia Hall, I believe, is with us today.

20 And how would you describe the role Ms. Hall played

21 in the process?

22    A    She provided us with background on

23 intellectual property and copyright fair use issues

24 as she understood them as an attorney.

25    Q    Are you aware of that at least once in

EXHIBIT 29 - 130

1  January and once in February, Ms. Hall prepared and

2  perhaps presented some PowerPoints providing an

3  overview of copyright compliance issues?  Did you

4  ever see those documents?

5      A    No.

6      Q    Were you aware that they were prepared?

7      A    No.

8      Q    Do you have any idea whether Ms. Hall made

9  any presentations in relation to those documents in

10  the January/February period to any unit of the

11  University System of Georgia?

12      A    No.

13      Q    Dr. Tyanna K. Herrington, associate

14  professor, School of Literature, Communication, and

15  Culture, Georgia Institute of Technology, similar

16  question:  Dr. Herrington bring any particular

17  perspectives as opposed to simply a faculty member?

18      A    Her primary role was as a faculty member to

19  talk -- to bring the perspective of someone who

20  actually uses copyrighted material in the classroom

21  environment.  She also had knowledge of the use of

22  technology from the standpoint of a humanities

23  professor, which was quite useful to us.

24      Q    Next is Nancy Seamans, dean of libraries at

25  Georgia State University, and I think it would be

EXHIBIT 29 - 131

1 self-evident why she would have participated.  How

2 active a committee of the committee was she?

3    A    She was present at all the meetings and she

4 arranged parking.

5    Q    That would be --

6    A    Invaluable.

7    Q    That was the dominant production made from

8 your counsel to us, was securing parking spots.

9         Then there's you, of course.  And then

10 there's Marie Lassiter, project manager for

11 Learning Resource Management, Office of Information &

12 and Instructional Technology, Board of Regents of the

13 University System of Georgia.  Was she an active

14 participant?

15    A    Yes.

16    Q    And what contributions in particular did

17 she make?

18    A    Her concerns were with technology and then

19 also with distance education issues that might arise.

20    Q    So give me an example of the technology

21 interest that would bear on work of the committee.

22    A    Well, if -- if we were going to -- if the

23 University System is offering classes in a remote

24 environment, distant education environment where

25 there would be students at spots around the state,

EXHIBIT 29 - 132

1 her expertise was in how that process was managed and

2 how we might support that.

3    Q    Dr. Teresa Joyce, associate provost,

4 Office of Academic Affairs, Kennesaw State

5 University, did she bring any particular perspectives

6 or expertise to the process?

7    A    She was an active member.  I would say she

8 functioned more as a faculty member.  I know she

9 holds an associate provost title, but I think -- I

10 saw her more as a representative of faculty.

11    Q    What are her fields of teaching?

12    A    I don't know.

13    Q    Don't know.  And we earlier discussed

14 Ms. Brigdon, I guess --

15    A    Uh-huh.

16    Q    -- who I take it was an active member and

17 an important liaison on technology issues.  Did she

18 make additional contributions to the committee?

19    A    I would say her chief contribution was she

20 had worked in the central office in the past, and she

21 was the one who knew Mr. Lee and knew Mr. Lee was the

22 one to go to get this -- get the Web site up and

23 running quickly, knew who to talk to, how to get it

24 done.  That, I think, was -- it was her chief

25 contribution.

EXHIBIT 29 - 133

1    Q    Does she teach, as well, to your knowledge?

2    A    I don't believe so.

3         MR. RICH:  Let's mark next a document

4    dated November 5, 2008 from Mr. McElwee to

5    Mr. Potter, part of an e-mail chain bearing

6    Bates No. 21031 to 21032.

7         (Exhibit 9 marked for identification.)

8    Q    (By Mr. Rich)  Looking at the next -- the

9 November 4 e-mail to what looks like each of the

10 committees from you --

11   A    Uh-huh.

12   Q    -- do you recall transmitting that e-mail?

13   A    The attached e-mail?

14   Q    Yes.

15   A    Yes.

16   Q    This was your introductory message to

17 committee members?

18   A    Yes.

19   Q    And you reference a statement from

20 Mr. Newsome that's in -- that is excerpted in

21 italics.

22   A    Yes.

23   Q    How long was the message to you in its

24 entirety?

25   A    As I recall, that was the e-mail that he

EXHIBIT 29 - 134

1 sent informing me that the chancellor wanted to

2 create the committee and asked me to -- and wanted me

3 to chair it.  So there was a section ahead of this

4 that talked about that, or maybe below.  I'm not sure

5 where it was in the e-mail.  And then also -- I would

6 say maybe half -- this represents maybe half of the

7 message.

8      Q    And what did the balance of the message

9 have to say?

10     A    Like I said, just more saying that the

11 chancellor wanted to create this committee, and if I

12 was willing to do it, they would be in touch.

13     Q    Did you retain a copy of Mr. Newsome's

14 e-mail to you in your files?

15     A    Yes.

16          MR. RICH:  We would request production

17     of that, please.

18     Q    (By Mr. Rich)  Now, the second paragraph of

19 Mr. Newsome's note, which you excerpted, states that,

20 "As the guidelines currently reflect established

21 principles of copyright law" -- which I take it is a

22 reference to 1997 guidelines --

23     A    Yes.

24     Q    -- "it will not be necessary to rewrite the

25 guidelines from scratch; rather, the committee will

EXHIBIT 29 - 135

1 be charged with simply recommending those changes

2 which will more accurately reflect acceptable use in

3 higher education, particularly with respect to

4 research libraries."  Do you see that?

5     A    Yes.

6     Q    Did the viewpoint as to that, as stated by

7 Mr. Newsome, evolve as your process went forward,

8 that is, the relationship of the new process to the

9 old guidelines?

10    A    Yes.

11    Q    How did it evolve?

12    A    We decided as a committee that rather than

13 attempt to revise the old guide, which was very long

14 and -- that it would be better to come up with

15 something new and that that something new would be

16 based upon sort of prevailing practice that we saw at

17 other universities.

18    Q    Did -- as part of your committee

19 deliberations, did y'all focus on changes in the

20 manner in which materials are utilized in the

21 classroom setting and in the university community

22 generally as part of the need to revisit the prior

23 policy?  I haven't stated that really well, but what

24 I'm trying to focus on is not legal advice, but

25 rather, were there changes in the way copyrighted

EXHIBIT 29 - 136

1 materials are consumed in the academic setting that

2 led the committee to revisit some, you know, prior

3 approaches?

4     A    Yes, there -- I think there were several

5 things.  I'm not sure if these were ever discussed,

6 it might just be more that we all recognized --

7     Q    Yeah.

8     A    -- the chief one being that, as we talked

9 about before -- we talked about licensing journals

10 from a variety of publishers.  Back in '97, there

11 weren't that many electronic journals.

12          Now, as I said, over half of our journals

13 are electronic and the use of -- the consumption of

14 those in classroom instruction is very different from

15 what was -- what it was like back in the '90s or

16 before that, in that you don't have to make a

17 photocopy, you know, that the material is available

18 on the Web, it's licensed, it can be used, as I said

19 before, for the E-Reserve system, we just link to it.

20 I think that's probably the biggest change.

21     Q    And can I just pause there --

22     A    Sure.

23     Q    -- and ask you, how was that fact -- how

24 was that change implemented and reflected in the new

25 policies?

EXHIBIT 29 - 137

1    A    I believe in the new policy, in the

2 E-Reserve portion of it, we talk about if there is a

3 license, a campus-wide or a system-wide license for a

4 copyrighted work, link to it, don't copy it and scan

5 it in, that's kind of -- almost common sense, just

6 provide a link to it since it's already -- the

7 license is already in place.

8    Q    Any other changes of that sort that you

9 think informed and was -- served as a backdrop for

10 the committee's work?

11    A    As I mentioned before, I think also there

12 was a recognition that while back in '90 -- that in

13 the '90s, there wasn't much else to draw from, and

14 the different universities had kind of gone in

15 different directions in advising faculty on copyright

16 and fair use, that there did seem now to be sort of a

17 prevailing model of the checklist approach to the

18 four factors.  And that was not available -- I don't

19 think that was available in '97.  We did not -- that

20 was not something we really -- as I recall, it's not

21 something we talked a lot about.  So I think we were

22 more influenced -- we were influenced by what other

23 universities -- we saw the universities doing.

24         MR. RICH:  Tony, if I were to ask the

25         witness if the committee was influenced by

EXHIBIT 29 - 138

1      any perceptions as to changes in law in the

2      intervening period, would you instruct him

3      not to answer?

4           MR. ASKEW:  Yes.

5           MR. RICH:  Then I won't ask the

6      question.

7      Q    (By Mr. Rich)  What was the required

8 approval process once the work of the committee was

9 finalized?

10     A    My understanding is that the only approval

11 required was for the chancellor to approve it.

12     Q    To your knowledge, did that occur?

13     A    Yes.

14     Q    Do you know the manner in which the

15 chancellor was briefed, advised of the efforts of the

16 committee?

17     A    My understanding is Mr. Newsome briefed him

18 on it.

19     Q    All right.  We're going to start marking in

20 sequence the different pieces of this new policy

21 document.  I have some questions to ask you about it.

