EXHIBIT 42

# 7

# Affect as Information: The Role of Public Mood in Political Reasoning

WENDY M. RAHN

Levels of political information are notoriously low in the American mass public. How is it that people arrive at political judgments in the absence of detailed information? In recent years, students of American public opinion have latched onto the notion of "heuristics," or simplifying rules of thumb, to explain how it is that people get by (Sniderman, Brody, and Tetlock 1991). These forms of "low-information rationality" (Popkin 1991) are thought to cut information-processing costs and lead some people to make the same sorts of judgments that they would have made had they been better informed. Lupia's (1994) study of voting on California ballot issues, for example, shows how less-well-informed voters can emulate the behavior of well-informed voters by relying on the cues provided by interest groups and political leadership.

In this chapter, I will argue that affective (i.e., emotional) experiences affect political reasoning and facilitate low-information rationality. In everyday discourse, "being emotional" is seen as dysfunctional, often resulting in decisions or actions that are later regretted. However, I wish to make the case that certain kinds of affective experiences can be useful, rather than dangerous, because they help inform the individual about the state of his or her world. This affective information can substitute for more cognitively expensive forms of information and can aid people in their attempts to form political opinions.[1]

ank Lynn Smith-Lovin for her work on the 1996 General Social Survey odule, Daniel Stevens for his research assistance, and the editors for their

PLAINTIFF'S EXHIBIT 260

130

## Affect as Information

It is not a new idea to political science that affective reactions may indeed be functional (see Marcus and MacKuen 1993; Sniderman, Brody, and Tetlock 1991). This chapter builds on earlier work by conceptualizing and measuring a specific form of affective experience, one that I call public mood. Public mood is the affective state that captures how individuals feel about the society in which they live. With two surveys and one experiment, I reveal a link between public mood and the ways in which people seek and process political information. That is, I show that variations in how people feel about their society correspond to systematic variations in how they form judgments about other matters, such as NAFTA. My efforts support the contention that affective states, such as public mood, affect how people think about politics and facilitate low-information rationality. My efforts also reinforce the growing realization (e.g., Damasio 1994; Lodge and Taber 2000) that basic cognitive processes, such as those that underlie political reasoning, cannot and do not operate independently of affective experiences.

## WHAT IS PUBLIC MOOD?

### Definition

As we have conceptualized it in various studies, public mood is a "diffuse affective state, having distinct positive and negative components, that citizens experience because of their membership in a particular political community" (Rahn, Kroeger, and Kite 1996: 31). The nation-state is the political community that has been the focus of our research to date.[2] Membership in a nation-state provides individuals with a national iden-

---

1991). Affect can also create long-run efficiencies in information processing. Positive affect, for example, may lead people to rely on well-developed prior knowledge structures (Bodenhausen, Kramer, and Süsser 1994). Because these knowledge structures (e.g., schemas, prototypes, and stereotypes) make information processing more parsimonious, cognitive capacity is freed up, allowing the information processing system to engage in other important tasks (Bless, Clore, Schwarz, Golian, Rabe, and Wölk 1996). Emotions, therefore, help to regulate attention (Derryberry and Tucker 1994). At high levels of arousal, positive and negative affect states, of course, may become dysfunctional, such as in manic-depressive illness or panic attacks. But at ordinary levels, affective states are now widely perceived in many areas of psychology to be functional for human rationality.

[2] In principle, there is nothing in the definition of public mood that restricts its reference point to the nation-state. For example, one can imagine experiencing public mood in a city or a state whose team wins a World Series or Super Bowl. In practice, however, our investigations of the properties of public mood have focused on the nation-state. Our focus is predicated on the idea that despite the ostensible weakening of the nation-state as a form of political organization, nation-states continue to be "the largest collectivities with which individuals have forged strong identifications" (Wrong 1994: 230).

131

GaState0033710

EXHIBIT 42 - 1

## Rahn

tity, a type of social identity that functions as a "means of locating and defining individual selves in the world" (Smith 1991: 17). National identity is usually reinforced through explicit instruction and continually recreated through subtle means, such as product advertising, weather maps, and sports reporting (Billing 1995).[3]

Self-categorization as a member of the American political community has important affective consequences. Because American national identity "extends the self" beyond the level of the individual, events that are group relevant, but not necessarily self-relevant, can instigate emotional responses.[4] Thus, public mood is a type of "social emotion," a concept developed by the psychologist Eliot Smith (1993) to distinguish feelings that arise because of group attachment, rather than more individually based experiences. To cite recent examples, the threat of military action in the Persian Gulf might make national identity salient, evoking feelings of anxiety and distress. And many Americans cheered when the U.S. gymnast, Kerri Strug, landed a gold-medal-winning vault during the 1996 Summer Olympic Games. When national identity is made especially salient, as in these kinds of situations, public mood can become an integral part of a person's private mood (Rahn and Hirshorn 1997).

