EXHIBIT 45

9

# Public Opinion and Democratic Politics:
# The Problem of Nonattitudes and the Social
# Construction of Political Judgment*

PAUL M. SNIDERMAN
PHILIP E. TETLOCK
LAUREL ELMS

The study of public opinion, although at one level preoccupied with the transient issues and political personalities of the day, takes its direction at a deeper level from a recurring consideration of a small number of enduring themes integral to the understanding of democratic politics. We want to take this opportunity to engage perhaps the most fundamental of these themes — the competence of ordinary citizens to discharge the responsibilities expected of them in modern democratic politics.

There is, of course, a distinguished literature deeply skeptical of the ordinary citizen's understanding of public affairs. But our concern here is not with the classic essays of Walter Lippman or Graham Wallas, notable and enduringly instructive as they are. Rather, we are concerned with more recent studies that purport to demonstrate that ordinary citizens lack attitudes on the important issues of the day.

Our concern is both normative and empirical. Democratic ideals cannot be reduced to issues of fact. But ideals, whether ethical or political, are subject to evaluation, and their evaluation cannot be indifferent to matters of fact. No one can be under an obligation to do what he or she does not have a capacity to do, and it cannot make sense to hold out as an ideal of conduct a standard of behavior that citizens cannot reach. The more imperfect ordinary citizens' understanding of political ideas, the less capable they are of grounded judgment, the more crabbed a creditable conception of democratic citizenship must be.

* Data collection was supported by the National Science Foundation (Grant No. SES 8508937). We want also to thank the Survey Research Center and the Institute for Personality and Social Research, both of the University of California, Berkeley, for invaluable assistance.

EXHIBIT 45 - 1

## Problems of Political Judgment

The portrait of the citizen painted by public opinion analysts has never been a flattering one. Beginning with the Columbia studies of Lazarsfeld and his colleagues,[1] a classic theme in the study of public opinion has been ordinary citizens' minimal level of attention to public affairs and knowledge of them, not to mention the minimal levels of constraint and stability in their political preferences (Converse, 1964). This portrait has been challenged from time to time,[2] but the challenges have been buried under an avalanche of demonstrations that levels of public information, comprehension, and consistency have remained low over the last four decades (e.g., Delli, Carpini, and Keeter, 1989, 1991; Smith, 1989; Sniderman, 1993). It has come to be taken for granted, thanks very much to the consistency and decisiveness of research on the public's level of political awareness, that ordinary citizens are not deeply engaged by public affairs, that they do not devote a major effort to organizing and coordinating their views on issues of public policy, and that their judgments about the major issues of the day, supposing that they have troubled to form any, often are ill-considered, superficial, and ephemeral.

The heart of the modern critique of citizen reasoning has concentrated on the problem of nonattitudes. There is surely merit in the suggestion that people, pummeled with question after question about issue after issue, sometimes will come up with "top-of-the-head" responses.[3] Every experienced survey researcher is aware that ordinary citizens sometimes are at a loss when asked their view about public policy, that the "positions" they take are sometimes improvised, and that, in trying to recall their attitudes toward matters of public concern, they often do so imperfectly. But the original argument (Converse, 1964, 1970), which claimed only that on some issues, because they are so abstract or peripheral, many people fail to form an attitude, has recently been transformed into the radically different claim that "most people, on most issues, do not 'really think' any particular thing",[4] that "*most* people really aren't sure what their opinions are on *most* political matters",[5] indeed, that most of the people, most of the time, just "make it up as they go along."[6]

This is an extraordinary assertion. It is one thing to acknowledge that ordinary citizens, from time to time, will construct a judgment on the spot about an issue they think and care little about. It is quite another thing to

1 Lazarsfeld, Berelson, and Gaudet, 1944; Berelson, Lazarsfeld, and McPhee, 1954.
2 Nie, Verba, and Petrocik, 1979.
3 The phrase belongs to Taylor and Fiske, 1978.  4 Zaller, 1994, p. 194.
5 Zaller, 1992, p. 76; italics added for emphasis.
6 "Making It Up as You Go Along" is the title of Chapter 5 in Zaller's *The Nature and Origins of Mass Opinion* (1992).

GaState0033737

GaState0033738

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

contend that ordinary citizens do not know where they stand on the issues of the day *as the rule and not as the exception*. If this is true, then it is necessary to scale back radically any presumption of citizen competence in democratic politics; it is also necessary to reconsider fundamentally any notion of a responsibility of political leaders to consult and take account of the judgments of citizens at large. If this is accurate, it is hard to understand in what sense public officials have a duty in a democratic polity to take account of their constituents' views. For the expanded version of the nonattitudes hypothesis amounts to an argument that citizens are not capable of exercising judgment on public affairs. They cannot manage the task of judgment, moreover, not just in the weak sense of determining what should be done, but even in the strong sense of determining what they think should be done. If those responsible for government know that whether the public approves or disapproves of a line of public policy hinges crucially on accidents of question wording, such leaders can hardly be said to have a duty to attend to what citizens think about a matter of public policy before making a determination about it. Indeed, if it is true that citizens are just making it up as they go along, then political leaders may even have an obligation to discount what the public thinks that it thinks, since if the questions had varied even slightly, the answers could well have varied markedly.

There is, therefore, much at stake in understanding the dynamics of public judgment. We proceed in four steps. First, we detail the expanded version of the nonattitudes argument. Second, we identify the specific response model underlying it. Third, we evaluate the evidence advanced in its favor. Finally, taking advantage of the new methods we have developed to integrate the classical public opinion interview with complex experimental designs, we examine directly the interplay of issue framing and political predispositions.

THE EXPANDED VERSION OF THE NONATTITUDES CLAIM

What does it mean to say that citizens, in taking a position on a matter of public concern, have made a genuine determination of where they stand and may, therefore, be said to hold a true attitude about the issue? To be committed to the view that people hold attitudes, it is argued, is to be committed to the "file drawer" model. On the file drawer model:

When people are asked how they feel about something, such as legalized abortion, their Uncle Harry, or anchovies on a pizza, presumably they consult a mental file containing their evaluation. They look for the file marked *abortion*, or *Uncle Harry*, or *anchovies*, and report the evaluation it contains.[7]

[7] Wilson and Hodges, 1992, p. 38, cited by Zaller, 1992, p. 35.

Problems of Political Judgment

By contrast, it is argued that attitudes are socially constructed and that rather than people reporting the contents of files they have retrieved, they instead figure out where they stand on the spot.

But what does it mean to say that citizens figure out, on the spot, where they stand on public issues? Citizens, the argument runs, lack organized, rehearsed, internally consistent political attitudes. Instead, they "fill up their minds with large stores of only partially consistent ideas, arguments, and considerations."[8] Their view of any given matter is, in consequence, confused and contradictory.[9] They "possess numerous, frequently inconsistent considerations relating to each issue."[10] And just as far as they have reasons to favor and to oppose any given course of action, they are capable of standing on opposing sides of most issues.[11] Why do most citizens stand on both sides of most issues? Indeed, the difficulty is precisely that they have failed to attend to public issues. Indeed, the difficulty is precisely that they have been paying attention, and

in an environment that carries roughly evenly balanced communications on both sides of issues, people are likely to internalize many contradictory arguments, which is to say, they are likely to form considerations that induce them both to favor and to oppose the same issues.[12]

As in most serious matters, the claim being made is not absolute but a matter of degree. The contention is not that "every member of the public is ambivalent on every issue," or that "everyone is ambivalent to the same degree,"[13] but that nonambivalence is "unusual."[14] Most people, on most political issues, are ambivalent, able to draw on those favorable to a proposal for public action and those unfavorable to it. But if most people have reasons for saying yes and for saying no, how on any particular occasion do one or two considerations in favor of saying yes or no happen to wind up at the "top of the head"?

---

[8] Zaller, 1992, p. 36.  [9] Zaller, 1992, p. 95.  [10] Zaller, 1992, p. 54.
[11] Zaller, 1992, p. 54.  [12] Zaller, 1992, p. 59.  [13] Zaller, 1992, p. 93.
[14] Zaller, 1992, p. 94. Zaller thus also turns Festinger on his head. Cognitive consistency theorists disagree among themselves over how much inconsistency typically exists within belief systems. Maximalists (such as McGuire, 1968) portray belief systems as tightly integrated. People may sometimes be slow to recognize contradictions, but they do typically put their mental house in order (e.g., work on the Socratic effect). Minimalists (such as Abelson, 1968) invoke the loose-linkage metaphor for characterizing belief systems. People often hold a lot of contradictory beliefs and preferences but fail to recognize the contradictions (and hence experience no dissonance). In the Ambivalence Deduction, Zaller seems to posit a level of tolerance for inconsistency that surpasses even the loosest of the loose-linkage models within the cognitive consistency tradition. Cognitive consistency – the tendency to organize one's beliefs and preferences into evaluatively harmonious gestalts – is, on Zaller's account, conspicuous by its absence.

