## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CAMBRIDGE UNIVERSITY PRESS, et al., <br><br>       Plaintiffs, <br><br> *-vs.-* <br><br> MARK P. BECKER, in his official capacity as Georgia State University President, et al., <br>       Defendants. | Civil Action No. <br> 1:08-CV-1425-ODE |

### DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...............................................................................4

II.   ARGUMENT .....................................................................................5
      A.   The Publishers Have Failed to Establish Direct
           Infringement By Any Named Defendant ..............................5
           1.   No "Volitional Act" can be Attributed to the
                University Administrators .............................................7
           2.   The Publishers' Reliance on *Luckey v. Harris* is
                Misplaced .......................................................................8
      B.   Plaintiffs Have Not and Cannot Show Any Liability for
           Contributory or Vicarious Copyright Infringement ..........11
           1.   Defendants Have Not Contributorily Infringed ........12
           2.   Defendants Have Not Vicariously Infringed ..............16
      C.   GSU's Online Practices, When in Accordance with the
           Policy, Reflect Proper Application of "Fair Use" ............20
           1.   The Publishers Seek A Windfall and Rely On
                Irrelevant Case Law ...................................................22
           2.   An Analysis of the Statutory Factors Favors a Finding
                of "Fair Use" ................................................................28
           a.   Purpose and Character of the Use .............................28
           b.   Nature of the Work .....................................................30
           c.   Amount and Substantiality of the Use ......................31
           d.   Effect on theMarket ...................................................33
           e.   Other Factors, Such as Good Faith ...........................34
      D.   The Plaintiff's Criticisms of the New Copyright Policy, and
           Particularly the Checklist, are Without Merit ..................38
      E.   The New Copyright Policy was Appropriately adopted by
           the University Administrators ............................................46
           1.   Defendants' New Copyright Policy Is More Than a
                Checklist .......................................................................46
           2.   The Checklist Is Supported By Law and In Keeping
                with Those of Other Institutions .................................49

III.  CONCLUSION ................................................................................50

i

# TABLE OF AUTHORITIES

**CASES**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) .............................................................. 16, 19-20

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2nd Cir. 1995) ........................................................... 24, 37-38, 44

*Arista Records LLC v. Usenet.com, Inc.*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................... 16, 18-20

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
   758 F. Supp. 1522 (S.D.N.Y. 1991) ................................................ 37-38, 44, 50

*Blackwell Publ. Inc. v. Excel Research Group, LLC*,
   661 F. Supp. 2d 786 (E.D. Mich. 2009) ................................................ 33, 37-38

*Bridgeport Music, Inc. v. Rhyme Syndicate Music*,
   376 F.3d 615 (6th Cir. 2004) .................................................................. 5

*Greenberg v. Nat'l Geographic Soc.*,
   488 F.3d 1331 (11th Cir. 2007) ........................................................... 12

*N.Y. Times Co., Inc. v. Tasini*,
   533 U.S. 483, 121 S. Ct. 2381 (2001)................................................... 12

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*,
   902 F.2d 829 (11th Cir. 1990) ............................................................ 11

*Costar Group, Inc. v. Loopnet, Inc.*,
   372 F.3d 544 (4th Cir. 2004) ................................................................ 6

*Costar Group, Inc. v. Loopnet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ........................................................... 6-8

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ........................................................ 16, 19

ii

*Greenberg v. Nat'l Geographic Soc.*,
    244 F.3d 1267 (11th Cir. 2001) ..........................................................................12

*King Records, Inc. v. Bennett*,
    438 F. Supp. 2d 812 (M.D. Tenn. 2006) ............................................................16

*Luckey v. Harris*,
    860 F.2d 1012 (11th Cir. 1988) ................................................................. Passim

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005).................................................................................... Passim

*Microsoft Corp. v. Silver Star Micro, Inc.*,
    No. 06-1350, 2008 U.S. Dist. LEXIS 1526 (N.D. Ga. Jan. 9, 2008) .................15

*Nunez v. Caribbean Int'l News Corp.*,
    234 F.3d 18 ..........................................................................................................50

*Oravec v. Sunny Isles Luxury Ventures L.C.*,
    469 F. Supp. 2d 1148 (S.D. Fla. 2006) ..............................................................17

*Parker v. Google*,
    242 Fed. Appx. 833 (3rd Cir. 2007).................................................................5, 8

*Princeton Univ. Press v. Mich. Document Servs. Inc.*,
    99 F.3d 1381 (6th Cir. 1996) ..............................................................................37

*Resnick v. Copyright Clearance Center*,
    422 F.Supp. 2d 252 (D.Mass. 2006)....................................................................6

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)............................................................................................12

*Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*,
    424 F.3d 50 (1st Cir. 2005)...................................................................................5

*Wihtol v. Crow*,
    309 F.2d 777 (8th Cir. 1962) ..............................................................................43

**STATUTES**

17 U.S.C. § 106 .................................................................................................21

17 U.S.C. § 107 ........................................................................................ Passim

17 U.S.C. § 501(a) ...............................................................................................5

## I.    INTRODUCTION

By their Motion, plaintiffs Cambridge University Press, Oxford University Press and Sage Publishers (hereinafter "Publishers" or "Plaintiffs") seek judicial approval of their exertion of monopolistic control over reasonable use of scholarly works in the educational environment—such reasonable use being a necessary part of the constitutional objective of promoting progress in the sciences and the useful arts.  Rather than recognizing a user's right to a "fair use"—especially with respect to "teaching"—the Publishers seek to impose a rigid permission system in an electronic environment that only insures maximum compensation based _not_ on "use" of a given copyrighted work, but rather, on the Publishers' simple provision of access to the work regardless of whether _any_ use, "fair use" or otherwise, is made.

Recognizing that the well-established statutory right of "fair use" is a threat to such control, the Publishers wrongly criticize members of the University System of Georgia ("USG") Board of Regents and the administrators of Georgia State University ("GSU") when they perform no act of copyright infringement, but

instead have enacted and begun the implementation and enforcement of a reasonable and responsible new policy on copyright and "fair use."  Remarkably, the publishers even criticize a component of the new copyright policy referred to as a "Fair Use Checklist," which is designed to assist the educational community in making correct decisions regarding fair use, including when excerpts of copyrighted works are offered to students in an electronic reserve system.  What is even more remarkable is that the criticized Fair Use Checklist is more detailed and comprehensive than a similar checklist provided by the Copyright Clearance Center ("CCC")—the Publishers acknowledged source for compensated permission to use copyrighted materials and an unnamed financial sponsor (in part) of this litigation.

In compliance with and satisfaction of their responsibility, the Board of Regents and University Administrators (collectively "University Administrators") adopted the new USG Policy on Copyright and Fair Use ("Policy") in February, 2009—a Policy that includes completion of the seasoned, competent and balanced Fair Use Checklist.  As a result of that Policy, the use of copyrighted materials online in the electronic course reserve system at GSU has decreased dramatically.  Consequently, this is not a case of "ongoing and continuous infringement"—as the Eleventh Amendment requires—but instead one of affirmative and effective

actions to ensure that professors at GSU and the University System of Georgia conduct a meaningful "fair use" analysis in the educational setting and thereby make the "tough calls" necessary in such an analysis.   Rather than facilitate infringement, as the Publishers allege, the individually named members of the Board of Regents and individually named GSU administrators embraced and fulfilled their responsibility by adopting a sound new Policy that is in the process of being implemented at GSU.   That Policy appropriately requires the professor— the person most familiar with the class being taught, the portion of the work to be used and the purpose of the proposed use and thus the one in the best possible position to conduct a "fair use" analysis—to conduct such an analysis.   The new Policy is in keeping with, and in many respects better than, similar copyright policies that have been adopted and implemented by other universities across the United States.

Once the University Administrators adopted the Policy, the Publishers could have considered the effect of that policy on the "fair use" of copyrighted materials in the electronic reserve system at GSU.   The Publishers, however, have chosen to pursue their copyright infringement claims based in large part on activities that preceded the adoption of the new Policy and old policies that have now been replaced.   Those past activities are clearly precluded from consideration based on

3

concepts of sovereign immunity under *Ex parte Young* and this Court's June 22, 2009 Protective Order.  Dkt. No. 111.

