# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS, et al.,

|  | Plaintiffs, |
| --- | --- |

*-vs.-*

MARK P. BECKER, in his official capacity as Georgia State University President, et al.,

Defendants.

Civil Action No.
1:08-CV-1425-ODE

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' THEIR MOTION OR SUMMARY JUDGMENT

Defendants, pursuant to L.R. 56.1. B.(2), hereby submit their Response in Opposition to Plaintiffs' Local Rule Statement of Material Facts to which there is purportedly no genuine issue to be tried.

## Preliminary Statement

In opposition to the Plaintiffs motion for summary judgment, the Defendants (the University Administrator") rely on the discovery in this case, and the following:

1.      Declaration of Patricia Dixon, Ph.D;

2.      Declaration of Jennifer Esposito, Ph.D.

3.      Declaration of Jodi Kaufmann, Ph.D.

4.      Declaration of Ann Kruger, Ph.D; and

5.      Declaration of Marian Meyers, Ph.D.[1]

Further, the Defendants ("University Administrators") object to all statements of alleged material facts not in dispute to the extent they are based on activities or circumstances prior to adoption of the New Copyright Policy, including the Fair Use Checklist, in February of 2009. In addition, Plaintiffs have just recently identified many new works. See, for example, Paragraphs 267, 268 and 269 herein. The Defendants object to the belated inclusion of such works. Plaintiff has not timely moved to amend any pleading in this case, and reference to these works after Defendants have moved for summary judgment on the works at issue is prejudicial.

With reference to Plaintiffs' Local Rule Statement of Material Facts, the University Administrators respond as follows.[2]

---

[1] Defendants sometimes refer to these declarations by "Name Decla., ¶ __."

[2] For the convenience of the Court, Defendants have includes live cites to the New Copyright Policy in their brief submitted simultaneously with this opposition to Plaintiffs' Statement of Facts. The New Copyright Policy and said citations are incorporated herein by reference.

**Specific Responses**

## I.    Plaintiff

### A.    *Cambridge University Press*

    **1.**    Plaintiff Cambridge University Press ("Cambridge") is not-for-profit publishing house of the University of Cambridge, which has 53 offices throughout the world, including in New York, which is the headquarters for the Americas branch. EX 4 (Declaration of Frank Smith, Cambridge University Press (Feb. 26, 2010) ("Smith Decl.")) ¶ 3.

    **RESPONSE:**  Admitted.

    **2.**    Cambridge has published scholarly works for the past 425 years and currently publishes academic books, textbooks, monographs, reference works, professional books, electronic products and over 240 journals. EX 4 (Smith Decl.) ¶3.

    **RESPONSE:**  Admitted.

    **3.**    Cambridge is the owner or exclusive licensee of the copyrights embodied in the following works listed in Exhibit 1 to Plaintiffs' Amended Complaint ("Exhibit 1 "): *Democracy Without Competition in Japan; The Cambridge Companion to the Organ; States and Social Revolutions: A Comparative Analysis of France, Russia, and China; Materials Development in Language Teaching; Focus on the Language Classroom; Legislative Leviathan.* EX 4 (Smith Decl.) ¶¶ 10-29; *see infra* paragraphs 240-252.

    **RESPONSE**:  This statement is neither material  nor relevant and, therefore, disputed.  The issue before the Court is whether there is any ongoing and continuous infringement.  None of these works were used after adoption of the New Copyright Policy in February of 2009.  If any use was or had been made, such use would have been analyzed in accordance with the New Copyright Policy such that there was no

continuous or ongoing infringement.  See, e.g., Plaintiffs' Ex. 22 (Fall, 2009 ERes

Report).

      **4.**    Each of the works listed in paragraph 3 above is registered with
the U.S. Copyright Office, with the exception of *The Cambridge Companion to the
Organ,* which is a foreign work protected under the Berne Convention. EX 4 (Smith
Decl.) ¶¶ 10-29; *see infra* paragraphs 240-252.

    **RESPONSE:**  Admitted.

### B.   *Oxford University Press*

      **5.**    Plaintiff Oxford University Press, Inc. ("Oxford" or "OUF") is a
not-for-profit corporation headquartered in New York and linked to Oxford
University Press in Oxford, England, which is the oldest and largest continuously
operating university press in the world. EX 5 (Declaration of Niko Pfund in Support
of Plaintiffs' Motion for Summary Judgment (Feb. 26, 2010) ("Pfund Decl.")) ¶ 3.

    **RESPONSE:**  Admitted.

      **6.**    Oxford publishes scholarly works including schoolbooks,
textbooks, and reference books, as well as scholarly monographs and non-fiction
books of interest to general readers in the humanities, social sciences, and the
physical and life sciences, and over 200 academic and research journals. EX 1
(Deposition of John Challice (June 12,2009) ("Challice Dep.")) 223:8-10; EX 5
(Pfund Decl.) ¶ 4.

    **RESPONSE:**  Admitted.

      **7.**    Oxford is the owner or exclusive licensee of the copyrights
embodied in the following works listed in Exhibit 1:  Science of Coercion:
Communication Research and Psychological Warfare 1945-1960; White
Supremacy:  A Comparative Study of American and South African History;
Awakening Children's Minds: How Parents and Teachers Can Make a Difference;
The Slave Community: Plantation Life in the Antebellum South. EX 5 (Pfund Decl.)
¶¶ 21-32; See infra paragraphs 253-260.

**RESPONSE:**  This statement is, in part, neither material nor relevant and is, therefore, disputed.  The issue before the Court is whether there is ongoing and continuous infringement.  Excluding two works ("Awakening Children's Minds: How Parents and Teachers Can Make a Difference," and "the Slave Community: Plantation Life in the Antebellum South"), none of these works were used after adoption of the New Copyright Policy in February of 2009.  See, e.g., Plaintiffs' Ex. 22, (ERes Report).  As to the other two works, Defendants submit that use thereof after adoption of the New Copyright Policy constituted a fair use.  *See* Declaration of Patricia Dixon, Ph.D., ¶¶ 3-6 (use of "The Slave Community; Plantation Life in the Antebellum South) and Declaration of Ann Kruger, Ph.D., ¶¶ 3-6 (use of "Awakening Children's Minds:  How Parent and Teachers Can Make a Difference). Thus, use of these two works after adoption of the New Copyright Policy does not constitute ongoing or continuous infringement.

      **8.**     Each of the works listed in paragraph 7 above is registered with the U.S. Copyright Office. EX 5 (Pfund Decl.) ¶¶ 21-32; *See infra* paragraphs 253-260.

    **RESPONSE:**  Admitted.

    **C.**    *SAGE Publications*

      **9.**     Plaintiff SAGE Publications ("SAGE") is a Delaware corporation headquartered in Thousand Oaks, California., with offices in Los Angeles, London, New Delhi, Singapore, and Washington D.C. EX 3 (Declaration of Sara Van Valkenburg, SAGE Publications (Feb. 26,2010) ("Van Valkenburg

Decl.")) ¶ 2.

**RESPONSE:** Admitted.

10. SAGE currently publishes books and textbooks in over 20 subject areas, and more than 560 journals in business, humanities, social sciences, science, technology, and medicine. EX 3 (Van Valkenburg Decl.) ¶¶ 4, 5.

**RESPONSE:** Admitted.

11. SAGE is the owner or exclusive licensee of the copyrights embodied in the following works listed in Exhibit 1: The SAGE Handbook of Qualitative Research; Changing the System: Political Advocacy for Disadvantaged Groups; and Feminist Media Studies. EX 3 (Van Valkenburg Decl.) ¶¶ 19-32; See infra paragraphs 261-266.

**RESPONSE:** This statement is neither material nor relevant, and is,

therefore, disputed. The issue before the Court is whether there is any ongoing and

continuous infringement. Excluding tow works ("The SAGE Handbook of

Qualitative Research"; "Feminist Media Studies"), none of these works were used

after adoption of the New Copyright Policy in February of 2009. As to the other

two works, Defendants submit that any use thereof after adoption of the New

Copyright Policy constituted fair use. See Declaration of Marian Meyers, ¶¶ 3, 4;

Declaration of Jodi Kaufman, ¶ 3. If any use was or had been made, such use would

have been analyzed in accordance with the New Copyright Policy such that there

was no continuous or ongoing infringement.

12. Each of the works listed in paragraph 11 above is registered with the U.S. Copyright Office, with the exception of *Feminist Media Studies,* which is a foreign work protected 'under the Berne Convention. EX 3 (Van Valkenburg Decl.)

¶ 19-32; *See infra* paragraphs 261-266.

**RESPONSE:**  Admitted.

### D.   *The Importance of Academic Publishing*

**13.**    Academic publishers play an important role in higher education. EX 6, Deposition of Jodi Kaufinann (May 6, 2009) ("Kaufmann Dep.") 22:16-20.

**RESPONSE:**  Admitted.

**14.**    Instructors rely on academic publishers to produce scholarship that can be used in the classroom and keep them abreast of what is happening in their field of study. Kaufmann Dep. 19:19-21:12,21 :24-22:25; EX 1 (Challice Dep.) 30:5-7; EX 7 (Deposition of Niko Pfund (June 15,2009) ("Pfund Dep.")) 217:21-218:3; EX 8 (Deposition of Diane Belcher (May 7,2009) ("Belcher Dep.») 38:8-9; EX 9 (Expert Report of Steven M. Sheffrin in Response to the Report of Kenneth Crews, Supplemental Initial Disclosures by Cambridge University Press, Oxford University Press, Inc., SAGE Publications (Oct. 15, 2009), Docket No. 124 ("Sheffrin Rpt.") 4-8.

**RESPONSE:**  Admitted.

**15.**    In many cases, professors depend on publication by scholarly publishers for their career advancement and university departments rely heavily on scholarly publishers to identify and develop young talent. EX 5 (Pfund Decl.), ¶ 44. EX 6 (Kaufmann Dep.) 19:19-20:2; EX 8 (Belcher Dep.) 38:8-9.

**RESPONSE:**  The University Administrators admit that, in addition to other

factors, a professor's career advancement is in part dependent on the professor's

publication of scholarly work.  Other factors also contribute to a professor's career

advancement.  *See* Sheffrin Depo., p. 138-9.  To the extent this statement excludes

such other factors, it is disputed.

**16.**    The high quality of Plaintiffs' academic works is directly

attributable to their involvement in all aspects of the publishing process, from selecting manuscripts for publications to the editing, design, sales, marketing, licensing and distribution ofthe works. *See* EX 3 (Van Valkenburg Decl.), ¶ 6; EX 5 (Pfund Decl.) ¶ 11; EX 50 (Deposition of Sara Van Valkenburg (June 29, 2009) ("Van Valkenburg Dep.")) 99:1-100:5; EX 1 (Challice Dep.) 23:8-15; EX 7 (Pfund Dep.) 252:9-253:11, 259:12-260:12.

**RESPONSE:** Admitted.

17.    The development of textbooks is particularly costly and resource-consuming. A publisher may employ between 100 and 300 paid outside reviewers to vet and edit a single work, design and create art, illustrations, tables and graphics and conduct focus groups to test the utility of a particular work. EX 5 (Pfund Decl.) ¶ 15.

**RESPONSE:** Admitted.

18.    Plaintiffs' operating expenses are tens of millions of dollars a year. EX 3 (Van Valkenburg Decl.) ¶ 7; EX 4 (Smith Decl.) ¶ 41; EX 5 (Pfund Decl.) ¶ 16.

**RESPONSE:** Admitted.

19.    Plaintiffs rely on income from sales of their books and journals, particularly at colleges and universities -which constitute the largest market for their works -to enable them to continue to publish high-quality scholarly works. EX 2 (Deposition of Frank Smith (July 1, 2009 ("Smith Dep.") 124:25-125:8; EX 1 (Challice Dep.) 230:8-14; EX 50 (Van Valkenburg Dep. ) 159:21-160:14. EX 5 (Pfund Decl.) ¶ 39.

**RESPONSE:** Admitted.

20.    As an alternative to purchasing an entire book or journal, Plaintiffs offer users *(e.g.,* professors and students) one-time, excerpt-specific licenses known as "permissions" to photocopy or digitally reproduce portions of their works in exchange for a fee. EX 4 (Smith Decl.) ¶ 9; EX 1 (Challice Dep.) 199:9-200:6; EX 7 (Pfund Dep.) 50:21-51:4, 170:8-11; EX 5 (Pfund Decl.) ¶ 15; EX 3 (VanValkenburg Decl.) ¶ 11.

**RESPONSE:** Admitted.

**21.** Permission to use portions of Plaintiffs' works can be obtained either directly from the Plaintiffs or through Copyright Clearance Center ("CCC"). EX 4 (Smith Decl.) ¶ 9; EX 2 (Smith Dep.) 30:11-15; EX 5 (Pfund Decl.) ¶ 16-18; EX 3 (Van Valkenburg Decl.) ¶¶ 18-20.

**RESPONSE:** Admitted.

**22.** Each work listed in Exhibit 1 is available for licensing directly from the publisher or through CCC.  EX 10 (Expert Report of Debra J. Mariniello In Response to the Report of Kenneth D. Crews, Declaration of Debra J. Mariniello (Feb. 26, 2010) ("Mariniello Rpt.")) 17; EX 4 (Smith Decl.) ¶ 9; EX 5 (Pfund Decl.). ¶ 19; EX 3 (Van Valkenburg Decl.), ¶ 16.

**RESPONSE:** Admitted.

**23.** Permissions represent a significant revenue stream to Plaintiffs. EX 4 (Smith Decl.) ¶ 41; EX 1 (Challice Dep.) 72:15-17; EX 50 (Van Valkenburg Dep.) 159:7-12; EX 3 (Van Valkenburg Decl.) ¶ 42.

**RESPONSE:** Admitted.

**24.** Plaintiffs also offer their works for sale through electronic platforms, including e-books (digital versions of published books) and databases, and through custom publishing programs that allow professors to create customized anthologies by combining content from several different works from a single publisher. *See* EX 4 (Smith Decl.) ¶ 8; EX 2 (Smith Dep.) 37:23-25, 43:2244:7; EX 5 (Pfund Decl.) ¶¶ 7-8; EX 7 (Pfund Dep.) 51 :2-4, 170:12-16,270:3-4; EX 1 (Challice Dep.) 61:21-62:8, 266:24-267:8,267:16-19; EX 3 (Van Valkenburg Decl.) ¶ 9-10; EX 50 (Van Valkenburg Dep.) 87:16-90:11,93:7-13, 96:19-97:2,149:5-22,154:15-17.

**RESPONSE:** Admitted.

## II.  **Defendants**

**25.** Georgia State University, located in Atlanta, Georgia, is a public university and a unit of the Regents of the University System of Georgia.

Defendants' Answer to First Amended Complaint for Declaratory Judgment and Injunctive Relief (Jan. 1, 2009) (hereinafter "GSU Answer"), Docket No. 42 ¶ 13.

**RESPONSE:** Admitted.

26. GSU President Mark P. Becker is the head of GSU and is its chief administrative officer, with supervisory authority over the administrators of the GSU library and the GSU Information Systems and Technology Department. Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Admission (May 13, 2009) (hereinafter "RFA"), Docket No. 92, Nos. 1, 2.

**RESPONSE:** Admitted.

27. The GSU Provost (currently Risa Palm) is responsible for monitoring the functions and officials of the University's academic administration, including correcting noncompliance with federal copyright law. *Id.* Nos. 18, 19.

**RESPONSE:** Admitted.

28. GSU Associate Provost for Information Systems and Technology J. L. Albert is responsible for the technical operation and maintenance of the ERes system at GSU and has supervisory authority for the GSU staff who support use of the uLearn course management system at GSU. *Id.* Nos. 42, 43.

**RESPONSE:** Admitted.

29. Defendant Nancy Seamans, the Dean of Libraries at GSU, has supervisory authority over the library staff responsible for the ERes system and is responsible for ensuring that usage of the ERes system complies with policies of the Board of Regents and GSU; Defendants' Amended and Supplemental Responses to Plaintiffs' First Set of Interrogatories to Defendants (May 19,2009) ("GSU Interrog. Resp."), Docket No. 95, No.4; *see* EX 14 (Deposition of Nancy Seamans (Mar. 10, 2009) ("Seamans Dep.")) 10:2-6, 12:5-21.

**RESPONSE:** Admitted.

30. The Board of Regents of The University System of Georgia ("USG"), the members of which are named (in their official capacities) as Defendants, has general supervisory authority over the operations of GSU and is

responsible for providing and maintaining the computer hardware and software that operates the uLearn course management system at GSU. RFA Nos. 55, 56.

**RESPONSE:**  The University Administrators admit that GSU is subject to

the supervisory authority of the Board of Regents and that the Board of Regents

elect the President of GSU.  To the extent this statement is directed to any other

subject matter, the citation to Request for Admission Nos. 55 and 56 does not

support such other stated facts and they are therefore in dispute.

31.    The named Defendants are responsible for preparing the University budget, library budget and IS&T budget, which includes funds for books, equipment, salaries and the hardware and software used to distribute course material electronically to students. RFA Nos. 13, 21, 47.

**RESPONSE:**  The University Administrators admit that the annual GSU

budget and the IS&T budget provide funding for the referenced items.  To the extent

this statement is directed to any other subject matter, the citations to Request for

Admission Nos. 13, 21 and 47 do not support such other stated facts and they are,

therefore, in dispute.

32.    The named Defendants have the authority to order that copyrighted works may be distributed electronically at GSU only if done so in compliance with policies set by (a) the State of Georgia Board of Regents, (b) Georgia State University, or (c) a court-ordered injunction.  RFA Nos. 3, 25, 52, 60.

**RESPONSE:**  Admitted.

33.    The named Defendants are aware that GSU faculty distribute course reading materials electronically and have the authority to effect a change in the way course material is distributed. EX 14 (Seamans Dep.) 10:2-6; EX 13 (Deposition of James Palmour (Apr. 23, 2009) ("Palm our Dep.")) 52:21.

**RESPONSE:**  The University Administrators admit that they are aware that GSU faculty past course materials, which may include reading materials, to the E-reserve and uLearn system.  To the extent this statement is directed to any other subject matter, the citations to the Seamans deposition and the Palmour deposition do not support such other stated facts and they are therefore in dispute.  More particularly, a professor can elect to past course material electronically or otherwise.  For example, in view of the New Copyright Policy, Professor Dixon elected to place course regarding assignments on physical reserve.  Declaration of Patricia Dixon, ¶ 5.  Such decisions are within the preview of the professor.  *Id.*

34.    GSU employees administer and maintain the ERes servers and software, and can remove and/or block access to specific course materials on the ERes system. EX 16; EX 13 (Palmour Dep.) 52:14-53:16; EX 18 (Deposition of Laura Burtle (Apr. 24, 2009) ("Burtle Dep.")) 133:24-135:14; EX 15 (Deposition of Denise Dimsdale (May 13, 2009) ("Dimsdale Dep.")) 35:18-36:1, 40:1-6, 41:20, 108:23-109:4.

