# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS,
OXFORD UNIVERSITY PRESS, INC.,
and SAGE PUBLICATIONS, INC.,

                    Plaintiffs,


        - v. -


MARK P. BECKER, in his official
capacity as Georgia State University
President, et al.,

                    Defendants.

Civil Action No. 1:08-CV-1425-ODE


# PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

762830.1

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT .....................................................................................................6

I.  DEFENDANTS' FAIR USE ANALYSIS HAS NO BASIS IN THE
    STATUTE OR IN RELEVANT CASE LAW ...........................................6

    A.  Factor 1 Weighs in Plaintiffs' Favor ....................................7

    B.  Factor 2 Weighs in Plaintiffs' Favor ..................................10

    C.  Factor 3 Weighs in Plaintiffs' Favor ..................................11

    D.  Factor 4 Weighs in Plaintiffs' Favor ..................................12

    E.  Other Factors ......................................................................16

II. DEFENDANTS' DEFENSE OF THE NEW COPYRIGHT POLICY
    DOES NOT COMPORT WITH THE LAW OR WITH THE
    RECORD EVIDENCE .........................................................................21

    A.  The New Policy as "More than a Checklist" .....................21

    B.  Defendants' Defense of the Checklist.................................23

CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) . ................8, 15

*Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991).  ............................................................................................ 11-12, 21

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)........................3, 8, 13, 20

*Harper & Row Publishers, Inc. v. Nation Enters., Inc.*, 471 U.S. 539 (1985) .......................................................................................... *passim*

*Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000).......................20

*Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287 (11th Cir. 2008) ....................................................................9, 11, 16, 19

*Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) . ................................................................................. *passim*

*Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984)............. 2-30, 16

*UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 34 (S.D.N.Y. 2000) ….......................................................................................... 3-4

*Wainwright Sec. Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977) ...............................................................................................16

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) . ...........................................8

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) .........................................................................7

## STATUTES, RULES, AND OTHER AUTHORITIES

17 U.S.C. § 504 ..................................................................................................20

Plaintiffs Cambridge University Press ("Cambridge"), Oxford University Press, Inc. ("Oxford"), and SAGE Publications, Inc. ("SAGE") (collectively, "Plaintiffs") submit this reply memorandum of law in response to Defendant's Brief in Opposition to Plaintiffs' Motion for Summary Judgment, Docket No. 201 ("Def. Opp. Mem.") and in further support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Local Rule 56.1.

## PRELIMINARY STATEMENT

Defendants' opposition brief clings tenaciously to the fiction that they bear no legal responsibility for the ongoing copyright infringement at Georgia State University (GSU) because they did not personally engage in unauthorized copying. Plaintiffs already have explained at length the flaws in this contention, *see* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Docket No. 185 ("Pl. Opp. Mem.") 15-48, and do not repeat those arguments here.  Suffice it to say that both the common-law doctrine of *respondeat superior*, which is a source of liability independent of the doctrines of contributory and vicarious infringement, and Defendants' "official capacity" responsibility for infringing conduct they undisputedly have the authority to stop

clearly provide grounds for holding Defendants liable and subject to prospective injunctive relief.

Concerning the central issue in this case – fair use – Defendants' opposition combines a misleading, incomplete, and largely nonresponsive gloss on the law with non-record factual assertions and improperly proffered declarations that reflect a futile last-minute effort to rewrite the record. In terms of the law, Defendants' novel interpretation of fair use boils down to the contention that fair use is whatever individual GSU professors think it is, without regard for the reasonableness of their determinations so long as they have been made in "good faith." This stunning assertion is coupled with the equally stunning suggestion that Plaintiffs and other copyright owners have no cause to complain about these determinations because the professors would not license or require the purchase of these works if required to do so. Defendants even accuse Plaintiffs of being greedy "monopolists" merely for seeking to enforce their copyright rights.

Defendants' perspective on copyright law runs counter to all relevant precedent, flips on its head the established conception of the fair use privilege as a *limited exception* to the norm of exclusivity conferred upon copyright owners,[1] and

---

[1] Defendants' assertion that "copyright exists primarily to benefit the public and only secondarily to benefit the author," (Def. Opp. Mem. 29), overlooks the fact that it is only by "motivat[ing] the creative activity of authors . . . by the provision

would, if accepted, threaten the viability of educational publishing.  It is Defendants' burden to justify the concededly massive unauthorized copying activities that are ongoing at GSU on the grounds of fair use, and they have woefully failed to meet that burden.

