## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CAMBRIDGE UNIVERSITY PRESS, *et al*.,<br><br>          Plaintiffs,<br><br>    -*vs.*-<br><br>MARK P. BECKER, in his official capacity as Georgia State University President, *et al*.,<br><br>          Defendants. | Civil Action File<br>No. 1:08-CV-1425-ODE |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION TO EXCLUDE THE EXPERT REPORT OF KENNETH D. CREWS

NOW COME defendants MARK P. BECKER, in his official capacity as Georgia State University President, *et al*. (collectively, "Defendants"), and file this memorandum in opposition to Plaintiffs' Motion to Exclude the Putative Expert Testimony of Kenneth D. Crews ("Motion"). In their Motion, Plaintiffs again seek to exclude Dr. Crews' timely-filed expert report and testimony on the grounds that it is inadmissible under Federal Rule of Evidence 702. (Pls.' Mot. (Dkt. 202) at 1-2.) Plaintiffs in many instances merely reassert the same arguments from their previous effort to exclude. (Or. (Dkt. 121) at 4.) This second attempt is no more availing than the first, and Defendants respectfully submit that the motion should be denied.

## ARGUMENT AND AUTHORITIES

### I. LEGAL STANDARD GOVERNING ADMISSIBILITY OF EXPERT TESTIMONY

The admissibility or exclusion of expert testimony is within the discretion of the trial court, derived from its authority to manage trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Under the Federal Rules, expert testimony is presumed admissible. *See, e.g., United States v. Paul*, 175 F.3d 906, 910 (11th Cir. 2001) ("[R]ules 702 and 703 give all expert witnesses testimonial leeway unavailable to other witnesses on the presumption that the expert's opinion 'will have a reliable basis in the knowledge and experience of his discipline.'" (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999))). The rejection of expert testimony is the exception rather than the rule. Commentary to Rule Changes, Court Rules, 192 F.R.D. 340, 418-20 (2000).

Expert testimony is admissible if the expert is qualified by special knowledge, skill, experience, training, or education and the expert's opinions are reliable and will help assist in the resolution of disputed fact issues. *Kumho Tire*, 526 U.S. at 141-42; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). To assist in this inquiry, the Court in *Daubert* identified several non-exclusive factors that a district court may consider: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and

publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.   509 U.S. at 593-94.   These factors are not limited to scientific testimony; they also apply to testimony based on "technical" or other "specialized" knowledge.  *Kumho Tire*, 526 U.S. at 141.  Moreover, they are not intended to be a "definitive check-list"; a district court has the flexibility to narrowly tailor the factors to the specific situation presented.  *Daubert*, 509 U.S. at 593.  Ultimately— and regardless of the factors relied upon—the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.  The objective of *Daubert* "is to ensure the reliability and relevancy of expert testimony." *Daubert*, 509 U.S. at 1176.

## II.   PLAINTIFFS' MOTION IS DUPLICATIVE AND RAISES MANY ISSUES ALREADY ADDRESSED BY THIS COURT

In their first motion to exclude Dr. Crews' expert report, Plaintiffs argued that the report was inadmissible under Federal Rule of Evidence 702 because "it does not help the Court determine a fact in issue."  (Pls.' First Mot. Excl. (Dkt. 106) at 1 ("First Motion").)  Plaintiffs continue to argue that the policies at peer

universities are "not relevant" (Pls.' Second Mot. Excl. (Dkt. 202-2) at 17), that the policies at other universities "should be disregarded" (*id*. at 18), and that Dr. Crews' expert report and trial testimony "will not assist the Court to understand the evidence or to determine a fact in issue" (*id*. at 7).

This Court previously disagreed, stating that the report's "information will be helpful to the Court in understanding the evidence presented, determining the facts, and crafting relief, if necessary." (Or. (Dkt. 121) at 4.) Indeed, this Court specifically stated that "discussion of copyright policies at other universities . . . [will be] helpful to the court," (*Id*.) and discussion of copyright policies at other universities, if appropriate, "will assist the Court in fashioning an appropriate injunction." (*Id*.) This Court has already stated that it is fully capable of appropriately determining which portions of the report to consider. (*Id*.)

