FILED IN CHAMBERS
(U.S.D.C. - Atlanta)

SEP 3 0 2010

By: ~James N. Hatten, Clerk~
~HMCauu~
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS;
OXFORD UNIVERSITY PRESS, INC.;
SAGE PUBLICATIONS, INC.,

         Plaintiffs

v.

MARK P. BECKER, in his
official capacity as President
of Georgia State University;
RISA PALM, in her official
capacity as Senior Vice
President for Academic Affairs
and Provost of Georgia State
University; J.L. ALBERT, in
his official capacity as
Georgia State University
Associate Provost for
Information Systems and
Technology; NANCY SEAMANS, in
her official capacity as Dean
of Libraries at Georgia State
University; ROBERT F. HATCHER,
in his official capacity as
Vice Chair of the Board of
Regents of the University
System of Georgia; KENNETH R.
BERNARD, JR., JAMES A BISHOP,
FREDERICK E. COOPER, LARRY R.
ELLIS, FELTON JENKINS, W.
MANSFIELD JENNINGS, JR., JAMES
R. JOLLY, DONALD M. LEEBERN,
JR., WILLIAM NESMITH, JR.,
DOREEN STILES POITEVINT,
WILLIS J. POTTS, JR., WANDA
YANCEY RODWELL, KESSEL
STELLING, JR., BENJAMIN J.
TARBUTTON, III, RICHARD L.
TUCKER, ALLAN VIGIL, and LARRY
WALKER, in their official
capacities as members of the
Board of Regents of the
University System of Georgia,

         Defendants

CIVIL ACTION NO.
1:08-CV-1425-ODE

ORDER

This is a copyright infringement case under 17 U.S.C. §§ 101 et seq. brought against various officials of the University System of Georgia, including officials of Georgia State University ("Georgia State"). Plaintiffs are three publishing houses who claim that Defendants are responsible for infringement of their copyrighted works. They complain of Georgia State's practice of allowing professors and other instructors to utilize electronic systems to reproduce and distribute excerpts from copyrighted works for academic use by Georgia State students, without paying copyright fees to them. Plaintiffs seek injunctive and declaratory relief. They do not seek damages.

Defendants respond that the electronic distribution which has occurred at Georgia State is protected by the statutory doctrine of fair use, in that these materials are used for the purpose of teaching, scholarship, research or non-profit educational purposes, as allowed by 17 U.S.C. § 107. The named Defendants also contend that they are improperly sued in this case, because they individually have not been engaged in the copying of Plaintiffs' materials or in making the fair use determinations with respect to individual works. They also contend they have not done anything to encourage improper use of Plaintiffs' copyrighted work.

Plaintiffs' initial complaint was filed April 15, 2008. The First Amended Complaint was filed December 15, 2008, and is the currently operative complaint. The First Amended Complaint states that it arises from "Georgia State's systematic, widespread, and

2

unauthorized copying and distribution of a vast amount of copyrighted works, including those owned or controlled by Plaintiffs" [First Amended Complaint, Doc. 39 at 5]. It asserts that the improper distribution of copyrighted materials at Georgia State is "pervasive, flagrant, and ongoing" [Id. at 6]. The First Amended Complaint lists specific copyrights of Plaintiffs which allegedly were infringed by the distribution of excerpts during 2006, 2007 and 2008. It alleges that Georgia State's then-existing "copyright primer" for instructors encouraged copying of copyrighted materials beyond the limits of fair use [Id. at 20-21].

In February 2009, the Board of Regents introduced a new copyright policy for University System of Georgia schools (hereinafter the "2009 Copyright Policy" or the "Current Policy") which was the culmination of efforts by the Board of Regents Select Committee on Copyright that had convened in late December 2008 [Doc. 142-2 at 51]. The Current Policy requires each instructor to evaluate whether distributing copies of an excerpt of copyrighted material is fair use by completing a "Fair Use Checklist" form [Id. at 52-53]. The Fair Use Checklist was derived from a checklist prepared by Defendants' expert Dr. Kenneth Crews, and is similar to one used at several other educational institutions [Doc. 187 at 66]. The Current Policy became effective on February 17, 2009. This was in the middle of the Spring 2009 semester. The full semesters which were impacted by the Current Policy began in May 2009. The 2009 Copyright Policy is contained in Appendix B and discussed more fully below.

3

The parties completed discovery in January 2010. Summary judgment motions were filed by both sides on February 26, 2010. While Plaintiffs' motion addresses the claimed inadequacy of the Current Policy, Plaintiffs rely on the alleged infringements which are listed in Exhibit 1 to the First Amended Complaint, which predates the Current Policy. Plaintiffs also list, in their Statement of Material Facts filed along with their Motion for Summary Judgment, additional alleged infringements, the great majority of which occurred before the 2009 Copyright Policy was enacted [Doc. 142-2 at 24-37, 64-76]. Most entries on this list do not contain full information: the author of the book, the course or professor involved, the specific pages or chapter excerpts which were copied, the total number of pages/chapters in the work as a whole, and the name of the copyright holder. For the most part, only the name of the book and the semester in which it was used are listed.

