# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS,
OXFORD UNIVERSITY PRESS, INC.,
and SAGE PUBLICATIONS, INC.,

                    Plaintiffs,

    *v.*

MARK P. BECKER, in his official
capacity as Georgia State University
President, et al.,

                    Defendants.

Civil Action
No. 1:08-CV-1425-ODE

# PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

# TABLE OF CONTENTS

**PAGE**

I.     THE CAUSE OF ACTION FOR COYPYWRIGHT INFRINGEMENT ........................................................................1

       A.     Plaintiffs Own Valid Copyrights...........................................3

       B.     Defendants Have Copied, Displayed, and Distributed Protected Elements of Plaintiffs' Works ...............................4

II.     DEFENDANTS ARE LIABLE FOR COPYRIGHT INFRINGEMENTS COMMITTED BY GSU EMPLOYEES UNDER RESPONDEAT SUPERIOR ........................................5

       A.     Defendants Are Liable for Infringements Committed by GSU Employees ...........................................6

       B.     Liability Under Respondeat Superior Is Not Dependent on Vicarious Liability ..................................8

       C.     Defendants Cannot Avoid Liability Simply by Instituting a New Policy ..................................................................9

III.     DEFENDANTS CAN BE HELD LIABLE UNDER THE *EX PARTE YOUNG* EXCEPTION TO SOVEREIGN IMMUNITY WITHOUT REFERENCE TO DOCTRINES OF SECONDARY COPYRIGHT INFRINGEMENT..................................10

IV.     DEFENDANTS ARE ALSO CONTRIBUTORILY LIABLE FOR COPYRIGHT INFRINGEMENT BY GSU EMPLOYEES ..............................................................17

V.     THE COPYING, DISTRIBUTION, AND DISPLAY OF PLAINTIFFS WORKS ON THE ERES AND ULEARN SYSTEMS AT GSU IS NOT FAIR USE ....................................21

i

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

A. The Role of the Fair Use Doctrine ......................................................21

B. Factor 1:  The Purpose and Character of the Use ...............................23

    1. Digitized course materials are not transformative ...................23

    2. Use by a nonprofit educational entity does not automatically qualify as fair use ...............................................27

    3. Good faith does not excuse infringing conduct .......................30

C. Factor Two: The Nature of the Copyrighted Work............................31

D. Factor Three:  The Amount and Substantiality of the Use ................33

E. Factor Four:  The Effect of the Use on the Potential Market for or Value of the Copyrighted Works..................................36

F. GSU'S Practices Are Inconsistent with Classroom and Library Guidelines........................................................................42

VI. THE DESIGN OF GSU'S FAIR USE CHECKLIST SUBVERTS THE  LAW OF FAIR USE .........................................................................45

VII. PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF COVERING ALL PLAINTIFF WORKS .......................................................53

A. Plaintiffs Have Made the Required Showing......................................53

# TABLE OF CONTENTS

**PAGE**

B.   Plaintiffs Are Entitled to an Injunction Covering
All of Their Works ................................................................54

VIII.  PLAINTIFFS ARE ENTITLED TO COSTS AND
ATTORNEY'S FEES .....................................................................60

## TABLE OF AUTHORITIES

<u>**CASES**</u><span style="float:right"><u>**PAGE(S)**</u></span>

*A&M Records, Inc. v. Napster, Inc.*
    239 F.3d 1004 (9th Cir. 2001) ................................................................18, 29

*A&M Records, Inc. v. Napster, Inc.,*
    No. C 99-05183 MHP, 2001 U.S. Dist. LEXIS 2186
    (N.D. Cal. Mar. 5, 2001)..............................................................................55

*Alexander v. Sandoval*
    532 U.S. 275 (2001)......................................................................................13

*Am. Geophysical Union v. Texaco Inc.*
    60 F.3d 913 (2d Cir. 1995) ................................................................. *passim*

*Arista Records, Inc. v. Becker Enters., Inc.*
    298 F. Supp. 2d 1310 (S.D. Fla. 2003)...................................................54, 59

*Arista Records, LLC v. Butler*
    No: 8:07-cv-3-T-23EAJ, 2007 U.S. Dist. LEXIS 93807
    (M.D. Fla. Dec. 21, 2007).............................................................................57

*Arista Records, Inc. v. Flea World, Inc.*
    No. 03-2670, 2006 WL 842883
    (D. N.J. Mar. 31, 2006).................................................................................18

*Barclays Capital Inc. v. Theflyonthewall.com*
    700 F. Supp. 2d 310 (S.D.N.Y. 2010) ..........................................................62

*Basic Books, Inc. v. Kinko's Graphics Corp.*
    758 F. Supp. 1522 (S.D.N.Y. 1991) ..................................................... *passim*

*Bd. of Pub. Educ. for Savannah v. State of Georgia.*
    No. CV 490-101, 1990 WL 608208
    (S.D. Ga. Sept. 24, 1990) .............................................................................13

# TABLE OF AUTHORITIES

**CASES**                                                 **PAGE(S)**

*Bill Graham Archives v. Dorling Kindersley Ltd.*
    448 F.3d 605 (2d Cir. 2006) .........................................................................50

*Biotrading & Financial Oy v. Biohit Ltd* [1998] F.S.R. 109 .....................................3

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*
    902 F.2d 829 (11th Cir. 1990) ......................................................................17

*Cable News Network v. Video Monitoring Servs. of America*
    940 F.2d 1471 (11th Cir. 1991) .....................................................................56

*Cable News Network v. Video Monitoring Servs. of Am.*
    949 F.2d 378 (11th Cir. 1991) ......................................................................56

*Cable News Network v. Video Monitoring Servs. of Am.*
    959 F.2d 188 (11th Cir. 1992) ......................................................................56

*Campbell v. Acuff-Rose Music, Inc.*
    510 U.S. 569 (1994)............................................................................ *passim*

*City of Chicago. v. Matchmaker Real Estate Sales Ctr., Inc.*
    982 F.2d 1086 (7th Cir. 1992) ........................................................................9

*Cummings v. Walsh Constr. Co.*
    561 F. Supp. 872 (S.D. Ga. 1983) ...................................................................9

*DC Comics Inc. v. Reel Fantasy, Inc.*
    696 F.2d 24 (2d Cir. 1982) .........................................................................37

*Edelman v. Jordan*
    415 U.S. 651 (1974)..................................................................................10

# TABLE OF AUTHORITIES

**<u>CASES</u>**                                                    **<u>PAGE(S)</u>**

*Elektra Entm't Group Inc. v. Brimley*
    No. CV-205-134, 2006 U.S. Dist. LEXIS 56798
    (S.D. Ga. Aug. 15, 2006) ..............................................................................57

*Elektra Entm't Group, Inc. v. Jensen*
    No. 1:07-CV-0054-JOF, 2007 U.S. Dist. LEXIS 60073
    (N.D. Ga. Aug. 16, 2007) ............................................................................58

*Ellison v. Robertson*
    357 F.3d 1072 (9th Cir. 2004) .....................................................................18

*Ex parte Young*
    209 U.S. 123 (1908).............................................................................. *passim*

*Fitzgerald v. CBS Broad., Inc.*
    491 F. Supp. 2d 177 (D. Mass. 2007)..........................................................39

*Fogerty v. Fantasy*
    510 U.S. 517 (1994)..............................................................................61, 62

*Folsom v. Marsh*
    9 F. Cas. 342 (C.C.D. Mass. 1841).........................................................24, 27

*Fonovisa, Inc. v. Cherry Auction, Inc.*
    76 F.3d 259 (9th Cir. 1996) .........................................................................17

*Gen. Bldg. Contractors Ass'n v. Pa.*
    458 U.S. 375 (1982)......................................................................................6

*Gordon v. Nextel Comm.*
    345 F.3d 922 (6th Cir. 2003) ........................................................................9

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                 <u>**PAGE(S)**</u>

*Greenberg v. Nat'l Geographic Soc'y*
      533 F.3d 1244 (11th Cir. 2008) .......................................................................2

*Grizzle v. Kemp*
      634 F.3d 1314 (11th Cir. 2011) ............................................................11, 12

*Harper & Row Pub., Inc. v. Nation Enters.*
      471 U.S. 539 (1985).............................................................. *passim*

*Infinity Broad. Corp. v. Kirkwood*
      150 F.3d 104 (2d Cir. 1998) .......................................................................26

*Joelsongs v. Shelley Broad. Co., Inc.*
      491 F. Supp. 2d 1080 (D. Ala. 2007) ........................................................57

*Letterese and Assoc., Inc. v. World Institute of Scientology Enters., Int'l*
      533 F.3d 1287 (11th Cir. 2008) ............................................................ *passim*

*Luckey v. Harris*
      860 F.2d 1012 (11th Cir. 1988) ......................................................11, 13, 15

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*
      518 F. Supp. 2d 1197 (C.D. Cal. 2007)................................................54, 55

*Milk Money Music v. Oakland Park Entertainment Corp.*
      No. 09-CV-61416, 2009 U.S. Dist. LEXIS 121661
      (S.D. Fla. Dec. 11, 2009)..............................................................57

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Missouri v. Jenkins*, 491 U.S. 274 (1989).............................................................60

*Mitek Holdings, Inc. v. Arce Eng'g Co.*
    198 F.3d 840 (11th Cir. 1999) .......................................................61

*New Era Publications Int'l v. Carol Publ'g Group*
    729 F. Supp. 992 (S.D.N.Y.),
    *aff'd*, 904 F.2d 152 (2d Cir. 1990)................................................34

*New World Music Co. v. Tampa Bay Downs, Inc*
    2009 WL 35184, *9 (M.D. Fla. Jan. 6, 2009) ................................53

*Olan Mills, Inc. v. Linn Photo Co.*
    23 F.3d 1345 (8th Cir. 1994) .........................................................60

*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*
    684 F.2d 821 (11th Cir. 1982) (quoted in *Mitek*, 198 F.3d at 842)..............61

*Orth-O-Vision, Inc. v. Home Box Office*
    474 F. Supp. 672 (S.D.N.Y. 1979) ................................................59

*Pac. & S. Co., Inc. v. Duncan*
    744 F.2d 1490 (11th Cir. 1994) ............................................26, 32, 53, 55, 60

*Pac. & S. Co. v. Duncan*
    618 F.Supp. 469 (N.D. Ga. 1985)..................................................56

*Pennhurst State Sch. & Hosp. v. Halderman*
    465 U.S. 89 (1984)........................................................................10

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Pennington Seed, Inc. v. Produce Exchange No. 299, L.L.C.*
    457 F.3d 1334 (Fed. Cir. 2006) ...............................................................15, 16

*Perfect 10, Inc. v. Amazon.com, Inc.*
    508 F.3d 1146 (9th Cir. 2007) ..........................................................18, 19, 60

*Princeton University Press v. Michigan Doc. Servs., Inc.*
    99 F.3d 1381 (6th Cir. 1996) ................................................................ *passim*

*Princeton Univ. Press v. Michigan Document Servs., Inc.*
    855 F. Supp. 905 (E.D. Mich. 1994) ...............................................................38

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*
    907 F. Supp. 1361 (N.D. Cal. 1995)................................................................18

*S. Bell Tel. and Tel. Co. v. Associated Tel. Directory Pub.*
    756 F.2d 801 (11th Cir. 1985) .........................................................................8

