## CONCLUSIONS OF LAW

    A.    <u>Jurisdiction and Venue</u>

        1.    The Court has jurisdiction over the parties.

        2.    The court does not have jurisdiction over the subject matter of this suit.

    B.    <u>Sovereign Immunity</u>

        3.    Georgia Constitution -  Article VIII, Sect. IV, ¶1 provides: (a) There shall be a Board of Regents of the University System of Georgia and (b) The government, control, and management of the University System of Georgia and all of the institutions in said system shall be vested in the Board of Regents of the University System of Georgia.

        4.    OCGA § 20-3-30 provides that the Board of Regents is "vested with all of the powers, privileges, and rights vested in former boards of trustees of the University of Georgia and all former boards of trustees."

        5.    OCGA § 20-3-31 provides that the Board of Regents shall have power to make such reasonable rules and regulations as are necessary for the performance of its duties.

6.     OCGA § 20-3-36 provides that the applicability of the doctrine of sovereign immunity to the Board of Regents is reaffirmed, except to the extent that the General Assembly may expressly provide.

7.     The ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court. *Bd. Of Trs. Of the Univ. of Ala. V. Garrett,* 531 U.S. 356, 363 (2001).

8.     "[A]n unconsenting State is immune from suits brought in federal courts." *Employees of Dep't of Pub. Health & Welfare v. Mo. Pub. Health Dep't*, 411 U.S. 279, 280, 93 S. Ct. 1614, 36 L. Ed 2d 251 (1973).

9.     The Eleventh Amendment also bars a suit against state officials when the state is the real, substantial party in interest. *See Pennhurst State Sch. & Hisp. v. Halderman*, 465 U.S. 279, 280 (1973).

10.    Suits against state officials in their official capacities are treated as suits against the state itself and immunities available to such officials are those the state possesses.

11.    Therefore, the Board of Regents and GSU, which is an institution of the University System of Georgia, and its employees, when acting within their official capacities, are arms of the state and therefore have the benefit of sovereign immunity.

467

12.    The Eleventh Amendment does not bar suit against a state official that seeks only prospective injunctive relief for that official's violation of federal law. *See Ex parte Young*, 209 U.S. 123 (1908).

13.    More specifically, *Ex parte Young* applies "where the underlying authorization upon which the named official acts is asserted to be illegal" under federal law, the "violation of federal law by [the] state official is ongoing," and the relief sought will end the violation. *Papasan v. Allain*, 478 U.S. 265 (1986).

14.    Plaintiffs cannot maintain a suit under *Ex parte Young* simply by naming an official tangentially involved in an alleged violation of federal law.

15.    The named official must be more than simply a supervisory official. *See Pennington Seed, Inc. v. Produce Exchange* No. 299, 457 F.3d 1334, 1342 (Fed. Cir. 2006).

16.    An allegation that Defendants are "in charge" is not sufficient to invoke *Ex parte Young*.

17.    However, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act,

or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157.

18.     The connection must be more than supervision – "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Los Angeles Country Bar Ass'n v. Eu,* 979 F.2d 697, 704 (9th Cir. 1992).

19.     "[T]here must be a connection between the state officer and the enforcement of the act or else the suit will merely make him a representative of the state and therefore improperly make the state a party to the suit." *Pennington Seed, Inc. v. Produce Exch. 299*, 457 F.3d 1334, 1342 (Fed. Cir. 2006).

20.     "A nexus between the violation of federal law and the individual accused of violating that law requires more than simply a broad general obligation to prevent a violation; it requires *an actual violation of federal law by that individual*... The fact that a University Official has a general, state-law obligation to oversee a University's patent policy does not give rise to a violation of federal patent law." *Id.* at 1342-43 (emphasis added).

21.     The "connection [between a defendant and an act in violation of the law] must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged

provision will not subject an official to suit." *See Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

22.    "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. 123, 157, 28 S. Ct. 441, 52 L. Ed. 714 (1908).

23.    "When a violation of federal law is alleged . . . the state official whose actions violate that law is the rightful party to the suit and prospective injunctive relief can only be had against him." *Pennington Seed, Inc. v. Produce Exchange* No. 299, 457 F.3d 1334, 1342 (Fed. Cir. 2006).

