# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS;
OXFORD UNIVERSITY PRESS, INC.;
SAGE PUBLICATIONS, INC.,

           Plaintiffs

v.

MARK P. BECKER, in his official
capacity as President of Georgia State
University; RISA PALM, in her official
capacity as Senior Vice President for
Academic Affairs and Provost of
Georgia State University; J.L. ALBERT,
in his official capacity as Georgia State
University Associate Provost for
Information Systems and Technology;
NANCY SEAMANS, in her official
capacity as Dean of Libraries at Georgia
State University; ROBERT F.
HATCHER, in his official capacity as
Vice Chair of the Board of Regents of
the University System of Georgia;
KENNETH R. BERNARD, JR., JAMES
A BISHOP, FREDERICK E. COOPER,
LARRY R. ELLIS, FELTON JENKINS,
W. MANSFIELD JENNINGS, JR.,
JAMES R. JOLLY, DONALD M.
LEEBERN, JR., WILLIAM NESMITH,
JR., DOREEN STILES POITEVINT,
WILLIS J. POTTS, JR., WANDA
YANCEY RODWELL, KESSEL
STELLING, JR., BENJAMIN J.
TARBUTTON, III, RICHARD L.
TUCKER, ALLAN VIGIL, and LARRY

CIVIL ACTION
NO. 1:08-CV-1425-ODE

WALKER, in their official capacities as members of the Board of Regents of the University System of Georgia,

Defendants.

## DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

## TABLE OF CONTENTS

I.  NATURE OF THE CASE, THE PARTIES, JURISDICTION, AND VENUE ...................................................................................1

II.  THE PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF SOVEREIGN IMMUNITY..........................................................4

  A.  PLAINTIFFS FAILED TO PROVE COPYING BY ANY DEFENDANT.........4

  B.  THE ELEVENTH AMENDMENT BARS SUITS AGAINST A STATE FOR COPYRIGHT INFRINGEMENT...............................................6

  C.  EX PARTE YOUNG DOES NOT APPLY ..................................8

III.  THE 2009 COPYRIGHT POLICY HAS NOT CAUSED DIRECT COPYRIGHT INFRINGEMENT ..........................................16

  A.  THE LEGAL STANDARD FOR DIRECT COPYRIGHT INFRINGEMENT..16

    1.  *Plaintiffs Must Provide A Copyright Registration*..................17

    2.  *Plaintiffs Have Failed To Prove Copyright Validity For Other Works At Issue*.........................................................18

    3.  *Plaintiffs Have Failed To Prove Ownership Of The Copyright In Other Works*.......................................................23

IV.  THE 2009 COPYRIGHT POLICY HAS NOT RESULTED IN THE MISUSE OF THE FAIR USE DOCTRINE; RATHER, IT HAS REGULATED PROPER APPLICATION OF THE FAIR USE DOCTRINE.................................................................27

  A.  THE FAIR USE DOCTRINE ..............................................27

  B.  KEY SUPREME COURT DECISIONS ILLUMINATE THE INQUIRY ........29

  C.  FAIR USE IN EDUCATION ...............................................35

**D.   APPLICATION OF FAIR USE TO THE ALLEGED INFRINGING WORKS** ...............................................................**41**

     *1.   Purpose And Character Of The Use* .......................**41**

     *2.   The Nature Of The Work Generally Favors Fair Use* ...........**47**

     *3.   The Amount And Substantiality Of The Use* .........................**50**

     *4.   Effect On The Market Value Of The Original* ......................**52**

**E.   THE 2009 POLICY IS IN KEEPING WITH THE DOCTRINE OF FAIR USE** ...............................................................**53**

**V.   ATTORNEYS' FEES** .................................................**58**

**VI.   PLAINTIFFS' REQUEST FOR AN INJUNCTION** ...............................**61**

**A.   THE PROPOSED INJUNCTION IS OVERBROAD**.........................…..… **63**

**B.   THE PROPOSED ORDER SEEKS TO IMPOSE RIGID RULES THAT CONGRESS DECLINED TO INCORPORATE IN THE FAIR USE STATUTE** ...............................................................**64**

**C.   THE PROPOSED ORDER SEEKS TO INCLUDE ADDITIONAL, UNPRECEDENTED STRICTURES THAT EXCEED EVEN THE CLASSROOM GUIDELINES** .................................................**67**

**D.   COMPLIANCE WITH THE PROPOSED ORDER WOULD BE PROHIBITIVELY EXPENSIVE** .........................................**68**

**E.   THE AUTHORITY ON WHICH PLAINTIFFS RELY IS INAPPOSITE**.......**69**

Defendants Mark P. Becker, in his official capacity as President of Georgia State University, et al., respectfully submit the following Conclusions of Law.

## PROPOSED CONCLUSIONS OF LAW[1]

### I.   NATURE OF THE CASE, THE PARTIES, JURISDICTION, AND VENUE

1.   This is an action for copyright infringement under 17 U.S.C. § 101, et. seq.

2.   Plaintiffs Cambridge University Press ("Cambridge"), Oxford University Press, Inc. ("Oxford"), and SAGE Publications, Inc. ("SAGE") are major publishing houses that publish scholarly works for use in academia.

3.   Defendants are members of the Board of Regents of The University System of Georgia or administrative officials of Georgia State University, a unit of the University System of Georgia.

4.   Plaintiffs contend that implementation of the 2009 Copyright Policy has resulted in massive infringement of Plaintiffs' copyrights in violation of 17 U.S.C. § 106.

---

[1] Defendants hereby designate any Proposed Findings of Fact properly characterized as Conclusions of Law to be such conclusions.   Defendants likewise hereby designate any Proposed Conclusions of Law properly designated as Findings of Fact to be such findings.

5.     The Court has jurisdiction over the parties to this action.  Venue is proper in this Court.  This Court further has jurisdiction over claims of copyright infringement.  26 U.S.C. § 1338(a) (federal courts have subject matter jurisdiction over "any civil action arising under any Act of Congress relating to … copying hereto … ").   However, as explained below, Plaintiffs' claims for copyright infringement against these Defendants, who are state officials, are barred under the Eleventh Amendment to the Constitution.

## II.     THE PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF SOVEREIGN IMMUNITY

### A.     Plaintiffs Failed To Prove Copying By Any Defendant

6.     It is undisputed that the Defendants here are state officials, sued in their official capacities.  As already found by the Court, the Defendants have committed no direct or personal act of alleged copyright infringement.   Thus, none of the Defendants directly infringe.  Costar Group, Inc. v. Loopnet, Inc., 372 F.3d 544, 549 (4th Cir. 2004).

7.     Defendants before trial moved to dismiss this case on sovereign immunity grounds, contending that the Court lacked subject matter jurisdiction to hear the case.  In addressing that motion, the Court indicated that it could not decide that motion based on the pleadings alone.  (Order, Dkt No. 267 at 12-14.)  The Court

expressly granted the parties the opportunity to present evidence and argument that would allow the Court to rule on the issue.  Id.

8.     More particularly, the Court stated that it would not address the Plaintiffs' argument  under Luckey v. Harris, 860 F.2d 1012 (11th Cir. 1988), or the Defendants' argument under Pennington Seed, Inc. v. Produce Exchange No. 299, 457 F. 3d 1334 (Fed. Cir. 2006), at that time because the pleadings (Plaintiffs' First Amended Complaint) asserted that Defendants themselves scanned, copied, displayed, and distributed Plaintiffs' copyrighted materials.

9.     Defendants moved at the close of Plaintiffs' evidence for judgment as a matter of law on the sovereign immunity issue.  The Court denied the motion at that time.  The evidence is now in.  Defendants maintain that this Court lacks subject matter jurisdiction and that this action should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(c) because Plaintiffs' claims are barred under the Eleventh Amendment.  The Court agrees.

10.    Despite their pleadings, the Plaintiffs failed to introduce any evidence showing that any Defendant scanned, copied, displayed, or distributed any of Plaintiffs' copyrighted materials.  Thus, Plaintiffs' position rests entirely on the legal argument that the Ex Parte Young exception applies because the Defendants have supervisory authority over those persons who are allegedly committing acts of direct

copyright infringement.  The Court rules that the <u>Ex Parte Young</u> exception does <u>not</u> apply.   Such authority does <u>not</u> establish liability for direct copyright infringement under <u>Ex Parte Young</u>.

### B.     The Eleventh Amendment Bars Suits Against A State For Copyright Infringement

11.     The Eleventh Amendment[2] prohibits suits in federal court against a non-consenting state by its citizens or citizens of other states.  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984); <u>Hans v. Louisiana</u>, 134 U.S. 1, 13-15 (1890); <u>Doe v. Moore</u>, 410 F.3d 1337, 1349 (11th Cir. 2005). It is undisputed that Defendants here, as state officials sued in their official capacities, are arms of the State of Georgia.  <u>See</u> <u>Williams v. Bd. of Regents of Univ. Sys. of Ga.</u>, 477 F.3d 1282, 1301 (11th Cir. 2007*)* (holding that the University System of Georgia and the Board of Regents are state entities for Eleventh Amendment purposes).

12.     In 1996, the Supreme Court confirmed the Eleventh Amendment immunity of the states in <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44 (1996), holding that the Eleventh Amendment bars a court's assertion of federal jurisdiction

---

2       The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  Therefore, it does implicate jurisdiction.

in a suit against a state unless the state has consented to be sued, the state unequivocally has waived its immunity, or the state's immunity has been abrogated. See Seminole Tribe, 517 U.S. at 72-77. The United States Supreme Court repeatedly has recognized these principles. See, e.g., Kimel v. Fla. Bd. of Regents, 528 U.S. 62 (2000) (barring ADEA claims); Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765 (2000) (barring suits by realtors under the False Claims Act); Alden et al. v. Maine, 527 U.S. 706 (barring private suit in federal or state court under the Fair Labor Standards Act); Coll. Sav. Bank v. Fla. Prepaid Post-Secondary Educ. Expense Bd., 527 U.S. 666 (1999) (barring Trademark Remedy Clarification Act claims); Fla. Prepaid Post-Secondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627 (1999) (barring Patent and Plant Variety Protection Remedy Clarification Act ("Patent Remedy Act") claims). Because the State of Georgia has not consented to be sued or waived its immunity, the Eleventh Amendment bars suit against the State unless Congress has effectively abrogated the State's immunity for this issue.

13. The United States Court of Appeals for the Eleventh Circuit recently ruled that Congress did not have authority to abrogate states' sovereign immunity through the Copyright Remedy Clarification Act, stating:

> It would be incongruous to hold that Congress may abrogate the States' sovereign immunity under the Copyright and Patent Clause for actions brought under the [Copyright Remedy Clarification Act]

> when the Supreme Court held that the clause does
> not provide this authority for the Patent Remedy
> Act.

Nat'l Ass'n of Eds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga., No. 08-13417, 2011 WL 649951, at *13-14 (11th Cir. Feb. 24, 2011).   Therefore, the Eleventh Amendment stands as a bar to suits against a state for issues of copyright infringement.

### C.    Ex Parte Young Does Not Apply

14.    The Plaintiffs offered no evidence that the State of Georgia has consented to suits such as Plaintiffs' or waived its Eleventh Amendment immunity with regard to such claims.

