# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS,
OXFORD UNIVERSITY PRESS, INC.,
and SAGE PUBLICATIONS, INC.,

                Plaintiffs,

      *v.*

MARK P. BECKER, in his official
capacity as Georgia State University
President, et al.,

                Defendants.

Civil Action
No. 1:08-CV-1425-ODE

## PLAINTIFFS' POST-TRIAL REPLY BRIEF

904437.1

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ......................................................................................... 10

I.   PLAINTIFFS HAVE SATISFIED THE FORMALITIES OF
     ORIGINALITY AND OWNERSHIP FOR EACH OF THE
     CONTESTED WORKS ................................................................. 10

     A.   Plaintiffs' Works Are Clearly Original Under *Feist*
          Without the Need for Author Testimony ............................... 14

     B.   Plaintiffs Have Demonstrated Ownership of Their Works ..... 21

II.  DEFENDANTS' CITATIONS TO EXHIBITS THAT ARE NOT
     IN EVIDENCE AND DEPOSITION TESTIMONY THAT WAS
     NOT PRESENTED TO THE COURT SHOULD BE
     DISREGARDED ......................................................................... 23

III. DEFENDANTS HAVE NOT MET THEIR BURDEN OF
     ESTABLISHING THAT THEIR COPYING IS FAIR USE ............ 24

     A.   Factor 1:  The Nature and Purpose of the Use ........................ 26

          1.   The lack of transformative value weighs heavily
               against fair use ........................................................... 26

               a.   The nature and importance of transformative
                    value ................................................................. 26

               b.   The case law makes clear that alleged
                    infringements are not transformative ................. 30

          2.   Defendants exaggerate the significance of an
               educational purpose ..................................................... 34

          3.   *Princeton University Press* and *Basic Books* are
               highly relevant ............................................................ 36

     B.   Factor 2:  The Nature of the Copyrighted Work ..................... 37

     C.   Factor 3:  The Amount and Substantiality of Portion Used .... 38

          1.   Defendants cannot hide behind irrelevant statistics ...... 38

          2.   Each separately authored chapter is a complete work ... 39

# TABLE OF CONTENTS
## (continued)

**Page(s)**

3.    There is no quantitative safe harbor ............................. 40

4.    The aggregate effect of the copying must be considered ................................................... 42

5.    The qualitative effect of the copying must be considered ................................................... 44

D.    Factor 4:  The Effect on the Market ........................................ 45

E.    Defendants Have Not Mounted a Fair Use Defense for Every Professor Who Infringed Plaintiffs' Works ............................ 51

IV.    DEFENDANTS' PORTRAYAL OF THE 2009 POLICY AS EFFECTIVE IN AVERTING INFRINGEMENT IGNORES THE EVIDENCE ..................................................................... 52

A.    Defendants' Claims Concerning the Effectiveness of the Policy Are Contradicted by the Trial Record .......................... 54

1.    Ineffective training ........................................................ 55

2.    Infringement is ongoing under the 2009 policy ............. 57

B.    Defendants' Efforts To Justify the Efficacy of the Checklist Are Unavailing ...................................................... 58

1.    The GSU Checklist is treated differently under GSU's policy than under the Columbia policy .............. 58

2.    Misleading citations to documents on CCC's website are unavailing ............................................................. 60

C.    The Other Cited Features of the Policy Are Immaterial ......... 63

V.    THE COURT HAS ALREADY PROPERLY REJECTED DEFENDANTS' SOVEREIGN IMMUNITY ARGUMENTS ........ 64

VI.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF .......... 68

A.    The Proposed Injunction Is Appropriate To Redress Defendants' Ongoing Infringing Conduct .............................. 69

B.    The Purported Deviations from the Guidelines, to the Extent They Exist, Are Reasonable .................................................. 71

# TABLE OF CONTENTS
## (continued)

**Page(s)**

C.    There Is No Basis for the Claim That Compliance Would Be Prohibitively Expensive ...................................................... 73

D.    Any Inadvertent Overbreadth Is Easily Curable ..................... 74

VII.  PLAINTIFFS ARE ENTITLED TO REASONABLE ATTORNEY'S FEES IF THEY PREVAIL; DEFENDANTS ARE NOT .......................................................................................... 74

A.    Plaintiffs Are Entitled to Attorney's Fees ............................... 74

B.    Defendants Are Not Entitled to Attorney's Fees .................... 76

CONCLUSION ........................................................................................... 77

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Geophysical Union v. Texaco, Inc.,*
  60 F.3d 913 (2d Cir. 1994) ........................................................... 1, 27, 47

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
  758 F. Supp. 1522 (S.D.N.Y. 1991) ................................................. *passim*

*BellSouth Advertising & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*,
  719 F. Supp. 1551 (S.D. Fla. 1988) ......................................................... 42

*Berg v. Symons*, 393 F. Supp. 2d 525 (S.D. Tex. 2005) ............................... 15

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ...................................................... 30, 31, 49

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .................... *passim*

*CJ Prods. LLC v. Concord Toys Int'l, Inc.*,
  No. 10-CV-5712, 2011 WL 178610 (E.D.N.Y. Jan. 19, 2011) ............... 16

*Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*,
  No. 06 C 4634, 2006 WL 4013750 (N.D. Ill. Oct. 6, 2006) ..................... 18

*Ex parte Young*, 209 U.S. 123 (1908) ..................................................... *passim*

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) .................................................................. 15, 16, 17

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ............................................ 77

*Greenberg v. Nat'l Geographic Soc'y,* 533 F.3d 1244 (11th Cir. 2008) ....... 35

*Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011) ......................................... 66

*Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic &*
  *Apostolic Church*, 194 F. Supp. 2d 30 (D.P.R. 2001) .............................. 18

*Leeds Music Ltd. v. Robin*, 358 F. Supp. 650 (S.D. Ohio, 1973) ................ 18

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Lifetime Homes, Inc. v. Residential Dev. Corp.,*
510 F. Supp. 2d 794 (M.D. Fla. 2007)........................................................13

*Luckey v. Harris,* 860 F.2d 1012 (11th Cir. 1988) ..............................65, 66, 67

*Maxtone-Graham v. Burtchaell*, 631 F. Supp. 1432 (S.D.N.Y. 1986)............41

*Meeropol v. Nizer*, 417 F. Supp. 1201 (S.D.N.Y. 1976), *reversed on other grounds*, 560 F.2d 1061 (2d Cir. 1977) ......................................................42

*Michael Grecco Photog., Inc. v. Everett Collection, Inc.*,
589 F. Supp. 2d 375 (S.D.N.Y. 2008) ........................................................13

*Montgomery v. Noga*, 168 F.3d 1282 (11th Cir. 1999) ..................................15

*Morelli v. Tiffany & Co.*, No. Civ. A 00-1961, 2001 WL 179898
(E.D. Pa. Jan. 10, 2001) .............................................................................18

*Pac. & S. Co., Inc. v. Duncan*, 618 F.Supp. 469 (N.D. Ga. 1985) .................11

*Pac. & S. Co*, Inc. v. Duncan, 744 F.2d 1490 (11th Cir. 1984)......................11

*Pennington Seed, Inc. v. Produce Exch.*, No. 299, L.L.C.,
457 F.3d 1334 (Fed. Cir. 2006) ......................................................64, 65, 68

*Peter Letterese & Assoc., Inc. v. World Instit. of Scientology
Enters., Int'l*, 533 F.3d 1287 (11th Cir. 2008)....................................37, 58

*Princeton Univ. Press v. Michigan Document Servs.*,
99 F.3d 1381 (6th Cir. 1996) .............................................................*passim*

*Sony Corp. of America v. Universal City Studios, Inc.*, 464
U.S. 417 (1984).......................................................................................33

*Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326
(11th Cir. 1999)........................................................................................65

*Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194 (4th Cir. 1998)...........30, 31, 32

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. Media Corp., Inc. v. Edde Entm't, Inc.*, 40 U.S.P.Q.2d 1581
   (S.D.N.Y. 1996) ......................................................................... 13

*Ward v. National Geographic Soc'y*, 208 F. Supp. 2d 429
   (S.D.N.Y. 2002) ......................................................................... 18

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) ........................... 31, 32

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ................................................... 32

*Yurman Design, Inc. v. Golden Treasure Imps., Inc.*,
   275 F. Supp. 2d 506 (S.D.N.Y. 2003) ....................................... 13

### STATUTES

17 U.S.C. § 102 ........................................................................................ 27

17 U.S.C. § 410 ........................................................................................ 13

17 U.S.C. § 412 ........................................................................................ 74

17 U.S.C. § 505 ........................................................................................ 76

### LEGLISLATIVE MATERIALS

H.R. Rep. No. 90-83, 90th Cong., 1st Sess. (1967) ...................................... 43

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) ................................... 43

### OTHER AUTHORITIES

MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
   (2010) .............................................................................. *passim*

U.S. Const. art. 1 § 8 ................................................................................ 65

904437.1

## PRELIMINARY STATEMENT

Defendants' proposed findings of fact and conclusions of law highlight the serious inadequacies of their attempted fair use and other defenses and reinforce the propriety of Plaintiffs' proposed injunctive relief.  In addition to attempting to resurrect the same sovereign immunity defense the Court has already rejected twice, Defendants try to derail a ruling on the merits by mounting a frivolous attack on a number of the representative works in issue, challenging their originality and ownership.

When they finally do reach the merits, Defendants advance a highly selective and grossly distorted analysis of fair use law that pays mere lip service to the critical elements that weigh against fair use – such as nontransformativeness and effect on market – while erroneously relying on the non-profit educational purpose of the challenged conduct as if it were dispositive, which it is not.  They also strain to defend the 2009 copyright policy despite a trial record that overwhelmingly proves its utter ineffectiveness in reforming the practices that gave rise to this lawsuit.  None of these misguided arguments should alter the conclusion that GSU is infringing Plaintiffs' copyrighted works, and that injunctive relief is warranted.

**The 2009 Copyright Policy**

Undoubtedly because of the fundamental weakness of their fair use defense, Defendants' merits defense focuses heavily on the attributes of the 2009 GSU copyright policy in the apparent hope that the Court will pay more attention to a litany of irrelevant procedural rules than to the law of fair use.  Indeed, Defendants go so far as to urge the Court to ignore whatever infringements it may find on the ground that the policy reflects a good-faith effort at legal compliance that supposedly has led to a reduced incidence of infringements.  *See* Defendants' Proposed Findings of Fact, Docket No. 410 ("Def. PFF") ¶ 3.

The trial record squarely refutes the most basic assertions made by Defendants as to the core attributes of the policy.  For example, Defendants claim that the policy is an "appropriate and effective" one that has "resulted in considered and legally correct fair use determinations."  Def. PFF ¶ 1.  But Defendants freely admit that the policy delegates fair use decisions entirely to faculty members without any independent evaluation of those determinations by GSU library staff or anyone else.  *See* Def. PFF ¶¶ 52, 98.  The record evidence (recounted at ¶¶ 203-222 of Executive Summary and Plaintiffs' Post-Trial Proposed Findings of Fact, Docket Nos. 409, 412 ("Pl. PFF") and ¶¶ 147-169 of Plaintiffs' Post-Trial Proposed Conclusions of Law, Docket No. 409-6 ("Pl.

PCL")) proves that this transfer of copyright compliance obligations to GSU faculty predictably resulted in completely uninformed affirmative fair use decisions by the faculty as to each of the 75 representative infringements based solely on GSU's biased Fair Use Checklist (the "Checklist").

Defendants further and baselessly maintain that the Checklist – which is "to be used as a tool by faculty members to work through an evaluation of fair use questions" and is required to be filled out and retained (*see* Def. PFF ¶¶ 56, 88-90) – has proven to be "competent and balanced" in assisting faculty in making fair use determinations, indeed, is "more cautious than necessary about the exercise of fair use." Def. PFF ¶¶ 1, 171.  These contentions are belied by the slanted construction of the Checklist itself, with its many deviations from basic copyright and fair use principles (*see* Pl. PCL ¶¶ 146-69) as well as by a trial record replete with conceded violations of the policy by faculty who failed to timely fill out and retain copies of the checklists.  *See* Pl. PFF ¶¶ 208-12.  Moreover, Plaintiffs have proved that the factual predicates for these assertions, in particular the asserted oversight by both the GSU library and university counsel, are non-existent.  *See* Def. PFF ¶¶ 98-99 (conceding lack of active oversight by GSU library staff); Pl. PFF ¶¶ 189-91.

Other supposedly salutary attributes of the 2009 policy cited by Defendants are also belied by the trial record.  These include:

- The assertion that it is meaningfully reinforced with "educational programs" (Def. PFF ¶ 1), notwithstanding a trial record that demonstrates the paucity of educational support provided to faculty (who regarded what little was offered as strictly voluntary and, as a rule, ignored it). Pl. PFF ¶ 203.

- The claim that the policy was derived in significant part from that of Columbia University (the legality of whose policy is not at issue) (Def. PFF ¶ 45), notwithstanding GSU's substantive revisions that removed a number of statements in the Columbia policy intended to apprise faculty of significant limitations on fair use of copyrighted works for teaching purposes.  *See* Trial Transcript Volume 13, Docket No. 396 ("6/3 Tr.") 106:8-112:14 (Crews).

