UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CAMBRIDGE UNIVERSITY PRESS, OXFORD UNIVERSITY PRESS, INC., and SAGE PUBLICATIONS, INC., <br><br> Plaintiffs, <br><br> - v. - <br><br> MARK P. BECKER, in his official capacity as Georgia State University President, et al., <br><br> Defendants. | Civil Action No. 1:08-CV-1425-ODE |

## DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Rather than attempt to answer and explain all of errors in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Defendants focus on the following primary issues: sovereign immunity, fair use, and Plaintiffs' claims for injunctive relief and attorneys fees. Then Defendants address the key examples of incorrect proposed findings of fact and changes in allegations and positions by Plaintiffs.

## I.      SOVEREIGN IMMUNITY

As a general rule, state officials are immune from suit in federal court.  In Ex parte Young, 209 U.S. 123 (1908), the Supreme Court carved out a narrow exception to Eleventh Amendment immunity for suits against state officials seeking to enjoin alleged ongoing violations of federal law.  See id. at 159–60.  The Ex parte Young exception proceeds on the fiction that an action against a state official seeking only prospective injunctive relief is not an action against the state and, as a result, is not subject to the doctrine of sovereign immunity.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105 (1984).

The Ex parte Young exception is not boundless.  Federal district courts cannot seek out and strike down any governmental action that violates federal law.  District courts can only adjudicate violations that are fairly traceable to a named defendant's allegedly unlawful conduct.  In other words, the named defendant must have a meaningful connection with the enforcement of a policy that creates an ongoing and continuous violation of federal law.  General supervisory authority is insufficient to invoke Ex parte Young.  See Women's Emergency Network v. Bush, 323 F.3d 937, 949-50 (11th Cir. 2003).

Ex parte Young thus does not relieve Plaintiffs of the obligation to name a proper defendant.  Here, Plaintiffs sued (1) the eighteen members of the Board of

Regents, (2) the President of Georgia State University, (3) the Provost of Georgia State University, (4) the Associate Provost of the IT Department, and (5) the Dean of Libraries, all in their official capacities.  In denying Defendants' renewed motion to dismiss, the Court set forth Plaintiffs' sole remaining claim: "If the policy caused the violations and the violations are or were ongoing and continuous within the timeframe established, then I believe that the Court could enter injunctive relief." (T. Vol. 8 at 91:1-5.)  Accordingly, to proceed under Ex parte Young, Plaintiffs must demonstrate that each named defendant has "some connection" with the adoption and enforcement of the Copyright Policy that directly resulted in the violation of Plaintiffs' federal rights in copyright.  The record is clear, however, that this is not the case.

The Copyright Policy was created by a special subcommittee ("Copyright Committee") selected by Erroll Davis, the Chancellor of the University System of Georgia, who is not named in this action.  (PX 683, DX 145; T. Vol. 12 at 49:21-50:12; T. Vol. 14 at 92:6-13, 93:25-94:8; DX 130.)  It was the *Chancellor* who charged the Copyright Committee with its responsibilities.  (T. Vol. 14 at 93:25-94:4; 122:12-123:18; 134:7-17; PX 1004.)  And it was the *Chancellor* who approved and adopted the Copyright Policy.  (T. Vol. 14 at 121:22-25; 112:9-113:2; 134:7-17.)  Besides the Dean of Libraries (Dr. Seamans), no Defendant was a member of the Copyright Committee.  None of the Defendants had any role in the formation of

the Copyright Committee or were involved in the implementation of the Copyright Policy. (T. Vol. 14 at 115:8-20; 134:7-17.)

Nevertheless, in an effort to manufacture a connection between the named Defendants and the Copyright Policy to meet the Ex parte Young exception, Plaintiffs contend that Defendants disbanded the Copyright Committee before gauging the Copyright Policy's success; neglected to provide for education, supervision, or enforcement protocols; did not allocate a permissions budget; and have oversight responsibility of all of the university's policies and can take corrective action if the policies are violated. (Dkt. 409 at 7-8, 41-44.) This is not the case. More importantly, even if all that were true, it would not justify the application of Ex parte Young.

The Copyright Committee disbanded after it completed its charge from the Chancellor—not because any named Defendant demanded it. (T. Vol. 14 at 134:15-17.) Moreover, GSU did, in fact, provide education, supervision, and enforcement protocols. (T. Vol. 12 at 91:19-94:16; T. Vol. 5 at 44-47, 176; T. Vol. 9 at 68-70; Greenberg Dep. at 15; T. Vol. 4 at 123:18-124:14, 127:16-128:3, 128:23-25, 129:1-15; T. Vol. 11 at 122:7-123:13, 124:3-24; T. Vol. 12 at 151:1-152: 3.) The Defendants have no statutory obligation to budget funds to pay licensing fees, nor do any of them have the power to assess student fees for licensing copyrighted works. (T. Vol. 12 at 149:15-150:16.)

4

Consequently, Plaintiffs' argument boils down to a contention that Defendants did not enforce copyright law at Georgia State.  In addition to being false, this is an insufficient reason to strip state officials of their immunity.  With respect to Defendants' oversight responsibility, every circuit court has refused to strip state officials of their sovereign immunity based solely on a general duty to enforce the law:

- Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir. 1979) (holding the governor or attorney general of a state are not the proper defendants in every action attacking the constitutionality of a state statute merely because they have a general obligation to enforce state laws).

- Mendez v. Heller, 530 F.2d 457, 460 (2d Cir. 1976) (attorney general's duties to support the constitutionality of challenged state statutes and to defend actions in which the state is interested do not make him a proper defendant).

- 1st Westco Corp. v. Sch. Dist. of Philadelphia, 6 F.3d 108, 113 (3d Cir. 1993) ("General authority to enforce the law of the state is not sufficient to make government officials the proper parties to litigation challenging the law.").

- Waste Mgmt. Holdings v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001), cert. denied, 535 U.S. 904 (2002) (mere fact governor is under general duty to enforce laws does not make him a proper defendant in every action attacking constitutionality of a state statute).

- Okpalobi v. Foster, 244 F.3d 405, 416 (5th Cir. 2001) (en banc) (in order to use the Ex Parte Young exception, the plaintiff must demonstrate that the state actor has "some connection" with a disputed act's enforcement).

- Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1415 (6th Cir. 1996) (Ex parte Young exception to immunity does not apply "when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute").

- McCrimmon v. Daley, 418 F.2d 366, 368 (7th Cir. 1969) (Attorney General was not a proper party defendant because "some connection with the

enforcement of the act" means that a state official must be designated in some
way to enforce the challenged act before the official can become a defendant).

- Reproductive Health Servs. of Planned Parenthood of St. Louis Region, Inc. v.
  Nixon, 428 F.3d 1139, 1146 (8th Cir. 2005) ("General authority to enforce the
  law of the state is not sufficient to make government officials the proper
  parties to litigation challenging the law.").

- Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir. 1992) (holding the general
  supervisory powers of the Attorney General were not sufficient to establish
  the connection with enforcement required by Ex parte Young).

- Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 919 (9th Cir.
  2004), cert. denied, 544 U.S. 948 (2005) ("This connection must be fairly
  direct; a generalized duty to enforce state law or general supervisory power
  over the persons responsible for enforcing the challenged provision will not
  subject an official to suit.").

- Bishop v. Oklahoma, 333 F. App'x 361, 365 (10th Cir. 2009) ("the Oklahoma
  officials' generalized duty to enforce state law, alone, is insufficient to subject
  them to a suit challenging a constitutional amendment they have no specific
  duty to enforce") (citing Women's Emergency Network v. Bush, 323 F.3d 937
  (11th Cir. 2003)).

- Women's Emergency Network v. Bush, 323 F.3d 937, 949-50 (11th Cir.
  2003) (where enforcement of state statute is the responsibility of parties other
  than governor, the governor's general executive power to enforce the statute is
  insufficient to confer jurisdiction over him in an action challenging statute as
  unconstitutional).

- Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1342 (Fed.
  Cir. 2006) (finding no causal connection between officials and the alleged
  patent infringement and concluding that a state official directing a university's
  patent policy is insufficient to causally connect that state official to a violation
  of federal patent law—i.e., patent infringement).

Because Eleventh Circuit law controls here, three cases are particularly instructive.

First, in Luckey v. Harris, the Governor and the Judges had a *direct role* in the

actual administration of the public defender system, because several state laws

specifically obligated them to do so.   860 F.2d 1012, 1015-16 (11th Cir. 1988).

Because there were systematic delays by Judges carrying out their state-mandated

duty and appointing counsel in criminal proceedings, and those delays *directly*

*resulted* in violations of the indigent defendants' (plaintiffs in Luckey)

Constitutional rights, Ex parte Young applied.  See id.  Importantly, the finding of

jurisdiction was not based on the defendants' mere supervisory authority of, but

rather their direct involvement in, the public defender system.

Second, in Summit Medical Associates v. Pryor, the Eleventh Circuit

dismissed an Ex parte Young action because none of the defendants had a

meaningful relationship to the *enforcement* of the law at issue.  180 F.3d 1326, 1342

(11th Cir. 1999).  The Court explained, "[o]nly if a state officer has the authority to

enforce an unconstitutional act in the name of the state can the Supremacy Clause be

invoked to strip the officer of his official or representative character and subject him

to the individual consequences of his conduct."  Id. at 1341.

Third, in Women's Emergency Network v. Bush, the Eleventh Circuit

affirmed the dismissal of Governor Bush from an Ex parte Young action.  323 F.3d

937, 950 (11th Cir. 2003).  Specifically, Governor Bush was not a proper party

because his only connection with the statute at issue was that he, along with six

members of his cabinet, were responsible for the department charged with

implementing the statute.  Id. at 949.  His shared authority was "simply too

attenuated" to establish that he was "responsible for" the statute's implementation. Id.  The Court declared that "general executive power" was not sufficient to confer jurisdiction.  Id. at 949-50.

Here, besides the Dean of Libraries (Dr. Seamans), none of the named Defendants had a direct role in the creation of the Copyright Policy.  None of the named Defendants had a direct role in the implementation of the Copyright Policy nor were they specifically obligated to administer it, as required in Luckey. Similarly, none of the Defendants had the power or authority to prevent a violation of copyright law, much like the defendants ultimately dismissed in Summit Medical. Moreover, it is the professors themselves who are responsible for ensuring compliance with the Copyright Policy and the copyright law, and for seeking assistance in completing the checklist if necessary.  They are the individuals best-suited to make fair use determinations and were provided adequate resources to do so.  (T. Vol. 13 at 57:9-59:23; T. Vol. 8 at 54:24-55:2.)  At most, the high level administrators named in this action—individual members of the Board of Regents, the President and Provost of GSU, the Associate Provost of GSU's IT department, and GSU's Dean of Libraries—have general executive power over all of GSU's policies; this is precisely the type of power that was inadequate to confer jurisdiction in Women's Emergency Network.  See also D.G. v. Henry, 591 F. Supp. 2d 1186 (N.D. Okla. 2008) (citing Luckey in dismissing action for insufficient connection).

8

Finally, Plaintiffs' complaint that Defendants failed to require that the professors complete and retain a hard copy checklist is a red herring.  Federal courts may only enjoin ongoing and continuous activity that violates federal law.  None of these alleged failures have any impact at all on Plaintiffs' federal rights.  Rather, they are complaints about state actors' neglected administration of a state policy crafted pursuant to state law.  O.C.G.A. §§ 20-3-31, 20-3-51.  Federal courts cannot enter an injunction compelling the Defendants to perform their state-law-established job duties:

> [a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

Pennhurst, 465 U.S. at 106.  Failing to complete a checklist and retain a copy does not violate federal law, and consequently, cannot give rise to the Ex parte Young exception.

## II.   FAIR USE

### A.   The 2009 Copyright Policy Has Not Resulted in Ongoing and Continuous Misuse of the Fair Use Defense

#### 1.   The weighing of the four factors

In their "Overview of Fair Use" (Conclusions of Law, Dkt. 409-6 ¶¶ 32-39), Plaintiffs argue that "the cases make clear" that more weight is accorded to the first and fourth factors. (Id. ¶¶ 37-38.)  Defendants disagree.  The fair use statute, 17 U.S.C. §107, does not indicate that one factor is to be weighed more heavily that any other factor.  Moreover, the Supreme Court's decision in <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569 (1994) shows that any former presumptions are abandoned and, therefore, the factors are weighed together.  While the facts of a given case may more readily influence one or more factors, <u>Campbell</u> makes clear that each factor is to be considered and the "task is not to be simplified with bright line rules." <u>Campbell</u>, 510 U.S. at 577.  As the Eleventh Circuit stated, "[a]ll four of the factors are to be explored, <u>and the results weighed together</u>, in light of the purposes of copyright." <u>Suntrust Bank v. Houghton Mifflin Co.</u>, 268 F.3d 1257, 1269 (11th Cir. 2001) (emphasis added).

Plaintiffs cite <u>Princeton University Press v. Michigan Document Services, Inc.</u>, 99 F.3d 1381 (6th Cir. 1996) and <u>American Geophysical Union v. Texaco, Inc.</u>, 60 F.3d 913 (2nd Cir. 1994) to support their attempt to reduce the analysis to those two factors.  Neither case, however, is particularly helpful to Plaintiffs.  First, both are commercial cases - a copyshop (<u>Michigan Document</u>) and a for-profit business that copied journal articles for use by its research department (<u>Texaco</u>).  Plaintiffs' argument that the "circumstances" of these cases dictate that factors one and four are

more important is without merit and contrary to the Supreme Court's teaching in

Campbell.   And in Texaco, the Second Circuit specifically acknowledges that

teaching:

> Prior to Campbell, the Supreme Court had characterized the fourth factor as the "single most important element of fair use," [citing Harper & Row and Nimmer].   However, Campbell's discussion of the fourth factor conspicuously omits this phrasing. Apparently *abandoning the idea that any factor enjoys primacy*, Campbell instructs that '[a]ll [four factors] are to be explored, and  the results weighed together, in light of the purpose of copyright. [510 U.S. at ____]   114 S. Ct. at 1171.

Texaco, 60 F. 3d at 926 (emphasis added).

As no one factor enjoys primacy, Defendants properly address all four factors

below.

