FILED IN CHAMBERS
U.S.D.C. - Atlanta

MAR 3 1 2016

James N. Hatten, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS;
OXFORD UNIVERSITY PRESS, INC.;
SAGE PUBLICATIONS, INC.,

     Plaintiffs,

v.

     CIVIL ACTION NO.
     1:08-CV-1425-ODE

MARK P. BECKER, in his official
capacity as President of
Georgia State University; RISA
PALM, in her official capacity
as Senior Vice President for
Academic Affairs and Provost of
Georgia State University; J.L.
ALBERT, in his official
capacity as Georgia State
University Associate Provost
for Information Systems and
Technology; NANCY SEAMANS, in
her official capacity as Dean
of Libraries at Georgia State
University; ROBERT F. HATCHER,
in his official capacity as
Vice Chair of the Board of
Regents of the University
System of Georgia; KENNETH R.
BERNARD, JR., LARRY R. ELLIS,
W. MANSFIELD JENNINGS, JR.,
JAMES R. JOLLY, DONALD M.
LEEBERN, JR., WILLIAM NESMITH,
JR., DOREEN STILES POITEVINT,
WILLIS J. POTTS, JR., C. DEAN
ALFORD, KESSEL STELLING, JR.,
BENJAMIN J. TARBUTTON, III,
RICHARD L. TUCKER, LARRY
WALKER, RUTLEDGE A. GRIFFIN,
JR., C. THOMAS HOPKINS, JR.,
NEIL L. PRUITT, JR., and PHILIP
A. WILHEIT, SR., in their
official capacities as members
of the Board of Regents of the
University System of Georgia,

     Defendants.

ORDER

# Table of Contents

I.   The Case on Remand . . . . . . . . . . . . . . . . . . . . . . 2

II.  Preliminary Matters  . . . . . . . . . . . . . . . . . . . . 14

III. FAIR USE ANALYSIS FOR INDIVIDUAL INFRINGEMENT CLAIMS . . . 20

     A.   Professor Kaufmann  . . . . . . . . . . . . . . . . . . 20

          Maymester 2009: EPRS 8500

          1.   The Craft of Inquiry (Oxford)  . . . . . . . . . 20
          2.   Handbook of Feminist Research (Sage) . . . . . . 24
          3.   Handbook of Social Theory (Sage) . . . . . . . . 29
          4.   The Sage Handbook of Qualitative Research
               (Third) (Sage) . . . . . . . . . . . . . . . . . 34
          5.   Handbook of Critical & Indigenous
               Methodologies (Sage) . . . . . . . . . . . . . . 38
          6.   Handbook of Narrative Inquiry (Sage) . . . . . . 42

          Summer 2009: EPRS 8510

          7.   The Sage Handbook of Qualitative Research
               (Second) (Sage)  . . . . . . . . . . . . . . . . 47

          Fall 2009: EPRS 8500

          8.   The Craft of Inquiry (Oxford)  . . . . . . . . . 52
          9.   Approaches to Qualitative Research (Sage)  . . . 52
          10.  Handbook of Feminist Research (Sage) . . . . . . 56
          11.  Handbook of Narrative Inquiry (Sage) . . . . . . 60
          12.  The Sage Handbook of Qualitative Research
               (Third) (Sage)   . . . . . . . . . . . . . . . . 64
          13.  Handbook of Social Theory (Sage)   . . . . . . . 69

     B.   Professor Esposito  . . . . . . . . . . . . . . . . . . 69

          Summer 2009: EPSF 8280

          14.  Handbook of Feminist Research (Sage) . . . . . . 70
          15.  The Sage Handbook of Qualitative Research
               (Second) (Sage)  . . . . . . . . . . . . . . . . 73
          16.  The Sage Handbook of Qualitative Research
               (First) (Sage) . . . . . . . . . . . . . . . . . 78

          Fall 2009: EPRS 8520

          17.  Theoretical Frameworks in Qualitative
               Research (Sage)  . . . . . . . . . . . . . . . . 83

i

C.  Professor Kruger  . . . . . . . . . . . . . . . . .  88

    Summer & Fall 2009: EPY 7090

    18.  *Awakening Children's Minds* (Oxford)  . . . . . .  88

    Fall 2009: EPY 8220

    19.  *Understanding Trauma* (Cambridge) . . . . . . . .  91

D.  Professor Orr . . . . . . . . . . . . . . . . . . .  95

    Summer 2009: MUS 8860

    20.  *Liszt: Sonata in B Minor* (Cambridge) . . . . . .  95
    21.  *The Cambridge Companion to Mendelssohn*
         (Cambridge)  . . . . . . . . . . . . . . . . . .  98
    22.  *The Cambridge Companion to Schumann*
         (Cambridge)  . . . . . . . . . . . . . . . . . . 101
    23.  *The Music of Berlioz* (Oxford)  . . . . . . . . . 103

    Fall 2009: MUS 8840

    24.  *The Organ as a Mirror of Its Time* (Oxford) . . . 106

E.  Professor Dixon . . . . . . . . . . . . . . . . . . 109

    Fall 2009: AAS 3000

    25.  *The Slave Community* (Oxford) . . . . . . . . . . 110
    26.  *African American Single Mothers* (Sage) . . . . . 114
    27.  *Black Children* (Sage). . . . . . . . . . . . . . 119
    28.  *Black Families (Third)* (Sage)  . . . . . . . . . 124

F.  Professor Hartwig . . . . . . . . . . . . . . . . . 129

    Fall 2009: AH 4900

    29.  *Ancient Egyptian Materials & Technology*
         (Cambridge)  . . . . . . . . . . . . . . . . . . 130

G.  Professor Kim . . . . . . . . . . . . . . . . . . . 132

    Fall 2009: AL 8550

    30.  *Fundamental Considerations in Language
         Testing* (Oxford) . . . . . . . . . . . . . . . . 133
    31.  *Assessing Speaking* (Cambridge) . . . . . . . . . 136
    32.  *Learning Vocabulary in Another Language*
         (Cambridge)  . . . . . . . . . . . . . . . . . . 140

H.   Professor McCombie . . . . . . . . . . . . . . . . . 143

     Fall 2009: ANTH 4440

     33.   International Health Organisations
           (Cambridge) . . . . . . . . . . . . . . . . . . 143
     34.   Evolution of Infectious Disease (Oxford) . . . . 146

I.   Professor Anggoro . . . . . . . . . . . . . . . . . . 149

     Fall 2009: EPY 8960

     35.   Language Acquisition & Conceptual
           Development (Cambridge) . . . . . . . . . . . . 149

J.   Professor Davis . . . . . . . . . . . . . . . . . . . 154

     Fall 2009: HIST 7010

     36.   Region, Race & Reconstruction (Oxford) . . . . . 154
     37.   The Unpredictable Past (Oxford) . . . . . . . . 158

K.   Professor Freeman . . . . . . . . . . . . . . . . . . 161

     Fall 2009: JOUR 4800

     38.   Living Ethics (Oxford) . . . . . . . . . . . . 161

L.   Professor Moloney . . . . . . . . . . . . . . . . . . 164

     Fall 2009: NURS 8035

     39.   Handbook of Mixed Methods (Sage) . . . . . . . . 165

M.   Professor Lasner . . . . . . . . . . . . . . . . . . 169

     Fall 2009: PERS 2001

     40.   Crabgrass Frontier (Oxford) . . . . . . . . . . 170
     41.   The Politics of Public Housing (Oxford) . . . . 174

N.   Professor Hankla . . . . . . . . . . . . . . . . . . 178

     Fall 2009: POLS 3450

     42.   Contemporary Cases in U.S. Foreign Policy
           (Sage) . . . . . . . . . . . . . . . . . . . . 178
     43.   U.S. Foreign Policy (Sage) . . . . . . . . . . . 183

O.   Professor McCoy . . . . . . . . . . . . . . . . . . . 187

     Fall 2009: POLS 8250

     44.   Regimes & Democracy in Latin America
           (Oxford) . . . . . . . . . . . . . . . . . . . 187

P.   Professor Whitten . . . . . . . . . . . . . . . . . . 191

Fall 2009: PSYC 4030

45.   *A World of Babies* (Cambridge) . . . . . . . . . 191

Q.   Professor Harvey . . . . . . . . . . . . . . . . . . 195

Fall 2009: SOCI 8030

46.   *The Power Elite* (Oxford) . . . . . . . . . . . 196

R.   Professor Ohmer . . . . . . . . . . . . . . . . . . 201

Fall 2009: SW 8200

47.   *The Sage Handbook of Qualitative Research
(Second)* (Sage) . . . . . . . . . . . . . . . 201
48.   *Utilization-Focused Evaluation* (Sage) . . . . . 205

IV.   Summary . . . . . . . . . . . . . . . . . . . . . . . 211

V.   Relief To Be Granted . . . . . . . . . . . . . . . . . 212

VI.   Costs and Attorneys' Fees . . . . . . . . . . . . . . 212

ATTACHMENT:   Permissions and Book Sales Revenue for Books Involved
on Remand

## I. The Case on Remand

This copyright infringement case is before the Court on remand from the United States Court of Appeals for the Eleventh Circuit. The case was previously tried to the undersigned sitting without a jury in May 2011. An Order[1] containing findings of fact and conclusions of law and final judgment was entered on May 11, 2012 [Doc. 423]. A final judgment was entered on September 30, 2012 [Doc. 463]. On appeal, Defendants Mark P. Becker, Risa Palm, J.L. Albert, Nancy Seamans, Robert F. Hatcher, Kenneth R. Bernard, Jr., Larry R. Ellis, W. Mansfield Jennings, Jr., James R. Jolly, Donald M. Leebern, Jr., William Nesmith, Jr., Doreen Stiles Poitevint, Willis J. Potts, Jr., C. Dean Alford, Kessel Stelling, Jr., Benjamin J. Tarbutton, III, Richard L. Tucker, Larry Walker, Rutledge A. Griffin, Jr., C. Thomas Hopkins, Jr., and Philip A. Wilheit, Sr.[2] (collectively, "Defendants") prevailed on most of the claims,[3] either because Plaintiffs Cambridge University Press, Oxford University Press, Inc., and Sage

---

[1]The Court refers to its May 11, 2012 Order [Doc. 423] as "Order," the United States Court of Appeals for the Eleventh Circuit's subsequent Opinion [Doc. 483] as "Opinion" or "Op." For ease of reference, this Court will also include citations to the respective published opinions, Georgia State University v. Becker, 863 F. Supp. 2d 1190, 1209 (N.D. Ga. 2012) (Evans, J.) and Cambridge Univ. Press v. Patton, 769 F.2d 1232 (11th Cir. 2014), but it will refer to them as "Becker" and "Patton" respectively.

[2]Most of the Defendants are Regents of the University System of Georgia; they tacitly approved the program which is involved in this case. Order at 17; Becker at 1209. The other Defendants are Georgia State officials.

[3]At the outset the trial involved 99 infringement claims. Plaintiffs abandoned 25 claims in mid-trial. This Court held that no prima facie case had been established as to 26 claims, leaving 48 claims for evaluation under the fair use analysis as discussed by the Court of Appeals.

Publications, Inc. (collectively, "Plaintiffs") did not establish a prima facie case or because Defendants succeeded on their fair use defense. Plaintiffs did not appeal this Court's rulings that no prima facie case had been established for 26 of the claims. The Court of Appeals affirmed in part and reversed in part this Court's overall fair use analysis; it announced some additional holdings governing fair use and the case was remanded with direction. Op. at 3, 112; Patton at 1284. As a result this Court must revisit the fair use analysis for 48 infringement claims.

Briefly, the fair use defense in this case centers on a program at Georgia State University ("Georgia State") which allows a professor to make small excerpts of copyrighted books available to students enrolled in his or her class without paying royalties or other fees to the publisher.[4] A fair use checklist is provided to assist in selecting the excerpts. The excerpts typically supplement an assigned textbook which students must purchase. Georgia State librarians scan the designated excerpts and upload them to a server. Class members then may download the excerpts to their computers and print them. The students must acknowledge and agree to respect the copyrighted nature of the materials. Some students bring the printed excerpts to class; others may read them in class on their computers. At the end of the course students' access to the electronic excerpts ends.

---

[4]For a full discussion see Order at 38-41; Cambridge Univ. Press v. Becker, 863 F. Supp. 2d 1190, 1219-21 (N.D. Ga. 2012) (Evans, J.), rev'd sub nom. Cambridge Univ. Press v. Patton, 769 F.2d 1232 (11th Cir. 2014).

3

Plaintiffs argue that students' unpaid use of the excerpts infringes their copyrights, cutting into their revenues and diminishing the value of their copyrights. Defendants argue that Georgia State's program is sanctioned by the fair use section of the Copyright Act, 17 U.S.C. § 107. They argue that all of Plaintiffs' infringement claims are barred by the defense of fair use. Plaintiffs disagree.

The trial evidence showed that Defendants could have purchased licenses (also called permissions) to make digital copies of some of the excerpts from either the Copyright Clearance Center or Plaintiffs directly. The fair use analysis, as determined by the Court of Appeals, makes it harder, but by no means impossible, for Defendants to establish fair use where such licenses were available but were not purchased.

The fair use doctrine is codified at 17 U.S.C. § 107, as follows:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

4

> The fact that a work is unpublished shall not itself bar a
> finding of fair use if such finding is made upon
> consideration of all the above factors.

17 U.S.C. § 107.

In reversing this Court's Order, the Court of Appeals held as follows:

(1) This Court erred in giving each of the four factors equal weight, and in evaluating the four § 107 factors in a segmented add-up-the-factors analysis, rather than conducting a holistic analysis. Op. at 56-57; Patton at 1260.

(2) Fair use factor one favors fair use in this case despite the nontransformative nature of Georgia State's use (the excerpts are nontransformative because they are mirror-image copies of a part of the book); Georgia State is a nonprofit educational institution and the excerpts were used for the purpose of teaching students. Op. at 60-75; Patton at 1267-68.

(3) "Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material that surpasses the bare facts necessary to communicate information, or derives from the author's experiences or opinions, the District Court should have held that the second factor was neutral, or even weighed against fair use in cases of excerpts that were dominated by such material. That being said, the second fair use factor is of relatively little importance in this case."[5] Op. at 80-81; Patton at 1270.

_____

[5] The Court of Appeals also held "[t]he second factor is of comparatively little weight in this case, particularly because the works at issue are neither fictional nor unpublished." Op. at 81 n.28; Patton at 1270 n.28.

(4) This Court erred in holding that factor two favored fair use in every case. Op. at 79; Patton at 1269-71.

(5) The third factor addresses whether Defendants have "'helped themselves overmuch' of the copyrighted work in light of the purpose and character of the use," citing Peter Letterese & Assocs. v. World Inst. of Scientology Enter., Int'l., 533 F.3d 1287, 1314 (11th Cir. 2008). Thus, factor three is intertwined with factor one and also with factor four in that it "partly functions as a heuristic to determine the impact on the market for the original." Op. at 82; Patton at 1271.

(6) in determining the permissible quantity of materials which may be copied under factor three, the Court must consider "not only . . . the quantity of the materials used, but . . . their quality and importance, too." Op. at 83; Patton at 1271 (quotation omitted).

(7) This Court erred in holding that factor three always favored fair use when the excerpt was no more than ten percent of the copyrighted book, or one chapter in the case of a book with ten or more chapters. Op. at 83; Patton at 1271-72.

(8) Because Defendants' use is wholly nontransformative, the threat of market substitution under factor four is severe, strengthening the importance of factor four in the overall analysis. Op. at 92-93; Patton at 1275-76.

(9) This Court erred in not assigning more weight to factor four than to the other factors because ". . . Defendants' unpaid copying was nontransformative and they used Plaintiffs' works for one of the purposes for which they were marketed." Op. at 111; Patton at 1283.

6

(10) Under factor four, the Court must consider "(1) the extent of the market harm caused by the particular actions of the alleged infringer," and "(2) whether unrestricted and widespread conduct of the sort engaged in by the defendant[] would result in a substantially adverse impact on the potential market." Op. at 92; Patton at 1275 (quotation omitted). The adverse impact is primarily that of market substitution; i.e., "use that supplants any part of the normal market for a copyrighted work." Id. ". . . the importance of [the fourth] factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." Id.

(11) ". . . the District Court did not err in finding that 'Defendants' use of small excerpts did not affect Plaintiffs' actual or potential sales of books.'" Op. at 94; Patton at 1276 (quoting Order at 74; Becker at 1236).

(12) "[Therefore] this case [now] concerns not the market for Plaintiffs' original works themselves or for derivative works based upon those works, but rather a market for licenses to use Plaintiffs' works in a particular way." Op. at 98; Patton at 1277-78.

(13) "Cognizant that fair use is an affirmative defense, the District Court kept the overall burden on Defendants to show that 'no substantial damage was caused to the potential market for or the value of Plaintiffs' works' in order to prevail on the question of whether the fourth factor should favor fair use." Op. at 101; Patton at 1279 (quoting Order at 76; Becker at 1237).

(14) "The central question under the fourth factor is not whether Defendants' use of Plaintiffs' works caused Plaintiffs to lose some potential revenue. Rather, it is whether Defendants' use--

7

taking into account the damage that might occur if 'everybody did
it'--would cause substantial economic harm such that allowing it
would frustrate the purposes of copyright by materially impairing
[Plaintiff's] incentive to publish the work." Op. at 93; Patton at
1276 (citing Harper & Row Publishers, Inc. v. Nation Enters., 471
U.S. 539, 566-67) (1985) (emphasis in original).

(15) ". . . keeping in mind the purposes animating copyright
law--the fostering of learning and the creation of new works--we must
determine how much of that value [the value of the work to its author
and the potential buyers] the implied licensee-fair users can capture
before the value of the remaining market is so diminished that it no
longer makes economic sense for the author--or a subsequent holder of
the copyright--to propagate the work in the first place." Op. at 51;
Patton at 1258.

(16) Copyright Clearance Center's ("CCC") licensing program and
Plaintiffs' own permissions programs constitute workable markets
through which universities like Georgia State may purchase licenses
to copy excerpts of Plaintiffs' works. Op. at 94; Patton at 1276.

(17) Plaintiffs bear the burden of showing that CCC provided in
2009 "reasonably efficient, reasonably priced, convenient access" to
users who wanted to copy the excerpt in question. Op. at 101; Patton
at 1279.

(18) Where a license to make digital copies of an excerpt was
not available in 2009, there is a presumption that Defendants' use of
the excerpt did not harm the plaintiff-publisher. Plaintiffs can
overcome the presumption of no market by going forward with evidence
of license availability and also with evidence of a potential, future
market. See Op. at 102-03; Patton at 1279-80.

8

(19) Defendants bear the ultimate burden of persuasion to show that their use did not materially impair the existing or potential market in order to prevail. Op. at 103; Patton at 1280.

(20) "Where the evidence showed that there was a ready market for digital excerpts of a work in 2009, the time of the purported infringements, the District Court found that there was small--due to the amount of money involved--but actual damage to the value of Plaintiffs' copyright. The District Court also properly took into account that widespread use of similar unlicensed excerpts could cause substantial harm to the potential market. Thus, where there was a license for digital excerpts available, the District Court generally held that the fourth factor weighed against a finding of fair use. In close cases, the District Court went further and examined the amount of permissions income a work had generated in order to determine how much this particular revenue source contributed to the value of the copyright in the work, noting that where there is no significant demand for excerpts, the likelihood of repetitive unpaid use is diminished." Op. at 99-100; Patton at 1278-79 (footnote omitted).

(21) Where the evidence shows there is no significant demand for an excerpt, the likelihood of repetitive unpaid use is diminished. Id.

(22) The fact that programs exist through which universities may license excerpts of Plaintiffs' works does not automatically mean that the Plaintiffs are entitled to payment for use of the excerpts. Op. at 95; Patton at 1276. "The goal of copyright is to stimulate the creation of new works, not to furnish copyright holders with control over all markets." Id. Nonetheless, availability of

9

licenses means that an unauthorized use should be considered less fair when there is a means to pay for the use. On the other hand, where licenses are not available, this makes factor four generally weigh in favor of fair use. Op. at 95-96; Patton at 1276-77.

(23) Plaintiffs may not "head off a defense of fair use by complaining that every potential licensing opportunity represents a potential market for purposes of the fourth fair use factor." Op. at 98; Patton at 1278.

(24) This Court erred in considering as a supplemental factor that Defendants' use promotes the dissemination of knowledge; this should have been considered as a part of factor one, which holds that educational uses are more apt to be fair. Op. at 107-08; Patton at 1282.

(25) This Court erred in considering as a supplemental factor that limited unpaid copying will not deter academic authors from creating new academic works; this should have been considered as part of the factor one analysis. Op. at 107-08; Patton at 1282.

(26) This Court erred in considering as a supplemental factor that "[t]he slight limitation of permissions income caused by the fair use authorized by this Order will not appreciably diminish Plaintiffs' ability to publish scholarly works and will promote the spread of knowledge"; this should have been considered as part of the factor four analysis. Op. at 107; Patton at 1282.

* * *

In its original Order, this Court used a general model to analyze fair use which was not specific to nontransformative

10

nonprofit educational uses.  Factor one was held to strongly favor fair use in all cases because of the nonprofit educational nature of the use.  After examination of the nature of the work in question, factor two was found to favor (but not strongly favor) fair use in all instances.  With respect to factor three, the Court set a cutoff of 10% of the pages of the book or one chapter for a book of ten chapters or more as the limit of fair use.  In instances where the use fell within the limit, this Court held that Defendants' use favored (but did not strongly favor) fair use.  Finally, the Court held that in all instances where permissions were available and were not paid, factor four strongly disfavored fair use.  In those cases where factors one and two favored Defendants (factor one weighing heavily in Defendants' favor and factor two weighing in Defendants' favor) and both factors three and four weighed in favor of Plaintiffs (factor three weighing in Plaintiffs' favor and factor four weighing heavily in Plaintiffs' favor), a tie was created which the Court went on to resolve by considering the evidence concerning damage to the potential permissions market.

In light of the Court of Appeals' direction, that approach must be modified.  First, in the fair use analysis for each infringement claim this Court will use the same fair use model as the Court of Appeals.  It will be specific to the nonprofit educational purpose of teaching and the nontransformative nature of the use (mirror image copying).  The method which will be used is to first evaluate each factor.  The evaluation of factor one ("purpose and character of the use") will reflect the nontransformative nature of Defendants' use.  Factor one will favor fair use in all cases.  It will not "strongly favor" fair use.  Op. at 74; <u>Patton</u> at 1267.  The evaluation of

11

factor two ("nature of the copyrighted work") will apply the standard set by the Court of Appeals. The evaluation of factor three ("amount and substantiality of the portion used") will take into account the effect of the favored nonprofit educational purpose of the use under factor one, plus the impact of market substitution as recognized under factor four, in determining whether the quantity and substantiality (value) of Defendants' unlicensed copying was excessive. All relevant record evidence will be considered; the factor three outcomes will vary.

The evaluation of factor four ("effect of the use upon the potential market for or value of the copyrighted work") will first look to see whether permissions were available to make digital copies of the excerpt in 2009, the year in which the claimed infringements occurred. If so, it follows that widespread copying of unpaid copyrighted excerpts at colleges and universities ("if everybody did it") could have caused substantial damage to the potential digital permissions market for excerpts of the copyrighted work at issue. It also could have caused substantial damage to the value of the copyrighted work. Factor four will initially favor Plaintiffs when digital permissions were available in 2009.

However, the Court of Appeals held that Defendants may seek to prove that in fact, the demand for excerpts of a particular copyrighted work was so limited that repetitive unpaid copying of excerpts from that work would have been unlikely even if unpaid copying of excerpts was a widespread practice in colleges and universities. In such a case the actions of Defendants in using unpaid excerpts would not have caused substantial damage to the potential market for the copyrighted work to such a degree that

12

Plaintiffs would lose the incentive to publish the work. Defendants may also seek to prove that their actions (even assuming widespread availability of unpaid excerpts) did not substantially affect the value of the copyrighted work in 2009. Defendants can do this by pointing to the records of permissions sales for excerpts from the book, as well as any other evidence which bears on harm to the potential market for the copyrighted work or harm to the value of the copyrighted work. Defendants may also seek to prove that the portion of the market captured by unpaid use is so slight that it would have had no effect on the author's or the Plaintiffs' decision to propagate the work in the first place. The outcome on factor four will vary according to the evidence. Whether factor four "strongly" favors fair use will depend on the evidence. Defendants have the final, overall burden of proof on factor four.

An initial determination will be made as to whether each of the four factors favors or disfavors fair use. The factors then will be weighed together. Factor four will be given additional weight and factor two will be given comparatively little weight for this purpose, as directed by the Court of Appeals. If a particular factor has noteworthy strength or weakness, the weight of that factor will be adjusted for purposes of the final weighing process.

Regarding the relative importance of the factors in a case involving nonprofit educational use of a mirror image of an excerpt, generally speaking factors one and three will rank close together, but a good bit behind factor four.[6] Factors one and three, though of

---

[6]The preeminence of factor four is a function of the nontransformative nature of Defendants' use and the fact that Defendants used Plaintiffs' works for one of the purposes for which

13

lesser importance than factor four, are still important--factor one for obvious reasons and factor three because the amount and substantiality of the copyrighted material taken is a critical consideration in determining whether Defendants' unpaid use was fair. Indeed, factor three is at the vortex of the holistic evaluation required by the Court of Appeals' Opinion. The Court of Appeals held that factor two is of "comparatively little importance," putting it in a distant last position. Op. at 81; Patton at 1270. This Court estimates the initial, approximate respective weights of the four factors as follows: 25% for factor one, 5% for factor two, 30% for factor three, and 40% for factor four.

## II.  **Preliminary Matters**

This Court has previously held that CCC was a ready market[7] for excerpts of copyrighted works in 2009. It implicitly decided that where the Plaintiffs had decided to use CCC to market digital permissions for specific works, those permissions were available at a reasonable price and in a convenient and reasonably efficient manner. The Court also pointed out that Defendants had not complained that CCC's permissions prices are unreasonable. Order at 76; Becker at 1237. Defendants now ask the Court to reconsider the question whether Plaintiffs' fees for permissions to make digital copies of excerpts are reasonable [Defs. Remand Brief, Doc. 501 at 16]. They point to the example of Professor Dixon's class in which

they are marketed.  Op. at 111; Patton at 1283.

[7]"Market" here means a place to purchase licenses at the price set by the publisher.  There is no price negotiation.

only 21 of 59 students downloaded an assigned excerpt [Id. at 53-55]. They point out that CCC's policy would have required a payment calculated by multiplying the per-page rate[8] times the number of pages copied times the number of students in the class (plus a $3.00 service fee) [Id. at 17]. Defendants state that in this particular example the payment required by CCC would have been $250.80 whereas basing the charge on the 21 students would have yielded a total charge of $88.20 [Id.].

Plaintiffs oppose Defendants' request [Pls. Remand Reply Br., Doc. 503 at 11], characterizing it as arbitrary. The Court does not agree that it is arbitrary.[9] However, the record shows that CCC's fee is set in advance, when permission is granted and payment is made based on a presumed number of users (students in the class) [Testimony of Carol Richman, Doc. 401 at 16-17]. While it is possible that a different arrangement could be established, the workability of such an arrangement is unclear; it is too late to make this request.

---

[8]The per-page rates are set by individual publishers.

[9]Plaintiffs also point out that this Court in effect previously determined that CCC's pricing scheme is reasonable. This Court did implicitly rule that CCC's overall pricing scheme (per page rate times number of pages times number of students in class) is reasonable, and it stands by that ruling. The per page rate (11¢ to 14¢) is reasonable, and there is nothing inherently unreasonable in the formula. See Order at 29-30; Becker at 1215-16. However, this would not preclude a determination that in a particular case the price would be so unreasonable as to affect the fair use analysis.

15

* * *

The infringement claims in this case arise from the use of unlicensed excerpts in 24 classes at Georgia State in 2009. Two-thirds of these classes (16 classes) had fewer than 20 students; four classes had 20-30 students; and the four remaining classes had between 42 and 114 students. The Court does believe there is merit in an argument that, for very large classes, basing the price charged (in part) on the number of students in the class could result in an excessive fee and that this reality should be taken into account in the fair use analysis. It is potentially applicable to Professor Dixon's class of 59 students, Professor Lasner's class of 114 students, Professor Hankla's class of 48 students, and Professor Ohmer's class of 42 students.[10] If applicable, it could affect the factor three analysis ("the amount and substantiality of the amount used in relation to the copyrighted work as a whole") in an instance where the amount of material used by the professor borders on an excessive amount. It is considered in the analyses for Professor Dixon's use of an excerpt from *African American Single Mothers*, see infra at p. 117, and Professor Lasner's use of an excerpt from *The Politics of Public Housing*, see infra p. 174.

---

[10]The Court expresses no opinion that the fee calculation for classes smaller than these would result in a reasonable fee. The record does not allow for precision analysis in this regard; the largest classes are outliers where precision analysis is not required.

16

* * *

On February 24, 2015 Plaintiffs filed a motion to reopen the record on remand [Doc. 489]. The motion sought to reopen the record to add evidence that permissions to make digital copies of certain of Plaintiffs' works were available in 2009. Defendants opposed the motion. Plaintiffs asked that the Court admit new evidence and re-evaluate 17 infringement claims of Oxford and Cambridge (9 from Oxford, 8 from Cambridge), asserting that this would be helpful in fashioning injunctive relief. An order entered April 22, 2015 [Doc. 494] commented "Plaintiffs have the cart before the horse" and stated that the Court would first make rulings on the infringement claims which were already before it; it would then determine what future course of action might be appropriate. Plaintiffs' motion was dismissed without prejudice.

Undeterred by the Court's April ruling, on June 1, 2015 Plaintiffs unilaterally filed a document titled Notice of Filing [Doc. 499]; a Declaration of Debra J. Mariniello, an officer of Copyright Clearance Center, was attached. The declaration states that 17 of Oxford's and Cambridge's excerpts involved in this case were available for digital copying through CCC in 2009. These excerpts save one had not been identified by the trial evidence as being available for digital copying. On the same date Plaintiffs filed Plaintiffs' Remand Brief [Doc. 500] which contains fair use analysis for 39 of the 48 infringement claims which are presented for fair use analysis. This includes 16 claims for which Plaintiffs rely exclusively on the Mariniello declaration to establish availability of digital permissions in 2009.

17

Defendants object to the filing and move that Plaintiffs' Remand Brief and the Mariniello declaration be stricken [Doc. 502]. The Court grants Defendants' motion. Plaintiffs' reliance on the Mariniello declaration in the Remand Brief is obviously improper. It is offered years after the close of the trial and entry of the judgment and after review by the Court of Appeals. The declaration is not in evidence. Defendants have had no opportunity to question Mariniello about the opinions referenced in her declaration. Also, Mariniello's stated opinions are conclusory. She does not explain how the information in CCC's computer led her to the conclusion that digital permissions for the various works were available in 2009. Allowing consideration of her declaration would fly in the face of precedent and logic. The Mariniello declaration [Doc. 499] is stricken from the record. All references in Plaintiffs' Remand Brief [Doc. 500] to the Mariniello declaration are stricken; all arguments in the remand brief based on the Mariniello declaration are stricken.

\* \* \*

In the fair use analyses for the various claims which follow, factor one ("the purpose and character of the use") will uniformly favor fair use because all uses were strictly of a nonprofit educational character for the sole purpose of teaching students in classes at a nonprofit educational institution, notwithstanding the nontransformative nature of the use. This outcome will be stated summarily in each fair use analysis to avoid repetition.

18

* * *

Factor two is "the nature of the copyrighted work."  17 U.S.C. 107(2).   To undertake this analysis the Court has focused on the particular chapter(s) used by the professor, rather than on the entire copyrighted work.  While the Court has not examined all of the chapters in the books with the same scrutiny as the particular chapter at issue, it is satisfied that the nature of all chapters in these books (and thus the books as a whole), with two exceptions, would be classified as either neutral to fair use or as disfavoring fair use.   The two exceptions are *Ancient Egyptian Materials and Technology* [Pls. Ex. 6] and *International Health Organisations* [Pls. Ex. 108].[11]   Those two books and the excepts from them are properly classified as favoring fair use or neutral on fair use.   Op. at 81; Patton at 1270.

* * *

The Court now turns to fair use analysis for individual infringement claims.  They will be considered in the same sequence as in this Court's original Order, but omitting the claims already finally adjudicated by the Court of Appeals.

---

[11]Both of these works were published by Cambridge.

19

## FAIR USE EVALUATION

### A.   Professor Kaufmann

Professor Kaufmann is an assistant professor at Georgia State in the College of Education [Tr. Vol. 5, Doc. 403 at 35-36].  Professor Kaufmann's courses teach students methods for conducting qualitative research, and consist predominantly of Ph.D. students [Id.].

### EPRS 8500 Qualitative/Interpretive Research in Education I, Maymester 2009

EPRS 8500 was taught by Professor Jodie Kaufmann during Maymester and fall of 2009.  The course syllabus required that students buy three texts, and that they complete several required readings which had been posted on Georgia State's electronic reserves system ("ERES") [Tr. Vol. 5, Doc. 403 at 68-76, 143-45; Pls. Exs. 516, 518].

### 1.   *The Craft of Inquiry: Theories, Methods, Evidence* (Robert R. Alford, Oxford 1998)

One of the posted readings was an excerpt from *The Craft of Inquiry: Theories, Methods, Evidence* ("*The Craft of Inquiry*"), by Robert R. Alford [Pls. Ex. 372].  Pages 21-31 (11 pages) of *The Craft of Inquiry*, the entirety of chapter two and 6.25% of the book, were uploaded to ERES for distribution to the students in Professor Kaufmann's EPRS 8500 Maymester 2009 course.  This was required reading [Doc. 403 at 120-21].

### Fair Use Analysis

Factor one ("the purpose and character of the use") favors fair use.

20

As to factor two ("the nature of the copyrighted work"), *The Craft of Inquiry* is an academic[12] non-fiction[13] work concerning the process of constructing a research project. The author's thesis is that three major paradigms of inquiry--multivariate, interpretive and historical--should be considered in this process. Various chapters of the book discuss the three major paradigms. Professor Kaufmann assigned the reading (via ERES) of chapter two, pages 21-31, "Designing a Research Project." This chapter advises that the writer should focus on the cognitive, not the emotional, choices that are presented. The writer should start the project by identifying a problem of interest and identifying theoretical and empirical entry points to the discussion. Then, the writer should move back and forth between those "tracks of analysis" to formulate one or more research questions. Once one or more research questions have been identified, the writer should turn to "a set of choices you will make in your project," namely the three paradigms of inquiry.

The writer's style in this chapter is modestly conversational but still rather formal. He addresses the reader as "you" and occasionally refers to himself as "I." The chapter is objectively descriptive of the various steps in developing a research question and the theoretical and empirical "tracks of analysis." Chapter two

---

[12]Almost all of the books involved in this case are academic in nature. By "academic," the Court means "Of, relating to, or characteristic of an educational institution or environment; concerned with the pursuit of research, education, and scholarship; scholarly, educational, intellectual." *Academic*, Oxford English Dictionary (3d ed. 2011).

[13]All of the books involved in this case are non-fiction.

21

has no humorous or fanciful aspects. It is didactic and prescriptive in a conventionally academic manner. It does contain some elements of author opinion, though they are not identified as such.   Author opinion does not dominate.   Under the standard set by the Court of Appeals, factor two neither favors nor disfavors fair use.   It is neutral.

As to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kaufmann uploaded one full chapter, 6.25% of the book (11 pages) [Pls. Ex. 372].   This selection was narrowly tailored to fit the pedagogical aim of the course and was not excessive for this purpose.   The percentage of the book used (6.25%) is small.   This chapter is not the heart of the work.   While chapter two has no greater value than any other chapter of the book, the Court does consider that a whole chapter of the book has greater value (quality) than part of a chapter, because it covers a complete, cohesive topic. The favored educational use of factor one--rather than a commercial use--tends to support more copying rather than less; on the other hand, the threat of market substitution pulls toward favoring less copying, rather than more.   Taking into account the small number of pages (11 pages) in the excerpt and the small percentage of the book, the Court finds the impact of market substitution to be well within acceptable limits.   Taking all of the foregoing into account, factor three favors fair use.

As to factor four ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court of Appeals held that the small excerpts involved in this case did not substitute for the books.   Op. at 94; Patton at 1276.   However, permissions to

22

make digital copies of excerpts from *The Craft of Inquiry* were available from CCC in 2009 [Pls. Ex. 375]. Defendants' unpaid use cost Oxford \$14.89, thereby causing small but actual damage to the value of Oxford's copyrighted work and depriving Oxford of \$14.89 in permissions revenue. Order at 110, 110 n.56; Becker at 1254, 1254 n.56. If "everybody" (colleges and universities) had programs like Georgia State's allowing unpaid copying of excerpts, Oxford could lose substantial revenues from digital permissions sales for this work, possibly causing substantial damage to the market for the copyrighted work. There also could be substantial damage to the value of the copyrighted work. Viewed alone, these considerations initially cause factor four to weigh in Oxford's favor.

Nonetheless, Defendants claim there was no substantial actual or potential damage to Oxford stemming from widespread use of excerpts of *The Craft of Inquiry*, much less the sort of damage which could impact Oxford's desire to publish the work. Defendants point to the evidence which shows that Oxford has gotten little to no permissions income from sales of excerpts of the book since its publication in 1998. Specifically, Oxford only received \$12.36 in electronic course content service ("ECCS") permissions from CCC in 2006[14] and \$188.62 in Academic Permissions Service ("APS") revenue in 2008 [Pls. Ex. 375]. Oxford sold no in-house permissions for copying excerpts of *The Craft of Inquiry* between publication in 1998 and November 7, 2010.[15] It is hard to see how (as of 2009) there was potential

---

[14]The Court infers that if ECCS permissions were available in 2006 they would have been available in 2009.

[15]The record evidence ends at November 7, 2010.

