IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
U.S.D.C. Atlanta

MAR - 2 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

CAMBRIDGE UNIVERSITY PRESS;
OXFORD UNIVERSITY PRESS,
INC.; SAGE PUBLICATIONS,
INC.,

       Plaintiffs,

v.

CIVIL ACTION NO.
1:08-CV-1425-ODE

MARK P. BECKER, in his
official capacity as
President of Georgia State
University; RISA PALM, in her
official capacity as Senior
Vice President for Academic
Affairs and Provost of
Georgia State University;
J.L. ALBERT, in his official
capacity as Georgia State
University Associate Provost
for Information Systems and
Technology; NANCY SEAMANS, in
her official capacity as Dean
of Libraries at Georgia State
University; ROBERT F.
HATCHER, in his official
capacity as Vice Chair of the
Board of Regents of the
University System of Georgia;
KENNETH R. BERNARD, JR.,
LARRY R. ELLIS, W. MANSFIELD
JENNINGS, JR., JAMES R.
JOLLY, DONALD M. LEEBERN,
JR., WILLIAM NESMITH, JR.,
DOREEN STILES POITEVINT,
WILLIS J. POTTS, JR., C. DEAN
ALFORD, KESSEL STELLING, JR.,
BENJAMIN J. TARBUTTON, III,
RICHARD L. TUCKER, LARRY
WALKER, RUTLEDGE A. GRIFFIN,
JR., C. THOMAS HOPKINS, JR.,
NEIL L. PRUITT, JR., and
PHILIP A. WILHEIT, SR., in
their official capacities as
members of the Board of
Regents of the University
System of Georgia,

       Defendants.

**OPINION**

# Table of Contents

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 2

II.   FAIR USE ANALYSIS FOR INDIVIDUAL INFRINGEMENT
     CLAIMS: FINDINGS OF FACT AND CONCLUSIONS OF LAW . . . 7

    A.   Professor Kaufmann. . . . . . . . . . . . . . 7

        Maymester 2009: EPRS 8500

        1.   *The Craft of Inquiry* (Oxford). . . . . . . 8
        2.   *Handbook of Feminist Research* (Sage) . . . . 14
        3.   *Handbook of Social Theory* (Sage) . . . . . . 19
        4.   *The Sage Handbook of Qualitative Research
           (Third)* (Sage) . . . . . . . . . . . . . . 25
        5.   *Handbook of Critical & Indigenous
           Methodologies* (Sage) . . . . . . . . . . . 32
        6.   *Handbook of Narrative Inquiry* (Sage) . . . . 37

        Summer 2009: EPRS 8510

        7.   *The Sage Handbook of Qualitative Research
           (Second)* (Sage). . . . . . . . . . . . . . 43

        Fall 2009: EPRS 8500

        8.   *The Craft of Inquiry* (Oxford). . . . . . . 50
        9.   *Approaches to Qualitative Research* (Sage). . 50
        10.  *Handbook of Feminist Research* (Sage) . . . . 54
        11.  *Handbook of Narrative Inquiry* (Sage) . . . . 59
        12.  *The Sage Handbook of Qualitative Research
           (Third)* (Sage) . . . . . . . . . . . . . . 62
        13.  *Handbook of Social Theory* (Sage) . . . . . . 68

    B.   Professor Esposito. . . . . . . . . . . . . . 68

        Summer 2009: EPSF 8280

        14.  *Handbook of Feminist Research* (Sage) . . . . 69
        15.  *The Sage Handbook of Qualitative Research
           (Second)* (Sage). . . . . . . . . . . . . . 73
        16.  *The Sage Handbook of Qualitative Research
           (First)* (Sage) . . . . . . . . . . . . . . 77

        Fall 2009: EPRS 8520

        17.  *Theoretical Frameworks in Qualitative
           Research* (Sage) . . . . . . . . . . . . . . 82

C.    Professor Kruger. . . . . . . . . . . . . . 87

       <u>Summer & Fall 2009: EPY 7090</u>

       18.   *Awakening Children's Minds* (Oxford). . . . . 88

       <u>Fall 2009: EPY 8220</u>

       19.   *Understanding Trauma* (Cambridge) . . . . . . 91

D.    Professor Orr . . . . . . . . . . . . . . . 96

       <u>Summer 2009: MUS 8860</u>

       20.   *Liszt: Sonata in B Minor* (Cambridge) . . . . 96
       21.   *The Cambridge Companion to Mendelssohn*
            (Cambridge) . . . . . . . . . . . . . 100
       22.   *The Cambridge Companion to Schumann*
            (Cambridge) . . . . . . . . . . . . . 103
       23.   *The Music of Berlioz* (Oxford). . . . . . . 106

       <u>Fall 2009: MUS 8840</u>

       24.   *The Organ as a Mirror of Its Time* (Oxford) 110

E.    Professor Dixon . . . . . . . . . . . . . . 114

       <u>Fall 2009: AAS 3000</u>

       25.   *The Slave Community* (Oxford) . . . . . . . 115
       26.   *African American Single Mothers* (Sage) . . 120
       27.   *Black Children* (Sage) . . . . . . . . . . 126
       28.   *Black Families (Third)* (Sage). . . . . . . 133

F.    Professor Hartwig . . . . . . . . . . . . . 139

       <u>Fall 2009: AH 4900</u>

       29.   *Ancient Egyptian Materials & Technology*
            (Cambridge). . . . . . . . . . . . . . 140

G.    Professor Kim . . . . . . . . . . . . . . . 143

       <u>Fall 2009: AL 8550</u>

       30.   *Fundamental Considerations in Language
            Testing* (Oxford) . . . . . . . . . . . 143
       31.   *Assessing Speaking* (Cambridge) . . . . . . 147
       32.   *Learning Vocabulary in Another Language*
            (Cambridge). . . . . . . . . . . . . . 150

H.   Professor McCombie. . . . . . . . . . . . . . 154

Fall 2009: ANTH 4440

33. *International Health Organisations*
(Cambridge). . . . . . . . . . . . . . . 154
34. *Evolution of Infectious Disease* (Oxford) . 157

I.   Professor Anggoro . . . . . . . . . . . . . 160

Fall 2009: EPY 8960

35. *Language Acquisition & Conceptual
Development* (Cambridge). . . . . . . . . . 161

J.   Professor Davis . . . . . . . . . . . . . . 167

Fall 2009: HIST 7010

36. *Region, Race & Reconstruction* (Oxford) . . 168
37. *The Unpredictable Past* (Oxford). . . . . . 173

K.   Professor Freeman . . . . . . . . . . . . . 176

Fall 2009: JOUR 4800

38. *Living Ethics* (Oxford) . . . . . . . . . 177

L.   Professor Moloney . . . . . . . . . . . . . 180

Fall 2009: NURS 8035

39. *Handbook of Mixed Methods* (Sage) . . . . . 181

M.   Professor Lasner. . . . . . . . . . . . . . 187

Fall 2009: PERS 2001

40. *Crabgrass Frontier* (Oxford). . . . . . . . 187
41. *The Politics of Public Housing* (Oxford). . 193

N.   Professor Hankla. . . . . . . . . . . . . . 196

Fall 2009: POLS 3450

42. *Contemporary Cases in U.S. Foreign Policy*
(Sage) . . . . . . . . . . . . . . . . . . 197
43. *U.S. Foreign Policy* (Sage) . . . . . . . . 202

O.   Professor McCoy . . . . . . . . . . . . . . 207

Fall 2009: POLS 8250

44. *Regimes & Democracy in Latin America*
(Oxford) . . . . . . . . . . . . . . . . . 208

P.   Professor Whitten . . . . . . . . . . . . . . . 212

Fall 2009: PSYC 4030

45.  *A World of Babies* (Cambridge). . . . . . . 212

Q.   Professor Harvey. . . . . . . . . . . . . . . 218

Fall 2009: SOCI 8030

46.  *The Power Elite* (Oxford) . . . . . . . . 218

R.   Professor Ohmer . . . . . . . . . . . . . . . 224

Fall 2009: SW 8200

47.  *The Sage Handbook of Qualitative Research*
     *(Second)* (Sage). . . . . . . . . . . . . . 224
48.  *Utilization-Focused Evaluation* (Sage) . . 230

III. SUMMARY. . . . . . . . . . . . . . . . . . . . 235

IV.  RELIEF TO BE GRANTED . . . . . . . . . . . . . 236

V.   COSTS AND ATTORNEYS' FEES . . . . . . . . . . 236

## I.  **INTRODUCTION**

This copyright infringement case is again before the Court on remand from the United States Court of Appeals for the Eleventh Circuit.  Specifically, in Cambridge IV[1] the Court of Appeals has given the following direction:

> In short, we held in Cambridge II that the District Court's original fourth-factor analysis was correct.  That holding precluded the district court from revisiting the fourth factor in Cambridge III. On remand, the district court must reinstate its original findings that the fourth factor strongly disfavors fair use for the 31 excerpts for which the publishers proved the availability of digital licenses.

Cambridge IV, 906 F.3d 1290, 1300 (2018).

In Cambridge IV the Court of Appeals also held as follows:

> (1)  [this court] erred in utilizing a quantitative rubric (25% for factor one; 5% for factor two; 30% for factor three and 40% for factor four). Instead, the court is directed to make a qualitative assessment of the four factors combined without "a mathematical formula at any step of its analysis."

Id. at 1300.  The Court of Appeals further stated in Cambridge IV:

> We reiterate our holding in Cambridge II that "the fourth factor looms large in the overall fair use analysis for each excerpt in this appeal, 769 F.3d at 1275, but we instruct the district court to evaluate the four factors qualitatively, not quantitatively, and to take care to consider them holistically "in the purposes of copyright."

Id. at 1301.

---

[1] The previous opinions of this Court are designated herein as Cambridge I and Cambridge III.  The previous opinions of the Court of Appeals are designated as Cambridge II and Cambridge IV.

Finally, the Court of Appeals held in <u>Cambridge IV</u> that this court erred when it considered the cost of purchasing licenses in finding that the third factor favored fair use in two instances. <u>Id.</u> at 1301.

The bottom line of the Court of Appeals' decision in <u>Cambridge IV</u> is the following:

> The district court must reinstate its earlier findings that factor four strongly disfavors fair use for 31 of the 48 excerpts. The district court must eschew a quantitative approach to the weighing and balancing of the fair use factors and give each excerpt the holistic, qualitative and individual analysis that the Act demands. And the district court must omit any consideration of price from its analysis of the third factor.

<u>Id.</u> at 1302.

In <u>Cambridge II</u> the Court of Appeals made the following rulings which continue to be pertinent to resolution of the fair use defense.

(1) Factor one favors fair use where Defendants' use is for a nonprofit educational purpose by a nonprofit educational institution, even though Defendants' use is nontransformative and it serves the same overall function as the original copyrighted work. <u>Cambridge II</u>, 769 F.3d 1232, 1267 (2014).

(2) Regarding factor two, where the excerpts of Plaintiffs' works contain "evaluative, analytical or subjectively descriptive material that surpasses the bare facts necessary to communicate information, or derives from the author's experiences or opinions" <u>id.</u> at 1270, the second factor is neutral, or even weighs against fair use, or even weighs "against fair use in

-3-

cases of excerpts that [are] dominated by such material." <u>Id.</u> at 1270.

(3) The second factor is "of relatively little importance in this case." <u>Id.</u> at 1270.

(4) The third factor addresses "whether Defendants have 'helped themselves overmuch' of the copyrighted work in light of the purpose and character of the use." <u>Id.</u> at 1271.

(5) Factor three is intertwined with factor one and also with factor four in that it "partly functions as a heuristic to determine the impact on the market for the original." <u>Id.</u> at 1271.

(6) In determining the permissible quantity of materials which may be copied under factor three one must consider "not only . . . the quantity of materials used, but . . . their quality and importance, too." <u>Id.</u> at 1271.

(7) Factor four counts more than any of the other factors where Defendants' use is nontransformative and Plaintiffs' works are used for one of the purposes for which they are marketed. <u>Id.</u> at 1275. Put another way, factor four "looms large" in the fair use analysis in this case. <u>Id.</u> at 1275.

(8) Factor four considers the extent of market harm caused by Defendants' actions and "whether unrestricted and widespread conduct of the sort engaged in by the Defendants would result in a substantially adverse impact on the potential market." <u>Id.</u> at 1275. The

adverse impact is primarily that of market substitution; i.e., "use that supplants any part of the normal market for a copyrighted work." <u>Id.</u> at 1275. "The importance of the fourth factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." <u>Id.</u> at 1275.

(9) The main question under the fourth factor is not whether Defendants' use of Plaintiffs' works caused Plaintiffs to lose <u>some</u> potential revenue. Rather it is "whether Defendants' use--taking into account the damage that might occur if 'everybody did it' would cause <u>substantial</u> economic harm such that allowing it would frustrate the purposes of copyright." <u>Id.</u> at 1276.

(10) "Where the evidence shows there is no significant demand for an excerpt, the likelihood of repetitive use is diminished." <u>Id.</u> at 1279.

While the factual background relevant to consideration of these issues is extensively set forth in previous opinions of this Court and the Court of Appeals, a brief overview is provided here before turning to the new findings of fact and conclusions of law which are necessary to address the rulings of the Court of Appeals in <u>Cambridge IV</u>.

Plaintiffs are three publishing houses that specialize in academic works. Plaintiff Cambridge University Press ("Cambridge") is the not-for-profit publisher of the University of Cambridge in Cambridge, England. Oxford University Press,

Inc. is a not-for-profit United States corporation which is affiliated with Oxford University in England. Plaintiff Sage Publications, Inc. ("Sage") is a for-profit Delaware corporation.

Defendants are officials affiliated with Georgia State University in Atlanta, Georgia ("Georgia State"). Georgia State is one part of the University of Georgia system.

In early 2009 Georgia State formally adopted a program which allowed professors to post excerpts of copyrighted works on its electronic reserve system; students enrolled in courses could digitally access and copy the excerpts. Access to the excerpts ended at the end of the course and restrictions applied to the use of the excerpts. No license fees were paid to Plaintiffs for these uses. This case concerns the unlicensed use of excerpts of certain of Plaintiffs' copyrighted works during three semesters in 2009 following Georgia State's adoption of the electronic reserves ("ERES") policy. A joint filing by the parties on March 15, 2011 reflected 99 claimed infringements[2] [Doc. 266].

---

[2]During the nonjury trial beginning May 17, 2011 Plaintiffs' evidence addressed 74 infringement claims. Plaintiffs dropped 25 claims and added one claim at the close of Plaintiffs' case in chief. Plaintiffs did this by filing a notice in the Clerk's Office on June 1, 2011 that they were taking this action [Doc. 361]. The filing of the notice was announced by Plaintiffs in open court on June 1, 2011. Defendants did not object to the dismissal of the 25 claims or to adding one new claim. Defendants did not request that the 25 claims be dismissed with prejudice. In Cambridge I this Court found that Plaintiffs failed to establish a prima facie case of copyright infringement (because of missing documents needed to establish the publisher's ownership of the work or the lack of evidence reflecting copyright registration) for 26 claims. The

Defendants contend that the use of unlicensed excerpts pursuant to the 2009 ERES program was protected by the fair use defense as set forth in 17 U.S.C. § 107. This statute provides:

> Notwithstanding the provisions of 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.


## II.  FAIR USE ANALYSIS FOR INDIVIDUAL INFRINGEMENT CLAIMS: FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Professor Kaufmann

Professor Kaufmann is an assistant professor at Georgia State in the College of Education [Tr. Vol. 5, Doc. 403 at 35-36]. Professor Kaufmann's courses teach students methods for

---

net result was that only 48 infringement claims were left for decision on the merits in Cambridge I.

conducting qualitative research, and consist predominantly of Ph.D. students [Id.].

EPRS 8500 Qualitative/Interpretive Research in Education I, Maymester 2009

EPRS 8500 was taught by Professor Jodie Kaufmann during Maymester and fall of 2009. The course syllabus required that students buy three texts, and that they complete several required readings which had been posted on Georgia State's electronic reserves system ("ERES") [Tr. Vol. 5, Doc. 403 at 68-76, 143-45; Pls. Exs. 516, 518].

> 1. *The Craft of Inquiry: Theories, Methods, Evidence* (Robert R. Alford, Oxford 1998)

*The Craft of Inquiry* was first published by Oxford in 1998. It is a 176 page, eight chapter book authored by Robert R. Alford. It provides an overview of sociological methodology and the relationships between the various approaches [Pls. Ex. 372]. *The Craft of Inquiry* retails for $32.95 [Jt. Ex. 5 at D-10]. The net sales revenue from the date of first publication through November 7, 2010 was $86,325.00 [Pls. Ex. 357]. Permissions to make licensed digital excerpts of the book were available in 2009 through Copyright Clearance Center ("CCC"). From July 1, 2004 until December 1, 2010, *The Craft of Inquiry* earned $12.36 in ECCS permissions revenue [Pls. Ex. 375; see also Attachment to this Order].[3]

_____

[3]Permissions revenues earned by Plaintiff-publishers serve as a useful proxy for estimating demand for licensed excerpts of the works at issue in this case. However, the Court does acknowledge that permissions revenues may not account for the full extent of copying of excerpts occurring at universities by professors and students. Based on Dr. Crews's report, the Court infers that unpaid use of excerpts occurred at many universities

One of the posted readings was an excerpt from *The Craft of Inquiry: Theories, Methods, Evidence* ("*The Craft of Inquiry*"), by Robert R. Alford [Pls. Ex. 372]. Pages 21-31 (11 pages) of *The Craft of Inquiry*, the entirety of chapter two and 6.25% of the book, were uploaded to ERES for distribution to the students in Professor Kaufmann's EPRS 8500 Maymester 2009 course. This was required reading [Doc. 403 at 120-21]. Had permissions been paid for the digital distribution of this excerpt, Oxford would have earned less than $14.89 in net revenue from permissions income.[4] The cost to students in the course would have been $20.16.

---

other than Georgia State in 2009. However, even if earned permissions revenues do not reflect all uses of an excerpt, they are still instructive as to the relative demand for excerpts of various works. For example, it is evident that a work such as *The Sage Handbook of Qualitative Research (Second Edition)*, which earned $6,324.61 in ECCS revenue (ECCS revenue means revenue from permissions which allow the user to make digital copies. ECCS permissions are obtained from CCC) from July 1, 2004 through December 1, 2010 and $45,498.72 in in-house permissions sales (probably digital) from Sage from 2004 through 2010, has stronger demand for licensed digital excerpts among academic users than Oxford's *The Craft of Inquiry*, which was used in the same course but has earned only $12.36 through ECCS over the same time period.

Furthermore, in Fiscal Year 2009, CCC paid royalties of $935,450.35 to Cambridge, $1,650,323.00 to Oxford, and $2,136,912.89 to Sage [Stipulations, Doc. 276 ¶ 33]. These figures make clear that Sage and Oxford had a larger presence in the excerpt market in 2009 than did Cambridge.

[4]The amount earned would have been $20.16, the amount charged by CCC, [Jt. Ex. 5 at D-10], less the $3.00 service fee charged by CCC to users, less $2.57 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt was nontransformative (in this case, mirror image copying). It serves the same overall function as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *The Craft of Inquiry* is an academic[5] non-fiction[6] work concerning the process of constructing a research project. The author's thesis is that three major paradigms of inquiry-- multivariate, interpretive and historical--should be considered in this process. Various chapters of the book discuss the three major paradigms. Professor Kaufmann assigned the reading (via ERES) of chapter two, pages 21-31, "Designing a Research Project." This chapter[7] advises that the writer should focus on

---

[5]Almost all of the books involved in this case are academic in nature. By "academic," the Court means "Of, relating to, or characteristic of an educational institution or environment; concerned with the pursuit of research, education, and scholarship; scholarly, educational, intellectual." *Academic*, Oxford English Dictionary (3d ed. 2011).

[6]All of the books involved in this case are non-fiction.

[7]The Court notes that factor two addresses "the nature of the copyrighted work," not "the nature of the excerpt taken." As noted in Cambridge I, this Court has conducted a detailed, close examination of the excerpts used by Defendants and has sufficiently examined the balance of the copyrighted work to determine that the nature of the excerpt fairly reflects the

-10-

the cognitive, not the emotional, choices that are presented. The writer should start the project by identifying a problem of interest and identifying theoretical and empirical entry points to the discussion. Then, the writer should move back and forth between those "tracks of analysis" to formulate one or more research questions. Once one or more research questions have been identified, the writer should turn to "a set of choices you will make in your project," namely the three paradigms of inquiry.

The writer's style in this chapter is modestly conversational but still rather formal. He addresses the reader as "you" and occasionally refers to himself as "I." The chapter is objectively descriptive of the various steps in developing a research question and the theoretical and empirical "tracks of analysis." Chapter two has no humorous or fanciful aspects. It is didactic and prescriptive in a conventionally academic manner. It does contain some elements of author opinion, though they are not identified as such. Author opinion does not dominate. Under the standard set by the Court of Appeals, factor two neither favors nor disfavors fair use. It is neutral.

As to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kaufmann uploaded one full chapter, 6.25% of the book (11 pages) [Pls. Ex. 372]. This selection was narrowly tailored

---

nature of the copyrighted work. That approach has been continued in this Opinion as well.

to fit the pedagogical aim of the course and was not excessive for this purpose. The percentage of the book used is small. This chapter is not the heart of the work. While chapter two has no greater value than any other chapter of the book, the Court does consider that a whole chapter of the book has greater value (quality) than part of a chapter, because it covers a complete, cohesive topic. The favored educational use of factor one--rather than a commercial use--tends to support more copying rather than less; on the other hand, the threat of market substitution pulls toward favoring less copying, rather than more. Taking into account the small percentage of the book and the small number of pages in the excerpt, the Court finds the potential impact of market substitution to be within acceptable limits. Taking all of the foregoing into account, factor three favors fair use.

As to factor four ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court of Appeals held that the small excerpts involved in this case did not substitute for the books. Cambridge II, 769 F.3d 1266. Hence, the potential market for the copyrighted work was not affected. However, permissions to make digital copies of excerpts from *The Craft of Inquiry* were readily available from CCC in 2009 [Pls. Ex. 375] and Defendants did not pay for permissions (licenses) to copy the excerpt. Defendants' unpaid use cost Oxford $14.89, thereby causing small but actual damage to the value of Oxford's copyrighted work and depriving Oxford of $14.89 in permissions revenue. If "everybody" (colleges and universities) had programs like Georgia State's allowing unpaid

-12-

copying of excerpts, Oxford could lose substantial revenues from permissions sales excerpts of this work, causing substantial damage to the value of the copyrighted work. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation for the purpose of deciding the fair use defense.

The record evidence shows that Oxford has gotten little to no permissions income from sales of excerpts of the book since its publication in 1998. Specifically, Oxford only received $12.36 in electronic course content service ("ECCS") permissions from CCC in 2006[8] and $188.62 in Academic Permissions Service ("APS") revenue in 2008 [Pls. Ex. 375]. There were no permissions sales in 2009 [Pls. Ex. 375]. Oxford sold no in-house permissions for copying excerpts of *The Craft of Inquiry* between publication in 1998 and November 7, 2010.[9] There was little likelihood of repetitive use of excerpts in 2009. This evidence mitigates the finding on factor four and calls for a mitigating adjustment of factor four, in Defendants' favor.[10]

---

[8]The Court infers that if ECCS permissions were available in 2006 they would have been available in 2009.

[9]The record evidence ends at November 7, 2010.

[10]As used in this Opinion, a "mitigating adjustment on factor four in Defendants' favor" results in factor four favoring Plaintiffs less than it otherwise would, but still favoring Plaintiffs.

Weighing the four factors together, placing the burden of proof on Defendants, giving factor four (as adjusted) extra weight and factor two insubstantial weight (in this instance, no weight because factor two is neutral) as directed by the Court of Appeals, Defendants prevail on the fair use defense. Accordingly, this infringement claim fails.

2. *Handbook of Feminist Research: Theory and Praxis* (Sharlene Nagy Hesse-Biber ed., Sage 2006)

The *Handbook of Feminist Research* was first published by Sage in 2006 [Pls. Ex. 247]. It is a 767 page, 43 chapter volume edited by Sharlene Nagy Hesse-Biber. The contributed chapters analyze feminist approaches to research methodology [Pls. Ex. 243; Jt. Ex. 5 at D-11]. The *Handbook of Feminist Research* retails for $146.00 [Jt. Ex. 5 at D-11]. The book earned net sales revenue in the amount of $94,085.88 between publication and the end of 2010 [Pls. Ex. 248]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009. However, licensed digital excerpts of the book were available through Sage's in-house permissions program, and the book earned $938.46 in permissions revenue from 2008 through the end of 2010 [Pls. Ex. 248]. In 2009, permissions revenue was $96.45 [Pls. Ex. 248].

Professor Kaufmann distributed unpaid digital copies of chapter 26 from the *Handbook of Feminist Research: Theory and Praxis* ("*Handbook of Feminist Research*") for her Maymester 2009 Qualitative/Interpretive Research in Education course. The excerpt is titled "Feminist Research Ethics," by Judith Preissle

-14-

[Tr. Vol. 5, Doc. 403 at 112; Pls. Ex. 243]. The excerpt (pages 515-534) is 20 pages long and constitutes 2.61% of the book's 767 total pages [Pls. Ex. 243]. It was required reading [Doc. 403 at 112; Pls. Ex. 516].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Moving to factor two ("the nature of the copyrighted work"), the *Handbook of Feminist Research* is an academic book that aims to enhance the reader's understanding of feminist research. Through the introduction of different feminist theories and methods, the book teaches the reader how feminist schools of thought impact both feminist research and scholarship in women's studies. The book contains four sections which (1) detail the rise of feminist research; (2) debate the existence of a unique feminist method; (3) investigate theoretical and practical issues for feminist researchers; and (4) present a combination of various views within the field to foster the creation of new research paradigms.

Chapter 26, "Feminist Research Ethics," begins by framing a concept of feminist ethics that focuses on relationships between the researcher and their subjects. The chapter then addresses how feminist ethics has affected three areas of

-15-

traditional research: ethics of research purpose, ethics of research roles and conduct, and ethics of representation. The conclusion of the chapter focuses on how conducting feminist research amplifies certain ethical challenges, including the disadvantages a researcher faces by remaining detached from their subjects and the potential power wielded by participants.

Chapter 26 is written in a formal tone, with use of the first person only to indicate the structure and direction of the work. The majority of the chapter is spent summarizing and detailing various ethical studies performed by other feminist researchers. The author complements these summaries with her own opinions on the ethics of feminist research. The additional observations provided by the author appear to come from her own analysis. Thus, the author's contribution is twofold: she synthesizes ethical conundrums within her field while describing other unresolved ethical issues. However, author opinion and analysis do not dominate. This excerpt, therefore, neither favors nor disfavors fair use under factor two.

Moving to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kaufmann uploaded 20 pages of the *Handbook of Feminist Research* to ERES. These pages make up 2.61% of the total book, which is a very small (not merely small) amount [Pls. Ex. 243]. This excerpt was narrowly tailored to fit the pedagogical aim of the course. Additionally, chapter 26 does not constitute the heart of the work. Factor three also considers the purpose of the use and the impact of substitution on the market for the work. Because the book was being used for

a nonprofit, educational purpose, the very small percentage of the book easily tilts in favor of fair use. The page count adequately limits the substitution effect of the use; it results in a smaller potential loss of permissions payments. Even though a full chapter of the book was used, taking all of the foregoing into account, factor three easily favors fair use.

Factor four ("the effect of the use upon the potential market for or value of the copyrighted work") looks to the effect of Defendants' use on the value of the copyrighted work. Digital permissions were available for excerpts of the *Handbook of Feminist Research* in 2009. By providing the excerpts free to her class, Professor Kaufmann deprived Sage of $31.30, less royalties payable to the external editor, in net revenue from permissions. This caused actual, but tiny damage to the value of the copyrighted work. If "everyone" (colleges and universities) allowed unpaid use of copyrighted excerpts, it could cause substantial harm to the value of the copyrighted work. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation in order to rule on the fair use defense.

The Court first finds that a slight augmenting adjustment of factor three, in Defendants' favor, should be made on account of the very small percentage (2.61%) of the copyrighted work which is represented by the excerpt chosen by Professor Kaufmann.

In addition, a mitigating adjustment in Defendants' favor should also be made on factor four. The *Handbook of Feminist Research* was first published in 2006 [Pls. Ex. 247]. The following table shows book sales for the *Handbook of Feminist Research* since its publication:

| Year | Book Sales Net Revenue |
|------|------------------------|
| 2006 | $17,241.00 |
| 2007 | $4,153.45 |
| 2008 | $15,015.80 |
| 2009 | $12,052.55 |
| 2010 | $5,623.08 |
| **Total** | **$94,085.88** |

[Pls. Ex. 248].

Over that same period of time, the *Handbook of Feminist Research* generated a small amount of permissions revenue. There is no evidence of CCC revenues for the *Handbook of Feminist Research*, but Sage did provide the figures for their in-house (presumably digital) permissions sales. Those figures are listed below:

| Year | Permissions Sales |
|------|-------------------|
| 2006 | $0.00 |
| 2007 | $0.00 |
| 2008 | $116.29 |
| 2009 | $96.45 |
| 2010 | $770.72 |
| **Total** | **$983.46** |

[Pls. Ex. 248].

Based on the data listed above, the Court finds that the value of the copyrighted work in 2009 was almost exclusively in book sales, not permissions. Defendants' actions had no impact on book sales. Defendants' actions had some very small impact on the value of the copyrighted work, including the value of permissions sales. But it is unlikely that Defendants' use of unpaid excerpts (even assuming the widespread availability of programs like Georgia State's) substantially damaged the value of the copyrighted work. That is because there was little interest in excerpts of the *Handbook of Feminist Research* in 2009; therefore, there was little likelihood of repetitive use of excerpts in 2009. For that reason, the factor four outcome is mitigated.

Weighing the factors (as adjusted) together, placing the burden of proof on Defendants, and taking into account the Court of Appeals' admonition that factor four "looms large," the Court finds that the overall weight of the four factors favors fair use. Defendants accordingly prevail on their fair use defense as to the *Handbook of Feminist Research*. This copyright infringement claim fails.

3. *Handbook of Social Theory* (George Ritzer & Barry Smart eds., Sage 2001

The *Handbook of Social Theory* was first published by Sage in 2001 in the United Kingdom and subsequently published in the United States [Pls. Ex. 288]. It is a 564 page, 39 chapter volume edited by George Ritzer and Barry Smart. The work provides an overview of social theory, and the chapters in the book discuss strengths and weaknesses of contemporary social

theory [Pls. Ex. 288; Jt. Ex. 5 at D-12]. The *Handbook of Social Theory* retails for $150.00 in hardcover and $69.95 in paperback [Jt. Ex. 5 at D-12]. The net sales revenue the book has earned (through 2010) amounts to £63,483.74 in the United Kingdom and $62,454.14 in the United States [Pls. Ex. 291]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in or before 2009. Licensed digital excerpts of this work were available directly from Sage; the book earned £2,470.01 from Sage's in-house permissions program from 2001 through 2010 [Pls. Ex. 291]. The Court infers that all of the permissions sales were to customers in the United Kingdom and that none were to customers in the United States.

Professor Kaufmann requested that pages 217-228 of the *Handbook of Social Theory*, one chapter,[11] be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 113; Pls. Exs. 288, 516]. The excerpt was Chapter 17, "Symbolic Interactionism at the End of the Century," which was written by Kent Sandstrom, Daniel Martin, and Gary Alan Fine. Had permissions fees been paid via Sage's permissions program for the digital distribution of this excerpt, students would have paid--and Sage would have earned--$18.72 in net revenue.[12]

---

[11]The assigned material did not include those footnotes which appeared on pages 229-231 at the end of the chapter. For purposes of this opinion the Court considers that the full chapter was assigned reading.

[12]The amount Sage earned would have been $18.72, the amount charged through its in-house program, less royalties it is

<u>Fair Use Analysis</u>

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt served the same function as the original copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: The *Handbook of Social Theory* is an academic book that seeks to survey and define the field of social theory in three steps. The book first discusses the classic social theorists, such as Karl Marx and Max Weber. The second step builds on the work of the classic theorists to present how the field has changed in light of current developments in postmodernism, rational choice theory, and contemporary feminism. The conclusion of the book highlights the current debates within the field as a springboard towards further development of social theory.

Chapter 17, "Symbolic Interactionism," provides an overview of the developments within symbolic interactionism, which is a subset of social theory. The chapter begins by providing six guiding premises of symbolic interactionism: (1) people are unique creatures because of their ability to use symbols; (2) people become distinctively human through their interaction; (3)

---

obligated to pay the external editor.

people are conscious and self-reflexive beings who actively shape their own behavior; (4) people are purposive creatures who act in and towards situations; (5) human society consists of people engaging in symbolic interaction; and (6) to understand people's social acts, we need to use methods that enable us to discern the meanings they attribute to these acts.

With these premises in mind, the bulk of the chapter surveys the contributions made by various lines of social interactionism research. These lines include work on the concept of self, emotional contributions, and the construction of social problems. The authors close by discussing how issues relating to developments in feminism, critical interactionism, and postmodernism will shape the discussion of symbolic interactionism in the future.

Chapter 17 is written in a formal tone, with no use of the first person or conversational techniques. The majority of the excerpt is spent summarizing and comparing other scholarly research in the field. Chapter 17 presents little to no direct opinion of the authors beyond the summaries of their previous works and is devoid of discussion of the authors' personal experiences. The chapter is both objectively and subjectively descriptive. Because the authors' opinion and subjective description do not dominate the discussion, factor two neither favors nor disfavors fair use. It is neutral.

As to factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"), "Social Interactionism" is a 12-page chapter, making up 2.12% of the total pages in the *Handbook of Social Theory* [Pls. Ex. 288].

The amount taken is tiny, even without the leavening effect of the nonprofit educational purpose and character of the use. Professor Kaufmann assigned the entire chapter, which gives the excerpt greater value than if only part of the chapter had been assigned. However, this chapter does not have any greater value than the other chapters in the work, and does not constitute the heart of the work. The excerpt fit Professor Kaufmann's pedagogical purpose, and the very small number of pages portends a small impact on the permissions market. Taking all of the foregoing into account, factor three easily favors fair use.

The fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), looks to the effect of Defendants' use on the value of the copyrighted work. Digital permissions were available for excerpts from Sage; there is no evidence that ECCS permissions were available from CCC. APS (hard copy) permissions were available through CCC. Professor Kaufmann's failure to obtain licensed excerpts from Sage caused very small harm to Sage; widespread use of unlicensed excerpts could cause substantial harm.[13] Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation to rule on the fair use defense.

---

[13]The Court infers that if Professor Kaufmann had sought digital permissions from Sage, it would have provided digital permissions.

First, the Court finds that an adjustment, in Defendants' favor, should be made to factor three on account of the very small size of the excerpt (2.12%).

Next, the Court finds that a mitigating adjustment to factor four should be made, in Defendants' favor, on account of the evidence pertaining to low permissions sales. The following table shows all book sales, all of which apparently were to customers in the United Kingdom.

| Year | Net Sales Revenue (Books) |
|---|---|
| 2001 | £32,922.61 |
| 2002 | £5,978.00 |
| 2003 | £10,066.04 |
| 2004 | £3,484.36 |
| 2005 | £1,639.93 |
| 2006 | £2,136.26 |
| 2007 | £1,680.54 |
| 2008 | £3,109.30 |
| 2009 | £1,028.64 |
| 2010 | £1,438.06 |
| **Total** | **£63,483.74** |

[Id.].

The following table shows all permissions revenues from the *Handbook of Social Theory* since 2004:

| Year | APS[14] | ECCS | In-House |
|------|---------|------|----------|
| 2005 | $47.12 | No Evidence | £0.00 |
| 2006 | $0.00 | No Evidence | £0.00 |
| 2007 | $127.50 | No Evidence | £25.74 |
| 2008 | $298.86 | No Evidence | £12.48 |
| 2009 | $18.32 | No Evidence | £116.48 |
| 2010 | $13.10 | No Evidence | £2,309.26 |
| **Total** | **$504.90** | | **£2,470.01** |

[Id.; Pls. Ex. 292].