22 Do you need a break, or are you okay?

23     A    I'm fine.

24          MR. RICH:  So let me just identify it

25     for the record.  Plaintiff's Exhibit 10 is

EXHIBIT 29 - 139

1    a document headed -- well, it's "University

2    System of Georgia Copyright Policy," and

3    this two-pager is labeled "Copyright

4    Generally."

5         (Discussion off the record.)

6         (Exhibit 10 marked for identification.)

7    Q    (By Mr. Rich)  Can you identify the

8  document we've marked as Plaintiff's 10?

9    A    Yes.  This is a section of the new Regents

10 copyright policy.

11        MR. RICH:  Mark next as Plaintiff's 11

12   a document bearing the logo of "University

13   System of Georgia Copyright Policy," and

14   the title of this document is "Policy on

15   the Use of Copyrighted Works in Education

16   and Research."

17        (Exhibit 11 marked for identification.)

18   Q    (By Mr. Rich)  And are you able to identify

19 this as another element of the new policy?

20   A    Yes.

21   Q    And overall, what would you describe as the

22 purpose of this one-pager?

23   A    I would say this sets forth the policy that

24 essentially the University System will adhere to

25 copyright law.

EXHIBIT 29 - 140

1    Q    Beginning of the second paragraph, it

2  states, "The University System of Georgia facilitates

3  compliance with copyright law and, where appropriate,

4  the exercise in good faith of full fair use rights by

5  faculty and staff in teaching, research, and service

6  activities.  Specifically, the University System of

7  Georgia" -- first bullet -- "informs and educates

8  students, faculty, and staff about copyright law,"

9  and it goes on.

10         In what ways does the University System of

11 Georgia inform and educate students, faculty, and

12 staff about copyright law?

13    A    Well, first and foremost, the policy itself

14 informs and educates students, faculty, and staff,

15 and that was -- that would be the first step.

16    Q    Any other tools?

17    A    At this point, that would be sort of in

18 development, how we're -- how that's going to happen.

19 The committee talked about it and determined that it

20 was not our -- we met our charge in providing the

21 policy, but that some education -- some educational

22 effort is needed going forward.

23    Q    And where does that responsibility repose?

24    A    That would be up to the chancellor to

25 determine now how that's going to be done.

EXHIBIT 29 - 141

1    Q    Did the committee make any recommendations

2 to the chancellor as to what components that --

3    A    No.

4    Q    -- might take?

5    A    No.

6    Q    That was outside of your scope of your

7 charge?

8    A    I saw it outside our scope, yes.

9    Q    Second bullet says, "Develops and makes

10 available tools and resources for faculty and staff

11 to assist in determining copyright status and

12 ownership and determining whether use of a work in a

13 specific situation would be a fair use and,

14 therefore, not an infringement under copyright law."

15 What are these a reference to?

16    A    This is a reference to the checklist that

17 is now part of the policy.

18    Q    Anything else?

19    A    No.

20    Q    Third bullet, "Facilitates use of materials

21 currently licensed by the University System of

22 Georgia and provides information on licensing of

23 third-party materials by the University System."

24         Is that what you just made reference to a

25 few answers ago, the fact the body of licensed

EXHIBIT 29 - 142

1 material that's available?

2    A    Yes.  I think it also references other

3 functions like GALILEO, which is our shared

4 electronic library, that we do offer licensed

5 copyrighted material there that all -- anybody within

6 the University System can use and that we do --

7 through GALILEO, to facilitate access and use of that

8 material.

9    Q    Does University of Georgia have a budget

10 for faculty who may make a determination that they

11 want to use materials but require copyright

12 permission to do so?

13    A    No.

14    Q    What is an individual faculty member to do

15 in that situation?

16    A    They would either use their -- I should

17 respond that my understanding would be --

18    Q    Yes.

19    A    -- that they would either use their own or

20 use departmental funds to do that.

21    Q    Or departmental funds?

22    A    Yes.

23    Q    And to your knowledge, just within the

24 University of Georgia itself, have departmental funds

25 been made available over time for that purpose?

EXHIBIT 29 - 143

1    A    Not to my knowledge, no.

2    Q    Last bullet, "Identifies individuals at the

3 University System and member institutions who can

4 counsel faculty and staff regarding application of

5 copyright law."

6         How does the University System do that and

7 who are these individuals?

8    A    I believe within the policy itself, we

9 reference -- we urge people to contact legal counsel

10 of their own institutions or to contact Mr. Newsome.

11    Q    Now, if Mr. Newsome gets a call, is he

12 going to personally give advice, or what's the plan?

13    A    That's my understanding, that he will

14 personally give advice to a faculty member, yes.

15    Q    Have you added extra phone lines in his

16 office?

17    A    It's not my department.

18         MR. RICH:  We're going to mark next a

19    document titled "Additional Guidelines for

20    Electronic Reserves."

21         (Exhibit 12 marked for identification.)

22    Q    (By Mr. Rich)  And is this another document

23 that's part of the policy that's been rolled out?

24    A    Yes.

25    Q    First sentence reads, "The University

EXHIBIT 29 - 144

1 System of Georgia supports instruction with

2 electronic reserves and similar electronic services."

3          What meaning of the word "supports" is

4 intended there?

5     A    I think it's in the context of the way

6 libraries support instruction, the way we provide

7 reading and viewing materials that can be used

8 outside the classroom or in the classroom to

9 supplement classroom instruction.  So we support

10 instruction.  We don't actually provide instruction.

11    Q    Provide the technological support for the

12 system as well, yes?

13    A    Yes.

14    Q    Now, the first bullet says -- it says, "The

15 following standards apply to use of copyrighted works

16 for electronic reserves."  The first bullet says,

17 "Instructors are responsible for evaluating, on a

18 case-by-case basis, whether the use of a copyrighted

19 work on electronic reserves requires permission or

20 qualifies as a fair use."

21          Pausing there, I take it that's a

22 fundamental element of the new policy.  Is that

23 correct?

24    A    Yes.

25    Q    That is, to repose in the instructors the

EXHIBIT 29 - 145

1 basic determination by use of the checklist, correct,

2 whether the intended uses are fair uses?

3     A     That's right.

4     Q     What sorts of checks and balances are

5 intended to be built into that process beyond

6 delegating that decision to individual faculty?

7     A     Well, first off, I think we have to have

8 faith in our faculty that they'll do the right thing

9 given the right tools and the right information.  So

10 that, I think, is the most important check or balance

11 on it.

12          Beyond that, we will -- we're still -- this

13 was just introduced, what, two weeks ago now, and, in

14 fact, has not been, at this point, formally released

15 to the full University System community.  But

16 libraries will need to develop procedures to make

17 sure that a checklist has been completed.

18          And then we will also need to talk about

19 what we're going to do with that checklist.  And

20 that's still -- like I say, it's still in the works

21 as to how we're going to do that.

22     Q     What's involved in the more formal rollout

23 of this that you said has not occurred yet?

24     A     Formal announcement --

25     Q     Formal announcement?

EXHIBIT 29 - 146

1    A    -- to all the faculty that this is now the

2  policy.

3    Q    Who is going to send that announcement?

4    A    Mr. Newsome.

5    Q    Is your committee involved in crafting --

6    A    No.

7    Q    -- that communication?

8    A    No.

9    Q    Do you know when that's going to occur?

10    A    I do not.  I would think very soon, but I

11  don't know.

12    Q    Now, if you're a faculty member and have to

13  dig into your own pocket for money, assuming your

14  department has no budget for permissions, what level

15  of confidence does that give you that in going

16  through a fair use checklist, they would be more

17  rather than less likely to conclude that a proposed

18  use is a fair use rather than one which requires

19  permission?

20    A    I'm not a faculty member.

21    Q    I'm asking you, though.  You worked with

22  faculty members on your committee and you've been

23  around faculty members your -- probably your entire

24  academic career.

25    A    I don't know what they would do.

EXHIBIT 29 - 147

1  Q Does that give you concern?

2  A Does it give me concern?  I would -- no,

3 because I -- no, it does not.

4  Q Was that a topic of discussion within your

5 committee, namely the incentives of faculty to apply

6 the guidelines in a way that wouldn't be economically

7 detrimental to themselves?

8  A We -- no, we did not discuss the economic

9 impact on faculty or other departments.

10  Q Did you do any trial balloons with faculty

11 members, whether those on the committee or off the

12 committee, saying, "Let's take the following

13 hypothetical situation and apply this new checklist,

14 how would you come out?"

15  A No.

16  Q Was it done, to your knowledge, against any

17 of the so-called Exhibit 1 works that were appended

18 to our complaint?

19  A Not to my knowledge.

20  Q Was it done with any group of E-Reserves

21 offerings at any of the 35 institutions within the

22 Georgia State system, to your knowledge?

23  A Not to my knowledge.

24  Q So sitting here today, you really have no

25 idea how individual faculty will apply these in any

EXHIBIT 29 - 148

1 individual situation?

2     A    No.

3     Q    Now, the second sentence of the first

4 bullet says, "If relying upon the fair use exception,

5 instructors must complete a copy of the fair use

6 checklist before submitting material for electronic

7 reserves."