As a type of affective experience, public mood belongs to that category of affective reactions that involve awareness of the target of one's feelings (in this case, the national political community), but potential unawareness of the source for these sentiments. These forms of "dedicated affect" include many types of experience. The anxiety that a claustrophobic feels in an elevator, for example, has a well-defined target, and the individual may even recognize that the fear is unreasonable. But the origins of these feelings may not reside in any explicit event in a person's life. Less extreme than phobias are widely shared feelings about certain classes of objects, such as the delight evoked by the sight of a baby or the recoil in response to certain animals. Plutchik (1994), for example, reports a study conducted by the ethologist Desmond Morris (1967) in which he asked children watching a zoo program to tell him which

---

[3] The kinds of events, people, and activities that are relevant to public mood processes depend on "collective representations," to use Durkheim's phrase, about the nature of national identity. These representations help citizens in a given national political community "imagine" the nation and its inhabitants (Anderson 1983). This imagining process is carried out by political leaders and citizens, and is formalized and perpetuated in such institutions as the mass media, the arts, citizenship and commemorative ceremonies, explicit instruction in school, and election campaigns (Anderson 1983; Bennett 1992; Billig 1995; Merelman 1986; Rahn, Brehm, and Carlson 1997; Spillman 1997).

[4] Smith and Henry (1996) provide experimental evidence that evoking a social identity results in a cognitive merger of the in-group with the self.

EXHIBIT 42 - 2

---

## Affect as Information

animals they liked or disliked the most. Leading the list of disliked animals were snakes, followed by spiders. Crocodiles and lions tied for third place. According to Plutchik, "The animals the children disliked most shared one important feature: they are dangerous to humans" (1994: 344). When the children were asked why they disliked these creatures, however, their responses mostly centered on physical attributes, such as "slimy" or "hairy." Fear reactions to certain animals make perfect sense from an evolutionary point of view, and provide people with a basis for "reasoning backwards" from their emotional response to the belief that such creatures should be avoided.[5] But the "real" sources for these feelings may lie in our evolutionary past, and therefore cannot be accessed consciously.[6]

Public mood shares with other forms of dedicated affect an "address."[7] That is, the feelings are about something that can be explicitly named. But the sources for these feelings may lie outside conscious awareness; they may have been forgotten perhaps, or the sources are so diffuse and multiple that adumbrating all of them would prove impossible.

In addition, public mood is an attribute of *individuals*, not "the public." In principle and in reality, public mood varies across individuals and over time for the same individual. A morning news item about U.S. children's test scores, for example, may make some individuals discouraged. But later, a record stock market close may lift some of these spirits, even if one does not have any investments. Public events are the source of public mood, and my interest here is in determining how

---

[5] Batson, Turk, Shaw, and Klein (1995) use the phrase "reasoning backwards" to refer to the process by which one uses one's feelings about a target to infer back to the values or beliefs that must have been responsible for them.

[6] Attitudes are also a form of dedicated affect (Jerry Clore, personal communication). With attitudes, one lacks awareness of the source for one's feelings, either because the critical event that led to the attitude formation was not salient at the time or because so many events or bits of information with affective implications have gone into the attitude that they are forgotten, as in on-line processing (Lodge, McGraw, and Stroh 1989). The "likability heuristic" that helps people decide what opposing groups want in politics is described by Sniderman, Brody, and Tetlock in precisely these terms: "Suffice it to observe that affect [toward groups] itself may be the residue of long biographies of cognitive transactions" (Sniderman, Brody, and Tetlock 1991: 115). And affect toward groups may also provide a basis for "reasoning backwards" to beliefs about them (Sniderman, Brody, and Tetlock 1991).

[7] Public mood and other forms of dedicated affect are distinguished from affective states that lack an "address." Undedicated affect is characterized by unawareness of source (which it shares with dedicated affect) and by the lack of a specific target object that is the focus of one's feelings. Free-floating anxiety, for example, is characterized by the fact that a source for these feelings cannot be located, nor can a specific target for anxiousness be specified.

GaState0033711

Rahn

individual-level shifts in public mood affect individual capacities for political information processing.[8]

## Effect

How might we expect public mood to affect the way that people seek and process information about politics? Ongoing research in psychology and cognitive science provides some clues. Consider, for example, the idea that some dedicated affective states provide a means for individuals to make choices without spending a great deal of effort thinking about them. This type of effect has been brought to light most explicitly in studies conducted by the Damasios and their colleagues (Bechara, H. Damasio, Tranel, and A. Damasio 1997; see more generally, A. Damasio 1994). For example, in one study they had normal participants and "emotion-impaired" patients play a card game in which decks of cards were associated with rewards and penalties.[9] People in the study did not know when a penalty card would be turned over, nor did they know how long the game would last. Certain decks had cards yielding high rewards but also large penalties; other decks carried less reward and less risk. Participants were asked to make choices among the decks about which cards to turn over. The decks were structured in such a way that the expected utility of drawing from the low-reward–low-penalty decks was much higher than the expected utility of drawing from the other decks.