EXHIBIT 45 - 2

*Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms*

contend that ordinary citizens do not know where they stand on the issues of the day *as the rule and not as the exception*. If this is true, then it is necessary to scale back radically any presumption of citizen competence in democratic politics; it is also necessary to reconsider fundamentally any notion of a responsibility of political leaders to consult and take account of the judgments of citizens at large. If this is accurate, it is hard to understand in what sense public officials have a duty in a democratic polity to take account of their constituents' views. For the expanded version of the nonattitudes hypothesis amounts to an argument that citizens are not capable of exercising judgment on public affairs. They cannot manage the task of judgment, moreover, not just in the strong sense of determining what should be done, but even in the weak sense of determining what they think should be done. If those responsible for government know that whether the public approves or disapproves of a line of public policy hinges crucially on accidents of question wording, such leaders can hardly be said to have a duty to attend to what citizens think about a matter of public policy before making a determination about it. Indeed, if it is true that citizens are just making it up as they go along, then political leaders may even have an obligation to discount what the public thinks that it thinks, since if the questions had varied even slightly, the answers could well have varied markedly.

There is, therefore, much at stake in understanding the dynamics of public judgment. We proceed in four steps. First, we detail the expanded version of the nonattitudes argument. Second, we identify the specific response model underlying it. Third, we evaluate the evidence advanced in its favor. Finally, taking advantage of the new methods we have developed to integrate the classical public opinion interview with complex experimental designs, we examine directly the interplay of issue framing and political predispositions.

### THE EXPANDED VERSION OF THE NONATTITUDES CLAIM

What does it mean to say that citizens, in taking a position on a matter of public concern, have made a genuine determination of where they stand and may, therefore, be said to hold a true attitude about the issue? To be committed to the view that people hold attitudes, it is argued, is to be committed to the "file drawer" model. On the file drawer model:

When people are asked how they feel about something, such as legalized abortion, their Uncle Harry, or anchovies on a pizza, presumably they consult a mental file containing their evaluation. They look for the file marked *abortion*, or *Uncle Harry*, or *anchovies*, and report the evaluation it contains.[7]

[7] Wilson and Hodges, 1992, p. 38, cited by Zaller, 1992, p. 35.

*Problems of Political Judgment*

By contrast, it is argued that attitudes are socially constructed and that rather than people reporting the contents of files they have retrieved, they instead figure out where they stand on the spot.

But what does it mean to say that citizens figure out, on the spot, where they stand on public issues? Citizens, the argument runs, lack organized, rehearsed, internally consistent political attitudes. Instead, they "fill up their minds with large stores of only partially consistent ideas, arguments, and considerations."[8] Their view of any given matter is, in consequence, confused and contradictory. They "possess numerous, frequently inconsistent considerations relating to each issue."[10] And just as far as they have reasons to favor and to oppose any given course of action, they are capable of standing on opposing sides of most issues.[11] Why do most citizens stand on both sides of most issues? It is not because they have failed to attend to public issues. Indeed, the difficulty is precisely that they have been paying attention, and

in an environment that carries roughly evenly balanced communications on both sides of issues, people are likely to internalize many contradictory arguments, which is to say, they are likely to form considerations that induce them both to favor and to oppose the same issues.[12]

As in most serious matters, the claim being made is not absolute but a matter of degree. The contention is not that "every member of the public is ambivalent on every issue," or that "everyone is ambivalent to the same degree,"[13] but that nonambivalence is "unusual."[14] Most people, on most political issues, are ambivalent, able to draw on those favorable to a proposal for public action and those unfavorable to it. But if most people have reasons for saying yes and for saying no, how on any particular occasion do one or two considerations in favor of saying yes or no happen to wind up at the "top of the head"?

---

[8] Zaller, 1992, p. 36.  [9] Zaller, 1992, p. 93.  [10] Zaller, 1992, p. 54.
[11] Zaller, 1992, p. 54.  [12] Zaller, 1992, p. 59.  [13] Zaller, 1992, p. 93.
[14] Zaller, 1992, p. 94. Zaller thus also turns Festinger on his head. Cognitive consistency theorists disagree among themselves over how much inconsistency typically exists within belief systems. Maximalists (such as McGuire, 1968) portray belief systems as tightly integrated. People may sometimes be slow to recognize contradictions, but they do typically put their mental house in order (e.g., work on the Socratic effect). Minimalists (such as Abelson, 1968) invoke the loose-linkage metaphor for characterizing belief systems. People often hold a lot of contradictory beliefs and preferences but fail to recognize the contradictions (and hence experience no dissonance). In the Ambivalence Deduction, Zaller seems to posit a level of tolerance for inconsistency that surpasses even the loosest of the loose-linkage models within the cognitive consistency tradition. Cognitive consistency – the tendency to organize one's beliefs and preferences into evaluatively harmonious gestalts – is, on Zaller's account, conspicuous by its absence.

256

EXHIBIT 45 - 3

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

From a social construction point of view, social cues are the crucial factor. Which particular considerations people attend to is a function of where their attention is directed just before they answer; and where their attention is directed just before they answer is a function of their immediate circumstances, particularly the specific wording of the questions put to them. Just so far as their attention is directed to the positive considerations they hold on a given matter of public policy, people will be inclined to give a thumbs up, but just so far as their attention is directed to the negative considerations they also hold about it, they will be inclined to give a thumbs down. In Zaller's words:

Which of a person's attitudes is expressed at different times depends on which has been made most immediately salient by chance and the details of questionnaire construction, especially the order and framing of questions.[15]

The result: lacking genuine attitudes to stabilize their judgments, most people can and will flip-flop on most issues, taking first one side and then the other as a function even of minor variations in the wording of a question. We therefore call this the "flip-flop model."

It has not always been appreciated that Zaller intends his argument to depart radically from, rather than to extend, previous work, although he himself is strikingly frank about his aims, declaring that his claim of ambivalence, for example, "both contradicts the dominant theories of mass political attitudes, those of Converse and Achen, and violates common sense notions of public opinion."[16] Nor, in making this claim, is he exaggerating. The flip-flop model turns the original nonattitudes model on its head. Converse's claim is that, having no real thoughts about some issues, yet being unwilling to acknowledge they have given issues little thought, citizens sometimes conjure up an opinion on the spot, choosing a position on a random basis, precisely in order to conceal the fact that they have failed to form one. Absence of thought, randomness of response, and impression management are the three keys to Converse's classic account of the dynamics of nonattitudes. By contrast, on the new version, the difficulty is not that people have too few ideas but that they have too many, going in all directions rather than pointing in none. As Zaller and Feldman put it, "most people possess opposing considerations on most issues that might lead them to decide the issue either way."[17] Furthermore, the position citizens take on any given occasion, rather than randomly chosen, is the product of immediate cues in the form of particular wordings and orderings of questions. The net result: believing everything, citizens believe nothing – the positions they

take, they take for the moment, and for no better reason than the fortuitous wording of the question put to them.[18]

In order to understand questions of cause and effect, we want to move from the general claims that are being advanced to the specific response models that have been delineated.

RESPONSE MODELS

*The Nature and Origins of Mass Opinion* is multifaceted and develops two quite different response models. One of these – the political awareness-predisposition model – is very far from controversial, and indeed, draws on the now standard account of political reasoning. Figure 9.1 represents the core of the model schematically.

Before commenting on substance, a word about terminology. The term "attitude" has an idiosyncratic use in the model, but once its usage is specified, there should be no problem, serious or slight. By an "attitude," Zaller has in mind a response, positive or negative, to a specific issue or candidate, by a "predisposition," a readiness systematically to respond positively or negatively to a class of issue-objects. In this usage, then, attitudes are the preferences that respondents express about particular courses of public action: "opinions," in the ordinary usage, whereas predispositions refer to underlying consistencies in response to political choices: their "attitudes," in the ordinary usage. So defined, opinions about an issue like job programs for blacks are examples of attitudes; ideological sets, liberal and conservative, are examples of predispositions.

Terminology in place, the awareness-predisposition model makes two points. First, the beliefs and preferences that citizens express about specific political choices are not conjured up on the spot. On the contrary, they are grounded in organized predispositions to respond consistently, either positively or negatively, favorably or unfavorably, to political objects, whether issues or candidates.[19] Second, the influence of predispositions on attitudes is conditional on political awareness: the better

---

[15] Zaller, 1992, p. 93.  [16] Zaller, 1992, p. 92.
[17] Zaller and Feldman, 1992, p. 585.

[18] There is a contrasting thread in Zaller's argument, his analysis of political predispositions, prominent in the second part of his book and difficult to reconcile with the nonattitudes argument of the first part. The more important political predisposition (e.g., liberalism-conservatism) as a basis for issue positions, the more predictable people's positions on issues – hence the weaker Zaller's nonattitudes argument. Moreover, the more important people's intermediate beliefs and evaluations, the more consistent people's intermediate beliefs and evaluations – hence the weaker his ambivalence deduction.
[19] See Campbell, 1963.

GaState0033741

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms



Figure 9.1. The political awareness–political predisposition model.

people's grasp of political issues and ideas, the stronger the connection between their stands on a specific issue and their broader orientation to politics.[20] So expressed, the sophistication-interaction hypothesis has become standard fare in the static analysis of political reasoning (e.g., Sniderman, Brody, and Tetlock, 1991). Zaller's contribution has been to apply the sophistication-interaction hypothesis to the dynamics as well as the statics of political reasoning. The pivotal question, from a dynamic point of view, is the differential responsiveness of citizens to political messages over time. Setting details to one side, the political sophistication mediator summarizes differences among citizens, over time, in the degree of their exposure to and understanding of the stream of political messages. Properly interpreted, the sophistication mediator supplies a mechanism to account for both the convergence of the politically sophisticated on a common position over time (the one-sided message case) and their divergence toward opposing positions (the two-sided message case).