Even if the Court should determine that the University Administrators have committed acts that could be characterized as direct or contributory or vicarious copyright infringement, a proper fair use analysis establishes that the questioned acts are a fair use of the Publisher's works-at-issue and therefore not copyright infringement.  When properly analyzed, all of the fair use factors weigh in favor of the defendant University Administrators—especially the fourth factor (market effect).  With respect to the fourth factor, the Publishers are unable to carry their burden of proof because, as demonstrated by the declarations submitted herewith, the GSU professors would not require students to purchase the books from which excerpts have been used or acquire licenses to use the excerpts if such use in an electronic reserve system is not a fair use.  The professors are unanimous in their conclusion that such minimal use is not worth the expense and difficulty of acquiring the entire book or compensated permission from the publishers.  As pointed out by the professors they simply would not use the material.  The consequence of such a decision is an unwarranted reduction in the educational experience.  For that reason, as well as others, the fair use provision in the

4

Copyright Law, 17 U.S.C. § 107, specifically identifies "teaching" as an example of acceptable fair use that is <u>not</u> copyright infringement.

In the final analysis, however, whether the Publishers agree or disagree with the fair use analysis provided by an individual professors' completed "Fair Use Checklists," the fact remains that none of the individually named University Administrators copied or distributed any copyrighted materials.  Rather, all of the defendant University Administrators fulfilled their responsibilities by adopting and directing implementation of the Policy.   Consequently, the University Administrators have not and will not directly, contributorily or vicariously infringe any of the asserted copyrights.  The Plaintiffs have therefore failed to demonstrate any conduct by the individually named defendants that can be fairly characterized as "ongoing and continuous" infringement of the asserted copyrights and Plaintiffs' Motion for Summary Judgment ("PMSJ") should be denied.

## II.   ARGUMENT

### A.    The Publishers Have Failed to Establish Direct Infringement By Any Named Defendant

In order to prove direct copyright infringement, Plaintiffs must show:  1) ownership of a valid copyright; and 2) a violation of one of the copyright holders exclusive rights.  17 U.S.C. § 501(a); *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615 (6th Cir. 2004).  But direct infringement requires more than

5

the simple provision of a vehicle through which others may engage in copyright infringement.  *See Parker v. Google, Inc.*, 242 Fed. Appx. 833 (3d Cir. 2007) (adopting the *Costar* volitional conduct standard (discussed *infra)* in finding no direct infringement where the defendant archived third party posts which included infringing material); *Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*, 424 F.3d 50, 57 (1st Cir. 2005) ("a listed infringing act (beyond authorization) is required for a claim" of direct infringement); *Costar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544 (4th Cir. 2004) ("volitional conduct" is required to show direct infringement); *Resnick v. Copyright Clearance Center*, 422 F.Supp. 2d 252 (D.Mass. 2006) (finding no direct infringement where a copyright clearance center allowed third parties to make copies of plaintiff's work).  Direct infringement requires actual volitional conduct that in some way causes infringement.  *Costar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004).

The defendants here—the University Administrators—are members of the Board of Regents of the University System of Georgia and Georgia State University administrators.[1]   None of the named defendants are accused of personally copying or distributing any of the subject works.  In fact, none have

---

[1] See Plaintiffs' Local Rule 56.1 Statement of Facts, Dkt.142-3 at ¶¶ 25-30.

ATL_IMANAGE-6875627.5

performed an allegedly infringing act. Therefore, none of the University Administrators are direct infringers. *See Costar Group, Inc. v. Loopnet, Inc.*, 372 F.3d 544, 549 (4th Cir. 2004). Plaintiffs effectively admit as much: "[t]he record here demonstrates ongoing conduct by GSU <u>employees</u>—faculty and library staff responsible for the distribution of electronic course materials." PMSJ (Dkt. No. 142) at 37 (emphasis added).

**1.** No "Volitional Act" can be Attributed to the University Administrators

In *Costar*, the Fourth Circuit affirmed a district court holding of no direct infringement where an internet service provider allowed subscribers to post pictures of commercial real estate on the internet. *Costar*, 372 F.3d at 547. The plaintiff in *Costar* attempted to establish direct infringement because the defendant put a gatekeeping system in place which sought to screen out infringing articles, just as the fair use filtering mechanism put in place by Defendants. 373 F.3d at 555. The *Costar* plaintiff alleged that the gatekeeping system, involving the review by the defendant's employees of uploaded photographs meant the defendant had an active, rather than passive, role in the display of the infringing photographs. But the court found that a plaintiff must show "volitional conduct— specifically, the act constituting infringement—to [establish liability for direct infringement]." *Id.* at 551 (citing *Religious Technology Center v. Netcom On-Line*

7

*Communication Services, Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995)).   The gatekeeping process put in place by the *Costar* defendant was <u>not</u> an act of direct infringement.   Instead, rather than a "volitional" act of infringement, the gatekeeping process furthered the goals of the Copyright Act by seeking to preclude infringement.   373 F.3d at 556.   This standard has been recently adopted by the Third Circuit.   *See, e.g., Parker v. Google, Inc.*, 242 Fed. Appx. 833 (3d Cir. 2007).

The similarities between *Costar* and this case are compelling because both involve a gatekeeping function and third party upload of allegedly infringing material.   Like the defendant in *Costar*, the University Administrators provide a forum to third parties.   Those third parties, be they professors and librarians in the case of GSU or website subscribers in the case of the *Costar* defendant, are able to upload documents.   This, without more, is not direct infringement.   The further act of review, either manually in the case of the *Costar* defendant or through the new Policy in the case of GSU, is <u>not</u> a volitional act of infringement, but rather an effort to preclude infringement.

>    **2.**    The Publishers' Reliance on *Luckey v. Harris* is Misplaced

In the absence of a volitional act by a named defendant, the Plaintiffs' attempt an end-around, contending that personal action by a defendant is

unnecessary if the person is merely an "official [that is] responsible for the challenged action."   Plaintiffs cite *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988) for this alleged proposition.  The cited case, however, does not permit the Publishers to sue the University Administrators simply by virtue of their positions.

In *Luckey*, the plaintiff filed suit against the Governor and members of the judiciary in their official capacities alleging that systematic deficiencies in the Georgia indigent criminal defense program, including the failure to allocate sufficient funds, denied indigent criminal defendants various constitutional rights. The defendants successfully moved to dismiss on grounds that this was essentially an action against the state and that state officials were entitled to immunity.  The Eleventh Circuit reversed, determining that the named defendants were in fact responsible for providing an indigent defense program that met minimum constitutional standards.   For example, the Governor was responsible for law enforcement and executing the laws, and the judges were responsible for administering the system for representation of the indigent criminally accused. Thus, the named defendants in *Luckey* had a "connection" with the asserted violation.   The *Luckey* defendants were the persons responsible for adopting a meaningful policy, such as by allocation of funds, to address the defense of Georgia's indigent criminally accused and they had not done so.

9

The Publishers' reliance on *Luckey* in this case is misplaced, both legally and factually. Legally, the *Luckey* case is not a copyright case and that difference is significant. The alleged violations here are specific acts of alleged unlawful copying. Those acts, as admitted by Plaintiffs, are performed by professors and library staff, <u>not</u> by the University Administrators. Copyright law acknowledges and expressly contemplates causes of action against third parties under the doctrines of contributory infringement and vicarious infringement. If, as Plaintiffs allege, the University Administrators have "authorized, facilitated and/or encouraged the copying of Plaintiffs' works" (PMSJ at 37), then the proper cause of action is one for contributory or vicarious infringement (neither of which is a viable cause of action in this case). The Publishers cannot avoid the obligation of alleging and proving a proper cause of action by relying on *Luckey*.

Moreover, unlike the Governor and Judges in *Luckey*, the University Administrators do not have the requisite "connection" with the underlying cause of action. Here, the University Administrators are responsible for setting and overseeing policy. The University Administrators are not responsible for determining whether the use of a subject excerpt is appropriate in a given class setting such that its provision to students is a "fair use." Rather, the role of the University Administrators is similar to that of the Governor—to adopt and oversee

10

meaningful policies.  However, unlike the Governor in *Luckey*, that is precisely what the University Administrators have done.  In February of 2009, the University Administrators developed and adopted the Policy.  By doing so, the University Administrators effectively addressed the "wrong" identified in the Complaint.  Here, applying the facts of *Luckey*, it is as if, after the Governor had appropriated the necessary funds and directed others to abide by the policy, the *Luckey* plaintiff sued the Governor for malpractice arising out of an individual attorney's failure to properly represent an accused indigent defendant.  That is not a proper cause of action against the Governor.  Likewise, as the Publishers complain of individual acts of alleged copyright infringement by individual professors offering specific classes, a proper cause of action does not lie against the University Administrators.