**RESPONSE:**  Admitted.

35.    GSU employees can determine the number of files containing course material that are available on ERes at a given time and the number of times a given file was accessed. EX 13 (Palmour Dep.) 98:13-99:19; *see also* EX 18 (Burtle Dep.) 105 :20-23, 119:7-15; Stipulations of Fact Regarding ERes and uLearn Usage at Georgia State University, Joint Notice of Filing Stipulations (Jul. 10, 2009) ("ERes/uLearn Stipulations"), Docket No. 118, ¶¶5-6, 18-20.

**RESPONSE:**  Admitted.

36.    The named Defendants have the authority to direct library staff to block access to or remove specific materials or specific course pages on the ERes

system, and have the authority to order that library personnel produce reports of ERes and uLearn activities for a specific time period, including if so ordered by the Court in order to monitor compliance with any court-ordered injunction.  RFA Nos. 6, 7, 8, 27, 28, 61.

**RESPONSE:**  Admitted.

## III.   GSU's Use of Copyrighted Scholarly Works

### A.   *Coursepacks*

37.   Coursepacks are excerpts of copyrighted works -typically photocopied from various books and/or journals -which are compiled by a professor into a custom anthology of course readings that students can purchase.  *See* EX 13 (Palmour Dep.) 25:1-6.

**RESPONSE:**  A coursepack is conventionally considered to be a collection

of bound readings in hard copy form designed by a professor for use in a particular

course.  *See,* e.g., <u>Blackwell Publishing, Inc. et al. v. Excel Research Group, LLC</u>,

661 F.Supp. 2d 786, 788 (E.D. Mich 2009).  To the extent this statement is directed

to any other subject matter, the citation to Mr. Palmour's deposition does not

support such other stated facts and they are, therefore, in dispute.

38.   At GSU, coursepacks are printed and bound together and sold as units through the GSU Bookstore. EX 13 (Palmour Dep.) 25:1-6.

**RESPONSE:**  Admitted.

39.   GSU pays permissions fees when copyrighted content is used in hard-copy coursepacks. EX 13 (Palmour Dep.) 129:18-21, 135:1-4.

**RESPONSE:**  Admitted.

40.   GSU has an account with CCC to pay for coursepack

permissions and from 1998 to 2008, GSU paid $18,905.42 to CCC for coursepack permissions. EX 51; EX 20; EX 18 (Burtle Dep.) 30:24-31:8; EX 13 (Palmour Dep.) 147:16-23.

**RESPONSE:** Admitted.

### B. *ERes*

**41.** ERes is the electronic course content portion of the third-party software that GSU uses to offer digitized copies of course reading material to students. EX 15 (Dimsdale Dep.) 33:2-6; EX 13 (Palmour Dep.) 38:2-14, 52:13-53:16; GSU Answer ¶ 2; *ERes/uLearn* Stipulations ¶ 1; EX 12 (Deposition of B.K. Dewar (Dec. 8, 2009) ("Dewar Dep.")) 67:9-14.

**RESPONSE:** Admitted.

**42.** GSU faculty submit requests to make course reading materials available via ERes to the GSU library staff (e.g., an undergraduate staff member). GSU Interrog. Resp. No.3; EX 13 (Palmour Dep.) 40:7-10; *see* EX 18 (Burtle Dep.) 39:15-40:1; EX 15 (Dimsdale Dep.) 18:17-19:7, 20:7-11, 22:2-9, 22:24-23:6.

**RESPONSE:** Admitted. The University Administrators further respond that

the GSU staff member may be someone other than an undergraduate student and

that all such persons are trained.

**43.** GSU library personnel post the requested material to ERes by scanning it (thereby creating a copy on a GSU computer) and then uploading the material to a computer server owned by GSU. EX 18 (Burtle 20:2-13); EX 13 (Palmour Dep.) 38:9-11, 40-41, 50:2-16; Expert Report of Robert B.K. Dewar, Supplemental Initial Disclosures by Cambridge University Press, Oxford University Press, Inc., SAGE Publications (Oct. 15, 2009), Docket No. 124 ("Dewar Rpt.") 3, 5.

**RESPONSE:** Admitted.

**44.** Students in a given course access the posted digital copies via a web page with the ERes web interface that is dedicated to the specific course (a

"course page"). *See* EX 15 (Dimsdale Dep.) 25:4-8, 29:17-18, 34:20-35 :12,40:20-22, 41:6-9; EX 13 (Palmour Dep.) 18:11-19, 38:9-11, 40-41, 50:2-16; Dewar Rpt. 3, 5.

**RESPONSE:** Admitted.

45.     Initial access to ERes materials generally is limited to students enrolled in a given course, but once students gain access to the material, they can do with it whatever could ordinarily be done with a PDF file. EX 15 (Dimsdale Dep.) 72:5-23; EX 18 (Burtle Dep.) 130:6-10; Dewar Rpt. 3-7.

**RESPONSE:** The statement is neither material nor relevant.  The University

Administrators are responsible for setting and overseeing policy.  They have no

control over "whatever could ordinarily be done with a PDF file" by a student.

Thus, the cited references to the Dimsdale and Burtle depositions do not support the

stated fact and to that extent, it is in dispute.

46.     Students are able to and do routinely view, download, and print copies of course reading materials distributed through ERes. EX 24 (Reifler Dep.) 128:21-129:4; EX 15 (Dimsdale Dep.) 68:14-15; *see* EX 18 (Burtle Dep.) 129:11-130:10; EX 6 (Kaufmann Dep.) 47:25-48:4.

**RESPONSE:** The University Administrators admit that students are able and

sometime do view, download and print copies of a posting on Eres.  The deponents

have no way of knowing whether students do so "routinely" or otherwise.  The

University Administrators are aware that students do not always access reading

materials on ERes.  Thus, to the extent this statement purports to describe any

circumstance as "routine," the citation to the referenced depositions do not support

such a fact and it is, therefore, in dispute.

47.  Multiple copies of copyrighted works are made every time a GSU student accesses course reading via ERes -one copy when a student views the work, another copy if the student saves the material, and yet another copy if the student prints the material *See* Dewar Rept. 6; EX 12 (Dewar Dep.) 67:9-14, 81:18-21, 82:6-9; EX 13 (Palmour Dep.) 60:4-9.

**RESPONSE:**  Admitted.

48.  GSU library personnel do not review a professor's ERes selection for copyright compliance, unless it raises a "red flag." *See, e.g.,* EX 52; EX 15 (Dimsdale Dep.) 59:23-62:17; 73:8-10.

**RESPONSE:**  GSU library personnel review each professor's ERes postings

and, if they find something that appears to be inappropriate, they raise a "red fly."

Thus, the citations to the Dimsdale deposition do not support the stated fact.

Plaintiffs Ex. 52, Dimsdale Dep. 59:23 - 62:17.

49.  GSU posts readings to ERes without asking permission from the copyright owner or paying permissions fees. EX 19.

**RESPONSE:**  The University Administrators admit that GSU professors

have posted reading materials to the ERes system without asking permission.  This

is <u>not</u> to say that all GSU professors have done so or that permission was required.

50.  GSU instructors believe that permission is not required to post material on ERes. EX 8 (Belcher Dep.) 56:7-9.

**RESPONSE:**  The University Administrators admit that Professor Belcher

was evidently not aware of the New Copyright Policy and its provisions for

obtaining permission.  However, that is not to say that all GSU professors were

unaware of the New Copyright Policy.  To the contrary, faculty were expressly

made aware of the New Copyright Policy and training seasons were provided.  See,

for example, Dixon Decla**., ¶3**.  Further, the cited deposition transcript does not

support the stated fact and, to that extent, it is in dispute.

      **51.**    GSU instructors were not aware that permission could be
obtained to use excerpts of copyrighted works on ERes. EX 8 (Belcher Dep.) 55:14-
17, 63:8-11; EX 6 (Kaufmann Dep.) 60:16-22, 72:19-73:7; EX 24 (Reifler Dep.)
42:2-9.

    **RESPONSE:**  The University Administrators admit that not all GSU

professors were immediately aware of all portions of the New Copyright Policy

adopted in February, 2009.  As a result, the University Administrators admit that

some GSU instructors were not immediately aware that permission could be

obtained.  However, professors have been made aware of the New Copyright Policy

by, for example, the New Copyright Policy Firm Use checklist, training sessions and

conversations with the GSU legal Affairs office.  *See* Declaration of Jennifer

Esposito, ¶¶ 3, 5; Declaration of Ann Kruger, ¶¶ 5, 6; and Declaration of Patricia

Dixon, ¶ 3.

      **52.**    Licenses to make copies of Plaintiffs' works available
electronically to students can be easily obtained. EX 5 (Pfund Decl.) , ¶ 17; EX 3
(Van Valkenburg Decl.) ¶11; EX 4 (Smith Decl.) ¶ 9.

    **RESPONSE:**  The University Administrators admit that, if a publisher or the

Copyright Clearance Center (CCC) own the copyright in an available work, a

license can be readily obtained.  However, there are many works that are out of print

or otherwise unavailable.

53.     GSU administrators are aware that Plaintiffs offer mechanisms for obtaining licenses to make copies of their works available electronically. *See* EX 13 (Palmour Dep.) 153:20-154:3; EX 18 (Burtle Dep.) 25:25-26:4; EX 29 (Deposition of William Potter (Mar. 9, 2009) ("Potter Dep.")) 29:8-18; *see also* EX 14 (Seamans Dep.) 42:23-32:6.

**RESPONSE:**  Admitted.

54.     The ERes software allows users to investigate licensing options with CCC and to manage their CCC licenses. EX 11 (Deposition of Debra J. Mariniello (June 30, 2009) ("Mariniello Dep. I")) 114:14-115:11; EX 10 (Expert Report of Debra J. Mariniello In Response to the Report of Kenneth D. Crews, Supplemental Initial Disclosures by Cambridge University Press, Oxford University Press, Inc., SAGE Publications, Inc. (Oct. 16, 2009), Docket No. 124 ("Mariniello Rpt.")) 14; *see also* EX 13 (Palmour Dep.) 166:21-167:23.

**RESPONSE:**  These statements are hearsay and, therefore, inadmissible.

The University Administrators admit that they have been informed it is possible to

manage CCC license with available ERes software.  The University Administrators

have no experience with any such software and do not know if it can be

implemented on the system as employed by GSU.  Thus, to that extent, this fact is in

dispute.

55.     "The technology of E-Reserves further offers the potential to track uses, to communicate copyright information to users, and perhaps to constrain further reproduction of works." Expert Report of Kenneth D. Crews (hereinafter "Crews Rpt."), Docket No. 104, 10.

**RESPONSE:**  Admitted that Dr. Crews make the referenced statement.

18

**56.**     The GSU library staff are aware that the ERes software offers copyright compliance features, "but they do not utilize these features."  EX 15 (Dimsdale Dep.) 121 :16-21 (discussing EX 53); EX 13 (Palmour Dep.) 167:8168:6.

**RESPONSE:**  Admitted.

**57.**     GSU has not budgeted for, does not intend to budget for, and has not established any procedures for obtaining licenses or permission to post electronic course material, including on ERes. EX 14 (Seamans Dep.) 48:19-25, 49:16-51:4; EX 13 (Palmour Dep.) 156:21-25, 159:5-10; EX 29 (Potter Dep.) 143:9-13; EX 18 (Burtle Dep.) 62:22-63:2.

**RESPONSE:**  Admitted.

**58.**     If individual instructors determine a proposed ERes posting requires permission from the copyright owner, they, and not the students or library, are responsible for paying any associated fees. EX 29 (potter Dep.) 143:9-20; EX 15 (Dimsdale Dep.) 84:7-18.

**RESPONSE:**  Admitted in part.  If, under the New Copyright Policy, the

professor determine that a use is <u>not</u> a fair use, professors also elect not to use the

material.  *See,* e.g., Kaufman Decl., ¶ 6; Dixon Decl.; ¶ 6.

## C.     *The Transition from Coursepack Usage to ERes*

**59.**     Licensed hard-copy coursepacks and materials posted to ERes serve the same function and offer the same content. EX 13 (Palmour Dep.) 138:17-20,140:22-25.

**RESPONSE:**  This statement is disputed.  The function of ERes is

fundamentally different by virtue of its providing electronic access.  Materials

posted to ERes can, therefore, vary dramatically—including video, links, course

syllabi, etc.  Coursepacks are simply a collection of readings.  See Response to

Fact No. 37 hereinabove.  Thus, this statement is in dispute, as the cited deposition transcript does not support the statement.

**60.**   Coursepack usage at GSU has been gradually declining in recent years while there has been a dramatic increase in electronic course content distribution. EX 13 (Palmour Dep.) 128:16-19, 140:15-25; EX 18 (Burtle Dep.) *23:17-20; see also* EX 8 (Belcher Dep.) 45:6-10, 53:4-9.

**RESPONSE:**  The University Administrator admit that their minimal use of coursepacks has been declining and their use of e-Reserves is increasing.  This is the result of several factors, including the adoption of "green" practices.  *See,* Plaintiffs' Ex. 13, Palmour Dep., 128:16-19; 140: 15-25.  Thus, the cited deposition citations do not support the statement, especially to the extent it references a "dramatic" increase or a "gradual" decline.

**61.**   In the Spring 2009 semester, coursepacks for about fifteen titles were offered for sale whereas materials for more than 300 courses were available on ERes. EX 13 (Palmour Dep.) 128:16-23; EX 21.

**RESPONSE:**  Admitted.

**62.**   Though GSU pays permissions fees when a copyrighted work is used in a hard-copy coursepack, when that very same copyrighted material is distributed electronically, no fee is paid. EX 13 (Palmour Dep.) 128:25-129:25, 135:5-7, 138:17-139:9; *see also* EX 8 (Belcher Dep.) 54:5-7, 54:20-25; EX 19.

**RESPONSE:**  This fact is in dispute.  GSU has not offered the "very same copyright material" via a coursepack and electronically.  To that extent, this statement is disputed.  The University Administrators admit that they have not paid

a fee for posting an excerpt to E-Res.  *See,* Response to Plaintiffs Statement of

Facts, ¶ 57.

      **63.**    GSU has encouraged faculty members to make course materials available via digital distribution, rather than coursepacks to avoid paying the copyright royalties associated with hard copy coursepacks. *See* EX 13 (Palmour Dep.) 128:25-129:12; 135:1-14; 141:7-16; EX 14 (Seamans Dep.) 144:2-8; EX 16-17.

     **RESPONSE:**  This fact is in dispute.  Mr. Palmour is not a University

Administrator and does not have authority to speak for GSU.  The cited Palmour

deposition testimony does not support the stated fact.  Ms. Seamans testimony is

directed to her to her experience regarding student willingness to use print-based

material versus electronic, and the benefit of access in terms of a 24/7 model.  The

Palmour testimony does not support the stated fact.

      **64.**    Students are charged 6 cents per page, plus copyright royalties of 15 to 20 cents per page, plus $1.00 per book plus a 1/3 markup for the bookstore profit for coursepacks, as compared to the five cents it costs students to print a page from ERes on university printers. EX 16; EX 13 (Palmour Dep.) 132:2134:16.

     **RESPONSE:**  Admitted.

      **65.**    GSU students request that their teachers use ERes as opposed to coursepacks, mainly for the cost. EX 25.

     **RESPONSE:**  This fact is in dispute.  The cited Exhibit 25 does not support

the stated fact.  Exhibit 25 is a collection of GSU financial records relating to

royalties paid for coursepacks Exhibit 25 does not address any student request for

ERes.  Thus, this stated fact is in dispute.

66.     The GSU administration believes it is "important" to provide" services that students are happy with because the students are their customers. EX 13 (Palmour Dep.) 144:25-145:5.

RESPONSE:  This fact is in dispute.  Mr. Palmour is not a University

Administrator and does not have authority to speak for GSU.  The cited Palmour

testimony does not support the stated fact.

D.     *Usage Statistics for ERes at GSU*

67.     Between 4,000 and 5,000 copyrighted excerpts have been offered via ERes each semester between 2005 and Spring 2009. EX 13 (Palmour Dep.) 102:5-107:3; EX 54-59.

RESPONSE:  This fact is in dispute as it relies on circumstances before

adoption of the New Copyright Policy in February of 2009.

68.     For each semester between 2005 and the Spring 2009 semester, the GSU ERes system logged over 100,000 "hits" of course materials per semester. EX 54-59.

RESPONSE:  This fact is in dispute as it relies on circumstances before

adoption of the New Copyright Policy in February of 2009.

69.     In the aggregate, the works posted on ERes have been accessed as many as 127,000 times each semester, and as many as 259,000 times each year. EX 21, EX 60; *see also* EX 18 (Burtle Dep.) 139:17-19.

RESPONSE:  This fact is in dispute as it relies on circumstances before

adoption of the New Copyright Policy in February of 2009.

70.     For the Spring 2009 semester, approximately 4,000 course materials for 334 courses were made available on ERes. EX 21; *see also* EX 18 (Burtle Dep.) 56:16-20.

**RESPONSE:** This fact is in dispute as it relies on circumstances before

adoption of the New Copyright Policy in February of 2009. The Spring semester

begins in January 2009.

**71.** The GSU ERes system logged 75,965 "hits" of course materials between January 1, 2009 and April 2, 2009, one month before the end of the Spring 2009 semester. EX 21.

**RESPONSE:** This fact is in dispute as it relies on circumstances before

adoption of the New Copyright Policy in February of 2009. The Spring semester

begins in January 2009.

**72.** During the three weeks of classes in May 2009 ("2009 Maymester"), nearly 200 course materials were posted to ERes, which were accessed over 2,700 times. EX 48.

**RESPONSE:** Admitted.

**73.** More than 230 course materials were posted to ERes for the Summer 2009 semester, which were accessed more than 4,500 times between June 8, 2009 and July 1, 2009 (mid-way through the semester). EX 49.

**RESPONSE:** Admitted.

**74.** In the first three weeks of the Fall 2009 semester, more than 1,000 course materials were posted to ERes, which were accessed more than 15,000 times. EX 22.

**RESPONSE:** Admitted.

**75.** On average, each ERes course page contains ten to fifteen readings. EX 21; *see* also EX 18 (Burtle Dep.) 56:16-20; EX 13 (Palmour Dep.) 11 7:21-118:4.

**RESPONSE:**  This fact is disputed as it relies on circumstances before adoption of the New Copyright Policy in February of 2009.  The Spring semester began in January 2009, before adoption of the New Copyright Policy.

76.   During the Spring 2009 semester, about sixty courses posted twenty or more excerpts to ERes. EX 21.

**RESPONSE:**  This fact is disputed as it relies on circumstances before adoption of the New Copyright Policy in February of 2009.  The Spring semester began in January 2009, before adoption of the New Copyright Policy.

77.   During the Spring 2009 semester, Professor Shapiro placed more than 100 excerpts on ERes for his course "Adapted Physical Education" (KHE7650). *Id.;* EX 13 (Palmour Dep.) 118:5-7.