Defendants urge that so long as a desired use is made in an academic setting and is viewed by a faculty member as furthering her pedagogical purpose, the use is "fair," and, as noted, they assert that Plaintiffs incur no "market harm" so long as the professor determines that neither she nor her students would have otherwise purchased or licensed the work.  These contentions misconceive the controlling inquiry: "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (citation omitted).

Defendants' self-serving view of copyright law, and the circular reasoning supporting it, has been rejected repeatedly by the courts.  As one court stated: "Stripped to its essence, defendant's 'consumer protection' argument amounts to

---

of a special reward," *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 429 (1984), that the public benefit is achieved.  *See* Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Docket No. 142 ("Pl. S.J. Mem.") 1-2.

762830.1

3

nothing more than a bald claim that defendant should be able to misappropriate plaintiffs' property simply because there is a consumer demand for it.  This hardly appeals to the conscience of equity." *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000).

Defendants would have the Court accord virtually dispositive significance to the fact that the challenged copying activity is occurring in a nonprofit university setting and for an educational purpose.  But, as Plaintiffs explained in their opening brief, these factors are not even of primary importance, let alone determinative, in a fair use analysis.  Nonprofit institutions enjoy no immunity from copyright law, and educational uses are not presumptively fair.  Were it otherwise, the output of all academic publishers would be subsumed by fair use when used at institutions of higher education, which would devastate the academic publishing business.  In fact, when <u>all</u> relevant factors are properly considered – including (i) the nontransformative nature of the copying; (ii) the fact that GSU benefits from using Plaintiffs' copyrighted materials "without paying the customary price," *Harper & Row Publishers, Inc. v. Nation Enters., Inc.*, 471 U.S. 539, 562 (1985); (iii) the quantitative and qualitative substantiality of the takings; and (iv) the clear market harm were Defendants' practices to continue and proliferate – the conclusion that GSU's copyright practices are not fair use as a matter of law is inescapable.

Defendants are not saved by their asserted good faith in adopting what they claim is a "sound" new copyright policy or by the supposedly improved copyright compliance by the professors and staff who are charged with applying the policy. Plaintiffs' claims turn on practice, not policy, and in that regard improving from terrible to bad in terms of respecting Plaintiffs' copyright rights – which is what has occurred at GSU – is no defense.

At that, Defendants' evidence of improved practice rests largely on evidence submitted by Defendants for the first time with their summary judgment briefing, after having flatly refused to produce it during discovery.  (This gamesmanship is the subject of a separate motion to exclude, and we urge the Court to view this testimony, if at all, skeptically.[2])  As a matter of law, moreover, good faith is not a

---

[2] When, some seven months ago, Plaintiffs requested that Defendants supplement their document productions concerning implementation of the new policy, including copies of completed fair use checklists, Defendants called the request cumulative, burdensome, and untimely.  In correspondence with Plaintiffs' counsel, they argued that nothing new or different would be found in such documents.  Defendants also have argued in prior motion practice before this Court that additional faculty deponents (beyond the three deposed by Plaintiffs) were "likely to provide similar testimony regarding their use of GSU's online systems." *See* Pl. S.J. Mem. 26 n.10.  Only when faced with a summary judgment record that eviscerates their fair use arguments have Defendants deemed their earlier positions "inoperative," taken pot shots at the assertedly non-representative nature of the evidence already adduced, and attempted belatedly to augment the record. Needless to say, Plaintiffs have had no opportunity to depose the professor declarants regarding the not-previously-disclosed documents they now offer the Court.

trump card that can convert into fair use the type of nontransformative copying that continues to occur at GSU.  Plaintiffs should not be required to continue to endure pervasive infringement and the associated lost income in the hopes that GSU's "learning curve" will eventually produce compliance with copyright law.

As Defendants have failed to raise a genuine issue of material fact as to Plaintiffs' motion for summary judgment, the Court should grant the motion and issue an appropriate injunction that will end GSU's infringing conduct.

## **ARGUMENT**

## I.   **DEFENDANTS' FAIR USE ANALYSIS HAS NO BASIS IN THE STATUTE OR IN RELEVANT CASE LAW**

Defendants spend the first fifteen pages of argument revisiting their contention that they bear no responsibility for the potentially infringing conduct of GSU's faculty, librarians, and staff notwithstanding that these state employees presumably are attempting to implement the very copyright policy adopted by the University System of Georgia Board of Regents and GSU that is in issue here.  As we have already demonstrated (*see* Pl. Opp. Mem. 15-48), this effort at abdication is a transparent and legally frivolous effort to evade the fair use issues on which this case should turn.  Defendants have no choice but to reach those issues later in their opposition, although they spend barely six pages discussing the application of the statutory four-factor test to the record evidence.  As we show below, that

762830.1

6

discussion is badly misguided as to the law of fair use as well as largely

nonresponsive to the central points raised in Plaintiffs' opening brief.  It fails

utterly to carry Defendants' burden to justify blatantly infringing conduct.