Plaintiffs' motion is essentially a motion for reconsideration of the Court's prior Order; such motions are not routinely granted. L.R. 7.2E; *see also Anderson v. Counts*, No. 1:07-CV-192, 2008 WL 268988, at *2 (N.D. Ga. Jan. 30, 2008). Reconsideration of a previous order is an extraordinary remedy and should be employed sparingly. *Region 8 Forest Servs. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 805-06 (11th Cir. 1993). Hence, a motion for reconsideration is appropriate only where there is: (1) newly discovered evidence; (2) an intervening

development or change in controlling law; or (3) a need to correct a clear error of law or fact. *Vidinliev v. Carey Int'l, Inc.*, 1:07-CV-762-TWT, 2008 WL 5459335, at *1 (N.D. Ga.  Dec. 15, 2008) (Thrash, J.).  A motion for reconsideration should not be used to present the Court with arguments already heard and dismissed, or to offer new legal theories or evidence that could have been presented in the previously-filed motion.  *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995), *aff'd* 87 F.3d 1242 (11th Cir. 1996) ("A motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court 'could have done it better' the first time.").  Plaintiffs' second motion to exclude squarely violates this principal.

Because this duplicative motion has already been considered and adjudicated, and is predicated on new legal theories that could have been presented in the previously-filed motion, the Court should deny it as an incorrect and impermissible request for a reconsideration of the previous decision by the Court.

## III.  PLAINTIFFS' RENEWED FEDERAL RULE OF EVIDENCE 702 ARGUMENT IS UNAVAILING

Plaintiffs repeat many of their First Motion arguments for the exclusion of Dr. Crews' report under Rule 702.  Ignoring this Court's instruction that Dr. Crews' report would be helpful, Plaintiffs assert that Dr. Crews is not qualified to

provide an expert opinion because the proposed testimony regarding the development of electronic reserves systems and of copyright policies at other universities is easily understood by an average layperson.  (Dkt. 202-2 at 6-8.) They also assert that Dr. Crews' opinions are "too biased to be reliable."  (*Id.* at 8.)

## A.    Dr. Crews Is An Expert

Dr. Crews is a preeminent expert in the field of copyright and fair use compliance in the college and university setting.  He has a P.h.D from UCLA's Graduate School of Library and Informational Science and a J.D. from Washington University in St. Louis.  (Dr. Crews' Exp. Report (Dkt. 104-2) at 3.)   His dissertation, studying fair use policies at major research universities in the United States, was the sole dissertation receiving the annual award from the Association of College & Research Libraries and from the Association for the Study of Higher Education.  (*Id.*)

Currently, he is the director of the Copyright Advisory Office at Columbia University.  (*Id.*)  As a researcher, teacher, and university administrator for the past 20 years, his career  has centered on copyright issues in the educational work of colleges and universities.  (*Id.*)   Dr. Crews has been an invited speaker at educational institutions and conferences in more than 40 states, and in countries on five continents.  (*Id.*)  Dr. Crews is often invited to educate faculty, librarians, and

other members of the academic community about copyright issues. (*Id*. at 4.)
Recently, the World Intellectual Property Organization ("WIPO") asked Dr. Crews
to conduct a survey and study of copyright exceptions applicable to libraries and
archives in the copyright laws of all 184 member countries. (*Id*.) Additionally, Dr.
Crews has testified in public hearings and in information sessions before the U.S.
Copyright Office. (*Id*. at 3.) He also has authored multiple publications on
copyright and fair use. (Id. at 3-5.) His expertise in this field is unquestionable.