In their Memorandum in Support of Defendants' Motion for Summary Judgment, Defendants argue that only the 2009 Copyright Policy is relevant at this juncture. Defendants also point out that since the 2009 Copyright Policy was enacted, the amount of copied material from Plaintiffs' works previously copied (the works listed in Exhibit 1 to the First Amended Complaint) has declined. Therefore, they claim the Current Policy has had a beneficial effect. In opposition, Plaintiffs state that "Defendants' attempt to reduce this to a case about the infringement of the works listed in Exhibit 1 to the Complaint — and no others — is completely disingenuous" [Plaintiffs' Memorandum, Doc. 185 at 10]. Plaintiffs reiterate that

4

Defendants' infringements are "massive."  In their Reply Brief, Defendants assert that Plaintiffs' identification of a large number of new claimed infringements only after the close of discovery (Defendants say this is over 270 new claimed infringements) is unfair both because of the timing and the limited detail provided.

After considering the foregoing, the Court agrees with Defendants that only the 2009 Copyright Policy is relevant to Plaintiffs' claims, which are for injunctive and declaratory relief only.   While it is somewhat unclear, the Court reads Plaintiffs' First Amended Complaint as seeking an injunction against Defendants' copyright policies.  This would include the Current Policy.  The Court also reads Plaintiffs' First Amended Complaint as claiming that the Current Policy as applied to Plaintiffs' copyrighted works has led to continuing abuse of the fair use privilege.  In this regard, only claimed infringements occurring after February 17, 2009 will be considered.  Further, only claimed infringements identified by Plaintiffs sufficiently early in the case to allow Defendants time for discovery will be considered.   As such, the parties' supplemental filings in response to this Court's August 11, 2010 and August 12, 2010 orders directing the parties to file detailed information about any alleged infringements that occurred after the implementation of the 2009 Copyright Policy are not considered as part of the record for purposes of the instant summary judgment motions. Defendants have not had an opportunity to conduct discovery as to these alleged infringements.  The net effect is that the current record does not provide an adequate basis for determining whether

an injunction should issue based on continuing infringement of Plaintiffs' copyrights under the Current Policy. There do remain some other issues which can be addressed at this time.

This case is before the Court on the parties' cross-motions for summary judgment [Docs. 142, 160]. Opposing briefs [Docs. 185, 186, 201][1] and reply briefs [Docs. 206, 210] have been filed. For the following reasons, Defendants' Motion for Summary Judgment [Doc. 160] is GRANTED in part and DENIED in part and Plaintiffs' Motion for Summary Judgment [Doc. 142] is DENIED.

I.   Statement of Undisputed Facts

The following facts are undisputed unless noted otherwise.

A.   Plaintiffs and Defendants

Cambridge University Press ("Cambridge"), Oxford University Press, Inc. ("Oxford"), and SAGE Publications, Inc. ("SAGE") (collectively, "Plaintiffs") are publishing houses that publish academic works including textbooks, academic books, reference works, and journals. Cambridge is the not-for-profit publishing house of the University of Cambridge in England. Its United States headquarters is located in New York [Plaintiffs' Statement of Facts, Doc. 142-2 at 1-2]. Oxford is a not-for-profit corporation headquartered in New York and linked to Oxford University Press in Oxford, England [Id. at 3]. SAGE is a Delaware corporation headquartered in Thousand Oaks, California [Id. at 4].

---

[1]Defendants moved to file a corrected brief in opposition to Plaintiffs' Motion for Summary Judgment [Doc. 201]. This motion [Doc. 201] is GRANTED and Defendants' corrected opposition brief has been considered.

6

Defendants are officials of Georgia State and/or the University System of Georgia. Georgia State, located in Atlanta, Georgia is a public university [Plaintiffs' Statement of Facts, Doc. 142-2 at 8]. The Court takes judicial notice that Georgia State had approximately 30,000 undergraduate and graduate students as of Fall 2009 and has 1,046 full-time faculty members. Quick Facts, GEORGIA STATE UNIVERSITY (July 12, 2010, 12:53 PM), http://www.gsu.edu/factsheet.html. The Board of Regents has general supervisory authority over Georgia State's operations and elects the President of Georgia State [Defendants' Response to Plaintiffs' Statement of Facts, Doc. 187 at 10-11].

B.    ERes and uLearn

ERes and uLearn are two different electronic systems that allow Georgia State instructors to provide reading materials to students in an electronic format. They are described in Appendix A. The two systems operate in different ways and instructors may choose to use one or both systems, but the general function of both systems is the same. The University System of Georgia's website states that "[t]he University System of Georgia supports instruction with electronic reserves and similar electronic services. The primary function of these services is to assure that students and teachers will have timely access to course-related library resources" [Stipulated University System of Georgia 2009 Copyright Policy, "Additional Guidelines for Electronic Reserves," Doc. 225-6]. Plaintiffs allege in their Complaint that Defendants infringed their copyrights through the use of ERes and uLearn [Doc. 39 at 22-25].

C.    The University System's 2009 Copyright Policy

The 2009 Copyright Policy is set out in Appendix B.  It gives the instructor responsibility for evaluating whether a particular reading to be distributed is fair use by completing a "Fair Use Checklist" form [Doc. 142-2 at 52-53].