*Salerno v. City Univ. of N.Y.*
    191 F. Supp. 2d 352 (S.D.N.Y. 2001) ...........................................................13

*Sandoval v. Hagan*
    197 F.3d 484 (11th Cir. 1999) .......................................................................12

*Shapiro, Bernstein & Co. v. H.L. Green Co.*
    316 F.2d 304 (2d Cir. 1963) ...................................................................6, 8, 9

*Sherry Mfg. Co., Inc. v. Towel King of Fla., Inc.*
    822 F.2d 1031 (11th Cir. 1987) .....................................................................61

# TABLE OF AUTHORITIES

## CASES                                                          PAGE(S)

*Sony BMG Music Entm't v. Villarreal*
    No. 5:06-CV-323(CAR), 2007 U.S. Dist. LEXIS 883
    (M.D. Ga. Jan. 5, 2007) ...........................................................................57, 59

*Sony Music Entm't v. Global Arts Prods.*
    45 F. Supp. 2d 1345 (S.D. Fla. 1999)...........................................................58

*Stewart v. Abend*
    495 U.S. 207 (1990)......................................................................................31

*Summit Medical Associates, P.C. v. Pryor*
    180 F.3d 1326 (11th Cir. 1999) ...................................................................11

*Suntrust Bank v. Houghton Mifflin Co.*
    268 F.3d 1257 (11th Cir. 2001) ....................................................1, 23, 31, 36

*Sygma Photo News, Inc. v. High Soc'y Magazine, Inc.*
    596 F. Supp. 28 (S.D.N.Y. 1984) ............................................................7, 8

*UMG Recordings, Inc. v. MP3.com, Inc.*
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ..........................................................26

*Warner Bros., Inc. v. Lobster Pot, Inc.*
    582 F. Supp. 478 (N.D. Ohio 1984) ............................................................10

*Weissman v. Freeman*
    868 F.2d 1313 (2d Cir. 1989) ........................................................24, 28, 33

*Worldwide Church of God v. Philadelphia Church of God, Inc.*
    227 F.3d 1110 (9th Cir. 2000) .....................................................................29

*Wall Data, Inc. v. L.A. County Sheriff's Dep't*
    447 F.3d 769 (9th Cir. 2006) .......................................................................29

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                   <u>**PAGE(S)**</u>

*Warner Bros. Records Inc. v. Tait*
    No.: 3:07-cv-134-J16-HTS, 2008 U.S. Dist.
    LEXIS 46034 (M.D. Fla. June 12, 2008) ......................................................56

## FEDERAL STATUTES, RULES, AND REGULATIONS

U.S. Const. art. 1, § 8 .........................................................................................21
17 U.S.C. § 101 ...........................................................................................1, 6, 28
17 U.S.C. ¶¶ 106(1), (3), (5) ...............................................................................1
17 U.S.C. § 107 ..........................................................................................21, 22
17 U.S.C. § 107(1) .............................................................................................46
17 U.S.C. ¶ 107(4) ............................................................................................36
17 U.S.C. § 108(g) ............................................................................................45
17 U.S.C. § 502(a) ............................................................................................53
17 U.S.C. § 504 ................................................................................................30
17 U.S.C. § 505 ................................................................................................60

## LEGISLATIVE MATERIALS

Copyright, Designs and Patents Act 1988 (as amended), ¶ 101(1) ..........................3

H.R. Rep. No. 1476, 94th Cong., 2d Sess. (1976),
*reprinted in* 1976 U.S. Code Cong. & Ad. News 5659, 5682-83......................42, 43

H.R. Conf. Rep. No. 1733, 94th Cong., 2d Sess. (1976).........................................43

H.R. Rep. No. 90-83, 90th Cong., 1st Sess. (1967)................................................44

## TABLE OF AUTHORITIES

**PAGE(S)**

## OTHER AUTHORITIES

3 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 12.04[A][1]
at 72 (2009) ...................................................................................6

COPINGER AND SKONE JAMES ON COPYRIGHT ¶¶ 22-20 (15th ed. Sweet & Maxwell,
London 2005).................................................................................3

William F. Patry, PATRY ON COPYRIGHT § 10:138 (March 2008)..........................32

Restatement (Third) of Agency (1999) ...................................................6

## I.   THE CAUSE OF ACTION FOR COPYRIGHT INFRINGEMENT

1.     Our nation's copyright law seeks to "promote[] the public access to new ideas and concepts."  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1262 (11th Cir. 2001).  It does so by "supplying the economic incentive to create and disseminate ideas," *Harper & Row Pub., Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985), including in the form of scholarly works.

2.     Copyright law "rewards the individual author in order to benefit the public," *id.* at 546 (citation omitted), because "[w]ithout this limited monopoly, authors would have little economic incentive to create and publish their work," which would undermine the goal of copyright.  *Suntrust Bank*, 268 F.3d at 1262.  The rights conferred by copyright are "designed to assure contributors to the store of knowledge a fair return for their labors."  *Harper & Row*, 471 U.S. at 546.

3.     Even where the *author* may not require a financial incentive to create, copyright law protects the *publisher's* incentive to "contribut[e] to the store of knowledge," *id.*, by disseminating the work.  As the Sixth Circuit noted in *Princeton University Press v. Michigan Doc. Servs., Inc.*, 99 F.3d 1381, 1391 (6th Cir. 1996), a case involving the photocopying of portions of scholarly books, "It is the publishers who hold the copyrights . . . and the publishers obviously need

economic incentives to publish scholarly works, even if the scholars do not need direct economic incentives to write such works."

4.     Among the exclusive statutory rights conferred on a copyright owner are the rights to reproduce the copyrighted work, to distribute copies of the work, and to display the copyrighted work publicly.  17 U.S.C. ¶¶ 106(1), (3), (5).

5.     Under the Copyright Act, to display a work "publicly" means (i) to display it "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered" or (ii) to "transmit [a] . . . display of the work . . . by means of any device or process, whether the members of the public capable of receiving the . . . display receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101.

6.     The Copyright Act defines "copies" as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 101.

7.     Copyright law is "media neutral." *Greenberg v. Nat'l Geographic Soc'y,* 533 F.3d 1244, 1257 (11th Cir. 2008).

8.      To establish copyright infringement, the plaintiff must demonstrate that (i) it owns a valid copyright in the allegedly infringed work(s) and (ii) the defendant copied protected elements of the work(s).  *Letterese and Assoc., Inc. v. World Institute of Scientology Enters., Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008).

## A.      **Plaintiffs Own Valid Copyrights**

9.      Each of the works listed on the Joint Filing of Alleged Infringements (originally filed as Docket No. 266) (the "Joint Filing") is an original work of authorship, the exclusive copyright rights to which are owned by, or exclusively licensed to, one of the Plaintiffs.

10.      Each work listed on the Joint Filing as to which Plaintiffs will present evidence of infringement at trial is registered with the U.S. Copyright Office or is protected under U.S. copyright law as a work first published in a country that is a signatory to the Berne Convention.

11.      Under UK law, an exclusive licensee has the same copyright rights as an assignee, including the right to sue for infringement.  Copyright, Designs and Patents Act 1988 (as amended), ¶ 101(1).  COPINGER AND SKONE JAMES ON COPYRIGHT ¶¶ 22-20 (15th ed. Sweet & Maxwell, London 2005).  An exclusive licensee includes an exclusive importer or distributor.  *Biotrading & Financial Oy v. Biohit Ltd* [1998] F.S.R. 109.  Accordingly, Plaintiff Oxford University Press,

3

Inc. has the right to sue for infringement of works published in the UK for which it is the exclusive U.S. distributor.

**B.      Defendants Have Copied, Displayed, and Distributed Protected Elements of Plaintiffs' Works**

12.      The unauthorized copying, display, and distribution of copyrighted works set forth in the Joint Filing is representative of current, *i.e.*, ongoing practice at Georgia State University (GSU).  Nov. 5, 2010 Hearing Tr., Docket No. 261, at 13-14.

13.      Defendants have stipulated that ordinary usage of the ERes system results in a variety of acts by GSU employees on the GSU computer system that, unless excused as fair use, constitute acts of copying, display, and distribution.  *See* Stipulated Facts ¶¶ 53-57.

14.      In order to send students copies of files through the ERes system, unauthorized digital copies are first created and stored in the memory of a computer server owned by GSU and operated by GSU information technology staff and then distributed to each student in the class who accesses the reading. Students who access the readings have the ability to view, download, and print copies.  Stipulated Facts ¶¶ 53-56.

15.     Defendants have stipulated that "[m]ultiple copies of copyrighted works are made every time a GSU student accesses course reading via ERes: one copy when a student views the work, another copy if the student saves the material, and yet another copy if the student prints the material."  Stipulated Facts ¶ 57.

16.     The display of Plaintiffs' copyrighted works to students by means of the ERes and uLearn systems is a public display as that term is defined by section 101 of the Copyright Act (*see supra* ¶ 4) even if access to readings posted on those systems is limited to students enrolled in the course for which the material is posted.

17.     Plaintiffs have established a prima facie case of copyright infringement.

## II.     DEFENDANTS ARE LIABLE FOR COPYRIGHT INFRINGEMENTS COMMITTED BY GSU EMPLOYEES UNDER RESPONDEAT SUPERIOR

18.     Defendants are strictly liable under the doctrine of respondeat superior for any acts of direct copyright infringement committed by GSU employees within the scope of their employment – regardless of whether Defendants personally participated in, contributed to, or benefited from the infringement.  *See* Sept. 30, 2010 Order, Docket No. 235, at 18 ("Respondeat superior is a theory enabling the imposition of . . . liability, whereby an employer can be held liable for tortious

actions taken by an employee that are within the scope of employment."); *see also* Restatement (Third) of Agency § 2.04 (1999) ("An employer is subject to liability for torts committed by employees while acting within the scope of their employment."); *Gen. Bldg. Contractors Ass'n v. Pa.*, 458 U.S. 375, 392 (1982) (stating that doctrine of respondeat superior "enables the imposition of liability . . . on the master for the wrongful acts of his servant").

### A.    Defendants Are Liable for Infringements Committed by GSU Employees

19.    It is "quite clear . . . that the normal agency rule of respondeat superior applies to copyright infringement by a servant within the scope of his employment."  *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963); 3 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 12.04[A][1] at 72 (2009) (hereinafter "Nimmer") ("To the extent that the infringer is the agent of another, the master can be held culpable for the infringement.").

20.    Just as copyright law provides that an employer is deemed the author of works created by employees within the scope of their employment under the "work made for hire" doctrine, *see* 17 U.S.C. § 101 (definition of "work made for hire"), so too are employers legally responsible for acts of infringement committed by employees within the scope of their employment.  *See* Nimmer, *supra*, at 72-73 ("[Just as the [work for hire] doctrine provides that the person who puts pen to

6

paper, quill to canvas, or finger to keyboard is not the 'author' of the work to the extent the employment relationship exists, so the person who copies a work is by like measure not the sole author of the infringement[.]").

21.     Courts routinely hold employers responsible for direct copyright infringement by their employees without recourse to secondary (i.e., vicarious or contributory) infringement doctrines. *See, e.g.*, *Harper & Row*, 471 U.S. 539 (holding defendant Nation enterprises liable for direct infringement by employee editor); *Letterese*, 533 F.3d 1287 (holding defendant Scientology organizations directly liable for copying of plaintiff's book by their employees); *Princeton Univ. Press*, 99 F.3d 1381 (holding defendant copyshop directly liable for copying by employees); *Sygma Photo News, Inc. v. High Soc'y Magazine, Inc.*, 596 F. Supp. 28, 33 (S.D.N.Y. 1984) (holding defendant employer liable for copyright infringement where record established that its employees, "within the scope of their employment and under the supervision of [the defendant], undertook the activities leading to the infringement of the copyright").