24.    Liability of supervisory officials cannot be predicated on vicarious liability or respondeat superior. *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir. 1999).

25.    Rather, supervisory officials can only be liable if they personally participate in the alleged constitutional violation or where there is a "causal connection between actions of the supervising official and the alleged

constitutional deprivation." *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990)).

26. A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so. *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003).

27. The "widespread abuse" requirement contemplates that constitutional violations must "occur with frequency," such as where "rights are systematically violated on a near-daily basis" via a "repeated pattern of unconstitutional behavior." *Holloman v. Harland,* 370 F.3d 1252, 1294 (11th Cir. 2004).

28. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences. *Holloman v. Harland,* 370 F.3d 1252, 1269 (11th Cir. 2004).

29.     In addition, the causal connection may be established and supervisory liability imposed where the supervisor's improper custom or policy ... result[s] in deliberate indifference to constitutional rights. *Holloman v. Harland,* 370 F.3d 1252, 1269 (11th Cir. 2004).

30.     For supervisory liability to attach, a "custom is a practice that is so settled and permanent that it takes on the force of law." *Cooper v. Dillon,* 403 F.3d 1208, 1221 (11th Cir. 2005).

31.     In order to establish a causal connection between the individual Defendants and the alleged infringement of Plaintiffs' copyrights, Plaintiffs must show that the Board of Regents' Copyright Policy itself is unconstitutional and results in each faculty member's deliberate indifference to constitutional rights. *Cooper v. Dillon,* 403 F.3d 1208, 1221 (11th Cir. 2005).

32.     Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." *Tittle v. Jefferson County Comm'n,* 10 F.3d 1535, 1542 (11th Cir. 1994).

33.     The failure to act or implement policy must be in the face of repeated violations or other indicators signifying a strong likelihood that the

situation will recur. *See Harris v. City of Marion,* 79 F.3d 56, 58-59 (7th Cir.1996); *West v. Tillman,* 2006 WL 2052520 (S.D. Ala. 2006).

34.    Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary. Thus, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Cottone,* 326 F.3d at 1360 (quoting *Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003)); *Brown v. Crawford,* 906 F.2d at 671("deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences").

35.    The standard for the imposition of liability upon a supervisor defendant who was not present when the alleged constitutional violation occurred is "extremely rigorous." *Bradley v. Florida Dept. of Labor and Employment,* 133 F.3d 797, 802 (11th Cir. 1998).

36.    Therefore, Plaintiff must show a causal connection which can be established when a history of widespread abuse puts the reasonable supervisor on notice of the need to correct the alleged deprivation and he fails to do so or when the supervisor's improper custom or policy resulted in the deliberate

indifference to a constitutional right. *Gonzales v. Reno,* 325 F.3d 1228, 1234-35 (11th Cir. 2003).

37.    *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988) requires a nexus between the violation of federal law and the individual accused of violating that law that exceeds a broad general obligation to prevent a violation. *See id.* at 1016.

38.    In *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), this stronger nexus was satisfied because  the defendant, the governor, is responsible for law enforcement in the state and is charged with executing the laws faithfully, has residual power to commence criminal prosecutions, and has the final authority to direct the attorney general to institute and prosecute on behalf of the state. *Id.* 1016. Likewise, Judges are responsible for administering the indigent system of representation. *Id.*

39.    The rights to copy and distribute copyrighted works are core rights under the Copyright Act.

40.    Section 107 of the Copyright Act provides that "fair use" of copyrighted materials is not infringement.

41.    Section 107 requires the balancing of four factors to determine whether a use is fair: (1) the purpose and character of the use, including whether

474

such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

42.     Courts are required to balance the fair use factors and apply an equitable rule of reason to determine fair use.  H.R. Rep. No. 94-1476, at 65-66 (1976); *see also Harper & Row v. Nation Enters.*, 471 U.S. 539, 560, 105 S. Ct. 2218, 85 L.Ed. 2d 588 (1985).

43.     Section 502(a) of the Copyright Act authorizes injunctions "to prevent or restrain infringement of a copyright."

44.     "Injunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Publ'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 785, (2d Cir. 1994).