15.    Instead, Plaintiffs seek relief based on the narrow exception to Eleventh Amendment immunity articulated in Ex Parte Young, which allows a plaintiff to seek prospective injunctive relief against state officials acting or threatening to act in violation of federal law, typically through the enforcement of state law, regulation, or policy in direct contravention of federal law.   See, e.g., Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 & n.10 (1989); Ex Parte Young, 209 U.S. at 159-60. However, because Defendants have not threatened and are not threatening to commit an actual violation of federal law and are instead acting in a merely supervisory role,

the narrow exception of <u>Ex Parte Young</u> does not apply.  <u>Pennington Seed, Inc. v. Produce Exch. No. 299, LLC</u>, 457 F.3d 1334 (Fed. Cir. 2006).

16.     Here, Plaintiffs argue that <u>Ex Parte Young</u> applies because the Defendants allegedly have "supervisory authority" over those allegedly committing acts of copyright infringement.  Plaintiffs contend that "[t]he only relevant question is whether the named Defendants have the *authority* to stop the direct violations about which Plaintiffs complain." (Dkt. 237 at 14 (emphasis in original)).  This theory of liability does not fall within the narrow <u>Ex Parte Young</u> exception to Eleventh Amendment immunity.

17.     In <u>Pennington Seed</u>, the Federal Circuit rejected Plaintiffs' exact argument, stating that "[t]he fact that a University Official has a general, state-law obligation to oversee a University's patent policy does not give rise to a violation of federal patent law." 457 F.3d at 1343.  The plaintiff, a licensee of a patent for a type of non-toxic fescue grass, sued the University of Arkansas and numerous official capacity defendants for patent infringement, alleging that the defendants' responsibility to supervise intellectual property activity and their ability to stop an ongoing violation of federal patent law were sufficient to causally connect the defendants to the alleged violation of federal law. <u>Id.</u> at 1342.  The Federal Circuit held that the broad general obligation of the defendants to prevent a violation of the

federal patent laws was insufficient to causally connect them to the infringement. Specifically, the court noted that the plaintiff's suit sought to "enjoin the University Officials from neglecting their job duties established by state law. But, a federal court cannot enjoin a state official to perform his or her duty under *state* law." Id. at 1343 (emphasis in original).  Accordingly, the Federal Circuit affirmed the dismissal of the plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), (b)(3), and (b)(6).

18.    Plaintiffs' attempt to defeat Defendants' Eleventh Amendment immunity based on an Ex Parte Young exception to state immunity fails because mere supervisory authority does not provide a sufficient connection with the 2009 Copyright Policy at issue.  The evidence was that there are thousands of professors at GSU who, of necessity, interpret and apply the 2009 Copyright Policy.   As Pennington Seed held:  "Allegations that University Officials failed to supervise intellectual property policy at the school is not an allegation of federal patent infringement and does not retain a sufficient causal connection to the activity."  See id. at 1343 n.5.   Similarly, allegations that the Board members or the GSU administrators adopted a flawed policy or merely have the authority to supervise professors who apply the policy do not provide the necessary causal connection.

19.    The crux of the issue before this Court is legal, namely—whether Defendants are sufficiently connected to the allegedly infringing actions to support an Ex Parte Young exception.  Plaintiffs have previously admitted the connection in this case is limited to (and indeed have based their entire argument upon) Defendants' "supervisory authority" to oversee the implementation of the Policy. (Dkt. 237 at 14.)

20.    Plaintiffs have offered no evidence of any causal connection other than to contend that Defendants have supervisory authority.  In fact, the evidence is that the Board members did not adopt the Policy—it was approved by the Chancellor— and the GSU administrators were wholly removed from the approval process.

21.    Plaintiffs' theory—that supervisory authority is a sufficient connection to the alleged infringement—directly contradicts Federal Circuit precedent and does not comport with Eleventh Circuit precedent.  First, the instant case is on all fours with Pennington Seed, wherein the court found that "there must be a connection between the state officer and the enforcement of the act" and that "[a] nexus between the violation of federal law and the individual accused of violating that law requires more than simply a broad general obligation to prevent a violation; it requires an actual violation of federal law by that individual."  Id. at 1342-43.  See also Summit Med. Assocs. v. Pryor, 180 F.3d 1326, 1342 (11th Cir. 1999) (holding a suit against

the Governor, the Attorney General, and the District Attorney was barred by the Eleventh Amendment as neither party had any relationship to the enforcement of the provision at issue); Women's Emergency Network v. Bush, 323 F.3d 937, 949 (11th Cir. 2003) (finding the Governor's general executive power insufficient to confer jurisdiction under Ex Parte Young, because his shared authority over the Department in charge of implementing the statute at issue was "simply too attenuated to establish that he [was] 'responsible for' [the statute's] implementation.").

22.    Second, Plaintiffs' theory that "the only relevant question is whether the named Defendants have the *authority* to stop . . . direct violations" (Dkt. 237 at 14) contradicts extensive precedent.  See Ex parte Young, 209 U.S. at 157 (rejecting the constitutionality of suit against Governor "based upon the theory that . . . , as the executive of the State, [he] was, in a general sense, charged with the execution of all its laws"); Children's Healthcare Is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1415 (6th Cir. 1996) ("Courts have not read Young expansively. Young does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.") (internal citations omitted), cert. denied sub nom., Children's Healthcare Is a Legal Duty, Inc. v. Montgomery, 519 U.S. 1149 (1997); Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir. 1992) ("[U]nder Ex Parte Young . . . there must be a threat of enforcement.").

23.     Plaintiffs rely on Luckey v. Harris, 860 F.2d 1012, 1015-16 (11th Cir. 1988).  This reliance is misplaced because that case presents an entirely different cause of action, civil rights violations under § 1983, for which the Fourteenth Amendment authorizes the abrogation of Eleventh Amendment immunity.

24.     Luckey involved an action under 42 U.S.C.A. § 1983.  Section 1983 actions against a state official in his official capacity, which seek only declaratory or injunctive relief, are not barred by the Eleventh Amendment because such actions are not treated as actions against the state.  Will, 491 U.S. at 71.  Section 1983 cases concern constitutional torts committed by a governmental employee exercising discretionary powers so that constitutional rights personal to the plaintiff are violated as a result.  This specifically implicates the due process clause of the Fourteenth Amendment, which expressly provides parties with at least one full and fair opportunity to litigate an issue before being bound by a prior determination of that issue.  See, e.g., Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n.7 (1979).  In other words, the Fourteenth Amendment authorizes the abrogation of Eleventh Amendment immunity for § 1983 actions.  As shown in Pennington Seed and Nat'l Ass'n of Bd's of Pharmacy, this is not so for patent and copyright cases.

25.     Plaintiffs cite to Sandoval v. Hagan, 197 F.3d 484 (11th Cir. 1999), and Board of Public Education for Savannah v. State of Georgia, No. CV 490-101, 1990

WL 608208 (S.D. Ga. Sept. 24, 1990), which similarly involve allegations of violations of Title VII of the Civil Rights Act of 1964, an act which properly and effectively abrogated the Eleventh Amendment through the Fourteenth Amendment, pursuant to 42 U.S.C.A. § 2000d-7.  Further to that point, any actions taken against state employees under Ex Parte Young in those cases were allowed because the state employees "by performing their duties . . . violate[d] plaintiffs' federal rights."  See Bd. of Pub. Educ. for Savannah, 1990 WL 608208, at *5.  The case law and fact patterns of these civil rights actions are wholly different and distinct from Plaintiffs' allegations of copyright infringement, and are therefore not analogous.  Once again, copyright infringement cases differ from those relied upon by Plaintiffs.  See Nat'l Ass'n of Bd's of Pharmacy, supra.

26.    Plaintiffs' citation to Salerno v. City University of New York, 191 F. Supp. 2d 352 (S.D.N.Y 2001), is also unavailing.  First, motions to dismiss the copyright claims against defendants Calendra Institute and the City University of New York in Salerno were granted: the Salerno plaintiffs did not even attempt to contest the dismissal of the claims against the institutions.  191 F. Supp. 2d at 356.  Second, the court allowed the claims against two individually named defendants to proceed because the plaintiffs were able to allege actual and direct involvement by those named defendants in the alleged copyright infringement.  Id. at 357.  This fact

14

pattern is not analogous because there is no direct or personal act of infringement by any Defendant in this case.

27.     To avoid dismissal, Plaintiffs needed specifically to prove that these Defendants were copying the subject excerpts, that these Defendants were obligated to enforce compliance with Copyright law, and how such enforcement contravenes Federal law.   In its order denying Defendants' motion to dismiss on sovereign immunity grounds, the Court expressly allowed Plaintiffs to introduce such evidence.   They did not.

28.     Because Plaintiffs' claims against the Board of Regents and GSU Administrators rely, solely, upon a theory of mere supervisory liability for the acts of GSU employees, and Plaintiffs have failed to demonstrate that any of the named Defendants were involved personally in any violations of Plaintiffs' legal rights, the claims do not satisfy the <u>Ex Parte Young</u> exception and must be dismissed for want of subject matter jurisdiction.   Therefore, for the same reasons that the Court awarded Defendants' judgment as a matter of law at trial on the issue of respondeat superior, Plaintiffs have likewise failed to prove that this Court has subject matter jurisdiction of the copyright infringement claims made against state officials.

## III.  THE 2009 COPYRIGHT POLICY HAS NOT CAUSED DIRECT COPYRIGHT INFRINGEMENT

29.    At the close of the Plaintiffs' evidence, the Court ruled that the Defendant Board members and GSU Administrators were not liable for alleged acts of direct copyright infringement by third parties under the doctrine of respondeat superior.  Also at the close of Plaintiffs' evidence, the Court ruled that the Defendant administrators are not liable for contributory acts of copyright infringement by third parties.

30.    Further, the Court ruled that a claim remained for direct copyright infringement resulting from adoption and implementation of the 2009 Copyright Policy, and that such a claim would be considered in light of the alleged acts of infringement during three (3) academic terms — the 2009 "Maymester" term, the 2009 Summer term, and the 2009 Fall term.  The Court thus considers the Plaintiffs' claim of direct copyright infringement resulting from implementation of the 2009 Copyright Policy.

### A.    The Legal Standard For Direct Copyright Infringement

31.    A *prima facie* case of direct copyright infringement requires Plaintiffs to prove ownership of a valid copyright and the copying of protected elements.  Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., 499 U.S. 340, 361 (1991); Peter Letterese & Assocs. v. World Inst. of Scientology Enters., 533 F.3d 1267, 1300

16

(11th Cir. 2008).  Here, Plaintiffs must prove that they have valid copyrights in each of the works from which 75 allegedly infringing excerpts were taken and that implementation of the 2009 Copyright Policy resulted in the copying of "protected elements" from each of the subject works.  Id.  Of course, as to this latter element, it requires that Plaintiffs identify the "protected elements."

### 1.  Plaintiffs Must Provide A Copyright Registration

32.    A first step in proving ownership of a valid copyright is to establish the "mandatory precondition" of producing a copyright registration for the subject work. 17 U.S.C. § 411(a), in pertinent part, provides:

> [N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.

33.    The Copyright Act provides a claim processing rule whereby the Plaintiffs must come forward with a copyright registration for each of the works at issue.  Reed-Elsevier v. Muchnick, 559 U.S. ____, 130 S. Ct. 1240, 1241-42 (2010) (Section 411(a) "establishes a condition—copyright registration—that plaintiffs ordinarily must satisfy before filing an infringement claim and invoking the Act's remedial provisions.")  The absence of a registration precludes the Court from determining the alleged act of infringement.