Particularly remarkable is Defendants' assertion that "the effectiveness of the 2009 Copyright Policy is reflected in the diminishing number of alleged infringements" because "only" 75 instances of infringement of the three Plaintiff publishers' works during the three representative academic terms were the subject of the trial.  Def. PFF ¶ 3.  This astonishing premise – that copyright infringements ought to be legally excused provided the defendant can demonstrate that it is infringing somewhat fewer of a plaintiff's works over time – finds no support in the law.   In any event, there is no record support for Defendants' contention that

the 2009 policy has brought about a meaningful diminution in infringing activity.[1] If anything, Plaintiffs' ability to document such a large volume of infringements during only these terms (two of them truncated) speaks to the large number of ongoing infringements at GSU.[2]

## Fair Use

Defendants fare no better with their gloss on fair use law and its application to the alleged infringements. They acknowledge that concepts such as transformativeness and potential for market harm are important to the fair use analysis, particularly if the challenged practices were to become widespread, but they then disregard these fundamental principles in their analysis because they sharply cut against finding the systematic, nontransformative copying at GSU to be fair use. Instead, Defendants try to short-circuit a proper four-factor analysis by

---

[1] The Court properly rejected Defendants' attempts at trial to, on the one hand, systematically object to Plaintiffs' proffers demonstrating persistent infringement over time while, on the other hand, themselves be permitted to show an alleged diminishing number of infringements over time. *See* Trial Transcript Volume 12, Docket No. 395 ("6/2 Tr.") 95:10-97:19.

[2] What is more, the record demonstrates that Plaintiffs represent only a small percentage of the total academic publishing market. *See* Pl. PFF ¶ 170; Trial Transcript Volume 3, Docket No. 401 ("5/19 Tr.") 33:2-34:20 (Pfund). The infringements experienced by Plaintiffs are likely but the tip of the iceberg in relation to overall infringing behavior by GSU. *See* JX 1, 2, 3; Trial Transcript Volume 4, Docket No. 402 ("5/20 Tr.") 111:11-112:1 (Dimsdale); Trial Transcript Volume 11, Docket No. 402 ("6/1 Tr.") 152:1-6 (Burtle).

904437.1

seizing on, and artificially inflating the significance of, the statutory references to "teaching" and "nonprofit educational purposes," while avoiding any meaningful analysis of Factors 3 and 4.  Defendants thus ignore or misrepresent case law that undercuts their unfounded effort to place "education" and "learning," uncoupled from the creation of new works of authorship, at the heart of fair use, while ascribing undue significance to dictum in a single footnote in a factually distinguishable Supreme Court parody case.

For Defendants, Factor 1 reduces to the fact that "the purpose and character of the use is for nonprofit, educational purposes," (Def. PFF ¶ 4) without regard to the more significant fact that the challenged uses here are not transformative.  They would place conclusive weight under Factor 2 on the conclusion that "the works at issue are fact-based," (*id.*) without acknowledging the undisputed creative elements of the works, which the Eleventh Circuit and other courts have found significant in cases involving comparable works of nonfiction.

Defendants' Factor 3 analysis centers on the irrelevant – and misleading – statistic that the *average amount* of the 75 takings is approximately 10% of the books involved (before being conveniently adjusted downward to eliminate the copying by the two most egregious infringers).  Defendants claim this amount of copying somehow is "[i]n keeping with recent Supreme Court precedent" and

904437.1

6

"appropriate for the favored purpose of teaching."  Def. PFF ¶ 4.  Nowhere,

however, do Defendants:

- cite any law that might validate a fair use analysis based solely upon an averaging of the length of individual infringements;

- attempt to apply Factor 3 on a work-by-work basis;

- discuss the fact that many takings constitute 100% of the author's contribution to an edited volume;

- attempt to square this strictly volume-based fair use litmus test with their own policy's (as well as their own expert's) recognition that there is no quantitative fair use safe harbor;

- address the impact of the aggregation of Plaintiffs' works with the unauthorized takings of works of other publishers; or

- discuss the *qualitative* significance of the takings, virtually all of which were attested to be important and even "necessary" to the pedagogical purposes of the professors.

Equally flimsy is Defendants' Factor 4 analysis, which ignores the plenitude

of evidence demonstrating harm to the market for Plaintiffs' works (which are

targeted at colleges and universities) (*see* Pl. PFF ¶¶ 256-80) and which fails to

address the obvious devastating impact on Plaintiffs' businesses that would ensue

if GSU's practices were to become the norm nationwide at the thousands of

schools that use online course reading systems.  Defendants also (incredibly)

question the existence of a viable permissions market, even though they have

stipulated that such a market exists (*see* Stipulated Fact 95, attached as Exhibit E to

904437.1

7

the Consolidated Pretrial Order, entered May 2, 2011, Docket No. 280), and even though the cases make clear that the prospect of adverse impact on this market is as relevant to Factor 4 harm as is harm to book sales.  The notion pressed by Defendants that the copying at GSU may somehow have a net positive impact on Plaintiffs' market by meaningfully stimulating book sales is both legally incorrect and factually baseless.

Finally, the suggestion that GSU professors would discontinue use of the works if their students were faced with paying permissions fees as low as several dollars lacked all credibility.  Defendants' unwillingness to pay the customary price is not a factor in the fair use analysis, and it certainly does not weigh *in favor* of fair use.  In any event, the record establishes that GSU has long paid permissions fees for the same copyrighted materials when made available as coursepacks and could, *for as little as $3.75 per student per academic year*, gain lawful access to a repertory of some two million academic works, including those published by two of the Plaintiffs.[3]

---

[3] The works of the third Plaintiff are available for electronic licensing on a per-work, transactional basis comparable to that GSU has used to obtain licenses for coursepacks.  *See* Pl. PFF ¶ 43-47, 76.

There is no record evidence that complying with copyright law in relation to ERes and uLearn practice would create any undue hardship on GSU or its student body.  In fact, President Becker affirmed that if GSU were required to pay permissions for the copying activities involved in this lawsuit, it would find a way to do so – most likely in the form of a student charge.  *See* Pl. PFF ¶ 115.

In sum, a full fair use analysis, conducted by following the straightforward dictates of the case law and applying them to the trial record, one-sidedly compels the conclusion that GSU has infringed upon Plaintiffs' rights and that Defendants have the legal responsibility to undertake appropriate remedial measures finally to bring these infringements to a halt.

## Injunctive Relief

The injunction Plaintiffs have proposed based on the Classroom Guidelines and other influential guidelines is not intended to be a fair use referendum purporting to define the outer limits of fair use in the educational setting as an abstract matter.  Rather, it represents a reasonable and administrable *remedial decree* to govern copyright compliance at an institution that has engaged in rampant infringement and has demonstrated its unwillingness to impose any sensible restrictions on itself.  It also should be recognized that the proposed injunction merely defines what can permissibly be used in GSU's ERes and uLearn

904437.1

9

systems *without* payment or permission.  For uses exceeding the stated fair use

parameters, GSU need only pay the standard price for permissions as it already

accustomed to doing when disseminating course reading materials in their more

traditional formats.

## ARGUMENT

## I.    PLAINTIFFS HAVE SATISFIED THE FORMALITIES OF ORIGINALITY AND OWNERSHIP FOR EACH OF THE CONTESTED WORKS

Defendants argue that Plaintiffs have failed to demonstrate the originality of

their foreign-published works and works registered more than five years after

publication, and likewise failed to demonstrate their ownership of certain other of

the representative works.  *See* Defendants' Proposed Conclusions of Law, Docket

No. 411 ("Def. PCL") ¶¶ 38-41, Def. PFF ¶¶ 183-98.  Even were one to credit

Defendants' meritless effort to identify purported infirmities, Defendants do not

dispute that Plaintiffs have satisfied the requisite formalities to establish a prima

facie case of copyright infringement for at least 25 of the works (representing 34

total infringements).  *See* Def. PCL ¶ 44.  If this case were to be adjudicated based

solely on these infringements, Plaintiffs would still be entitled to the relief they

seek.  *See* Pl. PCL ¶¶ 183-88.  In analogous cases involving the ongoing

infringement of plaintiffs' copyrighted works, courts have awarded relief –

including injunctions against future infringements of *any* of those plaintiffs' works – based on evidence as to far more limited numbers of works. *See, e.g.*, *Am. Geophysical Union v. Texaco*, 60 F.3d 913 (2d Cir. 1994) (case tried based on copying of eight articles); *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1384-85 (6th Cir. 1996) (alleging infringement of six representative books); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1526 (S.D.N.Y. 1991) (alleging twelve instances of infringement); *Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1499 n.17 (11th Cir. 1984) (upholding this Court's authority to issue an injunction addressing all plaintiff works, including "unregistered works," based on infringement of a single work); *Pac. & S. Co., Inc. v. Duncan*, 618 F. Supp. 469, 471 (N.D. Ga. 1985) (Evans, J.) (enjoining the copying of any of plaintiff's broadcast news programs).

Defendants' effort to trivialize the magnitude of the unlawful activity – whether measured as "merely" 34 infringements over three terms or "only" 75 infringements – by reference to the supposed absence of evidence of similar infringements across the range of other GSU course offerings (*see* Def. PCL ¶ 43, 46) is both misleading and irrelevant. Defendants have trumpeted the uniform treatment of *all* ERes book takings as fair uses. *See* Pl. PCL ¶ 3; Deposition of Mark P. Becker, Docket Nos. 316, 358 ("Becker Dep.") 65:5-10 (videotaped

904437.1

11

deposition played in Court, Trial Transcript Volume 8, Docket No. 406 ("5/26 Tr.") 9.  It is not surprising, therefore, that GSU has paid not even a penny in permissions fees for any ERes uses since at least May 2003.  *See* Pl. PFF ¶ 131. Consequently, the inference that Defendants would ask the Court to draw – that all ERes and uLearn postings other than those complained of by the Plaintiffs are copyright-compliant – is utterly implausible.  Moreover, in accordance with the Court's directive, this case was tried on the premise that the infringements identified on JX 5 were to be deemed representative of current practice at GSU, and Defendants have pointed to no evidence that warrants abandoning that stipulated understanding.

In any event, Defendants' efforts to cast doubt on whether Plaintiffs have demonstrated the originality of foreign works and works registered more than five years after publication (*see* Def. PCL ¶¶ 38-40, Def. PFF ¶¶ 183-86) as well as on whether Plaintiffs have demonstrated ownership of certain other works (or excerpts of works), are unavailing.  For the nineteen works registered more than five years after publication (*see* Def. PCL ¶ 38, Def. PFF ¶ 185), Defendants are simply wrong that these works "are not entitled" to the typical presumption that the facts as stated in the registration certificate (including that the work is original and that the registrant owns the work) are true.  *See* Def. PCL ¶ 37.

Under 17 U.S.C. § 410(c), "the evidentiary weight to be accorded" to a certificate of registration made after five years remains "within the Court's discretion," and courts routinely exercise such discretion and adopt a presumption of copyright validity. *See Lifetime Homes, Inc. v. Residential Dev. Corp.*, 510 F. Supp. 2d 794, 801 (M.D. Fla. 2007) (extending 17 U.S.C. § 410 presumption beyond five years where defendants "ha[d] not pointed to any evidence indicating that Plaintiffs' certificate of registration is not valid"); *Michael Grecco Photog., Inc. v. Everett Collection, Inc.*, 589 F. Supp. 2d 375, 381-82 (S.D.N.Y. 2008) (extending presumption where defendants offered no evidence to show certificates were invalid and where there was "considerable evidence," including license agreements, demonstrating plaintiff's ownership); *Yurman Design, Inc. v. Golden Treasure Imps., Inc.*, 275 F. Supp. 2d 506, 515-16 (S.D.N.Y. 2003); *U.S. Media Corp., Inc. v. Edde Entm't, Inc.*, 40 U.S.P.Q.2d 1581 (S.D.N.Y. 1996); *see also* 3 MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (2010) § 12.11[A][1]. Defendants have offered no reason why that approach is not appropriate here.[4] The wealth of evidence as to the validity of Plaintiffs' claims

---

[4] As Professor Nimmer explains, absent some reason to believe Plaintiffs' works were copied from a prior source – evidence that is absent here – extending the prima facie presumption is entirely reasonable: "To require plaintiff to prove his (or his predecessor author's) originality rather than requiring the defendant to

(summarized below and detailed, on a work-by-work basis, in Appendix A to Plaintiffs' Post-Trial Proposed Findings of Fact) establishes ample basis for presuming that the copyright for each of Plaintiffs' works is valid.

### A.   Plaintiffs' Works Are Clearly Original Under *Feist* Without the Need for Author Testimony

The trial record and documentary evidence clearly establish the originality of Plaintiffs' works registered outside the five-year window, as well as of those works protected under the Berne Convention without a U.S. registration, even without the presumption that flows from the registration certificates.  Indeed, the Court has already so indicated.  *See* Trial Transcript Volume 15, Docket No. 398 ("6/7 Tr.") 7:11-12 ("Well, I think it is clear that all of the items are copyrightable.").  Both the law and the evidence adduced by Plaintiffs fully support that conclusion.

The Supreme Court has held with respect to copyrightability that "the requisite level of creativity is extremely low; even a slight amount will suffice."

---

prove lack of originality would, it is said, impose upon the plaintiffs 'an impossible burden' in that he would be required to prove a negative (i.e., that he did *not* copy from any other source).  For this reason, even with respect to a registration certificate not obtained before or within five years after first publication of a work, a court exercising the discretion reposed in it would usually be well advised to adhere to the rule under the 1909 Act according such certificate a *prima facie* presumption, absent circumstances that call into question the reliability of the fact contained in the certificate."  NIMMER, *supra*, § 12.11[B][1][a] at 12-204.1.

*Feist Publ'ng, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991); *see also*

*Montgomery v. Noga*, 168 F.3d 1282 (11th Cir. 1999) (same); NIMMER, *supra*,

§§ 2.01[B], 3.04[B][2][b] (noting that *Feist* "invalidates the copyright only in the

most banal of works, such as the white pages of a phone book.").  It is obvious

from the face of Plaintiffs' works – each of which was entered into evidence and is

available for the Court's review – that they easily surmount the low originality bar

established by *Feist*.  Every one of Plaintiffs' works is a work of scholarship that

discusses, summarizes, analyzes, and/or describes the topic at hand through the

author's original expression.  *See* Pl. PFF ¶ 235 (summarizing testimony as to the

creative contribution of Plaintiffs' works); *see also* Trial Transcript Volume 1,

Docket No. 399 ("5/17 Tr.") 29:13-17 (Court observing that a research-based work

of scholarship "involve[s] qualitative choices by the researcher such that it would

be hard to say it's not creative").