## B.    Factor One Weighs in Favor of Fair Use

Plaintiffs' analysis of the first fair use factor suffers from two fatal defects: (1)

Plaintiffs effectively ignore the statutory mandate that consideration of the purpose

and character of the use expressly includes "whether such use is of a commercial

nature or for nonprofit, educational purposes," 17 U.S.C. §107(1); and (2)

Apparently recognizing that the statutory language of factor one favors the

Defendants, Plaintiffs focus on "transformative use" to the exclusion of all else.

### 1.    The Statutory Mandate of 17 U.S.C. §107(1) Cannot Be Ignored

17 U.S.C. §107(1) requires the Court to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." That inquiry requires a determination of whether a defendant's use of copyrighted material is of the type that copyright is meant to prohibit, or whether it is of the type that actually tends to advance copyright's goal of promoting "the Progress of Science and the Useful Arts." Fitzgerald v. CBS Broadcasting, Inc., 491 F. Supp. 2d 177, 184 (D. Mass. 2007). In Fitzgerald, a case relied upon by Plaintiffs, the court stated:

> Courts typically ask three questions . . . . First, courts ask whether a defendant's use of the copyrighted material falls into a category specifically identified by Congress in the copyright statute as especially important to copyright's ends: "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research." 17 U.S.C. § 107. Second, courts ask whether the defendant's use was "productive" or "transformative" - i.e. whether it added anything to the copyrighted work in its use, and thus is treatable more as a new work referencing the old than as an instance of strict copying. Third, courts ask whether the use was commercial - i.e. whether it primarily served defendant's private interests rather than the public interest in underlying copyright law. See 17 U.S.C. § 107; Arica Institute, Inc. v. Palmer, 970 F. 2d 1067, 1077 (2d Cir. 1992); Rubin v. Brooks-Cole Publishing Co., 836 F. Supp. 909, 917 (D. Mass. 1993); Campbell, 510 U.S. at 579; Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171, 1175 (5th Cir. 1980). These three questions are cumulative - courts consider all three in order to build a picture of the nature of the use.

Plaintiffs effectively ignore the first and third questions. As to the first question, there is no reasonable dispute that the uses here are for purposes of teaching. The uses here fall squarely into one (or more) of the enumerated categories of the statute, 17 U.S.C. § 107.

Plaintiffs likewise cannot seriously dispute that the use at this nonprofit, public university is noncommercial. Their analysis nonetheless ignores the Supreme Court's focus on the noncommercial nature of activity in <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S. 417 (1984), where a non-transformative use (videotaping television programs for time-shifted home viewing) was found to constitute fair use. Plaintiffs nonetheless attempt to cast the issue as commercial on grounds that the professors were trying to save money for their students. (<u>See</u> Conclusions of Law, Dkt. 409-6 ¶¶ 70-72.) This argument fails for several reasons. First, it is an exaggeration of the record. While some professors indicated that student cost was a factor, others recognized the educational advantages with using digital excerpts. For example, Prof. Moloney testified about her work with students in distance education. Prof. Moloney taught nursing courses to graduate students, many of whom were working and lived out of the area, some out of state. (T. Vol. 9 at 134:8-12, 23.) There are few students in the state taking these courses so they developed an internet-based program; they met once per month and the rest of the class was on-line. (T. Vol. 9 at 135:3-11 & 136:5-9.) (Prof. Moloney saw

significant differences between coursepacks and EREs for her students.  (T. Vol. 9 at 151:12 - 152:10.))  Of course, none of these uses were for the "private benefit" of the Board of Regents, GSU or any professor.[1]

Plaintiffs reliance here on the commercial copyshop cases, Kinko's and Michigan Document, is misplaced.  In those cases, the copyshops contended that the student's use of the copyrighted material, which was acknowledged to be educational, controlled.  The court in Kinko's expressly recognized that the student's use was educational.  258 F. Supp. at 1531.  In both decisions, however, the courts ruled that it was the commercial use by the copyshops that governed the analysis.  The uses in this case, by contrast, are for nonprofit, educational purposes—the very use expressly contemplated by factor one as the opposite of a commercial use.  Plaintiffs simply cannot, by relying on commercial copyshop cases, ignore the statutory mandate of Section 107(1) that the Court should consider whether the uses here are for nonprofit, educational purposes.

Plaintiffs compound their error by only focusing on the second question involving "transformative use."  Campbell clearly indicates that this is incorrect approach, holding that a transformative use is "not absolutely necessary for a finding

---

[1] By comparison, a sheriff's department's use of an address in Wall Data was commercial because the copies were made to save the sheriff's department the expense of purchasing authorized, complete copies.  Wall Data, Inc. v. L.A. County Sheriff's Dept., 447 F.3d 769 (9th Cir. 2006).

of fair use," <u>Campbell</u>, 510 U.S. at 579, particularly where the special category of educational use is involved.  As the Supreme Court stated:  "The obvious statutory exception to this focus on transformative uses is the straight reproduction of multiple copies for classroom distribution."  <u>Campbell</u>, 510 U.S. at 579, n.11.  This "obvious" exception plainly can be a fair use even when the copying is deemed non-transformative.

Plaintiffs improperly exaggerate the importance of a transformative use to the exclusion of all else.  Plaintiffs' reliance on <u>Texaco</u> for its approach in that commercial context is likewise misplaced.  With reference to this factor in even a commercial case, the Second Circuit stated:

> "Even though Texaco's photocopying is not technically a transformative use of the copyrighted material, we should not overlook the significant independent value that can stem from conversion of original articles into a format different from their original appearance [citing <u>Sony</u> and an article].… As previously explained, Texaco's photocopying converts the original [journal] articles.  Before modern photocopying, Chickering [the Texaco scientist who copied the articles] probably would have converted the original article into a more serviceable form by taking notes, whether cursory or extended; today he can do so with a photocopying machine.  <u>Nevertheless, whatever independent value derives from the more usable format of the photocopy does not mean that every instance of photocopying wins on the first factor</u>.  In this case, the <u>predominant archival purpose</u> of the copying tips the first factor against the copier, despite the benefit of a more usable format."

<u>Texaco</u>, 60 F.3d at 923, 924 (emphasis added).  Thus the Second Circuit recognized that even though Texaco's use involved converting the work into a more useable format, the predominantly archival purpose tipped the analysis of the first factor against the copier.  If Texaco's technically non-transformative use had been for a more protected purpose, this factor could weigh in favor of fair use even in a commercial setting where the use was deemed not transformative.  This principle would apply with greater force in a non-commercial environment such as non-profit education.

Plaintiffs' self-serving analysis fails under both the applicable law and the facts of this case.   While the <u>Campbell</u> case removed presumptions and demonstrated the importance of transformative uses, it did <u>not</u> eliminate or diminish consideration of the enumerated statutory categories or the distinction between commercial and nonprofit educational purposes.   Plaintiffs desperate attempt to eliminate such considerations is a recognition of the central role they play in the factor one analysis.[2]  Given the nonprofit educational context, this factor weighs in favor of fair use.

---

[2] Plaintiffs attack the professors and the checklists by noting that all found factor one to favor fair use.  That is understandable given that all were using the excerpts for non-profit educational purposes.  Also, several professors testified that if they determined a given use was <u>not</u> fair, they did <u>not</u> retain or sometimes even finish completing the checklist.

### C.      Factor Two Weighs in Favor of Fair Use

Plaintiffs first attempt to minimize Factor Two, arguing that it should be given less weight overall.  (See Pls.' Conclusions of Law, Dkt. 409-6 ¶ 74.)  Plaintiffs then argue a "scare tactic," asserting that the USG Copyright Policy will discourage authors from addressing important issues "for fear of losing their copyright protection."[3]  (Id. ¶ 75.)  Finally, Plaintiffs argue that the works at issue are at least partly "creative."  These arguments ring hollow.

The Campbell case recognizes the general rule that the greatest degree of protection is afforded to highly creative works, and the least amount of protection is afforded to works that are factual or practical in nature.  Specifically, the Campbell count stated:  "This factor calls for recognition that some works [i.e., creative] are closer to the core of intended copyright protection then others [i.e., fact-based], with the consequence that fair use is more difficult to establish when the former works are copied."  Campbell, 510 U.S. at 586.  See also Harper & Row v. The Nation, 471 U.S. 539, 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction.")

A key justification for this general rule is that copyright extends only to the original aspects of a work.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340,

---

3 Elsewhere, Plaintiffs also argue that publishers will lose their motivation to publish such works.  (See id. ¶¶ 8-18.)

361 (1991).  Works that are primarily factual contain less original authorship than works of fiction.  Another key justification is that the need to reproduce material of a factual nature is generally greater than it is for works of fiction.  Consequently, it is appropriate and consistent with the goals of copyright to permit a broader scope of fair use for fact-based works.

This is certainly the case in reference to scholarly works such as are at issue in this case.  Many of the works at issue included page after page of bibliographic reference at the conclusion of each chapter or the book.  (See, e.g., PX 354 at 284-90; PX 288 at 228-231; PX 142 at 224-41.)  (In some cases the pages were so numerous that Plaintiffs did not count them in determining a percentage of the work used.)  Defendants do not denigrate the quality of such authorship; to the contrary, they applaud it.  After all, the collection, organization and creation of reference material is what all professors do, including those at GSU.

Despite that meritorious effort, however, such scholarly works remain "fact-based" works that other teachers and scholars will read, reference, and teach.  It is customary and appropriate for the academic community to rely heavily on prior, fact-based work.  The doctrine of fair use encourages such activities.  In the unique environment of higher education, the context of this case, teachers are necessarily and properly afforded greater latitude to use scholarly works to promote the science of learning in accordance with copyright's Constitutional purpose.

18

When viewed in the context of the educational environment, Plaintiffs' scare tactics fail.  There is no evidence that any of these publishers are going to go out of business because professors are not addressing important topics for fear that they will lose their copyright.[4]  There is simply no evidence that implementation of the 2009 Copyright Policy at GSU has affected any of the three publishers.

Plaintiffs "scare tactic" is reminiscent of arguments that were made by the television and entertainment industry in <u>Sony</u>.  In that case, the plaintiff Universal contended that the use of videotape machines for free, time-shifted home viewing would have substantial negative effects on the entire television industry.  Decades later, we see that such scare tactics were nothing more than a litigant's hollow argument.  The same is true here.  The academic publishing industry is <u>not</u> at risk.  To the contrary, in view of the Draconian relief sought by the publishers, it is the ability of a teacher to make lawful fair use that is at risk.  Given that teaching, criticism, comment, and scholarship are enumerated categories of protected illustrative uses, the professor's right to make such use is paramount.

Regarding the nature of the work, the Second Circuit in <u>Texaco</u> accepted the publisher's argument that "a significant amount of creativity was undoubtedly used in the creation of the eight articles copied . . . , even at a glance their content

---

[4] In fact, Plaintiff Oxford University Press just announced that its pretax profits had surged by as much as 25%.  <u>See</u> http://thebookseller.com/profits-surge-oup.html.  In that same time period, Oxford sales have <u>grown</u> by 6%.  <u>Id.</u>

immediately reveals the predominantly factual nature of these works." <u>Texaco</u>, 60 F.3d at 925.   Yet the Court found that factor two weighted in favor of Texaco because of the factual nature of the works.  Id.  The court limited <u>Weissmann</u>, 868 F.2d at 1325, stating that "though we have previously recognized the importance of strong copyright protection to provide sufficient incentives for creation of scientific works, <u>see</u> <u>Weissmann</u> . . ., nearly every category of copyrightable works could plausibly assert that broad copyright protection was essential to the continued vitality of that category of works."  <u>Id.</u>  "Ultimately, then, <u>the manifestly factual character of the eight articles precludes us from considering the articles as within the core of the copyright laws protective purposes</u> . . . ." <u>Id.</u> (emphasis supplied) (citing <u>Campbell</u> and <u>Harper & Row</u>).

>Equally if not more importantly, in footnote 11, the Court stated:

>>Not only are the . . . articles essentially factual in nature, but the evidence suggests that [the Texaco scientist who copied them] was interested exclusively in the facts, ideas, concepts, or principles contained within the articles.  <u>Though scientists surely employ creativity and originality to develop ideas and obtain facts and thereafter to convey the ideas and facts in scholarly articles, it is primarily the ideas and facts themselves that are of value to other scientists in their research.</u>

<u>Id.</u> at 925 n.11.

The same is true here.  The scholarly works at issue are <u>not</u> at the core of the copyright laws protective purposes.  Several professors testified that they were using the excerpts to convey the facts and ideas described therein.  For example, Prof.

Kaufmann used Chapter 1 of <u>The Sage Handbook of Qualitative Research</u> because it gives a historical overview of the field, and the stage the field has gone through.  (T. Vol. 5 at 81.)  (This also explains why the professors generally viewed the excerpts as important, but replaceable.)   Being able to effectively convey such facts and ideas, which are <u>not</u> copyrightable, is of critical importance in the educational context.  As the Second Circuit found as to the factual works at issue in that case, 60 F.3d at 925, Factor Two in this case weighs in favor of fair use.

**D.     Factor Three Weighs In Favor of Fair Use**

The third factor focuses on "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3).   There are several flaws in Plaintiffs' analysis under this factor.  First, Plaintiffs misconstrue the "quantity" question and improperly attempt to change positions and focus on uses of individual chapters instead of the fractional uses of  books that the Court determined would be the allegations for consideration in this litigation.  (<u>See</u> Dkt. 235; <u>see also</u> discussion <u>infra</u>.)  Second, Plaintiffs misapply the qualitative analysis. Third, Plaintiffs overstate the relevance of the Classroom Guidelines.