23

substantial damage to Oxford's expectation of permissions income where there is so little likelihood of repetitive use of unpaid excerpts from this book. Potential book sales were not affected at all. Oxford had book sales of *The Craft of Inquiry* of $86,325 between publication and November 7, 2010 [Pls. Ex. 357]. The evidence thus clearly shows the potential market for sales of the copyrighted work was barely affected. The Court also finds that, while Defendants' unpaid use did cost Oxford $14.89, the negative effect on the value of the copyrighted work was tiny even if one assumes that other colleges and universities have policies similar to Georgia State's, because of the low chance of repetitive use of this excerpt. Accordingly, in the end factor four favors fair use, even though Defendants have the burden of proof.

Weighing the four factors together, giving factor four extra weight and factor two insubstantial weight as directed by the Court of Appeals, Defendants prevail on the fair use defense.

> 2. *Handbook of Feminist Research: Theory and Praxis* (Sharlene Nagy Hesse-Biber ed., Sage 2006)

Professor Kaufmann distributed unpaid digital copies of chapter 26 from the *Handbook of Feminist Research: Theory and Praxis* ("*Handbook of Feminist Research*") for her Maymester 2009 Qualitative/Interpretive Research in Education course. The excerpt is titled "Feminist Research Ethics," by Judith Preissle [Tr. Vol. 5, Doc. 403 at 112; Pls. Ex. 243]. The excerpt (pages 515-534) is 20 pages long and constitutes 2.61% of the book's 767 total pages [Pls. Ex. 243]. It was required reading [Doc. 403 at 112; Pls. Ex. 516]. Fair Use Analysis

Factor one favors fair use.

24

Moving to factor two, the *Handbook of Feminist Research* is an academic book that aims to enhance the reader's understanding of feminist research.    Through the introduction of different feminist theories and methods, the book teaches the reader how feminist schools of thought impact both feminist research and scholarship in women's studies.    The book contains four sections which (1) detail the rise of feminist research; (2) debate the existence of a unique feminist method; (3) investigate theoretical and practical issues for feminist researchers; and (4) present a combination of various views within the field to foster the creation of new research paradigms.

Chapter 26, "Feminist Research Ethics," begins by framing a concept of feminist ethics that focuses on relationships between the researcher and their subjects.    The chapter then addresses how feminist ethics has affected three areas of traditional research: ethics of research purpose, ethics of research roles and conduct, and ethics of representation.    The conclusion of the chapter focuses on how conducting feminist research amplifies certain ethical challenges, including the disadvantages a researcher faces by remaining detached from their subjects and the potential power wielded by participants.

Chapter 26 is written in a formal tone, with use of the first person only to indicate the structure and direction of the work.    The majority of the chapter is spent summarizing and detailing various ethical studies performed by other feminist researchers.    The author complements these summaries with her own opinions on the ethics of feminist research.    The additional observations provided by the author appear to come from her own analysis.    Thus, the author's contribution is twofold: she synthesizes ethical conundrums within

25

her field while describing other unresolved ethical issues. However, author opinion and analysis do not dominate. This excerpt, therefore, neither favors nor disfavors fair use under factor two.

Moving to factor three, Professor Kaufmann uploaded 20 pages of the *Handbook of Feminist Research* to ERES. These pages make up 2.61% of the total book, which is a very small (not merely small) amount [Pls. Ex. 243]. This excerpt was narrowly tailored to fit the pedagogical aim of the course. Additionally, chapter 26 does not constitute the heart of the book. Factor three also considers the purpose of the use and the impact of substitution on the market for the work. Op. at 82; Patton at 1271. Because the book was being used for a nonprofit, educational purpose, the very small percentage of the book easily tilts in favor of fair use. The page count adequately limits the substitution effect of the use; it results in a smaller loss of permissions payments. Even though a full chapter of the book was used, taking all of the foregoing into account, factor three easily favors fair use.

Factor four looks to the effect of Defendants' use on the value of the copyrighted work and the potential market for the work. Digital permissions were available for excerpts of the *Handbook of Feminist Research* in 2009 [Pls. Ex. 248]. By providing the excerpts free to her class, Professor Kaufmann deprived Sage of $31.30, less royalties payable to the external editor, in net revenue from permissions. Order at 111; Becker at 1255. This caused actual, but tiny, damage to the value of the copyrighted work. In addition, if other colleges and universities allowed unpaid use of copyrighted excerpts, it could cause substantial harm to the potential market for

26

and the value of the copyrighted work.    Factor four initially disfavors fair use.

Defendants can still prevail on factor four by proving that widespread unpaid copying practices would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work."  Op. at 93; Patton at 1276.    The *Handbook of Feminist Research* was first published in 2006 [Pls. Ex. 247].    The following table shows book sales for the *Handbook of Feminist Research* since its publication:

| Year | Book Sales Net Revenue |
|------|------------------------|
| 2006 | $17,241.00 |
| 2007 | $4,153.45 |
| 2008 | $15,015.80 |
| 2009 | $12,052.55 |
| 2010 | $5,623.08 |
| **Total** | **$94,085.88** |

[Pls. Ex. 248].

Over that same period of time, the *Handbook of Feminist Research* generated a small amount of permissions revenue.    There is no evidence of CCC revenues for the *Handbook of Feminist Research*, but Sage did provide the figures for their in-house (presumably digital) permissions sales.    Those figures are listed below:

| Year | Permissions Sales |
|------|-------------------|
| 2006 | $0.00 |
| 2007 | $0.00 |
| 2008 | $116.29 |
| 2009 | $96.45 |

27

| 2010 | $770.72 |
| Total | $983.46 |

[Pls. Ex. 248].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time that the alleged infringement occurred. It also pertains to damage to the value of the copyrighted work in 2009. For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Based on the data listed above, the Court finds that the value of the copyrighted work in 2009 was almost exclusively in book sales, not permissions. Defendants' actions had no impact on book sales. Op. at 94; Patton at 1276. Defendants' actions could have had some very small impact on the actual or potential market for digital permissions sales. But it is unlikely that Defendants' use of unpaid excerpts (even assuming the widespread availability of programs like Georgia State's) substantially damaged the value of the copyrighted work. It is also unlikely that Defendants' use of unpaid excerpts caused substantial damage to the potential market for the copyrighted work (book sales and digital permissions sales), such that Sage would lose its incentive to publish the *Handbook of Feminist Research*. Factor four, therefore, favors a finding of fair use.

In summary, factors one, three, and four favor fair use, while factor two is neutral. Weighting these factors as directed by the Court of Appeals, the Court finds that the overall weight of the four

28

factors favors fair use.  Defendants accordingly prevail on their fair use defense as to the *Handbook of Feminist Research*.

>   3.  *Handbook of Social Theory* (George Ritzer & Barry Smart eds., Sage 2001)

Professor Kaufmann assigned chapter 17 of the *Handbook of Social Theory* for her May 20, 2009 class session in EPRS 8500 [Tr. Vol. 5, Doc. 403 at 113; Pls. Ex. 516].  The chapter is titled "Symbolic Interactionism at the End of the Century" ("Symbolic Interactionism"), and it was written by Kent L. Sandstrom, Daniel D. Martin, and Gary Alan Fine.  The chapter (pages 217-228), is 12 pages long and 2.12% of the 564-page total book [Pls. Ex. 288].  It was required reading [Doc. 403 at 113; Pls. Ex. 516].

## Fair Use Analysis

Factor one favors fair use.

Factor two looks to the nature of the copyrighted work.  The *Handbook of Social Theory* is an academic book that seeks to survey and define the field of social theory in three steps.  The book first discusses the classic social theorists, such as Karl Marx and Max Weber.  The second step builds on the work of the classic theorists to present how the field has changed in light of current developments in postmodernism, rational choice theory, and contemporary feminism. The conclusion of the book highlights the current debates within the field as a springboard towards further development of social theory.

Chapter 17, "Symbolic Interactionism," provides an overview of the developments within symbolic interactionism, which is a subset of social theory.  The chapter begins by providing six guiding premises of symbolic interactionism: (1) people are unique creatures because of their ability to use symbols; (2) people become distinctively

29

human through their interaction; (3) people are conscious and self-reflexive beings who actively shape their own behavior; (4) people are purposive creatures who act in and towards situations; (5) human society consists of people engaging in symbolic interaction; and (6) to understand people's social acts, we need to use methods that enable us to discern the meanings they attribute to these acts.

With these premises in mind, the bulk of the chapter surveys the contributions made by various lines of social interactionism research. These lines include work on the concept of self, emotional contributions, and the construction of social problems. The authors close by discussing how issues relating to developments in feminism, critical interactionism, and postmodernism will shape the discussion of symbolic interactionism in the future.

Chapter 17 is written in a formal tone, with no use of the first person or conversational techniques. The majority of the excerpt is spent summarizing and comparing other scholarly research in the field. Chapter 17 presents little to no direct opinion of the authors beyond the summaries of their previous works and is devoid of discussion of the authors' personal experiences. The chapter is both objectively and subjectively descriptive. Because the authors' opinion and subjective description do not dominate the discussion, factor two neither favors nor disfavors fair use.

Factor three requires an analysis of the quantity and quality of the excerpt in light of factors one and four. "Social Interactionism" is a 12-page chapter, making up 2.12% of the total pages in the *Handbook of Social Theory* [Pls. Ex. 288]. The amount taken is tiny, even without the leavening effect of the nonprofit educational purpose and character of the use. Professor Kaufmann

assigned the entire chapter, which gives the excerpt greater value than if only part of the chapter had been assigned. However, this chapter does not have any greater value than the other chapters in the work, and does not constitute the heart of the work. The excerpt fit Professor Kaufmann's pedagogical purpose, and the very small number of pages portends a small impact on the permissions market. Taking all of the foregoing into account, factor three easily favors fair use.

Factor four measures the effect of the unpaid use on the value of the copyrighted work and on the potential market for the copyrighted work. Permissions to make digital copies of the *Handbook of Social Theory* were available in 2009 from Sage [Pls. Ex. 291]. Because Defendants used Sage's copyrighted material without paying for available permissions, Sage lost $18.72 in net revenue as a result of Professor Kaufmann's use. Order at 116, 116 n.57; Becker at 1257, 1257 n.57. This caused small but actual damage to the value of Sage's copyrighted work. Moreover, if all colleges and universities were to encourage unpaid use of small excerpts of copyrighted works, this could cause substantial harm to the potential market for this particular copyrighted work. It could also cause substantial harm to the value of the copyrighted work. These considerations cause factor four to initially incline in Sage's favor.

Sage presents evidence that it made £63,483.74 in net revenue from book sales of the *Handbook of Social Theory* from the date of publication in 2001 to the end of the calendar year in 2010 [Pls. Ex. 291]. The following table shows net book revenues for the *Handbook of Social Theory* from 2001 to 2010:

31

| Year | Net Sales Revenue (Books) |
|------|---------------------------|
| 2001 | £32,922.61 |
| 2002 | £5,978.00 |
| 2003 | £10,066.04 |
| 2004 | £3,484.36 |
| 2005 | £1,639.93 |
| 2006 | £2,136.26 |
| 2007 | £1,680.54 |
| 2008 | £3,109.30 |
| 2009 | £1,028.64 |
| 2010 | £1,438.06 |
| **Total** | **£63,483.74** |

[Id.].

The following table shows all permissions revenues from the *Handbook of Social Theory* since 2004:

| Year | APS[16] | ECCS | In-House |
|------|---------|------|----------|
| 2005 | $47.12 | No Evidence | £0.00 |
| 2006 | $0.00 | No Evidence | £0.00 |
| 2007 | $127.50 | No Evidence | £25.74 |
| 2008 | $298.86 | No Evidence | £12.48 |
| 2009 | $18.32 | No Evidence | £116.48 |
| 2010 | $13.10 | No Evidence | £2,309.26 |
| **Total** | **$504.90** | | **£2,470.01** |

[Id.; Pls. Ex. 292].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time

---

[16]The Court includes APS revenues because they add information concerning the relative appeal of various excerpts to users. Sage's in-house program provides digital excerpts to users.

that the alleged infringement occurred.   It also pertains to the damage to the value of the copyrighted work in 2009.   For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Defendants' use of an unpaid excerpt of the *Handbook of Social Theory* had no impact on the potential market for or value of the copyrighted book because the unpaid excerpts did not substitute for the books.   That has already been decided.   Op. at 94; Patton at 1276.   Defendants' use had some small impact on the potential market for digital permissions for excerpts of the book, but in combination with no loss of book sales the potential market was barely impacted. Put another way, the Court is persuaded that Defendants' use likely did not have a substantial impact on the potential market for the copyrighted work.   Finally, the Court finds that Defendants' use did not disincentivize Sage's continued publication of the work, because Sage can seek permissions fees through CCC's ECCS program and its own in-house program at virtually no marginal cost to itself.   As long as there is any possibility of gaining permissions fees, it is in Sage's interest to continue making permissions available.   While permissions are available, it follows that the copyrighted work still is in publication.   Therefore, the Court finds that Defendants have proven that their unpaid excerpt use, even assuming the widespread use of programs like Georgia State's, did not cause substantial harm to the potential market for or the value of the copyrighted work, such that Sage would be disincentivized from continuing publication of the work.   Factor four, therefore, favors fair use.

33

In summary, factors one, three and four favor fair use while factor two is neutral. Weighting all factors in the manner directed and considering them together, the Court finds that the use of the *Handbook of Social Theory* constitutes fair use. Sage's claim of infringement fails as to this work.

> 4. *The Sage Handbook of Qualitative Research (Third Edition)* (Norman K. Denzin & Yvonna S. Lincoln, eds., Sage 2005)

Professor Kaufmann caused pages 1-32, 357-375, 443-465, and 651-679 of *The Sage Handbook of Qualitative Research (Third Edition)* (*"Handbook, Third Ed."*)[17], the entirety of four chapters (out of 44 chapters) to be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5, Doc. 403 at 80-81 and 106-11]. The excerpt totaled 102 pages, or 8.30% of the 1,229-page book [Pls. Ex. 267].

## Fair Use Analysis

Factor one favors fair use.

Regarding factor two, the first excerpt was pages 1-32, the Introduction to the book. The Introduction, which was written by the external editors of the book, forecasts what will be in the book. It

---

[17]This book is the third in a series of four editions. The first edition was published in 1994; the second edition in 2000; the third edition in 2005; and the fourth edition in 2011. The successive editions share a common layout but they each contain a mix of new, reprinted or revised chapters. The books are produced by external editors who select the contributing authors and collaborate with them in writing the various chapters. All of the editions (as well as Sage's other books on qualitative research which are involved in this case) seek to validate and extend the acceptance of qualitative research, which is basically social research from a humanist point of view. The books aim to educate students on how to carry out qualitative research projects.

34

states: "[i]n this introductory chapter, we define the field of qualitative research, then navigate, chart, and review the history of qualitative research in the human disciplines" [Id. at 2]. In addition, "[w]e also present a conceptual framework for reading the qualitative research act as a multicultural, gendered process and then provide a brief introduction to the chapters that follow" [Id.]. The introduction states, "This volume is intended to serve as a bridge connecting historical moments, politics, the decolonization project, research methods, paradigms, and communities of interpretive scholars" [Id.]. Qualitative research is stated to be a field of inquiry which "crosscuts disciplines, fields, and subject matters" [Id.]. Also, "[i]n North America, qualitative research operates in a complex historical field that crosscuts at least eight historical moments" [Id. at 2-3]. The editors identify those eight historical moments as the traditional, the modernist, blurred genres, the crisis of representation, the postmodern, postexperimental inquiry, the methodologically contested present, and the fractured future [Id. at 3]. The future is said to be "concerned with moral discourse, with the development of sacred textualities" [Id.]. "The eighth moment [the fractured future] asks that the social sciences and the humanities become sites for critical conversations about democracy, race, gender, class, nation-states, globalization, freedom and community" [Id.]. This excerpt is primarily subjectively descriptive and contains considerable opinion of the editors.

Pages 357-375: The second reading assignment was all of chapter 14, titled "Critical Humanism and Queer Theory--Living With the Tensions." The material addresses what the author sees as the need to deal with the tensions between critical humanism and gay/queer

35

research.    The author's presentation is   straightforward.    He
recognizes  the  inherent  conflicts  in  the  two  traditions,  but
concludes that "there are some commonalities" [Id. at 370].   Both,
for instance, would ask researchers to adopt a critically self-aware
stance.   Both would seek out a political and ethical background "even
though, in a quite major way, they may differ on this--queer theory
has a prime focus on radical gender change, and humanism is broader"
[Id.].    The  author's  style  is  conventional;  his  approach  is
evaluative.   This chapter contains author opinion.

Pages 443-465: This excerpt is the entirety of chapter 17,
"Qualitative Case Studies."   The author describes the nature of
various types of case studies:   the intrinsic case study; the
instrumental case study; and the multiple case or collective case
study.   The chapter discusses case selection, the interactivity of
the case study, the process of data gathering and the matter of
triangulation.    This  chapter  is  objectively  and  subjectively
descriptive.   It contains author opinion.

Pages 651-679: This excerpt is chapter 25, titled "Narrative
Inquiry--Multiple Lenses, Approaches, Voices." The chapter describes
the  diverse  approaches  to  narrative  inquiry,  and  various
methodological issues in contemporary narrative inquiry.   The author
notes that "a major goal of this edition of the *Handbook* is exploring
how qualitative research can 'advance a democratic project committed
to social justice in an age of uncertainty'" [Id. at 667].   This
chapter is both objectively and subjectively descriptive; it contains
author opinion and evaluative description.

Under the standard set by the Court of Appeals, the foregoing
excerpts as a whole disfavor fair use because author opinion,

subjective description and evaluative expression dominate.  Factor two disfavors fair use.

As to factor three, Professor Kaufmann's selected excerpts constitute 8.30% of the pages in the book (102 pages in total) and the entirety of four chapters, one of which is the Introduction.  The selections fit the pedagogical aim of the course.  None of the chapters constitutes the heart of the work.  However, even taking into account the impact of the favored nature of the use under factor one, the quantity of material used is extremely large.  The use of four full chapters of the book leans strongly against fair use.  That the book contains 44 chapters does not alter the Court's thinking. Regarding the quality (value) of the material taken, a whole chapter of a book has greater value than part of a chapter because the whole chapter covers a complete, cohesive topic.  Copying four chapters draws a very large amount of value.  Also, the total page length of the excerpts (102 pages) is extremely large, causing considerable market substitution (lost permissions sales).  Weighing all of these considerations together, factor three weighs strongly against fair use.

As to factor four, permissions to make digital copies of excerpts were available in 2009 from both Sage and CCC.  Sage lost permissions income in the amount of $159.34 on account of Defendants' unpaid use.  Order at 120; Becker at 1259.  Moreover, if other universities and colleges allowed professors to use unpaid copies of excerpts of copyrighted books it could cause substantial damage to Sage's right to receive potential permissions income for digital

37

excerpts of the *Handbook, Third Ed.* and it could cause substantial damage to the value of the copyrighted work. This initially disfavors fair use.

While the Court of Appeals' ruling leaves open to Defendants a possible argument to rebut Plaintiffs' showing, Defendants concede this argument for Professor Kaufmann's use in the Maymester 2009 course [see Defs. Remand Br., Doc. 501 at 39-40]. Factor four favors Plaintiffs.

In summary, factor one favors Defendants; factors two, three and four favor Sage. In addition, the Court gives factor three extra weight in the final analysis because of the strength of the evidence on factor three.

After considering all four factors together, giving factor three extra weight and factors four and two the weight directed by the Court of Appeals, the Court finds Defendants' use of excerpts from the *Handbook, Third Ed.* was not a fair use. Thus, this claim of copyright infringement succeeds.

5. *Handbook of Critical and Indigenous Methodologies*
(Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2008)

Professor Kaufmann assigned two chapters from the *Handbook of Critical and Indigenous Methodologies* for her EPRS 8500 course: chapter five (pages 85-99), titled "Critical Race Theory and Indigenous Methodologies," by Christopher Dunbar, Jr.; and chapter seven (pages 135-156), titled "Indigenous Knowledges in Education" by Joe L. Kinchole and Shirley R. Steinberg [Tr. Vol. 5, Doc. 403 at 114-16; Pls. Ex. 516]. These excerpts, which totaled 37 pages (5.98% of the 619-page book), were required reading [Doc. 404 at 116; Pls. Exs. 231, 516].

38

Fair Use Analysis

Factor one favors fair use.

Factor two requires an analysis of the two chapters in question. The *Handbook of Critical and Indigenous Methodologies* is an academic book. The introduction states that the book looks to develop and connect indigenous methodologies[18] to existing areas of qualitative research in order to expand and further understand the field of qualitative research. The book has four parts; "Locating the Field: Performing Theories of Decolonizing Inquiry"; "Critical and Indigenous Pedagogies"; "Critical and Indigenous Methodologies"; and "Power, Truth, Ethics, and Social Justice."

Chapter five, "Critical Race Theory and Indigenous Methodologies," rests on two themes which are interwoven throughout the chapter. The chapter first provides an overview and critique of critical race theory, which seeks to analyze both the racially insensitive segments of the American psyche as well as enhance and expand upon race consciousness in people of color [see Pls. Ex. 231 at 87]. Chapter five then discusses the importance of incorporating the methods of indigenous scholars to create new research methodologies which both challenge the status quo and incorporate the key aspects of indigenous knowledge into critical race theory.

Chapter five is formally written to inform the reader of previous critical race literature, with the author adding analytical

---

[18]The preface defines indigenous methodologies as "research by and for Indigenous peoples, using techniques and methods drawn from the traditions and knowledges of these peoples" [Pls. Ex. 231 at x]. The preface contains no definition of indigenous, but implies that the term includes native, non-Western residents of various geographic locations.

discussion to link the various aspects of the literature together. Further, the excerpt devotes a section to a discussion of the author's personal experiences in doing research.

Chapter seven, "Indigenous Knowledges in Education," calls for an evaluation of how indigenous knowledge can change the way educators approach research.  The authors argue that methods of creating and maintaining indigenous knowledge must be sustained in order for the greater academic community to better access and appreciate the contributions indigenous knowledge can make to the field.  Chapter seven goes on to discuss the benefits of incorporating indigenous knowledge, including the reciprocal effect indigenous knowledge may have on dominant cultures and the ability to create a body of knowledge which better serves those indigenous people.

Chapter seven is highly evaluative, relying heavily on the authors' experiences and opinions.  The writing style is formal, but also somewhat conversational.  The chapter is didactic, inviting the reader to understand the benefits of protecting and incorporating indigenous knowledge in the hope that future researchers will accept and implement the authors' premise.  Given the dominance of author opinion and the evaluative nature of these two chapters, factor two weighs against a finding of fair use.

Factor three assesses the quantity and quality of the amount taken from the book, in light of the purpose of the use and the likelihood of market substitution.  Here, the chapters in question total 37 pages, or 5.98% of the entire work [Id.].  This is a small percentage of the overall work and a somewhat large number of pages. The chapters fit Professor Kaufmann's pedagogical purpose, and

40

neither constitutes the heart of the work. On the other hand, the use of two whole chapters leans against fair use. With respect to market substitution, use of a whole chapter--and even more so use of two chapters--represents a greater taking of value than merely part of a chapter. Considering this in combination with the quantity taken, factor three disfavors fair use.

Factor four addresses the effect of the use on the value of the copyrighted work and on the potential market for the work. Permissions to make digital copies of excerpts were available in 2009 [Pls. Exs. 237, 238]. Georgia State's use caused actual damage to the value of Sage's copyrighted work, as Sage would have earned an amount slightly less than $57.24 in permissions income from CCC for this excerpt. Order at 127, 127 n.65; Becker at 1262, 1262 n.65. Professor Kaufmann's use, therefore, caused tiny but actual damage to the value of Sage's copyrighted work. In addition, if other universities also allowed unpaid use of excerpts of copyrighted works, the potential market for the work could be substantially damaged. These considerations initially move factor four against a finding of fair use.

Defendants argue that repetitive use of unpaid excerpts of the book is unlikely. The record contains data for past permissions sales and sales of the book. Between publication in 2008 and the end of calendar year 2010, the *Handbook of Critical and Indigenous Methodologies* had $161,204.62 in book sales [Pls. Ex. 237]. However, Sage realized only $559.03 in permissions income from the *Handbook of Critical and Indigenous Methodologies* over the same time period. Of this permissions income, $37.84 came in the form of APS income,

41

$138.04 was from ECCS income, and the remaining $383.15 came from in-house permission/licensing sales [Pls. Exs. 237, 238].

Defendants bear the burden of proving that the potential loss of permissions sales to Sage is insubstantial, such that it would not impair Sage's willingness to publish the *Handbook of Critical and Indigenous Methodologies*. Based on the evidence before the Court, there is a small demand for excerpts of this book, and a small likelihood that use of unpaid excerpts from this book will cause substantial harm to Sage or to the value of its copyrighted work. It is unlikely that loss of permissions income would cause Sage to discontinue publishing this work. In addition, Defendants' use has had and will have no impact on the value of the copyrighted book or the potential market for the copyrighted book. Factor four, therefore, favors fair use.

In summary, factors one and four favor fair use and factors two and three disfavor fair use. Taking all of these factors into account, and weighting them as directed, Professor Kaufmann's use of the *Handbook of Critical and Indigenous Methodologies* was a fair use, and Plaintiffs do not succeed on a claim of copyright infringement.

6. *Handbook of Narrative Inquiry: Mapping a Methodology* (D. Jean Clandinin ed., Sage 2006)

Professor Kaufmann also assigned chapter one, titled "Locating Narrative Inquiry Historically: Thematics in the Turn to Narrative" ("Locating the Narrative Inquiry Historically") by Stefinee Pinnegar and J. Gary Daynes, from the *Handbook of Narrative Inquiry: Mapping a Methodology* ("*Handbook of Narrative Inquiry*") [Pls. Ex. 516]. The chapter (pages 3-34) is 4.51% of the 710-page book, or 32 pages, and was required reading [Tr. Vol. 5, Doc. 403 at 117-18; Pls. Ex. 258].

42

Fair Use Analysis

Factor one favors fair use.

Turning to factor two, the *Handbook of Narrative Inquiry* is an academic book which provides a comprehensive analysis of the field of narrative research.   The book begins by discussing the historical background of the field, and then moves to analyze different areas of narrative inquiry including traditional methodologies and professions driving narrative research.   This investigation of the field is expanded by the introduction of ethical concerns, representation issues, and a discussion of areas of narrative inquiry that need special attention, before finishing with a forward-looking overview of the field.

Chapter one's stated goal is "marking off the territory of this methodology" [Pls. Ex. 258 at 3].  The chapter provides definitions for qualitative inquiry and narrative inquiry, detailing the differences between the two.  The discussion then shifts to the four themes in research which cause a researcher to "turn," or change his way of thinking.   These themes, which include the relationship between the researcher and the researched and the jump from numbers to words as data, are then elaborated upon through examples and explanations based on various historical studies by scholars in the field.

"Locating Narrative Inquiry Historically" is simultaneously objectively and subjectively descriptive, as the chapter aims to acquaint readers with narrative inquiry through summaries and explanations of previous work in the field.   The chapter is formally written, and stems more from the authors' knowledge of the literature

43

rather than their experiences and opinions. Fair use factor two is neutral for this work.

Factor three looks to the quantity and quality of the excerpt. Here, Professor Kaufmann used 32 pages, which equates to 4.51% of the work [Pls. Ex. 258]. This is a very small percentage, especially taking into account the favored educational purpose established by factor one. As to the quality of the excerpt, the use of a whole chapter increases the excerpt's value. But the chapter selected by Professor Kaufmann is not the heart of the work. It did fit Professor Kaufmann's pedagogical purpose. And the impact of market substitution is sufficiently blunted by the size of the excerpt. Taking all of this into account, factor three favors fair use.

Factor four evaluates the effect of Defendants' use on the value of and the potential market for the copyrighted work. Permissions to make digital excerpts from CCC and Sage were available in 2009 [Pls. Exs. 262, 264]. Had permissions been paid, Sage would have earned less than $33.32 in net permissions revenue from Professor Kaufmann's class. Order at 134, 134 n.66; <u>Becker</u> at 1265, 1265 n.66. This represents actual, but minuscule, damage to the value of Sage's copyrighted work. Further, widespread unpaid use of excerpts by other universities could cause substantial damage to the potential market for the *Handbook of Narrative Inquiry*. These considerations initially incline factor four against fair use.

Defendants argue that it is, nonetheless, unlikely that substantial damage to the potential market is demonstrated. The

following table demonstrates book sales data for the *Handbook of Narrative Inquiry* since its publication in 2006:[19]

| Year | Book Sales |
|------|-----------|
| 2007 | $66,332.82 |
| 2008 | $31,868.12 |
| 2009 | $22,510.10 |
| 2010 | $10,804.62 |
| **Total** | **$131,515.66** |

[Pls. Ex. 262].  The following table demonstrates permissions sales data for the *Handbook of Narrative Inquiry* since 2006:

| Year | APS | ECCS | In-house | Total |
|------|-----|------|----------|-------|
| 2007 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2008 | $94.08 | $0.00 | $0.00 | $94.08 |
| 2009 | $0.00 | $18.52 | $112.60 | $131.12 |
| 2010 | $0.00 | $0.00 | $324.68 | $324.68 |
| **Total** | **$94.08** | **$18.52** | **$437.28** | **$549.88** |

[Pls. Exs. 262, 264].

The question here is twofold.  It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time that the alleged infringement occurred.  It also pertains to the damage to the value of the copyrighted work in 2009.  For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

---

[19]The book was first published on December 28, 2006 [Pls. Ex. 261].  Accordingly, there are no book sales or permissions sales figures for 2006 [Pls. Exs. 262, 264].

Defendants have met their burden under factor four. Defendants' use did not have any actual or potential impact on sales of the copyrighted book, or on the value of the copyrighted book. See Op. at 94; Patton at 1276. Also, the data on permissions and book sales demonstrates two points. First, the limited permissions revenue realized by Sage demonstrates low demand for digital excerpts of the *Handbook of Narrative Inquiry* such that the risk of repetitive use of these excerpts is low. It is unlikely that potential permissions loss would incentivize Sage to discontinue publication of the copyrighted work. Sage will likely continue making the work available via the digital permissions market, because the marginal cost to Sage to do so is nil or virtually nil. As long as the permissions are available, the work will be in publication. Second, any loss of permissions income in 2009 did not substantially damage the value of the copyrighted work because its value was overwhelmingly in book sales, not permissions sales. Thus, factor four weighs in favor of fair use.

In summary, factors one, three, and four all favor fair use and factor two is neutral. Weighting the factors in the manner directed, the Court finds that Professor Kaufmann's use of the *Handbook of Narrative Inquiry* was protected by fair use.

### EPRS 8510 Qualitative Research in Education II-Data Collection, Summer 2009

Professor Kaufmann's EPRS 8510 course looks at ways for students to collect data for qualitative research [Tr. Vol. 5, Doc. 403 at 38, 135]. Nine students were enrolled in the course during the summer 2009 semester [Id. at 135]. The course lasts roughly six weeks [Id. at 136]. As evidenced by the syllabus for this course and Professor

Kaufmann's testimony, students were required to purchase three texts for the course, as well as complete several readings posted on ERES [Id. at 136; Pls. Ex. 517]. All assigned readings, both from the textbooks and ERES, were required [Doc. 403 at 136].

> 7. *The Sage Handbook of Qualitative Research (Second Edition)* (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2000)

Professor Kaufmann caused pages 717-732 and 923-943 of *The Sage Handbook of Qualitative Research (Second Edition)* ("*Handbook, Second Ed.*"), the entirety of chapters 27 and 36, to be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8510 summer 2009 course as required reading [Tr. Vol. 403, Doc. 403 at 136-41; Pls. Ex. 517]. The excerpted chapters were "Reimagining Visual Methods: Galileo to Neuromancer" by Douglas Harper and "Writing: A Method of Inquiry" by Laurel Richardson [Pls. Ex. 265]. Together, the chapters represent 3.24% of the total 1,142-page work and have a combined total of 37 pages [Id.]. Had permissions been paid via CCC for the distribution of these excerpts, Sage would have earned less than $34.04 in net revenue from permissions income. Order at 137, 137 n.69; Becker at 1267, 1267 n.69.

Fair Use Analysis

Factor one favors fair use.

As to factor two, the first excerpt utilized was chapter 27, "Reimagining Visual Methods--Galileo to Neuromancer," pages 717-732. At the beginning of this chapter the author outlines his approach to the subject:

> First, I suggest a context in which to see photography and social research, this being the history of recorded perception. Next, I present visual sociology as field work photography guided by several research traditions. Third, I describe the social influences around which "picture

47

making" has taken place, noting how the social power involved in making images redefines institutions, groups and individuals. Finally, I suggest that visual sociology is, above all, a process of seeing guided by theory. Because visual sociology is a grab bag of research approaches and perspectives on understanding images in society, I aim to make several attenuated arguments and to weave them into a whole.

[Pls. Ex. 265 at 717]. The author's style is somewhat conversational, though still fairly formal. The first section of the chapter, titled "Visual Methods and the History of Recorded Perception," outlines the development of recorded perception though the telescope, the camera, motion pictures, television, video cameras, digital imagery, compact discs, and the creation of a virtual reality through electronic manipulation. This section is objectively descriptive.

The next section of the chapter, titled "A Visual Social Science through Research Photography," pages 720-724, shifts to the idea that the creator of images has opportunities to make visual statements by "knowing how the camera interprets social reality" [Id. at 724]. This section is both objectively and subjectively descriptive. It includes author opinion.

The next section of chapter 26, "Visual Narratives," pages 724-725, expands on the idea of the photographer as narrator, particularly when a succession of photographs may be used to develop a point of view. The author states,

The visual narrative, like the individual frames from which it is made, is a result of choices and decisions. If a researcher is conscious of these choices, the visual narrative may become a useful way to study certain kinds of social patterns. The methods used will, of course, influence the questions asked.

[Id. at 725]. The Court considers this section to be mostly objectively descriptive. It does include author opinion.

48

The next section, "Eliciting Cultural Explanation," pages 725-727, explains that photographic images "elicit cultural information that ranges from the micro (normative negotiation of social action) to cultural definition" [Id. at 726-27]. This section is objectively and subjectively descriptive. It includes author opinion.

The next section, "Experience and Image," page 727, discusses the "phenomenological mode." "The vantage point from this view is the self . . . ." [Id. at 727]. The author states this is a fourth way to look at images. This represents author opinion.

The next section of chapter 26 is titled "The Social Construction of Photography in Visual Sociology," pages 727-728. The author states, "It is not enough to describe visual research in terms offered above. Like all research, visual research depends upon and redistributes social power" [Id.]. This represents author opinion.

In the final section of chapter 26, "The Essence of Visual Sociology; and Where Are We Going?," pages 728-731, the author summarizes as follows:

> Assuming we are talking about research methods (given that this is a handbook of qualitative methods), and assuming we are speaking about the photographic end of the movement, the simplest way to do visual sociology is to photograph with sociological consciousness. Howard Becker (1974) was the first to make this argument and the point has not been made more elegantly since then.

[Id. at 729].

Overall, this chapter seeks to instruct a sociology student on how to use photographic technology to make a sociological point. Most basically, it is a how-to-do-it instruction. It includes author opinion plus elements which are objectively and subjectively descriptive.

49

The second excerpt assigned by Professor Kaufmann from the *Handbook, Second Ed*. was chapter 36, titled "Writing--A Method of Inquiry" [Id. at 923-943]. In the first part of the chapter, titled "Writing in Contexts," pages 924-940, the author discusses the historical roots of social scientific writing, including its dependence upon metaphor and prescribed writing formats, creative analytic practices, and the future of ethnography. This section is objectively descriptive.

The second part of the chapter, "Writing Practices," pages 940-943, urges the use of metaphors which enable the reader to derive sensory content from the material. It advocates careful choice of topic including, for example, consideration of who is the audience. It advocates choosing a journal article "that exemplifies excellence in qualitative research" [Id. at 940]. The author suggests joining a creative writing group or writing support group, keeping a journal and numerous other ways of extending one's creative power. This excerpt overall undoubtedly contains a good bit of author opinion. It also contains subjective and objective description.

Viewed together, the two chapters chosen by Professor Kaufmann contain some objective description, but subjective description and author opinion dominate. Factor two disfavors fair use.

As to factor three, Professor Kaufmann uploaded two full chapters of the *Handbook, Second Ed*. to ERES. This represents 37 pages and 3.01% of the total book [Doc. 265]. The chapters are not the heart of the book. The amount of material used by Professor Kaufmann was very small (not merely small) as a percentage of the total book. Factor three's relationship to factor one makes it even

clearer that 3.24% of the total work tends to favor fair use. The selection fit Professor Kaufmann's pedagogical purpose. Nonetheless, two full chapters were copied, and chapters have greater value than parts of chapters. In addition, the amount taken is a heuristic for impact on the market (it has a relationship to the amount of lost permissions); the Court finds that the market impact caused by use of 37 pages combined with the use of two chapters causes factor three to disfavor fair use.

Turning to factor four, Plaintiffs produced evidence that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program [Pls. Exs. 283, 286]. If Georgia State had purchased permissions for its digital use of the instant excerpts, Sage would have earned $34.04 in net revenue from permissions income. See Order at 137, 137 n.69; Becker at 1267, 1267 n.69. Widespread use of unlicensed excerpts by other colleges and universities could cause substantial harm to the potential market for permissions to make digital copies of the Handbook, Second Ed. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyrighted work. Upon initial review, factor four disfavors fair use.

The Court of Appeals' Opinion leaves open to Defendants the possibility of prevailing on factor four if they can shoulder the burden of proving that they did not cause substantial damage to the potential market for and the value of the copyrighted work. Defendants have conceded they cannot prevail on this argument [Defs. Remand Br., Doc. 501 at 43]. Accordingly, factor four disfavors fair use.

To summarize, factors two, three, and four disfavor fair use, while factor one favors fair use.   Thus, Defendants have not met their burden of proving that Professor Kaufmann's use of the *Handbook, Second Ed.* was a fair use under the Copyright Act.   This copyright infringement claim succeeds.