Based on the foregoing data, the Court finds it is unlikely that there would have been repetitive use of excerpts of the *Handbook of Social Theory* in 2009; there was not much demand for excerpts in the United States. This mitigates the factor four outcome.

Weighing the four factors (as adjusted) together, placing the burden of proof on Defendants, and recognizing that factor four "looms large," the Court finds that Defendants' use was a fair use. Accordingly, Defendants have proven their fair use defense, and this copyright infringement claim fails.

4. *The Sage Handbook of Qualitative Research (Third Edition)* (Norman K. Denzin & Yvonna S. Lincoln, eds., Sage 2005)

*The Sage Handbook of Qualitative Research (Third Edition)* was first published by Sage in 2005. It is a 1,229 page, 44

---

[14]APS revenues add information concerning the relative appeal of various excerpts to users. Sage's in-house program provides digital excerpts to users. The APS sales evidently were made to customers in the United States; the in-house permissions sales apparently were made to customers in the United Kingdom.

chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters analyze the theory and practice of qualitative research [Pls. Ex. 267]. *The Sage Handbook of Qualitative Research (Third Edition)* retails for $156.00 [Jt. Ex. 5 at D-13]. The book earned $1,327,804.06 in net sales revenue through December 2010 [Pls. Ex. 283]. Permissions for licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 358]. From publication until December 1, 2010, *The Sage Handbook of Qualitative Research (Third Edition)* earned $1,131.86 in ECCS permissions revenue [Pls. Ex. 287]. In addition, permissions to make licensed excerpts of this work are available directly from Sage; the book earned $18,711.95 through Sage's in-house permissions program from publication to December 1, 2010 [Pls. Ex. 283].

Professor Kaufmann caused pages 1-32, 357-375, 443-465, and 651-679 of *The Sage Handbook of Qualitative Research (Third Edition)*, the entirety of four chapters and 8.38% of the book, to be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 80-81 and 106-111]. Had permissions been paid via CCC for the distribution of these chapters, Sage would have earned under $159.34 in net revenue from permissions income.[15] The cost to students in the course would have been $190.46.

---

[15]The amount earned would have been $190.46, the amount charged by CCC, [Jt. Ex. 5 at D-10], less the $3.00 service fee charged by CCC to users, less $28.12 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: the first excerpt was pages 1-32, the Introduction to the book. The Introduction, which was written by the external editors of the book, forecasts what will be in the book. It states: "[i]n this introductory chapter, we define the field of qualitative research, then navigate, chart, and review the history of qualitative research in the human disciplines" [Id. at 2]. In addition, "[w]e also present a conceptual framework for reading the qualitative research act as a multicultural, gendered process and then provide a brief introduction to the chapters that follow" [Id.]. The introduction states, "This volume is intended to serve as a bridge connecting historical moments, politics, the decolonization project, research methods, paradigms, and communities of interpretive scholars" [Id.]. Qualitative research is stated to be a field of inquiry which "crosscuts disciplines, fields, and subject matters" [Id.]. Also, "[i]n North America, qualitative research operates in a complex historical field that crosscuts at least eight historical

moments" [Id. at 2-3].  The editors identify those eight historical moments as the traditional, the modernist, blurred genres, the crisis of representation, the postmodern, postexperimental inquiry, the methodologically contested present, and the fractured future [Id. at 3].  The future is said to be "concerned with moral discourse, with the development of sacred textualities" [Id.].  "The eighth moment [the fractured future] asks that the social sciences and the humanities become sites for critical conversations about democracy, race, gender, class, nation-states, globalization, freedom and community" [Id.].  This excerpt is primarily subjectively descriptive and contains considerable opinion of the editors.

Pages 357-375: The second reading assignment was all of chapter 14, titled "Critical Humanism and Queer Theory--Living With the Tensions."  The material addresses what the author sees as the need to deal with the tensions between critical humanism and gay/queer research.  The author's presentation is straightforward.  He recognizes the inherent conflicts in the two traditions, but concludes that "there are some commonalities" [Id. at 370].  Both, for instance, would ask researchers to adopt a critically self-aware stance.  Both would seek out a political and ethical background "even though, in a quite major way, they may differ on this--queer theory has a prime focus on radical gender change, and humanism is broader" [Id.].  The author's style is conventional; his approach is evaluative.  This chapter contains author opinion.

Pages 443-465: This excerpt is the entirety of chapter 17, "Qualitative Case Studies." The author describes the nature of various types of case studies: the intrinsic case study; the instrumental case study; and the multiple case or collective case study. The chapter discusses case selection, the interactivity of the case study, the process of data gathering and the matter of triangulation. This chapter is objectively and subjectively descriptive. It contains author opinion.

Pages 651-679: This excerpt is chapter 25, titled "Narrative Inquiry--Multiple Lenses, Approaches, Voices." The chapter describes the diverse approaches to narrative inquiry, and various methodological issues in contemporary narrative inquiry. The author notes that "a major goal of this edition of the *Handbook* is exploring how qualitative research can 'advance a democratic project committed to social justice in an age of uncertainty'" [Id. at 667]. This chapter is both objectively and subjectively descriptive; it contains author opinion and evaluative description.

Under the standard set by the Court of Appeals, the foregoing excerpts as a whole disfavor fair use because author opinion, subjective description and evaluative expression dominate. Factor two disfavors fair use.

As to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kaufmann's selected excerpts constitute 8.38% of the pages in the book (102 pages in total) and the entirety of four chapters, one of which is the Introduction. The selections fit the pedagogical aim of the course. None of the chapters

constitutes the heart of the work. However, even taking into account the impact of the favored nature of the use under factor one, the quantity of material used is extremely large. The use of four full chapters of the book leans very strongly against fair use. That the book contains 44 chapters does not alter the Court's thinking. Regarding the quality (value) of the material taken, a whole chapter of a book has greater value than part of a chapter because the whole chapter covers a complete, cohesive topic. Copying four chapters draws a very large amount of value. Also, the total page length of the excerpts (102 pages) is extremely large. This would cause considerable market substitution (lost permissions sales). Weighing all of these considerations together, factor three weighs against fair use.

As to the fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court first notes that Professor Kaufmann's use of the excerpt of *The Sage Handbook of Qualitative Research (Third Edition)* did not affect the market for the book as a whole.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Factor four strongly disfavors fair use.

A review of the fair use factors in this case shows that factor one favors fair use; factor two disfavors fair use;

factor three strongly disfavors fair use; and factor four strongly disfavors fair use. While it is arguably unnecessary to do so, the Court will look further and will conduct a holistic evaluation of the four factors.

First, revisiting the factor three analysis, the Court finds that Professor Kaufmann's unlicensed use of four chapters of *The Sage Handbook of Qualitative Research (Third Edition)*, is significantly excessive (8.38%; four chapters) requiring a significant adjustment of factor three, in Plaintiffs' favor.

The Court also finds that upon revisiting the factor four analysis, an adjustment favoring Plaintiffs' position is warranted. The Court's reasoning is as follows. The evidence shows that in 2008 colleges and universities paid $3,630.59 directly to Sage for excerpts from this book; in 2009 the permissions amount paid was $11,125.91. In addition, the book earned $3,174.20 in fees from CCC's ECCS and APS programs from 2004 to 2010.

The original version of *The Sage Handbook of Qualitative Research* was published in 1994; a second edition was published in 2000; the third edition, at issue here, was published in 2005. With respect to the third edition, the documentary evidence [Pls. Ex. 283] shows that book sales began with revenues of $379,940.00 in 2005, with the sales amount going down each year thereafter. In 2009, book sales brought in revenues of $153,234.95. But permissions revenue for Sage's in-house program jumped from $3,630.59 in 2008 to $11,125.91 in 2009. The trial evidence showed that Sage's in-house permissions were mostly for making digital copies of Sage's

-31-

copyrighted books. The high demand for digital excerpts of *The Sage Handbook of Qualitative Research (Third Edition)* in 2009 underscores the negative impact of Defendants' unpaid use on the value of the copyrighted work. This determination further strengthens the factor four analysis in Plaintiffs' favor.

Thus, a holistic examination of the four factors, placing the burden of proof on Defendants, adjusting factors three and four in Plaintiffs' favor, and giving factor four extra weight, shows that Defendants' use of the excerpt from *The Sage Handbook of Qualitative Research (Third Edition)* was not a fair use.

In summary, this infringement claim succeeds.

5.   *Handbook of Critical and Indigenous Methodologies* (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2008)

The *Handbook of Critical and Indigenous Methodologies* was first published by Sage in 2008 [Pls. Ex. 231]. It is a 619 page, 30 chapter volume edited by Norman K. Denzin, Yvonna S. Lincoln, and Linda Tuhiwai Smith. The chapters contain ideas and analysis concerning the relationship between critical methodologies and indigenous perspectives [Pls. Ex. 231]. The book seeks to show "how critical qualitative research can be used to address issues that matter to oppressed, colonized persons . . . ." [Pls. Ex. 231 at xii]. The *Handbook of Critical and Indigenous Methodologies* retails for $146.00 [Jt. Ex. 5 at D-15]. It has earned $161,204.62 in net sales revenue [Pls. Ex. 237]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 238]. From July 1, 2004 until December 1, 2010, the *Handbook of Critical and Indigenous Methodologies* earned $138.04 in ECCS permissions revenue in 2009

-32-

and 2010 combined [Pls. Ex. 238]. In addition, licensed excerpts of this work were available directly from Sage; the book earned $383.15 through Sage's in-house permissions program [Pls. Ex. 237].

Professor Kaufmann requested pages 85-99 and 135-156 of the *Handbook of Critical and Indigenous Methodologies*, the entirety of two chapters, be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 114-116]. The two chapters copied were "Critical Race Theory and Indigenous Methodologies" by Christopher Dunbar, Jr. and "Indigenous Knowledges in Education: Complexities, Dangers, and Profound Benefits" by Joe L. Kintheloe and Shirley R. Steinberg. Together, the two chapters represent 5.98% of the total work. Had permissions been paid via CCC for the distribution of these two excerpts, Sage would have earned less than $57.24 in net revenue from permissions income.[16] The cost to students in the course would have been $70.34.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a

---

[16]The amount earned would have been $70.34, the amount charged by CCC, [Jt. Ex. 5 at D-15], less the $3.00 service fee charged by CCC to users, less $10.10 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: The *Handbook of Critical and Indigenous Methodologies* is an academic book. The introduction states that the book looks to develop and connect indigenous methodologies[17] to existing areas of qualitative research in order to expand and further understand the field of qualitative research. The book has four parts; "Locating the Field: Performing Theories of Decolonizing Inquiry"; "Critical and Indigenous Pedagogies"; "Critical and Indigenous Methodologies"; and "Power, Truth, Ethics, and Social Justice."

Chapter five, "Critical Race Theory and Indigenous Methodologies," rests on two themes which are interwoven throughout the chapter. The chapter first provides an overview and critique of critical race theory, which seeks to analyze both the racially insensitive segments of the American psyche as well as enhance and expand upon race consciousness in people of color [see Pls. Ex. 231 at 87]. Chapter five then discusses the importance of incorporating the methods of indigenous scholars to create new research methodologies which both challenge the

---

[17]The preface defines indigenous methodologies as "research by and for Indigenous peoples, using techniques and methods drawn from the traditions and knowledges of these peoples" [Pls. Ex. 231 at x]. The preface contains no definition of indigenous, but implies that the term includes native, non-Western residents of various geographic locations.

status quo and incorporate the key aspects of indigenous knowledge into critical race theory.

Chapter five is formally written to inform the reader of previous critical race literature, with the author adding analytical discussion to link the various aspects of the literature together. Further, the excerpt devotes a section to a discussion of the author's personal experiences in doing research.

Chapter seven, "Indigenous Knowledges in Education," calls for an evaluation of how indigenous knowledge can change the way educators approach research. The authors argue that methods of creating and maintaining indigenous knowledge must be sustained in order for the greater academic community to better access and appreciate the contributions indigenous knowledge can make to the field. Chapter seven goes on to discuss the benefits of incorporating indigenous knowledge, including the reciprocal effect indigenous knowledge may have on dominant cultures and the ability to create a body of knowledge which better serves those indigenous people.

Chapter seven is highly evaluative, relying heavily on the authors' experiences and opinions. The writing style is formal, but also somewhat conversational. The chapter is didactic, inviting the reader to understand the benefits of protecting and incorporating indigenous knowledge in the hope that future researchers will accept and implement the authors' premise. Given the dominance of author opinion and the evaluative nature of these two chapters, factor two weighs against a finding of fair use.

As to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), the chapters in question total 37 pages, or 5.98% of the entire work [Id.]. This is a small percentage of the overall work and a somewhat large number of pages. The chapters fit Professor Kaufmann's pedagogical purpose, and neither constitutes the heart of the work. On the other hand, the use of two whole chapters leans against fair use. Use of a whole chapter--and even more so use of two chapters--represents a greater taking of value than merely part of a chapter. Considering this in combination with the quantity taken, factor three disfavors fair use.

As to the fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court first looks to whether Professor Kaufmann's use of the *Handbook of Critical and Indigenous Methodologies* affected the market for purchasing the book as a whole. Students would not pay $146.00 for the entire book when only 37 of 619 pages were required reading. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from the *Handbook of Critical and Indigenous Methodologies* had a negative effect on the market for sale of the book itself.

However, Defendants' use did cause actual though tiny damage to the value of Sage's copyrighted work in 2009. If "everyone" (colleges and universities) used unpaid excerpts of the *Handbook of Critical and Indigenous Methodologies* it could

-36-

cause substantial damage to the value of the copyrighted work. Thus, factor four strongly disfavors fair use.

A review of the fair use factors in this case shows that factor one favors fair use; factor two disfavors fair use; factor three disfavors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic assessment of the four factors to rule on the fair use defense.

The Court finds that between 2009 and 2010 Sage collected net ECCS permissions revenue of $138.04 from CCC for excerpts of *Handbook of Critical and Indigenous Methodologies*. One-half of that amount ($69.02) was in 2009 and one-half in 2010. Sage also collected $383.15 in in-house permissions for these excerpts in 2009. There is no evidence of any permissions income from any source prior to 2009. Based on this data, the Court finds there was very little prospect of repetitive use of excerpts of *Handbook of Critical and Indigenous Methodologies* in 2009. Therefore, a mitigating adjustment of factor four, favoring Defendants, is made.

Weighing the factors (as adjusted) together, placing the burden of proof on Defendants, recalling that factor two has insubstantial weight and factor four "looms large," the Court finds that Defendants do not prevail on their fair use defense. Accordingly, this infringement claim succeeds.

      6.   *Handbook of Narrative Inquiry: Mapping a Methodology* (D. Jean Clandinin ed., Sage 2006)

The *Handbook of Narrative Inquiry* was first published by Sage on December 28, 2006 [Pls. Ex. 258]. It is a 710 page, 24

-37-

chapter volume edited by D. Jean Clandinin. The chapters present an interdisciplinary overview of the methodology of narrative inquiry [Pls. Ex. 258; Jt. Ex. 5 at D-17]. The *Handbook of Narrative Inquiry* retails for $146.00 [Jt. Ex. 5 at D-17]. It has earned $131,515.66 in net sales revenue [Pls. Ex. 262]. Licensed digital excerpts of the book were also available through CCC in 2009 [Pls. Ex. 264]. From July 1, 2004 until December 1, 2010, the *Handbook of Narrative Inquiry* earned $18.52 in ECCS permissions revenue; all of this was in 2009 [Pls. Ex. 264]. In addition, licensed digital excerpts of this work were available directly from Sage during 2004-2010; the book earned $437.28 through Sage's in-house permissions program, $112.60 of which was in 2009 [Pls. Ex. 262].

Professor Kaufmann requested that pages 3-34 of the *Handbook of Narrative Inquiry* be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8500 Maymester 2009 course as required reading [Tr. Vol. 5 at 117-118]. The excerpt was the entirety of chapter one, which was written by Stefinee Pinnegar and J. Gary Daynes and entitled "Locating Narrative Inquiry Historically: Thematics in the Turn to Narrative." The chapter represents 4.51% of the total work. Had permissions been paid via CCC for the digital distribution of this excerpt, Sage would have earned less than $33.32 in net

revenue from permissions income.[18]  The cost to students in the course would have been $52.60.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying).  The excerpt fulfills the same purpose as the copyrighted work.  The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution.  Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work."  The Court makes the following findings in that regard:  the *Handbook of Narrative Inquiry* is an academic book which provides a comprehensive analysis of the field of narrative research.  The book begins by discussing the historical background of the field, and then moves to analyze different areas of narrative inquiry including traditional methodologies and professions driving narrative research.  This investigation of the field is expanded by the introduction of ethical concerns, representation issues, and a discussion of areas of narrative inquiry that need special attention, before finishing with a forward-looking overview of the field.

Chapter one's stated goal is "marking off the territory of this methodology" [Pls. Ex. 258 at 3].  The chapter provides

---

[18]The amount earned would have been $52.60, the amount charged by CCC, [Jt. Ex. 5 at D-17], less the $3.00 service fee charged by CCC to users, less $9.28 in fees charged by CCC to publishers, less any royalties Sage is obligated to pay the author.

definitions for qualitative inquiry and narrative inquiry, detailing the differences between the two. The discussion then shifts to the four themes in research which cause a researcher to "turn," or change his way of thinking. These themes, which include the relationship between the researcher and the researched and the jump from numbers to words as data, are then elaborated upon through examples and explanations based on various historical studies by scholars in the field.

"Locating Narrative Inquiry Historically" is simultaneously objectively and subjectively descriptive, as the chapter aims to acquaint readers with narrative inquiry through summaries and explanations of previous work in the field. The chapter is formally written, and stems more from the authors' knowledge of the literature rather than their experiences and opinions. Fair use factor two is neutral for this work.

As to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), here, Professor Kaufmann used 32 pages, which equates to 4.51% of the work [Pls. Ex. 258]. This is a small percentage, especially taking into account the favored educational purpose established by factor one. As to the quality of the excerpt, the use of a whole chapter increases the excerpt's value. But the chapter selected by Professor Kaufmann is not the heart of the work. It did fit Professor Kaufmann's pedagogical purpose. And the potential impact of market substitution is sufficiently blunted by the small size of the excerpt. Taking all of this into account, factor three favors fair use.

As to the fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court first looks to whether Professor Kaufmann's use of the *Handbook of Narrative Inquiry* affected the market for purchasing the book as a whole. Students obviously would not pay $146.00 for the entire book for which only 32 of 710 pages were required reading for Professor Kaufmann's course. Neither would a professor require students to purchase the entire book in such an instance. The use of the excerpt from the *Handbook of Narrative Inquiry* did not have a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, fair use factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the fair use factors.

The following table demonstrates book sales data for the *Handbook of Narrative Inquiry* since its publication in 2006:[19]

---

[19]The book was first published on December 28, 2006 [Pls. Ex. 261]. Accordingly, there are no book sales or permissions sales figures for 2006 [Pls. Exs. 262, 264].

| Year | Book Sales |
|------|-----------|
| 2007 | $66,332.82 |
| 2008 | $31,868.12 |
| 2009 | $22,510.10 |
| 2010 | $10,804.62 |
| **Total** | **$131,515.66** |

[Pls. Ex. 262]. The following table demonstrates permissions sales data for the *Handbook of Narrative Inquiry* since 2006:

| Year | APS | ECCS | In-house | Total |
|------|-----|------|----------|-------|
| 2007 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2008 | $94.08 | $0.00 | $0.00 | $94.08 |
| 2009 | $0.00 | $18.52 | $112.60 | $131.12 |
| 2010 | $0.00 | $0.00 | $324.68 | $324.68 |
| **Total** | **$94.08** | **$18.52** | **$437.28** | **$549.88** |

[Pls. Exs. 262, 264].

The limited permissions revenue realized by Sage from the *Handbook of Narrative Inquiry* shows low demand for excerpts of the book in 2009. The risk of repetitive use of these excerpts was low in 2009. The Court finds a mitigating adjustment should be made to factor four, in Defendants' favor.

Weighing all four factors (as adjusted) together, placing the burden of proof on Defendants, and heeding the admonition that factor four "looms large," the Court finds that Defendants succeed with their fair use defense; this claim of copyright infringement fails.

Professor Kaufmann's EPRS 8510 course looks at ways for students to collect data for qualitative research [Tr. Vol. 5, Doc. 403 at 38, 135]. Nine students were enrolled in the course during the summer 2009 semester [Id. at 135]. The course lasts roughly six weeks [Id. at 136]. As evidenced by the syllabus for this course and Professor Kaufmann's testimony, students were required to purchase three texts for the course, as well as complete several readings posted on ERES [Id. at 136; Pls. Ex. 517]. All assigned readings, both from the textbooks and ERES, were required [Doc. 403 at 136].

7. *The Sage Handbook of Qualitative Research (Second Edition)* (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2000)

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265]. It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters contain research and analysis concerning the theory and practice of qualitative research [Pls. Ex. 265; Jt. Ex. 5 at D-19]. *The Sage Handbook of Qualitative Research (Second Edition)* retails for $175.00, but is out of print [Jt. Ex. 5 at D-19]. The book has earned $1,300,053.54 in net sales revenue [Pls. Ex. 283]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in ECCS

permissions revenue [Pls. Ex. 286].[20]   In addition, licensed digital excerpts of this work were available directly from Sage; the book has earned $58,904.47 from 2000 through 2010 through Sage's in-house permissions program [Pls. Ex. 283].   This includes $3,814.52 in 2009.

Professor Kaufmann caused pages 717-732 and 923-943 of *The Sage Handbook of Qualitative Research (Second Edition)* ("*Handbook, Second Ed.*"), the entirety of chapters 27 and 36, to be uploaded to Georgia State's ERES system for distribution to the students in her EPRS 8510 summer 2009 course as required reading [Tr. Vol. 403, Doc. 403 at 136-41; Pls. Ex. 517].   The excerpted chapters were "Reimagining Visual Methods: Galileo to Neuromancer" by Douglas Harper and "Writing: A Method of Inquiry" by Laurel Richardson [Pls. Ex. 265].   Together, the chapters represent 3.24% of the total 1,142-page work and have a combined total of 37 pages [Id.].   Had permissions been paid via CCC for the distribution of these excerpts, Sage would have earned less than $34.04 in net revenue from permissions income.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying).   The excerpt serves the same purpose as the original work.   The excerpt was used for a nonprofit educational purpose by a

---

[20]This amount represents permissions income only for the second edition of this work.

nonprofit educational institution.  Thus, factor one favors fair use.

As to factor two ("the nature of the copyrighted work"), the first excerpt utilized was chapter 27, "Reimagining Visual Methods--Galileo to Neuromancer," pages 717-732.  At the beginning of this chapter the author outlines his approach to the subject:

> First, I suggest a context in which to see photography and social research, this being the history of recorded perception. Next, I present visual sociology as field work photography guided by several research traditions.  Third, I describe the social influences around which "picture making" has taken place, noting how the social power involved in making images redefines institutions, groups and individuals. Finally, I suggest that visual sociology is, above all, a process of seeing guided by theory.  Because visual sociology is a grab bag of research approaches and perspectives on understanding images in society, I aim to make several attenuated arguments and to weave them into a whole.

[Pls. Ex. 265 at 717].  The author's style is somewhat conversational, though still fairly formal.  The first section of the chapter, titled "Visual Methods and the History of Recorded Perception," outlines the development of recorded perception though the telescope, the camera, motion pictures, television, video cameras, digital imagery, compact discs, and the creation of a virtual reality through electronic manipulation.  This section is objectively descriptive.

The next section of the chapter, titled "A Visual Social Science through Research Photography," pages 720-724, shifts to the idea that the creator of images has opportunities to make visual statements by "knowing how the camera interprets social

-45-

reality" [Id. at 724]. This section is both objectively and subjectively descriptive. It includes author opinion.

The next section of chapter 26, "Visual Narratives," pages 724-725, expands on the idea of the photographer as narrator, particularly when a succession of photographs may be used to develop a point of view. The author states,

> The visual narrative, like the individual frames from which it is made, is a result of choices and decisions. If a researcher is conscious of these choices, the visual narrative may become a useful way to study certain kinds of social patterns. The methods used will, of course, influence the questions asked.

[Id. at 725]. The Court considers this section to be mostly objectively descriptive. It does include author opinion.

The next section, "Eliciting Cultural Explanation," pages 725-727, explains that photographic images "elicit cultural information that ranges from the micro (normative negotiation of social action) to cultural definition" [Id. at 726-27]. This section is objectively and subjectively descriptive. It includes author opinion.

The next section, "Experience and Image," page 727, discusses the "phenomenological mode." "The vantage point from this view is the self . . . ." [Id. at 727]. The author states this is a fourth way to look at images. This represents author opinion.

The next section of chapter 26 is titled "The Social Construction of Photography in Visual Sociology," pages 727-728. The author states, "It is not enough to describe visual research in terms offered above. Like all research, visual research

depends upon and redistributes social power" [Id.]. This represents author opinion.

In the final section of chapter 26, "The Essence of Visual Sociology; and Where Are We Going?," pages 728-731, the author summarizes as follows:

> Assuming we are talking about research methods (given that this is a handbook of qualitative methods), and assuming we are speaking about the photographic end of the movement, the simplest way to do visual sociology is to photograph with sociological consciousness. Howard Becker (1974) was the first to make this argument and the point has not been made more elegantly since then.

[Id. at 729].

Overall, this chapter seeks to instruct a sociology student on how to use photographic technology to make a sociological point. Most basically, it is a how-to-do-it instruction. It includes author opinion plus elements which are objectively and subjectively descriptive.

The second excerpt assigned by Professor Kaufmann from the *Handbook, Second Ed.* was chapter 36, titled "Writing--A Method of Inquiry" [Id. at 923-943]. In the first part of the chapter, titled "Writing in Contexts," pages 924-940, the author discusses the historical roots of social scientific writing, including its dependence upon metaphor and prescribed writing formats, creative analytic practices, and the future of ethnography. This section is objectively descriptive.

The second part of the chapter, "Writing Practices," pages 940-943, urges the use of metaphors which enable the reader to derive sensory content from the material. It advocates careful choice of topic including, for example, consideration of who is

-47-

the audience. It advocates choosing a journal article "that exemplifies excellence in qualitative research" [Id. at 940]. The author suggests joining a creative writing group or writing support group, keeping a journal and numerous other ways of extending one's creative power. This excerpt overall undoubtedly contains a good bit of author opinion. It also contains subjective and objective description.

Viewed together, the two chapters chosen by Professor Kaufmann contain some objective description, but subjective description and author opinion dominate. Factor two disfavors fair use.

As to factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kaufmann uploaded two full chapters of the *Handbook, Second Ed.* to ERES. This represents 37 pages and 3.24% of the total book [Doc. 265]. The chapters are not the heart of the work. The amount of material used by Professor Kaufmann was very small (not merely small) as a percentage of the total book. Factor three's relationship to factor one makes it even clearer that 3.24% of the total work tends to favor fair use. The selection fit Professor Kaufmann's pedagogical purpose. Nonetheless, two full chapters were copied, and chapters have greater value than parts of chapters. In addition, the amount taken is a heuristic for impact on the market (it has a relationship to the amount of potential lost permissions); the Court finds that the use of 37 pages combined with the use of two chapters causes factor three to disfavor fair use.

Turning to factor four ("the effect of the use upon the potential market for or value of the copyrighted work"), Plaintiffs produced evidence that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and Sage's in-house program [Pls. Exs. 283, 286]. If Georgia State had purchased permissions for its digital use of the instant excerpts, Sage would have earned $34.04 in net revenue from permissions income. Widespread use of unlicensed excerpts by other colleges and universities could cause substantial harm to the market for permissions. The unpaid use of the excerpt by Professor Kaufmann and her students caused very small, but actual, damage to the value of Sage's copyrighted work. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two disfavors fair use; factor three disfavors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation to resolve the fair use defense.

From July 1, 2004 through December 1, 2010 Sage had $45,498.78 in in-house (presumably digital) permissions income [Pls. Ex. 283] and $6,324.61 in ECCS permissions income [Pls. Ex. 286] from permissions sales for excerpts of the book. This includes $3,814.52 in in-house permissions sales in 2009. This calls for enhancement of factor four, in Plaintiffs' favor.

Weighing the fair use factors (as adjusted) together, placing the burden of proof on Defendants, giving factor two insubstantial weight and factor four additional weight, the

-49-

Court finds that the fair use defense fails. Accordingly, this copyright infringement claim succeeds.

## EPRS 8500 Qualitative/Interpretive Research in Education II, Fall 2009

Professor Kaufmann also taught EPRS 8500 in the fall of 2009 [Tr. Vol. 5, Doc. 403 at 143-45; Pls. Ex. 518].

> 8. *The Craft of Inquiry: Theories, Methods, Evidence* (Robert R. Alford, Oxford 1998)

One of the posted readings for EPRS 8500 in the fall 2009 semester was an excerpt from *The Craft of Inquiry* [Pls. Ex. 372]. Professor Kaufmann uploaded the entirety of chapter two, or 6.25% of the book, to Georgia State's ERES system [Doc. 403 at 168; Pls. Ex. 372].

## Fair Use Analysis

Because Professor Kaufmann used this excerpt previously during the Maymester term, and it has already been discussed above, see pp. 8-14 above, the fair use analysis need not be repeated. Professor Kaufmann's use in the fall of 2009 was a fair use.

> 9. *Approaches to Qualitative Research: A Reader on Theory and Practice* (Sharlene Nagy Hesse-Biber & Patricia Leavy eds., Oxford 2004)

*Approaches to Qualitative Research* was first published by Oxford in 2004 [Pls. Ex. 349]. It is a 564 page, 25 chapter volume edited by Sharlene Nagy Hesse-Biber and Patricia Leavy. The chapters provide a comprehensive overview and analysis of the theoretical underpinnings of qualitative research and applications for practice [Pls. Ex. 349]. *Approaches to Qualitative Research* retails for $92.00 in hardcover and $49.95 in paperback [Jt. Ex. 5 at D-58]. There is no evidence in the

record to show how much, if any, net sales revenue the book has earned. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 353]. From July 1, 2004 until December 1, 2010, *Approaches to Qualitative Research* earned $172.59 in ECCS permissions revenue [Pls. Ex. 353].

Professor Kaufmann assigned chapter 21 of *Approaches to Qualitative Research* for her November 30, 2009 class session [Pls. Ex. 518]. The chapter, pages 447-472, is titled "The Art and Politics of Interpretation," and was written by Norman K. Denzin [Pls. Ex. 349]. The chapter is 26 pages long and 4.61% of the 564-page book [Id.]. It was required reading for the course [Tr. Vol. 5, Doc. 403 at 169-70].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Factor two looks to the nature of the copyrighted work. *Approaches to Qualitative Research* is an academic book that aims to provide the reader with both a survey of qualitative research and the tools and skills necessary to conduct qualitative studies. The book starts by discussing the various epistemological and theoretical choices a researcher considers in designing and approaching qualitative research. The range of analytical choices and methods of studying culture are also

-51-

presented, with emphasis on potential concerns researchers face in their role as both individuals interacting with subjects and researchers trying to avoid intrusion on their subjects. Finally, the book teaches the reader how to interpret qualitative data and transform that data into scholarship.

Chapter 21, "The Art and Politics of Interpretation," addresses the ways in which a writer can make raw qualitative data meaningful to a reader. The chapter highlights themes that should come out in the researcher's writing, including descriptions that provide context and insight into the subjects of the study. A writer should also identify any research shortfalls due to personal style or bias. The chapter briefly describes various interpretive practices in qualitative research, and weighs the benefits and costs of each. Finally, the chapter ends with the author's observations about the future of qualitative studies.

Chapter 21 is didactic; it seeks to teach techniques for writing about qualitative research. It is also evaluative, analyzing the merits of various methods of writing about qualitative research. The chapter has a formal style. While it is a close question, the Court finds that author opinion and evaluative style dominate. Factor two thus disfavors fair use.

Factor three requires an analysis of the "amount and substantiality of the portion used in relation to the copyrighted work as a whole". "The Art and Politics of Interpretation" is a 26-page chapter, making up 4.61% of the total pages in *Approaches to Qualitative Research* [Pls. Ex. 349]. This is a small percentage of the overall book; it is

more than easily validated by the purpose and character of the use under factor one, and is small enough to adequately mitigate the substitution effect under factor four. Professor Kaufmann assigned the entire chapter, which gives the excerpt greater value than if only part of the chapter had been assigned. However, the chapter is not the heart of the work. The chapter narrowly served Professor Kaufmann's pedagogical purpose. Weighing the foregoing considerations, factor three favors fair use.

Factor four measures the effect of Defendants' use on the value of the copyrighted work and on the potential market for the copyrighted work. Because Defendants used Oxford's copyrighted material without payment, the value of Oxford's copyright was impaired to a minuscule degree. Sage lost approximately $55.69 in net revenue as a result of Professor Kaufmann's use. But widespread use of unpaid excerpts at other colleges or universities could cause substantial damage to the value of the copyrighted work. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two disfavors fair use; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic assessment to rule on the fair use defense.

The record reflects that Oxford received only $131.29 in APS income and $172.59 in ECCS income through CCC from January 1, 2005 to November 19, 2010 for permissions to copy this excerpt [Pls. Ex. 353]. The record contains no other

evidence of permissions sales, which demonstrates that there was a low risk of repetitive use of unpaid excerpts for *Approaches to Qualitative Research* in 2009. The record also contains no data concerning revenue from book sales which occurred.[21] The Court finds that factor four should be adjusted so as to mitigate the outcome on factor four, in Defendants' favor.

Weighing all of the factors (as adjusted) together, placing the burden of proof on Defendants, and giving factor two insubstantial weight and factor four additional weight as directed, Defendants' use of *Approaches to Qualitative Research* is protected by fair use. Thus, this infringement claim fails.[22]

10. *Handbook of Feminist Research: Theory and Praxis* (Sharlene Nagy Hesse-Biber ed., Sage 2006)

Professor Kaufmann used two chapters from the *Handbook of Feminist Research* in her fall 2009 Qualitative/Interpretive Research in Education course [Tr. Vol. 5, Doc. 403 at 154; Pls. Ex. 518]. The first excerpt, chapter 26 of the book (pages 515-534), is titled "Feminist Research Ethics," by Judith Preissle [Pls. Ex. 243]. The second excerpt, chapter eight of the book (pages 155-172), is titled "Toward Understandings of Feminist Ethnography," by Wanda S. Pillow and Cris Mayo [Id.]. The excerpts combine to total 38 pages and constitute 4.95% of the

---

[21]Obviously there were book sales. Sage tendered a copy of *Approaches to Qualitative Research* as evidence in this case, and Sage's claims of copyright infringement for this book involve Georgia State's copy of the book.

[22]The Court also finds that even without the mitigating adjustment of factor four, weighing the four factors would yield a determination that Defendants' use was a fair use.

pages in the book [Id.].  They were required reading [Doc. 403 at 154-56; Pls. Ex. 518].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt was nontransformative (here, mirror-image copying).  The excerpt serves the same purpose as the copyrighted original.  The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution.  Thus, factor one favors fair use.

Moving to factor two ("the nature of the copyrighted work"), the Court notes that it has already assessed the Handbook of Feminist Research and specifically, chapter 26, under the fair use factor two rubric.  See infra pp. 15-16. There is no need to duplicate that description here.  The Court found that chapter 26 balances objective description with author opinion, and it is therefore neutral under the factor two analysis.

Chapter eight, "Toward Understandings of Feminist Ethnography," starts by establishing the benefits of using identity categories, such as race and gender, in qualitative research.  Noting that these categories can also overlap, the chapter also discusses the intersection of identity categories. The chapter then narrows its focus to feminist custom and culture by chronicling past work on feminist ethnography.  Using these past works as an example, the chapter concludes by developing the distinctions created between feminist ethnography

and other identity categories when a researcher studies, analyzes, and writes about feminist culture.

Chapter eight is primarily objective, with long descriptions of previous authors' work. Complementing these objective descriptions are analytical passages which develop and explore various issues present when researching feminism and feminist cultures. The authors write in a formal tone with little to no discussion of their own experiences or opinions.