8          And I take it, if not here, elsewhere,

9 another important component of this policy is that

10 those checklists be retained in some fashion; is that

11 correct?

12    A    Yes.

13    Q    Whether by the faculty or some central

14 repository or some combination?

15    A    Yes.

16    Q    Okay.  And why is that important?

17    A    In case it were ever to be questioned

18 whether the faculty member had conducted a fair use

19 analysis, they'd have the checklist to demonstrate

20 it.

21    Q    Is it your personal view that conducting

22 the process in good faith is at least as important as

23 getting the answer, quote, right?

24    A    I don't know.  I have to think about that.

25 I would say at least as important, yes, in good

EXHIBIT 29 - 149

1 faith.

2    Q    Apart from any advice you've received from

3 counsel, do you have an understanding whether it is a

4 defense to a charge of copyright infringement that

5 you acted in good faith in trying to comply with the

6 copyright law?

7    A    Yes, it is my understanding, and I've

8 derived that understanding from -- I believe from the

9 work of the '97 committee and also from other

10 university Web sites I've looked at that say that.

11    Q    That it would be a complete defense to any

12 infringement charge?

13    A    I'm not sure about complete defense, just a

14 defense.  I'm not sure what "complete defense" is.

15    Q    Did anybody ever parse that in terms of

16 exposure to damages versus exposure to future

17 injunctive relief?

18    A    In what context?

19    Q    Context of --

20    A    Committee?

21    Q    -- good-faith effort.

22    A    No.

23         MR. ASKEW:  I advise you again not to

24    rely on any advice of counsel in answering

25    that question.

EXHIBIT 29 - 150

1        THE WITNESS:  No.

2     Q    (By Mr. Rich)  The -- one, two, three,

3 four, five -- sixth bullet on this exhibit, beginning

4 "Library reserves staff" --

5     A    Uh-huh.

6     Q    -- says, "should check to see whether

7 materials submitted for electronic reserves are

8 available through an electronic database or are

9 otherwise legally available.  If so, staff should

10 provide a link rather than scanning and posting the

11 material."

12        I believe you did testify to that a few

13 minutes ago, yes?

14     A    Yes.

15     Q    What is the actual procedure that is in

16 place or contemplated to effectuate that?

17     A    My understanding of our procedure at the

18 University of Georgia --

19     Q    Yeah.

20     A    -- is they take every request to put

21 something on reserve, they check it against one of

22 the databases to which we subscribe to see if that

23 item is available, in which case they provide the

24 link and inform the faculty member of that.

25     Q    And decline to post the material itself?

EXHIBIT 29 - 151

1    A    Yes, yes.

2    Q    The next bullet says, "Library reserves

3 staff should delete materials available on electronic

4 reserves at the conclusion of each semester."

5         My question is:  Does the new policy speak

6 to the appropriateness of posting the same material

7 in successive semesters?

8    A    Not that I recall.  I don't think we

9 addressed that specifically where we say it needs

10 to -- as we says here, it needs to come down at the

11 end of a semester.

12   Q    Do you believe -- is there anything in the

13 fair use checklist, to your recollection, that would

14 make it a strike against a fair use determination in

15 the second or third semester of use, as compared with

16 where you might come out in the first semester of use

17 of the same material?

18   A    I seem to recall there is something there.

19 I'd have to go back and look at it, but I thought

20 there was something.

21   Q    Okay.

22        MR. RICH:  Let's mark next the

23        component of the new policy labeled "The

24        Fair Use Exception."

25        (Exhibit 13 marked for identification.)

EXHIBIT 29 - 152

1    Q    (By Mr. Rich)  Do you recognize this as

2 another element of the policy?

3    A    Yes.

4    Q    In the third paragraph of this document,

5 beginning, "Moreover," it's written, beginning of the

6 second sentence, "Working through the four factors is

7 important.  Simple rules and solutions may be

8 compelling, but by understanding and applying the

9 factors, users receive the benefits of the law's

10 application to the many new needs and technologies

11 that continue to arise at member institutions within

12 the University System of Georgia."  Do you see that?

13    A    Yes.

14    Q    What is being conveyed in terms of how does

15 working through the factors provide benefits of how

16 the law is applied to new needs and technologies?

17    A    My understanding there is that the four

18 factors are constant, independent of the technologies

19 being used, and that if you adhere to the four

20 factors as new technologies become available, that

21 you would be sort of in sync with what you should be

22 doing.

23    Q    Under "Understanding the Four Factors" is

24 the statement that, "The four factors are

25 nonexclusive, so other factors may be considered in

EXHIBIT 29 - 153

1 determining whether a use is fair."  Do you see that?

2     A    Yes.

3     Q    How is that recognition worked into the

4 fair use checklist which faculty are asked to use?

5     A    I would say it's not -- I think the idea

6 there was that if someone did apply the four factors

7 and was still confused, that they should talk with

8 legal counsel to see if maybe there might be some

9 other factor that would apply, but -- and I don't

10 have any other factors in mind.  But in case there

11 would be something that would come up, that we wanted

12 to leave the door open that there might be some other

13 factors that might be important here.

14          MR. RICH:  I understand we're at a

15          tape change, so why don't we take a short

16          break.

17          THE WITNESS:  Okay.

18          THE VIDEOGRAPHER:  Off the record at

19          3:03:49.

20          (Recess taken.)

21          THE VIDEOGRAPHER:  This is Tape 5.  We

22          are back on the record at 3:21:41.

23     Q    (By Mr. Rich)  Mr. Potter, several more

24 questions on Plaintiff's Exhibit 13.  Under the

25 subheading "Purpose and Character of the Use," there

EXHIBIT 29 - 154

1 are a series of statements made about the concept of

2 transformative uses.

3          What is your understanding of the concept

4 of transformative use as it's applied in copyright?

5     A    My understanding is transformative use is

6 where you take a copyrighted piece, an article, song,

7 whatever, and creatively turn it into something else.

8 You spend a significant amount of creative effort

9 into coming up with a new work that, while it might

10 be based on the original work, actually is very

11 different because of the energy and the creative

12 efforts you've put into it.  And I think the best

13 example I know of is the 2 Live Crew transformation

14 of Pretty Woman into whatever their song was, but it

15 was a significant change.

16    Q    So that if all that's done is make a

17 photocopy or a digital copy, exact digital copy of an

18 excerpt of a copyrighted work without more, I take it

19 you would agree with me that doesn't qualify as

20 transformative?

21    A    If all you've done is make a photocopy of

22 it, yeah, I would not -- that's not transformative.

23    Q    Now, what if you've taken a series of

24 photocopies of excerpts and made an entire course

25 around it so that instead of taking preexisting

EXHIBIT 29 - 155

1 anthologies or textbooks, you in effect create your

2 own course reader by taking a chapter here, a chapter

3 there, an essay here, a journal article there, and

4 you create 10 or 15 or 20 works in a course, is there

5 a defensible argument there, as you've thought about

6 it, to assert that that's a transformative use of

7 those materials?

8     A    If you're saying that you would take, say,

9 20 photocopied works and organize them a certain way

10 and that would --

11     Q    Well, as course readings, you know, Week 1

12 we'll read Chapters 1 and 4 from this, and Week 2

13 we'll do the following, and that becomes your

14 curricular material for the course.

15     A    Well, I've -- given this is the first time

16 I've ever thought about this, I would say no.

17     Q    In the "Amount of the Work Used"

18 subheading, carrying over to the second page of this

19 document, you indicate -- it indicates, pardon me,

20 "No exact measures of allowable quantity exist in the

21 law."  And we talked about that a bit earlier.

22     A    Uh-huh.

23     Q    It goes on to say, "Any copying of an

24 entire work usually weighs heavily against fair use."

25 And then down a few sentences it says, "One may also

EXHIBIT 29 - 156

1 reproduce only a small portion of any work, but still

2 take 'the heart of the work.'  This concept is a

3 qualitative measure that may weigh against fair use."

4 Do you see that?

5     A    Yes.

6     Q    What are the tools that a faculty member

7 would be able to use in making a judgment under this

8 third factor under the fair use analysis of whether

9 the amount he or she proposes to use is sufficient,

10 but more than sufficient for his purpose and not

11 otherwise excessive?  What are the tools that your

12 committee has provided to make that analysis?

13     A    We provided the fair use checklist, which

14 has questions that address that, that point.

15     Q    Okay, we'll go through those in a minute.

16         Now, under the fourth factor, which

17 is impact on the market, indicates that -- the

18 second (sic) sentence, "If the purpose of the use is

19 commercial, any adverse market effect resulting from

20 that commercial use weighs against fair use.  If the

21 purpose of the use is noncommercial, however, an

22 adverse market effect is less likely, weighing in

23 favor of fair use."

24         Focusing on that second statement, namely

25 involving noncommercial, why is it and do you agree

EXHIBIT 29 - 157

1 that the fact that a use is noncommercial makes an

2 adverse market effect less likely?

3     A    My understanding of that is if you, as the

4 user, are not gaining from this in a commercial way,

5 then the use is less likely to be an infringement and

6 weighs -- would -- may weigh more toward fair use.