Participants without brain damage quickly began eliciting anticipatory autonomic responses before turning over a card from the high-risk decks, and they ultimately learned to avoid choosing from them. The patients, however, never developed this anticipatory response, although some did come to learn that choosing from certain decks carried higher penalties. Normal participants who developed the anticipatory responses often did so after turning over only 10 cards; yet they were unable to articulate the strategy responsible for these feelings until some 70 turns later. And even though three of the normal participants never reached the "conscious" reasoning stage, they were still able to make advantageous choices. Even more astonishing, the three brain-damaged partici-

[8] Of course, certain events, such as the Olympic example I mentioned, or the *Challenger* disaster, may move nearly everyone up or down at the same time because exposure to information about the event is virtually universal and the feelings evoked by the incident are consistently in the same direction across individuals. As a result, we could witness substantial aggregate volatility in the average level of public mood. In this chapter, however, I limit myself to examining individual-level effects of public mood.

[9] The impairment of these subjects was due to brain damage to the prefrontal cortex, an area of the brain implicated in emotional responding.

134

## Affect as Information

pants who were able to generate the insight that some decks were better than others were still not able to choose well. Apparently, the "hunches" normal participants developed in advance of acquiring explicit knowledge of the rule allowed them to proceed as if they had knowledge of the rule. This anticipatory feeling, which the researchers label a "covert bias," assists "the efficient processing of knowledge and logic necessary for conscious decisions" (Bechara et al. 1997: 1294). Based on the results, it appears that affect is often prior to more explicit cognitive strategies. Moreover, knowledge of the correct cognitive strategy, if unaccompanied by a "covert bias," does not by itself lead to utility maximizing choices.

## DOES PUBLIC MOOD AFFECT INFORMATION PROCESSING?

In this chapter, I base my claim that public mood affects the processing of political information and facilitates low-information rationality on my analysis of three distinct studies. My first two analyses are conducted on data from the 1996 General Social Survey (GSS), a national survey conducted by the National Opinion Research Center (see Kite and Rahn 1997, for evidence from local samples). I was able to administer six public-mood questions to a randomly selected subsample of approximately 700 GSS respondents. The mood markers I used in this particular study were worried, angry, upset, frustrated, enthusiastic, and hopeful. Respondents were given five options for indicating how frequently they felt these emotions when thinking about the United States: "always," "most of the time," "some of the time," "rarely," or "never."[10]

## Analysis 1: Public Mood and NAFTA Preferences

I first examine the correspondence between public mood and opinion about the desirability of NAFTA. In response to a question asking whether the United States benefits or does not benefit from NAFTA membership, fully 9% of the GSS sample admitted to never having heard of

[10] The public mood measures ask respondents for "generalized" mood ratings over a retrospective, but indefinite, time frame. Research by Parkinson and colleagues (Parkinson, Briner, Reynolds, and Totterdell 1995) on the accuracy of retrospective ratings of personal mood finds that retrospective reports of generalized mood are somewhat affected by current mood state, but in general, memory for affective experiences is, in fact, strongly determined by averaging across actual momentary mood states; that is to say, memory for mood is largely accurate. There is no reason to suspect that retrospective ratings of public mood are any less accurate than ratings of personal mood.

135     GaState0033712

EXHIBIT 42 - 3

Rahn

NAFTA, and another 47% said they "didn't know" whether the United States benefits. NAFTA, in other words, despite being the focus of many public debates, had low salience to the mass public. But almost half of the sample did offer an opinion one way or the other, and so the question is, on what basis did they decide that NAFTA was a good or bad thing?

To determine the basis of opinions on NAFTA, and to provide a compelling set of control variables against which I can evaluate the role of public mood, I begin my analysis by considering the many factors that previous scholars have used to explain opinion formation (see generally, Boninger, Krosnick, and Berent 1995; Kinder 1983; Zaller 1992): personality and predispositions, such as authoritarianism (Feldman and Stenner 1997; Geddes and Zaller 1989); general "postures" (Hurwitz and Peffley 1987); ideology (Converse 1964); partisanship (Campbell et al. 1960; Jacoby 1988); group cues (Converse 1964; Lupia 1994); social identities (Conover 1984); values (Feldman 1988); self-interest (Green and Gerken 1989); and information and knowledge (Bartels 1996; Delli Carpini and Keeter 1996; Dimock and Popkin 1995).