Dealing with the problem not of attitude change over time, but of attitude construction on any given occasion, Zaller advances a rather different, and at some levels conflicting, model. Figure 9.2 displays this second model schematically. Again, let us begin with terminology. Following Kelley (1983), Zaller defines a "consideration" as "any reason that might induce an individual to decide a political issue one way or the other."[21] For any given issue, any given person is likely to have considerations that are positive, inclining him to favor a particular course of public action, but likely also to have considerations that are negative, inclining him to oppose it. To signal its status, this claim is given a special title, the "Ambivalence Deduction." Although not given precise expression, the Ambivalence Deduction carries the implication that on most matters, most people have enough considerations that are negative and

[20] Assuming, obviously, a logical connection between the two.
[21] Zaller, 1992, p. 40.

260

---

## Problems of Political Judgment



Figure 9.2. The "considerations" model of attitude construction.

enough that are positive to make it likely that, given even a slight push, they can say yes as well as no, no as well as yes.

Given this premise, the key claim of the second model is this. Over a series of trials, the same individual will sometimes favor a proposed course of public action and sometimes oppose it – hence our characterization of this as the flip-flop model. Whether a person favors or opposes a proposed course of action on any particular occasion depends on the one or two considerations that, on that occasion, come to the top of her head. It does not, however, depend on the particular content of the consideration but rather on its affective direction. If the momentarily salient considerations are positive, she will favor the course of action; if negative, she will oppose it. But – and this is the crucial point – whether the momentarily salient considerations are positive or negative is not, as Converse hypothesized, randomly determined. Although Zaller agrees that there is an element of chance, his distinctive claim is that which considerations are salient on any given occasion depends on where a person's attention was directed, on that occasion, by the wording of the question. If the wording directed her attention to the positive considerations she holds, she will respond positively; if to the negative considerations, she will respond negatively.

A social construction view extends naturally to a nonattitudes account of question-wording effects. As a legion of experimental studies have demonstrated, the responses people express can vary as a function of variations in question wording, ordering, and formatting.[22] The point of

[22] For the classic work on the subject, see Schuman and Presser, 1981.

EXHIBIT 45 - 5

## Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

Figure 9.2 is to make explicit the intervening mechanism: the same person will favor completely opposing positions on an issue just so far as different considerations are called to his or her attention by the wording of the question. He or she will favor foreign aid or oppose it, support government assistance for blacks or criticize it, merely because, owing to the accidents of question wording, considerations on one side of the issue are momentarily more accessible than those on the other.

On this view, people change their positions, but not because they have changed their minds. On the contrary, because they don't have to change their minds, they can change their positions readily. Since, by hypothesis, most people walk about with considerations on both sides of most issues, which side they take on any particular occasion hinges on which considerations are called to their attention. And whether they happen to think of reasons for saying yes or saying no hinges on the accidents of question wording and ordering. Hence their capacity to flip-flop from one side of an issue to the other.

The thesis that political attitudes are situationally contingent, like any thesis, can be deployed in degrees. Zaller, it must be admitted, offers an extreme version, declaring rhetorically that citizens, rather than having views about matters of public importance, are simply "making it up as they go along." We shall instead concentrate on a more moderate interpretation, namely, that the differential accessibility of positive or negative considerations on any given occasion tends to be significantly – but not exclusively – a function of (typically semantic) cues encountered on that occasion. Hence the causal arrow, from predispositions to considerations, in Figure 9.2.

Yet, even on a moderate interpretation, the cue model of attitude construction makes its point not so much by the kind of factor it accentuates – situational cues in the form of question-wording effects – but rather by the kind of factor it omits (in its extreme version) or downplays (in its moderate version) – predispositions in the form of underlying tendencies to respond consistently positively or negatively to political objects.[23] Hence, the causal arrow from predispositions to political objects in Figure 9.2 is dashed.

To argue that political attitudes are socially constructed is distinctively to contend that the positions people take on political issues or candidates on any given occasion, at most, are shallowly rooted in deeper lying predispositions that are enduring over time and consistent across situations. After all, the point of Zaller's interpretation is to emphasize the probability that, on any given occasion, the same person could as

---

[23] The inclusion of situational cues, as we shall show, is as compatible with a combinatorial as with a constructionist account.

262

## Problems of Political Judgment

easily vote thumbs up as thumbs down; and whether he does the one or the other on any given occasion hinges on the particular considerations that come to the top of his head as a function of situational cues on a particular occasion.

From a social construction perspective, then, situational (or transient) and dispositional (or enduring) factors are at odds: the more important the former, the less important the latter. We want to develop, for the purpose of contrast, an interpretation grounded in cognitive combinatorics. This interpretation takes as its fundamental premise that responses, on any given occasion, tend to be a product of both situational and dispositional factors. People, on this second view, rely on both external and internal cues in generating responses to attitude surveys, not on one or the other. The positions they take, on any given occasion, may be a function of their overall attitudes in additive combination with the definition of the situation on that occasion; alternatively, they may be a multiplicative function of their overall attitude and their definition of that situation in light of their overall attitude. From this vantage point, the research challenge is to identify (a) the conditions under which different combinatorial principles apply and (b) the mediating mechanisms that produce distinctive combinatorial patterns.

To sharpen the contrast between social constructionist and cognitive combinatorial alternatives, let us specify a quartet of hypotheses. First, it follows from Zaller's theory of the survey response that the role of dispositional factors must be minimal; otherwise, people would respond consistently at different points in time and in different situations, which is precisely what a social construction account contends they do not do. It does not follow that the contribution of dispositional factors, even on a social construction account, is zero: only that their influence is minimal. By contrast, on a combinatorial hypothesis, even when responses to political issues are under the influence of question-wording variations, it need not be true that the influence of dispositional factors is minimal, and indeed, even when the influence of question-wording variations is strong, the influence of dispositional factors need not be weak.

If the impact of dispositional factors is not minimal, as we believe, then it is necessary to specify the nature of their joint impact with situational factors. Zaller maintains, by contrast, that citizens' ideas about political issues, rather than being organized and coherent, characteristically are a miscellany of positive and negative considerations, with any given citizen able, on any given occasion, to draw on considerations either favoring or opposing any given course of public action. Any given individual is about as likely as any other, it follows, to change sides on any given occasion. On a combinatorial hypothesis, too, any given

EXHIBIT 45 - 6

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

individual will behave differently in relevantly different circumstances. What distinguishes a combinatorial from a social construction point of view is the further contention that, even when people behave differently in one situation than in another, they tend to respond the same way relative to one another. A bigot will respond more negatively to African Americans in some situations than in others; but in all situations where there is any choice, a bigot will respond more negatively to African Americans than a person who is racially tolerant. We call this "the rank order invariance" hypothesis.

If it is further granted that some people are systematically more likely to be subject to the influence of situational cues than others, then from Zaller's perspective, those who are most influenceable should be those whose relevant dispositions are least consistent. The reasoning is straightforward. Other things being equal, the likelihood of a positive or negative consideration being accessible on any given occasion is a function of the ratio of positive to negative considerations on hand. It follows that, in situations that direct attention to positive considerations, those whose views of the matter are most mixed are the ones most likely to have positive considerations to draw on; and in situations that direct attention to negative considerations, they are also the ones most likely to have *them* to draw on. If so, the impact of situational cues should be curvilinear: decreasing as people approach either pole of a dispositional continuum, increasing as they approach its midpoint. We call this the "curvilinear-ambivalence" hypothesis.

We are broadly skeptical of the general claim that situational and dispositional factors are at odds with one another. But we are specifically dubious of the curvilinear-ambivalence hypothesis. Unless there is a zero order relation between the weight given a specific situational cue and the relevant political predisposition, their impact should be complementary, with the influence of situational cues approximately equal at any point along a dispositional continuum. For convenience we call this the "additivity" hypothesis.

Against the inclination to view behavior as a product of either situational or predispositional factors, if the relation between the two is linear and additive, their joint impact is complementary. So we believe it to be, more often than not. To get a clearer view of the logic of the problem, however, it is useful to consider alternative forms of the functional relation between the two. Situational and dispositional factors may be complementary in the weak sense of both mattering. They may be complementary in the strong sense that one matters because the other matters. Having set out the weak claim, in the form of the additivity hypothesis, we now set out the strong claim, in the form of the interaction hypothesis.

*Problems of Political Judgment*

For clarity, it will be helpful to revert for a moment to standard terminology, referring to predispositions as attitudes. An attitude, standardly conceived, represents a systematic tendency to respond consistently to a social or political object, with individuals reliably differing from one another depending on how positive or negative their attitude happens to be. Equivalently, following Bruner (1951) and Postman, Bruner, and Walk (1951), an attitude may be regarded as a perceptual hypothesis, that is, as a prejudgment about the favorability or unfavorability of a social or political object. On this interpretation, large question-wording effects do *not* signal weak attitudinal effects: question-wording effects occur precisely because people *do* have attitudes. In Bruner and Postman's vocabulary, "the stronger a perceptual hypothesis, the greater its likelihood of arousal in a given situation."[24] We call this the "interaction" hypothesis and shall test it in several versions.

Having sketched both the constructionist response model of nonattitudes and hypotheses specifying alternative interrelations of situational and predispositional factors, we now turn to the task of analysis.