**B.**  **Plaintiffs Have Not and Cannot Show Any Liability for Contributory or Vicarious Copyright Infringement**

Plaintiffs rely heavily on *Luckey*, so much so that the full extent of Plaintiffs' argument for secondary liability based on contributory and vicarious infringement is essentially the following:

> The record here demonstrates ongoing infringing conduct by GSU employees . . . ***subject to the authority of the "official capacity" defendants, who knew about, authorized, facilitated, and/or encouraged*** the copying of Plaintiffs' works without permission of the

11

> copyright owner.   Thus, Defendants' liability is clear unless the
> challenged practices qualify as fair use.

(PMSJ at 37 (citations to argument and statement of facts omitted).)  "Knew about,

authorized, facilitated, and/or encouraged," however, is not the legal standard for

either vicarious or contributory copyright infringement.  Nor do Plaintiffs provide

any citation to law to indicate that it is.  Regardless, any claims of secondary

liability fail as a matter of law.

### 1.   Defendants Have Not Contributorily Infringed

"[T]he well-settled test for a contributory infringer [is] 'one who, with

knowledge of the infringing activity, induces, causes or materially contributes to

the infringing conduct of another.'"  *Cable/Home Commc'n Corp. v. Network

Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (internal quotation marks omitted)

(citing, *inter alia*, *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987); *Columbia

Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir. 1984);

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d

Cir. 1971)); *see also Greenberg v. Nat'l Geographic Soc.*, 244 F.3d 1267, 1271 n.6

(11th Cir. 2001), *abrogated on other grounds by*, *N.Y. Times Co., Inc. v. Tasini*,

533 U.S. 483, 121 S. Ct. 2381 (2001), *as recognized by*, *Greenberg v. Nat'l

Geographic Soc.*, 488 F.3d 1331 (11th Cir. 2007).  In order to prevail on a claim of

contributory infringement under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster,*

12

*Ltd.*, 545 U.S. 913 (2005), Plaintiffs must prove that Defendants induced the infringement through "clear . . . affirmative steps . . . to foster infringement." *See Grokster*, 545 U.S. at 936-37.  Providing a mechanism whereby a user <u>can</u> infringe is not enough to establish inducement or an intent to induce where the system provided has substantial non-infringing uses.  *See id.* at 919, 939 n.12; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984).  Here, the uLearn and ERes systems can, without question, be used for substantial noninfringing uses:  professors post their own written materials; material is linked from licensed databases[2]; and materials are posted that fall within the parameters of fair use.  *See* Crews Report (Dkt. 104-2) at 10, 45 (describing posted materials). Furthermore, "mere knowledge of infringing potential or of actual infringing uses" is not enough to subject the distributor to liability.  *Grokster*, 545 U.S. at 937.

Here, contrary to any acts of inducement, the University Administrators have acted to <u>discourage</u> any copyright infringement by professors or other members of the university community.  DMSJ (Dkt.160-2) at 31-37.  These acts to discourage infringement are extensive and include the adoption of a new, comprehensive policy on copyright and fair use, the education of community

---

[2]  Links may be provided to databases licensed by the library where the copyright owner makes the original work available.  Linking is not an act of copying and therefore does not raise serious copyright concerns.  (Dkt. No. 104, at 10.)

13

members about copyright law, Policy on the Use of Copyrighted Works in Education and Research, http://www.usg.edu/copyright, and the adoption of a streamlined process for posting materials to the ERes system wherein each professor is required to account for his or her posting according to fair use standards. Defs.' Supp. SOF 7; Course Reserves - Guidelines for Instructors, http://www.library.gsu.edu/reserves/instructorinfo.asp. "The inducement rule [of *Grokster*] . . . premises liability on purposeful, culpable expression and conduct." *Grokster*, 545 U.S. at 937. Rather than purposeful and culpable inducements, the Policy involves purposeful efforts to discourage infringement on the part of any of the systems' users.[3]

The University Administrators' efforts to discourage infringement are in stark contrast to the unlawful acts courts have found to constitute promoting or profiting from copyright infringement. For example, in *Grokster*, the distributor of file sharing software (Grokster) was found to have contributorily infringed not merely because it distributed software used for an infringing purpose, but because it had promoted unlawful use of the software by targeting its advertisements to users who were known infringers (demonstrating an intent to infringe), and it failed

---

[3]   *See* Additional Guidelines for Electronic Reserves, http://www.usg.edu/copyright/additional_guidelines_for_electronic_reserves/.

14

to develop tools or mechanisms that could reduce infringing use.  545 U.S. at 939-40.  Notably, the Court added that "in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses."  *Id.* at 939 n.12.  Thus, without Grokster's targeted solicitation of known infringers, the Court would have given little, if any, weight to the company's failure to develop "mechanisms to diminish the infringing activity."  *See id.* at 939.

Contrary to *Grokster*, the University Administrators have created a comprehensive copyright policy, have educated faculty regarding that policy, and have established support systems whereby users can seek legal counsel.  Defs.' SOF at 216.  The Policy makes instructors "responsible for evaluating, on a case-by-case basis, whether the use of a copyrighted work on electronic reserves requires permission or qualifies as a fair use."  Defs.' SOF, at 8; s*ee also* Crews Report at 54.  The Policy also requires that if an instructor is "relying upon the fair use exception, [the instructor] must complete a copy of the fair use checklist before submitting material for electronic reserves."  Defs.' SOF at 9, 4-8; *see also* Crews Report at 55.  Library staff are empowered to examine requests that appear to be beyond fair use, and since the Policy was adopted, library staff have rejected at

least one request to copy material.  Defs.' SOF at 217.  (The is described in greater detail *infra*.)  Thus, unlike *Grokster*, the University Administrators have developed "tools or other mechanisms to diminish the infringing activity using their software."  *See id.* at 939.  In fact, the University Administrators have advocated for the proper and fair use of copyrighted materials.

## 2.    Defendants Have Not Vicariously Infringed

To prevail on a claim of vicarious liability for copyright infringement, Plaintiffs must show that the University Administrators "profit[ed] directly from the infringement and [had] a right and ability to supervise the direct infringer." *Grokster*, 545 U.S. at 931 n.9; *see also Microsoft Corp. v. Silver Star Micro, Inc.*, No. 06-1350, 2008 U.S. Dist. LEXIS 1526, at *23 (N.D. Ga. Jan. 9, 2008) (citing standard from *Grokster*).

In order to determine if the defendant profited, the relevant inquiry is "whether the infringing activity constitutes a draw for subscribers," not whether the infringing activity is "just an added benefit."  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  In *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001), for example, the court explained there was ample evidence that the infringing party's "future revenue is directly dependent upon increases in userbase" caused by the infringing activity.  Similarly, courts have found that an

16

alleged infringer obtains a direct financial benefit from the infringement where a defendant's revenue increase depends on the users' volume of downloads of the infringing material, *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156-57 (S.D.N.Y. 2009), and where the defendant retains profits from the infringing activity, *King Records, Inc. v. Bennett*, 438 F. Supp. 2d 812, 852 (M.D. Tenn. 2006). No such financial benefit exists in the present case.

Plaintiffs argue that because GSU has not funded permissions for use of electronic materials, GSU acquires a commercial advantage over schools that incur costs for electronic permissions or that pass such costs on to students. PMSJ at 46-47. This argument misrepresents the Policy, which is wholly neutral regarding the cost of any permissions. The Policy merely requires professors to conduct a fair use analysis. If that analysis determines that the use is <u>not</u> "fair," the policy requires the professor to either obtain permission or not use the subject excerpt, regardless of cost. The Policy thus works to insure that only appropriate materials are posted, such as if the professor is the copyright owner, or the material is linked from a source from which the GSU library has a license, or the use is a "fair use" within the meaning of copyright law. If other institutions are paying for permissions for materials that GSU does not, it is either because they do not have the licenses that GSU does, they are using GSU professors' copyrighted materials,

ATL_IMANAGE-6875627.5

or they are paying (unnecessarily) for uses that are "fair."  Regardless, there is no unfair competitive advantage and certainly no "profit" to substantiate a claim of vicarious liability.