**RESPONSE:**  This fact is disputed as it relies on circumstances before adoption of the New Copyright Policy in February of 2009.  The Spring semester began in January 2009, before adoption of the New Copyright Policy..

78.   During the Fall 2009 semester, forty-four excerpts were posted to ERes in connection with the course "Advanced Developmental Psychology" (EPY8220) and thirty-seven excerpts were posted to ERes in connection with the course "Comparative Culture" (PERS200 1). EX 22.

**RESPONSE:**  Admitted.

79.   The GSU College of Law maintains parallel procedures for making digital course material available via ERes. GSU Interr. Resp. No.3; EX 18 (Burtle Dep.) 104:17-20; *see also* EX 61; EX 15 (Dimsdale Dep.) 37:7-10.

**RESPONSE:**  The University admits that Georgia State Law School has its own library and maintains its own ERes.  See Plaintiffs Ex 18 (Butler dep.), 104:17-

20.  To the extent this statement is directed to other subject matter, the citations do

not support such other facts and they are, therefore, in dispute.

**80.**    The ERes system for the College of Law is stored on the same
GSU server as the ERes materials for the rest of the University. EX 18 (Burtle Dep.)
104:17-23.

**RESPONSE:**  Admitted.

**E.**    *uLearn*

**1)**    **Operation and Management of uLearn at GSU**

**81.**    uLearn is the electronic course management system that USG
licenses from the third-party vendor BlackboardlWebCT. EX 23 (Deposition of
Paula Christopher (June 10, 2009) ("Christopher Dep.") 19:3-10.

**RESPONSE:**  Admitted.

**82.**    uLearn resides on a server that is owned and maintained by USG,
and GSU pays USG a license fee of more than to USG for use of the uLearn
software. EX 13 (Palmour Dep.) 20 -21; EX 23 (Christopher Dep.) 19:3-10; 23:23-
24:11; EX 62.

**RESPONSE:**  Admitted.

**83.**    GSU encourages instructors to post reading materials on uLearn
for distribution to students. GSU Interr. Resp. No.1; EX 23 (Christopher Dep.)
24:14-22; GSU Answer ¶ 2; GSU Interrog. Resp. No.1; ERes/uLearn Stipulations
¶28.

**RESPONSE:**  Admitted.

**84.**    The only limitation on the quantity of material that can be posted
to uLearn is a limit on the size of each individual digital file. EX 23 (Christopher
Dep.) 63 :5-15.

**RESPONSE:**  Admitted.

**85.** Large digital files can be split into multiple PDF files and posted to uLearn. Dewar Rpt. 4; *see, e.g., EX* 63.

**RESPONSE:** Admitted.

**86.** Certain GSU instructors post required course reading materials on uLearn. EX 24 (Reifler Dep.) 40:15-22.

**RESPONSE:** Admitted in part. The GSU Administrators admit that

Professor Reifler posted some required course reading materials on uLearn. To the

extent this statement is directed to other subject matter, the citation to only Professor

Reifler's deposition does not support such other stated facts and they are, therefore,

in dispute.

**87.** Materials posted to uLearn serve the same function as paper coursepacks. EX 24 (Reifler Dep.) 129:8-13.

**RESPONSE:** This fact is in dispute. The University Administrators admit

that Professor Reifler testified that, in his opinion the difference between providing

student readings in a coursepack and posting student readings on uLearn was "not

much." That is not to say, however, that the function is "the same." The cited

Reifler deposition transcript does not support the stated fact.

**88.** Reading materials distributed through uLearn generally are in the PDP format, and copies of the material are made every time a student accesses material via uLearn. *See* EX 23 (Christopher Dep.) 119:6-11; *see also* Dewar Rpt.

**RESPONSE:** Admitted.

**89.** Students print readings from uLearn and bring them to class. EX 24 (Reifler Dep.) 128:21-129:2.

**RESPONSE:**  This fact is in dispute.  The University Administrators admit

that Professor Reifler testified that in his experience, graduate students print works

posted on uLearn.  However, Professor Reifler also testified that in his experience

undergraduate students do not.  Plaintiffs' Ex. 24 (Reifler Dep.), 128:21-129:2.  To

the extent this statement is directed to such other subject matter, the citation to

Professor Reifler's deposition does not support such other stated facts and they are,

therefore, in dispute.

> **90.**     Students pay GSU a fee for printing uLearn materials on GSU-
> owned computer printers. EX 23 (Christopher Dep.) 119:20-25; EX 13 (Palmour
> Dep.) 131 :2-4.

**RESPONSE:**  This fact is in dispute.  The University Administrators admit

that students pay a fee for printing provided by GSU.  See Plaintiffs' Ex. 23,

Christopher Depo., 119:20 - 25. To the extent this statement is directed to any other

subject matter, the cited references do not support such other stated facts and they

are therefore in dispute.

> **91.**     GSU instructors are able to and do upload electronic course
> materials to uLearn without the involvement of GSU library or IT personnel and
> without ever looking at a copyright policy. EX 23 (Christopher Dep.) 42:11-12;
> 79:20-23; 109:2-22.

**RESPONSE:**  This fact is in dispute.  The University Administrators admit

that GSU instructors are able to upload materials to uLearn without the involvement

of GSU library or IT personnel and without ever looking at a copyright policy.  To

the extent this statement is directed to any other subject matter, the cited references do not support such other stated facts and they are therefore in dispute.

**92.** GSU has no plans to institute procedures to ensure that professors comply with the Board of Regents copyright policy with regard to their use of uLearn. EX 23 (Christopher Dep.) 109:14-17.

**RESPONSE:** This fact is in dispute. In fact, not only do the University Administrators and GSU have a plan to institute such procedures, they have already done so. For example, the University Administrators adopted a New Copyright Policy, which includes a Fair Use Checklist. These procedures include providing a class for professors and others in the university community. *See,* for example, Dixon Declaration, ¶ 2 (adoption of new policy, checklist) and ¶ 3 (training session conducted by GSU Office of Legal Affairs).

**93.** On occasion, GSU administrators have become aware that professors were not complying with their copyright responsibilities, but these GSU administrators took no action. EX 23 (Christopher Dep.) 112:19-113:1.

**RESPONSE:** The fact is in dispute. The University Administrators admit that Paula Christopher inadvertently learned that one professor may have failed to comply with his or her copyright obligations, and that Paula Christopher took no further action. Plaintiffs Ex. 23, Christopher Dep., 112:19 - 113:1. To the extent this statement is directed to any other subject matter, the cited references do not support such other stated facts and they are therefore in dispute.

### 2) Data Depicting uLearn Usage

**94.** GSU has access to various data regarding usage of uLearn, including which course materials a student has accessed. EX 64; EX 23 (Christopher Dep.) 21:15-16, 44:5-10, 54:8-10, 72:10-18, 72:25-73:9, 74:16-21; ERes/uLearn Stipulations ¶¶37-41.

**RESPONSE:** Admitted.

**95.** Instructors' use of uLearn has increased in the five years preceding this litigation. EX 23 (Christopher Dep.) 28:19-21.

**RESPONSE:** Admitted.

**96.** As of June 10, 2009, there were approximately 2,500 active course pages on the uLearn system, approximately 150,000 total course pages, and more than 22,939 users with access to the uLearn system. EX 23 (Christopher Dep.) 60:14-61:9, 93:14-23.

**RESPONSE:** Admitted.

**97.** GSU Professor Reifler posted approximately ten readings to uLearn for his course "Political Psychology" (POLS4190) during the Spring 2009 semester. One of these readings, Sears, Huddy, & Jervis' "The Psychologies Underlying Political Psychology" from *The Oxford Handbook of Political Psychology* was accessed (or viewed) by students over 100 times during the semester. EX 65.

**RESPONSE:** This fact is in dispute.  To the extent this statement is directed to any other subject matter, the cited references do not support such other stated facts and they are therefore in dispute.

### F. *GSU's Infringement of Plaintiff Works Identified in the Amended Complaint*

### 1) Cambridge University Press Works

**98.**    GSU Professor Kim Reimann placed chapter 2 from
Cambridge's *Democracy Without Competition in Japan* (totaling thirty-three pages)
on ERes for the students enrolled in the course "Political Economy of Japan"
(POLS4256) during the Fall 2006 semester and assigned this work as required
reading. GSU Answer ¶ 25; EX 66. The ERes posting was accessed (or "hit") eight
times during the course of the semester by ERes users. EX 55; *see* ERes/uLearn
Stipulations, ¶¶18-20. Professor Reimann placed the same chapter on ERes for
students in "Political Economy of East Asia" (pOLS4255) during the Fall 2007
semester and assigned this work as required reading. EX 67; EX 68. The ERes
posting was posted with at least 45 other excerpts, and accessed (or "hit") six times
during the course of the semester and a total of 17 times by ERes users between the
beginning of 2005 and April 16, 2009. EX 57; EX 103.

**RESPONSE:**  The University Administrators admit that "GSU Professor

Kim Reimann placed chapter 2 from Cambridge's *Democracy Without Competition*

*in Japan* (totaling thirty-three pages) on ERes for the students enrolled in the course

"Political Economy of Japan" (POLS4256) during the Fall 2006 semester," and "for

students in "Political Economy of East Asia" (POLS4255) during the Fall 2007

semester, but dispute it was assigned as required reading or that it was accessed "by

ERes users."  GSU Answer ¶ 25; Plaintiffs' Ex 66, Ex 67; and GSU Answer ¶ 25;

EX 66. EX 67; EX 68. Ex 68.. The hit counts could have been created by one person

a repeatedly accessing the work and/or by the lawyers in connection with this case.

The University Administrators also dispute that this fact is material as the conduct is

not ongoing and continuous, and this fact relies on circumstances prior to adoption

of the New Copyright Policy in February of 2009.

**99.**    GSU Professor N. Lee Orr placed two chapters totaling thirty-

two pages from *Cambridge Companion to the Organ* on ERes for the students enrolled in his course "Baroque Music" (MUS8840) during the Fall 2006 semester. GSU Answer, ¶ 25. EX 55. He provided the same two chapters on ERes for the eight students in MUS8840 during the Summer 2008 semester. EX 69; EX 70. These two chapters were accessed a total of 18 and 22 times, respectively, between the beginning of 2005 and April 16, 2009. EX 103; *see also* ERes/uLearn Stipulations ¶¶18-20.

      **RESPONSE:**  The University Administrators admit that "GSU Professor N.

Lee Orr placed two chapters totaling thirty-two pages from *Cambridge Companion*

*to the Organ* on ERes for the students enrolled in his course "Baroque Music"

(MUS8840) during the Fall 2006 semester," but dispute that this fact is material as

the conduct is not ongoing and continuous.

      **100.**   Dr. William Downs taught the course "Comparative Political Analysis" (POLS8200) during the Fall 2007 and Fall 2008 semesters and placed chapters 1 and 2 (109 total pages) from Theda Skocpol's *States and Social Revolutions* on ERes for the students in this course and required the students to read these excerpts. GSU Answer, ¶ 25; EX 57; EX 59; *ERes/uLearn* Stipulations ¶¶ 8-17; EX 71; EX 72; EX 73; *see* EX 13 (Palmour Dep.) 194:8-13,220-221.  These excerpts were accessed a total of eight times by ERes users during these semesters, and a total of 28 times between the beginning of 2005 and April 16, 2009. EX 57; EX 59 at 000402; EX 103; *see* ERes/uLearn Stipulations, ¶¶ 18-20.

      **RESPONSE:**  The University Administrators admit that "Dr. William Downs

taught the course "Comparative Political Analysis" (POLS8200) during the Fall

2007 and Fall 2008 semesters and placed chapters 1 and 2 (109 total pages) from

Theda Skocpol's *States and Social Revolutions* on ERes for the students in this

course," but dispute it was assigned as required reading or that it was accessed "by

ERes users."  See, GSU Answer, ¶ 25; Plaintiffs Ex 57; Ex 59; Ex 71; Ex 72; Ex 73;

The hit counts could have been created by one person a repeatedly accessing the

work and/or by the lawyers in connection with this case.  The University

Administrators also dispute that this fact is material as the conduct is not ongoing

and continuous.

      **101.**   Numerous professors have taught the course "Practicum" (AL8900) over the past few years, all placing two chapters (thirty-seven pages) from Richard Allwright and Kathleen Bailey's *Focus on the Language Classroom* on ERes for students in this course.  GSU Answer ¶ 26; *See* EX 13 (Palmour Dep.) 181:18-23, 190:8-12, 221-223, 227:18-22; EX 8 (Belcher Dep.) 51:15-52:4; EX 74; EX 72; EX 75; *see* EX 105 (pdf file of chapter). These two chapters were accessed a total of seventy-one times by ERes users during the Fall 2008 semester, seventy-four times during the Spring 2009 semester, and a total of337 times between the beginning of 2005 and April 16, 2009. EX 59; EX 21; EX 103; *see ERes/uLearn* Stipulations, ¶¶ 18-20.

     **RESPONSE:**  The University Administrators admit that different professors

"have taught the course "Practicum" (AL8900) over the past few years, all placing

two chapters (thirty-seven pages) from Richard Allwright and Kathleen Bailey's

*Focus on the Language Classroom* on ERes for students in this course. See, EX 74;

EX 72; EX 75; *see* EX 105 The hit counts could have been created by one person

repeatedly accessing the work and/or by the lawyers in connection with this case.

The University Administrators also dispute that this fact is material as the conduct is

not ongoing and continuous.

      **102.**   GSU Professor John Bunting placed chapters 1, 4, and 6 (by

Gwyneth Fox, David Jolly and Rod Bolitho, and Philip Prowse, respectively) from *Materials Development in Language Teaching* (a total of sixty pages) on ERes for the sixteen students enrolled in his course "Material Design, Development and Publication" (AL8660) during the Fall 2007 semester and required the students to read these excerpts. GSU Answer ¶ 26; EX 72; EX 76. These chapters were accessed a total of sixty-six times by ERes users during the semester, and a total of 129 times between the beginning of 2005 and January 2009. EX 57; EX 103; *see* ERes/uLearn Stipulations , ¶¶ 18-20.

**RESPONSE:** The University Administrators admit that "GSU Professor John Bunting placed chapters 1, 4, and 6 (by Gwyneth Fox, David Jolly and Rod Bolitho, and Philip Prowse, respectively) from *Materials Development in Language Teaching* (a total of sixty pages) on ERes for the sixteen students enrolled in his course "Material Design, Development and Publication" (AL8660) during the Fall 2007 semester," but dispute it was assigned as required reading or that it was accessed "by ERes users." See, Plaintiffs Ex 72; Ex 76. The hit counts could have been created by one person a repeatedly accessing the work and/or by the lawyers in connection with this case. The University Administrators also dispute that this fact is material as the conduct is not ongoing and continuous.

   **103.** GSU Professor Lazarus placed chapters 5, 7 and 8 (eighty-six pages) of Gary Cox & Mathew McCubbins' *Legislative Leviathan* on ERes for the students enrolled in his course "American Legislative Process" (POLS8170) during the Spring 2008 semester, and required the students to read these excerpts. GSU Answer ¶ 26; EX 77; EX 58; ERes/uLearn Stipulations ¶¶8-17; *see* EX 13 (Palmour Dep.) 197-198, 211 :6-11. This reading was accessed a total of 104 times between the beginning of 2005 and January 2009. EX 103; ERes/uLearn Stipulations ¶¶18-20.

**RESPONSE:**  The University Administrators admit that "GSU Professor Lazarus placed chapters 5, 7 and 8 (eighty-six pages) of Gary Cox & Mathew McCubbins' *Legislative Leviathan* on ERes for the students enrolled in his course "American Legislative Process" (POLS8170) during the Spring 2008 semester," but dispute it was assigned as required reading or that it was accessed "by ERes users." See Plaintiffs Ex 77; Ex 58.  The hit counts could have been created by one person a repeatedly accessing the work and/or by the lawyers in connection with this case. The University Administrators also dispute that this fact is material as the conduct is not ongoing and continuous.

### 2)   Oxford University Press Works

**104.**   GSU Professor Darsey placed chapters 1 and 2 (totaling twenty-eight pages) from Christopher Simpson's *Science of Coercion* on ERes for the sixteen students enrolled in his,course "Theories of the Public" (COMM8100) during the Fall 2006 semester and required that the students read these excerpts. GSU Answer ¶ 27; EX 78; EX 79; EX 80; *see* EX 13 (Palmour Dep.) 177-178. These excerpts were accessed seventy-one times by ERes users during the Fall 2006 semester. EX 55; ERes/uLearn Stipulations ¶¶ 18-20.

**RESPONSE:**  The University Administrators admit that "GSU "Professor Darsey placed chapters 1 and 2 (totaling twenty-eight pages) from Christopher Simpson's *Science of Coercion* on ERes for the sixteen students enrolled in his,course "Theories of the Public" (COMM8100) during the Fall 2006 semester," but dispute it was assigned as required reading or that it was accessed "by ERes

users." See, Plaintiffs' Ex. 78; Ex 79; and Ex 80.  The hit counts could have been

created by one person a repeatedly accessing the work and/or by the lawyers in

connection with this case.  The University Administrators also dispute that this fact

is material as the conduct is not ongoing and continuous.

**105.**   GSU has copied and distributed excerpts of John Blassingame's
*The Slave Community: Plantation Life in the Antebellum South* via ERes.  GSU
Answer ¶ 27.

**RESPONSE:**  The University Administrators admit that Professors have

made available on ERes excerpts from "The Slave Community *Plantation Life in the*

*Antebellum South*" following adoption of the Policy and in accordance with the

Policy, but dispute that such uses constitute copyright infringement.

**106.**   GSU Professor Patricia Dixon has taught the courses "African-
American Male/Female Relationships" (AAS4030) and "African-American Family"
(AAS3000) on various occasions over the past few years.  Dixon placed chapters
four and seven (a total of seventy-eight pages) from *The Slave Community* on ERes
for the students enrolled in these courses during the Spring 2007, Fall 2007, Spring
2008, Fall 2008, and Spring 2009 semesters (among others), and required that the
students read these excerpts.  *Id.;* EX 81; EX 82; EX 83; EX·84; EX 85; EX 86; *see*
EX 13 (Palmour Dep.) 193:7-16, 201:6-13, 202:19-25, 206:715, 207:5-8, 210:7-11.
During the Spring 2008 semester of AAS3000, these two chapters were accessed a
total of ninety-seven times by ERes users. EX 58; EX 13 (Palmour Dep.) 201:6-13.

**RESPONSE:**  The University Administrators admit that "GSU Professor

Patricia Dixon has taught the courses "African-American Male/Female

Relationships" (AAS4030) and "African-American Family" (AAS3000) on various

occasions over the past few years, and placed chapters four and seven (a total of

seventy-eight pages) from *The Slave Community* on ERes for the students enrolled

in these courses during the Spring 2007, Fall 2007, Spring 2008, Fall 2008, and

Spring 2009 semesters," but dispute it was assigned as required reading or that it

was accessed "by ERes users."  See, Plaintiffs' Ex 81; Ex 82; Ex 83; Ex·84; Ex 85;

and Ex 86.  The hit counts could have been created by one person a repeatedly

accessing the work and/or by the lawyers in connection with this case.  The

University Administrators also dispute that all of the conduct is ongoing and

continuous.