### A.    Factor 1 Weighs in Plaintiffs' Favor

The centerpiece of Defendants' Factor 1 analysis is their effort to persuade

the Court that it need only consider the "non-commercial, non-profit, educational

environment" at GSU in evaluating this factor.  Def. Opp. Mem. 21.  Defendants

evidently believe that whether the uses at issue are transformative or whether GSU

may be seen as profiting from them are of no consequence.  *See id.* at 28.  This is

wrong as a matter of law.  As Plaintiffs have explained, no presumption of fair use

attaches to nontransformative copying for a nonprofit educational purpose.  *See* Pl.

S.J. Mem. 38, 44-47.  Try as Defendants might to minimize the legal significance

of transformativeness, the law is clear that it is <u>central</u> – irrespective of whether the

activities in question are "profit" or "nonprofit."  *See, e.g.*, *Worldwide Church of*

*God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117-20 (9th Cir. 2000)

(noting importance of transformative value and holding that church's distribution

of verbatim copies of book was not fair use despite religious and educational

purpose); Pl. S.J. Mem. 44-47.  The record here on transformativeness also is clear:

the ERes and uLearn copying concededly is <u>not</u> transformative, as acknowledged

by the chair of the committee that promulgated the new policy, GSU's head librarian, and GSU professors.  *See* Pl. S.J. Mem. 43.[3]

Defendants also place undue emphasis on the nonprofit nature of GSU.  The "mere fact that a use is . . . not for profit does not insulate it from a finding of infringement."  *Campbell*, 510 U.S. at 584.  Whether the challenged practices result in "[m]onetary gain for GSU," (Def. Opp. Mem. 22-23), or serve "the purpose of facilitating higher education in a non-profit environment," (*id.* at 28), is irrelevant.  The profit/nonprofit distinction turns not on the legal status of the user or on whether it charges for the use but on "whether the user stands to profit from . . . the copyrighted material without paying the customary price."  Pl. S.J. Mem. 44 (quoting *Harper & Row*, 471 U.S. at 562).  "Profit" need not be financial in nature; rather, the inquiry concerns "the value obtained by the secondary user from the use of the copyrighted material."  *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994); Pl. S.J. Mem. 44-45.

---

[3] Defendants' half-hearted effort to resuscitate a claim for transformativeness by suggesting that the mere use of copyrighted material as a "teaching tool" is transformative (Def. Opp. Mem. 29) is contrary to law.  *See, e.g.*, *Weissmann v. Freeman*, 868 F.2d 1313, 132-26 (2d Cir. 1989) (holding that defendant professor's use of plaintiff's academic article for teaching purposes was "unproductive" and not fair use); Pl. S.J. Mem. 44-45.

There is, accordingly, no merit to Defendants' contentions that the copyshop cases are "irrelevant" because they involved for-profit businesses, (*see* Def. Opp. Mem. 22-23), and that posting works on ERes and uLearn, by contrast, "can be nothing but fair use." *Id.* at 28. The argument that "cases governing commercial entities should not be expanded to govern non-profit educational institutions,"(*id.* at 24), ignores the fact that the neither the statute nor the case law makes such a distinction. *See* Pl. S.J. Mem. 44-47. There is no basis for Defendants' assertion that because the copy shop cases involved for-profit entities, it follows inexorably that the same conduct occurring at GSU, which is run on a nonprofit basis, must be fair use. Nothing in the copy shop cases states or implies such a conclusion. Even if that distinction were valid, it would not outweigh the fact that the challenged uses are not transformative and threaten market harm. *See Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1388 (6th Cir. 1996) ("[I]n the context of nontransformative use . . . the other statutory factors seem considerably less important."); *see also Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1310 (11th Cir. 2008) (stating that a nontransformative work "is less likely to be entitled to the defense of fair use because of the greater likelihood that it will 'supplant' the market for the copyrighted work.") (citation omitted); Pl. S.J. Mem. 41. With respect to the relevance of transformative value

and market harm, the copy shop cases are analytically indistinguishable; if anything, they strongly support the injunctive relief requested here.