Nonetheless, Plaintiffs attempt to distract the Court from Dr. Crews'
impressive and germane qualifications by arguing, for instance, that Dr. Crews
lacks training in "economics," "computer science," or "statistical analysis." (Dkt.
202-2 at 7.) Plaintiffs further seek to cast Dr. Crews' expert opinions aside as
"anecdotal" or overly broad. (*Id*. at 18 & 19.) They also complain that Dr. Crews
has no information on whether Georgia State University ("GSU") could operate a
system whereby license fees were charged back to students.[1] (*Id*. at 20.)
Plaintiffs' protestations have no bearing on Dr. Crews' expertise in the field of
copyright, particularly in the academic arena, or on his qualitative methods of
analysis. Accordingly, they do not warrant exclusion of Dr. Crews' expert report

---

[1] Plaintiffs cite the deposition of Mr. Palmour to support their assertion that "GSU employees suggested that GSU likely *would* be able to charge permission fees to students[.]" (Dkt. 202-2 at 21 n.3) (emphasis in original). What in fact was said was that there is currently no system in place to charge permission fees to students but that "*theoretically*" it was possible. (Palmour Dep. (Dkt. 167) at 156:24-157:18.)

or testimony.

Experts are properly evaluated under Rule 702 in terms of whether they have useful knowledge that will assist the Court, not on the basis of particularized training.  For example, expert witnesses who have offered testimony on economic questions include not only "economists," but also other types of experts addressing the same issues.  In *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000), the defendant complained that the trial court should not have allowed a CPA to offer expert testimony about the amount of damages "because he does not have a degree in economics or statistics or mathematics or some other 'academic' field that might bear on the calculation of damages."  The court summarily rejected the contention that *Daubert* requires that only a particular form of expertise be offered: "The notion that [*Daubert*] requires particular credentials for an expert witness is radically unsound."  *Id*.; *see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc*., 387 F. Supp. 2d 794, 801–02 (N.D. Ill. 2005) (noting that one does not need to be a CPA to testify about economic damages).

A person does not need to be an engineer or scientist with a formal education to qualify as an expert; *experience* is sufficient to establish expertise.  "Anyone with relevant expertise enabling him to offer responsible opinion

testimony helpful to judge or jury may qualify as an expert witness." *Loeffel*, 387 F. Supp. 2d at 801–02.  Indeed, courts typically are generous in finding that a proposed expert's training or experience satisfies Federal Rule of Evidence 702. *See, e.g., Floyd v. Hefner*, 556 F. Supp. 2d 617 (S.D. Tex. 2008) (rejecting assertion that an expert was unqualified because he did not have a formal degree in accounting and observing that the expert's 40 years of wide-ranging experience in the petroleum industry was sufficient qualification for valuation of oil and gas properties); *TVT Records v. Island Def Jam Music Group*, 250 F. Supp. 2d 341 (S.D.N.Y. 2003) (holding a certified public accountant with extensive experience in the music and entertainment industries qualified to make sales projections); *Heller Healthcare Fin., Inc. v. Boyes*, No. Civ. A. 300-CV-1335D, 2002 WL 1558340 (N.D. Tex. July 15, 2002) (rejecting defendant's argument that because the plaintiff's expert lacked experience in the healthcare industry, his opinion about eligible receivables should be excluded and noting that any deficiencies in the relevant expertise could be exposed by vigorous cross-examination).  Here, Dr. Crews' qualifications and experience regarding copyright compliance in the educational  environment is beyond legitimate dispute.

The cases cited by Plaintiffs are therefore plainly distinguishable.  For example, in the criminal case *United States v. Frazier*, the defendant attempted to

provide expert testimony from a forensic investigator about bruising to a victim's genital area in a kidnapping case where the victim also alleged that she had been raped.  387 F.3d 1244, 1261-63 (11th Cir. 2004).  The District Court excluded this opinion on the grounds that the investigator's opinion lacked scientific basis and there was no basis for assessing the reliability of the expert's opinion and he was "not qualified to offer expert medical testimony."  *Id*. at 1263, n.16.

Similarly, in *Oliveira v. Bridgestone Americas Holding, Inc*., the proposed expert offered to testify that a tire blow-out resulted from a defect in the tire, but he had no education, experience and training in the field of tire design or manufacturing. Rather, he had experience only in the general field of polymer chemistry and the bonding of certain materials.   Civ. A. No. 1:06-CV-1280-RLV, 2007 WL 1655842, at *1-3 (N.D. Ga. June 5, 2007).   The proposed expert's technical knowledge was thus insufficient to aid a fact-finder in reaching a conclusion that tire tread separation caused tire blow out.  *Id.*

In contrast to these cases, Dr. Crews has years of direct experience creating, analyzing, and implementing copyright policies, including licensing and fair use considerations, as well as considering the challenges a university faces with the choice of either "removing the material and losing the educational opportunity, or seeking permission and possibly incurring fees."  (Dkt. 104-2 at 25.)