The Fair Use Checklist sets out the four fair use factors: (1) Purpose and Character of the Use; (2) Nature of the Copyrighted Work; (3) Amount and Substantiality of Portion Used; and (4) Effect on Market for Original.  Beneath each factor are two columns titled "Weighs in Favor of Fair Use" and "Weighs Against Fair Use" with a number of different possible characteristics of the reading listed beneath each column title and a box to check whether that characteristic applies to the reading.  Each of these characteristics is derived from elements of copyright statutory and case law.  At the bottom of each column is a place to indicate whether that factor weighs in favor of or against fair use.   The Fair Use Checklist contemplates that instructors will go through each factor checking all items that apply, and then compare the number of checks in each column to decide whether that factor weighs for or against fair use.  Having done that for each factor, the instructor may find that "reliance on fair use is justified" if the factors favoring fair use outnumber those against it.  However, the instructors are required to consider all four fair use factors before making a decision [Doc. 187 at 70-71].  If after filling out the Fair Use Checklist the instructor concludes that the proposed use constitutes fair use, the instructor can distribute the work without obtaining

8

permission from the copyright holder (assuming that the library staff does not find any "red flags") [Doc. 142-2 at 59].

Most relevant to the instant case is the portion of the Current Policy titled "Additional Guidelines for Electronic Reserves," which sets out the following list of "standards" that apply "to use of copyrighted works for electronic reserves":

- Instructors are responsible for evaluating, on a case-by-case basis, whether the use of a copyrighted work on electronic reserves requires permission or qualifies as a fair use. If relying upon the fair use exception, instructors must complete a copy of the fair use checklist before submitting material for electronic reserves.
- Inclusion of materials on electronic reserves will be at the request of the instructor for his or her educational needs.
- Materials made available on electronic reserves should include a citation to the original source of publication and a form of copyright notice.
- The instructor, library or other unit of the institution must possess a lawfully obtained copy of any material submitted for electronic reserves.
- Access to course material on electronic reserves should be restricted by password to students and instructors enrolled in and responsible for the course.  Access should be terminated as soon as the student has completed the course.
- Library reserves staff should check to see whether materials submitted for electronic reserves are available through an electronic database or are otherwise legally available.  If so, staff should provide a link rather than scanning and posting the material.
- Library reserves staff should delete materials available on electronic reserves at the conclusion of each semester.
- Institutions at the University System of Georgia will impose no charge to students for access to materials on electronic reserves.

[Doc. 225-6].

The Current Policy further states:

If you are seeking to use a copyrighted work, you may have to obtain permission from the copyright owner. . . . Sometimes, the copyright owner may require a fee or impose other conditions.  You have to decide if the cost and conditions are acceptable . . . . Keep in mind that permission is not necessary if (1) your use is

> within fair use or another copyright exception; (2) the work is not protected by copyright at all; or (3) your use is within the terms of a license agreement.

[Doc. 225-9].

The policy provides links to numerous "collective licensing agencies" which are defined as "organizations meant to centralize copyright ownership information for their respective industries[,]" that may assist instructors seeking permission from copyright owners [Doc. 225-11]. One such link takes instructors to the website for the Copyright Clearance Center ("CCC"), and the policy states that "the CCC should be your starting point if you are looking to get permission for a text-based work. The CCC can grant permission for thousands of works, many instantly online." [Id.].[2]

---

[2]The CCC is a company that provides "licensing mechanisms specifically designed by the publishing community to foster innovative distribution formats (including electronic reserves)." [Doc. 39 at 26]. The CCC is financing 50% of this copyright litigation [Doc. 206-1 at 18].

It is undisputed that permission to use portions of Plaintiffs' works can be obtained through the CCC [Defendants' Response to Plaintiffs' Statement of Facts, Doc. 187 at 9]. These permissions are not free and it appears that pricing is based on the number of students in the course for which the instructor wishes to use the reading. Georgia State does license the use of some of the Plaintiffs' works through the CCC. Over approximately 10 years (1998-2008) Georgia State paid $18,905.42 directly to the CCC for licensing fees [Burtle Dep., Doc. 190-1 at 30-31]. This was only a small portion of the Georgia State budget for licensing of databases or electronic journals, which is "at least half" of "$4 to $5 million" [Id. at 27-28].

10

II.   The Fair Use Doctrine under 17 U.S.C. § 107

It is well established that particular instances of copying are not illegal because they are defensible as "fair use."   See Eldred v. Ashcroft, 537 U.S. 186, 220 (2003) ("The fair use defense affords considerable latitude for scholarship and comment. . . .") (internal quotation marks and citations omitted); See generally 4-13 Nimmer on Copyright § 13.05 (2010) (discussing the defense of fair use).  Fair use is an affirmative defense that requires a case-by-case analysis.  Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561 (1985).  Though the Copyright Act does not expressly define fair use, it lists "the factors to be considered" for the purpose of determining whether a particular instance of copying is fair use.  Specifically, the Copyright Act provides:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  Because of "the endless variety of situations and combinations of circumstances that can rise in a particular case . . . especially during a period of rapid technological change," Congress intended the statute to be fluid, leaving courts

11

"free to adapt the doctrine to particular situations on a case-by-case basis." H.R. REP. NO. 94-1476, at 66 (1976).