22.     Accordingly, under the doctrine of respondeat superior, Defendants are legally responsible for the challenged conduct of GSU employees within the scope of their employment – specifically, in scanning, copying, displaying and distributing Plaintiffs' copyrighted material via ERes and uLearn – to the extent

the Court finds that conduct constitutes direct copyright infringement.

23.     The Court, in its summary judgment decision, noted that "[a]bsent any egregious disregard for the 2009 Copyright Policy, any employee who partook in any alleged infringement was acting within the scope of his/her employment and therefore the second element of respondeat superior is satisfied." Sept. 30, 2010 Order, Docket No. 235, at 17-18. *See also id.* at 17 ("fair use determinations made through a good-faith implementation of the Current Policy would appear to be within the scope of employment").

24.     As discussed further below, indirect liability under respondeat superior is distinct from secondary liability under the doctrines of vicarious and contributory infringement. Under respondeat superior, as shown, copyright liability attaches to the employer once it has been established that one or more of its employees has engaged in acts of direct infringement. *See, e.g.*, *Sygma*, 596 F. Supp. at 33 (finding that the principle of respondeat superior imposed copyright infringement liability on defendant publisher for infringing activities by its employees within the scope of their employment).

**B.     Liability Under Respondeat Superior Is Not Dependent on Vicarious Liability**

25.     The test for vicarious infringement established in *Shapiro, Bernstein*, *supra*, and adopted by the Eleventh Circuit in *S. Bell Tel. and Tel. Co. v.*

8

*Associated Tel. Directory Pub.*, 756 F.2d 801 (11th Cir. 1985), was intended to extend traditional respondeat superior liability to situations involving defendants who, while *not* the employers of the direct infringers, nonetheless share with an employer the status of having control over and receiving a financial benefit from the conduct of the direct infringer.  *See*, *e.g.*, *Gordon v. Nextel Comm.*, 345 F.3d 922, 925-26 (6th Cir. 2003) (explaining that while "*respondeat superior* imposes liability on an employer for copyright infringement by an employee," the *Shapiro, Bernstein* test applies "outside the employer-employee context").

### C.    Defendants Cannot Avoid Liability Simply by Instituting a New Policy

26.    The mere existence of a policy that nominally prohibits employees/agents from engaging in the challenged conduct does not preclude liability; a principal (whether a state agency or not) cannot avoid liability by adopting a policy that shifts responsibility for the conduct to one or more agents. *See, e.g., City of Chicago. v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1096 (7th Cir. 1992).

27.    Even express instructions by an employer not to commit wrongdoing do not exculpate the employer for misconduct by employees that occurs within the scope of their employment.  *See, e.g., Cummings v. Walsh Constr. Co.*, 561 F. Supp. 872, 879 (S.D. Ga. 1983) (citation omitted).  Any other rule would

9

encourage employers to willfully ignore rampant copyright infringement or other wrongdoing by their employees where the employer could point to a policy nominally forbidding such conduct.

28. In the copyright context, courts have held that proprietors who hire performers remain liable for copyright infringement by the performers even where they expressly instructed them not to infringe. *See, e.g.*, *Warner Bros., Inc. v. Lobster Pot, Inc.*, 582 F. Supp. 478, 482-83 (N.D. Ohio 1984).

29. As the Court stated in its summary judgment ruling, "Defendants cannot encourage instructors to make . . . difficult, fact-based legal decisions and then claim themselves to be immune from liability for the resultant fair use decisions." Sept. 30, 2010 Order, Docket No. 235, at 17.

## III. DEFENDANTS CAN BE HELD LIABLE UNDER THE *EX PARTE YOUNG* EXCEPTION TO SOVEREIGN IMMUNITY WITHOUT REFERENCE TO DOCTRINES OF SECONDARY COPYRIGHT INFRINGEMENT

30. *Ex parte Young*, 209 U.S. 123 (1908), enables individuals to vindicate their federal rights against state officials in federal courts even where the sovereign immunity guaranteed by the Eleventh Amendment otherwise would bar their claims. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984); *see also Edelman v. Jordan*, 415 U.S. 651, 674-77 (1974).

31.     Under *Ex parte Young*, there is no need to show that state officials named as official-capacity defendants *personally* violated federal law – either directly or secondarily – to establish their liability for direct infringement by employees of the state institution.  For example, *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), involved class-action claims concerning inadequate funding for indigent legal services that were brought against the governor of Georgia and the state judges responsible for providing counsel to indigent defendants in Georgia courts.   The Eleventh Circuit  rejected the notion that an *Ex parte Young* defendant official must have taken some action personally that violates the Constitution or federal law, holding instead that "[p]ersonal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity."  *Id.* at 1013.  Rather, "[a]ll that is required is that the official be *responsible for* the challenged action."  *Id.* at 1013-14 (emphasis added).

32.     It is sufficient, the *Luckey* court explained, that the state officer sued "'by virtue of his office, ha[ve] some connection' with the . . . conduct complained of."  860 F.2d at 1015-16 (quoting *Ex parte Young*, 209 U.S. at 157).  *See also Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999) (holding that plaintiffs properly named as defendants Alabama's Governor and

Attorney General and the District Attorney because they were authorized to enforce the criminal liability provisions of the challenged statute).

33.     In *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011), the Eleventh Circuit held, in an action involving constitutional claims against the Georgia Secretary of State arising out of the enforcement of a statutory nepotism rule, that a state official is subject to suit in his official capacity "when his office imbues him with the responsibility to enforce the law or laws at issue in the suit."  *Id.* at 1319. Applying this principle, the court held:

> Although the Secretary of State cannot directly qualify or challenge candidates for local boards of education or certify the results of those elections, as a member and the chairperson of the State Election Board, he has both the power and the duty to ensure that the entities charged with those responsibilities comply with Georgia's election code in carrying out those tasks.  Pursuant to *Ex parte Young,* "[h]is power by virtue of his office sufficiently connect[s] him with the duty of enforcement to make him a proper party to a suit of the nature of the one now before" this Court. [citation omitted].   The District did not err in holding that the Secretary of State is a proper party to this action.

*Id*.

34.     The only relevant question under *Ex parte Young*, therefore, is whether Defendants have the authority to stop the violations of federal law about which Plaintiffs complain.  *See, e.g., Sandoval v. Hagan*, 197 F.3d 484, 492, 500-

01 (11th Cir. 1999) (holding that the Director of the Alabama Department of Public Safety could face a lawsuit alleging unlawful promulgation of English-only drivers' license exams), *overruled on other grounds by Alexander v. Sandoval*, 532 U.S. 275 (2001); *Bd. of Pub. Educ. for Savannah v. State of Georgia.*, No. CV 490-101, 1990 WL 608208, at *4 (S.D. Ga. Sept. 24, 1990) (unpublished) (rejecting defendants' argument that the *Ex parte Young* exception applies only when the official is "personally or individually involved in the unconstitutional action") (citing *Luckey*, 860 F.2d at 1015-16).

35.     In *Salerno v. City Univ. of N.Y.*, 191 F. Supp. 2d 352 (S.D.N.Y. 2001), the court permitted the plaintiffs to seek injunctive relief under *Ex parte Young* against an officer of a state university for ongoing copyright infringement.  The plaintiffs sued the chancellor of the City University of New York and the director of a state institute, alleging that the work of one of the plaintiffs was being infringed by employees of the university and of the institute.  The chancellor and the director moved to dismiss on the ground that the plaintiffs had not alleged with specificity how the officers were connected with the enforcement of the alleged violations of the plaintiff's copyright.  *Id.* at 357.  The defendants also argued that *Ex parte Young* was unavailable because the state was the "real party in interest."  *Id.*  The court rejected both arguments, explaining that *Ex parte Young* only

13

requires a plaintiff to allege "*some connection* between the official and the enforcement of the illegal act" and noting that the defendants' argument missed the point of *Ex parte Young*, which is to permit claims for prospective injunctive relief against state officials to ensure state compliance with federal law.  *See id.* at 357 (emphasis added).

36.     All of the Defendants have admitted that they have the authority and/or duty to ensure, in one way or another, that GSU complies with federal copyright law.  For example, Defendants have conceded that President Becker, Provost Palm, and Dean of Libraries Seamans each have the authority to direct library staff to block access to or remove specific infringing materials on the ERes system if required to do so by the Court.  *See* Stipulated Facts ¶¶ 41, 42, 45, 49; Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Admission, May 13, 2009 ("First RFA"), Docket No. 92, No. 7; Defendants' Amended and Supplemental Responses to Plaintiffs First Set of Interrogatories to Defendants, May 19, 2009 ("GSU Interrog. Response"), Docket No. 95, No. 4.

37.     Provost Palm, for example, is responsible for monitoring functions and officials of the University's academic administration and for "correct[ing] any conduct not consistent with the professional and legal fulfillment of the University's purposes and objectives," which obviously includes noncompliance

14

with copyright law.  *See* First RFA, Docket No. 92, Nos. 18-19; *see also* Stipulated Facts ¶ 42 (GSU Provost is responsible for, *inter alia*, "correcting noncompliance with federal copyright law"); Deposition of Mark P. Becker at 26:15-27:6, 88:6-15 (GSU President testifying that the Provost and Board of Regents are responsible for ensuring that use of the electronic reserves systems complies with federal copyright law and that it is within his authority to "direct the faculty at the university to comply with federal copyright law").

38.     Moreover, GSU's new copyright policy (on which Defendants stake their fair use defense) was drafted by a committee of which one defendant – Dean Seamans – was a member, and it was adopted by the members of the Board of Regents, each of whom also is a defendant.  As the Court recognized in its summary judgment order, "those Defendants who formulated the Current Policy are also responsible for overseeing its implementation." Sept. 30, 2010 Order, Docket No. 235, at 29.

39.     Accordingly, it is clear that under *Ex parte Young* the Court can order prospective injunctive relief against Defendants based upon a showing of direct infringements committed by GSU employees.  *See, e.g.*, *Luckey*, 860 F.2d at 1016; *see also* Sept. 30, 2010 Order, Docket No. 235, at 18, 30 n.8.

15

40.     Even under *Pennington Seed, Inc. v. Produce Exchange No. 299, L.L.C.*, 457 F.3d 1334 (Fed. Cir. 2006), the non-binding authority with which Defendants have sought to circumvent the Eleventh Circuit's *Ex parte Young* precedents, Plaintiffs' claims avoid a sovereign immunity bar.  As a procedural matter, *Pennington Seed* was decided on a motion to dismiss.  The court of appeals found that that the plaintiffs' attempt to establish the official capacity defendants' connection to the patent infringement at issue was marred by reliance on materials and argument outside the four corners of the complaint.  457 F.3d at 1342 n.4. Here, by contrast, the relevant facts concerning the role of each Defendant in overseeing the ERes system have been developed through discovery and stipulations.  Moreover, whereas in *Pennington Seed* the Federal Circuit held that "a federal court cannot enjoin a state official to perform his or her duty under *state law*," *id.* at 1343 (emphasis in original), here there is no dispute that Defendants have the authority and/or duty to ensure compliance with federal copyright law, as shown above.  Thus, the "nexus" showing required by the Federal Circuit between the defendants and a violation of federal law has been made with respect to each of the Defendants.