45.     Broad injunctions alter copyright into an engine of suppression, in contravention of its goal to promote the progress of science and threatening to encroach on First Amendment values.  Nimmer on Copyright sec. 14.06[C], at 14-123 to 14-124.

46.     The scope of an injunction should be no broader than the infringement. *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527 (5th

Cir. 1994); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790-91 (5th Cir. 1999).

47.     Permanent injunctions are not automatic after a finding of infringement in favor of Plaintiffs. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006).

C.     Mandatory Preconditions For Suit

48.     Moreover, the Court cannot adjudicate certain alleged acts of infringement because the Plaintiffs have failed to meet the mandatory precondition of producing a copyright registration.

49.     17 U.S.C. § 411 (a), in pertinent part provides:

> [N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with the title.

50.     Thus, § 411(a) of the Copyright Act sets forth a claim processing rule that precludes the Court from determining the alleged act of infringement. *See*, Reed-Elsevier v. Muchnick, 559 U.S. _____ (2010); M.G.B. Homes v. Ameron Homes, Inc., 903 F.2d 1486, 1488 (11th Cir. 1990).

51.     In view thereof, the Court declines to address those instances of alleged infringement where Plaintiffs have failed to provide a copyright

476

registration for a United States work. The referenced instances (professor; work; cite) are:

    a.    Professor Orr; The Cambridge Companion to Schubert; Joint Filing, Exhibit D-28.

    b.    Professor Orr; The Operas of Charles Gounod; Joint Filing, Exhibit D-30.

    c.    Professor Orr; The Cambridge Companion to Berlioz; Joint Filing, Exhibit D-35.

    d.    Professor Kim; Assessing Speaking; Joint Filing, Exhibit D-49.

    e.    Professor Orr; The Cambridge Companion to Bach; Joint Filing, Exhibit D-80.

D.    Plaintiffs Allegations of Copyright Infringement

52.    A prime facie case of direct copyright infringement requires Plaintiffs to first prove that they own a valid copyright in the subject work(s). Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Peter Letterese & Assocs v. World Inst. of Scientology Enters., 533 F.3d 1287, 1300 (11th Cir. 2008). Next, Plaintiffs must prove that the Defendant copied protectable elements from the subject works. Id.

53.    Therefore, the Court first looks at whether Plaintiffs have proved that they have a valid copyright in the subject works. Under § 410(c) of the Copyright Act of a certificate of registration is made before or within five (5) years

after first publication of the work, the certificate constitutes prime facie evidence of the validity of the copyright and of the facts as stated in the certificate. 17 U.S.C. § 410(c).

54. Registered works that have been registered outside of the five (5) year window established by § 410(c) are not entitled to a presumption of validity. Such Plaintiffs' works are:

a. Professor Murphy; More Grammar Games; Joint Filing, Exhibit D-3.

b. Professor Murphy; Five-Minute Activities; Joint Filing, Exhibit D-5.

c. Professor Orr; Liszt: Sonata in B Minor; Joint Filing, Exhibit D-29.

d. Professor Orr; The Cambridge Companion to Beethoven; Joint Filing, Exhibit D-32.

e. Professor Hartwig; Ancient Egyptian Materials and Technology; Joint Filing, Exhibit D-41.

f. Professor Kim; Criterion Referenced Language Testing; Joint Filing, Exhibit D-42.

g. Professor Kim; Assessing Grammar; Joint Filing, Exhibit D-43.

h. Professor Kim; Fundamental Considerations in Language Testing; Joint Filing, Exhibit D-45.

i. Professor Kim; Language Testing in Practice; Joint Filing, Exhibit D-46

j.    Professor Kim; Assessing Listening; Joint Filing, Exhibit D-47.

k.    Professor Kim; Assessing Speaking; Joint Filing, Exhibit D-49

l.    Professor Kim; Learning Vocabulary in Another Language; Joint Filing, Exhibit D-50

m.    Professor Kim; Assessing Vocabulary; Joint Filing, Exhibit D-51.

n.    Professor Kim; Assessing Writing; Joint Filing, Exhibit D-52.

o.    Professor McCombie; International Health Organisations and Movements 1918-1939; Joint Filing, Exhibit D-53

p.    Professor Anggoro; Language Acquisition and Conceptual Development; Joint Filing, Exhibit D-67.

q.    Professor Gainty; The Cambridge History of China; Joint Filing, Exhibit D-72.

r.    Professor Whitten; A World of Babies; Joint Filing, Exhibit D-89.

s.    Professor Harvey; The Power Elite; Joint Filing, Exhibit D-93.