17

34.    Several of the works asserted by the Plaintiffs are not "United States works" as identified in 17 U.S.C. § 411(a).  Rather, those several works are "foreign works" within the meaning of 17 U.S.C. § 104(b)(2), first published in the United Kingdom and published more than thirty (30) days subsequent in the United States.  Plaintiffs correctly contend that works first published in a country that is a signatory to the Berne Convention, such as the United Kingdom, are effectively protected as "United States works" in accordance with the Berne Convention's provisions allowing for reciprocal protection when such works are published within this time frame.  Thus, Plaintiffs do not necessarily need a U.S. copyright registration to bring a claim of infringement for works that satisfy those requirements.  However, the absence of a registration does result in other consequences as follows.

### 2.    Plaintiffs Have Failed To Prove Copyright Validity For Other Works At Issue

35.    It is well established that in addition to complying with the statutory formalities of registration, a plaintiff must also prove originality and copyrightability of the material.  Norma Ribbon & Trimming v. Little, 51 F.3d 45, 47 (5th Cir. 1995).  The term "original" as used in the copyright law means that the work was independently created by the author (as, opposed, for example, to being copied from other works), and that the work possesses some nominal degree of creativity.  Feist Publications, 499 U.S. at 351.

36.     A     timely     copyright     registration     enables     certain     evidentiary presumptions directed to copyright validity, including originality, compliance with statutory formalities, and copyrightability of the subject matter.  Section 410(c) of the Copyright Act, 17 U.S.C. § 410(c), provides as follows:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of registration made thereafter shall be within the discretion of the court.

37.     Thus, copyright registrations made before or within five (5) years after first publication of the work establish a presumption of the validity of the copyright and the facts as stated in the certificate.  However, copyright registrations that are obtained more than five (5) years after first publication are not entitled to any such presumptions.

38.     Plaintiffs have introduced certificates of registration for the following works, but these registrations were not made before or within five years after first publication of the associated works:  *More Grammar Games: Cognitive, Affective and Drama Activities for EFL Students* (PX 134; PX 136); *Five-Minute Activities: A Resource Book of Short Activities* (PX 92; PX 90); *Liszt: Sonata in B Minor* (PX 132; PX 130); *The Cambridge Companion to Beethoven* (PX 56; PX 53); *Ancient*

*Egyptian Materials and Technology* (PX 12; PX 6); *Criterion-Referenced Language Testing* (PX 87; PX 85); *Assessing Grammar* (PX 17; PX 15); *Fundamental Considerations in Language Testing* (PX 408; PX 406); *Language Testing in Practice* (PX 420; PX 418); *Assessing Listening* (PX 26; PX 24); *Assessing Speaking* (PX 36; PX 34); *Learning Vocabulary in Another Language* (PX 127; PX 125); *Assessing Vocabulary* (PX 46; PX 44); *Assessing Writing* (PX 41; PX 39); *International Health Organisations and Movements, 1918-1939* (PX 111; PX 108); *Language Acquisition and Conceptual Development* (PX 122; PX 119); *The Cambridge History of China*, Volume 8, Part 2 (PX 82; PX 79); *A World of Babies: Imagined Childcare Guides for Seven Societies* (PX 151; PX 147); and *The Power Elite* (PX 450; PX 448).

Nor is there any claim or indication that these works are foreign works within the meaning of 17 U.S.C. § 104(b)(2).   In accordance with § 410(c), the Court determines that these certificates of registration are entitled to no weight, and that Plaintiffs must prove a valid copyright in each such work.

39.   Plaintiffs here offered no author testimony.  Thus, Plaintiffs have failed to prove that the works at issue were independently created.  (In fact, it is apparent that in several instances many portions of various works were copied or at least derived from another source, and some of the excerpts of these works at issue

contain material in the public domain.)[3]  In the absence of a timely (within five (5) years) registration and author testimony proving that the foregoing works were independently created (*e.g.*, original to that author), the court finds that Plaintiffs have failed to prove ownership of a valid copyright in the works identified above.

40.    The following asserted works are "foreign works" within the meaning of 17 U.S.C. § 104(b)(2):   *Pronunciation Games* (PX 138); *Keep Talking: Communicative Fluency Activities for Language Teaching*; *Grammar Practice Activities* (1st edition) (PX 114); *Newspapers* (PX 433); *Role Play: Resource Books for Teachers* (PX 458); *Handbook of Social Theory* (PX 288); *Qualitative Research Practice* (PX 298); *Handbook of Ethnography* (PX 239); *The Cambridge Companion to Mendelssohn* (PX 65); *The Cambridge Companion to Schumann* (PX 75); *The Music of Berlioz* (PX 427); *Assessing Reading* (PX 29); *Assessing*

---

[3]  Plaintiffs have the burden of proof to establish copyright validity and the presence of protected elements.  Defendants, therefore, raised numerous specific questions regarding the originality of these materials.  In particular, testimony was elicited questioning the originality of certain portions of the copied excerpts from *Pronunciation Games*, *More Grammar Games: Cognitive, Affective and Drama Activities for EFL Students*; *Grammar Practice Activities* (1st edition); *Newspapers*; *Role Play: Resource Books for Teachers*; *Liszt: Sonata in B Minor*; *The Cambridge Companion to Mendelssohn*; *The Cambridge Companion to Schumann*; *The Cambridge Companion to Beethoven*; *The Music of Berlioz*; *Assessing Grammar*; *Assessing Reading*; *Fundamental Considerations in Language Testing*; *Language Testing in Practice*; *Assessing Listening*; *Assessing Language for Specific Purposes*; *Assessing Speaking*; *Learning Vocabulary in Another Language*; *Assessing Vocabulary*; and *Assessing Writing*.   Plaintiffs did nothing to overcome this evidence.

21

*Language for Specific Purposes* (PX 20); *A History of Feminist Literary Criticism* (PX 103); *Handbook of Social Theory* (2001) (PX 288); *North German Church Music in the Age of Buxtehude* (PX 437); and *Regimes and Democracy in Latin America: Theories and Methods* (PX 452). "Foreign works" are not entitled to the presumptions that exist in the case of a valid U.S. registration, including the *prima facie* presumption of copyright validity. 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.16[B][1][c]; *see Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 194 F. Supp. 2d 30, 39 (D.P.R. 2001) (noting "[t]he benefits of avoiding United States Registration are slight compared to the costs associated with not registering--notably giving up attorney's fees, statutory damages and the prima facie presumption of copyright validity"). A plaintiff seeking to enforce the copyrights of a foreign work must provide proof that the work is copyrightable. *See Ward v. Nat'l Geographic Soc.*, 208 F. Supp. 2d 429, 445 (S.D.N.Y. 2002); *see also Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.* No. 06 C 4634, 2006 WL 4013750, at *20 (N.D. Ill. Oct. 6, 2006) (explaining that without a certificate of copyright registration "there is no presumption in [plaintiff's] favor, the district court makes an independent determination regarding [plaintiff's] ownership of a valid copyright; a *de novo* determination as to whether plaintiff's work is copyrightable . . . . That means

[plaintiff] must provide proof on this issue"); *Morelli v. Tiffany and Co.*, No. Civ. A. 00-1961, 2001 WL 179898, at *1 (E.D. Pa. Jan. 10, 2001) ("The fact that plaintiff does not have a copyright registration . . . dictates that the burden of proof is on him in this infringement action to establish the copyrightability of his [work]."). One element of copyrightability is originality— independent creation and some minimal degree of creativity. Plaintiffs, again without any author testimony, have failed to make such proofs. (In fact, it is apparent that in several instances many portions of various works were copied or at least derived from another source, and some of the excerpts of these works at issue contain material in the public domain.) In addition, in several instances, Plaintiffs failed to produce during discovery or seek to admit at trial, evidence of assignments or licenses of rights from the authors of the foreign works. The court finds that Plaintiffs have failed to prove ownership of a valid copyright in any of these foreign works.

### 3.    Plaintiffs Have Failed To Prove Ownership Of The Copyright In Other Works

41.    To bring a claim for copyright infringement, Plaintiffs must also have properly secured the author's copyright by way of assignment or other transfer. However, with regard to the following excerpts and works, Plaintiffs have failed to prove they obtained an assignment of one or more of the author's copyright:

*Handbook of Social Theory* pages 217-228; *The SAGE Handbook of Qualitative Research* (2nd edition) pages 733-768; *Inside Interviewing: New Lenses, New Concerns* pages 415-428; *Handbook of Ethnography* pages 188-203; *Handbook of Feminist Research: Theory and Praxis* pages 71-106; *Handbook of Narrative Inquiry* pages 35-75; *Film Language: A Semiotics of the Cinema* pages 108-148; *Regimes and Democracy in Latin America: Theories and Methods* pages 39-50; *Behavior, Society, and Nuclear War*, Vol. 1 pages 8-15 and 19-48 or an editor agreement; *A World of Babies: Imagined Childcare Guides for Seven Societies* page 27; and *A History of Feminist Literary Criticism* 322-335.

42.    For these works, the Court rules that the Plaintiffs have failed to establish ownership of the underlying copyright and, therefore, all claims for infringement based thereon likewise fail.  As a result, the Court also rules that the Defendants prevail on these allegations.

43.    This case has presented an increasingly smaller number of alleged infringements over time.  At the outset, Plaintiffs asserted that GSU was committing massive acts of copyright infringement.  At the conclusion of discovery, in the conduct of summary judgment motions, the Court limited the parties to three (3) representative academic terms:  the 2009 "Maymester" term, the 2009 Summer term, and the 2009 Fall term.  In those three terms, Plaintiffs initially alleged 126 acts of

infringement by 48 professors (in 66 classes).  After a period of time for the parties to investigate those initial allegations, Plaintiffs reduced the alleged violations to 99 acts of infringement by 33 professors (in 40 classes).  At the close of Plaintiffs' case, Plaintiffs had reduced the alleged violations to 75 acts of infringement by 23 professors (in 29 classes).  Given that Georgia State University employs over 1,000 full time professors and hundreds of adjunct faculty teaching thousands of classes each term, Plaintiffs' claims of "massive" infringement were exaggerated.

44.    Moreover, recognizing that Plaintiffs failed to prove ownership of a valid copyright in many works as shown above, the Court finds that Plaintiffs can presently allege infringement of only the following twenty-five (25) works listed in Plaintiffs' June 1, 2011 filing (Dkt. 361) (except as otherwise noted):[4]  *The Craft of Inquiry: Theories, Methods, Evidence*; *Handbook of Feminist Research: Theory and Praxis*; *The SAGE Handbook of Qualitative Research* (3rd edition); *The SAGE Handbook of Qualitative Research* (2nd edition) (except for pages 733-768); *Handbook of Critical and Indigenous Methodologies*; *Handbook of Narrative Inquiry* (except pages 35-75); *Handbook of Feminist Research:  Theory and Praxis* (except pages 71-106); *The SAGE Handbook of Qualitative Research* (1st edition);

---

[4]   Where allegations of infringement encompass published material for which the protectable elements have not been demonstrated, Plaintiffs can assert infringement. But where the Court ultimately determines that these elements are not protectable, there will be no ruling of infringement on such portions

*Awakening Children's Minds*; *The Slave Community*; *African American Single Mothers: Understanding Their Lives and Families*; *Black Children*; *Black Families*; *Theoretical Frameworks in Qualitative Research*; *Understanding Trauma: Integrating Biological, Clinical and Cultural Perspectives; Region, Race and Reconstruction*; *The Unpredictable Past: Explorations in American Cultural History*; *Living Ethics: Across Media Platforms*; *The Organ As a Mirror of Its Time: North European Reflections 1610-2000*; *Handbook of Mixed Methods in Social and Behavioral Research*; *Crabgrass Frontier: The Suburbanization of the United States*; *The Politics of Public Housing: Black Women's Struggles Against Urban Inequality*; *Contemporary Cases in U.S. Foreign Policy: From Terrorism to Trade*; *U.S. Foreign Policy: The Paradox of W*orld Power; Utilization-Focused Evaluation: The New Century Text (3rd edition).