Consistent with the view expressed by the Court at trial, and contrary to

Defendants' unfounded assertions (*see* Def. PFF ¶¶ 183-84; Def. PCL ¶ 95), the

presence of "factual information" and third-party or public domain material in

Plaintiffs' works – whether discussed, described, analyzed, or even just quoted –

does not alter the conclusion that the works are copyrightable, even as to those

pages on which such information is found.  *See Berg v. Symons*, 393 F. Supp. 2d

904437.1

15

525, 540-41 (S.D. Tex. 2005) (accepting section 410(c) presumption of copyrightability despite fact that work incorporated "previously established" ideas); *CJ Prods. LLC v. Concord Toys Int'l, Inc.*, No. 10-CV-5712, 2011 WL 178610, at *3 (E.D.N.Y. Jan. 19, 2011) (extending presumption beyond five years and explaining that "the mere presence of other similar products does not undercut the legitimacy of plaintiffs' copyrights" and "certainly does not rebut the presumption of validity").

Plaintiffs' works obviously are not simply compilations that gather and reproduce preexisting material. *See, e.g.*, Trial Transcript Volume 7, Docket No. 405 ("5/25 Tr.") 36:11-40:16 (Kim) (acknowledging that the "ideas" and "content" of third parties discussed in Plaintiff works are presented through the "expression" of Plaintiffs' authors); 6/1 Tr. 97:18-98:16 (Duffield) (describing the value of the author's analysis and synthesis of subject matter).

Even if Plaintiffs' works *did* merely select third-party material and quote it verbatim, the works *still* would be copyrightable as compilations – and Defendants still would be liable for copying the creative elements of those compilations. *See Feist,* 499 U.S. at 348 ("even a directory that contains absolutely no protectable written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement."); *accord* Trial

Transcript Volume 10, Docket No. 393 ("5/31 Tr.") 61:15-62:17, 63:2-18

(Kruger).[5] That Plaintiffs' works may compile and discuss prior research is thus

irrelevant, and it is, accordingly, not necessary to address, on a page-by-page basis,

Defendants' contentions as to which pages do or do not contain "primarily factual

information and information from others' works" or public domain material. Def.

PFF ¶¶ 183-84. The bottom line is clear: not a single infringement claim as to

those works identified by Defendants in paragraphs 183 and 184 of their Proposed

Findings of Fact is compromised by the inclusion of third-party information.[6]

The suggestion that Plaintiffs failed to carry their burden of establishing

copyrightability because they did not call the actual authors to testify as to the

creative process (Def. PCL ¶ 39-40) shows the lengths to which Defendants will go

to avoid a reckoning on the merits. There is no such legal requirement, and

---

[5] Unlike patents, copyrights do not require novelty to be valid. *See Feist*, 499 U.S. at 345 ("Originality does not signify novelty; a work may be original even if it closely resembles other works"); Nimmer, *supra,* § 2.01[A] ("The copyright requirement of originality is to be contrasted with the patent requirement of novelty. . . . [A] work will not be denied copyright protection simply because it is substantially similar to a work previously produced by others, and hence, is not novel.").

[6] In the rare instances in which Plaintiffs' works include some entire pages that simply reproduce third-party or public-domain material verbatim, Plaintiffs have removed those pages from the page counts in their allegations. *See* Pl. PFF App. A at 2, 6, 8, 12, 14, 43, 45, 47, 49, 51, 64, 66, 76, 80, 82, 118. The impact of these deductions is negligible, and the counts of infringed pages remain significant.

Defendants fail to cite a single case suggesting there is.[7]   Courts clearly can, and

do, make such determinations based solely on review of the works in question.

*See, e.g.*, *Leeds Music Ltd. v. Robin*, 358 F. Supp. 650, 653-59 (S.D. Ohio 1973)

(rejecting allegation that copyright in Plaintiff musical was not copyrightable

because pirated from a preexisting story, based on the court's own examination of

the works rather than affidavits from authors).

Moreover, the record as it stands fully supports the conclusion that

Plaintiffs' works are original to their authors and are not, as Defendants imply,

"copied from other works."  Def. PCL ¶ 35.   Most obviously, the contract for

*every single work* identified by Defendants as lacking proof of originality contains

a warranty from the author that the work does not infringe any existing copyrights;

---

[7] The authorities Defendants do cite on the originality issue (*see* Def. PCL ¶ 40) offer scant support for the propositions for which they are offered.  *Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 194 F. Supp. 2d 30 (D.P.R. 2001), involved three songs that were registered with the U.S. Copyright Office, *not* foreign works lacking registration (the target of Def. PCL ¶ 40).  *Id.* at 35-37.   *Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d 429 (S.D.N.Y. 2002), *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, No. 06 C 4634, 2006 WL 4013750 (N.D. Ill. Oct. 6, 2006), and *Morelli v. Tiffany & Co.*, No. Civ. A 00-1961, 2001 WL 179898 (E.D. Pa. Jan. 10, 2001), all involved instances where the Copyright Office denied registration requests; they did not involve foreign works that lacked a registration because of Berne Convention protections. Finally, Plaintiffs have been unable to confirm that § 7.16[B][1][c] of NIMMER ON COPYRIGHT actually exists.

indeed, most go so far as to state that the work is "original" to the author.  For

example, many of Cambridge's contracts contain the following clause:

> The Author hereby warrants to the Syndicate that the Work is original
> in them; has not been previously published in book form; [and]
> contains nothing that is in any way an infringement of any existing
> copyright . . . .

PX 135 ¶ 15 (contract for *More Grammar Games*).[8]  This alone should settle the

matter or, at the very least, shift the burden to Defendants to point to some

evidence that these warranties are not truthful (which they have not done).

But that is not the only evidence of independent creation.  Each Plaintiff

representative testified in detail about the peer-review and editing process to which

every book Plaintiffs publish is subjected.  *See*  Pl. PFF ¶¶ 26-34.   Cambridge's

Mr. Smith, for example, described the multi-month (and often multi-year) process

whereby Cambridge editors, themselves experts in particular fields, solicit and

review proposals from authors, send the proposals and manuscripts to outside

experts for review, review the peer-review feedback with the authors, and work

closely with the authors to revise their works based on the feedback.  5/17 Tr.

58:20-64:1; *see also id.* 61:5-7 ("We're asking other scholars to look at this

proposal or manuscript and tell us does this make an important contribution to

---

[8] The contracts for each Plaintiff work were identified, work-by-work, in Appendix
A to Plaintiffs' Post-Trial Proposed Findings of Fact.

learning and scholarship . . . ."). Ms. Richman of SAGE and Mr. Pfund of Oxford

offered similar testimony. *See* Trial Transcript Volume 2, Docket No. 400 ("5/18

Tr.") 62:10-67:16 (Richman) (noting, among other things, that SAGE solicits

manuscripts to address topics that have not been previously addressed by other

scholars); Trial Transcript Volume 3, Docket No. 401 ("5/19 Tr.") 45:7-47:25

(Pfund).[9]  It is inconceivable that a book that was merely copied from some prior

source and not independently created could run this painstaking editorial and peer-

review gauntlet without being detected.   That nearly every GSU professor

identified Plaintiffs' works as being "necessary" to their teaching purposes further

indicates that they are original; were they mere slavish copies of prior works, the

professors could have used the prior works instead.   *See* Pl. PFF ¶¶ 24, 233;

*accord* NIMMER, *supra*, § 2.01[B] at 2-13 ("[I]t may be concluded that if any

author's independent efforts contain sufficient skill to motivate another's copying,

there is *ipso facto* a sufficient *quantum* of originality to support a copyright."). In

---

[9] Nearly every book at issue contains a preface or acknowledgements page where the author discusses this writing/editing process and his/her work refining and revising the work, thanks colleagues who read and commented on the manuscript, and explicitly identifies the sources of third-party material in the book (as distinguished from the author's own contribution). Many of the books also contain an editor's preface where the editor describes the new and unique contribution made by the book to the existing literature on the subject. *See, e.g.*, PX 53 at xi; PX 147 at iv.

light of this evidence, Defendants' assertions at Def. PFF ¶¶ 185-86 and Def. PCL ¶¶ 38-40 should be disregarded.  Defendants have failed to show that any of Plaintiffs' works are not original and thus not copyrightable.

### B.    <u>Plaintiffs Have Demonstrated Ownership of Their Works</u>

Defendants' contention that Plaintiffs have failed to demonstrate ownership of eleven works identified at Def. PCL ¶ 41 and Def. PFF ¶¶ 188-98 is also wrong. Appendix A to Plaintiffs' Post-Trial Proposed Findings of Fact compiled the evidence related to each of these works, but for the convenience of the Court we reprise that evidence here specifically as it relates to Plaintiffs' ownership of the eleven works challenged on this basis:

- *The SAGE Handbook of Qualitative Research* (2nd edition) (pp. 733-68); *Inside Interviewing: New Lenses, New Concerns* (pp. 415-28); *Handbook of Feminist Research: Theory and Praxis* (pp. 71-106); *Handbook of Narrative Inquiry* (pp. 35-75):  SAGE's copyright registration certificates for these works (each filed within five years of publication) establish a presumption of SAGE's ownership, including to the identified contributions, which Defendants have not rebutted with any evidence.[10]  PX 282, 295, 247, 261. In addition, Ms. Richman testified that "we have a policy that states that every contributing author must sign an agreement with us."  5/18 Tr. 64:24-65:4 (Richman).  For the *Handbook of Narrative Inquiry* (pp. 35-75), SAGE produced an assignment from the joint author of the identified excerpt, Jean Clandinin.

---

[10] As discussed above, Defendants' rely heavily on the section 410(c) presumption (or lack thereof) in attacking Plaintiffs' showing of originality; obviously they should not be able to disclaim the presumption when it cuts against them.

904437.1

- *Behavior, Society, and Nuclear War, Vol. 1* (pp. 8-15, 19-48):  Oxford owns the work by virtue of its contract with the author, the National Academy Press for the National Academy of Sciences.  PX 360.  Oxford's certificate of registration (filed within five years of publication) states that the National Academy Press is the "author for hire of entire book" and establishes a presumption of ownership, including ownership of the contributions (which are part of the "entire book"), that has not been rebutted.  PX 361.

- *Film Language: A Semiotics of the Cinema*: Oxford's registration certificate (filed concurrently with publication) creates a presumption of ownership of the English translation which GSU has not rebutted.  In any event, Oxford's contract with the foreign publisher that owns the work, which is in evidence, grants Oxford exclusive rights in the English translation.  PX 391, 393.

- *A World of Babies*:  Defendants do not appear to dispute that Cambridge owns pages 91-112, which were also distributed to students.  *See* Pl. PFF App. A 132-33.   Cambridge owns page 27, which is part of the introductory chapter by the editors, Judy De Loache and Alma Gottlieb, through its contract with Ms. De Loache and Ms. Gottlieb.  PX 148 ¶ 1.

- *Regimes and Democracy in Latin America: Theories and Methods* (pp. 39-50): Defendants do not appear to dispute that Oxford owns pages 1-38, which were also distributed to students.  *See* Pl. PFF App. A 128-129.

- *Handbook of Social Theory* pages 217-228:  SAGE owns the excerpt via assignment from Gary Fine, who signed the agreement "on behalf of [his] co-authors."  PX 290.

- *A History of Feminist Literary Criticism* (pp. 322-335):  Defendants are correct that Cambridge did not produce a contributor contract for the specified excerpt.  However, Cambridge's Mr. Smith testified that Cambridge would never publish a work where it did not have all rights to do so.  5/17 Tr. 64:8-22.

## II. DEFENDANTS' CITATIONS TO EXHIBITS THAT ARE NOT IN EVIDENCE AND DEPOSITION TESTIMONY THAT WAS NOT PRESENTED TO THE COURT SHOULD BE DISREGARDED

Defendants fail in many cases to cite any trial exhibits or testimony for their assertions.  *See*, *e.g.*, Def. PFF ¶¶ 199-207, 508, 654.  They also rely on exhibits that are not in evidence.  For example, Defendants cite Plaintiffs' Exhibit 378 in Paragraphs 186, 628, and 637, but the Court refused to admit this document. Defendants rely on other exhibits that are not in evidence and therefore should be disregarded, including:

- PX 683 (cited in Def. PFF ¶¶ 34, 37)
- DX 905 (cited in Def. PFF ¶ 289)
- DX 508 (cited in Def. PFF ¶ 314)
- PX 49 (cited in Def. PFF ¶¶ 390, 391, 394, 395)
- DX 810 (cited in Def. PFF ¶ 480)
- DX 558 (cited in Def. PFF ¶¶ 491, 496)

Defendants also rely on deposition testimony that was not presented to the Court and, therefore, is not in evidence (*see* 5/20 Tr. 91:6-9), and therefore should be disregarded.  For example, Defendants cite the following excerpts from the deposition of Jennifer McCoy that were not played in Court and are not in evidence: 44:6-12, 45:4-12, 46:3-9, 48:14-18 in support of Def. PFF ¶ 543.  In

904437.1

addition, Defendants do not provide specific citations to the excerpts of the

deposition from Daphne Greenberg that were played at trial (*see* Def. PFF ¶¶ 289-

99) instead citing the entirety of pages 6, 7, 9, 10, 12, 13, 16, 17, 19, 21, 22, 24, 25,

26, 36, 37, 40, 47.  Only limited excerpts from these pages were played for the

Court and were admitted in evidence. Thus, the Court should ignore Defendants'

Proposed Findings of Facts paragraphs 289-299.