 Regarding the quantitative analysis, the average amount used by the 23 professors, by *Plaintiffs' calculations*, was approximately 10 percent.   When consideration of the use by just two professors is eliminated, the average for the remaining 21, again using Plaintiffs' calculations, drops to 7.5% and the median

drops to 6.8%.[5]   Within this average, of course, many of the professors used less

than 5% of a work.[6]   These uses are reasonable.   <u>Maxtone-Graham v. Burtchaell</u>,

803 F.2d 1253, 1263 (2d Cir. 1986) (quotes comprising 4.3% of a book are not

incompatible with fair use); <u>Sundeman  v. The Seajay Soc'y, Inc.</u>, 142 F.3d 194 (4th

Cir. 1998) (literature scholar's quotations of 4 to 6% of original, unpublished novel

is fair use);  <u>New Era Publ'ns Intern., ApS v. Carol Publ'g Group</u>, 904 F.2d 152, 158

(2d Cir. 1990) (holding quotes from copyrighted works of subject of biography that

were 5-6% of 12 works, 8% or more of 11 works, and a minuscule amount of 25

works, each of which was a few pages in length, were not so much as to be unfair, in

part because the quotes were from published works).   And, as has been noted, the

practices of GSU's professors appear to be conservative compared to what takes

---

[5]   These calculations do not take into account the changes Plaintiffs made to their allegations in their post-trial proposed findings of fact and associated Appendices. Defendants do not agree with all of the changes (<u>e.g.</u>, the increase of the Summer 2009 allegation regarding Dr. Kruger by 20 pages (Dkt. 409 App. A at 41)), but in several instances Plaintiffs have properly reduced the percentage for which permission is purportedly required (<u>e.g.</u>, decreasing the allegation of infringement of <u>More Grammar Games</u> by 10 pages (<u>id.</u> at 7)), so the approximation of 10% used and the lesser percentages used by the 21 professors both over-state the actual quantities.

[6]   Also, if one excludes the excerpts used by just three professors, Murphy, Kim, and Kaufmann, the number of alleged infringements drops to only 40 for the remaining 20 professors, underscoring that this is hardly a case of "systematic" infringement, particularly when you consider that the 2009 Maymester, Summer, and Fall sessions involved thousands classes taught by hundreds if not thousands of professors.

place at other reputable institutions, as evidenced by their copyright and fair use polices.

Plaintiffs' arguments about Factor Three miss the mark in part because they place undue reliance on the Classroom Guidelines. A political artifact of the extensive work on the 1976 Copyright Act, the Guidelines do not limit the flexibility of the fair use analysis or restrict the explicit imprimatur given to making "multiple copies for classroom use." 17 U.S.C. § 107. The statute does <u>not</u> provide that multiple copies can be made only if it is a one-time use of a tiny excerpt resulting from a recent, spontaneous decision by the professor.[7]  To the contrary, the legislative history makes clear that the fair use doctrine was intended to remain flexible, that exact rules were rejected, that "there was no disposition to freeze the doctrine," and that "Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." H.R. Rep. No. 94-1476, p. 17 (1976). In regard to the Classroom Guidelines themselves, the legislative history states:

> The purpose . . . is to state the minimum and not the maximum standards of educational fair use under Section 107 … *the following statement of guidelines is not intended to limit the types of copying permitted under the standards of judicial decision and which are stated*

---

[7] One reasonable interpretation of the statutory "multiple copies" reference is that it is implicitly talking about entire works. Of course, there is no fixed limit on the quantity copied; copying an entire work may constitute a fair use. <u>Sony Corp. v. Universal City Studios, Inc.</u>, 464 U.S. 417, 447-55, 104 S. Ct. 774, 791-95 (1984).

> *in Section 107* of the Copyright Revision Bill.  There may be instances in which copying which does not fall within the guidelines … may nonetheless be permitted under the criteria of fair use.

H.R. Rep. No. 94-1476, p. 18 (1976) (emphasis supplied).  As the Supreme Court has expressly stated, "[t]he task is not to be simplified with bright-line rules," for the copyright statute, like the fair use doctrine, requires a case-by-case analysis. Campbell, 510 U.S. at 577 (citing, inter alia, Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1985); Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 448 (1984)).

In response to strong criticisms from representatives of the American Association of University Professors and the American Association of Law Schools, the committee reiterated its view that the Guidelines are not limitations but minimums providing a safe harbor:  "The Committee believes the guidelines are a reasonable interpretation of the minimum standards of fair use. Teachers will know that copying within the guidelines is fair use. Thus, the guidelines serve the purpose of fulfilling the need for greater certainty and protection for teachers." H.R. Rep. No. 94-1476, p. 21 (1976)(emphasis supplied.)  In short, Congress did not adopt the Guidelines, Plaintiffs' arguments notwithstanding.

Another clue to how cramped a view Plaintiffs are taking regarding the scope of educational fair use is their argument that the "strict limits" on library copying under Section 108 shed light on Congress's understanding of the limits on fair use

under Section 107.  (See, Plaintiffs' Proposed Conclusions of Law, Docket 409-6, p.

29, n. 7.)  To the contrary, subsection 108(f)(4) states explicitly that Section 108 is

<u>not</u> a limit on libraries' fair use rights under Section 107, and the legislative history

makes clear that Section 108, like the Guidelines, provides a safe harbor, not a limit

on libraries' fair use rights, much less a guidepost for divining the limits of Section

107 generally:

> The Register of Copyrights has recommended that the committee report
> describe the relationship between this section [107] and the provisions of
> section 108 relating to reproduction by libraries and archives.  The doctrine of
> fair use applies to library photocopying, and nothing contained in section 108
> 'in any way affects the right of fair use.'  <u>No provision of Section 108 is</u>
> <u>intended to take away any rights existing under the fair use doctrine.  To the</u>
> <u>contrary, section 108 authorizes certain photocopying practices which may not</u>
> <u>qualify as a fair use.</u>"

H.R. Rep. No. 94-1476, p. 23 (1976) (emphasis supplied).

To escape the conclusion that is inevitable under a proper analysis of factor

three, Plaintiffs, after trial commenced, started asserting that certain individual

chapters constituted works standing alone and that the professors had copied 100%

of such works.  (<u>See</u> discussion <u>infra</u>.)  This attempt to change positions mid-stream,

after acknowledging repeatedly that the professors used fractions of the relevant

"works" (<u>see, e.g.</u>, JX 5), is contrary to the Court's prior orders[8] and unfair and

should be rejected by the Court.  Moreover, as to at least eight chapters, Plaintiffs

---

[8]  <u>See</u> Court's Orders Dkt. Nos. 226, 227, 240, & 265.

have not proven assignment of the chapter author's copyright (so all Plaintiffs can rely on is the editor's copyright to the compilation, the book, as a whole) and Plaintiffs' evidence is incomplete as to two chapters, resulting in the same limited rights.[9]

Additionally, Plaintiffs' comparison to journal articles is simplistic and misleading.  It is true that some of the classroom reading materials consisted of articles from journals to which GSU pays to subscribe, but that does not mean that the professors (or GSU or the students) should pay for using excerpts from academic books.  Not only does the fact of the subscriptions shed no light on the scope of the professors' fair use rights, the paid subscriptions are the means by which GSU and its professors obtain access to the journal articles.  As for the books, GSU or the professor already owned the books from which the excerpts were taken.  Access to those books had already been acquired by purchase.

Plaintiffs then argue that the sub-factor asking whether the excerpt is narrowly tailored to the education purpose is irrelevant to the third factor.  That argument is specious.  According to the Supreme Court, the third factor asks whether "'the

---

[9] Lacking the required contractual assignments, Plaintiffs continue to rely in their post-trial Findings of Fact and the Attachments on their alleged "usual practice" of getting author assignments to support their claim of ownership as to several works. As discussed in more detail below, Defendants object to Plaintiffs' continued disregard of the Court's Order in limine precluding such evidence. <u>See</u> Court's Order dated May 13, 2011, Dkt. 310.

quantity and value of the materials used' are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 586.  The Court must examine whether "[t]he extent of copying" is consistent with or is more than necessary to further the purpose and character of the use. Id. at 586-87.  Hence, asking the professors whether the proposed excerpt is narrowly tailored to the need is not only consistent with a proper third-factor analysis, it reflects a proper respect for the copyrights of authors and their assignees.

Similarly, Plaintiffs' argument that this sub-factor merely reflects the fact that the excerpt was chosen by the professor for classroom reading is belied by the plain language of the question and the facts.  It is asking whether the excerpt, once chosen, has been narrowly tailored to the perceived need.  Professor Kaufmann testified this sub-factor made her focus on that question.  (T. Vol. 5 at 177.)  Plainly, she had not before.  Plaintiffs complain about Professor Duffield's use of a *portion* of one chapter of the work Behavior, Society, and Nuclear War.  He excerpted and used less than half of that one chapter, because that was the portion specifically tailored to his need.  (T. Vol. 11 at 73-74; PX 359.)

Also, Plaintiffs are only entitled to "count" those portions that are original to the authors.  As already shown, several of the books included multiple pages that plainly were not protectable and often the author and publisher acknowledged that fact.  Plaintiffs provided no author testimony identifying specific protectable

27

portions of any of the subject works.   In short, Plaintiffs have not meaningfully assessed the question of quantity, arguing that a use of a little as 2% and one as great as 30% (all according to Plaintiffs' count) equally constitute too great a quantity.

Plaintiffs also misconstrue the qualitative analysis. The focus should be on whether the heart of the infringed work has been taken.   Under Plaintiffs' tautological argument,[10] when Professor Kim copied a third-party's test incorporated in a book (see, e.g., T. Vol.  6 at 148 to 150, she was copying the "heart" of the work, simply because she copied it, even though plainly it is not even the author's work.  (PX 15, Assessing Grammar, pp. 114, 119, 127, 137, etc.).  And if a professor copied half a page of a book, he or she would be copying the heart, according to Plaintiffs' theory, because he or she thought it was sufficiently relevant to the class to make a copy.

In Maxtone-Graham, as noted, the Second Circuit found that the quotation of 4.3 percent of a pro-abortion book, Pregnant By Mistake,  in a later anti-abortion book was consistent with fair use.  803 F.2d at 1263.   The original book consisted of interviews of 17 women discussing their experiences with abortion.   The second book quoted from an unspecified subset of the interviews.   The Second Circuit found that the second author, Burtchaell, had not taken "the heart of Pregnant By Mistake,

---

[10] Plaintiffs' argument appears to be: it was copied therefore it must be the heart. This distorts the Supreme Court's "heart" analysis in Harper & Row.

since Maxtone-Graham's book consists of narratives by 17 women, *and has no identifiable core that could be appropriated.*" *Id.* (Emphasis supplied.) That is exactly the analysis many of the professors at GSU went through, opining that there was no "heart" to works that summarize multiple discrete aspects of a particular topic. (See, e.g., T. Vol. 5 at 180-182, T. Vol. 6 at 39, 47 (Kaufmann); T. Vol. 10 at 12-13, 25, 34, 46 (Kruger).) Their conclusions were correct.[11]

The portions used by the professors at GSU were reasonable "in relation to the purpose of the copying," Campbell, 510 U.S. at 586, that purpose being the goal of providing a quality education to students at the University. Each of the professors so testified and Plaintiffs offered no contrary purpose. The third factor weighs in favor of fair use.

### E.    Factor Four Weighs In Favor of Fair Use

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As discussed above, Plaintiffs' argument that this factor predominates is incorrect.

Regarding Plaintiffs' burden of proof, where, as here, the use is a non-profit educational use, the plaintiff must prove that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the

---

[11]   Defendants acknowledge that some cases Plaintiffs' cite, such as the copyshop cases, appear to support Plaintiffs' tautological argument. However, not only are those cases not dealing with educational fair use, their analysis is flawed.

copyrighted work; the plaintiff must show by a preponderance of the evidence that a meaningful likelihood of future harm exists.  Sony Corporation of America, et al. v. Universal Studios, Inc., 464 U.S. 417, 451, 104 S. Ct. 774 (1984).

Plaintiffs failed to meet this burden.  First, there is no credible evidence that Plaintiffs have suffered or are likely to suffer a loss of book sales.  In fact, the evidence is to the contrary.  Second, Plaintiffs exaggerate the risk of harm to permissions income and there is no credible evidence that if the practices at GSU were to expand, Plaintiffs' permissions revenue would suffer.

First, contrary to Plaintiffs' arguments, there is no evidence of any actual lost sales of books.   Representatives of Cambridge and Oxford admitted they have no evidence of any actual losses of sales of books.  (T. Vol. 2 at 28 (Frank Smith);  T. Vol. 3 at 141 (N. Pfund).)

Moreover, Plaintiffs presented no credible evidence of any "meaningful likelihood" of such harm in the future.  Id.  While Plaintiffs' witnesses made vague, conclusory statements of fear that such losses might possibly occur in the future, the evidence indicated the use of excerpts has the potential to *increase* the sale of books. Several professors believed assigning excerpts would promote books sales.  Some have seen students buy books after they assigned an excerpt to the class, and some purchased books when they themselves were students after a professor assigned an excerpt as reading material.  (T. Vol. 5 at 99, 100, 181, 182 (Kaufmann); T. Vol. 9 at

77 (Prof. Dixon); T. Vol. 10 at 26, 27, 47, 48, & 71 (Kruger); <u>see also</u> Dep. of Prof. Greenberg, pp. 19, 20.)

Notably, plaintiffs consistently give away significant numbers of books. Mr. Smith estimates Cambridge gives away approximately 20,000 books each year. T. Vol. 2 at 21. Often the number of books given away is significant in comparison to the number sold. <u>Id.</u> Cambridge's records show that, during one period, Cambridge sold 684 paperback copies of the work *Legislative Leviathan* and gave away 227 copies, or more than 30% of the quantity sold. Similarly, Cambridge sold 102 hard copies and gave away 29 hard copies, almost 30% of the number sold. T. Vol. 2 at 22; DX 59.

In addition, Cambridge allows for up to 10% of any of its books on Google Books to be viewed by anyone who logs onto Google. T. Vol. 2 at 23. Mr. Smith believes the free viewing of excerpts on Google has helped book sales. T. Vol. 2 at 28. Oxford gives away approximately 200,000 books each year. T. Vol. 3 at 135. In addition, there was no evidence that the use of excerpts was a market substitute for purchasing the entire book, or that any professor would have the students buy the entire book if it was determined the excerpt could not be fairly used. All evidence was to the contrary.[12]

---

[12] In this regard, Plaintiffs' complaint that two or three professors did not require the purchase of any textbooks is immaterial. The vast majority of professors

Moreover, Plaintiffs have greatly exaggerated their permissions revenue and thus the potential for loss.[13] While Plaintiffs have repeated the claim by Cambridge University's representative, Mr. Smith, that approximately 3-5% of annual revenues comes from permissions fees, T. Vol. 1 at 71, he later admitted that it was much less. In Cambridge's last fiscal year, 2009, the overall rights revenue (which includes permissions fees) was $1.2 million, only approximately 1% of Cambridge America's overall revenue. T. Vol. 2 at 35. And this figure includes revenues from corporations and other private businesses, as well as revenue from outside the United States. T. Vol. 2 at 30, 31; PX 2. More importantly, the permissions income from users of academic books totaled only $338,700 in FY 2009, or 1/3 of 1% of Cambridge's overall revenue. T. Vol 2 at 35, 36.[14] Similarly, Mr. Pfund admitted

---

required the students to purchase textbooks, usually multiple textbooks, some published by one of the Plaintiffs.