EPRS 8500 Qualitative/Interpretive Research in Education II, Fall 2009

Professor Kaufmann also taught EPRS 8500 in the fall of 2009 [Tr. Vol. 5, Doc. 403 at 143-45; Pls. Ex. 518].

8.   *The Craft of Inquiry: Theories, Methods, Evidence* (Robert R. Alford, Oxford 1998)

One of the posted readings for EPRS 8500 in the fall 2009 semester was an excerpt from *The Craft of Inquiry* [Pls. Ex. 372]. Professor Kaufmann uploaded the entirety of chapter two, or 6.25% of the book, to Georgia State's ERES system [Doc. 403 at 168; Pls. Ex. 372].

Fair Use Analysis

Because Professor Kaufmann used this excerpt previously during the Maymester term, and it has already been discussed above, see infra pp. 20-24 above, the fair use analysis need not be repeated. Professor Kaufmann's use was a fair use.

9.   *Approaches to Qualitative Research: A Reader on Theory and Practice* (Sharlene Nagy Hesse-Biber & Patricia Leavy eds., Oxford 2004)

Professor Kaufmann assigned chapter 21 of *Approaches to Qualitative Research* for her November 30, 2009 class session [Pls. Ex. 518].   The chapter, pages 447-472, is titled "The Art and Politics of Interpretation," and was written by Norman K. Denzin

[Pls. Ex. 349]. The chapter is 26 pages long and 4.61% of the 564-page book [Id.]. It was required reading for the course [Tr. Vol. 5, Doc. 403 at 169-70].

Fair Use Analysis

Factor one favors fair use.

Factor two looks to the nature of the copyrighted work. *Approaches to Qualitative Research* is an academic book that aims to provide the reader with both a survey of qualitative research and the tools and skills necessary to conduct qualitative studies. The book starts by discussing the various epistemological and theoretical choices a researcher considers in designing and approaching qualitative research. The range of analytical choices and methods of studying culture are also presented, with emphasis on potential concerns researchers face in their role as both individuals interacting with subjects and researchers trying to avoid intrusion on their subjects. Finally, the book teaches the reader how to interpret qualitative data and transform that data into scholarship.

Chapter 21, "The Art and Politics of Interpretation," addresses the ways in which a writer can make raw qualitative data meaningful to a reader. The chapter highlights themes that should come out in the researcher's writing, including descriptions that provide context and insight into the subjects of the study. A writer should also identify any research shortfalls due to personal style or bias. The chapter briefly describes various interpretive practices in qualitative research, and weighs the benefits and costs of each. Finally, the chapter ends with the author's observations about the future of qualitative studies.

53

Chapter 21 is didactic; it seeks to teach techniques for writing about qualitative research. It is also evaluative, analyzing the merits of various methods of writing about qualitative research. The chapter has a formal style. While it is a close question, the Court finds that author opinion and evaluative style dominate. Factor two thus disfavors fair use.

Factor three requires an analysis of the quantity and value of the excerpt in light of factors one and four. "The Art and Politics of Interpretation" is a 26-page chapter, making up 4.61% of the total pages in *Approaches to Qualitative Research* [Pls. Ex. 349]. This is a very small percentage of the overall book; it is more than easily validated by the purpose and character of the use under factor one, and is small enough to mitigate the substitution effect under factor four. Professor Kaufmann assigned the entire chapter, which gives the excerpt greater value than if only part of the chapter had been assigned. However, the chapter is not the heart of the work. The chapter narrowly served Professor Kaufmann's pedagogical purpose. Weighing the foregoing considerations, factor three favors fair use.

Factor four measures the effect of Defendants' use on the value of the copyrighted work and on the potential market for the copyrighted work. Because Defendants used Oxford's copyrighted material without payment, the value of Oxford's copyright was impaired to a minuscule degree. Sage lost approximately $55.69 in net revenue as a result of Professor Kaufmann's use. Order at 146, 146 n.72; Becker at 1271, 1271 n.72. But widespread use of unpaid excerpts at other colleges or universities could cause Oxford's potential market for the copyrighted work substantial harm and could cause substantial damage to the value of the copyrighted work. This

54

consideration causes factor four to initially incline in Sage's favor.

Defendants nonetheless contend there was no substantial harm to the potential market for the copyrighted work and that the value of the copyrighted work was not substantially damaged in 2009. The record reflects that Oxford received only $131.29 in APS income and $172.59 in ECCS income through CCC from January 1, 2005 to November 19, 2010 [Pls. Ex. 353]. The record contains no other evidence of permissions sales, which demonstrates a low risk of repetitive use of unpaid excerpts for *Approaches to Qualitative Research*. The record also contains no data concerning revenue from book sales which occurred.[20]

Defendants have the ultimate burden of proof on factor four. Defendants have carried this burden with evidence of very small permissions sales, the loss of which would cause no substantial harm to Sage and the fact that available permissions means the copyrighted work is still in publication. Factor four favors fair use.

Factors one, three, and four favor fair use, while factor two disfavors fair use. Weighing each of the factors together, and taking into account the weight of factor four and the weight of factor two as directed by the Court of Appeals, Defendants' use of *Approaches to Qualitative Research* is protected by fair use.

---

[20]Obviously there were book sales. Sage tendered a copy of *Approaches to Qualitative Research* as evidence in this case, and Sage's claims of copyright infringement for this book involve Georgia State's copy of the book.

55

10. *Handbook of Feminist Research: Theory and Praxis*
(Sharlene Nagy Hesse-Biber ed., Sage 2006)

Professor Kaufmann used two chapters from the *Handbook of Feminist Research* in her fall 2009 Qualitative/Interpretive Research in Education course [Tr. Vol. 5, Doc. 403 at 154; Pls. Ex. 518]. The first excerpt, chapter 26 of the book (pages 515-534), is titled "Feminist Research Ethics," by Judith Preissle [Pls. Ex. 243]. The second excerpt, chapter eight of the book (pages 155-172), is titled "Toward Understandings of Feminist Ethnography," by Wanda S. Pillow and Cris Mayo [Id.]. The excerpts combine to total 38 pages and constitute 4.95% of the pages in the book [Id.]. They were required reading [Doc. 403 at 154-56; Pls. Ex. 518].

Fair Use Analysis

Factor one favors fair use.

Moving to factor two, the Court notes that it has already assessed the *Handbook of Feminist Research* and specifically, chapter 26, under the fair use factor two rubric. See infra pp. 25-26. There is no need to duplicate those descriptions here. The Court found that chapter 26 balances objective description with author opinion, and it is therefore neutral under the factor two analysis.

Chapter eight, "Toward Understandings of Feminist Ethnography," starts by establishing the benefits of using identity categories, such as race and gender, in qualitative research. Noting that these categories can also overlap, the chapter also discusses the intersection of identity categories. The chapter then narrows its focus to feminist custom and culture by chronicling past work on feminist ethnography. Using these past works as an example, the chapter concludes by developing the distinctions created between

feminist ethnography and other identity categories when a researcher studies, analyzes, and writes about feminist culture.

Chapter eight is primarily objective, with long descriptions of previous authors' work. Complementing these objective descriptions are analytical passages which develop and explore various issues present when researching feminism and feminist cultures. The authors write in a formal tone with little to no discussion of their own experiences or opinions.

Considering the content and nature of chapters eight and 26 together, the Court finds that factor two weighs neither for nor against fair use in this instance. It is neutral.

Moving to factor three, Professor Kaufmann uploaded two chapters of the *Handbook of Feminist Research* to ERES. Chapter eight totals 18 pages, while chapter 26 totals 20 pages, bringing the combined total of the two excerpts to 38 pages, which is not a small number of pages [Pls. Ex. 243]. That combined total is 4.95% of the total book, which is a very small percentage of the copyrighted work. The excerpts were tailored to fit Professor Kaufmann's pedagogical purpose. Chapters eight and 26 do not constitute the heart of the book. Even though two whole chapters were used, the very small percentage of the book is mitigating. The page count (38 pages) is acceptable (though barely acceptable) mitigation of the impact of market substitution when considered together with all other factors. Factor three favors fair use.

Factor four evaluates the effect of Defendants' use on the value of the copyrighted work and the potential market for the work. Digital permissions were available for excerpts of the *Handbook of Feminist Research* in 2009 [Pls. Ex. 248]. By providing the excerpts

57

free to her class, Professor Kaufmann deprived Sage of less than $223.50[21] [Jt. Ex. 5, Doc. 266-4 at D-59]. This caused actual, but tiny, damage to the value of the copyrighted work. In addition, if other colleges and universities allowed unpaid use of excerpts of copyrighted works, it could cause substantial harm to the potential market for or the value of the copyrighted work. Factor four initially disfavors fair use.

Defendants can still prevail on factor four by proving that widespread unpaid copying practices would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276. The *Handbook of Feminist Research* was first published in 2006 [Pls. Ex. 247]. The following table shows book sales for The *Handbook of Feminist Research* since its publication:

| Year | Book Sales Net Revenue |
|------|------------------------|
| 2006 | $17,241.00 |
| 2007 | $4,153.45 |
| 2008 | $15,015.80 |
| 2009 | $12,052.55 |
| 2010 | $5,623.08 |
| **Total** | **$94,085.88** |

[Pls. Ex. 248].

Over that same period of time, the *Handbook of Feminist Research* generated a small amount of permissions revenue. There is no

---

[21]The figure provided in the parties' joint exhibit overstates the amount lost for this use because the calculation includes pages that this Court previously excluded from the relevant fair use inquiry. See Order at 149-50; Becker at 1273.

evidence of CCC revenues for the *Handbook of Feminist Research*, but Sage did provide the figures for their in-house (presumably digital) permissions sales.  Those figures are listed below:

| Year | Permissions Sales |
|------|-------------------|
| 2006 | $0.00 |
| 2007 | $0.00 |
| 2008 | $116.29 |
| 2009 | $96.45 |
| 2010 | $770.72 |
| **Total** | **$983.46** |

[Pls. Ex. 248].

The question here is twofold.  It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time that the alleged infringement occurred.  It also pertains to damage to the value of the copyrighted work in 2009.  For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Based on the data listed above, the Court finds that the value of the copyrighted work in 2009 was almost exclusively in book sales, not permissions.  Defendants' actions had no impact on book sales. Op. at 94; Patton at 1276.  Defendants' actions could have had some very small impact on the actual or potential market for digital permissions sales.  But it is unlikely that Defendants' use of unpaid excerpts (even assuming the widespread availability of programs like Georgia State's) substantially damaged the value of the copyrighted work.  It is also unlikely that Defendants' use of unpaid excerpts caused substantial damage to the potential market for the copyrighted

59

work (book sales and digital permissions sales), such that Sage would lose its incentive to publish the *Handbook of Feminist Research*. Factor four, therefore, favors a finding of fair use.

In summary, factors one, three, and four favor fair use, while factor two is neutral. Weighing these factors as directed, and weighing them together, the Court finds that Defendants prevail on their fair use defense.

11. *Handbook of Narrative Inquiry: Mapping a Methodology* (D. Jean Clandinin ed., Sage 2006)

Professor Kaufmann again used the *Handbook of Narrative Inquiry* in her fall 2009 Qualitative/Interpretive Research in Education Course, but assigned a different chapter than the one used in her Maymester class [Tr. Vol. 6, Doc. 404 at 21; Pls. Ex. 518]. That new assignment required her students to read chapter two (pages 35-75), titled "Mapping a Landscape of Narrative Inquiry: Borderland Spaces and Tensions" ("Mapping a Landscape"), by D. Jean Clandinin and Jerry Rosiek [Pls. Ex. 258]. The chapter totaled 41 pages, or 5.77% of the overall book [Id.].

Fair Use Analysis

Factor one favors fair use.

Factor two assesses the nature of the copyrighted work. As previously discussed, the *Handbook of Narrative Inquiry* is an academic book. See infra p. 43.

Chapter two, "Mapping a Landscape," begins by defining narrative inquiry as the studying of experiences, as embodied in the continuous interaction of human thought with the personal, social, and material environment. With this definition in mind, the chapter then compares and contrasts narrative inquiry with other forms of inquiry, such as

60

post-postivism, Marxism, critical theory, and post-structuralism. By performing this comparison, the chapter creates its metaphorical "map," noting where the fields of inquiry reside and intersect with one another. The chapter concludes with a closer look at the "borders" of the various methods of inquiry and addresses what occurs when the different fields of inquiry blur together.

Chapter two is primarily objective, as the authors describe the different methods of inquiry and the general theories which underlie those methods. The chapter is written in a formal tone, and aims to provide the reader with a brief education on various forms of narrative inquiry. Author analysis does not dominate. Taking all of this into account, factor two is neutral for this work.

Factor three addresses the quantity and quality of the excerpt used as it relates to the work as a whole. Here, Professor Kaufmann used 41 pages of the *Handbook of Narrative Inquiry*, which is the equivalent of 5.77% of the overall book [Pls. Ex. 258]. This is a small percentage. As for the value of the excerpt, chapter two is not the heart of the work, although a full chapter has more value than a part of a chapter. Use of the excerpt was narrowly tailored to serve Professor Kaufmann's pedagogical interest. The number of pages copied was quite large but not too large given the limitation to one chapter, the small percentage of the copyrighted work, and the nonprofit educational nature of the use, yet taking into account the impact of market substitution. Factor three favors fair use.

Factor four evaluates the effect of Defendants' use on the value of and the potential market for the copyrighted work. Permissions to make digital excerpts from CCC and Sage were available in 2009 [Pls. Exs. 262, 264]. Had permissions been paid, Sage would have earned

less than $102.46 in net revenues from digital permissions. Order at 153, 153 n.73; Becker at 1275, 1275 n.73. This represents actual, but minuscule, damage to the value of Sage's copyrighted work. Further, widespread unpaid use of excerpts by other universities could cause substantial damage to the potential market for the *Handbook of Narrative Inquiry*. These considerations initially incline factor four against fair use.

Defendants argue that it is, nonetheless, unlikely that substantial damage to the potential market is demonstrated. The following table demonstrates book sales data for the *Handbook of Narrative Inquiry* since its publication in 2006:[22]

| Year | Book Sales |
|------|-----------|
| 2007 | $66,332.82 |
| 2008 | $31,868.12 |
| 2009 | $22,510.10 |
| 2010 | $10,804.62 |
| **Total** | **$131,515.66** |

[Pls. Ex. 262]. The following table demonstrates permissions sales data for the *Handbook of Narrative Inquiry* since 2006:

| Year | APS | ECCS | In-house | Total |
|------|-----|------|----------|-------|
| 2007 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2008 | $94.08 | $0.00 | $0.00 | $94.08 |
| 2009 | $0.00 | $18.52 | $112.60 | $131.12 |
| 2010 | $0.00 | $0.00 | $324.68 | $324.68 |
| **Total** | **$94.08** | **$18.52** | **$437.28** | **$549.88** |

---

[22]The book was first published on December 28, 2006 [Pls. Ex. 261]. Accordingly, there are no book sales or permissions sales figures for 2006 [Pls. Exs. 262, 264].

[Pls. Exs. 262, 264].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time that the alleged infringement occurred. It also pertains to the damage to the value of the copyrighted work in 2009. For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Defendants have met their burden under factor four. Defendants' use did not have any actual or potential impact on the market for the copyrighted book, or on the value of the copyrighted book. See Op. at 94; Patton at 1276. With regard to the potential permissions market, the data on permissions and book sales demonstrates two points. First, the limited permissions revenue realized by Sage demonstrates low demand for digital excerpts of the *Handbook of Narrative Inquiry* such that the risk of repetitive use of these excerpts is low. Also, it is unlikely that potential permissions loss would incentivize Sage to discontinue publication of the copyrighted work. Further, Sage will likely continue making the work available via the digital permissions market, because the marginal cost to Sage to do so is nil or virtually nil. As long as permissions are available, the work will be in publication. Finally, any loss of permissions income in 2009 did not substantially damage the value of the copyrighted work because the work's value was overwhelmingly in book sales, not permissions sales. Thus, factor four weighs in favor of fair use.

In summary, factors one, three, and four favor a finding of fair use, while factor two is neutral. Weighting these factors in the

proportions required by the Court of Appeals' Opinion, Professor Kaufmann's use of the *Handbook of Narrative Inquiry* qualifies as a fair use.  Sage's claim of infringement as to this work, therefore, fails.

> 12. *Sage Handbook of Qualitative Research, Third Edition*
>     (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2005)

In the fall semester of 2009, Professor Kaufmann again assigned excerpts from the *Sage Handbook of Qualitative Research, Third Edition* ("*Handbook, Third Ed.*") as required reading for her EPRS 8500 course on Qualitative/Interpretive Research in Education [Tr. Vol. 5, Doc. 403 at 145-152; Pls. Ex. 518]. Specifically, she requested that seven chapters, or pages 1-32, 109-138, 357-375, 443-465, 547-557, 915-932, and 959-978 of the *Handbook, Third Ed.* be uploaded to ERES [Doc. 403 at 145-152; Pls. Ex. 518].  The excerpts posted to ERES consisted of 153 pages total or 12.45% of the 1,229-page book [Pls. Ex. 267].

Fair Use Analysis

Factor one favors fair use.

Factor two disfavors fair use for the reasons which follow.  As an initial matter, the Court has already evaluated three of the seven total excerpts under the rubric of factor two, including (1) pages 1-32 (introduction); (2) pages 357-375 (chapter 14); and (3) pages 443-465 (chapter 17) [see infra pp. 34-36].  There is no need to rehash the nature of these chapters at length, but in relevant part, the Court found as follows: (1) the introduction is both objectively and subjectively descriptive and it contains a considerable amount of author/editor opinion; (2) chapter 14 is evaluative and contains

64

author opinion; and (3) chapter 17 is primarily objectively descriptive.

This Court has yet to assess four of the seven excerpts in light of factor two. The first relevant excerpt is pages 109-138, or the whole of chapter five, "Freeing Ourselves from Neocolonial Domination in Research: A Kaupapa Maori Approach to Creating Knowledge," by Russell Bishop. In this chapter, the author identifies and sets aside research traditions that reinforce or reflect colonial power imbalances in the study of indigenous cultures. He also explores alternative paradigms that embody non-Western experiences and values by focusing on research on the Maori people, an indigenous community in New Zealand. After describing background issues involved in studying indigenous people, the author introduces the "Kaupapa Maori" approach to research. The remainder of the chapter is devoted to describing three research studies that the author performed using the Kaupapa Maori approach, and contrasting the approach with Western traditions. Overall, the chapter contains some objective description but it is dominated by the author's opinion and evaluative assessment.

The second excerpt is pages 547-557, or all of chapter 22, "*Testimonio*, Subalternity, and Narrative Authority," by John Beverly. In chapter 22, the author discusses the "*testimonio*," which is a testimonial narrative "produced in the form of a printed text, told in the first person by a narrator who is also the real protagonist or witness of the events she or he recounts" [Id. at 547]. The author contrasts *testimonio* with other similar narrative formats, such as autobiography, diary and ethnographic writing. The author examines one *testimonio* to illustrate the distinctive features of the format.

For instance, in response to a criticism regarding the historical accuracy of the *testimonio*, he explains that because it is a witness's account of an event, it necessarily reflects the speaker's reality rather than a detached observer's. Along these lines, the author explains that *testimonios* are a union of objectivity and solidarity, and are typically used to tell stories of oppressed or subaltern peoples. Overall, the author's approach to this chapter is evaluative. While it contains some objective description, it is dominated by the author's own subjective observations and critiques.

The third relevant excerpt is pages 915-931, or the whole of chapter 36, "Relativism, Criteria, and Politics," by John K. Smith and Phil Hodkinson. In the chapter, the authors respond to an issue touched on in the first edition of the *Handbook*: the age of relativism in research, or the realization that there is no possibility of theory-free observation and knowledge. In this vein, the authors discuss two ideas: (1) that researchers cannot step outside of their own social and historical standpoints; and (2) the decisions about research criteria and judgments about the worth of research represent social activities. The authors summarize several responses to the question of how to select criteria to evaluate research quality and methodology. Chapter 36 is academic and somewhat philosophical. It contains relatively equal parts objective description of historical research, and subjective evaluation and analysis.

The final excerpt is pages 959-978, or all of chapter 38, "Writing: A Method of Inquiry," by Laurel Richardson and Elizabeth Adams St. Pierre, which is a revision of a chapter by the same name in previous editions of the *Handbook*. Chapter 38 is divided into

three parts.    The first part, written by Richardson, discusses creative and analytical social scientific writing, writing in the genre of ethnography, and the direction that her work has taken.    The second part, written by St. Pierre, analyzes writing as a method of qualitative inquiry, with reference to the author's own personal experiences using writing as a method.    In the third and final part, Richardson gives 16 examples of exercises that help engage the writer to write as a method of knowing.    The nature of this chapter, which is fueled primarily by the authors' own personal experiences and opinions, does not support a finding of fair use.

Overall, the nature of the excerpts disfavors fair use.    In particular, the excerpted portions of the work are dominated by author opinion, analysis, evaluation, and subjective description. Thus, factor two disfavors fair use.

Turning to factor three, Professor Kaufmann uploaded 153 pages, or 12.45% of the *Handbook, Third Ed.*, to ERES [Pls. Ex. 267].    The number of pages copied is extremely large, even considering that the excerpts served the pedagogical aims of the course, and that none of the excerpts is the heart of the work.    An even more compelling factor weighing against fair use is that seven complete chapters were used.    Professor Kaufmann captured a very large amount of the book's value by copying and distributing seven complete chapters.    Because factor three takes into account the market impact caused by substitution, the unpaid use of seven complete chapters certainly weighs strongly against a finding of fair use.    Based on these considerations, Professor Kaufmann used much too much of the work-- both with respect to its quantity and quality--for factor three to

67

weigh in Defendants' favor.  Factor three weighs strongly against fair use.

Turning to factor four, digital permissions were available for excerpts of the *Handbook, Third Ed.*, in 2009 through CCC and Sage's in-house permissions program [Pls. Exs. 283, 286, 287].  If Georgia State had purchased permissions from Sage for its use of the *Handbook, Third Ed.* in Professor Kaufmann's class, Sage would have earned less than $467.31 in net revenue from permissions.  See Order at 157; Becker at 1277.  In other words, Georgia State's unpaid use caused Sage some actual harm.  It follows that widespread unpaid copying of excerpts of the book could cause substantial harm to the potential market for and the value of the copyrighted work.  Based on this initial assessment, factor four weighs against fair use.

The Court of Appeals' Opinion leaves room for Defendants to rebut Plaintiffs' showing depending on the facts of the case. However, Defendants have conceded that factor four weighs against fair use in this instance [see Defs. Remand Br., Doc. 501 at 47]. Accordingly, factor four weighs in favor of Plaintiffs, and against fair use.

To recap, factor one favors fair use, and factors two, three and four disfavor fair use.  Consistent with the Court of Appeals' direction, factor four is the most substantial factor, and factor two has insubstantial weight.  Additionally, the Court affords factor three substantial additional weight in this instance because Defendants used a notably excessive quantity and quality of the copyrighted work.  Defendants have clearly failed to discharge their burden with respect to this use.  The Court thus finds that Professor

Kaufmann's use of the *Handbook, Third Ed.* in the fall of 2009 was not a fair use. Accordingly, this claim of copyright infringement succeeds.

13. *Handbook of Social Theory* (George Ritzer & Barry Smart eds., Sage 2001)

Professor Kaufmann assigned chapter 17 of the *Handbook of Social Theory* for her September 28, 2009 class session in EPRS 8500 [Tr. Vol. 5, Doc. 403 at 157; Pls. Ex. 518]. The chapter (pages 217-228) is titled "Symbolic Interactionism at the End of the Century," ("Symbolic Interactionism"), and was written by Kent L. Sandstrom, Daniel D. Martin, and Gary Alan Fine [Pls. Ex. 288]. The chapter is 12 pages long and 2.12% of the 564-page book [Id]. It was required reading [Doc. 403 at 157].

<u>Fair Use Analysis</u>

Professor Kaufmann used the same excerpt previously during the Maymester term. The fair use analysis is on pages 29-34 above. The use of this excerpt was a fair use.

B.    <u>Professor Esposito</u>

Professor Esposito is a professor in the Educational Policy Studies department at Georgia State [Tr. Vol. 6, Doc. 404 at 52].

<u>EPSF 8280 Anthropology of Education, Summer 2009</u>

In the summer of 2009, Professor Esposito taught EPSF 8280, Anthropology of Education [<u>Id.</u> at 81]. EPSF 8280 is a graduate course that explores the methodology of ethnography and the study of culture in school settings [<u>Id.</u>]. Twenty two graduate students were enrolled in Professor Esposito's EPSF 8280 course during the summer 2009 semester [<u>Id.</u> at 52]. As evidenced by the Syllabus, students were required to purchase five texts for this course, as well as

complete several required readings posted on ERES [Id. at 79, Pls. Ex. 547].

### 14. *Handbook of Feminist Research: Theory and Praxis* (Sharlene Nagy Hesse-Biber ed., Sage 2006)

Professor Esposito assigned chapter eight, titled "Toward Understandings of Feminist Ethnography," of the *Handbook of Feminist Research* [Tr. Vol. 6, Doc. 404 at 56]. The excerpt (pages 155-172) is 18 pages long and 2.35% of the pages in the 767-page book [Pls. Ex. 243]. It was required reading [Doc. 404 at 56-57; Pls. Ex. 547].

Fair Use Analysis

Factor one favors fair use.

As previously discussed, the *Handbook of Feminist Research* broadly covers feminist theories, research, and practice. See infra p. 28. This Court has already evaluated chapter eight under the fair use factor two rubric, and concluded that chapter eight contains both objective description and author analysis. See infra pp. 56-57. Accordingly, fair use factor two is neutral.

Moving to factor three, Professor Esposito uploaded one chapter of the *Handbook of Feminist Research* to ERES. Chapter eight totals 18 pages, which is 2.35% of the book [Pls. Ex. 243]. This is a very small number of pages and a very small percentage of the overall book. Even though a whole chapter was used--and a whole chapter has more value than part of a chapter--chapter eight does not constitute the heart of the work. Analysis of factor three requires assessing the quality and quantity of the work in light of the purpose of the use and the threat of substitution on the market for the work. The book's use for a nonprofit, educational purpose amply endorses the amount and percentage of the book which was used. The small page

70

count strongly mitigates the impact of market substitution. Moreover, the excerpt was narrowly tailored to fit Professor Esposito's pedagogical purpose. Weighing all of these considerations together, factor three easily favors fair use.

Factor four looks to the effect of Defendants' use on the value of the copyrighted work and the potential market for the work. Digital permissions were available for excerpts of the *Handbook of Feminist Research* in 2009 [Pls. Ex. 248]. By providing the excerpts free to her class, Professor Esposito deprived Sage of $47.52, less royalties payable to the external editor, in net revenue from permissions. Order at 170; Becker at 1283. This caused actual, but tiny, damage to the value of the copyrighted work. In addition, if other colleges and universities allowed unpaid use of copyrighted excerpts, it could cause substantial harm to the potential market for and the value of the *Handbook of Feminist Research*. Factor four initially disfavors fair use.

Defendants can still prevail on factor four by proving that widespread unpaid copying practices would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276. The *Handbook of Feminist Research* was first published in 2006 [Pls. Ex. 247]. The following table shows book sales for the *Handbook of Feminist Research* since its publication:

| Year | Book Sales Net Revenue |
| --- | --- |
| 2006 | $17,241.00 |
| 2007 | $4,153.45 |

71

| 2008 | $15,015.80 |
| 2009 | $12,052.55 |
| 2010 | $5,623.08 |
| **Total** | **$94,085.88** |

[Pls. Ex. 248].

Over that same period of time, the *Handbook of Feminist Research* generated a small amount of permissions revenue. There is no evidence of CCC revenues for the *Handbook of Feminist Research*, but Sage did provide the figures for its in-house (presumably digital) permissions sales. Those figures are listed below:

| Year | Permissions Sales |
| --- | --- |
| 2006 | $0.00 |
| 2007 | $0.00 |
| 2008 | $116.29 |
| 2009 | $96.45 |
| 2010 | $770.72 |
| **Total** | **$983.46** |

[Pls. Ex. 248].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time that the alleged infringement occurred. It also pertains to damage to the value of the copyrighted work in 2009. For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Based on the data listed above, the Court finds that the value of the copyrighted work in 2009 was almost exclusively in book sales, not permissions. Defendants' actions had no impact on book sales.

Op. at 94; Patton at 1276. Defendants' actions could have had some very small impact on the actual or potential market for digital permissions sales. But it is unlikely that Defendants' use of unpaid excerpts (even assuming the widespread availability of programs like Georgia State's) substantially damaged the value of the copyrighted work. It is also unlikely that Defendants' use of unpaid excerpts caused substantial damage to the potential market for the copyrighted work (book sales and digital permissions sales), such that Sage would lose its incentive to publish the *Handbook of Feminist Research*. Factor four, therefore, favors a finding of fair use.

In summary, factors one, three, and four favor fair use while factor two is neutral. Weighting these factors as directed, and considering them together, the Court finds that the overall weight of the four factors favors fair use. Defendants accordingly prevail on their fair use defense as to this work.

> 15. *Sage Handbook of Qualitative Research, Second Edition*
> (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2000)

Professor Esposito assigned "Ethnography and Ethnographic Representation," by Barbara Tedlock for her summer 2009 class [Tr. Vol. 6, Doc. 404 at 53; Pls. Ex. 547]. This excerpt (pages 955-986), which is chapter 17 in the *Sage Handbook of Qualitative Research, Second Edition* ("*Handbook, Second Ed.*"), is 32 pages long, 2.80% of the 1,142-page book, and was required reading [Pls. Ex. 265].

Fair Use Analysis

Factor one favors fair use.

73

As to factor two, chapter 17 begins with an introduction to the work done by ethnographers[23] in studying various sections of the population.  This introduction includes a historical overview of some of the earliest ethnographic studies, which were originally carried out in the late nineteenth century.  The excerpt then discusses the "genres" of ethnography, or the ways in which ethnographers chose to relay their studies to the public.  Finally, the chapter highlights the ways in which the character and background of the ethnographer affects the results of the ethnographer's research.

Chapter 17 consists primarily of objective surveys of the field of ethnography.  The excerpt goes to great lengths to describe the studies and works of ethnographers, but does not incorporate the author's experiences.  The chapter is didactic, using a formal tone to teach individuals how to approach ethnography and ethnographic studies.  Chapter 17 is neutral under factor two of the fair use analysis.

Factor three assesses the quantity and quality of the material taken.  Here, Professor Esposito used 32 pages of the *Handbook, Second Ed.*, which represents 2.80% of the overall page count for the book [Pls. Ex. 265].  The excerpt fit Professor Esposito's pedagogical purpose.  The percentage of the book used by Professor Esposito was very small (not merely small) as a percentage of the total work.  The favored educational nature of the use further suggests that this percentage and the length of the excerpt favors fair use.  The number of pages taken is also a heuristic for impact

___

[23]"Ethnography" is a branch of anthropology that studies people, societies, and cultures.  *Ethnography*, Oxford English Dictionary (3d ed. 2011).

on the market (it has a relationship to the amount of lost permissions); the Court finds that the impact is small enough given the very small percentage of the work which was used. While Professor Esposito used a whole chapter of the book it is not the heart of the work. Taking all of this into account, factor three weighs in favor of Defendants.

Turning to factor four, digital permissions were available for excerpts of the *Handbook, Second Ed.* through both CCC and Sage's in-house permissions program in 2009 [see Pls. Exs. 283, 286, 287]. If Georgia State had purchased permissions for its use of the instant excerpts, Sage would have earned approximately $83.78 in net revenue from permissions income. See Order at 174, 174 n.85; Becker at 1285, 1285 n.85.

The record indicates that the first edition of the *Handbook* was published in 1994; a second edition, at issue here, was published in 2000; a third edition was published in 2005; and a fourth edition was published in 2011 [Pls. Ex. 283]. *The Handbook, Second Ed.* has not been printed since 2007.[24]

The evidence shows the following net revenues from book sales of the *Handbook, Second Ed.*:

| Year | Book Sales |
|------|------------|
| 2000 | $311,125.03 |
| 2001 | $360,496.82 |
| 2002 | $219,452.98 |

---

[24]See Jt. Ex. 5; Doc. 266-4 at D-14, D-19, D-98 (reflecting that book is out of print); see also Pls. Ex. 283 (demonstrating that no revenue was earned from sales of actual book in 2007 or any subsequent year).

| | |
|---|---|
| 2003 | $201,082.70 |
| 2004 | $197,120.59 |
| 2005 | $9,984.18 |
| 2006 | $791.24 |
| 2007 | $0.00 |
| 2008 | $0.00 |
| 2009 | $0.00 |
| 2010 | $0.00 |
| **Total** | **$1,300,053.54** |

The evidence shows the following permissions sales for excerpts of the *Handbook, Second Ed.*:

| Year | APS | ECCS | In-House | Total |
|---|---|---|---|---|
| 2000 | No Evidence | No Evidence | $2,000.00 | $2,000.00 |
| 2001 | No Evidence | No Evidence | $864.27 | $864.27 |
| 2002 | No Evidence | No Evidence | $3,741.74 | $3,741.74 |
| 2003 | No Evidence | No Evidence | $6,799.74 | $6,799.74 |
| 2004 | $1,507.09 | $617.33 | $8,792.24 | $10,916.66 |
| 2005 | $365.05 | $263.37 | $7,068.89 | $7,697.31 |
| 2006 | $479.40 | $365.57 | $6,932.44 | $7,777.41 |
| 2007 | $935.43 | $187.27 | $10,150.49 | $11,273.19 |
| 2008 | $703.96 | $311.63 | $6,949.23 | $7,964.82 |
| 2009 | $999.47 | $302.98 | $3,814.52 | $5,116.97 |
| 2010 | $418.64 | $228.23 | $1,790.91 | $2,437.78 |

| Total | $5,409.04 | $2,276.38 | $58,904.47[25] | $66,589.89 |
|---|---|---|---|---|

[Docs. 283, 286, 287].

Georgia State's unpaid use of the excerpts caused tiny but actual harm to the value of Sage's copyrighted work. If all colleges and universities had programs that allowed unpaid use of copyrighted excerpts, it could cause substantial damage to the potential market for and the value of the copyrighted work. This leads to the initial determination that factor four disfavors fair use.

Defendants can still prevail on factor four if they can prove that their unpaid use, even if coupled with widespread unpaid copying practices, did not cause substantial damage to the potential market for and the value of the copyrighted work, or that it did not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276. Defendants do not concede factor four with regard to Georgia State's unpaid use of the *Handbook, Second Ed.* in this instance [Defs. Remand Br., Doc. 501 at 50].

---

[25]Sage's in-house permissions sales appear to be attributable to the work of Sage's Custom Publishing Division, which assembles electronic course packs of excerpts from its works upon request by teachers. They are sent as a PDF attachment to the teacher, who is authorized to print them. [Testimony of Carol Richman, Doc. 400 at 73-74]. Thus, these sales do include permission to the teacher to make digital copies; they are treated here as digital permissions, the same as CCC's digital permissions (ECCS). Obviously, this service has been very successful for Sage. The Court infers that Sage's Higher Education Division caters to teachers and professors both in publication choices and in services which are offered.

Defendants' only arguments are as follows: "Regarding factor four, use of only 2.6%[26] of the work does not give rise to a meaningful or significant threat of market substitution. [Georgia State's] use would not and did not cause substantial harm. Regarding the lost digital licensing revenue, the price was unreasonable" [Defs. Remand Br., Doc. 501 at 50].

Regarding Defendants' first argument, the Court finds that copying 2.8% of a work could cause substantial harm if a large number of excerpt copies was made. In 2009 Sage received permissions income of $5,116.97 for excerpts of the *Handbook, Second Ed.* This is not a huge amount of sales, but it is enough to cause hesitation on the question whether Defendants have carried their burden of proof, particularly given the history of permissions sales for excerpts of this book.

Factor four disfavors fair use.

In summary, factors one and three favor fair use, factor two is neutral, and factor four disfavors fair use. Weighting the factors as directed by the Court of Appeals, and weighing all factors together, Defendants prevail on the fair use defense. Accordingly, Sage cannot sustain this claim of copyright infringement for the *Handbook, Second Ed.*

16. *Sage Handbook of Qualitative Research, First Edition*
(Norman K. Denzin & Yvonna S. Lincoln eds., Sage 1994)

For her summer 2009 class, Professor Esposito assigned "Working the Hyphens: Reinventing Self and Other in Qualitative Research" ("Working the Hyphens") by Michelle Fine [Tr. Vol. 6, Doc. 404 at 58;

---

[26]The percentage copied was actually 2.8%.

Pls. Ex. 547]. "Working the Hyphens" (pages 70-82) is the fourth of 36 chapters in the *Sage Handbook of Qualitative Research, First Edition* (*"Handbook, First Ed."*) [Defs. Ex. 739]. The chapter is 13 pages in length and represents 1.99% of the pages in the 653-page book [Id.]. It was required reading [Pls. Ex. 547].

## Fair Use Analysis

Factor one favors fair use.

Factor two analyzes the nature of the work. The *Handbook, First Ed.* roughly divides into three sections. First, the book locates the field of qualitative research by analyzing historical qualitative studies and discussing major research paradigms which influence modern qualitative fieldwork. The book then moves to the more practical aspects of performing qualitative research, including qualitative study design and ways to collect and interpret qualitative data. The concluding section of the book discusses where qualitative research may go in the future.

Chapter four, "Working the Hyphens," alludes to the qualitative research concept of "self-other," in which a qualitative researcher maintains separation and independence from the study subjects. The author of the chapter suggests that researchers should abandon this separation and examine their relationships with their subjects instead. This examination includes re-evaluating common assumptions of qualitative research, including the characterization that qualitative research subjects, such as indigenous peoples, are separated from the general population. The chapter also details various qualitative research writings that speak against separating the researcher from the subject. These works voice their discontent by either offering critiques which disturb the division between

79

researcher and subject or encouraging researchers to let their personal characteristics overcome the separation to enhance the resulting qualitative scholarship.