Considering the nature of chapters eight and 26 together, the Court finds that factor two weighs neither for nor against fair use in this instance. It is neutral.

Moving to factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kaufmann uploaded two chapters of the *Handbook of Feminist Research* to ERES. Chapter eight totals 18 pages, while chapter 26 totals 20 pages, bringing the combined total of the two excerpts to 38 pages, which is not a small number of pages [Pls. Ex. 243]. That combined total is 4.95% of the total book, which is a small percentage of the copyrighted work. The excerpts were tailored to fit Professor Kaufmann's pedagogical purpose. Chapters eight and 26 do not constitute the heart of the work. However, two whole chapters were used, and whole chapters represent greater value than an equal number of pages which do not comprise whole chapters. Thus, factor three disfavors fair use.

Factor four evaluates "the effect of the use upon the potential market for or value of the copyrighted work." Digital permissions were available for excerpts of the *Handbook of*

*Feminist Research* in 2009 [Pls. Ex. 248]. By providing the excerpts free to her class, Professor Kaufmann deprived Sage of less than $223.50[23] [Jt. Ex. 5, Doc. 266-4 at D-59]. This caused actual, but tiny, damage to the value of the copyrighted work. In addition, if other colleges and universities allowed unpaid use of excerpts of copyrighted works, it could cause substantial harm to the potential market for or the value of the copyrighted work. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three disfavors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the factors to rule on the fair use defense.

The following table shows book sales for The *Handbook of Feminist Research* since its publication:

| Year | Book Sales Net Revenue |
|------|------------------------|
| 2006 | $17,241.00 |
| 2007 | $4,153.45 |
| 2008 | $15,015.80 |
| 2009 | $12,052.55 |
| 2010 | $5,623.08 |
| **Total** | **$94,085.88** |

[Pls. Ex. 248].

Over that same period of time, the *Handbook of Feminist Research* generated a small amount of permissions revenue. There

---

[23]The figure provided in the parties' joint exhibit overstates the amount lost for this use because the calculation includes pages that this Court previously excluded from the relevant fair use inquiry.

is no evidence of CCC revenues for the *Handbook of Feminist Research*, but Sage did provide the figures for their in-house (presumably digital) permissions sales. Those figures are listed below:

| Year | Permissions Sales |
|------|------------------:|
| 2006 | $0.00 |
| 2007 | $0.00 |
| 2008 | $116.29 |
| 2009 | $96.45 |
| 2010 | $770.72 |
| **Total** | **$983.46** |

[Pls. Ex. 248].

Based on the foregoing data, the Court finds that the value of the copyrighted work in 2009 was primarily in book sales, not permissions. Defendants' actions had no impact on book sales. In 2009 Sage had only $96.45 in permissions revenue from *Handbook of Feminist Research*. Repetitive use of excerpts of the copyrighted work was unlikely. Thus, it is unlikely that Defendants' use of unpaid excerpts in 2009 (even assuming the widespread availability of programs like Georgia State's) substantially damaged the value of the copyrighted work. For this reason, a mitigating adjustment of factor four, favoring Defendants, is warranted.

Weighing all factors (as adjusted) together, placing the burden of proof on Defendants, and recalling that factor four "looms large," the Court finds that Defendants prevail on their fair use defense. This copyright infringement claim fails.

11. *Handbook of Narrative Inquiry: Mapping a Methodology* (D. Jean Clandinin ed., Sage 2006)

Professor Kaufmann again used the *Handbook of Narrative Inquiry* in her fall 2009 Qualitative/Interpretive Research in Education Course, but assigned a different chapter than the one used in her Maymester class [Tr. Vol. 6, Doc. 404 at 21; Pls. Ex. 518]. That new assignment required her students to read chapter two (pages 35-75), titled "Mapping a Landscape of Narrative Inquiry: Borderland Spaces and Tensions" ("Mapping a Landscape"), by D. Jean Clandinin and Jerry Rosiek [Pls. Ex. 258]. The chapter totaled 41 pages, or 5.77% of the overall book [Id.].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt was nontransformative (in this case, mirror image copying). It serves the same overall function as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Factor two assesses the nature of the copyrighted work. As previously discussed, the *Handbook of Narrative Inquiry* is an academic book. See infra pp. 39-40.

Chapter two, "Mapping a Landscape," begins by defining narrative inquiry as the studying of experiences, as embodied in the continuous interaction of human thought with the personal, social, and material environment. With this definition in mind, the chapter then compares and contrasts narrative inquiry with

other forms of inquiry, such as post-postivism, Marxism, critical theory, and post-structuralism. By performing this comparison, the chapter creates its metaphorical "map," noting where the fields of inquiry reside and intersect with one another. The chapter concludes with a closer look at the "borders" of the various methods of inquiry and addresses what occurs when the different fields of inquiry blur together.

Chapter two is primarily objective, as the authors describe the different methods of inquiry and the general theories which underlie those methods. The chapter is written in a formal tone, and aims to provide the reader with a brief education on various forms of narrative inquiry. Author analysis does not dominate. Taking all of this into account, factor two is neutral for this work.

Factor three addresses the quantity and quality of the excerpt used as it relates to the work as a whole. Here, Professor Kaufmann used 41 pages of the *Handbook of Narrative Inquiry*, which is the equivalent of 5.77% of the overall book [Pls. Ex. 258]. This is a small percentage. As for the value of the excerpt, chapter two is not the heart of the work, although a full chapter has more value than a part of a chapter. Use of the excerpt was narrowly tailored to serve Professor Kaufmann's pedagogical interest. The number of pages copied was quite large but not too large given the limitation to one chapter, the small percentage of the copyrighted work, and the nonprofit educational nature of the use, yet taking into account the potential impact of market substitution. Factor three favors fair use.

Factor four evaluates "the effect of the use upon the potential market for or value of the copyrighted work." Permissions to make digital excerpts from CCC and Sage were available in 2009 [Pls. Exs. 262, 264]. Had permissions been paid, Sage would have earned less than $102.46 in net revenues from digital permissions. Cambridge I, 863 F. Supp. 2d 1190, 1275 (N.D. Ga. 2012). This represents actual, but minuscule, damage to the value of Sage's copyrighted work. Further, widespread unpaid use of excerpts by other universities could cause substantial damage to the value of the copyrighted book, *Handbook of Narrative Inquiry*. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation.

The following table demonstrates book sales data for the *Handbook of Narrative Inquiry* since its publication in 2006:[24]

| Year | Book Sales |
|---|---|
| 2007 | $66,332.82 |
| 2008 | $31,868.12 |
| 2009 | $22,510.10 |
| 2010 | $10,804.62 |
| **Total** | **$131,515.66** |

---

[24]The book was first published on December 28, 2006 [Pls. Ex. 261]. Accordingly, there are no book sales or permissions sales figures for 2006 [Pls. Exs. 262, 264].

[Pls. Ex. 262]. The following table demonstrates permissions sales data for the *Handbook of Narrative Inquiry* since 2006:

| Year | APS | ECCS | In-house | Total |
|------|-----|------|----------|-------|
| 2007 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2008 | $94.08 | $0.00 | $0.00 | $94.08 |
| 2009 | $0.00 | $18.52 | $112.60 | $131.12 |
| 2010 | $0.00 | $0.00 | $324.68 | $324.68 |
| **Total** | **$94.08** | **$18.52** | **$437.28** | **$549.88** |

[Pls. Exs. 262, 264].

The evidence here shows that in 2009 there was very little demand for excerpts of the *Handbook of Narrative Inquiry*. Thus, there was little risk of repetitive use of these excerpts. For this reason there should be a mitigating adjustment to factor four in Defendants' favor.

Weighing all factors (as adjusted) together, placing the burden of proof on Defendants, giving extra weight to factor four and no weight to factor two (since it is neutral), Professor Kaufmann's use of the *Handbook of Narrative Inquiry* qualifies as a fair use. Sage's claim of infringement as to this work, therefore, fails.

12. *Sage Handbook of Qualitative Research, Third Edition* (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2005)

In the fall semester of 2009, Professor Kaufmann again assigned excerpts from the *Sage Handbook of Qualitative Research, Third Edition* ("*Handbook, Third Ed.*") as required reading for her EPRS 8500 course on Qualitative/Interpretive Research in Education [Tr. Vol. 5, Doc. 403 at 145-152; Pls. Ex. 518]. Specifically, she requested that seven chapters, or pages

-62-

1-32, 109-138, 357-375, 443-465, 547-557, 915-932, and 959-978 of the *Handbook, Third Ed.* be uploaded to ERES [Doc. 403 at 145-152; Pls. Ex. 518]. The excerpts posted to ERES consisted of 153 pages total or 12.45% of the 1,229-page book [Pls. Ex. 267].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Factor two ("the nature of the copyrighted work") disfavors fair use for the reasons which follow. As an initial matter, the Court has already evaluated three of the seven total excerpts under the rubric of factor two, including (1) pages 1-32 (introduction); (2) pages 357-375 (chapter 14); and (3) pages 443-465 (chapter 17) [see infra pp. 27-29]. There is no need to rehash the nature of these chapters at length, but in relevant part, the Court found as follows: (1) the introduction is both objectively and subjectively descriptive and it contains a considerable amount of author/editor opinion; (2) chapter 14 is evaluative and contains author opinion; and (3) chapter 17 is primarily objectively descriptive.

This Court has yet to assess four of the seven excerpts in light of factor two. The first relevant excerpt is pages 109-138, or the whole of chapter five, "Freeing Ourselves from Neocolonial Domination in Research: A Kaupapa Maori Approach to

Creating Knowledge," by Russell Bishop. In this chapter, the author identifies and sets aside research traditions that reinforce or reflect colonial power imbalances in the study of indigenous cultures. He also explores alternative paradigms that embody non-Western experiences and values by focusing on research on the Maori people, an indigenous community in New Zealand. After describing background issues involved in studying indigenous people, the author introduces the "Kaupapa Maori" approach to research. The remainder of the chapter is devoted to describing three research studies that the author performed using the Kaupapa Maori approach, and contrasting the approach with Western traditions. Overall, the chapter contains some objective description but it is dominated by the author's opinion and evaluative assessment.

The second excerpt is pages 547-557, or all of chapter 22, "Testimonio, Subalternity, and Narrative Authority," by John Beverly. In chapter 22, the author discusses the "testimonio," which is a testimonial narrative "produced in the form of a printed text, told in the first person by a narrator who is also the real protagonist or witness of the events she or he recounts" [Id. at 547]. The author contrasts testimonio with other similar narrative formats, such as autobiography, diary and ethnographic writing. The author examines one testimonio to illustrate the distinctive features of the format. For instance, in response to a criticism regarding the historical accuracy of the testimonio, he explains that because it is a witness's account of an event, it necessarily reflects the speaker's reality rather than a detached observer's. Along

-64-

these lines, the author explains that *testimonios* are a union of objectivity and solidarity, and are typically used to tell stories of oppressed or subaltern peoples. Overall, the author's approach to this chapter is evaluative. While it contains some objective description, it is dominated by the author's own subjective observations and critiques.

The third relevant excerpt is pages 915-931, or the whole of chapter 36, "Relativism, Criteria, and Politics," by John K. Smith and Phil Hodkinson. In the chapter, the authors respond to an issue touched on in the first edition of the *Handbook*: the age of relativism in research, or the realization that there is no possibility of theory-free observation and knowledge. In this vein, the authors discuss two ideas: (1) that researchers cannot step outside of their own social and historical standpoints; and (2) the decisions about research criteria and judgments about the worth of research represent social activities. The authors summarize several responses to the question of how to select criteria to evaluate research quality and methodology. Chapter 36 is academic and somewhat philosophical. It contains relatively equal parts objective description of historical research, and subjective evaluation and analysis.

The final excerpt is pages 959-978, or all of chapter 38, "Writing: A Method of Inquiry," by Laurel Richardson and Elizabeth Adams St. Pierre, which is a revision of a chapter by the same name in previous editions of the *Handbook*. Chapter 38 is divided into three parts. The first part, written by Richardson, discusses creative and analytical social scientific

writing, writing in the genre of ethnography, and the direction that her work has taken. The second part, written by St. Pierre, analyzes writing as a method of qualitative inquiry, with reference to the author's own personal experiences using writing as a method. In the third and final part, Richardson gives 16 examples of exercises that help engage the writer to write as a method of knowing. The nature of this chapter, which is fueled primarily by the authors' own personal experiences and opinions, does not support a finding of fair use.

Overall, the nature of the excerpts disfavors fair use. In particular, the excerpted portions of the work are dominated by author opinion, analysis, evaluation, and subjective description. Thus, factor two disfavors fair use.

Turning to factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kaufmann uploaded 153 pages, or 12.45% of the *Handbook, Third Ed.*, to ERES [Pls. Ex. 267]. The number of pages copied is extremely large, even considering that the excerpts served the pedagogical aims of the course, and that none of the excerpts is the heart of the work. An even more compelling factor weighing against fair use is that seven complete chapters were used. Professor Kaufmann captured a very large amount of the book's value by copying and distributing seven complete chapters. Because factor three takes into account the market impact caused by substitution, the unpaid use of seven complete chapters certainly weighs against a finding of fair use. Based on these considerations, Professor Kaufmann used much too much of the work--both with respect to its

-66-

quantity and quality--for factor three to weigh in Defendants' favor. Factor three weighs against fair use.

Turning to factor four ("the effect of the use upon the potential market for or value of the copyrighted work"), digital permissions were available for excerpts of the *Handbook, Third Ed.*, in 2009 through CCC and Sage's in-house permissions program [Pls. Exs. 283, 286, 287]. If Georgia State had purchased permissions from Sage for its use of the *Handbook, Third Ed.* in Professor Kaufmann's class, Sage would have earned less than $467.31 in net revenue from permissions. In other words, Georgia State's unpaid use caused Sage some actual harm. It follows that widespread unpaid copying of excerpts of the book could cause substantial harm to the value of the copyrighted work. Factor four weighs strongly against fair use.

To recap, factor one favors fair use; factors two and three both disfavor fair use, and factor four strongly disfavors fair use. Consistent with the Court of Appeals' direction, factor four is the most substantial factor, and factor two has insubstantial weight. Also, the Court affords factor three substantial additional weight in this instance because Defendants used a notably excessive quantity and quality of the copyrighted work. Finally, factor four is augmented yet further in Plaintiffs' favor on account of significant digital permissions sales in 2009 showing high repetitive use of excerpts of the *Handbook, Third Ed.* Defendants have clearly failed to discharge their burden with respect to this use. The Court thus finds that Professor Kaufmann's use of the *Handbook,*

*Third Ed.* in the fall of 2009 was not a fair use. Accordingly, this claim of copyright infringement succeeds.

13. *Handbook of Social Theory* (George Ritzer & Barry Smart eds., Sage 2001)

Professor Kaufmann assigned chapter 17 of the *Handbook of Social Theory* for her September 28, 2009 class session in EPRS 8500 [Tr. Vol. 5, Doc. 403 at 157; Pls. Ex. 518]. The chapter (pages 217-228) is titled "Symbolic Interactionism at the End of the Century," ("Symbolic Interactionism"), and was written by Kent L. Sandstrom, Daniel D. Martin, and Gary Alan Fine [Pls. Ex. 288]. The chapter is 12 pages long and 2.12% of the 564-page book [Idl. It was required reading [Doc. 403 at 157].

Fair Use Analysis

Professor Kaufmann used the same excerpt previously during the Maymester term. The fair use analysis is on pages 21-25 above. The use of this excerpt in the fall of 2009 was a fair use.

B. Professor Esposito

Professor Esposito is a professor in the Educational Policy Studies department at Georgia State [Tr. Vol. 6, Doc. 404 at 52].

EPSF 8280 Anthropology of Education, Summer 2009

In the summer of 2009, Professor Esposito taught EPSF 8280, Anthropology of Education [Id. at 81]. EPSF 8280 is a graduate course that explores the methodology of ethnography and the study of culture in school settings [Id.]. Twenty two graduate students were enrolled in Professor Esposito's EPSF 8280 course during the summer 2009 semester [Id. at 52]. As evidenced by

the Syllabus, students were required to purchase five texts for this course, as well as complete several required readings posted on ERES [Id. at 79, Pls. Ex. 547].

14. *Handbook of Feminist Research: Theory and Praxis* (Sharlene Nagy Hesse-Biber ed., Sage 2006)

Professor Esposito assigned chapter eight, titled "Toward Understandings of Feminist Ethnography," of the *Handbook of Feminist Research* [Tr. Vol. 6, Doc. 404 at 56]. The excerpt (pages 155-172) is 18 pages long and 2.35% of the pages in the 767-page book [Pls. Ex. 243]. It was required reading [Doc. 404 at 56-57; Pls. Ex. 547].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt was nontransformative (in this case, mirror image copying). It serves the same overall function as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Turning to factor two ("the nature of the copyrighted work"), as previously discussed, the *Handbook of Feminist Research* broadly covers feminist theories, research, and practice. See infra p. 15. This Court has already evaluated chapter eight under the fair use factor two rubric, and concluded that chapter eight contains both objective description and author analysis; analysis does not dominate. See infra pp. 55-56. Accordingly, fair use factor two is neutral.

Moving to factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Esposito uploaded one chapter of the *Handbook of Feminist Research* to ERES. Chapter eight totals 18 pages, which is 2.35% of the book [Pls. Ex. 243]. This is a very small number of pages and a very small percentage of the overall book. Even though a whole chapter was used--and a whole chapter has more value than part of a chapter--chapter eight does not constitute the heart of the work. Analysis of factor three requires assessing the quality and quantity of the work in light of the purpose of the use and the threat of substitution on the market for the work. The book's use for a nonprofit, educational purpose amply endorses the amount and percentage of the book which was used. The small page count strongly mitigates the potential impact of market substitution. Moreover, the excerpt was narrowly tailored to fit Professor Esposito's pedagogical purpose. Weighing all of these considerations together, factor three easily favors fair use.

Factor four looks to "the effect of the use upon the potential market for or value of the copyrighted work." Digital permissions were available for excerpts of the *Handbook of Feminist Research* in 2009 [Pls. Ex. 248]. By providing the excerpts free to her class, Professor Esposito deprived Sage of $47.52, less royalties payable to the external editor, in net revenue from permissions. Cambridge I, 863 F. Supp. 2d at 1283. This caused actual, but tiny, damage to the value of the copyrighted work. In addition, if "everyone" (colleges and universities) allowed unpaid use of copyrighted excerpts, it

-70-

could cause substantial harm to the value of the *Handbook of Feminist Research*. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the four factors.

First, the Court finds that an adjustment to factor three should be made, in Defendants' favor, because the percentage of the copyrighted work used by Professor Esposito was so very small (2.35%).

The following table shows book sales for the *Handbook of Feminist Research* since its publication:

| Year | Book Sales Net Revenue |
|------|------------------------|
| 2006 | $17,241.00 |
| 2007 | $4,153.45 |
| 2008 | $15,015.80 |
| 2009 | $12,052.55 |
| 2010 | $5,623.08 |
| **Total** | **$94,085.88** |

[Pls. Ex. 248].

Over that same period of time, the *Handbook of Feminist Research* generated a small amount of permissions revenue. There is no evidence of CCC revenues for the *Handbook of Feminist Research*, but Sage did provide the figures for its in-house (presumably digital) permissions sales. Those figures are listed below:

| Year | Permissions Sales |
|------|-------------------|
| 2006 | $0.00 |
| 2007 | $0.00 |
| 2008 | $116.29 |
| 2009 | $96.45 |
| 2010 | $770.72 |
| **Total** | **$983.46** |

[Pls. Ex. 248].

Based on the data listed above, the Court finds that the value of the copyrighted work in 2009 was almost exclusively in book sales, not permissions. Defendants' actions had no impact on book sales. Defendants' actions could have had some very small impact on the actual or potential market for digital permissions sales. However, the likely effect of Defendants' conduct is diminished by the fact that there was very little demand for excerpts of the *Handbook of Feminist Research* in 2009; hence repetitive use of the excerpt was unlikely. This calls for some mitigation in the strength of factor four, in Defendants' favor.

Weighing all four factors (as adjusted) together, placing the burden of proof on Defendants, and recalling that factor four "looms large," the Court finds that the overall weight of the four factors favors fair use. Defendants accordingly prevail on their fair use defense as to this work, and this infringement claim fails.

15. *The Sage Handbook of Qualitative Research (Second Edition)* (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2000)

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265]. It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters analyze the theory and practice of qualitative research [Pls. Ex. 265; Jt. Ex. 5 at D-14]. There is conflicting evidence in the record as to the retail price for *The Sage Handbook of Qualitative Research (Second Edition)*; the parties alternatively assert that it retails for $156.00 and for $175.00 [Jt. Ex. 5 at D-19, D-23]. There is conflicting evidence of whether *The Sage Handbook of Qualitative Research (Second Edition)* is currently out of print [Jt. Ex. 5 at D-19, D-23]. A reprint is available for an extra charge. The book has earned $1,300,053.54 in net sales revenue [Pls. Ex. 283]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in ECCS permissions revenue including $3,814.52 in 2009 [Pls. Ex. 286]. In addition, licensed excerpts of this work were available directly from Sage in 2009; the book has earned $58,904.47[25] through Sage's in-house permissions program from 2000 through 2010 [Pls. Ex. 283].

Professor Esposito requested that pages 455-486 of *The Sage Handbook of Qualitative Research (Second Edition)* be uploaded to

_____

[25]This amount represents permissions income only for the second edition of this work.

ERES for distribution to students in her EPSF 8280 course [Pls. Ex. 265; Tr. Vol. 6 at 54]. The excerpted chapter was entitled "Ethnography and Ethnographic Representation" by Barbara Tedlock. The excerpt was one chapter of the book totaling 32 pages, or 2.80% of the total work [Pls. Ex. 265]. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $83.78 in net revenue from permissions.[26] The cost to students in the course would have been $101.56.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: chapter 17 begins with an introduction to the work done by ethnographers[27] in studying various sections of the

---

[26]The amount earned would have been $101.56, the amount charged by CCC, [Jt. Ex. 5 at D-23], less the $3.00 service fee charged by CCC to users, less $14.78 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

[27]"Ethnography" is a branch of anthropology that studies people, societies, and cultures. *Ethnography*, Oxford English Dictionary (3d ed. 2011).

population. This introduction includes an historical overview of some of the earliest ethnographic studies, which were originally carried out in the late nineteenth century. The excerpt then discusses the "genres" of ethnography, or the ways in which ethnographers chose to relay their studies to the public. Finally, the chapter highlights the ways in which the character and background of the ethnographer affects the results of the ethnographer's research.

Chapter 17 consists primarily of objective surveys of the field of ethnography. The excerpt goes to great lengths to describe the studies and works of ethnographers, but does not incorporate the author's experiences. The chapter is didactic, using a formal tone to teach individuals how to approach ethnography and ethnographic studies. Chapter 17 is neutral under factor two of the fair use analysis.

Factor three assesses the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." Here, Professor Esposito used 32 pages of the *Handbook, Second Edition*, which represents 2.80% of the overall page count for the book [Pls. Ex. 265]. The excerpt fit Professor Esposito's pedagogical purpose. The percentage of the book used by Professor Esposito was very small (not merely small) as a percentage of the total work. The favored educational nature of the use further affirms that this percentage and the length of the excerpt favors fair use. The number of pages taken is also a heuristic for impact on the market (it has a relationship to the amount of lost permissions); the Court finds that the impact is small enough given the very small percentage of the work

which was used. While Professor Esposito used a whole chapter of the book it is not the heart of the work. Taking all of this into account, factor three favors fair use.

As to the fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court first looks to whether Professor Esposito's use of *The Sage Handbook of Qualitative Research (Second Edition)* affected the market for purchasing the book as a whole. The sales revenue for *The Sage Handbook of Qualitative Research (Second Edition)* in 2009 was $0.00. The book is technically out of print, but a reprint is available at an extra charge. The Court treats this as in print. Students would not pay $156.00 or $175.00 for an entire book when only 32 pages were required reading for Professor Esposito's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Sage Handbook of Qualitative Research (Second Edition)* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program. The unpaid use of the excerpt by Professor Esposito and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the four factors.

The Court finds that the very small percentage of the copyrighted work which is represented by the excerpt (2.8%) calls for an adjustment of factor three, in Defendants' favor.

In addition, the Court finds that strong demand for excerpts of the book in 2009 calls for an augmenting adjustment of factor four, in Plaintiffs' favor.

After considering all four fair use factors (as adjusted), weighing them together, placing the burden of proof on Defendants, and recalling that factor four "looms large," the Court finds that Defendants have not met their burden of proving that Professor Esposito's use of *The Sage Handbook of Qualitative Research (Second Edition)* was a fair use under the Copyright Act. Thus, this claim of copyright infringement succeeds.

16. *Sage Handbook of Qualitative Research (First Edition)* (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 1994)

*The Sage Handbook of Qualitative Research (First Edition)* was first published by Sage in 1994 [Defs. Ex. 739]. It is a 653 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln. The chapters provide analysis on the theory and practice of qualitative research [Jt. Ex. 5 at D-24]. *The Sage Handbook of Qualitative Research (First Edition)* is out of print [Jt. Ex. 5 at D-24] but reprints are available at an extra charge. There is no evidence in the record of the net sales

revenue from sales of the book itself.  Excerpts from the book were available for digital licensing through CCC in 2009 [Pls. Ex. 287].  From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (First Edition)* earned $4,632.40 in ECCS permissions revenue [Pls. Ex. 287].[28]

For her summer 2009 class, Professor Esposito assigned "Working the Hyphens: Reinventing Self and Other in Qualitative Research" ("Working the Hyphens") by Michelle Fine [Tr. Vol. 6, Doc. 404 at 58; Pls. Ex. 547].  "Working the Hyphens" (pages 70-82) is the fourth of 36 chapters in the *Sage Handbook of Qualitative Research (First Edition)* ("*Handbook, First Ed.*") [Defs. Ex. 739].  The chapter is 13 pages in length and represents 1.99% of the pages in the 653-page book [Id.].  It was required reading [Pls. Ex. 547].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt was nontransformative (in this case, mirror image copying).  It serves the same overall function as the copyrighted work.  The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution.  Thus, factor one favors fair use.

Factor two addresses the nature of the work.  The *Handbook, First Ed.* roughly divides into three sections.  First, the book locates the field of qualitative research by analyzing

---

[28]This figure is the Court's estimation of ECCS revenue based on its review of documentary evidence provided at trial.

historical qualitative studies and discussing major research paradigms which influence modern qualitative fieldwork. The book then moves to the more practical aspects of performing qualitative research, including qualitative study design and ways to collect and interpret qualitative data. The concluding section of the book discusses where qualitative research may go in the future.

Chapter four, "Working the Hyphens," alludes to the qualitative research concept of "self-other," in which a qualitative researcher maintains separation and independence from the study subjects. The author of the chapter suggests that researchers should abandon this separation and examine their relationships with their subjects instead. This examination includes re-evaluating common assumptions of qualitative research, including the characterization that qualitative research subjects, such as indigenous peoples, are separated from the general population. The chapter also details various qualitative research writings that speak against separating the researcher from the subject. These works voice their discontent by either offering critiques which disturb the division between researcher and subject or encouraging researchers to let their personal characteristics overcome the separation to enhance the resulting qualitative scholarship.

The chapter objectively describes two forms of previous qualitative literature: (1) examples of the self-other separation or (2) works that call for a re-analysis of the separation. The chapter is written in a formal tone and is devoid of any fanciful language or descriptions. The author

includes some personal accounts of her struggle with the self-other separation at the beginning of the chapter, but the remainder of the excerpt does not draw extensively on her experience. Overall, author opinion, subjective description and evaluative approach are present but do not dominate. Based on these aspects of the excerpt, fair use factor two is neutral.

Factor three assesses the amount and substantiality of the excerpt in relation to the work as a whole. The chapter, "Working the Hyphens" is 13 pages long, and represents 1.99% of the total pages of the *Handbook, First Ed.* [Defs. Ex. 739]. The chapter is a tiny part of the total work, and it is adequately tailored to the pedagogical purpose of Professor Esposito's course. It does not constitute the heart of the work. The 13-page length of the excerpt is easily accommodated by the nonprofit, educational use favored by factor one and it portends small impact from market substitution, a concern of factor four. Taking all of these considerations into account, factor three easily favors fair use.

Factor four looks to the effect of Professor Esposito's use on the potential market for or value of the copyrighted work. Digital permissions of the *Handbook, First Ed.* were available in 2009 [Pls. Ex. 287]. The unpaid use by Professor Esposito cost Sage less than $34.03 in net revenue. Cambridge I, 863 F. Supp. 2d at 1286 n.87. This amount represents actual damage to the value of Sage's copyrighted work, but the damage was minuscule. Nevertheless, if unpaid use of excerpts of copyrighted books became widespread at colleges and universities, it could substantially damage Sage's ability to receive digital

permissions income for excerpts of the *Handbook, First Ed.* Thus, Defendants' use (and the use of others) could substantially damage the value of the copyrighted work. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the four factors.

First, the Court finds that factor three should be adjusted, in Defendants' favor, because the excerpt used was not merely small; it was tiny.

In addition, permissions sales in the years leading up to 2009 showed a downward trend and permissions sales were very modest in 2009.

| Year | APS | ECCS | Total |
|------|-----|------|-------|
| 2004 | $751.84 | $601.29 | $1,353.13 |
| 2005 | $1,990.94 | $1,777.86 | $3,768.80 |
| 2006 | $2,000.72 | $1,455.03 | $3,455.75 |
| 2007 | $48.45 | $0.00 | $48.45 |
| 2008 | $74.36 | $19.58 | $93.94 |
| 2009 | $43.31 | $30.23 | $73.54 |
| 2010 | $28.56 | $0.00 | $28.56 |
| **Total** | **$4,938.18** | **$3,883.99** | **$8,822.17** |

[Docs. 286, 287].

Thus, the projected effect of Defendants' use of the unpaid excerpt on the value of the copyrighted work should be diminished on account of lack of demand for the excerpt in 2009. Repetitive use of excerpts was unlikely in 2009. Accordingly,

-81-

a mitigating adjustment of factor four, in Defendants' favor, will be made.

Weighing all four fair use factors (as adjusted) together, placing the burden of proof on Defendants, and recalling that factor four "looms large," the Court finds that Professor Esposito's use of the *Handbook, First Ed.* was a fair use. Accordingly, this copyright infringement claim fails.

EPRS 8520 Qualitative Research in Education III, Fall 2009

EPRS 8520 is a graduate course that focuses on data analysis [Tr. Vol. 6 at 87]. Fourteen doctoral candidates were enrolled in Professor Esposito's course during the fall 2009 semester [Jt. Ex. 5 at D-63; Tr. Vol. 6 at 61, 88]. As evidenced by the syllabus for this course, students were required to purchase two texts for this course, as well as complete several required readings posted on ERES [Pls. Ex. 513; Tr. Vol. 6 at 86-87].

17. Theoretical Frameworks in Qualitative Research (Vincent A. Anfara & Norman T. Mertz eds., Sage 2006)

*Theoretical Frameworks in Qualitative Research* was first published by Sage in 2006 [Pls. Ex. 305]. It is a 237 page, ten chapter volume edited by Vincent A. Anfara and Norma T. Mertz. The chapters provide analysis on the role of the theoretical framework in qualitative research through case examples [Jt. Ex. 5 at D-63]. The book retails for $51.95 [Jt. Ex 5 at D-63]. The book has earned $75,320.69 in net sales revenue [Pls. Ex. 308]. There is no evidence in the record of any permissions revenue earned through CCC. However, licensed digital excerpts of the book were available in 2009 through Sage's in-house

-82-

permissions program, and the book has earned $138.61 in permissions revenue [Pls. Exs. 308, 309].

Professor Esposito requested that pages xxiii-xxxii[29] and pages 189-196 of *Theoretical Frameworks in Qualitative Research* be uploaded to ERES for distribution to students in her EPRS 8520 course [Tr. Vol. 6 at 88; Pls. Ex. 639]. The two excerpts are a portion of the introduction and the entirety of the conclusion of the book, totaling sixteen pages, or 6.75% of the total work [Pls. Ex. 305]. Both the introduction and conclusion were written by the book's editors, Vincent A. Anfara and Norma T. Mertz. Had permissions been paid through its in-house permissions program to license this excerpt, Sage would have earned $26.88 less royalties payable to the external editors. The cost to students in the course would have been $26.88.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

---

[29]Although Joint Exhibit 5 states that the entire introduction, appearing on pages xii-xxx, was uploaded to ERES, Professor Esposito testified at trial that she assigned only a portion of the introduction, beginning at page xxiii. The Court credits this testimony. Thus, the Court will consider the smaller excerpt for purposes of the fair use determination.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *Theoretical Frameworks in Qualitative Research* is an academic work which provides an overarching explanation of theoretical frameworks, both in their use in and effect on qualitative research. The book first discusses the role of theory in qualitative research, defining a "theoretical framework" as "any empirical or quasi-empirical theory of social and/or psychological processes . . . that can be applied to the understanding of phenomena" [Pls. Ex. 305 at xxvii]. Relying on this definition, the book presents ten chapters in which various qualitative researchers discuss the theoretical frameworks they applied in select qualitative studies. The conclusion reflects on the different chapters and attempts to abstract key points for application in future qualitative research.

The section of the Introduction assigned by Professor Esposito, pages xxiii–xxxii, begins by using summaries of other authors' works to demonstrate two instances where theory directly affects qualitative research. In the first instance, theory affects the manner in which a researcher designs his study. Theory also affects the underlying epistemology of the qualitative study. The excerpt then defines the concept of a "theoretical framework" and provides additional discussion on both the boundaries of the definition and short examples of theoretical frameworks in practice. The Introduction finishes by outlining the remainder of the book for the reader.

The Introduction is didactic, teaching the reader about the role of theory in qualitative research and defining theoretical

frameworks for use in the remainder of the book. The central takeaway from the excerpt, the definition of theoretical frameworks, seems to come directly from the authors' opinions or experience in qualitative research. The other parts of the excerpt consist of objective descriptions of either previous qualitative studies or the other chapters of the book.

The Conclusion, pages 189-196, highlights two questions about theoretical frameworks: (1) how to find a theoretical framework, and (2) what type of effect the theoretical framework will have on the research. The authors then answer these questions by emphasizing key points from the previous chapters. The Conclusion includes insight from the authors themselves, with suggestions such as finding theoretical frameworks by searching other forms of scholarship and realizing that a theoretical framework will focus the study and reveal more meaningful conclusions within the study itself.

The Conclusion is also didactic, providing the reader with concrete advice on how to use a theoretical framework when performing qualitative research. The excerpt also synthesizes the previous chapters' analysis into additional advice, using the high points of the other authors' work as teaching tools and examples. The Conclusion maintains a formal tone, and does not contain any fanciful or humorous elements. Author opinion dominates both excerpts. Factor two disfavors fair use.

Factor three looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." It considers the quantity and quality (value) of the portion used, plus the purpose of the use and the potential harm of

-85-

market substitution. Here, Professor Esposito provided 18 pages to her students, or 6.75% of the total pages in *Theoretical Frameworks in Qualitative Research* [Pls. Ex. 303]. This is a small number of pages and a small percentage of the copyrighted work. Additionally, the excerpts were tailored to fit Professor Esposito's pedagogical purpose. However, the excerpts used by Professor Esposito were of great value in the overall structure of the book. The excerpt of the Introduction provides a working definition of theoretical frameworks, while the Conclusion synthesizes the major themes of each chapter for application by the reader in future qualitative studies. While the remainder of the book provides the examples which the Conclusion relies upon, the two excerpts capture the heart of the work.

The educational purpose of the use leans toward supporting the amount of material used, and harm from market substitution is reduced by the small size of the excerpt. But the small excerpts of *Theoretical Frameworks in Qualitative Research* that Professor Esposito used include the heart of the work, which makes factor three ultimately come down against fair use.

As to the fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), Professor Esposito's use of *Theoretical Frameworks in Qualitative Research* did not affect the market for purchasing the book. However, Professor Esposito deprived Sage of $26.88 in royalties. Because there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009, the unpaid use of the excerpt by Professor Esposito and her students caused very small, but actual, damage to the value

of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two disfavors fair use; factor three disfavors fair use; and factor four strongly disfavors fair use. The Court will look no further. Weighing all factors together, Defendants' fair use defense fails. This copyright infringement claim succeeds.