7 It doesn't make it a fair use, but it would tilt in

8 that direction.

9     Q    For the moment, I'm focusing on market

10 effect, though.  In other words, as opposed to what

11 the conclusion of that balancing might be in terms of

12 promoting fair use, what I'm asking you to focus on,

13 given your knowledge of the publishing industry that

14 you testified to earlier, is, why does it follow

15 necessarily that if the use is noncommercial, there

16 is less likely to be an adverse market effect on the

17 copyright owner?

18     A    Well --

19     Q    That's what I read this to say, anyway.

20     A    Well, again, I would -- I tend to equate

21 noncommercial with not-for-profit and educational

22 use.  And the -- my take on that would be that

23 there's a number of sales that might be made of an

24 item, and if you're not offering it on a commercial

25 basis, then you're not taking away from the market

EXHIBIT 29 - 158

1 for that item, you're not in the marketplace for

2 the -- you're not competing with the source -- the

3 commercial source of that piece.  But again, I think

4 it has to be looked at in a case-by-case basis to

5 really see what you're talking about, what the impact

6 would be.

7     Q    You would agree with me that any number of

8 book and journals publishers rely on income from

9 sales of their publications into the academic

10 marketplace --

11    A    Yes.

12    Q    -- is that the case?

13    A    Yes.

14    Q    And those users are not-for-profit

15 institutions, correct?

16    A    That's right.

17    Q    And you testified earlier that University

18 of Georgia itself maintains, with some 4,500 STM

19 publishers, including Elsevier and Wiley, on whose

20 advisory board you sat, licenses permitting

21 electronic uses of their materials, correct?

22    A    That's not 4,500 publishers.  It's 4,500

23 titles.

24    Q    Titles, beg your pardon, with a number of

25 publishers?

EXHIBIT 29 - 159

1    A    Right, that's right.

2    Q    That's correct, right?

3    A    That's right.

4    Q    And there is some consideration associated

5 with those licenses, I assume, correct?

6    A    Oh, yeah.

7    Q    And are you also aware of the fact that the

8 Copyright Clearance Center, representing many

9 publishers, offers a variety of permissions and

10 licensing options for the academic community to

11 secure permissions to use materials in the fashion

12 that a number of faculty across the University System

13 of Georgia would use such materials?  Are you

14 familiar with that fact?

15    A    As I mentioned before, I'm familiar vaguely

16 with what the Copyright Clearance Center does and

17 that that is their purpose, is to provide a means for

18 compensation of the rights holder.

19    Q    So would you agree with me that at least

20 from the perspective of all of those publishing

21 interests, that if it were the view that the

22 not-for-profit status of an institution prima facie

23 creates a basis for not needing a license or not

24 taking a license, that their markets for the sales

25 and licensing of their publications would be harmed,

EXHIBIT 29 - 160

1 correct?

2      A    I don't know.  I don't know about that.  I

3 know one thing, the Copyright Clearance Center has a

4 version of the copyright check -- of the four factor

5 checklist outline.  And if the Copyright Clearance

6 Center didn't think applying the four factors was

7 appropriate, including this factor, why would it have

8 it on its Web site?  So I would be -- I don't know

9 what the answer to that is.

10     Q    I was focusing more narrowly, not on use of

11 a checklist per se, but on the allegation here that

12 if the purpose of a use is noncommercial, an adverse

13 market effect is less likely.  And I'm --

14     A    Well, I think --

15     Q    -- trying to see, based on your knowledge

16 of the publishing industry, whether you might agree

17 with me that, in fact, there can be significant

18 adverse impacts on the revenue streams of any number

19 of publishers who rely, in part or in whole, on

20 income from sales and licensing to the academic

21 marketplace.

22     A    Well, as I said before, I do have some

23 knowledge of academic publishers.  I'm not sure how

24 great that knowledge is.  I do have some knowledge.

25 But as I see this, we're -- what we're talking about

EXHIBIT 29 - 161

1 is a continuum, commercial use on one end,

2 noncommercial use on the other, and that as you move

3 along that continuum, a noncommercial use is more

4 likely to waver -- to weigh in favor of fair use than

5 a commercial use.  I think really that's what this is

6 saying.

7          MR. RICH:  Let's mark next a document

8      labeled "Introduction to the Fair Use

9      Checklist."

10         (Exhibit 14 marked for identification.)

11     Q    (By Mr. Rich)  Is this another element of

12 the policy?

13     A    Yes.

14     Q    In the second paragraph, it's written, "As

15 you use the checklist and apply it to your proposed

16 use" -- and I take it that the audience for this is

17 faculty members --

18     A    Yes.

19     Q    -- "you are likely to check more than one

20 box in each column and even check boxes across

21 columns.  Some checked boxes will favor fair use and

22 others will weigh against fair use.  The ultimate

23 concern is whether the cumulative weight of the

24 factors weighs in favor of fair use or weighs against

25 fair use.  Because you are most familiar with your

EXHIBIT 29 - 162

1 project, you are probably best positioned to make

2 that decision." Did I read that correctly?

3     A     Yes.

4     Q     Now, how does that work exactly in terms of

5 how you do that balancing and how you determine if

6 the cumulative weight of the factors weighs in favor

7 of fair use or against it? Physically, how does one

8 do that? What -- how do you do that exercise and how

9 do you know where you come out?

10     A     Well, physically you would either print out

11 the checklist or bring the checklist up on your

12 screen. Our version -- our checklist is fillable, I

13 mean, you can actually check the boxes. You can fill

14 in -- type in the information on the work and then

15 click on the boxes. And I would say you either view

16 it on the screen or then print it out and look at it

17 and sort of gauge were most things checked on the

18 fair use side or on the not fair use side.

19     Q     Is your notion that you add up the entire

20 left column of checks versus the entire right column

21 of checks, or that you do the analysis within each

22 factor and see how many factors --

23     A     I think you would do it --

24     Q     -- favor or disfavor?

25     A     -- would do it within each factor and then

EXHIBIT 29 - 163

1 look at how the four factors weigh in comparison to

2 each other.

3         MR. RICH:  Let's mark the next one.

4     Yeah, the checklist.  Let's mark next a

5     document labeled "Fair Use Checklist," two

6     pages.

7         (Exhibit 15 marked for identification.)

8     Q    (By Mr. Rich)  Now, is this the new fair

9 use checklist to which we've been referring

10 periodically?

11    A    Yes.

12    Q    Okay.  Is the intent of your committee and

13 of the newly promulgated policy that across all 35

14 institutions within the University System of Georgia,

15 faculty members seeking to use copyrighted materials,

16 whether for reserve or E-reserve purposes, will be

17 required to go through the exercise of filling out

18 this fair use checklist?

19    A    Yes.

20    Q    No exceptions?

21    A    No exceptions.

22    Q    And where -- given what we read in the just

23 prior marked document, which is the viewpoint that

24 each faculty member is best positioned to make the

25 judgment, what measures have been put in place or

EXHIBIT 29 - 164

1 will be put in place to assure some degree of

2 uniformity in the manner in which faculty members

3 interpret this checklist and apply it in practice?

4     A    It was our consideration that just having

5 the same form that would be used across the entire

6 university system would bring some uniformity to the

7 process, and then the Web site as a whole would help

8 to bring uniformity to the process, and then the

9 educational process, which still needs to be geared

10 up, would do the same thing.

11     Q    Is -- from your committee's standpoint, is

12 there any intention of auditing or otherwise sampling

13 or taking a look at actual practice as it evolves

14 under this checklist approach?

15     A    From a committee standpoint, no.

16     Q    Is it your understanding that the

17 chancellor's office, as opposed to the committee,

18 will be making efforts in that direction?

19     A    I would say it's my assumption that they

20 would.  I wouldn't say it's my understanding.  It's

21 my assumption they would.

22     Q    Is that based on any discussions or

23 information or just an assumption?

24     A    I'm trying to recollect what our

25 discussions were about this; and honestly, I can't

EXHIBIT 29 - 165

1 recall what we -- where we left that.

2    Q    Let's go through these instructions so the

3 record is clear as to how this process works.  The

4 first sentence says, "Where the factors favoring fair

5 use outnumber those against it, reliance on fair use

6 is justified."  And here, am I correct that the use

7 of the term "factors" refers to what are listed as

8 Factors 1 through 4?

9    A    Yes.

10    Q    So the second sentence, then, instructs

11 that, "Where fewer than half the factors favor fair

12 use, instructors should seek permission from the

13 rights holder."

14         Am I right in reading that as saying,

15 therefore, if one of the factors -- if only one of

16 the factors favors fair use, that triggers the need

17 to seek permission?

18    A    Yes.

19    Q    Then it goes on to say, "Where the factors

20 are evenly split, instructors should consider the

21 total facts weighing in favor of fair use as opposed

22 to the total facts weighing against fair use in

23 deciding whether fair use is justified."

24         Am I correct that that means that if two

25 factors favor fair use and two factors oppose fair

EXHIBIT 29 - 166

1 use, that triggers further consideration and weighing

2 on the part of the professor?

3     A     Yes.

4     Q     Okay.  And how is the professor supposed to

5 go about resolving that split?