Many analogs of these factors for the NAFTA case study are available in the 1996 GSS in some form. For example, general posture toward free trade is assessed with a Likert question about whether limits on imports should be imposed in order to protect the U.S. economy. Partisanship and ideology are measured in the usual ways. The impact of reference groups is measured with a dummy variable for union membership. Domain-specific information is measured by responses to questions that asked respondents how much they had heard about NAFTA. And general knowledge is (rather poorly) measured by years of educational attainment. Self-interest is not easily defined on the NAFTA issue, but I include a measure of retrospective personal-financial assessments in order to pick up the role of personal-economic considerations.[11]

With these controls in hand, I now wish to pose the question, how does public mood affect opinion formation? To answer this question, I regressed NAFTA opinion (coded 1 for benefits, 0 if the United States doesn't benefit)[12] on the factors named above, the usual complement of demographic controls, and a measure of public mood valence, computed by subtracting the average frequency of negative feelings from the average frequency of positive feelings. All variables, except age and edu-

---

[11] My equation initially included a measure of authoritarianism. Its coefficient was virtually 0 and far from significant. In order to preserve cases, this variable was not included in the final equation.

[12] People who responded "don't know" to the NAFTA opinion question are excluded from the analysis.

136

*Affect as Information*

Table 7.1

| NAFTA Opinion Direction (1=U.S. Benefits, 0=Does Not Benefit) | Unstandardized Coefficient (Standard Error) |
|---|---|
| Public Mood Valence | .68*** (.16) |
| Union Membership (1=Member) | -.16# (.09) |
| Age | -.004* (.002) |
| Education | .010 (.011) |
| Race (1=Black, 0=Else) | .12 (.11) |
| Personal Financial Retrospections (1=Better than year ago) | -.05 (.07) |
| Sex (1=Female, 0=Male) | -.02 (.06) |
| How much heard or read (1=Lots) | -.21# (.11) |
| Party Identification (1=Strong Republican) | -.27*** (.10) |
| Ideology (1=Extremely Conservative) | -.06 (.14) |
| General Trade Orientation (1=Strongly disagree imports be limited) | .45*** (.11) |
| Constant | .47* (.24) |
| Adj. R² | .15 |
| N | 288 |

***p ≤.001  **p ≤.01  *p ≤.05  #p ≤.10, two-tailed

cation, which are coded in years, are scored to lie between 0 and 1, facilitating direct comparisons of the unstandardized coefficients.

The results, displayed in Table 7.1, are striking. The impact of public mood, quite simply, is enormous when compared to these other consid-

137

GaState0033713

EXHIBIT 42 - 4

Rahn

erations. Of course, other considerations are also operative, namely party identification and union membership. Members of unions, not surprisingly, were less positive in their evaluations of NAFTA's effects. And Republicans, despite their endorsement of free trade in the abstract, were less likely than Democrats to believe that a Clinton-supported policy is beneficial to the United States. Specific information about NAFTA is also important. Those people who have heard a lot about the issue tend to be more dubious about NAFTA's benefits, all else equal.

In Table 7.2, I show that the effect of public mood on opinion varies with the amount of information one holds about the issue. There, I divided the sample into three groups: those who had heard "a lot" about NAFTA; those who had heard "quite a bit"; and those who heard "not much" or "nothing at all." When I ran the equation separately within these three groups, some interesting patterns emerged, albeit the small number of cases makes comparison hazardous. The magnitude of the public mood coefficient is much smaller for those people who had heard a lot about NAFTA: They were much more able to link their general free-trade postures and their party identifications to their opinions; the coefficients are of considerable magnitude (.835 and -.60, respectively) compared to the low information group (.06 and -.39 respectively). The middle group was able to make use of a general posture toward free trade in evaluating the benefits of NAFTA, without, however, abandoning public mood. As Zaller (1992) argues, some considerations, apparently, depend on having some information in the first place so that appropriate linkages can be made to underlying predispositions (such as general postures on free trade or partisanship) or group interests (such as belonging to a union). Indeed, in the high-information group, there appears to be the partisan polarization that characterizes intense, two-sided information environments (see Zaller 1992).[13] Public mood, on the other hand, seems to have a greater impact on policy preferences at the lower end of the information range. For those less knowledgeable, this general-purpose consideration may be the only one operative. For those more informed, affective information is just one source of many, and it only starts to lose its utility at the very highest range of information, when partisan and other predispositions come to dominate.

## Analysis 2: Generalized Trust in Others

In the domain of opinion formation, public mood exists alongside other potential determinants, notably partisanship and other ideologically

---

[13] Average NAFTA opinion among highly informed, strong Republicans was .41; for strong Democrats in this group, .71. In contrast, among the less informed, the averages were .48 and .60, respectively.