TAKING STOCK: THE EVIDENCE ON HAND

Before examining our own studies, we want to evaluate the evidence supposed to establish the validity of the expanded version of the nonattitudes argument. A portion of the evidence is familiar, consisting of so-called stability coefficients. If citizens have genuine attitudes, the argument runs, then their positions on issues should be stable over time. On the assumption that nothing in the external world has changed in the interval, when people are asked their position on an issue a second time, their answers should be the same as the first ones. On the other hand, if they have not formed a genuine view about the issue, there is no reason why they should give the same answer the second time as the first. They should instead say the first thing that comes to mind. And, if this is so, the correlation of their positions on the same issue over time should be approximately zero.

Judged by this standard, Zaller's results fail on two counts. First, his analysis doesn't take account of the obvious alternative explanation. Since the time of Converse's seminal study, the standard rejoinder to a nonattitudes claim has been that the problem is not the absence of an attitude on the part of respondents, but the unreliability of the measures deployed to assess their attitudes (e.g., Achen, 1975). Zaller, however, doesn't correct for measurement error, which is puzzling considering how standardized arguments and counterarguments over nonattitudes have

---

[24] We owe this quote to Campbell, 1963, p. 112.

GaState0033743

EXHIBIT 45 - 7

*Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms*

become.[25] Worse, even in the absence of any compensating correction for measurement error, Zaller's turnover tables and test-retest correlations, rather than showing the absence of a relation over time, show marked stability over time. This is not, it should be emphasized, merely *our* reading of the results. Zaller concurs. His results, he acknowledges,[26] fall short of confirming his claims. But since it is quite clear that all the other evidence on over-time attitudinal stability, including Converse's, does not confirm Zaller's drastically expanded version of the nonattitudes problem, it is not obvious what evidentiary support it can claim.

No less vexing, the logic of Zaller's argument on question-wording effects suggests a prediction opposite to the prediction Zaller suggests. He argues that, lacking attitudes to stabilize their responses, respondents should be inclined to give different responses at different points in time. He also argues that the response they give on a particular occasion is a product of the particular wording of the question on that occasion. By design, the same wording is used in over-time measurement; otherwise, it would be logically impossible to tell whether a different response was an indication of a change in attitude or merely a change in wording. But since, according to Zaller's question-wording theory of the survey response, the response at any one point in time is a product of the particular wording of the question at that point in time, and since the wording of the question is the same at all points in time, according to Zaller's own question-wording argument, the response should not differ at different points in time, as he predicts, but be the same at all points in time, which is neither what he predicts nor what he claims to observe.[27]

*Problems of Political Judgment*

A more original line of argument offered in behalf of the view that people construct their political attitudes is based on the "stop-and-think" experiments. In these experiments, interviewers read a question about a political issue in the usual way but

without waiting for the respondent to answer, they ask the respondent to discuss particular phrases and ideas in the question.[28]

For example, on the question of whether government services in areas such as education and health care should be decreased or increased, respondents to this survey were not permitted to give an immediate answer to the question. Instead, the interviewer continued:

Before telling me how you feel about this, could you tell me what kinds of things come to mind when you think about *cutting government services*? (Any others?)

The interviewer wrote down respondents' remarks verbatim, and then asked:

Now, what comes to mind when you think about increases in government services? (Any others?)[29]

Using this procedure, Zaller finds that, depending on the issue, between one-third and one-half of the respondents in the stop-and-think experiments expressed more than one conflicting consideration[30] and also that the stability of issue positions was markedly lower when respondents were interrupted before being allowed to make their choice and were asked first to discuss key ideas and phrases.

Both findings – the increase in "conflicting" considerations and the decrease in stability – are said to support the nonattitudes claim.[31] Neither does. Consider the ambivalence finding. It is necessary to distinguish between the position that citizens take on an issue and the reasons they are capable of giving for taking a position on it, whether their own or others'. The two are not the same. You may have a definite position on an issue, yet without any difficulty may be able to cite, if asked, reasons not only for taking your side of the issue but also for taking the other. A person may unequivocally oppose affirmative action but be able, if asked, to mention reasons for supporting it, or the other way around. It does not follow that, because she is knowledgeable about reasons both for

---

25 The absence of an explicit correction for measurement error is harder to understand since at one point he declares that "response instability consists almost exclusively of chance variation around a largely stable central tendency," which seems to invoke precisely the kind of underlying, organizing response disposition, set within a measurement error framework, that the concept of attitude is intended to denote. See Zaller, 1992, p. 65.

26 See Zaller, 1994, p. 57.

27 On any given occasion, any specific consideration may be activated, i.e., come to the top of the head. But on every occasion, the proportion of positive and negative considerations is constant; that is, after all, the point of the Ambivalence Deduction. Since (i) what counts in determining a response is not the specific content of a consideration, but whether it is positive or negative, Zaller, following Kelly (1983), takes account not of the particular content of a consideration, but just of the number, or proportion, of positive to negative considerations; (ii) the proportion of positive and negative considerations is approximately constant over time; (iii) the probability on any given occasion of activating a positive or negative consideration is a function of the particular wording of a question; and (iv) the wording of the question is exactly constant over time; therefore, on Zaller's

argument, the response should be the same over time. It is, moreover, not open to Zaller to argue that it should be different, at different points in time, since the process is random. That is Converse's position, and Zaller explicitly rejects it. He must, moreover, reject it, since he wants to claim that nonattitudes are the rule, not the exception, and it is impossible to sustain an empirical claim that the responses of most people on most matters of public concern are randomly generated.

28 Zaller, 1992, pp. 55–56.    29 Zaller, 1992, p. 53, italics in the original.
30 Zaller, 1992, Table 4.2, p. 61.    31 Zaller, 1992, Table 5.3, p. 88.

EXHIBIT 45 - 8

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

supporting and for opposing affirmative action that she is internally conflicted, uncertain of her position, just making it up as she goes along. On the contrary, the more politically sophisticated she is, the more likely she simultaneously will be able to cite considerations on opposing sides of the issue *and* to possess a definite and stable attitude toward it (cf. Baron, 1994; Tetlock, Peterson, and Lerner, 1996).

There is a deeper difficulty with the stop-and-think procedure. People are asked their position on an issue. But before they are able to answer, they are stopped in their tracks. Their train of thought is interrupted. They are asked, instead of answering, to report on whatever ideas or associations the specific wording of a question calls to mind. Only then, having reported on whatever happened to come to their minds – which, but for this extraordinary request, might well not have come to their minds – are they allowed to give a response to the original question. Think about the consequences of interrupting in this way a person's train of thought. Suppose people really do have positions on an issue like welfare. But before they can give it, they are interrupted, then distracted by reporting a swirl of ideas. Surely, they risk being sidetracked. And the result? Using the stop-and-think procedure, Zaller finds precisely what other investigators using similar techniques find – namely, that interrupting and distracting people discombobulates them, making their answers more variable across time and circumstance (e.g., Wilson, 1990).[32]

The expanded version of the nonattitudes hypothesis, on the evidence to this point, is very far from having been sustained. But for an argument not to have been shown to be true is not the same as its having been shown to be false. We therefore turn to a direct examination of the impact of predispositional and situational factors.

THE PROBABLE CAUSE EXPERIMENT

To explore how judgments about public issues can be jointly grounded in the specific features of particular situations and in deeper lying political predispositions, we conducted the Probable Cause experiment. All respondents are asked to consider a situation "where the police see two young men ... walking very near a house where the police know drugs are being sold." Everyone is told that the police subsequently search them

---

[32] It is still harder to understand Zaller's reliance on the stop-and-think procedure given that he places himself in the camp of Wilson and his colleagues. Wilson has made use of just such a procedure, but in order to demonstrate that asking people why they believe a particular thing *changes* their attitude toward it at least temporarily, thereby weakening attitude-behavior consistency.

---

Problems of Political Judgment

and find they are carrying drugs. However, for a randomly selected half of the respondents, the young men are characterized as "well dressed and well behaved." In contrast, the other half are told that the young men "are using foul language." All respondents are then asked whether the police search was reasonable.

This is, we submit, a near-paradigmatic example of an issue-framing experiment. Respondents are asked to take a position on an issue of public concern, with a relevant feature of the issue deliberately varied to alter the probability that they will take one rather than the other side of the issue. In weighing the impact of both situational cues and political predispositions in shaping political attitudes, let us begin by considering the "minimal impact" hypothesis.

According to the minimal impact hypothesis, the judgments that citizens make about specific matters of public interest, rather than being grounded in consistently organized attitudes, are instead socially constructed, with the same people ready to favor or oppose a course of public action as a function of often minimally varied wordings or orderings of questions. By design, however, the Probable Cause experiment varies not a peripheral but an immediately relevant consideration in judging the propriety of police conduct – namely, the demeanor of the suspects. Their demeanor surely should make a difference to judgments about the propriety of police conduct. If the suspects were using foul language rather than being well dressed and well behaved, then, of course, respondents should be more likely to believe that the police search was reasonable.

A nearly taken-for-granted premise of Zaller's question-wording argument is that question-wording effects are in some straightforward sense very large – large enough, certainly, to outweigh the effect of an underlying attitude. This is an argument that has considerable plausibility, especially to those who have not had the opportunity to examine question-wording experiments on their own. The difficulty is that there is, properly considered, virtually no straightforward sense in which the relative contribution of so-called question-wording effects and of attitudes can be responsibly compared. But considering the relative paucity of information in the public domain, we think it is important to convey a sense of the order of magnitude of question-wording and attitudinal effects. Therefore, the various methodological pitfalls notwithstanding, we shall give a ballpark sense of orders of magnitude by looking at the impact of both kinds of effects expressed in terms of correlation coefficients.