The University Administrators have made clear they do not profit from use of the allegedly infringing materials.  Neither the University Administrators nor GSU charge for use of the ERes or uLearn systems.  *See* Defs.' SOF at 209; Additional Guidelines for Electronic Reserves, http://www.usg.edu/copyright/additional_guidelines_for_electronic_reserves/.) Thus, there is no profit from students' use of the system on which the allegedly infringing materials are posted or through which they are accessed.  *Cf. Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156-57 (S.D.N.Y. 2009) (stating that profit is established if the defendants' revenue increase depends on users' volume of downloads of the infringing material).  In addition, as Plaintiffs correctly state, GSU has no budget dedicated to paying permissions fees for materials on electronic systems, and they have no system to recoup from students any costs for buying such permissions.  *See* Defs.' SOF at 210-211.  Thus, GSU faculty members would decline to use works like those at issue if there was an obligation to pay permission fees.  *See id.* at 212.  If faculty members chose to pay permission fees, those fees would have to come from the professors' or students'

18

pockets rather than Defendants' since there is no budget at GSU from which to draw such fees. (*See id.*) Thus, Defendants cannot "profit" either directly or indirectly from use of works on ERes and uLearn because there are no fees earned by such use and there are no fees retained that would otherwise be spent on permissions. *See id.* at 208-212.

Furthermore, Defendants' expert Dr. Kenneth Crews made clear in his expert report that "E-Reserves are for nonprofit purposes, and the library will not charge any fees that could possibly diminish the strength of the nonprofit purpose." Crews Report at 57 (quoting the new copyright policy as stating: "Institutions at the University of Georgia System will impose no charge to students for access to materials on electronic reserves."); *see also* Dkt. No. 160-4, Ex. E at 8.) This point stands unrefuted.

Finally, there is an absence of evidence indicating that students are "drawn" to attend GSU because of the availability of the allegedly infringing works on the ERes and uLearn systems, *cf. Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (indicating financial benefit is incurred when the infringing activity constitutes a draw for paying customers); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (same), and Plaintiffs have not presented any such evidence. *See* Defs.' SOF at 213-214. At most, availability of the allegedly

19

infringing works on the ERes and uLearn systems is "just an added benefit" that in no way creates a "profit" as required for a vicarious infringement claim.  *Cf. Ellison*, 357 F.3d at 1079 (indicating that where the infringing activity is "just an added benefit" but does not draw paying subscribers, profit is not established). There is no evidence that GSU attracts students or retains students because of the availability of works on ERes and uLearn.  *See* Defs.' SOF at 213-214.   In addition, unlike the defendants in the *Arista Records* and *Napster* cases cited above, neither the University Administrators nor GSU are paid for the purpose of allowing the download of allegedly infringing material.  They are instead part of an educational system operating in an educational environment.

Plaintiffs have <u>not</u> established that the University Administrators profited from the alleged infringement, and the University Administrators have presented ample evidence that they do not so profit.

### C.    GSU's Online Practices, When in Accordance with the Policy, Reflect Proper Application of "Fair Use"

As shown, the University Administrators are not direct infringers.  Neither are they contributory or vicarious infringers.  Further, the Publishers attempt to avoid these well-established doctrines by relying on *Luckey v. Harris* fails.  Thus, the Court need not reach the issue of whether a particular copy or distribution is, in fact, a fair use.  However, should the Court determine to address the specific fair

use issues, it is apparent that the Plaintiffs attempt various analytical shortcuts, largely ignoring the factually intensive nature of the fair use inquiry.

Rather than evaluate each individual work as used by a given professor, the Publishers generalize all works as "scholarly," thereby ignoring the fact that the uses are made in a non-commercial, non-profit, educational environment and that the works used are typically fact-based non-fictional works entitled only to "thin" copyright protection.   Rather than look at both the qualitative and quantitative aspects of the amount used from these fact-based works, the Publishers cite to irrelevant course pack cases and assert merely that "from 14 to 110 pages" were used.   In addition, rather than evaluate the effect of a given use on the value of, or potential market for, the fact-based work, the Publishers create a generalized hypothetical that assumes a systematic "substitution" of unlicensed electronic works for licensed hard copy works.   In fact, if a professor determines that a given use is not a "fair use," the professor will simply not use the subject excerpt.   Thus, there is no substitution.   In fact, if not "fair use," no use of the excerpt will be made.   The publishers have not established as a matter of law that uses being made by GSU under the Policy are not fair uses, nor have they demonstrated that there is no issue of fact regarding the same.

21

### 1.   The Publishers Seek A Windfall and Rely On Irrelevant Case Law

Throughout their brief, Plaintiffs compare this case to copyright infringement cases involving copy shops and course packs. Plaintiffs' comparison is misplaced. As explained below, this is not just another copy shop case, and the Court should not treat it as such. Nowhere are the differences between the copy shop cases and this case more apparent than in a fair use analysis, particularly during evaluation of the first factor—purpose and character of the use. According to the fair use doctrine, "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational uses" must be considered. *See* 17 U.S.C. § 107. In this case, GSU—an educational, nonprofit institution—provides electronic course readings on ERes and uLearn for use by students. Their use is for educational purposes only, and access is limited to enrolled students with a password. *See* Crews' Report, at 18. ERes and uLearn are teaching tools. The selected works are often provided to students for additional knowledge on the subject matter of the class or as additional information on research methods or trends. *See id*. Also, with uLearn, professors can add questions and more study suggestions and students can add comments and observations. *See id.* Such uses exemplify the educational purpose and character inherent in GSU's electronic course management systems. Monetary gain for GSU

22

is not a consideration, and GSU does not profit from students' use of ERes and uLearn. *See* Defs.' SOF at 208. GSU also does not charge its students for use of ERes or uLearn. *See id*. at 209.

The kind of use described above is fundamentally different from the kind of use by corporate entities in the coursepack and copyshop cases cited by Plaintiffs. *See* PMSJ at 40-42. In *Princeton Univ. Press v. Mich. Document Servs. Inc.*, 99 F.3d 1381 (6th Cir. 1996), *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994), and *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991), each defendant sued for copyright infringement was a for-profit enterprise engaging in commercial activities. *See Princeton Univ. Press v. Mich. Document Servs. Inc.*, 99 F.3d 1381, 1383 (6th Cir. 1996) (commercial copy shop); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 920 (2d Cir. 1994) (for-profit corporation); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1528-29 (S.D.N.Y. 1991) (Kinko's Graphic Corporation); *see also Blackwell Publ. Inc. v. Excel Research Group, LLC,* 661 F. Supp. 2d 786, 788 (E.D. Mich. 2009) (limited liability company). These entities provided a business service and sought to maximize profits. *See, e.g., Princeton*, 99 F.3d at 1389; *Texaco* 60 F.3d at 922; *Blackwell*, 661 F. Supp. 2d at 791; *Kinko's* 758 F. Supp. at 1531. Their uses were purely commercial. *See, e.g., Kinko's*, 758 F. Supp. at 1531 (stating that "the use

23

[of the works-at-issue] in the hands of Kinko's employees is commercial" and that Kinko's "receives a profit component from the revenue it collects"). Indeed, the defendant in *Kinko's* intended to make a profit and "recognized and sought a segment of a profitable market, admitting that '[t]remendous sales and profit potential arise from this program.'" *See id.* The court in *Texaco* also noted the for-profit nature of the defendant's enterprise. *See Texaco*, 60 F.3d at 922 (stating that "Texaco's photocopying . . . could be regarded simply as another 'factor of production' utilized in Texaco's efforts to develop profitable products"). Similarly, the commercial copy shop in *Blackwell* "makes *money* from the copying." *See Blackwell*, 661 F. Supp. 2d at 791 (emphasis in original).