   **107.**   *The Slave* Community was accessed a total of 889 times between
the beginning of 2005 and January 2009. EX 103; *see* ERes/uLearn Stipulations ¶¶
18-20.

   **RESPONSE:**  Admitted.

   **108.**   GSU Professor Blumi placed fifty-one pages from *White
Supremacy* on ERes for the 21 students enrolled in his course "Survey of World
History Since 1500" (HIST1112) during the Spring 2007 semester and assigned this
excerpt as required reading. GSU Answer, ¶ 27; EX 56; ERes/uLearn Stipulations,
¶¶ 8-17; *see also* EX 13 (Palmour Dep.) 182:14-19. During the Spring 2007
semester, this excerpt was accessed a total of eight times by ERes users. EX 56; *see*
ERes/uLearn Stipulations ¶¶18-20.

   **RESPONSE:**  The University Administrators admit that "GSU Professor

Blumi placed fifty-one pages from *White Supremacy* on ERes for the 21 students

enrolled in his course "Survey of World History Since 1500" (HIST1112) during the

Spring 2007 semester," but dispute it was assigned as required reading or that it was

accessed "by ERes users."  See, Plaintiffs Ex. 56.  The hit counts could have been

created by one person a repeatedly accessing the work and/or by the lawyers in

connection with this case.  The University Administrators also dispute that this fact

is material as the conduct is not ongoing and continuous.

**109.**   GSU has copied and distributed excerpts of *Awakening Children's Minds* via ERes. GSU Answer, ¶ 27.

**RESPONSE:**  The University Administrators admit that professors have

made available on ERes excerpts from "Awakening Children's Minds," following

adoption of the Policy and in accordance with the Policy, but dispute that such uses

constitute copyright infringement.

**110.**   GSU Professor Kruger placed chapter six (thirty-nine pages) from Laura Berk's *Awakening Children's Minds: How Parents and Teachers Can Make a Difference* on ERes for the eighteen students enrolled in her course "Psychology of Learning:  Young Children" (EPY7090) during the Fall 2007 semester and assigned this as required reading.  GSU Answer, ¶ 27; EX 87; *see* EX 13 (Palmour Dep.) 185:18-25, 223:15-20.  This reading (which was split into two pdf files on ERes) was accessed a total of 35 times by ERes users during the Fall 2007 semester, 9 times during the Fall 2008 semester, and a total of 160 times between the beginning of 2005 and April 16, 2009. EX 57; EX 59; EX 103; *see* ERes/uLearn Stipulations, ¶¶ 18-20.

**RESPONSE:**  The University Administrators admit that "GSU Professor

Kruger placed chapter six (thirty-nine pages) from Laura Berk's *Awakening*

*Children's Minds: How Parents and Teachers Can Make a Difference* on ERes for

the eighteen students enrolled in her course "Psychology of Learning:  Young

Children" (EPY7090) during the Fall 2007," but dispute it was assigned as required

reading or that it was accessed "by ERes users."  See, Plaintiffs' Ex. 57; Ex. 59; Ex.

87, and Ex. 103.   The hit counts could have been created by one person a repeatedly

accessing the work and/or by the lawyers in connection with this case.  The

University Administrators also dispute that this fact is material as the conduct is not

ongoing and continuous.

### 3)    SAGE Publications Works

**111.**   GSU professors distributed 130 pages from the second edition of
*The SAGE Handbook of Qualitative Research* and 152 pages from the third edition
via ERes in 2007 alone. GSU Answer ¶¶ 22, 23; EX 88; *see* EX 13 (Palmour Dep.)
173-220; EX, 6 (Kaufmann Dep.) 105:24-106:7.  Readings from *The SAGE
Handbook* were accessed a total of 3,162 times between the beginning of 2005 and
April 16, 2009. EX 103; *see* ERes/uLearn Stipulations, ¶¶ 18-20.

**RESPONSE:**  The University Administrators admit that different GSU

professors have made available on ERes excerpts from the second and third edition

of "The *SAGE Handbook of Qualitative Research,*" following adoption of the Policy

and in accordance with the Policy, but dispute that such uses constitute copyright

infringement.

**112.**   GSU Professor Jodi Kaufmann placed numerous chapters
totaling approximately 150 pages from *The Handbook of Qualitative Research* on
ERes for the ten students enrolled in her course "Interpretive Inquiry in Education"
(EPSF9280) during the Fall 2006 semester and assigned these excerpts as required
readings for this course. EX 89; EX 55; EX 106 (PDF of one of the chapters from
*The SAGE Handbook of Qualitative Research* produced from GSU's server);
ERes/uLearn Stipulations ¶ 8-17. These readings were accessed a total of 160 times

during the Fall2006 semester by ERes users. EX 55; ERes/uLearn Stipulations ¶¶ 18-20.

**RESPONSE:** The University Administrators admit that "GSU Professor Jodi Kaufmann placed numerous chapters totaling approximately 150 pages from *The Handbook of Qualitative Research* on ERes for the ten students enrolled in her course "Interpretive Inquiry in Education" (EPSF9280) during the Fall 2006 semester," but dispute it was assigned as required reading or that it was accessed "by ERes users."  See, Plaintiffs' Ex. 89; Ex. 55; and Ex. 106.  The hit counts could have been created by one person a repeatedly accessing the work and/or by the lawyers in connection with this case.  The University Administrators also dispute that this fact is material as the conduct is not ongoing and continuous.

**113.**   Professor Kaufmann placed eight chapters from *The Handbook of Qualitative Research,* totaling over 180 pages, on ERes for the students enrolled in her course "Qualitative/Interpretive Research in Education I" (EPRS8500) during the Fall 2007 semester.  GSU Answer ¶ 23; EX 88; EX 57.  These readings were accessed a total of 657 times. EX 57; ERes/uLearn Stipulations ¶¶ 18-20. Professor Kaufmann taught the course again in the Fall 2008 semester and provided seven chapters of *The Handbook* to students, which were accessed 459 times. EX 59; EX 104.

**RESPONSE:** The University Administrators admit that "Professor Kaufmann placed eight chapters from *The Handbook of Qualitative Research,* totaling over 180 pages, on ERes for the students enrolled in her course "Qualitative/Interpretive Research in Education I" (EPRS8500) during the Fall 2007

semester," following adoption of the Policy and in accordance with the Policy, but

dispute that such uses constitute copyright infringement.  See, Plaintiffs' Ex. 88; and

Ex. 57.  The University Administrators also dispute that this fact is material as the

conduct is not ongoing and continuous.

**114.**   GSU Professor Belcher also placed five excerpts from *The Handbook of Qualitative Research,* totaling over 130 pages, on ERes for the ten students enrolled in her course "Qualitative Research" *(AL8961)* during the Spring 2007 semester without obtaining permission from SAGE. GSU Answer ¶ 22; EX 56; EX 90. These readings were accessed a total of 62 times during the semester. EX 56; *see* ERes/uLearn Stipulations ¶¶18-20.

**RESPONSE:**  The University Administrators admit that "GSU Professor

Belcher also placed five excerpts from *The Handbook of Qualitative Research,*

totaling over 130 pages, on ERes for the ten students enrolled in her course

"Qualitative Research" *(AL8961)* during the Spring 2007 semester," following

adoption of the Policy and in accordance with the Policy, but dispute that such uses

constitute copyright infringement.  See Plaintiffs' Ex. 56; and Ex. 90.  The

University Administrators also dispute that this fact is material as the conduct is not

ongoing and continuous.

**115.**   GSU Professor Marian Meyers placed four chapters totaling sixty-five pages from Liesbet van Zoonen's *Feminist Media Studies* on ERes for the students enrolled in her course "Women and Media" (JOU4780) during the Spring 2007 semester, which had an enrollment of thirty-four students. EX 56; ERes/uLearn Stipulations ¶¶8-17; EX 91; EX 92; EX 93. These excerpts were accessed a total of 245 times during the course of the semester, and a total of 508 times between the beginning of 2005 and April 16, 2009. EX 56; EX 103; *See*

ERes/uLearn Stipulations ¶¶18-20.

**RESPONSE:**  The University Administrators admit that "GSU Professor

Marian Meyers placed four chapters totaling sixty-five pages from Liesbet van

Zoonen's *Feminist Media Studies* on ERes for the students enrolled in her course

"Women and Media" (JOU4780) during the Spring 2007 semester, which had an

enrollment of thirty-four students," following adoption of the Policy and in

accordance with the Policy, but dispute that such uses constitute copyright

infringement.  See, Plaintiffs' Ex. 56; Ex. 91; Ex. 92; Ex. 93, and 103.  The

University Administrators also dispute that this fact is material as the conduct is not

ongoing and continuous.

**116.**   Meyers has continued to place excerpts from *Feminist Media
Studies* on ERes and assign them as required reading to the students enrolled in her
courses, including as recently as the Spring 2009 semester, during which chapters 2
and 3 were accessed a combined 93 times. *See, e.g.,* EX 94; EX 95; EX 96.

**RESPONSE:**  The University Administrators admit that it has continued to

use an excerpt from *Feminist Media Studies* on ERes for courses she has taught

following adoption of the Policy in accordance with the Policy, but dispute that such

uses constitute copyright infringement.

**117.**   Professor Emshoff taught the course "Introduction to Community
Psychology" (PSYC8200) during the Fall 2006 and Fall 2007 semesters and placed
chapters 2 and 7 from Milan J. Dluhy's Changing *the System: Political Advocacy for
Disadvantaged Groups* on ERes for the students in this course.  GSU Answer ¶ 24;
EX 97; EX 55, 57; EX 98; EX 99; EX 107 (PDP of one of the chapters, as produced

from GSU's server).  These excerpts were accessed a total of 64 times between the beginning of 2005 and April 16, 2009. EX 103; *see* ERes/uLearn Stipulations ¶¶ 18-20.

**RESPONSE:**  The University Administrators admit that "Professor Emshoff

taught the course "Introduction to Community Psychology" (PSYC8200) during the

Fall 2006 and Fall 2007 semesters and placed chapters 2 and 7 from Milan J.

Dluhy's Changing *the System: Political Advocacy for Disadvantaged Groups* on

ERes for the students in this course," but the University Administrators also dispute

that this fact is material as the conduct is not ongoing and continuous.

**118.**  GSU has not obtained permission from Plaintiffs or CCC for the digital duplication and distribution of any of the works listed in Exhibit 1 and described in paragraphs *supra* 98-117. GSU Answer ¶¶ 22 et seq.; *see also* EX 50 (Van Valkenburg Dep.) 16:3-4; EX 11 (Mariniello Dep. I) 49:4-6; EX 2 (Smith Dep.) 90:8-12.

**RESPONSE:**  Admitted.

**119.**  The distribution of course material described in paragraphs *supra* 98-117 is representative of the overall pattern of electronic course material distribution at GSU from 2005 to the present. EX 54-59; EX 21; EX 48-49; EX 22.

**RESPONSE:**  The University Administrators dispute that the distribution of

course material as described in Plaintiffs Statement of Facts is "representative of the

overall pattern of electronic course material distribution at GSU from 2005 to the

present," as GSU professors.  The cited exhibits do not support such a fact.

**120.**  In addition to the unauthorized distribution described in paragraphs 98-117, GSU has distributed electronically dozens of other excerpts of other copyrighted works from each Plaintiff without authorization or paying the

requisite permissions fees. EX 4 (Smith Decl.) ¶ 30; EX 5 (Pfund Decl.), 36; EX 3 (Van Valkenburg Decl.) ¶ 36; *see infra* paragraphs 267-269.

**RESPONSE:**  The University Administrators admit that GSU professors have made available on ERes excerpts from additional works following adoption of the Policy and in accordance with the Policy, but dispute that such uses constitute copyright infringement, that they were unauthorized or that permissions fees were required.  *See generally,* Defs. Additional Statement of Facts filed concurrently herewith.

### 4)     GSU's Ongoing Infringing Practices

**121.**   Under the new policy, GSU professors have posted full chapters and multiple chapters of copyrighted works to ERes. For example, during the *2009* Maymester, Professor Kaufmann posted six chapters comprising about 150 pages from *The SAGE Handbook of Qualitative Research* to ERes for her EPS8500 class. EX 48.

**RESPONSE:**  Admitted.

**122.**   During the Summer 2009 semester, the course "Introduction to Sociology" had a total of fifteen complete chapters from four different books posted to its ERes page. EX 49.

**RESPONSE:**  The University Administrators admit that "the course "Introduction to Sociology" had a total of fifteen complete chapters from four different books posted to its ERes page," following adoption of the Policy and in accordance with the Policy, but dispute that such uses constitute copyright

infringement.  The University Administrators also dispute that such fact is material

insofar as it does not concern the works-at-issue.

**123.**   During the Summer 2009 semester, Professor Kaufmarm posted two complete chapters totaling forty-two pages from *The SAGE Handbook of Qualitative Research* on ERes for the students enrolled in her course "Qualitative Research in Education II" (EPRS8510). EX 49.

**RESPONSE:**  Admitted

**124.**   During the Summer 2009 semester, Professor Esposito posted two complete chapters totaling 45 pages from *The SAGE Handbook of Qualitative Research* on ERes for the students enrolled in her course "Anthropology of Education" (EPS8280). EX 49.

**RESPONSE:**  Admitted.

**125.**   During the Summer 2009 semester, Professor Kruger placed nineteen pages from *Awakening Children's Minds* on ERes for the students enrolled in her course "Learning and the Learner" (EPY7090). EX 49.

**RESPONSE:**  Admitted.

**126.**   During the Fall 2009 semester, Professor Kaufmann placed eight excerpts from *The SAGE Handbook of Qualitative Research* (187 pages) on ERes for the students enrolled in her course "Qualitative/Interpretive Research in Education I" (EPRS 8500). EX 22.

**RESPONSE:**  Admitted.

**127.**   During the Fall 2009 semester, Professor Dixon placed chapter 7 (thirty-five pages) from *The Slave Community* on ERes for the students enrolled in her course "African American Family" (AAS3000). It was accessed 65 times as of September 15, 2009. EX 22.

**RESPONSE:**  Admitted.

**128.**   During the Fall 2009 semester, III pages from Vern L. Bengtson,

*Handbook of Theories of Aging* were distributed to students in Sociology of Aging (EPY8070) via ERes and accessed 31 times as of September 15, 2009. EX 22.

**RESPONSE:**  The University Administrators admit that "during the Fall

2009 semester, III pages from Vern L. Bengtson, *Handbook of Theories of Aging*

were placed on ERes for to students in Sociology of Aging (EPY8070)," the

University Administrators also dispute that such fact is material insofar as it does

not concern the works-at-issue.

      **129.**   During the Fall 2009 semester, 2 chapters each from Robert Binstock and Linda George (eds.), *Handbook of Aging and the Social Sciences* and Michael Marmot, *The Status Syndrome:  How* Social *Standing Affects Our Health and Longetivity* were distributed to students in Comparative Culture:  Aging in a Global Context (PERS2001) via ERes.  The were accessed 65 times as of September 15, 2009, EX 22.

**RESPONSE:**  The University Administrators admit that "during the Fall

2009 semester, 2 chapters each from Robert Binstock and Linda George (eds.),

*Handbook of Aging and the Social Sciences* and Michael Marmot, *The Status*

*Syndrome:  How* Social *Standing Affects Our Health and Longetivity* were

distributed to students in Comparative Culture:  Aging in a Global Context

(PERS2001)."  The University Administrators dispute that such fact is material

insofar as it does not concern the works-at-issue.

      **130.**   During the Fall 2009 semester, 2 chapters from C. Wright Mills, *The Power Elite* (Oxford University Press) were distributed to students in Social Theory I (SOCI8030) via ERes. EX 22.

**RESPONSE:** The University Administrators admit that "during the Fall 2009 semester, 2 chapters from C. Wright Mills, *The Power Elite* (Oxford University Press) were placed on ERes for students in Social Theory I (SOCI8030)." The University Administrators dispute that such fact is material insofar as it does not concern the works-at-issue.

131.   During the Fall 2009 semester, the introduction and first 2 chapters of Gerardo Munch (ed.), *Regimes and Democracy in Latin America: Theories and Methods* (Oxford University Press) were distributed to students in Latin American Politics (POLS8250) via ERes. EX 22.

**RESPONSE:**  The University Administrators admit that "During the Fall 2009 semester, the introduction and first 2 chapters of Gerardo Munch (ed.), *Regimes and Democracy in Latin America: Theories and Methods* (Oxford University Press) were placed on ERes for students in Latin American Politics (POLS8250)."  The University Administrators also dispute that such fact is material insofar as it does not concern the works-at-issue.

132.   During the Fall 2009 semester, a full chapter from James Brown and Thorn Hudson, *Criterion-referenced* Language *Testing* (Cambridge University Press) was distributed to students in Second Language Evaluation and Assessment (AL8550) via ERes. EX 22.

**RESPONSE:** The University Administrators admit that "during the Fall 2009 semester, a full chapter from James Brown and Thorn Hudson, *Criterion-referenced* Language *Testing* (Cambridge University Press) was distributed to

students in Second Language Evaluation and Assessment (AL8550)." The

University Administrators dispute that such fact is material insofar as it does not

concern the works-at-issue.

     **133.**   During the Fa112009 semester, a full chapter from Martha
Nussbaum, *The Fragility o/Goodness: Luck and Ethics in Greek Tragedy and
Philosophy* (Cambridge University Press) was distributed to students in Love:
Religious and Philosophical Perspectives (HONI 000) via ERes. EX 22.

    **RESPONSE:**  The University Administrators will admit that "during the

Fa112009 semester, a full chapter from Martha Nussbaum, *The Fragility*

*o/Goodness: Luck and Ethics in Greek Tragedy and Philosophy* (Cambridge

University Press) was distributed to students in Love: Religious and Philosophical

Perspectives (HONI 000)." The University Administrators also dispute that such

fact is material insofar as it does not concern the works-at-issue.

     **134.**   During the Fall 2009 semester, the first 4 chapters of Nicholas
Bloom, *Suburban Alchemy: 1960's New Towns and the Transformation of the
American Dream* were distributed to students in The American Suburb (HIST8655)
via ERes. EX 22.

    **RESPONSE:**  The University Administrators admit that "during the Fall

2009 semester, the first 4 chapters of Nicholas Bloom, *Suburban Alchemy:  1960's*

*New Towns and the Transformation of the American Dream* were distributed to

students in The American Suburb (HIST8655)." The University Administrators also

dispute that such fact is material insofar as it does not concern the works-at-issue.

**135.**   During the Fall 2009 semester, 9 selections totaling 148 pages from Michael Kimmel and Michael Messner (eds.), *Men's Lives* and 13 selections totaling 129 pages from Estelle Disch (ed.), *Reconstructing Gender: A Multicultural Anthology* were distributed to students in Gender & Society (SOCI3216) via ERes. The former was accessed 107 times as of September 15, 2009, the latter 234. EX 22.