To adopt the formalistic distinction urged by Defendants would be tantamount to concluding that GSU professors are entitled to perform the digital equivalent of walking into a bookstore, ripping out the relevant chapters of any books they want without paying, and then distributing free copies to their students. The fair use doctrine does not authorize such conduct just because those who engage in it are employed by a nonprofit educational institution.

Equally unfounded is Defendants' assertion that if GSU were required to pay to copy and distribute excerpts from Plaintiffs' works, Plaintiffs will have reaped a "windfall."  Def. Opp. Mem. 25.  The windfall, if any, lies in GSU benefiting from Plaintiffs' copyrighted works without payment, not in Plaintiffs seeking to enforce their constitutionally derived, statutorily guaranteed right to be compensated for excessive takings of their works of authorship.

## B.    Factor 2 Weighs in Plaintiffs' Favor

Defendants' Factor 2 analysis is almost entirely nonresponsive to Plaintiffs' opening brief.  They argue that the "fact-based" nature of the works in question weighs in their favor.  Def. Opp. Mem. 30.  But, as Plaintiffs have explained, the Factor 2 analysis does not adhere to a strict fact/fiction taxonomy.  *See* Pl. S.J.

762830.1

Mem. 49-51.  Defendants have no answer to Plaintiffs' showing that non-fictional

works of scholarship are accorded weight under Factor 2 despite their

"informational nature."  *Id.* at 50 (quoting *Letterese*, 533 F.3d at 1312).  They do

not even attempt to distinguish the books at issue here from those at issue in the

copy shop cases, in which the courts found that Factor 2 weighed in favor of the

plaintiffs.  *See Princeton University Press*, 99 F.3d at 1389; *Basic Books, Inc. v.

Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1532-33 (S.D.N.Y. 1991).

### C.    Factor 3 Weighs in Plaintiffs' Favor

Defendants' Factor 3 analysis also purports to locate holes in Plaintiffs'

argument that do not exist.  Contrary to Defendants' suggestion (*see* Def. Opp.

Mem. 31), Plaintiffs' third-factor analysis specifically addressed both the

quantitative and qualitative aspects of the infringements sued upon and showed

them to be substantial in both respects.  *See* Pl. S.J. Mem. 52-54.  As courts have

recognized, the selection of particular excerpts for teaching purposes demonstrates

their qualitative value.  *See id.* at 52-53 (citing cases).  Defendants are thus

mistaken when they claim that Plaintiffs "rely wholly on early cases that focus

primarily on a quantitative measure of fair use."  Def. Opp. Mem. 31.

As for the percentages taken, moreover, Defendants' own professor

declarations contain admissions that the takings that occur under GSU's new

policy – ranging from "less than ten percent" (Declaration of Jodi Kaufmann, Ph.D., dated April 2, 2010 ("Kaufmann Decl.") Docket No. 188 ¶ 3) to "no more than fifteen percent" (Declaration of Ann Kruger, dated April 2, 2010 ("Kruger Decl.") Docket No. 188 ¶ 4) to "less than twenty percent" (Declaration of Marian Meyers, dated April 2, 2010 ("Meyers Decl.") Docket No. 188 ¶ 3) – are well within the range found not to be consistent with fair use in the copy shop cases.  In *Princeton University Press*, for example, the court deemed takings of 5 percent or more to be "not insubstantial," 99 F.3d at 1389, and in *Basic Books*, the court found that the photocopying of passages of copyrighted academic books "rang[ing] from 14 to 110 pages, representing 5.2% to 25.1% of the works," weighed against the defendant. *Basic Books*, 758 F. Supp. at 1533.  Indeed, the *Basic Books* court found the copying of 110 pages from a book to be "grossly out of line with accepted fair use principles." *Id.* at 1533-34.  Plaintiffs have shown comparably excessive takings at GSU under the new policy. *See* Pl. Opp. Mem. 8 n.4, 11.

### D.    Factor 4 Weighs in Plaintiffs' Favor

In their discussion of Factor 4, Plaintiffs established that widespread uncompensated takings of the kind occurring to this day at GSU would, if allowed to continue, decimate their businesses by substituting for the book sales and permissions fees on which Plaintiffs' academic publishing activities depend. *See*

Pl. S.J. Mem. 54-58.  They explained that the reason transformative value lies at the heart of the fair use inquiry is because "[t]he mere duplication of an original serves as a market replacement for it, 'making it likely that cognizable market harm to the original will occur.'"  Pl. S.J. Mem. 54 (quoting *Campbell*, 510 U.S. at 591).  As noted, the takings here are paradigmatically nontransformative.