Dr. Crews' lack of a formal statistics, economics, or computer science degree does not disqualify his opinions in this case given the level of his professional experience in this field. *See S. Cement Co. v. Sproul*, 378 F.2d 48, 49 (5th Cir. 1967) ("'[A] person may become qualified as an expert by practical experience . . . Professional education is not a prerequisite.'") (quoting *Santana Marine Serv., Inc. v. McHale*, 346 F.2d 147, 148 (5th Cir. 1965)). In short, Plaintiffs fail to offer any meaningful reasons to question Dr. Crews' qualifications or the relevance of his testimony.

## B.    Dr. Crews Is Not Biased

Plaintiffs' assertion that Dr. Crews is biased because he "had a consulting session with officials of the University System of Georgia" regarding his own drafting of the GSU Copyright Policy ("Copyright Policy") is inaccurate. (Dkt. 202-2 at 9-10). Careful review of the cited deposition testimony reveals the following: Dr. Crews spoke with Assistant Attorney General Mary Jo Volkert by telephone and later met with Ms. Volkert and Defendants' attorney Steve Schaetzel at the offices of King & Spalding and later at GSU's counsel's offices. (Crews Dep. at 28:16-23; 36:9-39:1.) Naturally GSU sought evaluation from Dr. Crews, a leading authority on the subject. Plaintiffs seek to cast a negative light on this evaluation, turning GSU's effort to insure the adoption of the best policy possible

into a negative event.

Further, Dr. Crews did not write the Copyright Policy as Plaintiffs insinuate. (*See* Dkt. 202-2 at 10 ("coupled with his obvious self-interest in defending his own work"); *see also* Crews. Dep. at 43:23-44:14.)  Counsel for Defendants asked him for his opinion on the Copyright Policy after it was developed by an independent committee—the University Copyright Committee.  (Crews Dep. at 44:23-47:18.) While the independent committee considered a copyright policy from Columbia University drafted by Dr. Crews as guidance in crafting the Copyright Policy (Crews Dep. 71:10-18), Dr. Crews never testified that the Copyright Policy was "*his own work product*."  (Dkt. 202-2 at 10 (emphasis in original); *see also* Crews Dep. at 71:24-73:10.)  The version adopted by GSU is only modeled, in part, on some of the provisions of Dr. Crews' well-known checklist.  (Crews Dep. at 71:10-18.)

Dr. Crews allows and even encourages others to use his checklist, freely giving permission to third parties to develop their own policies while relying on portions of his well-known and well-respected checklist.  (*Id.*)  Dr. Crews' checklist, originally developed in the late 1990s, has been adopted in part or in whole by many users, including the Copyright Clearance Center, the publishers acknowledged licensing agent.  (Dkt. 104-2 at 57-58.)  The widespread influence

of the checklist, and its role in helping educators comply with copyright law, are rightfully sources of pride for Dr. Crews.  (Crews' Dep. at 73:8-10.)

Plaintiffs seek to cast this pride in a negative light.  Plaintiffs take the position that Dr. Crews, the original creator of the now widely-adopted fair use checklist, is incapable of assessing whether a third party, in the creation of their own checklist, has successfully adopted the principles and guidelines that have made his checklist so worthwhile.  (Dkt. 202-2 at 8-10.)  Dr. Crews' checklist is designed to ensure compliance with copyright law.  He is therefore the ideal party to opine on whether, in the creation of its fair use checklist, GSU has successfully integrated the proper guidelines for fair use compliance.