The defendant bears the burden of proof to show that a particular use is "fair use." Peter Letterese & Assoc., Inc. v. World Inst. of Scientology Enter., 533 F.3d 1287, 1307 n.21 (11th Cir. 2008); 3-12 Nimmer on Copyright § 12.11[F] (2010). Defendants appear to make the argument that in circumstances where the use is noncommercial, it is Plaintiffs' burden to demonstrate that the given use will harm the market for or value of the work. However, in Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 471, 451 (1984), to which Defendants cite, the United States Supreme Court did not hold that it is the plaintiff's burden to establish the fourth fair use factor, but instead concluded that the plaintiff had not overcome defendant's showing that the challenged noncommercial use would not adversely affect the potential market for the copyrighted work.[3]

Additionally, Congress amended 17 U.S.C. § 107 in 1992. While this amendment did not change the statute with regard to the four fair use factors, the House Report accompanying the amendment criticized those cases which mis-allocated the burden of proving fair use and stated that "the burden of proving fair use is always on the party asserting the defense, regardless of the type of relief sought by the copyright owner." H.R. REP. NO. 102-836, at 3 n.3. The Court therefore rejects any arguments by Defendants that Plaintiffs have the burden of proof on the fourth fair use

---

[3]However, the Court's discussion does give some impetus to Defendants' fair use argument.

12

factor and concludes that Defendants bear the burden of proof on
all four factors of the fair use defense.

III. Sovereign Immunity

It is undisputed that Defendants as state officials are arms
of the State of Georgia and they are being sued in their official
capacities. See O.C.G.A. § 20-3-36 ("The applicability of the
doctrine of sovereign immunity to the board of regents is
reaffirmed, except to the extent that the General Assembly may
expressly provide."); Nat'l Ass'n of Bds. of Pharmacy v. Bd. of
Regents of the Univ. Sys. of Ga., No. 3:07-CV-084, 2008 U.S. Dist.
LEXIS 32116, at *12-13 (M.D. Ga. Apr. 18, 2008). Therefore, the
Eleventh Amendment of the United States Constitution prohibits
suit against Defendants in federal court seeking retrospective or
compensatory relief. See Summit Med. Assocs., P.C. v. Pryor, 180
F.3d 1326, 1336-37 (11th Cir. 1999).

However, under the long-recognized exception to this rule
described in Ex parte Young, 209 U.S. 123 (1908), suit against
Defendants is allowed to the extent that it seeks "prospective
equitable relief to end continuing violations of federal law."
Id. The "ongoing and continuous" requirement is satisfied where
there is a threat of future violations of federal law that may be
remedied by prospective relief. Id. at 1338.

Here, Plaintiffs seek declaratory and injunctive relief
declaring that Defendants' actions regarding the electronic
distribution of copyrighted materials constitutes copyright
infringement, and granting permanent prospective injunctive relief
enjoining Defendants from digitally distributing Plaintiffs'
copyrighted works in the future. To obtain an injunction,

13

Plaintiffs must prove "a past infringement and a substantial likelihood of future infringements." Pac. & S. Co. v. Duncan, 744 F.2d 1490, 1499 (11th Cir. 1984). Therefore, past conduct (conduct occurring after February 17, 2009 and continuing thereafter) would be relevant in this case to the extent that it shows a "threat of future violations that may be remedied by prospective relief" under Ex Parte Young, and also to the extent that a showing of a past infringement is necessary to form the basis of an injunction.

IV.   Motions for Summary Judgment

A.   Summary Judgment Standard

The Court will grant summary judgment when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted). To be material, a fact must be identified by the controlling substantive law as an essential element of the non-moving party's case.     Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Furthermore, the issue must be genuine; there is no genuine issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249. In reviewing the record, the district court must construe the facts and make

14

all reasonable inferences in favor of the non-moving party. Id. at 255; Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

In their Motion for Summary Judgment, Defendants contend that Plaintiffs, as a matter of law, cannot succeed on their claim of direct infringement, contributory infringement, or vicarious infringement because Plaintiffs have not produced evidence to establish Defendants' liability for the allegedly infringing conduct. Defendants do not argue in this motion that the instructors' and/or employees' electronic distribution of portions of Plaintiffs' copyrighted works was fair use; rather, they contend that the named Defendants cannot be held liable for the copyright infringement alleged in this case.

In their Motion for Summary Judgment, Plaintiffs contend that the evidence establishes as a matter of law that Defendants are liable for direct infringement, contributory infringement, and vicarious infringement because they knew about, authorized, facilitated, and/or encouraged the copying of Plaintiffs' works without permission.

B.    Infringement

Plaintiffs have stated their copyright infringement claims under 17 U.S.C. § 106 as three separate claims for relief: (1) direct copyright infringement; (2) contributory copyright infringement; and (3) vicarious copyright infringement [Doc. 39 at 29-34]. Defendants argue that they are warranted summary judgment because Plaintiffs cannot show that Defendants directly, contributorily, or vicariously infringed their copyrights.