**IV.    DEFENDANTS ARE ALSO CONTRIBUTORILY LIABLE FOR COPYRIGHT INFRINGEMENT BY GSU EMPLOYEES**

41.    Defendants are also entitled to injunctive relief against Defendants under the doctrine of contributory liability.  A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (internal citation omitted); Sept. 30, 2010 Order, Docket No. 235, at 25-26.

42.    Contributory copyright infringement liability attaches to a range of material contributions.  Providing "the site and facilities for known infringing activity" is "sufficient to establish contributory liability." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (rejecting assertion that the defendant must have "expressly promoted or encouraged the sale of counterfeit products" and noting that "it would difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by [the defendant]").

43.    Providing a computer service used to store infringing material is sufficient to defeat a motion for summary judgment because "a reasonable trier of fact could conclude that [defendant] materially contributed to the copyright infringement by storing infringing copies of [plaintiff's] works on its USENET

17

groups and providing the groups' users with access to those copies." *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004). *See also Arista Records, Inc. v. Flea World, Inc.*, No. 03-2670, 2006 WL 842883, at *15 (D. N.J. Mar. 31, 2006) ("Plaintiffs need only provide a central 'hub' for infringing activity to materially contribute to infringement.") (citation omitted).

44.    A computer system operator can be held contributorily liable if it has "*actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works yet continues to provide access to infringing works." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (internal citation omitted); *see also A&M Records, Inc. v. Napster*, *Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (imposing contributory liability where the defendant "fail[ed] to purge [infringing] material from the system"); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1374 (N.D. Cal. 1995) (stating that the failure to "take simple measures to prevent further damage to plaintiff's copyrighted works" constitutes substantial participation).

45.    Defendants here had specific knowledge of the infringing activity, including, by means of the Amended Complaint, knowledge of the claimed infringement of specific works owned or controlled by one of the Plaintiffs, some

of which also appear on the Joint Filing – meaning that these works, at a minimum, continued to be copied, displayed, and distributed without authorization during the designated 2009 terms pursuant to the new copyright policy.

46.    As for material contribution, undisputed and/or stipulated evidence establishes that the named Defendants are in a position to order the removal of infringing materials from GSU online course reading systems, to discipline violators of University policy, and to ensure faculty and staff compliance with copyright law and with any court order in this case.  *See* Stipulated Facts ¶¶ 41-49; First RFA, Docket No. 92, Nos.  3, 7, 9, 10, 12 (Becker); Nos. 18, 19, 22, 25, 26, 28, 29, 30 (Palm); Nos. 59, 60 (Board of Regents); GSU Interrog. Response No. 4, Docket No. 95 (Seamans).

47.    As noted, the Court has found that "those Defendants who formulated the Current Policy are also responsible for overseeing its implementation."  Sept. 30, 2010 Order, Docket No. 235, at 29.  In fact, as noted above, the record shows that *all* of the Defendants have the authority to stop the infringement occurring by means of the ERes and uLearn computer systems, yet they have refused to "take simple measures to prevent further damage."  *See Perfect 10*, 508 F.3d at 1172. For instance, the record reflects only one instance (out of thousands) in which

library staff flagged as potentially infringing a work submitted for posting on

ERes.  *See* Plaintiffs' Proposed Findings of Fact ¶ 125.

48.     Another telling indicator of Defendants' failure adequately to ensure

compliance with copyright law in the operation of ERes and uLearn is the fact that

since May 2003, the record contains no evidence of GSU having made a single

payment to secure permission to use Plaintiffs' or any other publishers' works on

these systems.  Indeed, Defendants acknowledge that they have "no budget

dedicated to paying permissions fees" and "no system to recoup any costs for

buying such permissions from students."  Plaintiffs' Proposed Findings of Fact

¶¶ 135; Deposition of Mark R. Becker at 19:18-22.

49.     The adoption of a new copyright policy – which allocates more

discretion to faculty and less oversight to GSU administrators to block infringing

copies than in the past – does not weigh in Defendants' favor.  To the contrary, the

abdication of responsibility under the new policy by those who provide the "site

and facilities" for infringement is the kind of material contribution to infringement

that courts have condemned repeatedly as contributory infringement.  *See supra*

¶ 42.  *See also* Sept. 30, 2010 Order, Docket No. 235, at 17 (noting that

Defendants "cannot encourage instructors" to make fair use decisions and then

"claim themselves to be immune from liability").

## V.   THE COPYING, DISTRIBUTION, AND DISPLAY OF PLAINTIFFS WORKS ON THE ERES AND ULEARN SYSTEMS AT GSU IS NOT FAIR USE

### A.   The Role of the Fair Use Doctrine

50.    The ultimate purpose of copyright law is to "promote the Progress of Science and useful Arts by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings."  U.S. Const. art. 1, § 8.  As noted, copyright protection accomplishes this by supplying "the economic incentive to create and disseminate ideas."  *Harper & Row*, 471 U.S. at 558.

51.    Built into the fabric of copyright law is a judicially crafted fair use privilege that "permits courts to avoid rigid application of the copyright statute when, *on occasion*, it would stifle the very creativity which that law is designed to foster."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (citation omitted) (emphasis added).  The fair use privilege is a *limited exception* to the norm of exclusivity conferred upon copyright owners; it is not a doctrine that contemplates or excuses wholesale, system-wide copying of significant portions of countless thousands of copyrighted works, year after year, without any compensation to copyright owners.

52.    The fair use doctrine is codified in section 107 of the Copyright Act, 17 U.S.C. § 107.  Section 107 provides that the "*fair use* of a copyrighted work . . .

for purposes such as criticism, comment, news reporting, teaching (including

multiple copies for classroom use), scholarship, or research, is not an infringement

of copyright" (emphasis added).

53.     It bears noting that the statute provides that "fair use" for one of the

enumerated purposes – not "any use" – is not infringement.  Consistent with this,

the Supreme Court has disavowed reliance on "categories of presumptively fair

use."  *Letterese*, 533 F.3d at 1309 (quoting *Campbell*, 510 U.S. at 584).  Instead,

whether a particular use is "fair" depends on consideration of four non-exclusive

factors:

> (1)  the purpose and character of the use, including whether such use
>       is of a commercial nature or is for nonprofit educational purposes;
>
> (2)  the nature of the copyrighted work;
>
> (3)  the amount and substantiality of the portion used in relation to the
>       copyrighted work as a whole; and
>
> (4)  the effect of the use upon the potential market for or value of the
>       copyrighted work.

17 U.S.C. § 107.

54.     A proper fair use analysis does not entail simply adding up the

statutory factors "won" by each side to determine who prevails.  The Eleventh

Circuit has rejected reliance on a "four factor tally," noting that such "'rigid

application of the copyright statute' might 'stifle the very creativity which that law

is designed to foster.'" *Letterese*, 533 F.3d at 1308 n.22 (quoting *Campbell*, 510 U.S. at 577).

55.     Rather, fair use is an "equitable rule of reason," *Letterese*, 533 F.3d at 1308, under which the statutory factors as applied to the facts of the case are to be examined and weighed "in light of the purposes of copyright." *Id.* (quoting *Campbell*, 510 U.S. at 578). *See also Suntrust Bank*, 268 F.3d at 1268.

56.     As discussed more fully below, the "rule of reason" that the fair use doctrine requires the court to undertake "in light of the purposes of copyright" accords special importance to certain factors, notably, in the context of this case, Factors 1 and 4, given the nontransformative nature of the takings and the resulting direct market substitution for Plaintiffs' works.  By placing each factor and each subfactor on equal footing, however, the mechanical, "add up the checks" structure of the checklist, coupled with the inclusion of a number of duplicative "weighs in favor" subfactors, has the effect of depriving the most significant fair use criteria of the weight to which they are, by law, entitled.

### B.     Factor 1:  The Purpose and Character of the Use

#### 1.     Digitized course materials are not transformative

57.     The "central purpose" of the first-factor inquiry is to determine "whether the new work merely 'supersede[s] the objects' of the original creation

23

. . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579 (citations omitted).

58.     Transformative works "lie at the heart of the fair use doctrine[]." *Id. See also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1995). The centrality of transformative value to the fair use inquiry stems from its relationship to the constitutional objective of promoting the progress of science and the useful arts, which is "generally furthered by the creation of transformative works." *Campbell*, 510 U.S. at 579.

59.     Whereas a transformative work furthers the purposes of copyright, "an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use." *Am. Geophysical Union*, 60 F.3d at 923.  As Justice Story wrote, a use that "supersede[s] the use of the original work . . . will be deemed in law a piracy." *Folsom v. Marsh*, 9 F. Cas. 342, 344-45 (C.C.D. Mass. 1841).  *See also Letterese*, 533 F.3d at 1311 ("[A] work that is not transformative . . . is less likely to be entitled to the defense of fair use because of the greater likelihood that it will 'supplant' the market for the copyrighted work. . . .") (citation omitted); *Weissman*

24

*v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) ("where, as here, appellee's use [of appellant's academic article] is for the same purpose as [appellant's] . . . such use seriously weakens a claimed fair use").

60.    Photocopying or other exact duplication is a paradigmatic nontransformative use.  In *Princeton University Press*, *supra*, the leading fair use decision involving university course readings, the court stated:

> [T]he degree to which the challenged use has transformed the original copyrighted works . . . is virtually indiscernible.  If you make verbatim copies of 95 pages of a 316-page book, you have not transformed the 95 pages very much – even if you juxtaposed them to excerpts from other works and package everything conveniently.    This   kind   of   mechanical "transformation"  bears  little  resemblance  to  the  creative metamorphosis accomplished by the parodists in the *Campbell* case.

99 F.3d at 1389.

61.    In *American Geophysical Union*, *supra*, which involved the photocopying and archiving by Texaco scientists of copies of scientific journal articles, the Second Circuit observed that the photocopying "merely transforms *the material object* embodying the intangible article that is the copyrighted original work. . . . Texaco's making of copies cannot properly be regarded as transformative use of the copyrighted material."  60 F.3d at 923 (emphasis in original).

25

62.     There is no transformative value in the selection of materials for a compilation of reproductions, each of which serves the same purpose as the original.  In *Princeton University Press*, for example, the court found that even though coursepack anthologies allowed professors to create readings perfectly tailored to their courses, the anthologies nevertheless were not transformative.  99 F.3d at 1384.

63.     Similarly, in *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991), the court held that the defendant's production of coursepacks was not transformative: "The excerpts in suit were merely copied, bound into a new form, and sold," the court noted.  "The copying in suit had productive value only to the extent it put an entire semester's resources in one bound volume for students."  *Id.* at 1531.

64.     Nor is simply translating a work into a new medium or making it more accessible in the same medium transformative.  *See Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1994) (holding that TV news clipping service was "neither productive nor creative in any way"); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (holding that an unaltered retransmission of radio broadcasts was not transformative); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (noting that the

reproduction of audio CDs in MP3 format "simply repackages those recordings to facilitate their transmission through another medium").

65.     These decisions are consistent with Justice Story's observation that fair use involves "real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of scissors; or extracts of the essential parts, constituting the chief value of the original work." *Folsom,* 9 F. Cas. at 345 (quoted in *Campbell*, 510 U.S. at 578-79).