Similarly, "foreign-works" are not provided a presumption of validity.  The "foreign-works" identified by Plaintiffs are:

a.    Pronunciation Games; Joint Filing Exhibit D-1.

b.    Keeping Talking; Joint Filing Exhibit D-2.

c.    Grammar Practice Activities; Joint Filing Exhibit D-4

d.    Newspapers; Joint Filing Exhibit D-6

e.    Role Play; Joint Filing Exhibit D-7.

f.    Writing: Resource Books for Teachers; Joint Filing Exhibit D-8

g.    Vocabulary; Joint Filing Exhibit D-9.

h.    Handbook of Social Theory; Joint Filing Exhibit D-12

i.    Qualitative Research Practice; Joint Filing Exhibit D-16

j.    The Enlargement of the European Union; Joint Filing Exhibit D-18

k.    Handbook of Ethnography; Joint Filing Exhibit D-21.

l.    The Cambridge Companion to Mendelssohn; Joint Filing Exhibit D-30.

m.    The Cambridge Companion to Schumann; Joint Filing Exhibit D-31.

n.    The Music of Berlioz; Joint Filing Exhibit D-33.

o.    The Cambridge Companion to Berlioz; Joint Filing Exhibit D-35.

p.    Assessing Reading; Joint Filing Exhibit D-44.

q.    Assessing Language for Specific Purposes; Joint Filing Exhibit D-48

r.    A History of Feminist Literary Criticism; Joint Filing Exhibit D-56

s.    Handbook of Social Theory; Joint Filing Exhibit D-62

t.    North Italian Church Music in the Age of Monteverdi; Joint Filing Exhibit D-78

u.   North German Church Music in the Age of Buxtehude 1996; Joint Filing Exhibit D-79.

v.   The Cambridge Campanion to Bach; Joint Filing Exhibit D-80.

w.   Democratic Accountability in Latin America; Joint Filing Exhibit D-86.

x.   Regimes and Democracy in Latin America: Theories and Methods; Joint Filing Exhibit D-87

y.   Dionysus Since 69: Greek Tragedy at the Dawn of the Third Millennium; Joint Filing Exhibit D-90.

z.   Social Determinants of Health; Joint Filing Exhibit D-97

55.   As to the registered works for which the Plaintiffs are not entitled to a presumption, the Court has the discretion to determine the evidentiary weight to be accorded such certificates.  17 U.S.C. § 410(c).  The Court determines that the certificates are entitled to no evidentiary weight.

56.   As to the so-called "foreign-works" identified by Plaintiffs, the Court first finds that the Plaintiffs are not entitled to any presumption of copyright validity as to these works.  Further, a work is not a United States work if it was first published outside of the United States at least thirty (30) days before published inside the United States.  17 U.S.C. § 101; Berne Convention, Art. 3 ¶ 4. The Court finds that the Plaintiffs been the burden of proving that the subject works were indeed published first outside of the United States and that any

481

publication of the works inside of the United States occurred more than thirty (30) days thereafter.  The Court finds that the Plaintiffs have produced no such evidence in this regard.  See generally, Elsevier B.V. v. UnitedHealth Group, Inc. 2010 WL 150167 (S.D.N.Y.) Jan 14, 2010).

E.     Direct Infringement

57.     Direct infringement requires more than the simple provision of a vehicle through which others may engage in alleged acts of copyright infringement.  Parker v. Google, Inc., 242 F. App'x 833 (3d Cir. 2007); Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoameica, 424 F. 3d 50, 57 (1st Cir. 2005).  Direct infringement requires actual volitional conduct that in some way causes infringement Costar Group, Inc. v. Loopnet, Inc., 373 F.3d 544, 549 (4th Cir. 2004).