45.    As to these remaining claimed infringements, the Plaintiffs contend that adoption and implementation of the 2009 Copyright Policy has caused direct copyright infringement in each of the following instances.  For the reasons stated below, the Court finds that neither these nor those in which Plaintiffs continued to assert infringement claims (the 75 works asserted at the close of Plaintiffs' evidence) are instances of infringement.  Rather, they are fair use under 17 U.S.C. § 107.

46.     As a matter of law, even if this Court were to conclude that each of the remaining allegations of infringement were found to be valid, and Defendants' assertions of the fair use defense found invalid, this Court does not conclude that the alleged infringements constitute ongoing and continuous misuse of the fair use defense warranting an injunction against the State of Georgia.  Judgment therefore will be entered for Defendants and against Plaintiffs.

## IV.    THE 2009 COPYRIGHT POLICY HAS NOT RESULTED IN THE MISUSE OF THE FAIR USE DOCTRINE; RATHER, IT HAS REGULATED PROPER APPLICATION OF THE FAIR USE DOCTRINE

### A.     The Fair Use Doctrine

47.     Fair use remained a judge-made doctrine until the passage of the 1976 Copyright Act, which codified the doctrine in Section 107 as follows:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes of criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> 1.     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> 2.     the nature of the copyrighted work;

> 3.    the amount and sustainability of the portion used in relation to the copyrighted work as a whole; and
>
> 4.    the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

48.    The fair use of a copyrighted work is not an infringement.    An opportunity for a defendant to claim a fair use has long been recognized as necessary to fulfill the purpose of copyright as outlined by the U.S. Constitution:    "[t]o promote the Progress of Science and the useful Arts…."   Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I. § 8, cl. 8).

49.    The fair use doctrine is an "equitable rule of reason."   See Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., 533 F.3d. 1287, 1308 (11th Cir. 2008).   Applying that rule of reason, the Court assesses whether a given use is a fair use, bearing in mind that the examples of possible fair uses in the preamble are illustrative, rather than exclusive.   In making that assessment, it is well-established that "all four of the factors are to be explored, and the results weighed together, in light of the purposes of copyright.   SunTrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1268 (citations omitted).

50.    The fair use doctrine thus "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very

creativity the law is designed to foster." Campbell, 510 U.S. at 577 (quoting Stewart v. Abend, 495 U.S. 207, 236 (1990)). The Supreme Court has expressly stated: "The task is not to be simplified with bright-line rules," for the copyright statute, like the fair use doctrine, requires a case-by-case analysis. Campbell, 510 U.S. at 577 (citing, inter alia, Harper & Row, Publish., Inc. v. Nation Enters., 471 U.S. 539, 560 (1985); Song Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 448 (1984)).

### B.      Key Supreme Court Decisions Illuminate The Inquiry

51.    A brief review of key Supreme Court decisions sheds light on how fair use issues should be analyzed. The Supreme Court has looked at fair use in various contexts. First, the Supreme Court addressed fair use in the context of "time shifting" using video tape equipment in Sony Corp. v. Universal Studios, Inc., 464 U.S. 417 (1984). In a 5-4 decision, the Court confirmed an individual's right to make fair use of a copyrighted work by permitting "time shifting" even though the individual made a copy of the entire work. The Court expressly recognized that the use might be for educational purposes, but also for entertainment as well. Importantly, the individual making the copy in that case did nothing to the underlying work. The individual merely captured the copyrighted material by use of the videotape machine. While this making of a verbatim copy did not add to or

modify the copyrighted work, the Court nonetheless found the practice to be a fair use.

52.     Next, the Supreme Court considered the issue of fair use in the context of a periodical in Harper & Row.  In that case, the Court specifically considered whether the use of an excerpt from the then unpublished memoirs of President Gerald Ford that were quoted in an article in The Nation magazine was a fair use. Although the quotation was brief, the Court ruled it was not fair use.  The copied manuscript was not yet published and such works have long been granted a broader scope of protection.  Further, and perhaps more importantly, the work went directly to the most compelling part of Ford's memoirs -- his pardon of President Richard Nixon.  Harper & Row had granted Time magazine an exclusive license to publish excerpts of the book shortly before the entire work was to be shipped to bookstores. A few weeks before the publication date, a pirated copy of the manuscript was delivered to The Nation magazine.  The editors quickly prepared a story quoting some 300 words from Ford's 200,000 - word book, and arranged to have the manuscript returned to Harper & Row in hopes its absence would go undiscovered. Use of this relatively small excerpt led to cancellation by Time magazine of its commitment to pay a large fee to reprint excerpts of the Ford memoirs.  And still

further, the facts of how the defendant came to have a copy of the unpublished work were suspicious.

53.    The Supreme Court rejected the fair use defense in <u>Harper & Row</u>.  The Court put significant weight on the fact that the work was unpublished, stating "the unpublished nature of a work is a 'key, though not necessarily determinative, factor' tending to negate a defense of fair use."  The Supreme Court was also impressed with the fact that the magazine used the "heart" of the work—the portion of the Ford memoirs that many would find most compelling.

54.    In following years, lower courts tended to afford near conclusive weight to the unpublished status of a work.  <u>See, e.g.</u>, <u>Salinger v. Random House, Inc.</u>, 811 F.2d 90 (2d Cir. 1987), <u>cert. denied</u>, 484 U.S. 890 (1987).  In 1992, Congress amended Section 107 to add a final sentence:  "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon a consideration of all the above factors."  Thus, Congress made it clear that the fair use determination is to be made by considering all four factors.

55.    The Supreme Court again evaluated the fair use doctrine in <u>Campbell v. Acuff-Rose, Inc.</u>, 510 U.S. 569 (1994).  In that case, a rap parody version of the song "Pretty Woman" was found to be fair use.  The Court applied the traditional four fair use factors, but made some important alterations in its approach.  The Court

abandoned most "presumptions" and other conventions that had grown up around the factors.  For example, the Court made clear that a use for commercial purposes would <u>not</u> be presumptively against fair use.  As the Second Circuit noted, prior to <u>Campbell</u>, the Supreme Court had characterized the fourth fair use factor (harm to the market for the original work) as "the single most important element of fair use," <u>Harper & Row</u>, 471 U.S. at 566.  "However, <u>Campbell's</u> discussion of the fourth factor conspicuously omits this phrasing.  Apparently abandoning the idea that any factor enjoys primacy, <u>Campbell</u> instructs that '[a]ll [four factors] are to be explored, and the results weighed together, in light of the purposes of copyright.'"  The <u>Campbell</u> Court also ruled that the "amount" of the use (factor three) was not merely a measure of quantity, but that a person could use as much of the work as appropriate to serve the favored fair use purpose.

56.    Accordingly, the <u>Campbell</u> Court refused to analyze the four factors in isolation.  Instead, the Court stated that they must be examined with reference to one another.  For example, the favorable ruling on the purpose of the use (parody, in that case, as a form of criticism or comment) should be used to determine the appropriate meaning and application of the other factors.

57.    The <u>Campbell</u> Court also gave new emphasis to the "transformative" use as part of the purpose of the use (the first fair use factor).  In the <u>Campbell</u> case,

the Supreme Court characterized the purpose of the use as criticism and as transformative.  The Plaintiffs make much of the effect of the transformative use in the fair use analysis, going so far as to state that the fair use doctrine is "intended to accommodate socially productive transformative uses."  (Pl. Tr. Br., p. 21.)

58.    This Court recognizes the importance of a transformative use.  The inquiry into whether a use is "transformative" centers on "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message."  Campbell, 510 U.S. at 579.  A transformative use, therefore, can arise in different contexts and different ways.  Importantly, a transformative use can arise from using a work without changing the underlying material, but by giving the work a new purpose or usefulness.

59.    Even so, as expressly stated by the Campbell Court, while the goal of copyright is generally furthered by the creation of transformative works, a transformative use is "not absolutely necessary for a finding of fair use."  Campbell, 510 U.S. at 579 (citing Sony, 464 U.S. at 478-80 (Blackman, J., dissenting) (emphasis added)).  The fact that a given use is not transformative does not diminish an otherwise fair use.  A fair use need not be transformative; as stated in Campbell, all four factors must be explored.  Quite frankly, the Plaintiffs overstate the

importance of a transformative use.  As explained below, the issue of transformative use is only one consideration in evaluating the purpose and character of the use, as the statute itself specifies that the purpose and character of the use factor analysis must include "whether such use is of a commercial nature or is for nonprofit educational purposes."

60.    The <u>Campbell</u> case is the most recent Supreme Court case. Three important teachings are readily seen in that case.  First, the Supreme Court effectively abandoned "presumptions" and other conventions that had grown up around fair use.  For example, the Court made clear that a commercial use, such as record sales, would not be presumptively against fair use.  Likewise, the "amount of the use was not only a measure of quality, but also included a qualitative component; a person could use as much of a work as was appropriate to serve the favored purpose," such as criticism and comment (parody).

61.    Second, the <u>Campbell</u> Court did not permit the four factors to be analyzed in isolation.  The factors are to be examined in reference to one another. The Court did not specifically weight one factor over the other.

62.    Third, the <u>Campbell</u> Court acknowledged a special place for education. In addressing the first fair use factor, the purpose and character of the use, the Court expressly noted an "obvious statutory exception" with reference to transformative

works.  More particularly, the court stated that "[t]he obvious statutory exception to this focus on transformative uses is the straight reproduction of multiple copies for classroom use."   In other words, such an educational use is still a fair use even though it may not be "transformative."   One of the fundamental flaws of Plaintiffs' case is the refusal to recognize that pure "teaching," a favored purpose under the fair use statute, <u>without</u> transforming the underlying material or providing new scholarly analysis, remains at the heart of fair use protections.

### C.     Fair Use In Education

63.    The Court has found no case on point with the present, dealing purely with the application of the fair use doctrine in the academic environment.   The present case is one of first impression in that it is wholly within the nonprofit, educational environment.

64.    The issue of multiple photocopies for use in the classroom was addressed to some degree in 1976 at or around the time of the Copyright Act.  When Congress enacted the fair use statute in 1976, educators, publishers, and authors were concerned that the law might not be adequately defined.  Representatives of these parties (<u>not</u> Congressional representatives) got together and, through the Committee on the Judiciary, offered certain "classroom guidelines" that were placed in the legislative history.  The "Agreement on Guidelines for Classroom Copying in

Not-For-Profit Educational Institutions with Respect to Books and Periodicals," by their very terms, state only "the minimum . . . standards of educational fair use…." They allow for single copies of book chapters, articles, and other short works. Multiple copies are allowed, but only within a defined standard of "brevity," involving the counting of words. The brevity test is satisfied when the teacher stays within certain bright line limits, such as "an excerpt from any prose work of not more than 1,000 words or 10% of the work, whichever is less." H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976). The copy must also meet requirements of "spontaneity" and "cumulative effect." The guidelines also bar certain uses, such as the making of a collection of materials or "anthologies."