## III.   DEFENDANTS HAVE NOT MET THEIR BURDEN OF ESTABLISHING THAT THEIR COPYING IS FAIR USE

Against Plaintiffs' prima facie showing of infringement of their works, it is

Defendants' burden to prove fair use.  *See* Pl. PCL ¶ 33.  As Plaintiffs

demonstrated in their post-trial Conclusions of Law, at least three of the four fair

use factors, including the more important first and fourth factors, weigh heavily in

their favor.  Nothing in Defendants' submission alters that conclusion.

The lack of merit in Defendants' fair use arguments becomes apparent once

it is recognized that: (1) Congress did not intend the reference to "teaching" among

the illustrative potential fair uses identified in section 107 of the Copyright Act to

constitute per se authorization for systematic copying activity in the name of

education; (2) a nonprofit educational purpose is just one consideration in the fair

use calculus – one that is not in itself determinative even of Factor 1, much less of

the aggregate fair use assessment; (3) transformative uses – not "education" or "learning" – lie at the heart of fair use, and straight reproduction for teaching is not a transformative use; and (4) each of the alleged infringements deprived Plaintiffs of sales revenue or permissions fees to which they were entitled and on which they rely – an economic fact of life that, if GSU's practices were to become widespread, would fundamentally impair the viability of Plaintiffs' businesses.  Each of these factually supported and legally sound conclusions is incompatible with Defendants' fair use defense, which surely explains their refusal to acknowledge them.

Virtually all of the many errors that permeate Defendants' fair use discussion have already been addressed thoroughly in Plaintiffs' post-rial conclusions of law.  Those that bear special emphasis are discussed further below. In their post-trial filings, Plaintiffs demonstrate the yawning gap between the Copyright Act, the case law construing it, and the pertinent legislative history, on the one hand, and Defendants' sweeping contention that fair use confers upon non-profit educational institutions an almost unlimited privilege to freely appropriate copyright content, on the other.  This grossly distorted view of the law, which has continued to guide GSU copyright practice under the 2009 policy, warrants

904437.1

imposition of an injunction along the lines proposed by Plaintiffs that will bring

clear, fair criteria to bear on GSU's approach to fair use.

### A.   Factor 1:  The Nature and Purpose of the Use

####   1.   The lack of transformative value weighs heavily against fair use

Uses of copyrighted works that have transformative value lie at the heart of

Factor 1 and of the fair use doctrine generally.  *See* Pl. PCL ¶¶ 40-51.  There is no

legitimate question that the alleged infringements here – all of which involve

straight digital copying of Plaintiffs' works – are not transformative uses: they are

not.  *See* Pl. PCL ¶¶ 43-51.  Defendants nevertheless make a half-hearted effort to

preserve the possibility of a finding of transformativeness as to at least some of the

alleged infringements based on certain faculty members having mistakenly

believed their teaching use to have been transformative.  Defendants' main focus,

however, is to urge the Court to read this crucial element out of the fair use

analysis as it pertains to the copying in this case.

####   a.   The nature and importance of transformative value

Defendants' approach to fair use – specifically, their effort to downplay the

significance of the degree to which the challenged copying is transformative –

betrays a failure to understand the relationship between the fair use doctrine and

the concern of copyright law with the creation and dissemination of *new works of*

904437.1

*authorship.  See* 17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original

works of authorship fixed in any tangible medium of expression . . . .").  The

"central purpose" of the fair use Factor 1 inquiry is "whether *the new work*" merely

supersedes the original or, instead, adds something new," that is, "whether and to

what extent *the new work* is transformative."  *Campbell v. Acuff-Rose Music, Inc.,*

510 U.S. 569, 578-79 (1994) (emphasis added).

     Fair use is not, in other words, a balancing test that weighs "the social,

political and cultural benefits of the use" in the abstract against "any consequent

losses to the copyright proprietor."  Def. PCL ¶ 82 (quoting Paul Goldstein,

GOLDSTEIN ON COPYRIGHT § 10.2.1. at 10:19-20 (1996)).  Fair use instead generally

takes the form of transformative *works of authorship* that serve as vessels of the

social, political, and cultural benefits the fair use doctrine contemplates; it is, with

limited exceptions, anchored to new copyrightable expression.  A good classroom

discussion may be desirable because it advances learning, but it is not, by itself, a

concern of copyright law.  *See Texaco*, 60 F.3d at 924 (noting that the illustrative

fair uses listed in section 107 "refer primarily to *the work of authorship alleged to

be a fair use*, not to the activity in which the alleged infringer is engaged")

(emphasis added).

Defendants assert erroneously that teaching "is, arguably, in and of itself a transformative use." Def. PCL ¶ 80. This is not the case, as GSU's testifying faculty and Dean of Libraries intuitively understood. *See* Pl. PCL ¶ 43.[11] The claim that it is, or even might be, is refuted by the observation in *Campbell* – on which Defendants elsewhere rely – that "straight reproduction of multiple copies for classroom distribution" is "[t]he obvious statutory *exception* to th[e] focus on transformative uses." 510 U.S. at 579 n.11 (emphasis added).[12] It is thus irrelevant that an English teacher "may assign the reading of prose to teach a literary technique, whereas the original use was for entertainment or pleasure," (Def. PCL ¶ 80) because the reading is not transformed in any way by how it is taught. Any contrary claim shows a misunderstanding of what transformative value – and, more broadly, fair use – is.

The challenged ERes and uLearn uses are paradigmatic nontransformative uses because they do not give the copied works "a further purpose or different character," "alter[]" it with "new expression, meaning, or message," *Campbell*, 510

---

[11] During closing argument, Defendants' counsel conceded that "the majority" of the alleged infringements were nontransformative. 6/7 Tr. 53:17-54:6.

[12] Only one of the illustrative fair uses – teaching – is involved in this case. Contrary to Defendants' erroneous assertion (*see* Def. PCL ¶ 80), reproduction for purposes of classroom teaching is not criticism, comment, or scholarship within the meaning of section 107 of the Copyright Act.

U.S. at 579 (citations omitted), or, as Defendants put it, "giv[e] the work a new purpose or usefulness," (Def. PCL ¶ 58) within the meaning of the law of fair use. Plaintiffs' books are published principally for the academic market in the hope that they will be assigned as course readings; academia is Plaintiffs' principal market. *See* Stipulated Fact 12. When a GSU professor authorizes the copying and distribution to students of excerpts from one of Plaintiffs' books via ERes or uLearn without payment to or permission from the publisher, he or she is not furthering the purposes of copyright by adding anything new or different to the original work; rather, when portions of Plaintiffs' copyrighted books are chosen by professors as readings for their courses and made available to students as part of their coursework via ERes or uLearn, they are being used *exactly as they were intended to be used by Plaintiffs.*

Posting excerpts to ERes or uLearn thus directly supplants Plaintiffs' market, which is precisely why the lack of transformative value weighs so heavily against fair use. *See Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1311 (11th Cir. 2008) ("[A] work that is not transformative . . . is less likely to be entitled to the defense of fair use because of the greater likelihood that it will 'supplant' the market for the copyrighted work. . . .") (citation omitted). As the Court correctly observed during closing arguments:

904437.1

29

> The student was supposed to read the excerpts and then, I guess, in some cases they were discussed in class.  And that is not a transformative use, it is just the materials being used in the way the author intended for them to be used.

6/7 Tr. 52:23-53:2.

### b.   The case law makes clear that alleged infringements are not transformative

In attempting to show that an educational purpose is, by itself, transformative, Defendants rely on two cases that actually undermine their position.  *See* Def. PCL ¶¶ 72-75.  Both *Sundeman v.  Seajay Soc'y, Inc.*, 142 F.3d 194 (4th Cir. 1998), and *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), involved uses of copyrighted works in the creation of scholarly texts – transformative works – that fell squarely within the zone of protected fair uses, consistent with the purpose of copyright law to stimulate the creation of new copyrightable expression.  In *Sundeman*, for example, the court found transformative value in the defendant's paper analyzing the unpublished manuscript at issue:

> A reading of Blythe's paper clearly indicates that she attempted to shed light on Rawlings' development as a young author, review the quality of *Blood of My Blood*, and comment on the relationship between Rawlings and her mother.  The "further purpose" and

> "different character" of Blythe's work make it transformative, rather
> than an attempt to merely supersede *Blood of My Blood*.

142 F.3d at 202.  In *Bill Graham Archives,* the Second Circuit found that the

reproduction of the plaintiff's concert posters in an illustrated history of the

Grateful Dead was transformative because the images were used for a different

purpose than the purpose for which the images were created: they were used "as

historical artifacts to document and represent the actual occurrence of Grateful

Dead concert events" in a manner "that fulfill[ed] [the] transformative purpose of

enhancing the biographical information" in the book.  448 F.3d at 609-10.

These cases lend no support to the notion that fair use protects the

dissemination of knowledge through the unauthorized dissemination of *existing*

copyrighted works, which is what Defendants are doing.  The distinction between

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989), and *Sundeman*, *supra*,

clearly illustrates the point.  In *Sundeman*, the nonprofit educational purpose

involved a use consistent with the purpose of copyright law:  the creation of an

original work of scholarship based on the copyrighted text at issue.  In *Weissman*,

by contrast, the defendant professor deleted the plaintiff's name from a scientific

paper and substituted his own, added three words to the title, and made fifty copies

to be distributed to his students in a coursepack.  The Second Circuit held that the

use was "for the same intrinsic purpose" as the plaintiff's: "as an adjunct to lectures delivered in professional symposia," which "seriously weakens a claimed fair use," 868 F.2d at 1324, despite the nonprofit educational purpose of the copying.

Likewise, in *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000), the court found that the defendant church's free distribution of a large number of unauthorized copies of plaintiff's book *Mystery of the Ages,* which involved no "intellectual labor and judgment," *id*. at 1117, was not fair use simply because it had a religious and educational purpose. *See id.* at 1117-18. The differing results in these cases – explicable by the creation of transformative works of authorship in *Sundeman* and *Bill Graham* but not in *Weissmann* or *Worldwide Church of God* – illustrates the error in Defendants' claim to fair use protection based solely on the generic public interest in "promot[ing] the progress of science, e.g., learning." Def. PCL ¶ 79.[13]

---

[13] Defendants cite no authority for the proposition that the distinction between commercial and nonprofit educational purpose "has been described as whether the defendant's use served the defendant's private commercial interests or the public's interest in education." Def. PCL ¶ 79. "Education" in the abstract is not a concern of copyright law.

Similarly, Defendants' suggestion that the alleged infringements here are analogous to the scenario referenced in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 455 (1984), of "a teacher who copies for the sake of broadening his personal understanding of his specialty," (Def. PCL ¶ 85) is disingenuous.  This case does not involve copying for a teacher's personal study; it involves systematic, institution-wide copying for entire classes of students as a substitute for either purchasing or licensing authorized copies.[14]

Finally, contrary to Defendants' assertion (*see* Def. PCL ¶ 62), the Supreme Court has stated expressly that transformativeness, not "teaching," is at the heart of fair use.  *See* Pl. PCL ¶ 40.  Although "teaching" is among the illustrative fair uses listed in the preamble to section 107, the fact that straight reproduction for teaching purposes is nontransformative is the very reason that it – alone among the illustrative fair uses – is the subject of special guidelines embedded prominently in the legislative history of section 107.  Congress made a point of inserting the

---

[14] In *Sony* the Supreme Court found that the time-shifting of television programs through use of the Sony Betamax videocassette recorder by consumers was fair use despite the absence of transformativeness because the time-shifting did not result in market substitution for the plaintiffs' programming.  *See* 464 U.S. at 448-56.  Home taping, the Court found, affected only when, not whether, the programs were watched.  Here, by contrast, the market displacement is direct and obvious.  *Sony* is inapposite.

904437.1

Classroom Guidelines into the legislative history because it wanted to ensure that narrow limits would be placed on the scope of fair use for classroom copying, given the strong potential for market harm presented by such nontransformative copying.  *See* Pl. PCL ¶¶ 53-59.

> **2.    Defendants exaggerate the significance of an educational purpose**

Plaintiffs have already explained at length why the educational purpose of the alleged infringements should carry only limited weight in this case.  *See* Pl. PCL ¶¶ 61-63.   We emphasize two points.  First, giving dispositive weight to the nonprofit educational purpose of the copying without regard to the other fair use factors, as Defendants effectively urge, would improperly disregard Congress' intended incorporation of the Classroom Guidelines into the classroom-copying fair-use mix. As the Classroom Guidelines indicate, the "special place for education" under Factor 1 (Def. PCL ¶ 62) is of very modest significance.

Defendants' effort to minimize the significance of the Classroom Guidelines, including by claiming that they are "dated" because they predate *Campbell* (*see* Def. PCL ¶ 65) does not stand up against all the reasons they should be accorded substantial weight.  *See* Pl. PCL ¶¶ 52-59.  The Sixth Circuit in *Princeton University Press* – decided after *Campbell* – did not view them as dated,

and the fact that the challenged uses here are digital should make no difference. *See Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1257 (11th Cir. 2008) (noting that copyright law is "media neutral").  That Congress may have intended for fair use generally to be "fluid" (Def. PCL ¶ 65) has no bearing on the continuing need for appropriate constraints on the reproduction of multiple copies of copyrighted materials for classroom teaching.  That advances in technology have made that activity faster and cheaper from the standpoint of the users if anything reinforces the propriety of guidelines such as the Classroom Guidelines to rein in excessive copying of the type exhibited at GSU.

Second, Defendants' reliance on their nonprofit educational purpose is inconsistent with their acknowledgement that the Supreme Court has rejected the notion of presumptive fair uses.  *See* Def. PCL ¶ 60.  Defendants themselves rely on the lack of fair use presumptions in attempting to downplay the importance of transformative value (*see id.* ¶ 59), and their own expert has called the belief that a nonprofit educational use is necessarily a fair use a "myth" and "wrong" (*see* 6/3 Tr. 12:23-13:5 Crews).  Defendants want it both ways:  presumptions do not exist if they relate to the importance of transformative value, but they are dispositive when they relate to a nonprofit educational purpose.  In fact, as Defendants acknowledge, even the illustrative fair uses must be evaluated in accordance with

904437.1

35

the four statutory factors (*see* Def. PCL ¶ 49), and the alleged infringements here do not come close to surviving that four-factor scrutiny.