[13] Plaintiffs have also exaggerated the purported "heavy" nature of the permissions revenue. For example, the claim that no royalties were paid on this revenue (see, e.g., ¶271 of Pl's Proposed Findings of Fact) is incorrect. CCC paid royalties (see, e.g., PX 14) and Plaintiffs should have paid royalties on direct permissions payments. Moreover, there were costs associated with such revenue, such as personnel to monitor the activity. T. Vol. 3 at 124.

[14] Moreover, Plaintiffs' apparent attempt to portray FY 2009 as an outlier year, to indicate that Mr. Smith's estimate of permissions revenue was generally correct (see ¶124 of Pl's Proposed Conclusions of Law and footnote 18), is belied by Cambridge's own financial records, limited though their production has been. Cambridge's income in FY 2008 was slightly more than $109 million. PX 1, p. 1. It's rights income that year, which again includes permissions income, was $1,006,019, PX 2, or again *slightly under 1%* of Cambridge's income.

that permissions fees from academic books has accounted for well less than 1% of Oxford's overall income.  T. 3-147.[15]

Plaintiffs produced no expert witness as to market harm.  The representatives of Cambridge and Oxford, Messrs. Smith and Pfund, had testified as designated representatives of their respective employers under Fed. R. Civ. P. 30(b)(6), and neither of them could provide any analysis or study of market harm, and admitted they were not qualified to provide such testimony.  (T. Vol. 2 at 24, 25 (Smith); T. Vol. 3 at 138, 139 (Pfund).)

Plaintiffs' claims that all of the works at issue were available for permissioned or licensed excerpts via CCC (see, e.g. ¶118 of Plaintiffs' Proposed Conclusions of Law) is also unsupported.  Cambridge's representative, Mr. Smith testified that CCC is capable of handling only approximately 60% of their works overall and that Cambridge does not make their reference books, citing ESL books specifically, available for excerpting through CCC.  T. Vol. 1 at 69-70.  Mr. Smith admitted that he did not know if Cambridge would allow CCC to license excerpts of the ESL books at issue, and thus does not know if Professor Kim could have obtained

_____

[15]  Equally unfounded and unfair is Plaintiffs' claim that, for "the last few years," Cambridge's permissions income has fallen.  Cambridge's rights income in FY 2008 increased 15% from FY 2007 and in FY 2009 it increased 20% from FY 2008!  PX 2; T. Vol. 2 at 30.  Cambridge did not produce more current financial records (despite on-point requests from Defendants), rendering Plaintiffs' contention unfair as well as unsupported.

permission to use these works at GSU.   T. Vol. 1 at 133, 134.   Oxford's representative only testified that the "vast majority"  (later saying mid-90s by percent) of its works "are" available through CCC, but did not say they were available in 2009.  T. Vo. 3. at 69-70.  Only Sage's representative testified that all of Sage's works "are" available through CCC, but she did not state they were available in 2009.  T. Vol. 2 at 90. [16]  Similarly, regarding CCC's annual license program, the evidence showed that not all works were available, and that Cambridge was not even participating in 2009.  Perhaps that is why only 110 or so of the more than 4000 colleges and universities in the United States pay for the annual license.

Finally, plaintiffs' proof as to what would happen if the practices at GSU were to become widespread is lacking because plaintiffs had no evidence as to whether other colleges and universities were posting fewer excerpts on E-Reserve systems. Plaintiffs do not know how other institutions compare.  T. Vol. 3 at 77 (N. Pfund). As shown previously, there is some evidence that the practices at GSU, at least following the adoption of the current policy, are conservative when compared with the policies at several institutions allow quantitative levels of copying that exceed the average percentages at GSU.

---

[16]  The CCC representative only testified that each of the Plaintiffs participates in the licensing program.  T. Vol. 4 at 13.

Plaintiffs' financial records show that several of the works at issue have generated little permissions revenue from anywhere in the country.  For example, according to CCC's records, for the 5 ½ years from July 2004 through the end of 2010, permission fees have been paid: (i) one time, for the use by one professor at one institution, of any excerpt of  the Cambridge work "Assessing Grammar" (PX 19); (ii) twice at one institution for any excerpt of the work "Assessing Speaking" (PX 38); (iii) once at one university for any excerpt of "Assessing Vocabulary" (PX 48); (iv) twice at one institution for the work "Cambridge Companion to Berlioz" (PX 64); (v) once from a licensing agency for the "Cambridge History of China" (PX 84).

It appears (from the lack of records) that plaintiffs have received no permissions income at all for several of the works, such as "Grammar Practice Activities;" "Liszt, Sonata in B Minor";  "More Grammar Games;" "Pronunciation;" "Understanding Trauma;" "Materials Development in Language;" "Democracy Without Competition in Japan;" the "Cambridge Companion to the Organ;" and "Legislative Leviathan."

Plaintiffs' question the credibility of the unrebutted testimony by several professors that they would not have used the excerpts at issue if permissions fees were required.  Not only were the professors credible, however, they were adamant, and their testimony makes sense.  It is precisely because the students have already

paid hundreds of dollars for textbooks that the professors are reluctant to impose additional fees for excerpts of works that are important but not indispensible.

It bears repeating that Plaintiffs' argument regarding permissions fees is circular.  Given they have developed a licensing scheme that can charge users for a single page or even a paragraph of a work, every instance of copying, no matter how small,  may affect a potential market for the work to some degree.  The fair use defense would mean nothing if it addressed only those uses for which Plaintiffs have not yet developed a mechanism by which to charge fees for the use of such portions.

In sum, the fourth factor also weighs in favor of fair use.

## III.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE THEY ARE ENTITLED TO A PERMANENT INJUNCTION.

Under Section 502(a) of the Copyright Act, the Court may, in its discretion, grant a permanent injunction on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.  See 35 U.S.C. § 502(a).  The Supreme Court has "consistently rejected" the notion "that an injunction automatically follows a determination that a copyright has been infringed."  eBay Inc. v. MercExchange, LLC, 126 S. Ct. 1837, 1840 (2006); see also Peter Letterese and Assocs., Inc. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287, 1323 (11th Cir. 2008) ("[A] permanent injunction does not automatically issue upon a finding of copyright

infringement."); Microsoft Corp. v. Tech. Enters., LLC, No. 06-civ-22880, 2011 WL 1134238, at *2 (S.D. Fla. Mar. 28, 2011).

Plaintiffs bear the burden of satisfying the four-factor test reiterated in eBay before the Court may grant injunctive relief.  See eBay, 126 S. Ct. at 1839.  In particular, Plaintiffs must show: (1) that they have suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  Id.; Letterese, 533 F.3d at 1323; Microsoft, 2011 WL 1134238, at *2.

Plaintiffs have failed to demonstrate that an injunction is warranted under this four-factor test.  Indeed, Plaintiffs do not even cite this four-factor test in their papers.  Rather, they simply contend that "an injunction is appropriate where there is 'a past infringement and a substantial likelihood of future infringement'" -- a broader and more permissive two-part test than the four-factor test articulated in eBay.  (Pls.' Post-Trial Concl. of Law [Dkt. No. 409-6] ¶ 179 (citing New World Music Co. v. Tampa Bay Downs, Inc., No. 8:07-cv-398-T-33TBM, 2009 WL 35184, at *9 (M.D. Fla. Jan. 6, 2009))).[17]

---

[17]  While the New World Music case cites to the Eleventh Circuit's decision in Pac. and S. Co. v. Duncan 744 F.2d 1490, 1499 (11th Cir. 1984) for this proposition, the

There is a serious question regarding whether Plaintiffs' more permissive test survived the Supreme Court's decision in eBay.  In fact, several courts that have considered this issue have rejected Plaintiffs' two-part test as inconsistent with eBay.  See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197, 1209-10 (C.D. Calif. 2007) ("[T]he four eBay factors are the only relevant considerations for purposes of Plaintiffs' instant motion under the Copyright Act.  This Court can identify no place for a separate and distinct two-part MAI test or 'general rule' that could circumvent eBay…. MAI should only be relevant to the extent it informs the eBay analysis."); Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007) (applying eBay and rejecting plaintiff's assertion that "when copyright infringement has been proved and there is a threat of continuing infringement, the copyright holder is 'entitled to an injunction.'"); MDY Indus., LLC v. Blizzard Enter., Inc., 616 F. Supp. 2d 548,  (D. Ariz. 2009) ("The Court agrees with other district courts that MAI's two-part rule did not survive eBay."); but see Major Bob Music v. Heiman, No. 09-cv-341-bbc, 2010 WL 1904341, at *5 (W.D. Wis. May 11, 2010) (stating that "[b]efore a permanent injunction is issued, a plaintiff is required to satisfy a four-part test, though it is generally 'uncontroversial that a 'showing of past infringement and a substantial

---

Pac case was decided more than twenty years before the Supreme Court decided eBay.

likelihood of future infringement' justifies issuances of a permanent injunction" and quoting Nimmer on Copyright § 14.06[B] (2007)).

Because Plaintiffs have failed to demonstrate that an injunction would be warranted under the four-factor <u>eBay</u> test (the correct legal standard), their request for an injunction should be denied. <u>Cf</u>. <u>Barnstormers, Inc. v. Wing Walkers, LLC</u>, No. EP-10-cv-261-KC, 2011 WL 1671641, at *6 (W.D. Tex. May 3, 2011) (finding plaintiff waived request for injunction where it did not set forth <u>eBay</u> standard in its motion or any other argument or authority indicating why an injunction would be appropriate); <u>Miroglio S.P.A. v. Conway Stores, Inc.</u>, No. 05 Civ. 00121(BSJ)(GWG), 2007 WL 391565, at *7 (S.D.N.Y. Feb. 6, 2007) (denying request for permanent injunction where plaintiff's memorandum of law provides no briefing on the legal standards required for such an injunction or why an injunction is appropriate).

## IV.   PLAINTIFFS' PROPOSED INJUNCTION SHOULD BE REJECTED AS OVERBROAD.

"Injunctive relief should be narrowly tailored to fit specific legal violations." <u>Waldman Publ'g Corp. v. Landoll, Inc.</u>, 43 F.3d 775, 785 (2d Cir. 1994). Broad injunctions alter copyright into an engine of suppression, in contravention of its goal to promote the progress of science and threatening to encroach on First Amendment values. Nimmer on Copyright § 14.06[C].

Plaintiffs' proposed injunction runs afoul of these principles.  Indeed, it is overbroad in both the conduct enjoined and the persons covered.  Further, Plaintiffs' proposed injunction improperly seeks to supplant the flexible, statutory fair use framework under 17 U.S.C. § 107 with rigid, bright line rules that reflect the absolute minimum standards proffered by the Classroom Guidelines -- which are not part of the Copyright Act and do not have the force of law.  See, e.g., Marcus v. Rowley, 695 F.2d 1171, 1178 (9th Cir. 1983) (recognizing that the Guidelines "are not controlling on the court"); see also, e.g., Gregory K. Klingsporn, The Conference On Fair Use (CONFU) And The Future Of Fair Use Guidelines, 23 Colum.-VLA J.L. & Arts 101 (Winter 1999) ("the Classroom Guidelines are not part of the statutory text. . . . Judges and scholars have since struggled with the question of how much weight to give them.").  In light of its overbreadth, compliance with the proposed injunction would be extremely difficult, if not impossible, for GSU to administer and the costs to GSU would be unreasonable.

## A.   The Proposed Injunction Is Overbroad.

Plaintiffs' proposed injunction defines "GSU" (the party enjoined) as including, among other persons, "persons acting under [the] direction, control, or supervision" of any covered person, "including all part-time or full-time faculty employed by, and students enrolled at, GSU[.]"  (Dkt. 300-1 at 1, ¶ I.A).  Thus, the injunction would enjoin, among others, GSU faculty and students from, among other

things, "encouraging or facilitating" <u>any</u> unauthorized copying <u>by anyone</u> of covered Works, regardless of whether that third party is or is not affiliated with GSU.  Read literally, the injunction would require a GSU student to monitor and ensure that a non-student friend who the GSU student allows to make photocopies is not copying a covered Work without permission, lest the GSU student fall afoul of the "facilitating" prohibition.  An injunction that could lead to such a result is facially overbroad.

Similarly, because the injunction enjoins GSU from "encouraging or facilitating" any prohibited copying, GSU administrators arguably would have to monitor all faculty and student photocopying at copiers provided in its libraries to ensure that any such copying fell within the strictly specified limits.  Indeed, because the proposed injunction eliminates the flexibility inherent in the statutory fair use privilege enacted by Congress and applied by courts, the proposed injunction would make GSU responsible for monitoring every conceivable act of copying that takes place on its campus.

Under the proposed injunction, it even would be insufficient for GSU to monitor every student's photocopying behavior and every faculty member's decisions with respect to use of classroom materials.  Plaintiffs' injunction would also require that GSU give Plaintiffs access to all of its computer systems so that

Plaintiffs, too, could examine each professor's decisions.  (See Dkt. 300-1 at 5, ¶ VIII.B).

For at least **these** reasons, the Court should decline to enter Plaintiffs' proposed injunction.

### B.     The Proposed Order Improperly Seeks To Impose Rigid Rules That Congress Declined To Incorporate Into The Statutory Fair Use Framework.

Under Plaintiffs' proposed injunction, the only copying that would be permitted without permission is that which falls within the rigid bounds of the Classroom Guidelines (see Dkt. 300-1 at 2, ¶ III.B.1) -- as modified by Plaintiffs. (See id.; see also id. at ¶ III.B.2).  Plaintiffs' curtailment of the scope of fair use to the significantly restrictive limitations of the Classroom Guidelines is inconsistent with the Guidelines themselves.  Indeed, the Guidelines expressly state that their purpose "is to state the **minimum and not the maximum standards** of educational fair use under Section 107 of [the Copyright Act]."  H.R. Rep. No. 1476, at 68, U.S. Cong. & Admin. News 1976, p. 5681 (emphasis added); see also id. ("[t]here may be instances in which copying which does not fall within the guidelines . . . may nonetheless be permitted under the criteria of fair use"); 4 Nimmer on Copyright § 13.05[E], at 13-96 (Matthew Bender, Rev. Ed.) (courts may decide whether a use that exceeds the Guidelines may be fair use and whether a use that is within the Guidelines may exceed fair use; courts must balance the interests involved).  Thus,

Plaintiffs' injunction would do precisely what the Guidelines themselves decry -- convert the minimum standard into a de facto maximum for the amount of copying, regardless of the application of the fair use doctrine.