The chapter objectively describes two forms of previous qualitative literature: (1) examples of the self-other separation or (2) works that call for a re-analysis of the separation. The chapter is written in a formal tone and is devoid of any fanciful language or descriptions. The author includes some personal accounts of her struggle with the self-other separation at the beginning of the chapter, but the remainder of the excerpt does not draw extensively on her experience. Overall, author opinion, subjective description and evaluative approach are present but do not dominate. Based on these aspects of the excerpt, fair use factor two is neutral.

Factor three assesses the amount and substantiality of the excerpt in relation to the work as a whole. The chapter, "Working the Hyphens" is 13 pages long, and represents 1.99% of the total pages of the *Handbook, First Ed.* [Defs. Ex. 739]. The chapter is a tiny part of the total work, and it is adequately tailored to the pedagogical purpose of Professor Esposito's course. It does not constitute the heart of the work. The 13-page length of the excerpt is easily accommodated by the nonprofit, educational use favored by factor one and it portends small impact from market substitution, a concern of factor four. Taking all of these considerations into account, factor three easily favors fair use.

Factor four looks to the effect of Professor Esposito's use on the potential market for or value of the copyrighted work. Digital permissions of the *Handbook, First Ed.* were available in 2009 [Pls. Ex. 287]. The unpaid use by Professor Esposito cost Sage less than

80

$34.03 in net revenue. Order at 177, 177 n.87; Becker at 1286, 1286 n.87. This amount represents actual damage to the value of Sage's copyrighted work, but the damage is minuscule. Nevertheless, if unpaid use of excerpts of copyrighted books became widespread at colleges and universities, it could substantially damage Sage's ability to receive digital permissions income for excerpts of the *Handbook, First Ed*. Thus, Defendants' use could substantially damage the potential market for and the value of the copyrighted work. Factor four, therefore, initially cuts against fair use.

Defendants argue that as of 2009 there was no substantial damage to the potential market for the copyrighted work such that Sage's incentive to publish the book would be undermined, and no substantial damage to the value of the copyrighted work. To begin, the *Handbook, First Ed*. was no longer in print in 2009 [Jt. Ex. 5, Doc. 266-4 at D-24]. Any potential market for the *Handbook, First Ed*. consisted solely of potential permissions income.[27] Furthermore, permissions sales in the years leading up to 2009 showed a downward trend, as follows:

| Year | APS | ECCS | Total |
|------|-----|------|-------|
| 2004 | $751.84 | $601.29 | $1,353.13 |
| 2005 | $1,990.94 | $1,777.86 | $3,768.80 |
| 2006 | $2,000.72 | $1,455.03 | $3,455.75 |
| 2007 | $48.45 | $0.00 | $48.45 |
| 2008 | $74.36 | $19.58 | $93.94 |

---

[27]Sage as owner would have the right to reprint the book but it is very unlikely that Sage would choose to do this in light of the publication of the Second and Third Editions, both of which had been published long before 2009.

| 2009 | $43.31 | $30.23 | $73.54 |
| 2010 | $28.56 | $0.00 | $28.56 |
| **Total** | **$4,938.18** | **$3,883.99** | **$8,822.17** |

[Docs. 286, 287].

The inquiry under factor four pertains to harm to the potential permissions market. The potential market in this instance would begin in 2009, the year in which Sage alleges Georgia State infringed upon its copyright. At that time, the permissions income for the *Handbook, First Ed.* had shrunk to $73.54, and continued to fall in 2010 with total permissions income of $28.56 [Id.]. This general downward progression had started as early as 2007, when permissions income fell to $48.45 from $3,455.75 in 2006 [Id.].

From these figures, the Court makes the following findings. First, the tiny amounts of permissions income, beginning in 2007, show that in 2009 there was very low risk of repetitive use of unpaid excerpts of the *Handbook, First Ed.*, resulting in insubstantial impact on the potential permissions market. In addition, in 2009 and most likely thereafter, Sage continued to keep the *Handbook, First Ed.* out of print. Thus, even if all colleges and universities had programs such as Georgia State's (allowing unpaid use of small excerpts of copyrighted works), it would have no impact on Sage's decision to continue publishing the book. Sage has already made the decision that its economic interests no longer lie in sales of the book. Further, Sage would have no incentive to discontinue permissions sales via CCC's ECCS program because the marginal cost of this service to Sage is virtually nil; almost all costs are paid by users and Sage always would receive a net positive stream of money

82

from permissions.  So long as permissions are available, the book remains in publication.  The Court is satisfied that no substantial damage to the potential market for the copyrighted work likely occurred by virtue of Defendants' conduct, even assuming widespread availability of programs like Georgia State's.  There was also no substantial damage to the value of the copyrighted work.  Therefore, the Court finds that factor four favors Defendants.

In summary, factors one, three, and four favor a finding a fair use, while factor two is neutral.  The Court therefore finds that Professor Esposito's use of the *Handbook, First Ed.* was a fair use.

EPRS 8520 Qualitative Research in Education, Fall 2009

Professor Esposito also taught a course in the fall of 2009 for which Sage alleges an infringement.  That course, Qualitative Research in Education III, or EPRS 8520, was a course on data analysis [Tr. Vol. 6, Doc. 404 at 87].

> 17.    Theoretical Frameworks in Qualitative Research
>        (Vincent A. Anfara & Norman T. Mertz eds., Sage
>        2006)

Fourteen doctoral candidates were enrolled in the course [Id. at 61, 88].  Professor Esposito's course used free copies of portions of the Introduction and the entire Conclusion to *Theoretical Frameworks in Qualitative Research* [Id. at 62; Pls. Ex. 305].  The Introduction and the Conclusion were written by the editors of the book, Vincent A. Anfara, Jr. and Norma T. Mertz [Pls. Ex. 305].  The excerpts assigned by Professor Esposito (pages xxiii-xxxii and 189-196) were a combined length of 18 pages (7.59% of the book) and were required reading [Pls. Exs. 305, 513].

Fair Use Analysis

Factor one favors fair use.

83

Factor two requires the Court to assess the nature of the copyrighted work. *Theoretical Frameworks in Qualitative Research* is an academic work which provides an overarching explanation of theoretical frameworks, both in their use in and effect on qualitative research. The book first discusses the role of theory in qualitative research, defining a "theoretical framework" as "any empirical or quasi-empirical theory of social and/or psychological processes . . . that can be applied to the understanding of phenomena" [Pls. Ex. 305 at xxvii]. Relying on this definition, the book presents ten chapters in which various qualitative researchers discuss the theoretical frameworks they applied in select qualitative studies. The conclusion reflects on the different chapters and attempts to abstract key points for application in future qualitative research.

The section of the Introduction assigned by Professor Esposito, pages xxiii-xxxii, begins by using summaries of other authors' works to demonstrate two instances where theory directly affects qualitative research. In the first instance, theory affects the manner in which a researcher designs his study. Theory also affects the underlying epistemology of the qualitative study. The excerpt then defines the concept of a "theoretical framework" and provides additional discussion on both the boundaries of the definition and short examples of theoretical frameworks in practice. The Introduction finishes by outlining the remainder of the book for the reader.

The Introduction is didactic, teaching the reader about the role of theory in qualitative research and defining theoretical frameworks for use in the remainder of the book. The central takeaway from the

84

excerpt, the definition of theoretical frameworks, seems to come directly from the authors' opinions or experience in qualitative research.     The other parts of the excerpt consist of objective descriptions of either previous qualitative studies or the other chapters of the book.

The Conclusion, pages 189-196, highlights two questions about theoretical frameworks: (1) how to find a theoretical framework, and (2) what type of effect the theoretical framework will have on the research.  The authors then answer these questions by emphasizing key points from the previous chapters.  The Conclusion includes insight from the authors themselves, with suggestions such as finding theoretical frameworks by searching other forms of scholarship and realizing that a theoretical framework will focus the study and reveal more meaningful conclusions within the study itself.

The Conclusion is also didactic, providing the reader with concrete advice on how to use a theoretical framework when performing qualitative research.     The excerpt also synthesizes the previous chapters' analysis into additional advice, using the high points of the other authors' work as teaching tools and examples.     The Conclusion maintains a formal tone, and does not contain any fanciful or humorous elements.     Author opinion dominates both excerpts. Factor two disfavors fair use.

Factor three looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." Op. at 82; Patton at 1271. It considers the quantity and quality (value) of the portion used, plus the purpose of the use and the potential harm of market substitution. Here, Professor Esposito provided 18 pages to her students, or 7.59% of the total pages in *Theoretical*

85

*Frameworks in Qualitative Research* [Pls. Ex. 303]. This is a very small number of pages and a small percentage of the copyrighted work. Additionally, the excerpts were tailored to fit Professor Esposito's pedagogical purpose.  However, the excerpts used by Professor Esposito were of great value in the overall structure of the book. The excerpt of the Introduction provides a working definition of theoretical frameworks, while the Conclusion synthesizes the major themes of each chapter for application by the reader in future qualitative studies.  While the remainder of the book provides the examples which the Conclusion relies upon, the two excerpts capture the heart of the work.

The educational purpose of the use justifies the amount of material used, and harm from market substitution is reduced by the small size of the excerpts.  But the small excerpts of *Theoretical Frameworks in Qualitative Research* that Professor Esposito used include the heart of the work, which makes factor three ultimately come down against fair use.

Factor four looks to the effect of the use on both the value of the copyrighted work and the potential market for the work.  Sage presented evidence that digital excerpts were available for purchase through Sage's in-house permissions/licensing department in 2009 [Pls. Ex. 308].  By utilizing the excerpts without paying for them, Professor Esposito deprived Sage of less than $26.88 in revenue. Order at 180; Becker at 1288.  If professors at all colleges and universities used unpaid excerpts of copyrighted works, this could damage the permissions market for digital excerpts of *Theoretical Frameworks in Qualitative Research* and thus cause substantial damage to the potential market for the copyrighted work.  It could also

cause substantial damage to the value of the copyrighted work.  This initial analysis moves factor four against a finding of fair use.

The next step requires Defendants to prove that their use (assuming the widespread availability of programs like Georgia State's) likely did not cause substantial damage to the potential market for the copyrighted work or to the value of Sage's copyrighted work.  Record evidence demonstrates that Sage did have revenue from digital excerpt sales of *Theoretical Frameworks in Qualitative Research*, but these sales were quite low.  The book was initially published by Sage in 2006.  Book sales between publication in 2006 and the end of calendar year 2010 totaled $75,320.69 [Pls. Ex. 308].  During the same time, Sage received only $118.61 in in-house permissions licenses for digital copies of excerpts [Id.].  There were no CCC sales.  This shows low demand for digital licenses, and shows that the risk of repetitive unpaid use of excerpts of *Theoretical Frameworks in Qualitative Research* was limited as of 2009 and later.  Given these figures, plus the fact that Defendants' use had and will have no impact on book sales, Defendants have carried their burden under factor four.  The Court finds that the potential market for digital permissions sales from unpaid use of *Theoretical Frameworks in Qualitative Research* was insubstantial as of 2009, and that the potential market for the copyrighted work was not substantially impaired in 2009.  There was no substantial harm to the value of the copyrighted work in 2009.  Factor four favors fair use.

In summary, factors one and four favor fair use; factors two and three disfavor fair use.  Weighting the four factors as directed, and considering them together, the Court holds that Professor Esposito's

use of *Theoretical Frameworks in Qualitative Research* qualifies as a fair use.

    C.    Professor Kruger

    Dr. Anne Cale Kruger was an Associate Professor who taught graduate courses in educational psychology and special education [Tr. Vol. 10, Doc. 393 at 4, 6].

EPY 7090 Psychology of Learning and the Learner, Summer & Fall 2009

    In the summer and fall semesters of 2009, Professor Kruger taught EPY 7090, or "Psychology of Learning and the Learner," which was a single course that spanned over two semesters [Pls. Ex. 553]. The course covered the psychological principles that underlie teaching and learning that occur in school, and it was taught to master's degree students studying early childhood [Id.; Doc. 393 at 7]. There was no required textbook, and Professor Kruger posted all required readings on ERES [Pls. Ex. 553].

        18.   *Awakening Children's Minds: How Parents and Teachers Can Make a Difference* (Laura E. Berk, Oxford 2001)

    One such required reading was an excerpt from *Awakening Children's Minds* by Laura E. Berk. The excerpt consisted of pages 181-219 (39 pages), or the whole of chapter six: "Learning in Classrooms" [Pls. Ex. 354]. It constituted 12.19% of the 320-page book [Id.].

Fair Use Analysis

    Factor one favors fair use.

    As is relevant to factor two, *Awakening Children's Minds* is a work intended for teachers and parents. The author adopts the "sociocultural theory," which originated from the work of psychologist Lev Vygotsky, as her operating framework.

Chapter six focuses on the application of sociocultural theory to early childhood classrooms. The author discusses three themes: (1) teaching in the "zone," or in the range of tasks that a child cannot yet master independently but can master through collaboration; (2) ensuring that the classroom is rich in dialogue; and (3) ensuring that the classroom provides an abundance of literacy related activities.

The tone of chapter six is conversational, and the writing is straightforward. The excerpt does not contain any humorous or fanciful elements. It provides some examples that may come from the author's own imagination and experiences. However, the author primarily presents information and support derived from others' works in a way that is practical and useful for parents. For example, while the chapter provides contemporary examples of classroom methods, it repeatedly traces those methods to principles from Vygotsky's psychology. The chapter is not analytical or evaluative. The chapter does convey the author's overall opinion that the sociocultural approach to early childhood education is preferable to a traditional "whole-classroom" approach, but it is not dominated by the author's opinion. Accordingly, factor two is neutral.

Turning to factor three, the uploaded excerpt contains 39 pages, and represents 12.19% of the entire book. Use of this excerpt served the course's pedagogical purpose. Even taking into account Defendants' favored nonprofit use, the quantity of material used is excessive, particularly when the impact of market substitution is considered. Here, no evidence exists to demonstrate a digital permissions market for excerpts of *Awakening Children's Minds* in 2009 or thereafter making the likelihood that the unpaid excerpt will

89

substitute for the paid market nonexistent. Also, the quality (value) of the excerpt is somewhat greater as an entire chapter--which covers a discrete topic--as opposed to a portion of a chapter.  Even though chapter six is not the heart of the work, the Court concludes that factor three disfavors fair use.

Factor four requires this Court to determine whether Professor Kruger's use substantially diminished the value of Oxford's copyright in *Awakening Children's Minds* or the potential market for the work. Oxford has produced no evidence that digital excerpts of *Awakening Children's Minds* were available for purchase in 2009.  Accordingly, the unpaid use did not actually harm Oxford, as digital permissions were not available.

The record does contain evidence that Oxford earned $140.55 in royalties from digital permissions sales through ECCS in 2010 [Pls. Ex. 358].  Even if that evidence of the future market for *Awakening Children's Minds* is considered, the result is the same.  Between the date of publication in 2001 and November 7, 2010, actual book sales of *Awakening Children's Minds* netted $130,482.00 [Pls. Ex. 357]. Defendants' actions did not impact book sales at all.   There is no evidence that the work has earned any in-house permissions income or APS permissions income.  The only evidence pertaining to ECCS income is for 2010, in which Oxford earned $140.55 in ECCS permissions sales [Pls. Ex. 358].  At that time, *Awakening Children's Minds* had been in publication for nearly ten years, and permissions income was slight. Demand for excerpts of the work was low.  The Court is persuaded that even assuming widespread unpaid copying of excerpts, Defendants' use did not have a substantial adverse impact on the potential market for

excerpts of *Awakening Children's Minds* or on the potential market for the copyrighted work. Factor four favors fair use.

In this instance, factors one and four weigh in favor of fair use, factor two is neutral, and factor three disfavors fair use. As such, the overall balance fairly tips in Georgia State's favor. Georgia State's use of *Awakening Children's Minds* was a fair use.

EPY 8220 Advanced Developmental Psychology: Personality and Socialization, Fall 2009

Professor Kruger taught a seminar called "Advanced Developmental Psychology: Personality and Socialization," or EPY 8220, to doctoral students at Georgia State in the fall 2009 semester [Tr. Vol. 10, Doc. 393 at 7-8]. The seminar sought to actively explore and generate independent thinking and communication regarding research in social and personality development [Pls. Ex. 554]. Professor Kruger did not assign any required textbooks for the course, and all required readings were uploaded to ERES [see id.; Doc. 393 at 11-12].

> 19. *Understanding Trauma: Integrating Biological, Clinical, and Cultural Perspectives* (Laurence J. Kirmayer, Robert Lemelson, & Mark Barad eds., Cambridge 2007)

Professor Kruger uploaded to ERES an excerpt from *Understanding Trauma* [Pls. Ex. 554]. Specifically, she assigned chapter 11: "The Developmental Impact of Childhood Trauma" by Bessel A. van der Kolk [Pls. Ex. 142]. The excerpt consisted of pages 224-241 (18 pages), or 3.29% of the 547 pages in *Understanding Trauma* [Id.].

Fair Use Analysis

Factor one favors fair use.

With respect to factor two, *Understanding Trauma* is an academic work comprised of writings from multidisciplinary researchers and scholars. It seeks to provide an interdisciplinary model on the

impact of trauma from the perspectives of neurobiology, clinical science, and anthropology. Using "post-traumatic stress disorder" ("PTSD") as a baseline, *Understanding Trauma* seeks to present an integrated framework on the effects and the scope of individual trauma and large-scale collective trauma. *Understanding Trauma* is divided into three sections which provide perspectives from each of the three fields.

Chapter 11 is located in *Understanding Trauma*'s second section, which examines trauma from a clinical science perspective. In general, the chapter examines the developmental consequences of pervasive interpersonal childhood trauma, including physical, sexual, or emotional abuse and neglect, typically perpetrated by a caregiver. The author begins by explaining that the effects of childhood trauma are often described under the rubric of PTSD because it is the only trauma-related diagnosis in the Diagnostic and Statistical Manual ("DSM") IV, even though PTSD does not accurately reflect all of the symptoms of childhood trauma, such as impulse control, aggression, attentional and dissociative problems, and relationship problems. Moreover, the author notes, other symptoms are often diagnosed as separate psychiatric illnesses and described as being "comorbid" with PTSD, which incorrectly reflects that they occurred independently from the PTSD symptoms rather than as a result of the same traumatic event.  The author cautions that these imprecise diagnoses may result in application of unhelpful treatment methods.

After proposing that PTSD is an ill-fitting diagnosis for the full range of posttraumatic symptoms in children, the author examines the nature, causes, and effects of those symptoms and related psychiatric illnesses.  For example, he describes how early onset

chronic trauma can interfere with a child's abilities to integrate his or her cognitive, emotional, and sensory experiences, which in turn leads to problems regulating internal distress. When children cannot achieve control or stability, exposure to reminders of a trauma can cause them to reenact the trauma. Compounding the problem is the fact that adults--such as therapists or teachers--who are unaware of a child's trauma may misperceive the child's reactive behavior as rebellious or oppositional. With this background, the author advocates for the inclusion of "Developmental Trauma Disorder," in the DSM, which would encompass the predictable consequences experienced by children who suffer from interpersonal trauma. The chapter concludes with a discussion of the limitations of the typical PTSD treatment when applied to childhood trauma, and by suggesting treatment adjustments and alternatives.

The writing in this chapter is formal, clinical, and precise. The chapter is devoid of any anecdotal information or fanciful elements. The author frequently cites the work of others, but he also cites a great deal of his own research. Portions of the chapter are strictly informational, but much of the chapter conveys the author's own analysis regarding the limitations of the PTSD diagnostic criterion, how the experience of childhood trauma impacts development, and how a more precise diagnostic criterion would benefit treatment options. All of these ideas, however, are grounded in an established body of research and knowledge. Here, chapter 11 is fairly split between objectively descriptive writing and the author's own analysis. Accordingly, factor two is neutral, and it weighs neither for nor against fair use.

93

Turning to factor three, Professor Kruger uploaded one full chapter. This was 3.29%, or 18 of the 547 pages in *Understanding Trauma* [Pls. Ex. 142]. As a percentage of the copyrighted work, the excerpt was very small. The number of pages was also very small. Further, no evidence exists to demonstrate a digital permissions market for excerpts of *Understanding Trauma* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. The work also served the pedagogical purpose of the course. With respect to the value of the excerpt, chapter 11 was not the heart of the work, although it was a complete chapter. The overall work embraces a broad, interdisciplinary approach to individual and wide-scale trauma, while chapter 11 narrows in on trauma and childhood development. Considering the very small percentage of the work uploaded, the important educational purpose served, and the lack of market substitution, the portion that Professor Kruger uploaded easily qualifies as favoring fair use. Thus, factor three weighs in favor of fair use.

With respect to factor four, the record before the Court contains no evidence that digital permissions licensing was available for *Understanding Trauma* in 2009. However, Cambridge earned £33,639.00 in revenue from book sales between the book's publication in 2007 and November 2010 [Pls. Ex. 146]. As no digital market for the work existed in 2009, and Defendants' use caused no harm to the potential market for the copyrighted book, it follows that Defendants' unpaid use that year did not cause any harm to the potential market for the copyrighted work. See Op. at 99; Patton at 1278. There is also no evidence before the Court demonstrating the existence or viability of a future market. As Georgia State's unpaid

94

use did not actually harm Cambridge, and it is not likely that widespread conduct like Georgia State's would substantially impair a post-2009 market for the work, factor four weighs in favor of fair use.

Here, factors one, three, and four all weigh in favor of fair use, and factor two is neutral. Weighting the factors as directed, Georgia State has succeeded in carrying its burden.   The use of *Understanding Trauma* was a fair use.

D.   Professor Orr

Professor Orr is a tenured professor in the Music History and Literature Department at Georgia State [Tr. Vol. 7, Doc. 405 at 55]. MUS 8860 Romantic Period 1800-1900, Summer 2009

Professor Orr taught MUS 8860, a graduate course, in the summer session of 2009 [Id. at 56].   Ten students enrolled in the course [Id. at 59].  Professor Orr's syllabus listed two required texts, and he posted several additional required readings on ERES [Id. at 56-57, Pls. Ex. 523]

> 20.   *Liszt: Sonata in B Minor* (Kenneth Hamilton, Cambridge 1996)

Professor Orr assigned chapter three of *Liszt: Sonata in B Minor* ("*Liszt*"), by Kenneth Hamilton, for his summer 2009 class, "Paris from 1830 to 1848" [Tr. Vol. 7, Doc. 405 at 66-67; Pls. Ex. 523]. That chapter (pages 28-48), titled "Understanding the Sonata in B minor," is 21 pages in length and 20.79% of the book [Pls. Ex. 130]. It was required reading [Doc. 405 at 67; Pls. Ex. 523].

Fair Use Defense

Factor one favors fair use.

95

As to factor two, *Liszt* is an academic work which analyzes musician and composer Franz Liszt's "Sonata in B Minor." In addition to an in-depth discussion on the musical composition itself, the book discusses Liszt's personal situation at the time he wrote the work, as well as how some of Liszt's earlier works influenced the Sonata. The first few chapters, along with the historical interpretations of the Sonata included with the author's personal views, provide multiple perspectives from which the reader can understand the music. The book also includes a section on performance practices and performance histories of the Sonata for those who may be interested in performing the piece.

Chapter three, "Understanding the Sonata in B minor," consists of two sections interpreting the Sonata. The first section is a short analysis of various programmatic interpretations, or interpretations of music where the analysis determines what images or impressions the listener is supposed to receive from hearing the music. After claiming that the Sonata does not have a programme, the author shifts into a musical analysis. In order to analyze the piece on its musical merits, the author compares his interpretation of the Sonata to three historical interpretations. The remainder of chapter three is spent discussing the actual score of the piece, with the analysis contrasting how the four interpretations of the piece disagree on the location of the movements[28] within the Sonata.

---

[28]A movement is "a principal division of a longer musical work, usually differing in tempo from the other divisions and having a distinctive character of its own." *Movement*, Oxford English Dictionary (3d ed. 2011).

96

Chapter three is dominated by analysis, either from the author himself or from the three other historical analyses used in the excerpt.  The objective music of the Sonata guides the entire chapter, with the author complementing the music with observations and descriptions clearly derived from his own experience playing the piece.  Chapter three maintains a formal tone, and is somewhat didactic in its attempt to teach the reader about the Sonata beyond the notes on the sheets of music.  Factor two, therefore, disfavors a finding of fair use.

As to factor three, Professor Orr assigned 21 pages of *Liszt* as required reading for his class [Pls. Ex. 523].  These pages represent 20.79% of the work, which is a large amount of the work, even in light of the educational nature of Professor Orr's use. [Pls. Ex. 130].  Chapter three also constitutes the heart of the work, as it provides the in-depth analysis and interpretation of the piece for which the book is named.  No evidence exists to demonstrate a digital permissions market for excerpts of *Liszt* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent.  Also, the excerpt did fit Professor Orr's pedagogical purpose.  However, the percentage of the book which was used and the fact that the chapter is the heart of the work disfavor Defendants' position.  On balance, factor three goes against a finding of fair use.

As to factor four, Cambridge presented no evidence of digital license availability for *Liszt* in 2009.  Cambridge does present evidence that, since its publication, *Liszt* has generated £19,322 in book sales from its date of publication to the end of October 2010 [Pls. Ex. 133].  But in this case, the unpaid use by Professor Orr

did not actually harm Cambridge, as digital licenses for the book were not available. Similarly, Cambridge fails to present any evidence of a potential future market for digital excerpts. This lack of future market evidence is especially important in the case of *Liszt*, a book that had been published for 15 years at the time discovery occurred in this case. Defendants therefore demonstrate that their use had no actual effect on the value of Cambridge's copyrighted work or on the potential future market for the work. Factor four favors fair use.

The Court's analysis of *Liszt* has factors one and four favoring fair use and factors two and three disfavoring fair use. This split is settled based on the Court of Appeals' holding that factor four weighs the heaviest of all factors, while factor two weighs the least. Op. at 81, 93; Patton at 1270, 1275. With those relationships in mind, the combined weight of the fair use factors favors fair use. Professor Orr's use was protected, and Cambridge cannot sustain a copyright infringement claim for this work.

> 21. *Cambridge Companion to Mendelssohn* (Peter Mercer-Taylor ed., Cambridge 2004)

Professor Orr also required his students to read an uploaded excerpt of chapter six of *The Cambridge Companion to Mendelssohn* (*"Mendelssohn"*), which was edited by Peter Mercer-Taylor [Tr. Vol. 7, Doc. 405 at 77; Pls. Ex. 523]. The excerpt (pages 96-111), taken from a chapter titled "Symphony and overture," by Douglass Seaton, was 16 pages, or 4.83% of the 331-page book [Pls. Ex. 65].

Fair Use Analysis

Factor one favors fair use.

98

Turning to factor two, *Mendelssohn* is an academic work which surveys the life and works of composer Felix Mendelssohn.  The book devotes the majority of its pages to his music, with the majority of chapters discussing the various styles of music Mendelssohn composed during his life.  The other parts of the book look to the surrounding details of the composer's life, including his personal story, the environment in which he wrote his works, and the reception his works received both during his life and after his death.

The excerpt used by Professor Orr in his course was a section of chapter six, titled "Symphony and overture."  The excerpt tracks the development of Mendelssohn's music over the later half of his life. Eight different works by the composer are included in the excerpt: two musical interpretations of literary works, three overtures, and three symphonies.  The author analyzes each piece of music, explaining what Mendelssohn was doing at that stage of his life and how those outside life experiences influenced and manifested themselves in his works.  The analysis includes the actual sheet music from each of the pieces, such that the analysis of the themes and images created by the music are intertwined with the musical notes themselves.

The excerpt of chapter six objectively describes the later half of Mendelssohn's life in order to map the development of his music. The excerpt also relies heavily on two subjectively descriptive techniques to fully develop its discussion about Mendelssohn.  First, the excerpt ties the musical work to the external details of Mendelssohn's life.  Second, the chapter attempts to capture the effect Mendelssohn desired his listeners to experience when they heard his music.  Both of these subjective components appear to come

from the author's personal experience with the works of Mendelssohn, but they do not dominate the excerpt. Factor two, therefore, is neutral, neither favoring nor disfavoring fair use.

Factor three assesses the amount and importance of the excerpt in light of the purpose of the use and the harm of market substitution. The excerpt used by Professor Orr totaled 16 pages, making up 4.83% of the overall book [Pls. Ex. 65]. This is a very small part of the overall book, even in the more favorable viewing created by Professor Orr's educational nature of the use. The excerpt also takes from a chapter which is not the heart of the work, as chapter six is one of multiple chapters which analyzes various works produced by Mendelssohn over his life. Professor Orr's use of this excerpt is validated by his purpose in using the passage: the excerpt fit his pedagogical purpose. Finally, the very small number of pages used mitigates the impact of market substitution, especially considering that digital permissions were not available for this work in 2009. Factor three favors fair use.

Factor four measures the effect of Defendants' use on the value of the copyrighted work and on the potential market for the copyrighted work. Cambridge did not present evidence of digital license availability for *Mendelssohn* in 2009. It also did not present evidence suggesting a potential future market for digital excerpts of *Mendelssohn*, leading the Court to find that Professor Orr's use did not cause any harm to the potential market for digital permissions of *Mendelssohn*. Cambridge does provide evidence demonstrating that *Mendelssohn* had generated £24,826 in book sales from its date of publication to the end of October 2010 [Pls. Ex. 69]. But because Professor Orr's use also had no impact on book

100

sales, it did not affect the potential market for the copyrighted work or the value of the copyrighted work. Thus, factor four favors fair use.

In summary, factors one, three, and four favor fair use, while factor two is neutral. Taking these factors together, the Court finds that Professor Orr's use qualifies as fair use, protecting his use from a claim of copyright infringement by Cambridge.

> 22. *Cambridge Companion to Schumann* (Beate Perrey ed., Cambridge 2007)

One of the excerpts used in Professor Orr's summer 2009 Romantic Music course came from *The Cambridge Companion to Schumann* (*"Schumann"*), which was edited by Beate Perrey [Tr. Vol. 7, Doc. 405 at 80; Pls. Ex. 523]. The excerpt (pages 105-119), taken from a chapter titled "Why sing? Lieder and song cycles," is 15 pages, or 4.63% of the 324-page book [Pls. Ex. 75].

Fair Use Analysis

Factor one favors fair use.

Factor two requires assessment of the nature of the work. *Schumann* is an academic work that aims to introduce the reader to various aspects of composer Robert Schumann's life and works. The book begins with a discussion of Schumann's nature, personality, and the influences that affected the composer. The book then moves to discuss Schumann's works, analyzing the various forms of music Schumann produced during his career. The later chapters provide multiple accounts of the influence of Schumann's work on composers following his death.

The excerpt in question was taken from chapter six, which is titled "Why sing? Lieder and song cycles." The excerpt critically

analyzes various works by Schumann, who is best known for his composition of lieder, which are a form of German folk songs. The excerpt focuses on song cycles, which are a group of songs based on the same general subject or having some unifying feature. The two song cycles discussed in this excerpt, *Dichterliebe* and *Frauenliebe und-leben*, are each based on a different German poem. The excerpt discusses both the poems that the song cycles are based on and the methods used by Schumann to capture the poems in musical form.

The excerpt from chapter six shifts between objective descriptions of previous scholarship on Schumann's works and personal observations by the authors about the music. The tone of the chapter remains formal between both the objective descriptions and the personal observations. Because the chapter relies more on the objective scholarship and the descriptions of Schumann's work instead of the author's personal observations, factor two is neutral for this excerpt.

Turning to factor three, Professor Orr used 15 pages, or 4.63% of the 324-page book [Pls. Ex. 75]. This is a very small percentage, and a very small number of pages even without accounting for the favored educational purpose served by Professor Orr's use of the excerpt. It is sufficiently tailored to serve the pedagogical aims of Professor Orr's course. Additionally, it is acceptably small taking into account the impact of market substitution, especially considering that digital permissions licensing was not available for this work at the time and that Professor Orr assigned only a partial chapter. Further, the excerpt does not constitute the heart of the work. Factor three easily favors fair use.

Factor four considers what effect Defendants' use has on the value of the copyrighted work and on the potential market for the copyrighted work. Here, Cambridge presented no evidence of digital license availability in 2009 and no evidence of a potential future market for digital excerpts of *Schumann*. The only evidence that Cambridge presented for any sales of *Schumann* were of £27,866 in book sales from publication through October 2010 [Pls. Ex. 78]. Given that lack of evidence, plus the fact that Defendants' actions had no impact on book sales, Defendants demonstrate that substantial harm to Cambridge stemming from unpaid use of excerpts of the book is unlikely. Factor four favors fair use.

Reviewing the above analysis, factors one, three, and four all favor fair use, while factor two is neutral. Weighing all of these factors together and adjusting their weights in accord with the Court of Appeals' holdings, the combined factors determine that Professor Orr's use of *Schumann* was fair. In light of this finding of fair use, Cambridge's copyright infringement claim necessarily fails.

23. *The Music of Berlioz* (Julian Rushton, Oxford 2001)

Professor Orr uploaded an excerpt from *The Music of Berlioz* ("*Berlioz*"), by Julian Rushton, to ERES for the students in his summer 2009 Romantic Music course [Tr. Vol. 7, Doc. 405 at 83-84; Pls. Ex. 523]. The 18-page excerpt (pages 250-267), comes from chapter nine of the book, and constituted 4.75% of the overall book [Pls. Ex. 427].

Fair Use Analysis

Factor one favors fair use.

Turning to factor two, *Berlioz* is an academic discussion of various works by the composer Hector Berlioz. The book begins with

103

a biography of Berlioz's music, which attempts to set forth a chronological narrative of his works. The book goes on to interpret Berlioz's "musical data," discussing and dissecting the artist's technique. The final chapters of the book focus on Berlioz's works, offering new arguments for the meanings of Berlioz's various musical pieces.

The excerpt used in Professor Orr's class was taken from chapter nine, which is titled "A Fantastic Symphony." The excerpt analyzes Berlioz's *Symphonie Fantastique*, a piece considered to be one of Berlioz's finest works. The excerpt first assesses the programme of the work, or the images and pictures Berlioz wanted the listener to see and experience upon hearing the music. The excerpt notes how the symphony builds on the work of Beethoven, who had been a mentor to Berlioz.    Chapter nine dives into the music of the *Symphonie*, analyzing the piece section by section and noting the various musical techniques utilized by Berlioz.    The excerpt ends with a brief discussion of *Harold en Italie*, another symphony written by Berlioz.

The excerpt used by Professor Orr is evaluative, providing both a thematic and musical analysis of Berlioz's *Symphonie Fantastique*. The chapter relies on the sheet music of the piece, allowing the reader to see the notes of the music as the author explains his analysis.    The analysis moves between a restatement of previous scholarship on Berlioz and the author's own opinion of the music, with the author's opinion taking up slightly more of the excerpt. The excerpt is written in a formal tone, with any fanciful language strictly used to describe the nature of the music.  Even though the author's analysis is featured more prominently than the other scholarship, his opinion and analysis do not dominate the excerpt.

Because of that, factor two neither favors nor disfavors a finding of fair use for this excerpt.

Factor three looks to the quantity and the quality of the excerpt, assessing whether these elements of the excerpt are fair in light of the purpose and character of the use and the threat of market substitution. Here, Professor Orr used 18 pages of the book, which totals 4.75% of the overall book [Pls. Ex. 427]. This is a very small percentage of the work and a very small number of pages, particularly taking Professor Orr's educational use into account. Moreover, the excerpted portion was tailored to fit the pedagogical aims of Professor Orr's course. The excerpt does not constitute the heart of the work. The very small number of pages mitigates the impact of substitution, particularly in light of the fact that no digital permissions were available at the time. Given these considerations, factor three easily favors fair use.

As to factor four, Oxford presented no evidence of either digital license availability in 2009 or a potential future market for digital excerpts of *Berlioz*. The only evidence provided by Oxford on sales of *Berlioz* demonstrate that, as of November 2010, book sales from *Berlioz* have generated $9,580 in revenue [Pls. Ex. 357]. Defendants have the ultimate burden to prove, under factor four, that their use will not substantially impact the potential market for the copyrighted work such that Oxford's incentive to publish the work would be affected. With no record of any permissions sales, the Court finds there is little reason to believe that there will be repetitive sales of excerpts of *Berlioz*. Defendants' actions had no effect on potential book sales. The Court accepts Defendants' argument that their use of this excerpt did not affect either the

105

value of Oxford's copyrighted work or the potential market for the copyrighted work. Although Professor Orr's own use did cause some slight actual harm, factor four favors fair use.

Summarizing, fair use factors one, three, and four favor fair use, while factor two is neutral. Weighting these factors as directed and considering them together, Professor Orr's use of an excerpt of *Berlioz* qualifies as a fair use, thereby defeating Oxford's claim of copyright infringement.

MUS 8840 Baroque Music, Fall 2009

Professor Orr also taught a course on Baroque music in the fall of 2009 [Tr. Vol. 7, Doc. 405 at 85].

> 24. *The Organ as a Mirror of Its Time: North European Reflections 1610-2000* (Kerala J. Snyder ed., Oxford 2002)

For this course, Professor Orr assigned an excerpt from *The Organ as a Mirror of Its Time*, edited by Kerala J. Snyder [Id. at 86-87; Pls. Ex. 524]. The excerpt in question (pages 78-91), titled "The Organ in Seventeenth Century Cosmology," was written by Hans Davidson [Pls. Exs. 524, 441]. The excerpt spans 14 pages, or 3.57% of the book, and was required reading [Doc. 405 at 87; Pls. Ex. 441].

Fair Use Analysis

Factor one favors fair use.

Factor two requires assessment of the nature of the work. *The Organ as a Mirror of Its Time* is an academic work that examines six organs located throughout northern Europe. The discussion of each organ follows a similar structure. The book first discusses the historical and economic circumstances leading to the creation of the organ. The historical discussion is then followed by a more technical discussion in which the authors explain the aspects which

make the organ unique.  Finally, the discussion of the organ resumes its historical bent as the later chapters detail the life of the organ after its creation.  The book also comes with a compact disc containing music played on each of the six organs discussed in the book.