The Court notes Defendants have conceded this outcome in their remand brief.

## C. Professor Kruger

Dr. Anne Cale Kruger was an Associate Professor who taught graduate courses in educational psychology and special education [Tr. Vol. 10, Doc. 393 at 4, 6].

### EPY 7090 Psychology of Learning and the Learner, Summer & Fall 2009

In the summer and fall semesters of 2009, Professor Kruger taught EPY 7090, or "Psychology of Learning and the Learner," which was a single course that spanned over two semesters [Pls. Ex. 553]. The course covered the psychological principles that underlie teaching and learning that occur in school, and it was taught to master's degree students studying early childhood [Id.; Doc. 393 at 7]. There was no required textbook, and Professor Kruger posted all required readings on ERES [Pls. Ex. 553].

18. _Awakening Children's Minds: How Parents and Teachers Can Make a Difference_ (Laura E. Berk, Oxford 2001)

_Awakening Children's Minds_ was first published by Oxford in 2001 [Pls. Ex. 354]. It is a 320 page, seven chapter book authored by Laura E. Berk that advises parents and teachers of young children on how they can encourage children's cognitive and social competencies [Pls. Ex. 354; Jt. Ex. 5 at D-26]. The book is highly readable and probably sells well to general audiences such as parents of young children and not just to the academic community. The book retails for $28.00 [Jt. Ex. 5 at D-26]. The net sales revenue from the date of first publication through November 7, 2010 was $130,482.00 [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009, though it earned $171.36 in ECCS permissions revenue in 2010 [Pls. Ex. 358].

One such required reading was an excerpt from _Awakening Children's Minds_ by Laura E. Berk. The excerpt consisted of pages 181-219 (39 pages), or the whole of chapter six: "Learning in Classrooms" [Pls. Ex. 354]. It constituted 12.19% of the 320-page book [Id.].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt was nontransformative (in this case, mirror image copying). It serves the same overall function as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a

nonprofit educational institution. Thus, factor one favors fair use.

As is relevant to factor two ("the nature of the copyrighted work"), *Awakening Children's Minds* is a work intended for teachers and parents. The author adopts the "sociocultural theory," which originated from the work of psychologist Lev Vygotsky, as her operating framework.

Chapter six focuses on the application of sociocultural theory to early childhood classrooms. The author discusses three themes: (1) teaching in the "zone," or in the range of tasks that a child cannot yet master independently but can master through collaboration; (2) ensuring that the classroom is rich in dialogue; and (3) ensuring that the classroom provides an abundance of literacy related activities.

The tone of chapter six is conversational, and the writing is straightforward. The excerpt does not contain any humorous or fanciful elements. It provides some examples that may come from the author's own imagination and experiences. However, the author primarily presents information and support derived from others' works in a way that is practical and useful for parents. For example, while the chapter provides contemporary examples of classroom methods, it repeatedly traces those methods to principles from Vygotsky's psychology. The chapter is not analytical or evaluative. The chapter does convey the author's overall opinion that the sociocultural approach to early childhood education is preferable to a traditional "whole-classroom" approach, but it is not dominated by the author's opinion. Accordingly, factor two is neutral.

Turning to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), the uploaded excerpt contains 39 pages, and represents 12.19% of the entire book. Use of this excerpt served the course's pedagogical purpose. Even taking into account Defendants' favored nonprofit use, the quantity of material used is excessive, particularly when the potential impact of market substitution is considered. Also, the quality (value) of the excerpt is somewhat greater as an entire chapter—which covers a discrete topic—as opposed to a portion of a chapter. Even though chapter six is not the heart of the work, the Court concludes that factor three disfavors fair use.

Factor four is "the effect of the use upon the potential market for or value of the copyrighted work." Oxford has produced no evidence that excerpts of *Awakening Children's Minds* were available for purchase in 2009. The record does contain evidence that Oxford earned $140.55 in royalties from digital permissions sales through ECCS in 2010 [Pls. Ex. 358]. In 2010, Oxford earned $140.55 in ECCS permissions sales [Pls. Ex. 358]. However, the Court does not assume that if permissions were available in 2010, they would have been available in 2009. Because digital permissions were unavailable in 2009, Defendants' use in 2009 did not harm Oxford. Factor four favors fair use.

In this instance, factors one and four weigh in favor of fair use, factor two is neutral, and factor three disfavors fair use. Weighing the factors together, placing the burden of proof on Defendants, and recalling that factor four "looms large," the

overall balance tips in Georgia State's favor. Georgia State's use of *Awakening Children's Minds* was a fair use. This infringement claim fails.

EPY 8220 Advanced Developmental Psychology: Personality and Socialization, Fall 2009

Professor Kruger taught a seminar called "Advanced Developmental Psychology: Personality and Socialization," or EPY 8220, to doctoral students at Georgia State in the fall 2009 semester [Tr. Vol. 10, Doc. 393 at 7-8]. The seminar sought to actively explore and generate independent thinking and communication regarding research in social and personality development [Pls. Ex. 554]. Professor Kruger did not assign any required textbooks for the course, and all required readings were uploaded to ERES [see id.; Doc. 393 at 11-12].

19. *Understanding Trauma: Integrating Biological, Clinical, and Cultural Perspectives* (Laurence J. Kirmayer, Robert Lemelson, & Mark Barad eds., Cambridge 2007)

*Understanding Trauma: Integrating Biological, Clinical, and Cultural Perspectives* ("*Understanding Trauma*") was first published by Cambridge in 2007 [Pls. Ex. 142]. It is a 547 page, 21 chapter volume edited by Laurence J. Kirmayer, Robert Lemelson, and Mark Barad [Pls. Ex. 142]. The book provides interdisciplinary analyses of the individual and collective response to trauma. The book retails for $110.00 in hardback and $35.99 in paperback [Jt. Ex. 5 at D-66]. The net sales revenue from date of first publication to December 31, 2010 was £33,629.00 [Pls. Ex. 146]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts in 2009.

Professor Kruger uploaded to ERES an excerpt from *Understanding Trauma* [Pls. Ex. 554]. Specifically, she assigned chapter 11: "The Developmental Impact of Childhood Trauma" by Bessel A. van der Kolk [Pls. Ex. 142]. The excerpt consisted of pages 224-241 (18 pages), or 3.29% of the 547 pages in *Understanding Trauma* [<u>Id.</u>].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt was nontransformative (in this case, mirror image copying). It serves the same overall function as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

With respect to factor two ("the nature of the copyrighted work"), *Understanding Trauma* is an academic work comprised of writings from multidisciplinary researchers and scholars. It seeks to provide an interdisciplinary model on the impact of trauma from the perspectives of neurobiology, clinical science, and anthropology. Using "post-traumatic stress disorder" ("PTSD") as a baseline, *Understanding Trauma* seeks to present an integrated framework on the effects and the scope of individual trauma and large-scale collective trauma. *Understanding Trauma* is divided into three sections which provide perspectives from each of the three fields.

Chapter 11 is located in *Understanding Trauma*'s second section, which examines trauma from a clinical science perspective. In general, the chapter examines the developmental

consequences of pervasive interpersonal childhood trauma, including physical, sexual, or emotional abuse and neglect, typically perpetrated by a caregiver. The author begins by explaining that the effects of childhood trauma are often described under the rubric of PTSD because it is the only trauma-related diagnosis in the Diagnostic and Statistical Manual ("DSM") IV, even though PTSD does not accurately reflect all of the symptoms of childhood trauma, such as impulse control, aggression, attentional and dissociative problems, and relationship problems. Moreover, the author notes, other symptoms are often diagnosed as separate psychiatric illnesses and described as being "comorbid" with PTSD, which incorrectly reflects that they occurred independently from the PTSD symptoms rather than as a result of the same traumatic event. The author cautions that these imprecise diagnoses may result in application of unhelpful treatment methods.

After proposing that PTSD is an ill-fitting diagnosis for the full range of posttraumatic symptoms in children, the author examines the nature, causes, and effects of those symptoms and related psychiatric illnesses. For example, he describes how early onset chronic trauma can interfere with a child's abilities to integrate his or her cognitive, emotional, and sensory experiences, which in turn leads to problems regulating internal distress. When children cannot achieve control or stability, exposure to reminders of a trauma can cause them to reenact the trauma. Compounding the problem is the fact that adults--such as therapists or teachers--who are unaware of a child's trauma may misperceive the child's reactive behavior as

rebellious or oppositional. With this background, the author advocates for the inclusion of "Developmental Trauma Disorder," in the DSM, which would encompass the predictable consequences experienced by children who suffer from interpersonal trauma. The chapter concludes with a discussion of the limitations of the typical PTSD treatment when applied to childhood trauma, and by suggesting treatment adjustments and alternatives.

The writing in this chapter is formal, clinical, and precise. The chapter is devoid of any anecdotal information or fanciful elements. The author frequently cites the work of others, but he also cites a great deal of his own research. Portions of the chapter are strictly informational, but much of the chapter conveys the author's own analysis regarding the limitations of the PTSD diagnostic criterion, how the experience of childhood trauma impacts development, and how a more precise diagnostic criterion would benefit treatment options. All of these ideas, however, are grounded in an established body of research and knowledge. Here, chapter 11 is fairly split between objectively descriptive writing and the author's own analysis. Accordingly, factor two is neutral, and it weighs neither for nor against fair use.

Turning to factor three ("the amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Kruger uploaded one full chapter. This was 3.29%, or 18 of the 547 pages in *Understanding Trauma* [Pls. Ex. 142]. As a percentage of the copyrighted work, the excerpt was very small. The number of pages was also very small. Further, no evidence exists to demonstrate a digital permissions market

for excerpts of *Understanding Trauma* in 2009 or thereafter, making the likelihood that the unpaid excerpt would substitute for the paid market nonexistent. The work also served the pedagogical purpose of the course. With respect to the value of the excerpt, chapter 11 was not the heart of the work, although it was a complete chapter. The overall work embraces a broad, interdisciplinary approach to individual and wide-scale trauma, while chapter 11 narrows in on trauma and childhood development. Considering the very small percentage of the work uploaded, the important educational purpose served, and the relative lack of market substitution, the portion that Professor Kruger uploaded easily qualifies as favoring fair use. Thus, factor three weighs in favor of fair use.

With respect to factor four ("the effect of the use upon the potential market for or value of the copyrighted work"), the record before the Court contains no evidence that permissions licensing was available for *Understanding Trauma* in 2009. Cambridge earned £33,639.00 in revenue from book sales between the book's publication in 2007 and November 2010 [Pls. Ex. 146]. As no market for licensed excerpts of the work existed in 2009, Defendants' use caused no harm to the value of the copyrighted work. Factor four weighs in favor of fair use.

Here, factors one, three, and four all weigh in favor of fair use, and factor two is neutral. Weighting the factors as directed, and placing the burden of proof on Defendants, Georgia State has succeeded in carrying its burden. The use of *Understanding Trauma* was a fair use. This copyright infringement claim fails.

-95-

D.  <u>Professor Orr</u>

Professor Orr is a tenured professor in the Music History and Literature Department at Georgia State [Tr. Vol. 7, Doc. 405 at 55].

<u>MUS 8860 Romantic Period 1800-1900, Summer 2009</u>

Professor Orr taught MUS 8860, a graduate course, in the summer session of 2009 [<u>Id.</u> at 56].  Ten students enrolled in the course [<u>Id.</u> at 59].  Professor Orr's syllabus listed two required texts, and he posted several additional required readings on ERES [<u>Id.</u> at 56-57, Pls. Ex. 523]

20.  *Liszt: Sonata in B Minor* (Kenneth Hamilton, Cambridge 1996)

*Liszt: Sonata in B Minor* was first published by Cambridge in 1996 as part of the *Cambridge Music Handbooks* series, which provides introductions to major musical works for students knowledgeable about music [Pls. Ex. 130].  The book was written by Kenneth Hamilton [Pls. Ex. 130].  It has five chapters and a total of 101 pages.  It retails for $80.00 in hardback or $28.99 in paperback [Jt. Ex. 5 at D-29].  The book has earned £19,322 in net sales revenue from the date of first publication through October 31, 2010 [Pls. Ex. 133].  There is no evidence in the record reflecting that the work was available for licensed excerpts of any kind in 2009.

Professor Orr assigned chapter three of *Liszt: Sonata in B Minor* ("*Liszt*"), by Kenneth Hamilton, for his summer 2009 class, "Paris from 1830 to 1848" [Tr. Vol. 7, Doc. 405 at 66-67; Pls. Ex. 523].  That chapter (pages 28-48), titled "Understanding the Sonata in B minor," is 21 pages in length and 20.79% of the book

[Pls. Ex. 130]. It was required reading [Doc. 405 at 67; Pls. Ex. 523].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

As to factor two ("the nature of the copyrighted work"), *Liszt* is an academic work which analyzes musician and composer Franz Liszt's "Sonata in B Minor." In addition to an in-depth discussion on the musical composition itself, the book discusses Liszt's personal situation at the time he wrote the work, as well as how some of Liszt's earlier works influenced the Sonata. The first few chapters, along with the historical interpretations of the Sonata included with the author's personal views, provide multiple perspectives from which the reader can understand the music. The book also includes a section on performance practices and performance histories of the Sonata for those who may be interested in performing the piece.

Chapter three, "Understanding the Sonata in B minor," consists of two sections interpreting the Sonata. The first section is a short analysis of various programmatic interpretations, or interpretations of music where the analysis determines what images or impressions the listener is supposed

to receive from hearing the music. After claiming that the Sonata does not have a programme, the author shifts into a musical analysis. In order to analyze the piece on its musical merits, the author compares his interpretation of the Sonata to three historical interpretations. The remainder of chapter three is spent discussing the actual score of the piece, with the analysis contrasting how the four interpretations of the piece disagree on the location of the movements[30] within the Sonata.

Chapter three is dominated by analysis, either from the author himself or from the three other historical analyses used in the excerpt. The objective music of the Sonata guides the entire chapter, with the author complementing the music with observations and descriptions clearly derived from his own experience playing the piece. Chapter three maintains a formal tone, and is somewhat didactic in its attempt to teach the reader about the Sonata beyond the notes on the sheets of music. Factor two disfavors a finding of fair use.

As to factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Orr assigned 21 pages of *Liszt* as required reading for his class [Pls. Ex. 523]. These pages represent 20.79% of the work, which is a very large amount of the work, even in light of the educational nature of Professor Orr's use. [Pls. Ex. 130].

---

[30]A movement is "a principal division of a longer musical work, usually differing in tempo from the other divisions and having a distinctive character of its own." *Movement*, Oxford English Dictionary (3d ed. 2011).

Chapter three also constitutes the heart of the work, as it provides the in-depth analysis and interpretation of the piece for which the book is named. No evidence exists to demonstrate a permissions market for excerpts of *Liszt* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. Also, the excerpt did fit Professor Orr's pedagogical purpose. However, the percentage of the book which was used and the fact that the chapter is the heart of the work disfavor Defendants' position. On balance, factor three weighs very strongly against a finding of fair use.

As to factor four ("the effect of the use upon the potential market for or value of the copyrighted work"), Cambridge presented no evidence of digital license availability for *Liszt* in 2009. Cambridge does present evidence that, since its publication, *Liszt* has generated £19,322 in book sales from its date of publication to the end of October 2010 [Pls. Ex. 133]. But in this case, the unpaid use of excerpts by Professor Orr did not actually harm Cambridge, as licenses for excerpts of the book were not available and while the portion of the book copied was quite large, it was not so large as to substitute for the copyrighted book. Defendants therefore demonstrate that their unlicensed use likely had no actual effect on the value of Cambridge's copyrighted work or on the potential future market for the work. Factor four favors fair use.

The Court's analysis of *Liszt* has factors one and four favoring fair use; factor two disfavors fair use; and factor three very strongly disfavors fair use. Weighing the factors (as adjusted) together, giving factor two little weight and

factor four extra weight, and placing the burden of proof on Defendants, the combined weight of the fair use factors favors fair use slightly. Professor Orr's use was protected. Cambridge cannot sustain a copyright infringement claim for this work.

21. *Cambridge Companion to Mendelssohn* (Peter Mercer-Taylor ed., Cambridge 2004)

*The Cambridge Companion to Mendelssohn* was first published by Cambridge on October 21, 2004 in the United Kingdom and on November 29, 2004 in the United States [Pls. Exs. 65, 68]. It is part of the *Cambridge Companions to Music* series, which provides information on composers, instruments, or musical topics. *The Cambridge Companion to Mendelssohn* has fourteen chapters and a total of 331 pages [Pls. Ex. 65]. The book was edited by Peter Mercer-Taylor and provides analysis of the composer's life and music [Tr. Vol. 7 at 77; Jt. Ex. 5 at D-30]. It retails for $90.00 for hardcover or $32.99 for paperback [Jt. Ex. 5 at D-30]. It earned £24,826 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 69]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts between July 1, 2004 and December 1, 2010. The book earned $20.66 in APS revenue between July 1, 2004 and December 1, 2010 [Pls. Ex. 70].

Professor Orr also required his students to read an uploaded excerpt of chapter six of *The Cambridge Companion to Mendelssohn* ("*Mendelssohn*"), which was edited by Peter Mercer-Taylor [Tr. Vol. 7, Doc. 405 at 77; Pls. Ex. 523]. The excerpt (pages 96-111), taken from a chapter titled "Symphony and

overture," by Douglass Seaton, was 16 pages, or 4.83% of the 331-page book [Pls. Ex. 65].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Turning to factor two ("the nature of the copyrighted work"), *Mendelssohn* is an academic work which surveys the life and works of composer Felix Mendelssohn. The book devotes the majority of its pages to his music, with the majority of chapters discussing the various styles of music Mendelssohn composed during his life. The other parts of the book look to the surrounding details of the composer's life, including his personal story, the environment in which he wrote his works, and the reception his works received both during his life and after his death.

The excerpt used by Professor Orr in his course was a section of chapter six, titled "Symphony and overture." The excerpt tracks the development of Mendelssohn's music over the later half of his life. Eight different works by the composer are included in the excerpt: two musical interpretations of literary works, three overtures, and three symphonies. The author analyzes each piece of music, explaining what Mendelssohn was doing at that stage of his life and how those outside life

experiences influenced and manifested themselves in his works. The analysis includes the actual sheet music from each of the pieces, such that the analysis of the themes and images created by the music are intertwined with the musical notes themselves.

The excerpt of chapter six objectively describes the latter half of Mendelssohn's life in order to map the development of his music. The excerpt also relies heavily on two subjectively descriptive techniques to fully develop its discussion about Mendelssohn. First, the excerpt ties the musical work to the external details of Mendelssohn's life. Second, the chapter attempts to capture the effect Mendelssohn desired his listeners to experience when they heard his music. Both of these subjective components appear to come from the author's personal experience with the works of Mendelssohn, but they do not dominate the excerpt. Factor two, therefore, is neutral, neither favoring nor disfavoring fair use.

Factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole") assesses the amount and importance of the excerpt in light of the purpose of the use and the harm of market substitution. The excerpt used by Professor Orr totaled 16 pages, making up 4.83% of the overall book [Pls. Ex. 65]. This is a very small part of the overall book, especially in the more favorable viewing created by Professor Orr's educational nature of the use. The excerpt also takes from a chapter which is not the heart of the work, as chapter six is one of multiple chapters which analyzes various works produced by Mendelssohn over his life. Professor Orr's use of this excerpt is validated by his purpose in using the

-102-

passage: the excerpt fit his pedagogical purpose.  Finally, the very small number of pages used mitigates the potential impact of market substitution.  Factor three favors fair use.

Factor four ("the effect of the use upon the potential market for or value of the copyrighted work") measures the effect of Defendants' use on the value of the copyrighted work and on the potential market for the copyrighted work.  Cambridge did not present evidence of digital license availability for *Mendelssohn* in or before 2009.  Cambridge does provide evidence demonstrating that *Mendelssohn* had generated £24,826 in book sales from its date of publication to the end of October 2010 [Pls. Ex. 69].  But because Professor Orr's use of a small excerpt also had no impact on book sales, it did not affect the potential market for the copyrighted work.  It also did not affect the value of the copyrighted work.  Thus, factor four favors fair use.

In summary, factors one, three, and four favor fair use, while factor two is neutral.  Weighing these factors together and giving factor four extra weight, the Court finds that Professor Orr's use qualifies as fair use.  This claim of copyright infringement fails.

> 22. *Cambridge Companion to Schumann* (Beate Perrey ed., Cambridge 2007)

*The Cambridge Companion to Schumann* was first published by Cambridge on June 28, 2007 in the United Kingdom and on August 13, 2007 in the United States [Pls. Ex. 77].  It is part of the *Cambridge Companions to Music* series, which provides information on composers, instruments, or musical topics.  The

book was edited by Beate Perrey and surveys Schumann's life and music [Pls. Ex. 75]. It has thirteen chapters, a total of 324 pages [Pls. Ex. 75], and retails for $94.99 for hardcover or $31.99 for paperback [Jt. Ex. 5 at D-31]. It earned £27,866 in net sales revenue from date of first publication through October 31, 2010 [Pls. Ex. 78]. There is no evidence in the record reflecting that the work was available for licensed excerpts in 2009, digital or otherwise.

One of the excerpts used in Professor Orr's summer 2009 Romantic Music course came from *The Cambridge Companion to Schumann* ("*Schumann*"), which was edited by Beate Perrey [Tr. Vol. 7, Doc. 405 at 80; Pls. Ex. 523]. The excerpt (pages 105-119), taken from a chapter titled "Why sing? Lieder and song cycles," is 15 pages, or 4.63% of the 324-page book [Pls. Ex. 75].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Factor two requires assessment of the nature of the work. *Schumann* is an academic work that aims to introduce the reader to various aspects of composer Robert Schumann's life and works. The book begins with a discussion of Schumann's nature, personality, and the influences that affected the composer. The

book then moves to discuss Schumann's works, analyzing the various forms of music Schumann produced during his career. The later chapters provide multiple accounts of the influence of Schumann's work on composers following his death.

The excerpt in question was taken from chapter six, which is titled "Why sing? Lieder and song cycles." The excerpt critically analyzes various works by Schumann, who is best known for his composition of lieder, which are a form of German folk songs. The excerpt focuses on song cycles, which are a group of songs based on the same general subject or having some unifying feature. The two song cycles discussed in this excerpt, *Dichterliebe* and *Frauenliebe und-leben*, are each based on a different German poem. The excerpt discusses both the poems that the song cycles are based on and the methods used by Schumann to capture the poems in musical form.

This excerpt shifts between objective descriptions of previous scholarship on Schumann's works and personal observations by the authors about the music. The tone of the chapter remains formal between both the objective descriptions and the personal observations. Because the chapter relies more on the objective scholarship and the descriptions of Schumann's work instead of the author's personal observations, factor two is neutral for this excerpt.

Turning to factor three (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"), Professor Orr used 15 pages, or 4.63% of the 324-page book [Pls. Ex. 75]. This is a small percentage, and a very small number of pages even without accounting for the favored

educational purpose served by Professor Orr's use of the excerpt. It is sufficiently tailored to serve the pedagogical aims of Professor Orr's course. Additionally, it is acceptably small taking into account the potential impact of market substitution. Further, the excerpt does not constitute the heart of the work. Factor three easily favors fair use.

Factor four considers what effect Defendants' use had on the value of the copyrighted work and on the potential market for the copyrighted work. Here, Cambridge presented no evidence of license availability, digital or otherwise, in or before 2009. The only evidence that Cambridge presented for any sales of *Schumann* were of £27,866 in book sales from publication through October 2010 [Pls. Ex. 78]. Given that lack of evidence, plus the fact that Defendants' actions had no impact on book sales, Defendants demonstrate that harm to Cambridge in 2009 stemming from unpaid use of excerpts of the book was unlikely. Factor four favors fair use.

Reviewing the above analysis, factors one, three, and four all favor fair use, while factor two is neutral. Weighing all of these factors together, giving factor four extra weight, and placing the burden of proof on Defendants, the combined factors determine that Professor Orr's use of *Schumann* was fair. In light of this finding of fair use, Cambridge's copyright infringement claim necessarily fails.

23. *The Music of Berlioz* (Julian Rushton, Oxford 2001)

*The Music of Berlioz* was first published by Oxford on August 2, 2001 in the United Kingdom and on September 27, 2001

-106-

in the United States [Pls. Exs. 427, 993]. It is a ten chapter, 379 page book authored by Julian Rushton that provides analysis of Berlioz's musical style [Pls. Ex. 427; Jt. Ex. 5 at D-33]. The book retails for $65.95 [Jt. Ex. 5 at D-33]. It earned $9,580 in net sales revenue from date of first publication through November 7, 2010 [Pls. Ex. 78]. There is no evidence in the record reflecting that the work was available for licensed excerpts, digital or otherwise, in 2009.

Professor Orr uploaded an excerpt from *The Music of Berlioz* ("*Berlioz*"), by Julian Rushton, to ERES for the students in his summer 2009 Romantic Music course [Tr. Vol. 7, Doc. 405 at 83-84; Pls. Ex. 523]. The 18-page excerpt (pages 250-267), comes from chapter nine of the book, and constituted 4.75% of the overall book [Pls. Ex. 427].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Turning to factor two ("the nature of the copyrighted work"), *Berlioz* is an academic discussion of various works by the composer Hector Berlioz. The book begins with a biography of Berlioz's music, which attempts to set forth a chronological narrative of his works. The book goes on to interpret Berlioz's "musical data," discussing and dissecting the artist's

technique. The final chapters of the book focus on Berlioz's works, offering new arguments for the meanings of Berlioz's various musical pieces.

The excerpt used in Professor Orr's class was taken from chapter nine, which is titled "A Fantastic Symphony." The excerpt analyzes Berlioz's *Symphonie Fantastique*, a piece considered to be one of Berlioz's finest works. The excerpt first assesses the programme of the work, or the images and pictures Berlioz wanted the listener to see and experience upon hearing the music. The excerpt notes how the symphony builds on the work of Beethoven, who had been a mentor to Berlioz. Chapter nine dives into the music of the *Symphonie*, analyzing the piece section by section and noting the various musical techniques utilized by Berlioz. The excerpt ends with a brief discussion of *Harold en Italie*, another symphony written by Berlioz.

The excerpt used by Professor Orr is evaluative, providing both a thematic and musical analysis of Berlioz's *Symphonie Fantastique.* The chapter relies on the sheet music of the piece, allowing the reader to see the notes of the music as the author explains his analysis. The analysis moves between a restatement of previous scholarship on Berlioz and the author's own opinion of the music, with the author's opinion taking up slightly more of the excerpt. The excerpt is written in a formal tone, with any fanciful language strictly used to describe the nature of the music. Even though the author's analysis is featured more prominently than the other scholarship, his opinion and analysis do not dominate the

excerpt. Because of that, factor two neither favors nor disfavors a finding of fair use for this excerpt.

Factor three looks to the quantity and the quality of the excerpt, assessing whether these elements of the excerpt are fair in light of the purpose and character of the use and the threat of market substitution. Here, Professor Orr used 18 pages of the book, which totals 4.75% of the overall book [Pls. Ex. 427]. This is a small percentage of the work and a small number of pages, particularly taking Professor Orr's educational use into account. Moreover, the excerpted portion was tailored to fit the pedagogical aims of Professor Orr's course. The excerpt does not constitute the heart of the work and is less than a whole chapter. The number of pages is also small enough to mitigate the potential impact of market substitution. Given these considerations, factor three easily favors fair use.

As to factor four ("the effect of the use upon the potential market for or value of the copyrighted work"), Oxford presented no evidence of license availability for excerpts in 2009. The only evidence provided by Oxford on sales of *Berlioz* demonstrate that, as of November 2010, book sales from *Berlioz* have generated $9,580 in revenue [Pls. Ex. 357]. Defendants have the ultimate burden to prove, under factor four, that their use did not substantially impact the potential market for or value of the copyrighted work. With no record of any permissions sales, the Court finds there is little reason to believe that repetitive sales of excerpts of *Berlioz* were likely in 2009. Defendants' actions had no effect on potential book sales. The Court finds that Defendants' unlicensed use of this

excerpt likely did not affect either the value of Oxford's copyrighted work or the potential market for the copyrighted work. Factor four favors fair use.

Summarizing, fair use factors one, three, and four favor fair use, while factor two is neutral. Placing the burden of proof on Defendants, weighting these factors as directed and considering them together, Professor Orr's use of an excerpt of *Berlioz* qualifies as a fair use, thereby defeating Oxford's claim of copyright infringement.

<u>MUS 8840 Baroque Music, Fall 2009</u>

Professor Orr also taught a course on Baroque music in the fall of 2009 [Tr. Vol. 7, Doc. 405 at 85].

24. *The Organ as a Mirror of Its Time: North European Reflections 1610-2000* (Kerala J. Snyder ed., Oxford 2002)

*The Organ as a Mirror of Its Time* was first published by Oxford in 2002 [Pls. Exs. 441, 444]. It is a 25 chapter, 392 page work edited by Kerala J. Snyder. The book provides analysis of the organ's historical and cultural significance in Northern Europe [Pls. Ex. 441; Jt. Ex. 5 at D-77]. The book retails for $65.00 [Jt. Ex. 5 at D-77]. From date of first publication through November 7, 2010, the book earned $55,831 in net sales revenue [Pls. Ex. 357]. There is no evidence in the record reflecting that the work was available for licensed excerpts, digital or otherwise, in 2009.

For this course, Professor Orr assigned an excerpt from *The Organ as a Mirror of Its Time*, edited by Kerala J. Snyder [<u>Id.</u> at 86-87; Pls. Ex. 524]. The excerpt in question (pages 78-91), titled "The Organ in Seventeenth Century Cosmology," was written

-110-

by Hans Davidson [Pls. Exs. 524, 441]. The excerpt spans 14 pages, or 3.57% of the book, and was required reading [Doc. 405 at 87; Pls. Ex. 441].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Factor two requires assessment of the nature of the work. *The Organ as a Mirror of Its Time* is an academic work that examines six organs located throughout northern Europe. The discussion of each organ follows a similar structure. The book first discusses the historical and economic circumstances leading to the creation of the organ. The historical discussion is then followed by a more technical discussion in which the authors explain the aspects which make the organ unique. Finally, the discussion of the organ resumes its historical bent as the later chapters detail the life of the organ after its creation. The book also comes with a compact disc containing music played on each of the six organs discussed in the book.

Chapter six, titled "The Organ in Seventeenth Century Cosmology," builds on a connection between organs and the heavenly bodies. The chapter starts with a discussion about astrologer Johannes Kepler, who noted that planets moved at different speeds depending on how close they are to the sun.

Expressing these speeds as a ratio, Kepler realized that the range of movement of each planet could be expressed as musical tones over an interval of a major third. This idea, known as cosmic harmony, was then applied to the study of music, and the chapter provides examples of cosmic harmony scholarship. The link between the cosmos and organs is then discussed, as the organ is often used as a symbol of the universe with the organ player representing God.

This symbolism is then further developed in the context of two organs: the organ in St. Jacobi, Hamburg and the Compenius organ in Fredericksborg Castle. The chapter concludes with a comparison of the organs, which details the creation and physical descriptions of each organ.

Chapter six is an objective chapter which primarily relays both the concept of cosmic harmony and the physical description of two organs to the reader. Each of these topics of discussion are based heavily on the work of other scholars, with the author of the chapter distilling the information into his own words. The opinion of the author briefly emerges in comparing the two organs. The chapter is written in a formal tone, with little to no fanciful language. Because the chapter is dominated by the objective descriptions of both previous scholarship and the organs themselves, factor two is neutral.

Factor three determines whether the quantity and quality of the book used is fair in light of the purpose of the use and the harm that could occur based on market substitution. Here, Professor Orr used 14 pages, or 3.57%, of the 392 page book [Pls. Ex. 441]. That is a very small percentage of the book and

a very small number of pages. Moreover, the portion was tailored to serve the pedagogical aims of Professor Orr's course. The excerpt is not the heart of the work: while the book addresses six different organs from northern Europe, the chapter in question addresses only two, and focuses more on the theory of cosmic harmony than on the organs themselves. Because Professor Orr used the excerpt for an educational purpose, the quantity of pages provided to students is well within the range which could be considered fair. Finally, the very small number of pages reduces the potential impact of market substitution. Factor three, therefore, favors fair use.

Factor four requires this Court to determine whether Professor Orr's use likely substantially diminished the value of Oxford's copyright in *The Organ as a Mirror of Its Time* or the potential market for the work. Oxford has not produced any evidence that licensed excerpts of *The Organ as a Mirror of Its Time* were available in 2009. The evidence of sales that Oxford does provide only demonstrates that, as of November 2010, *The Organ as a Mirror of its Time* had generated $55,682 in book sales [Pls. Ex. 357]. In the absence of permissions sales evidence, and given that Defendants' actions had no effect on actual or potential book sales, the Court accepts Defendants' argument that their use of unlicensed excerpts likely did no harm to the potential market for the copyrighted work or the value of the copyrighted work. Factor four thus favors fair use.

In summary, factors one, three, and four all favor a finding of fair use for Professor Orr's use of *The Organ*, while

factor two is neutral. Adjusting the weight of the factors in accordance with the Court of Appeals' direction and weighing them together, and placing the burden of proof on Defendants, Professor Orr's use qualifies as a fair use, and defeats the claim of copyright infringement by Oxford.

E. Professor Dixon

Professor Dixon is a tenured professor in the African American Studies department at Georgia State [Tr. Vol. 9, Doc. 407 at 55].

AAS 3000 African American Family, Fall 2009

In the fall of 2009, Professor Dixon taught AAS 3000, a course which was titled African American Family [Id. at 56]. The course traces the historical and social transition of African American families from Africa to contemporary times [Pls. Ex. 542]. Fifty nine undergraduate students were enrolled in Professor Dixon's course during the fall 2009 semester [Doc. 405 at 67]. As evidenced by the syllabus, students were required to purchase three texts for this course [Id. at 57, Pls. Ex. 542]. Some required reading excerpts were placed on hard copy reserve in the library, while other required readings were posted to ERES [Id.]. As part of the course, Professor Dixon required students to form groups of two to three students and prepare a presentation for the class. Professor Dixon posted readings on ERES that were required for the students making the presentation; other students in the course were not required to read these excerpts [Doc. 405 at 61-62].

25. *The Slave Community: Plantation Life in the Antebellum South, Revised and Enlarged Edition* (John W. Blassingame, Oxford 1979)

*The Slave Community: Plantation Life in the Antebellum South* ("*The Slave Community*") was first published by Oxford in 1972 [Pls. Ex. 460]; the edition used by Professor Dixon was published in 1979. It is a paperback book. The book is a 430 page, eight chapter book authored by John W. Blassingame that presents a heavily documented description of the life of the black slave on Southern plantations before the Civil War [Pls. Ex. 460; Jt. Ex. 5 at D-37]. It is a research-based monograph. The book won awards when it was first published; it is currently in its thirty-second printing. It has been used extensively in college courses. The book retails for $42.95 [Jt. Ex 5 at D-37].

*The Slave Community* had net sales revenue from date of first publication to November 7, 2010 of $1,602,935.00 [Pls. Ex. 357]. Excerpts from the book were available for licensing through CCC in 2009 [Pls. Ex. 463]. From July 1, 2004 until December 1, 2010, *The Slave Community* earned $191.55 in ECCS permissions revenue and $10,732.20 in APS revenue [Pls. Ex. 463].

Professor Dixon requested that pages 249-283, the entirety of chapter seven, of *The Slave Community* be uploaded to ERES for distribution to students in her AAS 3000 course [Jt. Ex. 5 at D-37; Tr. Vol. 9 at 59]. The excerpt was titled "Plantation Realities" and totaled 35 pages or 8.14% of the work [Pls. Ex. 460]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $210.63 in net

-115-

revenue from permissions.[31] The cost to students in the course would have been $250.80. Professor Dixon owned several copies of this book [Tr. Vol. 9 at 59].