6     A     It was our expectation that they would look

7 at the factors, the check boxes, and see sort of

8 overall how things were leaning and see if they can

9 make a determination from that.  If they could not,

10 then they should consult legal affairs at their

11 institution or the Board of Regents.

12     Q     Assuming that, again, the process yielded

13 Factors 1 and 2, say, in favor, and 3 and 4 against,

14 how does staring at that list give any more insight

15 to the professor about how to resolve himself or

16 herself the issue of whether it is or isn't a fair

17 use?  What more is the policy statement -- what other

18 tools, if any, is the policy statement affording that

19 professor to resolve that tie?

20     A     I would say that there might be some facts

21 that would weigh more heavily than other facts.  And,

22 for example, profiting from use, if you look back --

23 it's split 2 and 2, and you look back and see that

24 you're going to profit from its use, then I think

25 that would weigh more toward -- weigh more against

EXHIBIT 29 - 167

1 the fair use.  And there are other elements like that

2 that might -- that tend to be more significant,

3 depending on the situation, than others would be.

4    Q   How have those been flagged from any of the

5 materials we've marked this afternoon?

6    A   I wouldn't say they've been flagged, but I

7 think in some of the explanatory material that comes

8 out and if -- we're also thinking that if a -- if an

9 instructor consults with legal affairs once on

10 something, they'll learn from that and be able to

11 apply that in the future.

12    Q   Is it purely volunteer that an instructor

13 consults with legal affairs?

14    A   Yes.  We say that they should consult legal

15 affairs, but --

16    Q   If they have questions?

17    A   If they have questions, but --

18    Q   But if they're confident in their analysis,

19 they don't need to?

20    A   That's right.

21    Q   In the last paragraph preceding the

22 checklist, instructors are required to "complete and

23 retain a copy of this checklist for each 'fair use'

24 of a copyrighted work in order to establish a

25 'reasonable and good faith' attempt at applying fair

EXHIBIT 29 - 168

1 use should any dispute regarding such use arise." Do

2 you see that?

3     A    Yes.

4     Q    What are -- why -- what are the quoted

5 reasonable and good faith words in that statement?

6 Why are there quotes around those?

7     A    My understanding is that is drawn from -- I

8 believe it's drawn from the statute itself, isn't it,

9 that it -- if you make a reasonable and good-faith

10 attempt at determining fair use, that you're afforded

11 some level of protection should a dispute arise.  But

12 again, I'm not -- I'm over my head on that.  This is

13 in there because -- based on the advice of counsel.

14     Q    Okay.  Now, am I right, therefore, that if,

15 on any given fair use determination, the professor

16 concludes that Factors 1, 2, and 3 all favor fair

17 use, the outcome of the Factor 4 analysis effect on

18 the market is not of consequence?

19     A    The way we've written it, yes.

20     Q    And you believe that's a correct

21 application of fair use law?

22     A    Yes, I do.

23     Q    And likewise, if Factors 1, 2, and 4 are

24 evaluated as favoring fair use, the amount and

25 substantiality of the taking becomes irrelevant?

EXHIBIT 29 - 169

1    A    Yes.

2    Q    Even if entire works are taken?

3    A    Well, as I've said several times before,
4 it's hard for me to conceive of an instance where
5 that would work, where that would be the case, but I
6 think it is possible.

7    Q    Technically, that would be a correct
8 outcome if one were able to undertake a list that
9 allowed you to check Factors 1, 2, and 4 in your
10 favor, correct?  That would be consistent with the
11 guidance of this --

12    A    Yes, it is.

13    Q    -- correct?

14    A    Yes.

15    Q    Now, if a professor selects any given
16 copyrighted work and believes that it advances the
17 pedagogical purpose for her course, in other words,
18 selects works specifically because they illustrate
19 issues, concerns, concepts that go to the core of the
20 course offering, truly believes that in good faith,
21 wants to offer those for students in the classroom,
22 isn't going to mark them up, isn't going to profit
23 from them, isn't going to charge the students for
24 them, taking that, which, as you understand these
25 Factor 1 guidelines, which boxes could and should

EXHIBIT 29 - 170

1 that faculty member properly check off?

2     A     Well, it's difficult without having an

3 actual item in front of me to be looking at.  But I

4 would say based on what you said, the nonprofit

5 educational box would be checked under --

6     Q     Right.

7     A     -- weighing in favor of fair use, teaching.

8     Q     Right.

9     A     It's not really research and scholarship; I

10 wouldn't mark that.  I wouldn't mark criticism.  I

11 wouldn't mark transformative.  I wouldn't mark

12 personal study.  I would mark use as necessary to

13 achieve your intended education --

14     Q     You would or would not?

15     A     I would.

16     Q     So it's three of those boxes?

17     A     Yeah.

18     Q     And then what would weigh against fair use

19 in my example?

20     A     Well, again, without having the actual

21 piece --

22     Q     Yes.

23     A     -- in hand, it's conceivable that -- I

24 can't imagine that in the situation you described,

25 that commercial activity would be involved or

EXHIBIT 29 - 171

1 profiting from use --

2     Q    Right.

3     A    -- or entertainment.

4     Q    Right.

5     A    It's -- possibly, I think you could

6 probably check nontransformative --

7     Q    Yeah.

8     A    -- because it's not a transformative use.

9 It's not for publication.  It's not for public

10 distribution.  And it would depend on the item as to

11 whether use exceeds that which is necessary to

12 achieve your intended purposes.  It's conceivable she

13 would have those other things marked, but taking --

14 taking too much to accomplish her purpose.

15     Q    But wouldn't you presume that a faculty

16 member selecting items for his or her course would

17 necessarily take what they believe is the appropriate

18 amount for that course --

19     A    I would think so.

20     Q    -- only in proposition?

21     A    But in going through the checklist, she

22 might see that last one and say, "Well, gee, maybe

23 that's not as much as I should -- maybe I'm taking

24 more than I should."

25     Q    Okay.  But even if we, for discussion sake,

EXHIBIT 29 - 172

1 check the second box, in my hypothetical, by 3 to 2,

2 Factor 1 would go to the faculty, right?

3      A     Yes.

4      Q     Okay.  Let's go to Factor 2.  Let's assume

5 that in my hypothetical are all political science

6 works looking at life in post 9 -- you know, civil

7 liberties in the post 9/11 environment, just to pick

8 a random topic, and again used only for the class, no

9 profit, no motive, using only as much as the

10 professor believes is appropriate, and these are all

11 in print and published works, okay?

12     A     Yes, okay.

13     Q     So in that situation, let's walk through

14 Factor 2, if you don't mind.  What would weigh for

15 and against?

16     A     It would weigh -- the fact that it's a

17 published work would weigh in favor.  It's a factual

18 or nonfiction work; that would weigh in favor.  It's

19 important to educational objective; she's already

20 established that.  So all three of those would be

21 checked.

22          Unpublished work, we've determined it's not

23 that.  If it's a political science article, it's

24 probably not -- probably creative.  I doubt from your

25 description it would be a consumable work.  So none

EXHIBIT 29 - 173

1 of those boxes would be checked.

2    Q    So Factor 2 would go to the faculty member

3 on that one?

4    A    Yes.

5    Q    It would go toward fair use?  Pardon me.

6 Yes?

7    A    Yes, I think it's -- that's right.

8    Q    Now, let's assume that no more than 10

9 percent of any of the works we've identified in this

10 civil liberties in a post 9/11 environment, no more

11 than that 10 percent of any published work has been

12 selected by the professor, and let's -- I'd be

13 interested in how you think that professor needs to

14 think through the Factor 3 elements as this checklist

15 is constructed.

16    A    Okay.  Well, I would expect that they would

17 think 10 percent is a small portion, so they would

18 check "small portion."

19    Q    Okay.

20    A    The determination whether the portion is

21 central or significant to the entire work as a

22 whole -- is not -- I'm sorry, is not central or -- I

23 think in this case, you need to look at the two boxes

24 on either side.  Is it central or is it not central

25 to the heart of the work?  That's going to depend

EXHIBIT 29 - 174

1 upon the individual item, so that could go either

2 way.

3    Q    How does the professor, who is not the

4 author, make that determination?

5    A    Well, especially if it's in their field, if

6 this is a political science professor, I would think

7 she would be able to make that determination if this

8 is really the critical part of the work.

9    Q    But what if there were 10 essays and the

10 professor has only selected one out of the 10 and

11 it's just this marvelous Pulitzer Prize winning book

12 of essays on this?

13    A    And she's taking one essay out of that

14 work?

15    Q    Yeah.

16    A    Again, I think she needs to look at the

17 individual -- it has to be weighed individually.

18    Q    Okay.

19    A    And the amount taken is narrowly tailored

20 to educational purpose, such as criticism, comment,

21 research, or subject being taught, or is more than

22 necessary, again, that's going to be dependent upon,

23 so I guess that could go either way.

24    Q    Well, if the professor determines that it's

25 a small portion, what would reasonably lead that

EXHIBIT 29 - 175

1 professor to conclude that the amount taken was not

2 narrowly tailored to the subject being taught, in

3 other words, this is the core curricular offering for

4 the course?