138

---

## Affect as Information

### Table 7.2

NAFTA Opinion Direction by Information Levels

|  | Low Specific Information | Medium Specific Information | High Specific Information |
|---|---|---|---|
| Public Mood Valence | .67** (.28) | .80** (.25) | .39 (.40) |
| Union Membership | -.006 (.17) | -.21# (.12) | -.28 (.28) |
| Age | -.005 (.004) | -.004# (.002) | -.007 (.005) |
| Education | .02 (.02) | .001 (.02) | .001 (.02) |
| Race | -.05 (.19) | .18 (.22) | .008 (.23) |
| Sex | -.11 (.11) | .03 (.08) | -.006 (.13) |
| Personal Financial Retrospections | -.007 (.13) | -.09 (.11) | .07 (.20) |
| Party Identification | -.39* (.18) | -.19 (.14) | -.60* (.25) |
| Ideology | -.06 (.28) | .003 (.21) | -.30 (.25) |
| General Free Trade Orientation | .06 (.23) | .50 (.17) | .84*** (.23) |
| Constant | .57 | .16 | .98 |
| Adj. R² | .06 | .13 | .27 |
| N | 90 | 141 | 57 |

*** p ≤ .001  ** p ≤ .01  * p ≤ .05  # p ≤ .10, two-tailed

tinted predispositions. Depending on the information environment and the framing of the policy choice, public mood may or may not be useful to individuals in reaching some sort of political judgment on these policy issues. But how do people form judgments in areas that are less subject to the to and fro of partisan and interest-group conflict? Here, possessing general or specific knowledge would seem to provide one with no obvious *political* linkages since these connections have not been made by political elites. This may be one reason that Zaller's (1992) opinion-

139

GaState0033714

EXHIBIT 42 - 5

formation model appears to perform best in attitude areas that are driven by partisan cleavages, such as electoral choice and policy disagreements. But for other types of attitudes, such as trust in government, the model does not appear to apply as well. "The reception-acceptance model is designed to capture the diffusion of particular ideas and messages, not the spread of amorphous moods and humors" (Zaller 1992: 300). Because it is specifically conceptualized to measure at the individual level these "amorphous moods and humors," public mood may have some utility as an explanation for attitudes precisely in those areas in which ideological, partisan, and other political predispositions don't apply.

I examine this proposition in the context of generalized trust in others, the origins of which have become the object of intense scholarly interest because of the connection between general, or social, trust and "social capital" (Putnam 1993). In societies marked by high levels of trust, desirable collective outcomes – such as well-functioning governments, economic growth, and low crime rates – are more likely because trust lowers transaction costs, facilitates cooperation for mutual benefit, and inhibits shirking (Fukuyama 1995; Putnam 1993). How social trust gets produced, then, is an important question to people in many different fields of inquiry.

Arriving at an assessment about whether "most people" are trustworthy would seem a most difficult task, for any one person is likely to have direct experience with only a very small fraction of the category, "most people." And unlike the evaluation of NAFTA opinions, partisan predispositions would seem to be of little use, as no politician or interest-group representative is against trust. So how does one decide to tell a survey interviewer that "most people can be trusted" or "you can't be too careful in dealing with people"? Does public mood play a role?

One could decide, for example, that most of the time, others can be trusted because it is in their self-interest to behave in a trustworthy way. Your judgment of the trustworthiness of most people "encapsulates" your knowledge of the incentives facing them. An important source of these incentives includes abstract systems of social, political, and economic organization that govern transactions among people (Seligman 1997). Confidence in these systems, particularly confidence in the state (Gambetta 1988; Levi 1996) may allow you to trust others, even those whom you do not know. By this account, trust is instrumental and is based on being aware of the incentives others face.

Another account places the origin of trust in social learning. Information gleaned from previous encounters with other people may provide for the individual a basis for generalizing to new interactions. Learned

trust allows one to make judgments about others without the knowledge of their incentives (Hardin 1993). In this "intuitive Bayesian" (Hardin 1993) account, a person with a high capacity to trust is a person who has been blessed with many fruitful experiences with others. The "leap of faith" that trust requires comes from optimism that others provide benefit rather than harm (Uslaner 1996). The civic engagement Putnam (1993) found in northern Italy may help create this optimism by providing people with settings in which they have positive dealings with others. And people without the capacity to trust are those who have had interactions with others that have taught them that trust is not justified.

A shortcut to this kind of learned-trust calculation may involve the use of the "cognitive miser's heuristic" (Orbell and Dawes 1991), or the projection of one's own level of trustworthiness onto others. The logic is as follows: Since I plan to behave in a trustworthy (or untrustworthy) way and others are similar to me, then they will do what I plan to do. Perceived similarity can be imputed on the basis of shared characteristics. The basis for similarity may be "imagined" rather than based on direct familiarity, such as in the case of shared group identity (Kramer, Brewer, and Hanna 1995; Seligman 1997).

There are thus numerous reasons that might lead our beleaguered survey respondent to offer a generalization about the likely trustworthiness of that amorphous category of folks, "most people." And many of these have been tested already in a model of social trust developed by Brehm and Rahn (1997). And all of them have some support, with personal optimism, confidence in government, and civic engagement doing most of the heavy lifting, though direct personal experience plays a small supporting role.

What I would like to consider here is that the decision to trust most people may be even simpler than these theories imply, a gut reaction rather than a considered evaluation of all these possibilities. In deciding whether most people are deserving of trust, individuals could avail themselves of the "affect-as-information" heuristic, implicitly asking themselves the question, "how do I feel about the society in which I live?" If the response is enthusiasm, an individual may "reason backwards" to the belief that it is because most people are pretty decent. If one feels worried, angry, upset, or afraid, on the other hand, the inference may be that these feelings arise because people cannot be counted on.