Table 9.1, accordingly, begins by reporting the correlation between the demeanor of the suspects – whether they were using foul language or well dressed and well behaved – and judgments about the police conduct

EXHIBIT 45 - 9

GaState0033746

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

Table 9.1. *Correlations between Level of Agreement That the Drug Search Was Reasonable, Question-Wording Variation, and Predispositional Factors*

| | Level of Agreement That the Drug Search Was Reasonable | |
|---|---|---|
| Queston-Wording Variable | | |
| Suspects: using foul language/ well dressed | .14 | (N = 1710) |
| Predispositional Factors | | |
| Law and order | .34 | (N = 967) |
| Traditionalism | .26 | (N = 1693) |
| Conventionality | .23 | (N = 1684) |
| Ideological self-identification | .21 | (N = 1682) |

– whether their search was reasonable or not. As the results make plain, the demeanor of the suspects makes a significant difference, but – and this is the key point – the difference it makes is far from vast expressed in terms of a correlation coefficient, .14.

The impact of this particular variation in question wording is manifestly modest, and one may wonder whether this particular illustration of a variation in question wording is atypical. We recognize that in one sense the size of question-wording effects is arbitrary. Effects of any desired size can be evoked: it is only necessary to maximize the semantic contrast between alternative wordings of a question. Nevertheless, from a social construction perspective, people construct their responses on the spot by relying on cues of the moment. If political attitudes are indeed so constructed, question-wording effects should typically be pronounced. In our study of race and American politics, there were thirty-eight question-wording experiments. Taking the absolute value of the standard correlation coefficient as a measure of the magnitude of the impact of alternative issue frames, the mean was .11 and the range was from .01 to .37.[33] In terms of the size of the impact of question-wording effects, then, the results of the Probable Cause experiment thus offer a typical illustration of the impact of question-wording effects.

[33] Nor can it be argued that the focus of this particular study, race, is responsible for the modest size of question-wording effects. Comparable calculations of question-wording effects from other studies we have done in examining attitudes toward quite different subjects are comparable in size.

270

*Problems of Political Judgment*

In weighing the difference that the demeanor of the suspects makes – whether, that is, they are using foul language or are well dressed and well behaved – it is also necessary to consider the role of predispositional factors. A number of such factors are potentially relevant. For example, the more importance people attach to maintaining respect for authority or preserving traditional ideas of right and wrong, the more likely they should be to believe that the police conduct was proper. Table 9.1 accordingly reports the impact, summarized in terms of correlations, between judgments about whether the police search was reasonable and an array of potentially relevant predispositions, including commitment to law and order, support for traditional values, conventionality, and ideological self-identification.[34] These correlations range from the mid .2's to the mid .3's, with the size of the smallest significantly larger than that of the question-wording variation and the size of the largest significantly larger still.

In our view, very little should be made of the absolute size of coefficients summarizing the impact of situational and predispositional factors in any specific circumstance. Which matters more, and which less, is a function of the specific phenomena selected for analysis, the terms of analysis, and the apparatus deployed to carry out the analysis.[35] Comparison of the size of coefficients, however, is instructive in the context of a claim that political attitudes are socially constructed. For to say that people decide their position on the spot is to say that they rely not on a predisposition, but on cues of the moment. Against this claim for the decisiveness of cues of the moment, over the range of variation characteristic of public opinion studies, two points are worth remarking. First, in our experience, question-wording effects rarely approach the influence that dispositional factors exercise commonly. Second, and more important by far, it does not follow from a finding of a question-wording effect that predispositional factors are not at work, let alone that the influence of the latter is swamped by that of the former – the minimal impact hypothesis.

This "horse race" approach is of limited value, however. Whether situational or dispositional factors account for more hinges on what one specifically wishes to account for and how one operationally wants to

[34] The measures are described in Appendix B.
[35] Funder and Ozer, 1983. We want to emphasize the potential for endless wrangling over effect sizes. One can easily set up studies in which question-wording manipulations are so heavy-handed that situational causes swamp individual differences. Or one can select highly partisan elite samples in which individual difference effects swamp those of anemic situational manipulations. Our point is simply that, given the evidence Zaller cites and the evidence we have collected over the years, individual differences in political attitudes generally account for as much or more of the variance as do question-framing and wording manipulations.

EXHIBIT 45 - 10

GaState0033747

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

go about accounting for it. We offer a comparison of their relative impact only to illustrate the weakness of the claim that situational factors characteristically have primacy. The more important question to address, however, is not whether predispositional or situational factors count for more, but how the two types of factors operate together.

In the spirit of Zaller's argument, situational factors should count for more the more capable people are of calling up considerations on both sides of an issue; conversely, situational factors should count for less, the more one-sided are people's orientations. To illustrate this argument, imagine that citizens are arrayed in terms of the importance they attach to law and order as a value, as shown in Figure 9.3. The further to the right they are, the higher the probability that an argument in favor of supporting the police will come to mind; the further to the left they are, the higher the probability that an argument in favor of supporting the rights of defendants will come to mind; the closer they are to the midpoint, the higher the probability that arguments on opposing sides of the issue will come to mind. It then follows, on Zaller's argument, that responsiveness to a situational cue such as the suspects' demeanor in the Probable Cause experiment should be curvilinear: heightened as one approaches the midpoint, diminished as one moves to the poles.

Figure 9.3 describes the prediction of curvilinearity following from the ambivalence hypothesis. Figure 9.4 presents a series of actual results from



Figure 9.4A. Actual responsiveness to a situational cue as a function of commitment to law and order.



Figure 9.4B. Actual responsiveness to a situational cue as a function of conventionality.



Figure 9.3. Ambivalence model: hypothesized responsiveness to a situational cue as a function of commitment to law and order.

272

EXHIBIT 45 - 11

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

*Problems of Political Judgment*

the Probable Cause experiment. As testimony of robustness, a number of dispositional factors are examined, and the likelihood of agreeing that the police search is reasonable is plotted as a function of each. To illustrate the role of predispositional factors, consider commitment to law and order as a value. We do this by taking account of the importance that respondents attach to strengthening law and order; by observing whether, in the case of a suspect arrested for a serious crime, they believe he should be permitted to remain silent or required to answer all questions; and, finally, by noting whether, in dealing with serious street crime, they believe it is more important to protect the rights of suspects even if a guilty person sometimes goes free or to stop such crimes and make the streets safe even if a suspect's rights are sometimes violated.

How are judgments about whether the police have behaved reasonably on a particular occasion influenced by both people's broader orientations and the features of the actual situation? In the case of the Probable Cause experiment, does the demeanor of the suspects matter more, as the attitude construction model suggests, for those whose responses to issues of order are most mixed and matter less for those whose responses are most one-sided, whatever side they happen to favor?

Figure 9.4A summarizes the joint impact of a predispositional factor, in the form of a commitment to law and order, and a situational cue, in the form of information about the suspects' demeanor. The upper line summarizes judgments about the reasonableness of searches of suspects using foul language; the lower line judgments about searches of well-dressed and well-behaved suspects. The greater the distance between the two lines, the greater the importance of the situational cue. If the ambivalence curvilinearity hypothesis is correct, then the lines should diverge nearer the midpoint of the underlying dispositional continuum and converge nearer the poles. Looking at Figure 9.4A, we see that (1) both lines rise monotonically from left to right, indicating that respondents are more likely to find the police search reasonable the more importance they attach to law and order as a value and (2) the two lines rise in approximately parallel fashion: a given increase in commitment to law and order as a value goes along with an approximately comparable increase in approval of police conduct in both situations. Figures 9.4B through 9.4D, which present equivalent analyses of the joint effect of the suspects' demeanor and conventionality, commitment to traditional values, and ideological self-identification, respectively, report comparable results.

All of these results are at odds with the hypothesis that situational cues have the greatest impact on those whose underlying orientations are the least one-sided. No doubt, there are specialized circumstances in which



Figure 9.4C. Actual responsiveness to a situational cue as a function of commitment to traditional values.



Figure 9.4D. Actual responsiveness to a situational cue as a function of ideological self-identification.

274

EXHIBIT 45 - 12

GaState0033749

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

the "ambivalence-curvilinearity" hypothesis applies, but the results of the Probable Cause experiment suggest two points.

The first concerns the meaning of a "midpoint" attitude. From a social construction perspective, if people are arrayed along an attitudinal continuum, those who fall midway between the two poles are the most ambivalent. The term "ambivalence" is intended, of course, to suggest that those midway between the poles are conflicted, divided in their own minds over the proper course of action, caught in a mental tug-of-war. Without denying that ambivalence exists, and sometimes translates into moderate or midrange responses to attitude scales, our results suggest that, as a rule, political attitudes should be thought of by analogy to tastes. Imagine arraying people as a function of how much they like ice cream. The closer a person is to the top of the order, the more he likes ice cream; the closer to the bottom, the less. And the person in between? She is not conflicted, ambivalent, uncertain about whether she likes ice cream or not: the point is that she likes it more than some, less than others. So, too, with political orientations. To fall near the middle of an attitudinal distribution is not to lack an attitude but to have one of median intensity.