From a legal standpoint then, the kind of use by GSU as compared to that of for-profit corporations is completely different, and cases governing commercial entities should not be expanded to govern non-profit educational institutions. Although Plaintiffs encourage this Court to conflate these uses, that would be inappropriate because a proper fair use analysis requires examination of "the purpose and character of the use"—specifically the commercial nature versus the non-profit educational nature of the use. *See* 17 U.S.C. § 107. This distinction— plainly set forth in the Copyright Act—is important, and the Court should carefully consider this distinction.

24

This case is further distinguishable from copyshop cases for economic reasons; in particular, the windfall Plaintiffs stand to gain if they succeed on their claims. Copyshops rely on licenses to reproduce and sell coursepacks. Any expenses associated with obtaining and paying for licenses are easily passed on to purchasers of coursepacks. In the usual arrangement, copyshops only pay licensing fees for the number of coursepacks sold and any unsold coursepacks are destroyed without payment. The copyshops' business model provides for such an arrangement with ease.

In stark contrast to the commercial business model of copyshops, GSU provides ERes and uLearn at no cost to disseminate educational materials and offer information resources to students, typically in reliance on fair use. *See* DMSJ at 1-2. Any licensing costs as easily passed on to customers of copyshops and coursepacks cannot be similarly absorbed by the university or passed on to students. Thus, licensing for ERes and/or uLearn would overcompensate Plaintiffs. For example, with the publishers' comprehensive license, GSU would pay permission fees for works never or rarely used by students. Unlike coursepacks, Plaintiffs would receive royalties based on availability as opposed to actual use. Similarly, with licenses for individual works, compensated permission is based on the number of students per class. GSU would therefore pay permission

25

for works not necessarily used by all the students in the class, and the Publishers would receive royalties based on potential use rather than actual use. These situations would allow Plaintiffs to take advantage of the digital age and reap an undeserved windfall. This windfall does not comport with the copy shop cases and their reasoning. While copy shops can precisely measure use based on the number of course packs sold and pay accordingly, any licensing by GSU—whether comprehensive or per work per students in a class—would unfairly compensate Plaintiffs.

The copy shops' business model also does not provide for an evaluation of fair use. As a commercial entity, copy shops lack motivation and incentive to consider fair use because the process of reviewing works and analyzing fair use requires staff time and training. It is easier and faster to pass on licensing costs to purchasers rather than incur expenses (both in time and money) for a fair use analysis. Fair use is thus immaterial to copy shops. However, just because copy shops have built a culture of licensing and disregard for fair use, educational institutions should not have to adopt that culture and eliminate a consideration of fair uses altogether. Such a course of action would contradict established copyright law and harm academic communities.

26

Although GSU cannot absorb the financial burden associated with comprehensive or individual work licensing, it can undertake fair use analyses because universities are motivated, unlike corporations, by the importance of fair use. Because GSU provides education and guidance on proper applications of fair use, GSU properly considers fair use in order to advance teaching, learning and research. *See* Defs.' SOF at 207. Moreover, GSU can do so on an individual, work-by-work basis as the law requires. Fair use analyses by faculty members at GSU promote higher education and satisfy students' educational interests. Fair use is not, as Plaintiffs contend, a way to deliberately avoid licensing costs.

Finally, Plaintiffs also contend that GSU's electronic course management systems are supplanting more traditional textbooks and course packs. *See* PMSJ at 15, 20-21. The purported choice to use *either* textbooks *or* electronic readings is an overstatement of the academic environment at GSU and is simply not true. Textbooks and course packs are still purchased by students attending GSU. Defs.' Supp. SOF 13. Professors provide electronic readings on ERes and uLearn in addition to, and often supplemental to, textbook reading assignments. *Id.* ERes and uLearn are just two means to use works among many means at GSU. By offering these electronic course management systems as options, GSU is merely keeping up with its educational offerings in a digital age. This Court should not

27

penalize GSU for these new and diverse uses; it is important that institutions remain flexible in this ever-changing electronic era.

For all these reasons, this Court should reject any analogy by Plaintiffs to copyshop cases and focus on GSU's characteristics as a non-profit, educational institution seeking to enhance learning through its electronic course management systems. When viewed this way, works posted on ERes an uLearn can be nothing but fair use.

### 2.   An Analysis of the Statutory Factors Favors a Finding of "Fair Use"

#### a.   Purpose and Character of the Use

Plaintiffs argue that merely translating a work or making it more accessible is not transformative, that GSU profits from infringement, and that GSU's practices are inconsistent with other guidelines. Of course, none of these points address the purpose and character of the use. It is undisputed that each use was made for the purpose of facilitating higher education in a non-profit environment. Unlike the coursepack cases, the posting of materials on ERes and uLearn is <u>not</u> for profit and <u>not</u> commercial, is wholly educational and undertaken by the professor to assist in educating students. That use of copyrighted materials is actually more "secure" than if it was in the traditional form of a book placed on reserve in the library because the electronic materials are maintained behind

28

password access.   Only students enrolled in a given class have access to the electronic work.   Moreover, Plaintiffs ignore the fact that many such uses would be transformative.   For example, use of an article in a medical journal written for the purpose of advancing scholarship is transformative when used to teach the medical concept (or research principles or any number of such purposes) because the article is being used as a teaching tool as opposed to merely providing information regarding medical scholarship.

As copyright exists primarily to benefit the public and only secondarily to benefit the author, the purpose of the use should be viewed in terms of its relevance to the public welfare.   *Sony Corp. of America. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).   GSU serves and educates the public.   Learning— especially in view of the statute's designation of teaching, scholarship and research as paradigmatic examples of fair use—is a pre-eminent purpose.   There is no "commercial" use here; rather, the use is for non-profit educational purposes.   The publishers, who purport to play an "integral role" in the educational process, cannot denigrate that process to suit their profit driven goals in this case.   The first factor favors a finding of "fair use."

29

**b.**     Nature of the Work

The Supreme Court ruled in *Campbell* that this factor may have no particular importance in the context of parody and criticism because any type of work is susceptible to a "fair use" for such purposes. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 581 (1994). The same may be said of teaching and electronic reserves. ERes encompasses much more than scholarly articles and book excerpts, including music, art, photography, software, and video. Fair use will apply differently to such different types of works. This factor, therefore, necessitates an evaluation of each individual work, which the publishers entirely fail to do. For example, the SAGE Handbook of Qualitative Research is clearly a fact-based work. The Publishers ignore these facts, instead classifying all works as "scholarly" and of an "academic nature." That is simply not the test. There is no evidence that all of these works are particularly creative, or entitled to anything other than the "slim" level of protection accorded fact-based works. *See Feist Pubs., Inc. v. Rural Tel. Svc. Co., Inc.*, 499 U.S. 340 (1991). The Publishers are not entitled to summary judgment or the issue of fair use without conducting a proper work-by-work analysis. Moreover, given that the Courts have found "fair use" to be properly made of many different types of works (music; photography; video; book excerpts), Plaintiffs' attempt to generalize the nature of the works-at-issue

30

should be rejected.  Fair use is a case-by-case analysis that depends upon the nature of the individual works.

**c.**     Amount and Substantiality of the Use

Plaintiffs predictably, and incorrectly, rely wholly on early cases that focus primarily on a quantitative measure of fair use.  However, courts have now adopted and apply a more flexible measure that expressly considers both quantitative and qualitative measures.  For example, in *Bill Graham Archives v. Darling Kindersley Ltd.*, the Second Circuit expressly acknowledged the Copyright Act's goal of promoting progress in the arts, *e.g.*, the promotion of learning.  448 F.3d 605, 608 (2d Cir. 2006).  That, of course, is exactly what the professors at GSU do.  Rather than address each individual use from a quantitative and qualitative perspective, Plaintiffs lump all uses together and assert that "14 pages" or an "entire chapter" was taken.  That is not a proper analysis.  The relative amount used (a percentage) must be considered, as well as whether the amount as used was what was necessary to achieve the desired goal of promoting learning.

The purpose of this factor is to prevent an exploitative use of the subject work at issue.  In other words, one must consider the amount used in relation to the size of the copyrighted work and evaluate the used portion as to its significance within the copyrighted work.  The Publishers have failed to perform this analysis.

Mere conclusory numbers do not address the amount used in relation to the size of the copyrighted work or in relation to the significance of the used portion to the work as a whole.