**RESPONSE:**  The University Administrators admit that "during the Fall 2009 semester, 9 selections totaling 148 pages from Michael Kimmel and Michael Messner (eds.), *Men's Lives* and 13 selections totaling 129 pages from Estelle Disch (ed.), *Reconstructing Gender: A Multicultural Anthology* were distributed to students in Gender & Society (SOCI3216)."  The University Administrators dispute that such fact is material insofar as it does not concern the works-at-issue.

**136.**   During the Fall 2009 semester, the first 54 pages of Corinn Codye, *Fearon's American Government* were distributed to students in Oral Communication III (IEP0730) via ERes. It was accessed 101 times as of September 15, 2009. EX 22.

**RESPONSE:**  The University Administrators admit that "during the Fall 2009 semester, the first 54 pages of Corinn Codye, *Fearon's American Government* were distributed to students in Oral Communication III (IEP0730)."  The University Administrators also dispute that such fact is material insofar as it does not concern the works-at-issue.

**137.**   During the Fall 2009 semester, 8 selections totaling 101 pages from Patrick Williams and Laura Chrisman, Colonial *Discourse and Post-Colonial Theory: A Reader* were distributed to students in Religion, Race, and Nation (RELS4255) via ERes. They were accessed 127 times as of September 15, 2009. EX 22.

**RESPONSE:**  The University Administrators admit that "during the Fall 2009 semester, 8 selections totaling 101 pages from Patrick Williams and Laura Chrisman, Colonial *Discourse and Post-Colonial Theory: A Reader* were distributed to students in Religion, Race, and Nation (RELS4255)."  The University Administrators also dispute that such fact is material insofar as it does not concern the works-at-issue.

138.   During the Fall 2009 semester, 3 chapters from Fritz Stein (ed.), *The Varieties of History: From Voltaire to the Present* were distributed to students in Introduction to Historical Studies (HIST3000) via ERes. It was accessed 54 times as of September 15, 2009. EX 22.

**RESPONSE:**  The University Administrators admit that "during the Fall 2009 semester, 3 chapters from Fritz Stein (ed.), *The Varieties of History: From Voltaire to the Present* were distributed to students in Introduction to Historical Studies (HIST3000)."  The University Administrators dispute that such fact is material insofar as it does not concern the works-at-issue.

139.   During the Fall 2009 semester, 7 selections totaling 108 pages fr0ID James L. Roark, *The American Promise: A Compact History* were distributed to students in Writing for University Exams V (IEP0950) via ERes. EX 22.

**RESPONSE:**  The University Administrators admit that "during the Fall 2009 semester, 7 selections totaling 108 pages fr0ID James L. Roark, *The American Promise: A Compact History* were distributed to students in Writing for University

Exams V (IEP0950)." The University Administrators also dispute that such fact is material insofar as it does not concern the works-at-issue.

**140.** GSU administrators have not noticed a change in the way that faculty use uLearn as a result of the new copyright policy. EX 23 (Christopher Dep.) 124:23-125:1.

**RESPONSE:** Disputed, as the witness cited is not a university administrator or a named defendant and her testimony was taken before the New Copyright Policy was fully implemented at GSU. Professors' use of the fair use checklist and review of the Policy has changed their thinking with regard to the fair use analysis and caused them to take a more conservative approach. See, for example, Esposito Decla, ¶5.

## IV.   Plaintiffs Are Harmed by GSU's Infringing Activities

### A.   *Sales of Copies of Original Work (Books)*

**141.** The market for the Plaintiffs' works include sales of copies of the original works. EX 4 (Smith Decl.) ¶ 4; EX 5 (Pfund Decl.) ¶¶38-39; EX 3 (Van Valkenburg Decl.) ¶ 4.

**RESPONSE:** Admitted.

**142.** Cambridge's Americas Branch had net income of about in 2009 (on net sales revenue of              ). EX 4 (Smith Decl.) ¶ 33.

**RESPONSE:** Admitted.

**143.** With respect to Cambridge works identified in the Amended Complaint:

**RESPONSE:** Admitted.

a.    *States and Social Revolutions* has earned at least                    in sales

revenue, EX 4 (Smith Decl.) ¶ 12;

b.    Cambridge *Companion to the Organ* has earned approximately in sales

revenue, EX 4 (Smith Decl.) ¶ 22;

c.    *Democracy Without Competition* has earned                    in sales

revenue, EX 4 (Smith Decl.) ¶ 15;

d.    Focus on the Language Classroom has earned approximately in sales

revenue, EX 4 (Smith Decl.) ¶ 18;

e.    Legislative Leviathan has generated approximately -in sales revenue,

EX 4 (Smith Decl.) ¶ 26;

f.    Materials Development in Language Teaching has earned a total of

in sales revenue, EX 4 (Smith Decl.) ¶ 29.

**144.**   Oxford's annual net income in fiscal year 2009 (on net sales
revenue of                    was                    . Its net income in fiscal
year 2008 (on net sales revenue of ) was                    . EX 5 (Pfund Decl.) ¶39.

**RESPONSE:**  Admitted.

**145.**   With respect to the Oxford works identified in the Amended
Complaint:

**RESPONSE:**  Admitted.

a. *The Slave Community* has earned a total of                in sales revenue through April 2009, EX 5 (Pfund Decl.) ¶ 23;

b. *Awakening Children's Minds* has earned                in sales revenue through April 24, 2009, EX 5 (Pfund Decl.) ¶ 26;

c. White *Supremacy* has earned                in sales revenue through April 24, 2009, EX 5 (Pfund Decl.) ¶ 32;

d. *Science of Coercion* has earned a total of                in sales revenue through April 24, 2009, EX 5 (Pfund Decl.) ¶29.

**146.** SAGE's net income in 2009 was                (on sales revenue of                ). EX 3 (Van Valkenburg Decl.) ¶ 39.

**RESPONSE:**  Admitted.

**147.** With respect to the SAGE works identified in the Amended Complaint:

**RESPONSE:**  Admitted.

a. *Changing the System* has earned                in sales revenue, EX 3 (Van Valkenburg Decl.) ¶ 29;

b. *Feminist Media Studies* has earned approximately                In sales revenue, EX 3 (Van Valkenburg Decl.) ¶ 33;

c. The second edition *of The SAGE Handbook of Qualitative Research* has earned                in sales revenue to date. The third edition has earned, in sales revenue to date, EX 3 (Van Valkenburg Decl.) ¶ 25.

148.   GSU's infringing activities substitute directly for the purchase of the Plaintiffs' books. In every instance in which GSU provided students with excerpts of digital course reading materials free of charge, the students did not have to purchase a copy of the book from which the excerpt was taken, and the Plaintiffs did not receive the sales revenue. EX 5 (Pfund Decl.), ¶ 38; EX 4 (Smith Decl.), ¶ 31; EX 3 (Van Valkenburg Decl.), ¶ 38.

**RESPONSE:**  Disputed, as professors would not require their students to

purchase the books if they were no longer permitted to use on ERes excerpts from

Plaintiffs' works in the on future.  See, for example, Esposito Decla., ¶ 5.

149.   The above-described sales revenues of each of the plaintiffs are less than they would have been had the GSU professors required students to purchase the Plaintiffs' original books rather than providing free digital excerpts via ERes or uLearn. EX 5 (Pfund Decl.), ¶ 38; EX 4 (Smith Decl.) ¶¶31-32; EX 3 (Van Valkenburg Decl.), ¶ 38.

**RESPONSE:**  Disputed.  The "facts" is based on a false premise because

professors would not require their students to purchase the books if they were no

longer permitted to use on ERes excerpts from Plaintiffs' works in the on future.

See generally, Defs.' Supp. Statement of Facts; Esposito Decla., ¶ 5.

**B.**   ***Permissions for Copying Excerpts of Original Works***

150.   The market for the Plaintiffs' works also includes "permissions" —*i.e.,* licenses to make and distribute copies of excerpts of the works, including to students. EX 5 (Pfund Decl.) ¶¶ 17-20, 40-42; EX 4 (Smith Decl.) ¶¶ 9, 37-40; EX 3 (Van Valkenburg Decl.) ¶¶ 13-17, 40-43.

**RESPONSE:**  Admitted.

151.   Permissions for Plaintiffs' works are granted both directly by Plaintiffs themselves and through Copyright Clearance Center (CCC). EX 5 (Pfund

Decl.) ¶¶ 18-20; EX 4 (Smith Decl.) ¶ 9; EX 3 (Van Valkenburg Decl.) ¶ 17; paragraphs 163-188, *infra* (describing CCC).

**RESPONSE:** Admitted.

**152.** The permissions market for Plaintiffs' works includes the copying and distribution of excerpts of Plaintiffs' works in both hard-copy and digital format, including coursepacks and through systems like GSU's ERes and uLearn systems. EX 5 (Pfund Decl.) ¶ 17-20, 40-42; EX 4 (Smith Decl.) ¶¶ 9, 3741; EX 3 (Van Valkenburg Decl.) ¶¶ 11-16, 37-41.

**RESPONSE:** Admitted.

**153.** Revenue from permissions is a crucial supplement to income from sales of the Plaintiffs' works, particularly as the works become older, fall out of print, or are replaced by newer editions and as usage migrated from print to online. EX 5 (Pfund Decl.) ¶¶ 42, 46; EX 3 (Van Valkenburg Decl.) ¶¶ 10, 45; EX 4 (Smith Decl.) ¶ 42.

**RESPONSE:** The University Administrators will admit that revenue from

permissions is a "supplement to income from sales of the Plaintiffs' works." The

sources cited do not support the fact that such supplement is "crucial," "particularly

as the works become older, fall out of print, or are replaced by newer editions and as

usage migrated from print to online."

**154.** Licensing income often permits Plaintiffs to continue to publish books that might otherwise be unprofitable. EX 1 (Challice Dep.) 254:2-16.

**RESPONSE:** Admitted.

**155.** Cambridge earned                          in permissions review in fiscal year 2009,                          in 2008, and                          in fiscal year 2007. EX 4 (Smith Decl.) ¶ 40.

**RESPONSE:** Admitted.

**156.** With respect to Cambridge works identified in the Amended Complaint:

**RESPONSE:** Admitted.

a.   *States and Social* Revolutions has earned                    in permissions fees for hard-copy and electronic coursepacks, EX 4 (Smith Decl.) ¶ 12;

b.   *Democracy* Without Competition has earned                    in permissions revenue, EX 4 (Smith Decl.) ¶ 16;

c.   *Focus on the* Language Classroom has earned                    in permissions revenue, EX 4 (Smith Decl.) ¶ 20.

**157.** Oxford earned                    in permissions revenue in fiscal year 2008 and                    in fiscal year 2009. EX 5 (Pfund Decl.) ¶ 42.

**RESPONSE:** Admitted.

**158.** With respect to Oxford works identified in the Amended Complaint:

**RESPONSE:** Admitted.

a.   *The Slave Community* has earned approximately                    in permissions fees to date, EX 5 (Pfund Decl.) ¶ 23;

b.   *Awakening Children's Minds* has earned                    in permissions fees to date, EX 5 (Pfund Decl.) ¶ 26.

c.   *White Supremacy* has earned                    in permissions fees to date, EX 5 (Pfund Decl.) ¶ 32.

**159.** SAGE earned                    in permissions revenue in 2008, in 2007, and in 2006. EX 3 (Van Valkenburg Decl.) ¶ 24.

**RESPONSE:** Admitted.

**160.** With respect to the SAGE works identified in the Amended

Complaint:

>    **RESPONSE:**  Admitted.

>    a.    *Changing the System* has earned                    in permissions fees, EX 3
>          (Van Valkenburg Decl.) ¶ 29;

>    b.    Feminist Media Studies has earned about                    in permissions
>          revenue, EX 3 (Van Valkenburg Decl.) ¶ 33;

>    c.    The second edition of The SAGE Handbook has earned                    in
>          permissions revenue to date.  The third edition of The SAGE Handbook
>          has earned                    in permissions revenue to date. EX 3 (Van
>          Valkenburg Decl.) ¶ 25.

>    **161.**    Even in instances where GSU professors wish to assign only an
> excerpt of a book, and therefore would not consider requiring students to purchase
> the entire book, unlicensed uses like those seen at GSU still substitute for the
> payment of permissions fees. In every instance in which GSU provided students
> with excerpts of digital course reading materials free of charge, Plaintiffs did not
> receive a permissions fee. EX 5 (Pfund Decl.) ¶¶ 40-41; EX 4 (Smith Decl.) ¶¶ 34-
> 37; EX 3 (Van Valkenburg Decl.) ¶¶ 40-41.

>    **RESPONSE:**  Disputed, as uses of Plaintiffs' works following adoption of
>
> the Policy were made in accordance with the Policy.  Such uses did not substitute
>
> for the payment of permissions fees, and would not require their students to
>
> purchase the books if they were no longer permitted to use on ERes excerpts from
>
> Plaintiffs' works in the on future.  See, for example, Esposito Decla., ¶ 5.

>    **162.**    The above-described permissions revenues of each of the
> plaintiffs (as well as those described below from CCC) are less than they would
> have been had GSU paid the requisite permissions fee rather than providing free
> digital excerpts via ERes or uLearn. EX 5 (Pfund Decl.) ¶¶ 40-42; EX 4 (Smith
> Decl.) ¶¶ 34-38; EX 3 (Van Valkenburg Decl.) ¶¶40-43; *see also* EX 2 (Smith Dep.)
> 96:6-9, 97:8-10; EX 50 (Van Valkenburg Dep.) 142:13-18, 165:16-22.

**RESPONSE:**  Disputed.  The "fact" is based on a false premise because it would not require their students to purchase the books if they were no longer permitted to use on ERes excerpts from Plaintiffs' works in the on future.  See generally, Defs.' Supp. Statement of Facts; Esposito Decla., ¶ 5.

### C.   *Permissions Granted by CCC*

**163.**   The permissions market for Plaintiffs' works includes permissions granted by Copyright Clearance Center on the Plaintiffs' behalf. EX 5 (Pfund Decl.) ¶¶17-20; EX 4 (Smith Decl.) ¶ 9; EX 3 (Van Valkenburg Decl.) ¶¶13-17.

**RESPONSE:**  Admitted.

**164.**   CCC is a not-for-profit corporation established in 1977 that acts as a centralized clearinghouse for the granting of reproduction rights for books, journals, newspapers, and other text, non-text, and multimedia works. EX 10 (Mariniello Rpt.) 4-5; EX 11 (Mariniello Dep. I) 25:16-23, 28:5-12.

**RESPONSE:**  Admitted.

**165.**   CCC has the nonexclusive right to issue licenses and grant permissions on behalf of tens of thousands of authors and publishers. EX 10 (Mariniello Rpt.) 5; EX 11 (Mariniello Dep. I) 18:12-15, 95:11-18, 120:19-21.

**RESPONSE:**  Admitted.

**166.**   CCC offers two types of transactional, *i.e.,* pay-per-use, licenses to users in the academic community: the Academic Permissions Service, (APS) and the Electronic Course Content Service (ECCS). EX 10 (Mariniello Rpt.) 7-8; EX 11 (Mariniello Dep. I) 90:1-3.

**RESPONSE:**  Admitted.

**167.**   APS permits users to obtain permission, on a work-by-work

basis, to photocopy and distribute physical copies of text-based copyrighted works, including books and journal articles. EX 10 (Mariniello Rpt.) 7; EX 11 (Mariniello Dep. I) 93:2-11.

**RESPONSE:**  Admitted.

**168.**   APS covers print uses on the academic campus, including use in coursepacks and classroom handouts. *Id.;* EX 11 (Mariniello Dep. I) 65: 10-17, 93:8-11.  The APS repertory has almost, works, including many of the Plaintiffs' works. EX 10 (Mariniello Rpt.) 18.

**RESPONSE:**  Admitted.

**169.**   CCC receives APS permissions requests from approximately 5,000 institutions annually. EX 11 (Mariniello Dep. I) 100:4-6.

**RESPONSE:**  Admitted.

**170.**   GSU itself has used APS to request permissions for use in coursepacks. EX 10 (Mariniello Rpt.) 8; *see* EX 13 (Palmour Dep.) 147:16-21.

**RESPONSE:**  Admitted.

**171.**   CCC's Electronic Course Content Service (ECCS) specifically licenses uses of excerpts in electronic format, *e.g.,* electronic "coursepacks," course management systems, faculty intranet sites, and systems comparable to GSU's ERes system. EX 11 (Mariniello Dep. I) 65:18-23, 117:9-21, 123:19-23; EX 10 (Mariniello Rpt.) 8.

**RESPONSE:**  Admitted.

**172.**   CCC'S ECCS repertory contains approximately works available for licensing. EX 10 (Mariniello Rpt.) 18.

**RESPONSE:**  Admitted.

**173.**   CCC has processed millions permission requests for academic uses in the past five years. EX 10 (Mariniello Rpt.) 5; EX 47 (Mariniello Dep. II) 98:24-99:10.

**RESPONSE:** Admitted.

174.   CCC's permissions requests are typically processed through their website, at www.copyright.com. EX 11 (Mariniello Dep. I) 100: 16-17. Much of CCC's permissions process is automated. *See* EX 10 (Mariniello Rpt.) 12; EX 11 (Mariniello Dep. I) 11.6:23-2¶, 121: 1-7.

**RESPONSE:** Admitted.

175.   For approximately 80% of digital permissions requests and 87% of print permissions requests, the user is given an answer on the spot. EX 10 (Mariniello Rpt.) 12; *see* EX 11 (Mariniello Dep. I) 103:13-15.

**RESPONSE:** The University Administrators will admit that "For

approximately 80% of digital permissions requests and 87% of print permissions

requests, the user is given an answer," within a matter of days.  Plaintiffs Ex. 11,

103: 13-15.  The referenced citations do not support the fact stated and it is therefore

in dispute.

176.   CCC and Plaintiffs rarely deny permissions requests- approximately 85-90% of APS requests and about 70% of ECCS permissions requests are granted. EX 11 (Mariniello Dep. I) 124:21-125:10; EX 5 (Pfund Decl.), ¶ 20; EX 3 (Van Valkenburg Decl.), ¶ 15.

**RESPONSE:** The University Administrators admit that "approximately 85-

90% of APS requests and about 70% of ECCS permissions requests are granted."

that CCC and Plaintiffs rarely deny permissions request.

177.   CCC charges in the range of 10-25 cents for each page copied for academic uses. EX 10 (Mariniello Rpt.) at 15. GSU's own expert, Dr. Kenneth Crews, has described this fee as "modest." Crews Rpt. 47.

**RESPONSE:**  The University Administrators admit that "CCC charges in the range of 10-25 cents for each page copied for academic uses."  The sources cited do not support the fact that this fee, when viewed in the aggregate for all students in the class who have access to such pages, is "modest" or that Dr. Crews described it as such.

**178.**  CCC has distributed to rightsholders over $140 million in license royalties from its pay-per-use academic permissions services since 1999, $14 million of which was distributed in 2008. EX 10 (Mariniello Rpt.) 3, 8; *see also* EX 47 (Mariniello Dep. II) 87:17-20.