Defendants attempt to skirt this market-harm reality with the assertion that if required to pay, GSU instructors would not assign Plaintiffs' works.  *See* Def. S.J. Mem. 40.  But Defendants have not cited – nor are Plaintiffs aware of – any authority for the proposition that market harm depends on the defendant's willingness to pay as an alternative to appropriating the plaintiff's intellectual property.  If that were the test, potential users of copyrighted material would never request licenses; they would simply engage in the unauthorized use and then, when challenged, claim fair use based on not being willing or able to pay the market price.[4]  The prospective nature of the market-harm inquiry, however, is directed

---

[4] That GSU students "still spend hundreds of dollars (if not thousands) each semester on textbooks," (Def. Opp. Mem. 33), and that GSU "pays hundreds of thousands of dollars each year for licenses," (*id.* at 33-34), is irrelevant.  Just as "no plagiarist can excuse the wrong by showing how much of his work he did not pirate," *Harper & Row*, 471 U.S. at 565 (citation and internal quotes omitted), so too an infringer cannot escape liability by pointing to materials he did not infringe.  At that, Defendants misportray the record as to declines in licensed hard-copy coursepacks in favor of unlicensed ERes coursepacks.  *See* Def. Opp. Mem. 27; Pl.

toward the impact of the conduct *if it were widespread*; it does not contemplate a

finding of no market harm based on rote representations of the type made here in

untested professor declarations that the material they deemed it fair use to copy

because it was important to their teaching purposes is nevertheless not worth the

cost of a modest permissions fee.

Defendants cite no support for their claim that "licensing costs . . . cannot be

. . . absorbed by the university or passed on to students."  Def. Opp. Mem. 25.  Nor

do they even attempt to explain how license costs have been absorbed at GSU

without disruption when the same course reading materials are offered as hard-

copy coursepacks, (*see* Pl. S.J. Mem. 15), yet purportedly cannot feasibly be

incurred when the same materials are offered electronically.

Plaintiffs have identified user-friendly, reasonably priced mechanisms for

licensing only those portions of works needed for educational use, including in

electronic form.  *See* Pl. S.J. Mem. 11-12; Declaration of Debra J. Mariniello,

dated February 24, 2010, ("Mariniello Decl.") Docket No. 163, Ex. 1 at 5-17.

Defendants' effort to portray such lawful access to Plaintiffs' works – via an entity

established at Congress's behest, *see* Mariniello Decl., Ex 1 at 4 – as impracticable

---

Mem. 20-21 (recounting the record evidence as to GSU's active encouragement of
a cost-saving shift away from coursepacks).

or unduly costly finds no record support.[5]  Indeed, an important element in the

Factor 4 analysis is the existence of a workable derivative market for licensing the

works involved.  *See* Pl. S.J. Mem. 56-57.  The record establishes the existence of

such a market here.  *See id.* at 11-12.  If anything, therefore, the unauthorized

copying at GSU "should be considered 'less fair' [because] there is a ready market

or means to pay for the use."  *Am. Geophysical*, 60 F.3d at 931.

That ERes postings at GSU may have decreased somewhat in number and in

length, (*see* Def. Opp. Mem. 34), does not undercut Plaintiffs' showing of market

harm or their entitlement to injunctive relief based on continuing infringement.

*See* Pl. Opp. Mem. 10-14.  This is not a damages case.  Plaintiffs need not

precisely quantify their economic harm to establish liability or obtain injunctive

relief.  They have provided the Court with evidence of the market value of GSU's

unauthorized copying and distribution.  *See* Declaration of Sara van Valkenburg,

dated February 26, 2010, ("van Valkenburg Decl."), Docket No. 166, ¶¶ 35-41;

---

[5]  Defendants' complaint that fees would have to be paid for "works never or rarely
used by students," Def. Opp. Mem. 25, has no application to these per-use licenses.
Their objection that "comprehensive" (*i.e.*, blanket) licenses, which are offered
through the CCC, (*see* Mariniello Decl. Ex. 1 pg. 10, Ex. B), can result, in theory,
in payment for works that might not be used by students, (Def. Mem. 25), is
misplaced, as that fact is compensated for by the benefit of having access to the
entire repertory without the need to engage in individual per-work transactions.
Mariniello Decl., Ex. 1 at 10, Ex. B.