Plaintiffs' suggestion that Dr. Crews was converted from a consulting expert to a testifying expert, and therefore "is too biased to be reliable" is without justification.  (*Id.* at 8.)  In fact, such conversion is commonplace.  *See Western Res. Inc. v. Union Pac. R.R. Co.,* No. 00-2043-CM, 2002 WL 181494, at *3 (D. Kan. Jan. 31, 2002) (six-year consulting expert converted to testifying expert).  As described in *Oklahoma v. Tyson Foods, Inc.*:

> It is a common trial tactic . . . to retain a consulting expert to review the available evidence and reach preliminary opinions under the protection of Rule 26(b)(4)(B).  If those preliminary opinions are not favorable to the retaining party, counsel would not list the consultant as a testifying expert in the case . . . but if the consultant's opinions are in line with counsel's theory of the case, counsel would then

designate the consultant as an expert witness.

No. 05-CV-329-GKF-PJC, 2009 WL 1578937, at *4 (N.D. Okla. June 2, 2009) (citations omitted).

Plaintiffs' citation to *Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1362 (M.D. Ga. 2009) does not support exclusion when a conversion occurs. (*See* Dkt. 202-2 at 9.)   The *Clarke* defendants challenged an internal medicine physician's qualifications under *Daubert* claiming that he was not qualified to render opinions as to a specific cause of death.  632 F. Supp. 2d at 1358.  As part of their challenge, the defendants argued his testimony was unreliable.  *Id.* at 1362.   The Court applied nine tests in its analysis, only one of which was whether the expert's opinion grew naturally and directly out of research he had conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying.  *Id.*  Although the expert was a consultant to the plaintiff's counsel, had testified for him on three prior occasions, and developed his opinions solely for the litigation, he was ultimately excluded because he failed either *other* tests.  *Id.* at 1360-68.   The court observed that the exact cause of death should be left to pathologists and coroners who regularly perform autopsies and offer opinions on the cause of death and not be subject to the criticism of a physician with no education, training, or experience in the field of pathology.  *Id.* at 1370.   Here,

however, the issue in the case is squarely within the areas where Dr. Crews regularly works: copyright issues in the educational environment.

Even if Dr. Crews was in some way biased, it would reflect on his credibility. It would not render him incompetent to testify.  Expert witnesses—like all other witnesses—may be interrogated for the purpose of showing any bias or prejudice where those factors may affect the value of their testimony.  *See Daubert*, 509 U.S. at 596.   Where expert testimony is based on well-established science, the courts generally have concluded that reliability problems go to weight, not admissibility.  *See id*.  Thus, if plaintiffs are genuinely concerned with bias, the proper challenge is through cross-examination.  *See, e.g., United States v. Greschner,* 802 F.2d 373, 382 n.12 (10th Cir. 1986) (cross examination to show bias or interest of a witness is entirely proper); *Collins v. Wayne Corp*., 621 F.2d 777, 784 (5th Cir. 1980) (holding that crossing an expert about his fees in prior cases is proper because "[i]mpeachment of witnesses through a showing of bias or interest aids the jury in its difficult task of determining facts when it is faced with contradictory assertions by witnesses on both sides of the case."); *United States v. Preciado-Gomez*, 529 F.2d 935, 942 (9th Cir. 1976) ("[E]xistence of bias or prejudice of one who has expressed an expert opinion can always be examined into on cross-examination of such expert; as well as the facts upon which his expert

opinion was based.").

Plaintiffs in this case did not request a jury.  The absence of a jury further speaks to a proper challenge by cross examination, as the Court is experienced in deciding between contradictory fact assertions by expert and lay witnesses alike.

Dr. Crews' short-lived role as a consultant that reviewed the new policy in no way detracts from his findings as an expert.  Dr. Crews is, in short, an exquisitely qualified expert whose credentials are an ideal fit for the central issues of copyright compliance and fair use in this case.  As already found by this court, his expert opinion will be of assistance.

## IV.   DR.  CREWS'  METHODS  SATISTFY  THE  *DAUBERT* REQUIREMENTS AND PLAINTIFFS' COMPLAINTS ABOUT HIS METHODOLOGY ARE ISSUES FOR CROSS-EXAMINATION

Failing to establish Dr. Crews as unqualified or biased, Plaintiffs next attack the methodology of his report, offering a veritable laundry list of criticisms ranging from purported "omissions" from a summary document to the allegedly "arbitrary" nature of what is a purposefully deep and broad sampling of the policies of peer universities.