A prima facie case of direct copyright infringement requires a showing that (1) Plaintiffs own a valid copyright in the work(s)

15

and (2) Defendants copied protected elements from the work(s). Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Peter Letterese & Assocs. v. World Inst. of Scientology Enters., 533 F.3d 1287, 1300 (11th Cir. 2008). Liability for copyright infringement can also be indirect. Indirect infringers can be held responsible for the actions of direct infringers on a theory of contributory or vicarious infringement. See MGM Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005). "One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." Id. (citations omitted). The Copyright Act does not expressly provide for indirect liability, but these doctrines have "emerged from common law principles and are well established in the law." Id.

### 1. Direct Infringement

As to Claim 1, direct infringement, the First Amended Complaint alleges that Defendants infringed Plaintiffs' copyrights "[b]y scanning, copying, displaying, and distributing Plaintiffs' copyrighted material — including but not limited to each copyrighted work identified on Exhibit 1 — on a widespread and continuing basis via the Georgia State website and other Georgia State computers and servers" [Doc. 39 at 29]. In their Motion for Summary Judgment, Defendants contend that they are entitled to judgment on this claim because no evidence shows that they have actually reproduced, distributed, or used Plaintiffs' copyrighted works. The individual Defendants also are not involved in making fair use determinations as to individual works.

16

Plaintiffs respond that Defendants can be held liable for direct infringement through the doctrine of respondeat superior; Defendants are responsible for and have authority over the employees who actually do the scanning, copying, displaying and/or distributing. Under the doctrine of respondeat superior, "an employer is subject to liability for torts committed by employees while acting within the scope of their employment." RESTATEMENT (THIRD) OF AGENCY § 2.04 (2006). Therefore, for the doctrine of respondeat superior to apply, two elements must be met: (1) there must be an employer/employee relationship and (2) the employee must be acting within the scope of his/her employment.

Defendants reply that any non-fair use of a copyrighted work by a Georgia State instructor is in violation of the Current Policy and therefore outside the scope of employment, such that they cannot be held liable for any of the unlawful copying alleged in this case.

Though it is conceivable that some egregiously non-fair uses (such as the electronic distribution of a large part of a copyrighted work) might fall outside the scope of employment as Defendants contend, fair use determinations made through a good-faith implementation of the Current Policy would appear to be within the scope of employment. The Current Policy encourages instructors to make fair use determinations and to use the fair use doctrine as a means of using copyrighted works in their courses; Defendants cannot encourage instructors to make these difficult, fact-based legal decisions and then claim themselves to be immune from liability for the resultant fair use decisions. Therefore, absent any egregious disregard for the 2009 Copyright

17

Policy, any employee who partook in any alleged infringement was acting within the scope of his/her employment and therefore the second element of respondeat superior is satisfied.

However, even though any employee who partook in the alleged infringement was likely acting within the scope of his/her employment, Defendants cannot be held liable for <u>direct</u> copyright infringement under the doctrine of respondeat superior as Plaintiffs contend. Respondeat superior is a theory enabling the imposition of <u>indirect</u> liability, whereby an employer can be held liable for tortious actions taken by an employee that are within the scope of employment. <u>See</u> <u>Sparks v. Pilot Freight Carriers, Inc.</u>, 830 F.2d 1554, 1558 n.4 (11th Cir. 1987) (stating that respondeat superior is a theory of indirect liability). In other words, respondeat superior applies in the copyright context as a basis for finding vicarious liability for infringement; it does not convert an indirect infringer into a direct infringer. [4] Plaintiffs cite no case in which a party was held directly liable, as opposed to indirectly liable, for the copyright infringements of another through the doctrine of respondeat superior. Vicarious liability, not direct liability, is the proper copyright law

---

[4]The fact that vicarious liability in copyright extends beyond the traditional scope of respondeat superior, such that a defendant may be held vicariously liable for copyright infringements even in the absence of a traditional employer-employee relationship, <u>see</u> <u>Gordon v. Nextel Communications and Mullen Advertising, Inc.</u>, 345 F.3d 922, 925 (6th Cir. 2003), does not mean that respondeat superior can be used to hold an employer <u>directly</u> liable for copyright infringement rather than indirectly liable.

concept to address liability under the doctrine of respondeat superior.

The Court concludes that Defendants cannot be held directly liable for any copyright infringements which may have occurred after the 2009 Copyright Policy was enacted. Georgia State as an entity is not capable of copying or reproducing copyrighted materials or making the individual fair use determinations. This must be done through its agents. Further, Georgia State cannot be held directly liable for actions of the individual instructors through a respondeat superior theory because respondeat superior applies in the copyright context as a basis for finding vicarious liability, not direct liability. Accordingly, Defendants' Motion for Summary Judgment as to Claim 1, direct liability for copyright infringement, is GRANTED and Plaintiffs' Motion for Summary Judgment as to Claim 1 is DENIED.