66.     Defendants have acknowledged that GSU's use of Plaintiffs' copyrighted works is not transformative.  *See* Plaintiffs' Proposed Findings of Fact ¶ 178.

### 2. Use by a nonprofit educational entity does not automatically qualify as fair use

67.     Consistent with its rejection of categories of presumptive fair use, the Supreme Court has cautioned that "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement."  *Campbell*, 510 U.S. at 584.  The nonprofit educational purpose of a work is "only one element of the first factor enquiry."  *Id.  See also Princeton Univ. Press*, 99 F.3d at 1385 (noting that statute "does not provide blanket immunity for 'multiple copies for classroom use'").

27

68.    The Supreme Court has made clear, moreover, that "the crux of the profit/nonprofit distinction is not whether the sole motive of the user is monetary gain but whether the user stands to profit from . . . the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.  The commercial use inquiry focuses on "the value obtained by the secondary user from the use of the copyrighted material." *Am. Geophysical Union*, 60 F.3d at 922.

69.    The definition of "financial gain" in the Copyright Act as the "receipt, or expectation of receipt, of anything of value," 17 U.S.C. § 101, plainly encompasses use without payment by a not-for-profit educational institution.

70.    The user need not profit financially for the use to be deemed commercial; the "absence of a dollars and cents profit does not inevitably lead to a finding of fair use." *Weissman*, 868 F.2d at 1324.  In *Weissman*, the Second Circuit rejected as clearly erroneous the trial court's holding that the unauthorized inclusion of the plaintiff's article in the readings for a course the defendant was teaching was fair use because it was "entirely for non-profit purposes."  868 F.2d at 1324.  The court of appeals found instead that that the first factor weighed against fair use based, in part, on the private professional benefits the defendant professor sought by using the article.  *Weissman*, 868 F.2d at 1324.

71.    Benefits obtained by nonprofit institutions from unauthorized copying have been held to cut against fair use.  In *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000), for example, the court held that the Philadelphia Church of God's unauthorized distribution to its followers of verbatim copies of copyrighted book *Mystery of Ages* "unquestionably profits PCG by providing it at no cost with the core text essential to its members' religious observance, by attracting . . . new members who tithe ten percent of their income to PCG, and by enabling the ministry's growth").

72.    Courts have found the requisite benefit to be shown where unauthorized copies were made to save the expense of purchasing authorized ones. *See Wall Data, Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006) ("the purpose and character of the Sheriff Department's use was commercial, because the copies were made to save the expense of purchasing authorized copies, or at least the expense of a more flexible license."); *see also Napster*, 239 F.3d at 1015.

73.    Defendants' expected effort to distinguish *Princeton University Press*, *supra*, and *Basic Books*, *supra*, on the ground that the defendants in those cases were commercial copyshops has no merit.  The nature of the copying – and its impact on the copyright owner – is exactly the same whether the copier is a for-

profit business or a nonprofit educational institution.  In both cases, moreover, the end use – classroom teaching – is the same.  To posit that essentially the same act of copying is infringement when done by a copyshop but fair use when done by a university is to elevate form over substance in a manner that is without basis in the law.

### 3.      Good faith does not excuse infringing conduct

74.    As the Eleventh Circuit noted in *Letterese*, professions of good faith "do[] not insulate a defendant from liability" and constitute "merely a 'presupposition' of a defendant's claim to the [fair use] defense."  533 F.3d at 1312 n.27.  *See also Harper & Row*, 471 U.S. at 562 (noting that fair use presupposes good faith and fair dealing).

75.    Put differently, the absence of good faith can invalidate a claim of fair use, but its presence does not override the four-factor analysis.  Therefore, even if the Court were to find GSU's current copyright policy and practice to reflect a good-faith effort to improve copyright compliance, it would not weigh in favor of treating either the policy itself or otherwise infringing acts taken pursuant to the policy as fair use.

76.    Section 504 of the Copyright Act, 17 U.S.C. § 504, which directs courts to remit statutory damages where a librarian or professor, or the library or

educational institution, had reasonable grounds for believing a use of a copyrighted work was fair use, does not apply to liability or to injunctive relief and thus has no bearing on this case.

\*   \*   \*

77.     The first factor clearly favors Plaintiffs.

**C.     <u>Factor Two: The Nature of the Copyrighted Work</u>**

78.     The second statutory fair use factor considers the nature of the copyrighted work.  Although the scope of fair use is greater with respect to works of fact than with respect to works of fiction, *Stewart v. Abend*, 495 U.S. 207, 237 (1990), these are not rigid categories.  There are, instead, "gradations as to the relative proportion of fact and fancy," and "the extent to which one must permit expressive language to be copied, in order to disseminate the underlying facts, will . . . vary from case to case."  *Harper & Row*, 471 U.S. at 563 (citation omitted).

79.     The Eleventh Circuit has referred to a "hierarchy of copyright protection" in which "original, creative works are afforded greater protection than derivative works or factual compilations."  *Suntrust Bank*, 268 F.3d at 1271.  Nonfiction works that are not simply selections or arrangements of factual material (e.g., statistical compilations or encyclopedias) are entitled to weight under the second-factor analysis.  *See Princeton Univ. Press*, 99 F.3d at 1389 (noting with

31

respect to university coursepacks that it "was certainly not telephone book listings that defendants were reproducing").

80.     In *Pac. & S. Co.*, *supra*, the Eleventh Circuit expressly disapproved of allowing too wide a berth for fair use with respect to factual works, noting that courts should "take care not to discourage authors from addressing important topics for fear of losing their copyright protections." 744 F.2d at 1497.[1]

81.     In *Letterese*, which concerned the non-fiction book *Big League Sales Closing Techniques*, the court noted that "[n]otwithstanding its informational nature [it] contains a significant 'proportion of fact and fancy,' and not merely in the subjective selection and arrangement of sales techniques; [the author] utilizes original expression that surpasses the bare facts necessary to communicate the underlying technique." 533 F.3d at 1312.

82.     Courts regularly accord scholarly works weight under the second factor. In *Princeton University Press* the Sixth Circuit noted that the excerpts copied from non-fiction scholarly books for the coursepacks at issue "contained creative material, or 'expression'" and concluded that the second factor cut against fair use. 99 F.3d at 1389.

---

[1] Leading copyright expert William Patry has argued that "a broad rule permitting more generous fair use of all factual works than of all fictional works should be avoided." William F. Patry, PATRY ON COPYRIGHT § 10:138 (March 2008).

83.    In *Weissman* the Second Circuit noted "the danger that allowing wholesale appropriation of scientific works presents."  868 F.2d at 1325. Observing that copyright protection provided the plaintiff with "an incentive to continue research," the court stated:

> [W]hile recognizing that fair use finds greater application in a factual scientific context, that recognition should not blind a court to the need to uphold those incentives necessary to the creation of works such as [the plaintiff's article].

*Id.*

84.    Given the analytical, scholarly nature of the works sued upon here (akin to those sued upon in *Princeton University Press* and *Basic Books*), the second factor favors Plaintiffs.

### D.    <u>Factor Three:  The Amount and Substantiality of the Use</u>

85.    The third fair use factor looks at the amount and substantiality of the portion used in relation to the copyrighted work as a whole.  In applying the third factor, courts "evaluate the qualitative aspects as well as the quantity of material copied."  *Basic Books*, 758 F. Supp. at 1533.

86.    Verbatim copying (such as photocopying) is "evidence of the qualitative value of the copied material."  *Harper & Row*, 471 U.S. at 565.

87.    In *Basic Books*, the court found that the portions of the plaintiffs' works copied for the five coursepacks at issue – twelve excerpts ranging from 14

to 110 pages in length and from 5.2 percent to 25.1 percent of the works

(corresponding to at least one chapter of a plaintiff's book in almost every case) –

"were critical parts of the books copied, since that is likely the reason the college

professors used them in their classes." *Id.* at 1533.  Based on the extent of the

copying, the court concluded that the excerpts were meant to be "a complete

representation of the concept explored in the chapter," *id.* at 1534 – "not material

supplemental to the assigned course material but *the* assignment," *id.* (emphasis in

original) – and thus were quantitatively and qualitatively significant.  *Id.*

88.     Similarly, in *Princeton University Press*, the Sixth Circuit compared

the extent of the copying – 8,000 words in the case of the shortest excerpt – to the

1,000-word "safe harbor" in the Classroom Guidelines (equivalent to roughly 2-3

pages of the books sued upon here) and found that the takings far exceeded the

Guidelines and were "not insubstantial."  99 F.3d at 1389.

89.     In calculating the percentage of the work copied, the denominator of

the calculation properly should include only the "copyrighted words" or the

"copyrighted materials in the book," not tables of contents, indices, and other

uncopyrightable front and back matter.  *See New Era Publications Int'l v. Carol*

*Publ'g Group*, 729 F. Supp. 992, 1000 and n.9 (S.D.N.Y.), *aff'd*, 904 F.2d 152 (2d

Cir. 1990).

90.     As for the qualitative aspect of the copying, the *Princeton University Press* court observed:

> [T]he fact that the professors thought the excerpts sufficiently important to make them required reading strikes us a fairly convincing "evidence of the qualitative value of the copied material." . . . We have no reason to suppose that in choosing the excerpts to be copied, the professors passed over material that was more representative of the major ideas of the work as a whole in preference for material that was less representative.

99 F.3d at 1389 (quoting *Harper & Row*, 471 U.S. at 565).

91.     The same conclusion should pertain with respect to the qualitative importance of the excerpts from Plaintiffs' books posted to ERes or uLearn by GSU instructors.  The completed checklists confirm that the selected readings were, in almost all cases, viewed as "necessary" to achieve the instructors' "intended educational purpose" and "[i]mportant to [their] educational objectives," as the fact of their having been assigned – in some cases repeatedly, semester after semester – indicates.

92.     In sum, the verbatim copying of Plaintiffs' works at GSU is substantial in both the quantitative and qualitative senses.  The Joint Filing reveals that the copying of one or more book chapters and and/or numerous cumulatively lengthy selections from books assigned as required reading remains routine.

93.     The third factor weighs in Plaintiffs' favor.

35

E.     **Factor Four:  The Effect of the Use on the Potential Market for or Value of the Copyrighted Works**

94.     The fourth and final statutory fair use factor requires a demonstration of "the effect of [Defendants'] use upon the *potential* market for or value of the copyrighted work." 17 U.S.C. ¶ 107(4) (emphasis added).  It requires the court to consider "not only the extent of market harm caused by the particular actions of the alleged infringer" but also "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original."  *Campbell*, 510 U.S. at 590 (quoting *Harper & Row*, 471 U.S. at 569).

95.     The first and the fourth factors harmonize in that "a work that merely supplants or supersedes another is likely to cause a substantially adverse impact on the potential market of the original," whereas "a transformative work is less likely to do so."  *Suntrust Bank*, 268 F.3d at 1274 n.28 (citation omitted).  *See also Letterese*, 533 F.3d at 1315 ("the adverse effect with which fair use is primarily concerned is that of market substitution").

96.     The exact duplication of an original serves as a market replacement for it, "making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591.

36

97.    In *Basic Books* the court found that although it was possible that reading coursepacks would "whet the appetite of students" to read more by the authors, it was "more likely that purchase of the packets obviates purchase of the full texts."  758 F. Supp. at 1534.