58.     Here, the Defendant Members of the Board of Regents and the University Administrators have committed no direct or personal act of alleged copyright infringement.  Therefore, none of the Defendants are direct infringes.  Costar Group, Inc. v. Loopnet, Inc., 372 F.3d 544, 549 (4th Cir. 2004).

59.     Plaintiffs instead contend that the individual Defendants are liable under the case of the Luckey v. Harris, 860 F.2d. 1012, 1015 (11th Circuit 1988), wherein the Eleventh Circuit held that "[p]ersonal action by defendants

individually is not a necessary condition of injunctive relief.... All that is required is that the official be responsible for the challenged action." Id. at 1015.

60.    Luckey v. Harris, however, does not permit the Publishers to sue the Defendants simply by virtue of their positions. In Luckey, the plaintiff filed suit against the Governor of Georgia and members of the judiciary in their official capacities alleging that systematic deficiencies in the Georgia indigent criminal defense program, including the failure to allocate sufficient funds, denied indigent criminal defendants various constitutional rights.    The defendants successfully moved to dismiss on grounds that this was essentially an action against the state and that state officials were entitled to immunity. The Eleventh Circuit reversed, determining that the named defendants were in fact responsible for providing an indigent defense program that met minimum constitutional standards. For example, the Governor was responsible for law enforcement and executing the laws, and the judges were responsible for administering the system for representation of the indigent criminally accused. Thus, the named defendants in Luckey had a "connection" with the asserted violation. The Luckey defendants were the persons responsible for adopting a meaningful policy, such as by allocation of funds, to address the defense of Georgia's indigent criminally accused and they had not done so.

61.    The Publishers' reliance on <u>Luckey</u> in this case is misplaced. The <u>Luckey</u> case is not a copyright case and that difference is significant.  The alleged violations here are specific acts of alleged unlawful copying.  Those acts, as admitted by Plaintiffs, are performed by professors and library staff, not by members of the Board of Regents or GSU administrators Copyright law acknowledges and expressly contemplates causes of action against third parties under the doctrines of contributory infringement and vicarious infringement. If, as Plaintiffs alleged the Defendants have "authorized, facilitated and/or "encouraged the copying of Plaintiffs' works, then the proper cause of action would have been for contributory or vicarious infringement.

62.    Moreover, unlike the Governor and Judges in <u>Luckey</u>, the Board of Regents and the GSU administrators do not have the requisite "connection" with the underlying cause of action.  Here, the GSU Defendants are responsible for setting and overseeing policy.   Those Defendants are <u>not</u> responsible for determining whether the use of a subject excerpt is appropriate in a given class setting such that its provision to students is a "fair use."  Rather, the role of the Defendants is similar to that of the Governor—to adopt and oversee meaningful policies.  However, unlike the Governor in <u>Luckey</u>, that is precisely what the University Administrators have done.  In February of 2009, the

484

Defendants developed and adopted the Policy. By doing so, the Defendants effectively addressed the "wrong" identified in the Complaint.

F.   Contributory Infringement

63.   Plaintiffs allege that Defendants have contributorily infringed Plaintiffs' copyrights by facilitating, encouraging and inducing librarians and professors to scan, copy, display and distribute plaintiffs' copyrighted material. The well-settled test for a contributory infringer is one who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another: Cable/Home Commc'n Corp. v. Network Prods. Inc, 902 F.2d 829, 845 (11th Cir. 1990).

64.   Liability for contributory copyright infringement may not be imposed by presuming intent to cause infringement solely from the design or distributions of a product capable of substantial lawful use. See, Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 933 (2005).

485

65.   The evidence establishes that the ERes and ULearn systems have significant noninfringing uses.   Moreover there is no indication in the record of a clear expression or other affirmative steps taken to foster infringement by Defendants with respect to ERes and ULearn systems.

66.   The 2009 Copyright Policy, does not demonstrate an intent by Defendants to encourage copyright infringement.   In fact, it was a positive step to avoid copyright infringement.

67.   The 2009 Copyright Policy does not encourage an improper application of the fair use defense.

68.   The Plaintiffs have not established that defendants induced, caused, or materially contributed to the unlawful distribution of Plaintiffs' copyrighted works by approving and implementing the use of Eres and ULearn systems.  As a result, Plaintiffs have failed to establish that Defendants have committed acts of contributory copyright infringement.