65.    The "Classroom Guidelines" are not law and have never been given the effect of law. Moreover, as Defendants argue, the guidelines are dated and not in keeping with the "no bright line," flexible inquiry of <u>Campbell</u>. To the contrary, because of "the endless variety of situations and combinations of circumstances that can arise in a particular case …," Congress intended the fair use statute to be fluid, leaving courts "free to adapt the doctrine to particular situations on a case-by-case basis." H.R. Rep. No. 94-1476 at 66 (1976). Thus, copying more than the amounts specified, or under conditions different than those specified can still qualify as fair use, based on an analysis of the four factors.

66.    The Plaintiffs assert that the so-called "coursepack cases" are essentially in the academic arena and argue that the Defendants are essentially creating unlawful electronic coursepacks or anthologies.   These cases are <u>Basic Books, Inc. v Kinko's Graphics Corp.</u>, 758 F. Supp. 1522 (S.D.N. Y 1991) and <u>Princeton Univ. Press v. Mich. Document Servs., Inc.</u>, 99 F. 3d 1381 (6th Cir 1996). In these cases, the courts evaluated the four fair use factors and determined that the copying done by commercial copy services was not fair use in preparation of hard copy coursepacks.   Interestingly, the Court in <u>Basic Book</u> stated that the use of the coursepacks, "in the hands of the students, was no doubt educational."   However, these cases were largely evaluated from the position of the copyshops that were benefitting financially, <u>not</u> the professors or students who obtain <u>no</u> financial benefit.

67.    Importantly, because the Plaintiffs here rely heavily on the Classroom Guidelines, the <u>Basic Books</u> Court declined to adopt the Guidelines as a legal standard.   Moreover, the court even declined to adopt one particular provision of the guidelines that would bar all anthologies.   Instead, the court stated:  "it is not clear that congress intended strict application of this prohibition without fair use balancing."  758 F. Supp. at 1537.

68.    The <u>Basic Books</u> and <u>Michigan Document</u> cases are irrelevant to the pure educational environment focused on students and professors as present in this

37

case.  The focus of the "coursepack" cases was on the commercial use being made by the copyshops.  Moreover, as stated, the use by the defendant copyshops was purely commercial; and <u>not</u> transformative.  The analysis of transformative use is not so simple in the present case.  Such critical differences render the coursepack cases of little to no assistance in addressing the present facts.

69.    Moreover, the fact that <u>Basic Books</u> refers to the coursepacks as "anthologies" does not mean that the e-Reserve system at GSU provides equivalent electronic anthologies.  In fact, it does not.  The <u>Basic Books</u> court recognized that the coursepacks were a "bound packet" — an organized, arranged and stable collection of literary pieces.  E-Reserve systems, including the system at GSU, do not provide "anthologies."  To the contrary, an e-Reserve system is characterized by its dynamic nature.  It is clear from the "hit counts" provided with the GSU e-Reserve reports that students do not necessarily access each excerpt that is uploaded to the system.  By comparison, a bound packet inherently mandates that the student possess every work in the packet.  Even then, it is important to note that the <u>Basic Books</u> court did not bar all anthologies.  Thus, even if it were relevant, <u>Basic Books</u> is of little help to the Plaintiffs on the straw man issue of "anthologies."

70.    As to <u>Michigan Documents</u>, it is important to note that the Second

Circuit expressly stated it was <u>not</u> addressing a situation more akin to that presented

here:

> As to the proposition that it would be fair use for the students or professors to make their own copies, the issue is by no means free from doubt.  We need not decide this question, however, for the fact is that the copying complained of here was performed on a profit-making basis by a commercial enterprise.

Moreover, while the <u>Michigan Documents</u> court was influenced by the publishers'

licensing efforts—the Court deems licensing relevant but certainly not

determinative.   Otherwise, the fact that the publishers can charge for an excerpt

would render the fourth factor analysis (harm to the market for the original work)

meaningless.

71.    In <u>American Geophysical Union v. Texaco Inc.</u>, 60 F. 3d 913 (2d Cir.

1994), the appellate court likewise examined the Classroom Guidelines, and refused

to adopt them as a legal standard.  The <u>Michigan Document</u> court likewise did <u>not</u>

adopt the Classroom Guidelines as a legal standard (but did use those guidelines as a

reference point).

72.    Another case that has an educational overtone is <u>Sundeman v. The

Seajay Society, Inc.</u>, 142 F.3d 194 (4th Cir. 1998).  In <u>Sundeman</u>, a literature scholar

presented at a conference her analysis of an unpublished novel by Rawlings.  The

analysis included quotations of 4 to 6% of the original novel.  The Rawlings' estate sued for copyright infringement, based on copies that researchers made of the entire manuscript and based on the quotes from the manuscript presented at the conference.

73.     The Sundeman court held that this was a fair use.  With reference to the first factor, the court ruled that the scholarly and critical nature of the presentation controlled, and that purpose outweighed any possible commercial gain from royalties or the like.  The second factor, the nature of the work, weighed against fair use because the work was unpublished.  As to the third factor, amount and substantiality, the court found that the lengthy quotes and copies of the manuscript were consistent with the purpose of scholarship and criticism (the approach as set forth in Campbell, avoiding "absolute rules" and instead evaluating the use in light of the purpose).  As to the fourth factor, market harm, the Court saw no meaningful harm but instead believed that the use could stimulate interest in the manuscript, which could increase sales upon publication.  Three of the four factors thus weighed in favor of fair use.

74.     Although outside of the educational context, a more recent case is also instructional.  In Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605 (2nd Cir. 2006), the court addressed the copying of complete posters that had commercial value and still found the taking to be fair use.  The Archives owned the

rights to certain concert posters from the 1960's. Dorling Kindersley included images of entire posters in a book about rock music history. The first three factors arguably weighed against fair use. The publisher was a commercial enterprise (a factor one consideration), the posters were reproduced in full (a factor three consideration) and the posters were highly artistic (a factor two consideration).

75.     Nonetheless, the Second Circuit ruled that use of the posters by Dorling Kindersley was fair use, in part because such use was for the scholarly purpose of examining the history of rock music. Further, the use was deemed transformative even though the works were copied verbatim; the posters originally served the purpose of advertising a concert. In the book, those same posters were historical. The book reprinted the posters in full, but at a reduced size and in low-quality copy. The court found these conditions relevant to the third factor – the "amount" of the work used. Moreover, the amount used was consistent with the scholarly purpose.

### D.     Application Of Fair Use To The Alleged Infringing Works

#### 1.     Purpose And Character Of The Use

76.     The Court must first consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The inquiry requires a determination of whether a

defendant's use of copyrighted material is of the type that actually tends to advance copyright's goals of promoting "the Progress of Science and the useful Arts."

77.     The first question is therefore whether the Defendants' uses falls into one of the categories enumerated by Congress in Section 107.  <u>See</u> 17 U.S.C. § 107. Those categories are "criticism, comment, news reporting, teaching …, scholarship, or research."  <u>Id.</u>  Each of the following uses falls into one or more of these categories.  More particularly, each of these uses was properly classified as criticism, comment, teaching or scholarship by the professors.

78.     The next question is whether the Defendants' uses were commercial or for nonprofit, educational purposes.  <u>See</u> 17 U.S.C. §107(1).  Again, the uses here can be generalized as being for nonprofit, educational purposes.  There is effectively no dispute that the uses here were <u>not</u> motivated by profit.  The uses here were for classic educational purposes – for various classes at Georgia State University.  GSU is a non-profit educational institution.  Thus, once again, each use was properly classified by the professors as for nonprofit, educational uses.

79.     The commercial vs. nonprofit, educational purposes issue has been described as whether the defendant's use served the defendant's private commercial interests or the public's interest in education.   As set out above, the public's interest is to promote the progress of science, e.g., learning.  None of these professors used

the subject excerpt for a private commercial interest.  Each of these professors used the subject excerpt for education (teaching, scholarship, criticism, comment, etc.) – the fundamental mission of Georgia State University.  The uses here all were for nonprofit, educational purposes, which are favored as fair use.

80.     Another question in this first factor is whether the Defendants' use is transformative.  Plaintiffs contend that merely "digitized course materials are not transformative and, as a result, the first factor weighs against fair use."  Plaintiffs, however, wrongly make "transformative use" the end-all of the analysis and overlook the teaching use being made, which lies at the heart of fair use protection, without transforming the material, as the Supreme Court noted in Campbell. Moreover, teaching is, arguably, in and of itself a transformative use.  An English teacher may assign the reading of prose to teach a literary technique, whereas the original use was for entertainment or pleasure.

81.     The first fair use factor, purpose and character of the use, seems to continue the theme of the preamble to Section 107, which itemizes uses that are illustrative of fair use.  Of course, simply falling within one of those illustrative uses does not end the inquiry.  See Los Angeles News Service v. KCAL-TV Channel 9, 108 F.3d 1119 (9th Cir. 1997), cert. denied, 522 U.S. 823 (1997) (fact that defendant

television station was engaged in news reporting did not automatically allow for a fair use defense since that factor could be outweighed by other considerations).

82.     Even so, Professor Goldstein has noted that the illustrative uses in the preamble to Section 107 "characteristically involve situations in which the social, political and cultural benefits of the use outweigh any consequent losses to the copyright proprietor . . . ." Goldstein, Copyright §10.2.1 at 10:19 – 10:20 (1996).

83.     Others have referred to the illustrative uses as examples of "productive use." Nimmer, 13.05[A][i][b], pp. 13-162-170. The productive use concept is akin to, if not the same as, the so-called transformative use. If a defendant merely engages in a merely "reproductive" or non-transformative use, there is arguably little to no social benefit to the defendant's activities and less reason to apply the fair use defense.

84.     The <u>Sony</u> case addressed productive use. In that case, the Court addressed the issue of whether home videotaping (e.g., time shifting) constituted copyright infringement or fair use. The homeowner adds nothing to the video material or makes any other use. It is a "reproductive" use that is not transformative (or productive). The Court, however, held that the fair use analysis is not "rigidly circumscribed" by a productive use requirement, and that while "the distinction

between 'productive' and 'unproductive' uses may be helpful . . . it cannot be wholly determinative." <u>Sony</u>, 464 U.S. at 448.

85.    The <u>Sony</u> Court went on to identify a number of non-productive (non-transformative) uses that it felt would qualify as fair, specifically including "a teacher who copies for the sake of broadening his personal understanding of his specialty . . . ." Thus, the notion of a use being non-transformative is not and never has been determinative.

86.    The <u>Sony</u> case is to be contrasted with <u>Campbell</u>.  There, the activity of the rap group 2 Live Crew was "transformative."  Even then, the Court stated that "transformative use is not absolutely necessary for a finding of fair use." <u>Campbell</u>, 510 U.S. at 579.