### 3. *Princeton University Press* and *Basic Books* are highly relevant

Defendants' contention that *Princeton University Press*, 99 F.3d 1381,  and *Basic Books*, 758 F. Supp. 1522, are "irrelevant to the pure educational environment focused on students and professors," (Def. PCL ¶ 68) is wrong.  The end use of the copied materials in those cases – classroom teaching – was exactly the same as in this case, and the courts in those cases both focused not on "the commercial use being made by the copyshops," (*id.*) as Defendants contend, but rather on the impact of the unauthorized, nontransformative copying on the market for the plaintiffs' works, which is no less deleterious in this case.  The courts noted and accorded weight to the commercial character of the defendants, but it was not the dispositive element in the courts' reasoning.  *See* Pl. PCL ¶ 67 and n.8.  To accord its inverse (the nonprofit educational nature of the defendant) dispositive weight here would distort the import of those decisions, and would unduly emphasize one subsidiary element of the overall fair use analysis at the expense of the balance of the fair use factors.

\* \* \*

In sum, for the foregoing reasons and those previously addressed, Factor 1 weighs heavily in Plaintiffs' favor.

## B.   Factor 2:  The Nature of the Copyrighted Work

Defendants' argument as to Factor 2 – that it weighs in favor of fair use because Plaintiffs' works are factual (*see* Def. PCL ¶ 90) – is overly simplistic and wrong for the reasons already set forth in Plaintiffs' post-trial brief.  *See* Pl. PCL ¶¶ 74-80.  Defendants cannot ignore the law of this Circuit, which recognizes that even nonfiction works can contain creative elements and are, accordingly, entitled to weight in the fair use analysis.  *See Letterese*, 533 F.3d at 1312 (finding with respect to a manual on sales techniques that "notwithstanding its informational nature," it contains "original and creative expression" and concluding that Factor 2 was neutral).[15]

Defendants cannot credibly deny that Plaintiffs' scholarly works contain creative elements after their own witnesses uniformly admitted the obvious fact

---

[15] Defendants state misleadingly that "the courts in coursepack cases have held that the nature of scholarly, fact-based works weighs in favor of fair use," when the only case to have so held (and which otherwise held virtually parallel practices to be infringing) is the only one they cite: *Basic Books, supra*.  *See* Def. PCL ¶ 94. By contrast, in *Princeton University Press*, *supra*, a circuit court decision that Defendants ignore, the court found that academic coursepacks were "certainly not telephone book listings" but, instead, "contain[ed] creative material, or 'expression'" and awarded Factor 2 to the plaintiff publishers.  99 F.3d at 1389.

that they do.  As the Court correctly observed with respect to Oxford's book *The Slave Community*: "It would be a creative work in the sense that the person who wrote the book had to go out and do research and evaluate the facts."  6/7 Tr. 59:24-60; *see also* 5/17 Tr. 29:13-17 (Court observing that "that type of research effort would necessarily involve qualitative choices by the researcher such that it would be hard to say that it's not creative").

In short, because Plaintiffs' nonfiction works are not simply factual compilations but contain obviously creative elements, Factor 2 should tilt in Plaintiffs' favor, as in *Princeton University Press*, or at worst be neutral, as in *Letterese*.

### C. Factor 3:  The Amount and Substantiality of Portion Used

Defendants' theory for their Factor 3 analysis – that an average quantitative percentage of all the takings at issue below a certain level weighs in favor of fair use – is unsupported by any legal authority.

#### 1. Defendants cannot hide behind irrelevant statistics

Defendants attempt to obscure the excessive takings they have enabled and tolerated by resort to irrelevant statistics, *i.e.*, by contending that "the average use" of the 75 representative takings is "only approximately ten percent . . . of the entire work."  Def. PCL ¶ 99.  Defendants do not and cannot cite any authority for

measuring the amount taken by averaging all the infringements – a notable departure from the work-by-work approach on which they otherwise insist.

They further distort the analysis by removing the most prolific alleged infringers from the calculation (*see* Def. PFF ¶ 204) despite the fact that their conduct, no less than that of the other professors, occurred under Defendants' supervision pursuant to a policy promulgated by the Board of Regents after this lawsuit had put them on notice of the infringement problem.  The attempt to so dismiss Professor Kaufmann's conduct is particularly inappropriate, as she was specifically identified as a recidivist infringer in the Complaint.  *See* Pl. PFF ¶ 289.

Overall, Defendants' hide-the-ball statistics cannot mask the fact that more than one-third – 28 – of the alleged infringements involved takings ranging from 10 to 30 percent of the entire book.

## 2.    Each separately authored chapter is a complete work

Defendants' statistics also obscure the true magnitude of the copying by failing to account for the fact that separately authored chapters in edited volumes (compilations) are distinct copyrighted works as a matter of law.  *See* Pl. PCL ¶¶ 84-87.  A Factor 3 analysis should examine how much of each of these individual contributions, not how much of the entire book of which they are a part, was copied.  Treating a copy of a separately authored chapter in *The SAGE*

*Handbook of Qualitative Research* as two percent of the whole book rather than as 100 percent of the author's contribution makes no sense: the level of copyright protection for that contribution should have nothing to do with how many other essays happen to be collected into the same edited volume.  *See* Pl. PCL ¶ 86 n.11.

Notably, every one of the alleged infringements that is less than five percent of the entire book involves the copying of at least a full chapter from an edited volume.  *See* Pl. PCL ¶ 84.  Fully half of the books at issue (32 of 64) are edited volumes, meaning that the proper treatment of the chapters in those books as complete works would sharply increase all of Defendants' calculations as to the amount copied, including their favored "average" calculation.

### 3.      There is no quantitative safe harbor

Defendants' almost complete reliance on asserted percentages of the works taken is also legally untenable.  GSU's 2009 policy itself rejects the notion of a quantitative fair use safe harbor.  *See* 6/2 Tr. 62:19-63:6; 143:23-144:4 (Seamans).  And Defendants' own expert, Dr. Crews, acknowledged that the law provides no such bright-line guidance.  6/6 Tr. 44:3-11 (Crews).  Defendants nonetheless used Dr. Crews to put before the Court slivers of copyright policies apparently adopted by other colleges and universities in an effort to suggest otherwise.

While the arbitrarily selected sample of such policies contained a myriad of provisions relating to the application of the fair use doctrine to electronic uses of copyrighted materials, Dr. Crews, at the behest of Defendants' counsel, read into the record during his direct examination only those aspects of the policies that purported to establish a quantitative fair use safe harbor.  6/3 Tr. 26:21-38:9 (Crews); *id.* 38:25-39:17 (admitting non-scientific nature of survey conducted by his wife); DX 325.  He did so despite his knowledge that use of such strictly quantitative tests is arbitrary and not in keeping with fair use law; that the various policies cited include numerous other fair use criteria (6/6 Tr. 43:13-44:2);[16] that he does not know how any of these policies operates in practice (*id*. 42:11-43:7); that none of these policies has been tested for its conformance with copyright law; and that fair use determinations are case and situation-specific.  *See, e.g.*, *Maxtone-Graham v. Burtchaell*, 631 F. Supp. 1432, 1436 (S.D.N.Y. 1986) ("Since the doctrine of fair use is a legal doctrine having Constitutional implications, it cannot

---

[16] In fact, the policies include a variety of common factors, all of which are omitted from the USG copyright policy, such as (i) library oversight of fair use determinations; (ii) limiting material that can be posted to electronic reserves to one-term use without permissions (i.e., a prohibition against repeat use); and (iii) guidance that the total amount of readings should be a small proportion of total assigned readings for a course (stated differently, electronic reserves is not a substitute for coursepacks or anthologies).  6/6 Tr. 44:16-45:16, 48:8-12, 50:2-54:2l (Crews); DX 325; JX 4.

be subject to definition or restriction as a result of any . . . trade custom or practice, no matter how long continued."); *Meeropol v. Nizer,* 417 F. Supp. 1201, 1210 (S.D.N.Y. 1976), *reversed on other grounds*, 560 F.2d 1061 (2d Cir. 1977) ("Fair use is a legal question to be determined by the court not by alleged industry practice."); *BellSouth Advertising & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.,* 719 F. Supp. 1551 (S.D. Fla. 1988) (alleged "standard industry practice" is "not relevant to the fair use defense").

Undaunted by any of these constraints on the probative value of Dr. Crews' testimony, Defendants attempt to bolster their fair use claims based on the contention that the average amount of copying from Plaintiffs' works falls within the parameters of these arbitrarily chosen and selectively-described policies. It is surely a sign of desperation that Defendants would attempt to validate GSU's own copyright practices by reference to snippets drawn from Dr. Crews' wholly unreliable "survey" evidence relating to a criterion (a quantitative limit) that GSU itself declined to adopt.

### 4. The aggregate effect of the copying must be considered

Defendants' exclusive focus on a quantitative average also fails to account for the effect of aggregating the takings of Plaintiffs' works (and those of other publishers) in digital course reading compilations on ERes and uLearn. *See* Pl.

904437.1

42

PCL ¶ 15.  The relevance of this consideration to an evaluation of infringement claims of the type asserted here is well established.  As one of the House Reports underlying the 1976 Copyright Act recognized:

> Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented.

H.R. Rep. No. 90-83, 90th Cong., 1st Sess. (1967), at 35 (cited approvingly in H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976), at 67).

This concern with aggregation is echoed in the admonition in the Classroom Guidelines that copying "shall not be used to create or to replace or substitute for anthologies, compilations or collective works."  Agreement on Guidelines for Classroom Copying in Not-For-Profit Educational Institutions with Respect to Books and Periodicals, H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976), § III(A).  Both the ALA Model Policy and CONFU Policy featured in Dr. Crews' testimony specifically state that unpermissioned electronic reserves uses shall constitute only a small proportion of total assigned course readings (*see* 6/6 Tr. 48:8-49:19 (Crews)), a limitation that has been incorporated in Plaintiffs' proposed injunction.  *See* Docket No. 300-1 § III.B.2.  Finally, *Princeton University Press* and *Basic Books* both recognized the enhanced potential for market harm when faculty members build their courses in significant part on numerous unlicensed

reading materials. *See Princeton Univ. Press*, 99 F.3d at 1390 (citing the "systematic" character and "anthologized content" of coursepack copying as weighing against a finding of fair use); *Basic Books*, 758 F. Supp. at 1537-38 ("the fact that these excerpts were placed in anthologies weighs significantly against defendant"); *id.* at 1527-29 (describing contents of the coursepacks in which portions of the works at issue were included).

### 5. The qualitative effect of the copying must be considered

As for the qualitative aspect of the takings, Defendants (purporting to speak for the Court) simply assert that the portions used "were reasonable 'in relation to the purpose of the copying.'" Def. PCL ¶ 100 (citing *Campbell*, 510 U.S. at 586). But *Campbell* is inapposite. *Campbell* involved a song parody – a transformative use. The Supreme Court stated that for a parody to be effective, the parodist "must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." 510 U.S. at 588. In other words, the parody needs to incorporate as much of the original as necessary to fulfill its transformative purpose. This principle has no relevance to the nontransformative copying at issue here. "[P]roviding a quality education to students at the University," (Def. PCL ¶ 100) is not a transformative purpose and thus is entitled to no special latitude under Factor 3. Defendants would have the Court endorse as "reasonable"

904437.1

whatever copying GSU professors decide will serve their pedagogical needs. These cases do not support this proposition.

For all of these reasons, Factor 3 weighs heavily in Plaintiffs' favor.

### D.     Factor 4:  The Effect on the Market

Defendants' perfunctory Factor 4 analysis ignores the governing law and instead relies almost exclusively on record evidence that is both legally irrelevant and lacking in credibility.  *See* Def. PCL ¶¶ 101-04; Def. PFF ¶¶ 177-80. Defendants' principal arguments – that there is no record evidence of lost book sales and that Plaintiffs' assertion of lost permissions fees is circular and thus not cognizable – have no merit.

It is stipulated that Plaintiffs rely on income from sales of their books and journals, particularly at colleges and universities, to enable them to continue to publish high-quality scholarly works, and Plaintiffs have shown that GSU's infringing activities substitute directly for the purchase of the Plaintiffs' books. *See* Stipulated Fact 12; Pl. PCL ¶ 106.   Book sales (including sales of custom-published compilations) have been lost and will continue to be adversely impacted if professors continue to have one or more chapters of their books posted on ERes or uLearn rather than requiring students to purchase the books.  *See* Pl. PCL ¶ 106. The displacement of book sales seems especially likely given the practice of some

professors to rely largely or even exclusively on ERes or uLearn postings for course readings.  *See* Pl. PCL ¶ 129.

Similarly, it is stipulated that the market for Plaintiffs' works also includes "permissions" and that permissions represent a significant revenue stream for Plaintiffs.  *See* Stipulated Facts 95-99. These stipulations foreclose Defendants' claim that the unauthorized copying has had no impact on permissions fees.  It also strains credulity to suggest (as Defendants do) that professors would jettison leading texts in their fields, on which some of them have relied semester after semester (*see* Pl. PFF ¶ 228; Pl. PCL ¶ 91) rather than ask students to pay a modest permissions fee.  GSU finds a way to pay for coursepacks, electronic journal articles, and football and other student activities.  *See, e.g.*, Def. PFF ¶ 76 (GSU "spent close to $4 million on electronic materials in 2009, which included journal packages, databases, and e-book packages"); *id.* ¶ 72 (permissions fees have been paid for coursepacks); *id.* ¶ 78 (GSU students pay a $35 library fee).  In short, the claim that Defendants cannot be expected to figure out a way to cover modest fees for the right to post book excerpts on ERes or uLearn simply is not plausible. There is also no legal authority for the proposition that the asserted reluctance to pay for use of a copyrighted work justifies simply taking it under the guise of fair use.  The fact that Plaintiffs, working with CCC, have striven to make their works

readily available at affordable prices in digital form (*see* Pl. PCL ¶ 100; Pl. PFF ¶¶ 5, 11) further undermines GSU's argument that its refusal to pay for the right to use digital book excerpts should count in its favor under Factor 4.