Further, Plaintiffs' proposed injunction would permit a copy of only 10 percent or 1,000 words of a prose work, whichever is less. In many cases, the 1,000 word restriction will be the effective limit, which may prohibit copying even the one page of a work permitted in other injunctions relied on by Plaintiffs. See Basic Books, Inc. v. Kinko's Graphics Corp., No. 89 CIV. 2807 (CBM), 1991 WL 311892 (S.D.N.Y. Oct. 16, 1991) (unreported) [Dkt. 300-2]; Princeton Univ. Press v. Michigan Doc. Svcs., Inc., 99 F.3d 1381 (6th Cir. 1996) [Dkt. 300-3].

Even more curious, Plaintiffs' proposed injunction improperly seeks to include additional restrictions that exceed even the Classroom Guidelines. For example, the "cumulative effect" limitation in the Guidelines -- which limits the total number of excerpts that can be made without permission -- would be enforced across the entire institution under the proposed injunction, not simply per course/class term, as the Guidelines provide. (See Dkt. 300-1 at 2-3, ¶ III.B.1; see id. at 8).

The proposed injunction also includes another restriction not recognized in the Guidelines that provides that copies made without permission may not "comprise more than 10% of the total reading (whether assigned, required, suggested, supplemental, or otherwise) for a particular course." (Id. at 3, ¶ III.B.2). Here,

again, the flexible principles of the fair use doctrine are jettisoned altogether. Instead, this provision is intended to ensure that 90 percent of each class's readings would be provided through purchased works or copies for which permission fees were paid, regardless of whether every professor is otherwise fully in compliance with the Classroom Guidelines' requirements -- and certainly regardless of whether the uses would be protected under the fair use privilege in any event.

The additional restrictions in Plaintiffs' order that extend beyond even what is contained in the Guidelines are designed for a single purpose: to increase the permission fees to be collected by Plaintiffs or Plaintiffs' licensing agent. As discussed below, this is merely one of the ways in which the proposed order would impose unreasonably high, potentially prohibitive, costs on Defendants.

### C. Compliance With The Proposed Order Would Be Prohibitively Expensive.

Finally, the administrative costs alone of complying with the proposed injunction would be enormous, including monitoring, record-keeping, reporting, and notice and educational requirements. And those costs do not reflect that greater volume of permission fees that necessarily would be required as a result of the imposition of the highly-restrictive Classroom Guidelines, as modified by Plaintiffs. Such costs could approach a level at which institutions of higher education deem it infeasible to provide EReserves, uLearn, faculty websites, course websites, or other

systems that fulfill the institutions' educational mission.  Such a result would be in direct contravention of the policy underlying the Copyright Act.  <u>See</u> 17 U.S.C. § 107 ("the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright").

For all the reasons stated herein, the Court should decline to enter Plaintiffs' proposed injunction.

## V.    ATTORNEYS' FEES SHOULD BE DENIED

Under Section 505 of the Copyright Act, the Court <u>may</u> award a reasonable attorney's fee and costs to the prevailing party.  <u>See</u> 17 U.S.C. § 505.  Attorneys' fees "are to be awarded ... only as a matter of the court's discretion."  <u>Fogerty v. Fantasy, Inc.</u>, 114 S. Ct. 1023, 1033 (1994).

"'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised" upon consideration of the following non-exclusive factors: frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence.  <u>Id.</u> at 1033, n.19 (quoting <u>Hensley v. Eckerhart</u>, 103 S. Ct. 1933, 1941-42 (1983) and citing <u>Lieb v. Topstone Indus., Inc.</u>, 788 F.2d 151, 156 (1986)).

These factors may guide a court's discretion, "so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." Fogerty, 114 S. Ct. at 1033 n.19.

Plaintiffs contend that they are entitled to an award of costs and attorneys' fees under 17 U.S.C. § 505 because Defendants' reliance on the fair use defense was "objectively unreasonable." (See Pls.' Post-Trial Concls. of Law [Dkt. No. 409-6] ¶¶ 196-197). The Court should deny Plaintiffs' request for fees and costs for at least two reasons. First, there has been no determination that Plaintiffs are the prevailing party in this case. In fact, Defendants have prevailed on all of Plaintiffs' copyright infringement claims decided to date. Second, Defendants' reliance on the fair use defense was in no way objectively unreasonable, and is based on sound factual and legal foundation.

**A.     There Has Been No Determination That Plaintiffs Are The Prevailing Party; In Fact, Defendants Have Prevailed On Each Of Plaintiffs' Copyright Infringement Claims Decided To Date.**

Under 17 U.S.C. § 505, attorneys' fees and costs may be awarded to the "prevailing party." See 17 U.S.C. § 505. Generally, the prevailing party under this section is "identified as the party succeeding on a significant litigated issue that achieves some of the benefits sought by that party in initiating the suit." Cable/Home Comm'n Corp. v. Network Prods., Inc., 902 F.2d 829, 853 (11th Cir. 1990). "A party's success on a claim that is 'purely technical or de minimis' does

not qualify him as a 'prevailing party.'" Id. (quoting Warner Bros., Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1126 (2d. Cir. 1989)).

It is difficult to characterize Plaintiffs as the prevailing party in this case. In fact, Defendants have prevailed on each of Plaintiffs' copyright infringement claims decided to date.[18] For example, on summary judgment, the Court found in favor of Defendants and against Plaintiffs on Plaintiffs' direct infringement claim and Plaintiffs' vicarious copyright infringement claim. (See 9/30/2010 Order [Dkt. No. 235]). On Plaintiffs' motion for reconsideration, the Court struck Plaintiffs' label of Count 1 as a "direct infringement claim," and allowed Plaintiffs to proceed under Count 1 only under a theory of indirect infringement. (See 12/28/2010 Order [Dkt. No. 249]).

At trial, on Defendants' motion for directed verdict at the close of Plaintiffs' case, the Court ruled in favor of Defendants and against Plaintiffs on Plaintiffs' indirect infringement claim and on Plaintiffs' contributory infringement claim. (See T. Tr. at 8-90, 95). Following the close of Plaintiffs' case, the only claim the Court found remained to be litigated was "a direct infringement claim based on the devising and implementation of the policy." (Id. at 8-90). Accordingly, Plaintiffs

---

[18] This fact strongly supports an award of fees to Defendants, not Plaintiffs. See Lil' Joe Wein Music, Inc. v. Jackson, No. 06-20079-CIV, 2008 WL 2688117, at *5 (S.D. Fla. July 1, 2008) ("All of Plaintiff's copyright claims were resolved in favor of Defendants. This is a factor which strongly supports an award of attorney's fees to Defendants.").

cannot be fairly characterized as the prevailing party in this case -- they have lost on every copyright infringement claim that has been decided to date.

**B.    Even If Plaintiffs Could Be Considered To Be A Prevailing Party, They Are Not Entitled To An Award Of Fees.**

Plaintiffs contend that they are entitled to an award of fees because Defendants' fair use defense was "objectively unreasonable."[19]    In particular, Plaintiffs claim Defendants' fair use defense "is unsupported by any judicial precedent; is irreconcilable with Congressional intent as embodied in the Classroom Guidelines; is invoked to justify taking for free in digital form the same material Defendants acknowledge would be infringing in paper (coursepack) form; and is predicated on the unilateral promulgation of a new copyright policy in the middle of the lawsuit that has demonstrably failed to rein in the widespread unauthorized takings of Plaintiff[s]' copyrighted works that prompted this suit…."  (Pls.' Post-Trial Concls. of Law [Dkt. No. 409-6] ¶ 197).  Plaintiffs' criticisms of Defendants' fair use defense are without merit.

First, the fair use checklist and the fair use analyses the professors performed in accordance with the fair use checklist are wholly consistent with and well grounded in the four factor test of 17 U.S.C. § 107 and the substantive law of fair

_____

[19]  Plaintiffs do not contend they are entitled to a fee award based on frivolousness, motivation, or  the need to advance considerations of compensation and deterrence. Accordingly, Defendants will not address these <u>Fogerty</u> factors.

use.  Notably, Plaintiffs did not even attempt to proffer any expert testimony at trial to suggest otherwise.

Second, the fair use checklist and the fair use analyses the professors performed are not inconsistent with the Classroom Guidelines.  The Classroom Guidelines -- which are not controlling law, in any event -- merely suggest a minimum standard for what could constitute an educational fair use.  Indeed, the legislative history makes explicitly clear that the groups that negotiated the Guidelines envisioned there could be instances of copying that are a fair use, even though they fall outside the scope of the Guidelines.  Thus, the Classroom Guidelines do not provide any basis for Plaintiffs' claim that Defendants' reliance on fair use was objectively unreasonable.

Third, Defendants have at all times acted in good faith (which Plaintiffs apparently do not dispute), and Defendants' defenses in this case are not only meritorious, but they have thus far prevailed.  This alone would justify the Court's denial of Plaintiffs' request for fees.  "[T]he fact that a losing party has acted in good faith or that his legal position had arguable merit will justify an exercise of the district court's discretion in deciding not to award attorney's fees."  Sherry Mfg. Co. v. Towel King of Fl., Inc., 822 F.2d 1031, 1034 (11th Cir. 1987); see also Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 832 (11th Cir. 1982) (applying Section 505 to a prevailing plaintiff's fees demand; "[T]he defendant's

good faith and the complexity of the legal issues involved likely would justify a denial of fees to a successful plaintiff….").

Fourth, the fact that the parties disagree about what amount of copying constitutes a fair use does not mean that Defendants' position was objectively unreasonable.

> Courts regularly reject reasonable legal positions in favor of other reasonable legal arguments. Indeed, precisely because the law may be susceptible to more than one reasonable interpretation, litigation occurs. Thus, the cases applying this Fogerty factor teach that a court must consider … the clarity of the law with respect to the losing party's position at the time that the losing party pressed its argument.

Luken v. Int'l Yacht Council, Ltd., 581 F. Supp. 2d 1226, 1240 (S.D. Fla. 2008).

The law of fair use is unquestionably murky. See Princeton Univ. Press v. Michigan Doc. Svcs., 99 F.3d 1381, 1392 (6th Cir. 1996). Indeed, "[f]air use is one of the most unsettled areas of the law. The doctrine has been said to be 'so flexible as virtually to defy definition." Id. (quoting Time Inc. v. Bernard Geis Assoc., 293 F. Supp. 130, 144 (S.D.N.Y. 1968) and holding that "[the court] cannot say that the defendants' belief that their copying constituted fair use was so unreasonable as to bespeak willfulness")). Accordingly, even if the Court ultimately finds that one or more of the professors' uses was not a fair use, this does not mandate an award of fees to Plaintiffs. See Thompkins v. Lil' Joe Records, Inc., No. 02-61161-CIV, 2008 WL 896898, at ** (S.D. Fla. Mar. 31, 2008) ("While Plaintiff's argument was

ultimately unsuccessful, that fact does not mean that Plaintiff's argument did not raise an important issue which has now been decided for the first time in this Circuit.").

Finally, an award of fees to Plaintiffs would not further the interests of the Copyright Act.   "The touchstone of attorney's fees under § 505 is whether imposition of attorney's fees will further the interests of the Copyright Act, i.e., by encouraging the raising of objectively reasonable claims and defenses …."   Mitek Holdings, Inc. v. Arce Eng'g Co., 198 F.3d 840, 842-43 (11th Cir. 1999).   "Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible.   To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement."   Fogerty, 114 S. Ct. at 1030.

As this Court has noted, the present case is the first to address fair use in the academic context as it relates to professors and students and the use of electronic reserves.   Defendants have funded the worthwhile address of these issues for the purpose of judicial determination and guidance.   Where, as here, "close infringement cases are litigated, copyright law benefits from the resulting clarification of the doctrine's boundaries."   Lotus Dev. Corp. v. Borland Int'l, Inc., 140 F.3d 70, 75 (1st

Cir. 1998).  The purposes of the Copyright Act would not be served by chilling a defendant's desire to advance a meritorious fair use defense by awarding fees to a prevailing plaintiff when that defense is found to be unsuccessful, albeit reasonable. "[T]he need to advance considerations of compensation and deterrence goes hand in hand with the inquiry into the reasonableness of the parties' positions.  Consistent with furthering the purposes of the Copyright Act, a party that advances a reasonable position should not be deterred from doing so for fear that it will have to pay attorney's fees if it loses."  Luken, 581 F. Supp. 2d at 1246.

Finally, Defendants were objectively reasonable in the implementation of the new policy at Georgia State University.  While Defendants proposed that the parties stay the case in order to see how effective the policy would be once implemented for a period of time, Plaintiffs refused -- perhaps because they were not and are not paying any costs of the litigation.  Given these facts, it would be inequitable to impose attorneys' fees on Defendants.

For these reasons, Plaintiffs' request for fees should be denied.

## VI.   RESPONSE TO PLAINTIFFS PROPOSED FINDINGS OF FACT

The Defendants will not address each error and omission in Plaintiffs' Proposed Findings.  However, as Plaintiffs have been unable to prove certain necessary elements of their case, they have made certain allegations and changed

others that demonstrate the inability to make the necessary proofs.  Defendants first set forth Plaintiffs' Proposed Finding, and then provide a brief response.

### A.      Specific Responses to Selected Proposed Findings of Fact

47.      All three Plaintiffs participate in various CCC licensing programs, and each Plaintiff work at issue in the litigation is available for licensing directly through CCC.  Trial Transcript Volume 4, May 20, 2011, Docket No. 402 ("5/20 Tr.") 13:13-15 (Armstrong); <u>see</u> Appendix A (identifying the per-page, per-student, and per-course fee had GSU chosen to license each infringed work via CCC); <u>see also</u> Docket No. 361; 5/18 Tr. 90:2-18 (Richman); 5/19 Tr. 69:1-70:12, 72:22-73:1 (Pfund); 5/17 Tr. 67:24-69:13, 69:22-70:3 (Smith).