Chapter six, titled "The Organ in Seventeenth Century Cosmology," builds on a connection between organs and the heavenly bodies.  The chapter starts with a discussion about astrologer Johannes Kepler, who noted that planets moved at different speeds depending on how close they are to the sun.  Expressing these speeds as a ratio, Kepler realized that the range of movement of each planet could be expressed as musical tones over an interval of a major third.  This idea, known as cosmic harmony, was then applied to the study of music, and the chapter provides examples of cosmic harmony scholarship.  The link between the cosmos and organs is then discussed, as the organ is often used as a symbol of the universe with the organ player representing God.

This symbolism is then further developed in the context of two organs: the organ in St. Jacobi, Hamburg and the Compenius organ in Fredericksborg Castle.  The chapter concludes with a comparison of the organs, which details the creation and physical descriptions of each organ.

Chapter six is an objective chapter which primarily relays both the concept of cosmic harmony and the physical description of two organs to the reader.  Each of these topics of discussion are based heavily on the work of other scholars, with the author of the chapter distilling the information into his own words.  The opinion of the author briefly emerges in comparing the two organs.  The chapter is

107

written in a formal tone, with little to no fanciful language. Because the chapter is dominated by the objective descriptions of both previous scholarship and the organs themselves, factor two is neutral.

Factor three determines whether the quantity and quality of the book used is fair in light of the purpose of the use and the harm that could occur based on market substitution. Here, Professor Orr used 14 pages, or 3.57%, of the 392 page book [Pls. Ex. 441]. That is a very small percentage of the book and a very small number of pages. Moreover, the portion was tailored to serve the pedagogical aims of Professor Orr's course. The excerpt is not the heart of the work: while the book addresses six different organs from northern Europe, the chapter in question addresses only two, and focuses more on the theory of cosmic harmony than on the organs themselves. Because Professor Orr used the excerpt for an educational purpose, the quantity of pages provided to students is well within the range which could be considered fair. Finally, the very small number of pages reduces the impact of substitution, especially considering that digital permissions licensing was not available for this work at the time. Factor three, therefore, favors fair use.

Factor four requires this Court to determine whether Professor Orr's use substantially diminished the value of Oxford's copyright in *The Organ as a Mirror of Its Time* or the potential market for the work. Oxford has not produced any evidence that digital excerpts of *The Organ as a Mirror of Its Time* were available in 2009 and has provided no other evidence of a potential market for digital excerpts of the book. The evidence of sales that Oxford does provide only demonstrates that, as of November 2010, *The Organ as a Mirror of its*

*Time* had generated $55,682 in book sales [Pls. Ex. 357]. In the absence of permissions sales evidence, and given that Defendants' actions had no effect on actual or potential book sales, the Court accepts Defendants' argument that there was no harm to the actual or potential market for the copyrighted work and no impact on the value of the copyrighted work. Factor four thus favors fair use.

In summary, factors one, three, and four all favor a finding of fair use for Professor Orr's use of *The Organ*, while factor two is neutral. Adjusting the weight of the factors in accordance with the Court of Appeals' decision and weighing them together, Professor Orr's use qualifies as a fair use, and defeats the claim of copyright infringement by Oxford.

E.   Professor Dixon

Professor Dixon is a tenured professor in the African American Studies department at Georgia State [Tr. Vol. 9, Doc. 407 at 55].

AAS 3000 African American Family, Fall 2009

In the fall of 2009, Professor Dixon taught AAS 3000, a course which was titled African American Family [Id. at 56]. The course traces the historical and social transition of African American families from Africa to contemporary times [Pls. Ex. 542]. Fifty nine undergraduate students were enrolled in Professor Dixon's course during the fall 2009 semester [Doc. 405 at 67]. As evidenced by the syllabus, students were required to purchase three texts for this course [Id. at 57, Pls. Ex. 542]. Some required reading excerpts were placed on hard copy reserve in the library, while other required readings were posted to ERES [Id.]. As part of the course, Professor Dixon required students to form groups of two to three students and prepare a presentation for the class. Professor Dixon posted

109

readings on ERES that were required for the students making the presentation; other students in the course were not required to read these excerpts [Doc. 405 at 61-62].

> 25. *The Slave Community: Plantation Life in the Antebellum South, Revised and Enlarged Edition* (John W. Blassingame, Oxford 1979)

Professor Dixon assigned chapter seven (pages 249-283) of *The Slave Community: Plantation Life in the Antebellum South, Revised and Enlarged Edition* ("*The Slave Community*") to her students for their classes during the week of August 25-27 [Tr. Vol. 9, Doc. 407 at 59-60; Pls. Ex. 542]. The chapter, titled "Plantation Realities," was 35 pages long (8.14% of the 430-page book), and was required reading [Pls. Ex. 460; Doc. 407 at 60].

Fair Use Analysis

Factor one favors fair use.

Factor two requires the Court to determine the nature of the work. *The Slave Community* is an academic work that describes the lives of black slaves in the southern United States prior to the Civil War. It is heavily documented, drawing from personal records left by slaves. The author seeks to present slavery from the viewpoint of the slaves themselves. Various chapters discuss the manner in which Africans were enslaved, the impact of slavery on the South, the culture of slaves, and various personality types exhibited by slaves.

Chapter seven, titled "Plantation Realities," provides an overview of a slave's life on the antebellum plantation. It details the various functions slaves performed on plantations, and discusses the power dynamics which existed between plantation owner, overseers, and slaves. The author occasionally compares accounts of plantation

110

life by non-slave authors, such as plantation owners, to the personal memoirs of slaves. These comparisons highlight both areas of agreement, such as relations between white children and the slaves who cared for them, and areas of disagreement, such as the benevolence or harshness of plantation owners and overseers. The chapter discusses the tension between the effort to produce sufficient harvests with the need to control the slave population.

Chapter seven is objective, relying on primary sources in the form of personal memoirs and records to paint a picture of the life of a plantation slave. The author's opinion occasionally emerges in the passages, but the stark facts usually stand on their own. The chapter is written in a formal tone, and contains little to no analysis or subjective discussion. With this in mind, the Court finds factor two is neutral.

Factor three asks whether the quantity and quality of the work used is fair, given the purpose and character of the use and the effect of market substitution. "Plantation Realities" spans 35 pages, or 8.14% of the 430-page book [Pls. Ex. 460]. This is a small percentage of the overall book, particularly given the nonprofit pedagogical purpose served by the use of this chapter in Professor Dixon's class. The number of pages is not small but is acceptably small to counter the impact of market substitution. While a full chapter has more value than part of a chapter, chapter seven is not the heart of the work. Taking the foregoing into account, factor three favors fair use.

Factor four looks to the effect of Defendants' use on the value of the copyrighted work and the potential market for the work. Digital permissions were available for excerpts of *The Slave*

*Community* in 2009 [Pls. Exs. 206, 207, 208]. By providing the excerpts free to her class, Professor Dixon deprived Oxford of approximately $210 in net revenue. Order at 212, 212 n.99; Becker at 1303, 1303 n.99. This caused actual though tiny damage to the value of the copyrighted work. In addition, if other colleges and universities allowed unpaid use of copyrighted excerpts it could cause substantial harm to the potential market for and the value of the copyrighted work. Factor four initially disfavors fair use.

Defendants can still prevail by proving that widespread unpaid copying practices would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276. The record evidence shows high net book sales revenue and moderate permissions sales for *The Slave Community*. The book has generated $1,602,935 in net book sales revenue since its publication in 1979 [Pls. Ex. 357].[29] The permissions sales figures for *The Slave Community* are the following:

| Year | APS | ECCS | In-House | Total |
|------|------|------|----------|-------|
| 2004 | $187.43 | $0.00 | No Evidence | $187.43 |
| 2005 | $2,275.31 | $0.00 | No Evidence | $2,275.31 |
| 2006 | $1,958.81 | $0.00 | No Evidence | $1,958.81 |
| 2007 | $2,136.19 | $0.00 | No Evidence | $2,136.19 |
| 2008 | $1,241.75 | $90.37 | No Evidence | $1,332.12 |
| 2009 | $1,348.85 | $50.59 | No Evidence | $1,399.44 |
| 2010 | $1,583.86 | $50.59 | No Evidence | $1,634.45 |
| **Total** | **$10,732.20** | **$191.55** | | **$10,923.75** |

---

[29]The book sales revenue is not broken into years.

[Pls. Ex. 463].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time the alleged infringement occurred. Also, it pertains to damage to the value of the copyrighted work in 2009. For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Because *The Slave Community* was published in 1979, the permissions sales from 2004 to 2010 plus the book sales demonstrate there was still interest in the book in 2009, notwithstanding its age.[30] The Court believes that there was a potential market of some substance for digital permissions sales going forward from 2009. However, the potential permissions market was not so great that its absence likely would have affected Oxford's decision to propagate the work in the first place. Op. at 51; Patton, at 1258. Here, the

---

[30]Niko Pfund, Acting Present and Publisher for the Academic and Trade Division of Oxford University Press, testified to the continuing viability of *The Slave Community* in his examination:

Pfund:    I think [*The Slave Community*] was published in 1952 or something. It was published in 1972, and it's the 36th printing.

Counsel:  What does it mean when a work goes through numerous printings?

Pfund:    It means a very happy publisher. It also means that it's obviously found an audience. I can see it's been through 36 printings which is a rarity for us, and that it means it's a work that's had an impact, and that it's finding a continual audience and readership.

[Tr. Vol. 3, Doc. 401 at 47-48].

113

extreme discrepancy between the amount of book sales and the amount of permissions sales is so great that Defendants carry their burden of proof on factor four.

Summarizing the foregoing analysis, factors one, three, and four favor fair use, while factor two is neutral. Weighing these factors together, and weighting them as directed, the Court finds that Professor Dixon's use of *The Slave Community* constitutes a fair use.

> 26. *African American Single Mothers: Understanding Their Lives and Families* (Bette Dickerson ed., Sage 1995)

Professor Dixon also assigned chapter seven of *African American Single Mothers* to students in her fall 2009 African American Family course [Tr. Vol. 9, Doc. 407 at 60; Pls. Ex. 542]. The excerpt, pages 117-145, titled "African American Children in Single-Mother Families," is 29 pages long, which is 12.5% of the 232-page book [Pls. Ex. 202]. The assigned reading was authored by Suzanne M. Randolph [Id.].

Fair Use Analysis

Factor one favors fair use.

Factor two analyzes the nature of the work. *African American Single Mothers* is an academic work that aims to provide a broad picture of issues affecting the lives of African American single mothers. The book explores the ways in which modern society evaluates motherhood, and contrasts these evaluations with the perception of single motherhood in the African American culture. The book also explores institutional issues faced by single African American mothers, such as the varying levels of support available in raising their children, and proposes policies and strategies to provide more equal opportunities to all single mothers.

Chapter seven, titled "African American Children in Single-Mother Families," collects various studies and data about single mothers and African American children to reach conclusions about the challenges facing single mother African American families.    The chapter starts with general findings concerning the relative success of children with one or two parents, the impact of reduced income due to a single parent household, and the role of a child in a single parent household.    The chapter goes on to investigate other factors which weigh on single mother families, including differences in male and female children of single mothers, various potential family structures (such as grandparents living with the family) and the effect on children, and the effect of spirituality and community on a child's development.    The chapter concludes by identifying gaps in the research surveyed by the chapter and recommends future steps to fill those research gaps.

Chapter seven is primarily objective, using previous studies on single mothers and African American communities.    The author occasionally provides her own opinion in the form of summary paragraphs following the discussion of previous studies.    The author's opinions appear to come from her analysis of the studies mentioned earlier in the chapter.    The chapter is written in a formal tone with no fanciful elements.    Given these details about chapter seven, factor two is neutral.

Factor three asks whether the quantity and quality of the excerpt used is fair, given the purpose and character of the use and the impact of market substitution.    The outcome on factor three is close.    "African American Children in Single-Mother Families" spans 29 pages, or 12.5% of the 232-page book [Pls. Ex. 460].    This is a

large percentage of the overall book and a fairly large number of pages. Taking into account both the educational purpose served by Professor Dixon's use of the excerpt and the impact of market substitution the amount used borders on being excessive, even though chapter seven is not the heart of the book.

These facts alone do not meet Defendants' burden of proof. However, the Court finds that the price which would have been required by Oxford (via CCC) for permissions to make digital copies of this excerpt ($250.80)[31] would have been excessive. This price reflects that the excerpt would be made available to 59 students, but CCC's and Oxford's marginal cost for authorizing digital copies would be virtually nil and would not vary no matter how many digital copies were authorized. This allows the Court to look more favorably on the quantity of Professor Dixon's use than it otherwise would, so as to more closely realign the cost to reasonable cost. Having added this consideration, and taking into account that the value taken (one chapter which is not the heart of the work) is not too great, Defendants meet their burden of proof on factor three. Factor three weighs in favor of fair use.

Factor four requires assessment of the effect of Defendants' use on the value of the copyrighted work and the potential market for the copyrighted work. Digital permissions of *African American Single Mothers* were available from Sage in 2009 [Pls. Ex. 206]. Professor Dixon's unpaid use of excerpts of the book deprived Sage of less than $203.61 in net revenues in permissions. Order at 215, 215 n.100; Becker at 1304, 1304 n.100. If "everyone" allowed unpaid use of

---

[31]Jt. Ex. 5, Doc. 266-4 at D-37.

copyrighted excerpts, this could cause substantial harm to the value of the copyrighted work. It could also cause substantial harm to Sage's expectation of permissions income, in turn impacting the potential market for the copyrighted work. This consideration initially moves factor four against fair use.

Based on the Court of Appeals' Opinion, however, Defendants may still prevail on factor four if they can show that widespread availability of unpaid copying would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276.

The documentary evidence demonstrates that *African American Single Mothers* has had sporadic book sales beginning about three years after its publication in 1995. The book sales data for the work is listed below:

| Year | Net Revenue |
|------|-------------|
| 1995 | $20,671.69 |
| 1996 | $11,805.31 |
| 1997 | $7,061.53 |
| 1998 | $1,460.53 |
| 1999 | $876.17 |
| 2000 | $3,045.11 |
| 2001 | -$487.74 |
| 2002 | $802.64 |
| 2003 | $549.23 |
| 2004 | $2,473.47 |
| 2005 | $1,567.16 |
| 2006 | $870.61 |
| 2007 | $1,302.00 |

| | |
|---|---|
| 2008 | $675.48 |
| 2009 | $334.66 |
| 2010 | $0.00 |
| **Total** | **$53,007.85** |

[Pls. Ex. 206].

Permissions sales for *African American Single Mothers* since 1995 are shown in the following table:

| Year | APS | ECCS | In-House | Total |
|---|---|---|---|---|
| 1995 | No Evidence | No Evidence | $0.00 | $0.00 |
| 1996 | No Evidence | No Evidence | $0.00 | $0.00 |
| 1997 | No Evidence | No Evidence | $58.10 | $58.10 |
| 1998 | No Evidence | No Evidence | $254.43 | $254.43 |
| 1999 | No Evidence | No Evidence | $157.79 | $157.79 |
| 2000 | No Evidence | No Evidence | $114.36 | $114.36 |
| 2001 | No Evidence | No Evidence | $59.05 | $59.05 |
| 2002 | No Evidence | No Evidence | $49.57 | $49.57 |
| 2003 | No Evidence | No Evidence | $631.87 | $631.87 |
| 2004 | $0.00 | $73.44 | $342.41 | $415.85 |
| 2005 | $140.45 | $302.94 | $266.22 | $709.61 |
| 2006 | $11.02 | $207.47 | $382.81 | $601.30 |
| 2007 | $0.00 | $198.29 | $86.29 | $284.58 |
| 2008 | $0.00 | $0.00 | $198.29 | $198.29 |
| 2009 | $0.00 | $0.00 | $40.38 | $40.38 |
| 2010 | $0.00 | $0.00 | $0.00 | $0.00 |
| **TOTAL** | **$151.47** | **$782.14** | **$2,641.57** | **$3,575.18** |

[Pls. Exs. 206, 208].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time the alleged infringement occurred. Also, it pertains to damage to

118

the value of the copyrighted work in 2009.   For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

The evidence shows that, as of 2009, there was little to no likelihood of multiple future sales of either the book or permissions. Also, Defendants' actions and those of any others caused no damage to book sales. See Op. at 94; Patton, at 1276.   Thus, the Court finds that no substantial damage was done to the potential market for the copyrighted work or to the value of the copyrighted work.   Also, so long as there is any possible interest in permissions, Sage would continue to make them available. As long as permissions are available the copyrighted work remains in publication. Defendants have carried their burden.   Factor four favors fair use.

Summarizing the above analysis, factors one, three, and four favor fair use and factor two is neutral.   Weighting all factors as directed by the Court of Appeals, Professor Dixon's use of *African American Single Mothers* was fair.   Sage's claim of copyright infringement on this work fails.

> 27.  *Black Children: Social, Educational, and Parental Environments (Second Edition)* (Harriette Pipes McAdoo ed., Sage 2001)

Professor Dixon also assigned chapter six of *Black Children: Social, Educational, and Parental Environments (Second Edition)* ("*Black Children*") edited by Harriette Pipes McAdoo, for her classes during the week of November 17-19 [Tr. Vol. 9, Doc. 407 at 63-65; Pls. Ex. 542].   That chapter (pages 73-96), titled "Racial Identity Development in African American Children: Cognitive and Experimental

119

Antecedents," is 24 pages in length, and comprises 9.38% of the 256-page copyrighted work [Pls. Ex. 209].  The chapter was written by Carolyn Bennett Murray and Jelani Mandera [Id.].

## Fair Use Analysis

Factor one favors fair use.

Factor two requires a determination of the nature of the work. *Black Children* is an academic work which explores the unique aspects of African American child development.  The book works through four environments which critically affect any child's development: (1) the socioeconomic environment; (2) the parental environment; (3) the internal environment as it relates to racial attitudes and socialization; and (4) the educational environment.  These four environments are examined throughout the book with a particular focus on how the African American child's experience differs from that of other non-African American children.

Chapter six, "Racial Identity Development in African American Children: Cognitive and Experimental Antecedents," addresses the cognitive growth of children, with a specific focus on African American children's understanding of race.  Viewing the child's development as a collection of different processes, the chapter discusses cognitive readiness, racial awareness, and the role of skin color, media, and public school curriculum in shaping a child's understanding of race.  These influences support the chapter's thesis that multiple aspects of society lead African American children to either identify as white or view white skin as the optimal skin color.    The chapter concludes with methods parents can use to normalize and foster positive skin color associations in African American children.

120

Chapter six is objective, with the majority of the chapter spent citing previous studies on child development. The authors offer some opinions, as well as subjective summaries, at the end of their restatements of previous studies. The chapter maintains a formal tone throughout its analysis, and does not contain any fanciful language or aspects which appear to stem from the authors' personal experience. Factor two is neutral.

Factor three addresses whether the quantity and quality of the work used is fair, given the nature of the use and the impact of market substitution. Chapter six is 24 pages, or 9.38% of the total book [Pls. Ex. 209]. This is a small percentage of the book, especially given the educational nature of Professor Dixon's use. While a whole chapter was used, it is not the heart of the work. As Professor Dixon testified, chapter six is "just one component or aspect of black children" [Doc. 407 at 65]. Relatedly, Professor Dixon adequately tailored the selection to fulfil the pedagogical purpose of her course. Substitution impact is adequately mitigated by the number of pages in the excerpt. Taking all of this into account, factor three favors fair use.

Turning to factor four, digital permissions were available to make excerpts of *Black Children* in 2009. Unpaid use by members of Professor Dixon's class cost Sage less than $168.50 in net revenue from permissions. Order at 218, 218 n.101; Becker at 1306, 1306 n.101. Professor Dixon's use, therefore, had an actual, though tiny, effect on the value of Sage's copyright in *Black Children*. If other colleges and universities allowed use of unpaid excerpts of copyrighted books, damage could be caused to the potential market for

and the value of the copyrighted work. This initially causes factor four to disfavor fair use.

Based on the Court of Appeals' Opinion, however, Defendants may still prevail on factor four if they can show that widespread availability of unpaid copying would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276.

Since its publication in 2001, *Black Children* has had net revenue from book sales as follows:

| Year | Book Sales |
|------|------------|
| 2001 | $11,942.70 |
| 2002 | $20,589.24 |
| 2003 | $19,026.90 |
| 2004 | $21,055.74 |
| 2005 | $17,791.56 |
| 2006 | $4,302.71 |
| 2007 | $5,747.00 |
| 2008 | $891.89 |
| 2009 | $2,219.36 |
| 2010 | $1,261.62 |
| **Total** | **$104,828.72** |

[Pls. Ex. 214].

Permissions income has been as follows:[32]

---

[32]These figures are lower than the totals provided in Pls. Ex. 216, but that exhibit also includes permissions income Sage earned on APS and ECCS permissions for the first edition of *Black Children*.

122

| Year | APS | ECCS | In-House | Total |
|------|-----|------|----------|-------|
| 2001 | No Evidence | No Evidence | $39.00 | $39.00 |
| 2002 | No Evidence | No Evidence | $0.00 | $0.00 |
| 2003 | No Evidence | No Evidence | $63.00 | $63.00 |
| 2004 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2005 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2006 | $45.90 | $0.00 | $0.00 | $45.90 |
| 2007 | $97.41 | $56.61 | $56.61 | $210.63 |
| 2008 | $226.82 | $0.00 | $164.53 | $391.35 |
| 2009 | $123.52 | $26.78 | $418.50 | $568.80 |
| 2010 | $198.25 | $0.00 | $351.49 | $549.74 |
| Total | $691.90 | $83.39 | $1,093.13 | $1,868.42 |

[Pls. Exs. 214, 216].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time the alleged infringement occurred. Also, it pertains to damage to the value of the copyrighted work in 2009. For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

The evidence shows that, as of 2009, there was a small likelihood of some future repetitive use of unpaid excerpts of *Black Children*. But Defendants' actions did not harm sales of the copyrighted book. It is unlikely that Defendants' actions (or those of others) substantially damaged the potential market for the copyrighted work or the value of the copyrighted work. The Court is also persuaded that any damage would not have incentivized Sage to discontinue publication of the work. So long as there is any

123

possible interest in excerpts, Sage will likely continue making them available via digital permissions, for which there is little to no marginal cost.   Defendants thus carry their burden.   Factor four favors fair use.

Reviewing the Court's earlier analysis, factors one, three, and four favor fair use and factor two is neutral.   Weighting these factors as directed, and considering them together, Professor Dixon's use of *Black Children* qualifies as a fair use, defeating Sage's copyright infringement claim.

> 28.   *Black Families (Third Edition)* (Hariette Pipes McAdoo ed., Sage 1996)

Professor Dixon also assigned her fall 2009 African American Family students chapter 12 (pages 214-233) of *Black Families (Third Edition)* [Tr. Vol. 9, Doc. 407 at 65-67; Pls. Ex. 524].   That chapter, titled "Out There Stranded? Black Families in White Communities" ("Out There Stranded"), written by Beverly Daniel Tatum, is 20 pages long, which represents 4.81% of the 416-page copyrighted work [Defs. Ex. 749].

Fair Use Analysis

Factor one favors fair use.

Factor two requires the Court to determine the nature of the copyrighted work.   *Black Families* is an academic work that collects various perspectives on black families.   The purpose of the work is to highlight the pressures faced by black families in modern society. Sections of the book cover historical conceptualizations of African American families; economics and social mobility; socialization and gender relations; and advocacy and family policies in society.

124

Chapter 12, "Out There Stranded?," focuses on the experience of black children who have grown up in predominantly white communities. The chapter discusses parents' concerns about the lack of community for their children as compared to during their own upbringing, racism at public schools, and the children's struggles in coming to age in a primarily white community.

Chapter 12 has two subparts. The first half of the chapter, which reports the parents' concerns, is objective. The author relies on other studies to provide analysis and insight on parents' views of their children's experience. The other half of the chapter, which focuses on the children's views, relies on a study performed by the author herself. Both parts contain the author's opinion: some come from her analysis of the previous literature, while others involve opinions based on her experience with black children raised in white communities. The chapter maintains a formal tone at all times. Because author opinion dominates, factor two disfavors fair use.

Factor three requires the Court to determine whether the quantity and quality of the work used is fair, given the purpose and character of the use and the impact of market substitution. "Out There Stranded" is a 20 page chapter, which is 4.81% of the 416-page book [Defs. Ex. 749]. This is a very small percentage of the book and a small number of pages, easily within the allowable quantity given the nonprofit, educational nature of the use. Similarly, the excerpt is sufficiently tailored to serve Professor Dixon's pedagogical purpose. The small number of pages also adequately mitigates market substitution. Although the use of a whole chapter captures more value than a part of a chapter, chapter 12 is not the

heart of the book.    Taking all of this into account, factor three favors fair use.

Factor four looks to the effect of Defendants' use on the value of and the potential market for the copyrighted work.    Digital permissions were available for excerpts of *Black Families* in 2009. Providing the class with unpaid excerpts of *Black Families* deprived Sage of less than $140.42 in net permissions revenue.    Order at 222, 222 n.104; Becker at 1308, 1308 n.104.    This unpaid use caused actual, but tiny, harm to the value of the copyright for *Black Families*.    If other universities and colleges allowed use of unpaid excerpts of copyrighted books, substantial damage could be done to the potential market for *Black Families*, and the value of the copyrighted work could be substantially damaged.    This consideration initially moves factor four to disfavor fair use.

Based on the Court of Appeals' Opinion, however, Defendants may still prevail on factor four if they can show that widespread unpaid copying of excerpts within college and university communities would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish [this particular] work."    Op. at 93; Patton at 1276.

The infringement alleged here involves the third edition of *Black Families*.    While the record contains no evidence of when the first edition was published, the second edition was published in 1988; the third edition, at issue here, was published in 1996; and a fourth edition was published in 2006 [Pls. Ex. 222].    The net book sales revenue for the third edition was as follows:

126

| Year | Book Sales |
|------|-----------:|
| 1995 | $38.32 |
| 1996 | $16,709.33 |
| 1997 | $36,440.18 |
| 1998 | $15,464.44 |
| 1999 | $9,804.23 |
| 2000 | $14,034.94 |
| 2001 | $23,900.23 |
| 2002 | $11,412.93 |
| 2003 | $4,651.50 |
| 2004 | $6,418.18 |
| 2005 | $4,991.64 |
| 2006 | $685.08 |
| 2007 | -$125.60 |
| 2008 | -$37.37 |
| 2009 | $0.00 |
| 2010 | $0.00 |
| **Total** | **$144,388.03** |

[Pls. Ex. 222]. The decline in book sales in 2006, 2007, 2008, 2009 and 2010 was likely brought about by the publication of the fourth edition in 2006.

Regarding the market for permissions to make excerpts of the work, the record shows the following sales:

| Year | APS | ECCS | In-House | Combined |
|------|-----|------|---------:|---------:|
| 1995 | No Evidence | No Evidence | $12.80 | $12.80 |
| 1996 | No Evidence | No Evidence | $688.54 | $688.54 |
| 1997 | No Evidence | No Evidence | $905.76 | $905.76 |
| 1998 | No Evidence | No Evidence | $93.44 | $93.44 |
| 1999 | No Evidence | No Evidence | $537.06 | $537.06 |

| 2000 | No Evidence | No Evidence | $257.29 | $257.29 |
| 2001 | No Evidence | No Evidence | $86.72 | $86.72 |
| 2002 | No Evidence | No Evidence | $830.26 | $830.26 |
| 2003 | No Evidence | No Evidence | $634.90 | $634.90 |
| 2004 | $59.97 | $0.00 | $239.62 | $299.59 |
| 2005 | $92.82 | $61.20 | $227.30 | $381.32 |
| 2006 | $0.00 | $136.68 | $122.40 | $259.08 |
| 2007 | $0.00 | $142.80 | $172.82 | $315.62 |
| 2008 | $0.00 | $124.44 | $158.30 | $282.74 |
| 2009 | $0.00 | $159.46 | $134.64 | $294.10 |
| 2010 | $135.66 | $0.00 | $88.06 | $223.72 |
| Total | $288.45 | $624.58 | $5,189.91 | $6,102.94 |

[Pls. Exs. 222, 224].

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the time the alleged infringement occurred. Also, it pertains to damage to the value of the copyrighted work in 2009. For both, the Court assumes that "everybody" (all colleges and universities) had programs similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Defendants' use of unpaid excerpts in 2009 had no impact on the potential market for the book. See Op. at 94; Patton at 1276. Assuming the widespread acceptance of programs like Georgia State's, the potential permissions market in 2009 may have been slightly impacted. However, competition from the fourth edition would likely undercut those potential permissions sales for the third edition. Taking all of that into account, the Court also finds that Defendants' use (and that of any others) likely did not cause

128

substantial damage to the potential market for the copyrighted <u>work</u>. It also did not cause substantial damage to the value of the copyrighted work in 2009. The Court finds it unlikely that Sage would withdraw excerpts of the work from the permissions market so long as there is any possible demand for excerpts, because making digital excerpts available will always be net positive to Sage. Factor four, therefore, favors fair use.

In summary, factors one, three, and four favor fair use, while factor two disfavors fair use. In weighing the four factors together, the Court adjusts the weights of the factors as directed in the Court of Appeals' Opinion. This yields a determination that Professor Dixon's use was a fair use. Sage's claim of infringement of *Black Families* fails. Defendants have carried their burden, and Professor Dixon's use qualifies as a fair use.

F.    Professor Hartwig

Professor Melinda Hartwig is a professor in the Art History department at Georgia State [Tr. Vol. 9, Doc. 407 at 26-27].

<u>AH 4900 Materiality of Ancient Egyptian Painting, Fall 2009</u>

During the fall 2009 semester, Professor Hartwig taught a course titled "AH 4900: The Materiality of Ancient Egyptian Painting" [<u>Id.</u> at 29, Pls. Ex. 550]. AH 4900 is a seminar for undergraduate and graduate students that examines historical and material aspects of ancient Egyptian art [<u>Id.</u>]. Thirteen students were enrolled in Professor Hartwig's course during the fall 2009 semester [Jt. Ex. 5 at D-41]. There were no required textbooks for the course, and all assigned readings were made available through ERES [Pls. Ex. 550].

29. *Ancient Egyptian Materials and Technology* (Paul T. Nicholson & Ian Shaw eds., Cambridge 2000)

Professor Hartwig made available two excerpts from *Ancient Egyptian Materials and Technology* ("*Egyptian Materials*") [Tr. Vol. 9, Doc. 407 at 33-36; Pls. Ex. 550]. The excerpts were: (1) a portion of chapter two (pages 44-54), titled "Stone," by Barbara Aston, James Herrel, and Ian S. Shaw, and (2) the entirety of chapter four (pages 104-120), titled "Painting Materials," by Lorna Lee and Stephen Quirke [Doc. 407 at 33-36; Pls. Ex. 550]. The two excerpts span 28 pages and constitute 3.87% of the 724-page copyrighted work [Pls. Ex. 6].

## Fair Use Analysis

Factor one favors fair use.

Turning to factor two, *Egyptian Materials* is an academic reference work that discusses the materials and methods used by Egyptians to construct various aspects of their society. The book covers organic, inorganic, and food materials, with each chapter focusing on a single object (such as woods, metals, or meats). The specific chapter structures vary depending on the material discussed, but they generally review sources for the material, methods for its production, and common uses in ancient Egypt.

The first excerpt used by Professor Hartwig (pages 44-54) was taken from chapter two, titled "Stone." The chapter discusses various stones used in ancient Egypt. The chapter follows an identical format for each stone identified: the section provides the definition, Egyptian source, description, uses, and examples. Specific stones covered by this page range include marble, obsidian, and quartz.

The first excerpt is wholly objective, restating facts and details about the stones in question. It is written in a formal tone, and is devoid of any fanciful language. At no point does the excerpt move from the dry facts about the stones to a subjective discussion, and the information contained in the excerpt does not come from the author's experience or opinion.

The second excerpt (pages 104-120) is the entirety of chapter four of the book, titled "Painting Materials." The chapter provides information about different painting materials with a focus on pigments. The chapter opens by discussing a pigment analysis the authors performed with the British Museum. The authors explain how their methods and results from the British Museum study provide additional information to the already existing body of ancient Egyptian pigment scholarship. The chapter then discusses various pigments, drawing on both the authors' work and historical scholarship to explain where the color has been found and how the color was produced. The chapter ends with a brief discussion of painting mediums, such as stone, plaster, papyrus, and wood.

Chapter four is wholly objective, relying on previous color studies to discuss ancient Egyptian pigments and mediums. The authors rely, in part, on a study they performed, but this study was merely a factual evaluation of various physical evidence. Other than their reliance on the objective results of their study, the authors' opinion or analysis is absent from the chapter. With this in mind, both excerpts favor a finding of fair use under factor two.

Factor three directs the Court to assess the quantity and quality of the excerpt in light of the purpose of the use and the harm of market substitution. Here, Professor Hartwig uploaded 28

131

pages, totaling 3.87% of the 724-page book [Pls. Ex. 6], which is a very small percentage, especially in light of the nonprofit, educational nature of Professor Hartwig's use. Use of these excerpts also fit Professor Hartwig's pedagogical purpose. The excerpts in question include one whole chapter plus part of another chapter, but neither is the heart of the work. Finally, the impact of market substitution is nonexistent, as digital permissions licensing was not available for the work in 2009. Factor three favors fair use.

Factor four looks to the effect of Defendants' use on the value of the copyrighted work and the potential market for the work. Cambridge has provided no evidence that digital permissions for *Egyptian Materials* were available in 2009. The only evidence provided by Cambridge of any sales is of £170,793 in book sales from the date of publication through October 2010 [Pls. Ex. 13]. Accordingly, the unpaid use did not actually harm Cambridge, as digital permissions were not available. Similarly, as there were no digital permissions, Defendants' unpaid use that year did not cause any harm to the potential market for the copyrighted work. See Op. at 99; Patton at 1278. Factor four favors fair use.

Summarizing the analysis above, factors one, two, three, and four all favor fair use. The use of *Egyptian Materials* by Professor Hartwig was a fair use. Cambridge's claim that Professor Hartwig's use infringed their copyright fails.

G.   Professor Kim

YouJin Kim is a professor in the Applied Linguistics and English as a Second Language ("ESL") Department at Georgia State [Tr. Vol. 6, Doc. 404 at 96].

132

AL 8550 Second Language Evaluation and Assessment, Fall 2009

In the fall semester of 2009, Professor Kim taught AL 8550, or "Second Language Evaluation and Assessment" [Id.; Pls. Ex. 519]. The course was offered to in-service and pre-service[33] teachers who wanted to become second-language teachers in English, French, and Spanish [Doc. 404 at 140]. The course sought to acquaint students with existing testing items and to help them design and score effective classroom-based tests [Id.]. There was a required textbook in the course, and additional required and optional readings uploaded to uLearn and ERES [Pls. Ex. 519; Doc. 404 at 101].

> 30. *Fundamental Considerations in Language Testing* (Lyle Bachman, Oxford 1990)

One optional reading that Professor Kim uploaded to uLearn was an excerpt from *Fundamental Considerations in Language Testing* ("*Fundamental Considerations*"), by Lyle F. Bachman [Doc. 404 at 101, 147; Pls. Ex. 519]. The excerpt consisted of pages 81-110 (30 pages), or chapter four: "Communicative language ability" [Pls. Ex. 406]. The excerpt constituted 7.14% of the 420-page book [Id.].

Fair Use Analysis

Factor one favors fair use.

With respect to factor two, *Fundamental Considerations* is an academic book. It is part of a series on teaching language that contains 23 other books. The book seeks to provide a conceptual foundation for answering practical questions related to the

---

[33]"In-service" refers to students already working as teachers, and "pre-service" refers to students planning to become teachers [Doc. 404 at 140].

development and use of language tests.  The book adopts a broad view of language ability, or a "communicative language ability" approach, which assumes that language is more than a simple transfer of information.  Communicative language ability presumes that language is a dynamic interaction between the situation, the user, and the discourse.  With this view in mind, each of the book's eight chapters discusses a related set of issues relevant to the development and use of language tests and language testing research.

Chapter four, which Professor Kim uploaded to uLearn, describes in detail the "communicative language ability" conceptual framework. The chapter begins by describing the limitations of several alternative language ability models, and then provides an overview of the author's proposed framework for communicative language ability. The author's framework contains three primary components: (1) language competence, or specific knowledge of a language, such as vocabulary and grammar; (2) strategic competence, which encompasses dynamic skills for assessing the context of a communication and negotiating meaning; and (3) psychophysiological mechanisms, which include visual and auditory functions, and receptive and productive channels of communication.  The bulk of chapter four fleshes out these three components and their subcategories.

Overall, the tone of chapter four is informative, and the chapter is mostly straightforward and explanatory.  The author frequently uses large passages from others' writings to describe the framework's subcomponents or to provide related models that served as precursors to the communicative language ability framework.  The author occasionally uses illustrative examples that are light and even humorous, some of which are based on his own personal

134

experiences and some of which are borrowed from others' experiences and writings. As described in chapter four, the communicative language ability framework is largely built from substantive research conducted by people other than the author; however, the author appears to be responsible for the precise composition described. The substance of the chapter is fairly split between the author's own analysis and descriptions of others' work. Accordingly, factor two is neutral, and it weighs neither for nor against fair use.

Moving to factor three, Professor Kim uploaded one full chapter of the work. The excerpt consisted of 30 pages, or 7.14% of the entire work [Pls. Ex. 406]. Thus, the percentage copied was small, especially considering the educational nature of the use. Further, the use served Georgia State's important pedagogical aims, and no evidence exists to demonstrate a digital permissions market for excerpts of *Fundamental Considerations* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. With respect to the quality of the work copied, on the one hand, the chapter at issue is integral to the overall work; however, it is not the heart of the work. To be sure, chapter four provides an overarching framework for understanding the components of language ability that language testers are interested in testing, but it only tangentially discusses language testing, which is the focus of the overall work. Considering also that the quantity of copied material was small and that it did not constitute the heart of the work, yet taking into account the impact of market substitution, the excerpt uploaded by Professor Kim was not excessive. For these reasons, factor three favors fair use.