<u>Fair Use Analysis</u>

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the copyrighted original. It was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *The Slave Community* is an academic work that describes the lives of black slaves in the southern United States prior to the Civil War. It is heavily documented, drawing from personal records left by slaves. The author seeks to present slavery from the viewpoint of the slaves themselves. Various chapters discuss the manner in which Africans were enslaved, the impact of slavery on the South, the culture of slaves, and various personality types exhibited by slaves.

Chapter seven, titled "Plantation Realities," provides an overview of a slave's life on the antebellum plantation. It details the various functions slaves performed on plantations, and discusses the power dynamics which existed between

---

[31]The amount earned would have been $250.80, the amount charged by CCC [Jt. Ex. 5 at D-37], less the $3.00 service fee charged by CCC to users, less $37.17 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

plantation owner, overseers, and slaves. The author occasionally compares accounts of plantation life by non-slave authors, such as plantation owners, to the personal memoirs of slaves. These comparisons highlight both areas of agreement, such as relations between white children and the slaves who cared for them, and areas of disagreement, such as the benevolence or harshness of plantation owners and overseers. The chapter discusses the tension between the effort to produce sufficient harvests with the need to control the slave population.

Chapter seven is objective, relying on primary sources in the form of personal memoirs and records to paint a picture of the life of a plantation slave. The author's opinion occasionally emerges in the passages, but the stark facts usually stand on their own. The chapter is written in a formal tone, and contains little to no analysis or subjective discussion. With this in mind, the Court finds factor two is neutral.

Factor three asks whether the quantity and quality of the work used is fair, given the purpose and character of the use and the effect of market substitution. "Plantation Realities" spans 35 pages, or 8.14% of the 430-page book [Pls. Ex. 460]. This is a fairly small percentage of the overall book, particularly given the nonprofit pedagogical purpose served by the use of this chapter in Professor Dixon's class. The number of pages is not small but is acceptably small to counter the impact of market substitution. While a full chapter has more value than part of a chapter, chapter seven is not the heart of

the work.    Taking the foregoing into account, factor three favors fair use.

As to the fourth fair use factor, effect on the potential market for or value of the copyrighted work, the Court first looks to whether Professor Dixon's use of *The Slave Community* affected the market for purchasing the book as a whole. Students would not pay $42.95 for the entire book when only 35 pages were required reading for Professor Dixon's course. Neither would a professor require students to purchase the entire book in such an instance.    Therefore, the Court rejects any argument that the use of the excerpt from *The Slave Community* had a negative effect on the market for purchase of the book itself.    Nonetheless, by providing the excerpts free to her class, Professor Dixon deprived Oxford of approximately $210 in net revenue.    This caused actual though tiny damage to the value of the copyrighted work.    In addition, if "everyone" (other colleges and universities) used unpaid excerpts it could cause substantial harm to the value of the copyrighted work. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use.    The Court will look further and will conduct a holistic evaluation.

First, the Court will look again at factor three.    The percentage of the copyrighted work used by Professor Dixon (8.14%) together with the number of pages in the excerpt (35) borders on being excessive.    Some mitigation of factor three is

in order.   The Court will slightly adjust factor three, in Plaintiffs' favor.

Second, the Court will look again at factor four.   The record evidence shows very high net book sales revenue and fairly steady APS permissions sales for *The Slave Community*. The book generated $1,602,935 in net book sales revenue between its publication in 1979 and November 7, 2010 [Pls. Ex. 357].[32] The permissions sales figures for *The Slave Community* are the following:

| Year | APS | ECCS | In-House | Total |
|---|---|---|---|---|
| 2004 | $187.43 | $0.00 | No Evidence | $187.43 |
| 2005 | $2,275.31 | $0.00 | No Evidence | $2,275.31 |
| 2006 | $1,958.81 | $0.00 | No Evidence | $1,958.81 |
| 2007 | $2,136.19 | $0.00 | No Evidence | $2,136.19 |
| 2008 | $1,241.75 | $90.37 | No Evidence | $1,332.12 |
| 2009 | $1,348.85 | $50.59 | No Evidence | $1,399.44 |
| 2010 | $1,583.86 | $50.59 | No Evidence | $1,634.45 |
| **Total** | **$10,732.20** | **$191.55** | | **$10,923.75** |

[Pls. Ex. 463].

The permissions sales data and trial testimony demonstrate that there was still substantial interest in *The Slave Community* in 2009, notwithstanding its age.[33]   The Court believes there was

---

[32]The book sales revenue data is not broken into years.

[33]Niko Pfund, Acting Present and Publisher for the Academic and Trade Division of Oxford University Press, testified to the continuing viability of *The Slave Community* in his examination:

Pfund:   I think [*The Slave Community*] was published in 1952 or something.  It was published in 1972, and it's the 36th printing.

a market of substance for permissions sales in 2009. In 2011, the book was in its 36th printing. Digital permissions sales in 2009 were only $50.59, but 2009 APS permissions sales were $1,348.85. This calls for an adjustment of factor four, in Plaintiffs' favor.

Weighing the four factors (as adjusted) together, placing the burden of proof on Defendants, and recalling that factor four "looms large," the Court finds that Professor Dixon's use of *The Slave Community* in 2009 did not constitute a fair use. This copyright infringement claim succeeds.

26. *African American Single Mothers: Understanding Their Lives and Families* (Bette Dickerson ed., Sage 1995)

*African American Single Mothers* was first published by Sage in 1995 [Pls. Ex. 202]. It is a 232 page, ten chapter volume edited by Bette Dickerson. The book is part of the *Sage Series on Race and Ethnic Relations*, which is designed for academic users studying and working in areas related to race and ethnic relations [Pls. Ex. 202]. The book gives an Afrocentric, feminist perspective on the African American mother-centered family [Pls. Ex. 202]. The book retails for $67.95 in paperback

---

Counsel: What does it mean when a work goes through numerous printings?

Pfund: It means a very happy publisher. It also means that it's obviously found an audience. I can see it's been through 36 printings which is a rarity for us, and that it means it's a work that's had an impact, and that it's finding a continual audience and readership.

[Tr. Vol. 3, Doc. 401 at 47-48].

[Jt. Ex. 5 at D38]. The book has earned $53,007.84 in net sales revenue [Pls. Ex. 206]. Excerpts from the book were available for digital licensing through CCC in 2009 [Pls. Ex. 206]. From July 1, 2004 until December 1, 2010, *African American Single Mothers* earned $782.14 in ECCS permissions revenue [Pls. Ex. 206]. In addition, licensed digital excerpts were available directly from Sage through its in-house permissions program in 2009; the book has earned $2,841.57 through Sage's permissions program [Pls. Ex. 206, 207].

Professor Dixon requested that pages 117-145 of *African American Single Mothers* be uploaded to ERES [Jt. Ex. 5 at D-38]. This 29 page excerpt was a chapter written by Suzanne M. Randolph entitled "African American Children in Single-Mother Families" [Pls. Ex. 202]. The chapter represents 12.50% of the book [Pls. Ex. 202; Jt. Ex. 5 at D-38]. The excerpt was not required reading for the entire class; rather, it was used by two to three students to prepare for a class presentation [Tr. Vol. 9 at 62; Pls. Ex. 542]. Only those students responsible for the presentation of this work were required to read the excerpt from *African American Single Mothers* [Tr. Vol. 9 at 62], but the excerpt had a hit count of fifteen on the ERES system [Jt. Ex. 3 at 75]. Had permissions fees been paid via CCC for the digital distribution of this excerpt to the entire class, Sage would have earned less than $203.61 in net revenue from permissions.[34] The cost to students in the course would have

---

[34]The amount earned would have been $242.54, the amount charged by CCC, [Jt. Ex. 5 at D-38], less the $3.00 service fee charged by CCC to users, less $35.93 in fees charged by CCC to

been \$242.54. Professor Dixon owned a copy of this book [Tr. Vol. 9 at 79].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *African American Single Mothers* is an academic work that aims to provide a broad picture of issues affecting the lives of African American single mothers. The book explores the ways in which modern society evaluates motherhood, and contrasts these evaluations with the perception of single motherhood in the African American culture. The book also explores institutional issues faced by single African American mothers, such as the varying levels of support available in raising their children, and proposes policies and strategies to provide more equal opportunities to all single mothers.

Chapter seven, titled "African American Children in Single-Mother Families," collects various studies and data about single mothers and African American children to reach conclusions about

---

publishers, less royalties Sage is obligated to pay the external editor.

the challenges facing single mother African American families. The chapter starts with general findings concerning the relative success of children with one or two parents, the impact of reduced income due to a single parent household, and the role of a child in a single parent household. The chapter goes on to investigate other factors which weigh on single mother families, including differences in male and female children of single mothers, various potential family structures (such as grandparents living with the family) and the effect on children, and the effect of spirituality and community on a child's development. The chapter concludes by identifying gaps in the research surveyed by the chapter and recommends future steps to fill those research gaps.

Chapter seven is primarily objective, using previous studies on single mothers and African American communities. The author occasionally provides her own opinion in the form of summary paragraphs following the discussion of previous studies. The author's opinions appear to come from her analysis of the studies mentioned earlier in the chapter. The chapter is written in a formal tone with no fanciful elements. Given these details about chapter seven, factor two is neutral.

Factor three asks whether the quantity and quality of the excerpt used is fair, given the purpose and character of the use and the potential impact of market substitution. "African American Children in Single-Mother Families" spans 29 pages, or 12.5% of the 232-page book [Pls. Ex. 460]. This is a relatively large percentage of the overall book and a fairly large number of pages. Even taking into account the educational purpose

served by Professor Dixon's use of the excerpt, the amount used is excessive. The Court finds that factor three weighs against fair use.

As to the fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court first looks to whether Professor Dixon's use of *African American Single Mothers* affected the market for purchasing the book as a whole. Students would not pay $67.95 for the entire book when only 29 pages were required reading for Professor Dixon's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *African American Single Mothers* had a negative effect on the market for sale of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program. The unpaid use of the excerpt by Professor Dixon and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three disfavors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation to rule on the fair use defense.

*African American Single Mothers* had sporadic book sales beginning about three years after its publication in 1995. The book sales data for the work is listed below:

| Year | Net Revenue |
| --- | --- |
| 1995 | $20,671.69 |
| 1996 | $11,805.31 |
| 1997 | $7,061.53 |
| 1998 | $1,460.53 |
| 1999 | $876.17 |
| 2000 | $3,045.11 |
| 2001 | -$487.74 |
| 2002 | $802.64 |
| 2003 | $549.23 |
| 2004 | $2,473.47 |
| 2005 | $1,567.16 |
| 2006 | $870.61 |
| 2007 | $1,302.00 |
| 2008 | $675.48 |
| 2009 | $334.66 |
| 2010 | $0.00 |
| **Total** | **$53,007.85** |

[Pls. Ex. 206].

Permissions sales for *African American Single Mothers* since 1995 are shown in the following table:

| Year | APS | ECCS | In-House | Total |
| --- | --- | --- | --- | --- |
| 1995 | No Evidence | No Evidence | $0.00 | $0.00 |
| 1996 | No Evidence | No Evidence | $0.00 | $0.00 |
| 1997 | No Evidence | No Evidence | $58.10 | $58.10 |
| 1998 | No Evidence | No Evidence | $254.43 | $254.43 |

| | | | | |
|---|---|---|---|---|
| 1999 | No Evidence | No Evidence | $157.79 | $157.79 |
| 2000 | No Evidence | No Evidence | $114.36 | $114.36 |
| 2001 | No Evidence | No Evidence | $59.05 | $59.05 |
| 2002 | No Evidence | No Evidence | $49.57 | $49.57 |
| 2003 | No Evidence | No Evidence | $631.87 | $631.87 |
| 2004 | $0.00 | $73.44 | $342.41 | $415.85 |
| 2005 | $140.45 | $302.94 | $266.22 | $709.61 |
| 2006 | $11.02 | $207.47 | $382.81 | $601.30 |
| 2007 | $0.00 | $198.29 | $86.29 | $284.58 |
| 2008 | $0.00 | $0.00 | $198.29 | $198.29 |
| 2009 | $0.00 | $0.00 | $40.38 | $40.38 |
| 2010 | $0.00 | $0.00 | $0.00 | $0.00 |
| **TOTAL** | **$151.47** | **$782.14** | **$2,641.57** | **$3,575.18** |

[Pls. Exs. 206, 208].

A mitigating adjustment in Defendants' favor should be made to factor four on account of the fact that there was little prospect of repetitive use of excerpts of *African American Single Mothers* in 2009. This significantly decreases the likelihood that unlicensed use of excerpts would have appreciably damaged the value of the copyrighted work in 2009.

Based on the foregoing reasoning, the Court weighs factors one, three and four (as adjusted) together, placing the burden of proof on Defendants and keeping in mind that factor four "looms large"; the result is that Defendants have proven their fair use defense. Therefore, this infringement claim fails.

27. *Black Children: Social, Educational, and Parental Environments (Second Edition)* (Harriette Pipes McAdoo ed., Sage 2001)

*Black Children (Second Edition)* was first published by Sage in 2002 [Pls. Ex. 209]. It is a 256 page, twelve chapter volume

-126-

edited by Harriette Pipes McAdoo [Pls. Ex. 209]. The book provides analysis of experiences unique to black children [Jt. Ex. 5 at D-39; Pls. Ex. 209]. The book retails for $114.00 in hardback and $58.95 in paperback [Jt. Ex. 5 at D-39]. The book has earned $104,828.72 in net sales revenue [Pls. Ex. 214]. Digital excerpts from the book were available for licensing through CCC in 2009 [Pls. Ex. 215]. From July 1, 2004 until December 1, 2010, *Black Children (Second Edition)* earned $116.03 in ECCS permissions revenue [Pls. Ex. 216]. In addition, licensed digital excerpts of the book are available directly from Sage through its in-house permissions program; the book has earned $1,237.63 through Sage's permissions program [Pls. Exs. 214, 215].

Professor Dixon requested that pages 73-96, the entirety of chapter six, of *Black Children (Second Edition)* be uploaded to ERES for distribution to students in her AAS 3000 course [Pls. Ex. 209]. The excerpted chapter was entitled "Racial Identity Development in African American Children: Cognitive and Experiential Antecedents" by Carolyn Bennett Murray and Jelani Mandara. It totaled 24 pages or 9.38% of the work. The excerpt was not required reading for the entire class; rather, it was used by two to three students to prepare for a presentation to the class [Tr. Vol. 9 at 64; Pls. Ex. at 542]. Only those students responsible for the presentation of this work were required to read the excerpt from *Black Children (Second Edition)* [Tr. Vol. 9 at 64]. The excerpt had a hit count of thirteen on the ERES system [Jt. Ex. 3 at 174]. Had permissions been paid to CCC for the distribution of this excerpt to the

entire class, Sage would have earned less than $168.50 in net revenue from permissions.[35]  The cost to students in the course would have been $201.24 [Jt. Ex. 5 at D-39].  Professor Dixon owned a copy of this book [Tr. Vol. 9 at 63].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying).  The excerpt serves the same purpose as the original work.  The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution.  Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work."  The Court makes the following findings in that regard:  *Black Children* is an academic work which explores the unique aspects of African American child development.  The book works through four environments which critically affect any child's development: (1) the socioeconomic environment; (2) the parental environment; (3) the internal environment as it relates to racial attitudes and socialization; and (4) the educational environment.  These four environments are examined throughout the book with a particular focus on how the African American child's experience differs from that of other non-African American children.

---

[35]The amount earned would have been $201.24, the amount charged by CCC, [Jt. Ex. 5 at D-39], less the $3.00 service fee charged by CCC to users, less $29.74 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editor.

Chapter six, "Racial Identity Development in African American Children: Cognitive and Experimental Antecedents," addresses the cognitive growth of children, with a specific focus on African American children's understanding of race. Viewing the child's development as a collection of different processes, the chapter discusses cognitive readiness, racial awareness, and the role of skin color, media, and public school curriculum in shaping a child's understanding of race. These influences support the chapter's thesis that multiple aspects of society lead African American children to either identify as white or view white skin as the optimal skin color. The chapter concludes with methods parents can use to normalize and foster positive skin color associations in African American children.

Chapter six is objective, with the majority of the chapter spent citing previous studies on child development. The authors offer some opinions, as well as subjective summaries, at the end of their restatements of previous studies. The chapter maintains a formal tone throughout its analysis, and does not contain any fanciful language or aspects which appear to stem from the authors' personal experience. Factor two is neutral.

Factor three addresses whether the quantity and quality of the work used is fair, given the nature of the use and the impact of market substitution. Chapter six is 24 pages, or 9.38% of the total book [Pls. Ex. 209]. This is a relatively small percentage of the book, given the educational nature of Professor Dixon's use. While a whole chapter was used, it is not the heart of the work. As Professor Dixon testified, chapter six is "just one component or aspect of black children"

[Doc. 407 at 65].  Professor Dixon adequately tailored the selection to fulfill the pedagogical purpose of her course. Potential substitution impact is adequately mitigated by the number of pages in the excerpt.  Taking all of this into account, factor three favors fair use.

As to the fourth fair use factor, effect on the potential market for or value of the copyrighted work, the Court first looks to whether Professor Dixon's use of *Black Children (Second Edition)* affected the market for purchasing the book as a whole. Students would not pay $58.95 (or $114.00 for the hardcover version) for the entire book when only 24 pages were required reading for Professor Dixon's course.  Neither would a professor require students to purchase the entire book in such an instance.  Therefore, the Court rejects any argument that the use of the excerpt from *Black Children (Second Edition)* had a negative effect on the market for the purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program.  The unpaid use of the excerpt by Professor Dixon and her students caused very small, but actual, damage to the value of Sage's copyright.  In addition, widespread use of similar unlicensed excerpts could cause substantial harm.  Defendants' unlicensed use cause Sage to lose permissions income.  Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly

disfavors fair use. The Court will look further and will conduct a holistic assessment to determine the outcome of the fair use defense.

Revisiting factor three, the Courts finds that the percentage of the copyrighted work (9.38%) used by Professor Dixon borders on the excessive. It is at the top end of a "reasonable" range. Accordingly, some mitigation of the factor three outcome, in Plaintiffs' favor, is appropriate.

Since its publication in 2001, *Black Children* has had net revenue from book sales as follows:

| Year | Book Sales |
|------|-----------|
| 2001 | $11,942.70 |
| 2002 | $20,589.24 |
| 2003 | $19,026.90 |
| 2004 | $21,055.74 |
| 2005 | $17,791.56 |
| 2006 | $4,302.71 |
| 2007 | $5,747.00 |
| 2008 | $891.89 |
| 2009 | $2,219.36 |
| 2010 | $1,261.62 |
| **Total** | **$104,828.72** |

[Pls. Ex. 214].

Permissions income has been as follows:[36]

---

[36]These figures are lower than the totals provided in Plaintiffs' Exhibit 216, but that exhibit also includes permissions income Sage earned on APS and ECCS permissions for the first edition of *Black Children*.

| Year | APS | ECCS | In-House | Total |
|------|-----|------|----------|-------|
| 2001 | No Evidence | No Evidence | $39.00 | $39.00 |
| 2002 | No Evidence | No Evidence | $0.00 | $0.00 |
| 2003 | No Evidence | No Evidence | $63.00 | $63.00 |
| 2004 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2005 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2006 | $45.90 | $0.00 | $0.00 | $45.90 |
| 2007 | $97.41 | $56.61 | $56.61 | $210.63 |
| 2008 | $226.82 | $0.00 | $164.53 | $391.35 |
| 2009 | $123.52 | $26.78 | $418.50 | $568.80 |
| 2010 | $198.25 | $0.00 | $351.49 | $549.74 |
| **Total** | **$691.90** | **$83.39** | **$1,093.13** | **$1,868.42** |

[Pls. Exs. 214, 216].

The evidence shows that there was only a small likelihood of repetitive use of excerpts of *Black Children* in 2009. Thus, it is unlikely that unlicensed excerpt use in 2009 had a substantial impact on the value of the copyrighted work. This calls for some mitigation in the factor four outcome, in Defendants' favor.

Weighing all factors (as adjusted) together, placing the burden of proof on Defendants, and giving factor four extra weight, the Court finds that the factors weigh in favor of fair use; accordingly, the fair use defense prevails. This copyright infringement claim does not succeed.

28.  *Black Families (Third Edition)* (Hariette Pipes
     McAdoo ed., Sage 1996)

*Black Families (Third Edition)* was first published by Sage
in 1997 [Defs. Ex. 749].[37]  It is a 416 page, 21 chapter volume
edited by Harriette Pipes McAdoo.  The chapters address the
historical and modern challenges experienced by black families
in the United States [Jt. Ex. 5 at D-40].  The book retails for
$114.00 in hardback and $58.95 in paperback [Jt. Ex. 5 at D-40].
The book has earned $144,388.03 in net sales revenue [Pls. Ex.
222].  Licensed digital excerpts from the book were available
through CCC in 2009 [Pls. Exs. 224, 223].  From July 1, 2004
until December 1, 2010, *Black Families (Third Edition)* earned
$931.60 in ECCS permissions revenue [Pls. Ex. 224].  In
addition, the work is available for licensed excerpts through
Sage's in-house permissions program; it has earned $3,561[38]
through Sage's permissions program [Pls. Ex. 222].

Professor Dixon requested that pages 214-233, one full
chapter, of *Black Families (Third Edition)* be uploaded to ERES
for distribution to students in her AAS 3000 course [Jt. Ex. 5
at D-40].  The excerpt was entitled "Out There Stranded?: Black
Families in White Communities" by Beverly Tatum.  The chapter

---

[37]Plaintiffs' Exhibit 217, the fourth edition of *Black
Families*, was admitted at trial as well. Although the syllabus
for the course lists the fourth edition of the work, the parties
stipulated in Joint Exhibit 5 that the third edition was the one
at issue in this case.  The Court analyzes the infringement
claim with respect to the third edition of the work.

[38]This amount represents permissions income only for the
edition of the work at issue in this case.  Plaintiffs asserted
a higher amount, but that number appears to aggregate the income
from multiple editions of the work.

was twenty pages or 4.80% of the total work [Defs. Ex. 749].
The excerpt was not required reading for the entire class;
rather, it was used by two to three students to prepare for a
presentation to the class [Tr. Vol. 9 at 67; Pls. Ex. 542].
Only those students responsible for the presentation of the work
were required to read the excerpt from *Black Families (Third
Edition)* [Tr. Vol. 9 at 67]. The excerpt had a hit count of
nine on the ERES system [Jt. Ex. 3 at 174]. Had permissions
been paid via CCC for the distribution of this excerpt to the
entire class, Sage would have earned less than $140.42 in net
revenue from permissions[39] [Jt. Ex. 5 at D-40]. The cost to
students would have been $168.20. Professor Dixon owned several
copies of this book [Tr. Vol. 9 at 79].

Fair Use Analysis

As to the first element of fair use ("the purpose and
character of the use"), Defendants' use of the excerpt is
nontransformative (in this case, mirror image copying). The
excerpt serves the same purpose as the original work. The
excerpt was used for a nonprofit educational purpose by a
nonprofit educational institution. Thus, factor one favors fair
use.

The second fair use factor is "the nature of the
copyrighted work." The Court makes the following findings in
that regard: *Black Families* is an academic work that collects

---

[39]The amount earned would have been $168.20, the amount
charged by CCC, [Jt. Ex. 5 at D-40], less the $3.00 service fee
charged by CCC to users, less $24.78 in fees charged by CCC to
publishers, less royalties Sage is obligated to pay the external
editor.

various perspectives on black families. The purpose of the work is to highlight the pressures faced by black families in modern society. Sections of the book cover historical conceptualizations of African American families; economics and social mobility; socialization and gender relations; and advocacy and family policies in society.

Chapter 12, "Out There Stranded?," focuses on the experience of black children who have grown up in predominantly white communities. The chapter discusses parents' concerns about the lack of community for their children as compared to during their own upbringing, racism at public schools, and the children's struggles in coming to age in a primarily white community.

Chapter 12 has two subparts. The first half of the chapter, which reports the parents' concerns, is objective. The author relies on other studies to provide analysis and insight on parents' views of their children's experience. The other half of the chapter, which focuses on the children's views, relies on a study performed by the author herself. Both parts contain the author's opinion: some come from her analysis of the previous literature, while others involve opinions based on her experience with black children raised in white communities. The chapter maintains a formal tone at all times. Because author opinion dominates, factor two disfavors fair use.

Factor three requires the Court to determine whether the quantity and quality of the work used is fair, given the purpose and character of the use and the impact of market substitution. "Out There Stranded?" is a 20 page chapter, which is 4.81% of

the 416-page book [Defs. Ex. 749]. This is a small percentage of the book and a small number of pages, easily within the allowable quantity given the nonprofit, educational nature of the use. Similarly, the excerpt is sufficiently tailored to serve Professor Dixon's pedagogical purpose. The small number of pages also adequately mitigates the potential for market substitution. Although the use of a whole chapter captures more value than a part of a chapter, chapter 12 is not the heart of the work. Taking all of this into account, factor three favors fair use.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Dixon's use of *Black Families (Third Edition)* affected the market for purchasing the book as a whole. Students would not pay $58.95 for the entire book (or $114.00 for the hardcover version) when only twenty pages were required reading for Professor Dixon's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Black Families (Third Edition)* had a negative effect on the market for the purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage. The unpaid use of the excerpt by Professor Dixon and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could

cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two disfavors fair use; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation to determine the outcome of the fair use defense.

The infringement alleged here involves the third edition of *Black Families.* While the record contains no evidence of when the first edition was published, the second edition was published in 1988; the third edition, at issue here, was published in 1996; and a fourth edition was published in 2006 [Pls. Ex. 222]. The net book sales revenue for the third edition was as follows:

| Year | Book Sales |
|------|-----------|
| 1995 | $38.32 |
| 1996 | $16,709.33 |
| 1997 | $36,440.18 |
| 1998 | $15,464.44 |
| 1999 | $9,804.23 |
| 2000 | $14,034.94 |
| 2001 | $23,900.23 |
| 2002 | $11,412.93 |
| 2003 | $4,651.50 |
| 2004 | $6,418.18 |
| 2005 | $4,991.64 |
| 2006 | $685.08 |
| 2007 | -$125.60 |
| 2008 | -$37.37 |

| | |
|---|---|
| 2009 | $0.00 |
| 2010 | $0.00 |
| **Total** | **$144,388.03** |

[Pls. Ex. 222].  The decline in book sales in 2006, 2007, 2008, 2009 and 2010 was likely brought about by the publication of the fourth edition in 2006.

Regarding the market for permissions to make excerpts of the work, the record shows the following sales:

| Year | APS | ECCS | In-House | Combined |
|---|---|---|---|---|
| 1995 | No Evidence | No Evidence | $12.80 | $12.80 |
| 1996 | No Evidence | No Evidence | $688.54 | $688.54 |
| 1997 | No Evidence | No Evidence | $905.76 | $905.76 |
| 1998 | No Evidence | No Evidence | $93.44 | $93.44 |
| 1999 | No Evidence | No Evidence | $537.06 | $537.06 |
| 2000 | No Evidence | No Evidence | $257.29 | $257.29 |
| 2001 | No Evidence | No Evidence | $86.72 | $86.72 |
| 2002 | No Evidence | No Evidence | $830.26 | $830.26 |
| 2003 | No Evidence | No Evidence | $634.90 | $634.90 |
| 2004 | $59.97 | $0.00 | $239.62 | $299.59 |
| 2005 | $92.82 | $61.20 | $227.30 | $381.32 |
| 2006 | $0.00 | $136.68 | $122.40 | $259.08 |
| 2007 | $0.00 | $142.80 | $172.82 | $315.62 |
| 2008 | $0.00 | $124.44 | $158.30 | $282.74 |
| 2009 | $0.00 | $159.46 | $134.64 | $294.10 |
| 2010 | $135.66 | $0.00 | $88.06 | $223.72 |
| **Total** | **$288.45** | **$624.58** | **$5,189.91** | **$6,102.94** |

[Pls. Exs. 222, 224].

Defendants' use of unpaid small excerpts in 2009 had no impact on the potential market for the book.  Assuming the

widespread acceptance of programs like Georgia State's, the potential permissions market in 2009 may have been slightly impacted. However, there was relatively little demand for excerpts of the book in 2009. Because repetitive use of excerpts was unlikely, the factor four outcome is mitigated in Defendants' favor.

Weighing together factors one, two, three and four (as adjusted), giving factor two little weight and factor four extra weight, and placing the burden of proof on Defendants, the Court finds that Defendants have proved their fair use defense. Accordingly, this copyright infringement claim fails.

### F. Professor Hartwig

Professor Melinda Hartwig is a professor in the Art History department at Georgia State [Tr. Vol. 9, Doc. 407 at 26-27].

AH 4900 Materiality of Ancient Egyptian Painting, Fall 2009

During the fall 2009 semester, Professor Hartwig taught a course titled "AH 4900: The Materiality of Ancient Egyptian Painting" [Id. at 29, Pls. Ex. 550]. AH 4900 is a seminar for undergraduate and graduate students that examines historical and material aspects of ancient Egyptian art [Id.]. Thirteen students were enrolled in Professor Hartwig's course during the fall 2009 semester [Jt. Ex. 5 at D-41]. There were no required textbooks for the course, and all assigned readings were made available through ERES [Pls. Ex. 550].

29. _Ancient Egyptian Materials and Technology_ (Paul T. Nicholson & Ian Shaw eds., Cambridge 2000)

Professor Hartwig made available two excerpts from _Ancient Egyptian Materials and Technology_ ("_Egyptian Materials_") [Tr. Vol. 9, Doc. 407 at 33-36; Pls. Ex. 550]. The excerpts were: (1) a portion of chapter two (pages 44-54), titled "Stone," by Barbara Aston, James Herrel, and Ian S. Shaw, and (2) the entirety of chapter four (pages 104-120), titled "Painting Materials," by Lorna Lee and Stephen Quirke [Doc. 407 at 33-36; Pls. Ex. 550]. The two excerpts span 28 pages and constitute 3.87% of the 724-page copyrighted work [Pls. Ex. 6].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Turning to factor two, _Egyptian Materials_ is an academic reference work that discusses the materials and methods used by Egyptians to construct various aspects of their society. The book covers organic, inorganic, and food materials, with each chapter focusing on a single object (such as woods, metals, or meats). The specific chapter structures vary depending on the material discussed, but they generally review sources for the material, methods for its production, and common uses in ancient Egypt.

The first excerpt used by Professor Hartwig (pages 44-54) was taken from chapter two, titled "Stone." The chapter discusses various stones used in ancient Egypt. The chapter follows an identical format for each stone identified: the section provides the definition, Egyptian source, description, uses, and examples. Specific stones covered by this page range include marble, obsidian, and quartz.

The first excerpt is wholly objective, restating facts and details about the stones in question. It is written in a formal tone, and is devoid of any fanciful language. At no point does the excerpt move from the dry facts about the stones to a subjective discussion, and the information contained in the excerpt does not come from the author's experience or opinion.

The second excerpt (pages 104-120) is the entirety of chapter four of the book, titled "Painting Materials." The chapter provides information about different painting materials with a focus on pigments. The chapter opens by discussing a pigment analysis the authors performed with the British Museum. The authors explain how their methods and results from the British Museum study provide additional information to the already existing body of ancient Egyptian pigment scholarship. The chapter then discusses various pigments, drawing on both the authors' work and historical scholarship to explain where the color has been found and how the color was produced. The chapter ends with a brief discussion of painting mediums, such as stone, plaster, papyrus, and wood.

Chapter four is wholly objective, relying on previous color studies to discuss ancient Egyptian pigments and mediums. The

authors rely, in part, on a study they performed, but this study was merely a factual evaluation of various physical evidence. Other than their reliance on the objective results of their study, the authors' opinion or analysis is absent from the chapter. With this in mind, both excerpts favor a finding of fair use under factor two.

Factor three directs the Court to assess the quantity and quality of the excerpt in light of the purpose of the use and the potential harm of market substitution. Here, Professor Hartwig uploaded 28 pages, totaling 3.87% of the 724-page book [Pls. Ex. 6], which is a very small percentage, especially in light of the nonprofit, educational nature of Professor Hartwig's use. Use of these excerpts also fit Professor Hartwig's pedagogical purpose. The excerpts in question include one whole chapter plus part of another chapter, but neither is the heart of the work. Factor three favors fair use.

Factor four looks to the effect of Defendants' use on the value of the copyrighted work and the potential market for the work. Cambridge has provided no evidence that digital permissions for *Egyptian Materials* were available in 2009. The only evidence provided by Cambridge of any sales is of £170,793 in book sales from the date of publication through October 2010 [Pls. Ex. 13] and $241.49 in APS permissions sales in 2005-2008 [Pls. Ex. 14]. Because digital excerpts were unavailable in 2009, factor four favors fair use. <u>Cambridge II</u>, 769 F.3d 1232, 1279.

Summarizing the analysis above, factors one, two, three, and four all favor fair use. The use of *Egyptian Materials* by

-142-

Professor Hartwig was a fair use. Cambridge's claim that Professor Hartwig's use infringed its copyright fails.

G. **Professor Kim**

YouJin Kim is a professor in the Applied Linguistics and English as a Second Language ("ESL") Department at Georgia State [Tr. Vol. 6, Doc. 404 at 96].

## AL 8550 Second Language Evaluation and Assessment, Fall 2009

In the fall semester of 2009, Professor Kim taught AL 8550, or "Second Language Evaluation and Assessment" [Id.; Pls. Ex. 519]. The course was offered to in-service and pre-service[40] teachers who wanted to become second-language teachers in English, French, and Spanish [Doc. 404 at 140]. The course sought to acquaint students with existing testing items and to help them design and score effective classroom-based tests [Id.]. There was a required textbook in the course, and additional required and optional readings uploaded to uLearn and ERES [Pls. Ex. 519; Doc. 404 at 101].

30. *Fundamental Considerations in Language Testing*
(Lyle Bachman, Oxford 1990)

One optional reading that Professor Kim uploaded to uLearn was an excerpt from *Fundamental Considerations in Language Testing* ("*Fundamental Considerations*"), by Lyle F. Bachman [Doc. 404 at 101, 147; Pls. Ex. 519]. The excerpt consisted of pages 81-110 (30 pages), or chapter four: "Communicative language

---

[40]"In-service" refers to students already working as teachers, and "pre-service" refers to students planning to become teachers [Doc. 404 at 140].

ability" [Pls. Ex. 406]. The excerpt constituted 7.14% of the 420-page book [Id.].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

With respect to factor two, *Fundamental Considerations* is an academic book. It is part of a series on teaching language that contains 23 other books. The book seeks to provide a conceptual foundation for answering practical questions related to the development and use of language tests. The book adopts a broad view of language ability, or a "communicative language ability" approach, which assumes that language is more than a simple transfer of information. Communicative language ability presumes that language is a dynamic interaction between the situation, the user, and the discourse. With this view in mind, each of the book's eight chapters discusses a related set of issues relevant to the development and use of language tests and language testing research.

Chapter four, which Professor Kim uploaded to uLearn, describes in detail the "communicative language ability" conceptual framework. The chapter begins by describing the limitations of several alternative language ability models, and then provides an overview of the author's proposed framework for

-144-

communicative language ability.  The author's framework contains three primary components: (1) language competence, or specific knowledge of a language, such as vocabulary and grammar; (2) strategic competence, which encompasses dynamic skills for assessing the context of a communication and negotiating meaning; and (3) psychophysiological mechanisms, which include visual and auditory functions, and receptive and productive channels of communication.  The bulk of chapter four fleshes out these three components and their subcategories.

Overall, the tone of chapter four is informative, and the chapter is mostly straightforward and explanatory.  The author frequently uses large passages from others' writings to describe the framework's subcomponents or to provide related models that served as precursors to the communicative language ability framework.  The author occasionally uses illustrative examples that are light and even humorous, some of which are based on his own personal experiences and some of which are borrowed from others' experiences and writings.  As described in chapter four, the communicative language ability framework is largely built from substantive research conducted by people other than the author; however, the author appears to be responsible for the precise composition described.  The substance of the chapter is fairly split between the author's own analysis and descriptions of others' work.  Accordingly, factor two is neutral, and it weighs neither for nor against fair use.