5     A    I mean, if she's -- if it's a book on 9/11

6 and it's a civil liberties and her focus is on civil

7 liberties and there's an essay on -- or, I'm sorry, a

8 chapter that involves, I don't know, the actual

9 events of 9/11, I would say that's not relevant.  And

10 I think she would have to make that determination

11 that some things just aren't --

12     Q    Highly subjective, yes?

13     A    Subjective, yes, but I think something that

14 can be discussed and reasoned.

15     Q    With whom?

16     A    With herself to a large extent.

17     Q    She would have a conversation with herself

18 about it?

19     A    I think -- yeah, I think we at some point

20 need to trust that the faculty are honest brokers in

21 this, yes.

22     Q    But it is -- even in good faith, it's

23 highly subjective, a judgment such as is it narrowly

24 tailored for the subject you're teaching?

25     A    Yes --

EXHIBIT 29 - 176

1    Q    It would almost be denial of your

2  pedagogical ability to select works which you

3  self-determined to be not relevant to what you're

4  teaching?

5    A    Yeah, I would say subjective.  Highly

6  subjective, I don't know.

7    Q    Okay.

8    A    Just subjective.

9    Q    Strike highly?

10    A    Yeah.

11    Q    And then on the weighs against fair use, if

12  it's small, I take it it's not large?

13    A    Right, I think those -- all three of those

14  facts, you know, I doubt that you're going to check

15  one on one side -- you're going to check both of the

16  pairs on either side, so yeah, if it's not -- if it's

17  small, it's not going to be large.  If it's not

18  central, it's not going to be central.

19    Q    Right.

20    A    If it's narrowly tailored, it's not going

21  to be broad, so...

22    Q    Right.

23    A    But again, I think it's going to depend on

24  the work itself to determine how those are checked.

25    Q    So if, in my hypothetical, the professor

EXHIBIT 29 - 177

1 took 20 works in this field from collections,

2 anthologies of essays, from full book-length

3 treatises on the subject, but not more than 10

4 percent of the work in any case, and satisfied

5 herself -- and that became the entire course reading

6 for the semester, so that's all, and convinced

7 herself through this process that with respect to

8 each of those 20, they satisfactorily met the

9 Factor 1, 2, 3 analysis, as I think we established

10 before, the faculty member needn't even go through

11 the fourth factor, which is what effect on the market

12 for the original taking these 20 offerings and

13 comprising an entire course from it would -- didn't

14 need to make that assessment, correct?

15      A    The way we've written this, yes.

16      Q    What do you understand a small portion of a

17 work to be?

18      A    Well, it depends.  It depends on the

19 individual situation, circumstance, and the work

20 we're talking about.  But I wouldn't set a -- I don't

21 think I can say there's an ironclad rule that it's

22 5 percent, 10 percent, whatever.  It's -- would have

23 to be analyzed on an individual basis.

24      Q    But that element, is that a quantitative

25 element as part of a larger series of factors, or

EXHIBIT 29 - 178

1 what is small and large intended to mean?

2     A     Well, it's intended to mean small or large.

3 I mean, it's -- I think you can tell if something is

4 small and something is large.

5     Q     Well, as a percentage of the whole or in

6 terms of numbers of pages?

7     A     I'm -- you know, we're trying to avoid

8 setting a quantitative standard here.  I think it --

9 because once -- as soon as I say 10 percent is -- say

10 10 percent, I go out and find something where 10

11 percent is too much.  I'll find something else where

12 30 percent is okay.  So I just don't think you can

13 get into a percentage.

14     Q     All right.  So I'm now teaching that

15 political science course.  I'm an old political

16 science major, all right?  I'm teaching that course

17 and I am staring now at this checklist, and I've got

18 my list of chapters here, this is a 9-page chapter,

19 that's a 40-page chapter, but I know that

20 cumulatively, they're all 10 percent or less in my

21 example of these much larger ones.  How do I make a

22 judgment if what I'm about to take is small or large

23 other than just my own purely subjective view of what

24 small and large mean?

25     A     Well, I think it's purely your subjective

EXHIBIT 29 - 179

1 view as an old political science professor who's been

2 reading the literature for years and has some

3 understanding of what the literature is like and is

4 probably also an author yourself as to whether

5 something is small or large.  I would also say that

6 it's going to be -- whether you check that or not,

7 you've still got two other factors, two other facts

8 to look at --

9      Q    Right.

10     A    -- that would probably come into play.

11     Q    Right.  But I -- I need to still check one

12 of those boxes.  I'm staring at small and large and I

13 don't think -- you know, I'm saying to myself, gosh,

14 that committee that wrote this policy hasn't given me

15 a whole lot of help here.  They're saying the entire

16 thing is too much and even one chapter may be too

17 much if it's the heart of the book.  You're just

18 giving me not a lot to work with here.  So how do you

19 expect -- how many faculty members are there

20 system-wide at any -- at this moment in the Georgia

21 State University System?

22          MR. ASKEW:  I'm going to object to the

23     form of the question.  You want to restate

24     that.  That was kind of a rambling question

25     going on about --

EXHIBIT 29 - 180

1          MR. RICH:  Thank you.

2     Q    (By Mr. Rich)  How many standing faculty
3 are there right now throughout the 35 institutions
4 under the University System of Georgia?

5     A    I don't know.

6     Q    Do you have any estimate?

7     A    No.  I know there's roughly 2,000 at the
8 University of Georgia, but I'm not sure what it would
9 be at the -- throughout the entire system.

10    Q    So we would be into five figures probably
11 in total?

12    A    I don't know.

13    Q    It's many thousands?

14    A    Yes.

15    Q    So potentially you have many thousands of
16 instructors staring at a checklist and trying to make
17 judgments such as whether a proposed taking is small
18 or large.  Do you have any reason to believe there
19 will be any uniform application of those concepts?

20    A    Yes, because this is within the context of
21 the policy document, the policy Web site we've
22 established, yes, absolutely.

23    Q    Are there circumstances where you think
24 taking as much as 20 percent of a work could
25 rationally be viewed as a small portion?

EXHIBIT 29 - 181

1     A    The purpose of -- I would say again, I'm

2 not a faculty member, I don't do this, but I would

3 say --

4     Q    But you're a reader?

5     A    I don't read reserve readings.

6     Q    No. But you read works, don't you?

7     A    Sure.

8     Q    So you know what 20 percent of a work

9 comprises?

10    A    Yeah.

11    Q    Is that a small portion of a work?

12    A    It could be a small portion.

13    Q    Could be?

14    A    Yeah.

15    Q    Could 30 percent be a small portion?

16    A    It depends on the work, but yeah.

17    Q    Could multiple chapters of a work be a

18 small portion?

19    A    It's less likely to be. It could be.

20    Q    Does it matter to you whether these

21 concepts are applied in a manner that creates any

22 sense of uniformity in practice?

23    A    Does it matter to me, yes.

24    Q    Why?

25    A    As we said at the beginning of the

EXHIBIT 29 - 182

1 checklist, we want the faculty to -- at the beginning

2 of the document, we want the faculty to comply with

3 copyright law. And to do that, we do need some level

4 of uniformity, and I think we need to work toward

5 that.

6    Q    Now, if everybody goes and consults with

7 the office of legal affairs at their respective

8 institution --

9    A    Uh-huh.

10    Q    -- what do you understand the level of

11 uniform advice will be coming from the various legal

12 affairs officers at the various institutions?

13    A    I would assume that they're professionals

14 and they will work to provide the best possible

15 advice they can give and that they would consult with

16 each other as well. And for the -- most of the

17 campuses, they're going to be relying on advice from

18 the system office. And then I would expect at the

19 research universities, that those legal advisors

20 would consult with each other.

21    Q    But sitting here today, you're unaware of

22 any process for obtaining information as to actual

23 practice as it evolves under these -- under this

24 checklist approach, correct?

25    A    Yes.

EXHIBIT 29 - 183

1    Q    Now, looking at Factor 4, please --

2    A    Okay.

3    Q    -- first box on the left asks for an

4 assessment of no significant effect on market or

5 potential market for copyrighted work, yes?

6    A    Yes.

7    Q    How does a typical faculty member possess

8 the sufficient information to make that judgment in

9 relation to its use?

10    A    Well, first, I would say we have members --

11 faculty members on the committee who did not see a

12 problem with that.  But again, I would point out that

13 these are faculty who work with other faculty and

14 have usually been teaching for a long time, and I

15 think they can make that -- they can make a

16 determination.

17    Q    Wouldn't you agree with me that, in part,

18 the potential effect on the market is a result of

19 cumulative decisions made by many individual

20 decision-makers, so that if one individual decided to

21 use one chapter from one Elsevier work, you might

22 reasonably conclude it won't much effect Elsevier's

23 worldwide income, yet if 5,000 faculty members, or

24 multiplied across universities, tens of thousands

25 faculty members, made similar fair use decisions,

EXHIBIT 29 - 184

1 that you might have an impact cumulatively on the

2 publisher's market for sales and licensing?

3     A    No, I don't see that.  I mean, that's a

4 very -- that's a hypothetical and I don't --

5 hypothetical question.  I don't know how faculty

6 behave.  I don't know -- the fact is that not all

7 faculty take advantage of electronic reserves, not

8 all faculty use copyrighted works in instruction.  So

9 no, I don't necessarily agree with that.