Testing this requires pitting public mood against some of the other bases for trust judgments. A thoroughgoing test is made difficult by the construction of the GSS sample. Some of the crucial items were administered to only half or two-thirds of the full sample, and because the public-mood questions were asked of only one-quarter of the GSS sample, we are left with the situation that the number of usable cases is

GaState0033715

EXHIBIT 42 - 6

Rahn

small. In addition, the GSS did not ask about group involvement in the 1996 survey. However, they did ask all respondents whether they voted in the 1992 presidential election, and so I can use reported turnout as one indicator of civic involvement.[14]

I use a measure of fear of crime in one's neighborhood and a measure of the alteration in one's financial status in the last year to reflect recent personal experiences that might contribute to judgments of others' trustworthiness. I also include a measure of authoritarian predispositions, measured by the importance adults place on obedience in child rearing (Feldman and Stenner 1997). Civic engagement is captured with the turnout variable, as already mentioned. Race, to some degree, reflects one's environment, and educational attainment, the investment that has been made on one's behalf by one's parents (Hardin 1993). And age is used to capture cohort effects on trust that are still not well understood, though they may be based, in part, on the rapid rise in materialistic value orientations that occurred in children who were part of the late baby boom or postboom generations (Rahn and Transue 1997).

As in our earlier analysis, confidence in government is measured by a scale that includes confidence ratings of Congress, the Executive Branch, and the Supreme Court ($\alpha = .67$). Responses to these questions were averaged, and the resulting scale was recoded to lie between 0 and 1. Personal optimism is measured by a question asking how many days in the past week the respondent felt happy, and it ranges from 0 to 7 days. Public mood is measured as before. The dependent variable is a scale based on the degree to which respondents felt that most people were trustworthy, fair, and helpful ($\alpha = .66$). With the exceptions of age and education, which are measured in years, and personal optimism, which is measured in days, variables are scaled to lie between 0 and 1.

Table 7.3 displays the results of this analysis. As with NAFTA opinions, there is a significant correspondence between respondents' public mood and their assessments of others' trustworthiness. Personal optimism, authoritarianism, and civic engagement (as measured by turnout) are also of some importance. The effects of confidence in government, fear of crime, and age – variables that we found in our earlier analysis to be of some importance – appear to be completely mediated through the other variables in the model. I interpret these results as evidence that one's public mood summarizes confidences in governing authorities, perceived security in one's neighborhood, and distinctive cohort experiences, plus myriad other factors that are impossible to catalog in full. Public

[14] The GSS is administered in the spring. Respondents who were not eligible to vote in 1992 are excluded from the analysis.

142

Affect as Information

Table 7.3

| | |
|---|---|
| The Origins of Social Trust (1=Trusting) | |
| Public Mood Valence | .60*** (.16) |
| Age | .0016 (.002) |
| Education | .02* (.01) |
| Race | -.14# (.07) |
| Sex | .003 (.05) |
| Personal Financial Retrospections | .06 (.07) |
| Personal Happiness | .03** (.01) |
| Fear of Walking Alone at Night? (1=Yes) | -.008 (.05) |
| Turnout in 1992 (1=Yes) | .173** (.06) |
| Importance of Obedience in Child rearing (1=Most Important) | -.19** (.07) |
| Confidence in National Government (1=A Great Deal) | .03 (.11) |
| Constant | -.44* |
| Adj. R² | .28 |
| N | 169 |

***p ≤ .001  ** p ≤ .01  * p ≤ .05  # p ≤ .10, two-tailed

mood corresponds with strong patterns in respondents' trust assessments and acts in a way that is consistent with the notion that it summarizes a lot of detailed information about the political community. Put another way, Table 7.3 provides evidence that public mood affects political reasoning and facilitates low-information rationality.

I performed the same analysis within different educational strata – those with more than a high school education versus those with less edu-

143   GaState0033716

EXHIBIT 42 - 7

*Rahn*

Table 7.4

| The Origins of Social Trust by Level of Education | | |
|---|---|---|
| | 12 years or less | 13 years or more |
| Public Mood Valence | .72*** (.21) | .52* (.23) |
| Age | .003 (.002) | .001 (.003) |
| Education | .07*** (.02) | .006 (.02) |
| Race | -.18# (.09) | -.05 (.11) |
| Sex | .06 (.07) | .02 (.07) |
| Personal Financial Retrospections | .193* (.097) | -.003 (.09) |
| Personal Happiness | -.002 (.016) | .07*** (.02) |
| Fear of Walking Alone at Night? | -.12# (.07) | .05 (.07) |
| Turnout in 1992 | .14* (.07) | .20* (.09) |
| Importance of Obedience in Child rearing | -.13 (.09) | -.30* (.11) |
| Confidence in National Government | -.12 (.15) | -.06 (.15) |
| Constant | -1.1*** | -.28 |
| Adj. R² | .39 | .26 |
| N | 75 | 94 |