The second point concerns the joint impact of situational and predispositional factors. The ambivalence-curvilinearity hypothesis offers an avenue for conceding that, even from a social construction perspective, both may matter. But the hypothesis retains the spirit of the social construction perspective, predicting that if people are making use of situational cues in arriving at their judgments, they do not have established predispositions to guide their responses, and vice versa. The results of the Probable Cause experiment suggest instead that the influence of predispositional and situational factors, rather than being mutually exclusive, is complementary. Any given individual, depending on the particular circumstances, may be more likely to approve of the conduct of the police or less; however, in any given set of circumstances, the individual who is more predisposed in general to favor law and order than one who is less predisposed is more likely to approve of the conduct of the police in carrying out the search. So far as this is true, the influence of predispositional and situational factors should be additive, not antagonistic.

THE HELPING HAND EXPERIMENT

To claim that the impact of situational and predispositional factors is additive is a weak version of the hypothesis that their influence is complementary. We now consider a strong version.

*Problems of Political Judgment*

A political attitude, standardly conceived, represents a perceptual hypothesis: an organized readiness to adopt a particular perspective on a public issue. The more liberal a person's outlook on politics, the more consistently he or she should support a broad set of proposals for government assistance for the disadvantaged; conversely, the more conservative a person's outlook, the more consistently he or she should oppose them. But it does not follow from this that a liberal is equally likely to support every conceivable proposal to assist the disadvantaged and that a conservative is equally likely to oppose every conceivable proposal to assist the disadvantaged, still less that either is equally likely to support any particular proposal in every conceivable set of circumstances. It will make a difference – indeed, from the perspective of any normative theory of political reasoning, it ought to make a difference – (1) what the government specifically is proposing to do (not every form of assistance is equally meritorious); (2) who exactly the government is proposing to assist (not everyone who is not well off is equally badly off); and (3) why the people to be helped may distinctively merit help or not (not every person who may benefit from government assistance has an equally strong claim to merit it). All of these considerations may matter in the determinations citizens make about whether to support a specific proposal to assist some who are disadvantaged. The interesting issue is how, exactly, they may matter. On Zaller's argument, if people are attending to considerations like who is to be helped, or how they are to be helped, or why they are to be helped, considerations that vary from case to case, they are not responding on the basis of an attitude they have formed in advance. By contrast, we suggest that not only may citizens' responses to a specific policy proposal be affected both by these considerations and by a general attitude, but also that the importance of these particular considerations may depend on their general attitude. After all, considerations like who is to be helped by a particular program, or what they may either have done or failed to do in their own behalf to qualify for help, represent subarguments for or against particular proposals for public action. But these arguments need not be evaluated in a vacuum. How far they are seen to be compelling can depend on the perspective from which they are viewed.

On this interactive hypothesis, predispositions facilitate responses to dispositionally consonant situational cues. The more pronounced, organized, and developed citizens' political predispositions are, the more likely they are to recognize and respond to cues consonant with them: the more liberal they are, the more likely they are to recognize and respond to considerations relevant to a liberal; the more conservative, the more likely they are to recognize and respond to considerations

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

relevant to a conservative. Responsiveness to a dispositionally consonant situational cue, it follows, should be a curvilinear function of a person's location on a dispositional continuum. The ambivalence hypothesis also suggests a curvilinear function, but its form is convex, with those nearest the midpoint the most responsive and those closest to the poles least responsive. By contrast, the "cue weighting" hypothesis predicts a curvilinear function concave in form, with those closest to the poles the most responsive and those nearest the midpoint the least responsive.

Moreover, to take the argument a step further, the steepness of this concave function, rather than being a constant, should be a function of political awareness and sophistication. The argument is a familiar one. Other things being equal, the likelihood of citizens understanding the messages to which they are exposed is a function of their level of political awareness. If so, the more politically sophisticated liberals are, the more likely they should be to respond to messages consonant with liberal views; the more politically sophisticated conservatives are, the more likely they should be to respond to messages consonant with conservative views.

Figure 9.5 maps this two-part expectation. Responsiveness to a dispositionally consonant situational cue is represented as a function both of the intensity of the predisposition and of the level of political sophistication. The function is concave, since responsiveness increases with intensity, with the degree of concavity a function of political awareness,

## Problems of Political Judgment

the thatched area between the two curves mapping the greater responsiveness of the more politically aware at the poles of the underlying predisposition.

We test the reasoning underlying Figure 9.5 through the "Helping Hand" experiment. Very briefly, all respondents are told about a program designed to help people "who have problems with poverty." Taking advantage of computer-assisted interviewing, we inform one-half of the respondents that the programs are intended to help people, "many of whom are blacks and minorities," while the other half are told that they are intended to help "new immigrants from Europe." Independently, however, we inform one-half of the respondents that the programs are designed to help "people who have shown that they want to work their way out of their own problems" and the other half that they are designed to help "people who have had trouble hanging on to jobs." We assume that conservatives are likely to attach more importance than liberals to people showing that they want to work their way out of their own problems than liberals, and conversely, that liberals are likely to attach more importance than conservatives to helping blacks and minorities.

In the Helping Hand experiment, then, liberals and conservatives are each presented with a cue consonant with their position. Taking advantage of experimental randomization, Table 9.2 estimates the extent to which the judgments that citizens make about a proposal to assist the disadvantaged are a function of their political predispositions (in the form of their ideological self-identification); the availability of a cue consonant with their political orientation (in the upper panel, whether they are making an effort to help themselves or not; in the lower panel, whether the group to be helped is black or white); and, finally, their level of political awareness (taking years of education as a proxy for political awareness).

The upper panel of Table 2 focuses on the condition in which a cue consonant with a conservative orientation is randomly presented; the lower panel, on the condition in which a cue consonant with a liberal position is randomly presented. Column 1 tests for the predicted two-way interaction (political predisposition × consonant cue; column 2, for the predicted three-way interaction (political predisposition × consonant cue × education). Both are significant. The more pronounced citizens' ideological orientations, the greater the weight they place on a specific piece of information consonant with their orientation and bearing on the political judgment they are asked to make; and, no less important, the more politically aware they are, the more likely this is true. In a word, political attitudes, rather than working at cross-purposes with situational cues, help citizens get the point of them, and the better they are at political reasoning, the more likely this is to be true.



Figure 9.5. Model of the cue weighting hypothesis: ideology by cue by sophistication.

278

GaState0033750

EXHIBIT 45 - 14

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

Table 9.2. *Situational and Dispositional Sources of Support for Poverty Programs*

| Conservative Cue | Disposition–Situation Interaction | Disposition–Situation–Awareness Interaction |
|---|---|---|
| Beneficiaries help themselves[1] | .017 (.030) | .074 (.126) |
| Ideological self-placement | .049 (.043) | .113 (.100) |
| Effort of beneficiaries × ideology | −.112* (−.330) | |
| Education | | .319** (.260) |
| Effort of beneficiaries × ideology × education | | −.098** (−.476) |

| Liberal Cue | Disposition–Situation Interaction | Disposition–Situation–Awareness Interaction |
|---|---|---|
| Beneficiaries black[2] | −.142 (−.240) | −.103 (−.175) |
| Ideological self-placement | −.129 (−.113) | −.097 (−.085) |
| Race of beneficiaries × ideology | .153** (.438) | |
| Education | | −.088 (−.072) |
| Race of beneficiaries × ideology × education | | .084** (.402) |

*Notes:* Weighted $N = 1676$.
Standardized beta coefficients in parentheses.
* $p \leq .05$; ** $p \leq .01$.
[1] This is a randomized variable taking two values: beneficiaries of the program either "have shown that they want to work their way out of their own problems" or "have had trouble hanging on to jobs."
[2] This is a randomized variable taking two values: beneficiaries of the program are either "blacks and minorities" or "new immigrants from Europe."

## REPRISE

There are two quite different reasons to grapple with the problem of political attitudes and political judgment. The narrower reason is to understand better the dynamics of public opinion interviews; the broader one is to understand better the quality of citizens' judgments in liberal

---

*Problems of Political Judgment*

democracies. These two reasons, though different in character, are not in conflict. On the contrary, it is not possible to respond to the normative issue of what citizens may have a right, or even a responsibility, to do without addressing the empirical issue of what they are capable of doing.

It has again become fashionable to suggest that citizens are incapable of judgment on matters of public interest. This skepticism now takes the form of a general claim that political attitudes are socially constructed. Though available in a number of formulations, this general claim consists of two crucial claims. The first is that "most people possess opposing considerations on most issues that might lead them to decide the issue either way."[36] The second is that most people, on most issues, will just as readily take one side of an issue as the other, depending "on which has been made most immediately salient by chance and the details of questionnaire construction, especially the order and framing of questions."[37] The first we have called the "flip-flop claim"; the second, the "ambivalence claim."

There is, so far as we can see, no evidence in favor of the flip-flop claim. Neither the results of the question-wording experiments nor those of over-time stability calculations remotely approach the strength required to sustain the suggestion that most citizens could, on any given occasion, just as easily line up on one side of most issues as on the other. Nor is the flip-flop claim, applied to real issues, self-evidently plausible. Who really supposes that on issues like affirmative action or welfare or crime citizens have no genuine attitudes, that "most people, on most issues, do not 'really think' any particular thing,"[38] that "they are simply making it up as they go along?"

The second claim, the ambivalence claim, is, to borrow a metaphor, the turtle on which all the other explanatory turtles stand. However, it suffers from two kinds of difficulties: the first methodological, the second conceptual. The empirical difficulty is that the strongest evidence for it derives from the stop-and-think experiment, but the stop-and-think experiment, applied to real issues, is the weakest link methodologically. The experiment has two drawbacks. First, it confuses the position people have on an issue with the reasons they may, on request, come up with for taking a position on the issue, theirs or others'. Second, it purports to show that responses to issues are unstable and contradictory. What it actually shows is that respondents, not surprisingly, are less likely to remember their accustomed response if their customary train of thought is interrupted.