The Publishers assert that the checklist has been interpreted to authorize the use of multiple book chapters if it is concluded that the use is narrowly tailored to the educational purpose.  That is incorrect.  The checklist properly provides—and GSU professors analyze—both quantitative and qualitative considerations.  Defs.' Supp. SOF 6.  For example, the checklist specifically provides that a "small portion used" may be in favor of fair use, whereas a "large portion . . . used" may weighs against.  Similarly, the checklist specifically provides that if the "portion used is central to [the] work or 'heart of the work,'"that weighs against fair use. The checklist further indicates that professors must consider whether the amount taken is narrowly tailored to the specific education purpose it is intended to serve. Accordingly, GSU professors consider whether the amount taken is small (e.g., less than 10%) as compared to the entire work and whether the portion used is what is necessary for its specific purpose. (Defs.' Supp. SOF 6, 19-21, 25.)

The Publishers have failed to do a proper quantitative and qualitative analysis of each portion used in relation to each cited work and have misconstrued implementation of the Policy.

32

**d.**    Effect on theMarket

At one point, this factor was considered the most important.  *Harper and Row, Inc. v. Nation Enterprises*, 471 U.S. 539, 566 (1985).   Since *Campbell*, however, its importance has been reduced and placed in context.  510 U.S. at 594. In *Bill Graham*, the court found that fair uses can stimulate the market for an original work.  448 F.3d at 615.  In *Campbell*, the Supreme Court recognized the copyright owners do not and cannot control all markets, and that some market harm is not contrary to fair use.  510 U.S. at 594.

Thus, it should be recognized that ERes has, at most, only a limited effect (positive or negative) on the market for the copyrighted works at issue.  First, the materials are available only to those who have a password, which limits use to those select, relatively few students taking a particular class.  Second, the evidence here is that if a given use is <u>not</u> a fair use, the professor will <u>not</u> make any use of the work or will return to a traditional reserve desk hard copy.  Defs.' Supp. SOF 3, 15-17, 22, 24, 26.   In either instance, the market for the original is wholly untouched.   Third, and perhaps most importantly, there is no evidence of a wholesale substitution of electronic content for paper content (e.g., course packs). GSU students still spend hundreds of dollars (if not thousands) each semester on textbooks.  *See id.* at 13.  GSU still pays hundreds of thousands of dollars each

33

year for licenses.  *See id.* at 29.  To the extent relevant, adoption of the Policy has already reduced the use of copyrighted works; professors are decreasing the amount of reading assignments posted on ERes, reducing the amount of particular works available on ERes, limiting their reading assignments to works available through library subscriptions, placing works on physical reserve instead of ERes, and not using certain works at all.  *Id.* at 3.

Fourth, the Publishers' "aggregate harm" model, apparently based on language in *Campbell*, is fundamentally flawed.  The Publishers ask the Court to assume that simply because an increasing number of electronic permission requests have not immediately replaced the recent decrease in hard copy permission requests, there is a correlative harm.  This logic is faulty and unsupported.  For example, the decrease in requests could be due to reduced budgets in a difficult economy.  More appropriately, and contrary to the Publisher's theory, such reduced requests could be, in part, due to the proper application of the "fair use" doctrine.

### e.    Other Factors, Such as Good Faith

A good faith understanding and application of fair use is critical for many reasons, as it has been recognized by Congress and the courts as a vital part of the law.  For example, Section 504(c)(2) sets for the framework for recovery of

34

damages in an infringement case, including recovery of statutory damages. Statutory damages can be the most serious financial consequence of an infringement, but the Copyright Act still provides:

> The Court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords.

Section 504 thus establishes that a librarian or professor, and the library or educational institution, will be protected from statutory damages if the person acted in good faith reliance on fair use. By implication, the statute is encouraging such parties to learn about the law and apply it in a reasonable and good faith manner. That is precisely what GSU has done here.

Good faith is part of the interpretation of fair use itself. In *Kinko's,* the court inferred bad faith from the fact that Kinko's did not review or revise its standards. 758 F. Supp. 1522. In contrast, the First Circuit in *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (2000), ruled that acting in good faith will weigh in favor of fair use on the "purpose" factor. That court found good faith in the fact that the user credited the source of a photograph, used a lawfully obtained copy, and believed that it was using the copyrighted work in a lawful manner. The Policy

35

relies on similar concepts.  By conscientiously adhering to appropriate standards of fair use, GSU instructors and librarians act in the belief that they are within the law.

Plaintiffs contend that professors' limited uses of the works-at-issue following GSU's adoption of the Policy are not fair uses because they do not comply with the "Agreement on Guidelines for Classroom Copying in Not-for-Profit Educational Institutions With Respect to Books and Periodicals" (the "Classroom Guidelines"). Putting aside the fact that Plaintiffs have not set forth any assessment of the "brevity" or "spontaneity" of each excerpt, the number of instances each excerpt was used, or the extent to which each use substituted for the purchases of books— the purported limits of acceptable classroom copying in the Classroom Guidelines—the Guidelines are ***not*** determinative of whether any use at GSU is a "fair use" under section 107 of the Copyright Act.  *See Wihtol v. Crow,* 309 F.2d 777 (8th Cir. 1962) ("the guidelines represent merely the Congressional Committees' understanding of what the courts would regard as fair use in applying the traditional judicial doctrine of fair use.  Congress does not purport to substitute its judgment for that of the courts in any particular case."); *see also Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F. Supp. 1522, 1536-37 (S.D.N.Y. 1991) (declining to adopt Classroom Guidelines as a legal standard and instead

36

determining that fair use of each item must be evaluated individually); *American Geophysical Union v. Texaco Inc.,* 60 F.3d 913 (2d Cir 1994) (assessing Classroom Guidelines but ultimately refusing to adopt them as a legal standard).

Moreover, the Classroom Guidelines "state the minimum and not the maximum standards of educational fair use . . . " *Classroom Guidelines,* H.R. Rep. No. 94-1476 at 68-70 (1976).  For example, the Guidelines permit only single copies of chapters, articles and other short works for an instructor to use in preparing for a class.  Meticulously defined standards of "brevity," "spontaneity" and "cumulative effect" – standards that are not found in the text of the "fair use" exception to the Copyright Act – apply to multiple copies for classroom use.  They also include a complete bar on "anthologies," which is not in the "fair use" exception and which the court in *Basic Books* expressly declined to adopt.  758 F. Supp. at 1537.  Additionally, while they gained some acceptance after New York University settled a copyright infringement claim in 1983 on terms based on the Classroom Guidelines, Dr. Crews' review of university policies in connection with this case demonstrates they have played a lessened role in the application of fair use through the intervening years.  (Crews Report at 22 (stating the Classroom Guidelines are "widely considered by libraries to be too impractical and restrictive to use") *(citing* Steven J. Melamut, et al., "Fair Use or Not Fair Use: That is the

Electronic Reserves Questions," *Journal of Interlibrary Loan, Document Delivery & Electronic Reserve,* 11 (2000): 12.))  Given the Classroom Guidelines' narrow (and increasingly out of favor) interpretation of fair use, the Guidelines cannot serve as a proxy for proving copyright infringement and/or the absence of fair use.

### D.   The Plaintiff's Criticisms of the New Copyright Policy, and Particularly the Checklist, are Without Merit

Plaintiffs first argue that the Fair Use Checklist is an insufficient tool to deter copyright infringement, asserting that it improperly places responsibility for conducting the fair use analysis on professors and that it is biased towards a conclusion that the proposed use is a fair use.  PMSJ at 24-26, 29-30.  The first alleged weakness—delegation of the checklist's completion to professors—is in fact one of its greatest strengths.  No one is better positioned to understand the material to be placed on ERes, the purpose for which the material will be used, or the amount of the work to be used (both quantitatively and qualitatively) than the professor.  (*See* Crews' Report at 58; Seamans Depo. at 64; http://www.usg.edu/copyright/introduction_to_the_fair_use_checklist/ ("Because you [professor] are most familiar with your project, you are probably best positioned to make [the] decision [on whether the cumulative weight of the fair use factors weighs in favor of fair use or weighs against fair use]."").)  In other words, no one could better know the information that goes into a fair use analysis.