**RESPONSE:**  Admitted.

**179.**  Since 2007, CCC has paid royalties related to its Academic Permissions Service and "Electronic Course Content Service (*i.e.,* those services specifically covering print and digital copies in the U.S. academic setting) of more than                        to Cambridge, over                        to Oxford, and over to SAGE. EX 10 (Mariniello Rpt.) 9-10.

**RESPONSE:**  Admitted.

**180.**  In Fiscal Year 2009, CCC processed about                        APS permission requests                        and ECCS requests. EX 10 (Mariniello Rpt.) 7-8, 19; *see also* EX 11 (Mariniello Dep. I) 99:6-18, 124:5-9.

**RESPONSE:**  Admitted.

**181.**  CCC offers .an annual subscription license for academic institutions known as the Academic Annual Copyright License ("AACL"), which permits an academic institution to pay a single "blanket" fee annually to make unlimited print and digital reproductions of the covered works across all of its academic activities, without the need to secure separate permission for each work copied. EX 10 (Mariniello Rpt.) 7, 10; EX 11 (Mariniello Dep. I) 64:4-11.

**RESPONSE:**  Admitted.

**182.**   The AACL covers distribution in coursepacks (hard-copy and digital), course management systems, classroom handouts, ERes-like systems and others. EX 10 (Mariniello Rpt.) 10; *see* EX 11 (Mariniello Dep. I) 63:21-64:64:11.

**RESPONSE:**  Admitted.

**183.**   The AACL repertory has over works. EX 10 (Mariniello Rpt.) 18.  SAGE's works and Oxford's works are available for license through the AACL. EX 11 (Mariniello Dep. I) 74:10-14.

**RESPONSE:**  Admitted.

**184.**   More than               institutions, including both private colleges and public universities, have signed up for the AACL. EX 10 (Mariniello Rpt.) 10; EX 11 (Mariniello Dep. I) 76:16-20.

**RESPONSE:**  Admitted.

**185.**   In addition to the CCC website, CCC offers Rightslink, which integrates CCC's licensing services into publishers' own web sites and enables readers to request "on the spot" permission directly from those web sites (with CCC handling the "back-end" transaction). EX 10 (Mariniello Rpt.) 13; EX 11 (Mariniello Dep. I) 66:2-15.

**RESPONSE:**  The University Administrators admit that "In addition to the

CCC website, CCC offers Rightslink, which integrates CCC's licensing services

into publishers' own web sites and enables readers to request "on the spot"

permission directly from those web sites (with CCC handling the "back-end"

transaction)."  The referenced citations do not support the fact that permission is

always given "on the spot."

**186.**   CCC also offers Application Programming Interfaces (APIs) that incorporate CCC's licensing functionality into software programs (including Docutek, the software used in the GSU ERes system) such that the software can

communicate directly with CCC's licensing system and process licensing transactions from within the software application. EX 10 (Mariniello Rpt.) 13-14; *see* EX 47 (Mariniello Dep. II) 142:10-21.

**RESPONSE:** The University Administrators admit that "In addition to the

CCC website, CCC offers Rightslink, which integrates CCC's licensing services

into publishers' own web sites and enables readers to request "on the spot"

permission directly from those web sites (with CCC handling the "back-end"

transaction)." The referenced citations do not support the fact that permission is

always given "on the spot."

187.   Print permissions requests through CCC CAPS) have declined steadily since 2005. EX 10 (Mariniello Rpt.) 19. The increase in digital permissions requests (ECCS) since that time has not made up for the decreases in print permissions requests. EX 10 (Mariniello Rpt.) 19.

**RESPONSE:** The University Administrators admit that print permissions

requests through CCC CAPS) have declined since 2005, and that the increase in

digital permissions request is not proportionate to the decline. The sources cited do

not support the fact that there has been an increase in unlicensed uses or that such

effects are somehow correlative.

188.   Plaintiffs' livelihood would be at risk should GSU's conduct become a widely accepted practice in the academic community. EX 4 (Smith Decl.) ¶¶40-41; EX 5 (Pfund Decl.) ¶ 43; EX 3 (Van Valkenburg Decl.) ¶¶ 43-46; EX 1 (Challice Dep.) 85:11-22; EX 7 (Pfund Dep.) 74:3-7,243:8-18; EX 2 (Smith Dep.) 95:25-96:15,97:7-10.

**RESPONSE:**  The sources cited do not support the fact that "Plaintiffs' livelihood would be at risk should GSU's conduct become a widely accepted practice in the academic community," or that GSU's practices are not in the academic community consistent with others' practices.

## V.    **GSU's Policies Regarding Electronic Course Material Distribution**

### A.    *Policy Prior to February 2009*

**189.**    Prior to February 2009, the University System of Georgia's official position on copyright law as applied to its member institutions (including GSU) was embodied in a 1997 "Regents' Guide to Understanding Copyright & Educational Fair Use." EX 26.

**RESPONSE:**  The University Administrators admit that USG made available prior to February 2009 a set of guidelines entitled "Regents' Guide to Understanding Copyright & Education Fair Use."  The sources cited do not support the fact that such guidelines are the USG's "official position on copyright law as applied to its member institutions."  The University Administrators dispute that this fact is material as the referenced conduct is not ongoing and continuous.

**190.**    The Defendants' expert, Dr. Kenneth Crews, reviewed this policy at the time of its promulgation in 1997 and characterized it as one "that just says yes to everything." EX 27 (Deposition of Kenneth Crews (Dec. 10, 2009) ("Crews Dep.")) 20:2-6; 22:9-23:12.

**RESPONSE:**  Admitted, but the University Administrators dispute that this fact is material as the conduct is not ongoing and continuous.

**191.** Crews communicated "serious concerns" about the policy which remained in place from 1997-2009 at GSU. EX 27 (Crews Dep.) 21:2-3; EX 100.

**RESPONSE:** Admitted, but the University Administrators dispute that this fact is material as the conduct is not ongoing and continuous.

**192.** Under the ple-2009 policies, GSU library employees reviewed each request to post material on ERes for compliance with GSU's fair use parameters, *i.e.,* determining that: (1) the library owned a copy of the requested work, and (2) the requested excerpt was shorter than the greater of one chapter or 20 percent of the total work. EX 13 (Palmour Dep.) 40:2-19; 79:3-9; EX 18 (Burtle Dep.) 54:11-13,142:8-10,146:10-16.

**RESPONSE:** Admitted, but the University Administrators also dispute that this fact is material as the conduct is not ongoing and continuous.

**193.** Under the pre-2009 policy, GSU gave little, if any, guidance regarding the fair use parameters and the use of copyrighted materials on ERes to faculty, some of whom were only vaguely aware of the one chapter or 20 percent rule. *See* EX 8 (Belcher Dep.) 76:6-77:1, 79:13-22; EX 6 (Kaufmann Dep.) 27:68; 31:3-32:2; EX 24 (Reifler Dep.) 13:3-23.

**RESPONSE:** The sources cited do not support the fact that "Under the pre-2009 policy, GSU gave little, if any, guidance regarding the fair use parameters and the use of copyrighted materials on ERes to faculty, some of whom were only vaguely aware of the one chapter or 20 percent rule." To the contrary, the GSU library was diligent in monitoring and addressing applicable Board of Regent guidelines. The University Administrators dispute that this fact is material as the conduct is not ongoing and continuous.

**194.** Under the pre-2009 policy, Defendants distributed thousands of

copyrighted works via ERes each semester without permission from the copyright owners and students accessed these works more than 100,000 times each semester. *See supra* ¶¶ 67-68.

**RESPONSE:** The University Administrators admit that "Under the pre-2009 policy, Defendants made available thousands of excerpts of copyrighted works via ERes each semester." The sources cited do not support the fact that permission was required for such uses or that the excerpts were accessed by students. The University Administrators dispute that this fact is material as the conduct is not ongoing and continuous.

### B.   *The New Copyright Policy Introduced by the Board of Regents During Litigation*

**195.** The Board of Regents introduced a new copyright policy for USG schools on February 17, 2009. EX 14 (Seamans Dep.) 21:14-15; EX 32.

**RESPONSE:** Admitted.

**196.** The policy was the result of efforts by the Board of Regents Select Committee on Copyright, which convened in late December 2008, eight months after the commencement of this lawsuit. EX 29 (Potter Dep.) 110:9-11.

**RESPONSE:** Admitted.

**197.** The Committee was working under deadlines established by Defendants' counsel, and it completed consideration and approval of the new policy over the course of sixty days, as compared with the Regents' prior copyright guidelines, which took nine months to complete. EX 29 (potter Dep.) 109:21-113:4; 115:7-12; EX 101; EX 102.

**RESPONSE:** The University Administrators admit that the Committee "completed consideration and approval of the new policy over the course of sixty days,"  The sources cited do not support the fact that the Committee was "working under deadlines established by Defendants' counsel."

**198.**   The first draft of the new policy was written by Defendants' counsel, without the involvement of key Committee members. EX 29 (Potter Dep.) 82:7-23; EX 14 (Seamans Dep.) 145:9-146:7.

**RESPONSE:** The sources cited do not support the fact that the "first draft of the new policy was written by Defendants' counsel, without the involvement of key Committee members."

**199.**   The Defendants' expert witness, who opined on the appropriateness of the new policy, drafted the guidelines and checklist on which the new policy was based. *See* Crews Rpt. 57, 69.

**RESPONSE:** The University Administrators will admit that the checklist guidelines were derived in part from documents prepared by Dr. Crews and that Dr. Crews "opined on the appropriateness of the new policy,"  The sources cited do not support the fact that Dr. Crews "drafted the guidelines and checklist on which the new policy was based."

**200.**   Plaintiffs were first advised about the new copyright policy in February 2009, following public announcement of the new policy. *See* EX 32.

**RESPONSE:** Admitted.

**201.**   The new copyright policy was implemented at GSU to some extent during the 2009 Maymester and more fully instituted during the 2009

Summer semester. EX 14 (Seamans Dep.) 100:4-16; EX 18 (Burtle Dep.) 103:14*17; see also* EX 15 (Dimsdale Dep.) 59:16-22

**RESPONSE:** Admitted.

**202.** The new policy places on the instructor the responsibility for evaluating whether a particular reading posted on ERes is fair use by completing a "Fair Use Checklist" form ("Checklist"). Crews Rpt. 54; *see also* EX 14 (Seamans Dep.) 20:10-18,155:13-19; EX 29 (Potter Dep.) 164:22-165:10; EX 15 (Dimsdale Dep.) 56:1-7, 103:2-3; EX 18 (Burtle Dep.) 93:23-94:11.

**RESPONSE:** Admitted.

**203.** Undertaking copyright training is not a prerequisite to completing the Checklist or posting copyrighted material on ERes and not all GSU 52 faculty members who fill out the Checklist have received copyright training. EX 18 (Burtle Dep.) 59:23-60:1, 9:1-:12-19,163:16-21.

**RESPONSE:** The sources cited do not support the fact that copyright

training is not a prerequisite to completing the Checklist or posting copyrighted

material on ERes and not all GSU faculty members who fill out the Checklist have

received copyright training." insofar as faculty are required to review the Policy and

educational material available before using ERes. To the contrary, the introduction

of the policy included training from GSU Legal Affairs. See, for example, Kruger

Decla., ¶ 5; Dixon Decla., ¶ 3.

**204.** GSU does not intend to establish a system to evaluate instructors' fair use determinations. EX 14 (Seamans Dep.) 167:16-168:4.

**RESPONSE:**  This fact is disputed.  The sources cited do not support the fact

that to the extent that Plaintiffs have cited the testimony of only one GSU

administrator taken before the Policy was fully implemented.

      **205.**   GSU administrators stated that the process of filling out the
checklist in good faith is "at least as important" as getting the answer right. EX 29
(potter Dep.) 149:21-150:1.

**RESPONSE:**  This fact is disputed.  The sources cited do not support the fact

that to the extent that the witness cited is not an administrator of GSU and his

testimony was taken before the Policy was fully implemented.

      **206.**   GSU administrators believe that GSU's copyright policy
precludes the unlicensed use of readings distributed electronically that were deemed
by an instructor to be "required" for a given course. *See* EX 14 (Seamans Dep.) 79:
12-80:9.

**RESPONSE:**  This fact is disputed.  The sources cited do not support the fact

that the Policy restricts ERes to "required" reading.  The University Administrators

admit that ERes is generally limited to supplemental reading.

      **207.**   GSU professors make both required and supplemental readings
available to students through the ERes system. EX 13 (Palmour Dep.) 26:3-15,
38:15-39:3, 139:25-141:6.

**RESPONSE:**  Admitted that certain GSU professors have, on occasion, made

both required and supplemental readings available to students through the ERes

system.  To the extent a further admission is sought, the cited references do not

support the fact and it is disputed.

**208.**   The Board of Regents committee that drafted the new copyright policy and the Checklist did not evaluate how individual faculty members would likely apply the policy in practice. EX 29 (Potter Dep.) 148:24-149:2.

**RESPONSE:**  This fact is disputed.  The sources cited do not support the fact

that no member of the Committee evaluated how "individual faculty members

would likely apply the policy in practice."

**209.**   Pursuant to the new policy, GSU library personnel do not review instructors' ERes requests for compliance with copyright law, or even ascertain if a checklist has been filled out, although they are encouraged to refuse obviously infringing uses of ERes (*i.e.,* "red flags") on a voluntary basis. EX 29 (Potter Dep.) 146:7-21, 168:12-20; EX 14 (Seamans Dep.) 34:23-36:6, 112:2-8; EX 18 (Burtle Dep.) 93:23-94:11, 196:3-8; EX 15 (Dimsdale Dep.) 28:22-25, 56:17, 114:8-10.

**RESPONSE:**  This fact is disputed.  The sources cited do not support the fact

that "Pursuant to the new policy, GSU library personnel do not review instructors'

ERes requests for compliance with copyright law, or even ascertain if a checklist has

been filled out," as staff ensure the professor has complied with the Policy and

reviews the use for "red flags."

**210.**   GSU library staff have not been given any training or guidelines as to what constitutes a "red flag." EX 15 (Dimsdale Dep.) 59:23-60:6; EX 14 (Seamans Dep.) 36:3-18.

**RESPONSE:**  Disputed, as the Office of Legal Affairs has provided training

to faculty and staff regarding the Policy and its implementation.  See  Seamans

Depo., Plaintiffs Ex. 14, 36:3-15.

**211.**   GSU library staff did not identify any "red flags" for textual works during the 2009 Maymester or summer semester. EX 15 (Dimsdale Dep.)

64:6-65:3.

**RESPONSE**:  The sources cited do not support the fact that "GSU library

staff did not identify any "red flags" for textual works during the 2009 Maymester

or summer semester." as only one staff member is cited.

### C.    *The Fair Use Checklist*

**212.**   The Fair Use Checklist outlines the four statutory fair use factors
and, under each factor, provides descriptions of various proposed uses of course
material under a "weighs in favor of fair use" column or "weighs against fair use"
column. EX 33; EX 34.

**RESPONSE:**  Admitted.

**213.**   The Checklist calls for professors to review each factor with
respect to each work they propose to digitally distribute and decide which ones -in
his or her view -apply to the proposed use. EX 34.

**RESPONSE:**  Admitted.

**214.**   In filling out the checklist, if there are more checks in the
"weighs in favor of fair use" column, as opposed to the "weighs against fair use"
column, the corresponding factor cuts in favor of fair use. EX 34.

**RESPONSE:**  Disputed, as professors are required to consider all four fair

use factors before making a decision.  See, Defs.' Additional. SOF No. 5.

**215.**   If more than half of the factors favor fair use, the instructor is
authorized to use the work in question without permission. EX 34; EX 29 (potter
Dep.) 163:19-164:2; EX 14 (Seamans Dep.) 150:21-151:3.

**RESPONSE:**  Disputed, as professors are required to consider all four fair

use factors before making a decision.  See, Defs.' Additional. SOF No. 5.

**216.**   Under the Checklist, if three of the four factors are deemed to favor fair use, the instructor need not analyze the remaining factor. EX 29 (Potter Dep.) 169:14-22; *see also* EX 6 (Kaufmann Dep.) 88:10-20; EX 24 (Reifler Dep.) 77 :25-78:7.

**RESPONSE:**  Disputed, as professors are required to consider all four fair use factors before making a decision.  See, Defs.' Supp. SOF No. 5.

**217.**   GSU professors have experienced confusion and had difficulty completing the Checklist. *See* EX 6 (Kaufmann Dep.) 79:8; EX 8 (Belcher Dep.) 98:14, 103 :18-20; EX 24 (Reifler Dep.) 96:20-21.

**RESPONSE:**  Disputed.  To the contrary, Professors have found the New Copyright Policy,n including completion of the checklise, to enhance their understanding of fair use.  See, for example, Kruger Decla., ¶ 5.

**218.**   GSU personnel fin Factor 1 weighs in favor of fair use when material on ERes is used in a classroom setting. EX 14 (Seamans Dep.) 180:17-181:18, 192:25-193:21; EX 18 (Burtle Dep.) 170:4-7; EX 24 (Reifler Dep.) 56:25-57:20; EX 6 (Kaufmann Dep.) 77:18-78:12; EX 8 (Belcher Dep.) 91:15-20,

117: 12-18; *see also* EX 15 (Dimsdale Dep.) 52:15-17.

**RESPONSE:**  Admitted.

**219.**   GSU personnel do not believe that photocopying a work for teaching purposes is trans formative, but in completing the Checklist, GSU instructors have determined that Factor 1 weighs in favor of fair use for non-transformative uses. EX 29 (potter Dep.) 155:21-22; EX 24 (Reifler Dep.) 58:22-59:13; EX 8 (Belcher Dep.) 89:4-5; 91:6-14; EX 6 (Kaufmann Dep.) 67:7-68:20; EX 24 (Reifler Dep.) 59:13; *see also* EX 1 (Challice Dep.) 179:23-182:3.

**RESPONSE:**  Admitted.

**220.**   GSU personnel generally find Factor 2 of the Checklist weighs in favor of fair use when published, non-fiction works are used in the classroom. EX

14 (Seamans Dep.) 196:11-197:15; EX 24 (Reifler Dep.) 63:24-65:11; EX 8 (Belcher Dep.) 119:9-15.

**RESPONSE:**  Admitted.

**221.**  In completing the Checklist, GSU instructors have considered distribution of a copyrighted work to all students enrolled in a course not to be a "public" distribution. EX 24 (Reifler Dep.) 59:22-60:4; EX 8 (Belcher Dep.) 89:16-23.

**RESPONSE:**  Admitted.

**222.**  In completing the Checklist, GSU instructors have considered a commercial use to be one that they personally derive a financial benefit from. *See* EX 24 (Reifler Dep.) 56:25:-58:3; EX 8 (Belcher Dep.) 86:11-21.

**RESPONSE:**  Disputed.  The Plaintiffs' statement that "In completing the

Checklist, GSU instructors have considered a commercial use to be one that they

personally derive a financial benefit from." is unsupported by the cited sources.