762830.1

Declaration of Niko Pfund, dated February 26, 2010 ("Pfund Decl."), Docket No. 166, ¶¶ 38-41; Declaration of Frank Smith, dated February 25, 2010 ("Smith Decl."), Docket No. 164, ¶¶ 31-36.  Proving that all of the potential revenues associated with the infringements committed at GSU would, in fact, have been realized by Plaintiffs is not necessary to establish the harm to Plaintiffs' sales and licensing markets that has occurred, and that would in the future occur, if the Court were to endorse GSU's cavalier approach to copyright compliance.  As the Supreme Court stated in *Sony*, "Actual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage.  Nor is it necessary to show with certainty that future harm will result." 464 U.S. at 451.  Rather, the crux of the matter is that, in the words of the Second Circuit, Defendants' provision of Plaintiffs' works to students for free is being done "with the obvious intent, if not the effect, of fulfilling the demand for the original work."  *Wainwright Sec. Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977).

### E.     Other Factors

1. *Work-by-Work Fair Use Analysis.*  Defendants – who bear the burden of proof as to their fair use defense, *Letterese*, 533 F.3d at 1307 n.21, and who are obliged on this motion to identify a genuine issue of material fact – instead attempt

to shift the burden by arguing that Plaintiffs have failed to undertake a fair use analysis with respect to each individual work.  *See* Def. Opp. Mem. 30.  In fact, the discussions in Plaintiffs' declarations of each of the works identified in Exhibit 1 to the Complaint.  *See* van Valkenburg Decl. ¶¶ 19-32; Pfund Decl. ¶¶ 21-32; Smith Decl. ¶¶ 10-29, combined with the attestations as to market harm contained in those declarations and with the evidence (including professor depositions) as to how and the extent to which these works have been posted to ERes, more than suffice to make the necessary showing.  To expose the emptiness of Defendants' argument, however, Plaintiffs below walk through the fair use analysis as to two representative Exhibit 1 works.

a. *Feminist Media Studies*:  For the Spring 2010 semester Professor Meyers posted on ERes chapters 2 and 3 (32 pages) of SAGE's *Feminist Media Studies* by Liesbet van Zoonen for JOU4780.  *See* Pl. Opp. Mem. 11; Declaration of John H. Rains IV, dated April 26, 2010 ("Rains Decl.") at Ex. A.[6]  According to Professor Meyers, she completed the fair use checklist for the works she placed on ERes and "concluded that each such use was a fair use."  Meyers Decl. ¶ 2.  But her conclusion as to *Feminist Media Studies* was erroneous.  As for the first factor, the use is nontransformative, and a benefit is being obtained by GSU without paying

---

[6] Rains Decl. Ex. A shows increased ERes "hits" on Plaintiff works since February.

the customary price (the CCC or publisher permission fee).  The educational

purpose does not override these two factors.  Factor 1 thus weighs against fair use.

Factor 2 also weighs against fair use, as the book is a creative work of scholarship,

not a mere factual compilation.  *See* van Valkenburg Decl. ¶ 29.  Factor 3 also

weighs against fair use:  the two chapters posted comprise some 20% of the 155-

page book and are qualitatively important – as their selection by Professor Meyers

indicates – in that they set the analytical framework for the rest of the book.

Finally, Factor 4 weighs against fair use because the book is readily available for

purchase or licensing – alternative streams of revenue of which SAGE has been

deprived by the unauthorized taking and of which it would be deprived many times

over if the conduct were widespread.  *See* Mariniello Decl., Ex. 1 at 8-10; van

Valkenburg Decl. ¶ 31.

     b.  *SAGE Handbook of Qualitative Research*:  For the Spring 2010 semester

Professor Kaufmann posted 6 chapters (133 pages) of the third edition of *The*

*SAGE Handbook of Qualitative Research* (Denzin & Lincoln, eds.) on ERes for

EPRS8500.  Pl. Opp. Mem. 11; Rains Decl. Ex. A.  This is not fair use: (i) the use

is (admittedly) nontransformative, (*see* Deposition of Jodi Kaufmann, dated May 6,

2009 ("Kaufmann Dep."), Docket No. 173 at 67:7-68:9; Kaufmann Decl. Ex. A),

and confers a benefit without payment; (ii) the book is highly creative, comprised

of original research, analysis, and expression, (*see* van Valkenburg Decl. ¶¶ 19-20); (iii) the use is of a large, qualitatively important portion of the book – six complete chapters amounting to some 11% of the book (and 100% of the chapters copied), including the Introduction, (*id.* ¶ 19); and (iv) permission to use the work is readily available for a modest fee. *Id.* ¶ 20.