In creating his report, Dr. Crews performed extensive research on the Copyright Policy and its implementation at  GSU.  Dr. Crews began by reviewing many documents, including the current policy and the depositions of Ms. Burtle,

Ms. Seamans, Mr. Palmour, Ms. Belcher, Ms. Kaufman, and Mr. Potter.   (Dkt. 104-2 at 6.)  Dr. Crews then performed relevant legal and library science research and reviewed the current copyright policies of a wide range of colleges and universities.  (*Id.* at 6-7.)  Finally, Dr. Crews met with GSU counsel to finalize his report.  (*Id.* at 7.)  Despite his thorough review of the Copyright Policy, its implementation, and the best practices of GSU's peer universities, Plaintiffs contend that Dr. Crews' report is "so methodologically flawed" that the Court should completely disregard its findings.  (Dkt. 202-2 at 11.)  Plaintiffs' laundry list of hindsight observations and personal preferences are matters that go to the weight of the testimony, not its admissibility, and therefore are fit for review on cross examination.   None of the issues raised by Plaintiffs' Motion warrant exclusion of the report.

Plaintiffs begin with an attack on Dr. Crews' reliance on his wife to help him by downloading "an assortment of [copyright and fair use] policies . . . show[ing] a range of different approaches that different universities and different libraries have taken on electronic reserves."  (Crews' Dep. at 61:15-19.)  According to Plaintiffs, it was inappropriate for Dr. Crews to delegate any tasks to his wife.  Specifically, Plaintiffs argue that Mrs. Crews has "no background in copyright law" and therefore could not have completed the simple task of downloading a range of

copyright policies.   (Dkt. 202-2 at 13.)   No case law is cited to support this contention.   Moreover, Plaintiffs fail to acknowledge that Mrs. Crews is herself a highly educated librarian, holding a number of degrees including a Master's degree in Library Science.   (Crews' Dep. at 62:15.)   Mrs. Crews was fully capable of performing her assigned downloading task; Plaintiffs offer no legitimate reason to doubt this capability.

Plaintiffs next quibble with the survey technique, calling it "haphazard" and "without . . . any discernible organizing principle."  (Dkt. 202-2 at 14.)  Plaintiffs seem to overlook the key point here:  the sample is intended to ensure that the policies reviewed represent those at schools of varying sizes an in varying geographic locations in order to provide the Court with an accurate and representative sample of the policies at peer universities.  If only the policies from schools in Georgia, or only liberal arts schools, or only five to ten policies had been downloaded, Plaintiffs would complain that the sample was biased or too limited.   Instead, at least 37 policies were downloaded, from colleges widely ranging in size, from Carlow University to Pennsylvania State University, and widely varying in location, from the University of Alaska, Fairbanks, to Clark Atlanta University. (Dkt. 104-2 at 29-44.)  Plaintiffs' criticism—that the sampling was somehow *too* random—misses the point.  Dr. Crews, in addition to his own

broad experience, has reviewed a meaningful cross-section of policies.  Plaintiffs offer no reasonable criticism which calls into doubt whether the sample was representative or whether the sample size was somehow insufficient.

Failing to offer any meaningful critiques of the survey methodology, Plaintiffs attempt to create an issue by focusing on the technical implementation of the copyright policy.  It is true that Dr. Crews did not consult with any "IT people" as alleged by the Plaintiffs.  (Dkt. 202-2 at 12.)  Plaintiffs attempt to cast this as a failure by Dr. Crews to learn of GSU practices.  (*Id.*)  Plaintiffs are here merely recasting their relevance arguments in an attempt to re-litigate the issues of their First Motion.  Further, when Defendants proposed a stay in the litigation so that the Plaintiffs could track the implementation of the new policy and see the results in practice, Plaintiffs refused.  (Dkt. 58 at Ex. C & Ex. D.)  Accordingly, Plaintiffs have only themselves to blame for the absence of a greater factual investigation into copyright compliance practices.