### 2.   Vicarious Infringement

In Claim 3 of the First Amended Complaint, Plaintiffs allege that Defendants infringed Plaintiffs' copyrights "[b]y allowing professors and other employees of Georgia State University to scan, copy, display, and distribute Plaintiffs' copyrighted material . . .; by facilitating, encouraging, and inducing students to view, download, copy, and further distribute that copyrighted material; by failing to supervise or prevent such infringement . . .; and by profiting by such infringement" [Doc. 39 at 32]. Defendants contend that they are entitled to judgment as a matter of law on this claim because Plaintiffs cannot establish that Defendants (Georgia State) profit from the alleged infringing activities. Plaintiffs contend that they are entitled

to judgment as a matter of law on this claim because Defendants receive a generalized financial benefit by attracting and retaining students through the reduced cost of reading materials.

To prevail on a claim of vicarious liability for copyright infringement, Plaintiffs must show that Defendants "profit[ed] directly from the infringement and [had] a right and ability to supervise the direct infringer." Grokster, 545 U.S. at 931 n.9; S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers, 756 F.2d 801, 811 (11th Cir. 1985)("An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity . . . is personally liable for the infringement.") (internal quotation marks and citations omitted). The relevant inquiry to determine if Defendants profited directly from the infringement is "whether the infringing activity constitutes a draw for subscribers"; the fact that the infringing activity is "just an added benefit" is not sufficient. See Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004). Profiting directly has also been characterized as having "a direct financial interest" in the infringement. See HRH Architects, Inc. v. Lansing, No. 1:08-CV-1479-RLV, 2009 U.S. Dist. LEXIS 46255, at *23-24 (Vining, J.) (N.D. Ga. Apr. 22, 2009).

Georgia State/Defendants have the right and ability to supervise the professors, instructors, and other employees.

Here, there is no evidence in the record to support the conclusion that Defendants (Georgia State) have profited from the professors, instructors, and other employees' allegedly infringing use of Plaintiffs' works. Plaintiffs contend that Defendants'

20

statement that "they encourage University institutions to utilize current technology for the educational environment to attract and retain students" is sufficient to show that Defendants directly profited from the alleged infringement.    The Court disagrees. This statement merely shows that Defendants believe that "current technology" helps attract and retain students; however, "current technology" includes many features besides electronic course readings such as wireless internet access, electronic library catalogues, and multimedia-capable classrooms.  Further, even if this statement could be construed to refer to ERes and uLearn, it does not show that Defendants directly profited from <u>copyright infringement</u>.    The fact that ERes and uLearn, which have significant non-infringing uses, may be attractive to students does not indicate that Defendants profit from the unlawful distribution of copyrighted works.

Further, Plaintiffs' selective excision of deposition testimony regarding Georgia State's alleged "shift" from coursepacks[5] to electronic readings also fails to show that electronic readings are a direct draw for students or that Defendants have a direct financial interest in copyright infringement.  James Palmour, an "information systems specialist"

---

[5]Coursepacks are printed anthologies composed of all the required readings for a particular course, which are typically designed by the instructor and brought to a commercial copyshop for printing.    Students then purchase the coursepacks either directly from the copyshop or from the school bookstore. Typically, the copyshop and/or the school bookstore profit from coursepack sales [Defendants' Reply, Doc. 210 at 18].    Georgia State's practice is to pay the publisher for permissions for all the works included in the coursepack [<u>Id.</u>].

at Georgia State whose job included processing coursepacks and ERes postings, stated in his deposition that the royalty payments to publishers that are required to distribute coursepacks were a "problem" because "it makes the coursepack too expensive for the students" [Palmour Dep., Doc. 144-3 at 142]. He stated that he was aware of a shift in preference among Georgia State administrators that professors should use electronic reserves instead of paper coursepacks

> [o]nly in the general sense that there's been a longstanding trend to try to move things away from printing to online, and that includes like the catalogue and schedule of classes . . . . In general it's part of the trend of going green and green, less paper. And also cutting costs because we're in pretty tight budget times now.

[Id. at 145]. He also stated that he thought it was important for Georgia State to provide services that students are happy with because students are "our customers" [Id. at 145-46].

Georgia State professor Diane Belcher stated in her deposition that she "probably" chose to put a particular reading on ERes rather than having students purchase the entire book because she was already requiring students to buy two other books for that course and when she required students to purchase a book it was because she was either assigning the reading of the entire book or "at least half" [Belcher Dep., Doc. 143-8 at 61]. When asked why she would not have students purchase a book from which she was assigning two chapters, she stated that it was because the students "won't buy it. . . . Students tend to be very pragmatic and in fact this is a common complaint on student evaluations, if you don't use most of the book they say they see no reason to purchase it" [Id.].

22

This testimony does not show that Defendants have a direct financial interest in the copyright infringements alleged in this case.  There is no evidence in the record that Defendants obtained any financial benefit from the use of ERes and uLearn generally, let alone from the alleged use of those programs to infringe Plaintiffs' copyrights.  Palmour's statement that moving away from coursepacks had to do with "cost cutting" fails to show a direct financial benefit from copyright infringement and there is no evidence establishing that instructors use ERes and uLearn as direct substitutes for coursepacks.  Considering that ERes and uLearn offer significantly greater capabilities than paper coursepacks, such as video, audio, and web links, it is unreasonable to conclude that any correlation between a decreased use of coursepacks is somehow caused by the alleged copyright infringements through ERes and uLearn.