98.    In addition to lost book sales, lost permissions fees are an important aspect of market harm, especially where the copyright holder is already successfully exploiting the licensing market.  *Princeton Univ. Press*, 99 F.3d at 1387.  *See also Am. Geophysical Union*, 60 F.3d at 930 ("since there currently exists a viable market for licensing these rights for individual journal articles, it is appropriate that potential licensing revenues for photocopying be considered in a fair use analysis"); *Harper & Row*, 471 U.S. at 569 (considering harm to marketability of first serialization rights); *DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir. 1982) ("one of the benefits of ownership of copyrighted material is the right to license its use for a fee").

99.    The Second Circuit, discussing the relevance of an established licensing market, explained that "the right to seek payment for a particular use tends to become legally cognizable under the fourth fair use factor when the means for paying for such use is made easier," *Am. Geophysical Union*, 60 F.3d at 930-

31, and that unauthorized use "should be considered 'less fair' when there is a
ready market or means to pay for the use." *Id.* at 931.

100.  In *Princeton University Press*, the Sixth Circuit noted the existence of
a working licensing market for the coursepacks created by the defendant:

> The potential uses of the copyrighted works at issue in the case before
> us clearly include the selling of permission to reproduce portions of
> the works for inclusion in coursepacks – and the likelihood that
> publishers actually will license such reproduction is a demonstrated
> fact.  A licensing market already exists here . . . .

99 F.3d at 1388 (internal citations omitted); *see also Princeton Univ. Press v.
Michigan Document Servs., Inc.,* 855 F. Supp. 905, 908 (E.D. Mich. 1994)
(describing the "clear and relatively simple procedures in place" for copyshops to
seek permissions).  The Sixth Circuit further noted that "[t]he three plaintiffs
together have been collecting permission fees at a rate approaching $500,000 a
year."  *Princeton Univ. Press*, 99 F.3d at 1387.

101.  The Second Circuit in *American Geophysical Union* likewise pointed
to the ready availability of permissions as justifying the inclusion of evidence of
the licensing of excerpts in the factor-four analysis:

> [T]he publishers . . . have created, primarily through the CCC, a
> workable market for institutional users to obtain licenses for the right
> to produce their own copies of individual articles via photocopying.
> The District Court found that many major corporations now subscribe
> to the CCC systems for photocopying licenses.  Indeed, it appears
> from the pleadings, especially Texaco's counterclaim, that Texaco

itself has been paying royalties to the CCC.  Since the Copyright Act explicitly provides that copyright holders have the 'exclusive rights' to 'reproduce' and 'distribute copies' of their works, and since there currently exists a viable market for licensing these rights for individual journal articles, it is appropriate that potential licensing revenues for photocopying be considered in a fair use analysis.

60 F.3d at 930.

102.   As for the impact on the market for permissions if the unauthorized copying were found to be fair use, the Sixth Circuit in *Princeton University Press* stated:

> [M]ost of the copyshops that compete with MDS in the sale of coursepacks pay permission fees for the privilege of duplicating and selling excerpts from copyrighted works. . . . If copyshops across the nation *were to start doing* what the defendants have been doing here, this revenue stream would shrivel and the potential value of the copyrighted works of scholarship published by the plaintiffs would be diminished accordingly.

99 F.3d at 1387 (emphasis added).  *See also Basic Books*, 758 F. Supp. at 1534 (concluding that the defendant's nationwide business of "usurping plaintiffs' copyrights and profits" could not be sustained because it would frustrate the intent of copyright law to encourage creative expression); *Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 189 (D. Mass. 2007) (finding that if unauthorized use of plaintiff's photograph in television program were fair use, all similar uses would be fair use, destroying the only potential market for the photographs).

39

103.   The Eleventh Circuit reached a similar conclusion in *Letterese*, observing: "The unrestricted and widespread dissemination of the Sales Course – a use that is not transformative of the book and may be regarded as appropriating 'the heart' of its expression – . . . *may well usurp* the potential market for *Big League Sales* and derivative works." 533 F.3d at 1317-18 (emphasis added).

104.   Similarly, the Second Circuit in *American Geophysical Union* found:

> [I]f Texaco's unauthorized photocopying was not permitted as fair use, the publishers' revenues would increase significantly since Texaco would (1) obtain articles from document delivery services (which pay royalties to publishers for the right to photocopy articles), (2) negotiate photocopying licenses directly with individual publishers, and/or (3) acquire some form of photocopying license from the Copyright Clearance Center Inc. ("CCC").

60 F.3d at 929.

105.   If GSU continues to avoid payment for digital copies of Plaintiffs' works, and if that practice becomes widespread, such that other schools follow GSU's lead in not paying permissions fees (either because they decide to infringe or because this Court decides that such activities are fair use), then the revenue associated with such permissions necessarily will be impacted.

106.   The Sixth Circuit observed in *Princeton University Press* that the loss of the publishers' permissions revenue stream could "only have a deleterious effect

upon the incentive to publish academic writings." 99 F.3d at 1391. "If publishers cannot look forward to receiving permission fees," the court asked rhetorically, "why should they continue publishing marginally profitable books at all?" *Id.* "[H]ow," the court continued, "will artistic creativity be stimulated if the diminution of economic incentives for publishers to publish academic works means that fewer academic works will be published?" *Id.*

107.   Defendants have stipulated that Plaintiffs' operating expenses are in the tens of millions of dollars a year and that permissions represent a significant revenue stream for Plaintiffs. Stipulated Facts ¶¶ 11, 15.

108.   There is uncontroverted record evidence of a well established, widely used system for licensing excerpts from academic books for the very type of educational use engaged in by GSU – the customized assembly by faculty of numerous excerpts from copyrighted works into comprehensive electronic course readings. At trial, Plaintiffs will establish the actual and potential adverse impact on this market of the ongoing infringement of their works at GSU.

109.   The fourth factor, like the others, clearly weighs against fair use.

* * *

110.   Consideration of all of the fair use factors, each of which weighs in Plaintiffs' favor, leads inescapably to a finding that GSU practices, as exemplified

41

by the Joint Filing, do not constitute fair use, thereby mandating entry of judgment for Plaintiffs.

111.   We note that with respect to those Joint Filing works that were posted to ERes at the direction of faculty members whom Defendants are not offering as trial witnesses (Lasner, Danis, Thompson, Raengo, Harvey, Perkins, Anggoro, and Whitten), Defendants will necessarily have failed to make a showing that the copying, display, and distribution of portions of those works by means of ERes or uLearn constituted fair use.

F.   **GSU'S Practices Are Inconsistent with Classroom and Library Guidelines**

112.   Any doubt as to the unlawfulness of the ongoing, unauthorized copying of Plaintiffs' works at GSU should be dispelled by the sharp divergence of GSU's practices from the specific and highly restrictive guidelines drafted by Congress specifically in order to confine the scope of fair use in the context of classroom copying for teaching purposes.

113.   The "Agreement on Guidelines for Classroom Copying in Not-for-Profit Educational Institutions With Respect to Books and Periodicals" (the "Classroom Guidelines"), H.R. Rep. No. 1476 at 68-71, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S. Code Cong. & Ad. News 5659, 5682-83, were accepted by conferees from both Houses of Congress as "part of their

42

understanding of fair use."  H.R. Conf. Rep. No. 1733, 94th Cong., 2d Sess. at 70

(1976).

114.   The Classroom Guidelines set forth several criteria for permissible

unauthorized copying for classroom use, including: (i) brevity (1,000 words); (ii)

spontaneity (decision to use the material is too close to time of use to reasonably

expect to obtain timely permission); (iii) limited copying (no more than nine

instances of multiple copying during a term, only a limited number of copies from

works by one author or from any one collective work); and (iv) non-substitution

(copying does not substitute for purchase of books, publishers' reprints, or

periodicals).  The Guidelines further state that the unauthorized creation of

"anthologies, compilations or collective works" is not allowed and that the copying

shall not "be repeated with respect to the same item by the same teacher from term

to term."  H.R. Rep. No. 1476 at 69.

115.   As the 1967 House Report (citing approvingly in the 1976 House

Report) explained:

> Where the unauthorized copying displaces what
> realistically might have been a sale, no matter how minor
> the amount of money involved, the interests of the
> copyright owner need protection.  Isolated instances of
> minor infringements, when multiplied many times,
> become in the aggregate a major inroad on copyright that
> must be prevented.

H.R. Rep. No. 90-83, 90th Cong., 1st Sess. (1967), at 35 (cited approvingly in H.R.

Rep. No. 94-1476, 94th Cong., 2d Sess. (1976), at 67).

116.   In *Princeton University Press*, the court found, with reference to the

Classroom Guidelines, that "[i]n its systematic and premeditated character, its

magnitude, its anthological content, and its commercial motivation, the copying

done by [the copyshop defendant] goes well beyond anything envisioned by the

Congress."  99 F.3d at 1390.  The court concluded that the fact that the defendant's

copying was "light years away from the safe harbor of the guidelines weighs

against a finding of fair use."  *Id.* at 1391.  *See also Basic Books*, 758 F. Supp. at

1536 (finding that coursepack copying "clearly deviates from the letter and spirit

of the Guidelines").

117.   That the regular, systematic, and extensive unauthorized copying of

course materials – even by a nonprofit institution – is contrary to Congress's

understanding of fair use is confirmed by the strict limits placed on unauthorized

copying by libraries under section 108 of the Copyright Act.  Except to preserve

unpublished works or to replace damaged, lost, stolen, or deteriorating copies (in

which case three copies may be made), section 108 permits libraries to make or

distribute "no more than one copy" of a work so long as it is done "without any

purpose of direct or indirect commercial advantage," and the library is open to the

public or to persons not affiliated with the library of institution of which it is a part. 17 U.S.C. § 108(a)(1).

118.    Section 108 expressly prohibits "systematic reproduction or distribution" of single or multiple copies or "related or concerted reproduction or distribution of multiple copies . . . of the same material."  17 U.S.C. § 108(g).

119.    The same principle – that mechanical copying by a nonprofit public institution for private educational use must be limited to avoid interfering with the market for the copyrighted work – precludes a finding of fair use with respect to the practices challenged here.

## VI.    THE DESIGN OF GSU'S FAIR USE CHECKLIST SUBVERTS THE LAW OF FAIR USE

120.    In numerous respects the design of GSU's "Fair Use Checklist" (the "Checklist") – the centerpiece of its copyright policy – fails to accurately reflect the fair use law discussed above.  To the contrary, it is pervaded by deviations from the law which, collectively, subvert Plaintiffs' and other publishers' copyright rights by rationalizing extensive, nontransformative takings of their works as fair use.

121.    The inherent flaws in the Checklist are manifested in the record evidence demonstrating that, in practice, the Checklist invariably produces affirmative fair use determinations by GSU faculty who rely almost exclusively on

the Checklist for guidance as to fair use.  The erroneous understandings of fair use reflected on the Joint Filing and in EREs and uLearn activity more generally are directly attributable to the faulty design of the Checklist.

122.   Below, we describe some of the flaws in the Checklist that have misled GSU faculty as to the law of fair use and contributed to the utter failure of the new policy to reform GSU's copyright compliance.

**Factor 1**

123.   Although the statute identifies "nonprofit educational purpose" as a relevant consideration under the first fair use factor, 17 U.S.C. § 107(1), the Checklist includes at least three duplicative subfactors under Factor 1 that address this consideration: "[n]onprofit educational," "[t]eaching," and "[u]se is necessary to achieve your educational purpose."  GSU faculty almost always check the first two of these boxes and usually all three, *see* Plaintiffs' Proposed Findings of Fact ¶ 177, as every reading they choose for a class at GSU will, by definition, satisfy each of these overlapping criteria.