G.   The Fair Use Defense

69.   It is well established that particular instances of copying are not illegal because they are defensible as "fair use."  See Eldred v. Ashcroft, 537 U.S. 186, 220 (2003) ("The fair use defense affords considerable latitude for scholarship and comment....") (internal quotation marks and citations omitted); See generally, 4-13 Nimmer on Copyright § 13.05 (2010) (discussing the defense of fair use). Fair use is an affirmative defense that requires a case-by-case analysis.  Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561 (1985).

70.   Though the Copyright Act does not expressly define fair use, it lists "the factors to be considered" for the purpose of determining whether a particular instance of copying is fair use.  Specifically, the Copyright Act provides:

> [T]he fair use of a copyrighted work... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include--
>
> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)   the nature of the copyrighted work;
>
> (3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.

71.    Because of "the endless variety of situations and combinations of circumstances that can rise in a particular case especially during a period of rapid technological change," Congress intended the statute to be fluid, leaving courts "free to adapt the doctrine to particular situations on a case-by-case basis." H.R. REP. NO. 94-1476, at 66 (1976).  The defendant bears the burden of proof to show that a particular use is "fair use."  Peter Letterese & Assoc., Inc. v. World Inst. of Scientology Enter., 533 F.3d 1287, 1307 n.21 (11th Cir. 2008); 3-12 Nimmer on Copyright § 12.11[F] (2010).

72.    The Plaintiffs rely on various coursepack cases and argue that the Defendants are essentially creating electronic coursepacks or anthologies.  The course pack cases, include Basic Books, Inc. v Kinko's Graphics Corporation, 758 F. Supp. 1522 (S.D.N.Y 1991) and Princeton University Press v. Mich. Document Servs., Inc., 99 F. 3d 1381 (6th Cir 1996).  In these cases, the courts evaluated the four fair use factors and determined that the copying done by the commercial services was not fair use in preparation of hard copy coursepacks.  Interestingly, the Court in Basic Books stated that the use of the coursepacks, "in the hands of the students, was no doubt educational."  Importantly, because the Plaintiffs here likewise cite frequently to the Agreement on Guidelines for Classroom copying in

488

Not-for-Profit Educational Institutions with Respect to Books and Periodicals, H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976), the Court declined to adopt the guidelines as a legal standard. Moreover, the court declined to adopt one particular provision of the guideline that would bar all anthologies. Instead, the court held: "it is not clear that congress intended strict application of this prohibition without fair use balancing." 758 F. Supp. 1537.

73. Both parties also rely on <u>American Geophysical Union v Texaco Inc.</u>, 60 F. 3d 913 (2d Cir. 1994). In <u>Texaco</u>, the court likewise examined the classroom Guidelines from 1976, and refused to adopt them as a legal standard. The <u>Michigan Document Services</u> court likewise did not adopt the Classroom Guidelines as a legal standard, but did use those guidelines as a reference point to find that the commercial service's copying in that case was not fair use.

74. The Supreme Court has looked at fair use in various contexts. First, the Supreme Court addressed fair use in the context of "time shifting" using video tape equipment in Sony Corporation v Universal Studios, Inc, 464 U.S. 417 (1984). In that case, the Court confirmed an individual's right to make fair use of a copyrighted work by permitting "time shifting" even though the individual made a copy of the entire work. The Court expressly recognized that the use might be for educational purposes, but also for entertainment as well.

489

75.     Second, the Supreme Court considered the issue of fair use in the context of a periodical in <u>Harper & Row, Publishers, Inc. v. Nation Enterprises</u>, 471 U.S. 539 (1985).  In that case, the Court was considering the fair use of an excerpt from the then unpublished memoirs of President Gerald Ford quoted in an article in The Nation magazine.  Although the quotation was brief, the Court ruled it was not fair use.  The copied manuscript was not yet published and such works have long been granted a broader scope of protection.  Further, and perhaps more importantly, the work went directly to the most compelling part of Ford's memoirs -- his pardon of President Richard Nixon.  Yet further, the use led to cancellation by Time magazine of its commitment to pay a large fee to reprint excerpts of the Ford memoirs.  And still further, the facts of how the defendant came to have a copy of the unpublished work were suspicious.