87.    Even after <u>Campbell</u>, the transformative status of a given use is not determinative.  In <u>Castle Rock Entertainment v. Carol Publishing Group</u>, 955 F. Supp. 260 (S.D.N.Y. 1997), <u>aff'd</u>, 150 F.3d 132 (2nd Cir. 1998), the defendants produced a trivia book based on the television show "Seinfeld."  Every answer in the book was based on an episode of the show, and dialogue from the show was quoted in the book.  The court found the book was transformative.  The court further found that the book was a work of criticism or comment.  Even so, the court found the

book did not make a fair use of the copyrighted material from the television show. A work's status as "transformative" or "non-transformative" is not determinative.

88.    Accordingly, the Court focuses on the Supreme Court's <u>Campbell</u> decision and the statutory language of the first fair use factor requiring a determination of whether the use is commercial or a nonprofit, educational use.  In the years after <u>Sony</u>, many courts suggested that this factor was determinative.  If a use was commercial, it was presumptively not a fair use.  <u>Campbell</u> did away with such presumptions.  With reference to the commercial presumption, the <u>Campbell</u> Court did away with it because "if . . . commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses in the preamble paragraph of Section 107, including news reporting, comment, criticism, teaching, scholarship and research . . . ."  <u>Campbell</u>, 510 U.S. at 584.

89.    The illustrative uses of the preamble, and the qualifying language of the first factor, are and must remain pre-eminent.  <u>Campbell</u> rightly did away with fair use presumptions, and rightly placed the illustrative uses at the forefront of the analysis.  The purpose and character of these uses are "nonprofit, educational purposes."  This factor, regardless of whether a use is deemed "transformative" or otherwise, in the present case favors fair use because each of the accused uses are for

comment, criticism, teaching, scholarship and research in accordance with the preamble of Section 107, and are for nonprofit, educational purposes in accordance with the first factor of Section 107.

### 2.    The Nature Of The Work Generally Favors Fair Use

90.    The second fair use inquiry requires the Court to consider the "nature of the copyright work."  See 17 U.S.C. § 107(2).  This most often is a matter of a court determining whether the copyrighted work at issue is factual or creative, because, in general, fair use is more likely to be found in factual works than creative works.  See Campbell, 510 U.S. at 586 (citing Nimmer § 13.05[A] ("Application of the fair use defense [is] greater . . . in the case of factual works than the case of works of fiction or fantasy.")); cf. Harper & Row, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.").

91.    Here, there is no real dispute that the works are, generally speaking, factual or fact-based works.  There is, of course, a range of protection for such works.  As the Supreme Court stated in Campbell, "[t]his factor calls for recognition that some works are closer to the core of copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  Campbell, 510 U.S. at 586.

92.     The "nature of the work" factor is in part a recognition of the general rule that copyright extends only to the original, "protected elements" aspects of a work.  Works that are intensely factual, such as an almanac or a statistical table, contain less original authorship than creative works, such as a fictional novel. Moreover, the need to reproduce material of a factual nature is often greater than the need to reproduce works of fiction.  Consequently, this factor recognizes that it is appropriate to permit a broader scope of fair use for fact-based works.  "Similarly, defendants may be afforded greater latitude to copy from works of an academic or scholarly nature both because it is customary in the academic community to rely heavily on prior academic work and because academic writers may have a strong need to quote extensively from prior work."  Schecter, Intellectual Property:  The Law of Copyrights, Patents and Trademarks, § 10.2.2, p. 224 (2003).

93.     While certain of the present works include some element of creativity, that does not change the fact that they are fact-based works.  As such, there is generally a greater need to copy the factual material for a protected purpose such as teaching, scholarship, criticism, or comment.  The works at issue is this case are <u>not</u> highly creative.  These are not works of "fancy."  <u>See</u> <u>Letterese</u>, 533 F.3d at 1312. To the contrary, it is appropriate to permit a broader scope of fair use for such fact-based works.

94.     As noted above, Plaintiffs rely heavily on coursepack cases, which given the unique circumstances of this case, are irrelevant.  For example, Plaintiffs rely on the Michigan Document case for the proposition that courts accord scholarly works weight against fair use under the second factor.  Plaintiffs, however, fail to recognize that the courts in coursepack cases have held that the nature of scholarly, fact-based works weigh in favor of fair use.  See Basic Books, 758 F. Supp. at 1533.  Thus, even if such cases were relevant, they do not stand for the broad proposition advanced by the Plaintiffs.  Rather, the Court finds that the present works are, generally speaking, fact-based in nature and therefore weigh in favor of fair use.  Such a conclusion is consistent with Weissman v. Freeman, 868 F.2d 1313, 1325 (2d Cir. 1989), wherein the Second Circuit expressly recognized that "fair use finds greater application in a factual scientific context."  Here, given that Professors admitted that they advance their careers by publishing, there is no concern that the incentive to create new scholarly works will be decreased by application of the fair use doctrine.  To the contrary, it would appear to enhance the creation of such works as they would find their way into the academic marketplace.

95.     It is to be remembered that "creativity for purposes of fair use is more difficult to establish than mere threshold copyrightability."  Fitgerald, 491 F. Supp. at 188; cf. Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., 499 U.S. 340.  Here,

there has been no author testimony and, therefore, no showing of what is even minimally creative.  Granting the publishers exclusive ownership of such fact-laden works does not promote the progress of the useful Arts.  Dissemination of such information "will provide valuable source material for future biographers … or for historians or social scientists…."  Rosemont Enters., Inc. v. Random House, Inc., 366 F.2d 303, 307 (2d Cir 1966).  As Justice Brennan explained, "[t]he arena of public debate would be quiet … if … a philosopher [could copyright] his treaties and thus obtained a monopoly on the ideas they contained."  Harper & Row, 471 U.S. at 582 (Brennan, J., dissenting).  Plaintiffs here cannot assert such a monopoly by claiming that these fact-based works contain sufficient "creativity" that has neither been identified or proven.  The works at issue here are fact-based work.  Accordingly, this factor favors fair use.

### 3.  The Amount And Substantiality Of The Use

96.  The third factor focuses on "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), and asks whether "'the quantity and value of the materials used' are reasonable in relation to the purpose of the copying."  Campbell, 510 U.S. at 586.  The Court must focus on whether "[t]he extent of copying" is consistent with or more than necessary to further the purpose and character of the use.  Id. at 586-87.

97.    The Plaintiffs here show no regard for this third factor, asserting that a use of a little as 2% and as great as 30% (counted according to their own biased method of ignoring pages of the work) equally constitute too great of an amount. The evidence belies Plaintiffs' claims of "massive" and "whole" takings. Rather, the GSU professors carefully used only those portions necessary to fulfill the educational purpose.

98.    The Plaintiffs' approach is much too broad.  First, Plaintiffs are only entitled to consider or "count" that portion that is original to Plaintiffs' authors.  As already shown, there was no author testimony identifying such protected portions of the subject works.

99.    As to a quantitative measure, it is apparent that GSU professors are <u>not</u> outliers; GSU professors are acting in a manner consistent with the policies of other institutions.  In fact, the average use is only approximately ten percent (10%) of the entire work.

100.   As for a qualitative judgment, the Court finds that the portions used were reasonable "in relation to the purpose of the copying," <u>Campbell</u>, 510 U.S. at 586, that purpose being the goal of providing a quality education to students at the University.  Each of the professors so testified and Plaintiffs offered no contrary purpose.  The third factor weighs in favor of fair use.

### 4.    Effect On The Market Value Of The Original

101.   The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107 (4).  This inquiry considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market' for the original."  Campbell, 510 U.S. at 590.

102.   Plaintiffs have offered no evidence of any market harm on the asserted works as a whole.  There was no evidence at trial that Plaintiffs' sale of the books had diminished as a result of the uses made at GSU.  Instead, the Plaintiffs rely on the loss of "permissions" revenue, pointing out that under licensing plans offered by the CCC, GSU professors could pay to use select pages from the work, including a chapter or even multiple chapters.

103.   The Plaintiffs' argument here is circular, facilitated by the development of a licensing scheme that can charge users for a single page or brief portions of a work.  In a sense, every use affects a potential market for the work.  The fair use defense would mean nothing if it addressed only those uses that Plaintiffs have not yet developed a mechanism by which to charge for such portions of the work.

104.   Moreover, there was evidence at trial that exposure to a given work by means of an excerpt can and does stimulate persons to purchase the work.  Various professors, especially these working with graduate students, testified to their own and students' purchases of the works as a result of reading an excerpt in the conduct of a given class.  In view thereof, the Court finds that this factor weighs in favor of fair use.  Weighing all four factors, the Court finds that the Defendants have met their burden of proving fair use.

### E.    The 2009 Policy is in Keeping With the Doctrine of Fair Use

105.   The 2009 Copyright Policy gives the instructor responsibility for evaluating whether a particular reading or excerpt is fair use.  The Court finds that this is appropriate under the circumstances because the professor is in the best position to evaluate the four fair use factors.

106.   To that end, the 2009 Copyright Policy includes a Fair Use Checklist that sets out four fair use factors:

(1)     Purpose and Character of the Use; (2) Nature of the Copyrighted Work; (3) Amount and Substantiality of Portion Used; and (4) Effect on Marked for Original.  Beneath each factor are two columns titled "Weighs in Favor of Fair Use" and "Weighs Against Fair Use" with a number of different possible characteristics of

the reading listed beneath each column title and a box to check whether that characteristic applies to the reading.

107.   Each of these characteristics is derived from elements of copyright statutory and case law.  At the bottom of each column is a place to indicate whether that factor weighs in favor of or against fair use.   The Fair Use Checklist contemplates that instructors will go through each factor checking all items that apply, and then compare the number of checks in each column to decide whether that factor weighs for or against fair use.  Having done that for each factor, the instructor may find that "reliance on fair use is justified" if the factors favoring fair use outnumber those against it.  However, the instructors are required to consider all four fair use factors before making a decision.  If after filling out the Fair Use Checklist the instructor concludes that the proposed use constitutes fair use, the instructor can distribute the work without obtaining permission from the copyright holder (assuming that the library staff does not find any "red flags").  The Court rules that the 2009 Copyright Policy Fair Use Checklist, in keeping with the <u>Campbell</u> case, appropriately considers all four fair use factors.

108.   Most relevant to the instant case is the portion of the 2009 Copyright Current Policy titled "Additional Guidelines for Electronic Reserves," which sets out

the following list of "standards" that apply "to use of copyrighted works for electronic reserves":

- Instructors are responsible for evaluating, on a case-by-case basis, whether the use of a copyrighted work on electronic reserves requires permission or qualifies as a <u>fair use</u>.  If relying upon the fair use exception, instructors must complete a copy of the fair use <u>checklist</u> before submitting material for electronic reserves.

- Inclusion of materials on electronic reserves will be at the request of the instructor for his or her educational needs.

- Materials made available on electronic reserves should include a citation to the original source of publication and a form of copyright notice.

- The instructor, library or other unit of the institution must possess a lawfully obtained copy of any material submitted for electronic reserves.

- Access to course material on electronic reserves should be restricted by password to students and instructors enrolled in and responsible for the course.  Access should be terminated as soon as the student has completed the course.

- Library reserves staff should check to see whether materials submitted for electronic reserves are available through an electronic database or are otherwise legally available.  If so, staff should provide a link rather than scanning and posting the material.