As for Defendants' circularity argument that the existence of a licensing system cannot establish the need to obtain a license, it was expressly rejected by the Second Circuit back in 1994 in *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).  The *Texaco* court held that circularity was avoided if the market-harm analysis is confined to viable, existing, or likely to be developed markets for the plaintiff's work, of which CCC, even then, was recognized to be one.  As the Court stated:

> [T]he publishers . . . have created, primarily through the CCC, a workable market for institutional users to obtain licenses for the right to produce their own copies of individual articles via photocopying. The District Court found that many major corporations now subscribe to the CCC systems for photocopying licenses.  Indeed, it appears from the pleadings, especially Texaco's counterclaim, that Texaco itself has been paying royalties to the CCC.  Since the Copyright Act explicitly provides that copyright holders have the "exclusive rights" to "reproduce" and "distribute copies" of their works, and since there currently exists a viable market for licensing these rights for individual

journal articles, it is appropriate that potential licensing revenues for
photocopying be considered in a fair use analysis.

60 F.3d at 930 (citations omitted).  Defendants' suggestion that CCC is not an

established market for purposes of Factor 4 (*see* Def. PCL ¶¶ 102-03) cannot be

taken seriously; it is contrary to all relevant legal authority and to the trial record.

Defendants have admitted that CCC "created the market for licensing copyrighted

material," (Def. PFF ¶ 162); the GSU policy instructs faculty that "CCC should be

your starting point if you are looking to get permission for a text-based work" and

that CCC "can grant permission for thousands of works, many instantly online"

(JX 4 at 15); and it is stipulated that permissions fees are an important source of

revenue for Plaintiffs and that CCC offers a variety of licensing services for

academic users covering a huge number of works.  *See* Stipulated Facts 14-39.

None of Defendants' outdated and/or misleading assertions concerning CCC affect

these undisputed facts.[17]

Second, Defendants' hypothetical objection to being required to pay

permissions fees for "a single page," (Def. PCL ¶ 103) should be saved for the case

---

[17] For instance, Defendants claim that subscribers to the AACL are offered a
"limited number of titles" and "only 17%" of the titles in the AACL repertory
include digital rights.  Def. PFF. ¶¶ 124, 125.  In fact, subscribers to the AACL are
offered access to a "huge number of titles" in the AACL repertory: approximately
2 million titles for both digital and print rights.  5/20 Tr. 71:3-7 (Armstrong).

in which the taking of a single page is claimed to be an infringement.  The takings

here consist of one or more full chapters from Plaintiffs' works (*see* Docket

No. 361) – far in excess of what can reasonably be claimed to be fair use.

Defendants' counterfactual assertion that evidence admitted at trial showed

that "exposure to a given work by means of an excerpt can and does stimulate

persons to purchase the work" (Def. PCL ¶ 104) is legally irrelevant.  On those rare

occasions where courts mention the potentially sales-stimulating effect of an

infringer's use on the market, that effect does not itself weigh in favor of finding

fair use; it is offered as additional support for a conclusion that the use has no

*negative* effect on the market for the original.  *See, e.g.*, *Bill Graham Archives*, 448

F.3d at 615 n.5.

In any event, there is no admissible evidence of stimulated purchases of any

of the works at issue by GSU students.  *See* Pl. PCL ¶ 132 n.19.  It is disingenuous

to claim that students who supposedly cannot afford modest permissions fees

nonetheless will rush out to purchase entire books after reading assigned excerpts

from those books.  As the Court surmised, it might perhaps occur "sporadically,"

(6/7 Tr. 66:15-19) with a "negligible" effect.  *Id.* 67:7-8.  *See also* 5/19 Tr. 84:22-

85:7 (Oxford's Niko Pfund testifying that in his experience "it is the rare student

who takes the initiative to read more than is assigned to them").  Even if there were

an occasional sale stimulated by access to a free excerpt of one of Plaintiffs' books, it could not be assumed to negate the likely overall adverse market impact of providing free book excerpts to entire classes across the university.

Finally, Defendants have no right to infringe Plaintiffs' works on the premise that it benefits Plaintiffs. It is the exclusive prerogative of the copyright owner to exercise its copyright rights in a manner it believes is likely to stimulate sales of the copyrighted work. Thus, for example, Cambridge has the exclusive right to authorize Google and Amazon to post portions of its books in order to stimulate sales (*see* 5/18 Tr. 22:25-24:2, 37:6-39:20 (Smith)) and to provide complimentary copies to professors in the hopes that they will assign them to their students (*see id.* 20:21-24 (Smith)). By contrast, when GSU professors have book excerpts posted on ERes or uLearn as required readings, they are doing so without the publisher's permission and are not acting for the purpose of stimulating sales. *See id.* 39:21-40:8 (Smith).

In the end, Defendants cannot dispute the testimony of Plaintiffs' witnesses that continuation of the conduct represented by the alleged infringements will have a serious adverse effect on their ability to continue their publishing activities, which, ultimately, also will harm GSU by shrinking the supply of scholarly texts that are the foundation of university teaching.

904437.1

50

E.     **Defendants Have Not Mounted a Fair Use Defense for Every Professor Who Infringed Plaintiffs' Works**

Eight professors identified in Plaintiffs' Revised Filing Concerning Plaintiff Works Alleged to be Infringed at GSU During the 2009 Maymester, Summer 2009, and Fall 2009 Academic Terms (Docket No. 361) did not testify at trial, either live or by deposition.  Accordingly, Defendants have failed to carry their burden of proof to establish that Professors Angorro, Barker, Freeman, Harvey-Wingfield, Lasner, McCombie, Ohmner, and Whitten made proper fair use determinations.

The only "evidence" Defendants offer with respect to these professors is out-of-court statements contained in trial exhibits.  In light of the admissions of several professors who did testify that they did not complete checklists prior to requesting that readings be posted on ERes or uLearn (a fact that was not apparent from the recreated checklists that bear misleading 2009 dates),[18] the Court should give no weight to the out-of-court statements of these non-testifying witnesses concerning their purported fair use determinations and should instead hold that Defendants

---

[18] *See, e.g.*, Trial Transcript Volume 6, Docket No. 404 ("5/24 Tr.") 112:18-24 (Kim); 5/25 Tr. 30:15-22 (Kim cont.); 5/25 Tr. 103:18-23, 114:4-6, 118:6-10 (Davis); Deposition of Dennis Gainty, Docket Nos. 323, 380 ("Gainty Dep.") 47:13-15, 20 (videotaped deposition played in Court, Trial Transcript Volume 9, Docket No. 407 ("5/27 Tr.") 96).

904437.1

have failed as a matter of law to carry their burden of proof as to the corresponding

alleged infringements.

## IV. DEFENDANTS' PORTRAYAL OF THE 2009 POLICY AS EFFECTIVE IN AVERTING INFRINGEMENT IGNORES THE EVIDENCE

Defendants' effort to defend the 2009 policy flies in the face of the

overwhelming record evidence of its ineffectiveness. The rampant infringements

of Plaintiffs' works that result from faculty attempts to follow the Fair Use

Checklist make clear that this tool is anything but an "appropriate and effective"

one for facilitating copyright compliance. Def. PCL ¶ 113. The legally relevant

attributes of the current policy are the uniformly erroneous fair use determinations

that have resulted from use of the Checklist (*see* Pl. PFF ¶¶ 203-22; Pl. PCL

¶¶ 147-69) not the palliatives relied on by Defendants such as password protected

access to ERes and "citation to the original source of publication." Def. PCL

¶ 108. It is clear, moreover, that the alleged infringements flowed directly from the

policy – as Defendants implicitly concede by defending the fair use determinations

on the ground that they were arrived at by the professors working through the

Checklist.

As the trial record shows, professor after professor following the policy still

believed that having one or more chapters of Plaintiffs' works (including the

904437.1

entirety of many authors' contributions to edited volumes) posted on ERes or uLearn was fair use – indeed believed that the policy blessed unauthorized copying ranging from 5,500 words to more than 100,000 words, and up to seven chapters and 151 pages, of Plaintiffs' books.  Not a single professor following the policy found that even *a single statutory fair use factor* on the Checklist weighed against fair use.  *See* Pl. PCL ¶ 169.  The bottom line is that regardless of whether the policy may have seemed cautious on paper to those who adopted it, it has proven to be anything but *in practice*.

The trial record shows resoundingly that putting in place a policy that delegated responsibility for copyright compliance entirely to the faculty, without any substantive oversight and without any enforcement procedures to detect and remedy abuses, did not solve the copyright infringement problem at GSU, and thus, did not, as Defendants contend, discharge their legal obligations.  *See, e.g.*, Defendants' Conclusions of Law, Docket No. 343 ¶ 62 ("Defendants developed and adopted the Policy.  By doing so, the Defendants effectively addressed the 'wrong' identified in the Complaint.").

### A.     Defendants' Claims Concerning the Effectiveness of the Policy Are Contradicted by the Trial Record

Many of Defendants' characterizations of the alleged infringements at GSU (*see* Def. PFF ¶¶ 199-207) are simply counsel's arguments presented in the guise of record evidence.  Most fundamentally, Defendants' assertion that the "limited usage of plaintiffs' works by professors at Georgia State University fails to prove an ongoing and continuous misuse of the fair use defense by Georgia State or the Board of Regents" (Def. PCL ¶ 207) is directly contradicted by the wealth of evidence as to how GSU's copyright policy has encouraged, rather than curtailed, ongoing infringement.  Pl. PFF ¶¶ 174-222.

In practice, GSU's copyright policy is not "appropriate and effective" or "competent and balanced," and it surely has *not* "resulted in considered and legally correct fair use determinations."  Def. PFF ¶ 1.  The suggestion that the Checklist is "more cautious than necessary about the exercise of fair use," (Def. PFF ¶ 171) exemplifies Defendants' cavalier view of the rampant copyright abuse at GSU and its disregard of the trial reord.  Dr. Crews, the source of this characterization, formed his opinion as to GSU's policy *before being informed of the record evidence as to how the policy actually has been implemented.  See* 6/3 Tr. 15:1-17, 125:15-127:10 (Crews).  Cross-examination exposed that the factual supposition

underlying his opinion, namely, the purported existence of active oversight of fair use determinations by library staff (*see* Def. PFF ¶¶ 169-70) was false.  *See* Pl. PFF ¶ 144, 191; Def. PFF ¶¶ 98-99 (conceding lack of library oversight).  When asked whether "red flag" review limited to library staff flagging huge portions of a book was consistent with his conception of a meaningful library review process, Dr. Crews responded, "I am going to give you a very direct answer. . . . And the answer is, no."  6/3 Tr. 137:24-138:4 (Crews).  As we show further below, the policy fails in a number of respects to live up to Defendants' spin.

### 1.    Ineffective training

The 2009 policy is not meaningfully supported by "educational programs," (Def. PFF ¶ 1) even though Dean Seamans testified that the Select Committee knew that faculty needed "some education and training in copyright," (6/2 Tr. 125:5-10 (Seamans)) in order to be able to make the fair use determinations required by the policy.  The trial record demonstrates the paucity of educational support provided to faculty.  Most of the testifying professors (11 out of 16) believed that training was optional and had readings posted on ERes and uLearn without ever attending a training session (*see, e.g.*, 5/25 Tr. 61:17-25 (Orr); *id.* 98:22-99:1 (Davis); 5/26 Tr. 142:15-21 (Hankla)).  Moreover, the little training that was offered was of such poor quality that even those professors who did attend

904437.1

training (e.g., Kaufmann, Esposito, Dixon, Greenberg) were no better informed than those who did not.

Professor Kaufmann, for example, was identified in the Amended Complaint as an egregious infringer (*see* Docket No. 39 ¶ 23), and she was singled out for training in the new policy by Cynthia Hall of GSU's Office of Legal Affairs in advance of her deposition in this case (*see* Trial Transcript Volume 5, Docket No. 403 ("5/23 Tr.") 45:15-47:1).  Yet Professor Kaufmann still had seven chapters and 151 pages of *The SAGE Handbook of Qualitative Research* posted on ERes for the Fall 2009 semester, thus continuing the very infringing conduct of which Plaintiffs had specifically complained.  Ms. Hall never advised Professor Kaufmann that her ERes postings were not fair use (*see* 5/23 Tr. 66:12-67:5). Instead, she told Professor Kaufmann that each of the fair use factors was to be weighted equally (*id.* 47:24-48:2), and told her that keeping her takings to under 15 percent of the book would be "safe" (*id.* 89:21-90:3).  The Department of Legal Affairs endorsed Professor Kaufmann's view that assigning multiple chapters from *The SAGE Handbook of Qualitative Research* would not hurt sales of the book because students would not otherwise have known about it (*see* Deposition of Jodi Kaufmann, Docket Nos. 173, 373 ("Kaufmann Dep.") 57:12-25 (videotaped deposition played in Court, 5/23 Tr. 94)) and apparently never advised her that,

904437.1

*inter alia*, posting the same chapters in multiple semesters was repeat use and that she needed to investigate the availability of licensing *before* making her fair use determination. *See* 5/23 Tr. 94:15-96:23, 101:3-21 (Kaufmann). No wonder Defendants have attempted to deflect focus from Professor Kaufmann's conduct. *See* Def. PCL ¶ 99; Def. PFF ¶ 206.