Response:  Plaintiffs have testified that not all permissions are granted or available through the CCC.  For example, Cambridge does not give the CCC the right to handle permissions for its English as a Second Language Works because they want to sell the books, and not allow any permissions.  5/17 Tr. 69:25-70:11 (Smith)). Cambridge does not grant permissions for excerpts over 20%.  (5/17 Tr. 68:4-5 (Smith)). Further, the CCC often rejects requests for permissions because the publishers themselves do not have the rights for the works that they publish. (Dft. FOF, ¶137.)  Also, Plaintiffs have provided no evidence as to how the amounts in Appendix A, a document Plaintiffs created, shows that such licensing fees are available.

53.   As a not-for-profit organization, CCC's primary objective is not to maximize revenue.  5/20 Tr. 10:5-6 (Armstrong).  Rather, CCC acts as a solutions provider that serves as a marketplace for the exchange of rights between rightsholders and the users of copyrighted content, providing a balanced middle ground between them.  5/20 Tr. 6:22-7:6, 10:5-14 (Armstrong).

Response:  The CCC is a silent party to this litigation and is paying 50% of Plaintiffs' legal fees.  Such activities do not constitute "providing a balanced middle ground."  (Dft. FOF, ¶116.)

81.   CCC's academic licensing programs accommodate fair use.  5/20 Tr. 49:7-18, 50:6-24, 66:15-67:9 (Armstrong); DX 68 (contract for CCC academic annual license stating that license fees set forth "are net of all factors that might otherwise be considered deductions therefrom, including fair use").

Response:  The CCC does not assist in determining fair use determinations. (5/20 Tr. 67:15-20 (Armstrong)).  The CCC's transactional programs like the APS and ECCS do not accommodate fair use because when a customer requests permissions, she has already done a fair use analysis and has determined that her use is not fair, without any assistance from the CCC.  (5/20 Tr. 49:11-22).  Further, the CCC's Annual License actually produces a windfall because the user is paying for a copy even though the use is fair (so-called "net fair use").   Even in such

circumstances, the CCC would not reduce any fees under the license.  (5/20 Tr. 50:7-24).

89.    The AACL repertory contains over 1.3 million works.  SAGE's works and Oxford's works are available for license through the AACL.   Stipulated Facts ¶ 37.

Response:  Only 17% of the titles covered by the CCC's Annual Copyright License include digital rights. The remaining 83% of the titles are available only for print rights to the end user.  (Dft. FOF, ¶124).

90.    The AACL is not intended to replace a purchase or subscription to a work, but rather covers subsequent copying of the work for distribution within the institution.  5/20 Tr. 69:21-70:21 (Armstrong).

Rebuttal:  In addition to paying an initial fee and an annual fee, to obtain the CCC's Annual Copyright License, a subscriber must own a hard copy of each of the original works.  (Dft. FOF, ¶126).

108.  If a course reading were determined to infringe the copyright of the owner, President Becker would order it to be removed.  Becker Dep. 88:10-15 (by video, see 5/26 Tr. 8).

Response:  If a course reading was determined to infringe the copyright of the owner, GSU would take the appropriate action to be in compliance with the law,

which can include its removal or a payment of a licensing fee.  Becker Dep. 88:10-89:1 (by video, see 5/26 Tr. 8).

115.   It is possible for GSU to levy a similar student fee to cover copyright permissions, including a fee of approximately $3.75 per student for CCC's annual academic license, although to date it has not done so.  6/2 Tr. 117:13-16 (Seamans); Becker Dep. 64:16-67:16 (by video, see 5/26 Tr. 8).

Response:  Before an additional student fee can be charged to GSU students, the fee must go through an evaluation process and must be approved by both students and faculty through a vote.  (Dft. FOF, ¶79).  The faculty and students do not pass such additional fees easily, as the recent sustainability fee, which had strong support, was not passed.   (Dft. FOF, 80).

124.   There are no technical restrictions on students' ability to save, print, copy, or email the material posted to ERes.  5/20 Tr. 115:4-6 (Dimsdale).

Response:   A student must agree to comply with copyright law before accessing and using material found on a Course Reserve page.  (Dft. FOF, ¶107).

126.   In 2009, immediately following her service on the Select Committee on Copyright that promulgated the new copyright policy, Dean of Libraries Nancy Seamans testified that ERes was intended to provide students access only to non-required readings, as opposed to required readings.   6/2 Tr. 104:16-105:18 (Seamans).   Dean Seamans was also of the view that required course readings,

however they are assembled or collected, require permission from the copyright owner to be utilized as course readings.  6/2 Tr. at 108:15-110:3 (Seamans).

Response:  Dean Seamans no longer subscribes to the view that the ERes System is only for the use of supplemental materials.  (6/2 Tr. at 105:2-7(Seamans)).

129.  The library does not obtain permission for book excerpts that are scanned and posted to ERes, even if they are required reading.  5/20 Tr. 111:11-112:1 (Dimsdale); 6/1 Tr. 152:1-6 (Burtle).

Response:  If permission is required, it is the responsibility of the professor to obtain the permission.  (5/20 Tr. 111:11-19 (Dimsdale)).  When submissions are made to the ERes System, a Professor explains why she is authorized to place the item on the ERes System.  If the use is determined to be a fair use, no permission is required.  However, if the professor finds that permission is required, the professor must provide proof to the ERes System Staff of that she has received permission from the copyright holder.  (Dft. FOF, ¶¶85, 87, and 94).

153.  Plaintiffs had limited access to uLearn only between February and April 2009.  Despite requests to Defendants for access after that time period (and contrary to the erroneous claim made by Defendants' counsel at closing), Plaintiffs were denied access to uLearn subsequent to April 2009, and thus were precluded from reviewing reports for the 2009 Maymester, 2009 summer and 2009 fall terms at issue in this litigation.  See 5/23 Tr. 8:24-9:7 (Christopher); 6/7 Tr. 84:7-10.

Response:   Defendants object to this submission on the grounds that it is unsupported by the evidence provided.  None of the evidence shows that Plaintiffs were denied access to the uLearn system.  Further, Plaintiffs' requested four dates to access uLearn, and such requests were granted.  Any further requests to access the uLearn system were not denied.  Plaintiffs' additional requests to access the uLearn system came after the close of discovery.  Even when such request came after the close of discovery, Defendants did supply Professor Kim's uLearn information.

156.   The testimony of numerous GSU witnesses established the equivalent purpose and function of electronic course readings distributed via ERes/ uLearn and paper coursepacks, and that the only meaningful difference between the two from the standpoint of students in the class is that coursepacks include paper copies of the underlying work and ERes excerpts, at least initially, provide digital copies of the same works – although students often convert these into printed paper copies.  For example:

- Professor Greenberg testified that there is no distinction from the student's perspective between coursepacks and ERes other than one being paper and one being digital.  Greenberg Dep. 51:1-15 (by video, see 6/2 Tr. 40).

- Professor Gabler-Hover's syllabus instructs students that "[M]any of the prose and fiction items you will need for the course are on library e-reserve

for you to print out immediately, forming a course packet for yourself."
PX534.

- Professor Duffield, when asked if there was "any difference to you in terms of your educational objectives if the student gets a chapter in a coursepack as opposed to getting that same chapter through EReserves?," answered that it would not make a difference to him.  6/1 Tr. 108:12-17 (Duffield).

- Professor Davis testified that other than the fact that the coursepack is bound, there is no difference between coursepacks and EREs.  5/25 Tr. 115:24-116:17 (Davis).

- Professor Dixon testified that the only difference is that money is charged for coursepacks whereas EReserves is free.  Dixon Dep. at 67:10-13 (by video, see 5/25 Tr. 169).

- Professor Orr testified that he could have made the same excerpts for each of the classes that he posted to EREs available to students in a bound physical coursepack, but that he instead placed them on EREs so students could access them for free.  5/25 Tr. 91:2-9 (Orr).

Objections:  Defendants object to Plaintiffs submission on the grounds that Plaintiffs mischaracterize testimony.

Response:  To the extent that Plaintiffs cite trial testimony of professors in support of this proposition, such professors testified that the manner students accessed the materials was irrelevant to the educational purposes – <u>not</u> that there was no difference between coursepacks and ERes.  T. Vol. 11 at 108:12-17 (Duffield) (no difference to educational objectives if material obtained from coursepack or on ERes); T. Vol. 7 at 116:12-17 (Davis) (no "functional" difference between providing readings to students using ERes and coursepacks); T. Vol. 7 at 91:2-12 (Orr) (could have made the materials available on ERes, via coursepacks, or on library reserves).  There are numerous differences between electronic reserves and coursepacks.  For example,  when a school obtains licenses sufficient to print 50 coursepacks, for example, but only sells 15, the school does not pay license fees for the 35 unsold coursepacks.  However, when the university purchases electronic licenses from the CCC for 50 students, but only 15 enroll in a course, the school pays for all 50 students.  T. Vol. 4 at 62:8 – 63:9.  Access to materials on ERes is limited only to students in the class and restricted by randomly generated passwords.  T. Vol. 11 at 120:10-16.  Students cannot access materials on ERes after the end of the semester.  T. Vol. 11 at 120:21-24.  Importantly, a professor cannot place a work on ERes without permission unless the professor performs a fair use analysis.  T. Vol. 11 at 121:18-22.

167.   Plaintiffs are the owners or exclusive licensees of the copyright in each work identified in the Amended Complaint (Docket No. 39) and the Revised Filing Concerning Plaintiff Works Alleged to Be Infringed at GSU During the 2009 Maymester, Summer 2009, and Fall 2009 Academic Terms (June 1, 2011) (Docket No. 361) ("Revised Infringement List").[20]  Specific details on the ownership of each of the works at issue, with accompanying citations to the record, are set forth at Appendix A.

Response:  The record is replete with examples of Plaintiffs' failing to provide copyright ownership.  See Dft. FOF, ¶188-198.

196.   The sole tool from the new GSU policy that GSU faculty rely on in making fair use decisions is the Fair Use Checklist 6/6 Tr. 129:20-131:8 (Potter); JX 4.   Defendants' expert, Professor Crews, testified that while a checklist is a useful tool, it should be "but one of . . . a series of support mechanisms" for faculty members, and that he "would never recommend" using the checklist as the "litmus test" for fair use determinations.  6/3 Tr. 104:25-105:14 (Crews).

Response:  The fair use checklist was not the only tool supplied to the GSU faculty for making fair use decisions; the faculty was also supplied the 2009

---

[20]  Plaintiffs' Revised Infringement List updated the information reflected on the parties' Joint Filing of Alleged Infringements (Docket No. 266, submitted March 15, 2011) to reflect this Court's various in limine rulings and those alleged infringements for which Plaintiffs presented evidence for during trial and continue to maintain claims.

Copyright Policy.  6/6 Tr. 129:20-23 (Potter).  The 2009 Copyright Policy includes hyperlinks to other websites that are intended to be (a) part of the 2009 Copyright Policy and (b) used to assist faculty members' understanding of copyright.  (Dft. FOF, ¶57).  Further, educational programs were provided at GSU, which was recommended by the Committee.  (6/6 Tr. 234:4-6 (Potter).

248.  Correspondingly, GSU did not produce a single checklist on which "large portion or entire work used" was marked under Factor 3, even where the checklist reflected the proposed use of excerpts of as many as 74, 80, and 151 pages, or one or more complete chapters constituting, in many cases, entire works of a contributing author to a compilation.  5/24 Tr. 122:11-19 (Kim); 5/27 Tr. 143:10-20 (Moloney); PX 558, 563-567, 570-603, 606, 608, 613, 629, 639, 643, 647-652, 654-662, 938; DX 346, 347, 348, 428, DX 429, 473, DX 474, 480, 481, 386, 464.

Response:  Plaintiffs did not identify a single "entire work" used in their own joint submission of alleged infringements.  See JX-5.

253.  Moreover, despite the fact that GSU properly pays fees for journal articles contained in licensed electronic journal databases, if those same journal articles later appears as book chapters, the GSU faculty's implementation of current copyright policy uniformly has resulted in their making those same articles available to students via ERes without authorization from or payment to the rightsholder.  5/25 Tr. 126:2-129:7 (Davis).

Response:   Plaintiffs argument is false.   GSU has paid fees for use of the journal articles, and therefore have the right to place such articles on ERes.   If GSU has a license through a journal article, they have authorization from the rightsholder.

258.   GSU's infringing activities substitute directly for the purchase of Plaintiffs' books (or, as detailed elsewhere, licensing of excerpts of the books).   5/17 Tr. 51:2-10 (Smith); see 5/18 Tr. 57:11-58:7 (Richman).   In every instance in which GSU provided students with excerpts of digital course reading materials free of charge, the students did not have to purchase a copy of the book from which the excerpt was taken, and Plaintiffs did not receive the sales revenue.   See 5/17 Tr. 74:10, 75:4-11 (Smith).

259.   For example, had Professor Harvey required the 16 students in her course "Social Theory" (SOCI8030) to purchase The Power Elite by C. Wright Mills at its retail list price of $19.95, instead of using the work without permission, Oxford would have received revenue from 16 sales ($319.20).   See 5/19 Tr. 78:9-79:5 (Pfund); JX 5.   See Appendix A (providing retail list price for all infringed Plaintiff works).

263.   The above-described sales revenues of each of the Plaintiffs are less than they would have been had the GSU professors required students to purchase Plaintiffs' original books rather than providing free digital excerpts via ERes or

uLearn.  See supra ¶257; 5/17 Tr. 51:2-10, 74:10, 75:4-11 (Smith); 5/18 Tr. 83:21-23, 84:1, 84:6-21 (Richman); 5/19 Tr. 78:9-25 (Pfund).

264.  In addition, the sales revenue of each Plaintiff would significantly decline should the activities at GSU become widespread.  See 5/17 Tr. 75:4-11 (Smith).  Decreases in sales revenue jeopardize Plaintiffs' business model and make it difficult for them to support their operating expenses and to continue to publish high quality scholarly works.  5/19 Tr. 28:24-29:7, 75:1-76:18 (Pfund); 5/18 Tr. 82:20-24 (Richman); 5/17 Tr. 75:24-75:2 (Smith).