As for factor four, there is no evidence in the record that digital licensing permissions were available for *Fundamental Considerations* in 2009.   However, Oxford earned £151,242.15 in revenue from book sales between the book's publication and November 2010. See Order at 237-38, 238 n.106; Becker at 1315, 1315 n.106. As no digital market for the work existed in 2009, and Defendants' use caused no harm to the potential market for the copyrighted book, it follows that Defendants' unpaid use that year did not cause any harm to the potential market for the copyrighted work.   See Op. at 99; Patton at 1278.   For the same reasons, Defendants' unpaid use of excerpts of *Fundamental Considerations* did not cause substantial damage to the value of the copyrighted work. Factor four tips in favor of fair use.

Accordingly, factors one, three, and four favor fair use, and factor two is neutral. Taking all factors into account and weighting them as directed by the Court of Appeals, Defendants have carried their   burden.     Georgia   State's   unpaid   use   of   *Fundamental Considerations* was a fair use.

31.   *Assessing Speaking* (Sari Luoma, Cambridge 2004)

Among the required readings that Professor Kim uploaded to uLearn for her fall 2009 AL 8550 course were two excerpts from *Assessing Speaking* by Sari Luoma [Pls. Ex. 519].     The excerpts consisted of two full chapters of the eight chapter work [see id.; Pls. Ex. 34; Tr. Vol. 6, Doc. 404 at 108]. Specifically, Professor Kim uploaded chapter four, "Speaking scales," which is pages 59-95 (37 pages), and chapter seven, "Developing speaking tasks," which is pages 139-169 (31 pages) [Pls. Exs. 34, 519]. Combined, the excerpts total 68 pages, or 29.82% of the 228-page book [Pls. Ex. 34].

136

Fair Use Analysis

Factor one favors fair use.

With respect to factor two, *Assessing Speaking* is one part of the eleven volume "Cambridge Language Assessment Series" [Pls. Ex. 34]. The work discusses problems with assessing speaking in the language learning context, and provides a readable overview of literature on the topic. *Assessing Speaking*'s target audience includes teachers and researchers interested in reflecting on speaking assessment practices and developing new assessment methods. A constant theme throughout the work is that speaking assessment in language learning takes place in a cycle, wherein each stage relates to and informs the following stages.

The first uploaded excerpt is pages 59-95, or chapter four, which covers the nature and development of speaking scales. "Speaking scales" refers to the ratings used in assessing a language learner's ability to speak a target language. The author begins the chapter by describing six examples of existing speaking scales. For each example, she identifies and compares different features of the scales. The next portion of the chapter discusses concerns in developing speaking scales, such as the number of levels each scale should include to distinguish between degrees of ability, and the number and type of criteria that should be included to describe performance at each level. Chapter four moves on to discuss intuitive, qualitative, and quantitative methods for developing speaking assessment scales. To conclude, chapter four summarizes research on the progression of speaking ability in fluency, pragmatic skills, and grammar.

Most of chapter four describes existing speaking scales and previous research on their development. Much of the page count in chapter four is devoted to tables wherein the example scales are reproduced from other sources. However, the chapter also contains the author's own synthesis of the research and literature in a way that is instructive and analytical, in that it highlights the advantages and disadvantages to the various scales, features, and development methods.

The second uploaded excerpt is chapter seven, which focuses on developing tasks for assessing speaking. In the chapter, the author provides eighteen examples of various speaking tasks, such as descriptive, narrative, or comparing/contrasting tasks. For each example, the author explains the general task category, the advantages and disadvantages of the type of task or the particular example used, and the testing purposes that would likely require or benefit from each type of task. In the second portion of the chapter, the author discusses practical issues with task design, like writing "task specifications" or blueprints for the task, creating the actual materials for the task, and crafting the instructions for the task. The task examples, which dominate chapter seven, are taken or adapted from other sources. The discussions for each example are more descriptive than analytical; however, they contain some analytical features. The smaller segment of the chapter on practical considerations in task design is partly objectively descriptive, and partly based on the author's own experiences.

Overall, the excerpts at issue contain elements of the author's own analysis and subjective description; however, the excerpts are

138

predominated by examples from and reproductions of others' works. Accordingly, factor two is neutral.

Turning to factor three, Professor Kim uploaded two full chapters, or 68 pages of *Assessing Speaking* [Pls. Ex. 34]. The uploaded portion constitutes 29.82% of the entire work [Id.]. The unpaid use of full chapters leans against fair use because each chapter of a work covers a cohesive topic. Copying two full chapters greatly compounds this tendency. Moreover, Georgia State used a very substantial percentage of the book. However, to the extent that factor three considers the impact of market substitution, the impact here is nonexistent, as no evidence exists to demonstrate a digital permissions market for excerpts of *Assessing Speaking* in 2009. Georgia State's use promoted its pedagogical aim; however, the portion uploaded is simply too large to support a finding of fair use. In light of these considerations, factor three weighs strongly in favor of Plaintiffs, and against fair use.

As to factor four, there is no evidence that digital permissions were available for *Assessing Speaking* in 2009. The record demonstrates that Cambridge earned £58,893.00 in revenue from book sales from the date of publication through the end of January 2011 [Pls. Ex. 37]. As there was no digital market for the work at the time of Georgia State's use, it follows that Georgia State's use did not actually harm the market, and also that the use would not likely cause substantial market harm even if "everybody did it." See Op. at 99, Patton at 1278 ("If the market for digital excerpts were in fact de minimis or zero, then neither Defendants' particular use nor a widespread use of a similar kind would be likely to cause significant market harm."). Defendants' use did not cause damage to the value of

139

Oxford's copyrighted work.  Accordingly, factor four weighs in favor of fair use.

In this instance, factors one and four favor fair use, factor two is neutral, and factor three disfavors fair use.  The Court weights these factors as directed and also gives factor three extra weight on account of the strength of the evidence on that factor. Weighing all factors together, the Court finds that the outcome favors fair use.  Defendants succeed in proving that the use of *Assessing Speaking* was a fair use.

32. *Learning Vocabulary in Another Language* (I.S.P. Nation, Cambridge 2001)

For her AL 8550 course, Professor Kim uploaded to uLearn an excerpt from *Learning Vocabulary in Another Language*, by I.S.P. Nation [Pls. Ex. 519; Tr. Vol. 6, Doc. 404 at 105].  She specifically uploaded pages 344-379 (36 pages), or chapter ten: "Testing vocabulary knowledge and use" [see Pls. Exs. 519, 125].  The uploaded excerpt was 7.33% of the 491-page work.  When she designed the syllabus, Professor Kim initially marked the excerpt as required reading, but she later pinpointed a few required examples from the chapter [Doc. 404 at 144].

Fair Use Analysis

Factor one favors fair use.

Factor two directs the Court to examine the nature of the work. *Learning Vocabulary in Another Language* is part of the "Cambridge Applied Linguistics Series" [Pls. Ex. 125].  The total work consists of eleven chapters, with each chapter focusing on a different aspect of learning vocabulary.  The work was designed for second and foreign language teachers.

140

Chapter ten, the specific excerpt at issue, covers testing vocabulary. It is structured around questions that second language teachers typically ask about vocabulary testing. For example, the chapter starts with the question, "What kind of vocabulary test is best?" After providing several vocabulary test item examples, the author explains that the test-maker must first determine what he or she wants to test and the target degree of difficulty. The chapter then gives a relatively thorough discussion of existing research regarding vocabulary testing items. The author provides practical advice about which test items are most effective in various settings, and for adjustments that test-makers might make in order to isolate an examinee's specific knowledge or to vary the level of difficulty. The chapter moves on to examine targeted areas of vocabulary testing, such as how to measure words the learners do not know well and learners' total vocabulary size. In its final section, chapter ten discusses purposes for which vocabulary tests may be given--to diagnose weaknesses, to test short- or long- term achievement, or to evaluate proficiency--and the features of tests given for each specific purpose.

Overall, the tone of the chapter is informative, and the writing is straightforward. The chapter contains an in-depth discussion of research--both the author's own research and others' research--on vocabulary testing. Chapter ten contains several large tables, which were presumably created by the author. The chapter's unique organizational format of ordering the discussion and research around teachers' typical questions seems to be the result of the author's own analysis. In sum, the chapter is fairly split between the author's analysis and objective descriptions of others' research.

Thus, factor two is neutral, and it weighs neither for nor against fair use.

With respect to factor three, Professor Kim uploaded an entire chapter. The 36-page excerpt was 7.33% of the 491 pages in *Learning Vocabulary in Another Language*. Quantity wise, the overall percentage of the work used is small. The excerpt furthered the course's pedagogical purpose, and no evidence exists to demonstrate a digital permissions market, or any market substitution, for excerpts of *Learning Vocabulary in Another Language* in 2009. Quality wise, a whole chapter has more value than part of a chapter. However, chapter ten is not any more or less important than any other chapter and is not the heart of the work. In particular, the book as a whole covers the broad subject of learning vocabulary, while chapter ten focuses on the narrow facet of vocabulary testing as a tool for learning vocabulary. Insofar as factor three acts as a heuristic for the effect of Defendants' use on the market for the work, the market impact is acceptable (though barely so). Because Georgia State used a small portion of *Learning Vocabulary in Another Language,* which was not the heart of the work, and the copied portion does not indicate undue harm from market substitution, factor three tips in favor of fair use.

As for factor four, the record contains no evidence that digital permissions were available for *Learning Vocabulary in Another Language* in 2009. Cambridge earned £151,583.00 in revenue from book sales between May 20, 2002 and January 31, 2011 [Pls. Ex. 128]. As no digital market for the work existed in 2009, and Defendants' use caused no harm to the potential market for the copyrighted book, it follows that Defendants' unpaid use that year did not cause any harm

142

to the potential market for the copyrighted work.  See Op. at 99; Patton at 1278.  By the same token, Defendants' use caused no damage to the value of the copyrighted work.  Factor four thus weighs in favor of fair use.

Here, factors one, three, and four favor fair use, and factor two is neutral.  Mindful of the factors' relative weight, the Court is persuaded that Georgia State has discharged its burden of demonstrating that its use of *Learning Vocabulary in Another Language* was a fair use.

H.   Professor McCombie

Dr. Susan McCombie is a professor at Georgia State who teaches in the Department of Anthropology [Pls. Ex. 536].

## ANTH 4440/6550 Epidemiology and Anthropology, Fall 2009

Professor McCombie taught a course called "Epidemiology and Anthropology," or ANTH 4440/6440, at Georgia State in the fall semester of 2009 [Id.].  The course covered the basic principles of epidemiology, including disease outbreak investigation, disease control, and analysis of risk factors [Id.].  For the course, Professor McCombie required one textbook, and recommended a second textbook.  The remainder of the course readings were uploaded onto ERES, or provided through other means.

> 33.  *International Health Organisations and Movements 1918-1939* (Paul Weindling ed., Cambridge 1995)

One such reading uploaded to ERES was an excerpt from *International Health Organisations* [Id.].  Professor McCombie assigned and caused to be uploaded to ERES, chapter 11, or pages 222-243 (22 pages) [Id.].  Chapter 11 is titled: "The cycles of eradication: the Rockefeller Foundation and Latin American public

143

health (1918-1940)," by Marcos Cueto [Pls. Ex. 108].  The uploaded excerpt accounts for 6.20% of the total 355-page total work [Id.].

Fair Use Analysis

Factor one favors fair use.

As to factor two, *International Health Organisations* is part of the "Cambridge History of Medicine" series, and it is an academic work.  It contains 15 total chapters, each of which is comprised of a different study or examination on international health and welfare organizations between the First and Second World Wars.  The work seeks to provide a cohesive and integrated view on what the authors and editors believe to be a previously neglected area of study: the role of international organizations in promoting welfare.

Chapter 11 looks at the Rockefeller Foundation's ("RF") early twentieth-century disease eradication efforts in Latin America.  The chapter begins with a brief introduction regarding the political and economic factors that precipitated the United States' interest in disease eradication campaigns in the region, which led to the RF's involvement.  The author explains that three diseases in particular-- hookworm, yellow fever, and malaria--caught the RF's attention because they were perceived to be susceptible to termination through short-term efforts.  The author then provides a detailed, chronological discussion of the RF's campaigns for each disease. Although the results of the separate campaigns were mixed, enthusiasm for the goal of disease eradication was cyclical, or characterized by periods of "boom" and "bust."  To conclude, the author identifies several byproducts of the RF's disease eradication campaigns, including increased U.S. influence in Latin America.

144

"The cycles of eradication" is a straightforward and informative historical account of the RF's Latin American involvement. The chapter is an historical examination and is objectively descriptive. It is not evaluative or overtly analytical. While it draws on the author's historical research, it is not based on his own experiences. Accordingly, factor two weighs in favor of fair use.

Turning to factor three, Professor McCombie uploaded a full chapter of *International Health Organisations*, or 6.20% of the total work (22 pages) [Pls. Ex. 108]. The percentage and number of pages that Professor McCombie uploaded was small, taking into account that the excerpt was used to support Georgia State's pedagogical aims and the negligible market substitution effect given the lack of evidence of digital permission availability for *International Health Organisations* in 2009. As for the quality of the excerpt in relation to the overall work, the essay at hand was not any more or less important than the other chapters in *International Health Organisations*. "The cycles of eradication" certainly embodies the work's underlying theme; however, it provides only one of the many perspectives included in the work. Therefore, it is not the heart of the work. For these reasons, the excerpt uploaded for Professor McCombie's class was not excessive, and factor three tips in favor of fair use.

With respect to factor four, there is no evidence in the record that permissions licensing in any form--digital or otherwise--was available for *International Health Organisations* in 2009. Similarly, there is no evidence regarding a potential future market for digital permissions. While Cambridge earned £16,284.00 in revenue from book sales between the date of publication and November 7, 2010 [Pls. Ex.

112], Defendants' use did not harm Cambridge's book sales.  See Op. at 94; Patton at 1276.  Thus, Georgia State's use caused no actual harm in 2009 and it is unlikely that widespread use of unpaid excerpt copies would have caused substantial harm to the potential market for *International Health Organisations*.  Hence, Defendants' use did not impact the potential market for or the value of the copyrighted work. Accordingly, factor four favors fair use.

Factors one, two, three, and four each favor fair use in this instance.  Weighting the factors as directed and considering them together, the Court finds Georgia State has carried its burden, and its unpaid use of an excerpt from *International Health Organisations* was a fair use.

> 34.  *Evolution of Infectious Disease* (Paul W. Ewald, Oxford 1994)

Professor McCombie also assigned her ANTH 4440/6440 class an excerpt from *Evolution of Infectious Disease* by Paul W. Ewald, which was uploaded to ERES [Pls. Ex. 536].  The excerpt consisted of pages 15-34 (20 pages), or the whole of chapter two: "Symptomatic Treatment (Or How to Bind *The Origin of Species* to *The Physician's Desk Reference*)" [see id.; Pls. Ex. 388].  It constitutes 6.56% of the 305-page work [Pls. Ex. 388].

Fair Use Analysis

Factor one favors fair use.

Factor two looks to the nature of the work.  *Evolution of Infectious Disease* is an academic work aimed primarily at students and professionals in the health sciences.  The author seeks to integrate epidemiology and evolutionary studies for the benefit of modern science.  The author specifically purports to break with the

146

traditional view that parasites theoretically should evolve towards benign coexistence with their hosts.    This view, according to the author, contradicts both the evidence and natural selection.    The work is divided into 11 chapters, each of which focuses on a different aspect of the evolution of disease and its modern applications.

Chapter two applies the evolutionary perspective to disease symptoms.    The author disagrees with the admonition that one should not merely treat the symptoms of a disease because that assumes that symptoms are merely side effects of the disease.    The author argues that symptoms are better described as adaptations of a disease that benefit either the host (and serve as "defenses" of the host) or the parasite (which serve as "manipulations" of the host).    For instance, the author explains how a fever is a defensive symptom in instances where a pathogen cannot survive at the fever's higher temperatures. In six separate sections, the author discusses examples of symptoms that can be described as defensive, manipulative, or both. Additionally, the author discusses theoretical and practical treatment and policy implications for each classification.    In conclusion, the author restates his point that symptoms are not merely side effects of disease.

Chapter two is primarily scientific and informational; however, it is colored by the author's own broad hypothesis that the study of diseases and treatment can benefit from an evolutionary perspective. Despite the scientific subject matter, the tone is light, as the author includes several comical metaphors and asides.    Overall, while chapter two contains objectively descriptive elements, it is fairly dominated by the author's subjective analysis and evolutionary

147

framework, which surpass the bare facts. Consequently, factor two weighs against fair use.

Turning to factor three, Professor McCombie uploaded all of chapter two of *Evolution of Infectious Disease*, or 6.56% of the total work [Pls. Ex. 388]. The percentage of the overall work uploaded-- 6.56%--was small and the number of pages, 20, is small in light of the favored educational use. Additionally, no evidence exists to demonstrate a digital permissions market for excerpts of *Evolution of Infectious Disease* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. As for the quality of the excerpt uploaded, chapter two is valuable in that it is a discrete section that covers an entire topic. However, chapter two, which covers "symptomatic treatment," is not the heart of *Evolution of Infectious Disease*, which as a whole presents a broad and multifaceted hypothesis. The excerpt also furthered the pedagogical purpose of the course. Given all of these considerations, the portion of the work that Georgia State uploaded was not excessive, and factor three tips in favor of fair use.

Factor four looks to the effect on the market for and on the value of the copyrighted work, stemming from Defendants' unpaid use. There is no evidence that permissions were available for excerpts of *Evolution of Infectious Disease* digitally in 2009 or otherwise. Oxford earned £222,038.50 in revenue from book sales between the date of publication and November 7, 2010 [Pls. Ex. 357]; however, Defendants' use had no impact on book sales. Op. at 94; Patton at 1276. Therefore, Georgia State's unpaid use did not cause any harm to the potential market for the copyrighted work and had no impact on

148

the value of the copyrighted work. Accordingly, Georgia State has carried its burden and factor four favors fair use.

In sum, factors one, three, and four weigh in favor of fair use, and factor two weighs against fair use. As the three most substantial factors weigh in Georgia State's favor, and only the most insubstantial weighs against fair use, Georgia State has satisfied its burden with respect to this instance of infringement. Georgia State's use of *Evolution of Infectious Disease* was a fair use.

I.    Professor Anggoro

At the time of trial, Dr. Florencia Anggoro was no longer employed at Georgia State.

EPY 8960 Seminar in Educational Psychology, Fall 2009

Professor Anggoro taught a course in fall 2009 at Georgia State's College of Education [Defs. Ex. 610]. The course, EPY 8960, was a seminar in educational psychology titled "Culture, Language and Cognition," that sought to examine the empirical and theoretical approaches to understanding human thinking across languages and cultures. The syllabus indicated that there was no required course textbook, but all of the readings, including an excerpt from *Language Acquisition and Conceptual Development*, were available through ERES [Id.].

> 35.    *Language Acquisition and Conceptual Development*
> (Melissa Bowerman & Stephen C. Levinson eds.,
> Cambridge 2001)

The relevant excerpt consisted of pages 566-588 (23 pages), or the entirety of chapter 19: "Covariation between spatial language and cognition, and its implications for language learning." The excerpt constituted 3.75% of the 614-page book [Pls. Ex. 119].

149

Fair Use Analysis

Factor one favors fair use.

With respect to factor two, *Language Acquisition* is one volume of a three-volume series called "Language, Culture and Cognition." *Language Acquisition* is an academic collection of scholarly papers that synthesizes research in the areas of early cognition and language.  The book starts with the proposition that the fields of cognition and language acquisition had previously taken divergent paths, and suggests taking a unified approach in order to more closely examine human development in both capacities.  The book seeks to identify which cognitive processes children are biologically endowed with, which develop as a result of the child's environment and thus are susceptible to culture and language biases, and how the processes coalesce.  Its 19 total chapters are divided into four parts: (1) foundational issues; (2) constraints on word learning; (3) entities, individuation, and quantification; and (4) relational concepts in form-function mapping.

The excerpt at issue, chapter 19, is authored by Steven C. Levinson, who coedited the volume, and it is the final chapter in the work.  As the title suggests, the chapter proposes that cognition "covaries," or has a correlated variation with linguistic systems. It starts by describing three levels, or "degrees," of increasing complexity for "the mapping problem," or how children attach meaning to words.  The author suggests that some of children's language acquisition occurs at the most complex third-degree level, which presumes that children match language-specific words onto language-specific word meanings, which are in turn composed of non-universal

concepts. In support, the author discusses his own research findings that adults perform nonlinguistic cognitive tasks in line with the spatial frame of reference (i.e., relative, or "to the right of," or absolute, or "north of") employed in their native language. The author then uses these findings to support his overall thesis that the problem facing a child acquiring language is vast because she must construct not only the language-specific words and meanings, but the underlying concepts that are not shared across cultures. The chapter concludes with several heuristics that may explain how children succeed in the seemingly insurmountable task of acquiring language.

The tone of chapter 19 is mostly formal yet somewhat colloquial. It contains occasional parenthetical asides and footnotes that lighten the tone; but the chapter is not humorous or fanciful. The author uses objective data to support his propositions, yet he also includes illustrative examples based on his own personal research experiences. Portions of the text summarize previous chapters in order to situate the author's own observations into the larger context of the volume; however, the thrust of the chapter is the author's analysis of his own research proposals and findings. Even though the chapter introduces the author's own research and analysis, it is grounded in an established preexisting body of research and knowledge. Because the chapter contains an even balance of objective description and analysis, factor two is neutral, and weighs neither for nor against fair use.

As for factor three, Professor Anggoro uploaded all 23 pages of chapter 19, which is 3.75% of the entire work [Pls. Ex. 119]. Thus, Georgia State used a very small percentage of the overall work for a

151

favored educational purpose. To the extent that the number of pages copied suggests the impact of market substitution, the impact here is small. The use of this excerpt also served the course's pedagogical purpose. Georgia State uploaded the entirety of chapter 19, which represents a greater "quality" copied than would a partial chapter. However, chapter 19 cannot be described as the heart of the work. In light of these considerations, Georgia State's use was not excessive. Accordingly, factor three favors Defendants.

Factor four looks to the effect of Defendants' use on the value of and the potential market for the copyrighted work. Digital permissions were available for excerpts of Learning Acquisition in 2009 [Pls. Exs. 222, 224]. If permissions fees had been paid for Georgia State's use, Cambridge would have earned less than $26.39 in net revenue. See Order at 273; Becker at 1333. Accordingly, Georgia State's unpaid use caused Cambridge slight but actual harm. Moreover, widespread unpaid copying of excerpts by other colleges and universities could substantially impair the potential future market for excerpts of Learning Acquisition and the value of the copyrighted work. As such, it initially appears that factor four disfavors fair use.

Under the Court of Appeals' Opinion, however, Defendants may prevail on factor four if they can demonstrate that widespread unpaid copying would not cause substantial economic harm such that it would materially impair Cambridge's incentive to publish the work. Op. at 93; Patton, at 1276.

The evidence at trial showed that Language Acquisition was published in 2001 [Pls. Ex. 119]. According to the record evidence,

152

sales of the actual book resulted in £456.00 in revenue in 2010[34] [Pls. Ex. 123]. Cambridge's revenue from permissions sales between July 1, 2004 and December 1, 2010 is represented by the following table:

| Year | APS | ECCS | Total |
|-------|----------|----------|----------|
| 2004 | $0.00 | $0.00 | $0.00 |
| 2005 | $108.79 | $0.00 | $108.79 |
| 2006 | $51.86 | $563.81 | $615.67 |
| 2007 | $96.78 | $0.00 | $96.78 |
| 2008 | $0.00 | $76.25 | $76.25 |
| 2009 | $0.00 | $0.00 | $0.00 |
| 2010 | $0.00 | $29.33 | $29.33 |
| **Total** | **$257.43** | **$669.39** | **$926.82** |

[Pls. Ex. 124].

Again, the relevant inquiry pertains to both harm to the potential market for the copyrighted work as of 2009, and (2) damage to the value of the copyrighted work in 2009, assuming that all colleges and universities had programs similar to Georgia State's. Here, the evidence shows that permissions sales for *Language Acquisition* declined beginning in 2006, ultimately reaching zero in 2009. Therefore, the potential permissions market as of 2009 was negligible. It was unlikely that Sage would receive substantial future permissions from this book, as of 2009, even if other schools had programs similar to Georgia State's. It is also obvious that there was no repetitive use of permissions in 2009, such that the

---

[34]Although the book was first published in 2001, the record only contains information about Cambridge's revenue from actual book sales for the year 2010.

value of the copyrighted work would have been affected. Accordingly, factor four favors Georgia State.

In summary, factors one, three, and four favor fair use and factor two is neutral. Accordingly, Georgia State has met its burden, and the Court is satisfied that its use of *Language Acquisition* was a fair use.

J.    Professor Davis

Dr. Marni Davis was an Assistant Professor in Georgia State's history department [Tr. Vol. 7, Doc. 405 at 95; Pls. Ex. 512]. Her focus was on American history and ethnic and immigration history, particularly Jewish history [Doc. 405 at 96].

HIST 7010 Issues and Interpretations in American History, Fall 2009

In the fall 2009 semester, Professor Davis taught HIST 7010, or "Issues and Interpretations in American History," which was a graduate seminar that examined scholarly works about the social, cultural, political, and economic history of the United States from colonization to present [Doc. 405 at 104-05; Pls. Ex. 512]. Professor Davis required students to purchase 14 books for the course, and she also posted additional required readings on ERES [Pls. Ex. 512].

> 36.    *Region, Race and Reconstruction* (J. Morgan Kousser and
>        James M. McPherson eds., Oxford 1982)

Among the reading assignments posted to ERES was an excerpt from *Region, Race and Reconstruction* [Defs. Ex. 769]. Professor Davis specifically assigned pages 143-177 (35 pages), which is one full chapter, titled "Ideology and Race in American History," by Barbara J. Fields [Id.; Defs. Ex. 769]. The excerpt uploaded was 7.00% of the 500-page book [Defs. Ex. 769].

<u>Fair Use Analysis</u>

Factor one favors fair use.

With respect to factor two, *Region, Race and Reconstruction* is a historical work devoted to C. Vann Woodward, an acclaimed historian of the American South. The book is comprised of essays written by Woodward's former Ph.D. students on topics that informed his work such as the American South, race relations, and Reconstruction after the Civil War. The book consists of 15 chapters organized around these three subjects.

"Ideology and Race in American History" is the first essay in the section on "Race." The author discusses how the concept of race in American history is an ideology shaped by historical context, which is constantly changing with new experiences. For instance, the author discusses how "white supremacy" could not have meant the same thing to all white people across the country, or even across the South. Along these lines, the author discusses how the American concept of race was shaped by slavery, the destruction of slavery and the subsequent "racial" question, and the subsequent struggles facing freedmen in Reconstruction-era American society. The author concludes by noting that history does not provide us with "central themes," but rather with decisions and outcomes.

The tone of "Ideology and Race in American History" is formal and academic. The chapter covers historical subject matter, but throughout the essay, the author's perspective, particularly her opinion that Americans and historians tend to treat race as if it transcends history, is salient. Despite the factual nature of historical works, the essay at hand contains equal parts factual

description and analysis. Accordingly, factor two weighs neither for nor against fair use. It is neutral.

With respect to factor three, 35 pages or one full essay from *Region, Race, and Reconstruction* was uploaded to ERES for use by graduate students in Professor Davis' course [Defs. Ex. 769]. The uploaded excerpt (7.00% of the book) was small in light of Georgia State's pedagogical purpose and the nonprofit educational nature of the use. The excerpt also advanced the pedagogical aim of the course. To the extent that the amount copied is a heuristic for market substitution, here, that quantity is within acceptable limits. As for the substantiality (value) of the excerpt, the essay itself was no more or less important to the overall work than any other essay in the collection. Georgia State did upload an entire essay or chapter--as opposed to a portion of an essay--which in this case, represents one particular author's complete discussion on a topic. However, the essay at issue is not the heart of the work. Taking all considerations into account, the size of the excerpt was not excessive given the purpose for which it was used and the impact of market substitution. Factor three favors fair use.

With respect to factor four, the Court must examine the effect of Georgia State's unpaid use on the value of and the potential market for the copyrighted work. Digital permissions licensing was available for excerpts of *Region, Race and Reconstruction* in 2009 through CCC [Pls. Ex. 457]. Had permissions been paid for Georgia State's use of the instant excerpt, Oxford would have earned less than $60.69 in net revenue. See Order at 285; Becker at 1338. Accordingly, Georgia State's use caused Oxford small, but actual harm. Moreover, if "everybody did it," unpaid use like Georgia

State's could cause substantial harm to the potential market for and the value of the copyrighted work.   This leads to a preliminary determination that factor four should favor Plaintiffs; however, Defendants argue that they are entitled to prevail based on the record of low permissions sales, plus the fact that Defendants' use did not impact book sales.

From the date of publication in 1982 through November 7, 2010, sales of the actual book netted $2,199 [Pls. Ex. 357].[35]  The record evidence of permissions sales of *Region, Race, and Reconstruction* from July 1, 2004 through December 1, 2010 is represented by the following chart:

| Year | APS | ECCS | Total |
|------|-----|------|-------|
| 2004 | $269.63 | $0.00 | $269.63 |
| 2005 | $74.66 | $68.85 | $143.51 |
| 2006 | $1,341.20 | $0.00 | $1,341.20 |
| 2007 | $43.45 | $160.65 | $204.10 |
| 2008 | $18.87 | $196.55 | $215.42 |
| 2009 | $16.52 | $127.90 | $144.42 |
| 2010 | $71.40 | $68.85 | $140.25 |
| Total | $1,835.73 | $622.80 | $2,458.53 |

[Pls. Ex. 457].   There is no evidence of any in-house permissions sales.

Again, under factor four the Court must assess the harm to the potential market for the copyrighted work, beginning in 2009, and the harm to the value of the copyrighted work in 2009.   For both inquiries, the Court assumes that "everybody" (all colleges and universities) had programs like Georgia State's allowing for unpaid

---

[35]The record evidence for book sales is not broken down by year.

157

copying of small excerpts of copyrighted works in 2009 and thereafter.

The evidence here shows overall small book sales and very small permissions sales as of 2009. Defendants' use did not impact book sales at all. There is fairly low interest in excerpts. Even assuming widespread availability of programs like Georgia State's, it is unlikely that the potential market for the copyrighted work sustained substantial damage from use of unpaid excerpts of this work, or that Defendants' use substantially damaged the actual value of the copyrighted work in 2009.

To recap, factors one, three, and four favor fair use and factor two is neutral. Weighting the factors as directed, the scale tips in favor of fair use. Georgia State's use of *Region, Race and Reconstruction* was a fair use.

> 37. *The Unpredictable Past: Explorations in American Cultural History* (Lawrence W. Levine, Oxford 1993)

Among the readings that Professor Davis posted to ERES for her HIST 7010 seminar was an excerpt from *The Unpredictable Past* by Lawrence W. Levine [Tr. Vol. 7, Doc. 405 at 110; Pls. Ex. 512]. In particular, Professor Davis uploaded chapter three, which is titled "Slave Songs and Slave Consciousness: An Exploration in Neglected Sources" [Pls. Exs. 477, 512]. The uploaded excerpt consisted of pages 35-58 (24 pages), or 6.09% of the 394-page work [Pls. Ex. 477].

Fair Use Analysis

Factor one favors fair use.

As for factor two, *The Unpredictable Past* is a collection of Levine's previously published essays on various topics in American history. The book centers around the idea that perceptions about the past change and develop over time in unpredictable ways. Each essay

158

contains a brief introduction written by the author.  The book is divided into three sections: (1) Thinking About History; (2) Patterns of African-American Culture; and (3) Towards an Understanding of Popular Culture.

The excerpt at issue, chapter three, is the first essay in the "Patterns of African-American Culture" section.  In "Slave Songs and Slave Consciousness," Levine challenges the notion that slavery eroded African-Americans' linguistic and institutional lives. Levine does so by examining the oral tradition of slave songs and the songs' insight into slaves' reality.  He critiques other historians' works on the topic of slave songs by identifying assumptions and conclusions that are colored by past historians' particular perspectives.   Overall, the essay addresses historical and modern debates regarding various aspects of slave songs.   Topics covered include slave songs' origins, or whether they were derived from African cultures or were adapted from Anglo-European songs; their spontaneous creation and transmission, which served as a community dialogue, a way to deliver secret messages, and a means by which to preserve oral tradition; and their subject-matter, which was often spiritual, but sometimes secular.

The tone of the essay is formal.   The essay contains large portions of quoted material from actual slave songs and from others' writings regarding the songs; however, these pieces of material are connected by Levine's critical analysis. Although the essay contains factual elements along with analytical elements, the analytical components dominate.   Accordingly, factor two falls in favor of Oxford, and against fair use.

159

Factor three looks to the portion of the work copied. Professor Davis uploaded all of chapter three of *The Unpredictable Past*. Use of the excerpt narrowly served Georgia State's pedagogical goals. The excerpt consisted of 24 pages and was 6.09% of the total work. Thus, the quantity uploaded was small when viewed in light of Professor Davis' educational use.  Insofar as the quantity of uploaded pages reflects the impact of market substitution, no evidence exists to demonstrate a digital permissions market for excerpts of *The Unpredictable Past* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. As for the quality of the excerpt in relation to the overall work, in this instance, Georgia State uploaded an entire essay or chapter of the work, which has more value than would a portion of an essay.  But the essay at issue was not the heart of the work.  Taking all considerations into account, the portion of *The Unpredictable Past* that Georgia State uploaded to ERES was not excessive.  Accordingly, factor three favors fair use.

Factor four examines the effect of Defendants' unpaid use on the market.  There is no evidence in the record that digital excerpts were available for *The Unpredictable Past* in 2009 or otherwise. Oxford earned $79,367.92 in revenue from book sales between the book's publication in 1993 and November 7, 2010 [Pls. Ex. 357]; however, Defendants' use had no impact on Oxford's book sales.  See Op. at 94; Patton at 1276.  Accordingly, there was no market for digital excerpts from the work, and Georgia State's unpaid use accordingly caused no market harm and no harm to the value of the copyrighted work.  Factor four, therefore, favors Defendants.

In this case, factors one, three, and four weigh in Georgia State's favor, and factor two weighs in Plaintiffs' favor. Weighting the factors as directed, the scale clearly tips in favor of Georgia State. Accordingly, its use of *The Unpredictable Past* was a fair use.

K.   Professor Freeman

Dr. Carrie Packman Freeman was an Assistant Professor of Communication at Georgia State in 2009 [Pls. Ex. 535].

JOUR 4800 Media Ethics & Society, Fall 2009

In the fall semester of 2009, Professor Freeman taught a course called "Media Ethics and Society," or J4800 [Id.]. Professor Freeman required students to purchase one textbook for the course, and occasionally posted additional required readings to uLearn and ERES.

38.   *Living Ethics: Across Media Platforms* (Michael Bugeja, Oxford 2007)

Included among those required readings posted to ERES[36] were two excerpts from *Living Ethics: Across Media Platforms* ("*Living Ethics*"), by Michael Bugeja [see id.; Jt. Ex. 5, Doc. 266-4 at D-76]. The total posting was 13 pages, or pages 116-121 from chapter three and pages 299-305 from chapter 10 [Doc. 266-4 at D-76]. *Living Ethics* contains 365 total pages [Pls. Ex. 423]. The posted excerpts represent 3.56% of the total book [Id.].

Fair Use Analysis

Factor one favors fair use.

---

[36]Professor Freeman's syllabus indicates that the reading was posted to uLearn; however, this Court previously found that the syllabus was in error, and the excerpt was actually posted to ERES. See Order at 291 n.126; Becker at 1341, n.126.

With respect to factor two, *Living Ethics* is an academic fiction work that seeks to provide media students a practical and readable guide to personal and professional ethical standards.  It is divided into three sections: (1) Building Your Ethical Base; (2) Testing Your Ethical Base; and (3) Enhancing Your Ethical Base.  A central theme of the book is the idea that ethics codes are "living" because they must adjust to different workplace environments and should be revised and renewed regularly.   To illustrate realistic situations that require difficult judgment calls, the work incorporates discussions from dozens of media professionals regarding various ethical dilemmas.

The first excerpt that Professor Freeman uploaded to ERES, pages 116-121 (6 pages), was copied from Part I, chapter three, titled "Truth."  This portion of the chapter discussed "visual judgment calls" [Pls. Ex. 423].  The author explains that media professionals are often called upon to use professional judgment in determining whether to publish visual depictions that may be newsworthy but are also graphic, offensive, or insensitive.   The author includes comments from a student photojournalist who covered a teenager's drowning for a newspaper, accompanied by the picture that the photojournalist selected for publication.   The remainder of the section consists of an experienced photojournalist's commentary about several photographs he took in sensitive situations, and later chose to publish, along with reproductions of the subject photographs.

The second excerpt--pages 299-305 (seven pages)--was taken from Part III, chapter 10 titled "Value Systems."  This excerpt discusses "creating codes," referring to personal ethics codes.   In this segment, the author discusses the importance of value statements to

162

job-seekers, suggests how readers may use their value systems to their advantage when interviewing, and includes comments from a well-established professional in the field. The section concludes with a code-drafting exercise.

The first excerpt contains some material that comes directly from the author, however it is dominated by others' photographs and commentary. In contrast, the second excerpt mainly consists of the author's own material about ethics codes, although the advice contained therein is grounded in an existing body of knowledge about ethics in the media. Neither excerpt is humorous or fanciful. To the extent that the excerpts contain material written by the author, the material is objectively descriptive. Moreover, while the tone of the excerpted material is informational and practical, it is not analytical. Accordingly, factor two is neutral.