Moving to factor three, Professor Kim uploaded one full chapter of the work.  The excerpt consisted of 30 pages, or 7.14% of the entire work [Pls. Ex. 406].  Thus, the percentage

copied was relatively small, especially considering the educational nature of the use. Further, the use served Georgia State's important pedagogical aims. With respect to the quality of the work copied, on the one hand, the chapter at issue is integral to the overall work; however, it is not the heart of the work. To be sure, chapter four provides an overarching framework for understanding the components of language ability that language testers are interested in testing, but it only tangentially discusses language testing, which is the focus of the overall work. Considering also that the quantity of copied material was small and that it did not constitute the heart of the work, yet taking into account the potential impact of market substitution, the excerpt uploaded by Professor Kim was not excessive. For these reasons, factor three favors fair use.

As for factor four, there is no evidence in the record that digital licensing permissions were available for *Fundamental Considerations* in 2009. Defendants' unlicensed use of a small excerpt did not cause harm to the potential market for the copyrighted book. Because digital licenses to copy excerpts were unavailable in 2009, Defendants' unpaid use of excerpts of *Fundamental Considerations* did not cause damage to the value of the copyrighted work. <u>Cambridge II</u>, 769 F.3d 1232, 1279. Factor four tips in favor of fair use.

Accordingly, factors one, three, and four favor fair use, and factor two is neutral. Taking all factors into account and weighting them as directed by the Court of Appeals, and recalling that factor four "looms large," Defendants have

-146-

carried their burden. Georgia State's unpaid use of *Fundamental Considerations* was a fair use.

31. *Assessing Speaking* (Sari Luoma, Cambridge 2004)

Among the required readings that Professor Kim uploaded to uLearn for her fall 2009 AL 8550 course were two excerpts from *Assessing Speaking* by Sari Luoma [Pls. Ex. 519]. The excerpts consisted of two full chapters of the eight chapter work [see id.; Pls. Ex. 34; Tr. Vol. 6, Doc. 404 at 108]. Specifically, Professor Kim uploaded chapter four, "Speaking scales," which is pages 59-95 (37 pages), and chapter seven, "Developing speaking tasks," which is pages 139-169 (31 pages) [Pls. Exs. 34, 519]. Combined, the excerpts total 68 pages, or 29.82% of the 228-page book [Pls. Ex. 34].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

With respect to factor two, *Assessing Speaking* is one part of the eleven volume "Cambridge Language Assessment Series" [Pls. Ex. 34]. The work discusses problems with assessing speaking in the language learning context, and provides a readable overview of literature on the topic. *Assessing Speaking*'s target audience includes teachers and researchers interested in reflecting on speaking assessment practices and

-147-

developing new assessment methods. A constant theme throughout the work is that speaking assessment in language learning takes place in a cycle, wherein each stage relates to and informs the following stages.

The first uploaded excerpt is pages 59-95, or chapter four, which covers the nature and development of speaking scales. "Speaking scales" refers to the ratings used in assessing a language learner's ability to speak a target language. The author begins the chapter by describing six examples of existing speaking scales. For each example, she identifies and compares different features of the scales. The next portion of the chapter discusses concerns in developing speaking scales, such as the number of levels each scale should include to distinguish between degrees of ability, and the number and type of criteria that should be included to describe performance at each level. Chapter four moves on to discuss intuitive, qualitative, and quantitative methods for developing speaking assessment scales. To conclude, chapter four summarizes research on the progression of speaking ability in fluency, pragmatic skills, and grammar.

Most of chapter four describes existing speaking scales and previous research on their development. Much of the page count in chapter four is devoted to tables wherein the example scales are reproduced from other sources. However, the chapter also contains the author's own synthesis of the research and literature in a way that is instructive and analytical, in that it highlights the advantages and disadvantages to the various scales, features, and development methods.

The second uploaded excerpt is chapter seven, which focuses on developing tasks for assessing speaking. In the chapter, the author provides eighteen examples of various speaking tasks, such as descriptive, narrative, or comparing/contrasting tasks. For each example, the author explains the general task category, the advantages and disadvantages of the type of task or the particular example used, and the testing purposes that would likely require or benefit from each type of task. In the second portion of the chapter, the author discusses practical issues with task design, like writing "task specifications" or blueprints for the task, creating the actual materials for the task, and crafting the instructions for the task. The task examples, which dominate chapter seven, are taken or adapted from other sources. The discussions for each example are more descriptive than analytical; however, they contain some analytical features. The smaller segment of the chapter on practical considerations in task design is partly objectively descriptive, and partly based on the author's own experiences.

Overall, the excerpts at issue contain elements of the author's own analysis and subjective description; however, the excerpts are predominated by examples from and reproductions of others' works. Accordingly, factor two is neutral.

Turning to factor three, Professor Kim uploaded two full chapters, or 68 pages of *Assessing Speaking* [Pls. Ex. 34]. The uploaded portion constitutes 29.82% of the entire work [Id.]. The unpaid use of full chapters comprising 29.82% of the work leans very strongly against fair use. Georgia State's use promoted its pedagogical aim; however, the portion uploaded is

much too large to support a finding of fair use. In light of these considerations, factor three weighs very strongly in favor of Plaintiffs, and against fair use.

As to factor four, there is no evidence that digital permissions were available for *Assessing Speaking* in 2009. The record demonstrates that Cambridge earned £58,893.00 in revenue from book sales from the date of publication through the end of January 2011 [Pls. Ex. 37]. While the excerpt used was very large, it was not so large as to substitute for the book and did not affect the potential market for the book. Because digital permissions were unavailable, Defendants' use likely did not affect the value of Oxford's copyrighted work. Accordingly, factor four weighs in favor of fair use.

In this instance, factors one and four favor fair use, factor two is neutral, and factor three strongly disfavors fair use. Weighing all factors (as adjusted) together, giving factor four extra weight, and placing the burden of proof on Defendants, and recalling that factor four "looms large," the Court finds that Defendants succeed in proving that the use of *Assessing Speaking* was a fair use. This infringement claim fails.

    32.  *Learning Vocabulary in Another Language* (I.S.P.
         Nation, Cambridge 2001)

For her AL 8550 course, Professor Kim uploaded to uLearn an excerpt from *Learning Vocabulary in Another Language*, by I.S.P. Nation [Pls. Ex. 519; Tr. Vol. 6, Doc. 404 at 105]. She specifically uploaded pages 344-379 (36 pages), or chapter ten: "Testing vocabulary knowledge and use" [see Pls. Exs. 519, 125].

The uploaded excerpt was 7.33% of the 491-page work. When she designed the syllabus, Professor Kim initially marked the excerpt as required reading, but she later pinpointed a few required examples from the chapter [Doc. 404 at 144].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

Factor two directs the Court to examine the nature of the work. *Learning Vocabulary in Another Language* is part of the "Cambridge Applied Linguistics Series" [Pls. Ex. 125]. The total work consists of eleven chapters, with each chapter focusing on a different aspect of learning vocabulary. The work was designed for second and foreign language teachers.

Chapter ten, the specific excerpt at issue, covers testing vocabulary. It is structured around questions that second language teachers typically ask about vocabulary testing. For example, the chapter starts with the question, "What kind of vocabulary test is best?" After providing several vocabulary test item examples, the author explains that the test-maker must first determine what he or she wants to test and the target degree of difficulty. The chapter then gives a relatively thorough discussion of existing research regarding vocabulary testing items. The author provides practical advice about which

test items are most effective in various settings, and for adjustments that test-makers might make in order to isolate an examinee's specific knowledge or to vary the level of difficulty. The chapter moves on to examine targeted areas of vocabulary testing, such as how to measure words the learners do not know well and learners' total vocabulary size. In its final section, chapter ten discusses purposes for which vocabulary tests may be given--to diagnose weaknesses, to test short- or long- term achievement, or to evaluate proficiency--and the features of tests given for each specific purpose.

Overall, the tone of the chapter is informative, and the writing is straightforward. The chapter contains an in-depth discussion of research--both the author's own research and others' research--on vocabulary testing. Chapter ten contains several large tables, which were presumably created by the author. The chapter's unique organizational format of ordering the discussion and research around teachers' typical questions seems to be the result of the author's own analysis. In sum, the chapter is fairly split between the author's analysis and objective descriptions of others' research. Thus, factor two is neutral, and it weighs neither for nor against fair use.

With respect to factor three, Professor Kim uploaded an entire chapter. The 36-page excerpt was 7.33% of the 491 pages in *Learning Vocabulary in Another Language*. Quantity wise, the overall percentage of the work used is relatively small. The excerpt furthered the course's pedagogical purpose, and no evidence exists to demonstrate a digital permissions market, or any market substitution, for excerpts of *Learning Vocabulary in*

*Another Language* in 2009. Quality wise, a whole chapter has more value than part of a chapter. However, chapter ten is not any more or less important than any other chapter and is not the heart of the work. In particular, the book as a whole covers the broad subject of learning vocabulary, while chapter ten focuses on the narrow facet of vocabulary testing as a tool for learning vocabulary. Because Georgia State used a small portion of *Learning Vocabulary in Another Language,* which was not the heart of the work, and the copied portion does not indicate harm from market substitution, factor three tips in favor of fair use.

As for factor four, the record contains no evidence that digital permissions were available for *Learning Vocabulary in Another Language* in 2009. Cambridge earned £151,583.00 in revenue from book sales between May 20, 2002 and January 31, 2011 [Pls. Ex. 128]. As no digital market for excerpts of the work existed in 2009, Defendants' use likely caused no damage to the value of the copyrighted work. Factor four thus weighs in favor of fair use.

Here, factors one, three, and four favor fair use, and factor two is neutral. Mindful of the factors' relative weight, placing the burden of proof on Defendants, and weighing the factors together, the Court is persuaded that Georgia State has discharged its burden of demonstrating that its use of *Learning Vocabulary in Another Language* was a fair use.

H.   Professor McCombie

Dr. Susan McCombie is a professor at Georgia State who teaches in the Department of Anthropology [Pls. Ex. 536].

ANTH 4440/6550 Epidemiology and Anthropology, Fall 2009

Professor McCombie taught a course called "Epidemiology and Anthropology," or ANTH 4440/6440, at Georgia State in the fall semester of 2009 [Id.].  The course covered the basic principles of epidemiology, including disease outbreak investigation, disease control, and analysis of risk factors [Id.].  For the course, Professor McCombie required one textbook, and recommended a second textbook.  The remainder of the course readings were uploaded onto ERES, or provided through other means.

33.   *International Health Organisations and Movements 1918-1939* (Paul Weindling ed., Cambridge 1995)

One such reading uploaded to ERES was an excerpt from *International Health Organisations* [Id.].  Professor McCombie assigned and caused to be uploaded to ERES, chapter 11, or pages 222-243 (22 pages) [Id.].  Chapter 11 is titled: "The cycles of eradication: the Rockefeller Foundation and Latin American public health (1918-1940)," by Marcos Cueto [Pls. Ex. 108].  The uploaded excerpt accounts for 6.20% of the 355-page total work [Id.].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying).  The excerpt fulfills the same purpose as the copyrighted work.  The

-154-

excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

As to factor two, *International Health Organisations* is part of the "Cambridge History of Medicine" series, and it is an academic work. It contains 15 total chapters, each of which is comprised of a different study or examination on international health and welfare organizations between the First and Second World Wars. The work seeks to provide a cohesive and integrated view on what the authors and editors believe to be a previously neglected area of study: the role of international organizations in promoting welfare.

Chapter 11 looks at the Rockefeller Foundation's ("RF") early twentieth-century disease eradication efforts in Latin America. The chapter begins with a brief introduction regarding the political and economic factors that precipitated the United States' interest in disease eradication campaigns in the region, which led to the RF's involvement. The author explains that three diseases in particular--hookworm, yellow fever, and malaria--caught the RF's attention because they were perceived to be susceptible to termination through short-term efforts. The author then provides a detailed, chronological discussion of the RF's campaigns for each disease. Although the results of the separate campaigns were mixed, enthusiasm for the goal of disease eradication was cyclical, or characterized by periods of "boom" and "bust." To conclude, the author identifies several byproducts of the RF's disease eradication campaigns, including increased U.S. influence in Latin America.

"The cycles of eradication" is a straightforward and informative historical account of the RF's Latin American involvement. The chapter is an historical examination and is objectively descriptive. It is not evaluative or overtly analytical. While it draws on the author's historical research, it is not based on his own experiences. Accordingly, factor two weighs in favor of fair use.

Turning to factor three, Professor McCombie uploaded a full chapter of *International Health Organisations*, or 6.20% of the total work (22 pages) [Pls. Ex. 108]. The percentage and number of pages that Professor McCombie uploaded was small, taking into account that the excerpt was used to support Georgia State's pedagogical aims and the negligible market substitution effect given the lack of evidence of digital permission availability for *International Health Organisations* in 2009. As for the quality of the excerpt in relation to the overall work, the essay at hand was not any more or less important than the other chapters in *International Health Organisations*. "The cycles of eradication" certainly embodies the work's underlying theme; however, it provides only one of the many perspectives included in the work. Therefore, it is not the heart of the work. For these reasons, the excerpt uploaded for Professor McCombie's class was not excessive, and factor three tips in favor of fair use.

With respect to factor four, there is no evidence in the record that permissions licensing in any form--digital or otherwise--was available for *International Health Organisations* in 2009. Cambridge earned £16,284.00 in revenue from book sales

between the date of publication and November 7, 2010 [Pls. Ex. 112], Defendants' use did not harm Cambridge's book sales. Thus, Georgia State's unpaid use of the excerpt caused no actual harm in 2009 to either the potential market for or the value of the copyrighted work. Accordingly, factor four favors fair use.

Factors one, two, three, and four each favor fair use in this instance. Weighting the factors as directed, considering them together, and placing the burden of proof on Defendants, the Court finds Georgia State has carried its burden, and its unpaid use of this excerpt from *International Health Organisations* was a fair use.

34. *Evolution of Infectious Disease* (Paul W. Ewald, Oxford 1994)

Professor McCombie also assigned her ANTH 4440/6440 class an excerpt from *Evolution of Infectious Disease* by Paul W. Ewald, which was uploaded to ERES [Pls. Ex. 536]. The excerpt consisted of pages 15-34 (20 pages), or the whole of chapter two: "Symptomatic Treatment (Or How to Bind *The Origin of Species* to *The Physician's Desk Reference*)" [see id.; Pls. Ex. 388]. It constitutes 6.56% of the 305-page work [Pls. Ex. 388].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

-157-

Factor two looks to the nature of the work. *Evolution of Infectious Disease* is an academic work aimed primarily at students and professionals in the health sciences. The author seeks to integrate epidemiology and evolutionary studies for the benefit of modern science. The author specifically purports to break with the traditional view that parasites theoretically should evolve towards benign coexistence with their hosts. This view, according to the author, contradicts both the evidence and natural selection. The work is divided into 11 chapters, each of which focuses on a different aspect of the evolution of disease and its modern applications.

Chapter two applies the evolutionary perspective to disease symptoms. The author disagrees with the admonition that one should not merely treat the symptoms of a disease because that assumes that symptoms are merely side effects of the disease. The author argues that symptoms are better described as adaptations of a disease that benefit either the host (and serve as "defenses" of the host) or the parasite (which serve as "manipulations" of the host). For instance, the author explains how a fever is a defensive symptom in instances where a pathogen cannot survive at the fever's higher temperatures. In six separate sections, the author discusses examples of symptoms that can be described as defensive, manipulative, or both. Additionally, the author discusses theoretical and practical treatment and policy implications for each classification. In conclusion, the author restates his point that symptoms are not merely side effects of disease.

Chapter two is primarily scientific and informational; however, it is colored by the author's own broad hypothesis that the study of diseases and treatment can benefit from an evolutionary perspective. Despite the scientific subject matter, the tone is light, as the author includes several comical metaphors and asides. Overall, while chapter two contains objectively descriptive elements, it is fairly dominated by the author's subjective analysis and evolutionary framework, which surpass the bare facts. Consequently, factor two weighs against fair use.

Turning to factor three, Professor McCombie uploaded all of chapter two of *Evolution of Infectious Disease*, or 6.56% of the total work [Pls. Ex. 388]. The percentage of the overall work uploaded--6.56%--was small and the number of pages, 20, is small in light of the favored educational use. Additionally, no evidence exists to demonstrate a digital permissions market for excerpts of *Evolution of Infectious Disease* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. As for the quality of the excerpt uploaded, chapter two is valuable in that it is a discrete section that covers an entire topic. However, chapter two, which covers "symptomatic treatment," is not the heart of *Evolution of Infectious Disease*, which as a whole presents a broad and multifaceted hypothesis. The excerpt also furthers the pedagogical purpose of the course. Given all of these considerations, the portion of the work that Georgia State uploaded was not excessive, and factor three tips in favor of fair use.

Factor four looks to the effect of the use by Georgia State and others on the potential market for and value of the copyrighted work. There is no evidence that permissions were available for excerpts of *Evolution of Infectious Disease* digitally in 2009 or otherwise. Oxford earned £222,038.50 in revenue from book sales between the date of publication and November 7, 2010 [Pls. Ex. 357]; however, Defendants' use of the small excerpt had no impact on book sales. Therefore, Georgia State's unpaid use did not cause any harm to the potential market for the copyrighted work and had no impact on the value of the copyrighted work. Accordingly, Georgia State has carried its burden and factor four favors fair use.

In sum, factors one, three, and four weigh in favor of fair use, and factor two weighs against fair use. As the three most substantial factors weigh in Georgia State's favor, and only the most insubstantial weighs against fair use, Georgia State has satisfied its burden with respect to this instance of infringement. Georgia State's use of *Evolution of Infectious Disease* was a fair use. This infringement claim fails.

I.   Professor Anggoro

At the time of trial Professor Anggoro was no longer employed at Georgia State. During the fall 2009 semester, she taught a course in the College of Education at Georgia State [Defs. Ex. 610].

EPY 8690 Seminar in Educational Psychology, Fall 2009

EPY 8690 is a course that examines the empirical and theoretical approaches to understanding human thinking across languages and cultures [Defs. Ex. 610]. Nine students enrolled

in this seminar in the fall semester of 2009 [Jt. Ex. 5 at D-67]. According to the syllabus, there was no required textbook for the course; all assigned readings were made available online through ERES [Defs. Ex. 610].

> 35. _Language Acquisition and Conceptual Development_
> (Melissa Bowerman & Stephen C. Levinson eds.,
> Cambridge 2001)

_Language Acquisition and Conceptual Development_ was first published by Cambridge in 2001 [Pls. Ex. 119]. It is a nineteen chapter, 614 page volume edited by Melissa Bowerman and Stephen C. Levinson [Pls. Ex. 119]. The book is part of the _Cambridge Language, Culture, and Cognition_ series, which focuses on the role that various aspects of language play in human cognition. The book grew out of a conference in which papers by various authors were presented; the papers were revised by the authors and are reprinted as chapters in the book. The book is probably a collective work. _Language Acquisition and Conceptual Development_ analyzes the interaction between language acquisition and early cognition [Pls. Ex. 119]. It is aimed at linguistics scholars. The book retails for $140.00 in hardback and $53.00 in paperback [Jt. Ex. 5 at D-67]. The net sales revenue from January 26, 2010, through October 31, 2010 was £456.00 [Pls. Ex. 123]. Digital excerpts from the book were available for licensing through CCC in 2009 [Pls. Ex. 124]. From July 1, 2004 until December 1, 2010, _Language Acquisition_ earned $669.39 in ECCS permissions revenue [Pls. Ex. 124].

Professor Anggoro requested that pages 566-588, or one full chapter totaling 3.75% of the book, be posted on the ERES system [Defs. Ex. 610; Jt. Ex. 5 at D-67]. The excerpt was the

entirety of chapter nineteen, which is entitled "Covariation between spatial language and cognition, and its implications for language learning" by Stephen C. Levinson [Pls. Ex. 119]. Had permissions been paid via CCC for the distribution of this excerpt, Cambridge would have earned less than $26.39 in net revenue from permissions.[41] The cost to students would have been $34.05.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *Language Acquisition* is one volume of a three-volume series called "Language, Culture and Cognition." *Language Acquisition* is an academic collection of scholarly papers that synthesizes research in the areas of early cognition and language. The book starts with the proposition that the fields of cognition and language acquisition had previously taken divergent paths, and suggests taking a unified approach in

_____

[41]The amount earned would have been $34.05, the amount charged by CCC, [Jt. Ex. 5 at D-67], less the $3.00 service fee charged by CCC to users, less $4.66 in fees charged by CCC to publishers, less royalties Cambridge is obligated to pay the external editors.

order to more closely examine human development in both capacities. The book seeks to identify which cognitive processes children are biologically endowed with, which develop as a result of the child's environment and thus are susceptible to culture and language biases, and how the processes coalesce. Its 19 total chapters are divided into four parts: (1) foundational issues; (2) constraints on word learning; (3) entities, individuation, and quantification; and (4) relational concepts in form-function mapping.

The excerpt at issue, chapter 19, is authored by Steven C. Levinson, who coedited the volume, and it is the final chapter in the work. As the title suggests, the chapter proposes that cognition "covaries," or has a correlated variation with linguistic systems. It starts by describing three levels, or "degrees," of increasing complexity for "the mapping problem," or how children attach meaning to words. The author suggests that some of children's language acquisition occurs at the most complex third-degree level, which presumes that children match language-specific words onto language-specific word meanings, which are in turn composed of non-universal concepts. In support, the author discusses his own research findings that adults perform nonlinguistic cognitive tasks in line with the spatial frame of reference (i.e., relative, or "to the right of," or absolute, or "north of") employed in their native language. The author then uses these findings to support his overall thesis that the problem facing a child acquiring language is vast because she must construct not only the language-specific words and meanings, but the underlying

concepts that are not shared across cultures. The chapter concludes with several heuristics that may explain how children succeed in the seemingly insurmountable task of acquiring language.

The tone of chapter 19 is mostly formal yet somewhat colloquial. It contains occasional parenthetical asides and footnotes that lighten the tone; but the chapter is not humorous or fanciful. The author uses objective data to support his propositions, yet he also includes illustrative examples based on his own personal research experiences. Portions of the text summarize previous chapters in order to situate the author's own observations into the larger context of the volume; however, the thrust of the chapter is the author's analysis of his own research proposals and findings. Even though the chapter introduces the author's own research and analysis, it is grounded in an established preexisting body of research and knowledge. Because the chapter contains an even balance of objective description and analysis, factor two is neutral, and weighs neither for nor against fair use.

As for factor three, Professor Anggoro uploaded all 23 pages of chapter 19, which is 3.75% of the entire work [Pls. Ex. 119]. Thus, Georgia State used a small percentage of the overall work for a favored educational purpose. To the extent that the number of pages copied suggests the potential impact of market substitution, the impact here is small. The use of this excerpt also served the course's pedagogical purpose. Georgia State uploaded the entirety of chapter 19, which represents a greater "quality" copied than would a partial chapter. However,

chapter 19 cannot be described as the heart of the work.   In
light of these considerations, Georgia State's use was not
excessive.   Accordingly, factor three favors fair use.

As to the fourth fair use factor, effect on the potential
market for or value of the copyrighted work, the Court first
looks to whether Professor Anggoro's use of *Language Acquisition*
affected the market for purchasing the book as a whole.
Students would not pay $53.00 for the entire book (or $140.00
for the hardcover version) when only 23 pages were assigned for
Professor Anggoro's course.   Neither would a professor require
students to purchase the entire book in such an instance.
Therefore, the Court rejects any argument that the use of the
excerpt from *Language Acquisition* had a negative effect on the
potential market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was
a ready market for licensed digital excerpts of this work in
2009 through CCC.   The unpaid use of the excerpt by Professor
Anggoro and her students caused very small, but actual, damage
to the value of Cambridge's copyright.   In addition, widespread
use of similar unlicensed excerpts could cause substantial harm.
Cambridge lost permissions income.   Factor four strongly
disfavors fair use.

In summary, factor one favors fair use; factor two is
neutral; factor three favors fair use; and factor four strongly
disfavors fair use.   The Court will look further and will
conduct a holistic assessment of the factors.

The evidence at trial showed that *Language Acquisition* was
published in 2001 [Pls. Ex. 119].   According to the record

-165-

evidence, sales of the actual book resulted in £456.00 in revenue in 2010[42] [Pls. Ex. 123]. Cambridge's revenue from permissions sales between July 1, 2004 and December 1, 2010 is represented by the following table:

| Year | APS | ECCS | Total |
|------|-----|------|-------|
| 2004 | $0.00 | $0.00 | $0.00 |
| 2005 | $108.79 | $0.00 | $108.79 |
| 2006 | $51.86 | $563.81 | $615.67 |
| 2007 | $96.78 | $0.00 | $96.78 |
| 2008 | $0.00 | $76.25 | $76.25 |
| 2009 | $0.00 | $0.00 | $0.00 |
| 2010 | $0.00 | $29.33 | $29.33 |
| **Total** | **$257.43** | **$669.39** | **$926.82** |

[Pls. Ex. 124].

Again, the relevant inquiry pertains to both harm to the potential market for the copyrighted work as of 2009, and harm to the value of the copyrighted work in 2009, assuming that "everybody" had programs similar to Georgia State's. Here, the evidence shows that permissions sales for *Language Acquisition* declined beginning in 2006, ultimately reaching zero in 2009. Therefore, it is obvious that there likely was no repetitive use of excerpts in 2009, such that the value of the copyrighted work would have been affected. This calls for mitigation of the factor four outcome, in Defendants' favor.

---

[42]Although the book was first published in 2001, the record only contains information about Cambridge's revenue from book sales for the year 2010.

In summary, weighing factors one, three, and four (as adjusted) together, giving factor four extra weight, and placing the burden of proof on Defendants, the Court finds that Georgia State has met its burden to prove that its use of *Language Acquisition* was a fair use. This copyright infringement claim fails.

J.   Professor Davis

Professor Davis is an Assistant Professor in the Department of History at Georgia State [Tr. Vol. 7 at 95]. Her focus is on American history and ethnic and immigration history in the United States, specifically Jewish history [Tr. Vol. 7 at 96; Doc. 405 at 96]. She has taught at Georgia State since 2008.

Professor Davis regularly uses Georgia State's ERES system for distributing readings to students enrolled in her classes; she prefers the ERES system to using coursepacks, which sell the assigned readings to students in hard copy, because she prefers to distribute the material electronically [Tr. Vol. 7 at 116]. When Professor Davis came to Georgia State in 2008, she talked to her department head and came to the understanding that it was permissible to post excerpts of readings on the ERES system if the amount copied was less than twelve percent and was used for a noncommercial purpose [Tr. Vol. 7 at 96-97]. She learned about Georgia State's new Copyright Policy in February 2009 [Tr. Vol. 7 at 97-98]. At that time, she read the policy and paid attention to the checklist provided. However, she did not attend any of the training sessions because she thought they were voluntary [Tr. Vol. 7 at 98-99]. Professor Davis discussed fair use issues with her department head [Tr. Vol. 7 at 99].

<u>HIST 7010 Issues and Interpretations in American History, Fall 2009</u>

HIST 7010 is a graduate seminar that examines a selection of scholarly works about the social, cultural, political and economic history of the United States from colonization to the present [Tr. Vol. 7 at 104]. Seventeen graduate students were enrolled in Professor Davis's HIST 7010 course during fall semester 2009 [Jt. Ex. 5 at D-73]. As evidenced by the syllabus and Professor Davis's testimony, students were required to purchase fourteen texts for the course, as well as complete several readings posted on ERES [Tr. Vol. 7 at 161; Pls. Ex. 512].

> 36. *Region, Race and Reconstruction* (J. Morgan Kousser and James M. McPherson eds., Oxford 1982)

*Region, Race, and Reconstruction* was first published by Oxford in 1982 [Defs. Ex. 769; Pls. Ex. 456]. It is a 500 page, fifteen chapter volume edited by J. Morgan Kousser and James M. McPherson. The book provides historical analysis of the American South [Jt. Ex. 5 at D-73]. Its retail price is $29.95 [Jt. Ex. 5 at D-73], and net sales revenue from the date of first publication through November 7, 2010 was $2,199 [Pls. Ex. 357]. Licensed digital excerpts were available through CCC in 2009 [Pls. Ex. 457]. From July 1, 2004 until December 1, 2010, *Region, Race, and Reconstruction* earned $622.80 in permissions revenue from ECCS [Pls. Ex. 457].

Professor Davis requested that pages 143-177, which was one full chapter of *Region, Race, and Reconstruction,* be uploaded to ERES for distribution to students in her fall 2009 HIST 7010

-168-

course [Tr. Vol. 7 at 143-144]. The chapter is authored by Barbara J. Fields and entitled "Ideology and Race in American History." It represents 35 pages or 7.00% of the total work. This chapter was assigned as required reading [Tr. Vol. 7 at 113; Pls. Ex. 512]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $60.69 in net revenue from permissions.[43] The cost to students would have been $74.40.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: Region, Race and Reconstruction is an historical work dedicated to C. Vann Woodward, an acclaimed historian of the American South. The book is comprised of essays written by Woodward's former Ph.D. students on topics that informed his work such as the American South, race relations, and Reconstruction after the Civil War. The book consists of 15

---

[43]The amount earned would have been $74.40, the amount charged by CCC, [Jt. Ex. 5 at D-73], less the $3.00 service fee charged by CCC to users, less $10.71 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the external editors.

chapters organized around these three subjects. "Ideology and Race in American History" by Barbara J. Fields is the first essay in the section on "Race." The author discusses how the concept of race in American history is an ideology shaped by historical context, which is constantly changing with new experiences. For instance, the author discusses how "white supremacy" could not have meant the same thing to all white people across the country, or even across the South. Along these lines, the author discusses how the American concept of race was shaped by slavery, the destruction of slavery and the subsequent "racial" question, and the subsequent struggles facing freedmen in Reconstruction-era American society. The author concludes by noting that history does not provide us with "central themes," but rather with decisions and outcomes.

The tone of "Ideology and Race in American History" is formal and academic. The chapter covers historical subject matter, but throughout the essay, the author's perspective, particularly her opinion that Americans and historians tend to treat race as if it transcends history, is salient. Despite the factual nature of historical works, the essay at hand contains equal parts factual description and analysis. Accordingly, factor two weighs neither for nor against fair use. It is neutral.

With respect to factor three, 35 pages or one full essay from *Region, Race, and Reconstruction* was uploaded to ERES for use by graduate students in Professor Davis's course [Defs. Ex. 769]. The uploaded excerpt (7.00% of the book) was small in light of Georgia State's pedagogical purpose and the nonprofit

educational nature of the use. The excerpt also advanced the pedagogical aim of the course. To the extent that the amount copied is a heuristic for potential market substitution, here, that quantity is within acceptable limits. As for the substantiality (value) of the excerpt, the essay itself was no more or less important to the overall work than any other essay in the collection. Georgia State did upload an entire essay or chapter--as opposed to a portion of an essay--which in this case, represents one particular author's complete discussion on a topic. However, the essay at issue is not the heart of the work. Taking all considerations into account, the size of the excerpt was not excessive given the purpose for which it was used and the potential impact of market substitution. Factor three favors fair use.

As to the fourth fair use factor, effect on the potential market for or value of the copyrighted work, the Court first looks to whether Professor Davis's use of the excerpt affected the market for purchasing the book as a whole. Students would not pay $29.95 for the entire book when only 35 pages were required reading for Professor Davis's course, particularly in light of the fact that there were already fourteen required texts for the course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Region, Race and Reconstruction* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in

2009 through CCC. The unpaid use of the excerpt by Professor Davis and her students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the combined four factors.

From the date of publication in 1982 through November 7, 2010, sales of the actual book netted $2,199 [Pls. Ex. 357].[44] The record evidence of permissions sales of *Region, Race, and Reconstruction* from July 1, 2004 through December 1, 2010 is represented by the following chart:

| Year | APS | ECCS | Total |
|---|---|---|---|
| 2004 | $269.63 | $0.00 | $269.63 |
| 2005 | $74.66 | $68.85 | $143.51 |
| 2006 | $1,341.20 | $0.00 | $1,341.20 |
| 2007 | $43.45 | $160.65 | $204.10 |
| 2008 | $18.87 | $196.55 | $215.42 |
| 2009 | $16.52 | $127.90 | $144.42 |
| 2010 | $71.40 | $68.85 | $140.25 |
| **Total** | **$1,835.73** | **$622.80** | **$2,458.53** |

[Pls. Ex. 457]. There is no evidence of any in-house permissions sales.

---

[44]The record evidence for book sales is not broken down by year.

The evidence here shows overall small book sales and very small permissions sales as of 2009. Defendants' use did not impact book sales at all. There was fairly low interest in excerpts. Even assuming widespread availability of programs like Georgia State's, it is unlikely that there would have been much repetitive use of excerpts of the book in 2009 so as to affect the value of the copyrighted work. This calls for a mitigating adjustment of factor four, in Defendants' favor.

Weighing factors one, two, three, and four (as adjusted) together, giving factor four extra weight, and placing the burden of proof on Defendants, the scale tips in favor of fair use. Georgia State's use of *Region, Race and Reconstruction* was a fair use, and this copyright infringement claim fails.

> 37. *The Unpredictable Past: Explorations in American Cultural History* (Lawrence W. Levine, Oxford 1993)

Among the readings that Professor Davis posted to ERES for her HIST 7010 seminar was an excerpt from *The Unpredictable Past* by Lawrence W. Levine [Tr. Vol. 7, Doc. 405 at 110; Pls. Ex. 512]. In particular, Professor Davis uploaded chapter three, which is titled "Slave Songs and Slave Consciousness: An Exploration in Neglected Sources" [Pls. Exs. 477, 512]. The uploaded excerpt consisted of pages 35-58 (24 pages), or 6.09% of the 394-page work [Pls. Ex. 477].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The

-173-

excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

As for factor two, *The Unpredictable Past* is a collection of Levine's previously published essays on various topics in American history. The book centers around the idea that perceptions about the past change and develop over time in unpredictable ways. Each essay contains a brief introduction written by the author. The book is divided into three sections: (1) Thinking About History; (2) Patterns of African-American Culture; and (3) Towards an Understanding of Popular Culture.

The excerpt at issue, chapter three, is the first essay in the "Patterns of African-American Culture" section. In "Slave Songs and Slave Consciousness," Levine challenges the notion that slavery eroded African-Americans' linguistic and institutional lives. Levine does so by examining the oral tradition of slave songs and the songs' insight into slaves' reality. He critiques other historians' works on the topic of slave songs by identifying assumptions and conclusions that are colored by past historians' particular perspectives. Overall, the essay addresses historical and modern debates regarding various aspects of slave songs. Topics covered include slave songs' origins, or whether they were derived from African cultures or were adapted from Anglo-European songs; their spontaneous creation and transmission, which served as a community dialogue, a way to deliver secret messages, and a means by which to preserve oral tradition; and their subject-matter, which was often spiritual, but sometimes secular.

The tone of the essay is formal. The essay contains large portions of quoted material from actual slave songs and from others' writings regarding the songs; however, these pieces of material are connected by Levine's critical analysis. Although the essay contains factual elements along with analytical elements, the analytical components dominate. Accordingly, factor two falls in favor of Oxford, and against fair use.

Factor three looks to the portion of the work copied. Professor Davis uploaded all of chapter three of *The Unpredictable Past*. Use of the excerpt narrowly served Georgia State's pedagogical goals. The excerpt consisted of 24 pages and was 6.09% of the total work. Thus, the quantity uploaded was small when viewed in light of Professor Davis's educational use. Insofar as the quantity of uploaded pages reflects the impact of market substitution, no evidence exists to demonstrate a digital permissions market for excerpts of *The Unpredictable Past* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. As for the quality of the excerpt in relation to the overall work, in this instance, Georgia State uploaded an entire essay or chapter of the work, which has more value than would a portion of an essay. But the essay at issue was not the heart of the work. Taking all considerations into account, the portion of *The Unpredictable Past* that Georgia State uploaded to ERES was not excessive. Accordingly, factor three favors fair use.

Factor four examines the effect of Defendants' unpaid use on the potential market for or value of the copyrighted work. There is no evidence in the record that digital excerpts were

available for *The Unpredictable Past* in 2009 or otherwise. Oxford earned $79,367.92 in revenue from book sales between the book's publication in 1993 and November 7, 2010 [Pls. Ex. 357]; however, Defendants' use of small excerpts had no impact on the potential market for the book. Licensed digital excerpts were unavailable; thus, Georgia State's unpaid use caused no harm to the value of the copyrighted work. Id. at 1278. Factor four, therefore, favors Defendants.