10     Q    If I were to represent to you -- and I'm

11 not asking you to adopt it as true, and I know you're

12 not a lawyer, although you've read 2 Live Crew and I

13 assume some of the other cases in the area --

14     A    I just know about them.

15     Q    -- if I were to represent to you that a

16 number of courts have interpreted Factor 4 as looking

17 not simply at the immediate impact on the market of

18 the defendants' practices, but what would happen if

19 those practices multiplied out across a universe of

20 users, I'm just asking you to assume that for the

21 sake of my question, that is relevant, how could any

22 individual University of Georgia faculty member be in

23 a position to make that assessment?

24     A    I'm sorry, I just don't understand your

25 question.

EXHIBIT 29 - 185

1    Q    Let's move on given the hour.

2         The second box is, "Use stimulates market

3  for original work."

4    A    Uh-huh.

5    Q    How would you expect a given faculty member

6  would make that determination?  What's involved

7  there?

8    A    I think -- my understanding from some

9  faculty is they found that when they use a

10 copyrighted work in the classroom, that that -- that

11 students often decide they would like to acquire the

12 entire work themselves.

13   Q    Down several other boxes, "Licensing or

14 permission unavailable," do you see that?

15   A    Uh-huh.

16   Q    Question for you is:  Is there any

17 presumption that a faculty member should first

18 inquire as to the availability of licensing or

19 permission and the price of that permission before

20 going through this exercise?

21   A    No.

22   Q    How is the faculty member supposed to make

23 the judgment, sitting in his or her office or at his

24 or her computer, that licensing or permission is

25 unavailable from a given publisher?

EXHIBIT 29 - 186

1    A    My understanding of this point would be

2 that if they've gotten this far on it and the -- so

3 the weight of factors is looking more and more like

4 they need to -- that it would weigh against fair use,

5 then they ought to look into licensing and

6 permission.  But they may find that licensing or

7 permission is not available, so they would be, I

8 think, addressing that question after they had done

9 some other analysis.

10    Q    What is the intended meaning of "one or few

11 copies made or distributed"?

12    A    I think there we're talking about if you're

13 making photocopies, that you're not doing it for the

14 entire class, you might just be doing it for one

15 student who might have asked the specific question or

16 wanted to follow up on a specific matter.

17    Q    The next box says, "User owns lawfully

18 acquired or purchased copy of original work."  Is

19 this -- and then the corresponding box to the right

20 says, "User does not own lawfully acquired or

21 purchased copy of the work."

22         I take it that a factor favoring fair use,

23 at least under Factor 4, is whether the work from

24 which copying is to be made is lawfully possessed by

25 the professor?

EXHIBIT 29 - 187

1    A    By the professor or by the library.

2    Q    Or by the library, yes.

3    A    Or by the institution.

4    Q    Okay.  So that if somebody wanted to use

5 ILL to get access for purposes of E-Reserves copying,

6 is that outside of the contemplation of this system?

7    A    I don't know.  I don't believe so.  I think

8 it would still be -- it's a legally acquired copy.

9    Q    What would be the circumstance in which it

10 wouldn't consist of a lawfully acquired or purchased

11 copy?  What would you -- anything come to mind, what

12 kind of copy?

13    A    What comes to mind, my -- I think it would

14 be you might have some third or fourth generation

15 photocopy that you don't know how -- where it came

16 from or how you came in possession of it and you

17 really, at that point, don't know whether it was

18 legally acquired, in which case you shouldn't use it.

19    Q    On the right side of the Factor 4, midway

20 down is a -- is a factor that says, "Repeated or

21 long-term use that demonstrably affects the market

22 for the work."  What is that a reference to?

23    A    My recollection is that that applies to

24 using something three or four semesters in a row,

25 when you teach the same class repeatedly, over and

EXHIBIT 29 - 188

1 over again, and you know you're going to use that

2 item, that you know that you're -- it's something you

3 should acquire.  So I think it's more -- that gets

4 back to that question of taking things down after --

5 at the end of the semester.

6    Q    Thank you.

7         What empirical data, if any, did the

8 committee use in arriving at its conclusions and

9 formulating the checklists?  By that, I mean

10 empirical data relating to copying activity across

11 the university system.

12    A    None.

13    Q    None.

14         MR. RICH:  I'd like to take a few

15    minutes to see where I am.  Can we do that?

16         THE VIDEOGRAPHER:  Off the record at

17    4:10:55.

18         (Recess taken.)

19         THE VIDEOGRAPHER:  Back on the record

20    at 4:28:44.

21    Q    (By Mr. Rich)  Last few questions for the

22 day.

23    A    Okay.

24    Q    Did your committee give consideration to

25 the impact which the new policy is intended to have

EXHIBIT 29 - 189

1 on copyrighted materials which reside in one or more

2 of the E-Reserve systems across the 35 institutions

3 in the University System?

4      A    That currently reside?

5      Q    Yes.  Let me -- let me ask the question

6 differently, try to be clearer.

7      A    All right.

8      Q    Are there any interests on the committee's

9 part or any purpose on the committee's part to

10 examine, review, and, as appropriate, modify

11 materials that currently reside on one or more

12 E-Reserve systems in light of the new policy?

13      A    No.

14      Q    Is that a subject which was given

15 consideration?

16      A    No, because our thought was that anything

17 currently on reserve would be coming down and we

18 would start fresh, start new.

19      Q    When is it expected that the fresh start

20 would occur, and with respect to what materials and

21 what academic terms is it anticipated the new policy

22 will apply?

23      A    Our expectation would be that any -- once

24 the policy is promulgated and is made known, that

25 from that point forward, anything put on E-reserves

EXHIBIT 29 - 190

1 would be subjected to this new -- to the four-factor

2 test, so anything still to be put on reserve this

3 semester would be covered.

4        So the cutoff would be whenever the

5 announcement is made that the policy is in place.  So

6 going forward, if they make the announcement next

7 week, that would be -- we would go forward from

8 there.  But the material currently on reserve I think

9 is just a -- we didn't really discuss that, no.

10    Q    What's the first full academic term to

11 which the new policy would apply?

12    A    First full academic term would be summer

13 2009.

14    Q    What other -- what are the key elements

15 that need to be put in place for this policy to be

16 properly and fully implemented?

17    A    Well, I think for it to be properly and

18 fully implemented, we just need to announce it.  That

19 should make it -- that -- as I say, the -- once a

20 chancellor approves it and we announce it, it should

21 become the policy of the University System.

22        We'd like -- the committee would like to

23 see some other things happen, such as further

24 educational efforts, which might take the form of an

25 online instructional package.  That's really not up

EXHIBIT 29 - 191

1 to us.  We turn that back to the chancellor's office

2 to determine how to do that.

3          And then, also, I would say that the

4 library directors do intend to discuss this at our

5 meeting in a week or so, a couple weeks, I think, and

6 we'll talk about how to make sure that the E-Reserve

7 is applied within the libraries uniformly.

8     Q    Is that at the RACL meeting you're

9 referring to?

10    A    Yes.  We're meeting in Macon, I think, on

11 the -- two weeks from Friday.

12    Q    Has the committee disbanded at this point?

13    A    Yes.

14    Q    Now, a document was made available to us in

15 discovery indicating that while in the short-term, if

16 I've got this right, the Columbia system or model

17 would be pursued, that in the longer term, the goal

18 was to look more like the Minnesota experience.  Does

19 that ring a bell with you?

20    A    What document was that?

21    Q    We haven't marked it yet.  I'm -- why don't

22 we just mark it so you don't have to guess.

23          MR. RICH:  What are we up to?

24    Plaintiff's 16 is a document bearing Bates

25    No. 20857 to 20858.  It's from Ray Lee to

EXHIBIT 29 - 192

1       Beth Brigdon with a cc to you and someone

2       named Tom Maier, M-a-i-e-r.

3             (Discussion off the record.)

4             (Exhibit 16 marked for identification.)

5       Q    (By Mr. Rich)  You -- have you seen this

6  before?

7       A    Yes, I did.  I think, actually, it's

8  mentioned.  It's one of the other documents --

9       Q    Yeah, I thought it was, also.

10      A    -- which mentioned that, too.  I would say

11 part of that is I think Beth was misinterpreting our

12 discussion, or maybe I'm -- I don't want to be unfair

13 to her.  I think what she's saying is that Columbia,

14 as sort of a static model, is where we like to start,

15 but Minnesota is much more interactive in that they

16 would -- for example, the fair use checklist that

17 Minnesota uses, you fill it out online in a very

18 interactive way.  And I think it even tries to guide

19 you through certain things.  And there's other --

20 it's just a much more lively site.

21            And some members of the committee thought

22 we should eventually have something like that.  They

23 even argued, I must say, that we ought to stay in

24 business and do that.  I said no, no, find another

25 chair --

EXHIBIT 29 - 193

1    Q    No thank you.

2    A    -- if you're going to do that.  But I think

3 that was -- there certainly was a thought that we

4 wanted to go that route down the road, and I think

5 that's something -- when I say we turned the

6 educational effort back to the chancellor's office,

7 that's something that needs to be considered.  There

8 are Web experts, Web designers in the University

9 System office who could look at taking the site we

10 have and making it more interactive.  And that's, I

11 think, what it's referring to.  So it's not the

12 content as it is the design and interactivity.