***p ≤.001   **p ≤.01   *p ≤.05   # p ≤.10, two-tailed

cation – in order to see whether, as before, the effect of public mood varies with knowledge. As seen in Table 7.4, the coefficient on public mood is large for both groups. Its size, however, is somewhat diminished for the well educated, suggesting that its influence may be somewhat muted for those with more cognitive resources, although the small number of cases makes this difference statistically unreliable. The main difference between the two groups seems to lie in the use of

144

## Affect as Information

recent personal experiences or predispositions in making trust assessments. Authoritarianism and personal optimism, both personality predispositions the origins of which are a combination of biology and experience, are much more important for the better-educated group. For the less-well-educated group, however, the coefficients for retrospective assessments of personal-financial well-being and fear of walking at night in one's neighborhood are sizable in comparison to their counterparts in the well-educated group. Notice, too, that both race and years of education are important for those in the less-well-educated group. To the extent that these are demographic stand-ins for the quality of one's personal experiences, they conform to the pattern as well.

The foregoing analyses of NAFTA and social trust suggest that public mood may supply an important source of information for making many different politically relevant judgments. The main variation observed in these analyses is that the better informed appear to be less reliant on public mood and more reliant on various kinds of predispositions. In the NAFTA case, these predispositions are political; for social trust, the predispositions are based in personality. Therefore, a tentative generalization that emerges from these tests is that the better informed have less need for public mood, and so the extent to which public mood affects political reasoning and facilitates low-information rationality is greater for those with less information.

## Analysis 3: A Misattribution Experiment

So far, the argument for the informational role of public mood has been based on examining its impact in a cross-sectional survey setting. Such analyses are always vulnerable to objections about the nature of causality. Does public mood cause the judgments being examined or does it work the other way around?[15] To answer this question, Jerry Clore and I conducted an experiment within a survey in which we made use of the so-called misattribution paradigm. Schwarz and Clore (1983) were the first to establish firmly the informational role of moods by using this type of experimental design, and our study replicated its logic.

[15] I believe that the reverse causality argument is implausible with respect to opinions on NAFTA, because so few people had opinions about it. In contrast, virtually everyone answered the public mood questions. For social trust, the argument is potentially more compelling. However, when I estimated, via two-stage least squares, a reciprocal model of trust and public mood, this analysis completely supports the recursive results reported in Table 7.3. The coefficient for the social trust to public mood link has the wrong sign and is statistically insignificant (β = –.01, p <.84).

145

GaState0033717

EXHIBIT 42 - 8

The basic element of a misattribution experiment involves providing some subjects with an explanation for something, and then comparing their responses to others who were supplied with an alternative explanation. Schwarz and Clore (1983) used a variation of the misattribution paradigm to study the impact of current mood state on judgments. In their studies, the experimental treatment involved providing some subjects with an explanation for their feelings that would discredit them as a basis for evaluation. For the experimental control group, no such attribution was provided. The informational role of affect could then be established by comparing these two groups of subjects. For subjects not provided an explanation, Schwarz and Clore expected to find a correspondence between mood and judgment; that is, subjects in good moods would evaluate the target object (in this case, their own lives) more positively than subjects in negative moods. For misattribution subjects, however, mood was expected to be viewed as less reliable and, therefore, its information value discounted, resulting in reduced mood-congruency effects.

In one version of this basic design, the researchers called people up under the guise of conducting a public opinion survey. In some cases, these phone calls were made on warm, sunny days; in others, on rainy days. As expected, people called on sunny days reported higher levels of momentary happiness, or mood, than people called on rainy days. In all cases, people were asked to rate the quality of their lives "overall." However, some people were led either directly or indirectly to connect the weather to their current moods. In the direct condition, the interviewer explicitly stated that the purpose of the survey was to see how the weather influences a person's mood. In the indirect condition, the interviewer in an aside more innocuously asked, "By the way, how's the weather down there?" For subjects called on rainy days, self-reported overall life satisfaction depended on whether they were supplied, either directly or indirectly, the link between the weather and their current mood state. Rainy-day subjects not supplied with the weather attribution reported much lower levels of general life satisfaction than rainy-day subjects cued to the fact that the weather just might have something to do with their mood. Moreover, rainy-day subjects supplied with the weather attribution were just as satisfied with their lives as sunny-day subjects.

In our version of the misattribution paradigm, we purchased a few minutes of interviewing time in early 1994 on a national continuous telephone survey conducted daily by the University of Wisconsin's Survey Center, and 646 respondents were randomly assigned to one of two conditions, misattribution or control. In the control condition ($n = 336$), respondents were first asked the public mood questions, followed by a

series of Likert-type political-attitude statements. In the misattribution condition ($n = 310$), a manipulation designed to get respondents to doubt the relevance of their public moods was inserted in between the measurement of public mood and the political judgments. The interviewer asked the respondent: "Please answer true or false: These feelings I've had about the country are due mostly to the way the United States is portrayed in television advertising and on TV programs." After recording the respondent's answer, the interviewer moved on to the political-attitude items.