---

[36] Zaller and Feldman, 1992, p. 585.
[37] Zaller, 1992, p. 93.   [38] Zaller, 1994, p. 194.

EXHIBIT 45 - 15

GaState0033752

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

Quite apart from methodological problems, Zaller's argument suffers from a deeper conceptual problem. As we have seen, he proposes two propositions of attitudes, not one, and though the first is predicated on the proposition that people do not have political predispositions organizing and making coherent their beliefs about and their responses to specific issues, the second takes as its central premise that people do. It is very far from obvious how it is possible to argue at the same time that people lack organized, coherent dispositions to respond consistently (either positively or negatively) to political objects and that they have such dispositions. The conflict is less obvious because, in Zaller's treatment, the two models are taken up seriatim. This separation, in addition to obscuring the tension between them, has the further unfortunate effect of framing the analysis in either-or terms, suggesting that a difference in responses to a question as a function of the wording of the question is, in itself, proof of the absence of a genuine underlying attitude. In turn, treating dispositional and question-wording effects as mutually exclusive leads to the extreme suggestion that most citizens, on most issues, can and will flip-flop, taking first one side and then the other merely as a function of seemingly minor variations in the wording of a question.

By contrast, we concentrate on assessing *simultaneously* the impact of predispositional and situational factors. When the influence of both is assessed simultaneously and not seriatim, a different picture emerges. It turns out to be emphatically not the case that if respondents attend to situational cues, they do not act on the basis of attitudinal priors. On the contrary, they tend to make use of all the information at hand, viewing the specific choice they are asked to make in the light of their political priors plus taking account of its distinctive features. Nor is there a tug-of-war between their predispositions and the distinguishing features of a specific choice they are asked to make on a given occasion. The two are complementary. But they may be complementary in two different ways, one we have illustrated with the Probable Cause experiment, the other with the Helping Hand experiment.

In the Probable Cause experiment, the response to question-wording effects is uniform. Liberals are as likely as conservatives to take the use of foul language in a public place as a violation of acceptable standards. If question-wording effects are uniform, the impact of predispositional and situational factors is additive. The person who is most committed to law and order as a value is even more likely to believe the police had probable cause for a drug search if the suspects were using foul language rather than being well dressed and well behaved. But then, so too is the person most supportive of the rights of crime suspects. Each reacts the same way relative to the other. Both adjust their response the same way relative to the situation. In the Helping Hand experiment, by contrast, their response

to specific features of a situation is itself a function of their general predispositions. The liberal is more likely to favor government assistance for the disadvantaged than the conservative and still more likely to do so if those to be assisted are black; the conservative is more likely to oppose government assistance and still more likely to do so if those to be helped have not shown that they will make the effort to help themselves. The relation between predisposition and question wording is interactive. But in either case, whether in the Probable Cause or the Helping Hand experiment, citizens make use of all the information at hand.

The expanded version of the nonattitudes thesis claims that most citizens do not know what they think about most issues and, lacking genuine attitudes to stabilize their judgments, flip-flop from one side of an issue to the opposite as a function of situational cues in the form of question-wording effects. We have examined question-wording effects in two conditions: when the weight attached to the cue is independent of people's political predispositions and when it is dependent. The flip-flop model fails in both conditions. In both, citizens make their best estimate of the right course of action based on their political priors, updated by current information about the specific decision they are being asked to make. In the first condition, the relation between the two is additive; in the second, interactive. If the situational cue is orthogonal to the attitudinal predisposition, then the effect of the cue is complementary. It increases by an approximately constant amount the probability, at any point along the underlying dispositional continuum, of a response consonant with it. If the weight of the cue is related to a person's location along the underlying dispositional continuum, then the effect is interactive. Consonant cues reinforce people's underlying disposition, and do so more strongly the stronger the disposition. In neither condition, then, do citizens simply flip-flop from one side of an issue to the opposite under the control of situational cues in the form of question-wording effects.

In making a determination as to how a specific problem, given a particular set of circumstances, should be dealt with at a given time, citizens need to make use of two kinds of information. The first is their general views about how problems of this type should be dealt with; the second is the information they have on hand about the particular features of the specific problem they wish to resolve. So, in the Probable Cause experiment, in determining whether the police conduct on a particular occasion was or was not reasonable, citizens can, and should, draw both on their attitudes toward law and order in general and on the information they have on the demeanor of the suspects on this particular occasion. Analogously, in the Helping Hand experiment, in judging whether a particular government program is or is not deserving of

EXHIBIT 45 - 16

GaState0033753

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

support, citizens can, and should, draw both on their attitudes toward government assistance in general and on the information they have on the distinctive features of the specific program they are being asked to evaluate – who is to be helped, what kind of help they are to get, and what they may have done to deserve help. Indeed, as a general principle, if citizens are to make judgments about actual matters of public policy approximately rationally, they need to take account of their political priors updated by information on the distinctive features of the specific problem and the course of public action before them. If citizens acted only on the basis of their political attitudes, they would be blind to the present; if they acted only on the basis of their immediate circumstances, they would be blind to the past. They must, if they are to be approximately rational, take account of both, and our results show they do. It is accordingly an irony worth observing when citizens are judged not to know what they think because they are paying attention to what they are specifically being asked to think about.

APPENDIX A: SAMPLE DESCRIPTION

We shall rely on data from a national telephone survey – the Race and American Values Study – to explore these issues. The survey, funded by the National Science Foundation, was carried out on a nationwide random-digit telephone sample designed by the Survey Research Center of the University of California, Berkeley. The target population for the study was all English-speaking adults, eighteen years of age or older, residing in households with telephones, within the forty-eight contiguous states. An unusually large number of interviews, 2223, were completed, with a 65.3% response rate.

Because the telephone interviews, which the Survey Research Center of the University of California also conducted, were computer-assisted, we were able to randomize many elements of the questionnaire, including some items discussed in this chapter. The interviewing was implemented using the CASES software developed by the Computer-Assisted Survey Methods Program of the University of California, Berkeley.

The sample of telephone numbers for this survey was generated using a new stratified two-phase procedure that produced a high proportion of households in the sample, yet did not require the replacement methodology of the two-stage Mitofsky-Waksberg method. A discussion of the sampling methodology used for this study can be found in R. J. Casady and J. M. Lepkowski, "Optimal Allocation for Stratified Telephone Survey Designs," *Proceedings of the Section on Survey Research Methods*, American Statistical Association (1991). The sampling was carried out in the following steps:

*Problems of Political Judgment*

1. The area code and prefix combinations were ordered geographically, and a large first-phase sample of those combinations was selected with systematic random sampling. Four-digit random numbers were appended to the area code and prefix combinations to generate complete telephone numbers.

2. The selected first-phase telephone numbers were compared with a tape created by Donnelley Marketing Services, which gives the number of listed residential telephone numbers in each series of 100 numbers – that is, how many residential telephone numbers in phone directories begin with the same eight digits. Based on this information, the selected telephone numbers were placed into two strata – telephone numbers from series with no residential listings and telephone numbers from series with at least one listing.

3. From the stratified pool of first-phase selections, a second-phase sample was drawn. Many replicate samples of telephone numbers were drawn from the stratum containing telephone numbers from series of numbers with at least one residential listing; a random sample of telephone numbers was also drawn from the other stratum, but with a smaller sampling fraction. This method of disproportionate sampling resulted in the selection of a second-phase sample in which approximately half of the selected telephone numbers turned out to be households. The difference in selection probabilities between the two strata is compensated for by using weights. Only four cases were completed from the zero-listing stratum, but they receive weights of 10.3 relative to cases in the main sample.

4. A small supplementary sample of telephone numbers from new prefixes was also drawn to compensate for the fact that the major sampling work just described was carried out several months before the beginning of this study. A new Bellcore tape was obtained, and 761 area code and prefix combinations that had not appeared on the older tape were identified. A sample of 102 such prefixes was selected at random, and four-digit random numbers were appended to each selected prefix to generate the supplementary sample. Of those 102 numbers, 6 turned out to be households, and interviews were completed at 5 of them. Those completed cases receive weights of 3.0 relative to cases in the main sample.

In addition to the weighting adjustments for selection probabilities already mentioned, the weight used for analysis incorporated adjustments for number of telephone lines and number of eligible adults in the household. The final weight also included poststratification adjustments for

284

EXHIBIT 45 - 17

gender, race, age, and education. The variance of the weight is .45 for all cases; it is .42 for whites alone.

## APPENDIX B: MEASURES

### Commitment to Law and Order

This measure is an additive index of three items: the rating (from 0 to 10) of the importance of "strengthening law and order"; whether someone arrested for a serious crime "should have to answer all questions," or "should be permitted to remain silent"; and whether "In dealing with serious street crime like hold-ups or robbery . . . it's more important to 'Protect the rights of suspects even if a guilty person sometimes goes free' or 'Stop such crimes and make the street safe even if suspects' rights are sometimes violated.'"

### Commitment to Traditional Values

This measure is an additive index of six items rated from 0 to 10: preserving the traditional ideas of right and wrong"; "respect for authority"; "following God's will"; "improving standards of politeness in everyday behavior"; "strengthening law and order"; and "maintaining respect for America's power in the world."