38

Plaintiffs have not identified a person who might be better positioned to conduct this analysis, and certainly do not suggest that the professor should not participate. In addition, contrary to Plaintiffs' insinuation that professors are not equipped to evaluate their own proposed uses of materials, the Policy provides professors with helpful and accurate instructions on how to conduct the analysis, emphasizing that "**[a]ll four [fair use] factors** should be evaluated in each case, and no one factor will determine the outcome."[4]

Furthermore, if professors are confused about how to complete the checklist, they can review instructions about the checklist and background information on copyright and fair use law provided in the written policy or, particularly at GSU, consult legal counsel.[5]   The online copy of the policy refers professors to other various resources, and the checklist itself states that "Instructors should consult the Legal Affairs office at their institution or at the Office of the Board of Regents if they have questions regarding analysis of the four factors."[6]

---

[4] *See* http://www.usg.edu/copyright/the_fair_use_exception/.

[5]        *See,       e.g.,*       http://www.usg.edu/copyright/copyright_generally/; http://www.usg.edu/copyright/the_fair_use_exception; http://www.usg.edu/fair_use_checklist.

[6] *See* http://www.usg.edu/copyright/copyright_generally/ (links, for example, to Additional Resources, Additional Guidelines for Electronic Reserves, and the Select Committee on Copyright).

39

The copyright educational materials provided to the university community through the online materials, the educational programs, and the ability of professors to contact legal affairs for further advice means that professors are better equipped to tailor their use of materials to uses that are fair.   Although Plaintiffs will no doubt argue that when professors tailor their uses to fair uses, they are merely circumventing the law of copyright to avoid paying permissions fees, that characterization misses the point that what professors are doing is engaging in <u>fair use</u>.

Plaintiffs also complain that the checklist is biased in favor of fair use and the professors do not have to complete all portions of the checklist to decide that their use is a fair use.  (PMSJ, Dkt. No. 142, at 25-26.)  Plaintiffs state that

> GSU's own copyright law expert admitted he was 'troubled' by the completely un-nuanced procedure called for by the new policy and conceded that he had no idea how the new policy was in fact being implemented.

(*Id*. at 26.)  Plaintiffs have taken Dr. Crews' testimony out of context and ignore the explicit instructions provided on how to use the checklist.

First, Dr. Crews did not use the word "troubled" in his answers; this language was used by Plaintiffs' attorney during questioning.  Instead, Dr. Crews in fact testified that GSU was taking proper steps to evaluate fair use and that he did not have personal knowledge that everything GSU was doing was within fair

40

use.  Crews' Depo. (Dkt. 176) at 180-82.  Likewise, Dr. Crews stated that he "would question" if "under factor two the checklist almost always resulted in an analysis favoring unlicensed use . . ." and it "would bother" him "if instructors determined the nature of copyrighted work favored fair use because his use was important or educational" and that was the only reason evaluated.    *Id.* at 227-228.  Far from treating the educational environment of professors' use of materials on EREs as the end of the analysis, however, the Policy instructs professors: "While fair use is intended to apply to teaching, research, and other such activities, an educational purpose alone does not make a use fair."   *See* http://www.usg.edu/copyright/the_fair_use_exception/.   The checklist itself says "[n]o single item or factor is determinative of fair use."   Fair Use Checklist, http://www.usg.edu/copyright/fair_use_checklist.   In fact, the description of the fair use exception in the written policy repeatedly states that all four factors should be considered, stating:

> **All four factors** should be evaluated in each case, and no one factor will determine the outcome. . . . The "purpose and character of the use" is only one of four factors that users must analyze in order to conclude whether or not the use is fair, and therefore lawful.

*See* http://www.usg.edu/copyright/the_fair_use_exception/ (emphasis in original).

Although Plaintiffs treat it as a bias inserted in the fair use analysis by the University Administrators, it is the nature of the university environment that many

41

(if not most) uses of materials placed on electronic reserves will be for nonprofit educational purposes.  The law explicitly favors nonprofit educational uses over commercial uses.  That is not a bias; that is the law.

Furthermore, contrary to another of Plaintiffs' insinuations, the Policy does not consider it a foregone conclusion that all professors' uses of materials will be deemed fair uses.  *See* PMSJ at 44.  That is why the library's instructional page on "How to Submit [an EReserves] Request" tells the professor that if the use is not within fair use (or otherwise open to legal use) "you must obtain permission to use the item from the copyright holder."   *See* http://www.library.gsu.edu/reserves/. The online copy of the Policy then provides links to sample permissions letters.[7] "Evidence of permission [then] must be submitted to the library with [the professor's reserve request."  *See* http://www.library.gsu.edu/reserves/.

Importantly, Defendants' efforts under the Policy have changed behaviors. In response to their use of the Policy tools, professors have changed their course reading selections.  Defs.' Supp. SOF 3.  Some have decided not to use certain materials because they were not deemed "fair uses." *Id.* at 3, 4.  Since adoption of the Policy, library staff have rejected a request to post on ERes and professors have

---

7                                                                                 *See* http://www.usg.edu/copyright/additional_resources/identifying_the_copyright_owner/.

increased their use of links to licensed materials.  *See* Defs.' SOF at 217; Defs.' Supp. SOF 3, 13.  Other professors have either substantially decreased the amount of material they plan to use in order to fall within the bounds of fair use or they have returned to the old reserve system of placing a single source book "on reserve" at the reference desk.  Defs.' Supp. SOF 3, 24.

Plaintiffs' claims of professorial confusion are likewise without merit.  Of the more than 1000 full time faculty, Plaintiffs argue that the three professors they deposed did not fully understand how to apply some of the fair use factors and that one professor was unaware that he would be required to complete a checklist before uploading materials to the university's electronic systems.[8]

Plaintiffs again fail to provide a complete picture.  For example, Professor Reifler did state that he was not aware of the new policy requiring that he complete a checklist.  He had not, however, failed to complete a required checklist because he had not requested that any materials be added to the electronic reserves system since the Policy was launched.  Professor Reifler's experience in fact emphasizes why the Policy must be viewed in its entirety.  Once a professor in Reifler's position decides to have material placed on ERes, under the Policy, the professor

---

[8] The Plaintiffs elected to take only three (3) depositions.  The Defendants agreed to fourteen (14), but the Publishers unilaterally determined to take only three.

must access the library's main ERes page.[9]   The Policy requires that professors submit their requests via an online request form at http://www.library.gsu.edu/reserves/.  "Step 1" under "How to Submit a Request" states:  "Review the Board of Regents Policy on the Use of Copyrighted Works in Education and Research and, if you are using electronic reserves, review the Additional Guidelines for Electronic Reserves."[10]   The words of this sentence are internally linked to the Policy and guidelines (*i.e.,* the instructor can just click on the words themselves to access the information).   Under Step 1, the sub-steps direct the professor to determine if the library already has a license to the material, then determine if the item is in the public domain, and then use the Fair Use Checklist.   The words of the instructions provide an internal link to the Fair Use Checklist.   In bold letters the instructions state, "**You must print and save a copy of the completed checklist for your records.**"   If the professor determines that the desired use is not a fair use, the instructions inform the professor "you must obtain permission to use the item from the copyright holder . . . . Evidence of permission must be submitted to the library with your reserve request."   Only then does the library's instructional page move on to Step 2, telling the professor how to

_____

[9] *See* Docutek ERes, http://reserves.gsu.edu/eres/

[10]     *See*   Course   Reserves   -   Guidelines   for   Instructors, http://www.library.gsu.edu/reserves/instructorinfo.asp.

ATL_IMANAGE-6875627.5

submit the electronic reserve request.  In addition, the "Additional Guidelines for Electronic Reserves" explain that "Instructors are responsible for evaluating, on a case-by-case basis, whether the use of a copyrighted work on ERes requires permission or qualifies as a <u>fair use</u>.  If relying upon the fair use exception, instructors must complete a copy of the fair use <u>checklist</u> before submitting material for electronic reserves."

Thus, while Professor Reifler may have missed the email announcement of the Policy, the Policy itself ensures that professors will become aware before posting any materials to ERes.  Likewise, professors like Kaufmann and Belcher can obtain "more direction" and additional "guidance" as needed through the various online and other referenced resources.  For example, on GSU's main ERes page, http://reserves.gsu.edu/eres/, in red lettering, it states:

> In response to new . . . copyright guidelines, procedures for ERes have changed. If you are making requests for digitized material, you must submit your request via the online request form at http://www.library.gsu.edu/reserves/.  More information about our new procedures is also available at that address.  Please contact reserve staff at libreserves@langate.gsu.edu or 404-413-2840 for assistance.  If you have questions concerning copyright law, please contact legal affairs at 404-413-0500 or Burns Newsome at Burns.Newsome@usg.edu.