Professor Diane Belcher stated during her cited deposition that she had never

completed a Fair Use Checklist.  Belcher Dep. 85:15-19.  The deposition testimony

cited was based on a hypothetical review of the checklist during her deposition.

Belcher Dep. 83:15-19; 86:11-21.  In addition, Professor Belcher testified that if her

students were paying her to give them copies that would constitute a commercial use

under the fair use analysis, but she did not indicate that there are not other

commercial uses.  *Id.*  Professor Jason Reifler likewise had not completed Fair Use

Checklists in accordance with the Policy in order to evaluate the fair use of works he

planned to post on EReserves.  Reifler Dep. Tr. at 10-11.  Rather, he completed

Checklists in response to his notice of deposition.  *Id.*  At the time of his deposition,

he had not had the opportunity to evaluate any works he planed to post on

EReserves with the Fair Use Checklist.  *Id.*

>        **223.**   In completing the Checklist, instructors have determined that the
> "nature of the copyrighted work" favors fair use where the instructor deems his or
> her use of the work to be "important" to his or her "educational objectives." EX 8
> (Belcher Dep.) 93:12-94:4; EX 6 (Kaufmann Dep.) 78:25-79:3.

**RESPONSE:**  The University Administrators dispute the statement as

unsupported by the cited sources.  The Plaintiffs' statement that "In completing the

Checklist, instructors have determined that the 'nature of the copyrighted work'

favors fair use where the instructor deems his or her use of the work to be

'important' to his or her 'educational objectives.'" is unsupported by the cited

sources.  Professor Diane Belcher stated during her cited deposition that she had

never completed a Fair Use Checklist.  Belcher Dep. 85:15-19.  The deposition

testimony cited was based on a hypothetical review of the checklist during her

deposition.  Belcher Dep. 83:15-19; 92:24-25 ("Q. . . . *If* you were to offer or

complete a checklist . . ." (emphasis added)); 93:12-94:14.  Therefore any

statements made by Professor Belcher were about what she may consider in

completing a Checklist not about things she actually considered or decided in

completing a Checklist.

Professor Jodi Kaufmann specifically states in the cited testimony that she considers all three of the elements that weigh in favor of fair use to collectively indicate that the "nature of the copyrighted work" favors fair use, not that one of the factors alone does so.  Kaufmann Dep. 78:25-79:3.

**224.**  In completing the Checklist, GSU instructors have relied upon varying numerical rules to determine how much of an original work may be taken without permission. EX 6 (Kaufmann Dep.) 79:18-20; EX 24 (Reifler Dep.) 40:67, 61:17-22; 65:17-21; EX 8 (Belcher Dep.) 120:8-10.

**RESPONSE:**  Disputed.  Under Factor 3 of the Checklist, GSU instructors have stated that a "narrowly tailored" use or use of a portion that is "not central" to the entire work may outweigh the fact that a large portion was used. *See* EX 34; EX 24 (Reifler Dep.) 69:8-13, 117-119.  See also Defs' Additional Facts, Nos. 4, 6, 9.

**225.**  In completing the Checklist, GSU instructors considered it impossible or unlikely that any chapter in an edited compilation of independent articles could represent "the heart of the work," even where multiple articles were used in their entirety. EX 6 (Kaufmann Dep.) 80:13-81:3; *see* EX 8 (Belcher Dep.) 95:20-96:1.

**RESPONSE:**  Admitted.

**226.**  In completing the Checklist, Professor Belcher stated that although she "[hadn't] really looked at the whole book," she assumed two chapters were "not the heart of the book." EX 8 (Belcher Dep.) 100:24-101:1.

**RESPONSE:**  Admitted.

**227.**  In completing the Checklist, GSU instructors have considered multiple articles taken from an edited compilation as portions of one original, rather than as the entirety of each individual article. EX 24 (Reifler Dep.) 61 :3-22; EX 6

(Kaufmann Dep.) 69:12-20,79:21-80:8; *see also* EX 8 (Belcher Dep.) 96:211, 115:4-13,116:2-10.

**RESPONSE:**  Admitted that at least certain GSU professors considered

multiple articles taken from an edited compilation as portions of one original.

**228.**   In completing the Checklist, GSU instructors have considered Factor 3 to potentially "take precedence" over the other factors. EX 24 (Reifler Dep.) 85:9-12.

**RESPONSE:**  The sources cited do not support the fact that to the extent one

professor is cited and his testimony was taken before he had a chance to use the

Policy and before the Policy was fully implemented.

**229.**   In completing the Checklist, GSU instructors have failed to consider the availability of licensed versions of the same content. EX 24 (Reifler Dep.) 75:1-4; EX 6 (Kaufman Dep.) 65:23-66:8, 74:15-22, 85:17-22, 86:3-7.

**RESPONSE:**  Admitted

**230.**   In completing the Checklist, GSU instructors have analyzed market harm under Factor 4 in terms of the number of copies made, rather than the size of the portion taken, the nature of the market for the original, or other factors. EX 24 (Reifler Dep.) 76:20-78:7.

**RESPONSE:**  The sources cited do not support the fact that to the extent one

professor is cited and his testimony was taken before he had a chance to use the

Policy and before the Policy was fully implemented.

**231.**   In completing the Checklist, GSU instructors have considered the posting of a copyrighted work on ERes or uLearn to constitute a single copy rather than a distribution of multiple copies. EX 8 (Belcher Dep.) 105:9-22; EX 24 (Reifler Dep.) 95:6-10.

**RESPONSE:**  Admitted

232.   In completing the Checklist, GSU instructors have failed to consider the aggregate impact on the market for the original if the proposed taking were to be repeated by a larger group of instructors at GSU and other institutions. EX 24 (Reifler Dep.) 73:13-18; EX 6 (Kaufmann Dep.) 59:7-12; EX 8 (Belcher Dep.) 101 :23-102:4.

**RESPONSE:**  Admitted that at least certain professors have not considered

the aggregate impact.

233.   In completing the checklist, GSU instructors assume that placing a work on ERes would not have a significant effect on the market under Factor 4 because students might later purchase the work. EX 6 (Kaufmann Dep.) 83:4-84:24; EX 24 (Reifler Dep.) 72:14-73:2.

**RESPONSE:**  Admitted

234.   In completing the checklist, GSU instructors did not consider the cost of creating the materials or the publisher's need to make a profit. EX 6 (Kaufmann Dep.) 83:4-84:24, 94:25-95:7.

**RESPONSE:**  The sources cited do not support the fact that to the extent one

professor is cited and his testimony was taken before he had a chance to use the

Policy and before the Policy was fully implemented.

235.   GSU instructors who fill out the Checklist distribute required reading material via ERes without permission, relying on fair use. EX 34; *see, e.g.* , EX 24 (Reifler Dep.) 40:15-41:1, 75:11-20, 111:6-8, 119:14-17, 121:17-22; EX 6 (Kaufmann Dep..) 87:15-21; EX 13 (Palmour Dep.) 25:7-27:7, 38:15-39:14; 141:5-6.

**RESPONSE:**  The University Administrators will admit that GSU instructors

who fill out the Checklist distribute required reading material via ERes without

permission, relying on fair use.  The sources cited do not support the fact that

material distributed is "required reading material."

236.   Plaintiffs support and are themselves users of the fair use doctrine, but understand it to be principally embracing limited and transformative uses. EX 5 (Pfund Decl.) ¶ 33; EX 3 (Van Valkenburg Decl.) ¶ 18.

**RESPONSE:**  Admitted.

237.   Oxford and;Cambridge authors regularly incorporate previously created material into new works for scholarly purposes. Oxford's fair use guidelines, however, state that it is *usually* acceptable to quote 1-3% of an original unit *if* the use is transformative. When Oxford and Cambridge exceed fair use limits, they pay permission fees; Oxfords' permissions fees run into the hundreds of thousands of dollars and are the single largest plant cost for Oxford's Higher Education Group. EX 5 (Pfund Decl.) ¶ 33; EX 4 (Smith Decl.) ¶ 30.

**RESPONSE:**  Admitted.

238.   SAGE authors regularly incorporate previously-created material into new works for scholarly purposes, but they do so in connection with transformative uses. SAGE does not merely reprint prior works, but incorporates very small portions of other works (a paragraph, a table or an illustration) into publications in which that content is criticized, commented on, adapted or supplemented. SAGE's fair use guidelines warn against competing with the original work in the marketplace. EX 3 (Van Valkenburg Decl.) ¶ 19.

**RESPONSE:**  The University Administrators will admit that SAGE authors

incorporate previously-created material into new works for scholarly purposes in

connection with transformative uses.  SAGE does not merely reprint prior works,

but incorporates very small portions of other works (a paragraph, a table or an

illustration) into publications in which that content is criticized, commented on,

adapted or supplemented, and that  SAGE's fair use guidelines warn against

competing with the original work in the marketplace.  The sources cited do not

support the fact that Sage authors "regularly" incorporate such material and that

such material is a "very small portion."

**VI.**   **Plaintiff Ownership of Copyrighted Works in Complaint**

      **240.**   Cambridge is the exclusive licensee of the copyright to Ethan Scheiner's *Democracy Without Competition* (246 pages). EX 4 (Smith Decl.) ¶ 14.

    **RESPONSE:**  Admitted.

      **241.**   *Democracy Without Competition* is registered with the U.S. Copyright Office in the name' of the author. EX 4 (Smith Decl.) ¶ 15.

    **RESPONSE:**  Admitted.

      **242.**   Cambridge owns the copyright to *The Cambridge Companion to the Organ* (321 pages) as a whole and the copyrights to the individual essays that make up the book's individual chapters. EX 4 (Smith Decl.) ¶ 24.

    **RESPONSE:**  Admitted.

      **243.**   *The Cambridge Companion to the Organ* is a foreign work protected under the Berne Convention. EX 4 (Smith Decl.) ¶ 21.

    **RESPONSE:**  Admitted.

      **244.**   Cambridge has registered chapters 14 and 15 of *The Cambridge Companion to the Organ* with the U.S. Copyright Office in its own name. *Id.*

    **RESPONSE:**  Admitted.

      **245.**   Cambridge owns the copyright to Theda Skocpol's *States and Social Revolutions* (350 pages). EX 4 (Smith Decl.) ¶ 11.

    **RESPONSE:**  Admitted.

**246.**   Cambridge has registered *States and Social Revolutions* with the U.S. Copyright Office in its own name. EX 4 (Smith Decl.) ¶ 11.

**RESPONSE:**  Admitted.

**247.**   Cambridge owns the copyright to Brian Tomlinson's *Materials Development in Language Teaching* (346 pages) as a whole and the copyrights to the individual essays that make' up the book's individual chapters. EX 4 (Smith Decl.) ¶ 31.

**RESPONSE:**  Admitted.

**248.**   Cambridge has registered chapters 1, 4, and 6 of *Materials Development in Language Teaching* with the U.S. Copyright Office in its own name. EX 4 (Sinith Decl.) ¶ 31.

**RESPONSE:**  Admitted.

**249.**   Cambridge owns the copyright to Richard Allwright and Kathleen Bailey's *Focus on the Language Classroom* (223 pages). EX 4 (Smith Decl.) ¶ 18.

**RESPONSE:**  Admitted.

**250.**   Cambridge has registered *Focus on the Language Classroom* with the U.S. Copyright Office in its own' name. EX 4 (Smith Decl.) ¶ 17.

**RESPONSE:**  Admitted.

**251.**   Cambridge is the exclusive licensee of the copyright to Gary Cox and Matthew McCubbins' *Legislative Leviathan: Party Government in the House* (274 pages). EX 4 (Smith Decl.) ¶ 24.

**RESPONSE:**  Admitted.

**252.**   *Legislative Leviathan* is registered with the U.S. Copyright Office in the name of the authors. EX 4 (Smith Decl.) ¶ 25.

**RESPONSE:**  Admitted.

**253.** Oxford is the exclusive licensee of the copyright to Christopher Simpson's *Science of Coercion* (224 pages), including the right to file suit in the author's name. EX 5 (Pfund Decl.) ¶ 28.

**RESPONSE:**  Admitted.

**254.** *Science of Coercion* is registered with the U.S. Copyright Office in the name of the author. EX 5 (Pfund Decl.) ¶ 28.

**RESPONSE:**  Admitted.

**255.** Oxford is the exclusive licensee of the copyright to George M. Fredrickson's *White Supremacy* (340 pages) and has the right to file suit in the author's name. EX 5 (Pfund Decl.) ¶ 31.

**RESPONSE:**  Admitted.

**256.** *White Supremacy* is registered with the U.S. Copyright Office in the name of the author. EX 5 (Pfund Decl.) ¶ 31.

**RESPONSE:**  Admitted.

**257.** Oxford owns the exclusive copyright to Laura Berk's *Awakening Children's Minds* (296 pages). EX 5 (Pfund Decl.) ¶ 25.

**RESPONSE:**  Admitted.

**258.** Oxford has registered *Awakening Children's Minds* with the U.S. Copyright Office in its own name. EX 5 (Pfund Decl.) ¶ 25.

**RESPONSE:**  Admitted.

**259.** Oxford owns the exclusive copyright to John Blassingame's *The Slave Community* (382 pages). EX 5 (Pfund Decl.) ¶ 22.

**RESPONSE:**  Admitted.

**260.** Oxford has registered *The Slave Community* with the U.S. Copyright Office in its own name. EX 5 (Pfund Decl.) ¶ 22.

**RESPONSE:**  Admitted.

261.   SAGE owns the copyright to *The SA GE Handbook of Qualitative Research* (Norman Denzin & Yvonna S. Lincoln, eds.) as a whole and the copyrights to the individual essays that make up the book's individual chapters. EX 3 (Van Valkenburg Decl.) ¶¶22-23.

**RESPONSE:**  Admitted.

262.   SAGE has registered *The SAGE Handbook of Qualitative Research* and each contribution to *The SAGE Handbook of Qualitative Research* with the U.S. Copyright Office in its own name. EX 3 (Van Valkenburg Decl.) ¶.

**RESPONSE:**  Admitted.

263.   SAGE is the exclusive licensee of the copyright to Liesbet van Zoonen's *Feminist Media Studies* (155 pages). EX 3 (Van Valkenburg Decl.) ¶ 30.

**RESPONSE:**  Admitted.

264.   *Feminist Media Studies* is not registered with the U.S. Copyright Office, but it is a foreign work protected under the Berne Convention. EX 3 (Van Valkenburg Decl.) ¶ 30.

**RESPONSE:**  Admitted.

265.   SAGE owns the copyright to Milan J. Dluhy's *Changing the System* (117 pages). EX 3 (Val). Valkenburg Decl.) ¶ 27.

**RESPONSE:**  Admitted.

266.   SAGE has registered *Changing the System* with the U.S. Copyright Office in its own name. EX 3 (Van Valkenburg Decl.), ¶ 27.

**RESPONSE:**  Admitted.

## VII.   GSU'S Unauthorized Distribution of Additional Plaintiff Works

267.   The reports documenting use of the ERes system at GSU reveal

that in addition to the unauthorized distribution of electronic course material listed in Exhibit 1 and described in paragraphs *supra* 98-139, GSU has distributed over one hundred other Cambridge works electronically without permission, including (with the semesters of use indicated parenthetically):

- Achievement and Motivation (Fall 2005)

- A Defense of Abortion (Fall 2008)

- Aesthetics and Cognition in Kant's Critical Philosophy (Fall 2006 and Spring 2007)

- A History of Feminist Literary Criticism (Fall 2009)

- American Naive paintings (Spring 2008)

- Ancient Egyptian Materials and Technology (Fall 2009)

- A New Order of Things: Property, Power, and the Transformation of the Creek Indians (Spring 2005 and 2007)

- Arabic Historical Thought in the Classical Period (Fall 2006)

- Arabic Thought in the Liberal Age / Muhammad Abduh (Spring 2007)

- Aristotle, Kant, and the Stoics (Fall 2006 and 2008; Spring 2009; Summer 2006)

- Assessing Grammar (Fall 2009)

- Assessing Reading (Spring 2005, 2006 and 2007)

- Assessing Writing (Spring 2005, 2006 and 2007)

- Augustine: The City of God against the Pagans (Fall and Summer 2008)

- Bringing Transnational Relations Back In (Spring 2006)

- Cheap Print and Popular Piety (Fall 2005; Spring 2007 and 2008; Summer 2005);

- Congress: Structure and Policy (Fall 2007; Spring 2006 and 2008)

- Contractarianism and Rational Choice (Spring 2006 and 2008)

- Creating the Kingdom of Ends (Fall and Summer 2006)

- Criterion-Referenced Language Testing (Fall 2009; Spring 2005, 2006, 2007 and 2009)

- Culture in Second Language Teaching and Learning (Spring 2007); Exploring the Dynamics of Second Language Writing (Spring 2006);

- For the Sake of Simple Folk(Fa1l2006 and 2007)

- Getting and Spending (Fall 2005 and 2006; Spring 2006 and 2007; Summer 2005 and 2006)

- Getting Rich: America's New Rich and How They Got That Way (Fall 2007 and 2008; Summer 2008)

- Global Capital, Political Institutions, and Policy Change in Developed Welfare States (Spring 2007)

- Idealism and Freedom: Essays on Kant's Theoretical and Practical Psychology. (Fall 2005 and 2007; Spring 2005 and 2008)

- Institutions and Ethnic Politics in Africa (Fall 2007)

- Intellectual Development (Fall 2005 and 2006; Spring 2005 and 2007; Summer 2005 and 2006)

- International Health Organisations and Movements (Fall 2005, 2006, 2008 and 2009; Spring 2008)

- International Human Rights and Humanitarian Law (Fall and Summer 2007)

- Language Acquisition and Conceptual Development (Fall 2008 and 2009; Spring 2009; Summer 2008)

- Language Teacher. Awareness (Fall 2007 and 2008; Spring 2005, 2006, 2007, 2008 and 2009; Summer 2005, 2006 and 2008)

- Methodology in Language Teaching (Fall 2006 and 2007; Spring 2006 and 2008)

- Modernism (Fall 2006; Spring 2007)

- New Essays on Human Understanding (Spring 2007; Fall 2006 and 2008)

- On the Genealogy of Morality (Fall and Summer 2008)

- Outline of a Theory of Practice (Fall 2005, 2006, 2007 and 2008; Spring 2007)

- Policy, Office, or Votes (Fall 2007)

- Political Parties: Organization and Power (Fall 2007)

- Post-Communist Party Systems (Fall 2007)

- Practical Philosophy (Fall 2007; Spring 2006 and 2008)

- Pragmatics in Language Teaching (Fall 2005; Summer 2007)

- Propaganda and Democracy (Fall 2006)

- Qualitative Analysis for Social Scientists (Fall 2008; Spring 2005)

- Reading the West (Fall 2006; Spring 2007, 2008 and 2009)

- Rethinking Linguistic Relativity (Fall 2008; Spring 2005)

- Rethinking World History (Fall and Spring 2007)

- Second Language Classrooms (Summer 2005 and 2007)