Replicating the foregoing analysis for every work sued upon would be a pointless exercise.  These examples – based on the conduct of professors whose copyright compliance Defendants cite as exemplary and involving Exhibit 1 works that still are being infringed more than a year after the new policy was put in place – should more than suffice to establish Plaintiffs' entitlement to injunctive relief.

2. *Defendants' "Good Faith."*  Defendants' avowal of good faith, (*see, e.g.,* Def. Opp. Mem. 34-35), cannot turn continued widespread, unauthorized, nontransformative copying into fair use.  As the Eleventh Circuit stated in *Letterese*, "[S]ince good faith does not insulate a defendant from liability and is merely a 'presupposition' of a defendant's claim to the [fair use] defense, its existence . . . would not outweigh the commercial and superseding nature of defendants' use."  533 F.3d at 1312 n.27; *see also Harper & Row*, 471 U.S. at 562 (noting that fair use presupposes good faith and fair dealing).  In other words, the

<u>absence</u> of good faith may invalidate the defendant's claim of fair use, but its presence cannot outweigh or override the other factors.

The only case Defendants cite in which good faith was found to weigh in the defendant's favor, *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (cited in Def. Opp. Mem. 35), is easily distinguishable. *Nunez* involved what the court found to be a transformative use of the plaintiffs' photographs by a newspaper "in conjunction with editorial commentary," which gave the pictures a "new 'meaning, or message.'" *Id.* (quoting *Campbell*, 510 U.S. at 579). The defendant in that case "believed in good faith that the photographs were available for general, unrestricted circulation and redistribution," and the use did not aim to compete with the plaintiff. *Id.* Here, by contrast, GSU professors are supplying Plaintiffs' copyrighted material to students for free notwithstanding the existence of well-established sales and licensing markets, and there is no question that Plaintiffs' works are not in the public domain and thus no basis for a good-faith belief in the absence of copyright restrictions.

Section 504 of the Copyright Act (cited in Def. Opp. Mem. 34-35), which directs courts to remit statutory damages where a librarian or professor, or the library or educational institution, had reasonable grounds for believing a use of a

copyrighted work was fair use, does not apply to liability or injunctive relief and thus is not relevant here.

3. *Classroom Copying Guidelines*. Defendant devote two full pages to knocking down the strawman argument that Plaintiffs contend the Classroom Guidelines define the limits of fair use in this case. *See* Def. Opp. Mem. 36-38. Plaintiffs make no such argument. What Plaintiffs do argue is that the principle animating the Guidelines – that "mechanical copying by a nonprofit public institution for private educational use must be limited to avoid interfering with the market for the work," (Pl. S.J. Mem. 49) – precludes a finding of fair use in this case. The copy shop cases similarly did not denote the Guidelines as the litmus test for fair use but, instead, cited them to reinforce the degree to which the challenged copying activities exceeded a reasonable conception of fair use in the academic setting. *See Princeton Univ. Press*, 99 F.3d at 1390-91; *Basic Books*, 758 F. Supp. at 1536.

## II.   DEFENDANTS' DEFENSE OF THE NEW COPYRIGHT POLICY DOES NOT COMPORT WITH THE LAW OR WITH THE RECORD EVIDENCE

### A. The New Policy as "More than a Checklist"

As if unburdened by the fact record, Defendants tout the new copyright policy as "more than a checklist." Def. Opp. Mem. 46. They assert that it provides

a "comprehensive tool that educates the educational community regarding

copyright law and fair use standards" and "multiple resources offering additional

information and assistance in complying with copyright law." *Id.* at 49.  To

support these assertions, Defendants fill two pages with supposed examples of the

richness of the resources provided.  *Id.* at 47-49.  The problem with these

assertions is that, however well intended, the record reflects that they form no part

of day-to-day practice.[7]

By way of example, Defendants repeatedly cite to the availability of "GSU

legal counsel to train library staff and faculty."  *See*, *e.g.*, Def. Opp. Mem. 47-48.

To provide the appearance that this asserted resource is in fact being utilized, one

(and only one) of Defendants' declarants attests to having attended a training

session conducted by university counsel Cynthia Hall.  *See* Dixon Decl. ¶ 3.

Plaintiffs' counsel was advised, however, that Ms. Hall left GSU in May 2009

(Rains Decl. Ex. B), and Defendants have provided no evidence that the limited

outreach begun by Ms. Hall has continued in her absence or, indeed, that *any* legal

resources have been committed to ERes compliance since then.

---

[7] Merely issuing instructions not to commit wrongdoing does not exculpate an
employer for the misconduct of employees.  *See* Pl. Opp. Mem. 34 (citing cases).