Regardless, the evidence in this case already demonstrates that the new Regents Policy as adopted at GSU is modifying behavior.  Dr. Crews' testimony is directed to that policy and whether it appropriately addresses issues of fair use in the educational environment.  Dr. Crews' findings were properly directed to the *policy*:

The Georgia University Policy . . . when followed by instructors, librarians, and others at the university . . . will provide an effective means for promoting compliance with the law . . . I reach the following observations about the Georgia University Policy:

- The Policy avoids myths and misperceptions of fair use that have appeared in some policies and literature.
- The policy includes a standard of fair use [that] is based soundly on the four factors in the statute and is consistent with case law.
- The policy directs instructors to use the fair use checklist, giving them an overview of many aspects of fair use.
- The policy includes a standard of fair use that preserves the law's flexibility to meet new needs and changing circumstances; as a result, the policy will be easily extended to innovations in education, such as the adoption of course management systems.
- The policy in fact has had real consequences; faculty members have testified that they have revised their use of copyrighted works based on the newly issued policy.
- The policy is consistent with, and similar to, many policies that have been in place at colleges and universities throughout the country.

Because of these characteristics and qualities of the Georgia University Policy, I believe the policy is an appropriate policy for adoption by and implementation at the University System of Georgia.

(Dkt. 104-2 at 68-69.)  These opinions are not biased nor are they ill-conceived.

Rather, they are based on Dr. Crews' educational training and experience.

Plaintiffs' attempts to distract from Dr. Crews' proper testimony regarding the

GSU policy is without merit.

As a final matter, Dr. Crews has offered a number of summaries of the

various copyright policies of GSU's peer universities.  Dr. Crews reviewed at least

37 university policies, and offered summaries of many of them.  (Dkt. 104-2 at 29-

44.)   Dr. Crews did not hide any information; he instead offered each of the copyright policies *in full*.  (Dkt. 104-2, Ex. E.)  Any purported "omissions" from Dr. Crews' summaries are more properly labeled as a difference of opinion between Plaintiffs and Dr. Crews about which items were most relevant to include in a summary of the policy.

As shown in his report and at his deposition, Dr. Crews considered sufficient facts and data for his opinion.  He properly applied the appropriate principles and methodology in accordance with professional and judicial standards.  His report is reliable and relevant.  Plaintiffs may cross-examine Dr. Crews about the basis for his opinions at trial to demonstrate any alleged weaknesses in his selected methodology.  *Daubert*, 509 U.S. at 596 ("[v]igorous cross examination, presentation of contrary evidence and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence.")

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiffs' Motion be denied in its entirety.

Respectfully submitted this 11th day of May, 2010.

THURBERT E. BAKER          033887
Attorney General

R. O. LERER                446962
Deputy Attorney General

DENISE E. WHITING-PACK  558559
Senior Assistant Attorney General

MARY JO VOLKERT
Georgia Bar No. 728755
Assistant Attorney General


*/s/ Katrina M. Quicker*
King & Spalding LLP
Anthony B. Askew
Georgia Bar No. 025300
Special Assistant Attorney General
Stephen M. Schaetzel
Georgia Bar No. 628653
Katrina M. Quicker
Georgia Bar No. 590859
Kristen A. Swift
Georgia Bar No. 702536

**Attorneys for Defendants**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia, that the foregoing memorandum complies with the font and point selections approved by the Court in L.R. 5.1B.   The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

*/s/ Katrina M. Quicker*_____
Katrina M. Quicker
(Ga. Bar No. 590859)

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CAMBRIDGE UNIVERSITY PRESS, et al., <br><br>            Plaintiffs, <br><br>       -*vs.*- <br><br> MARK P. BECKER, in his official capacity as Georgia State University President, et al., <br><br>            Defendants. | Civil Action File <br> No. 1:08-CV-1425-ODE |

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that, on this 11th day of May, 2010, I have electronically filed the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION TO EXCLUDE THE EXPERT REPORT OF KENNETH D. CREWS** with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Edward B. Krugman
krugman@bmelaw.com
Georgia Bar No. 429927
Corey F. Hirokawa
hirokawa@bmelaw.com
Georgia Bar No. 357087
John H. Rains IV
Georgia Bar No. 556052

BONDURANT, MIXSON
& ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

R. Bruce Rich
Randi Singer
Todd D. Larson

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


*/s/ Katrina M. Quicker*
Katrina M. Quicker
 (Ga. Bar No. 590859)