Further, as stated above, ERes and uLearn are capable of substantial non-infringing uses and Palmour did not testify that the cost-cutting was somehow created by copyright infringement. Rather, there is evidence in the record that the electronic distribution of course readings does not create cost savings. Defendants do not charge for the use of ERes or uLearn [Palmour Dep., Doc. 167 at 139], and the instructors testified that if they were required to pay to use a reading on ERes or uLearn, they would not use that reading rather than pay a licensing fee [Kaufmann Decl., Doc. 188-4 ¶ 6; Dixon Decl., Doc. 188-2 ¶ 6; Esposito Decl,, Doc. 188-3 ¶ 5; Meyers Dep., Doc. 188-6 ¶ 6; Seamans Dep., Doc. 160-11 at 134].

23

Moreover, there is absolutely no evidence that the electronic, cost-free distribution of course materials attracts students to attend Georgia State. Though Professor Belcher indicated that she does consider cost to students when deciding what books she will require for purchase and what excerpts she places on ERes and/or uLearn, it is unreasonable to conclude from this that students choose to attend Georgia State due to the copyright infringements alleged in this case. There is also no indication in the record that electronic distribution of copyrighted works has replaced requiring students to purchase textbooks. The Georgia State professors testified that they still require students to purchase textbooks and other reading materials for their courses [Doc. 188-2 ¶ 5; Doc. 188-3 ¶ 3; Doc. 188-4 ¶ 4].

Overall, the evidence presented does not indicate that Defendants "profited directly from" or "had a direct financial interest in" the infringement alleged by Plaintiffs. There is absolutely no evidence in the record showing that Georgia State benefitted financially from the alleged infringements. At most, if the Court takes the inferential steps suggested by Plaintiffs, any benefit the infringement provides to students constitutes "just an added benefit" rather than a clear "draw" to Georgia State. Therefore, the Court GRANTS Defendants' Motion for Summary Judgment as to the third claim, vicarious copyright infringement and DENIES Plaintiffs' Motion for Summary Judgment as to the third claim.

24

### 3.   Contributory Infringement

As to Claim 2, contributory infringement, the First Amended
Complaint alleges that Defendants infringed Plaintiffs' copyrights
"[b]y facilitating, encouraging, and inducing librarians and
professors to scan, copy, display, and distribute Plaintiffs'
copyrighted material — included but not limited to each
copyrighted work identified on Exhibit 1 — on a widespread and
continuing basis via the Georgia State University website and
other Georgia State computers and servers . . . ." [Doc. 39 at
30].[6]  Defendants contend that they are entitled to judgment as a
matter of law on this claim because no evidence indicates that
they have induced, caused, or materially contributed to the direct
infringement alleged in this case.   They claim that, on the
contrary, they have discouraged copyright infringements by faculty
members through the adoption of the 2009 Copyright Policy.
Plaintiffs contend that they are entitled to judgment as a matter
of law on this claim because Defendants have failed to use their
authority to stop known infringements on electronic systems they
provide.

"[T]he well-settled test for a contributory infringer [is]
one who, with knowledge of the infringing activity, induces,
causes, or materially contributes to the infringing conduct of
another."  Cable/Home Commc'n Corp. v. Network Prods., Inc., 902

---

[6]The Court believes this theory of liability would have the
students who download the materials as the infringers and
Defendants (Georgia State) as the contributory infringer.   The
contributory infringer would seemingly have to be a party separate
from the infringer.   The issue of contributory infringement is
discussed in the framework provided by the parties.

F.2d 829, 845 (11th Cir. 1990) (internal quotation marks and citations omitted). "Knowledge" is determined using an objective standard: know, or have reason to know. Id. Liability for contributory copyright infringement may not be imposed by presuming intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use. See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 933 (2005); Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1244 (11th Cir. 2007). However, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." Grokster, 545 U.S. at 919.

Plaintiffs contend that contributory liability is established solely by Defendants' undisputed knowledge of the electronic distribution of their works and the fact that Defendants have the authority and ability to remove infringing material from ERes and uLearn. They argue that they need not show that Defendants induced or caused the infringing activity in order to be held contributorily liable, and that the following is sufficient to constitute "material contribution": Defendants' provision of the "site and facilities" for the electronic distribution of copyrighted materials; Defendants' failure to remove "infringing works"; Defendants' encouragement of the use of ERes and uLearn; and Georgia State's failure to pay permission fees to distribute Plaintiffs' works (or to establish a budget dedicated to doing so). The Court disagrees.

26

Here, there is no evidence that Defendants "induced, caused, or materially contributed" to the unlawful distribution of copyrighted works by sanctioning the use of ERes and uLearn. To the extent that Defendants could be considered "distributors" of ERes and uLearn and were aware that these programs could be used for copyright infringement, these facts are insufficient to deem them contributorily liable because ERes and uLearn are capable of significant non-infringing uses. See Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 442 (1984) (holding that the distributor of a VCR with no stated or indicated intent to promote infringing uses could not be held contributorily liable for copyright infringements that occurred through the use of the VCR because the VCR was also "capable of commercially significant noninfringing uses"); Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 846 (11th Cir. 1990). In Sony, the Supreme Court created a "safe harbor" in contributory copyright infringement that limits the Court's ability to impute culpable intent as a matter of law from the characteristics or uses of a distributed product. Sony Corp., 464 U.S. 417.