124.   As a result, even if the use is recognized to be nontransformative, that crucial "weighs against fair use" factor is always outweighed by the three near-automatic "weighs in favor of fair use" factors.  This effectively gives the nonprofit educational purpose of the use dispositive significance under Factor 1 –

directly contrary to what the case law teaches.  *See, e.g., Campbell*, 510 U.S. at 584

("the commercial or nonprofit educational purpose of a work is only one element

of the first factor enquiry into its purpose and character").

125.   The inclusion of "[u]se is necessary to achieve your educational

purpose" in the "weighs in favor" column reflects a distortion of the law in a

manner that improperly favors fair use.  In *Campbell*, the Supreme Court found

that a parodist required the latitude to take as much of the original song as

necessary to "conjure up" the original, i.e., for the listener to recognize what song

was being parodied.  510 U.S. at 588.  But the principle that a parodist needs to

take enough of the original for his new, transformative work to be recognizable as

a parody does not support the very different proposition that mechanical

reproduction – a nontransformative use – is justified because an instructor believes

it necessary for his or her educational purpose.  The *Campbell* Court linked the

defendant's need for the original to his transformative purpose; in connection with

ERes and uLearn, there is no transformative purpose.

126.   The unwarranted importance the checklist ascribes to the pedagogical

purpose of the copying is tantamount to arguing that the more important a

copyright holder's work to the infringer, the less copyright protection it merits.  It

also suggests to faculty members, who are novices in copyright law, that fair use is

47

defined by the user's need – a proposition at odds with the incentivizing purposes of copyright law and with the nature of fair use as a limited exception to copyright protection. *See Basic Books*, 758 F. Supp. at 1535 (rejecting defendant's "fair use by reason of necessity" argument in the absence of evidence that "enjoining [defendants] from pirating plaintiffs' copyrights would halt the educational process").

127.   Similar analysis applies to "[i]mportant to educational objectives" (Factor 2) and "[a]mount taken is narrowly tailored to educational purpose" (Factor 3) – two additional duplicative subfactors that GSU instructors check as a matter of course merely by virtue of having selecting the work for their students (thus bringing to five the number of checks attributable to the nonprofit educational use). It is semantic hair-splitting to say that either "[a]mount taken is narrowly tailored to educational purpose" or "[i]mportant to educational objectives" differs in any meaningful way from "use is necessary to achieve your intended educational purpose" (Factor 1).

**Factor 2**

128.   The Checklist is also skewed inappropriately by counting in favor of fair use the fact that a work is published (as is true of all of Plaintiffs' works).  The Supreme Court held in *Harper & Row* that the taking of an unpublished work

48

weighed strongly against fair use.  471 U.S. at 553-54.  However, the fact that use

of an unpublished work weighs against fair use does not support the converse

proposition: that use of a *published* work weighs *in favor of* fair use.

129.   The three "weighs in favor" boxes under Factor 2 – " [p]ublished,"

"[f]actual or nonfiction," and "[i]mportant to educational objectives" – are, again,

necessarily checked almost invariably for excerpts from Plaintiffs' books.  *See*

Plaintiffs' Proposed Findings of Fact ¶ 179.  Moreover, by failing to distinguish

between different types of nonfiction works depending on the degree of creativity,

as the law requires, *see, e.g.*, *Letterese*, 533 F.3d at 1312, the Checklist ignores the

fact that academic works are entitled to greater protection than mere factual

compilations.  On the other side of the ledger, the Factor 2 "weighs against"

criteria – that the work is unpublished, "[h]ighly creative," and "[c]onsumable" –

will almost never apply to university course readings, with the exception, perhaps,

assignments for literature classes.  The Checklist is thus designed to favor fair use

even for takings from highly creative works of scholarship.

**Factor 3**

130.   Similar to its treatment of "published," although the Checklist

correctly instructs that it weighs against fair use if the portion copied without

authorization is the "heart" of the work, *see Harper & Row*, 471 U.S. at 565-66,

neither *Harper & Row* nor any other case stands for the proposition that if the portion taken is *not* "central" to the work, as the Checklist puts it, it weighs *in favor of* fair use.  The inclusion of this criterion on the "weighs in favor" column, together with the inevitably checked "amount taken is narrowly tailored to educational purpose" – outweighs what should be the key consideration under Factor 3:  whether a large portion of the work is being used (which was not checked on a single checklist produced by Defendants in this action).  *See* Plaintiffs' Proposed Findings of Fact ¶ 182.

### Factor 4

131.   Under Factor 4, the Checklist includes "[u]se stimulates market for original work" in the "weighs in favor of fair use" column, but this factor will usually be duplicative of "[n]o significant effect on market or potential market." Although some courts cite the potential stimulative effect of an infringer's use as support for a finding of no adverse effect on the market for the original, *see, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 n.5 (2d Cir. 2006), it is not given independent significance as a justification for unlicensed copying.  The Checklist, however, effectively double-counts in favor of fair use by giving each of these criteria its own "weighs in favor" box.

132.   Another unwarranted "weighs in favor" subfactor under Factor 4 is "[n]o similar product [is] marketed by the copyright holder."  Counting this as weighing in favor of fair use misses the obvious the fact that the unauthorized ERes copying competes with the sale or licensing of *the original work* marketed by the copyright owner.  Moreover, a work that is unique deserves, if anything, *more* copyright protection, not less.

133.   The Checklist also errs in providing fair-use credit under Factor 4 if the book is "[n]o longer in print." This ignores the fact that this consideration has been largely mooted by the development of a robust licensing market that allows instructors to obtain inexpensive licenses to copy and distribute excerpts of out-of-print books.  As *Harper & Row* made clear, the key consideration is whether the original is available "through normal channels."  *Id.* at 553; *see also Am. Geophysical Union*, 60 F.3d at 929.  Therefore, so long as the desired excerpt is available for licensing – as the Joint Filing works are – an infringer is not entitled to affirmative fair use credit because the book happens to be out of print. Moreover, the checklist already has a Factor 4 box for "[l]icensing or permission unavailable," such that including separate check boxes for "out of print" and "licensing or permission unavailable" becomes yet another way of artificially multiplying the checks on the "weighs in favor" column so as to tilt the factor in

51

favor of fair use even for takings that directly displace Plaintiffs' permissions market.

134.   Although the Checklist provides that if "[o]ne or few copies [are] made or distributed," it fails to instruct that ERes involves the making of multiple copies per student (as Defendants have stipulated).  *See* Stipulated Facts ¶ 57; Plaintiffs' Proposed Findings of Fact, ¶ 185.  A more fundamental flaw is the fact that the inquiry is largely irrelevant:  the law requires consideration of the impact of the infringing conduct *if it were to become widespread*, *Campbell*, 510 U.S. at 590 – an inquiry that is unaffected by the number of unauthorized copies the defendant makes and distributes.

135.   Yet another unwarranted Factor 4 "favors fair use" box is "[u]ser owns lawfully acquired or purchased copy of original work."  Whether the infringer owns the copy from which copies are made and distributed has no bearing on the market impact of the unauthorized copies made from the owned original.

136.   Finally, the Checklist counts as favoring fair use the fact that access to the work is restricted to students in the class or some other small group.  But there is no "It could be worse" exception in copyright law.  Like "[o]ne or few copies made," this inquiry is properly subsumed within the question of whether the copying impacts the market or potential market for the work, which requires the

court to consider the impact if the copying were to become widespread.

137.   As the foregoing paragraphs make clear, the pervasive, ongoing infringement at GSU is a direct consequence of the defective design of the Checklist, which – intentionally or not – improperly multiplies the "checks" in favor of fair use so as to effectively perpetuate the infringement for which Plaintiffs seek injunctive relief.

## VII.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF COVERING ALL PLAINTIFF WORKS

### A.   Plaintiffs Have Made the Required Showing

138.   The Court is authorized to grant an injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).

139.   As a matter of substantive copyright law, "an injunction is appropriate when there is 'a past infringement and a substantial likelihood of future infringement.'"  *New World Music Co. v. Tampa Bay Downs, Inc.,* 2009 WL 35184, *9 (M.D. Fla. Jan. 6, 2009) (quoting *Pac. & S. Co.,* 744 F.2d at 1499).

140.   As shown above, Defendants are legally responsible for the ongoing infringing conduct by GSU employees – faculty and library staff responsible for the selection, copying, and distribution of electronic course materials – and such

53

conduct, exemplified by the takings listed on the Joint Filing, is not fair use for the reasons set forth above.

141.   Defendants' current policies and practices present a "threat of continuing violation," *Basic Books*, 758 F. Supp. at 1542, sufficient to warrant an injunction that covers existing and future works owned or controlled by Plaintiffs.

### B.   Plaintiffs Are Entitled to an Injunction Covering All of Their Works

142.   Courts routinely grant injunctive relief in copyright actions when a plaintiff has demonstrated (i) infringement of a representative sample of works emblematic of a pattern of unlawful practice and (ii) a likelihood that the infringement will continue absent an injunction.

143.   It is "standard practice" for plaintiffs prosecuting suits involving infringing systems such as those utilized at GSU to identify a limited number of representative infringements as evidence of a larger pattern of ongoing violations. *See Arista Records, Inc. v. Becker Enters., Inc.*, 298 F. Supp. 2d 1310, 1315 (S.D. Fla. 2003).  Based on such examples, courts regularly enjoin defendants from infringing any of the plaintiffs' copyrighted works.

144.   For example, in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197 (C.D. Cal. 2007), a group of record-company and movie-studio plaintiffs appended to their complaint – exactly as Plaintiffs did here –

54

exhibits identifying certain of their works found on the file-sharing systems of

Grokster, StreamCast, and the other defendants, while making clear that the list

was only a sample of the "massive" infringement taking place on those systems.

*See* Pl. Opp. Ex. 8, *Metro-Goldwyn-Mayer Studios, Inc., et al. v. Grokster*, *Ltd., et

al.,* Complaint for Damages and Injunctive Relief for Copyright Infringement (Oct.

2, 2001) at 13.  The court (after a remand from the Supreme Court) entered an

injunction covering "all of Plaintiffs' copyrighted works whether now in existence

or later created," not just the works in the exhibits attached to the complaint.