76.     Third, the Supreme Court evaluated the fair use doctrine in the context of a musical work in <u>Campbell v Acuff-Rose, Inc.</u>, 510 U.S. 569 (1994). In that case, a rap parody version of the song Pretty Woman was found to be fair use.  The Court applied the traditional four fair use factors, but made some important alterations in its approach.    First, the Court abandoned most "presumptions" and other conventions that had grown up around the factors.  For example, the Court made it clear that a use for commercial purposes, such as the

490

sales of the parody recording, would not be presumptively against fair use. The Court also ruled that the "amount" of the use was not merely a measure of quantity, but that a person could use as much of the work as appropriate to serve the favored purpose.

77.   Next, the Campbell Court refused to analyze the four factors in isolation.  Instead, the Court stated that they must be examined with reference to one another.  For example, the favorable ruling on the purpose of the use (parody, in that case, as a form of criticism or comment) should be used to determine the appropriate meaning and application of the other factors.  Next, the Court gave new emphasis to the "transformative" use as part of the purpose of the use (the first fair use factor).   In the Campbell case, the Supreme Court characterized the purpose of the use as criticism and as transformative.

78.   The Plaintiffs make much of the effect of the transformative use in the fair use analysis, going so far as to state that the fair use doctrine is "intended to accommodate socially productive transformative uses." (Pl. Tr. Br., p. 21.)   This Court recognizes the importance of a transformative use.   A transformative use can arise in different contexts and in different way.  Under the Campbell case, a transformative use can arise from using a work without changing the underlying material, but by giving that work a new purpose or usefulness.

Regardless, it is still not essential for a particular use to be transformative in order for such use to be a fair use. A transformative use is indicative but not determinative of the fair use analysis because, as Campbell teaches, all four factors should be analyzed and considered.

79. Campbell is the most recent Supreme Court decision on fair use. Since that case, other courts have relied upon its teaching. For example, in Sundeman v The Seajay Society, Inc, 142 F. 3d 194 (4th Cir. 1998), a literature scholar presented at a conference her analysis of an unpublished novel. That analysis included quotations of approximately 4% to 6% of the original unpublished work. The original work's author's estate brought suit, claiming copyright infringement based on the copies that researchers made of the manuscript, and based on the quoting and paraphrasing of the manuscript in the conference presentation. The court held that this was a fair use, looking at all of the factors. More particularly, the court found that the first factor favored fair use because the scholarly and critical purpose outweighed any possible financial benefit from royalties. The second factor weighted against fair use since the original work was an unpublished manuscript of a creative novel. As to the third factor, the court ruled that lengthy quotes from the original were consistent with the scholarship and criticism purposes. As to the fourth factor, the Court saw no

harm to the market for the work and, in fact, determined that the use could have stimulated interest in the work.

80.     In yet another case, the Second Circuit held that the copying of entire posters was a fair use in <u>Bill Graham Archives v. Dorling Kindersley Ltd.</u>, 448 F.3d 605 (2d Cir. 2006).   The Bill Graham Archives owned the rights to certain psychedelic concert posters and the Defendant included images of those posters in a book about rock music history.   Although the publisher was a commercial enterprise and the work was for commercial purposes, the Court found that this was a fair use even though the posters were reproduced in full and they were highly artistic.   On the fair use factors, the Second Circuit ruled that the use was for scholarly purposes (examining the history of modern music) and that the use was transformative.   The original posters served the purpose of advertising concerts.   In the transformative use, the posters were "historical artifacts" that documented relevant events.   While the accused book reprinted the posters in full, they were of a reduced size and quality.   The Court found these conditions important in terms of the "amount" of the taking.   The Court further found that this use did not affect the market for the work.   In a finding reminiscent of <u>Sundeman</u>, the Second Circuit determined that the reprinted posters in the accused work could actually boost sales of the originals.

493

81.   In view of the foregoing legal principles, the Court addresses the alleged acts of infringement in this case in order of the parties' Joint Filing.