- Library reserves staff should delete materials available on electronic reserves at the conclusion of each semester.

- Institutions at the University System of Georgia will impose no charge to students for access to materials on electronic reserves.

109.   The 2009 Copyright Current Policy further states:

> If you are seeking to use a copyrighted work, you may have to obtain permission from the copyright owner . . .    Sometimes, the copyright owner may

> require a fee or impose other conditions.  You have
> to decide if the cost and conditions are acceptable . .
> . .  Keep in mind that permission is not necessary if
> (1) your use is within fair use or another copyright
> exception; (2) the work is not protected by copyright
> at all; or (3) your use is within the terms of a license
> agreement.

The Policy provides links to numerous "collective licensing agencies" which are defined as "organizations meant to centralize copyright ownership information for their respective industries[,]" that may assist instructions seeking permission from copyright owners.  One such link takes instructors to the website for the Copyright Clearance Center ("CCC"), and the policy states that "the CCC should be your starting point if you are looking to get permission for a text-based work.  The CCC can grant permission for thousands of works, many instantly online."  [Id.].[5]

110.   The Publishers now criticize the Fair Use Checklist.  However, it is clear that before the case was brought, the publishing community, as represented by the CCC, embraced it.

111.   For approximately eight years, even though the CCC does not offer any express guidance to its customers on fair use, the CCC website provided a very similar checklist.  (Armstrong; T. Vol. 4 at 52; Def. Ex. 14.)  The CCC checklist

---

[5]   The CCC is a copy that provides licensing mechanisms specifically designed by the publishing community to foster innovative distribution formats (including electronic reserves)."  The CCC is financing 50% of this copyright litigation.

(Ex. 14), like the 2009 Copyright Policy Checklist, was based on that of Dr. Crews, GSU's expert.  The CCC Fair Use Checklist is still accessible today on the same webpage.  (T. Vol. 4 at 52-3.)

112.  Although the CCC no longer expressly promotes its own Fair Use Checklist, it has provided a White Paper directed to electronic reserves.  Def. Ex. 906.  That White Paper sets forth the CCC's current position on what constitutes "Best Practices and Guidelines" for electronic reserves, such as the use of password protection, taking down the material posted at the end of the semester, working from authorized originals, and including copyright notices.  (T. Vol. 4 at 78-82.)  In addition, the CCC's White Paper on "Best Practices and Guidelines" for electronic reserves recognizes that "most experts" advise using a single article or chapter in an electronic reserves system, without reference to any percentage amount.  (T. Vol. 4 at 82-83.)  Many of the now complained of excerpts were a chapter or less, which is exactly what CCC acknowledges as a best practice or guideline.  The 2009 Copyright Policy is in keeping with the CCC's public statements of "best practices."

113.  The Court finds that the 2009 Copyright Policy Fair Use Checklist is an appropriate and effective tool for professors to apply in making fair use determinations.  The Plaintiffs have failed to prove that the Policy has caused misuse of the fair case defense.

## V.   **ATTORNEYS' FEES**

114.   Section 505 of the Copyright Act, 17 U.S.C. § 505, grants the Court power to award both costs and attorneys' fees to the prevailing party:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof . . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

Such awards are, by statute, wholly within the discretion of the Court.

115.   Even so, an award of attorneys' fees is not available if the plaintiff did not obtain a copyright registration for the work at issue prior to the acts of infringement or within the three month statutorily provided grace period.  17 U.S.C. § 412(2).

116.   The factors to be considered in an attorneys' fee determination include "frivolousness, motivation, objective unreasonableness . . ., and the need in particular circumstances to advance considerations of compensation and deference." Fogorty v. Fantasy, 510 U.S. 517, 534 n.19 (1994).  Such factors, however, must be considered so as to be "faithful to the purposes of the Copyright Act."   Mitek Holdings, Inc. v. Ace Eng'g Co., 198 F.3d 840, 842 (11th Cir. 1999).

117.   In Fogorty v. Fantasy, the Supreme Court held that attorneys' fees should be awarded in an "evenhanded" manner in the discretion of the trial court.  In

other words, no longer are courts to apply a different standard depending on whether they are making an attorneys' fee award to a plaintiff or a defendant.

118.   Defendants are entitled to their attorneys' fees in this case based on a consideration of compensation.   As the Court has noted, the present case is the first to address fair use in the academic context as it relates to professors and students and the use of electronic reserves.   Defendants have funded the worthwhile address of such issues for the purpose of judicial determination and guidance.   Moreover, Defendant GSU has itself borne the cost of this litigation.   In contrast, the Plaintiffs' litigation costs have been borne by third parties -- The Copyright Clearance Center ("CCC") and the Association of American Publishers ("AAP").   Had Defendants not contested these important issues, such publisher groups and agents would have simply continued to adopt or amend their fair use policies in order to avoid a lawsuit and without the resulting legal guidance.[6]

---

[6]     See http://cornellsun.com/node/18733 (Cornell and newspaper article detailing AAP contacting Cornell informing "the University that the library e-Reserve and system of posting copyrighted material only at course websites were in violation of copyright law and [AAP] would sue if the practice was not stopped"); see also http://dukechronicle.com/article/e-reserves-raise-copyright-concerns.     The Duke University newspaper, following Cornell, quotes AAP Vice President of Legal Affairs, as stating:   "Schools, made basic changes in policies reflecting things that were adapted at Cornell,'" and "Duke reacted differently, but made some changes. We will continue to watch Duke, and all other universities, to make sure they are abiding by the standards of fair use."   Of course, those "standards" are those as

119.   An award of attorneys' fees in this case thus furthers the purpose of the Copyright Act by allowing this case of first impression regarding academic fair use to be presented to the Court for determination.   In contrast, the Plaintiffs maintained this litigation even after the University System of Georgia adopted a new copyright policy that addressed many claimed concerns and reflected many of the "best practices" advocated by the CCC -- another silent funding party in this litigation. Under such circumstances, any request for attorneys' fees by Plaintiffs should be denied.

120.   Yet further, Defendants are entitled to fees because the extent of alleged infringing activity has been exaggerated by Plaintiffs.   The original allegations in this case were for thousands of works and a massive amount of alleged infringements.   Such claims, at best, made claims for publishers not present in this suit, and at worst, were unsupported.   Early in discovery, Defendants asked for a complete identification of the alleged infringed copyrighted works, but did not receive any such identification until after the close of discovery and in response to Defendants' motion for summary judgment.   Once Defendants adopted the new copyright policy, they proposed a stay of the case to allow all parties to evaluate its

---

promulgated by publishers and organizations such as the AAP, a silent funding party in this case.

effectiveness.  The Plaintiffs refused.  An award of attorneys' fees would deter such tactics in future litigation.

## VI.   PLAINTIFFS' REQUEST FOR AN INJUNCTION

121.   Section 502(a) of the Copyright Act authorizes injunctions "to prevent or restrain infringement of a copyright."  "Injunctive relief should be narrowly tailored to fit specific legal violations."  Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994).  Broad injunctions alter copyright into an engine of suppression, in contravention of its goal to promote the progress of science and threatening to encroach on First Amendment values.  Nimmer on Copyright sec. 14.06[C], at 14-123 to 14-124.  The scope of an injunction should be no broader than the infringement.  See Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527 (5th Cir. 1994); Alcatel USA, Inc. v. DGI Techs., Inc., 166 F.3d 772, 790-91 (5th Cir. 1999).  Permanent injunctions are not automatic after a finding of infringement. eBay Inc. v. MercExchange, *LLC*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006).

122.   On May 11, 2011, Plaintiffs filed a statement regarding the injunctive relief they seek in this case, along with a proposed order, copies of orders entered by courts in other jurisdictions in cases that Plaintiffs (incorrectly) argue are "analogous" to the action before this Court, and a copy of the "Policy Statement on

Photocopying of Copyrighted Materials for Classroom and Research Use" (the "NYU Policy") adopted by New York University ("NYU") on or about May 9, 1983 in connection with the settlement of litigation in which it was at that time involved. See Proposed Injunctive Relief [Dkt. No. 300].

123.   The Court has reviewed Plaintiffs' Proposed Injunctive Relief and proposed Order and declines to enter the Order on several grounds.  First, Plaintiffs' claims are barred by the doctrine of sovereign immunity, and therefore no injunction may issue against these Defendants.   Further, Plaintiffs' proposed injunction is exceedingly overbroad in several respects, including with respect to the conduct enjoined -- both prohibited and required -- and the persons covered.   Further, Plaintiffs' proposed injunction seeks to have this Court do what Congress explicitly declined to do -- give legal effect to the "Classroom Guidelines," which Congress chose not to enact as part of the statutory fair use privilege, 17 U.S.C. § 107. Significantly, outside of stipulated judgments, no court has entered an order enjoining a litigant to adhere to those Guidelines, as would Plaintiffs' proposed injunction. And Plaintiffs' proposed injunction far exceeds even those requirements, essentially eviscerating the fair use privilege.   Indeed, Plaintiffs' proposed Order does not incorporate the statutory fair use privilege, or refer to or acknowledge the concept of fair use at all.  Rather, it seeks to substitute rigid, bright-line rules for the

flexible, case-by-case application of the fair use privilege.   In light of its overbreadth, compliance with the proposed injunction would be extremely difficult, if not impossible, to administer and the costs to GSU would be unreasonable.

### A.   The Proposed Injunction Is Overbroad

124.   Plaintiffs' proposed injunction seeks to define "GSU," *i.e.*, the party enjoined, as including, among other persons, "persons acting under [the] direction, control, or supervision" of any covered person, "including all part-time or full-time faculty employed by, and students enrolled at, GSU[.]"   (Dkt. 300-1 at 1, ¶ I.A). Thus, the injunction would enjoin, among others, GSU faculty and students from, among other things, "encouraging or facilitating" **any** copying without permission of any covered Works **by anyone**, regardless of whether that third party is or is not affiliated with GSU.   Read literally, the injunction would require a GSU student to monitor and ensure that a non-student friend to whom the GSU student lends fifty cents for making photocopies is not copying a covered Work without permission, lest the GSU student fall afoul of the "facilitating" prohibition.   An injunction that could lead to such a result is facially overbroad.

125.   Similarly, because the injunction enjoins GSU from "encouraging or facilitating" any prohibited copying, GSU administrators arguably would have to monitor all faculty and student photocopying at copiers provided in its libraries to

ensure that any such copying fell within the strictly specified limits.  Indeed, because it eliminates the flexibility inherent in the statutory fair use privilege enacted by Congress and applied by courts, the proposed injunction would make GSU responsible for monitoring every conceivable act of copying that took place on its campus.

126.   Under the proposed injunction, it even would be insufficient for GSU to monitor every student's photocopying behavior and every faculty member's decisions with respect to use of classroom materials.  Plaintiffs' injunction would require GSU to give Plaintiffs access to all of its computer systems so that Plaintiffs, too, could examine each professor's decisions.  (*See* Dkt. 300-1 at 5, ¶ VIII.B.)

127.  The foregoing provisions alone render the proposed injunction problematic on the basis of their overbreadth and impossibility to administer as a practical matter.  The injunction is even more problematic, however, when one considers its attempt to wring any flexible, case-by-case application of fair use principles from the university setting, as discussed below.