### 2.     Infringement is ongoing under the 2009 policy

Likewise, the contention that "the effectiveness of the 2009 Copyright Policy is reflected in the diminishing number of alleged infringements," (Def. PFF ¶ 3) has no basis in fact and is irrelevant as a matter of law. There is no authority for the premise that copyright infringements should be legally excused on the basis that the Defendants' infringing conduct has diminished over time. Nor is there any record support for the assertion that the 2009 policy has brought about a meaningful diminution in infringing activity. The evidence as to infringements of Plaintiffs' works during the three representative terms belies any such conclusion. The Court properly rejected Defendants' attempts at trial to prevent Plaintiffs from demonstrating persistent infringement dating back to prior time periods while at the same time contending they should be permitted to show a diminishing number of infringements over a similar period. *See* 6/2 Tr. 94:24-97:19.

904437.1

Finally, Defendants cannot excuse their own infringing conduct by alluding to courses and uses of other works as to which no infringements were alleged.  It is no defense to infringement to demonstrate how many copyrighted works, whether of Plaintiffs or others, were not infringed.  *Cf. Letterese*, 533 F.3d at 1315 (citing authority for the proposition that a taking cannot be excused by showing how much of the copyrighted work was not taken).

### B.   <u>Defendants' Efforts To Justify the Efficacy of the Checklist Are Unavailing</u>

GSU's flawed Fair Use Checklist has in fact "caused misuse of the fair use defense."  Def. PCL ¶ 113.  It does not accurately reflect the law, and it does *not* "appropriately consider[] all four fair use factors." Def. PCL ¶ 107.  Instead, as the trial record made clear (*see* Pl. PFF ¶¶ 218-20), it is biased toward producing inevitable affirmative fair use findings for any assigned course reading.  The uniformly lopsided fair use tallies (*see* Pl. PFF ¶ 220, Appendix C) prove that the Checklist is at the heart of the problem.

### 1.   **The GSU Checklist is treated differently under GSU's policy than under the Columbia policy**

Defendants attempt to defend the Checklist and 2009 policy as reasonable based on the assertion that the policy was modeled on that of Columbia University.  *See* Def. PFF ¶ 45.  Putting to one side that the Court has not been asked to rule on

904437.1

the legality of Columbia or any other school's policy (on its face or as applied), the

GSU policy deviates from Columbia's policy in such significant ways that this

comparison only underscores the inadequacy of the GSU policy.  *See id.*  For one,

GSU's policy puts the Checklist forward as *the* tool by which faculty are to make

fair use determinations.  *See* Pl. PCL ¶ 142; *see also* Def. PCL ¶ 113.  Columbia,

by contrast, uses its own version of a fair use checklist only as a *supplemental* tool,

not as the sole determinant of fair use.  *See* 6/3 Tr. 105:9-14 (Crews).  Indeed, Dr.

Crews, who designed the Columbia policy (PX 1012), admitted that while a

checklist is a useful tool, it should be "but one of . . . a series of support

mechanisms" for faculty members and that he "would never recommend" using the

checklist as the "litmus test" for fair use determinations.  *See* Pl. PFF ¶ 196.

Further, in editing the Columbia policy "to fit the needs of the University

System of Georgia," (Def. PFF ¶ 46) the GSU Select Committee jettisoned a

number of significant cautionary recommendations bearing on the interpretation

and application of the Checklist.  For example: (1) the Columbia policy states that

"not all nonprofit educational uses are fair," but GSU's does not (*see* 6/3 Tr.

106:12-107:19); (2) the Columbia policy states that "[unlicensed] use of a work

that is commercially available specifically for the educational market is generally

disfavored," but GSU's does not (*see id.* 109:1-110:13); (3) Columbia's policy

states that a book chapter "might be a relatively small portion of the book, but the same content might be published elsewhere as an article or essay and be considered the entire work in that context," but GSU's policy does not (*see id.* 110:17-111:7); and (4) the Columbia policy states that Factor 4 "means fundamentally that if you make a use for which a purchase or license of the copyrighted work could realistically have been made, that fact weighs against a finding of fair use" and cautions that "[t]o evaluate this factor, you may need to make a simple investigation of the market to determine if the work is reasonably available for purchase or licensing," but the GSU policy does not (*see id.* 111:15-112:14).  The Columbia policy also cautions against weighing each fair use factor equally, whereas GSU's copyright policy accords equal weight to each statutory factor and, indeed, to each of the criteria listed on the Checklist.  *See* JX 4 at 7; PX 1012; DX 911; 6/3 Tr. 114:14-115:16 (Crews); *see also* 6/7 Tr. 51:6-7 (Defendants' counsel stating "[I]t is our position that the four factors are to be weighed equally.")

### 2.    Misleading citations to documents on CCC's website are unavailing

Defendants attempt to bolster the *bona fides* of the Checklist by arguing that CCC formerly had a similar checklist on its website.  *See* Def. PCL ¶ 111.  But the CCC checklist is legally irrelevant; certainly no estoppel arises from the fact that

Plaintiffs' licensing agent once offered an edited version of a third-party's checklist as part of a suite of tools to educate its clients about fair use. *See* 5/20 Tr. 52:4-10, 53:9-14 (Armstrong). In any event, CCC's CEO Tracy Armstrong testified that CCC never endorsed the checklist (as CCC does not provide fair use advice), let alone recommended that it be used as the sole basis for academic users to make fair use determinations (*see* 5/20 Tr. 52:11-20 (Armstrong)). Further, and contrary to Defendants' false assertion that the checklist remains on CCC's website (*see* Def. PFF ¶ 156), it was removed from the collection of fair use resources on the CCC website in 2008 after it "became clear that th[e] document was being perceived by many as the beginning and the end of what was needed to be referenced in terms of permissioning" and that such usage "was not consistent with [CCC's] views" and "was causing confusion" among CCC's clients. 5/20 Tr. 52:21-53:23 (Armstrong).

Defendants similarly distort their discussion of a CCC White Paper on guidelines and best practices for electronic reserves, concerning which they assert that the USG copyright policy "is in keeping with the CCC's public statements of 'best practices.'" Def. PCL ¶ 112. But a plain facial reading of the document at issue demonstrates that the USG copyright policy falls woefully short of CCC's best practices. *See* 5/20 Tr. 83:2-17 (Armstrong). Some of the crucial aspects of

CCC's "best practices and guidelines for using e- reserves" that are *not* found in the USG Copyright Policy, were *not* implemented at GSU, and are conveniently *omitted* from Defendants' discussion are:

- Online Does Not Mean Free

- Limit E-Reserve Materials to Small Excerpts

- E-Reserves Require the Same Permissions as Coursepacks

- E-Reserves are Not a Substitute for the Purchase of Textbooks (or Coursepacks)

- Get Permission Before Posting – Unlike inter-library loans, you need to secure copyright permissions *prior* to posting content.  Reposting of the same material for use in a subsequent semester requires a new permission

- Passwords Are a Good Start – . . . "However, by itself, the use of authentication measures such as passwords is not enough to satisfy the fair use standard and permission is still required prior to use of the content"

*See* DX 906; JX 4; 5/20 Tr. 84:13-85:24 (Armstrong).[19]

---

[19] Defendants also claim misleadingly that "many of the now complained of excerpts were a chapter or less, which is exactly what CCC acknowledges as a best practice or guideline."  Def. PCL ¶ 112.  Defendants' briefing leaves out the fuller context of the CCC document, which notes that "even brief excerpts must be viewed in the overall context of other readings for a course . . . . If the total effect is to create a compilation or digital coursepack of unlicensed materials, the case for treating individual excerpts as fair use is significantly weakened and permission should be sought."   5/20 Tr. 83:2-17 (Armstrong); DX 906.

## C.    The Other Cited Features of the Policy Are Immaterial

None of the supposedly meaningful safeguards in the policy to which Defendants point (*see* Def. PCL ¶ 55) relate to the law of fair use, and the record proves that these miscellaneous provisions have not prevented widespread copyright infringement from occurring at GSU.  For example, deleting ERes postings at the end of the semester and restricting access to ERes have no bearing on whether the postings are fair use; at most they *mitigate the potential additional market harm* from such postings.  In this regard, the record shows that students who have been given access to course materials via ERes and uLearn are free to retain any copies indefinitely.  *See* Pl. PFF ¶ 158.

Likewise, the fact that the policy contains a link to the CCC website and indicates (buried at the bottom of page 15) that CCC can grant permission instantly online for thousands of works (*see* JX 4 at 15) is of no consequence because Defendants failed to ensure that the faculty were aware of the significance of CCC to the fair use analysis.  None of the testifying professors actually contacted CCC to find out if permission was available and, indeed, most of them had never even heard of CCC.  *See* Pl. PCL ¶ 165.  Coupled with the lack of any permissions budget to enable such payments, this "feature" of the 2009 policy is but window dressing.

Defendants also claim erroneously that the "USG Copyright Policy is different from most other copyright policies because it includes the commitment of an oversight check of many fair use decisions by the library." Def. PFF ¶ 169. But this "commitment" does not exist; GSU's Dean of Libraries testified that *there is no enforcement mechanism to ensure that the GSU copyright policy is carried out appropriately* and that faculty have not blatantly infringed copyright. *See* Pl. PFF ¶¶ 189, 191.

* * *

In sum, Defendants' effort to portray the 2009 policy as a reasonable response to the infringing conduct Plaintiffs identified in the Complaint does not withstand scrutiny.

## V.   THE COURT HAS ALREADY PROPERLY REJECTED DEFENDANTS' SOVEREIGN IMMUNITY ARGUMENTS

Notwithstanding the Court's denial of their renewed motion to dismiss on sovereign immunity grounds, Defendants ask the Court yet again to find that it lacks subject matter jurisdiction to enter an injunction against them. *See* Def. PCL ¶¶ 6-28. In rehashing the issue, Defendants ignore the Court's previous ruling and the undisputed facts on which it was based and continue to treat *Pennington Seed, Inc. v. Produce Exchange No. 299, L.L.C.*, 457 F.3d 1334 (Fed. Cir. 2006), as if it

were the law in this Circuit, which it is not.  After Plaintiffs rested their case,

Defendants renewed their sovereign immunity-based motion to dismiss.  5/26 Tr.

19:24-20:2.  After considering the same fact record and cases on which Defendants

now rely, the Court denied the motion and articulated the standard for overcoming

a sovereign immunity bar.  *Id*. 52:17-56:10; Pl. PCL ¶ 141.  There is no basis to

reconsider that ruling.

     As the Court correctly observed, "*Luckey v. Harris* [860 F.2d 1012 (11th

Cir. 1988)] . . . . is controlling," and implicit in *Luckey* is the question of "whether

the defendants who are named are in a position to do something meaningful to stop

the violation" of federal law.  5/26 Tr. 53:2-6.

     In stark contrast to the Federal Circuit's outlier opinion in *Pennington Seed*,

the Eleventh Circuit's clear formulation of the *Ex parte Young* standard is whether

"'by virtue of his office, [the official] has *some* connection' with the . . . conduct

complained of."  *Luckey*, 860 F.2d at 1015-16 (quoting *Ex parte Young*, 209 U.S.

123, 157 (1908)) (emphasis added).  *See also Summit Med. Assocs., P.C. v. Pryor*,

180 F.3d 1326, 1341 (11th Cir. 1999) (holding that plaintiffs properly named as

defendants Alabama's Governor and Attorney General and the District Attorney

because they were authorized to enforce the criminal liability provisions of the

challenged statute).  "Personal action by defendants individually is not a necessary

904437.1

condition of injunctive relief against state officers in their official capacity."

*Luckey*, 860 F.2d at 1015.  Rather, "[a]ll that is required is that the official be

*responsible for* the challenged action."  *Id.* (emphasis added); *see also Grizzle v.*

*Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (holding that a state official is subject

to suit in his official capacity "when his office imbues him with the responsibility

to enforce the law or laws at issue in the suit").

Defendants' strained attempt to avoid jurisdiction by distinguishing this case

from *Luckey* on the ground that *Luckey* involved a constitutional tort claim

advanced under section 1983 (*see* Def. PCL ¶ 24) is unavailing.  Nothing in *Luckey*

or in any other case holds (or even hints) that suits against official capacity

defendants for prospective injunctive relief under other federal laws, such as the

Copyright Act, are barred by the Eleventh Amendment.

After considering the controlling law, the Court articulated *Luckey*'s

application to this case: "If the policy caused violations and the violations are or

were ongoing and continuous within the timeframe established, then I believe that

the Court could enter injunctive relief under the *Ex parte Young* line of cases."

5/26 Tr. 91:1-5.  As Plaintiffs have shown, Defendants are responsible for adopting

and overseeing the implementation of the 2009 policy, and the record contains

abundant evidence of a causal link between the ongoing infringements and the policy.  *See* Pl. PCL ¶¶ 142-45.

The record also contains ample evidence to support an injunction under the *Ex parte Young* doctrine as set forth in *Luckey*, namely, that the official simply "be responsible for the challenged action."  860 F.2d at 1015.  Because Plaintiffs have already briefed and argued this issue extensively,[20] a few examples suffice.

- Defendants have admitted that they have the authority or duty to ensure that GSU complies with federal copyright law.  President Becker, Provost Palm, and Dean of Libraries Seamans each have the authority to direct library staff to block access to or remove specific infringing materials on the ERes system if required to do so by the Court.  *See* Pl. PFF ¶¶ 98-100; Stipulated Facts 41, 42, 45, 49; PX 975, Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Admission, May 13, 2009.

- Provost Palm is responsible for "correct[ing] any conduct not consistent with the professional and legal fulfillment of the University's purposes and objectives," which includes "correcting noncompliance with federal copyright law."  *See* PX 975, Nos. 18-19; Stipulated Fact 42.