Rebuttal to 258-259 and 263-264:  Plaintiffs have failed to provide any evidence of the loss of sales of books as a result of excerpts being placed on the ERes System.  Further, Plaintiffs logic is flawed, considering that students often buy used books, from which Plaintiffs would not receive any revenue.

277.  For example, SAGE could have created a custom publishing order for the 235 pages of SAGE works that Professor Kaufmann used in her EPRS8500 course during the Summer 2009 academic term at a cost of $0.12 per page (even less than SAGE's typical per-page charge of $0.14), or $28 per student.  PX 516; 5/18 Tr. 74:21-75:2, 79:19-80:2 (Richman); 6/7 Tr. 22:11-23:1.

Objections:  Defendants object on the grounds that this submission fails to show that such a service was available during the Maymester, Summer, and Fall Semesters of 2009.

64

Defendants further object to the following submissions because the majority of the submissions mischaracterize testimony, are argumentative, legal arguments or legal conclusions. (¶¶ 197, 218, 221, 224, 227, 229, 240-241, 243-245, 252, and 278.)

## VII. PLAINTIFFS' IMPROPER ALLEGATIONS

Plaintiffs' proposed findings of fact and conclusions of law boldly disregard this Court's orders on the scope of this case and on what evidence is relevant to Plaintiffs' and Defendants' requirements of proof. They cite evidence not in the trial record, discuss activities outside the scope of the case, and make claims based on nothing more than evidence the Court has already stated is insufficient.

Most egregious, however, is Plaintiffs' attempt to now assert <u>56 new allegations of infringement</u> (of contributions to collective works), while simultaneously materially expanding another allegation of infringement, and continuing to assert allegations of infringement <u>entirely</u> <u>contrary</u> to the evidence.

### A. Plaintiffs' Attempts to Expand the Allegations of Infringement in Post-Trial Briefing

#### 1. New allegations of Infringement

For much of the three years of this litigation, Plaintiffs' case was elusive. Plaintiffs made sweeping statements regarding infringement of their works and those of other publishers. They insinuated, and sometimes said blatantly, that all use of the e-Reserves system at GSU for posting of reading materials violates their

copyright rights.  (See Dkt. 235 at 3-4.)  This, without consideration of fair use and often without considering licenses held by GSU to the very materials about which Plaintiffs alleged infringing use.

In an effort to reign-in Plaintiffs' claims to a straight-forward and defensible case, this Court ordered Plaintiffs to file with the Court a clear presentation of claims of infringement over a set, three-semester period.  (Dkt. 226; Dkt. 227.)  The Court required that Plaintiffs identify, inter alia, "[t]he title of the work that was allegedly infringed," "[t]he owner of the copyright for that work," [a] brief description of that work including its total number of pages and chapters," and "[t]he number of pages and chapters of that work that were electronically distributed."  (Dkt. 226 at 1.)  In response, Plaintiffs enumerated approximately 126 uses of works purportedly owned or controlled by them.  (Dkt. 228.)  Each allegation of copying was therein identified by reference to the relevant book, segregated by semester, course, and professor. The "work" listed was always the book from which excerpts were used.  The description of the "work" was a description of the book.  The percentage of the "work" copied was the number of pages copied divided by the total number of pages in the book.  Subsequent filings, up to and throughout trial, were the same.

For example, on November 5, 2010, and March 3, 2011, this Court ordered that the parties jointly develop "an accurate and complete list of all alleged infringements from the 2009 Maymester, Summer 2009 term, and Fall 2009 term."

66

(Dkt. 265 at 1; Dkt. 240 at 3.)   In response, the parties jointly filed on March 15, 2011, a list of approximately 99 alleged infringements. (Dkt. 266.)   Again, each allegation of copyright infringement defined the infringed work as the book.  (See Dkt. 266-1; Dkt. 266-2; Dkt. 266-3.)   The parties also prepared one-page summaries of each allegation of infringement, which again were done by book.  (Dkt. 266 ¶ 3; Dkt. 266-4.)

Before trial, in response to Defendants' objections and motions in limine, Plaintiffs further narrowed their allegations to 90 alleged infringements.  (See Dkt. 288 at 13 & n.11; Dkt. 266-4 at 69, 70-72, 92-93, 95 (identifying 9 alleged uses of the 4 works dropped by Plaintiffs in Dkt. 288).)  Plaintiffs decreased their allegations yet further during Defendants' presentation of their case, stating that their "remaining claims cumulate to 75 instances of claimed infringement relating to 64 separate works." (Dkt. 361 at 2.)

Now, seven weeks after the end of trial, Plaintiffs have raised no less than 56 new allegations of infringement.  Although Plaintiffs refer to the "75 instances of infringement" in their filing (Dkt. 409 at 12), Appendix A to their findings of fact includes 56 new, separate allegations of infringement of contributions to collective works.  (See generally Dkt. 409 App. A; see, e.g.,  Dkt. 409 App. A at 16 (alleging infringement of 100% of Preissle's contribution), 18 (alleging infringement of 100% of the contributors' article), 20 (alleging infringement of 100% each of Denzin &

Lincoln's, Plummer's, Stake's, and Chase's contributions), 44 (alleging infringement of 80% of Seaton's contribution), 46 (alleging infringement of 68% of Dunsby's contribution).)

In some of these cases, Plaintiffs' do not even have a basis to assert such claims because, as noted previously, they have not demonstrated any assignment by the contributing author(s). (Dkt. 410 ¶ 188.) For example, Plaintiffs newly allege infringement of the copyright rights to Kent L. Sandstrom, Daniel D. Martin, and Gary Alan Fine's contribution to Handbook of Social Theory.[21] (Dkt. 409 App. A at 18.) Yet Plaintiffs did not introduce at trial or produce in discovery evidence of contributing author agreements with authors Sandstrom or Martin. (But see PX 290 (agreement with Fine).) Accordingly, they do not have standing to assert this newly-alleged claim.

Plaintiffs' new allegations are rife with such problems. As detailed in Defendants' papers, Plaintiffs do not have contributing author agreements for numerous works at issue. (See Dkt. 410 ¶ 188 and evidence cited therein.) And the Court has already said that general statements regarding the practice of the industry to obtain author agreements is insufficient to establish Plaintiffs' rights. (See supra.)

---

[21] Plaintiffs allege 100% infringement. The pages alleged to have been copied, however, are 217-228, which make up a portion of chapter 17, not its entirety. (PX 228.)

More fundamentally, however, Plaintiffs should not be permitted to assert such new allegations at this stage.  In three separate filings with this Court—9 months before trial, 2 months before trial, and after the close of Plaintiffs' case during trial—Plaintiffs represented that their allegations of infringement related to the entirety of the books at issue, whether a monograph by a single author or a collective work with many contributors.  (Dkt. 228; Dkt. 266; Dkt. 361.)  Copyright protection is afforded to collective works separate and apart from protections afforded to individual authors, and Plaintiffs have acknowledged as much.  The Court gave Plaintiffs ample opportunity to make the claims they now assert anew, even allowing Plaintiffs to define their claims of infringement during the pendency of summary judgment, long after the close of discovery.  (See Dkt. 227; Dkt. 228.)  They did not make these claims.  Nor did Defendants prepare their case to defend against these new claims.  Plaintiffs' attempt to once again ignore the Court's orders regarding the scope of the case should not be countenanced.

This issue was alluded to at trial when Plaintiffs began questioning Defendants' witnesses during cross examination about whether they considered an individual chapter or essay in a collective work to be the "entire work."  The Court noted this line of questioning.  In particular, the Court pointed out that Plaintiffs appeared to be raising the argument that use of a chapter in a collective work may amount to use of 100% of the work.  (T. Vol. 5 at 158-165.)  At that time,

Defendants' counsel highlighted for the Court that Plaintiffs had not alleged any 100% use of a work.  Defendants referenced specifically the agreed list of alleged infringements filed with the Court in March 2010 (Dkt. 266).  (T. Vol. 5 at 165.) This point was not refuted by Plaintiffs' counsel, who to this day refer to the "75 instances of infringement."  (Dkt. 409 at 12.)

In light of the posture of this case, this Court's grant to Plaintiffs' of ample opportunity to plead their case, and the severe prejudice to Defendants were Plaintiffs permitted to now assert such new allegations of infringement, Plaintiffs' newly-alleged claims of infringement related to the individual contributions to the collective works at issue in this case should be foreclosed.

## 2.    Expanded Allegations of Infringement

Plaintiffs also have, without support and without highlighting the change to the Court or Defendants, further expanded their otherwise-existing allegations of infringement.  Up until post-trial briefing, Plaintiffs maintained two allegations of infringement regarding Dr. Kruger's use of Awakening Children's Minds in her course EPY 7090 in Summer and Fall 2009.  (Compare Dkt. 409 App. A at 41, with Dkt. 266-2 at 3.)  Plaintiffs alleged use of pages 181-199 in Summer and 181-219 in Fall.  (See, e.g., Dkt. 266-2 at 3.)  At trial, it was shown that Dr. Kruger had only one course of EPY7090 over this time period, involving the same students, and that a reading from Awakening Children's Minds was assigned only once to this cohort.

70

(T. Vol. 10 at 7, 30; PX 553.)   Rather than acknowledge this factual reality and combine the two use allegations into one (effectively deleting the Summer 2009 allegation since the evidence indicated the work was not assigned until the Fall term), Plaintiffs have <u>added</u> pages 200-219 to their Summer 2009 allegation, artificially raising the number of allegations, the amount of the work used, and the average percentage of works used.   (<u>See</u> Dkt. 409 App. A at 41.)   This 20-page increase is not supported anywhere in the record.   Plaintiffs cite Dr. Kruger's irrelevant and unrelated statement that when completing her fair use analysis for posting the <u>Awakening Children's Minds</u> excerpt for Summer 2009, she considered whether use of the entire chapter, pages 181-219 was fair.   (<u>Id.</u>)[22]

---

[22]   Furthermore, the evidence shows that Dr. Kruger's use was a fair use.   Dr. Kruger's EPY 7090 course taught over the course of GSU's Summer 2009 and Fall 2009 terms was for non-profit educational purposes, the reading of <u>Awakening Children's Minds</u> was for teaching purposes, and access to the excerpt was restricted to students enrolled in the class.   . (<u>See</u> T. Vol. 10 at 7, 30, 48.)   The chapter assigned draws on the works of other scholars (<u>see, e.g.</u>, PX 354 at 284 nn.2 & 11, 285 nn.13-31, 286 nn.32-45, 287 nn.46-56, 58-62, 288 nn.63-80, 289 nn.81-93, 290 nn.94-96), and charts spanning nearly four full pages of the chapter are merely adaptations of others' work (PX 354 at 214-15, 217-18, 289 n.90, 290 n.96).   Dr. Kruger's course deals with early childhood education and focuses on teaching different theories and how those theories can be applied in the classroom setting.   (T. Vol. 10 at 30; PX 553 at 66281.)   <u>Awakening Children's Minds</u> addresses a specific theory of child development attributed to Lev Vygotsky and applies that theory in a variety of contexts.   (PX 354 & at xii; T. Vol. 10 at 32, 46; PX 553 at 66285.)   Dr. Kruger selected the chapter from the work that addressed her specific teaching point related to application of Vygotsky's theory in early childhood education, specifically in primary grade classroom practice.   (T. Vol. 10 at 32, 34, 43-46; PX 553 at 66285-86.)

### 3. Further Allegations of Infringement with No Support in the Record

Plaintiffs also continue to assert allegations of infringement that have no support in the record. For example, the evidence showed that Dr. Kaufmann did not use two of the three chapters from The SAGE Handbook of Qualitative Research (2nd ed.) (PX 265) of which she was accused in Maymester 2009. (Dkt. 410 ¶ 222.) Indeed, during trial Defendants raised this issue with Plaintiffs before the Court. (T. Vol. 6 at 2-3.) At that time, Plaintiffs represented that Plaintiffs "just want to . . . confirm from the reports that indeed it was not offered or not posted and available to students and not accessed by students during the Maymester," and that, if so, the allegation properly should be omitted. (Id.) The two chapters at issue do not appear on the EReserves report, do not appear on Dr. Kaufmann's course syllabus, and Dr. Kaufmann testified were not used. (T. Vol. 6 at 4-5; PX 516; DX 512; see also Dkt. 410 ¶ 222.) Yet Plaintiffs continue to assert in their post-trial filing that those chapters were copied. (Dkt. 409 Ex. A at 22)

### 4. Continued Assertions of Ownership Where Copyrightability or Ownership Has Not Been Established

In tacit admission that Plaintiffs were asserting copyright ownership in portions of works that were not copyrightable, Plaintiffs have post-trial decreased the pages included in their allegations of infringement of the following works: More Grammar Games: Cognitive, Affective and Movement Activities for EFL Students;

Grammar Practice Activities (1st ed.); Newspapers; Role Play: Resource Books for Teachers; Assessing Grammar; Assessing Reading; Assessing Speaking; Assessing Vocabulary; Assessing Writing; Theoretical Frameworks in Qualitative Research; and The Organ As a Mirror of Its Time: North European Reflections 1610-2000. (Dkt. 409 App. A at 5, 7, 11, 13, 63, 65, 75, 79, 81, 102, 117.)  Plaintiffs' concession does not, however, go far enough.

For at least some of these works and many others, Plaintiffs do not, as described in Defendants' papers, get a presumption of validity of the copyright. (See, e.g., Dkt. 410 ¶¶ 185-186.)  Yet Plaintiffs have not established copyrightability of any of the other pages that remain part of their allegations.