Turning to factor three, Professor Freeman uploaded 3.56% of the overall work, or 13 pages [Pls. Ex. 423]. The uploaded material consisted of two portions of two separate chapters. The quantity of the overall work uploaded was very small, especially in light of Georgia State's pedagogical purpose. The use of *Living Ethics* was educational in nature, further supporting a finding of fair use. Relatedly, insofar as the quantity uploaded serves as a heuristic for market substitution, no evidence exists to demonstrate a digital permissions market for excerpts of *Living Ethics* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. With respect to the quality (value) of the work uploaded, the partial excerpts of chapters uploaded here have less value than would complete chapters because a complete chapter represents a work's full discussion of a

163

topic.  Additionally, neither excerpt can be described as the heart of the work.  In light of these considerations, the portions of *Living Ethics* that Georgia State uploaded to ERES were not excessive in relation to the copyrighted work.  Thus, factor three weighs in favor of Georgia State's fair use.

Factor four looks to the effect of Georgia State's unpaid use on the market.  While Oxford earned $37,875.00 in revenue from book sales between publication and November 7, 2010 [Pls. Ex. 357], there is no evidence that digital licensing permissions were available for *Living Ethics* in 2009.  Georgia State's use had no impact on Oxford's book sales for *Living Ethics*.  See Op. at 94; Patton at 1276.  The Court thus finds that no market existed for digital excerpts of the work at that time, and it follows that Georgia State's unpaid use had no impact on the market for the copyrighted work.  It also did not affect the value of the copyrighted work.  Factor four weighs in favor of fair use.

To summarize, factors one, three, and four all favor fair use.  Factor two is neutral.  Georgia State has carried its burden of demonstrating that its use of *Living Ethics* was a fair use.

L.    Professor Moloney

Margaret F. Moloney was an associate professor in Georgia State's School of Nursing in 2009, and she also coordinated the nursing school's doctoral program [Tr. Vol. 9, Doc. 407 at 132].

NURS 8035 Theoretical and Philosophical Foundations of Nursing, Fall 2009

Professor Moloney taught a graduate course called "Theoretical and Philosophical Foundations for Nursing," or NURS 8035, in the fall semester of 2009 [Pls. Ex. 545].  The course was designed to provide doctoral students a philosophical foundation for nursing [Doc. 407 at

164

134].    There  were  three  required  textbooks  for  the  course  and
additional  required  readings  were  posted  to  ERES  [Pls. Ex. 545].

> 39.  *Handbook  of  Mixed  Methods  in  Social  &  Behavioral
>      Research*  (Abbas Tashakkori & Charles Teddlie eds.,
>      Sage 2002[37])

One  of  the  required  readings  that  Professor  Moloney  posted  to
ERES  was  an  excerpt  from  the  *Handbook  of  Mixed  Methods  in  Social  &
Behavioral  Research*  ("*Handbook  of  Mixed  Methods*")  [Pls. Ex. 545;
Doc. 407 at 137-38].  She  specifically  assigned  her  students  chapter
20: "Status  of  Mixed  Method  Research  in  Nursing," by  Sheila  Twinn
[Pls. Ex. 545; Defs. Ex. 773].   The  excerpt  consisted  of  pages 541-
556 (16 pages), which  was  2.04%  of  the  784-page  work  [Defs. Ex. 773].
Fair Use Analysis

Factor  one  favors  fair  use.

Turning  to  factor  two,  which  examines  the  nature  of  the  work,
the  *Handbook  of  Mixed  Methods*  is  an  academic  work.    It  presents
social  and  behavioral  science  applications  of  the  "mixed  method"
research  design,  which  incorporates  techniques  from both quantitative
and  qualitative  research  traditions.   The  book  is  organized  into  four
sections:     (1)    philosophical    and    theoretical    issues;
(2)   methodological   issues;   (3)   application   issues;   and
(4) conclusions  and  future  directions.

The  excerpt  at  issue,  chapter  20,  is  located  in  the  book's  third
section.    As  its  title,  "Status  of  Mixed  Method  Research  in
Nursing,"  suggests,  the  author  examines  the  status  of  the  mixed
method  design  in  nursing  research.    The  author  begins  by  discussing
traditions  in  nursing  research,  and  how  those  traditions  contributed

---

[37]A second edition of the *Handbook of Mixed Methods* was published
in 2010, but only the first edition is at issue here.

to the development of nursing knowledge and clinical interventions. The author explains that in the late 1990s, nursing research shifted from an overly scientific focus on the research paradigm to a focus on the research question, including the context for the research question.   This   shift,   she   suggests,   contributed   to   the implementation of mixed methods research in nursing.   With this observation, the author segues into a literature review of mixed method nursing research, which she sorts into three categories: (1) theoretical discourse; (2) critiques; and (3) empirical studies. Chapter 20 then assesses the quality of existing research produced via the mixed method approach and its contribution to nursing.  To conclude, the author identifies several substantive and practical issues emerging from application of the mixed method to nursing.

Overall, the tone of the chapter is informational and academic, and the style is formal.   Overall, the chapter is an objective discussion about the introduction and eventual acceptance of the mixed method in nursing research. Chapter 20 is neither humorous nor fanciful. Chapter 20 does implicitly endorse subjective qualitative research methods and thus does contain author opinion.   As such, factor two is neutral.

As is relevant to factor three, Professor Moloney uploaded 2.04% (16 pages) of the *Handbook of Mixed Methods* to ERES [Defs. Ex. 773]. This is a very small amount given the educational purpose for which the excerpt was used.  Additionally, to the extent that the portion copied serves as a heuristic for market impact, the impact is very small. And the use of this excerpt served the pedagogical purpose of the course.   Quality wise, Georgia State uploaded one complete chapter of the work, which has more value than would a portion of a

166

chapter. Nevertheless, chapter 20 has no more or less value than any of the other 25 chapters in the book, and it cannot be described as the heart of the work. Accordingly, Georgia State did not use an excessive portion of the *Handbook of Mixed Methods*. Factor three easily weighs in favor of Georgia State's fair use.

Factor four examines the effect of the use on the potential market for and the value of the copyrighted work. Permissions were available for excerpts of the *Handbook of Mixed Methods* in 2009 through CCC, APS, and Sage's in-house program [Pls. Exs. 256, 257]. If CCC permissions had been paid for Georgia State's use of *Handbook of Mixed Methods*, Sage would have earned less than $26.66 in net revenue. See Order at 295; Becker at 1343. Thus, Georgia State's unpaid use of excerpts from the *Handbook of Mixed Methods* caused Sage small but actual harm. The market for excerpts of the work could suffer substantial harm if other colleges and universities had programs like Georgia State's. This leads to an initial determination that factor four disfavors fair use.

However, Defendants can rebut this initial determination by showing that widespread copying of excerpts would not likely cause substantial economic harm to Sage to a degree that would impair Sage's incentive to publish the work. Op. at 93; Patton at 1276.

Sage's permissions revenue for the work is shown as follows:

| Year | APS | ECCS | In-House | Total |
|------|-----|------|----------|-------|
| 2002 | No Evidence | No Evidence | $0.00 | $0.00 |
| 2003 | No Evidence | No Evidence | $0.00 | $0.00 |
| 2004 | $29.17 | $0.00 | $57.21 | $86.38 |
| 2005 | $0.00 | $22.85 | $234.71 | $257.56 |

167

| | | | |
|---|---|---|---|
| 2006 | $0.00 | $0.00 | $47.89 | $47.89 |
| 2007 | $99.24 | $0.00 | $570.85 | $670.09 |
| 2008 | $549.67 | $0.00 | $987.75 | $1,537.42 |
| 2009 | $142.21 | $28.56 | $927.45 | $1,098.22 |
| 2010 | $213.49 | $0.00 | $0.00 | $213.49 |
| **Total** | **$1,033.78** | **$51.41** | **$2,825.86** | **$3,911.05** |

[Pls. Exs. 255; 257].

Sage's net revenue from book sales of the *Handbook of Mixed Methods* is reflected in the following table:

| Year | Book Sales |
|---|---|
| 2002 | $39,910.06 |
| 2003 | $52,345.45 |
| 2004 | $59,524.96 |
| 2005 | $57,687.95 |
| 2006 | $47,824.05 |
| 2007 | $51,909.40 |
| 2008 | $45,581.17 |
| 2009 | $28,665.05 |
| 2010 | $7,629.59 |
| **Total** | **$391,077.68** |

[Pls. Ex. 255].

Georgia State bears the ultimate burden with respect to factor four. The inquiry at hand looks to harm to the potential market for the copyrighted work beginning in 2009, and damage to the value of the copyrighted work in 2009. The Court will assume that all colleges and universities had programs similar to Georgia State's in and after 2009.

168

There is a likelihood of small future repetitive use which could, in turn, have a small negative impact on the potential market for permissions sales of *Handbook of Mixed Methods*.   However, the potential permissions market is very small compared to potential revenue from book sales. Also, Sage's permissions revenue represents only a small slice of the overall value of the copyrighted work. Georgia State's use of unpaid excerpts had no impact at all on the potential market for the book.   See Op. at 94; Patton at 1276.   It is unlikely that Defendants' use of unpaid excerpts (even assuming the widespread availability of programs like Georgia State's) substantially damaged the value of the copyrighted work.   It is unlikely that widespread availability of unpaid copying of excerpts substantially harmed the potential market for the copyrighted work (book sales and digital permissions sales), such that Sage's incentive to publish the work would be impaired.   Accordingly, Georgia State has satisfied its burden and factor four tilts in favor of fair use.

To recap, factors one, three, and four all favor fair use and factor two is neutral.   Accordingly, Georgia State has clearly discharged its burden, and its use of excerpts from *Handbook of Mixed Methods* was a fair use.

M.   Professor Lasner

Professor M. Lasner taught at Georgia State in 2009 [Pls. Ex. 537].

PERS 2001 Comparative Culture, Fall 2009

Professor Lasner taught a course called "Global Cities," or PERS 2001 at Georgia State in the fall semester of 2009 [Id.].   The course sought to "introduce key themes and issues in the social sciences--

including the fields of history, economics, sociology, and urban policy and planning--through exploration of the growth of cities and their problems." [Id.]. There were no required textbooks in the course, and Professor Lasner posted all required readings to ERES [Id.].

> 40. *Crabgrass Frontier: The Suburbanization of the United States* (Kenneth T. Jackson, Oxford 1985)

One such required reading was an excerpt from *Crabgrass Frontier*, by Kenneth T. Jackson. Professor Lasner specifically posted chapter 14, titled "The Drive-in Culture of Contemporary America" [Pls. Ex. 368]. The excerpt consisted of pages 246-271 (26 pages), which is 6.42% of the 405-page book [Id.].

Fair Use Analysis

Factor one favors fair use.

Turning to factor two, which examines the nature of the work, *Crabgrass Frontier* is a quasi-academic book which appears to have been written for both general audiences and the academic community. In it, the author explores the suburbanization of America and its causes and effects through many themes including intellectual, architectural, urban, transportational, and public policy perspectives. *Crabgrass Frontier* portrays American suburbs as unique from an international standpoint based on the following four characteristics: (1) population density; (2) home-ownership; (3) residential status; and (4) journey-to-work. Each of the chapters focuses on a different aspect of suburban life, such as the house and the yard or the age of automobility.

Chapter 14, which is the excerpt that Professor Lasner uploaded to ERES, discusses contemporary America's "drive-in culture." By

170

"drive-in culture," the author refers to the way American life became restructured around the suburbs and the automobile. After a brief introduction about cars' increased popularity between the 1950s and 1980s, the author discusses factors that precipitated America's investments in interstate highway development, including lobbyists' efforts and the Cold War-era idea that Americans should decentralize away from cities to avoid atomic attacks. The chapter then discusses development of other structures that accommodated America's automobile obsession, like garages, motels, gasoline service stations, shopping centers, mobile homes, and drive-in theaters and churches. The author devotes a brief section to each structure, wherein he explains the structure's general stages of historical development and includes vignettes illustrating its cultural role. The chapter then moves on to discuss how suburbanization created "centerless" cities, or collections of suburbs that lacked an urban center. The final section in the chapter describes the decentralization of factories and offices in line with the suburban trend. The author concludes by noting that the country failed to fully contemplate the forward-reaching effects of its investment in automobiles as opposed to mass transit, and the ephemeral quality of the structures that accompanied that shift.

The tone of chapter 14 is academic, but also conversational. While the chapter is not humorous or fanciful, there are occasional references to popular culture and primary sources that lighten the author's otherwise matter-of-fact style of writing. The author's own perspective is obvious; however, the chapter is primarily informational and historical. All things considered, the chapter is a mix of factual information and subjective commentary and analysis.

171

However, author opinion dominates in the book as a whole. Accordingly, factor two leans against fair use.

Turning to factor three, Georgia State uploaded a small part of *Crabgrass Frontier* to ERES. Specifically, the excerpt consisted of 26 pages, or 6.42% of the total work [Pls. Ex. 368]; this is a small amount and easily within the parameters contemplated for a favored educational use. The market impact of Georgia State's unpaid use is mitigated sufficiently by the small number of pages in the excerpt. The excerpt also furthers the pedagogical aims of the course. Regarding the value of the amount used, the uploaded excerpt was a full chapter rather than a partial chapter. But chapter 14 is not the heart of the work; it addresses only one suburbanization feature of the many discussed in the book. Taking all of the foregoing into account, the portion uploaded is not excessive. Factor three weighs in favor of fair use.

Factor four examines "the effect of the use on the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Digital permissions licensing was available for *Crabgrass Frontier* in 2009 [Pls. Ex. 371]. If fees had been paid for use of excerpts of the book in Professor Lasner's class, Oxford would have earned less than $302.33 in net revenue. See Order at 298; Becker at 1345. Georgia State's unauthorized use caused slight but actual economic harm to the value of the copyrighted work. If all colleges and universities allowed unpaid use of copyrighted excerpts, the harm to the permissions market for excerpts of *Crabgrass Frontier* could be substantial. This leads to an initial determination that factor four disfavors fair use.

172

Defendants argue that the record of insubstantial permissions shows that substantial damage to the market for and the value of the copyrighted work is unlikely, even if all schools have programs like Georgia State's.   Indeed, Defendants may prevail on factor four notwithstanding the small amount of actual harm their unpaid use caused to Oxford if they can show that widespread unpaid copying of excerpts would not cause substantial harm to Oxford to a degree that would materially impair Oxford's incentive to publish *Crabgrass Frontier*.   Op. at 93; Patton at 1276.

According to the record, Oxford earned $740,414 from book sales between the date of *Crabgrass Frontier*'s publication in 1985 through November 7, 2010 [Pls. Ex. 357].[38]  The following chart demonstrates the permissions gained by Oxford via CCC for *Crabgrass Frontier*:

| Year | APS | ECCS | In-House | Total |
|-------|------------|---------|-------------|------------|
| 2004 | $318.01 | $0.00 | No Evidence | $318.01 |
| 2005 | $753.69 | $0.00 | No Evidence | $753.69 |
| 2006 | $584.97 | $0.00 | No Evidence | $584.97 |
| 2007 | $253.68 | $94.25 | No Evidence | $347.93 |
| 2008 | $377.60 | $0.00 | No Evidence | $377.60 |
| 2009 | $281.62 | $0.00 | No Evidence | $281.62 |
| 2010 | $306.51 | $0.00 | No Evidence | $306.51 |
| **Total** | **$2,876.08** | **$94.25** | **No Evidence** | **$2,970.33** |

[Pls. Ex. 371].

Georgia State ultimately bears the burden of proof with respect to factor four.   The past pattern of permissions earnings shows that permissions earnings are very small when compared with revenue from

---

[38]There is no evidence of APS, ECCS, or in-house permissions sales of *Crabgrass Frontier* from 1985 to 2003.

sales of the book. Even if Oxford received no permissions income from this book it is unlikely that it would discontinue book sales. The same evidence shows that there was no substantial damage to the value of the copyrighted work in 2009. Georgia State has successfully discharged its burden with respect to factor four.

In sum, factors one, three, and four all favor Georgia State's fair use, while factor two leans against fair use. Here, Georgia State has discharged its burden, as the weight of the fair use factors clearly tips in its favor. Accordingly, Georgia State's use of *Crabgrass Frontier* was a fair use.

> 41. *The Politics of Public Housing: Black Women's Struggles Against Urban Inequality* (Rhonda Y. Williams, Oxford 2004)

Another required reading posted to ERES for Professor Lasner's "Global Cities" course was an excerpt from *The Politics of Public Housing: Black Women's Struggles Against Urban Inequality* ("*The Politics of Public Housing*"), by Rhonda Y. Williams [Pls. Ex. 537]. Professor Lasner specifically assigned pages 21-53 (33 pages--all of chapter one), which is titled: "Creating 'A Little Heaven for Poor People': Decent Housing and Respectable Communities" [Id.; Pls. Ex. 445]. The 33-page excerpt accounts for 10.78% of the 306-page book [Pls. Ex. 445]. There were 114 students in the class [Jt. Ex. 5, Doc. 266-4 at D-83].

Fair Use Analysis

Factor one favors fair use.

As is relevant to factor two, *The Politics of Public Housing* is a non-fiction work. In it, the author tells the stories of low income black women who strived to provide decent lives for their families while living in public housing and engaging in community and

174

political activism in Baltimore, Maryland after 1930.   The author seeks to explore public housing and other public assistance programs, and to recast those programs' legacies by looking at individual women's experiences.   The book is split into three sections--(1) Beginnings; (2) Shifting Landscapes; and (3) Respect, Rights, and Power--each of which has two chapters.

The excerpt at issue, chapter one, is located in the book's first section.   The chapter begins by introducing Clara Perry Gordon, who moved to Baltimore as a child around 1925, and was a resident of the city's first public-housing efforts.   The author describes the circumstances that precipitated Baltimore's public-housing development in the early twentieth century, including squalid housing conditions for working-class people, overcrowding, and social, political, and economic disadvantages facing African-Americans, all of which were compounded by the Great Depression.   The chapter then discusses how, despite hostile political conditions, social reformers established a municipal housing program in Baltimore in 1937.   The author examines how public housing divided citizens by race, class, and gender, but explains how, in reality, those selected for the housing programs were elite, based on income and prior living situation requirements, competition for homes, and lengthy personal interviews.   As a result, she explains, the first tenants were enthusiastic and proud of their homes and communities.   Throughout the chapter, the author includes quotes and stories from Gordon's experiences.   The concluding section of the chapter discusses how the circumstances of the first housing programs shaped black tenants' political culture, and how they soon formed organizations to maintain and advance their communities.

The tone of chapter one is straightforward and informational. The text is primarily historical, and is peppered with quotes from the author's interviews and research. The chapter is organized according to the overall work's focal points, which are African-American women and political organization. All in all, the chapter is evenly divided between objective description and the author's own analytical composition. Accordingly, factor two is neutral, and it weighs neither for nor against fair use.

Factor three looks to the amount and substantiality of the portion used. The outcome on factor three is close. Georgia State copied one full chapter consisting of 33 pages, or 10.78% of *The Politics of Public Housing* [Pls. Ex. 445]. This is not an insubstantial number of pages or an insubstantial percentage. However, Georgia State's favored educational objective permits slightly more copying than would otherwise be allowed. Also, the use of this excerpt served the pedagogical purpose of the course. These factors are sufficient to meet Georgia State's burden of proof. However, in addition, the Court finds that the price which would have been required by Oxford (via CCC) for permissions to make digital copies of this excerpt ($454.44) would have been excessive. This price reflects that the excerpt would be made available to 114 students, but CCC's and Oxford's marginal cost for authorizing digital copies would be virtually nil, and would not vary no matter how many digital copies were authorized. This allows the Court to look more favorably on the quantity of Professor Lasner's use than it otherwise would, so as to more nearly realign the cost to reasonable cost. Thus, the quantity taken is within acceptable limits. Turning to the value of the portion copied, Georgia State's use of one full

176

chapter is less likely to be a fair use than the use of a partial chapter. However, the material taken is not the heart of the work. After weighing all of the foregoing considerations, factor three weighs in favor of fair use.

Turning to factor four, the Court must examine harm to the potential market for the copyrighted work caused by Georgia State's unpaid copying of an excerpt from *The Politics of Public Housing*. There is no evidence in the record that permissions licensing was available for excerpts of *The Politics of Public Housing* in 2009. As such, there was no permissions market for digital excerpts of the work. Additionally, the record reveals no evidence suggesting the existence of a potential future market for excerpts of the work. The record evidence indicates only that between the work's 2004 publication and November 7, 2010, Oxford netted $45,113[39] from sales of the actual book [Pls. Ex. 366]. Defendants' use had no impact on book sales. As there is no evidence of a potential permissions market, it is unlikely that widespread unpaid copying of excerpts across universities would substantially damage the actual or potential market for the copyrighted work or the value of the copyrighted work in 2009. Thus, Georgia State has carried its burden with respect to fair use factor four.

Here, factors one, three, and four favor fair use, while factor two is neutral. Weighting the factors as directed, the scale tips in

---

[39]This Court's previous Order reflected this amount as $45,085. Order at 301; Becker at 1346. However, that figure failed to take into account $28 in earnings reflected on the first page of Pls. Ex. 366.

favor of fair use.  Accordingly, Georgia State's use of *The Politics of Public Housing* was a fair use.

N.    Professor Hankla

Charles R. Hankla was an Associate Professor in Georgia State's Political Science Department in 2009 [Tr. Vol. 8 at 97, Doc. 406 at 97].  He taught courses in international relations, comparative politics, and research methods [Id.].

POLS 3450 U.S. Foreign Policy, Fall 2009

In the fall semester of 2009, Professor Hankla taught a course called "U.S. Foreign Policy," or POLS 3450 [Doc. 406 at 100; Defs. Ex. 623].  It was an undergraduate level course that covered the history of, theoretical underpinnings for, and current issues in U.S. foreign policy [Doc. 406 at 100-01; Defs. Ex. 623].  Professor Hankla required his students to purchase two textbooks for the course, and he posted additional required readings online[40] [Doc. 406 at 102-05; Defs. Ex. 623].

> 42.    *Contemporary Cases in U.S. Foreign Policy: From Terrorism to Trade, Second Edition* (Ralph G. Carter, ed. Sage[41] 2005)

One required reading was an excerpt from *Contemporary Cases in U.S. Foreign Policy* [Doc. 406 at 105-06; Defs. Ex. 623].  The assigned reading consisted of pages 89-121 (33 pages), which was the

---

[40]The record contains contradictory information as to where the readings were posted.  The course syllabus indicates that they were posted to uLearn [Defs. Ex. 623], but Professor Hankla testified that they were posted to ERES [Doc. 406 at 102-05].  The Court credits Professor Hankla's testimony.  Moreover, the uploading program used is immaterial to this Court's present analysis, as it is undisputed that free copies of excerpts from the work were made available to students of Professor Hankla's course.

[41]The work was published by "CQ Press," which is a division of Sage [Defs. Ex. 776; Doc. 400 at 59].

entirety of chapter four, titled "The Return of the Imperial Presidency? The Bush Doctrine and U.S. Intervention in Iraq," and written by Jeffres S. Lantis and Eric Moskowitz [see Defs. Exs. 623; 776]. The 33-page excerpt represents 6.61% of the 499-page book.

Fair Use Analysis

Factor one favors fair use.

Factor two looks to the nature of the work. *Contemporary Cases in U.S. Foreign Policy* is essentially an academic work. It is a collection of 15 original case studies--each of which comprises a separate chapter--on contemporary foreign policy issues. The chapters are organized into four parts: (1) Intervention Policy; (2) National Defense and Security Policy; (3) Trade Policy; and (4) Multilateral Policy. The book is designed for classroom use, as each chapter begins with discussion questions, and the topics were chosen to illustrate the range and diversity of issues and the variety of participants in the policymaking process after the cold war.

The excerpt at issue--chapter four--is a case study on the United States' intervention in Iraq in 2003. The chapter begins with an excerpt from a 2002 graduation speech given by then President George W. Bush about his goals for promoting American security. The chapter explains how the September 11 attacks red U.S. foreign policy, and enabled the Bush administration to accumulate an unusual amount of power with respect to foreign policy. Along these lines, the authors explain that "the imperial presidency" refers to dominance of the U.S. executive branch in foreign policymaking, which historically tends to occur in times of emergency or crisis. The subsequent sections zero in on the Bush administration's internal

179

decision-making concerning intervention in Iraq, and the efforts to garner Congressional support. The authors pay particular attention to the individual actors involved, such as Bush's cabinet members, and members of Congress. The chapter briefly describes international reactions to U.S. intervention and public support for the action. The chapter concludes with a brief note on the U.S.'s prolonged involvement in Iraq, and the authors reiterate the characteristics of and concerns about the presence of a very strong executive.

All in all, the tone of chapter four is academic and conventional. The writing is clear and direct. The authors' opinions animate the case study to some extent; however, it is first and foremost a balanced historical account of the circumstances and executive decisions leading up to the intervention. Put another way, although the authors convey their perspective, it is secondary to the facts conveyed. Accordingly, factor two is neutral.

Turning to factor three, the 33-page excerpt at hand accounts for 6.61% of the overall work [Defs. Ex. 776]. This is a small percentage. Thirty-three pages is not an especially small number of pages but it is acceptable when considering the impact of market substitution in light of Georgia State's nonprofit educational purpose. The excerpt also furthers the pedagogical goals of the course. Furthermore, although the use of an entire chapter is less fair than use of a partial chapter, chapter four is not any more qualitatively substantial than any other chapter in the work. The excerpt at issue is not the heart of the work. Accordingly, neither the quantity nor quality of the copied excerpt is excessive in light of Georgia State's nonprofit educational purpose, and factor three favors fair use.

Factor four directs this Court to look at the impact of Georgia State's use on the potential market for the copyrighted work and the value of the copyrighted work. Digital permissions licensing was available for excerpts of *Contemporary Cases in U.S. Foreign Policy* in 2009 through Sage's in-house permissions program [Pls. Ex. 229, 230]. If permissions had been paid for Georgia State's use, Sage would have earned $190.08, less royalties paid to the external editor. See Order at 305; Becker at 1348. Georgia State's unpaid use of the excerpt accordingly caused slight but actual harm to the potential market for and the value of the copyrighted work. If all colleges and universities had programs like Georgia State's (allowing unpaid use of small excerpts of copyrighted works), it could cause substantial harm. This results in an initial determination that factor four favors Plaintiffs.

Georgia State can still prevail if it shows that it is unlikely that widespread policies allowing unpaid use of small excerpts would cause substantial damage to the permissions market for *Contemporary Cases in U.S. Foreign Policy*, such that it would impair Sage's incentive to publish the book.

Sage's life-to-date revenue from book sales was $365,751.22 [Pls. Ex. 229]. Sage's permissions revenue for *Contemporary Cases in U.S. Foreign Policy* is represented as follows:[42]

---

[42]The evidence reflecting revenue from Sage's in-house permissions sales of excerpts from *Contemporary Cases in U.S. Foreign Policy* is not broken down by year, rather, it reflects CQ Press's (Sage) "life to date" earnings [Pls. Ex. 229].

| Year  | APS      | In-House     | Total    |
|-------|----------|--------------|----------|
| 2004  | $132.60  | No Evidence  | $132.60  |
| 2005  | $59.29   | No Evidence  | $59.29   |
| 2006  | $110.29  | No Evidence  | $110.29  |
| 2007  | $83.39   | No Evidence  | $83.39   |
| 2008  | $0.00    | No Evidence  | $0.00    |
| 2009  | $22.19   | No Evidence  | $22.19   |
| 2010  | $7.40    | No Evidence  | $7.40    |
| Total | $415.16  | $333.81      | $748.97  |

[Pls. Exs. 229, 230].

The burden of proof as to factor four rests with Georgia State. Again, the relevant inquiry assumes that all colleges and universities had programs like Georgia State's, which permit unpaid copying of small excerpts of copyrighted works. The Court must then examine the damage to the potential market for the copyrighted work (book sales and digital permissions sales) starting in 2009, and the harm to the value of the copyrighted work in 2009.

The record evidence shows that past permissions earnings have historically been very small compared to sales of the actual book. In 2009, repetitive copying of excerpts from the book was unlikely. It is unlikely that Sage would have discontinued book sales of *Contemporary Cases in U.S. Foreign Policy*, even if its permissions income from the work had been reduced to zero. It is also unlikely that unpaid copying in 2009 substantially impacted the value of the copyrighted book. Accordingly, Georgia State has succeeded in discharging its burden, and factor four weighs in its favor.

To summarize, factors one, three, and four favor fair use; factor two is neutral. Accordingly, Georgia State has carried its burden of demonstrating that its use of *Contemporary Cases in U.S. Foreign Policy* was a fair use.

182

43.  *U.S. Foreign Policy: The Paradox of World Power*
(Steven W. Hook, Sage[43] 2005)

Another required reading in Professor Hankla's POL 3450 course was an excerpt from *U.S. Foreign Policy: The Paradox of World Power*, by Steven W. Hook [Tr. Vol. 8, Doc. 406 at 123-24].  Professor Hankla assigned pages 153-188 (36 pages), or chapter six, which is titled "The Foreign-Policy Bureaucracy" [Id. at 124-125; Defs. Exs. 623, 777].  The excerpt is 6.94% of the 519-page book.

Fair Use Analysis

Factor one favors fair use.

As is relevant to factor two, *U.S. Foreign Policy* is an academic book.  In it, the author seeks to "explore th[e] paradox of U.S. world power, to identify its key sources and manifestations, and to consider its future implications" [Defs. Ex. 777].  He also hopes to present a concise, yet comprehensive overview of the U.S. foreign-policy process.  The book is organized into four parts: (1) The Setting of U.S. Foreign Policy; (2) Governmental Sources of Foreign Policy; (3) External Sources of Foreign Policy; and (4) Policy Domains.

Chapter six, the excerpt at issue, is located in the book's second section, on governmental sources of foreign policy.  In it, the author discusses management of foreign policy through federal executive agencies.  Chapter six includes basic overviews of four bureaucratic clusters, or "complexes" of U.S. foreign policy, that manage (1) diplomacy, (2) national security, (3) economic affairs, and (4) intelligence.  The chapter begins with a section titled

---

[43] *U.S. Foreign Policy* was published by CQ Press, which is a division of Sage [Defs. Ex. 777; Doc. 400 at 59].

"Agency Functions and Dysfunctions," which explains how the U.S.'s foreign policy bureaucracy developed in response to changing global roles and responsibilities between World War II and the Cold War. The author explains how bureaucracies should lend stability to the constantly changing government, but that they instead compete with one another, which frustrates their common national interests. In its following discussion of each foreign-policy complex, the chapter covers the foreign policy bureaucracy's structural features, relationships with the White House and Congress, and impact on the foreign-policy process. The chapter in particular notes how structural deficiencies in executive bureaucracies failed to comprehend foreign and domestic warning signs regarding the September 11, 2001 attacks. In concluding, the author reflects on how the competing forces of centralization of power in the White House, the fragmentation of control across the bureaucracy, and the tensions they create are likely to become more pronounced in upcoming years.

The tone of chapter six is formal and academic. The style is straightforward and conventional. The chapter contains a few pictures, several large tables that depict and describe the structure of several large and complex agencies, and a few text boxes containing quotes from primary sources and focused examples. The chapter contains some but not much of the author's own opinion or creative analysis. It is primarily explanatory and factual. Accordingly, factor two is neutral.

Turning to factor three, which examines the quantity and quality of the excerpt, here, Georgia State made unpaid copies of 36 pages, or 6.94% of the overall work [Defs. Ex. 777]. Accordingly, Georgia

184

State used a small percentage of the work. While the market impact of unpaid permissions is a countervailing consideration, in this case the number of pages copied is acceptable when viewed in combination with the small percentage and the nonprofit educational character of the use. Use of an entire cohesive chapter is less fair than use of a partial chapter; however, chapter six cannot be described as the heart of the work because it covers only a snippet of the book's overall topic. The Court concludes that neither the quantity nor the quality of the work copied is excessive. Accordingly, factor three favors fair use.

Factor four examines the impact of Georgia State's use of the excerpt of *U.S. Foreign Policy* on the potential market for the work and on the actual value of the copyrighted work in 2009. Digital permissions licensing was available for the book in 2009 through Sage's in-house permissions program [Pls. Ex. 314]. If Georgia State had paid for its use, Sage would have earned $207.36, less any fees due to the external editor. See Order at 307-08; Becker at 1349. As such, Georgia State's unpaid copying caused slight but actual economic harm to Sage, which leads the Court to an initial determination that factor four should favor Plaintiffs.

Nonetheless, Georgia State contends that substantial economic harm to Sage from widespread unpaid copying of excerpts of *U.S. Foreign Policy* is unlikely based on the record of low permissions income from sales of excerpts of the work.

Sage earned $738,328.89 in "life to date" sales revenue from book sales for *U.S. Foreign Policy* [Pls. Ex. 314]. In contrast, Sage's permissions revenue for excerpts of *U.S. Foreign Policy* is

represented in the following table[44]:

| Year | APS | In-House | Total |
|---|---|---|---|
| 2008 | $137.70 | No Evidence | $137.70 |
| **Total** | **$137.70** | **$285.33** | **$423.03** |

[Pls. Exs. 314, 315].

Georgia State has the burden of demonstrating that widespread unpaid copying of excerpts generally would not cause substantial damage to the market for the copyrighted work such that it would materially impair Sage's incentive to publish the work. Here, the record evidence indicates that the permissions market for excerpts of *U.S. Foreign Policy* is very small. This is especially so when the permissions sales are compared to the market for the actual book. Even if Sage's permissions income were eliminated entirely, Sage likely would retain a financial incentive to publish *U.S. Foreign Policy*. In addition, it is unlikely that the value of the copyrighted work was substantially damaged in 2009 by the unpaid use of book excerpts by Georgia State or others. Accordingly, Georgia State has succeeded in discharging its factor four burden. Factor four favors fair use.

Factors one, three, and four all weigh in favor of the conclusion that Georgia State's use of an excerpt from *U.S. Foreign Policy* was a fair use. Factor two is neutral. Weighting the factors as directed, Georgia State has discharged its burden of proving that its use of the work was a fair use.

_____

[44]The evidence of sales revenue from CQ Press reflects "life to date" revenue, but it does not provide a specific date range [Pls. Ex. 314]. The Court assumes this would be from date of publication (2005) to near the end of 2010.

O.    Professor McCoy

Professor Jennifer McCoy is a tenured professor in Georgia State's Political Science department [Deposition of Jennifer McCoy ("McCoy Dep."), Doc. 329 at 9-10].

## POS 8250 Latin American Politics, Fall 2009

In the fall semester of 2009, Professor McCoy taught POS 8250, a graduate level course titled "Latin American Politics" [Id. at 22; Pls. Ex. 901].   The course provided an overview of the history of contemporary politics of Latin American countries with a particular focus on democratization in Latin America [Pls. Ex. 901].   Professor McCoy assigned six required books for purchase in the course, and posted additional required and suggested readings on ERES [Id.].

> 44.    *Regimes and Democracy in Latin America: Theories and Methods* (Gerardo L. Munck ed., Oxford 2007)

Among the required readings was an excerpt from *Regimes and Democracy in Latin America: Theories and Methods* ("*Regimes and Democracy*") [Doc. 329 at 24-25; Pls. Ex. 901].   In relevant part,[45] Professor McCoy required students to read the segment titled "Introduction: Research Agendas and Strategies in the Study of Latin American Politics," and chapter one, "The Study of Politics and Democracy: Touchstones of a Research Agenda," both of which were written by Gerardo L. Munck [Pls. Exs. 452, 901].   The total excerpt

---

[45]Professor McCoy also assigned students chapter two of *Regimes and Democracy in Latin America* [see Pls. Ex. 901]; however, the Court previously determined that Plaintiffs failed to demonstrate that they owned all copyright interests in chapter two.   See Order at 312; Becker at 1351.   As that conclusion was not disturbed on appeal, see Opinion at 1253, the Court need not revisit it now.

187

posted to ERES consisted of pages 1-38 (38 pages)[46], which is 12.71% of the 299-page book [Pls. Ex. 452].

Fair Use Analysis

Factor one favors fair use.

As to factor two, *Regimes and Democracy* is an academic work that evaluates and builds on the existing body of research about political processes in Latin America.   The book is part of a series on democratization intended for students of comparative politics and related fields.   In addition to the introduction, the book has nine total chapters that are organized into three parts: (1) Research Agendas;   (2)   Concepts,   Data,   and   Description;   and   (3)   Causal Theorizing and Testing.

Professor McCoy assigned the introduction and chapter one as required readings.   In the introduction, the author first provides an overview of research in Latin American politics, and an assessment of the research methodology employed.   He pays particular attention to two steps of the research process: (1) theory generation; and (2) empirical analysis.     The introduction's later section gives a chapter-by-chapter description of the book and highlights the book's contributions to the overall body of research on Latin American politics.   The author describes how the book attempts to respond to some of the methodological shortcomings in the research.

The author begins chapter one by noting that democracy has been a "master concept" in Latin American politics over the past 25 years [Pl.'s Ex. 452].   He argues that future progress on the research

---

[46]In this Court's previous Order, it stated that Professor McCoy copied 39 pages; however, the excerpt was actually 38 pages.   See Order at 313; Becker at 1352.

agenda hinges on two questions to be explored in the chapter, the first being "What is democracy?" and the second being "What are the implications of other political values beyond democracy for democracy?" [Id.]. The majority of the chapter is organized into three sections. In the first section, the author builds on scholar Robert Dahl's conceptualization of democracy, which is that democracy is about more than forming a government. The author then poses two more questions that he attempts to answer in the second section: (1) how far does the democratic political process extend beyond the formation of government?; and (2) are there rights other than political rights that are constitutive of democracy? In the third and final section, the author presents related conceptual issues and empirical questions, such as non-political rights that are integral to a democracy and the need to examine potential trade-offs between democracy and other values. In the chapter's concluding remarks, the author explains that clear and widely accepted answers to the original two questions addressed in the chapter are essential for a unified research agenda for democracy.