In this case, factors one, three, and four weigh in Georgia State's favor, and factor two weighs in Plaintiffs' favor. Weighting the factors as directed, and placing the burden of proof on Defendants, the scale clearly tips in favor of Georgia State. Accordingly, its use of *The Unpredictable Past* was a fair use.

K.  Professor Freeman

Dr. Carrie Packman Freeman was an Assistant Professor of Communication at Georgia State in 2009 [Pls. Ex. 535].

JOUR 4800 Media Ethics & Society, Fall 2009

In the fall semester of 2009, Professor Freeman taught a course called "Media Ethics and Society," or J4800 [Id.]. Professor Freeman required students to purchase one textbook for the course, and occasionally posted additional required readings to uLearn and ERES.

-176-

38. *Living Ethics: Across Media Platforms* (Michael Bugeja, Oxford 2007)

Included among those required readings posted to ERES[45] were two excerpts from *Living Ethics: Across Media Platforms* ("*Living Ethics*"), by Michael Bugeja [see id.; Jt. Ex. 5, Doc. 266-4 at D-76]. The total posting was 13 pages, or pages 116-121 from chapter three and pages 299-305 from chapter 10 [Doc. 266-4 at D-76]. *Living Ethics* contains 365 total pages [Pls. Ex. 423]. The posted excerpts represent 3.56% of the total book [Id.].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

With respect to factor two, *Living Ethics* is an academic non-fiction work that seeks to provide media students a practical and readable guide to personal and professional ethical standards. It is divided into three sections: (1) Building Your Ethical Base; (2) Testing Your Ethical Base; and (3) Enhancing Your Ethical Base. A central theme of the book is the idea that ethics codes are "living" because they must adjust to different workplace environments and should be revised and

---

[45]Professor Freeman's syllabus indicates that the reading was posted to uLearn; however, this Court previously found that the syllabus was in error, and the excerpt was actually posted to ERES.

renewed regularly. To illustrate realistic situations that require difficult judgment calls, the work incorporates discussions from dozens of media professionals regarding various ethical dilemmas.

The first excerpt that Professor Freeman uploaded to ERES, pages 116-121 (6 pages), was copied from Part I, chapter three, titled "Truth." This portion of the chapter discussed "visual judgment calls" [Pls. Ex. 423]. The author explains that media professionals are often called upon to use professional judgment in determining whether to publish visual depictions that may be newsworthy but are also graphic, offensive, or insensitive. The author includes comments from a student photojournalist who covered a teenager's drowning for a newspaper, accompanied by the picture that the photojournalist selected for publication. The remainder of the section consists of an experienced photojournalist's commentary about several photographs he took in sensitive situations, and later chose to publish, along with reproductions of the subject photographs.

The second excerpt--pages 299-305 (seven pages)--was taken from Part III, chapter 10 titled "Value Systems." This excerpt discusses "creating codes," referring to personal ethics codes. In this segment, the author discusses the importance of value statements to job-seekers, suggests how readers may use their value systems to their advantage when interviewing, and includes comments from a well-established professional in the field. The section concludes with a code-drafting exercise.

The first excerpt contains some material that comes directly from the author, however it is dominated by others'

photographs and commentary. In contrast, the second excerpt mainly consists of the author's own material about ethics codes, although the advice contained therein is grounded in an existing body of knowledge about ethics in the media. Neither excerpt is humorous or fanciful. To the extent that the excerpts contain material written by the author, the material is objectively descriptive. Moreover, while the tone of the excerpted material is informational and practical, it is not analytical. Accordingly, factor two is neutral.

Turning to factor three, Professor Freeman uploaded 3.56% of the overall work, or 13 pages [Pls. Ex. 423]. The uploaded material consisted of two portions of two separate chapters. The quantity of the overall work uploaded was very small, especially in light of Georgia State's pedagogical purpose. The use of *Living Ethics* was educational in nature, further supporting a finding of fair use. Insofar as the quantity uploaded serves as a heuristic for market substitution, no evidence exists to demonstrate a digital permissions market for excerpts of *Living Ethics* in 2009 or thereafter making the likelihood that the unpaid excerpt will substitute for the paid market nonexistent. With respect to the quality (value) of the work uploaded, the partial excerpts of chapters uploaded here have less value than would complete chapters because a complete chapter represents a work's full discussion of a topic. Additionally, neither excerpt can be described as the heart of the work. In light of these considerations, the portions of *Living Ethics* that Georgia State uploaded to ERES were not

excessive in relation to the copyrighted work. Thus, factor three weighs in favor of Georgia State's fair use.

Factor four looks to the effect of Georgia State's unpaid use on the potential market for or value of the copyrighted work. While Oxford earned $37,875.00 in revenue from book sales between publication and November 7, 2010 [Pls. Ex. 357], there is no evidence that digital licensing permissions were available for *Living Ethics* in 2009. Georgia State's unlicensed use of the small excerpt had no impact on the potential market for *Living Ethics.* Because digital excerpts of the work were unavailable, Georgia State's unpaid use did not affect the value of the copyrighted work. Id. at 1277. Factor four weighs in favor of fair use.

To summarize, factors one, three, and four all favor fair use. Factor two is neutral. Georgia State has carried its burden of demonstrating that its use of *Living Ethics* was a fair use. This copyright infringement claim fails.

L. Professor Moloney

Professor Margaret Moloney is an Associate Professor at Georgia State's School of Nursing, where she also coordinates the doctoral program [Tr. Vol. 9 at 132]. In addition to teaching, Professor Moloney is a practicing nurse practitioner [Tr. Vol. 9 at 132-133]. She has also authored several publications, including research articles that have been published in research journals [Tr. Vol. 9 at 133]. Professor Moloney learned about Georgia State's new Copyright Policy in 2009 but does not recall whether she attended a training session at that time [Tr. Vol. 9 at 146].

NURS 8035 is a graduate course that provides a foundation in philosophy to nursing doctoral students [Tr. Vol. 9 at 134]. Fourteen students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-81; Tr. Vol. 9 at 134]. According to the syllabus, there were three required textbooks for the course; additional required readings were made available online through ERES without seeking permission [Pls. Ex. 545; Tr. Vol. 9 at 151].

> 39. *Handbook of Mixed Methods in Social & Behavioral Research* (Abbas Tashakkori & Charles Teddlie eds., Sage 2002[46])

*Handbook of Mixed Methods* was first published by Sage in 2002 [Pls. Ex. 254]. It is a 26 chapter, 784 page volume edited by Abbas Tashakkori and Charles Teddlie that addresses combining quantitative and qualitative research approaches for the social and behavioral sciences [Defs. Ex. 773]. The book retails for $151.00 [Jt. Ex. 5 at D-81]. The net sales revenue from date of first publication through 2010 for this edition of the book was $391,077.68 [Pls. Ex. 255]. Licensed digital excerpts of the book were available through CCC in 2009. From July 1, 2004 until December 1, 2010, *Handbook of Mixed Methods* earned $51.41 in ECCS permissions revenue [Pls. Ex. 257]. In addition, licensed digital excerpts of the book were available through Sage's in-house permissions program in 2009, and Sage has earned

---

[46]A second edition of the *Handbook of Mixed Methods* was published in 2010, but only the first edition is at issue here.

$2,825.86 in revenue from in-house licensing of excerpts of the book [Pls. Ex. 255].

Professor Moloney requested that pages 541-556, or one full chapter totaling 2.04% of the book, be posted on the ERES system [Defs. Ex. 773; Jt. Ex. 5 at D-81]. The excerpt was written by Sheila Twinn and entitled "Status of Mixed Methods Research in Nursing" [Defs. Ex. 773]. Had permissions been paid to CCC for the distribution of this excerpt, Sage would have earned less than $26.66 in net revenue from permissions.[47] The cost to students would have been $34.36. Professor Moloney owns a personal copy of *Handbook of Mixed Methods* [Tr. Vol. 9 at 148].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: the *Handbook of Mixed Methods* is an academic work. It presents social and behavioral science applications of the "mixed method" research design, which incorporates techniques

---

[47]The amount earned would have been $34.36, the amount charged by CCC, [Jt. Ex. 5 at D-81], less the $3.00 service fee charged by CCC to users, less $4.70 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

from both quantitative and qualitative research traditions. The book is organized into four sections: (1) philosophical and theoretical issues; (2) methodological issues; (3) application issues; and (4) conclusions and future directions.

The excerpt at issue, chapter 20, is located in the book's third section. As its title, "Status of Mixed Method Research in Nursing," suggests, the author examines the status of the mixed method design in nursing research. The author begins by discussing traditions in nursing research, and how those traditions contributed to the development of nursing knowledge and clinical interventions. The author explains that in the late 1990s, nursing research shifted from an overly scientific focus on the research paradigm to a focus on the research question, including the context for the research question. This shift, she suggests, contributed to the implementation of mixed methods research in nursing. With this observation, the author segues into a literature review of mixed method nursing research, which she sorts into three categories: (1) theoretical discourse; (2) critiques; and (3) empirical studies. Chapter 20 then assesses the quality of existing research produced via the mixed method approach and its contribution to nursing. To conclude, the author identifies several substantive and practical issues emerging from application of the mixed method to nursing.

Overall, the tone of the chapter is informational and academic, and the style is formal. Overall, the chapter is an objective discussion about the introduction and eventual acceptance of the mixed method in nursing research. Chapter 20

is neither humorous nor fanciful. Chapter 20 does implicitly endorse subjective qualitative research methods and thus does contain author opinion. As such, factor two is neutral.

As is relevant to factor three, Professor Moloney uploaded 2.04% (16 pages) of the *Handbook of Mixed Methods* to ERES [Defs. Ex. 773]. This is a very small amount. Additionally, to the extent that the portion copied serves as a heuristic for market impact, the impact is very small. And the use of this excerpt served the pedagogical purpose of the course. Quality wise, Georgia State uploaded one complete chapter of the work, which has more value than would a portion of a chapter. Nevertheless, chapter 20 has no more or less value than any of the other 25 chapters in the book, and it cannot be described as the heart of the work. Accordingly, Georgia State did not use an excessive portion of the *Handbook of Mixed Methods*. Factor three easily weighs in favor of Georgia State's fair use.

As to the fourth fair use factor, effect on the potential market for or value of the copyrighted work, the Court first looks to whether Professor Moloney's use of *Handbook of Mixed Methods* affected the market for purchasing the book as a whole. Students would not pay $151.00 for the entire book when only sixteen pages were assigned for Professor Moloney's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Handbook of Mixed Methods* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program. The unpaid use of the excerpt by Professor Moloney and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the four factors to determine the viability of the fair use defense.

First, in light of the fact that Professor Moloney used only a tiny portion of the copyrighted work (2.04%), factor three is adjusted slightly, in Defendants' favor.

Sage's permissions revenue from the work is shown as follows:

| Year | APS | ECCS | In-House | Total |
|------|-----|------|----------|-------|
| 2002 | No Evidence | No Evidence | $0.00 | $0.00 |
| 2003 | No Evidence | No Evidence | $0.00 | $0.00 |
| 2004 | $29.17 | $0.00 | $57.21 | $86.38 |
| 2005 | $0.00 | $22.85 | $234.71 | $257.56 |
| 2006 | $0.00 | $0.00 | $47.89 | $47.89 |
| 2007 | $99.24 | $0.00 | $570.85 | $670.09 |
| 2008 | $549.67 | $0.00 | $987.75 | $1,537.42 |
| 2009 | $142.21 | $28.56 | $927.45 | $1,098.22 |
| 2010 | $213.49 | $0.00 | $0.00 | $213.49 |

| Total | $1,033.78 | $51.41 | $2,825.86 | $3,911.05 |

[Pls. Exs. 255; 257].

Sage's net revenue from book sales of the *Handbook of Mixed Methods* is reflected in the following table:

| Year | Book Sales |
|------|-----------|
| 2002 | $39,910.06 |
| 2003 | $52,345.45 |
| 2004 | $59,524.96 |
| 2005 | $57,687.95 |
| 2006 | $47,824.05 |
| 2007 | $51,909.40 |
| 2008 | $45,581.17 |
| 2009 | $28,665.05 |
| 2010 | $7,629.59 |
| **Total** | **$391,077.68** |

[Pls. Ex. 255].

In 2009 there was a likelihood of small repetitive use of excerpts which could have had a small negative impact on the market for permissions sales of *Handbook of Mixed Methods*. However, Sage's permissions revenue represents only a small slice of the overall value of the copyrighted work. Georgia State's use of unpaid excerpts had no impact at all on the potential market for the book. It is unlikely that the use of unpaid excerpts in 2009 (even assuming the widespread availability of programs like Georgia State's) would have substantially damaged the value of the copyrighted work.

Accordingly, a slight mitigating adjustment of factor four in Defendants' favor is appropriate.

Weighing all factors (as adjusted) together, placing the burden of proof on Defendants, and giving factor four extra weight, the Court finds that Defendants have proven their fair use defense. This copyright infringement claim fails.

M.  Professor Lasner

During the fall 2009 semester, Professor Lasner taught PERS 2001 Comparative Culture at Georgia State [Pls. Ex. 537].

PERS 2001 Comparative Culture, Fall 2009

PERS 2001 is an undergraduate course that introduces key themes and issues in the growth of modern industrial cities [Pls. Ex. 537]. One hundred fourteen students were enrolled in Professor Lasner's course during the fall 2009 semester [Jt. Ex. 5 at D-82]. As evidenced by the syllabus for this course, there were no required textbooks for the course; all assigned readings were made available through ERES [Pls. Ex. 537].

40.  *Crabgrass Frontier: The Suburbanization of the United States* (Kenneth T. Jackson, Oxford 1985)

*Crabgrass Frontier: The Suburbanization of the United States* ("*Crabgrass Frontier*") was first published by Oxford in 1985 [Pls. Ex. 368]. It is a 405 page, sixteen chapter work written by Kenneth T. Jackson. It is a commentary on the emergence of the American suburb, its establishment, and its negative cultural impact [Pls. Ex. 368]. While the book is frequently used in sociology courses, it is inferred that it was written for general audiences. It retails for $19.95 [Jt. Ex. 5 at D-82], and net sales revenue from the date of first

-187-

publication through November 7, 2010 was $740,414.00 [Pls. Ex. 357]. Licensed digital excerpts of the book were available through CCC in 2009. From July 1, 2004 until December 1, 2010, *Crabgrass Frontier* earned $94.25 in ECCS permissions revenue [Pls. Ex. 371]. It also earned $2,876.08 in APS revenue during the same period [Pls. Ex. 371].

Professor Lasner requested that pages 246-271 of *Crabgrass Frontier* be uploaded to ERES for distribution to students in his PERS 2001 course [Pls. Ex. 368]. The excerpt, entitled "The Drive-in Culture of Contemporary America," was one chapter of the book, totaling 26 pages or 6.42% of the total work [Pls. Ex. 368]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $302.33 in net revenue from permissions.[48] The cost to students would have been $358.68.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

---

[48]The amount earned would have been $358.68, the amount charged by CCC, [Jt. Ex. 5 at D-82], less the $3.00 service fee charged by CCC to users, less $53.35 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *Crabgrass Frontier* is a quasi-academic book which appears to have been written for both general audiences and the academic community. In it, the author explores the suburbanization of America and its causes and effects through many themes including intellectual, architectural, urban, transportational, and public policy perspectives. *Crabgrass Frontier* portrays American suburbs as unique from an international standpoint based on the following four characteristics: (1) population density; (2) home-ownership; (3) residential status; and (4) journey-to-work. Each of the chapters focuses on a different aspect of suburban life, such as the house and the yard or the age of automobility.

Chapter 14, which is the excerpt that Professor Lasner uploaded to ERES, discusses contemporary America's "drive-in culture." By "drive-in culture," the author refers to the way American life became restructured around the suburbs and the automobile. After a brief introduction about cars' increased popularity between the 1950s and 1980s, the author discusses factors that precipitated America's investments in interstate highway development, including lobbyists' efforts and the Cold War-era idea that Americans should decentralize away from cities to avoid atomic attacks. The chapter then discusses development of other structures that accommodated America's automobile obsession, like garages, motels, gasoline service stations, shopping centers, mobile homes, and drive-in theaters and churches. The author devotes a brief section to each structure,

wherein he explains the structure's general stages of historical development and includes vignettes illustrating its cultural role. The chapter then moves on to discuss how suburbanization created "centerless" cities, or collections of suburbs that lacked an urban center. The final section in the chapter describes the decentralization of factories and offices in line with the suburban trend. The author concludes by noting that the country failed to fully contemplate the forward-reaching effects of its investment in automobiles as opposed to mass transit, and the ephemeral quality of the structures that accompanied that shift.

The tone of chapter 14 is academic, but also conversational. While the chapter is not humorous or fanciful, there are occasional references to popular culture and primary sources that lighten the author's otherwise matter-of-fact style of writing. The author's own perspective is obvious; however, the chapter is primarily informational and historical. All things considered, the chapter is a mix of factual information and subjective commentary and analysis. However, author opinion dominates in the book as a whole. Accordingly, factor two leans against fair use.

Turning to factor three, Georgia State uploaded a small part of *Crabgrass Frontier* to ERES. Specifically, the excerpt consisted of 26 pages, or 6.42% of the total work [Pls. Ex. 368]; this is a small amount, within the parameters contemplated for a favored educational use. The market impact of Georgia State's unpaid use is mitigated sufficiently by the small number of pages in the excerpt. The excerpt also furthers the

pedagogical aims of the course. Regarding the value of the amount used, the uploaded excerpt was a full chapter rather than a partial chapter. But chapter 14 is not the heart of the work; it addresses only one suburbanization feature of the many discussed in the book. Taking all of the foregoing into account, the portion uploaded is not excessive. Factor three weighs in favor of fair use.

As to the fourth fair use factor, effect on the potential market for or value of the copyrighted work, the Court first looks to whether Professor Lasner's use of *Crabgrass Frontier* affected the market for purchasing the book as a whole. Students would not pay $19.95 for the entire book when only 26 pages were required reading for Professor Lasner's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Crabgrass Frontier* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2007 through CCC. The Court infers that if digital permissions were available in 2007, they would have been available in 2009. The unpaid use of the excerpt by Professor Lasner and his students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two disfavors fair use; factor three favors fair use; and factor

four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation to determine the viability of the fair use defense.

According to the record, Oxford earned $740,414 from book sales between the date of *Crabgrass Frontier*'s publication in 1985 through November 7, 2010 [Pls. Ex. 357].[49] The following chart demonstrates the permissions gained by Oxford via CCC for *Crabgrass Frontier*:

| Year | APS | ECCS | In-House, | Total |
|------|-----|------|-----------|-------|
| 2004 | $318.01 | $0.00 | No Evidence | $318.01 |
| 2005 | $753.69 | $0.00 | No Evidence | $753.69 |
| 2006 | $584.97 | $0.00 | No Evidence | $584.97 |
| 2007 | $253.68 | $94.25 | No Evidence | $347.93 |
| 2008 | $377.60 | $0.00 | No Evidence | $377.60 |
| 2009 | $281.62 | $0.00 | No Evidence | $281.62 |
| 2010 | $306.51 | $0.00 | No Evidence | $306.51 |
| **Total** | **$2,876.08** | **$94.25** | **No Evidence** | **$2,970.33** |

[Pls. Ex. 371].

The evidence shows that in 2009 there was only slight interest in excerpts of *Crabgrass Frontier*. There was relatively little risk of repetitive use of these excerpts. Accordingly, the Court finds that a slight mitigating adjustment of factor four in Defendants' favor is appropriate.

Weighing all factors (as adjusted) together, placing the burden of proof on Defendants, and giving factor four extra

---

[49]There is no evidence of APS, ECCS, or in-house permissions sales of *Crabgrass Frontier* from 1985 to 2003.

weight and factor two insubstantial weight, the Court finds that Defendants have proven their fair use defense. This copyright infringement claim fails.

41. *The Politics of Public Housing: Black Women's Struggles Against Urban Inequality* (Rhonda Y. Williams, Oxford 2004)

Another required reading posted to ERES for Professor Lasner's "Global Cities" course was an excerpt from *The Politics of Public Housing: Black Women's Struggles Against Urban Inequality* ("*The Politics of Public Housing*"), by Rhonda Y. Williams [Pls. Ex. 537]. Professor Lasner specifically assigned pages 21-53 (33 pages--all of chapter one), which is titled: "Creating 'A Little Heaven for Poor People': Decent Housing and Respectable Communities" [Id.; Pls. Ex. 445]. The 33-page excerpt accounts for 10.78% of the 306-page book [Pls. Ex. 445]. There were 114 students in the class [Jt. Ex. 5, Doc. 266-4 at D-83].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

As is relevant to factor two, *The Politics of Public Housing* is a non-fiction work. In it, the author tells the stories of low income black women who strived to provide decent lives for their families while living in public housing and

-193-

engaging in community and political activism in Baltimore, Maryland after 1930. The author seeks to explore public housing and other public assistance programs, and to recast those programs' legacies by looking at individual women's experiences. The book is split into three sections--(1) Beginnings; (2) Shifting Landscapes; and (3) Respect, Rights, and Power-- each of which has two chapters.

The excerpt at issue, chapter one, is located in the book's first section. The chapter begins by introducing Clara Perry Gordon, who moved to Baltimore as a child around 1925, and was a resident of the city's first public-housing efforts. The author describes the circumstances that precipitated Baltimore's public-housing development in the early twentieth century, including squalid housing conditions for working-class people, overcrowding, and social, political, and economic disadvantages facing African-Americans, all of which were compounded by the Great Depression. The chapter then discusses how, despite hostile political conditions, social reformers established a municipal housing program in Baltimore in 1937. The author examines how public housing divided citizens by race, class, and gender, but explains how, in reality, those selected for the housing programs were elite, based on income and prior living situation requirements, competition for homes, and lengthy personal interviews. As a result, she explains, the first tenants were enthusiastic and proud of their homes and communities. Throughout the chapter, the author includes quotes and stories from Gordon's experiences. The concluding section of the chapter discusses how the circumstances of the first

housing programs shaped black tenants' political culture, and how they soon formed organizations to maintain and advance their communities.

The tone of chapter one is straightforward and informational. The text is primarily historical, and is peppered with quotes from the author's interviews and research. The chapter is organized according to the overall work's focal points, which are African-American women and political organization. All in all, the chapter is evenly divided between objective description and the author's own analytical composition. Accordingly, factor two is neutral, and it weighs neither for nor against fair use.

Factor three looks to the amount and substantiality of the portion used. Georgia State copied one full chapter consisting of 33 pages, or 10.78% of *The Politics of Public Housing* [Pls. Ex. 445]. This is not an insubstantial number of pages or an insubstantial percentage. Georgia State's favored educational objective does permit slightly more copying than would otherwise be allowed. Also, the use of this excerpt served the pedagogical purpose of the course. Turning to the value of the portion copied, Georgia State's use of one full chapter is less likely to be a fair use than the use of a partial chapter. The material taken is not the heart of the work. After weighing all of the foregoing considerations, factor three weighs against fair use.

Turning to factor four, the Court must examine harm to the value of the copyrighted work caused by Georgia State's unpaid copying of an excerpt from *The Politics of Public Housing*. The

record evidence does not reveal that permissions for excerpts were available in 2009. It does indicate that between the work's 2004 publication and November 7, 2010, Oxford netted $45,113[50] from sales of the book [Pls. Ex. 366]. Defendants' use of the 10.78% excerpt likely had no impact on book sales. Because digital permissions were unavailable in 2009, factor four favors Defendants. Cambridge II, 769 F.3d 1232, 1279. Thus, Georgia State has carried its burden with respect to fair use factor four.

Here, factors one and four favor fair use, while factor three disfavors fair use and factor two is neutral. Weighting the factors as directed, and placing the burden of proof on Defendants, the scale tips in favor of fair use. Accordingly, Georgia State's use of *The Politics of Public Housing* was a fair use.

    N.    Professor Hankla

Professor Charles Hankla is an Associate Professor in the Department of Political Science at Georgia State [Tr. Vol. 8 at 97]. He generally teaches courses in international relations, comparative politics, and research methods [Tr. Vol. 8 at 97]. He has taught at Georgia State since 2004 [Tr. Vol. 8 at 97]. Professor Hankla stated that the two strict rules he applies to his fair use determinations are (1) that either he or the library must own a copy of the book before he will assign an

---

[50]This Court's previous Order reflected this amount as $45,085. However, that figure failed to take into account $28 in earnings reflected on the first page of Plaintiffs' Exhibit 366.

excerpt of it to his class, and (2) that he never assigns more than twenty percent of a work [Tr. Vol. 8 at 134]. He learned about Georgia State's new Copyright Policy in the spring of 2009 and began using the fair use checklist at that time [Tr. Vol. 8 at 111].

POLS 3450 U.S. Foreign Policy, Fall 2009

POLS 3450 is an undergraduate level course that analyzes the history, development, and current challenges of U.S. foreign policy [Tr. Vol. 8 at 100-101; Defs. Ex. 623]. Forty eight students were enrolled in Professor Hankla's POLS 3450 course during fall semester 2009 [Jt. Ex. 5 at D-84]. As evidenced by the syllabus and Professor Hankla's testimony, students were required to purchase two texts for the course; additional required readings were posted on ERES [Defs. Ex. 623; Tr. Vol. 8 at 102].

> 42. *Contemporary Cases in U.S. Foreign Policy: From Terrorism to Trade, Second Edition* (Ralph G. Carter, ed. Sage[51] 2005)

The second edition of *Contemporary Cases in U.S. Foreign Policy* was published by CQ Press, a division of Sage, in 2005 [Defs. Ex. 776; Tr. Vol. 2 at 59]. It is a 499 page, fifteen chapter volume edited by Ralph G. Carter that addresses various aspects of contemporary U.S. foreign policy through recent case examples [Defs. Ex. 776]. The Court infers that it is a textbook intended for use in college level classes. Its retail price is $38.95 [Jt. Ex. 5 at D-84]. The book has earned

---

[51]The work was published by "CQ Press," which is a division of Sage [Defs. Ex. 776; Doc. 400 at 59].

$365,751.22 in sales revenue, but the record does not indicate whether this amount is for all of the editions of the book or only the second edition, a paperback book, at issue here [Pls. Ex. 229]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009, but licensed digital excerpts of the book were available through Sage's in-house permissions program in 2009. The book has earned $333.81 through Sage's permissions program, though the record does not reflect the year(s) in which individual permissions payments were made to Sage [Pls. Ex. 314].

Professor Hankla requested that pages 89-121 of *Contemporary Cases in U.S. Foreign Policy* be uploaded to ERES for distribution to students in his fall 2009 POLS 3450 course [Tr. Vol. 8 at 107]. The excerpt was a full chapter of the book and totaled 33 pages, or 6.61% of the book [Defs. Ex. 776]. This chapter, entitled "The Return of the Imperial Presidency? The Bush Doctrine and U.S. Intervention in Iraq," was written by Jeffrey S. Lantis and Eric Moskowitz. It was assigned as background reading for the entire course and was not assigned to be completed for a particular class meeting [Tr. Vol. 8 at 107; Defs. Exs. 623, 776]. Had permissions been paid through its in-house program for the distribution of this excerpt, Sage would have earned $190.08, less royalties payable to the external editor. The cost to students would have been $190.08. Professor Hankla owns a copy of *Contemporary Cases in U.S. Foreign Policy* [Tr. Vol. 8 at 122].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *Contemporary Cases in U.S. Foreign Policy* is essentially an academic work. It is a collection of 15 original case studies--each of which comprises a separate chapter--on contemporary foreign policy issues. The chapters are organized into four parts: (1) Intervention Policy; (2) National Defense and Security Policy; (3) Trade Policy; and (4) Multilateral Policy. The book is designed for classroom use, as each chapter begins with discussion questions, and the topics were chosen to illustrate the range and diversity of issues and the variety of participants in the policymaking process after the cold war.

The excerpt at issue--chapter four--is a case study on the United States' intervention in Iraq in 2003. The chapter begins with an excerpt from a 2002 graduation speech given by then President George W. Bush about his goals for promoting American security. The chapter explains how the September 11 attacks affected U.S. foreign policy, and enabled the Bush administration to accumulate an unusual amount of power with respect to foreign policy. Along these lines, the authors

explain that "the imperial presidency" refers to dominance of the U.S. executive branch in foreign policymaking, which historically tends to occur in times of emergency or crisis. The subsequent sections zero in on the Bush administration's internal decision-making concerning intervention in Iraq, and the efforts to garner Congressional support. The authors pay particular attention to the individual actors involved, such as Bush's cabinet members, and members of Congress. The chapter briefly describes international reactions to U.S. intervention and public support for the action. The chapter concludes with a brief note on the U.S.'s prolonged involvement in Iraq, and the authors reiterate the characteristics of and concerns about the presence of a very strong executive.

All in all, the tone of chapter four is academic and conventional. The writing is clear and direct. The authors' opinions animate the case study to some extent; however, it is first and foremost a balanced historical account of the circumstances and executive decisions leading up to the intervention. Put another way, although the authors convey their perspective, it is secondary to the facts conveyed. Accordingly, factor two is neutral.

Turning to factor three, the 33-page excerpt at hand accounts for 6.61% of the overall work [Defs. Ex. 776]. This is a small percentage. Thirty-three pages is not an especially small number of pages but it is acceptable when considering the impact of market substitution in light of Georgia State's nonprofit educational purpose. The excerpt also furthers the pedagogical goals of the course. Furthermore, although the use

of an entire chapter is less fair than use of a partial chapter, chapter four is not any more qualitatively substantial than any other chapter in the work. The excerpt at issue is not the heart of the work. Accordingly, neither the quantity nor quality of the copied excerpt is excessive in light of Georgia State's nonprofit educational purpose, and factor three favors fair use.

As to the fourth fair use factor, effect on the potential market for or value of the copyrighted work, the Court first looks to whether Professor Hankla's use of *Contemporary Cases in U.S. Foreign Policy* affected the market for purchasing the book as a whole. The Court infers that students would not pay $38.95 for the entire book when only 33 pages were assigned for Professor Hankla's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *Contemporary Cases in U.S. Foreign Policy* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Hankla and his students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly

disfavors fair use. The Court will look further and will conduct a holistic evaluation of the fair use defense.

The record reflects that between 2004 to mid 2010 APS permissions (licenses to make hard copies) were available from CCC; a total of $415.16 in royalties was paid by CCC to Sage for excerpts of *Contemporary Cases in U.S. Foreign Policy*. Also, $333.81 was earned by Sage for in-house digital permissions. The small amount of permissions payments suggests that there was little demand for excerpts of the book; the Court therefore finds there was little prospect of repetitive use of excerpts in 2009. It is unlikely that Defendants' use substantially harmed the value of the copyrighted book. This calls for a mitigating adjustment, in Defendants' favor, on factor four.

In summary, weighing all factors (as adjusted) together, giving factor four extra weight, and placing the burden of proof on Defendants, the Court finds that Defendants prevail on their fair use defense. This infringement claim fails.

43.   *U.S. Foreign Policy: The Paradox of World Power* (Steven W. Hook, Sage[52] 2005)

*U.S. Foreign Policy* was published by CQ Press, a division of Sage, in 2004 [Pls. Ex. 313; Tr. Vol. 2 at 59]. It is a 519 page, twelve chapter book that discusses the various forces that impact the making of contemporary U.S. foreign policy [Defs. Ex. 777]. The Court infers from its content that it is a textbook intended for use in college level classes. Its retail price in paperback is $84.95 [Jt. Ex. 5 at D-85]. The book has earned

---

[52]*U.S. Foreign Policy* was published by CQ Press, which is a division of Sage [Defs. Ex. 777; Doc. 400 at 59].

$738,328.89 in sales revenue [Pls. Ex. 314]. There is no evidence in the record reflecting that the work was available for licensed digital excerpts through CCC in 2009, but licensed digital excerpts of the book were available through Sage's in-house permissions program in 2009. The book has earned $285.33 through Sage's permissions program [Pls. Ex. 314].

Professor Hankla requested that pages 153-188 of *U.S. Foreign Policy* be uploaded to ERES for distribution to students in his fall 2009 POLS 3450 course [Jt. Ex. 5 at D-85]. The excerpt, entitled "The Foreign-Policy Bureaucracy," was a full chapter of the book and totaled 36 pages, or 6.94% of the total work [Defs. Ex. 777]. Had permissions been paid through its in-house permissions program for the distribution of this excerpt, Sage would have earned $207.36 less any fees it is obligated to pay the external editor. The cost to students would have been $207.36. Professor Hankla owns a copy of *Contemporary Cases in U.S. Foreign Policy* [Tr. Vol. 8 at 134].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt fulfills the same purpose as the copyrighted work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *U.S. Foreign Policy* is an academic book. In it,

-203-

the author seeks to "explore th[e] paradox of U.S. world power, to identify its key sources and manifestations, and to consider its future implications" [Defs. Ex. 777]. He also hopes to present a concise, yet comprehensive overview of the U.S. foreign-policy process. The book is organized into four parts: (1) The Setting of U.S. Foreign Policy; (2) Governmental Sources of Foreign Policy; (3) External Sources of Foreign Policy; and (4) Policy Domains.

Chapter six, the excerpt at issue, is located in the book's second section, on governmental sources of foreign policy. In it, the author discusses management of foreign policy through federal executive agencies. Chapter six includes basic overviews of four bureaucratic clusters, or "complexes" of U.S. foreign policy, that manage (1) diplomacy, (2) national security, (3) economic affairs, and (4) intelligence. The chapter begins with a section titled "Agency Functions and Dysfunctions," which explains how the U.S.'s foreign policy bureaucracy developed in response to changing global roles and responsibilities between World War II and the Cold War. The author explains how bureaucracies should lend stability to the constantly changing government, but that they instead compete with one another, which frustrates their common national interests. In its following discussion of each foreign-policy complex, the chapter covers the foreign policy bureaucracy's structural features, relationships with the White House and Congress, and impact on the foreign-policy process. The chapter in particular notes how structural deficiencies in executive bureaucracies failed to comprehend foreign and domestic warning

signs regarding the September 11, 2001 attacks. In concluding, the author reflects on how the competing forces of centralization of power in the White House, the fragmentation of control across the bureaucracy, and the tensions they create are likely to become more pronounced in upcoming years.

The tone of chapter six is formal and academic. The style is straightforward and conventional. The chapter contains a few pictures, several large tables that depict and describe the structure of several large and complex agencies, and a few text boxes containing quotes from primary sources and focused examples. The chapter contains some but not much of the author's own opinion or creative analysis. It is primarily explanatory and factual. Accordingly, factor two is neutral.

Turning to factor three, which examines the quantity and quality of the excerpt, here, Georgia State made unpaid copies of 36 pages, or 6.94% of the overall work [Defs. Ex. 777]. Accordingly, Georgia State used a small percentage of the work. The number of pages copied is acceptable when viewed in combination with the small percentage and the nonprofit educational character of the use. Use of an entire cohesive chapter is less fair than use of a partial chapter; however, chapter six cannot be described as the heart of the work because it covers only a snippet of the book's overall topic. The Court concludes that neither the quantity nor the quality of the work copied is excessive. Accordingly, factor three favors fair use.

As to the fourth fair use factor, effect on the potential market for or the value of the copyrighted work, the Court first looks to whether Professor Hankla's use of *U.S. Foreign Policy*

affected the market for purchasing the book as a whole. Students would not pay $84.95 for the entire book when only 36 pages were required reading for Professor Hankla's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *U.S. Foreign Policy* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work through Sage's in-house program in 2009. The unpaid use of the excerpt by Professor Hankla and his students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic assessment of the four factors.

The record reflects that Sage earned $738,328.89 in "life to date" sales revenue from book sales for *U.S. Foreign Policy* [Pls. Ex. 314].[53] In contrast, Sage's permissions revenue for

_____

[53]The evidence of sales revenue from CQ Press reflects "life to date" revenue, but it does not provide a specific date range [Pls. Ex. 314]. The Court assumes this would be from date of publication (2005) to near the end of 2010.

excerpts of *U.S. Foreign Policy* is represented in the following table:

| Year | APS | In-House | Total |
|------|-----|----------|-------|
| 2008 | $137.70 | No Evidence | $137.70 |
| **Total** | **$137.70** | **$285.33** | **$423.03** |

[Pls. Exs. 314, 315].