13    Q    Now that you've had all of two weeks or so

14 to step back from the committee's activities and get

15 perspective on them, is there anything, as you -- in

16 the time you've had to consider it, or indeed

17 informed by today's discussion and deposition, is

18 there anything that was left out of the policy

19 document or was stated incompletely in that document

20 that, given your druthers, you would have liked to

21 have seen contained in the final documentation?

22    A    No.  The only thing I would say, I think we

23 ought to put a -- on the checklist itself, we ought

24 to put a logo or something on it.  That's the only

25 thing I saw.

EXHIBIT 29 - 194

1          MR. RICH:  I have no further

2     questions.

3                    EXAMINATION

4  BY MR. ASKEW:

5     Q    Dr. Potter, I have a few follow-up

6  questions for you, sir.

7          Would you take a look at Exhibit No. 1

8  again.  It's the first exhibit that was shown you in

9  these depositions -- in this deposition.  Do you have

10  that in front of you now?

11     A    Yes.

12     Q    What is the status today of this University

13  of Georgia Libraries' Copyright Policy that's marked

14  as Plaintiff's Exhibit 1 in this deposition?

15     A    I would say it's been superseded by the

16  Regents -- the University System policy that we've

17  been discussing.  And when I get back, I will

18  instruct the staff to start working on either

19  revising this or removing it, as they might determine

20  we should do it, I think, at -- as you pointed out,

21  it looks like it's from the early '90s and it needs

22  to be revised, so we will go back and do that.

23     Q    With respect to Exhibit 2, which is the

24  1997 Regents Guide, that was adopted, I think, in

25  about 1997, what is the status of the Regents Guide

EXHIBIT 29 - 195

1 today?

2   A   Well, based on our discussion this morning,
3 I thought it had been archived already.  I went and
4 checked, and it's still out there at the old URL.
5 And I was not aware of that, and I will bring it to
6 the attention of the system office that it needs to
7 be moved somewhere else and made into an archived
8 version so that -- so it's clear that the new policy
9 is what people should be looking at.

10   Q   Why is there an interest in retaining that
11 document in the archives, Dr. Potter?

12   A   I think for historical purposes, so that
13 we -- people can see what the situation was like in
14 1997.  And I think, again, as a librarian, I don't
15 like to throw anything away.  I think it should be
16 retained for its artifactual value.

17   Q   Is it your understanding that some
18 informational notice will be placed with respect to
19 that 1997 Regents Guide --

20   A   Yes.

21   Q   -- to show that it's being retained for
22 historical purposes only?

23   A   Yes.

24   Q   Can you explain for us, Dr. Potter, why
25 the -- this new committee that is responsible for the

EXHIBIT 29 - 196

1 2009 policy and guidelines was able to complete its

2 work within 60 to 90 days, whereas the committee that

3 was responsible for the 1997 Regents Guide took

4 possibly as long as seven or eight months?

5    A   Well, first of all, you had a more

6 experienced chair than you did before, but I think

7 the real experience was that we had the benefit of

8 counsel, of King & Spalding, to help us on it this

9 time.  We didn't have that before.  It was just the

10 committee was working on it before.

11        MR. ASKEW:  That's all the questions I

12    have.  Mr. Rich?

13           FURTHER EXAMINATION

14 BY MR. RICH:

15    Q   I just have one follow-on question to that.

16    A   You said you were finished.

17    Q   I was, but he triggered -- that's what

18 happens when your counsel opens the door, other than

19 the paid commercial for King & Spalding, which I

20 won't touch.

21        In Plaintiff's Exhibit 9, where you

22 excerpted the note or the statement from Burns

23 Newsome --

24    A   Let me find it again.

25    Q   Take your time.

EXHIBIT 29 - 197

1       MR. RICH:  Tony, do you have a copy

2    handy?

3       MR. ASKEW:  Yes.  There you go.

4       MR. RICH:  I just have one question.

5       THE WITNESS:  Okay.

6    Q    (By Mr. Rich)  If you'd look at the second

7 italicized paragraph --

8    A    Uh-huh.

9    Q    -- it begins by saying, "As the

10 guidelines" -- which is a reference to the 1997

11 guidelines -- "currently reflect established

12 principles of copyright law, it will not be necessary

13 to rewrite the guidelines from scratch."

14       Is it your understanding, sir, that the

15 1997 guidelines currently reflect established

16 principles of copyright law?

17    A    Yes, that's my understanding.

18       MR. RICH:  I have no further

19    questions.

20       THE VIDEOGRAPHER:  Off the record at

21    4:41:25.

22       (Deposition concluded at 4:41 p.m.)

23

24

25

EXHIBIT 29 - 198

```
 1              E R R A T A   P A G E

 2              Pursuant to Rule 30(e) of the Federal Rules
        of Civil Procedure and/or Georgia Code Annotated
 3      9-11-30(e), any changes in form or substance which
        you desire to make to your deposition testimony
 4      shall be entered upon the deposition with a
        statement of the reasons given for making them.
 5      To assist you in making any such corrections,
        please use the form below.  If supplemental or
 6      additional pages are necessary, please furnish
        same and attach them to this errata sheet.

 7

                I, the undersigned, WILLIAM GRAY POTTER, do
 8      hereby certify that I have read the foregoing
        deposition and that, to the best of my knowledge,
 9      said deposition is true and accurate with the
        exception of the following corrections below.

10

11

12 Page / Line /      Change        /      Reason
13 _____ / _____ / _____ / _____
14 _____ / _____ / _____ / _____
15 _____ / _____ / _____ / _____
16 _____ / _____ / _____ / _____
17 _____ / _____ / _____ / _____
18 _____ / _____ / _____ / _____
19 _____ / _____ / _____ / _____
20 _____ / _____ / _____ / _____
21 _____ / _____ / _____ / _____
22 _____ / _____ / _____ / _____
23 _____ / _____ / _____ / _____
24 _____ / _____ / _____ / _____
25 _____ / _____ / _____ / _____
```

EXHIBIT 29 - 199

```
 1  Page    Line         Change                    Reason

 2  ____ / ____ / _____ / _____

 3  ____ / ____ / _____ / _____

 4  ____ / ____ / _____ / _____

 5  ____ / ____ / _____ / _____

 6  ____ / ____ / _____ / _____

 7  ____ / ____ / _____ / _____

 8  ____ / ____ / _____ / _____

 9  ____ / ____ / _____ / _____

10  ____ / ____ / _____ / _____

11  ____ / ____ / _____ / _____

12  ____ / ____ / _____ / _____

13  ____ / ____ / _____ / _____

14  ____ / ____ / _____ / _____

15  ____ / ____ / _____ / _____

16  ____ / ____ / _____ / _____

17

18              _____

              WILLIAM GRAY POTTER

19

20  Sworn to and subscribed before me

    this _____ day of _____ 2009.

21

22  _____

    Notary Public

23  My commission expires _____

24

25
```

EXHIBIT 29 - 200

```
 1              C E R T I F I C A T E

 2   STATE OF GEORGIA

 3   COBB COUNTY

 4          I hereby certify that the foregoing

 5   transcript was taken down, as stated in the caption,

 6   and the questions and answers thereto were reduced to

 7   typewriting under my direction; that the foregoing

 8   pages represent a true and correct transcript of the

 9   evidence given upon said hearing.  I further certify

10   that I am not of kin or counsel to the parties in the

11   case, am not in the regular employ of counsel for any

12   of said parties, nor am I in anywise interested in the

13   result of said case.

14          Disclosure pursuant to OCGA 9-11-28(d):

15   The party taking this deposition will receive the

16   original and one copy based on our standard and

17   customary per page charges.  Copies to other parties

18   will likewise be furnished at our standard and

19   customary per page charges.  Incidental direct expenses

20   of production may be charged to any party where

21   applicable.

22

                  _____

23                MICHELLE M. BOUDREAUX, RPR

                  CCR-B-2165

24

25
```

EXHIBIT 29 - 201

```
1                         DISCLOSURE
2
   STATE OF GEORGIA
3
   COUNTY OF DEKALB
4
5
           Deposition of WILLIAM GRAY POTTER
6
7          Pursuant to Article 8.B of the Rules and
   Regulations of the Board of Court Reporting of the
8  Judicial Council of Georgia, I make the following
   disclosure:
9
           I am a Georgia Certified Court Reporter acting
10 as an agent of Shugart & Bishop to provide court
   reporting services for this deposition. I will not be
11 taking this deposition under any contract
   that is prohibited by OCGA 15-14-37 (a) and (b).
12
           Shugart & Bishop has no contract to
13 provide reporting services with any party to the case,
   any counsel in the case, or any reporter or reporting
14 agency from whom a referral might have been made to
   cover this deposition.  Shugart & Bishop will
15 charge its usual and customary rates to all parties in
   the case, and a financial discount will not be given to
16 any party to this litigation.
17
18 _____, CCR-B-2165
19 DATE: _____
20
21
22
23
24
25
```

EXHIBIT 29 - 202