Our choice of television as the attribution target was based on two things. First, we needed to suggest a source for public mood feelings that people would see as plausible. But second, this source had to be seen as dubious enough to get respondents to second-guess their own feelings as reliable. Television seemed to meet this criterion as well. For example, in 1974, less than 18% of respondents in the GSS said that they had hardly any confidence in television. By 1994, which was the year we did our experiment, the percentage of no-confidence responses had nearly doubled.

Our attribution manipulation, however, was not as successful as we had hoped. Less than half of the respondents ($n = 120$) assigned to the misattribution condition actually responded "true" to the interviewer's question about TV, and so we were forced to differentiate the misattribution condition into two, nonexperimental groups, "true responders" and "false responders."[16] The predictions for the design are as follows: Subjects in the control condition should show public mood effects on at least some judgments because their feelings about the country act as a source of information, and this information has not been called into question. Subjects in the "false" group should also show public mood effects on judgment, but for a different reason: By rejecting the misattribution suggestion of television, respondents implicitly affirm the validity of their feelings. In other words, the control and the "false" groups should resemble each other in terms of the average levels of the political judgments. For respondents in the "true" condition, however, we expect to see the discounting of public mood on political judgments because by attributing their feelings to television, subjects implicitly cast doubt on their reliability as information sources.

To examine these predictions, we treated each respondent's political judgment as a deviation from his or her overall judgment mean, in order to control for within-subject variability that might arise from the ques-

---

[16] The "true" group did not differ significantly from the "false" group with respect to age, race, personal mood, party identification, economic assessments, or job performance ratings of President Clinton and Congress. However, the "true" group was less educated.

EXHIBIT 42 - 9

*Rahn*



Figure 7.1. The misattribution of public mood.

tion format (e.g., acquiescence bias) or perspective effects (Green 1988; Wilcox, Sigelman, and Cook 1989). Because we use deviations rather than raw scores, a positive value indicates that the judgment was more positive than an individual's average judgment; negative scores mean the reverse. The seven judgments listed below were then submitted to an analysis of covariance in which group (control, true, false) was a between-subjects variable and education was a covariate:

- *Trust in government:* You can generally trust the government to do what is right.
- *External efficacy:* People like me don't have any say in what government does.
- *Responsiveness:* If public officials are not interested in hearing what the people think, there is really no way to make them listen.
- *Group conflict:* In America, we don't have to worry about group conflicts tearing up the country like they did in Yugoslavia.
- *Problem-solving efficacy:* It seems like as Americans, we can no longer find ways to solve our problems.
- *Global efficacy:* The United States can accomplish quite a lot in the world, provided that our leaders and the people really want to do it.
- *Security threat:* It won't be long until another strong country will start being a troublemaker for the United States now that the Soviet Union is gone.

Of these seven judgments, three showed significant differences ($p \leq .04$) by attribution group: trust in government, external efficacy, and group conflict. Consistent with expectations, the means in the control and false groups do not differ. But in the true group, two of the judgments (group conflict and trust in government) are significantly more positive, and the efficacy item is significantly more negative, in comparison to the control and false groups.

The pattern in the data in Figure 7.1 suggests that the attribution to television caused the "true responders" to engage in correction of their judgments for the now-discredited influence of public mood feelings. Judgments that were more negative than a respondent's average judgment were "corrected" in a more positive direction; the more positive efficacy judgment was corrected in a negative direction. These results suggest that people may possess "naive theories" about the biasing impact of emotions that are used as a basis for readjusting judgments if it is believed that the initial value of the judgment was unduly influenced by some factor deemed to be inappropriate (Wegener and Petty 1995). Respondents in the false condition, however, did not need to correct their judgments, because they had affirmed their feelings by rejecting television as their source. Therefore, their judgments resemble those made by

148

GaState0033719

EXHIBIT 42 - 10

respondents in the control condition, those individuals who were not made aware of the emotional aspects of their opinions.

### CONCLUSION

There are many forms of low-information rationality available to citizens. I have endeavored to show in this chapter that public mood may be extremely important in informing some kinds of judgments. It is not that public mood causes individuals to ignore other information; rather, it appears to be most serviceable precisely in those situations when other information may be lacking or when the judgment is inherently a difficult and complex one. To the extent that public mood serves as a "barometer of the nation" in the same way that personal affective states serve as a "barometer of the ego" (Mayer and Hanson 1995), it may efficiently integrate the affective implications stemming from many aspects of American life, from the economy to popular culture.

GaState0033720

PART II

*Internal Elements of Reason*

EXHIBIT 42 - 11