### Conventionality

This measure is an additive combination of six items: the ratings of three values – the importance of "preserving traditional ideas of right and wrong", "respect for authority"; and "improving politeness" – all on a scale from 0 to 10 and of three questions on the qualities respondents think a child should have – "independence OR respect for elders?", "obedience OR self-reliance?", and "curiosity OR good manners?"

### Black Work Ethic Index

This index draws on a larger measure of stereotypes, where respondents were asked to judge how well a number of descriptors describe "most blacks," and combines responses to a quartet of stereotypes: "dependable," "lazy," "hardworking," and "irresponsible."

### Ideological Self-Identification

A 7-point measure, in branching format, running from strong liberal to strong conservative.

---

## References

Abelson, Robert P. 1968. "Discussion: Minimalist vs. Maximalist Positions on Cognitive Structure." In Robert P. Abelson, Elliot Aronson, William J. McGuire, Theodore M. Newcomb, Milton J. Rosenberg, and Percy H. Tannenbaum, eds., *Theories of Cognitive Consistency: A Sourcebook.* Chicago: Rand McNally and Company, pp. 526–528.

Achen, Christopher. 1975. "Mass Political Attitudes and the Survey Response." *American Political Science Review* 69: 1218–1231.

Baron, Jonathan. 1994. *Thinking and Deciding*, 2nd ed. New York: Cambridge University Press.

Berelson, Bernard, Paul F. Lazarsfeld, and William N. McPhee. 1954. *Voting: A Study of Opinion Formation in a Presidential Campaign.* Chicago: University of Chicago Press.

Bishop, George F., Alfred J. Tuchfarber, and Robert W. Oldendick. 1978. "Change in the Structure of American Political Attitudes: The Nagging Question of Question Wording," *American Journal of Political Science* 22: 250–269.

Bruner, Jerome S. 1951. "Personality Dynamics and the Process of Perceiving." In R. R. Blake and G. U. Ramsey, eds., *Perception: An Approach to Personality.* New York: Ronald Press, pp. 121–147.

Campbell, Donald T. 1963. "Social Attitudes and Other Acquired Behavioral Dispositions." In Sigmund Koch, ed., *Psychology: Study of a Science.* New York: McGraw-Hill, vol. 6, 94–172.

Converse, Philip E. 1964. "The Nature of Belief Systems in Mass Publics." In David Apter, ed., *Ideology and Discontent.* New York: Free Press, 206–261.

Converse, Philip E. 1970. "Attitudes and Non-Attitudes: Continuation of a Dialogue." In Edward R. Tufte, ed., *The Quantitative Analysis of Social Problems.* Reading, Mass: Addison-Wesley. 168–190.

Delli Carpini, Michael X., and Scott Keeter. 1989. "Political Knowledge of the U.S. Public: Results from a National Survey." Paper presented at the annual meeting of the American Association for Public Opinion Research, St. Petersburg, Florida.

Delli Carpini, Michael X., and Scott Keeter. 1991. "Stability and Change in the U.S. Public's Knowledge of Politics." *Public Opinion Quarterly* 55: 583–612.

Funder, David C., and Daniel J. Ozer. 1983. "Behavior as a Function of the Situation." *Journal of Personality and Social Psychology* 44: 107–112.

Hyman, Herbert. 1969. "Social Psychology and Race Relations." In I. Katz and Patricia Gurin, eds., *Race and the Social Sciences.* New York: Basic Books, pp. 3–48.

Kelley, Stanley, Jr. 1983. *Interpreting Elections.* Princeton: Princeton University Press.

Kinder, Donald, and L. M. Sanders. 1990. "Mimicking Political Debate with Survey Questions: The Case of White Opinion on Affirmative Action for Blacks." *Social Cognition* 8: 73–103.

Lazarsfeld, Paul F., Bernard Berelson, and Hazel Gaudet. 1944. *The People's Choice: How the Voter Makes Up His Mind in a Presidential Campaign.* New York: Duell, Sloan and Pierce.

Lewin, Kurt. 1935. *A Dynamic Theory of Personality: Selected Papers.* New York: McGraw-Hill.

GaState0033754

EXHIBIT 45 - 18

GaState0033755

288

Paul M. Sniderman, Philip E. Tetlock, and Laurel Elms

McGuire, William J. 1968. "Theory of the Structure of Human Thought." In Robert P. Abelson, Elliot Aronson, William J. McGuire, Theodore M. Newcomb, Milton J. Rosenberg, and Percy H. Tannenbaum, eds., *Theories of Cognitive Consistency: A Sourcebook*. Chicago: Rand McNally and Company, pp. 140–162.

Nie, Norman H., Sidney Verba, and John R. Petrocik. 1979. *The Changing American Voter*. Cambridge: Harvard University Press.

Postman, L., J. S. Bruner, and R. D. Walk. 1951. "The Perception of Error." *British Journal of Psychology* 42:1–10.

Schuman, Howard, and Stanley Presser. 1981. *Questions and Answers in Attitude Surveys: Experiments on Question Form, Wording, and Context*. New York: Academic Press.

Smith, Eric R. A. N. 1989. *The Unchanging American Voter*. Berkeley: University of California Press.

Sniderman, Paul M. 1993. "The New Look in Public Opinion Research." In Ada W. Finifter, ed., *Political Science: The State of the Discipline II*. Washington, D.C.: The American Political Science Association, pp. 219–245.

Sniderman, Paul M., Richard A. Brody, and Philip E. Tetlock. 1991. *Reasoning and Choice: Explorations in Political Psychology*. New York: Cambridge University Press.

Sniderman, Paul M., and Thomas Piazza. 1993. *The Scar of Race*. Cambridge: Harvard University Press.

Sniderman, Paul M., Philip E. Tetlock, and Edward G. Carmines. 1993. *Prejudice, Politics and the American Dilemma*. Stanford: Stanford University Press.

Taylor, Shelly E., and Susan Fiske. 1978. "Salience, Attention, and Attribution: Top of the Head Phenomena." In L. Berkowitz, ed., *Advances in Experimental Social Psychology*. New York: Academic Press, vol. 11, pp. 249–288.

Tetlock, Philip E., Randall S. Peterson, and Jennifer S. Lerner. 1996. "Revising the Value Pluralism Model of Ideological Reasoning: Incorporating Social Content and Context Postulates." In Clive Seligman, James M. Olson, and Mark P. Zanna, eds., *The Psychology of Values*. Hillsdale, NJ: Erlbaum, 25–51.

Tourangeau, Roger, and Kenneth A. Rasinski. 1988. "Cognitive Processes Underlying Context Effects in Attitude Measurement." *Psychological Bulletin* 103: 299–314.

Wilson, Timothy D. 1990. "Self-Persuasion Via Self-Reflection." In James M. Olson and Mark P. Zanna, eds., *Self-Inference Processes: The Ontario Symposium*. Hillsdale, NJ: Erlbaum, pp. 43–67.

Wilson, Timony D., and Sara D. Hodges. 1992. "Attitudes as Temporary Constructions." In Leonard L. Martin and Abraham Tesser, eds., *The Construction of Social Judgments*. Hillsdale, NJ: Erlbaum, 37–65.

Zaller, John. 1992. *The Nature and Origins of Mass Opinion*. New York: Cambridge University Press.

Zaller, John. 1994. "Elite Leadership of Mass Opinion: New Evidence from the Gulf War." In W. Lance Bennett and David L. Paletz, eds., *Taken by Storm: The Media, Public Opinion, and U.S. Foreign Policy in the Gulf War*. Chicago: University of Chicago Press, 186–209.

Zaller, John, and Stanley Feldman. 1992. "A Simple Theory of the Survey Response: Answering Questions versus Revealing Preferences." *American Journal of Political Science* 36: 579–616.

# 10

## Implications of a Latitude-Theory Model of Citizen Attitudes for Political Campaigning, Debate, and Representation

GREGORY ANDRADE DIAMOND

Political public opinion can be expressed either positively or negatively. A positively expressed attitude endorses a particular policy from among a range of options for a given issue. Favoring a reduction in defense spending or a prohibition of late-term abortions are both positively expressed attitudes. A negatively expressed attitude on an issue indicates what one does *not* want to happen and is difficult to portray as crisply. With respect to defense spending, for example, one might feel: "No increase is needed; any more than a slight increase would be damaging; drastic cuts are also unreasonable; even some moderate cuts are worrisome." Here one rules out disliked positions and is left with a set of options ranging from inoffensive at worst to desirable at best. Politicians retain some latitude to endorse policies from within this range of nonobjectionable options without alienating the voter.

Whatever virtue negatively expressed attitudes may have – such as more accurately reflecting the way people think about many issues – they are messy, disturbingly provisional, and difficult to summarize across persons. Academic and political observers have avoided them; while recognizing that negative *information* may play strong roles in determining political attitudes (Lau, 1982), they construct the attitudes themselves as positively expressed. Elsewhere (Diamond and Cobb, 1996), I argue that modeling political attitudes in this unwieldy, imprecise, negatively expressed fashion greatly aids our understanding of real voters' conceptions of real candidates. This chapter explores some of the counterintuitive implications of this negatively expressed political opinion – based

---

Jim Kuklinski first suggested that I explore the implications of latitude theory for theories of representation, and I gratefully acknowledge his and Michael Cobb's help in puzzling them out. The responsibility for these ideas, and particularly for any errors, remains solely mine.

EXHIBIT 45 - 19