With any new policy, there is a learning curve.  Even at an institution of higher education, it takes time for new policies to be implemented and properly used.  GSU is going through that process, and all of the professor depositions taken

45

by the Plaintiffs, to at least some extent, reflect that learning curve.  However, that period of adjustment does not indicate that professors or others are incapable of applying the Policy.  Plaintiffs' opportunistic argument to that effect is simply wrong.

**E.**     The New Copyright Policy was Appropriately adopted by the University Administrators

The New Copyright Policy appropriately and actively encourages professors, students and others in the academic community to comply with copyright law and provides them with information and tools to assist in that effort.

**1.     Defendants' New Copyright Policy Is More Than a Checklist**

Despite Plaintiffs' characterization, the Policy is more than a checklist.  It includes an explanation of copyright principles, an explanation of fair use principles, an introduction to the checklist, guidelines for e-reserves, and various other resources.  The Policy provides direction to faculty, staff, students, and the public, including the means by which that information is disseminated and it identifies the roles and responsibilities for various staff and faculty.  *See generally*, Seamans Depo., Dkt. No. 174, at 70; Policy on the Use of Copyrighted Works in Education and Research, http://www.usg.edu/copyright; Additional Guidelines for Electronic                                                              Reserves,

http://www.usg.edu/copyright/additional_guidelines_for_electronic_reserves/.[11]

The New Copyright Policy specifically:

- informs and educates about copyright law, including the exclusive rights of copyright holders as set forth in 17 U.S.C. § 106, the application of the four fair use factors in 17 U.S.C. § 107, and other copyright exceptions;

- makes available tools and resources for faculty and staff to assist in determining copyright status and ownership and determining whether use of a work in a specific situation would be a fair use and, therefore, not an infringement under copyright law;

- facilitates use of materials currently licensed by the University System of Georgia and provides information on licensing of third-party materials by the University System; and

- identifies individuals at the University System and member institutions who can counsel faculty and staff regarding application of copyright law.

- provides a website that is readily accessible, thorough, and informative to educate regarding copyright and fair use, including a general description of copyright law and a narrative explaining the four fair use factors.  (*See, e.g.*, Seamans depo, Dkt. No. 174, at 25.);

- provides for GSU legal counsel to train library staff and faculty. (Seamans depo., Dkt. No. 174, at 21-25.);

- centralizes requests for posting materials on ERes thereby requiring all persons posting materials on ERes to review the library's copyright policy  (http://www.library.gsu.edu/reserves/);

---

[11] For the Court's convenience, written portions of the New Copyright Policy, where reasonable, have been referenced herein to the webpage on which this material appears.  These citations, in part, indicate the broad dissemination of the policy and the ease with which members of the university community can access this information.

- directs users via the library home page, to legal affairs if they have questions, providing direct contact information (http://reserves.gsu.edu/eres/);

- informs professors how to locate already-licensed materials and links professors to resources explaining how to obtain permissions if they determine that their use is not a fair use. (http://www.library.gsu.edu/reserves/instructorinfo.asp);

- encourages professors to provide proper copyright notice and attribution. (http://www.usg.edu/copyright/additional_guidelines_for_electronic_reserves/);

- instructs professors that materials posted on ERes must comply with copyright law, by using a licensed copy, by obtaining permission, or by making a determination that the use is a fair use;

- requires professor to complete a Fair Use Checklist, directing professors to retain a copy of their analysis of the fair use factors (http://www.usg.edu/copyright/introduction_to_the_fair_use_checklist/; http://www.usg.edu/copyright/fair_use_checklist (follow link to checklist, 1); http://www.library.gsu.edu/reserves/instructorinfo.asp);

- provides that the ERes and uLearn systems are password protected to limit access to students in the relevant class;

- removes materials from the system once the term ends (http://www.usg.edu/copyright/additional_guidelines_for_electronic_reserves/);

- requires that users of the ERes system to click-through a reminder about copyright protection and their limited rights to use and copy materials before they can link to material on the system ; and

- authorizes library staff to reject postings to the ERes system if professors do not provide a copy of their permission and the posting does not appear to be within the fair use guidelines.  (Seamans depo., Dkt. No. 147, at 36.)

ATL_IMANAGE-6875627.5

The University Administrators did much more than simply devise a checklist.  They created a comprehensive tool that educates the educational community regarding copyright law and fair use standards, and they provided multiple resources offering additional information and assistance in complying with copyright law.

### 2. The Checklist Is Supported By Law and In Keeping with Those of Other Institutions

Given the straightforward nature of the checklist and its applicability to many different circumstances, many others have adopted it.  Dr. Crews reports that more than 125 institutions of higher learning have adopted some form of a fair use checklist.  *See* Crews Rebuttal Report (Dkt. No. 127-2) at 20 - 29.  The use of such a checklist has acquired significant acceptance in the educational environment.  Dr. Crews conducted an extensive review of the checklist in view of those adopted by other universities.  He compared its specific provisions to "fair use" case law.  Dr. Crews concluded:

> Because of [the] characteristics and qualities of the . . . Policy, I believe that the policy is an appropriate policy for adoption by and implementation at the University System of Georgia.

Crews Report at 69.[12]

---

[12] CCC has made a similar checklist available online, though the checklist is no longer accessible as a link from CCC's website. *See*

49

## III.   CONCLUSION

For the foregoing reasons, the University Administrators respectfully submit

that the Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted this 5th day of April, 2010.

THURBERT E. BAKER
Georgia Bar No. 033887
Attorney General

R. O. LERER
Georgia Bar No. 446962
Deputy Attorney General

DENISE E. WHITING-PACK
Georgia Bar No. 558559
Senior Assistant Attorney General

MARY JO VOLKERT
Georgia Bar No. 728755
Assistant Attorney General

KING & SPALDING LLP

*/s/ Katrina Quicker*
Anthony B. Askew
Georgia Bar No. 025300
Special Assistant Attorney General
Stephen M. Schaetzel
Georgia Bar No. 628653
Katrina M. Quicker
Kristen A. Swift
Georgia Bar No. 702536

***Attorneys for Defendants***

---

http://www.copyright.com/Services/copyrightoncampus/basics/fairuse_list.html ; Rebuttal Expert Rep. of Kenneth J. Crews, J.D., Ph.D. (Dkt. 127-2) at 28. The CCC checklist was provided as a guide to educational institutions concerning the need to acquire permission to use a copyrighted work. The CCC checklist was remarkably similar to the Fair Use Checklist. Given that the Publishers have acknowledged that CCC is a source for compensated permission to use their copyrighted material (PMSJ at 12) and that the CCC is a unnamed financial sponsor (in part) of this litigation (Defs.' Supp. SOF 28), the Publisher's criticisms of the checklist ring hollow.

50

# **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia, that the foregoing Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment complies with the font and point selections approved by the Court in L.R. 5.1B.  The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

*/s/ Katrina M. Quicker*_____
Katrina M. Quicker
(Ga. Bar No. 590859)

51

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAMBRIDGE            UNIVERSITY   §
PRESS, *et al.*,                        §
  Plaintiffs,              §
                                          §
v.                                        §      Case No. 1:08-CV-1425-ODE
                                          §
MARK P. BECKER, in his official   §
capacity as Georgia State University §
President, *et al.*,                    §
   Defendants.         §
                                          §
                                          §
                                          §

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this 5th day of April, 2010, I have electronically filed the foregoing **Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Edward B. Krugman
krugman@bmelaw.com
Georgia Bar No. 429927
Corey F. Hirokawa
hirokawa@bmelaw.com
Georgia Bar No. 357087
John H. Rains IV
Georgia Bar No. 556052

BONDURANT,        MIXSON        &
ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

R. Bruce Rich
Randi Singer
Todd D. Larson

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*/s/ Katrina M. Quicker*_____
Katrina M. Quicker
(Ga. Bar No. 590859)