- Second Language Teacher Education (Fall 2007 and 2008; Spring 2005,2007,2008 and 2009; Summer 2005,2007, and 2008)

- Second Language Writing (Fall 2005 and 2008; Spring 2007; Summer 2008)

- Selected Philosophical Writings (Spring 2006 and 2008)

- Sociolinguistics and Language Teaching (Fall 2005; Spring 2007)

- Statistical Analyses for Language Assessment (Spring 2005, 2006 and 2007)

- Strength Through Joy: Consumerism and Mass Tourism in the Third Reich (Spring 2008; Summer 2007)

- Teacher Learning in Language Teaching (Fall 2005 and 2007; Spring 2006 and 2008)

- Teachers as Course Developers (Fall 2005 and 2008; Spring 2007)

- Teachers' Narrative Inquiry as Professional Development (Fall 2005; Spring 2008)

- Testing for Language Teachers (Spring 2005, 2006 and 2007)

- The Anthropological Lens (Fall 2005 and 2006; Spring 2006)

- The Cambridge Companion to Adam Smith (Fall 2008; Spring 2009)

- The Cambridge Companion to Atheism (Spring 2008; Summer 2007)

- The Cambridge Companion to Bach (Summer 2008)

- The Cambridge Companion to Bartok (Spring 2009; Summer 2007)

- The Cambridge Companion to Berg (Spring 2009; Summer 2007)

- The Cambridge Companion to Berlioz (Fall 2007)

- The Cambridge Companion to Debussy (Spring 2009)

- The Cambridge Companion to Delacroix (Fall 2008)

- The Cambridge Companion to Early Modern Philosophy (Summer 2007)

- The Cambridge Companion to Greek and Roman Philosophy (Fall 2007)

- The Cambridge Companion to Handel (Summer 2005 and 2008)

- The Cambridge Companion to Mozart (Spring 2008 and Summer 2006)

- The Cambridge Companion to Oscar Wilde (Fall 2005 and Spring 2006)

- The Cambridge Companion to Plato (Spring 2009)

- The Cambridge Companion to Ravel (Spring 2009 and Summer 2007)

- The Cambridge Companion to Rawls (Fall 2007)

- The Cambridge Companion to Shakespeare on Film (Fall and Summer 2007)

- The Cambridge Companion to Sibelius (Spring 2009)

- The Cambridge Companion to The Eighteenth Century Novel (Spring 2008)

- The Cambridge Companion to The Musical (Spring 2006)

- The Cambridge Companion to Twentieth Century Irish Drama (Spring 2009)

- The Cambridge History of China (Fall 2009)

- The Cambridge History of Christianity: World Christianities (Fall 2008)

- The Cambridge History of the Pacific Islanders (Fall 2007)

- The Fragility of Goodness (Fall 2009 and Spring 2008)

- The Global Cold War (Summer 2008)

- The Hellenistic Philosophers (Fall 2008 and Spring 2009)

- The Ideological Origins of the British Empire (Spring 2007 and 2008)

- The IMF and Economic Development (Spring 2007 and 2009)

- The Internet and the Language Classroom: A Practical Guide for Teachers (Fall 2007)

- The Invention of Tradition (Fall 2005; Spring 2008 and 2009)

- The Language Teaching Matrix (Fall 2006 and 2007; Spring 2006 and 2008)

- The Ottoman Empire and Early Modern Europe (Spring 2007 and 2008)

- The Postmodern Turn (Fall 2006)

- The Primate Fossil Record (Fall 2005, 2006 and 2008; Spring 2006 and 2007)

- The Psychology of Survey Response (Spring 2005)

- The Power of Human Rights (Spring 2006)

- The Roots of Evil (Fall 2005 and 2006)

- The Sublime: A Reader in British Eighteenth Century Aesthetic Theory (Spring 2007)

- Training Foreign Language Teachers (Spring 2008)

- Understanding Communication in Second Language Classrooms (Fall 2007 and 2008; Spring 2005,2007,2008 and 2009)

- Understanding Trauma (Spring 2008 and 2009; Fall 2007, 2008, and 2009)

- Using the Board in the Language Classroom (Fall 2007)

- Women and Gender in Early Modern Europe (Fall 2005 and 2006)

**RESPONSE:**  The University Administrators renew their objection to these new works, and admit only that "reports documenting use of the ERes system at GSU reveal that," other Cambridge works are available on ERes.  The sources cited do not support the fact that GSU has engaged in "unauthorized distribution of Cambridge works or that permission was necessary for any such uses.  The University Administrators also dispute that such fact is material insofar as it does not concern the works-at-issue.

268.   The reports documenting use of the ERes system at GSU reveal that in addition to the unauthorized distribution of electronic course material listed in Exhibit 1 and described in paragraphs supra 98-139, GSU has distributed dozens of other Oxford works (including OUP UK works for which OUP USA has exclusive U.S. distribution rights) electronically without permission, including (with the semesters of use indicated parenthetically):

- Adolescents at Risk (Summer 2005; Fall 2005, 2006, 2007)

- Adult Neurogenesis (Fall 2006, 2007)

- A History of Our Time: Readings on Postwar America (Summer 2005)

- America in the Great War (Spring 2008)

- American Religion: A Documentary History (Fall 2009)

- Anthropology and Public Health (Spring 2009; Fall 2005, 2007 and 2009)

- Approaches to Qualitative Research (Summer 2008; Fall 2006, 2008 and 2009)

- Approaches to Social Research (Spring 2005)

- A Priori Knowledge (Spring 2007; Summer 2006; Fall 2005, 2006)

- Becoming Ecological (Fall 2008)

- Behavior, Society, and Nuclear War (Fall 2007)

- Benchmarks for Science Literacy (Summer 2006)

- Between Dignity and Despair (Spring 2005)

- Biology of Aggression (Fall 2006)

- Challenges of the Third Age (Fall 2009)

- Christianity in the' West (Summer 2005; Fall 2005, 2006, 2007)

- City Lights: Urban-Suburban Life in the Global Society (Spring 2005, 2006,2007)

- Community Practice (Fall 2005, 2006, 2007, 2008)

- Crabgrass Frontier (Spring 2005, 2006 and 2007; Fall 2008 and 2009)

- Crimes of Writing'(Spring 2007, 2008; Fall 2005, 2006, 2007, 2008)

- Democracy in Latin America (Fall 2009)

- Developmental Influences on Adult Intelligence (Fall 2005, 2006, 2007)

- Disorderly Conduct: Visions of Gender in Victorian America (Spring 2009)

- Documentary: A History of the Non-Fiction Film (Spring 2007)

- Documents of American Constitutional and Legal History (Fall 2006)

- Encyclopedia of Rhetoric (Spring 2007)

- Ensuring Inequality (Fall 2005 and 2009)

- Essays in Jurisprudence and Philosophy (Fall 2005)

- Essays on Actions and Events (Spring 2005)

- Ethical Issues in Professional Life (Spring 2005; Fall 2006)

- Ethical Theory (Fall 2006)

- Evolutionary Medicine (Spring 2008; Fall 2005, 2006, 2008 and 2009)

- Evolution of Infectious Disease (Spring 2008; Fall 2005, 2006, 2008 and 2009)

- Feminism and Cultural Studies (Spring 2007)

- Feminist Approaches to Theory and Methodology (Spring 2009)

- Film Theory and Criticism (Fall 2009)

- Gender and Conversational Interaction (Summer 2006)

- Handbook of Adult Development and Learning (Spring 2007, 2008; Summer 2007, 2008; Fall 2007, 2008 and 2009)

- How Should One Live: Essays on the Virtues (Spring 2006)

- Indigenous Peoples in International Law (Spring 2007; Fall 2006)

- Inner Lives and Social Worlds (Fall 2006, 2008)

- Interpreting Kant's Critiques (Spring 2005)

- Introduction to International Relations (Fall 2008)

- Introduction to Philosophy (Fall 2007)

- Language Ideologies: Practice and Theory (Spring 2005)

- Law in Public Health Practice (Spring 2007)

- Living Ethics (Fall 2009)

- Love's Knowledge (Spring 2008)

- Manufacturing Religion (Summer 2008; Fall 2008)

- Meeting the Communist Threat (Summer 2008)

- Morals by Agreement (Spring 2006, 2007, 2008)

- Myths and Memories of the Nation (Spring 2009; Fall 2005)

- Neighborhoods and Health (Fall 2009)

- North German Church Music in the Age of Buxtehude (Fall 2009)

- Objective Knowledge: An Evolutionary Approach (Fall 2009)

- Old World Encounters (Spring 2008; Fall 2007)

- OUP Illustrated History of Ireland (Spring 2005)

- Pity the Nation: Lebanon at War (Spring 2006)

- Principles of Community Psychology (Summer 2005; Fall 2005, 2006)

- Qur'an and Woman (Fall 2005)

- Race, Ethnicity, and Sexuality (Spring 2008)

- Second Language Acquisition (Spring 2009)

- Sex, Gender, and Sexuality (Fall 2008)

- Shades of Freedom (Summer 2008)

- Silent Covenants: Brown v. Board of Education and the Unfulfilled

- Hopes for Racial Reform (Spring 2005)

- Single Case Research Designs (Fall 2005, 2007)

- Slave Culture (Spring 2006 and 2007; Summer 2005, 2006, 2007; Fall 2005,2006)

- Slave Religion: The Invisible Institution in the Antebellum South (Spring 2005)

- Social Determinants of Health (Fall 2009)

- Social Work Practice (Fall 2006, 2007)

- Teaching American English Pronunciation (Spring 2005, 2006, 2007, 2008, 2009; Fall 2005, 2006, 2007,2008)

- Television: The Critical View (Fa112009)

- The Craft of Inquiry (Spring 2007 and 2008; Summer 2007, 2008; Fall 2006, 2007, 2008 and 2009)

- The Crusades (Fa11 2008)

- The Enlargement of the European Union (Spring 2008)

- The Examinations of Anne Askew (Spring 2007,2008; Summer 2005; Fall 2005)

- The Foundations of Mind: Origins of Conceptual Thought (Spring 2009; Summer 2008; Fall 2008)

- The Gendered Society Reader (Fall 2009)

- The Globalization, of World Politics (Spring 2005, 2009; Fall 2007)

- The Impartial Spectator (Fall 2008)

- The Model Order of a Suburb (Fall 2005)

- The Modern Middle East (Spring 2007)

- The Organ as a Mirror of its Time (Fall 2009)

- The Oxford Companion to World Exploration (Spring 2008; Fall 2007)

- The Oxford Encyclopedia of Ancient Egypt (Fall 2007 and 2009)

- The Oxford Handbook of Jurisprudence and Philosophy of Law (Summer 2005 and 2006; Fall 2005, 2006)

- The Oxford Handbook to Philosophy of Religion (Spring 2008; Summer 2007)

- The OUP Handbook of Economic Geography (Spring 2005, 2006)

- The Oxford History of the Crusades (Spring 2009; Fall 2008)

- The Peculiarities of German History (Fall 2008)

- The Phonology of English as an International Language (Fall 2008)

- The Political Economy of the World Trading System (Fall 2008)

- The Politics of Public Housing (Fall 2009)

- The Power Elite (Spring 2007 and 2008; Fall 2009)

- The Signifying Monkey (Spring 2008, 2009)

- The Sociological Imagination (Spring 2007; Fall 2006)

- The Strange Career of Jim Crow (Spring 2005; Summer 2005, 2006)

- Topics in Stoic Philosophy (Spring 2009; Fall 2008)

- Varieties of Capitalism: The Institutional Foundations of Comparative Advantage (Spring 2007, 2009)

- Virtue Ethics (Spring 2006)

- We Now Know: Rethinking Cold War History (Summer 2008)

- When Prisoners Come Home: Parole and Prisoner Reentry (Fall 2008)

- Witchcraft, Oracles, and Magic Among the Azande (Spring 2007)

**RESPONSE:**  The University Administrators renew their objection to these new works and admit only that "reports documenting use of the ERes system at GSU reveal that," other Oxford works are available on ERes.  The sources cited do not support the fact that GSU has engaged in "unauthorized distribution of Oxford works or that permission was necessary for any such uses.  The University Administrators also dispute that such fact is material insofar as it does not concern the works-at-issue.

269.   The reports documenting use of the ERes system at GSU reveal that in addition to the unauthorized distribution of electronic course material listed *in Exhibit 1 and described in paragraphs supra 98-139, GSU has distributed portions of dozens of other SAGE works electronically without permission, including (with the semesters of use indicated parenthetically):*

- African American Acculturation (fall 2006 and 2008)

- African American Single Mothers (fall 2009)

- Agenda Setting (fall 2007)

- An Introduction to Survey Research, Polling, and Data (spring 2005)

- Applications of Case Study Research (spring 2006, 2007, 2008 and 2009; fall 2006)

- Before the Vote: Forecasting American National Elections (spring 2005 and 2006; fall 2005)

- Black Families (fall 2005 and 2009)

- Catching a Wave: Reclaiming Feminism/or the 21st Century (fall 2007)

- Children's Ethnic Socialization (fall 2006 and 2008)

- Contemporary Black Thought (spring 2005, 2006, 2007, 2008 and 2009)

- Critical Ethnography (spring 2008)

- Designing Qualitative Research (fall 2006; spring 2007, 2008 and 2009)

- Discourse and Social Psychology: Beyond Attitudes and Behaviour (fall 2008)

- Doing Media Research (fall 2008)

- Doing Urban Research (spring 2006)

- Educational Psychology in Context (fall 2007, 2008 and 2009; spring 2008)

- Evaluation/or the· 21st Century (spring 2006 and 2008)

- Focus Groups (spring 2006 and 2007)

- Family Violence Across the Lifespan (fall 2008)

- Foundations of Empowerment Evaluation (spring 2006)

- Fourth Generation Evaluation (spring 2006 and 2008)

- Gender, Race and Class in Media: A Text Reader (spring 2005,2006, 2007 and 2009; fall 2008)

- Handbook of Data Analysis (fall 2006)

- Handbook o/Ethnography (spring 2006, 2007, 2008 and 2009; fall 2006)

- Handbook of Feminist Research (fall 2008 and 2009; spring 09)

- Handbook of Interview Research (spring 2008)

- Handbook of Mixed Methods in Social and Behavioral Research (fall 2009)

- Handbook of Narrative Inquiry (fall 2008 and 2009)

- Handbook of Social Intervention (summer 2005; fall 2005, 2006, 2007,2008 and 2009; spring 2006 and 2008)

- Handbook of Social Theory (fall 2006 and 2007; spring 2007 and 2008; summer 2007 and 2008)

- Handbook of Youth Mentoring (spring 2005, 2007 and 2009)

- Hierarchical Linear Model (spring 2006)

- Identity: A Reader (fall 2009)

- Interviews: An Introduction to Qualitative Research Interviewing (spring and fall 2007)

- Local Economic Development: Analysis and Practice (spring 2005)

- Mass Communication and Society (spring 2009)

- Methods of Life Course Research: Qualitative and Quantitative Approaches (spring 2009)

- Mindful Inquiry in Social Research (fall 2006)

- Miscommunication and Problematic Talk (fall 2005, 2006 and 2007)

- Naturalistic Inquiry (spring 2008)

- Of Crime and Criminality (spring 2008 and 2009)

- Participation in Human Inquiry (spring 2005)

- Phenomenological Research Methods (fall 06; spring 2007, 2008 and 2009)

- Primary Prevention Practices (summer 05; fall 2005, 2006 and 2007)

- Public Communication Campaigns (spring 2009)

- Qualitative Interviewing (spring 2007)

- Qualitative Research and Evaluation Methods (fall 2006, 2007 and 2008; spring 2007)

- Qualitative Research Practice (fall 2008)

- Race, Culture, and Difference (fa11 2006)

- Reading and Understanding Research (spring 2006 and 2007)

- Representation: Cultural Representations and Signifying Practices (fall 2009)

- Research Practice for Cultural Studies (fall 2006; spring 2008)

- Rethinking the Media Audience (fall 2008; spring 2009)

- Survey Questions: Handcrafting the Standardized Questionnaire (spring 2005)

- Symbolic Exchange and Death (spring 2009)

- Telephone Survey Methods: Sampling, Selection, and Supervision (spring

2005)

- The Body and Social Theory (fall 2005)

- The Foundations of Social Research (fall 2006)

- The Persuasion Handbook (spring 2007)

- The Social Construction of Gender (spring 2007 and 2008)

- Using Foucault's Methods (fall 2006)

- Utilization Focused Evaluation (spring 2006 and 2008; fall 2009)

- Visual Culture: The Reader (spring 2005, 2006 and 2008; fall 2008)

- Visual Methodologies (spring 2005)

- Women in Mass Communication (spring 2007).

**RESPONSE:**  The University Administrators renew their objection to these new works and admit only that "reports documenting use of the ERes system at GSU reveal that," other SAGE works are available on ERes.  The sources cited do not support the fact that GSU has engaged in "unauthorized distribution of SAGE works or that permission was necessary for any such uses.  The University Administrators also dispute that such fact is material insofar as it does not concern the works-at-issue.

Respectfully submitted this 5th day of April, 2010.

THURBERT E. BAKER
Georgia Bar No. 033887
Attorney General

R. O. LERER
Georgia Bar No. 446962
Deputy Attorney General

DENISE E. WHITING-PACK
Georgia Bar No. 558559
Senior Assistant Attorney General

MARY JO VOLKERT
Georgia Bar No. 728755
Assistant Attorney General
KING & SPALDING LLP

*/s/ Katrina M. Quicker*
Anthony B. Askew
Georgia Bar No. 025300
Special Assistant Attorney General
Stephen M. Schaetzel
Georgia Bar No. 628653
Katrina M. Quicker
Georgia Bar No. 590859
Kristen A. Swift
Georgia Bar No. 702536

**Attorneys for Defendants**

1

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia, that the foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' THEIR MOTION OR SUMMARY JUDGMENT complies with the font and point selections approved by the Court in L.R. 5.1B.  The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

*/s/ Katrina M. Quicker*_____
Katrina M. Quicker
 (Ga. Bar No. 590859)

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAMBRIDGE UNIVERSITY          §
PRESS, *et al.*,              §
                             §
    Plaintiffs,        §
                             §
v.                           §                Case No. 1:08-CV-1425-ODE
                             §
MARK P. BECKER, in his official §
capacity as Georgia State University §
President, *et al.*,          §
                             §
    Defendants.        §
                             §
                             §

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 5th day of April, 2010, I have electronically filed the foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' THEIR MOTION OR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Edward B. Krugman
krugman@bmelaw.com
Georgia Bar No. 429927
Corey F. Hirokawa
hirokawa@bmelaw.com
Georgia Bar No. 357087
John H. Rains IV
Georgia Bar No. 556052

BONDURANT, MIXSON &
ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

R. Bruce Rich
Randi Singer
Todd D. Larson

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


*/s/ Katrina M. Quicker*_____
   Katrina M. Quicker
    (Ga. Bar No. 590859)

ATL_IMANAGE-6850139.1