Similarly while Defendants cite provisions of the new policy that "identify" and "link professors to" various resources that they "*can*" access in making copyright determinations in relation to ERes course offerings, (Def. Opp. Mem. 47-48 (emphasis added)), the record is devoid of evidence that professors *in fact* avail themselves of these tools.  Indeed, but for Professor Dixon's reference to one training session, none of the professor declarations refers to use of any resource other than the checklist.  And while Defendants also prominently cite the new policy's "authoriz[ation of] library staff to reject postings to the ERes system," they concede that in the more than a year the new policy has been in effect, during which time there have been several thousand ERes postings, only one proposed posting has been challenged by library staff.  *See* Def. Opp. Mem. 15-16, 49; Deposition of Laura Burtle, dated April 24, 2009 ("Burtle Dep."), Docket No. 169 at 41:15-42:14.

### B.  Defendants' Defense of the Checklist

Without making clear how it is legally relevant, Defendants engage in a lengthy defense of the GSU fair use checklist.  In doing so, they fail to rebut Plaintiffs' showing that the checklist, as a result of its faulty design, produces the

unlawful copying reflected in the ERes reports, which speak for themselves.[8]  *See* Pl. Opp. Mem. 7-14; Rains Decl. Ex. A.  As we have shown, the inherent flaws in the checklist are compounded by the fact that its implementation is delegated to professors with inadequate copyright training and virtually no supervision (indeed, with respect to uLearn, no supervision).  *See* Pl. S.J. Mem. 22-31.

The completed checklists belatedly produced with Defendants' opposition papers with the apparent purpose of demonstrating reasonable implementation of fair use principles scarcely constitute models of sound practice.  Professor Esposito's checklists are identical for every work, and none of them contains a check in any "Weighs Against Fair Use" box, despite Professor Esposito having assigned between one and three full chapters of seven different books.  *See* Esposito Decl. Ex. A; Rains Decl. Ex. C.  For her part, Professor Kaufmann did not once check "large portion used" even where an entire chapter was taken.  *See* Kaufmann Decl. Ex. A.

---

[8] Defendants' assertion that Plaintiffs' criticisms of the GSU checklist "ring hollow" because the CCC formerly posted a similar fair use checklist, *see* Def. Opp. Mem. 50 n.12, itself rings hollow.  The CCC checklist is not, and was never, endorsed by CCC as an authoritative guide to making fair use determinations; it was simply offered as one of several available tools for use by academic libraries in creating their own copyright policies.  *See* Deposition of Debra J. Mariniello, dated June 30, 2009 at 190:24-193:1.  CCC has never held itself out as a legal copyright resource, as opposed to a facilitator of licensed transactions.  *Id.* 196:2-197:18.

In short, Defendants' inappropriate eleventh-hour effort to clean up the record as to the hapless efforts of GSU faculty to engage in meaningful fair use evaluations is unavailing.

## **CONCLUSION**

As Defendants have failed to raise any genuine issues of material fact as to Plaintiffs' motion for summary judgment, Plaintiffs' respectfully urge the Court to grant the motion and enter an appropriate permanent injunction.

This 26th day of April, 2010.

/s/ John H. Rains IV
Edward B. Krugman
Georgia Bar No. 429927
John H. Rains IV
Georgia Bar No. 556052


BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
krugman@bmelaw.com
rains@bmelaw.com

R. Bruce Rich (*pro hac vice*)
Randi Singer (*pro hac vice*)
Jonathan Bloom (*pro hac vice*)
Todd D. Larson (*pro hac vice*)

762830.1

25

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
r.bruce.rich@weil.com
randi.singer@weil.com
jonathan.bloom@weil.com
todd.larson@weil.com

*Attorneys for Plaintiffs*

762830.1

26

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that this document complies with the font and point selections set forth in Local Rule 5.1.  This document was prepared in Times New Roman 14 point font.

<u>/s/ John H. Rains IV</u>
John H. Rains IV

762830.1

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** by CM/ECF filing system which will automatically send e-mail notification of such filing to the following attorney of record:

Anthony B. Askew, Esq.
Stephen M. Schaetzel, Esq.
Katrina M. Quicker, Esq.
John P. Sheesley, Esq.
Kristen A. Swift, Esq.
C. Suzanne Johnson, Esq.
Laura E. Gary, Esq.
King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia 30309

Mary Jo Volkert, Esq.
Assistant S. Attorney General
40 Capitol Square
Atlanta, Georgia 30334

This 26th day of April, 2010.

/s/John H. Rains IV
John H. Rains IV

762830.1