However, "where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, Sony's . . . rule will not preclude liability." Grokster, 545 U.S. at 935. In Grokster, the Supreme Court confronted the question of whether the distributor of software allowing computer users to share electronic files through peer-to-peer networks could be held contributorily liable for the infringing acts of third parties using the software. The Court

27

held that despite the fact that the software was capable of both lawful and unlawful use, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." Id. at 919.

Here, the evidence indicates that ERes and uLearn have significant noninfringing uses. They can be used to facilitate distribution of materials protected by fair use. They can be used to digitally distribute works for which Georgia State owns licenses. They can also be used to distribute copyrighted works with permission from the copyright holders. They can be used to distribute original materials created by the instructors or materials for which the instructors or the university owns copyrights. uLearn allows instructors to utilize a wide range of "tools" to manage their courses, such as discussion forums, quizzes, and announcement pages. None of these activities implicate copyright infringement.

Moreover, there is no indication in the record of a "clear expression or other affirmative steps taken to foster infringement" by Defendants with respect to ERes and uLearn. The fact that no budget exists to pay permissions fees for electronic postings cannot be said to encourage unlawful conduct. Indeed, the instructors testified that if they determined that a use of a work was not fair such that permissions fees must be paid, they would simply elect not to use the work [Kaufmann Decl., Doc. 188-4 ¶ 6; Dixon Decl., Doc. 188-2 ¶ 6; Esposito Decl,, Doc. 188-3 ¶ 5; Meyers Dep., Doc. 188-6 ¶ 6; Seamans Dep., Doc. 160-11 at 134] .

The fact that Georgia State administrators encourage the use of electronic systems such as ERes and uLearn also does not constitute a material contribution to copyright infringement, since these systems allow for significant non-infringing uses as described above.

The 2009 Copyright Policy on its face does not demonstrate an intent by Defendants to encourage copyright infringement; in fact, it appears to be a positive step to stop copyright infringement.[7] Having said that, those Defendants who formulated the Current Policy are also responsible for overseeing its implementation. The record before the Court on the motions for summary judgment

---

[7]The Court acknowledges that it would be virtually impossible to produce a copyright policy for the benefit of instructors which would anticipate every possible fact combination which might be relevant to a fair use determination. The Court also notes Plaintiffs' criticism that the Fair Use Checklist is too rigid and also notes that it does not warn instructors of the possibility of personal liability for infringement. However, overall the Current Policy cannot be said to be an intentional effort to encourage infringement.

The 2009 Copyright Policy seems comparable to, and in many cases far more comprehensive than, the copyright policies instituted by other colleges and universities. For example, Indiana University Northwest's copyright policy permits copies of copyrighted works to be placed on electronic reserves pursuant to fair use as long as the amount copied is less than 50% of a book or article. See Crews Report, Doc. 104-1 at 31. Emory University's copyright policy allows the placement of copyrighted material on electronic reserves if the instructor determines after a reasonable analysis that the content is fair use. Id. at 39. Emory's website includes a general overview of the four fair use factors, but does not require a formalized review such as a checklist. Mercer University's policy is similar to Emory's, with the limitation that complete books or "substantial" parts of works cannot be copied without permission. Id. at 40.

29

does not speak to the question of whether in practice the Current Policy is encouraging improper application of the fair use defense. The Court therefore DENIES both Defendants' and Plaintiffs' motions for summary judgment as to the contributory infringement claim.

V.   Further Proceedings

Going forward, in order to show that Defendants are responsible for the copyright infringements alleged in this case, Plaintiffs must show that the 2009 Copyright Policy resulted in ongoing and continuous misuse of the fair use defense.[8] To do so, Plaintiffs must put forth evidence of a sufficient number of instances of infringement of Plaintiffs' copyrights to show such ongoing and continuous misuse. Defendants will have the burden of showing that each specified instance of 2009 Copyright Policy infringement was a fair use.

Both sides will be limited to the list of claimed infringements produced in response to the Court's August 11, 2010 and August 12, 2010 orders.

The parties are DIRECTED to confer and determine whether further discovery is needed before resolving the remaining contributory infringement claim. Within twenty (20) days, the parties shall present a proposed scheduling order.

---

[8]Under Ex parte Young, 209 U.S. 123 (1908), suit against Defendants is allowed to the extent that it seeks " prospective equitable relief to end continuing violations of federal law." Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1336 (11th Cir. 1999). Plaintiffs must therefore satisfy the "ongoing and continuous" requirement from Ex parte Young in order to receive prospective relief. Id. at 1338.

VI.  Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment [Doc. 160] is GRANTED in part and DENIED in part, and Plaintiffs' Motion for Summary Judgment [Doc. 142] is DENIED.

SO ORDERED, this **30** day of September, 2010.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

31