*Grokster,* 518 F. Supp. 2d at 1229.  In doing so, the court went out of its way to

explain that the injunction was "entirely proper" and cited supporting case law to

that effect from the Eighth, Ninth, and Eleventh Circuits.  *Id.*[2]

145.   This approach is typical in the Eleventh Circuit.  In *Pac. & S. Co*, 744

F.2d 1490 – one of the cases cited in *Grokster* – a television station owner sued

over the infringement of a single newscast but sought to enjoin the defendant from

infringing any of its other newscasts.  The Eleventh Circuit rejected the

defendant's argument that the injunction could not sweep more broadly than the

---

[2] *See also A&M Records, Inc. v. Napster, Inc.*, No. C 99-05183 MHP, 2001 U.S. Dist. LEXIS 2186, at *4 (N.D. Cal. Mar. 5, 2001) (extending the injunction beyond the specific works identified in the complaint to all of the plaintiffs' works present on the Napster peer-to-peer file-sharing system).

single work named in the suit and upheld this Court's authority to issue an

injunction addressing all plaintiff works, including "unregistered works" and

"works that have not been created."  *Id.* at 1499 n.17; *Pac. & S. Co. v. Duncan*,

618 F.Supp. 469, 471 (N.D. Ga. 1985) (Evans, J.) (enjoining the copying of any of

the plaintiff's broadcast news programs).  The issue arose again in *Cable News*

*Network v. Video Monitoring Servs. of America*, 940 F.2d 1471 (11th Cir. 1991),

where the panel overturned an injunction preventing the copying of any of CNN's

daily newscasts in addition to the lone work identified in the complaint.  *Id.* at

1486.  The Eleventh Circuit, sitting en banc, vacated the panel decision, *see Cable*

*News Network v. Video Monitoring Servs. of Am.*, 949 F.2d 378 (11th Cir. 1991),

after which the district court reinstated the injunction covering all of the plaintiff's

newscasts.  *See Cable News Network v. Video Monitoring Servs. of Am.*, 959 F.2d

188 (11th Cir. 1992).

146.    District courts in this Circuit have followed suit.  In numerous cases,

the complaints have identified a representative sample of works allegedly infringed

by the defendant, and the trial courts have issued broad injunctions covering all of

the plaintiffs' works.  *See, e.g., Warner Bros. Records Inc. v. Tait*, No.: 3:07-cv-

134-J16-HTS, 2008 U.S. Dist. LEXIS 46034, at *9 (M.D. Fla. June 12, 2008)

(enjoining the defendant from "directly or indirectly infringing Plaintiffs' rights

under federal or state law in the Exhibit A Recordings and any sound recording, whether now in existence or later created, that is owned or controlled by Plaintiffs"); *Sony BMG Music Entm't v. Villarreal*, No. 5:06-CV-323(CAR), 2007 U.S. Dist. LEXIS 883, *10 (M.D. Ga. Jan. 5, 2007) (granting injunction "barring Defendant from infringing upon all of Plaintiffs' copyrighted recordings, and not just those eight recordings listed herein"); *Arista Records, LLC v. Butler*, No: 8:07-cv-3-T-23EAJ, 2007 U.S. Dist. LEXIS 93807, at *12 (M.D. Fla. Dec. 21, 2007) ("Because the defendant's admissions show not only her liability for infringement of the twenty-two infringed recordings but also a substantial threat of continuing infringement, enjoining the defendant from further infringement of the [plaintiff's] sound recordings, whether now in existence or later created, is appropriate."); *Elektra Entm't Group Inc. v. Brimley*, No. CV-205-134, 2006 U.S. Dist. LEXIS 56798, at *11 (S.D. Ga. Aug. 15, 2006) (same).[3]

147.   Courts routinely extend copyright injunctions to include not only all of the plaintiff's works currently in existence but also those not yet created.  In the

---

[3] Recent cases have extended injunctive relief beyond the plaintiffs' works to entire *categories* of copyright owners' works.  For example, in *Milk Money Music v. Oakland Park Entertainment Corp.*, No. 09-CV-61416, 2009 U.S. Dist. LEXIS 121661, at *7-*10 (S.D. Fla. Dec. 11, 2009), the court enjoined the defendant from infringing the copyrights of all members of ASCAP, the repertory of which encompasses several million works.  *See also Joelsongs v. Shelley Broad. Co., Inc.*, 491 F. Supp. 2d 1080, 1086-87 (D. Ala. 2007) (same).

leading fair use decision involving educational coursepacks, the Sixth Circuit rejected the defendants' argument that the district court "exceeded its powers by enjoining them from reproduction of future copyrighted works," explaining: "We do not find the argument persuasive. The weight of authority supports the extension of injunctive relief to future works." *Princeton Univ. Press*, 99 F.3d at 1392-93. Similarly, in *Basic Books,* – in which the complaint identified 12 sample excerpts of works copied by Kinko's without permission for use in coursepacks, 758 F. Supp. at 1542 – the court entered an injunction covering "any work in which plaintiffs or any of them now own or hereafter acquire a copyright or exclusive right under copyright in the material copied." 1991 WL 311892, at *1 (S.D.N.Y. Oct. 16, 1991).[4]

148.    The specific titles identified on the Joint Filing do not represent the limit of Defendants' liability or define the scope of potential injunctive relief. To the contrary, the undisputed facts confirm the "substantial threat" of continued infringement of Plaintiffs' works. Were Defendants successful in their attempt to

---

[4] *See also Elektra Entm't Group, Inc. v. Jensen*, No. 1:07-CV-0054-JOF, 2007 U.S. Dist. LEXIS 60073, at *8-*9 (N.D. Ga. Aug. 16, 2007) ("In cases where there is such a history and threat of continued infringement, a district court ought not only to issue a broad permanent injunction protecting present works, but can protect works not yet created." (citations omitted)); *Sony Music Entm't v. Global Arts Prods.*, 45 F. Supp. 2d 1345, 1347 (S.D. Fla. 1999) (same).

limit the relief to the Joint Filing works, Plaintiffs would be compelled to file a new suit for other of their works currently on the system and another action every time a new work of theirs appears on the GSU electronic course reading systems.

149.   The broad injunctions entered in the cases cited above were crafted precisely to avoid such inefficiency.  As the *Arista Records* court explained, "[B]ecause Plaintiffs continually create new works – works that would be vulnerable to infringement if the injunction were limited to existing works, and that would require new litigation to redress each future infringement – the requested injunction follows standard practice in copyright cases by covering works to be created in the future."  298 F. Supp. 2d at 1315; *see also Villarreal*, 2007 U.S. Dist. LEXIS 883, at *10 (same); *Orth-O-Vision, Inc. v. Home Box Office*, 474 F. Supp. 672, 686 (S.D.N.Y. 1979) ("[I]t would be inequitable to grant the copyright owner . . . judgment on the issue of liability without enjoining the infringement of future registered works.  Otherwise, HBO would be required to bring a separate infringement action every time it register[ed] a new copyright work . . . .").

150.   To the extent GSU's systematic practices violate copyright law, the appropriate remedy is an injunction barring the Defendants from continuing to engage in those practices across the range of Plaintiffs' works, not just with respect to the Joint Filing works.

151.   The cases make clear that the registration status of such additional works is not material to the issuance of injunctive relief.  Indeed, in the Eleventh Circuit the works covered by an injunction *need not even be registered.  See Pac. & S. Co.,* 744 F.2d at 1499 n.17 ("[T]he statute provides for injunctions to prevent infringement of 'a copyright,' not necessarily the registered copyright that gave rise to the infringement action."); *see also Perfect 10*, 508 F.3d at 1154 n.1 ("Once a court has jurisdiction over an action for copyright infringement under section 411, the court may grant injunctive relief to restrain infringement of any copyright, whether registered or unregistered." (citations omitted)); *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir. 1994).

## VIII.  <u>PLAINTIFFS ARE ENTITLED TO COSTS AND ATTORNEY'S FEES</u>

152.   Section 505 of the Copyright Act, 17 U.S.C. § 505, provides:  "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs."

153.   An award of attorney's fees "ancillary to prospective relief" is "not subject to the strictures of the Eleventh Amendment." *Missouri v. Jenkins*, 491 U.S. 274, 279 (1989).

60

154.   The "only preconditions to an award of fees is that the party receiving the fee be the 'prevailing party' and that the fee be reasonable." *Mitek Holdings, Inc. v. Arce Eng'g Co.*, 198 F.3d 840, 842 (11th Cir. 1999) (citation omitted).

155.   The factors courts take into consideration in determining the appropriateness of an award of attorney's fees include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy*, 510 U.S. 517, 534 n.19 (1994). *See also Mitek,* 198 F.3d at 842.

156.   The foregoing factors must be applied in a manner "faithful to the purposes of the Copyright Act." *Mitek*, 198 F.3d at 842 (quoting *Fogerty*, 510 U.S. at 534 n.19).

157.   A showing of bad faith on the part of the defendant is not a prerequisite to an award of attorney's fees. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 832 (11th Cir. 1982) (quoted in *Mitek*, 198 F.3d at 842); *Sherry Mfg. Co., Inc. v. Towel King of Fla., Inc.*, 822 F.2d 1031, 1034 (11th Cir. 1987).  Nor does a finding of good faith on the part of the losing party mandate a denial of attorney's fees to the prevailing party. *Sherry Mfg. Co.*, 822 F.2d at 1035.

158.   Prosecution of copyright infringement defenses (including fair use) in the face of contrary prior decisions involving closely analogous facts has been held to be "objectively unreasonable" under *Fogerty*.  *Barclays Capital Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d 310, 330 (S.D.N.Y. 2010).

159.   Defendants' insistence on litigating through trial a fair use defense that: cannot be squared with the two closest judicial precedents – *Princeton University Press* and *Basic Books*; that is not supported by any other judicial precedent; that is irreconcilable with Congressional intent as embodied in the Classroom Guidelines; that is invoked to justify taking for free in digital form the same material Defendants acknowledge would be infringing in paper form; and that is predicated on the unilateral promulgation of a new copyright policy in the middle of the lawsuit that has demonstrably failed to rein in the widespread unauthorized takings of Plaintiff' copyrighted works that prompted this suit is objectively unreasonable.

160.   An award of attorney's fees in these circumstances would further the purpose of the Copyright Act by (i) protecting Plaintiffs' ability to remuneration for the digital copying, display, and distribution of their copyrighted works, as is necessary to preserve their incentive to continue to publish such works and (ii) discouraging GSU and other schools from treating the migration from paper to

digital copying as an opportunity to engage in widespread unauthorized copying of

significant portions of copyrighted books, thereby depriving the publishers of

revenue from their primary market on which their business models depend.

Respectfully submitted this 17th day of May, 2011.

/s/ John H. Rains IV
Edward B. Krugman
krugman@bmelaw.com
Georgia Bar No. 429927
John H. Rains IV
rains@bmelaw.com
Georgia Bar No. 556052

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, Georgia  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

R. Bruce Rich (*pro hac vice*)
Randi Singer (*pro hac vice*)
Jonathan Bloom (*pro hac vice*)
Todd D. Larson (*pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Plaintiffs*

63

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing **PLAINTIFFS'**

**PROPOSED CONCLUSIONS OF LAW** with the Clerk of Court using the

CM/ECF filing system which will send e-mail notification of such filing to

opposing counsel as follows:

> Stephen M. Schaetzel, Esq.
> Natasha H. Moffitt, Esq.
> John W. Harbin, Esq.
> Kristen A. Swift, Esq.
> C. Suzanne Johnson, Esq.
> Mary Katherine Bates, Esq.
> KING & SPALDING
> 1180 Peachtree Street
> Atlanta, Georgia  30309
>
> Katrina M. Quicker, Esq.
> Richard W. Miller, Esq.
> BALLARD SPAHR, LLP
> 999 Peachtree Street, Suite 1000
> Atlanta, Georgia  30309
>
> Anthony B. Askew, Esq.
> McKeon, Meunier, Carlin & Curfman, LLC
> 817 W. Peachtree Street, Suite 900
> Atlanta, Georgia 30308
>
> Mary Jo Volkert, Esq.
> Assistant S. Attorney General
> 40 Capitol Square
> Atlanta, Georgia 30334

This 17th day of May, 2011.

/s/ John H. Rains IV
John H. Rains IV
Georgia Bar No. 556052