**B.     The Proposed Order Seeks To Impose Rigid Rules That Congress Declined To Incorporate In The Fair Use Statute**

128.  Plaintiffs' injunction does not reference Section 107 of the Copyright Act or the fair use privilege anywhere within its text.  Instead, the only coping that

would be permitted without permission is that which falls within the rigid bounds of the "Agreement on Guidelines for Classroom Copying in Not-For-Profit Educational Institutions with Respect to Book and Periodicals," often referred to as the "Classroom Guidelines" (see Dkt. 300-1 at 2, ¶ III.B.1) -- notably, as modified by Plaintiffs.  (See id.; see also id. at ¶ III.B.2).

129.   As noted in the NYU Policy incorporated into the order in Addison-Wesley Pub'g Co., Inc. v. New York Univ., No. 82 CIV 8333 (ADS), 1983 WL 1134 (S.D.N.Y. May 31, 1983) (unreported), the Guidelines arose from negotiations between education and publishing interests in 1976.  Id. at *6 n.3.  Although they appear in the legislative history, the Guidelines are not part of the Copyright Act and do not have the force of law.  See, e.g., Marcus v. Rowley, 695 F.2d 1171, 1178 (9th Cir. 1983) (Guidelines "are not controlling on the court"); see also, e.g., Gregory K. Klingsporn, The Conference On Fair Use (CONFU) And The Future Of Fair Use Guidelines, 23 Colum.-VLA J.L. & Arts 101 (Winter 1999) ("the Classroom Guidelines are not part of the statutory text. . . . Judges and scholars have since struggled with the question of how much weight to give them.").

130.   Moreover, the Guidelines expressly state that their purpose "is to state the minimum and not the maximum standards of educational fair use under Section 107 of [the Copyright Act]."  H.R. Rep. No. 1476, at 68, U.S. Cong. & Admin.

News 1976, p. 5681; see also id. ("[t]here may be instances in which copying which does not fall within the guidelines . . . may nonetheless be permitted under the criteria of fair use"); 4 NIMMER ON COPYRIGHT § 13.05[E], at 13-96 (Matthew Bender, Rev. Ed.) (courts may decide whether a use that exceeds the Guidelines may be fair use and whether a use that is within the Guidelines may exceed fair use; courts must balance the interests involved).

131.   Here, Plaintiffs' injunction would do precisely what the Guidelines themselves decry -- establish a *de facto* maximum for the amount of copying without permission, regardless of the application of the fair use doctrine.   That is, the Guidelines' brevity requirement, as incorporated in the injunction, permits a copy of only 10 percent or 1000 words of a prose work, whichever is less.   In many cases, therefore, the 1000-word restriction will be the effective limit, which may prohibit copying even the one page of a work permitted in other injunctions relied on by Plaintiffs.   See Basic Books, Inc. v. Kinko's Graphics Corp., No. 89 CIV. 2807 (CBM), 1991 WL 311892 (S.D.N.Y. Oct. 16, 1991) (unreported) [Dkt. 300-2]; Princeton Univ. Press v. Michigan Doc. Svcs., Inc., 99 F.3d 1381 (6th Cir. 1996); (Dkt. 300-3).

**C.**   **The Proposed Order Seeks To Include Additional, Unprecedented Strictures That Exceed Even The Classroom Guidelines**

132.   Further, the proposed injunction seeks to modify the Guidelines to render them even more restrictive.   First, the "cumulative effect" limitation in the Guidelines -- which limits the total number of excerpts that can be made without permission -- would be enforced across the entire institution under the proposed injunction, not simply per course/class term, as the Guidelines provide.   (See Dkt. 300-1 at 2-3, ¶ III.B.1; see id. at 8).

133.   Second, the proposed injunction adds a restriction that does not appear in the Guidelines, providing that copies made without permission may not "comprise more than 10% of the total reading (whether assigned, required, suggested, supplemental, or otherwise) for a particular course."   (Id. at 3, ¶ III.B.2).   Here, again, the flexible principles of the fair use doctrine are jettisoned altogether. Instead, this provision is intended to ensure that 90 percent of each class's readings would be provided through purchased works or copies for which permission fees were paid, regardless of whether every professor is otherwise fully in compliance with the Classroom Guidelines' requirements -- and certainly regardless of whether the uses would be protected under the fair use privilege in any event.

134.   The additional restrictions in Plaintiffs' order that extend beyond even what is contained in the Guidelines are designed for a single purpose:  to increase the

permission fees to be collected by Plaintiffs or Plaintiffs' licensing agent. As discussed below, this is merely one of the ways in which the proposed order would impose unreasonably high, potentially prohibitive, costs on Defendants.

### D.     Compliance With The Proposed Order Would Be Prohibitively Expensive

135.   The administrative costs alone of complying with the proposed injunction would be enormous, including monitoring, record-keeping, reporting, and notice and educational requirements.  And those costs do not reflect that greater volume of permission fees that necessarily would be required as a result of the imposition of the Classroom Guidelines and Plaintiffs' proposed modifications thereto.  Such costs could approach a level at which institutions of higher education deem it infeasible to provide EReserves, uLearn, faculty websites, course websites, or other systems that fulfill the institutions' educational mission.  Such a result would be in direct contravention of the policy underlying the Copyright Act.  See 17 U.S.C. § 107 ("the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright").

**E.     The Authority On Which Plaintiffs Rely Is Inapposite**

136.   Along with their proposed injunction, Plaintiffs submitted copies of injunctions entered in three cases, the facts of which are markedly different from this case:  Basic Books, Inc. v. Kinko's Graphics Corp., No. 89 CIV. 2807 (CBM), 1991 WL 311892 (S.D.N.Y. Oct. 16, 1991) (unreported); Princeton Univ. Press v. Michigan Doc. Svcs., Inc., 99 F.3d 1381 (6th Cir. 1996); and Addison-Wesley Pub'g Co., Inc. v. New York Univ., No. 82 CIV 8333 (ADS), 1983 WL 1134 (S.D.N.Y. May 31, 1983) (unreported).

137.   As an initial matter, in each of those cases, the only defendants at the time that the courts entered the injunctions were commercial, for-profit copy shops. See Basic Books, 1991 WL 311892, at *1; Princeton Univ. Press, 99 F.3d at 1381; Addison-Wesley, 1983 WL 1134, at *1.   As Plaintiffs note, NYU was a named defendant earlier in the Addison-Wesley case, and the injunction incorporated the NYU Policy that NYU adopted on or about May 9, 1983.  Notably, that policy was adopted and issued "as part of the settlement" of that case.  (See Dkt. 300-5 at 5).

138.   Indeed, the injunction issued in Addison-Wesley was itself a consent Order and Final Judgment, in which the parties stipulated to the scope of the injunctive relief.  See Addison-Wesley, 1983 WL 1134, at *1 [Dkt. 300-4 at 1]. Similarly, the injunction issued in Princeton University Press was a stipulated order,

the scope of which was agreed to by the parties as part of the settlement of that action.  (See Dkt. 300-3 at 1).  There is no indication what consideration, if any, was exchanged in connection with settlement of those prior actions.

139.  Of the authority on which Plaintiffs rely, only the Basic Books order was not a consent judgment entered in connection with settlement, and that order is much more circumscribed than Plaintiffs' proposed order.  And the order issued in Princeton University Press is essentially the same as that issued in Basic Books. (See Dkt. 300-3 at 2-3).  Neither attempts to incorporate the Guidelines like Plaintiffs' proposed order.

140.  Further, even in Addison-Wesley, the single instance where an injunction refers to the Classroom Guidelines, the NYU Policy expressly states that "[t]he doctrine of fair use may now or hereafter permit specific photocopying in certain situations, within limitations, beyond those specified in the Guidelines." Addison-Wesley, 1983 WL 1134, at *6.  Indeed, the NYU Policy further notes that the introductory statement to the Guidelines states, among other things:

> The purpose of the following guidelines is to state the minimum standards of educational fair use under Section 107 of H.R. 2223. The parties agree that the conditions determining the extent of permissible copying for educational purposes may change in the future; . . . .
>
> Moreover, the following statement of guidelines is not intended to limit the types of copying permitted under the standards of fair

> use under judicial decision and which are stated in Section 107 of
> the Copyright Revision Bill.  There may be instances in which
> copying which does not fall within the guidelines stated below
> may nonetheless be permitted under the criteria of fair use.

Id. at *6 n.3.  Notably, Plaintiffs' proposed injunction does not carry any such

acknowledgement concerning fair use.  (See generally Dkt. 300-1).  Thus, Plaintiffs'

assertion that the NYU Policy operates "in similar fashion" to Paragraph III.B of

Plaintiffs' proposed injunction (Dkt. 300 at 2) is incorrect; Plaintiffs' injunction

seeks to eliminate any application of the flexible approach that Congress adopted

with respect to fair use in favor of rigid strictures that Congress did not adopt.

For all the reasons stated herein, the Court denies Plaintiffs' request for an

injunction, and declines to enter Plaintiffs' proposed injunction.

Respectfully submitted this 22nd day of July, 2011.

SAMUEL S. OLENS
Georgia Bar No. 551540
Attorney General

R. O. LERER
Georgia Bar No. 446962
Deputy Attorney General

DENISE E. WHITING-PACK
Georgia Bar No. 558559
Senior Assistant Attorney General

MARY JO VOLKERT
Georgia Bar No. 728755
Assistant Attorney General
KING & SPALDING LLP

*/s/ Stephen M. Schaetzel*
Stephen M. Schaetzel
Georgia Bar No. 628653

John W. Harbin
Georgia Bar No. 324130
Natasha Moffitt
Georgia Bar No. 367468
Mary Katherine Bates
Georgia Bar No. 384250
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: sschaetzel@kslaw.com

Anthony B. Askew
Georgia Bar No. 025300
Special Assistant Attorney General
McKeon, Meunier, Carlin & Curfman, LLC
817 W. Peachtree Street NW, Suite 900
Atlanta, GA 30308
Phone: 404-645-7709
Fax: 404-645-7707
taskew@m2IPlaw.com

Katrina M. Quicker
Georgia Bar No. 590859
BALLARD SPAHR LLP
999 Peachtree Street, Suite 1000
Atlanta, GA 30309-3915
Telephone: (678) 420-9300
Facsimile: (678) 420-9301
Email: quickerk@ballardspahr.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia, that the foregoing DEFENDANTS' PROPOSED CONCLUSIONS OF LAW complies with the font and point selections approved by the Court in L.R. 5.1B.  The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

*/s/ Stephen M. Schaetzel*
Stephen M. Schaetzel
Georgia Bar No. 628653

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS,
et al.,

                              Plaintiffs,

-*vs.*-

MARK P. BECKER, in his official
capacity as Georgia State University
President, et al.,

                              Defendants.

Civil Action No.
1:08-CV-1425-ODE

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this 22nd day of July, 2011, I have electronically filed the foregoing DEFENDANTS' PROPOSED CONCLUSIONS OF LAW with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Edward B. Krugman
krugman@bmelaw.com
Georgia Bar No. 429927
Corey F. Hirokawa
hirokawa@bmelaw.com
Georgia Bar No. 357087
John H. Rains IV
Georgia Bar No. 556052

BONDURANT,      MIXSON      &
ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

R. Bruce Rich
Jonathan Bloom
Randi Singer
Todd D. Larson

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


*/s/ Stephen M. Schaetzel*_____
Stephen M. Schaetzel
Georgia Bar No. 628653