- As President Becker acknowledged that he, as well as the Provost and the Board of Regents, are responsible for ensuring that use of the electronic reserves systems complies with federal copyright law and that it is within his authority to "direct the faculty at the university to comply with federal copyright law."  Becker Dep. 26:15-27:6, 88:6-15 (by video, 5/26 Tr. 9).

---

[20] *See* Pl. PCL ¶¶ 141-42; 5/26 Tr. 28:25-49:6.

Finally, even under *Pennington Seed*, *Ex parte Young* liability is clearly appropriate here.  As an initial matter, *Pennington Seed* was decided on a motion to dismiss.  The Federal Circuit found that that the plaintiffs' attempt to establish the official capacity defendants' connection to the patent infringement at issue was marred by reliance on materials and argument outside the four corners of the complaint.  457 F.3d at 1342 n.4.  Here, by contrast, the relevant facts concerning the role of each Defendant in overseeing the ERes system have been developed through stipulations, requests to admit, and trial testimony.  Moreover, whereas in *Pennington Seed* the Federal Circuit held that "a federal court cannot enjoin a state official to perform his or her duty under *state* law," *id.* at 1343 (emphasis in original), the evidence here shows that Defendants have the authority and duty to ensure compliance *with federal copyright law*.  Thus, the heightened "nexus" between the defendants and a violation of federal law arguably required by the Federal Circuit has been clearly established with respect to Defendants.

## VI.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

The widely varying, idiosyncratic, yet uniformly erroneous fair use standards the testifying professors used to evaluate the alleged infringements make a compelling case for an injunction containing clear guidelines that can be applied by faculty with relative ease and consistency.  *See* Pl. PCL ¶ 188.  Plaintiffs'

proposed injunction is a reasonably modified version of the Classroom Guidelines which, as Plaintiffs have shown, reflect the considered view of Congress and of interested parties representing educators, publishers, and librarians as to appropriate fair use parameters for straight reproduction for classroom teaching. *See* Docket No. 300-1; Pl. PCL ¶ 58.  Defendants' objections to the proposed injunction are not well-founded.

A.   **The Proposed Injunction Is Appropriate To Redress Defendants' Ongoing Infringing Conduct**

Defendants attack the Classroom Guidelines upon which Plaintiffs' proposed injunction is based, asserting that they are "not part of the Copyright Act and do not have the force of law."  Def. PCL ¶ 129.  But the Guidelines represent a negotiated understanding by an impressive array of interested parties, expressly endorsed by Congress, as to the limited fair use latitude that should be accorded to straight reproduction for classroom teaching.  *See* Pl. PCL ¶¶ 53-59.  The signatories to the Classroom Copying Guidelines include, among many others:

- American Association of Law Libraries

- American Association of School Administrators

- American Association of School Librarians

- American Counsel on Education

- National Commission for Libraries and Information Science

- National Education Association of the United States

- American Association of University Professors

- Association of American Law Schools

- Association for Supervision and Curriculum Development

PX 1014; 6/6 Tr. 55:15-58:5 (Crews).

While it is true that the Guidelines state minimum rather than maximum standards of educational fair use (*see* Def. PCL ¶ 130), what Defendants argue for instead amounts to *no* standards.  GSU evidently believes that professors should be allowed to continue to determine, in their own discretion, how much unauthorized copying is necessary to meet their educational objectives without cost to their students.  Thus, even if the Court finds that infringements warranting injunctive relief have occurred, Defendants apparently would have the Court adopt an injunction with no teeth that affords no more guidance as to fair use than does the current policy.  That plainly makes no sense.

Given the extensiveness of the infringing conduct here, there is little equity in Defendants' position that they ought not to be bound by "minimum" fair use standards.  The injunction would be a *remedial decree* imposed on Defendants who have put in place and perpetuated practices that have repeatedly infringed Plaintiffs' copyright rights, including as to takings that exceed the word limits of

904437.1

70

the Guidelines by up to *100 times.*  On this record, Defendants' objection to clear

criteria that are consistent with the Guidelines and that are less restrictive than

those imposed in *Princeton University Press* and *Basic Books* has little force.

Defendants' suggestion that the Classroom Guidelines are outdated (*see* 5/17

Tr. 27:9-18 (Schaetzel)), rings hollow given that GSU itself incorporates and

references the Classroom Copying Guidelines in own its faculty handbook.  *See*

PX 1002 § 313.01.  Defendants' assertion that the 2009 policy "superseded" the

Guidelines (Def. PFF ¶ 58) is contradicted by President Becker's testimony that

"the policy is what [the faculty are] expected to comport with, but [the Guidelines]

may help them in understanding their evaluation of fair use."  Becker Dep. 105:23-

106:5 (by video, 5/26 Tr. 9).  And Dr. Crews acknowledged that many universities,

including NYU, incorporate the Classroom Guidelines into their fair use policies.

*See* 6/6 Tr. 58:21-59:1 (Crews).

### B.    The Purported Deviations from the Guidelines, to the Extent They Exist, Are Reasonable

Defendants complain of certain respects in which, they claim, the proposed

injunction is more restrictive than the Classroom Guidelines.  First, they claim the

"cumulative effect" provision of the injunction "would be enforced across the

entire institution under the proposed injunction, not simply per course/class term,

as the Guidelines provide." Def. PCL ¶ 132 (citing Docket No. 300-1 at 2-3

(¶ III.B.1)). Plaintiffs did not intend for uses of their material to be tallied across

all courses offered at the university. To the extent the Court finds it ambiguous,

this provision easily could be modified to make it clear that *for each course each

term*, a consideration of the total copying should include Plaintiffs' works as well

as the works of other publishers.

Defendants next complain that the provision that unauthorized copies may

not "comprise more than 10% of the total reading . . . for a particular course," Def.

PCL ¶ 133 (citing Docket No. 300-1 at 3 (¶ III.B.2)), does not appear in the

Guidelines. This provision is simply intended to give concrete meaning to the

Guidelines' admonition against de facto creation of anthologies of readings under

the guise of fair use. In this regard, the language of the injunction closely tracks

concepts contained in both the American Library Association (ALA) Model Policy

and 1996 CONFU Conference on Fair Use, as well as similar provisions in some of

the copyright policies cited by Dr. Crews. 6/6 Tr. 48:8-49:19 (Crews).

In addition, the prohibition on repeat use is found in the 1976 Classroom

Guidelines, the ALA Model Policy, and the CONFU Guidelines, all of which

prohibit repeat uses of the same materials in successive terms. 6/6 Tr. 45:17-48:6

(Crews).

904437.1

72

### C.  There Is No Basis for the Claim That Compliance Would Be Prohibitively Expensive

Defendants' complaint that "[t]he administrative costs alone of complying with the proposed injunction would be enormous," (Def. PCL ¶ 135) is unsupported. Nothing on the face of the injunction should be unduly onerous in terms of compliance, and Defendants have adduced no testimony to support their contrary contention. Nor do they provide any specifics to support this generalized claim.

We do not understand this complaint to concern ability to pay permissions fees, which would be equally unfounded. GSU has been paying permissions fees in connection with coursepacks for years (*see* Def. PFF ¶ 72) and spent almost $4 million on electronic materials, including journal packages, in 2009. *Id.* ¶ 76. It also levies a number of student fees. *See id.* ¶ 78; Pl. PFF ¶ 114. There is no principled basis for the proposition that GSU should be permitted to take book excerpts for free in connection with ERes and uLearn while paying for electronic journals and e-books as well as for book excerpts when copied in paper form. Nor is there any record support for the claim that adequate funding could not be secured.  To the contrary, President Becker testified that he has the power to recommend a budget that includes funds to pay permissions to the owners of

904437.1

copyrights in works posted on ERes.  *See* Becker Dep. 55:21-56:5 (by video, 5/26

Tr. 9).

### D.  <u>Any Inadvertent Overbreadth Is Easily Curable</u>

Defendants' overly-literal reading of the proposed injunction as requiring,

*inter alia*, students to monitor their friends' copying (*see* Def. PCL ¶¶ 124-27) is a

misinterpretation of the intended focus of the injunction, which is meant to apply

to the unauthorized copying and distribution of course reading materials by GSU

employees.  Any modifications that might be appropriate to eliminate ambiguity

could be easily accomplished.

## VII.  **PLAINTIFFS ARE ENTITLED TO REASONABLE ATTORNEY'S FEES IF THEY PREVAIL; DEFENDANTS ARE NOT**

### A.  <u>Plaintiffs Are Entitled to Attorney's Fees</u>

Plaintiffs have explained why, if they prevail in this action, they should be

awarded their reasonable attorney's fees.  *See* Pl. PCL ¶¶ 190-98.  Defendants'

only challenge to such a fee award is a technical one: that attorney's fees are

available only if a copyright registration in the infringed work was obtained prior

to the infringements or within three months of first publication.  *See* Def. PCL

¶ 115 (citing 17 U.S.C. § 412(2)).  But, as explained below, section 412(2) should

not affect Plaintiffs' entitlement to attorney's fees or the amount of the award even

though some of the representative works alleged to have been infringed were

904437.1

74

registered after commencement of the action or are foreign works that are not registered in the United States.

This action was brought to challenge a widespread practice of copyright infringement at GSU in connection with its online course reading systems.  As is common, Plaintiffs identified a sample of specific works, identified in Exhibit 1 to the Amended Complaint, that were representative of those being infringed at GSU. Each of those works was duly registered prior to the commencement of the action. As a result of Defendants' scuttling of the policy on which the Complaint was based in the middle of the litigation in favor of the current policy, the Court ultimately determined that the case would be tried on the basis of a different (although overlapping) group of works copied during 2009 and deemed representative of current practice at GSU.  *See* Nov. 5, 2010 Hearing Transcript, Docket No. 261, 11-14.  The case remains one seeking a prospective injunction against a pattern of infringing conduct at GSU, not one limited to relief relating solely to infringements of particular works.

Accordingly, Plaintiffs' entitlement to attorney's fees should not be affected by the registration status of a subset of the works on Docket No. 361 that are not works on which Plaintiffs originally sued.  The Court directed Plaintiffs to identify all of their works from the designated 2009 period that Defendants had copied.  To

904437.1

75

deny an attorney's fee award on the fact that certain of the works not identified as

being part of the suit until after they were infringed were not registered *prior* to

infringement makes no sense in this context.  Had Plaintiffs recommenced this

lawsuit following adoption of the new policy based solely on the 2009

infringements and with an eye to meeting the requirements of section 412(2), there

would be no question that Plaintiffs would be entitled to attorney's fees should

they prevail – notwithstanding the fact that the second lawsuit would have been

directed at the identical conduct and sought the identical relief to that implicated

here.  There is no reason to exalt form over substance in this manner.

So long as a sufficient number of the works now in issue were registered

prior to commencement of the action – as there were (*see* Pl. PFF ¶¶ 167-68) – that

should suffice to entitle Plaintiffs to an undiminished attorney's fee award should

they prevail.

### B.   Defendants Are Not Entitled to Attorney's Fees

If the Court rules, as it should, that Defendants' affirmative defenses have no

merit, the issue of their attorney's fees will be moot, as only a prevailing party is

eligible for attorney's fees in a copyright suit.  *See* 17 U.S.C. § 505 ("the court may

also award a reasonable attorney's fee to the prevailing party as part of the costs").

Even if the Court were to rule in Defendants' favor on the merits, there would be no basis to award them attorney's fees.  Attorney's fees are awarded at the court's discretion based on consideration of factors that include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 535 n.19 (1994).  None of these considerations warrant penalizing Plaintiffs for seeking a ruling as to the legality of the widespread, nontransformative copying of their works at GSU by means of online course reading systems – a practice that has injured Plaintiffs' businesses and threatens even greater harm if replicated on a national scale.

That GSU has borne the cost of litigating a case that will provide "legal guidance" to others (Def. PCL ¶ 118) forms no basis to award them attorney's fees.  Any resulting legal guidance will have been the result of Plaintiffs' initiative in pursuing this litigation in the first instance.

## CONCLUSION

For all of the foregoing reasons, as well as those set forth in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Defendants should be enjoined

904437.1

77

from infringing Plaintiffs' copyright rights, and Plaintiffs should be awarded their

reasonable attorney's fees.

Respectfully submitted this 30th day of July, 2011.

/s/ John H. Rains IV
Edward B. Krugman
krugman@bmelaw.com
Georgia Bar No. 429927
John H. Rains IV
rains@bmelaw.com
Georgia Bar No. 556052

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

R. Bruce Rich (*pro hac vice*)
Randi Singer (*pro hac vice*)
Jonathan Bloom (*pro hac vice*)
Todd D. Larson (*pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

***Attorneys for Plaintiffs***

904437.1

78

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing **PLAINTIFFS'**

**POST-TRIAL REPLY BRIEF** with the Clerk of Court using the CM/ECF filing

system which will send e-mail notification of such filing to opposing counsel as

follows:

      Stephen M. Schaetzel, Esq.
      John W. Harbin, Esq.
      Natasha H. Moffitt, Esq.
      Kristen A. Swift, Esq.
      C. Suzanne Johnson, Esq.
      Mary Katherine Bates, Esq.
      KING & SPALDING
      1180 Peachtree Street
      Atlanta, Georgia  30309

      Katrina M. Quicker, Esq.
      Richard W. Miller, Esq.
      BALLARD SPAHR, LLP
      999 Peachtree Street, Suite 1000
      Atlanta, Georgia  30309

      Anthony B. Askew, Esq.
      McKeon, Meunier, Carlin & Curfman, LLC
      817 W. Peachtree Street, Suite 900
      Atlanta, Georgia 30308

      Mary Jo Volkert, Esq.
      Assistant S. Attorney General
      40 Capitol Square
      Atlanta, Georgia 30334

904437.1

This 30th day of July, 2011.

/s/ John H. Rains IV
John H. Rains IV
Georgia Bar No. 556052