Further, many of the copyright registrations for works at issue expressly state that not all pages of the work are covered by the copyright.  (See, e.g., PX 261 (excluding claims on "some text, tables, and figures from other sources and some with permission"); PX 247 (registration for Handbook of Feminist Research: Theory and Praxis excluding claims on some unidentified text); PX 236 (registration for Handbook of Critical and Indigenous Methodologies excluding claims on some unidentified text); see also, e.g., PX 450; PX 420; PX 408; PX 318; PX 306; PX 295; PX 282; PX 264; PX 151; PX 145; PX 127; PX 122; PX 111; PX 87; PX 41; PX 36; PX 26; PX 12.)  Plaintiffs never demonstrated which pages are covered by the registrations by producing a deposit copy with appropriate designations (or by

some other means), meaning the otherwise-available presumption cannot, without more, be attributed to the pages alleged to have been copied.  In addition, Plaintiffs failed to prove ownership of excerpts used from the following works by failing to provide either or both a valid editor(s)' or authors' assignment:   Five-Minute Activities: A Resource Book of Short Activities (no agreement signed by authors); Handbook of Social Theory (no agreement with two of three authors); The Sage Handbook of Qualitative Research (2d ed.) (no agreements for one excerpt); Inside Interviewing: New Lenses, New Concerns (no agreement for either author); Handbook of Ethnography (no agreement for any of three authors); Handbook of Feminist Research: Theory and Praxis (no agreement for pages 71-106); Handbook of Narrative Inquiry (no agreement from one of two authors); Film Language: A Semiotics of the Cinema (no assignment by author to Oxford or the foreign publisher of excerpt at pages 108-148); Regimes and Democracy in Latin America: Theories and Methods (no agreement with author Mazzuca for excerpt at pages 39-50); Behavior, Society, and Nuclear War, Vol. 1 (no author agreement for pages 8-15 or 19-48 and no editor agreement); A World of Babies: Imagined Childcare Guides for Seven Societies (no agreement for one of two authors); A History of Feminist Literary Criticism (no agreement with author).  Plaintiffs attempt to rely on such certificates of registration to establish ownership.  (See, e.g., Dkt. 409 App. A at 33 (regarding Inside Intervewing: New Lenses, New Concerns); see also PX 295 (the

registration for Inside Interviewing for "editing, compilation, some text" and "some text and charts" but acknowledging that the work is "based on or incorporates" "some text by other authors").)   Further still, Defendants have rebutted the presumption afforded to certain of the alleged works by pointing to specific unprotectable material in the accused pages.  (See, e.g., id. ¶ 183.)

Plaintiffs also still do not acknowledge that the public domain material contained in the following pages did not require any permission and that copying of that material cannot support Plaintiffs' case for alleged infringements:  pages 31, 35, 37, 41, 43 and 45 of Liszt: Sonata in B Minor; pages 96, 97,  and 99 of The Cambridge Companion to Mendelssohn; pages 114, 116 and 118 of The Cambridge Companion to Schumann; pages 174-175 and 178-180 of The Cambridge Companion to Beethoven; pages 260 and 262 of The Music of Berlioz; pages 80-83 and 89 of The Organ As a Mirror of Its Time: North European Reflections 1610-2000;[23] and page 24 of North German Church Music in the Age of Buxtehude. (See PX 130; PX 65; PX 75; PX 53; PX 427; PX 441; PX 437.)   Rather, Plaintiffs maintain that these portions were impermissibly copied and include them in the counts and calculations of alleged infringement that purportedly warrant a sweeping, punitive injunction.  (See Dkt. 409 App. A at 42-51, 117-19.)   Under the law, it is

---

[23]   Plaintiffs exclude one page from their allegation of infringement, but do not specify which of these pages it is.

not incumbent upon Defendants to prove that the pages were not copyrightable; it was Plaintiffs' burden to show that they are, and Plaintiffs failed to do so.

In some instances, where Defendants have directly challenged the originality of particular works (see, e.g., Dkt. 410 ¶ 183), Plaintiffs have merely included broad assertions of originality, stating "there is no question that each work is sufficiently original to be entitled to copyright protection, whether or not it discusses or cites third-party materials." (Dkt. 409 at 5.) And Plaintiffs make bold, unsupported statements that the pages are "original" and "protectable," citing only to the book itself. (See, e.g., Dkt. 409 App. A at 72, 74, 116.)[24]

*** 

These several efforts by Plaintiffs to maintain and increase the raw number of allegations of infringement and the purported quantities of use, in apparent hopes of reaching some critical mass required by this Court to warrant an injunction, are transparent attempts to overcome the inherent fallacies in Plaintiffs' case.

---

[24] Without implying that this list is exhaustive, Defendants further note that other of Plaintiffs' purported support for originality is plainly lacking. For example, in the case of Five-Minute Activities: A Resource Book of Short Activities, Plaintiffs cite for originality the book itself, an unsigned draft agreement between the authors and the publisher, and the insufficient trial testimony of the publisher's representative. (Dkt. 409 App. A at 10.)

**B.     Plaintiffs Attempt to Use Evidence in Ways This Court Has Multiple Times Ruled Inappropriate and Cite to Evidence Not in the Trial Record**

In their post-trial briefing, Plaintiffs repeatedly cite evidence and make arguments this Court has ruled irrelevant and inadmissible.  Most obviously, because they cannot make their case on the record.

Precisely because of Plaintiffs' indications that they would attempt to present such evidence in support of their case, Defendants filed a motion in limine to ensure the smooth progression of trial and to ensure that all parties and the Court had the same understanding of the evidence at issue and the proofs to be made.  (See Dkt. 272; Dkt. 301.)  On May 12, 2011, consistent with its prior orders defining the scope of this case (see Dkt. 235, Dkt. 240, Dkt. 265), this Court granted Defendants' motion outright, stating "Plaintiffs are only permitted to introduce evidence of the alleged infringed works identified in Plaintiffs' August 20, 2010 filing and the parties' March 15, 2011 filing."  (Dkt. 310 at 3.)

Yet, in their post-trial filing, Plaintiffs repeatedly reference this expressly-excluded evidence, even citing such evidence not in the trial record.  For example, on page 113 of the unredacted copy of Plaintiffs' findings of fact (¶ 289), Plaintiffs describe Professor Dixon's use of excerpts from The Slave Community as far back as Spring 2007.  (Dkt. 409 ¶ 289.)  In so doing, they cite deposition testimony not in the trial record.  (Compare Dkt. 409 ¶ 289 (citing Dixon Dep. 45:13-23), with Dkt.

355 (providing Dixon deposition designations made at trial, which do not include this excerpt).)[25]  Dr. Dixon's use of a work in Spring 2007 has not been at issue in this case since this Court's protective order issued over two years ago.  (See June 19, 2009 Protective Order, Dkt. 111 at 5-6 (prohibiting Plaintiffs' further inquiry into practices prior to adoption of the 2009 Copyright Policy except for limited purposes not implicated here).)   And the Court reiterated this point by sustaining Defendants' objection at trial to Plaintiffs attempt—in direct contradiction to this Court's May 12, 2011 Order—to submit evidence of such uses into evidence.  (See T. Vol. 8 at 17-18.)

Similarly, for each allegation summary sheet contained in Plaintiffs' Appendix A, Plaintiffs include "Total number of works on ERes/uLearn for course." (See, e.g., Dkt. 409 App. A at 1.)   Appendix A, in turn, points to Plaintiffs' Appendix B, which provides purported lists of all the works posted to EReserves for the courses otherwise at issue in this case, extracted from several joint trial

---

[25]  This is but one example of Plaintiffs citing deposition testimony not in the trial record.   On page 99, in paragraph 252, Plaintiffs cite Kaufmann deposition testimony not one part of which was designated at trial. (Compare Dkt. 409 ¶ 252, with Dkt. 373.)   On page 105, in paragraph 276, Plaintiffs cite an entire page of Palmour deposition testimony not designated at trial. (Compare Dkt. 409 ¶ 276, with Dkt. 349.)   Again on page 110, Plaintiffs cite Kaufmann deposition testimony not designated at trial.  (Compare Dkt. 409 ¶ 285, with Dkt. 373.)

exhibits.[26]  In its May 12, 2011 Order, this Court expressly ruled that such evidence

is irrelevant.  (Dkt. 310 at 3; see also Dkt. 272; Dkt. 301.)

Indeed, in their opposition to Defendants' motion in limine to exclude such

irrelevant evidence (Dkt. 272), Plaintiffs expressly argued that they should be able to

use the information excluded from trial to demonstrate the "context" of the alleged

infringing copying by presenting evidence of works posted on EReserves prior to

implementation of the new Policy.  (Dkt. 287 at 2-3.)  They also argued that they

---

[26]  The evidence to which Plaintiffs cite—Joint Exhibits 1, 2, and 3—was admitted
for an entirely different purpose.  Those Exhibits are EReserves reports that
demonstrate the posting of the works at issue on the EReserves systems and provide
a hit count demonstrating access to those files.

Further, although each page of Appendix B states that it is "[e]xcerpted
without alteration" (Dkt. 409 App. B), at least some alterations are evident.  For
example, Appendix B, page 9, is purportedly an unaltered extraction of Dr. Kim's
Course Reserves postings for course AL8550 in Fall 2009, but the title of the course
has been changed (likely accurately) from "Seccond Language Evaluation" to
"Second Language Evaluation."  (Compare Dkt. 409 App. B at 9, with JX 3 at
GaState 64817.)  Plaintiffs' summaries of this data also appear unrealiable.  For
example, Plaintiffs indicate on pages 15 through 29 of Appendix A that Dr.
Kaufmann used 18 excerpts from 11 works in her course EPRS8500 in Maymester
2009.  Without admitting the accuracy of the extraction, page 2 of Appendix B
indicates, rather, that either 18 excerpts of 12 works were used or 17 excerpts of 11
works were used (since, per the Library's note "Need tp and cp"—need title page
and copyright page—the Pink excerpt should be excluded from the count).

Many of Plaintiffs' citations to the record are similarly suspect.  For example,
Plaintiffs claim, on the one hand, that professors' analysis of a work and its
application to their course has no bearing on the Court's fair use evaluation, but then
attempt to rely upon professor testimony to define the character of a work.  (See Dkt.
409 ¶ 243 (citing Professor Duffield's comparison of articles and book chapters in
collective works).)

should be able to use the information included in Appendix B (posting of other materials on EReserves) to establish a "digital anthologizing" argument.  (Dkt. 287 at 7-9.)   With full knowledge of these arguments, this Court excluded all such evidence (Dkt. 310 at 3), a point the Court was forced to make repeatedly throughout trial when Plaintiffs' frequently attempted to introduce such excluded evidence and arguments (see, e.g., T. Vol. 8 at 17-18, 154-55.).   Yet Plaintiffs now offer it again, even citing documents outside the trial record.

Plaintiffs also have ignored this Court's instructions on the requirements of proof, asserting that they have established facts on the basis of evidence the Court already has said is insufficient.  For example, Plaintiffs repeatedly claim that they have established their rights in certain copyrights at issue based only on testimony that it is Plaintiffs' practice to obtain assignments from contributing authors.  (See, e.g., Dkt. 409 App. A at 33 (regarding Inside Interviewing: New Lenses, New Concerns).)   Although Plaintiffs were ordered to provide proofs of ownership, including author agreements (Dkt. 240 at 2), many were never produced (and, consequently, are not in evidence).   (See Dkt. 410 ¶¶ 187-188.)   Defendants' challenges to Plaintiffs' ownership, and Plaintiffs subsequent inability to prove ownership, means Plaintiffs do not have standing to pursue the claims based on the copyrights in these identified works.  (See id.)  This Court said as much in its May 12, 2011 Order excluding "evidence related to alleged copyright infringement of

80

works for which Plaintiffs have not provided any admissible evidence to show Plaintiffs' ownership of the copyright for the works." (Dkt. 310 at 3.) And at trial, the Court clarified that testimony regarding industry practice of obtaining author agreements is not enough to establish ownership. Yet Plaintiffs continue to assert ownership by citing such testimony as dispositive. (<u>See, e.g.</u>, Dkt. 409 App. A at 33-35, 92-93.)

## VIII. CONCLUSION

In view of the foregoing, Defendants assert that Plaintiffs have failed to establish that the devising and implementing of the USG Copyright Policy caused ongoing and continuous misuse of the fair use defense. Accordingly, judgment should be entered in favor of Defendants.

Respectfully submitted this 30th day of July, 2011.

> SAMUEL S. OLENS
> Georgia Bar No. 551540
> Attorney General
>
> R. O. LERER
> Georgia Bar No. 446962
> Deputy Attorney General
>
> DENISE E. WHITING-PACK
> Georgia Bar No. 558559
> Senior Assistant Attorney General
>
> MARY JO VOLKERT
> Georgia Bar No. 728755
> Assistant Attorney General
>
>
> KING & SPALDING LLP
>
> */s/ Stephen M. Schaetzel*
> Stephen M. Schaetzel
> Georgia Bar No. 628653
>
> John W. Harbin
> Georgia Bar No. 324130
> Natasha H. Moffitt
> Georgia Bar No. 367468
> Mary Katherine Bates
> Georgia Bar No. 384250
> KING & SPALDING LLP
> 1180 Peachtree Street, N.E.
> Atlanta, GA 30309
> Telephone: (404) 572-4600
> Facsimile: (404) 572-5100
> Email: sschaetzel@kslaw.com

Anthony B. Askew
Georgia Bar No. 025300
Special Assistant Attorney General
McKeon, Meunier, Carlin & Curfman, LLC
817 W. Peachtree Street NW, Suite 900
Atlanta, GA 30308
Phone: 404-645-7709
Fax: 404-645-7707
taskew@m2IPlaw.com

Katrina M. Quicker
Georgia Bar No. 590859
BALLARD SPAHR LLP
999 Peachtree Street, Suite 1000
Atlanta, GA 30309-3915
Telephone: (678) 420-9300
Facsimile: (678) 420-9301
Email: quickerk@ballardspahr.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia, that the foregoing DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW complies with the font and point selections approved by the Court in L.R. 5.1B.  The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

*/s/ Stephen M. Schaetzel*_____
Stephen M. Schaetzel
Georgia Bar No. 628653

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CAMBRIDGE UNIVERSITY PRESS, et al., | |
| Plaintiffs, | Civil Action No. 1:08-CV-1425-ODE |
| -*vs.*- | |
| MARK P. BECKER, in his official capacity as Georgia State University President, et al., | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this 30th day of July, 2011, I have electronically filed the foregoing DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Edward B. Krugman
krugman@bmelaw.com
Georgia Bar No. 429927
Corey F. Hirokawa
hirokawa@bmelaw.com
Georgia Bar No. 357087
John H. Rains IV
Georgia Bar No. 556052

BONDURANT, MIXSON &
ELMORE, LLP
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

R. Bruce Rich
Jonathan Bloom
Randi Singer
Todd D. Larson

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


*/s/ Stephen M. Schaetzel*_____
Stephen M. Schaetzel
Georgia Bar No. 628653