The tone of both the introduction and the first chapter is formal and scholarly. The introduction is factual and objective, as it provides context for and describes the content of the overall work. While the author's analytical perspective animates the introduction to some degree, the introduction contains mostly objectively descriptive material. The content in chapter one is more inventive and evaluative, in that the author analyzes the elements that are essential to a procedural definition of democracy; however, the inventive material builds on existing literature and research. Considering both excerpts together, the copied material is an even

189

balance of objectively descriptive material and the author's analysis. Neither type of material dominates the total excerpt copied. Accordingly, factor two is neutral.

With respect to factor three, Professor McCoy posted 38 pages, or 12.71% of the overall work, to ERES [Pls. Ex. 452]. The quantity of material used by Professor McCoy is excessive, even when taking into account the favored educational use recognized in factor one, that the excerpt was tailored to meet Professor McCoy's pedagogical purpose, and the lack of market substitution due to a lack of evidence of digital permissions for *Regimes and Democracies* in 2009. The quality (value) of the excerpt taken is not too great. Overall, factor three weighs against fair use.

Factor four looks to the effect of Defendants' use on the potential market for and value of the copyrighted work. See 17 U.S.C. § 107(4). Oxford earned $12,689.00 in revenue from book sales for *Regimes and Democracy in Latin America* between the date of its publication and November 7, 2010 [Pls. Ex. 357]. However, there is no evidence before the Court that digital permissions were available for *Regimes and Democracy in Latin America* in 2009.[47] As there was no digital market for permissions, Georgia State's use of unpaid digital excerpts did not harm Oxford. It follows that Georgia State's use did not cause substantial harm to the potential market for the copyrighted work or to the value of the copyrighted work in 2009. Accordingly, factor four favors fair use.

---

[47]Oxford presents evidence of $348.33 in APS sales, but those sales occurred in 2008 [Pls. Ex. 454].

In sum, factors one and four favor fair use, factor two is neutral, and factor three disfavors fair use. Weighting these results as directed, the scale clearly favors fair use.

P.    Professor Whitten

Professor Kathleen Whitten taught in the Psychology Department at Georgia State in 2009 [Pls. Ex. 557].

PSYC 4030 Introduction to Cross-Cultural Psychology, Fall 2009

In the fall semester of 2009, Professor Whitten taught PSYC 4030, or "Introduction to Cross-Cultural Psychology," which sought to explore the influence of culture on human cognition, emotion and behavior [Id.]. Professor Whitten required one textbook in the course and posted additional required readings electronically [Id.]

> 45.    *A World of Babies: Imagined Childcare Guides for Seven Societies* (Judy DeLoache & Alma Gottlieb, Cambridge 2000)

One such required reading was an excerpt from *A World of Babies*, by Judy DeLoache and Alma Gottlieb [Id.]. Professor Whitten specifically assigned page 27, which is an excerpt from the introductory chapter one, and pages 91-112 (22 pages), which is a portion of chapter four [Id.; Pls. Ex. 147]. The total excerpt posted was 23 pages, which constitutes 7.85% of the 293-page book [Pls. Ex. 147].

Fair Use Analysis

Factor one favors fair use.

As for factor two, *A World of Babies* is partially fiction and partially non-fiction. It explores child-rearing in seven different cultures--like Puritan New England and the Beng of the Ivory Coast-- in the format of a Western childcare manual. Each manual, or chapter, is written from the perspective of a fictional member of

191

each respective society, but the information in the manuals is based on anthropological and historical research. The work confronts the notion that caring for infants is natural, obvious, or common-sense, by presenting a range of cultural beliefs and practices associated with childcare.

The first page of the excerpt--page 27--is an excerpt from chapter one that explains the organization of the seven subsequent chapters. The second portion of the excerpt--pages 91-112--is taken from chapter four, "Gift from the Gods: A Balinese Guide to Early Child Rearing." The first portion of the chapter is an introduction to Balinese culture that summarizes its history, political structure, economy, and religion. The chapter then provides "biographical" information about the manual's fictional author. The remaining portion of the excerpt is devoted to the fictional manual. The manual describes the benefits of having a child in Balinese culture, including heightened political status, marital security, and having a caretaker through old age. It goes on to explain several unique facets of Balinese culture as they relate to pregnancy and childbearing, such as offerings and spiritual cleansing rituals. The fictional author describes how children are "divine," or new gods, for the first 210 days of their lives, which is one full year in the Balinese ritual calendar. The remaining portion of the excerpt describes other aspects of raising an infant in Bali, like the specific roles for male children, the significance of birth order, naming conventions, and dressing, feeding, and bathing habits.

The tone of the excerpt is straightforward and informational, although somewhat lighthearted. The excerpt contains fanciful elements, as the majority of the chapter four excerpt is written from

192

the perspective of a fictional Balinese healer.  Additionally, the organization and format are creative.  On the other hand, the portion of the excerpt describing Balinese history and culture is objectively descriptive, and even the "manual" portion is more informational than fictional.  Moreover, the information conveyed about pregnancy and infancy in Balinese culture is grounded in facts derived from an existing body of anthropological research.  All in all, the chapter is an even balance of creative and objective material.  Indeed, the authors describe the work as "a mix of fact and fiction — fictional authors presenting factual information" [Pls. Ex. 147].  Accordingly, factor two falls neither for nor against fair use; it is neutral.

Factor three is concerned with the amount and substantiality of the portion copied.  With respect to the quantity of the work copied, Georgia State used 23 pages, or 7.85% of *A World of Babies*, which is a small amount [Pls. Ex. 147].  The amount is acceptable given the educational nature of Professor Whitten's use, and the fact that the excerpt furthered the pedagogical purpose of the course.  Further, to the extent that the portion copied serves as a heuristic for market substitution, any impact here was also small.  As for the quality (value) of the work copied, the excerpted material contains one page from one chapter, and a portion of a second chapter.  Copying less than a chapter tends to be more fair than would the use of an entire chapter.  In addition, the excerpt copied is not the heart of the work.  In sum, the quantity and quality of the work copied were within acceptable limits, especially in light of Georgia State's favored educational purpose.  Thus, factor three favors Georgia State's fair use.

193

Factor four requires this Court to examine the impact of Georgia State's unpaid use of an excerpt of *A World of Babies* on the value of Cambridge's copyright of the work and on the potential market for the copyrighted work. The Court infers that digital permissions were available for *A World of Babies* in 2009 [Pls. Ex. 153]. If Georgia State had purchased permissions for its use of the excerpt, Cambridge would have earned less than $36.47 in net revenue. Order at 319; Becker at 1354. As such, Georgia State caused Cambridge small but actual harm, which leads to the initial determination that factor four should disfavor fair use.

Georgia State argues that widespread availability of unpaid copying would not substantially harm the potential permissions market for this particular work, given that there has been low demand for permissions, as demonstrated by the following table:

| Year | APS | ECCS | Total |
|------|-----|------|-------|
| 2004 | $89.67 | $0.00 | $89.67 |
| 2005 | $163.55 | $0.00 | $163.55 |
| 2006 | $156.44 | $0.00 | $156.44 |
| 2007 | $355.61 | $0.00 | $355.61 |
| 2008 | $307.53 | $62.99 | $370.52 |
| 2009 | $146.05 | $0.00 | $146.05 |
| 2010 | $63.16 | $0.00 | $163.16 |
| **Total** | **$1,382.01** | **$62.99** | **$1,445.00** |

[Pls. Ex. 153]. Meanwhile, the book earned £99,831 from book sales of *A World of Babies* [Pls. Ex. 152].

Georgia State carries the burden of proving that widespread availability of unpaid copying likely would not have a substantial adverse effect on the potential market for the copyrighted work.

Digital permissions sales were low as of 2009, with little likelihood of repetitive use of excerpts. Nevertheless, it is unlikely that Cambridge would withdraw excerpts of the work from the permissions market so long as there is any possible demand for them. Moreover, nothing done by Defendants or any others had any impact on the potential market for sales of the book. Op. at 94; Patton at 1276. Therefore, it is unlikely that the potential market for the copyrighted work was substantially impacted by Defendants' actions in 2009. It is also unlikely that Defendants' (and any others) actions had substantial impact on the value of the copyrighted work. Accordingly, Georgia State has successfully discharged its burden. Factor four falls in favor of fair use.

In sum, factors one, three, and four favor Georgia State's fair use, while factor two is neutral. Georgia State has met its burden, as the balance clearly tips in its favor. As such, Georgia State's use of an excerpt from A World of Babies was a fair use.

Q.    Professor Harvey

In 2009, Professor Adia Harvey was a Professor in Georgia State's Sociology Department [Pls. Ex. 530].

SOCI 8030 Social Theory I, Fall 2009

In the fall semester of 2009 Professor Harvey taught SOCI 8030, or "Social Theory I," a graduate level course on classical social theory [see id.]. There were two required textbooks in the course in addition to required readings posted to ERES [Id.].

46.    *The Power Elite (New Edition)*[48] (C. Wright Mills, Oxford 2000)

Among the required readings was an excerpt from *The Power Elite (New Edition)* by C. Wright Mills [Id.].  Professor Harvey's students were specifically assigned pages 269-324 (56 pages), or 12.5% of the 448-page book [Id., Pls. Ex. 448].  The excerpt contained all of chapter 12, "The Power Elite," and chapter 13, "The Mass Society" [Pls. Ex. 448].

Fair Use Analysis

Factor one favors fair use.

Factor two looks to the nature of the copied work.  *The Power Elite* is a quasi-academic work written for consumption by both sociologists and a wider audience.  The book examines the organization of power in the United States, which the author argues is concentrated in the military, corporate, and political elite.  The book contains 15 total chapters and an afterword[49] [Pls. Ex. 448].

The first excerpt posted to ERES for Professor Harvey's students was the twelfth chapter, which shares the title "The Power Elite." The author begins with a proposition that post-Civil War changes in the American structure of power were, and still are, characterized by shifts in the political, economic, and military orders.  He elaborates by describing five periods in American history in terms of the relative weight of power among the three orders: (1) from the

---

[48]Defendants concede that Georgia State's use of this work was "outside the scope of fair use" [Defs. Remand Br., Doc. 501 at 63]. For consistency, however, the Court will conduct an independent fair use analysis.

[49]The first edition of the book, published in 1956, consisted of the same 15 chapters without the afterword, which was first included in the "new edition" [see Pls. Ex. 450].

196

Revolution through the John Adams administration, during which the political order was supreme; (2) the early nineteenth century, when the orders loosely shared power; (3) the Congressional elections of 1866 through the First World War, which experienced a power shift from government to corporation; (4) the New Deal, which exhibited a struggle between political and economic forces; and (5) the conclusion of the Second World War through the time of the author's writing, which involved a more pronounced coincidence of all three orders.  The next portion of the chapter more closely examines social similarities in the ideals and associations of individuals who compose "the power elite."  The author discusses structural features that reinforce the unity of the power elite, such as the interchangeability of top roles in each of the three orders.  The chapter's conclusion suggests that the author's contemporary organization of power--consolidated power at the top and a "stalemated" middle society--has had ramifications for the "bottom" of society, or the American public [Id.].

The next excerpt--chapter 13, "The Mass Society"--addresses the ramifications identified in the previous chapter.  To begin the chapter the author notes that, historically, public opinion has an important role in American society because official decisions and private decisions of consequence are almost always negotiated in terms of the public welfare.  The chapter moves on to demonstrate how, in theory, opinion and discourse should be the tools of the public in a democracy.  The author contrasts this ideal with his interpretation of reality, which he describes as "a society of masses" rather than a "community of publics" [Id.]  According to the author, the later version of the public exhibits the following four

197

characteristics: (1) a higher disparity in the ratio of opinion givers to receivers; (2) fewer opportunities for leadership in the public; (3) difficulty translating ideas into social action; and (4) more control by institutional authority. According to the author, although media and education should counteract the mass society, they often serve to reinforce it. The chapter concludes with a review of the book's central idea--that American society has a unified group-- "the power elite"--at the top, a stalemated middle level, and an increasingly powerless mass society at the bottom.

The tone of these two chapters, when considered together, is critical, and at times provocative, but still intellectual. They contain a great deal of the author's own opinion and subjective description of the development of American society. Although the author's observations are grounded in research, the bulk of chapters 12 and 13 are devoted to the author's sociological analysis. As author opinion and evaluation dominate these chapters, factor two disfavors fair use.

Turning to factor three, here, Georgia State uploaded 56 pages or 12.5% of the 448-page book [Pls. Ex. 448]. While the percentage copied is leavened somewhat by the educational purpose of Georgia State's use, the number of pages copied is a heuristic for market substitution (it has a relationship to lost permissions), and the market substitution here was likely very large. Although these considerations are offset by the pedagogical goals of the course furthered by the use of this excerpt, the quantity of the book copied weighs against a finding of fair use. As for the quality of the work copied, in this instance Georgia State copied two complete chapters of the book. Even more damaging for Defendants is the fact that the

chapters used summarize the author's thesis in *The Power Elite*; they are where the ideas explained in the other chapters coalesce. Chapters 12 and 13 are the heart of the work.[50] Accordingly, Georgia State used an impermissible quantity and quality of *The Power Elite*. Factor three weighs heavily against Defendants and in favor of Plaintiffs.

Factor four looks to the impact of Defendants' use on the market for the copyrighted work and the value of the copyrighted work. Digital permissions were available for excerpts of *The Power Elite* in 2009 through CCC [Pls. Ex. 451]. If Georgia State had purchased permissions for its use of the excerpted portion, Oxford would have earned less than $91.39 in net revenue. Order at 324; Becker at 1357. As such, Georgia State's unpaid use caused small but actual market harm to Oxford. This consideration, standing alone, leads to an initial determination that factor four disfavors fair use.

The Court of Appeals' Opinion leaves open the possibility for Defendants to prevail on factor four if they demonstrate it is unlikely that widespread unpaid use of excerpts from *The Power Elite* will substantially harm the market for the work such that Oxford would no longer have an incentive to publish the work. The following table demonstrates revenues CCC generated for Oxford through sales of APS and ECCS permissions from 2004 to 2010:

| Year | APS | ECCS | In-House | Total |
|------|-----|------|----------|-------|
| 2004 | $464.37 | $0.00 | No Evidence | $464.37 |
| 2005 | $1,254.31 | $97.52 | No Evidence | $1,351.83 |

---

[50]The Court made the same finding in its initial Order [Order at 328; Becker at 1359].

199

| 2006 | $702.99 | $88.74 | No Evidence | $791.73 |
| 2007 | $1,401.89 | $55.89 | No Evidence | $1,457.78 |
| 2008 | $272.24 | $59.67 | No Evidence | $331.91 |
| 2009 | $328.34 | $13.77 | No Evidence | $342.11 |
| 2010 | $221.75 | $0.00 | No Evidence | $221.75 |
| Total | $4,645.89 | $315.59 | No Evidence | $4,961.48 |

[Pls. Ex. 451]. Oxford produced no evidence regarding in-house permissions. Between the book's publication in 2000 and November 7, 2010, book sales brought in net revenue of $232,467.00 [Pls. Ex. 357].

The factor four inquiry is twofold. It looks to the harm to the potential market as of 2009, and damage to the value of the copyrighted work in 2009. The record evidence suggests that there is little likelihood of future repetitive unpaid copying of excerpts of *The Power Elite*. In addition, permissions sales are a tiny part of the total revenue that Oxford has earned from sales of *The Power Elite*. The overwhelming majority of the copyrighted work's value lies in the actual book, rather than in permissions sales. Defendants' actions had no effect on the potential market for book sales. Op. at 94; Patton at 1276. Assessing these facts together, it is unlikely that Defendants' actions (and the actions of any others) substantially harmed the value of the copyrighted work in 2009 or the potential market for the work beginning in 2009. It is likely that Sage will not discontinue offering excerpts of the book or the book itself for the foreseeable future. Accordingly, Defendants have succeeded in carrying their burden with respect to factor four and it falls in their favor.

200

In sum, factors one and four favor fair use, while factors two and three disfavor fair use. The Court weights factors four and two as directed by the Court of Appeals; however, factor three is given extra weight in this instance because Georgia State copied a very large quantity of the book (56 pages, two chapters that are the heart of the work). The Court finds that the combined weight of factors one and four is still enough to tip the scale in favor of Defendants. Thus, Georgia State's unpaid use of *The Power Elite* was a fair use.

R.     Professor Ohmer

Professor Mary Ohmer taught in Georgia State's School of Social Work in 2009 [Pls. Ex. 522].

## SW 8200 Evaluation & Technology, Fall 2009

In the fall semester of 2009, Professor Ohmer taught a course called "Evaluation & Technology," or SW 8200, which addressed the roles of evaluation and technology in the modern social work practice environment [Id.]. Professor Ohmer required students to purchase two textbooks in the course, and she posted additional required readings to ERES [Id.].

> 47.   *Sage Handbook of Qualitative Research (Second Edition)*
> (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2000)

One such required reading was an excerpt from the *Sage Handbook of Qualitative Research (Second Edition)* ("*Handbook, Second Ed.*") [Id.]. Professor Ohmer specifically posted chapter 30, or pages 803-820 (18 pages), titled "Software and Qualitative Research," by Eben A. Weitzman [Pls. Exs. 522, 265]. The posted excerpt constituted 1.58% of the 1,142-page book.

## Fair Use Analysis

Factor one favors fair use.

201

Factor two examines the nature of the copyrighted work.  The book's 36 chapters are organized into six parts: (1) Locating the Field; (2) Paradigms and Perspectives in Transition; (3) Strategies of Inquiry; (4) Methods of Collecting and Analyzing Empirical Materials; (5) The Art and Practices of Interpretation, Evaluation, and Representation; and (6) The Future of Qualitative Research.

The excerpt at issue, chapter 30, is located in Part 4.  In it, the author examines the role of software in qualitative research, including the history, critical debates, guidelines for choosing software to match research needs, and a note on future directions for scholarship and development.  The chapter begins with a succinct history of qualitative research and technology, and segues into a discussion about the benefits and limitations of relevant software. Most notably, the author explains that while software can provide tools to assist researchers in analyzing data it cannot actually conduct the analyses.  Next, the author gives an annotated list of types of software available.  The bulk of the chapter is devoted to explaining how a researcher should choose a software program based on immediate and long-term research needs, data sources, research approach, research goals, and resources.  In the final substantive section, the author analyzes several "debates," or points of contention concerning the use of software in qualitative research including whether the use of software forces a researcher to sacrifice familiarity with the data and whether new researchers should first learn to conduct analysis by hand.  In concluding, the author touches on topics in need of further future scholarship, and areas of improvement for qualitative research software development.

The tone of chapter 30 is informational and academic. The material in the chapter is descriptive, rather than analytical. For instance, even when the author seeks to explain why certain software features are more appropriate for specific circumstances, the resulting discussion is not so much an analysis as it is an evenhanded matching of research needs to software functions. While some of the chapter is likely colored by the author's own opinions and experiences, chapter 30 is predominantly an impartial explanation of the advances in research software and what types of software are most amenable to various qualitative research circumstances. As chapter 30 contains both factual presentations plus author opinion, factor two is neutral.

Factor three examines the amount taken in relationship to the original. Here, Professor Ohmer uploaded 18 pages, or 1.58% of the 1,142-page work, which is a small number of pages and a tiny percentage of the copyrighted work. The number of pages copied functions to some extent as a heuristic for market substitution; the degree of market substitution is acceptably small when viewed in connection with the tiny percentage of the copyrighted work. Quality wise, the use of one complete chapter is less fair than would be the use of a part of a chapter. However, chapter 30 specifically is no more or less important than any other in the 36-chapter work. Chapter 30 is not the heart of the work. The chapter also fit the course's pedagogical purpose. Thus, neither the quantity nor the quality of the excerpt uploaded to ERES is excessive. Accordingly, factor three favors fair use.

Turning to factor four, digital permissions were available for excerpts of the *Handbook, Second Ed.* through both CCC and Sage's in-

203

house permissions program in 2009 [see Pls. Exs. 283, 286, 287]. If Georgia State had purchased permissions for its use of the instant excerpts, Sage would have earned $89.96 in net revenue from permissions income. Order at 331; Becker at 1360. Georgia State's unpaid use of the excerpts caused tiny but actual harm to the value of Sage's copyright. If all colleges and universities had programs that allowed unpaid use of copyrighted excerpts, it could cause substantial damage to the permissions market for digital excerpts of this book and to the value of the copyrighted book. This leads to the initial determination that factor four disfavors fair use.

Defendants can still prevail on factor four, however, if they can prove that their unpaid use, even if coupled with widespread unpaid copying practices, did not cause substantial damage to the potential market for and the value of the copyrighted work, or that it did not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276. Defendants do not concede factor four regarding this instance of Georgia State's use of the *Handbook, Second Ed.* [Defs. Remand Br., Doc. 501 at 60]. However, Defendants' only arguments are that "there were no lost sales of this book" and "the pricing was not reasonable in that it required payment for the students' potential-- rather than actual--copying" [Id. at 69]. These arguments do not suffice to cause factor four to tilt in Defendants' favor because they do not address potential loss of permissions income; the other argument, concerning charging only for students who use the excerpt, has been rejected as untimely.

204

In summary, factors one and three favor fair use, factor two is neutral, and factor four disfavors fair use. Weighting these factors as directed by the Court of Appeals, Professor Ohmer's use of the *Handbook, Second Ed.* was a fair use.

48. *Utilization-Focused Evaluation: The New Century Text (Third Edition)* (Michael Quinn Patton, Sage 1996)

Professor Ohmer assigned chapters one and two (pages 2-38) of *Utilization-Focused Evaluation*, by Michael Quinn Patton, as required reading for her fall 2009 class [Pls. Ex. 522]. Those chapters, titled "Evaluative Use: Both Challenge and Mandate" and "What Is Utilization-Focused Evaluation? How Do You Get Started?" respectively, were a combined 37 pages long and were 8.28% of the 447-page copyrighted work [Pls. Ex. 316].

Fair Use Analysis

Factor one favors fair use.

As to factor two, *Utilization-Focused Evaluation* is a semi-academic work which explores the field of program evaluation, which is a method by which projects, policies, and programs are evaluated for their effectiveness and efficiency.[51]  The author uses the book to promote a version of program evaluation known as "utilization-focused evaluation."  The book aims to inform the reader about how to create and perform utilization-focused evaluation by incorporating information the author has collected in the decades[52] since he first promoted the practice.

_____

[51]Program evaluation is most commonly used in the assessment of government programs [Id.].

[52]The alleged infringement involves the third edition of *Utilization-Focused Evaluation*. The first edition of the book appears to have been published in 1978 [Pls. Ex. 316 at xiv].

Chapter one, titled "Evaluative Use: Both Challenge and Mandate," provides an introduction to the field of program evaluation. The chapter chronicles the early uses of program evaluation, which the author believes were defined by overly dense evaluations which were underutilized by policymakers in shaping new programs. Using these early failures as a teaching moment, the chapter focuses on the key aspects of effective program evaluation, such as accuracy, feasibility, and utility.

Chapter one is mostly factual in nature. The chapter reviews the initial landscape of program evaluation and chronicles the progression within the field. The chapter is written in a formal tone.

Chapter two, titled "What Is Utilization-Focused Evaluation? How Do You Get Started?" explains the concept of utilization-focused evaluation, asserting that an evaluation should consider the evaluation's use throughout all steps of the analysis. The chapter closes with a discussion of how the hallmarks of a utilization-focused approach, such as target questions and a continuous feedback loop, turn program evaluations into tangible results.

Chapter two is didactic. It relies on other researchers' studies to illustrate the concepts presented. The author presents the chapter in a conversational tone and focuses on some of his own experiences in developing the concept of utilization-focused evaluation. Factor two is neutral for these excerpts.

As to factor three, Professor Ohmer used 37 pages of *Utilization-Focused Evaluation*, which is 8.28% of the overall page count of the book [Pls. Ex. 316]. Standing alone, the percentage used is small, and it is a permissible amount in light of Professor

206

Ohmer's educational purpose, even considering the impact of market substitution. Use of this excerpt also served Professor Ohmer's pedagogical purpose. However, when the fact that Professor Ohmer used two complete chapters is added, the amount used becomes disqualifying, even though the two chapters used are not the heart of the work. Factor three disfavors fair use.

As to factor four, ECCS permissions were available to make digital excerpts of *Utilization-Focused Evaluation* in 2009. The unpaid use by members of Professor Ohmer's class cost Sage less than $189.92 in net revenue. Order at 334, 334 n.143; Becker at 1362, 1362 n.143. This use, therefore, caused tiny but actual harm to the value of Sage's copyrighted work. If other colleges and universities allowed use of unpaid excerpts of *Utilization-Focused Evaluation*, this could cause substantial harm to the potential market for digital permissions and in turn to the potential market for the copyrighted work. It could also substantially impact the value of the copyrighted work. Upon initial review, factor four disfavors fair use.

Under the standard set by the Court of Appeals, Defendants may still prevail by proving that the availability of widespread unpaid copying practices would not "cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the publisher's] incentive to publish the work." Op. at 93; Patton at 1276.

*Utilization-Focused Evaluation* has been published in four editions. The first edition was published in 1978; the second edition was published in 1986; the third edition, at issue here, was published in 1996; and the fourth edition was published in 2008 [Pls.

207

Exs. 316, 318]. According to the preface of the book, the third edition was updated to reflect "recent evaluation research": this recent research "substantially increased the length of the book because so much has happened on so many fronts" [Pls. Ex. 316 at xiv].

The following table shows book sales for the third edition of *Utilization-Focused Evaluation* since its publication in 1996:

| Year | Book Sales (Net Sales Revenue) |
|---|---|
| 1996 | $7,993.02 |
| 1997 | $83,394.21 |
| 1998 | $94,216.81 |
| 1999 | $66,635.06 |
| 2000 | $76,871.35 |
| 2001 | $73,127.46 |
| 2002 | $81,717.62 |
| 2003 | $71,702.55 |
| 2004 | $70,281.09 |
| 2005 | $61,562.69 |
| 2006 | $72,441.76 |
| 2007 | $61,434.64 |
| 2008 | -$8,588.77[53] |
| 2009 | -$92.11 |
| 2010 | -$101.94 |
| **Total** | **$812,595.44** |

[Pls. Ex. 319].

---

[53]The negative net sales revenue for 2008-2010 undoubtedly reflects returned copies of the third edition from those who decided to get the fourth edition instead.

The following table shows permissions revenue earned on excerpts from the third edition of *Utilization-Focused Evaluation* from 1996 to 2010:

| Year | APS | ECCS | In-House | Total |
|------|------------|-------------|-------------|-------------|
| 1996 | No Evidence | No Evidence | $45.00 | $45.00 |
| 1997 | No Evidence | No Evidence | $35.00 | $35.00 |
| 1998 | No Evidence | No Evidence | $45.00 | $45.00 |
| 1999 | No Evidence | No Evidence | $68.00 | $68.00 |
| 2000 | No Evidence | No Evidence | $65.62 | $65.62 |
| 2001 | No Evidence | No Evidence | $339.67 | $339.67 |
| 2002 | No Evidence | No Evidence | $1,445.34 | $1,445.34 |
| 2003 | No Evidence | No Evidence | $745.56 | $745.56 |
| 2004 | $216.75 | $94.86 | $1,601.77 | $1,913.38 |
| 2005 | $319.24 | $94.86 | $844.81 | $1,258.91 |
| 2006 | $224.00 | $457.89 | $1,719.12 | $2,401.01 |
| 2007 | $419.73 | $648.82 | $1,268.93 | $2,337.48 |
| 2008 | $154.64 | $763.37 | $1,853.66 | $2,771.67 |
| 2009 | $67.12 | $246.09 | $1,015.06 | $1,328.27 |
| 2010 | $0.00 | $357.00 | $375.71 | $732.71 |
| Total | $1,401.48 | $2,662.89 | $11,468.25 | $15,532.62 |

[Pls. Exs. 319, 321].[54]

The question here is twofold. It pertains to harm to the potential market for the copyrighted work beginning in 2009, the year the alleged infringement occurred. Also, it pertains to damage to the value of the copyrighted work in 2009. For both, the Court assumes that "everybody" (all colleges and universities) had programs

---

[54]The APS and ECCS numbers are slightly less than the totals that appear in the exhibit, as the exhibit contains APS and ECCS figures from other editions of *Utilization-Focused Evaluation*.

similar to Georgia State's (allowing unpaid copying of small excerpts of copyrighted works) in 2009 and thereafter.

Defendants' actions had no impact on book sales. Small excerpts do not substitute for books. Op. at 94; Patton at 1276. Moreover, book sales had ceased prior to 2009. Permissions sales did occur in 2009 and 2010, albeit in smaller amounts than in most previous years. It is a close question whether Defendants establish, by a preponderance of the evidence, that their actions caused no substantial harm to the potential market for digital permissions in 2009. Defendants are also challenged in carrying the burden of proof on the question whether Defendants' actions substantially harmed the value of the copyrighted work, because the value of the copyrighted work in 2009 was entirely attributable to actual and potential permissions plus the copyright's (undefined) intangible value.

Defendants make two arguments. First, they point out that no book sales were lost. Second, they argue that the cost of permissions is unreasonable because the price calculation does not consider that a student may not download and use an excerpt. These arguments are unpersuasive. It appears quite likely that there will be no more sales of the third edition in light of the publication of the fourth edition. The argument about unreasonable cost due to some students' failure to use the material has been rejected, see infra pp. 15-16.

Taking all of this into account, the Court finds that Defendants do not carry their burden of proving that no substantial damage was done to the actual or potential market for or the value of the copyrighted work. Factor four, therefore, disfavors fair use.

In conclusion, factor one favors fair use, factor two is neutral, and factors three and four disfavor fair use. Accordingly, Defendants have not met their overall burden to prove that Professor Ohmer's use of *Utilization-Focused Evaluation* was a fair use. Sage's infringement claim succeeds as to this work.

## IV.   <u>Summary</u>

Defendants' Motion to Strike Portions of Plaintiffs' Remand Brief and to Disregard Declaration [Doc. 502] is GRANTED.

This case is currently before the Court for fair use analysis with respect to 48 infringement claims. Plaintiffs are entitled to prevail on the claims involving these works in these Georgia State classes:

<u>Maymester 2009</u>:

- *The Sage Handbook of Qualitative Research (Third Edition)* (Professor Kaufmann, EPRS 8500 Qualitative/Interpretive Research in Education I)

<u>Summer 2009</u>:

- *The Sage Handbook of Qualitative Research (Second Edition)* (Professor Kaufmann, EPRS 8510 Qualitative Research in Education II - Data Collection)

<u>Fall 2009</u>:

- *The Sage Handbook of Qualitative Research (Third Edition)* (Professor Kaufmann, EPRS 8500 Qualitative/Interpretive Research in Education II)

- *The Sage Handbook of Qualitative Research (Second Edition)* (Professor Esposito, EPSF 8280 Anthropology of Education)

- *The Power Elite* (Professor Harvey, SOCI 8030 Social Theory I)

- *The Sage Handbook of Qualitative Research (Second Edition)* (Professor Ohmer, SW 8200 Evaluation & Technology)

- *Utilization-Focused Evaluation (Third Edition)* (Professor Ohmer, SW 8200 Evaluation &  Technology)

211

With respect to the other infringement claims, Defendants are entitled to prevail.

## V.   Relief To Be Granted

Plaintiffs are DIRECTED to file, within twenty (20) days of entry of this Order, the proposed text of any injunctive or declaratory relief they seek, together with the rationale supporting their request.   Alternative proposals are acceptable.   Should Plaintiffs desire to present additional evidence in support of a request for injunctive relief, they should indicate with specificity what that evidence would be and how it would assist the Court in determining what injunctive relief, if any, to prescribe. Defendants may state their opposition, if any, and may propose one or more alternative orders, within fifteen (15) days after Plaintiffs' filing.   If Defendants object to Plaintiffs' proposal(s) or if Defendants suggest one or more alternative order(s), the rationale shall be stated.   Each side's filings shall not exceed thirty (30) pages, including any attachments.

## VI.   Costs and Attorneys' Fees

Section 505 of the Copyright Act, 17 U.S.C. § 505 provides:

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

Defendants are the prevailing side and are entitled to an award of costs and attorneys' fees.   Defendants shall file a properly documented request for an award within twenty (20) days of the date of entry of this Order; Plaintiffs' response is due within fifteen

212

(15) days of the date of entry of this Order.    The parties are DIRECTED to confer with a view toward resolving disputed issues pertaining to the amount of the award.

The Clerk is DIRECTED to re-submit the file upon expiration of the above-referenced time period.

SO ORDERED, this  31  day of March, 2016.

Orinda D. Evans
ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

213

## Cambridge

| **Work** | **Publica-tion Date** | **APS Income** (Pls. Ex. #) (7/1/2004-12/1/2010) | **ECCS Income** (Pls. Ex. #) (7/1/2004-12/1/2010) | **Net Sales Revenue** (Pls. Ex. #) (through 10/31/2010) |
|---|---|---|---|---|
| *Liszt: Sonata in B Minor* | 1996 | None | None | £19,322 (133) |
| *The Cambridge Companion to Mendelssohn* | 2004 | $20.66 (70) | None | £24,826 (69) |
| *The Cambridge Companion to Schumann* | 2007 | None | None | £27,866 (78) |
| *Ancient Egyptian Materials* | 2000 | $241.49 (14) | None | £170,793 (13) |
| *Assessing Speaking* | 2004 | $72.93 (38) | None | £58,893 (37) |
| *Learning Vocabulary in Another Language* | 2001 | $214.74 (129) | None | £151,583 (128) |
| *International Health Organisations* | 1995 | $52.62 (113) | None | £16,284 (112) |
| *Understanding Trauma* | 2007 | None | None | £33,629 (146) |
| *Language Acquisition and Conceptual Development* | 2001 | $257.43 (124) | $669.39 (124) | £456 (123) |
| *A World of Babies* | 2000 | $1,382.01 (153) | $62.99 (153) | £99,831 (152) |

## Oxford

| **Work** | **Publication Date** | **APS Income** (7/1/2004 - 12/1/2010) (Pls. Ex. #) | **ECCS Income** (7/1/2004 - 12/1/2010) (Pls. Ex. #) | **Net Sales Revenue** (through 11/7/10) (Pls. Ex. 357 & 366) |
|---|---|---|---|---|
| *The Craft of Inquiry* | 1998 | $188.62 (375) | $12.36 (375) | $86,325.00 |
| *Awakening Children's Minds* | 2001 | none | $140.55 (358) | $130,482.00 |
| *The Music of Berlioz* | 2001 | None | None | $9,580.00 |
| *The Slave Community* | 1972 | $10,732.20 (463) | $191.55 (463) | $1,602,935.00 |
| *Fundamental Considerations in Language Testing* | 1990 | $555.68 (409) | none | £151,242.15 |
| *Evolution of Infectious Disease* | 1994 | None | None | £222,038.50 |
| *Approaches to Qualitative Research* | 2004 | $131.29 (353) | $172.59 (353) | None |
| *Region, Race and Reconstruction* | 1982 | $1,835.73 (457) | $622.80 (457) | $2,199 |
| *The Unpredictable Past* | 1993 | $701.05 (480) | None | $79,367.92 |
| *Living Ethics* | 2008 | $114.24 (426) | None | $37,875.00 |
| *The Organ as a Mirror of its Time* | 2002 | None | None | $55,831.00 |
| *Crabgrass Frontier* | 1985 | $2,876.08 (371) | $94.25 (371) | $740,414.00 |
| *The Politics of Public Housing* | 2004 | None | None | $45,113.00 |
| *Regimes and Democracy in Latin America* | 2007 | $348.33 (454) | None | $12,689.00 |
| *The Power Elite* | 1956 | $4,645.89 (451) | $315.59 (451) | $232,467.00 |

Attachment p. 2

| Sage | | | | | |
|---|---|---|---|---|---|
| **Work** | **Publica-tion Date** | **APS Income** (7/1/2004-12/1/2010) (Pls. Ex. #) | **ECCS Income** (7/1/2004-12/1/2010) (Pls. Ex. #) | **In-House Permissions Income** (from date of publication) (Pls. Ex. #) | **Net Sales Revenue** (Pls. Ex. #) |
| *Handbook of Feminist Research* | 2007 | None | None | $983.46 (248) | $94,085.88 (248) |
| *Handbook of Social Theory* | 2001 | $504.90 (292) | None | £2,470.01 (291) | £63,483.74 (291) |
| *The Sage Handbook of Qualitative Research (Third)* | 2005 | $2,042.34 (287) | $1,131.86 (287) | $18,711.95 (283) | $1,327,804.06 (283) |
| *The Sage Handbook of Qualitative Research (Second)* | 2000 | 10351.4 (286) | $6,324.61 (286) | $58,904.47 (283) | $1,3000,053.54 (283) |
| *Handbook of Critical and Indigenous Methodologies* | 2008 | $37.84 (238) | $138.04 (238) | $383.15 (237) | $161,204.62 (237) |
| *The Sage Handbook of Qualitative Research (First)* | 1994 | $4,938.18 | $3,883.99 | None | None |
| *African American Single Mothers* | 1995 | $151.47 (208) | $782.14 (208) | $2,841.57 (206, 207) | $53,007.84 (206) |
| *Black Children (Second)* | 2002 | $819.40 (216) | $116.03 (216) | $1,237.63 (214, 215) | $104,828.72 (214) |
| *Black Families (Third)* | 1997 | $1,217.87 (224) | $931.60 (224) | $3,561 (222) | $144,388.03 (222) |
| *Theoretical Frameworks in Qualitative Research* | 2006 | None | None | $138.61 (308, 309) | $75,320.69 (308) |
| *Handbook of Mixed Methods* | 2003 | $1,033.78 (256) | $51.41 (256) | $2,825.86 (255) | $391,077.68 (255) |
| *Contemporary Cases in U.S. Foreign Policy* | 2005 | $415.16 (230) | None | $333.81 (314) | $365,751.22 (314) |
| *U.S. Foreign Policy: The Paradox of World Power* | 2005 | $137.70 (315) | None | $285.33 (314) | $738,238.89 (314) |
| *Utilization-Focused Evaluation (Third)* | 1997 | $1,671.61 (321) | $2,688.92 (321) | $15,490.85 (319) | $812,595.44 (319) |