Georgia State has the burden of demonstrating that, assuming widespread unpaid copying of excerpts generally in 2009, its copying of this excerpt would not have caused substantial damage to the potential market for or the value of the copyrighted work. Here, the record evidence indicates that the permissions market for excerpts of *U.S. Foreign Policy* was very small in 2008 and probably nonexistent in 2009. There was little likelihood of repetitive use of excerpts in 2009. Thus, it is unlikely that the value of the copyrighted work was substantially damaged in 2009 by the use of unpaid excerpts. Accordingly, the Court finds that a mitigating adjustment should be made in Defendants' favor as to factor four.

Weighing together factors one, three, and four (as adjusted), giving factor four extra weight and placing the burden of proof on Defendants, leads to the conclusion that Georgia State's use of an excerpt from *U.S. Foreign Policy* was a fair use. Thus, this copyright infringement claim fails.

O. Professor McCoy

Professor Jennifer McCoy is a tenured professor in Georgia State's Political Science department [Deposition of Jennifer McCoy ("McCoy Dep."), Doc. 329 at 9-10].

In the fall semester of 2009, Professor McCoy taught POS 8250, a graduate level course titled "Latin American Politics" [Id. at 22; Pls. Ex. 901]. The course provided an overview of the history of contemporary politics of Latin American countries with a particular focus on democratization in Latin America [Pls. Ex. 901]. Professor McCoy assigned six required books for purchase in the course, and posted additional required and suggested readings on ERES [Id.].

44. *Regimes and Democracy in Latin America: Theories and Methods* (Gerardo L. Munck ed., Oxford 2007)

Among the required readings was an excerpt from *Regimes and Democracy in Latin America: Theories and Methods* ("*Regimes and Democracy*") [Doc. 329 at 24-25; Pls. Ex. 901]. In relevant part,[54] Professor McCoy required students to read the segment titled "Introduction: Research Agendas and Strategies in the Study of Latin American Politics," and chapter one, "The Study of Politics and Democracy: Touchstones of a Research Agenda," both of which were written by Gerardo L. Munck [Pls. Exs. 452, 901]. The total excerpt posted to ERES consisted of pages 1-38 (38 pages), which is 12.71% of the 299-page book [Pls. Ex. 452].

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is

_____

[54]Professor McCoy also assigned students chapter two of *Regimes and Democracy in Latin America* [see Pls. Ex. 901]; however, the Court previously determined that Plaintiffs failed to demonstrate that they owned all copyright interests in chapter two. As that conclusion was not disturbed on appeal, the Court need not revisit it now.

nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

As to factor two, *Regimes and Democracy* is an academic work that evaluates and builds on the existing body of research about political processes in Latin America. The book is part of a series on democratization intended for students of comparative politics and related fields. In addition to the introduction, the book has nine total chapters that are organized into three parts: (1) Research Agendas; (2) Concepts, Data, and Description; and (3) Causal Theorizing and Testing.

Professor McCoy assigned the introduction and chapter one as required readings. In the introduction, the author first provides an overview of research in Latin American politics, and an assessment of the research methodology employed. He pays particular attention to two steps of the research process: (1) theory generation; and (2) empirical analysis. The introduction's later section gives a chapter-by-chapter description of the book and highlights the book's contributions to the overall body of research on Latin American politics. The author describes how the book attempts to respond to some of the methodological shortcomings in the research.

The author begins chapter one by noting that democracy has been a "master concept" in Latin American politics over the past 25 years [Pls. Ex. 452]. He argues that future progress on the research agenda hinges on two questions to be explored in the

chapter, the first being "What is democracy?" and the second being "What are the implications of other political values beyond democracy for democracy?" [Id.]. The majority of the chapter is organized into three sections. In the first section, the author builds on scholar Robert Dahl's conceptualization of democracy, which is that democracy is about more than forming a government. The author then poses two more questions that he attempts to answer in the second section: (1) how far does the democratic political process extend beyond the formation of government?; and (2) are there rights other than political rights that are constitutive of democracy? In the third and final section, the author presents related conceptual issues and empirical questions, such as non-political rights that are integral to a democracy and the need to examine potential trade-offs between democracy and other values. In the chapter's concluding remarks, the author explains that clear and widely accepted answers to the original two questions addressed in the chapter are essential for a unified research agenda for democracy.

The tone of both the introduction and the first chapter is formal and scholarly. The introduction is factual and objective, as it provides context for and describes the content of the overall work. While the author's analytical perspective animates the introduction to some degree, the introduction contains mostly objectively descriptive material. The content in chapter one is more inventive and evaluative, in that the author analyzes the elements that are essential to a procedural definition of democracy; however, the inventive material builds

on existing literature and research. Considering both excerpts together, the copied material is an even balance of objectively descriptive material and the author's analysis. Neither type of material dominates the total excerpt copied. Accordingly, factor two is neutral.

With respect to factor three, Professor McCoy posted 38 pages, or 12.71% of the overall work, to ERES [Pls. Ex. 452]. The quantity of material used by Professor McCoy is excessive, even when taking into account the favored educational use recognized in factor one, that the excerpt was tailored to meet Professor McCoy's pedagogical purpose, and the lack of market substitution due to a lack of evidence of digital permissions for *Regimes and Democracies* in 2009. The quality (value) of the excerpt taken is too great. Overall, factor three weighs against fair use.

Factor four looks to the effect of Defendants' use on the potential market for and value of the copyrighted work. See 17 U.S.C. § 107(4). Oxford earned $12,689.00 in revenue from book sales for *Regimes and Democracy in Latin America* between the date of its publication and November 7, 2010 [Pls. Ex. 357]. However, there is no evidence before the Court that digital permissions were available for *Regimes and Democracy in Latin America* in 2009.[55] As there was no digital market for permissions, Georgia State's use of unpaid digital excerpts did not harm Oxford. It follows that Georgia State's use did not

---

[55]Oxford presents evidence of $348.33 in APS sales. Those sales occurred in 2008 [Pls. Ex. 454].

cause substantial harm to the value of the copyrighted work in 2009. Accordingly, factor four favors fair use.

In sum, factors one and four favor fair use, factor two is neutral, and factor three disfavors fair use. Weighting these results as directed, and placing the burden of proof on Defendants, the scale clearly favors fair use.

P. Professor Whitten

Professor Kathleen Whitten taught a class in the Department of Psychology at Georgia State during the fall semester of 2009 [Pls. Ex. 557].

PSYC 4030 Introduction to Cross-Cultural Psychology,[56] Fall 2009

PSYC 4030 is a course that examines the influence of culture on human cognition, emotion, and behavior with a focus on psychology theory and research [Pls. Ex. 557]. Thirteen students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-89]. According to the syllabus, there was one required textbook for the course; additional required readings were made available online through uLearn or ERES [Pls. Ex. 557].

45. *A World of Babies: Imagined Childcare Guides for Seven Societies* (Judy DeLoache & Alma Gottlieb, Cambridge 2000)

*A World of Babies* was first published by Cambridge in 2000 [Pls. Ex. 147]. It is an eight chapter, 293 page volume edited by Judy DeLoache and Alma Gottlieb that contains contributions

---

[56]Joint Exhibit 5 refers to the title of this course as Cross-Cultural Psychology. This Opinion will refer to the course using the title that appears on the syllabus, Introduction to Cross-Cultural Psychology.

discussing how various societies care for babies [Pls. Ex. 147].
From the contents of the book, the Court infers that it was
intended for general readership, although it can be used in an
academic setting. The book retails for $55.99 in hardback and
$30.99 in paperback [Jt. Ex. 5 at D-89]. The net sales revenue
from August 3, 2000, through October 31, 2010 was £99,831 [Pls.
Ex. 152]. Licensed digital excerpts of the book were available
through CCC in 2009. From July 1, 2004 until December 1, 2010,
*A World of Babies* earned $62.99 in ECCS permissions revenue and
$1,382.01 in APS income [Pls. Ex. 153].

Professor Whitten requested that page 27 and pages 91-112
be posted on the ERES system for distribution to students in her
PSYC 4030 course [Pls. Ex. 147; Jt. Ex. 5 at D-89]. Page 27 is
a portion of chapter one, which was authored by Judy DeLoache
and Alma Gottlieb. Pages 91-112 are a portion of chapter four,
which was authored by Marissa Diener [Pls. Ex. 147]. Together,
the pages represent 7.85% of the book. Had permissions been
paid via CCC for the distribution of this excerpt, Cambridge
would have earned less than $36.47 in net revenue from
permissions.[57] The cost to students would have been $45.90.

Fair Use Analysis

As to the first element of fair use ("the purpose and
character of the use"), Defendants' use of the excerpt is
nontransformative (in this case, mirror image copying). The

---

[57]The amount earned would have been $45.90, the amount
charged by CCC, [Jt. Ex. 5 at D-89], less the $3.00 service fee
charged by CCC to users, less $6.43 in fees charged by CCC to
publishers, less royalties Cambridge is obligated to pay the
external editors.

excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *A World of Babies* is partially fiction and partially non-fiction. It explores child-rearing in seven different cultures--like Puritan New England and the Beng of the Ivory Coast--in the format of a Western childcare manual. Each manual, or chapter, is written from the perspective of a fictional member of each respective society, but the information in the manuals is based on anthropological and historical research. The work confronts the notion that the manner of caring for infants is natural, obvious, or common-sense, by presenting a range of cultural beliefs and practices associated with childcare.

The first page of the excerpt--page 27--is an excerpt from chapter one that explains the organization of the seven subsequent chapters. The second portion of the excerpt--pages 91-112--is taken from chapter four, "Gift from the Gods: A Balinese Guide to Early Child Rearing." The first portion of the chapter is an introduction to Balinese culture that summarizes its history, political structure, economy, and religion. The chapter then provides "biographical" information about the manual's fictional author. The remaining portion of the excerpt is devoted to the fictional manual. The manual describes the benefits of having a child in Balinese culture,

including heightened political status, marital security, and having a caretaker through old age. It goes on to explain several unique facets of Balinese culture as they relate to pregnancy and childbearing, such as offerings and spiritual cleansing rituals. The fictional author describes how children are "divine," or new gods, for the first 210 days of their lives, which is one full year in the Balinese ritual calendar. The remaining portion of the excerpt describes other aspects of raising an infant in Bali, like the specific roles for male children, the significance of birth order, naming conventions, and dressing, feeding, and bathing habits.

The tone of the excerpt is straightforward and informational, although somewhat lighthearted. The excerpt contains fanciful elements, as the majority of the chapter four excerpt is written from the perspective of a fictional Balinese healer. Additionally, the organization and format are creative. On the other hand, the portion of the excerpt describing Balinese history and culture is objectively descriptive, and even the "manual" portion is more informational than fictional. Moreover, the information conveyed about pregnancy and infancy in Balinese culture is grounded in facts derived from an existing body of anthropological research. All in all, the chapter is an even balance of creative and objective material. Indeed, the authors describe the work as "a mix of fact and fiction — fictional authors presenting factual information" [Pls. Ex. 147]. Accordingly, factor two falls neither for nor against fair use; it is neutral.

Factor three is concerned with the amount and substantiality of the portion copied. With respect to the quantity of the work copied, Georgia State used 23 pages, or 7.85% of *A World of Babies*, which is a relatively small amount [Pls. Ex. 147]. The amount is acceptable given the educational nature of Professor Whitten's use, and the fact that the excerpt furthered the pedagogical purpose of the course. Further, to the extent that the portion copied serves as a heuristic for potential market substitution, any impact here was also small. As for the quality (value) of the work copied, the excerpted material contains one page from one chapter, and a portion of a second chapter. Copying less than a chapter tends to be more fair than would the use of an entire chapter. In addition, the excerpt copied is not the heart of the work. In sum, the quantity and quality of the work copied are within acceptable limits, especially in light of Georgia State's favored educational purpose. Thus, factor three favors Georgia State's fair use.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Whitten's use of *A World of Babies* affected the market for purchasing the book as a whole. Students would not pay $30.99 for the entire book (or $55.99 for the hardcover version) when only 23 pages were required reading for Professor Whitten's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *A World of Babies* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Whitten and her students caused very small, but actual, damage to the value of Cambridge's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Cambridge lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic assessment to determine the outcome of the fair use defense.

First, the Court notes that the percentage of the work which was used (7.85%) is at the upper range of what is a reasonable amount. Accordingly, Plaintiffs are entitled to an adjustment of factor three, in their favor.

In addition, the record contains the following evidence concerning permissions earned by excerpts from *A World of Babies*:

| Year | APS | ECCS | Total |
|------|-----|------|-------|
| 2004 | $89.67 | $0.00 | $89.67 |
| 2005 | $163.55 | $0.00 | $163.55 |
| 2006 | $156.44 | $0.00 | $156.44 |
| 2007 | $355.61 | $0.00 | $355.61 |
| 2008 | $307.53 | $62.99 | $370.52 |
| 2009 | $146.05 | $0.00 | $146.05 |
| 2010 | $63.16 | $0.00 | $163.16 |

| Total | $1,382.01 | $62.99 | $1,445.00 |
|-------|-----------|--------|-----------|

[Pls. Ex. 153]. Meanwhile, the book earned £99,831 from book sales of *A World of Babies* [Pls. Ex. 152].

The Court infers that if digital permissions were available in 2008, digital permissions would have been available in 2009. Nonetheless it is obvious that there was little demand for excerpts of *A World of Babies* in 2009. Therefore, there was little risk of repetitive use of excerpts in 2009. For this reason, the outcome on factor four is mitigated in Defendants' favor.

In summary, weighing all factors (as adjusted) together, giving factor four extra weight and placing the burden of proof on Defendants, Defendants prevail on their fair use defense. This copyright infringement claim fails.

Q.    Professor Harvey

Professor Harvey is a Professor in the Sociology Department at Georgia State [Pls. Ex. 530].

SOCI 8030 Social Theory I, Fall 2009

SOCI 8030 is a graduate level course focused on analysis of classical social theory [Pls. Ex. 530]. Sixteen students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-93]. According to the syllabus, there were two required textbooks for the course; additional required readings were made available online through ERES [Pls. Ex. 530].

46.    *The Power Elite (New Edition)* *(C. Wright Mills, Oxford 2000)*

*The Power Elite* was first published by Oxford in 1956 [Pls. Ex. 450]. It is a fifteen chapter, 448 page work authored by C.

Wright Mills that critiques the organization of power in the United States [Pls. Ex. 448]. It was written originally for general audiences, but has been used frequently in college sociology courses. At issue here is the new edition of the work, which contains a new afterword by Alan Wolfe and was published by Oxford in 2000 [Pls. Ex. 450]. This book retails for $19.95 in paperback [Jt. Ex. 5 at D-93]. The net sales revenue from date of first publication in 2000 through November 7, 2010 was $232,467.00 [Pls. Ex. 357]. Licensed digital excerpts of the book were available through CCC in 2009. From July 1, 2004 until December 1, 2010, the new edition of *The Power Elite* earned $315.59 in ECCS permissions revenue [Pls. Ex. 451]. It also earned $4,645.89 in APS revenues.

Professor Harvey requested that pages 269-297 and 298-324, or two full chapters totaling 12.50% of the work, be posted on ERES for distribution to students in her SOCI 8030 course [Jt. Ex. 5 at D-93]. Had permissions been paid via CCC for the distribution of this excerpt, Oxford would have earned less than $91.39 in net revenue from permissions.[58] The cost to students would have been $110.52.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The

---

[58]The amount earned would have been $110.52, the amount charged by CCC, [Jt. Ex. 5 at D-93], less the $3.00 service fee charged by CCC to users, less $16.13 in fees charged by CCC to publishers, less royalties Oxford is obligated to pay the author.

excerpt serves the same purpose as the copyrighted original. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in that regard: *The Power Elite* is a quasi-academic work written for consumption by both sociologists and a wider audience. The book examines the organization of power in the United States, which the author argues is concentrated in the military, corporate, and political elite. The book contains 15 total chapters and an afterword[59] [Pls. Ex. 448].

The first excerpt posted to ERES for Professor Harvey's students was the twelfth chapter, which shares the title "The Power Elite." The author begins with a proposition that post-Civil War changes in the American structure of power were, and still are, characterized by shifts in the political, economic, and military orders. He elaborates by describing five periods in American history in terms of the relative weight of power among the three orders: (1) from the Revolution through the John Adams administration, during which the political order was supreme; (2) the early nineteenth century, when the orders loosely shared power; (3) the Congressional elections of 1866 through the First World War, which experienced a power shift from government to corporation; (4) the New Deal, which

_____

[59]The first edition of the book, published in 1956, consisted of the same 15 chapters without the afterword, which was first included in the "new edition" [see Pls. Ex. 450].

exhibited a struggle between political and economic forces; and (5) the conclusion of the Second World War through the time of the author's writing, which involved a more pronounced coincidence of all three orders. The next portion of the chapter more closely examines social similarities in the ideals and associations of individuals who compose "the power elite." The author discusses structural features that reinforce the unity of the power elite, such as the interchangeability of top roles in each of the three orders. The chapter's conclusion suggests that the author's contemporary organization of power-- consolidated power at the top and a "stalemated" middle society --has had ramifications for the "bottom" of society, or the American public [Id.].

The next excerpt--chapter 13, "The Mass Society"--addresses the ramifications identified in the previous chapter. To begin the chapter the author notes that, historically, public opinion has an important role in American society because official decisions and private decisions of consequence are almost always negotiated in terms of the public welfare. The chapter moves on to demonstrate how, in theory, opinion and discourse should be the tools of the public in a democracy. The author contrasts this ideal with his interpretation of reality, which he describes as "a society of masses" rather than a "community of publics" [Id.] According to the author, the later version of the public exhibits the following four characteristics: (1) a higher disparity in the ratio of opinion givers to receivers; (2) fewer opportunities for leadership in the public; (3) difficulty translating ideas into social action; and (4) more

control by institutional authority. According to the author, although media and education should counteract the mass society, they often serve to reinforce it. The chapter concludes with a review of the book's central idea--that American society has a unified group--"the power elite"--at the top, a stalemated middle level, and an increasingly powerless mass society at the bottom.

The tone of these two chapters, when considered together, is critical, and at times provocative, but still intellectual. They contain a great deal of the author's own opinion and subjective description of the development of American society. Although the author's observations are grounded in research, the bulk of chapters 12 and 13 are devoted to the author's sociological analysis. As author opinion and evaluation dominate these chapters, factor two disfavors fair use.

Turning to factor three, here, Georgia State uploaded 56 pages or 12.5% of the 448-page book [Pls. Ex. 448]. While the percentage copied is leavened somewhat by the educational purpose of Georgia State's use, the number of pages copied is a heuristic for market substitution (it has a relationship to lost permissions) and the potential market substitution here was large. The quantity of the book copied weighs against a finding of fair use. As for the quality of the work copied, in this instance Georgia State copied two complete chapters of the book, enhancing the taking of value. Even more damaging for Defendants is the fact that the chapters used summarize the author's thesis in *The Power Elite*; they are where the ideas explained in the other chapters coalesce. Chapters 12 and 13

are the heart of the work. Accordingly, Georgia State used an impermissible quantity and quality of *The Power Elite*. Factor three disfavors fair use.

As to the fourth fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"), the Court first looks to whether Professor Harvey's use of *The Power Elite* affected the market for purchasing the book as a whole. Students probably would not pay $19.95 for the entire book when only 12.50% of it was required reading for Professor Harvey's course. Neither would a professor require students to purchase the entire book in such an instance. Therefore, the Court rejects any argument that the use of the excerpt from *The Power Elite* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC. The unpaid use of the excerpt by Professor Harvey and her students caused very small, but actual, damage to the value of Oxford's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Oxford lost permissions income. Factor four strongly disfavors fair use.

A review of the fair use factors in this case shows that factor one favors fair use; factor two disfavors fair use; factor three disfavors fair use; and factor four strongly disfavors fair use. The Court will look no further. Defendants' fair use defense fails; this infringement claim

succeeds.  The Court notes that Plaintiffs have conceded this outcome in their remand brief.

R.    Professor Ohmer

Professor Mary Ohmer is a professor in the School of Social Work at Georgia State [Pls. Ex. 522].

SW 8200 Evaluation and Technology, Fall 2009

SW 8200 is a course that addresses the role of evaluation and technology in the modern social work practice environment [Pls. Ex. 522].  Forty two students enrolled in this course in the fall semester of 2009 [Jt. Ex. 5 at D-98].  According to the syllabus, there were two required textbooks for the course; additional required readings were made available online through ERES [Pls. Ex. 522].

47.  *Sage Handbook of Qualitative Research (Second Edition)* (Norman K. Denzin & Yvonna S. Lincoln eds., Sage 2000)

*The Sage Handbook of Qualitative Research (Second Edition)* was first published by Sage in 2000 [Pls. Ex. 265].  It is a 1,142 page, 36 chapter volume edited by Norman K. Denzin and Yvonna S. Lincoln.  The chapters analyze the theory and practice of qualitative research [Pls. Ex. 265].  There is conflicting evidence in the record as to the retail price for *The Sage Handbook of Qualitative Research (Second Edition)*; the parties alternatively assert that it retails for $156.00 and for $175.00 [Jt. Ex. 5 at D-19, D-23, D-98].  There is also conflicting evidence as to whether *The Sage Handbook of Qualitative Research (Second Edition)* is out of print [Jt. Ex. 5 at D-19, D-23, D-98].

In 2009, the book had $0.00 in net sales revenue, but it has earned $1,300,053.54 in total net sales revenue [Pls. Ex. 283]. Licensed digital excerpts of the book were available through CCC in 2009 [Pls. Ex. 286]. From July 1, 2004 until December 1, 2010, *The Sage Handbook of Qualitative Research (Second Edition)* earned $6,324.61 in ECCS permissions revenue [Pls. Ex. 286].[60] In addition, licensed excerpts of this work are available directly from Sage; the book has earned $58,904.47[61] through Sage's in-house permissions program from 2000 to 2010 [Pls. Ex. 283]. This includes $3,814.52 in 2009 [Pls. Ex. 283].

Professor Ohmer requested that pages 803-820 of *The Sage Handbook of Qualitative Research (Second Edition)* be uploaded to ERES for distribution to students in her SW 8200 course as required reading [Pls. Ex. 522]. The excerpt was one chapter of the book totaling eighteen pages, or 1.58% of the total work [Pls. Ex. 265]. The excerpted chapter was entitled "Software and Qualitative Research" and authored by Eben A. Weitzman. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $89.96 in net revenue

---

[60]These amounts represent permissions income only for the second edition of this work.

[61]The amount asserted by Plaintiffs for this work is higher than the amount reported here.

from permissions income.[62]   The cost to students would have been $108.84.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying).   The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution.   Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work."   The Court makes the following findings in that regard:   The book's 36 chapters are organized into six parts: (1) Locating the Field; (2) Paradigms and Perspectives in Transition; (3) Strategies of Inquiry; (4) Methods of Collecting and Analyzing Empirical Materials; (5) The Art and Practices of Interpretation, Evaluation, and Representation; and (6) The Future of Qualitative Research.

The excerpt at issue, chapter 30, is located in Part 4.   In it, the author examines the role of software in qualitative research, including the history, critical debates, guidelines for choosing software to match research needs, and a note on future directions for scholarship and development.   The chapter begins with a succinct history of qualitative research and technology, and segues into a discussion about the benefits and

---

[62]The amount earned would have been $108.84, the amount charged by CCC, [Jt. Ex. 5 at D-98], less the $3.00 service fee charged by CCC to users, less $15.88 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the external editors.

limitations of relevant software. Most notably, the author explains that while software can provide tools to assist researchers in analyzing data it cannot actually conduct the analyses. Next, the author gives an annotated list of types of software available. The bulk of the chapter is devoted to explaining how a researcher should choose a software program based on immediate and long-term research needs, data sources, research approach, research goals, and resources. In the final substantive section, the author analyzes several "debates," or points of contention concerning the use of software in qualitative research including whether the use of software forces a researcher to sacrifice familiarity with the data and whether new researchers should first learn to conduct analysis by hand. In concluding, the author touches on topics in need of further future scholarship, and areas of improvement for qualitative research software development.

The tone of chapter 30 is informational and academic. The material in the chapter is descriptive, rather than analytical. For instance, even when the author seeks to explain why certain software features are more appropriate for specific circumstances, the resulting discussion is not so much an analysis as it is an evenhanded matching of research needs to software functions. While some of the chapter is likely colored by the author's own opinions and experiences, chapter 30 is predominantly an impartial explanation of the advances in research software and what types of software are most amenable to various qualitative research circumstances. As chapter 30

contains both factual presentations plus author opinion, factor two is neutral.

Factor three examines the amount taken in relationship to the original. Here, Professor Ohmer uploaded 18 pages, or 1.58% of the 1,142-page work, which is a small number of pages and a tiny percentage of the copyrighted work. The number of pages copied functions to some extent as a heuristic for market substitution; the degree of market substitution is acceptably small when viewed in connection with the tiny percentage of the copyrighted work. Quality wise, the use of one complete chapter is less fair than would be the use of a part of a chapter. However, chapter 30 specifically is no more or less important than any other in the 36-chapter work. Chapter 30 is not the heart of the work. The chapter also fit the course's pedagogical purpose. Thus, neither the quantity nor the quality of the excerpt uploaded to ERES is excessive. Accordingly, factor three favors fair use.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Ohmer's use of *The Sage Handbook of Qualitative Research (Second Edition)* affected the market for purchasing the book as a whole. Students would not pay $156.00 or $175.00 for an entire book when only eighteen pages were required reading for Professor Ohmer's course. Neither would a professor require students to purchase the entire book in such an instance. The sales revenue for *The Sage Handbook of Qualitative Research (Second Edition)* in 2009 was $0.00, and the book may currently be out of print. Therefore, the Court rejects any argument that the use of the excerpt from

The *Sage Handbook of Qualitative Research (Second Edition)* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program. The unpaid use of the excerpt by Professor Ohmer and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

In summary, factor one favors fair use; factor two is neutral; factor three favors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation in order to rule on the fair use defense.

First, the Court revisits factor three. The unlicensed excerpt was 1.58% of the copyrighted work, a tiny (not merely small) portion. This calls for an adjustment of factor three, in Defendants' favor.

Second, the Court revisits factor four. The high demand for licensed excerpts in 2009 calls for an upward adjustment of factor four, in Plaintiffs' favor.

Weighing all factors together, giving factor four extra weight, and placing the burden of proof on Defendants, the Court finds that Defendants do not prevail on their fair use defense. This copyright infringement claim succeeds.

48. *Utilization-Focused Evaluation: The New Century
    Text(Third Edition)* (Michael Quinn Patton, Sage
    1996)

*Utilization-Focused Evaluation (Third Edition)* was first published by Sage in 1996 [Pls. Ex. 318]. It is a 447 page, fifteen chapter work written by Michael Quinn Patton that advocates user-based evaluation of government and institutional programs. It prescribes standards and evaluation methods [Pls. Ex. 316]. The third edition of *Utilization-Focused Evaluation* retails for $115.00 in hardcover and $77.95 in paperback, but was out of print[63] in 2009 [Jt. Ex. 5 at D-99]. The net sales revenue from the date of first publication through 2010 for the hardback and paperback combined was $812,595.44 [Pls. Ex. 319]. By 2007, sales had virtually ceased. However, permissions income continued to accrue from both CCC permissions and Sage's in-house program. Licensed digital excerpts of the book were available through CCC in 2009. From July 1, 2004 until December 1, 2010, *Utilization-Focused Evaluation* earned $2,688.92 in ECCS permissions revenue[64] [Pls. Ex. 321]. In addition, licensed digital excerpts were available through Sage's in-house permissions program in 2009; the third edition

---

[63]In 2008, the fourth edition of the book was published.

[64]This amount of ECCS revenue may include permissions fees earned by earlier editions of the book.

of the book has earned $15,490.85[65] through in-house licensing permissions revenue [Pls. Ex. 319].

Professor Ohmer requested that pages 2-38 of *Utilization-Focused Evaluation* be uploaded to ERES for distribution to students in her fall 2009 SW 8200 course [Pls. Ex. 522]. The excerpt included two full chapters of the book and totaled 37 pages, or 8.28% of the total work [Pls. Ex. 316]. These chapters were assigned as required reading [Pls. Ex. 522]. Had permissions been paid via CCC for the distribution of this excerpt, Sage would have earned less than $189.92 in net revenue.[66] The cost to students would have been $226.44.

Fair Use Analysis

As to the first element of fair use ("the purpose and character of the use"), Defendants' use of the excerpt is nontransformative (in this case, mirror image copying). The excerpt serves the same purpose as the original work. The excerpt was used for a nonprofit educational purpose by a nonprofit educational institution. Thus, factor one favors fair use.

The second fair use factor is "the nature of the copyrighted work." The Court makes the following findings in

---

[65]The amount asserted by Plaintiffs for this work is higher than the amount reported here. The Court was unable to verify the higher amount due to insufficient documentation and insufficient explanation of the documentary evidence provided at trial.

[66]The amount earned would have been $226.44, the amount charged by CCC, [Jt. Ex. 5 at D-99], less the $3.00 service fee charged by CCC to users, less $33.52 in fees charged by CCC to publishers, less royalties Sage is obligated to pay the author.

that regard: *Utilization-Focused Evaluation* is a semi-academic work which explores the field of program evaluation, which is a method by which projects, policies, and programs are evaluated for their effectiveness and efficiency.[67]  The author uses the book to promote a version of program evaluation known as "utilization-focused evaluation."  The book aims to inform the reader about how to create and perform utilization-focused evaluation by incorporating information the author has collected in the decades[68] since he first promoted the practice.

Chapter one, titled "Evaluative Use: Both Challenge and Mandate," provides an introduction to the field of program evaluation.  The chapter chronicles the early uses of program evaluation, which the author believes were defined by overly dense evaluations which were underutilized by policymakers in shaping new programs.  Using these early failures as a teaching moment, the chapter focuses on the key aspects of effective program evaluation, such as accuracy, feasibility, and utility.

Chapter one is mostly factual in nature.  The chapter reviews the initial landscape of program evaluation and chronicles the progression within the field.  The chapter is written in a formal tone.

Chapter two, titled "What Is Utilization-Focused Evaluation? How Do You Get Started?" explains the concept of

---

[67]Program evaluation is most commonly used in the assessment of government programs [<u>Id.</u>].

[68]The alleged infringement involves the third edition of *Utilization-Focused Evaluation.*  The first edition of the book appears to have been published in 1978 [Pls. Ex. 316 at xiv].

utilization-focused evaluation, asserting that an evaluation should consider the evaluation's use throughout all steps of the analysis. The chapter closes with a discussion of how the hallmarks of a utilization-focused approach, such as target questions and a continuous feedback loop, turn program evaluations into tangible results.

Chapter two is didactic. It relies on other researchers' studies to illustrate the concepts presented. The author presents the chapter in a conversational tone and focuses on some of his own experiences in developing the concept of utilization-focused evaluation. Factor two is neutral for these excerpts.

As to factor three, Professor Ohmer used 37 pages of *Utilization-Focused Evaluation*, which is 8.28% of the overall page count of the book [Pls. Ex. 316]. Standing alone, the percentage of pages used is a permissible amount in light of Professor Ohmer's educational purpose, even considering the potential impact of market substitution. Use of this excerpt also served Professor Ohmer's pedagogical purpose. However, when the fact that Professor Ohmer used two complete chapters is added, the amount used becomes disqualifying, even though the two chapters used are not the heart of the work. Factor three disfavors fair use.

As to the fourth fair use factor, effect on the market, the Court first looks to whether Professor Ohmer's use of *Utilization-Focused Evaluation* affected the market for purchasing the book as a whole. The parties state in their joint exhibit that the book is currently out of print, so

students could not have purchased a copy. Therefore, the Court rejects any argument that the use of the excerpt from *Utilization-Focused Evaluation* had a negative effect on the market for purchase of the book itself.

Plaintiffs produced evidence demonstrating that there was a ready market for licensed digital excerpts of this work in 2009 through CCC and through Sage's in-house program. The unpaid use of the excerpt by Professor Ohmer and her students caused very small, but actual, damage to the value of Sage's copyright. In addition, widespread use of similar unlicensed excerpts could cause substantial harm. Sage lost permissions income. Factor four strongly disfavors fair use.

A review of the fair use factors in this case shows that factor one favors fair use; factor two is neutral; factor three disfavors fair use; and factor four strongly disfavors fair use. The Court will look further and will conduct a holistic evaluation of the four factors.

In 2009 the third edition of the book had a total of $1,390.77 in permissions sales [Doc. 319]. This does not call for mitigation of factor four.

Weighing the four factors (as adjusted) together, giving factor four additional weight, and placing the burden of proof on Defendants, the Court finds that Defendants' use of the excerpt of *Utilization-Focused Evaluation (Third Edition)* was not a fair use. This copyright infringement claim succeeds.

### III. **SUMMARY**

This case is currently before the Court for fair use analysis with respect to 48 infringement claims. Plaintiffs are entitled to prevail on the claims involving these works in these Georgia State classes:

Maymester 2009:

- *The Sage Handbook of Qualitative Research (Third Edition)* (Professor Kaufmann, EPRS 8500 Qualitative/Interpretive Research in Education I)

- *Handbook of Critical and Indigenous Methodologies* (Professor Kaufmann, EPRS 8500 Qualitative/Interpretive Research in Education I)

Summer 2009:

- *The Sage Handbook of Qualitative Research (Second Edition)* (Professor Kaufmann, EPRS 8510 Qualitative Research in Education II - Data Collection)

- *The Sage Handbook of Qualitative Research (Second Edition)* (Professor Esposito, EPSF 8280 Qualitative Research in Education II - Data Collection)

Fall 2009:

- *The Sage Handbook of Qualitative Research (Third Edition)* (Professor Kaufmann, EPRS 8500 Qualitative/Interpretive Research in Education II)

- *The Sage Handbook of Qualitative Research (Third Edition)* (Professor Kaufmann, EPRS 8500)

- *Theoretical Frameworks in Qualitative Research* (Professor Esposito, EPRS 8520)

- *The Slave Community* (Professor Dixon, AAS 3000)

- *The Power Elite* (Professor Harvey, SOCI 8030 Social Theory I)

- *The Sage Handbook of Qualitative Research (Second Edition)* (Professor Ohmer, SW 8200 Evaluation & Technology)

- *Utilization-Focused Evaluation (Third Edition)* (Professor Ohmer, SW 8200 Evaluation & Technology)

With respect to all other infringement claims, Defendants are entitled to prevail.

## IV.  **RELIEF TO BE GRANTED**

Plaintiffs are DIRECTED to file, within twenty (20) days of entry of this Order, the proposed text of any injunctive or declaratory relief they seek, together with the rationale supporting their request.  Alternative proposals are acceptable. Defendants may state their opposition, if any, and may propose one or more alternative orders, within fifteen (15) days after Plaintiffs' filing.  If Defendants object to Plaintiffs' proposal(s) or if Defendants suggest one or more alternative order(s), the rationale shall be stated.  Each side's filings shall not exceed thirty (30) pages, including any attachments.

## V.  **COSTS AND ATTORNEYS' FEES**

Section 505 of the Copyright Act, 17 U.S.C. § 505 provides:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

The parties are directed to confer with a view toward resolving disputed issues pertaining to taxation of costs and an award of attorneys' fees.  If agreement is not achieved, the Court directs both sides to file briefs addressing which party (or parties) is (or are) the prevailing party (or parties) and whether the Court should exercise its discretion to award costs. Legal authority and analysis would be helpful.  Assertions alone

will be unhelpful. Plaintiffs' brief is due twenty (20) days after entry of this Order; Defendants may respond within twenty (20) days after the filing of Plaintiffs' brief. Plaintiffs may reply no later than ten (10) days after the filing of Defendants' brief.

The Clerk is DIRECTED to re-submit the file upon expiration of the above-referenced time period.

SO ORDERED, this _2_ day of March, 2020.

_____
ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE